## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

―――――――――――――――――――――――――

|  |  |
|---|---|
| HULLEY ENTERPRISES LTD.,<br>YUKOS UNIVERSAL LTD., and<br>VETERAN PETROLEUM LTD.,<br><br>*Petitioners*,<br><br>v.<br><br>THE RUSSIAN FEDERATION,<br><br>*Respondent*. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. _____

―――――――――――――――――――――――――

## PETITION TO CONFIRM ARBITRATION AWARDS

Petitioners Hulley Enterprises Ltd. ("Hulley"), Yukos Universal Ltd. ("YUL"), and Veteran Petroleum Ltd. ("VPL" and, together with Hulley and YUL, "Petitioners"), by and through their attorneys, Shearman & Sterling LLP, state as follows:

### NATURE OF THE PROCEEDING

1.      Petitioners seek confirmation of three arbitral awards (the "Awards") rendered on July 18, 2014 by a distinguished three-member arbitral tribunal sitting in The Hague under the auspices of the Permanent Court of Arbitration. The Arbitral Tribunal unanimously found that the Russian Federation engaged in an illegal campaign to destroy OAO Yukos Oil Company ("Yukos") and transfer its assets to state-owned oil company Rosneft. The Awards describe in detail the concerted steps that the Russian Federation took to achieve this unlawful expropriation, as well as its substantial efforts to cloak its willful conduct with a veneer of legitimacy – which included the creation of a fifty-member task force dedicated to manufacturing evidence against Yukos, the fabrication of massive tax claims against the company, and the illicit transfer of its

assets to State-owned Rosneft via sham auctions.  The Tribunal awarded Petitioners, Yukos' majority shareholders, USD 50,020,867,798 in damages.

2.      The proceedings that led to the Awards were, in the Tribunal's words, "mammoth."  They included a ten-day hearing on jurisdiction and a twenty-one day hearing on the merits, attended by over fifty party representatives as well as a variety of fact and expert witnesses.  The transcript of these hearings is over 3,300 pages.  The parties' written submissions exceeded 6,500 pages and were accompanied by more than 11,000 exhibits.  After careful consideration of the voluminous record, the Tribunal meticulously presented its factual and legal findings and conclusions in two sets of comprehensive awards: interim jurisdictional awards that exceed 200 pages and final awards that exceed 600 pages.

3.      The Awards are subject to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958 (the "New York Convention").  Under applicable law, a district court "shall confirm" an award falling under the New York Convention "unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention."  9 U.S.C. § 207.  There are no such grounds for refusal or deferral of recognition here.  The Court, accordingly, should confirm the Awards.

PARTIES, JURISDICTION AND VENUE

4.      Petitioners Hulley Enterprises Ltd. and Veteran Petroleum Ltd. are companies organized under the laws of Cyprus.  Petitioner Yukos Universal Ltd. is a company organized under the laws of The Isle of Man.  Petitioners were claimants in the three arbitrations in which the awards they seek to confirm were issued.

5.      The Russian Federation is a foreign state.  It was the respondent in the arbitrations at issue.

6.      This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1330(a) and 9 U.S.C. § 203.

7.      The Russian Federation is not immune from the jurisdiction of this Court under at least two sovereign immunity exceptions: (i) 28 U.S.C. § 1605(a)(6), because this action seeks confirmation of awards that are "governed by a treaty or other international agreement in force in the United States calling for the recognition and enforcement of arbitral awards," *i.e.*, the New York Convention; and (ii) 28 U.S.C. § 1605(a)(1), because the Russian Federation's agreement to arbitrate reflects an implied waiver of immunity with respect to actions to enforce the award.

8.      This Court has personal jurisdiction over the Russian Federation pursuant to 28 U.S.C. § 1330(b).

9.      Venue is proper in this District under 28 U.S.C. § 1391(f)(4).

10.     This petition was timely filed in accordance with 9 U.S.C. § 207.

## FACTUAL BACKGROUND

11.     Petitioners were the controlling shareholders of Yukos, a Russian oil company formed in 1993.  (Awards ¶ 1.)[1]  Following the dissolution of the Soviet Union, Yukos rose to prominence as Russia's largest oil company and the first fully privatized oil company in the country.  (*Id.* ¶¶ 5, 63, 272, 822.)  By 2003, thanks to a planned merger with another Russian oil company, Yukos was poised to become the world's fourth largest oil producer.  (*Id.* ¶ 822.)

12.     In 2003, however, the Russian Federation began a campaign devised to bankrupt Yukos, appropriate the company's assets, and silence the company's head, Mikhail

---

[1] The Tribunal issued three final awards on July 18, 2014 that correspond to the three arbitrations initiated separately by each Petitioner.  (*See* Declaration of Emmanuel Gaillard dated November 12, 2014 ("Gaillard Decl."), Exhibit A (Hulley Award); *id.*, Exhibit B (YUL Award); *id.*, Exhibit C (VPL Award).) The "three arbitrations were heard in parallel" (Awards ¶ 2) and these awards are substantially identical. Citations to "Awards" herein refer to paragraph numbers containing the same content in each of the three final awards.

Khodorkovsky. (*Id.* ¶¶ 515, 756, 811, 1404, 1583.) The Russian government viewed both the company's growing success and Mr. Khodorkovsky's increasing political and economic clout as a threat. (*Id.* ¶¶ 811, 1404, 1583.) Of particular concern to Russia was Mr. Khodorkovsky's financing of political parties not aligned with Vladimir Putin and Yukos' developing plans to merge with Western oil interests, which were seen by the Russian government as a national betrayal. (*Id.* ¶¶ 142, 799.)

13.     Russia escalated its assault on Yukos after a February 2003 meeting at the Kremlin, attended by President Putin, at which Mr. Khodorkovsky gave a presentation raising questions about government corruption. (*Id.* ¶¶ 142, 509, 768-69, 799.) According to President Putin's then-Chief Economic Advisor, Dr. Andrei Illarionov, this did not sit well with Russia's leader and, in the wake of this meeting, "a case needed to be fabricated" against Yukos and Mr. Khodorkovsky "to launch the Government attack under the guise of 'legitimate' court proceedings." (*Id.* ¶¶ 142, 799.) To accomplish this, a fifty-person government unit was created within Russia's General Prosecutor's Office to devise a plan of attack and manufacture evidence against Yukos. (*Id.* ¶¶ 146, 767, 799.)

14.     This special unit brainstormed a variety of allegations that could be made to publicly justify the planned government crackdown on the company and the prosecution of Mr. Khodorkovsky. (*Id.* ¶¶ 516, 767, 799.) After considering approximately fifteen different theories, the Russian government eventually settled on alleging that Yukos had engaged in a series of tax-avoidance schemes. (*Id.*)

15.     Russian authorities deployed the full arsenal of government resources at their disposal to execute their plan. This included harassment, interrogations, arrests, and criminal prosecutions of Yukos' management, employees, auditors, and lawyers, as well as large-scale tax

reassessments, VAT charges, fines, and asset freezes.  (*Id.* ¶¶ 627, 694, 761-93, 804.)  It also included a series of full-scale raids at Yukos' offices, the homes of Yukos' management and lawyers, and even a boarding school for disadvantaged children that Yukos had sponsored.  (*Id.* ¶¶ 772-74, 777, 783-84.)  Business at Yukos ground to a halt as heavily-armed, masked officers would sweep onto the premises, interrogating employees – often pressuring them to tell officers what they wanted to hear – knocking computers off desks, and seizing large numbers of company documents.  (*Id.* ¶¶ 773-74.)  The raids took a major toll on Yukos, instilling fear in the company's employees, prompting many to resign, and impeding day-to-day operations and record-keeping due to the seizure of key documents.  (*Id.* ¶¶ 772-74, 777, 783-84.)  Russian courts acted in concert with other Russian authorities to ensure the success of the campaign against Yukos, resulting in what one human rights group described as "a literal orgy of lawlessness."  (*Id.* ¶ 761.)

16.     Among those arrested and subjected to invented charges – including fraud, tax evasion and embezzlement – were Platon Lebedev, Director of Hulley and YUL, and Mr. Khodorkovsky himself, who was seized at gunpoint by Russian special forces in October 2003.  (*Id.* ¶¶ 771, 778.)  They were later tried in proceedings in which they were denied basic due process.  (*Id.* ¶¶ 785, 1583.)  At their trials, both men were forced to sit in metal and glass cages equipped with hidden microphones.  (*Id.* ¶¶ 176, 1583.)  Defense witnesses were subjected to government intimidation and even criminal charges.  (*Id.* ¶¶ 176, 783.)  Both Mr. Khodorkovsky and Mr. Lebedev were found guilty, given lengthy sentences, and spent more than a decade in prison, much of it at remote locations that have been described as the "most inaccessible penal colonies in Russia."  (*Id.* ¶¶ 177, 785.)

17.     The arrests of Mssrs. Lebedev and Khodorkovsky, their treatment at trial, and their detention provoked widespread international criticism of the Russian government for failing to adhere to basic due process principles and human rights standards.  (*Id*. ¶ 791.)  Even then-Russian Prime Minister Mikhail Kasyanov publicly expressed disapproval of Mr. Khodorkovsky's arrest and treatment – a stance that angered President Putin, who subsequently removed Mr. Kasyanov from his post.  (*Id*. ¶¶ 142, 799.)

18.     In the months after Mr. Khodorkovsky's arrest, Russia issued arrest warrants for senior Yukos executives Leonid Nevzlin, Vladimir Dubov, and Mikhail Brudno.  (*Id*. ¶ 781.)  All three, however, had left Russia after receiving private warnings from the Kremlin that Yukos would be seized and that criminal charges would be lodged against its leadership.  (*Id*. ¶ 770, 781.)  A number of other Yukos personnel also left Russia, after enduring harassment and threats at the hands of Russian authorities.  (*Id*. ¶ 786.)  Many of these executives and employees became the subject of Russian extradition requests, which were uniformly rejected. (*Id*.)  Courts in Israel, Lithuania, Cyprus, the Czech Republic, and the United Kingdom all refused such extradition requests, finding the Russian government's prosecutions to be politically motivated and expressing doubt about the ability of Russian courts to retain independence in the face of mounting political interference.  (*Id*.)

19.     Russia's campaign of harassment and baseless prosecutions continued for several years, causing a steady stream of Yukos executives and employees to leave the country and motivating executives already outside of the country not to return.  (*Id*. ¶¶ 786, 788.)  One of the less fortunate was Yukos' Executive Vice President Vasily Aleksanyan, who, very shortly after being appointed to his position, was arrested when heavily-armed masked officers stormed his apartment.  (*Id*. ¶ 789.)  While imprisoned, Mr. Aleksanyan was diagnosed with lymphoma and

AIDS.  (*Id.*)  The Russian Federation offered him release and medical treatment in return for providing testimony against his fellow Yukos executives.  (*Id.*)  He refused to perjure himself and was held in pre-trial detention for nearly three years.  (*Id.*)  He was never tried for any crime.  (*Id.*)  Russia eventually released him on bond in the face of a European Court of Human Rights judgment harshly criticizing his detention.  (*Id.*)  He died at age 39 from complications relating to his conditions, a few years after being released.  (*Id.*)  Russia's own Human Rights Council decried his treatment at the hands of the Russian government as "simply monstrous."  (*Id.*)

20.     Russia did not reserve its brutal tactics only for Yukos employees.  Lawyers for Mr. Khodorkovsky and Mr. Lebedev were also targeted.  (*Id.* ¶¶ 175-76, 783.)  Their phones were put under surveillance, they were threatened with disbarment and lawsuits, and they were harshly interrogated and beaten to the point that they required hospitalization.  (*Id.* ¶ 783.)  Local and international bar associations expressed deep concerns about this conduct.  (*Id.*)

21.     Yukos' auditor PricewaterhouseCoopers ("PwC") was also targeted by authorities.  PwC had a long and close relationship with Yukos.  (*Id.* ¶ 1190.)  Since 1997, it had served as both an auditor and tax advisor to the company and possessed full access to Yukos records.  (*Id.* ¶¶ 1190-91.)  This relationship ended in April 2004 when PwC decided to cut ties after an initial wave of government interrogations and harassment.  (*Id.* ¶¶ 1197-98.)

22.     This decision, however, failed to appease the Russian government, which wanted PwC to disavow its audit reports of Yukos to aid the government's plans to destroy the company and seize its assets under the guise of challenging Yukos' accounting practices.  (*Id.* ¶ 1253.)  PwC thus became the target of raids and legal action.  (*Id.* ¶¶ 1198-1206.)  In March 2006, a case was filed against PwC for tax violations relating to expatriate employees' salaries.  (*Id.* ¶ 1199.)  In December 2006, PwC was prosecuted for allegedly colluding with Yukos on tax evasion.  (*Id.*

¶ 1200.)  In March 2007, fifty Russian officers raided PwC's Moscow offices, seizing documents and later fining the firm.  (*Id*. ¶ 1201.)  Criminal charges were filed against PwC employees.  (*Id*. ¶ 1203.)  In April 2007, the Russian Finance Ministry launched an investigation into the firm's auditing practices.  (*Id*. ¶ 1205.)

23.     As revealed by a 2007 Wikileaks cable, PwC management had privately conveyed to the U.S. Embassy that these prosecutions were "politically motivated" and expressed fears that they could lead to not just fines but criminal prosecutions and, ultimately, Russia's withdrawal of the firm's auditing license.  (*Id*. ¶¶ 1213-14, 1223, 1252.)  Motivated by these fears, in June 2007 PwC succumbed to government pressure to withdraw its audit reports for Yukos.  (*Id*. ¶¶ 104, 1207, 1253.)  The day after the firm went public with that decision, Russia dropped all criminal charges against PwC employees.  (*Id*. ¶¶ 1210, 1221.)  PwC proceeded to cooperate with Russian authorities in their campaign against Yukos and Mr. Khodorkovsky.  (*Id*. ¶ 1253.)  PwC continues to operate successfully in Russia today.  (*See, e.g.*, *About Us*, PwC Russia, *available at* http://www.pwc.ru/en/about/index.jhtml.)

24.     As it raided Yukos' offices and harassed and leveled criminal charges against Yukos' executives, employees, lawyers, and auditors, Russia also directly attacked the company by levying a series of tax reassessment judgments against it.  (Awards ¶¶ 88-92, 344-58, 364-78, 414-83, 515, 996.)

25.     The first of these orders was issued in December 2003, when – despite official confirmations in September, October and November of that same year that Yukos had no unsettled tax debts – the Russian Tax Ministry ordered a reassessment of Yukos' tax payments for the year 2000.  (*Id*. ¶¶ 90-92.)  Less than a month later, the government released a report contending that Yukos owed over USD 3 billion.  (*Id*. ¶¶ 92, 517, 520.)  The Tax Ministry

subsequently rejected Yukos' objections to this report and in April 2004 issued a decision finding Yukos liable for USD 3.48 billion in taxes, interest and fines for the year 2000. (*Id*. ¶¶ 517, 521, 599, 900.) The Tax Ministry demanded that Yukos pay the full balance within two days. (*Id*. ¶¶ 521, 900, 1512.) Even before this two-day payment period had expired, however, the Tax Ministry lodged a claim to collect the full amount allegedly owed. (*Id*. ¶¶ 522, 901.)

26.     Between September and December 2004, the Tax Ministry issued a series of similar judgments that purported to reassess Yukos' tax liability for the years 2001, 2002 and 2003. (*Id*. ¶¶ 545-47, 552, 557-59, 561, 566-68, 909.) Yukos was ordered to pay USD 4.1 billion for 2001 tax liabilities, USD 6.76 billion for 2002 tax liabilities, and USD 6.1 billion for 2003 tax liabilities. (*Id*.)

27.     Yukos challenged each of these tax reassessments in Russian courts. (*Id*. ¶¶ 523, 551, 563, 574.) The company was denied due process rights in these proceedings, the outcomes of which were predetermined. (*Id*. ¶ 648.) Yukos made repeated efforts to negotiate a settlement after losing its court challenges, but these offers were summarily rebuffed and in many instances received no response from Russian tax authorities. (*Id*. ¶¶ 911-19.) Russia later claimed that its non-responsiveness stemmed from the government's refusal to negotiate tax settlements – which is refuted by instances in which the government has indeed negotiated and reached settlements with companies for reductions of taxes. (*Id*. ¶ 976.)

28.     Meanwhile, as it rushed to levy ever-increasing tax burdens on Yukos and continued its campaign of harassment and intimidation, Russia revealed its true aim: to acquire Yukos' core asset, the oil production company Yuganskneftegaz ("YNG"). (*Id*. ¶¶ 985, 1021.) In July 2004, Russia first announced its plan to seize and sell YNG, allegedly in an effort to satisfy Yukos' newfound tax debt for the year 2000, despite the fact that Yukos had already

begun to pay this alleged debt and despite the fact that YNG was worth far in excess of the USD 3.48 billion then allegedly owed.  (*Id*. ¶¶ 988, 993.)

29.     In November 2004, Russia officially announced that YNG would be auctioned off the following month to satisfy Yukos' alleged tax debts.  (*Id*. ¶ 997.)  Yukos immediately sought legal relief to forestall the auction.  (*Id*. ¶ 998.)  Its efforts were swiftly rejected by the Russian courts.  (*Id*.)

30.     The auction, held on Sunday, December 19, 2004, was a staged event, rigged by the Russian Federation to facilitate the transfer of YNG to state-owned Rosneft under the pretext of an arm's length asset sale.  (*Id*. ¶¶ 1003, 1037.)  Government conditions for participating in the auction included clearance by the Russian Federal Antimonopoly Service.  (*Id*. ¶ 1000.)  Two companies were allowed to participate: Gazpromneft, a Russian state-owned company, and Baikal Finance Group.  (*Id*. ¶ 1002.)  Baikal had been incorporated thirteen days prior to the auction.  (*Id*. ¶ 999.)  Its official address was the site of a bar in the town of Tver and its share capital value was listed as equivalent to USD 359.  (*Id*. ¶¶ 143, 999.)  Baikal won the auction for YNG, which lasted ten minutes, with a single bid for USD 9.35 billion, a fraction of YNG's value.  (*Id*. ¶¶ 993, 1003.)  Gazpromneft declined to place a bid.  (*Id*.)  Shortly after the auction, Baikal was acquired by Rosneft.  (*Id*. ¶ 1006.)  As owner of YNG, Rosneft was able to become a major international oil producer; its profits for 2013 alone exceeded USD 15 billion.[2]  Dr. Illarionov, President Putin's Chief Economic Advisor when the auction took place, testified that the auction was a "scam" that marked "one of the low points in Russia's recent history."  (*Id*. ¶ 143.)

_____

[2] Stephen Bierman and Elena Mazneva, *Rosneft Dividend to Jump as 2013 Profit Rises*, Bloomberg (Feb. 4, 2014), *available at* http://www.bloomberg.com/news/2014-02-04/rosneft-full-year-profit-rises-51-following-tnk-bp-acquisition.html; Rosneft Press Release, *Rosneft posts record 2013 results* (Feb. 4, 2014), *available at* http://www.rosneft.com/news/pressrelease/04022014.html.

31.     After gutting Yukos of its most profitable asset, Russia took the final step to destroy the company: drive it into bankruptcy.  As part of this effort, Rosneft entered into a confidential agreement with one of Yukos' creditors – a syndicate of banks led by Société Générale ("SocGen") – under which Rosneft would pay SocGen the full outstanding amount owed by Yukos in exchange for SocGen's claims against the company.  (*Id*. ¶¶ 1045, 1064.)  A key condition of this arrangement: SocGen was required to first institute bankruptcy proceedings against Yukos.  (*Id*. ¶ 1065.)  SocGen complied and petitioned a Russian court to declare Yukos bankrupt.  (*Id*. ¶ 1069.)  Shortly thereafter, Rosneft paid SocGen the full amount of Yukos' outstanding debt as agreed.  (*Id*. ¶ 1071.)  Concurrent with the SocGen-initiated bankruptcy proceeding, YNG – now a Rosneft subsidiary – filed a separate petition to declare Yukos bankrupt.  (*Id*. ¶ 1072.)  This claim was joined with SocGen's petition. (*Id*. ¶ 1074.)

32.     In March 2006, a Moscow court ordered the commencement of bankruptcy proceedings, placed Yukos under supervision, appointed a bankruptcy administrator and formally substituted Rosneft as creditor in place of SocGen.  (*Id*. ¶ 1075.)  Yukos subsequently convened an extraordinary general shareholders' meeting, at which shareholders were presented with and approved by majority vote management's proposed rehabilitation plan.  (*Id*. ¶ 1078.)  This plan was sent to Yukos' bankruptcy administrator.  (*Id*. ¶ 1080.)  In July 2006, Yukos' creditors voted on whether to accept Yukos' rehabilitation plan or, alternatively, the bankruptcy administrator's proposal that Yukos be declared bankrupt and that receivership proceedings against it commence.  (*Id*. ¶ 1089.)  At this point, 94 percent of Yukos' outstanding debt was under the control of the Russian Federation through the Federal Taxation Service, Rosneft and YNG.  (*Id*.)  The vote was to declare Yukos bankrupt.  (*Id*.)  In November 2007, the court

ordered that Yukos be struck from the register of companies, thus legally extinguishing its shares. (*Id.* ¶ 1099.)

33.     The Russian Federation's actions – which, as summarized in the foregoing paragraphs, included harassment, and in many instances, prosecution of Yukos leaders, employees, legal representatives and auditors, as well as large-scale tax reassessments, asset seizures, and a forced auction – succeeded in destroying shareholder value in Yukos and transferring its assets to state-owned and controlled Rosneft.

## THE ARBITRATION

34.     In November 2004, Petitioners initiated arbitration proceedings against the Russian Federation under the Energy Charter Treaty (the "ECT").[3]   (A copy of the ECT is at Gaillard Decl., Exhibit G.)  The Russian Federation signed the ECT in December 1994.  The ECT establishes a multilateral framework for cross-border cooperation in the energy industry and includes provisions that govern signatories' relationships with investors.  Petitioners' claims were based on: (a) the Russian Federation's failure to treat Petitioners' investments in Yukos in a fair and equitable manner and on a non-discriminatory basis as required by Article 10(1) of the ECT;[4] and (b) the Russian Federation's expropriation of Petitioners' investments in violation of

---

[3] *Hulley Enterprises Limited (Cyprus) v. The Russian Federation*, PCA Case No. AA 226; *Yukos Universal Limited (Isle of Man) v. The Russian Federation*, PCA Case No. AA 227; *Veteran Petroleum Limited (Cyprus) v. The Russian Federation*, PCA Case No. AA 228.

[4] ECT, Art. 10(1) ("Each Contracting Party shall, in accordance with the provisions of this Treaty, encourage and create stable, equitable, favourable and transparent conditions for Investors of other Contracting Parties to make Investments in its Area.  Such conditions shall include a commitment to accord at all times to Investments of Investors of other Contracting Parties fair and equitable treatment. Such Investments shall also enjoy the most constant protection and security and no Contracting Party shall in any way impair by unreasonable or discriminatory measures their management, maintenance, use, enjoyment or disposal.  In no case shall such Investments be accorded treatment less favourable than that required by international law, including treaty obligations.  Each Contracting Party shall observe any obligations it has entered into with an Investor or an Investment of an Investor of any other Contracting Party.").

Article 13(1) of the ECT.[5]  Article 26 of the ECT provides that disputes between investors such as Petitioners and ECT signatories such as the Russian Federation must be submitted to arbitration.

35.     The seat of the arbitration was The Hague in the Netherlands.  The Netherlands is a member of the New York Convention.  The ECT provides that "[c]laims submitted to arbitration hereunder shall be considered to arise out of a commercial relationship or transaction for the purposes of article I of that Convention."  (ECT, Art. 26(5)(b).)

36.     The parties nominated arbitrators to serve on a three-member tribunal charged with hearing the dispute.  Petitioners initially nominated Daniel Price; after Mr. Price resigned in 2007 to accept a White House appointment, Petitioners nominated Dr. Charles Poncet.  The Russian Federation nominated Judge Stephen M. Schwebel.  The Honorable L. Yves Fortier PC CC OQ QC was appointed as the Tribunal's chairman.

37.     Each of these arbitrators has an impeccable record, is eminently qualified, and is highly distinguished.  Dr. Poncet is a renowned Swiss lawyer and arbitrator who publishes extensively on matters of international arbitration.  Judge Schwebel served for three terms as a judge on the International Court of Justice, including as President of the Court, has been a member of various UN committees, including the UN's International Law Commission, and has taught international law at universities and institutes all over the world, including at Johns Hopkins, Cambridge, the Australian National University, and the Graduate Institute of

---

[5] ECT, Art. 13(1) ("Investments of Investors of a Contracting Party in the Area of any other Contracting Party shall not be nationalized, expropriated or subjected to a measure or measures having effect equivalent to nationalization or expropriation (hereinafter referred to as 'Expropriation') except where such Expropriation is: (a) for a purpose which is in the public interest; (b) not discriminatory; (c) carried out under due process of law; and (d) accompanied by the payment of prompt, adequate and effective compensation.  Such compensation shall amount to the fair market value of the Investment expropriated . . .").

International Studies in Geneva.  The Honorable Yves Fortier has served as President of the UN Security Council, Canada's Ambassador and Permanent Representative to the United Nations, President of the London Court of International Arbitration, Chairman of the World Bank's Sanctions Board, and President of the Canadian Bar Association.

38.     The parties and the members of the Tribunal signed Terms of Appointment on October 31, 2005, agreeing, among other things, that: "(a) the members of the Tribunal had been validly appointed in accordance with the ECT and the UNCITRAL Rules; (b) the proceedings would be conducted in accordance with the UNCITRAL Rules; (c) the International Bureau of the [Permanent Court of Arbitration] would act as registry; (d) the dispute would be decided in accordance with the ECT and applicable rules and principles of international law; [and] (e) the language of the arbitration would be English."  (Awards ¶ 15.)

39.     The Tribunal set a procedural calendar, which provided that jurisdictional objections raised by the Russian Federation would be addressed first.  (*Id*.)  The Russian Federation raised several objections under the ECT to the Tribunal's jurisdiction to entertain the dispute and to the admissibility of the claims.  (*Id*. ¶ 21.)  Between November 2006 and November 2008, the parties exchanged two rounds of written submissions concerning these issues.  (*Id*. ¶ 19.)  The submissions spanned hundreds of pages and were accompanied by over twenty witness statements and more than a thousand exhibits.  (*Id*.)  The Tribunal held a ten-day hearing on jurisdiction in late 2008.  (*Id*. ¶ 20.)  In November 2009, the Tribunal issued unanimous interim awards, exceeding 200 pages, rejecting or deferring each of Russia's jurisdictional challenges.  (*Id*. ¶ 21.)[6]

---

[6] Copies of the interim jurisdictional awards are attached hereto.  (Gaillard Decl., Exhibit D ("Hul. Jur. Award"); *id*., Exhibit E ("YUL Jur. Award"); *id*., Exhibit F ("VPL Jur. Award").)  These awards are substantially identical and are collectively referred to as "Jur. Awards."

40.     In its interim awards, the Arbitral Tribunal determined unanimously *inter alia* that the Russian Federation is bound by the ECT in its entirety, and subject to its investor-State arbitration provision, Article 26, even though the ECT was never ratified by the Russian Duma. (Jur. Awards ¶¶ 393-98.)   In this regard, the Tribunal held that the Russian Federation, by signing the ECT in 1994, accepted its provisions on provisional application contained in Article 45.[7]  (Jur. Awards ¶ 388.)  The Tribunal held that that the binding character of the ECT includes the obligation to arbitrate investment disputes pursuant to its Article 26.  (Jur. Awards ¶¶ 378, 382.)  The Tribunal further held that the Russian Federation's termination of the provisional application of the ECT in 2009 had no impact on investments made before such termination took effect on October 19, 2009. Accordingly, investments made prior to that date, including those at issue in the arbitrations, are protected until October 19, 2029, pursuant to the express provisions of the ECT.   (Jur. Awards ¶¶ 386-88.)   The Tribunal therefore dismissed the Russian Federation's objection that provisional application of the ECT did not provide a basis for the Tribunal's jurisdiction over the merits of Petitioners' claims in the arbitrations.

41.     Moreover, the Tribunal also dismissed the Russian Federation's objections to jurisdiction and/or admissibility based on the arguments that Petitioners did not qualify as protected "investors" under the ECT (Jur. Awards ¶¶ 411-17), that the "investment" at issue in the arbitrations was not protected by the ECT (Hul. Jur. Award ¶¶ 429-34; YUL Jur. Award ¶¶ 430-35; VPL Jur. Award ¶¶ 465-91), and that Petitioners were barred by the "denial of benefits" provision of Article 17 of the ECT from bringing a claim (Hul. Jur. Award ¶¶ 455-58; YUL Jur. Award ¶¶ 456-59; VPL Jur. Award ¶¶ 512-15).

---

[7] Article 45(1) of the ECT provides as follows: "Each signatory agrees to apply this Treaty provisionally pending its entry into force for such signatory in accordance with Article 44, to the extent that such provisional application is not inconsistent with its constitution, laws or regulations."

42.     The arbitrations then proceeded to the merits stage.

43.     In September 2010, Petitioners filed a 424-page Memorial on the Merits, which was accompanied by 1,045 exhibits, nine fact witness statements, and two expert reports. (Awards ¶ 25.)

44.     In April 2011, the Russian Federation filed a 787-page Counter-Memorial on the Merits, which was accompanied by 2,868 exhibits and eight expert reports.  (*Id*. ¶ 27.)

45.     In March 2012, Petitioners filed a 474-page Reply on the Merits, which was accompanied by 629 exhibits and two expert reports.  (*Id*. ¶ 38.)

46.     In August 2012, the Russian Federation filed an 819-page Rejoinder on the Merits, which was accompanied by 1,739 exhibits and seven expert reports.  (*Id*. ¶ 40.)

47.     In October and November 2012, the Tribunal held a twenty-one day merits hearing at the Peace Palace in The Hague.  Over fifty party representatives attended.  Seven fact witnesses and three expert witnesses provided live testimony.  (*Id*. ¶ 49.)

48.     In December 2012, the parties filed post-hearing briefs, which, as directed by the Tribunal, were limited to 100 pages each.  (*Id*. ¶ 54.)

49.     In August 2013, the Tribunal invited the parties to comment on a July 2013 European Court of Human Rights decision relating to Russia's treatment of Messrs. Khodorkovsky and Lebedev.  (*Id*. ¶ 55.)  The parties submitted comments to the Tribunal on that decision as well as on developments in two other Yukos-related arbitral proceedings.  (*Id*. ¶¶ 56-57.)

50.     In January 2014, the Tribunal invited the parties to comment on the relevance, if any, of Mr. Khodorkovsky's recent pardon and release, after having spent over a decade in prison.  (*Id*. ¶ 58.)  The parties made the requested submissions.  (*Id*.)

51.     On May 7, 2014, after nearly ten years of proceedings, the Tribunal formally declared the record closed.  (*Id*. ¶ 60.)  As discussed below, the Tribunal issued the Final Awards on July 18, 2014.

52.     On November 10, 2014, the Russian Federation petitioned the Dutch courts to set aside the Awards.

<u>LEGAL STANDARDS</u>

53.     The Awards are subject to the New York Convention, which applies "to the recognition and enforcement of arbitral awards made in the territory of a State other than the State where the recognition and enforcement of such awards are sought."   New York Convention, Art. I(1); *see also* 9 U.S.C. § 201 ("The [New York Convention] shall be enforced in United States courts in accordance with this chapter.").

54.     "Confirmation proceedings under the Convention are summary in nature, and the court must grant the confirmation unless it finds that the arbitration suffers from one of the defects listed in the Convention."  *Argentine Republic v. National Grid Plc*, 637 F.3d 365, 369 (D.C. Cir. 2011); *see also* 9 U.S.C. § 207 ("The court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention.").

<u>THE AWARDS</u>

55.     The Tribunal issued three substantially identical Final Awards on July 18, 2014, each of which exceeds 600 pages.  (Gaillard Decl., Exhibit A (Hulley Award); *id*., Exhibit B (YUL Award); *id*., Exhibit C (VPL Award).)  The Awards meticulously detail the arbitrations' procedural history (*see* Awards ¶¶ 8-62), factual background (*see id*. ¶¶ 63-105), the parties' positions and requests for relief (*see id*. ¶¶ 106-111), the applicable law (*see id*. ¶¶ 112-116), the testimony that had been provided by twenty-three witnesses either live or via affidavit (*see id*. ¶¶

117-256), the legal issues (*see id*. ¶¶ 257-271), the Tribunal's analysis of the evidentiary record (*see id*. ¶¶ 272-1253), the Tribunal's conclusions of fact and law (*see id*. ¶¶ 1254-1692), the quantification of damages (*see id*. ¶¶ 1693-1829 and Tables T1-T9), and the apportionment of arbitration costs (*see id*. ¶¶ 1830-1887).

56.     The Tribunal concluded that Russia had waged a "full assault on Yukos and its beneficial owners in order to bankrupt Yukos and appropriate its assets while, at the same time, removing Mr. Khodorkovsky from the political arena."  (*Id*. ¶¶ 515, 1404; *see also id*. ¶ 1583 ("Russian courts bent to the will of Russian executive authorities to bankrupt Yukos, assign its assets to a State-controlled company, and incarcerate a man who gave signs of becoming a political competitor."); *id*. ¶ 820 (the Russian Federation's "intimidation and harassment of Yukos's senior executives, mid-level employees, in-house counsel and external lawyers by the Russian authorities . . . not only disrupted the operations of Yukos but also contributed to its demise and thereby damaged Claimants' investment").)

57.     In particular, the Tribunal found that the tax reassessments levied against Yukos were part of the Russian Federation's fraudulent effort to destroy the company and poach its assets.  As the Tribunal stated in summary: "After having now traversed, at some length, the treatment of Yukos by Russian tax authorities, the bailiffs and the courts, and having considered the totality of the evidence, . . . the Tribunal has concluded that the primary objective of the Russian Federation was not to collect taxes but rather to bankrupt Yukos and appropriate its valuable assets."  (*Id*. ¶ 756.)

58.     The Tribunal also found that Russia's forced auction of Yukos' core asset, YNG, purportedly effected to satisfy Yukos' newfound tax debts, was in fact part and parcel of Russia's plot against Yukos – indeed, they found it to be "one of the most striking episodes in

the saga of Yukos's demise." (*Id.* ¶ 981.)  The Tribunal concluded that "the YNG auction was rigged" in order "to facilitate the acquisition of YNG by State-owned Rosneft," explaining that:

> [T]he auction of YNG was not driven by motives of tax collection but by the desire of the State to acquire Yukos' most valuable asset and bankrupt Yukos.  In short, it was in effect a devious and calculated expropriation by Respondent of YNG.

(*Id.* ¶¶ 1036-37; *see also id.* ¶ 985 ("[A]fter having reviewed the totality of the circumstances leading to the YNG auction and the auction itself, the Tribunal concludes that this episode provides yet more compelling evidence that the Russian Federation was not engaged in a true, good faith tax collection exercise but rather was intent on confiscating the most valuable asset of Yukos and effectively transferring it to the Russian State."); *id.* ¶ 1579 (referring to Russia's "auction of YNG at a price that was far less than its value").)

59.    The Tribunal further concluded that Rosneft not only profited greatly from this scheme, but was a key participant in it that acted under the control and direction of the Russian Federation.  (*E.g.*, *id.* ¶ 1581 (the expropriation "was in the interest of the largest State-owned oil company, Rosneft, which took over the principal assets of Yukos virtually cost-free"); *id.* ¶ 1007 (noting that "YNG alone was [in mid-2006] valued at USD 55.78 billion" and that "Rosneft itself described the YNG acquisition as 'the most monumental bargain in Russia's modern history'"); *id.* ¶ 1474 ("Rosneft was such a creature of President Putin's entourage that it reflexively implemented his policies."); *id.* ¶ 1472 (finding that statements at a press conference "constitute[d] President Putin's public acceptance and assertion that Rosneft's purchase of the YNG shares from Baikal was an action in the State's interest, the inference being that the State, then 100 percent shareholder of Rosneft, the most senior officers of which were members of President Putin's entourage, directed that purchase in the interest of the State"); *see also id.*

¶ 1009 ("[V]ery soon after it was acquired by Rosneft, a significant portion of the tax assessments levied against YNG were set aside or vastly reduced by Russian courts.").)

60.     The Tribunal additionally found fraud in Yukos' bankruptcy proceedings, holding that "the totality of the bankruptcy proceedings . . . were not part of a process for the collection of taxes but rather, as submitted by Claimants, indeed the final act of the destruction of the Company by the Russian Federation and the expropriation of its assets for the sole benefit of the Russian State and State-owned companies Rosneft and Gazprom." (*Id.* ¶ 1180 (internal quotations omitted).)

61.     Having found that "Yukos was the object of a series of politically motivated attacks by the Russian authorities that eventually led to its destruction" (*id.* ¶ 1253), the Tribunal held that Russia violated its obligations under the ECT.  Specifically, the Tribunal found that "the measures that Respondent has taken in respect of Yukos . . . have had an effect 'equivalent to nationalization or expropriation'" in violation of Article 13 of the ECT. (*Id.* ¶ 1580.)  Having found that the Russian Federation "stands in breach of its treaty obligations under Article 13 of the ECT," the Tribunal found that it did "not need to consider whether Respondent's actions [we]re also in breach of Article 10 of the Treaty." (*Id.* ¶ 1585.)

62.     The Tribunal quantified Petitioners' damages by determining what the present value of their shares in Yukos would have been but for the illegal expropriation and reducing that amount by 25 percent, which the Tribunal found accounted for Petitioners' contribution to the injury they suffered. (*Id.* ¶¶ 1693-1829 and Tables T1-T9.)  The Tribunal awarded Petitioners a combined total of USD 50,020,867,798 in damages. (*Id.* ¶ 1827.)  It divided this sum among the three Petitioners proportionally, based upon their shareholdings.  Accordingly, it found Hulley was entitled to USD 39,971,834,360, VPL was entitled to USD 8,203,032,751, and YUL was

entitled to USD 1,846,000,687. (*Id.*) The Tribunal afforded the Russian Federation a 180-day grace period within which to pay this award, during which time interest would not accrue. (*Id.* ¶ 1691.) The Tribunal ordered that, at this expiration of this grace period, interest would begin to accrue at a rate equal to the yield on 10-year U.S. Treasury bonds. (*Id.* ¶ 1692.)

63.    Pursuant to Articles 40(1) and 40(2) of the UNCITRAL rules, the Tribunal also ordered the Russian Federation to reimburse Petitioners USD 60 million in attorney's fees (USD 47,946,190 to Hulley, USD 9,839,533 to VPL, and USD 2,214,277 to YUL) and EUR 4,240,000 in arbitration costs (EUR 3,388,197 to Hulley, EUR 695,327 to VPL, and EUR 156,476 to YUL). (*Id.* ¶¶ 1867, 1869, 1887.) The Tribunal ordered post-award interest to accrue on these balances if not paid within 180 days. (*Id.* ¶¶ 1869, 1887.)

64.    All decisions by the Tribunal were unanimous.

## CONCLUSION

65.    The Awards that Petitioners ask this Court to confirm were the product of unquestionably thorough arbitration proceedings in which the parties were given ample opportunity to plead their cases and present any and all evidence that they thought relevant. The proceedings were overseen by one of the most experienced and distinguished arbitral tribunals ever constituted, who issued awards reflecting the highest levels of care and rigor. The interim awards on jurisdiction and admissibility alone exceeded 200 pages. The Tribunal's ultimate findings and rulings on the merits are amply supported by the record and were set forth in exhaustive 600-page final awards that meticulously detail the relevant facts, applicable law, and the Tribunal's reasoned analysis. Arbitration awards are entitled to summary confirmation on a much lesser showing.

WHEREFORE, Petitioners respectfully request that this Court enter an order:

(i)    Confirming in their entirety each of the Final Awards issued on July 18, 2014 that are attached as Exhibits A, B, and C to the accompanying Declaration of Emmanuel Gaillard;

(ii)    Directing judgment to be entered thereon for: (a) USD 50,020,867,798 in damages (divided amongst Petitioners as provided in the Awards, *i.e.*, USD 39,971,834,360 to Hulley, USD 8,203,032,751 to VPL, and USD 1,846,000,687 to YUL); (b) USD 60,000,000 in attorney's fees (divided amongst Petitioners as provided in the Awards, *i.e.*, USD 47,946,190 to Hulley, USD 9,839,533 to VPL, and USD 2,214,277 to YUL); (c) EUR 4,240,000 in arbitration costs (divided amongst Petitioners as provided in the Awards, *i.e.*, EUR 3,388,197 to Hulley, EUR 695,327 to VPL, and EUR 156,476 to YUL); and (d) interest, as set forth in the Awards, which begins to accrue on January 15, 2015 on any of the foregoing amounts that remain unpaid as of that date at a rate equal to the yield on ten-year U.S. Treasury bonds as of January 15, 2015 (and then the dates of compounding yearly thereafter); and

(iii)    Granting such other and further relief as the Court may deem just and proper.

Dated:  November 25, 2014
     Washington, D.C.

SHEARMAN & STERLING LLP

Christopher Ryan
SHEARMAN & STERLING LLP
801 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2604
Telephone: (202) 508-8000
E-mail:   christopher.ryan@shearman.com

Henry Weisburg
Richard Schwed
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, New York 10022-6069
Telephone: (212) 848-4000
E-mail:   hweisburg@shearman.com
       richard.schwed@shearman.com