# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| HULLEY ENTERPRISES LTD., ) <br> YUKOS UNIVERSAL LTD., and ) <br> VETERAN PETROLEUM LTD., ) <br> ) <br> *Petitioners,* ) <br> ) <br> *v.* ) <br> ) <br> THE RUSSIAN FEDERATION ) <br> ) <br> *Respondent.* ) | Case No. 1:14-cv-01996-ABJ |

## RESPONDENT'S MOTION TO DISMISS THE PETITION TO CONFIRM ARBITRATION AWARDS FOR LACK OF SUBJECT MATTER JURISDICTION

Pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure and the Court's Minute Orders of August 4, 2015 and October 19, 2015, Respondent, the Russian Federation, respectfully submits this motion to dismiss the Petitioners' Petition to Confirm Arbitration Awards, in its entirety, for lack of subject matter jurisdiction.

Pursuant to Rule 7(a) of the Civil Rules of the United States District Court for the District of Columbia, Respondent submits herewith a Memorandum of Points and Authorities in Support of its Motion to Dismiss.  Respondent also submits the following documents, with exhibits, in further support of its Motion to Dismiss:

1. The Declaration of Gitas Povilo Anilionis, dated October 16, 2015, describing the control structure of SP Russian Trust and Trade ("RTT") and its role in the acquisition and subsequent transfers of the Yukos shares;

2.  The Declaration of Arkady Vitalyevich Zakharov, dated October 14, 2015, describing the control structure of Menatep Group and IF Menatep and its role, along with RTT, in the acquisition and subsequent transfers of the Yukos shares;

3.  The Declaration of Colonel of Justice Sergey A. Mikhailov, dated October 14, 2015, regarding criminal investigations involving Mr. Mikhail Khodorkovsky, Mr. Platon Lebedev, and Mr. Andrey Kraynov;

4.  The Expert Report of S.P. Kothari, dated October 20, 2015, analyzing the chain of transactions involving the Yukos shares between 1995 and 2001;

5.  The Expert Report of Professor James Dow, dated October 20, 2015, addressing the method of damages valuation developed by the Tribunal;

6.  The Opinion of Russian Law of Professor Anton V. Asoskov dated October 20, 2015, addressing issues of Russian civil law and private international law, and reaffirming his prior Expert Report dated October 30, 2014 (submitted to the District Court of The Hague, Netherlands, in the set aside proceedings);

7.  The Expert Opinion of Professor George A. Bermann, dated October 20, 2015, opining on issues related to recognition of the arbitration awards under the New York Convention;

8.  The Expert Opinion of Professor Rudolf Dolzer, dated October 20, 2015, opining on questions of international law related to recognition of the arbitration awards;

9.  The Declaration of Albert Jan van den Berg, dated October 20, 2015, regarding the ongoing proceedings initiated by the Russian Federation in the District Court of The Hague to set aside the arbitration awards;

10. The Declaration of Pavel Yurievich Boulatov, dated October 20, 2015, describing and explaining certain Russian laws and regulations that were in force between 1995 and 2000;

11. Pursuant to the Court's October 19, 2015 Minute Order and D.C. Local Civil Rule 7(n)(1), a certified list of the contents of the entire record of the underlying arbitrations, as the unfiled documents from that record are too voluminous to file at this time, but are to be provided to the Court as permitted under LCvR 7(n).

12. The Declaration of Francis A. Vasquez, dated October 20, 2015, attaching indices and documents supporting the motion.

Finally, Respondent submits herewith a Proposed Order pursuant to Rule 7(c) of the Civil Rules of the United States District Court for the District of Columbia.

Dated: Washington, D.C.
       October 20, 2015

Respectfully submitted,

**WHITE & CASE** LLP

/s/ Carolyn B. Lamm
Carolyn B. Lamm (D.C. Bar No. 221325)
Francis A. Vasquez, Jr. (D.C. Bar No. 442161)
Frank Panopoulos (D.C. Bar No. 459365)
Eckhard Robert Hellbeck  (D.C. Bar No. 437619)
Chauncey Bratt (D.C. Bar No. 1018133)
701 Thirteenth Street, N.W.
Washington, D.C. 20005
Phone: (202) 626-3600
Fax:     (202) 639-9355

*Counsel for the Russian Federation*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 20, 2015, I filed a true and correct copy of the foregoing

Motion to Dismiss the Petition to Confirm Arbitration Awards for Lack of Subject Matter

Jurisdiction with the Clerk of Court using the CM/ECF system, which will send notification of

such filing to the following:

Christopher M. Ryan
SHEARMAN & STERLING LLP
801 Pennsylvania Avenue, NW
Suite 900
Washington, DC 20004-2604
Phone: (202) 508-8098
Fax:    (202) 508-8100
Email: christopher.ryan@shearman.com

Henry S. Weisburg
Richard F. Schwed
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, NY 10022-6069
Phone: (212) 848-4193
Fax:    (646) 848-4193
Email: hweisburg@shearman.com
         rschwed@shearman.com

*Counsel for Hulley Enters. Ltd., Yukos Universal Ltd.,*
*and Veteran Petroleum Ltd.*

/s/ Carolyn B. Lamm
Carolyn B. Lamm (D.C. Bar No. 221325)

## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

_____
)
HULLEY ENTERPRISES LTD., YUKOS       )
UNIVERSAL LTD., AND VETERAN       )
PETROLEUM LTD.,       )
       )
          *Petitioners*,    )  Case No. 1:14-cv-01996-ABJ
       )
       v.       )
       )
THE RUSSIAN FEDERATION,       )
       )
          *Respondent*.    )
_____ )

## THE RUSSIAN FEDERATION'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS THE PETITION TO CONFIRM ARBITRATION AWARDS FOR LACK OF SUBJECT MATTER JURISDICTION

**WHITE & CASE** LLP

Carolyn B. Lamm (D.C. Bar No. 221325)
Francis A. Vasquez, Jr. (D.C. Bar No. 442161)
Frank Panopoulos (D.C. Bar No. 459365)
Eckhard Robert Hellbeck  (D.C. Bar No. 437619)
Chauncey Bratt (D.C. Bar No. 1018133)
701 Thirteenth Street, N.W.
Washington, D.C. 2000
Phone: (202) 626-3600
Fax:    (202) 639-9355

*Counsel for Respondent*

October 20, 2015

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...........................................................................................................1

BACKGROUND ...........................................................................................................5

I.    As Petitioners Failed To Disclose To The Tribunal: Petitioners Are Owned And Controlled Exclusively By Six Russian Oligarchs, And Have Never Conducted Substantial Business Activity In Cyprus Or The Isle Of Man...........................................5

II.    In 1995, As Not Disclosed To The Tribunal, The Oligarchs Obtained Ownership Of Yukos By Defrauding The Russian Federation During An LFS Auction ..................7

III.    Between 1996 And 2000 The Oligarchs Implemented A Series Of Secret Transactions Devised To Consolidate The Yukos Shares Offshore, Avoid Russian Taxation And Currency Controls, And Conceal The Identity Of The True Owners........................................................................................................14

IV.    The Oligarchs Implemented A Massive Tax Evasion Scheme, Defrauding The Russian Federation Of Billions Of Dollars In Taxes ....................................................18

V.    The Russian Federation Sought To Enforce Its Tax Laws .............................................20

VI.    On The Basis Of A Treaty That Russia Never Ratified, An Arbitral Tribunal Sitting In The Hague (Not Knowing The Extent Of The Oligarchs' Deception And Collusive Activities) Awarded Petitioners Over $50 Billion.................................22

ARGUMENT .............................................................................................................25

I.    The Court Lacks Subject-Matter Jurisdiction Under The FSIA .....................................25

    A.    Applicable Standards For A Jurisdictional Determination Under the FSIA..........26

    B.    The Exception To Sovereign Immunity For Confirming An Arbitral Award Does Not Apply Because There Was No Agreement to Arbitrate ............28

        1.    An Agreement to Arbitrate Was Not Formed Because Russia's Provisional Application of the ECT Did Not Include Application of The Arbitration Provisions in Article 26..........................................................28

        2.    An Agreement to Arbitrate Was Not Formed Because The Russian Federation Did Not Make An Offer to Arbitrate Under the ECT To Fraudsters ................................................................................................31

        3.    An Agreement to Arbitrate Was Not Formed Because The Russian Federation Did Not Offer to Arbitrate With Russian Nationals ..................34

        4.    An Agreement to Arbitrate Was Not Formed Because Neither Petitioners Nor the Tribunal Followed A Mandatory Precondition Under the ECT ....................................................................................................36

    C.    The Exception To Sovereign Immunity For Confirming An Arbitral Award Does Not Apply Because The Award Is Not Subject to the New York Convention....................................................................................38

    D.    The Russian Federation Has Not Waived Its Sovereign Immunity ......................39

**TABLE OF CONTENTS**

II.   The Court Lacks Subject Matter Jurisdiction Under The FAA And N.Y. Convention ............................................................................................................42

     A.   Applicable Standard For a Jurisdictional Determination Under the FAA and New York Convention ....................................................................42

     B.   The Award Does Not Meet the Jurisdictional Requirements Under the FAA and New York Convention .........................................................43

          1.   There Is No Agreement To Arbitrate ...........................................43

          2.   The Subject Matter Of The Dispute And Claims Is Not Commercial ..........43

CONCLUSION .......................................................................................................................44

# **TABLE OF AUTHORITIES**

## **CASES**                                                                        Page(s)

*Aquamar S.A. v. Del Monte Fresh Produce N.A., Inc.,*
179 F.3d 1279 (11th Cir.1999) ..........................................................40

*Argentine Republic v. Amerada Hess Shipping Corp.,*
488 U.S. 428 (1989)...........................................................................25

*AT&T Techs., Inc. v. Commc'ns Workers of Am.,* 475 U.S. 643 (1986)........................................31

*Belize Soc. Dev. Ltd. v. Gov't of Belize,* 794 F.3d 99 (D.C. Cir. 2015)........................................39

*\*BG Grp. PLC v. Republic of Argentina,* 134 S. Ct. 1198 (2014)...........................................31, 38

*Capital Ventures Int'l v. Republic of Argentina,*
552 F.3d 289 (2d. Cir. 2009)...............................................................40

*\*Chevron Corp. v. Ecuador,* 795 F.3d 200 (D.C. Cir. 2015) ................................................26, 28

*China Minmetals Materials Imp. & Exp. Co., Ltd. v. Chi Mei Corp.,*
334 F.3d 274 (3d Cir. 2003)................................................................28

*Creighton Ltd. v. Gov't of the State of Qatar,*
181 F.3d 118 (D.C. Cir. 1999) ..................................................... 25, 40-42

*\*Diag Human S.E. v. Czech-Republic-Ministry of Health,*
64 F. Supp. 3d 22 (D.D.C. 2014) ....................................... 5, 25, 26, 39-43

*\*First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba,*
462 U.S. 611 (1983)...........................................................................27

*\*Foremost-McKesson, Inc. v. Islamic Republic of Iran,*
905 F.2d 438 (D.C. Cir. 1990) ............................................................26, 40

*Frolova v. U.S.S.R.,* 761 F.2d 370 (7th Cir. 1985) .....................................................41

*\*Granite Rock Co. v. Teamsters,* 561 U.S. 287 (2010) ...............................................27

*Mar. Int'l Nominees Establishment v. Republic of Guinea,* 693 F.2d 1094
(D.C.Cir.1982) ..................................................................................40

*Medellín v. Texas,* 522 U.S. 491(2008) ....................................................27

Page(s)

*Nat'l R.R. Passenger Corp. v. Boston & Maine Corp.*,
   850 F.2d 756 (D.C. Cir. 1988) ....................................................................27

*Phoenix Consulting Inc. v. Republic of Angola*,
   216 F.3d 36 (D.C. Cir. 2000) .....................................................................26

*Princz v. Fed. Republic of Germany*, 26 F.3d 1166 (D.C. Cir. 1994) ...........41

*Republic of Ecuador v. Chevron Corp.*, 638 F. 3d 384 (2d Cir. 2011).............32

*Saudi Arabia v. Nelson*, 507 U.S. 349 (1993).................................................25

*Scandinavian Satellite Sys., AS v. Prime TV Ltd.*,
   291 F.3d 839 (D.C. Cir. 2002) ..................................................................33

*Steelworkers v. Warrior & Gulf Nav. Co.*, 363 U.S. 574 (1960)....................31

*U.S. Titan, Inc. v. Guangzhou Hua Shipping Co.*,
   241 F.34d 135 (2d Cir. 2001).....................................................................42

*World Wide Minerals, Ltd. v. Republic of Kazakhstan*,
   296 F.3d 1154 (D.C. Cir. 2002) .................................................................39

## STATUTES

9 U.S.C. § 202 .......................................................................................4, 5, 42

28 U.S.C. § 1605(a)(1)............................................................................ passim

28 U.S.C. § 1605(a)(6)............................................................................ passim

## TREATIES

Convention for the Recognition and Enforcement of Foreign Arbitral Awards, June
   10, 1958, 21 U.S.T. 2517, 330, U.N.T.S. 38, codified at 9 U.S.C. §§ 201-208
   (2000) ................................................................................................. passim

Energy Charter Treaty,
   17 December 1994, 2080 U.N.T.S. 95, Reg. No. 36116. .............................. passim

## INTERNATIONAL AUTHORITY

*ADC Affiliate Limited et al. v. Hungary*, ICSID Case No. ARB/03/16, Award
   (2 October 2006) .......................................................................................33

Page(s)

*Aguas del Tunari  v. Bolivia*, ICSID Case No. ARB/02/3, Decision on Jurisdiction
(21 October 2005) ..................................................................................................33

*Case Concerning The Barcelona Traction, Light & Power Co. Ltd.
(Belgium v. Spain)*, 1970 I.C.J. Rep. 3..................................................................33

*Case of Khodorkovskiy v. Russia*, App. No. 5829/04, Judgment
(Eur. Ct. H.R. November 28, 2011)........................................................................21

*In re Production-Tech. Ass'n for Capital Repairs v. ArbatStroy LLC*,
Resolution of the Supreme Arbitrazh Court No. 11535/13
(28 Jan. 2014) (Russia) .........................................................................................30

*Khodorkovskiy and Lebedev v. Russia*, Apps. Nos. 11082/06, 13772/05,
Judgment  (Eur. Ct. H.R. July 25, 2013)...............................................................19

*Loewen Group Inc. v. United States of America*, Award,
 ICSID Case No. ARB(AF)/98/3 (June 26, 2003) ..................................................34

*OAO Neftyanaya Kompaniya Yukos v. Russia*, App. No. 14902/04,
Judgment (Eur. Ct. H.R. Sept. 20, 2011) ..............................................................19

*Plama Consortium Ltd. v. Republic of Bulgaria*,
ICSID Case No. ARB/03/24, Award (Aug. 27, 2008)...........................................32

*Saluka v. Czech Republic*, UNCITRAL,
Partial Award (17 March 2006) .............................................................................33

*SAUR International S.A. v. Argentine Republic*,
ICSID Case No. ARB/04/4,
Decision on Jurisdiction and Liability (June 6, 2012) ...........................................32

*Tokios Tokeles v. Ukraine*, ICSID Case No. ARB/02/18,
Decision on Jurisdiction (29 April 2004)...............................................................33

L. Caplan & J. Sharpe, *United States*, in *Commentaries On Select Model Investment
Treaties* (Chester Brown, ed. 2013) ......................................................................37

W. Park, *Tax Arbitration and Investor Protection*,
in *Investment Protection And The Energy Charter Treaty*
(Graham Coop & Clarisse Ribeiro, eds. 2008) ......................................................37

## <u>INTRODUCTION</u>

This enforcement proceeding raises important issues at the intersection of foreign sovereign immunity, international investment treaty arbitration, and public policy. The extraordinary issues in this proceeding arise because the fraud perpetrated by the Russian oligarchs that own and control Petitioners – and use Petitioners to hide and wash their fraud – and Petitioners' lack of candor with the arbitration tribunal, resulted in a US$50 billion award against Respondent, the largest arbitration award in modern times. That lack of candor continues before this Court. It is an affront to any system based on the rule of law to condone that fraud by finding jurisdiction to confirm the award against a foreign sovereign that did not offer or consent to arbitrate disputes under the Energy Charter Treaty ("ECT")[1] with fraudsters who are Russian nationals, and their off-shore shell companies that were created to hide the fraud, avoid taxes, and obtain an investment in violation of Russian law.

Petitioners Hulley Enterprises Ltd. ("Hulley"), Veteran Petroleum Ltd. ("Veteran"), and Yukos Universal Ltd. ("YUL") are shell companies that are owned, controlled and operated by six Russian criminal oligarchs (*i.e.*, Mikhail Khodorkovsky, Platon Lebedev, Leonid Nevzlin, Mikhail Broudno, Vladimir Dubov, and Vassily Shakhnovsky) ("Oligarchs"). These Oligarchs colluded to fix the Loans-for-Shares ("LFS") auctions in 1995-96, by which they first obtained fraudulently their shares in the state-owned OAO Yukos Oil Company ("Yukos"), and then transferred those shares to on- and off-shore shell companies to hide illegally their ownership, ultimately transferring them to Petitioners. Petitioners are not nationals of Cyprus or the Isle of Man as they would have this Court believe. Rather, they ***admittedly*** are corporate shells with no function other than to hold the Oligarchs' shares in Yukos and to transfer them to the benefit of

---

[1]   Energy Charter Treaty, 17 December 1994, 2080 U.N.T.S. 95.

the Oligarchs.  Petitioners were created and controlled by the Oligarchs to conceal fraud and other unlawful activity, including evasion of Russian tax, currency, and anti-monopoly laws.

Petitioners were not candid with the arbitration tribunal ("Tribunal") and did not disclose their Russian nationality and their participation in the fraud during the arbitration.   The Award was expressly contingent on the absence of a link between the illegal acquisition of the Yukos shares by the Oligarchs and Petitioners' alleged investment.  Specifically, the Tribunal found that the Petitioners were unrelated to the persons or entities that violated Russian law in originally acquiring the shares.  Ex. R-63 ¶ 1370 (Hulley Final Award).  ***Petitioners failed to correct this misimpression of the Tribunal, which Petitioners certainly knew to be false***.

The Tribunal acknowledged that Petitioners could have been "barred from seeking relief under the ECT" if their investment was made "in bad faith or in violation of the laws of the [Russian Federation]."  Ex. R-63 ¶ 1364 (Hulley Final Award).  The Tribunal moreover agreed that if Petitioners' investment was the culmination of ***a "series of transactions" that was "sufficiently connected" to the illegal acquisition of the Yukos shares*** in 1995 and 1996, their claims might be barred.

> The Tribunal agrees with Respondent that an examination of the legality of an investment should not be limited to verifying whether the last in a series of transactions leading up to the investment was in conformity with the law. The making of the investment will often consist of several consecutive acts and all of these must be legal and bona fide.  Ex. R-63 ¶ 1369 (Hulley Final Award).

Indeed, the Tribunal quoted with approval the correct conclusion of Dr. Claudia Annacker, that

> [I]t would be incompatible with economic reality and undermine the integrity of the legal process if serious irregularities – illegalities – infecting the process of the making of the investment would not affect the availability of investment treaty protection, whether or not a specific transaction, part of the process, if viewed in isolation, might be legal.

> Now, this conclusion applies *a fortiori* **where a claimant is not unrelated to the persons or entities that committed these illegalities, but is an investment vehicle owned and controlled by the same persons who committed the illegalities** . . . Otherwise, investment treaty protection could be achieved simply by shifting investments through layers of ownership and control to launder illegal investments. Ex. R-63 ¶ 1368 (Hulley Final Award).

The Tribunal declined to reach any conclusions regarding the allegations of illegality, reasoning that the illegal transactions "connected to the acquisition of Yukos" in 1995 and 1996 "involved Bank Menatep and the Oligarchs, an entity and persons *separate from [Petitioners]*." Ex. R-63 ¶ 1370 (Hulley Final Award) (emphasis added).   As explained in detail in the Background Section of this brief, the expert report of Mr. Kothari attaching the share registry of Yukos demonstrating the Oligarchs' continuous ownership of the shares through multiple off-shore companies, including Petitioners, to obscure their identities and Russian nationality, and the witness statements, the Tribunal was misled in reaching this conclusion.

Respondent's witnesses Messrs. Anilionis and Zakharov observe, for example, that the "head of the Menatep group of companies [including Bank Menatep] was Mr. Mikhail Borisovich Khodorkovsky." Anilionis ¶ 3; Zakharov ¶ 3.   Although Hulley Enterprises Ltd. subsequently acquired a majority of these Yukos shares after a series of related-party transactions, "at all times . . . [i]n practical terms, [] the shares were actually owned and controlled" by Mr. Khodorkovsky and his associates.   Anilionis ¶¶ 32-33; Zakharov ¶ 15 (the shares "remained at all times in the control of the principals of Bank Menatep and ZAO Rosprom, including Mr. Khodorkovsky, Mr. Nevzlin, and Mr. Lebedev, who conducted the various transactions through the holding companies controlled by [RTT].").   Mr. Anilionis explains that at the Mr. Khodorkovsky presided over weekly meetings with RTT, at which he delivered oral instructions and directly conveyed instructions about the creation of the holding companies to hold secretly the Oligarch's shares.   Anilionis ¶¶ 7, 9, 10-11, 15.

In short, the Tribunal did not have before it all of the evidence of Petitioners' collusion and deception to obtain an investment illegally, and deception about their Russian nationality. That evidence – which goes to ***the heart*** of the Court's jurisdiction – has been recently obtained and is submitted herewith, including the share registry for Yukos.  The transactions recorded in the share registry, witness statements by persons acting at the time under the direction of the Oligarchs, and transaction records, all now establish the continued ownership of Yukos shares by these Oligarchs from 1995 through 2004, their Russian nationality, and their fraud.

The Oligarchs' fraud nullified any purported agreement to arbitrate between Russia and Petitioners.  ***If*** any offer to arbitrate existed under the ECT for Russia (which, as explained herein, was not the case because of the terms of treaty's provisional application), the Russian Federation nonetheless did not offer – and therefore did not consent – to arbitrate disputes under the ECT with fraudsters, or with its own nationals, let alone those who illegally obtained an investment.  The non-existence of an arbitration agreement results in the Court lacking subject matter jurisdiction over this case under the Foreign Sovereign Immunities Act ("FSIA"),[2] because neither of the two exceptions to foreign sovereign immunity posited by Petitioners applies due to the lack of an arbitration agreement.  Likewise, jurisdiction is lacking under Section 202 of Federal Arbitration Act ("FAA"), 9 U.S.C. § 202, because there is not an arbitration agreement.  Jurisdiction is further lacking under the FSIA and FAA because Petitioners' claims are in connection with the exercise of Russia's public law functions: its sovereign and regulatory powers of taxation, procurement, and policing.  Therefore, the dispute and award are not in connection with "commerce," and the "legal relationship" between Petitioners and Russia is not commercial.

---

[2]    Foreign Sovereign Immunities Act of 1976, Pub. L. No. 94-583, 90 Stat. 2891 (codified as amended at 28 U.S.C. §§ 1330, 1332(a), 1391(f), 1441(d), and 1602-1611).

Consequently, the Petition should be dismissed pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction.  *See Diag Human S.E. v. Czech-Republic-Ministry of Health*, 64 F. Supp. 3d 22, 28-33 (D.D.C. 2014) (dismissing petition to enforce arbitration award for lack of subject matter jurisdiction under FSIA and FAA § 202).

In addition to this motion addressing subject-matter jurisdiction, the Russian Federation has filed a companion motion and supporting memorandum addressing that the Petition should not be confirmed pursuant to Article V of the New York Convention[3] ("N.Y. Convention Motion").

## BACKGROUND

### I.    As Petitioners Failed To Disclose To The Tribunal: Petitioners Are Owned And Controlled Exclusively By Six Russian Oligarchs, And Have Never Conducted Substantial Business Activity In Cyprus Or The Isle Of Man

In their Petition, Petitioners present themselves as companies based in Cyprus and the Isle of Man.  Pet. ¶ 4.  As Petitioners acknowledged explicitly in November 2006, however, each of these three entities is merely a shell company that does "*not engage in any substantial business activity in its place of organization (or elsewhere).*"  *See* Ex. R-439 (Nov. 3, 2006 Letter to Tribunal from Petitioners) (emphasis added).  Petitioners failed to disclose to the Tribunal, however, that Petitioners are owned and controlled by six Russian criminals, who are colloquially known throughout the Russian Federation and Eastern Europe as "Oligarchs": Mikhail Khodorkovsky, Leonid Nevzlin, Platon Lebedev, Mikhail Brudno, Vassili Shakhnovsky, and Vladimir Dubov.  *Id.* at 2.  As explained below, Petitioners – and their predecessor entities – were owned and controlled by these same Russian Oligarchs since 1995, when these men deceptively submitted collusive bids to fraudulently obtain the ownership of Yukos assets from

---

[3]    Convention for the Recognition and Enforcement of Foreign Arbitral Awards ("New York Convention"), June 10, 1958, 21 U.S.T. 2517, 330, U.N.T.S. 38, codified at 9 U.S.C. §§ 201-208 (2000).

the Government of the Russian Federation in a Loans-for-Shares auction and investment tender in 1995. *See* Anilionis Decl. ¶¶ 19-21; Zakharov Decl. ¶¶ 7-11; Ex. R-270 (*Berezovsky v. Abramovich*, [2012] EWHC 2463 (Comm) ¶¶ 224, 231); Ex. R-265 ¶ 121 (Berezovsky Statement); Ex. R-266 at 52 (Berezovsky Transcript).

Specifically, both Hulley (located in Cyprus) and YUL (located in the Isle of Man) are wholly-owned subsidiaries of a company known as Group Menatep Ltd. ("GML"), which is incorporated in Gibraltar. Ex. R-439 (Nov. 3, 2006 Letter to Tribunal from Petitioners). GML is held, in turn, by seven trusts located in the Bailiwick of Guernsey for the exclusive benefit of the six Oligarchs. *Id.* at 2. For its part, Veteran is merely an extension of YUL. *See* Ex. R-461 (Veteran Trust Agreement, Apr. 25, 2001). The shares of Veteran are held in trust in the Bailiwick of Jersey, by a custodian-trustee appointed by YUL. *See id.* § 2. This custodian-trustee casts all of its votes based on Veteran's Yukos shares in accordance with the instructions of a voting committee dominated by YUL's appointees. *See id.* § 9(3); Ex. R-462, §§ 4-8 (Veteran Trust Amendment, Oct. 8, 2007). Moreover, all dividends based on Veteran's Yukos shares are paid exclusively to YUL. *See* Ex. R-461 § 4 (Veteran Trust Agreement, Apr. 25, 2001). Finally, in 2007, YUL amended Veteran's trust agreement to empower the custodian-trustee and an unidentified "Russian Service Provider," who is appointed solely by YUL, to divide any damages recovered by Veteran in these proceedings between YUL and the Oligarchs. *See id.* § 3(3); Ex. R-462, §§ 1-3 (Veteran Trust Amendment, Oct. 8, 2007).

Accordingly, even though the Oligarchs laundered their ownership of Yukos (in addition to the extraordinary revenues received from the production of crude oil through the Yukos facilities in Russia) through an elaborate network of shell companies and trusts located in a variety of offshore jurisdictions (specifically Jersey, Guernsey, Gibraltar, the Isle of Man, and

Cyprus), there is no economic substance to any of these entities.  Rather, it was the Russian

Oligarchs' creation of Bank Menatep, Rosprom and RTT, among others, that led to the initial

acquisition by the Russian Oligarchs of Yukos' assets through fraudulent and deceptively rigged

bids in the auction of Yukos, that is the source of revenue, and the basis for Petitioners' alleged

acceptance of the Russian Federation's offer to arbitrate under the ECT.  This offer, if any under

ECT, was not open to be accepted by Russian nationals who obtained their investments through

fraudulent means, and which are void *ab initio*.  Given that none of these entities conducts "*any*

*substantial business activity in its place of organization (or elsewhere)*," any purported

distinctions between the Petitioners and the Russian Oligarchs, who own and control them, are

purely illusory and were deceptively not revealed.  *See* Ex. R-439 (Nov. 3, 2006 Letter to

Tribunal from Petitioners) (emphasis added).

## II.     In 1995, As Not Disclosed To The Tribunal, The Oligarchs Obtained Ownership Of Yukos By Defrauding The Russian Federation During An LFS Auction

Contrary to Petitioners' representations to the Tribunal and this Court, and as explained

in the declarations submitted by the Oligarchs' former employees, Mr. Gitas Anilionis and Mr.

Arkady Zakharov, the six Oligarchs behind Petitioners previously served during the 1990s as

executives and directors of three interrelated Russian entities known as Bank Menatep,

ZAO Rosprom, and Russian Trust and Trade ("RTT").   Anilionis Decl. ¶¶ 3-5; Zakharov

Decl. ¶ 2.   In 1994, it was reported that Bank Menatep was "*controlled by one of the most*

*powerful crime clans in Moscow*."   Ex. R-463 (*Washington Times*, "Most of Russia's Biggest

Banks Linked To Mob, CIA Report Says," Dec. 5, 1994) (emphasis added).

In 1995, the Oligarchs decided to obtain ownership of Yukos by fraudulently

manipulating an auction conducted by the Russian Federation in relation to the privatization of

its State-owned enterprises through the LFS Program.  *See* Anilionis Decl. ¶¶ 19-21; Zakharov

Decl. ¶¶ 7-11.  The majority of Yukos shares were still State-owned at this time.  *See* Ex. R-63 ¶¶ 71, 1284 (Hulley Final Award).

The LFS program was established by Presidential Decree No. 889, which was issued by President Boris Yeltsin on August 31, 1995.  *See* Ex. R-261 (Presidential Decree No. 889).  The purpose of the LFS program was to use highly valuable state-owned assets as collateral for the Government of the Russian Federation to borrow funds "for covering the federal budget deficit." *See id.*, Preamble.  In a LFS auction, private bidders were permitted to submit competitive proposals to make loans to the Government.  *See id.* App'x 1 § 5.  The bidder who offered the largest loan would be selected as the winner.  *Id.*  The winner's loan would be secured by a pledge of the shares of large, State-owned enterprises, such as Yukos, as collateral.  *Id.* § 6.  In the event that the Government defaulted on the loan provided by the winner of the LFS auction, the winner (acting as the Government's "Commission Agent") would be obliged to sell the pledged shares to a third party.  *Id.* § 7.  The proceeds of this sale would be applied toward the repayment of the original loan, with the surplus proceeds to be divided between the Government and the winner of the LFS auction.  *See id.*, App'x 4 § 8.  Specifically, the Government was entitled to receive 70% of any proceeds in excess of the loan amount, and the winner of the LFS auction was entitled to receive 30%.  *See id.*; Ex. R-63 ¶ 1285 (Hulley Final Award).

Bank Menatep was appointed as the organizer of a LFS auction for 45% of the shares of Yukos, which was held on December 8, 1995.  *See* Ex. R-4 (LFS Minutes No. 1).  The Russian Federation conducted this LFS auction jointly with an investment tender for an additional 33% of the shares of Yukos.  Ex. R-262 at 6 (State Property Committee Order No. 1458).  In the investment tender, participants were obligated to commit to making an additional investment of

US$ 200 million for improvements in specific Yukos facilities ("the development of oil fields" and "a network of petroleum depots") between 1996 and 1998. *See id.* at 7.

As was stated explicitly in Presidential Decree No. 889, the LFS auction for the shares of Yukos would be invalid unless at least two independent bidders participated. Ex. R-261 § 6 (Presidential Decree No. 889). This requirement was repeated in State Property Committee Order No. 1458 and, even more fundamentally, was mandatory under Article 447(5), a peremptory provision of the Civil Code of the Russian Federation ("CCRF"). *See* Asoskov ¶ 36; Ex. R-262 § 26 (State Property Committee Order No. 1458); Ex. R-272, Art. 447(5) (CCRF). It was also explicitly provided by numerous provisions of Russian law, including Presidential Decree No. 889, that the LFS program was to be conducted in accordance with "principles of competitiveness," that "restricting competition [wa]s not allowed," and that any "[a]greements or concerted practices that may lead towards" the "lowering . . . of prices" were prohibited. *See* Asoskov ¶¶ 36-40; Ex. R-261 § 7 (Presidential Decree No. 889); Ex. R-272, Art. 10, 168, 169, and 170 (CCRF); Ex. R-277, Art. 8 (Law No. 948-I on Competition); Ex. R-274, Art. 30(1) (Law No.1531-I On Privatization).

In disregard of these prohibitions under Russian law, the Oligarchs devised and implemented an elaborate and fraudulent scheme to manipulate the LFS auction and investment tender. This is confirmed by the declarations of the Oligarch's own employees, Mr. Anilionis and Mr. Zakharov, who at the direction of Messrs. Khodorovsky, Lebedev and others, helped to put this fraudulent scheme into motion. *See* Anilionis Decl. ¶¶ 7, 19-21; Zakharov Decl. ¶¶ 7-11.

*First*, the Oligarchs secretly created numerous shell companies to feign independence from one another and from the companies that the Oligarchs held openly: Bank Menatep and ZAO Rosprom. *See* Anilionis Decl. ¶¶ 7-14; Zakharov Decl. ¶¶ 2, 4-6. Khodorovsky and

Lebedev instructed the employees of joint venture RTT to establish and register companies to submit the collusive bids.  *See* Anilionis Decl. ¶ 19.  RTT's joint venture participants were Bank Menatep and Menatep S.A., which were owned and controlled by Mr. Khodorkovsky, Mr. Lebedev, and their fellow Oligarchs.  *See* Anilionis Decl. ¶¶ 4-14; Zakharov Decl. ¶¶ 2-6.  The Oligarchs instructed the RTT employees who registered these shell companies to serve also as their nominal directors for the purposes of signing corporate documents and executing contracts. Anilionis Decl. ¶ 12; Zakharov Decl. ¶ 2.  The employees of RTT were not, however, permitted to make any decisions themselves regarding the corporate affairs of these shell companies. Anilionis Decl. ¶ 12; Zakharov Decl. ¶ 2.  Rather, all decisions regarding these shell companies were made by the Oligarchs, who also provided all of the funding for any transactions – generally through loans and promissory notes provided by Bank Menatep.  Anilionis Decl. ¶¶ 12-14; Zakharov Decl. ¶¶ 2, 9.  This arrangement was kept carefully hidden from the Government and from the Russian public.  All RTT employees were obliged to maintain confidentiality, and were aware that if they disclosed the nature of their work for the Oligarchs, their employment would be terminated.  Anilionis Decl. ¶ 15; Zakharov Decl. ¶ 6.

**Second**, after Bank Menatep had been appointed as the organizer of the LFS auction and investment tender for Yukos shares, the Oligarchs instructed RTT employees to submit bids to the LFS auction and investment tender through two shell companies known as ZAO Laguna and ZAO Reagent.  Anilionis Decl. ¶¶ 19-21; Zakharov Decl. ¶¶ 7-11.  The general director of ZAO Laguna was Mr. Zakharov, who was also an RTT employee.  *See* Ex. R-5 (LFS Minutes No. 2).  The general director of ZAO Reagent was Mr. Andrei Vasilyevich Koval, who was Mr. Zakharov's colleague from RTT.  *See* Anilionis Decl. ¶¶ 19-21; Zakharov Decl. ¶¶ 7-11; Ex. R-3 (List of RTT Employees).  The bidding documentation did not reveal the shell companies' actual

connections – or the actual connections of their general directors, Mr. Zakharov and Mr. Koval – to the Oligarchs. *See* Ex. R-6 (Application of ZAO Laguna). Other than these two shell companies controlled by RTT employees (and, ultimately, by the Oligarchs), no other applicants were permitted to participate in the LFS auction or investment tender for Yukos shares. *See* Ex. R-4 (LFS Minutes No. 1); Ex. R-5 (LFS Minutes No. 2).

*Third*, the shell company controlled by Mr. Koval, ZAO Reagent, submitted a bid of US$ 150.1 million, which was slightly above the minimum bidding price (of US$ 150 million) and slightly below the bid submitted by ZAO Laguna, which was US$ 159 million. *See* Ex. R-5 (LFS Minutes No. 2). This enabled ZAO Laguna to "win" the LFS auction (for 45% of Yukos) and investment tender (for 33% of Yukos) on behalf of Bank Menatep and ZAO Rosprom, and falsely created the appearance of competition. *See id.* This was illegal. Asoskov ¶¶ 36-40. *The Oligarchs' collusion to obtain the Yukos shares and deception concerning the real identity of the owners was not known by the Russian Government nor revealed to the Tribunal. See, e.g.*, Ex. R-437 ¶¶ 296, 365 n.553 (Hulley Rejoinder on Jurisdiction).

These bids were fixed, low-ball bids designed to secure the ownership of Yukos for next-to-nothing in real terms. By the summer of 1997, when the shares of Yukos began trading publicly, it was recognized that the market value of Yukos was actually *close to US$ 6 billion*. Ex. R-263 (Wall St. J., *The Khodorkovsky Affair*, Nov. 17, 2003).

*Fourth*, the Oligarchs colluded illegally with other prospective bidders to ensure that their shell companies would not face any other competition in the LFS auction and investment tender for Yukos. Specifically, the Oligarchs entered into a collusive agreement with another criminal syndicate controlled by their fellow oligarch, Mr. Boris Berezovsky, to determine in advance who would win which LFS auction for the shares of which State-owned enterprise.

Many years later, this collusive agreement was admitted publicly in the testimony of Mr. Berezovsky and other witnesses in a high-profile case before an English court in *Berezovsky v. Abramovich*, [2012] EWHC 2463 (Comm).   As Mr. Berezovsky explained in that case, "I reached agreement with (among others) Mr Khodorkovsky and his Menatep colleagues . . . that we would not compete against each other in any of the loans-for-shares auctions."  Ex. R-265 ¶ 121 (Berezovsky Statement); Ex. R-266 at 52 (Berezovsky Transcript).   The High Court described this agreement in its decision.   Ex. R-270 ¶¶ 224-231 (*Berezovsky v. Abramovich*, [2012] EWHC 2463 (Comm)).   It was also illegal under Russian law.   Asoskov ¶¶ 36-40.

This agreement was also confirmed by Mr. Berezovsky's former colleague, Mr. Roman Abramovich, by Mr. Abramovich's attorney, and *by Mr. Leonid Nevzlin, who is the principal Oligarch behind Petitioners today*.  *See* Ex. R-267 at 22-23 (Abramovich Transcript) ("Q. . . . [J]ust dealing with the agreement that Mr Berezovsky managed to make with Menatep, this was again a contribution that Mr Berezovsky's side made to the success of the auction bid, wasn't it? A. Yes."); Ex. R-268 at 19 (Abramovich's Attorney Transcript) ("Mr Berezovsky made a collusive agreement with Bank Menatep that they would bid fractionally less than [Mr. Berezovsky's shell company]."); Ex. R-269 at 65-66 (Nevzlin Transcript) ("[A]ll the companies which participated in these loans for share auctions, all, further down the line, became the owners of these privatised [companies]. And the question of ownership structure was discussed and decided by them before they entered the auction, before they made their investment.").

Indeed, the evidence demonstrates that a company controlled by Mr. Khodorkvosky through RTT employees, known as ZAO Tonus, provided the necessary second bid for a shell company controlled by Mr. Berezovsky and his associates to obtain another large, State-owned oil company known as Sibneft.  *See* Ex. R-264 (*Moscow Times*, "Auctions End on Contentious

Note").  In that auction, as Justice Gloster concluded, "[t]he only other bidder at the [LFS] auction [for Sibneft] was a syndicate organised by Bank Menatep, controlled by Mr. Khodorkovsky.  He had agreed with Mr. Berezovsky, in advance, to bid slightly more than the reserve and slightly less than [Mr. Berezovsky's shell company]."  *Berezovsky v. Abramovich* ¶¶ 224, 231.  As Justice Gloster further recounted, "this resulted from earlier agreements with Mr. Khodorkovsky and his Menatep colleagues, and with other oligarchs who were interested in obtaining control of other State businesses under the loan-for-shares scheme, that they would not compete against each other in any of the loans-for-shares auctions."  *Id.* ¶¶ 224, 231.

*Fifth*, after the Government defaulted on its loan in 1996, the Oligarchs once again used collusive bidding to maintain control of Yukos.  Pursuant to a Commission Agreement with the Russian Fund of Federal Property, Bank Menatep organized a tender for the sale of the collateralized shares of Yukos.  Ex. R-464 (Bank Menatep's Commission Agreement); Ex. R-47 (1996 Report on Sale of Yukos Stock).  Just as in the original 1995 LFS auction and investment tender for Yukos, once again only two companies – ZAO Monblan and the "Moscow Food Factory" – were permitted to participate.  *See* Ex. R-47 (1996 Report on Sale of Yukos Stock).  As explained by Mr. Anilionis and Mr. Zakharov, both of these companies were also ultimately controlled by the Oligarchs.  Zakharov Decl. ¶ 10; Anilionis Decl. ¶ 27.

In this tender, the Moscow Food Factory submitted a bid of US$ 160.05 million, which was slightly above the minimum price (of US$ 160 million), and slightly below that of ZAO Monblan, which was US$ 160.1 million.  Ex. R-47 (1996 Report on Sale of Yukos Stock).  This enabled ZAO Monblan to "win" the auction on behalf of Bank Menatep and ZAO Rosprom by bidding only US$ 1.1 million above the original amount borrowed by the Government (US$ 159 million), while once again artificially creating the illusion of competition.  *Id.*  The Oligarchs'

collusive bidding scheme ensured that the Russian Federation would receive only US$ 770,000 from the 1996 tender of the collateralized shares of Yukos. *See* Ex. R-261, App'x 4 § 8 (Presidential Decree No. 889); Ex. R-63 (Hulley Final Award ¶ 1285).

The Oligarchs' corporate manipulations described above constituted manifest violations of Russian law, particularly Presidential Decree No. 889, and Articles 10, 168, 169, and 170 of the Civil Code of the Russian Federation. Asoskov ¶¶ 36-40. As explained by Professor Asoskov, Russian judicial practice unanimously confirms that any collusive bidding by auction or tender participants in order to fraudulently ensure the success of a secretly pre-selected bidder is unlawful. *See* Asoskov ¶¶ 41-46; *see also* Ex. R-280 (Presidium of the Supreme Commercial Court, Case No. 3894/14) ("If the relevant circumstances indicating *coordinated manipulation of prices* at the auction are established, *the court may recognize the bids and the contract for sale of property . . . invalid* based on Articles 10 and 168 of the Civil Code of the Russian Federation, and *apply the consequences of their invalidity*.") (emphasis added); Ex. R-281 (Resolution of the Federal Commercial Court for the Northern Caucasus District No. F 08-346/2005 dated March 10, 2005); Ex. R-282 (Resolution of the Federal Commercial Court for the North Caucasus District No. F08-2633 dated August 2001); Ex. R-283 (Resolution of the Federal Commercial Court for the Moscow District No. KG-A40/3254-08 dated May 27, 2008).

## III.   Between 1996 And 2000 The Oligarchs Implemented A Series Of Secret Transactions Devised To Consolidate The Yukos Shares Offshore, Avoid Russian Taxation And Currency Controls, And Conceal The Identity Of The True Owners

Between 1996 and 2000, as Mr. Anilionis and Mr. Zakharov explain, the Oligarchs secretly instructed RTT employees to execute a series of transactions to transfer the shares of Yukos between an elaborate network of more than a dozen shell companies located in the Russian Federation and in offshore jurisdictions. Anilionis Decl. ¶¶ 22-33; Zakharov Decl. ¶¶ 12-15.

This account is confirmed by Professor S.P. Kothari, who has conducted extensive analysis of the share registry for Yukos and traced the shares through the network of shell companies, including ZAO Astarta, ZAO Tonus, MQD International Ltd. (BVI), Parton Ltd. (unknown jurisdiction); Virtus Ltd. (unknown jurisdiction); Bels Ltd. (unknown jurisdiction); Ebon Crown Ltd. (Ireland), Medusa (Gibraltar), Avimore (Cyprus), Hawksmoor (Cyprus), and Kandall (Isle of Man), Kincaid Enterprises Ltd. (Cyprus), Temerain Enterprises Ltd. (Cyprus), Cayard Enterprises Ltd. (Cyprus), Wandworth Enterprises Ltd. (Cyprus), and Barion Enterprises Ltd. (Cyprus). Kothari Op. ¶¶ 14-44. As Professor Kothari concludes, it can be verified that 100% of the shares of Yukos currently in Petitioners' possession originated with the LFS auction and investment tender, and were moved by the Oligarchs in a chain of secret transactions through offshore shell companies until at last they were received by Petitioners in 2000 and 2001. *Id.* ¶¶ 10, 45. As is confirmed by Mr. Anilionis, Mr. Zakharov, and the contracts themselves, these transactions were executed by RTT employees acting at the specific direction of the Oligarchs. *See* Anilionis Decl. ¶¶ 22-33; Zakharov Decl. ¶¶ 12-15. Moreover, Mr. Anilionis and Mr. Zakharov explain that the revenues produced in Russia from the Yukos assets were transferred by RTT employees through a series of shell companies that contributed nothing and ultimately were destined for the Oligarchs. Anilionis Decl. ¶¶ 34-37; Zakharov Decl. ¶¶ 16-17.

As Professor Asoskov explains in his opinion, these secret transactions also violated Russian law. The Oligarchs' continuous efforts to divide the sales of Yukos shares into multiple small transactions – rather than a single large transaction – constituted repeated violations of Article 18 of Law No. 948-I on Competition. Asoskov ¶ 50. Under this provision, the "acquisition by a person (group of persons) of voting stock (shares) in the authorized capital or capital of an economic entity, giving such person (group of persons) the right to dispose of more

than 20 percent of such stock (shares)" can only be performed with the "preliminary permission" of the Ministry of Anti-Monopoly Policy.  Ex. R-277, Art. 18 (Law No. 948-I on Competition). Because all of the companies controlled by RTT employees were ultimately controlled by the Oligarchs, these companies constituted a "group of persons" under Article 8 of Law No. 948, such that an approval from the Ministry of Anti-Monopoly Policy was required before any of these sales could be made lawfully.   Asoskov ¶ 50; Ex. R-277, Art. 18 (Law No. 948-I on Competition).   Accordingly, because the total shares held by this "group of persons" was collectively far greater than 20% of Yukos, each of these sales between companies controlled by the Oligarchs was executed in violation of Russian law.  Asoskov ¶ 50.

As is revealed by an internal memorandum written contemporaneously for Mr. Oleg Sheiko, one of the Oligarchs' key executives, a critical motivation for these transactions was to conceal the actual ownership of Yukos throughout this period.  The Oligarchs were apprehensive that their fraudulent manipulation of the auctions and tenders in 1995 and 1996 would be discovered.  *See* Ex. R-52 § 4 (2002 Sheiko Memorandum).   Mr. Sheiko warned that "[b]y *disclosing the beneficiary holders of its shares and how they acquired them* the Company may trigger the *attempts for the revision of the entire privatization*," and that "the full disclosure of all of the Controlling Shareholders" may "entail possible attacks on the respective shareholders on the *legal and regulatory grounds*."  *Id.* §§ 1, 4 (emphasis added).

Indeed, long before this internal memorandum was written, it was widely recognized both by the Government and by the Russian public that many of the LFS auctions had been won through collusive bidding and other fraudulent manipulation.  In this regard, on December 4, 1998, the State Duma enacted Resolution No. 3331-II GD.  As explained in this Resolution, the State Duma concluded that many of the loans-for-shares auctions were actually sham

16

transactions because the participants were "by turns, the same legal entities, which allowed them to co-ordinate their actions in advance in order to acquire blocks of shares at a marked-down price."  Ex. R-284 (State Duma Resolution No. 3331-II GD).  As the State Duma concluded, these transactions were thus void *ab initio* under Article 170 of the CCRF.  *Id.*

In 2004, the same conclusion was reached by a comprehensive report issued by the Audit Chamber of the Russian Federation.  As the Audit Chamber explained, the LFS auction for Yukos had resulted in transactions that were void *ab initio* because, specifically, "competition was *de facto* absent," "the auction itself was a veiled form of self-purchase of shares," and "the disposition of federal property was made at significantly lower prices," such that "the tender actually assumed a sham character."  Ex. R-285 (2004 Report of the Audit Chamber).  The Audit Chamber concluded that Bank Menatep had actually lent the Russian Federation its own money, given that the amount of the loan amount was roughly identical to the amount of dormant funds that the Ministry of Finance had deposited with Bank Menatep.  *Id.*

Based on the timing of the 1998 Resolution of the State Duma, the 2002 memorandum to Mr. Sheiko, and the 2004 Report issued by the Audit Chamber, it is evident that the Oligarchs intended to keep their actual ownership of Yukos secret in order to avoid the consequences of their unlawful activities.  The LFS auction for Yukos, as well as other fraudulently manipulated LFS auctions, had deprived the Government and the Russian public of a substantial part of the Russian Federation's property and rights to develop its own natural resources.  In this environment, as Mr. Sheiko was advised, "disclosing the beneficiary holders of [Yukos's] shares and how they acquired" might indeed have "trigger[ed] the attempts for the revision of the entire privatization." Ex. R-52 §§ 1, 4 (Sheiko Memorandum).

As elaborated below, the Oligarchs also sought to avoid taxes on the revenue earned by the production of crude oil, and did so by establishing shell companies in so-called low-tax regions in Russia that sold to entities in offshore tax havens such as the Isle of Man, Cyprus, and the British Virgin Islands.  The low-tax regions, however, were established to spur development in depressed areas, not allow tax evasion schemes.  The Oligarchs also apparently sought to avoid currency controls requiring repatriation of foreign exchange earnings.

Accordingly, the Oligarchs implemented their plan to deceive the Russian Federation from the outset, subsequently concealing material evidence from the Tribunal as to the true ownership of Petitioners, their Russian nationality, and their connection to the illegality of the initial investment.

## IV.    The Oligarchs Implemented A Massive Tax Evasion Scheme, Defrauding The Russian Federation Of Billions Of Dollars In Taxes

From 1999 through 2004, by systematically shifting its profits to sham trading entities registered in the Russian Federation's low tax regions, Yukos evaded billions of dollars in taxes. Much like the shell companies used to conceal the actual ownership of Yukos, these sham trading entities also consisted of shell companies owned and controlled by the Oligarchs through their nominal directors, who were RTT employees.  *See* Anilionis Decl. ¶¶ 34-37; Zakharov Decl. ¶¶ 16-17.

This fraudulent scheme is well-documented.  The European Court of Human Rights ("ECHR") concluded in two separate unanimous judgments that the company had engaged in tax evasion on a massive scale:

> [T]he company's "tax optimisation techniques" applied with slight variations throughout 2000-2003 consisted of switching the tax burden from the applicant company and its production and service units to letter-box companies in domestic tax havens in Russia. These companies, with no assets, employees or operations of their own, were nominally owned and managed by third parties,

> although in reality they were set up and run by the applicant
> company itself. In essence, the applicant company's oil-producing
> subsidiaries sold the extracted oil to the letter-box companies at a
> fraction of the market price. The letter-box companies, acting in
> cascade, then sold the oil either abroad, this time at market price or
> to the applicant company's refineries and subsequently re-bought it
> at a reduced price and re-sold it at the market price. Thus, the
> letter-box companies accumulated most of the applicant
> company's profits. Since they were registered in domestic low-tax
> areas, they enabled the applicant company to pay substantially
> lower taxes in respect of these profits. Subsequently, the letter-box
> companies transferred the accumulated profits unilaterally to the
> applicant company as gifts. The Court observes that substantial tax
> reductions were only possible through the mixed use and
> simultaneous application of at least two different techniques. The
> applicant company used the method of transfer pricing, which
> consisted of selling the goods from its production division to its
> marketing companies at intentionally lowered prices and the use of
> sham entities registered in the domestic regions with low taxation
> levels and nominally owned and run by third persons . . .

*OAO Neftyanaya Kompaniya Yukos v. Russia*, App. No. 14902/04, Judgment ¶ 591

(Eur. Ct. H.R. Sept. 20, 2011) ("First ECHR Judgment").  *See also Khodorkovskiy and Lebedev*

*v. Russia*, Apps. Nos. 11082/06, 13772/05, Judgment ¶ 786 (Eur. Ct. H.R. July 25, 2013)

("Second ECHR Judgment").   "The arrangement was obviously aimed at evading the general

requirements of the Tax Code, which expected taxpayers to trade at market prices . . . , and by its

nature involved certain operations, such as unilateral gifts between the trading companies and the

applicant company through its subsidiaries, which were incompatible with the rules governing

the relations between independent legal entities . . . ."   First ECHR Judgment ¶ 593; Second

ECHR Judgment ¶ 786.

Yukos's scheme was not mere tax optimization. It was also money laundering, tax

evasion, and a structure established to violate numerous provisions of Russian law. The

European Court found that Yukos and its senior managers actively "misrepresented or concealed

some important aspects that scheme," that "the system of oil sales set by Yukos was deliberately

opaque," that "[t]he trading companies were registered in the names of third persons not formally connected to Yukos or its managers, and had been managed by fictional directors," that "Yukos was not prepared to defend the lawfulness of the tax optimisation technique in courts," that certain trading entities located in one low-tax region were wound up and then immediately re-organized in another low-tax region "in order to render it more difficult for the authorities to scrutinize the business operations of those companies, to trace their assets and their affiliation with other companies and persons," and generally that "the scheme was organised in such a way as to complicate possible investigations into it."  Second ECHR Judgment ¶¶ 808-09, 818.

## V.       The Russian Federation Sought To Enforce Its Tax Laws

Starting in December 2003, the Russian tax authorities issued a series of tax assessments in respect of the Oligarchs' fraudulent scheme, seeking from Yukos approximately $24.15 billion in back profit taxes and VAT, interest and fines.  Gaillard Decl., Ex. A ¶ 517, (Dkt. # 2-1); Ex. B ¶ 517, (Dkt. # 2-2), Ex. C ¶ 517, (Dkt. # 2-1).   These assessments were upheld by the Russian courts.  *Id.*

Petitioners suggest that the crackdown by the Russian authorities on the Oligarchs' fraudulent scheme was baseless and motivated by a desire to silence its Chairman and CEO, Mikhail Khodorkovsky, because of his apparent political ambitions.   *See* Pet. ¶ 12.   The European Court addressed and rejected that contention twice.   Contrary to Petitioners, the European Court found that the factual conclusions of the Russian courts in respect of the tax assessments were "sound"  and that their conclusions that Yukos' tax arrangements were unlawful were "neither arbitrary nor manifestly unreasonable" (First ECHR Judgment ¶¶ 590; 594), that, to the contrary, "there existed a sufficiently clear legal basis for finding [Yukos] liable in the Tax Assessments 2000-2003" (*id.* ¶ 599), that "each of the Tax Assessments 2000-2003 pursued a legitimate aim of securing the payment of taxes and constituted a proportionate

measure in pursuance of this aim" and that "given the gravity of [Yukos]'s actions there is nothing in the case file to suggest that the rates of the fines or interest payments can be viewed as having imposed an individual and disproportionate burden, as such, on the applicant company." *Id.* ¶ 606.

The ECHR likewise considered and rejected the notion that the tax assessments of Yukos were politically motivated and imposed for an improper purpose:

> [As regards] the applicant company's references to the allegedly political motivation behind the prosecution of the applicant company and its owners and officials . . . .  The fact remains, however, that those statements were made within their respective context and that as such they are of little evidentiary value for the purposes of Article 18 of the Convention.  Apart from the findings already made earlier, the Court finds no indication of any further issues or defects in the proceedings against [Yukos] which would enable it to conclude that there has been a breach of Article 18 of the Convention on account of [Yukos'] claim that the State had misused those proceedings with a view to destroying [Yukos] and taking control of its assets.

First ECHR Judgment ¶ 665.  The ECHR similarly rejected Mr. Khodorkovsky's claim that the charges brought against him were politically motivated:

> [A]ny person in the applicant's [Mr. Khodorkovsky] position would be able to make similar allegations. In reality, it would have been impossible to prosecute a suspect with the applicant's profile without far-reaching political consequences. The fact that the suspect's political opponents or business competitors might directly or indirectly benefit from him being put in jail should not prevent the authorities from prosecuting such a person if there are serious charges against him. In other words, high political status does not grant immunity.

*Case of Khodorkovskiy v. Russia*, App. No. 5829/04, Judgment ¶¶ 257-58 (Eur. Ct. H.R. November 28, 2011).  In so concluding, the ECHR observed that the case had received considerable public attention and cautioned against basing one's decision on public opinion, rather than evidence:

> [The] political process and adjudicative process are fundamentally
> different. It is often much easier for a politician to take a stand than
> for a judge, since the judge must base his decision only on
> evidence in the legal sense.

*Id.* ¶ 259.

The admonition was appropriate.  In the period 2003 to 2009, Petitioners and related entities – including Group Menatep and GML – engaged in an extensive public relations campaign, spending at least $3.7 million for lobbying activities in the United States.[4]  Among the explicit aims of these lobbying efforts were (a) an attempt to convince Congress to pass resolutions condemning the Russian Federation, and (b) other lobbying activities addressing issues such as "actions taken by the Russian authorities against principals of GML and Yukos."  Investigative journalist Lucy Komisar described that aggressive PR campaign as "Spinning Khodorkovsky."  Ex. R-159 (Lucy Komisar, *Yukos Kingpin on Trial*, CorpWatch (May 10, 2005)).  She observed that, as a result, "[m]ajor U.S. media routinely obscure references to [Mr. Khodorkovsky's] criminality . . . .  But, contrary to U.S. press reports, Khodorkovsky and Yukos were not singled out by Putin . . . .  Today, Russian authorities have continued the crackdown on tax-evading transfer pricing schemes . . . ."  *Id.*

## VI.    On The Basis Of A Treaty That Russia Never Ratified, An Arbitral Tribunal Sitting In The Hague (Not Knowing The Extent Of The Oligarchs' Deception And Collusive Activities) Awarded Petitioners Over $50 Billion

As more fully described in the memorandum of law supporting the companion N.Y. Convention Motion ("N.Y. Convention Brief"), in November 2004, Petitioners initiated three arbitrations against the Russian Federation in The Hague, in the Netherlands (the

---

[4] *See, e.g.*: (*i*) APCO Worldwide Inc., 2003 Year End Lobbying Report for Yukos Oil Company, U.S. Senate, Lobbying Disclosure Act Database, Ex. R-465 (detailing Yukos' U.S.-only expenditures of more than $40,000 for 2003); (*ii*) BKSH & Associates, 2004 Midyear and Year End Lobbying Reports for Yukos Oil Company, U.S. Senate, Lobbying Disclosure Act Database, Ex. R-466 (detailing Yukos' U.S.-only expenditures of more than $40,000 for 2004); (*iii*) Greenberg Traurig, Lobbying Reports for Group Menatep, U.S. Senate, Lobbying Disclosure Act Database, R-467 (detailing Group Menatep's U.S.-only expenditures of more than $820,000 for 2006-2009); *see also* Ex. R-468.

"Arbitrations").[5]  *See* Pet. ¶¶ 34-35.  Petitioners purported to bring the proceedings under the

ECT, a treaty that the Russian Federation signed, but never ratified.  Gaillard Decl., Ex. D ¶ 37,

(Dkt. # 2-4); Ex. E ¶ 37, (Dkt. # 2-5), Ex. F ¶ 37, (Dkt. # 2-6).

   The Russian Federation objected to the Tribunal hearing the dispute on several

jurisdictional grounds.  The Tribunal ultimately rejected the jurisdictional challenges in three

Interim Awards on Jurisdiction and Admissibility (the "Interim Awards") dated November 30,

2009, and in its Final Awards dated July 18, 2014 (the "Final Awards" and, together with the

Interim Awards, the "Awards").  *See* Convention Br. Background § I.

   Petitioners hid from the Tribunal evidence that the Oligarchs who control them acquired

Yukos fraudulently, through systematic rigging of the Loan-for-Shares auctions, concealment of

the true identity of the bidders and deceit as to the legitimacy of the competition.  During the

arbitration, Petitioners nebulously represented to the Tribunal that they had "***first purchased***

***Yukos Shares in 1999***," and that the shares had originated with "***a variety of companies ('the***

***original sellers')***."  Ex. R-437 ¶ 296 (Hulley Rejoinder on Jurisdiction) (emphasis added).

Petitioners failed to disclose that all of these supposed "original sellers," *i.e.*, Hawksmoor,

Avimore, Ebon Crown, Medusa Shipping, and Kandall, had also been effectively owned and

controlled by RTT employees on behalf of the Oligarchs.  *See* Anilionis Decl. ¶ 29; Zakharov

Decl. ¶ 12; Kothari Op. ¶¶ 14-21, Table 2.  Petitioners failed to disclose that the actual owners of

Yukos shares were at all times the Oligarchs, who created multitudes of shell companies to

obscure their collusive activity.  Petitioners also asserted that, when Mr. Gulin signed contracts

on behalf of Hulley Enterprises Ltd., "Mr. Gulin was acting pursuant to a Power of Attorney

issued to him by [Hulley Enterprises Ltd.] (and executed by [Hulley Enterprises Ltd.'s] two

---

[5] Pursuant to the Court's October 19, 2015 Minute Order and D.C. Local Civil Rule 7(n)(1), a certificate of the complete record of the arbitration proceedings is filed with the Russian Federation's motions.

Cypriot directors)."  Ex. R-437 ¶ 365 n.553 (HEL Rejoinder on Jurisdiction).  Petitioners failed to reveal that Mr. Gulin, like all other RTT employees, actually took all of his secret instructions exclusively from the Oligarchs, and that the Oligarchs routed the Yukos shares through numerous shell companies in order to conceal the actual ownership of Yukos.  Anilionis Decl. ¶¶ 22-33; Zakharov Decl. ¶ 12.

In upholding its jurisdiction to hear the dispute, the Tribunal (unaware of the true facts due to Petitioners' continuing deception) found *inter alia* that:

(1) The Russian Federation was bound to arbitrate with Petitioners under the ECT, notwithstanding the fact that it never ratified that treaty.  Gaillard Decl., Ex. D ¶ 600 (Dkt. # 2-4); Ex. E ¶ 601 (Dkt. # 2-5), Ex. F ¶ 612 (Dkt. # 2-6);

(2) Petitioners were protected investors under the ECT, notwithstanding the facts that they were mere shell companies owned by Russian nationals and that, as the Tribunal acknowledged, "the ECT is directed towards *the promotion of foreign investment, especially of investment by Western sources* in the energy resources of the Russian Federation and other successor States of the USSR."  *Id.* ¶¶ 433-34 (emphasis added).

(3) The Tribunal could hear the claims, notwithstanding the facts that the ECT requires in mandatory terms that questions of "whether a tax constitutes an expropriation" shall be first referred to the tax authorities of the relevant Contracting States and no such referral took place. Gaillard Decl., Ex. A ¶ 1429 (Dkt. # 2-1); Ex. B ¶ 1429 (Dkt. # 2-2), Ex. C ¶ 1429 (Dkt. # 2-3).

(4) The claims were not barred, notwithstanding Petitioners and their affiliates' widespread fraud in acquiring and operating Yukos, because the fraud involved not Petitioners themselves, but the Russian individuals who controlled them, and because in the Tribunal's opinion the "unclean hands" doctrine is not known in international law.  *Id.* ¶¶ 1357-72.

As discussed below, these issues all relate to whether any agreement to arbitrate existed at all, and should be considered by this Court anew, as courts in other jurisdictions are currently considering.   As detailed in the N.Y. Convention Brief, those proceedings include set-aside proceedings in the Netherlands where the Awards were rendered, opposing enforcement actions in Belgium and France, and an application to dismiss an enforcement proceeding in the United Kingdom for lack of jurisdiction.   All of these proceedings remain pending.

## ARGUMENT

There are "two prerequisites" to a district court's subject matter jurisdiction over an action seeking to enforce a foreign arbitral award against a foreign sovereign: (1) there must be a basis upon which the court may enforce a foreign arbitral award; and (2) the foreign sovereign must not enjoy sovereign immunity from such an enforcement action.   *Creighton Ltd. v. Gov't of the State of Qatar*, 181 F.3d 118, 121 (D.C. Cir. 1999); *Diag Human*, 64 F. Supp. 3d at 27.

Here, neither prerequisite is present.   As discussed below, the Russian Federation is immune from enforcement of the Awards under the FSIA and there is no jurisdiction under the FAA provisions codifying the New York Convention.

## I.     The Court Lacks Subject-Matter Jurisdiction Under The FSIA

"[T]he FSIA provides the sole basis for obtaining jurisdiction over a foreign state in federal court[.]"   *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 439 (1989).   Under the FSIA, "a foreign state is presumptively immune from the jurisdiction of the United States courts unless a specified exception applies."   *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993); *Diag Human*, 64 F. Supp. 3d at 30.

Petitioners assert that the Court has subject-matter jurisdiction because the exceptions to sovereign immunity for confirming arbitral awards and implied waivers of immunity apply.

Petition ¶ 7.  Petitioners are wrong.  Neither of these exceptions applies because an agreement to arbitrate was never formed between Petitioners and Russia, and the Russian Federation has not waived its sovereign immunity in the ECT or otherwise.  *See Chevron Corp. v. Ecuador*, 795 F.3d 200, 204 (D.C. Cir. 2015) ("If there is no arbitration agreement or no award to enforce, the District Court lacks jurisdiction over the foreign state and the action must be dismissed.").

### A.      Applicable Standards For A Jurisdictional Determination Under the FSIA

In a challenge to subject-matter jurisdiction under the FSIA, the plaintiff "bears the initial burden of supporting its claim that the FSIA exception applies," but the ultimate decision requires a factual inquiry and determination.  *Chevron*, 795 F.3d at 204 (inside quotation and citation omitted).  The D.C. Circuit explained in *Chevron* that:

> Once Chevron made [its] showing, the burden shifted to Ecuador to demonstrate by a preponderance of the evidence that the BIT and the notice to arbitrate did not constitute a valid arbitration agreement between the parties.  ***The jurisdictional task before the District Court was to determine whether Ecuador had sufficiently rebutted the presumption that the BIT and Chevron's notice of arbitration constituted an agreement to arbitrate***.

*Chevron*, 795 F.3d at 205 & n.3 (emphasis added) (holding that it "was error" for the district court to "eschew[] making this determination as part of its jurisdictional analysis").

The Court must go beyond the pleadings to make its jurisdictional determination.  *E.g., Phoenix Consulting Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000) ("[T]he court may not deny the motion to dismiss [under the FSIA] merely by assuming the truth of the facts alleged by the plaintiff and disputed by the defendant. Instead, the court must go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss."); *Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 449 (D.C. Cir. 1990) (same); *Diag Human*, 64 F. Supp. 3d at 27 ("When considering dismissal for lack of jurisdiction, the court is not limited to the allegations of the complaint.

Rather, a court may consider such materials outside the pleadings as it deems appropriate to resolve the question of whether it has jurisdiction to hear the case.") (inside quotation and citations omitted).

The Court's determination is guided by federal common law, which includes international law. *See First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 622-23 & n.11 (1983) ("*Bancec*") (holding that when Congress enacted the FSIA, it "expressly acknowledged 'the importance of developing a uniform body of law' concerning the amenability of a foreign sovereign to suit in United States courts," that "international law. . .  is part of our law," and that "the principles governing this case are common to both international law and federal common law, which in these circumstances is necessarily informed . . . by international law") (internal quotations and citations omitted).  Further, "[t]he interpretation of a treaty, like the interpretation of a statute, begins with its text." *Medellín v. Texas*, 522 U.S. 491, 506 (2008).  The negotiation and drafting history of the treaty, as well as the post ratification understanding of signatory nations, are also considered as "aids to [the] interpretation" of a treaty. *Id.* at 507.

Most critically, the Court determines its jurisdiction *de novo*.  Thus, in this case, the Court must make an independent determination as to whether or not an agreement to arbitrate was formed between Petitioners and the Russian Federation.  It is well-settled that ***the Court*** – not the arbitrators – decide whether an arbitration agreement was formed.  *See, e.g.*, *Granite Rock Co. v. Teamsters*, 561 U.S. 287, 299-300 (2010) (holding that disputes "over the formation of the parties' arbitration agreement" are "matters . . . ***the court must resolve***") (emphasis added); *Nat'l R.R. Passenger Corp. v. Boston & Maine Corp.*, 850 F.2d 756, 761 (D.C. Cir. 1988) ("if the parties disagree as to whether they ever entered into any arbitration agreement at

all, the court must resolve that dispute") (internal quotation and citation omitted); *China Minmetals Materials Imp. & Exp. Co., Ltd. v. Chi Mei Corporation*, 334 F.3d 274, 288-89 (3d Cir. 2003) (holding that "a party that opposes enforcement of a foreign arbitration award under the Convention on the grounds that the alleged agreement containing the arbitration clause on which the arbitral Tribunal rested its jurisdiction was *void ab initio* is entitled to present evidence of such invalidity to the district court, which must make ***an independent determination*** of the agreement's validity and therefore of the arbitrability of the dispute") (emphasis added).  The same rule applies in foreign courts.  Bermann ¶¶ 17-23 (citing cases).

### B. The Exception To Sovereign Immunity For Confirming An Arbitral Award Does Not Apply Because There Was No Agreement to Arbitrate

Section 1605(a)(6) of the FSIA provides that a foreign state shall not be immune from the jurisdiction of the Court in any case:

> In which the action is brought either to enforce ***an agreement made by the foreign state*** . . . or to confirm an award made pursuant ***to such an agreement to arbitrate***, if . . . (B) the agreement or award is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards.

28 U.S.C § 1605(a)(6) (emphasis added).

As noted above, the arbitration exception of the FSIA does not apply in the absence of an agreement to arbitrate.  *Chevron*, 795 F.3d at 204.  For the reasons discussed below, an agreement to arbitrate was never formed in this case.

### 1. An Agreement to Arbitrate Was Not Formed Because Russia's Provisional Application of the ECT Did Not Include Application of The Arbitration Provisions in Article 26

Article 45(1) of the ECT provides: "Each signatory agrees to apply this Treaty provisionally pending its entry into force for such signatory in accordance with Article 44, to the extent that such provisional application is not inconsistent with its constitution, laws or

regulations." The meaning of Article 45(1) is that, until the treaty enters into force, only those provisions of the treaty will be applied that are not inconsistent with a signatory State's laws. Dolzer ¶¶ 11-88; Bermann ¶¶ 29, 33.

Accordingly, signatories such as Austria, France, and Germany applied only those provisions of the ECT that were consistent with their constitutions, laws or regulations. Dolzer ¶¶ 76-80. Indeed, the European Community, itself a party to the ECT, and its members States expressed in a joint statement that Article 45(1) "does not create any commitment beyond what is compatible with the existing internal legal order of the Signatories" and "this interpretation allows the Community to limit provisional application to matters which fall under its competence." Dolzer ¶ 72 (citing Ex. R-469 (1994 Joint EC Statement)); *see also* Dolzer ¶ 84 (discussing statements by the U.S. and Japanese governments during the preparatory work of the ECT that the provisional application of the treaty will be different from country to country and signatories need not change their domestic laws to be consistent with the treaty during provisional application).

In the case of Russia's provisional application of the ECT, Article 26, which contains the arbitration provisions, was never applied because it was inconsistent with Russian law, and Russia never ratified the treaty. Professor Asoskov explains that Russian law prohibits the arbitration of public law disputes, which encompasses most disputes involving the government, including government contracts. Asoskov ¶¶ 53-59; *see also* Dolzer ¶ 90 (explaining that, unlike bilateral commercial arbitration, multi-lateral treaty investor-State arbitration is essentially a mechanism to resolve public law disputes). The dispute between Petitioners and Russia is a public law dispute under Russian law because Petitioners claims are brought under the ECT and are in connection with the exercise of Russia's exercise of its police powers, *i.e.*, to impose tax

penalties and prosecute tax evasion, and procurement powers, *i.e.*, the Loans for Shares auction. Asoskov ¶¶ 53-59; *see, e.g.*, Ex. R-470 (Resolution of the Supreme Commercial Court No. 11535/13 (28 Jan. 2014), in the matter *Production-Tech. Ass'n for Capital Repairs v. ArbatStroy LLC* (reversing the arbitration court's award in a dispute arising out of an auction because the dispute concerned public procurement, which is a matter of public law and non-arbitrable))).  For this reason, ECT Article 21 contains a provision that any dispute regarding tax discrimination or expropriation "shall" be referred to the competent tax authorities by the Investor and, if the Investor does not make the referral, the Tribunal must do so.  *See* Argument § I.B.4 below.  To the extent that the dispute is not viewed as a tax dispute, its foundation is in the LFS Public Procurement Program and the exercise of the State's police powers visa-vis its nationals. Russian law also precludes the arbitration of such disputes.  Asoskov ¶¶ 55-59.  Consequently, Russia's provisional application of the ECT could not include an offer to arbitrate under Article 26, because any such offer would have related to a public law dispute under the ECT, and particularly in this case the exercise of its sovereign police and procurement powers.  Dolzer ¶ 93; Bermann ¶¶ 32-33.  Asoskov ¶¶ 55-59.

The Tribunal erroneously concluded that "Investor-State disputes such as the present one are arbitrable under Russian Law." *See, e.g.*, Ex. R-62 ¶ 370 (Hulley Interim Award).  The Tribunal's understanding is wrong because, as Professor Asoskov explains, nothing in the *Russian Law on Foreign Investment*, cited by the Tribunal, converts "public law" disputes (as opposed to private law disputes) into arbitrable disputes.  Expert Report of Prof. Asoskov dated Oct. 30, 2014 (Ex. R-293) ¶ 106.  The arbitral tribunal also misinterpreted Article 45(1) to mean that "by signing the ECT, the Russian Federation agreed that the Treaty as a whole would be applied provisionally pending its entry into force unless the principle of provisional application

*itself* were inconsistent 'with its constitutions, laws or regulations.'"  *See, e.g.*, Ex. R-62 ¶ 301 (Hulley Interim Award) (emphasis added); Dolzer ¶¶ 18-88; Bermann ¶¶ 29, 33 (both discussing why the tribunal's "all or nothing" interpretation of Article 45(1) was incorrect).

Therefore, pursuant to Article 45(1) of the ECT, the dispute resolution provisions of Article 26 of the ECT were excluded from the provisional application of the treaty, and were not applicable absent ratification of the ECT by the Russian Federation, which never occurred. Accordingly, no offer was ever made by Russia to arbitrate with Petitioners, no agreement to arbitrate was formed between Russia and Petitioners, and Russia did not consent to any arbitration with Petitioners.  Dolzer ¶¶ 93-95; Bermann ¶¶ 30-33; Asoskov ¶¶ 53-59.

      **2.**    **An Agreement to Arbitrate Was Not Formed Because The Russian Federation Did Not Make An Offer to Arbitrate Under the ECT To Fraudsters**

Even if the ECT's provisional application included a standing offer, Russia did not make any offer to Petitioners.  It is well-established that arbitration is a matter of consent and that parties are not bound to arbitrate unless they have agreed to do so.  *BG Grp PLC v. Republic of Argentina*, 134 S. Ct. 1198, 1206 (2014) ("'[A] party cannot be required to submit to arbitration any dispute which he has not agreed to so submit.'") (quoting *Steelworkers v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960)); *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648-49 (1986) ("arbitrators derive their authority to resolve disputes only because the parties have agreed in advance to submit such grievances to arbitration").

An arbitration agreement may be formed pursuant to an investment treaty by means of a state's standing offer contained in the treaty to arbitrate a dispute falling within the terms of the treaty, and an investor's acceptance as contained in its notice to arbitrate.  *See BG Grp*, 134 S. Ct. at 1211 (recognizing "how an offer to arbitrate in an investment treaty can be accepted"); *Chevron*, 795 F.3d at 205 (holding that Ecuador may rebut "the presumption that the BIT and

Chevron's notice of arbitration constituted an agreement to arbitrate."); *Republic of Ecuador v. Chevron Corp.*, 638 F. 3d 384, 392-93 (2d Cir. 2011) (explaining that for an agreement to arbitrate under a treaty, there must be consent to arbitrate "in accordance with the Treaty's terms").

ECT Article 26(3) contains the Russian Federation's standing offer.  It provides that "each Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration."  Petitioners' consent required to perfect the arbitration agreement once a dispute has arisen is contained in ECT Article 26(4), which provides that "the Investor shall further provide its consent in writing" only "[i]n the event that an Investor chooses to submit the dispute" to international arbitration.

The Russian Federation's offer contains the implicit and inherent condition that Petitioners acted lawfully; that is, that Petitioners' shareholdings of Yukos had not been obtained and perpetuated by fraud and unlawful conduct.  Professors Dolzer and Bermann explain that this principle is well-established.  Dolzer ¶¶ 112-152; Bermann ¶¶ 40-44; *see, e.g.*, *SAUR Int'l S.A. v. Argentine Republic*, ICSID Case No. ARB/04/4, Decision on Jurisdiction and Liability (June 6, 2012) ¶ 308 ("The condition of not committing a serious violation of the legal order is a tacit condition, inherent to any BIT as, in any event, it is incomprehensible that a State offer the benefit of protection through arbitration if the investor, in order to obtain such protection, has acted contrary to the law."); *Plama Consortium Ltd. v. Republic of Bulgaria*, ICSID Case No. ARB/03/24, Award (Aug. 27, 2008) ¶¶ 138-139 (concluding that "the substantive protections of the ECT cannot apply to investments that are made contrary to law").  Thus, where international tribunals have found illegality, including fraud, in the making of an investment, they have concluded that they lacked jurisdiction because the host State could not be deemed to have

offered its consent to purported investors who made their investments in violation of the host State's law.  Dolzer ¶¶ 112-152 (citing arbitral decisions).

Similarly, under U.S. law and international law, the corporate form will "not be regarded when to do so would work fraud or injustice," or when "a corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created."  *See e.g.*, *Bancec*, 462 U.S.at 630; *Scandinavian Satellite Sys., AS v. Prime TV Ltd.*, 291 F.3d 839, 846 (D.C. Cir. 2002) (same).   In the *Case Concerning The Barcelona Traction, Light & Power Co. Ltd. (Belgium v. Spain)*, the International Court of Justice ruled that the principle of piercing the corporate veil also was part of international law:

> The wealth of practice already accumulated on the subject in municipal law indicates that the veil is lifted, for instance, to prevent the misuse of the privileges of legal personality, as in certain cases of fraud or malfeasance, to protect third persons such as a creditor or purchaser, or to prevent the evasion of legal requirements or of obligations. . . . In accordance with the principle expounded above, the process of lifting the veil . . . is equally admissible to play a similar role in international law.

*Barcelona Traction*, 1970 I.C.J. Rep. 3, 39 ¶ 58; *see also Tokios Tokeles v. Ukraine*, ICSID Case No. ARB/02/18, Decision on Jurisdiction (29 April 2004), paras. 54-56 (reasoning that corporate nationality will be disregarded when "the Claimant used its formal legal nationality for an improper purpose"); Dolzer ¶¶ 160-166 (citing arbitral decisions).[6]  Thus, the Oligarchs who beneficially own and control Petitioners cannot hide behind the veil of a corporate shell to conceal their ownership of Yukos shares and perpetuate their fraud.

---

[6] *E.g., Aguas del Tunari  v. Bolivia*, ICSID Case No. ARB/02/3, Decision on Jurisdiction (21 October 2005), para. 245 ("[T]he corporate form may be abused and that form may be set aside for fraud or on other grounds."); *ADC Affiliate Limited et al. v. Hungary*, ICSID Case No. ARB/03/16, Award (2 October 2006), para. 358 (confirming that corporate nationality is legally irrelevant "where the real beneficiary of the business misused corporate formalities in order to disguise its true identity and therefore to avoid liability"); *Saluka v. Czech Republic*, UNCITRAL, Partial Award (17 March 2006), para. 230 (explaining that courts and tribunals should "look behind the corporate structures of companies involved in proceedings before it … where corporate structures had been utilized to perpetrate fraud or other malfeasance")

Accordingly, Russia's standing offer to arbitration in Article 26 of the ECT was not made to fraudsters or their shell companies.  Russia – or any sovereign for that matter – could not consent to such an arbitration.  It is beyond dispute that the LFS auctions were fraudulent.  *See* 1998 Resolution of the Duma (Ex. R-284); 2004 Audit Report (Ex. R-285); Asoskov ¶¶ 36-48. The only unresolved issue in the arbitration was the connection between those auctions and the Petitioners.  *See* Yukos Universal Ltd. Final Award ¶ 1370 (Ex. R-63).  As detailed in the Background Section above, and in the witness statements and expert reports submitted herewith, the Oligarchs fraudulently obtained their shares of Yukos through the LFS program in 1995 and perpetuated that fraud by transferring their shares through on and off-shore shell companies to conceal their ownership of the shares from the Russian Federation (and the Tribunal), including transferring them to Petitioners.  *See* Anilionis ¶¶ 16-33; Zakharov ¶¶ 7-14; Kothari ¶¶ 14-44 and Figures 1-3 (charts tracing transactions).  Moreover, Petitioners intently withheld this information from the Tribunal.  *See* Background §VI, above.

Due to this pattern of fraud and illegality, there was no offer or consent to arbitrate as a matter of law.  Thus, the FSIA's arbitration exception does not apply to vitiate Russia's sovereign immunity.

### 3. An Agreement to Arbitrate Was Not Formed Because The Russian Federation Did Not Offer to Arbitrate With Russian Nationals

Russia's offer under the ECT, if any, is for "[d]isputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former."  ECT Art. 26(1).  Such provisions are common in investment treaties because under customary international law, a national does not have the right to bring an international law claim against its own State.  *See e.g., Loewen Group Inc. v. United States of America*, Award, ICSID Case No. ARB(AF)/98/3 (June 26, 2003) ¶¶ 222-24 ("The format of NAFTA is clearly intended

to protect the investors of one Contracting Party against unfair practices occurring in one of the other Contracting Parties."); United States-Singapore Free Trade Agreement, Art. 15.11(b) (providing a denial of benefits clause pursuant to which the host State of the investment denies the treaty's benefits to an investor of the other Party that has no substantial business activities in that State and is owned or controlled by a national of the host State); Dolzer ¶¶ 167-214 (citing arbitration decisions).

As a result, a host State's offer to arbitrate is not made to claimants that are mere shell companies owned and controlled by the host State's own nationals, and the latter cannot accept the standing offer to arbitrate. Moreover the same veil piercing theory above operates here to reveal the true owners were the Russian nationals, who participated in the LFS collusion and own and control Petitioners today. Bermann ¶¶ 34-38; *see e.g., Nat'l Gas S.A.E. v. Arab Republic of Egypt*, ICSID Case No. ARB/11/7, Award (Apr. 3, 2014) ¶¶ 136-137 (dismissing case because the claimant was under the control of an Egyptian national). Indeed, Article 17 of the ECT allows the host State to deny benefits to shell companies owned by *third*-State investors; *a fortiori*, the ECT would not protect shell companies owned by the host State's own nationals. When the veil of contrived and deceptive corporate ownership is pulled aside, the Oligarchs who are all Russian nationals under ECT Article 1(7)(a)(i) cannot as such accept the offer, if any, to arbitrate under the ECT.

As detailed in the Fact section above, each of Petitioners acknowledged during the arbitration that it is a shell company that does not engage in any substantial business activity in its respective place of organization (or elsewhere) and that its principal activity is holding the shares of Yukos. *See* Ex. R-439 (Nov. 3, 2006 letter to Tribunal by Petitioners). Petitioners also did not contest, and the Tribunal confirmed, that through a series of shell companies and trusts

the ultimate beneficiaries that own and control Petitioners were at all relevant times Russian nationals, *i.e.*, the Oligarchs.  *See* Ex. R-439 (Nov. 3, 2006 letter to Tribunal by Petitioners); *see also* Kothari ¶¶ 14-44.

Accordingly, because Petitioners admittedly are mere shells that are owned and controlled by Russian nationals, and with no purpose other than holding Yukos shares for the purpose of perpetuating the Oligarchs' fraud and illegal behavior, Russia did not make an offer of arbitration under the ECT to Petitioners, and Petitioners could not accept any such offer. Therefore, Russia did not consent to arbitration with Petitioners and there was no agreement to arbitrate.

**4.    An Agreement to Arbitrate Was Not Formed Because Neither Petitioners Nor the Tribunal Followed A Mandatory Precondition Under the ECT**

An agreement to arbitrate also was not formed because the Petitioners failed to use the mandatory tax-dispute referral mechanism under Article 21(5) of the ECT, which is a precondition to the formation of consent with respect to tax disputes under the treaty.

Under Article 21(5) of the ECT, an investor that alleges that a tax is expropriatory or discriminatory, as Petitioners did here, is obliged to refer to the Competent Tax Authority the question of whether a tax constitutes an expropriation or is discriminatory:

> The Investor or the Contracting Party alleging expropriation shall refer the issue of whether the tax is an expropriation or whether the tax is discriminatory to the relevant Competent Tax Authority.

ECT Art. 21(5)(b)(i); Dolzer ¶ 215.  Further, if the Investor does not do so, the tribunal "shall make a referral to the relevant Competent Tax Authorities."  *Id.*  ECT Article 21(5)(b)(iii) further provides that the determination by the Competent Tax Authorities on whether a tax assessments is discriminatory is binding on the Tribunal:

> Bodies called upon to settle disputes pursuant to Article 26(2)(c) or 27(2) may take into account any conclusions arrived at by the Competent Tax Authorities regarding whether the tax is an expropriation. Such bodies shall take into account any conclusions arrived at within the six-month period prescribed in subparagraph (b)(ii) by the Competent Tax Authorities regarding whether the tax is discriminatory. Such bodies may also take into account any conclusions arrived at by the Competent Tax Authorities after the expiry of the six-month period.

Similar referral mechanisms are common in investment treaties, including many U.S. investment treaties and the 2012 Model BIT.  Dolzer ¶ 217.  The mechanism is necessary to ensure that the ultimate decision-maker "has appropriate expertise to resolve the specialized matter before it."  L. Caplan & J. Sharpe, *United States*, in *Commentaries On Select Model Investment Treaties* 848 (Chester Brown, ed. 2013). In the specific context of the ECT, the mechanism was designed to assist tribunals "to distinguish normal and abusive taxes." W. Park, *Tax Arbitration and Investor Protection*, in *Investment Protection And The Energy Charter Treaty* 131 (Graham Coop & Clarisse Ribeiro, eds. 2008); Dolzer ¶ 219.

In *BG Group*, the U.S. Supreme Court distinguished between preconditions to the **formation** of an arbitration agreement, which are substantive conditions to the State's consent to enter into an arbitration agreement, and procedural preconditions to an arbitration agreement, which implicate performance of an agreement but not the State's consent to enter into an arbitration agreement.  *See BG Grp*, 134 S. Ct. at 1207.  The provision at issue in BG Group was a requirement in Article 8(2) of the investment treaty between Argentina and England that a claimant first file its dispute with the domestic courts of Argentina, and then after 18 months it may send notice of an arbitration.  *Id.*  The Supreme Court held this provision was not a precondition to the formation of an arbitration agreement because it was:

> ***a purely procedural requirement***—a claims-processing rule that governs when the arbitration may begin, but not whether it may occur or what its substantive outcome will be on the issues in dispute.

*BG Grp*, 134 S. Ct. at 1207 (emphasis added).

The reference to the Competent Tax Authorities in Yukos' case would have been to the tax authorities in England, Cyprus, and Russia.  Dolzer ¶ 223.  The reference was a precondition to the formation of an arbitration agreement because – unlike the procedural provision at issue in *BG Group* – the determination by these Competent Tax Authorities on whether the tax assessments of Yukos were discriminatory is ***substantive*** and would have been ***binding*** on the Tribunal pursuant to Article 25(1)(b)(iii).  Dolzer ¶ 225.  A substantive provision cannot be brushed aside as "a purely procedural requirement—a claims-processing rule that governs when the arbitration may begin . . . ."  *BG Grp*, 134 S. Ct. at 1207.

Yet the Tribunal wrongly brushed aside the referral mechanism under Article 21(5) as "an exercise in futility" and held that "this is simply not a case in which the Tribunal could have been assisted by referring the matter to the tax authorities."  *See, e.g.*, Hulley Final Award ¶¶ 1421-27.  The Tribunal's conclusion that "there is no possibility that the relevant authorities would in fact be able to come to some timely and meaningful conclusion about the dispute or make any timely determinations that could potentially serve to assist the Tribunal's decision-making" violated the mandatory terms of Article 21(5) requiring the Tribunal to make the referral if the Investor does not.

Petitioners never referred their tax issues to the Competent Tax Authorities.  Nor did the Tribunal.  Thus, the Russian Federation's purported offer to arbitrate in the ECT was never accepted ***in accordance with its terms*** and no agreement to arbitrate was ever formed.

## C.   The Exception To Sovereign Immunity For Confirming An Arbitral Award Does Not Apply Because The Award Is Not Subject to the New York Convention

The arbitration exception of the FSIA provides as a further jurisdictional requirement that the award to be confirmed or the arbitration agreement underlying it "is or may be governed by a

treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards."  28 U.S.C § 1605(a)(6)(B).  The New York Convention is the relevant treaty in this case.

*Social Dev. Corp. v. Government of Belize*, 794 F.3d 99, 103 (D.C. Cir. 2015).

In *Belize*, the DC Circuit explained that the New York Convention, as codified in § 202 of the FAA, applies to awards that arise "out of a legal relationship, whether contractual or not, which is considered as commercial."  *Id.*  The award in this case is not governed by the New York Convention because it does not arise from a legal relationship "which ha[s] a connection to commerce."  *Id.* at 105; *Diag Human*, 64 F. Supp. 2d at 28.  As explained more fully in Argument § II.B.2 below, the dispute and legal relationship between Petitioners and Russia is not "commercial."  Petitioners' claims concern public law matters because they are in connection with the exercise of Russia's sovereign police and regulatory powers of taxation and procurement.

Because the jurisdictional requirements of § 1605(a)(6)(b) are not met, this exception to sovereign immunity does not apply.

### D.	The Russian Federation Has Not Waived Its Sovereign Immunity

The FSIA's waiver exception provides that a foreign state shall not be immune from the jurisdiction of U.S. courts it "has waived its immunity either explicitly or by implication[.]" 28 U.S.C. § 1605(a)(1).  The exception does not apply in this case because the Russian Federation has not waived its sovereign immunity explicitly or implicitly in the ECT or otherwise.

Explicit waivers of sovereign immunity are narrowly construed "in favor of the sovereign" and are not enlarged "beyond what the language requires." *World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1162 (D.C. Cir. 2002) (internal quotes and

citation omitted).  "[A] foreign sovereign will not be found to have waived its immunity unless it has clearly and unambiguously done so."  *Id.* (citing and quoting *Aquamar S.A. v. Del Monte Fresh Produce N.A., Inc.,* 179 F.3d 1279, 1292 (11th Cir.1999) ("An express waiver under section 1605(a)(1) must give a clear, complete, unambiguous, and unmistakable manifestation of the sovereign's intent to waive its immunity.")); *see also Maritime Int'l Nominees Establishment v. Republic of Guinea,* 693 F.2d 1094, 1100 n. 10 (D.C.Cir.1982) (holding that under the FSIA, Congress contemplated waivers of a "specific and explicit nature"); *Capital Ventures Int'l v. Republic of Argentina*, 552 F.3d 289, 293 (2d. Cir. 2009) ("The term 'explicit,' in this context, takes its normal meaning of 'clear and unambiguous.'").

The ECT does not contain an express waiver by a contracting state of its sovereign immunity from suit, and the Russian Federation has not otherwise made ***any*** statement – let alone a clear and unambiguous one –waiving its sovereign immunity in this case.  *See Amerada Hess*, 488 U.S. at 442-43 ("we do not see how a foreign state can waive its immunity under § 1605(a)(1) by signing an international agreement that contains no mention of a waiver of immunity to suit in United States courts or even the availability of a cause of action in the United States.").

Implicit (or implied) waivers also are construed narrowly, and deduced from state conduct demonstrating an intention to waive immunity.  *Creighton*, 181 F.3d at 122; *Foremost-McKesson*, 905 F.2d at 444; *Diag Human*, 64 F. Supp. 3d at 31.  The D.C. Circuit has found implied waivers in three circumstances: when "(1) a foreign state has agreed to arbitration in another country; (2) a foreign state has agreed that the law of a particular country governs govern a contract; or (3) where a foreign state has filed a responsive pleading in an action without raising the defense of sovereign immunity."  *Foremost-McKesson*, 905 F.2d at 444 (citing

statute's legislative history); *Diag Human*, 64 F. Supp. 3d at 30.  "[C]ourts have been reluctant to stray beyond these [three] examples when considering claims that a nation has implicitly waived its defense of sovereign immunity." *Princz v. Fed. Republic of Germany*, 26 F.3d 1166, 1174 (D.C. Cir. 1994).

Courts also have construed these three examples to require a nexus to the United States – such as selecting U.S. law to govern a dispute – in order to find an implicit waiver of immunity from U.S. jurisdiction.  *See Creighton*, 181 F.3d at 122-23.  With respect to agreements to arbitrate, courts will not find an implicit waiver of foreign sovereign immunity unless the arbitration is to be conducted in the United States.  *Id.* at 122 (quoting *Frolova v. U.S.S.R.*, 761 F.2d 370, 377 (7th Cir. 1985) ("most courts have refused to find an implicit waiver of immunity to suit in American courts from a contract clause providing for arbitration in a country other than the United States.")).

None of the three specific circumstances that U.S. courts have held to constitute an implied waiver of foreign sovereign immunity is present here.

First, the Russian Federation has not "agreed to arbitration" with Petitioners, whether in the United States or anywhere else.  For the reasons discussed in Argument § I.B above, an arbitration agreement was never formed between Russia and Petitioners.  For this very same reason, the suggested exception that a signatory to the N.Y. Convention may have impliedly waived its sovereign immunity does not apply: absent an arbitration agreement, signing the N.Y. Convention alone is not dispositive of the jurisdictional prerequisite.  *See Diag Human*, 64 F. Supp. 3d at 30-31 n.3 (holding that the Czech Republic did not impliedly waive its sovereign immunity because, among other things, there was not an arbitration agreement between the parties).  In other words, absent an arbitration agreement with Petitioners, the Russian Federation

did not "contemplate enforcement actions in other signatory states," including the United States. *Creighton*, 181 F.3d at 123.

Second, the Russian Federation has never agreed that U.S. law would govern the arbitration or the alleged arbitration agreement with Petitioners.  Third, the Russian Federation has not implicitly waived its immunity by appearing or filing any responsive pleading in the U.S. litigation at issue that does not preserve its sovereign immunity.

## II. The Court Lacks Subject Matter Jurisdiction Under The FAA And N.Y. Convention

The second jurisdictional prerequisite is that there must be a basis upon which the court may enforce the foreign arbitral award.  That basis would be provided by the FAA and New York Convention, but is lacking here.

### A. Applicable Standard For a Jurisdictional Determination Under the FAA and New York Convention

Section 202 of the FAA provides in relevant part: "An arbitration agreement or arbitral award arising out of a legal relationship, whether contractual or not, which is considered as commercial, including a transaction, contract, or agreement described in section 2 of this title, falls under the Convention."  9 U.S.C. § 202.  As this Court explained in *Diag Human*, there is a "four-part test for when the Convention and FAA will apply:"

> "(1) There is a written agreement; (2) the writing provides for arbitration in the territory of a signatory of the convention; (3) the subject matter is commercial; and (4) the subject matter is not entirely domestic in scope."

64 F. Supp. 2d at 28 (quoting *U.S. Titan, Inc. v. Guangzhou Hua Shipping Co.*, 241 F.34d 135, 146 (2d Cir. 2001)).  "If each requirement is satisfied, then the agreement properly falls under the New York Convention."  *Diag Human*, 64 F. Supp. 2d at 28.  Here, the first and third requirements are not met.

**B.      The Award Does Not Meet the Jurisdictional Requirements Under the FAA and New York Convention**

**1.      There Is No Agreement To Arbitrate**

For all the reasons discussed in Argument Section I above, there was no arbitration agreement between Petitioners and the Russian Federation, let alone a written arbitration agreement.  Therefore, not all the requirements of Section 202 are met and, accordingly, the Court lacks subject matter jurisdiction to hear the Petition under the FAA and N.Y. Convention.

**2.      The Subject Matter Of The Dispute And Claims Is Not Commercial**

In *Diag Human*, this Court explained that a "commercial legal relationship" has been interpreted to mean "either a maritime transaction or a contract involving commerce."  64 F. Supp. 2d at 28 (inside quotation and citation omitted).  The D.C. Circuit has further explained that the term "commercial" in the FAA § 202 and Article I of the New York Convention "refers to matters which have a connection to commerce."  *Belize*, 794 F.3d at 105 (holding that an agreement to sell real property and provide telecommunications services is commercial and governed by the New York Convention).

Unlike the circumstances in *Belize*, here there was no arbitration agreement.  More critically, even if there was an agreement, the dispute between Petitioners and Russia is not "commercial."  As explained in Argument § I.B.1, above, Petitioners' claims concern public law matters because they are in connection with the exercise of Russia's sovereign authority: its police, taxation, procurement, and enforcement powers.  The "nature of the relationship between the parties," is clearly regulatory, not commercial.  *Diag Human*, 64 F. Supp. 3d at 29.

Article 26(5)(b) of the ECT does not support a different outcome.  That Article provides that any claims submitted to arbitration "shall be considered to arise out of a commercial relationship or transaction for the purposes of Article I of the [New York] Convention."

However, as also explained in Argument § I.B.1 above, because public law disputes are not arbitrable under Russian law, pursuant to ECT Article 45(1) the dispute resolution provisions of Article 26 of the ECT, including Article 26(5)(b), were excluded from the provisional application of the treaty.  Asoskov ¶¶ 53-59; Dolzer ¶ 95.

Because the subject matter of the dispute and award is not "commercial," not all the requirements of FAA § 202 are met.  Accordingly, the Court lacks subject matter jurisdiction to hear the Petition under the FAA and N.Y. Convention.

## **CONCLUSION**

For the reasons stated above, Petitioners' Petition should be dismissed because, in the absence of an arbitration agreement, the Court lacks subject matter jurisdiction under the FSIA to adjudicate the Petition, and the Petition cannot be confirmed or enforced under the New York Convention.

Date:  October 20, 2015                              Respectfully submitted,

**WHITE & CASE** LLP

___/s/ CarolynB.Lamm_____
Carolyn B. Lamm (D.C. Bar No. 221325)
Francis A. Vasquez, Jr. (D.C. Bar No. 442161)
Frank Panopoulos (D.C. Bar No. 459365)
Eckhard Robert Hellbeck (D.C. Bar No. 437619)
Chauncey Bratt (D.C. Bar No. 1018133)
701 Thirteenth Street, N.W.
Washington, D.C. 20005
Phone: (202) 626-3600
Fax: (202) 639-9355
clamm@whitecase.com
fvasquez@whitecase.com

*Counsel for the Russian Federation*