**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

_____
                                          )
HULLEY ENTERPRISES LTD.,                  )
YUKOS UNIVERSAL LTD., and                 )        Case No. 1:14-cv-01996-BAH
VETERAN PETROLEUM LTD.,                   )
                                          )
            *Petitioners*,                )
                                          )
        v.                                )
                                          )
THE RUSSIAN FEDERATION,                   )
                                          )
            *Respondent*.                 )
_____   )


**PETITIONERS' MEMORANDUM OF LAW IN OPPOSITION TO RESPONDENT'S**
**MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION**

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................. ii

PRELIMINARY STATEMENT .................................................................................... 1

BACKGROUND ........................................................................................................... 6

ARGUMENT ................................................................................................................. 9

I.      The Russian Federation's Arbitrability Objections Do Not Establish That the Court
        Lacks Subject Matter Jurisdiction ..................................................................... 10

        A.      Objections to Arbitrability Do Not Provide Grounds for Challenging the
                Arbitration Exception to Sovereign Immunity ........................................ 11

        B.      The Russian Federation's Agreement to Arbitrate Arbitrability Requires That
                the Court Defer to the Tribunal's Decision That the ECT's Arbitration Clause
                Applied to the Dispute ............................................................................. 15

        C.      The Russian Federation's Arbitrability Objections Have No Merit .................... 22

II.     The Russian Federation's Argument that the Awards Do Not Arise Out of a
        Commercial Relationship Is Baseless ................................................................ 38

        A.      The Express Terms of the Arbitration Clause Establish that the Awards Arise
                Out of a Commercial Relationship for Purposes of the New York Convention .... 38

        B.      The Awards In Fact Arose Out of a Commercial Relationship For Purposes
                of the New York Convention ................................................................... 41

CONCLUSION ............................................................................................................. 45

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Am. Fed'n of Gov't Employees, Local 2924 v. Fed. Labor Relations Auth.*,
    470 F.3d 375 (D.C. Cir. 2006) .................................................................................................28

*Argentine Republic v. National Grid Plc*,
    637 F.3d 365 (D.C. Cir. 2011) ...................................................................................................9

*BCB Holdings Ltd. v. Gov't of Belize*,
    No. 14-1123, 2015 WL 3896102 (D.D.C. June 24, 2015) ......................................................12

\* *Belize Soc. Dev. Ltd. v. Gov't of Belize*,
    794 F.3d 99 (D.C. Cir. 2015) ..............................................................................6, 41, 42, 44

\* *BG Group, PLC v. Argentina*,
    134 S. Ct. 1198 (2014) ................................................................................................. *passim*

*Brennan v. Opus Bank*,
    796 F.3d 1125 (9th Cir. 2015) .................................................................................................20

\* *Chevron Corp. v. Ecuador*,
    795 F.3d 200 (D.C. Cir. 2015) ..................................................................................... *passim*

*China Minmetals Materials Imp. & Exp. Co., Ltd. v. Chi Mei Corporation*,
    334 F.3d 274 (3d Cir. 2003).............................................................................................14, 21

*Chorley Enterprises, Inc. v. Dickey's Barbecue Restaurants, Inc.*,
    No. 14-1799, 2015 WL 4637967 (4th Cir. Aug. 5, 2015) .......................................................33

*Clark v. Takata Corp.*, 192 F.3d 750 (7th Cir. 1999) ....................................................................36

*Consol. Rail Corp. v. Metro. Transp. Auth.*,
    No. 95-2142, 1996 WL 137587 (S.D.N.Y. Mar. 22, 1996).....................................................21

*Creighton Ltd. v. Gov't of the State of Qatar*,
    181 F.3d 118 (D.C. Cir. 1999) ...................................................................................................9

*Diag Human S.E. v. Czech Republic-Ministry of Health*,
    64 F. Supp. 3d 22 (D.D.C. 2014) .............................................................................10, 44, 45

\* *First Options of Chicago, Inc. v. Kaplan*,
    514 U.S. 938 (1995)..........................................................................................5, 15, 19, 21

*Foremost-McKesson, Inc. v. Islamic Republic of Iran*,
    905 F.2d 438 (D.C. Cir. 1990) .........................................................................................14, 15

*Granite Rock Co. v. Teamsters,*
    561 U.S. 287 (2010)..............................................................................14, 21

*M.B.L. Int'l Contractors, Inc. v. Republic of Trinidad & Tobago,*
    725 F. Supp. 52 (D.D.C. 1989) ...........................................................10

*Mercadante v. XE Servs., LLC,*
    78 F. Supp. 3d 131 (D.D.C. 2015)........................................................20

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,*
    460 U.S. 1 (1983)................................................................................22

*Nat'l R.R. Passenger Corp. v. Boston & Maine Corp.,*
    850 F.2d 756 (D.C. Cir. 1988) .................................................14, 18, 21

*Parnell v. CashCall, Inc.,*
    No. 14-12082, 2015 WL 6504332 (11th Cir. Oct. 28, 2015) ................20

*Pearce v. E.F. Hutton Grp., Inc.,*
    828 F.2d 826 (D.C. Cir. 1987) .............................................................22

*Phoenix Consulting Inc. v. Republic of Angola,*
    216 F.3d 36 (D.C. Cir. 2000)..........................................................14, 15

* *Rent-A-Center, West, Inc. v. Jackson,*
    561 U.S. 63 (2010)...................................................................19, 20, 21

*Republic of Argentina v. BG Group PLC,*
    555 F. App'x 2 (D.C. Cir. 2014)............................................................43

*Republic of Ecuador v. Chevron Corp.,*
    638 F.3d 384 (2d Cir. 2011).............................................................18, 32

*Schneider v. Kingdom of Thailand,*
    688 F.3d 68 (2d Cir. 2012)...............................................................18, 21

*Sullivan v. Kidd,*
    254 U.S. 433 (1921).............................................................................40

*Sumitomo Shoji America, Inc. v. Avagliano,*
    457 U.S. 176 (1982).......................................................................30, 33

*TermoRio S.A. E.S.P. v. Electranta S.P.,*
    487 F.3d 928 (D.C. Cir. 2007) ..............................................................9

*Thomas v. City of Chattanooga,*
    398 F.3d 426 (6th Cir. 2005) ...............................................................36

*TMR Energy Ltd. v. State Prop. Fund of Ukraine*,
 411 F.3d 296 (D.C. Cir. 2005) ............................................................................9

*United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*,
 484 U.S. 29 (1987) ............................................................................................9

*Viterbo v. Dow Chemical Co.*,
 826 F.2d 420 (5th Cir. 1987) ..........................................................................37

*W & T Travel Servs., LLC v. Priority One Servs., Inc.*,
 69 F. Supp. 3d 158 (D.D.C. 2014) ..................................................................17

*WMATA v. Mergentime Corp.*,
 626 F.2d 959 (D.C. Cir. 1980) ........................................................................23

*Zeiler v. Deitsch*,
 500 F.3d 157 (2d Cir. 2007) ............................................................................37

**Statutes**

9 U.S.C. § 201 ..........................................................................................................10

9 U.S.C. § 202 ...................................................................................................37, 41

28 U.S.C. § 1330(a) ...................................................................................................9

28 U.S.C. § 1605(a)(1) .............................................................................................10

28 U.S.C. § 1605(a)(6) ...........................................................................................3, 9

**Treaties**

2012 U.S. Model Bilateral Investment Treaty ........................................................40

Agreement for the Promotion and Protection of Investments, Indon.-Russ., Sept.
 6, 2007 ..............................................................................................................25

Agreement for the Promotion and Protection of Investments, Arg.-U.K., Dec. 11,
 1990, 1765 U.N.T.S. 38 ...................................................................................42

Agreement for the Promotion and Protection of Investments, Can.-Peru, Nov. 14,
 2006 ..................................................................................................................39

Agreement for the Promotion and Reciprocal Protection of Investment, Qatar-
 Russ., Feb. 12, 2007 .........................................................................................25

Agreement for the Promotion and Reciprocal Protection of Investments, Eth.-
 Russ., Feb. 10, 2000 .........................................................................................29

Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention"), June 10, 1958, 21 U.S.T. 2517 ................................................2, 10

The Dominican Republic-Central America-United States Free Trade Agreement, Aug. 5, 2004, Hein's No. KAV 7157 ......................................................................................39

Energy Charter Treaty, Dec. 17, 1991, 2080 U.N.T.S. 95.................................................... *passim*

North American Free Trade Agreement, U.S.-Can.-Mex., Dec. 17, 1992, 32 I.L.M. 289 ...............................................................................................................................39

Treaty Concerning the Encouragement and Reciprocal Protection of Investment, U.S.-Uru., Nov. 4, 2005, T.I.A.S. No. 06-1101 ........................................................................39

Treaty Concerning the Encouragement and Reciprocal Protection of Investment, U.S.-Russ., June 17, 1992, 31 I.L.M. 794...............................................................................25

Treaty Concerning the Encouragement and Reciprocal Protection of Investments, U.S.-Rwanda., Feb. 19, 2008, Hein's No. KAV 8387.............................................................39

United States-Chile Free Trade Agreement, U.S.-Chile, June 6, 2003, Hein's No. KAV 6375...............................................................................................................................39

Vienna Convention on the Law of Treaties, May 23, 1969, 1155 U.N.T.S. 331 ........................22

**International Authority**

*ADC Affiliate Ltd. and ADC & AMC Management Ltd. v. The Republic of Hungary,* ICSID Case No. ARB/03/16, Award (Oct. 2, 2006) ...............................................30

*Kardassopoulos v. Georgia*, ICSID Case No. ARB/05/18, Decision on Jurisdiction (July 6, 2007)....................................23

*Plama Consortium Ltd. v. Republic of Bulgaria*, ICSID Case No. ARB/03/24, Award (Aug. 27, 2008)............................................................31

*Plama Consortium Ltd. v. Republic of Bulgaria*, ICSID Case No. ARB/03/24, Decision on Jurisdiction (Feb. 8 2005) ...................................30

*Quasar de Valores SICAV S.A. et al v. Russian Federation*, SCC Arbitration No. V 024-2007, Award (July 20, 2012).....................................................35

*Tokios v. Ukraine*, ICSID Case No. ARB/02/18, Decision on Jurisdiction (Apr. 29, 2004) ................................30

UNCITRAL Arbitration Rules, G.A. Res. 31/98 (1976).................................................5, 8, 19, 34

**Secondary Sources**

Bernard D. Reams & Jon S. Schultz, *The North American Free Trade Agreement (NAFTA): Documents and Materials Including a Legislative History of the North American Free Trade Agreement Implementation Act: Public Law 103-182* (1994) ..................................................................................................................39

Flávio S. Barboza, *Enforcement of International Investment Arbitral Awards,* 6 Revista Brasileira de Arbitragem, Issue 21 (2009) ..................................................39

Gary B. Born, *International Commercial Arbitration* 296 (2d. ed. 2014)....................................41

Kenneth J. Vandevelde, *Arbitration Provisions in the BITS and the Energy Charter Treaty, in The Energy Charter Treaty: An East-West Gateway For Investment And Trade* 409 (Thomas W. Wälde ed., 1996)......................................................38

Lee M. Caplan & Jeremy K. Sharpe, *United States, in Commentaries on Selected Model Investment Treaties* 755 (Chester Brown ed., 2013).....................................40

Neil Buckley, *Russia's Yukos threats signal a lurch away from international law*, Financial Times (Aug. 5, 2015) ...............................................................................9

Noah Rubins & Evgeniya Rubinina, *Russia: Overview of Investment Treaty Programme,* Global Arbitration Review (Sept. 18, 2015).........................................8

Thomas Grove, *Russia Threatens Retaliation Against European State-Controlled Companies,* The Wall Street Journal (June 19, 2015) .............................................9

Thomas Roe, *Settlement of Investment Disputes Under the Energy Charter Treaty* 19 (1972)...................................................................................................................39

U.S. Dep't of State Office of the Spokesperson, *U.S. Concludes Review of Model Bilateral Investment Treaty* (Apr. 20, 2012)..........................................................40

Yuri A. Yershov, Report *The Energy Charter Treaty, in International Scientific Journal: Ecology – 21st Century* 23 (2001) ...........................................................26

Pursuant to the Court's October 22, 2015 Minute Order, Petitioners Hulley Enterprises Ltd., Yukos Universal Ltd., and Veteran Petroleum Ltd. respectfully submit this Memorandum of Law Opposing Respondent's Motion to Dismiss for Lack of Subject Matter Jurisdiction.

## PRELIMINARY STATEMENT

This is an action to confirm arbitration awards holding the Russian Federation liable for one of the largest acts of theft ever perpetrated.  More than a decade ago, the Russian Federation devised and implemented a scheme to appropriate oil-producing assets worth tens of billions of dollars from OAO Yukos Oil Company and transfer them to Rosneft, a Yukos competitor owned and controlled by the Russian Federation.  The Russian Federation effectively orchestrated the most hostile of hostile takeovers to benefit its commercial oil interests.  Indeed, Rosneft has used those stolen assets over the past decade to become one of the world's largest oil companies, boasting vast global operations that generate annual revenues in excess of US$ 100 billion.

Petitioners – the former majority shareholders of Yukos – each initiated arbitration against the Russian Federation under the Energy Charter Treaty ("ECT"), a treaty covering, among other things, protection of commercial investment in the energy, oil, and gas fields.  The Russian Federation actively participated in the decade-long proceedings that followed, including by submitting over two thousand pages of briefing, 15 expert reports, 20 witness statements, and over five thousand exhibits (much of which concerned the same false allegations of wrongdoing and baseless challenges to arbitrability that the Russian Federation raises now).  After careful consideration, a highly distinguished Tribunal rejected the Russian Federation's positions and found that it had, in violation of the ECT, deprived Petitioners of the value of their investment.  Unhappy with the result of the arbitrations in which it had agreed to participate, the Russian Federation has refused to comply with the awards and sought to impede their enforcement, including by threatening retaliation against any nation that enforces them.

This action is governed by the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention"), a treaty in force in over 150 nations, as incorporated into U.S. law in Chapter 2 of the Federal Arbitration Act.  Such actions are summary in nature and are subject to strong presumptions in favor of enforceability.  Indeed, enforcing courts "may" (but are not compelled to) decline to enforce an award only if specific limited, process-oriented grounds set forth in the Convention are met.  Courts reject efforts to expand such proceedings beyond their intentionally narrow confines and do not permit the losing party to re-litigate the merits of the dispute that was submitted to arbitration.

The Russian Federation seeks to evade its obligations under the Awards by advancing a litany of meritless objections and accusations that largely reflect an improper attempt to transform this limited, summary proceeding into a wide-ranging, plenary review of issues exhaustively presented and addressed in the underlying arbitrations.  These arguments fall into two categories, corresponding to the two briefs the Russian Federation filed in opposition to enforcement of the awards: (1) challenges to the Court's subject matter jurisdiction; and (2) challenges under Article V of the New York Convention, which sets forth the narrow grounds on which a court can refuse to confirm an award governed by the Convention.

The Court has ordered Petitioners to focus in this brief solely on the legal issues raised in the Russian Federation's subject matter jurisdiction brief.  (Minute Order, Oct. 22, 2015.)  Under the Court's order, there are two topics that Petitioners are not to address at this time: (1) the factual allegations made by the Russian Federation; and (2) the Article V challenges set forth in the Russian Federation's separate New York Convention brief.  (*Id.*)  The Court provided that Petitioners will be given an opportunity to address those topics later.  (*Id.*)[1]

---

[1] Petitioners welcome that opportunity, as the factual allegations that the Court has instructed Petitioners not to address are false, including the allegation that Petitioners were dishonest or somehow hid evidence

In actions against foreign nations, a court has subject matter jurisdiction if an exception to sovereign immunity applies. The Court has subject matter jurisdiction here under the "arbitration exception" to sovereign immunity, which applies when an action seeks to confirm an award which "is or may be governed by a treaty," such as the New York Convention, "calling for the recognition and enforcement of arbitral awards." 28 U.S.C. § 1605(a)(6). The Russian Federation challenges this conclusion on two grounds: (1) the dispute was not arbitrable under the ECT's arbitration clause; and (2) the dispute did not arise out of a "commercial relationship" as required by the New York Convention. These arguments are baseless.

The Russian Federation's first argument fails because courts should not conduct a *de novo* determination of arbitrability when assessing the arbitration exception to sovereign immunity. Rather, as confirmed by the DC Circuit this year, this exception is satisfied where, as here, a petitioner has shown there was an agreement to arbitrate. *See Chevron Corp. v. Ecuador*,

---

or facts from the Tribunal (which Petitioners will show is contradicted by, among other things, the voluminous arbitration record). While Petitioners are sensitive to the Court's order and will not address these allegations in detail now, Petitioners respectfully note that the Russian Federation's own pleadings demonstrate their lack of merit. For example, while the Russian Federation claims that "Petitioners failed to disclose to the Tribunal" that "Petitioners are owned and controlled by six Russian . . . 'Oligarchs'" (SMJ Br. at 5), it later acknowledges that the Tribunal in fact had full knowledge of the identities of Petitioners' beneficial owners. (Article V Br. at 6 ("[T]he Tribunal recognized, among other things: The Petitioners are . . . beneficially owned by the Oligarchs.") (citing the Awards).) Indeed, the very first thing the Russian Federation argued in the very first substantive pleading it submitted in the arbitrations was that Petitioners are "shell compan[ies]" that are "part of a criminal enterprise . . . directed by six Russian oligarchs" and that "[t]his is a dispute between these Russian oligarchs and the Russian Federation." (Oct. 15, 2005 Statements of Defense, Banifatemi Decl., Ex. 4 ¶ 1.) This has been an issue from the very beginning, was the subject of mountains of evidence in the arbitrations, and was thoroughly and carefully considered by a fully informed Tribunal. Similarly, the Russian Federation claims that it is presenting "recently obtained" evidence, identifying a "share registry for Yukos" in particular. (SMJ Br. at 4.) However, the accompanying declaration that purports to authenticate that document asserts that "the computer servers containing this share registry were confiscated [by Russian authorities] from [their custodian] on July 4, 2003," which is *over 12 years ago* and before the arbitrations even began. (Mikhailov Decl.¶ 6, ECF No. 24-3.) The Russian Federation's declaration from Gitas Anilionis similarly fails to include "recently obtained" evidence; indeed, the Russian Federation relied heavily on statements from Mr. Anilionis (dating back to 2000) in the arbitrations. When permitted to do so by the Court, Petitioners will establish that the Russian Federation's factual allegations are false and that all related argument and evidence is either presented to the Tribunal or could have been presented to it.

795 F.3d 200, 207 (D.C. Cir. 2015) ("The District Court correctly determined that the BIT [*i.e.*, a treaty with an arbitration clause] and [petitioner]'s notice to arbitrate satisfied the . . . FSIA.").

Indeed, the DC Circuit has expressly rejected the argument "that the FSIA require[s] a *de novo* determination of arbitrability." *Id.* at 206. The Russian Federation's argument on this point is substantively identical to the one that was rejected by the DC Circuit:

> Ecuador argues that the FSIA required the District Court to make a *de novo* determination of whether Ecuador's offer to arbitrate in the BIT encompassed Chevron's breach of contract claims. According to Ecuador, if Chevron's claims are not covered by the BIT, then Ecuador never agreed to arbitrate with Chevron, and the District Court consequently lacked jurisdiction. In Ecuador's view, the arbitrability question is therefore a jurisdictional question that must be addressed by the District Court. *Ecuador conflates the jurisdictional standard of the FSIA with the standard for review under the New York Convention.*

*Id.* at 205 (emphasis added). In other words, the Russian Federation's arbitrability objections do not provide a basis for challenging subject matter jurisdiction, but rather are relevant, if at all, only to the extent they support a defense under Article V of the New York Convention. Indeed, the same arbitrability challenges the Russian Federation makes in its "subject matter jurisdiction" brief are also argued in its separate brief to be grounds for non-enforcement under Article V. Under the DC Circuit's decision in *Chevron*, instead of advancing those arbitrability arguments twice (under separate "subject matter jurisdiction" and "Article V" headings), the Russian Federation should have advanced them only once in its Article V brief. In light of this Court's order that only subject matter jurisdiction is presently at issue, the Court should refuse to consider the Russian Federation's arbitrability challenges at this time and find that they have no bearing on the Court's subject matter jurisdiction over this matter.

In any event, even if the Court were to consider the Russian Federation's arbitrability challenges now, they can and should be easily disposed of as a matter of law for a variety of reasons. Most importantly, these arbitrability challenges all fail because the Russian Federation

agreed that the Tribunal would decide arbitrability.  Indeed, the record could not be clearer that the Russian Federation consciously and expressly "reached the determination to accept the jurisdiction of this Arbitral Tribunal to determine its own jurisdiction."  (July 29, 2005 Russian Federation Letter to Tribunal, Banifatemi Decl., Ex. 3 at 2.)  Moreover, the Russian Federation agreed at the outset to arbitrate in accordance with the 1976 UNCITRAL Rules, which provide that "[t]he arbitral tribunal shall have the power to rule on objections that it has no jurisdiction, including any objections with respect to the existence or validity of the arbitration clause." UNCITRAL Rules art. 21.  In light of this explicit language, courts have held that adoption of the UNCITRAL Rules reflects an unambiguous and binding agreement that the arbitral tribunal alone decides challenges, like the Russian Federation's, to the applicability of an arbitration clause.  Indeed, the DC Circuit reaffirmed this principle earlier this year.  *Chevron*, 795 F.3d at 208 ("Incorporation of the UNCITRAL arbitration rules . . . constitutes clear and unmistakable evidence that the parties agreed to arbitrate arbitrability.").  As the Supreme Court has held, "a court must defer to an arbitrator's arbitrability decision when the parties submitted that matter to arbitration."  *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995).  Further, as explained below, even if the Court were to independently decide arbitrability, it should find, just as the Tribunal did, that the dispute was properly arbitrated under the ECT.

The Russian Federation's argument that the dispute does not satisfy the New York Convention's "commercial relationship" requirement is also baseless.  The arbitration clause in the ECT expressly provides – in unambiguous terms – that the commercial relationship requirement is satisfied.  (ECT art. 26(5)(b) ("Claims submitted to arbitration hereunder shall be considered to arise out of a commercial relationship or transaction for the purposes of [the New York] Convention.").)  The Russian Federation's sole argument against enforcing that language

as written is that its arbitrability challenges render the ECT's arbitration clause inapplicable. This argument fails for the reasons noted above.  Moreover, even apart from the ECT's express provision that the commercial relationship requirement is satisfied, there are various other grounds for reaching the same conclusion.  The dispute arose under a treaty relating to commercial investment and concerned the Russian Federation destroying Yukos and transferring its assets primarily to a competing, state-owned oil company (Rosneft) to benefit the Russian Federation's commercial interests.  These circumstances easily satisfy the commercial relationship requirement, especially in light of recent DC Circuit precedent clarifying the expansive nature of the requirement.  *See Belize Soc. Dev. Ltd. v. Gov't of Belize*, 794 F.3d 99, 105 (D.C. Cir. 2015) ("commercial" in this context "refers to matters which *have a connection to commerce*" and "[a] matter or relationship may be commercial even though it does not arise out of or relate to a contract") (emphasis added).

## BACKGROUND

Petitioners were the majority shareholders of Yukos, the first fully privatized oil company in Russia.  (ECF No. 4 ("Petition") ¶ 11.)  The underlying arbitrations concerned the Russian Federation's successful campaign to destroy Yukos and transfer its assets to state-owned oil company Rosneft.  (*Id*. ¶¶ 11-33.)  The Tribunal found that the Russian Federation had violated obligations under the ECT (ECF No. 2 ("Gaillard Decl."), Ex. G).   (Petition ¶¶ 55-64.)

Petitioners initiated the underlying proceedings in late 2004 under the ECT's arbitration clause.  (*Id*. ¶ 34.)  In February 2005, Petitioners formally served Notices of Arbitration on the Russian Federation.  (Banifatemi Decl., Ex. 1.)  Shortly thereafter, the Russian Federation retained Cleary Gottlieb Steen & Hamilton LLP to represent it in the arbitrations.  On April 8, 2005, the Russian Federation sent a letter "hereby appoint[ing] Judge Stephen Schwebel as arbitrator."  (Banifatemi Decl., Ex. 2.)  A highly distinguished three-member tribunal was

constituted.  (Petition ¶¶ 36-37.)  On July 29, 2005, Cleary Gottlieb, on behalf of the Russian

Federation, sent a letter to the Tribunal noting that "the requests for arbitration . . . have been in

the possession of the Russian Federation for some time," asserting that "[t]he Russian Federation

during that time has reached the determination to accept the jurisdiction of this Arbitral Tribunal

to determine its own jurisdiction," and identifying its non-ratification of the ECT as one basis for

challenging the Tribunal's jurisdiction.  (Banifatemi Decl., Ex. 3 at 2, 4th paragraph.)

On October 15, 2005, the Russian Federation submitted its initial responsive pleading in

the arbitrations.  (Statements of Defense, Banifatemi Decl., Ex. 4.)  In this pleading, among other

challenges, the Russian Federation argued that the ECT was inapplicable because: (i) the Russian

Federation had not ratified the ECT and thus its application of the ECT was only partial and

excluded the arbitration clause; (ii) Petitioners did not qualify as "Investors" under the ECT

because Petitioners were shell companies whose ultimate owners had engaged in wrongdoing

and were Russian nationals; and (iii) Article 21 of the ECT rendered the dispute not arbitrable.

(*Id.* ¶¶ 7-10, 14-21, 47-55.)  It concluded by "request[ing] that the Tribunal issue an award . . .

[d]etermining that it has no jurisdiction over the Russian Federation or this dispute."  (*Id.* ¶ 102.)

On October 30, 2005, the Russian Federation, Petitioners, and the Tribunal signed Terms

of Appointment agreeing, among other things, that "the proceedings shall be conducted in

accordance with the UNCITRAL Rules" and that the dispute would be decided "in accordance

with the [ECT] and applicable rules and principles of international law."  (Banifatemi Decl., Ex.

5 ¶¶ 4(a), 9.)  The UNCITRAL Rules that the Russian Federation agreed would govern provide

that "[t]he arbitral tribunal shall have the power to rule on objections that it has no jurisdiction,

including any objections with respect to the existence or validity of the arbitration clause," and

"shall have the power to determine the existence or the validity of the contract of which an

arbitration clause forms a part."  UNCITRAL Rules art. 21, Banifatemi Decl., Ex. 6.

The Tribunal bifurcated the arbitrations into jurisdictional and merits phases.  (Petition ¶ 39.)  In the jurisdictional phase, the Russian Federation submitted 400 pages of briefing, 805 exhibits, and 20 witness statements.  (Gaillard Decl., Exs. D-F (the "Interim Awards") ¶ 69.)  Petitioners submitted 337 pages of briefing, 1,094 exhibits, and 7 witness statements.  (*Id*.)  The Tribunal held a ten-day hearing on jurisdiction in late 2008.  (Petition ¶ 39.)  In November 2009, the Tribunal issued unanimous interim awards rejecting (or deferring until the next phase) each of the Russian Federation's arbitrability challenges.  (*Id*.)

In the subsequent merits phase, the Russian Federation submitted 1,606 pages of pre-hearing briefing, 4,607 exhibits, and 15 expert reports.  (*Id*.)  Petitioners submitted 898 pages of pre-hearing briefing, 1,674 exhibits, nine fact witness statements, and four expert reports.  (*Id*.)  In late 2012, the Tribunal held a 21-day merits hearing, attended by over 50 party representatives, at which seven fact witnesses and three expert witnesses provided live testimony.  (*Id*. ¶ 47.)  On July 18, 2014, the Tribunal issued final awards (the "Awards").  (Gaillard Decl., Exs. A-C.)  The Awards, which exceed 600 pages, unanimously found that the Russian Federation violated obligations owed to Petitioners under the ECT.  (Petition ¶¶ 55-61.)

After losing in the arbitrations, the Russian Federation proclaimed that the Awards were "unjust and politically motivated" and asserted that it will not comply with them.[2]  It has also threatened to retaliate against countries whose courts attach assets to satisfy the Awards.  For example, the Russian Federation sent a letter to this Court asserting that a ruling against it "could seriously undermine the credibility of a reputable American court" and warning that "[a]ny

---

[2] This is apparently the Russian Federation's routine position: "Russia appears to have failed to honor all of the awards in the public domain that have been rendered against it."  Noah Rubins & Evgeniya Rubinina, *Russia: Overview of Investment Treaty Programme*, Global Arbitration Review, Response to Question No. 18 (Sept. 18, 2015), Banifatemi Decl., Ex. 28.

attempt to use injunctive remedies will be considered by the Russian Federation as grounds for taking adequate and proportionate retaliatory steps in relation to the USA, its citizens, and legal entities." (ECF No. 18 at 2.) It has made similar threats against other countries.[3]

## ARGUMENT

"Confirmation proceedings under the [New York] Convention are summary in nature." *Argentine Republic v. National Grid Plc*, 637 F.3d 365, 369 (D.C. Cir. 2011). Courts "do not sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts." *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 38 (1987). Instead, so long as subject matter jurisdiction exists, a court "may refuse to enforce the award only on the grounds explicitly set forth in Article V of the Convention." *TermoRio S.A. E.S.P. v. Electranta S.P.*, 487 F.3d 928, 935 (D.C. Cir. 2007).

"The FSIA confers upon district courts subject matter jurisdiction as to 'any claim for relief in personam with respect to which the foreign state is not entitled to immunity.'" *TMR Energy Ltd. v. State Prop. Fund of Ukraine*, 411 F.3d 296, 324 (D.C. Cir. 2005) (quoting 28 U.S.C. § 1330(a)). There is an "arbitration exception" to sovereign immunity for actions brought to confirm an award that "is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards." 28 U.S.C. § 1605(a)(6). "The New York Convention is exactly the sort of treaty Congress intended to include in the arbitration exception." *Creighton Ltd. v. Gov't of the State of Qatar*, 181 F.3d 118, 121 (D.C. Cir. 1999). That Convention applies to actions, such as this, for "the recognition and enforcement of arbitral awards made in the territory of a State other than the State where the

---

[3] *See, e.g.,* Neil Buckley, *Russia's Yukos threats signal a lurch away from international law*, Financial Times (Aug. 5, 2015), http://www.ft.com/cms/s/0/61baf1ec-3b6f-11e5-bbd1-b37bc06f590c.html; Thomas Grove, *Russia Threatens Retaliation Against European State-Controlled Companies,* The Wall Street Journal (June 19, 2015), http://www.wsj.com/articles/russia-threatens-retaliation-against-european-state-controlled-companies-1434735408; Russian Diplomatic Note to France, Banifatemi Decl., Ex. 20.

recognition and enforcement of such awards are sought." New York Convention art. I(1); *see also* 9 U.S.C. § 201; Petition ¶ 35 (the Awards were made in the Netherlands).[4]

The Russian Federation challenges the applicability of the arbitration exception to sovereign immunity on two grounds: (i) the dispute was not arbitrable under the ECT's arbitration clause; and (ii) the New York Convention does not apply because the Awards did not arise from a "commercial relationship." Neither argument has merit.

## I.  The Russian Federation's Arbitrability Objections Do Not Establish That the Court Lacks Subject Matter Jurisdiction

Petitioners have satisfied their burden of establishing subject matter jurisdiction based on the arbitration exception to sovereign immunity. It is therefore the Russian Federation's burden to demonstrate that the exception does not apply. The Russian Federation attempts to do so by arguing, erroneously, that the Court must conduct a *de novo* review of arbitrability to determine if it has subject matter jurisdiction under the arbitration exception. Specifically, the Russian Federation challenges the ECT's applicability on the grounds that: (1) the Russian Federation was bound by the ECT only partially and to the exclusion of its arbitration clause; (2) arbitration with alleged "fraudsters" or "Russian nationals" was beyond the scope of the ECT's arbitration clause; and (3) the Tribunal failed to follow a "tax-dispute referral mechanism" in Article 21 of the ECT. (SMJ Br. at 28-38.) These arguments fail to establish a lack of subject matter

---

[4] Subject matter jurisdiction also exists because the Russian Federation's agreement to arbitrate constitutes an implied waiver of immunity with respect to award enforcement. *See, e.g.*, *M.B.L. Int'l Contractors, Inc. v. Republic of Trinidad & Tobago*, 725 F. Supp. 52, 54 (D.D.C. 1989) ("Respondent impliedly waived its sovereign immunity by agreeing to submit this dispute to arbitration which is governed by the Convention.") (citing 28 U.S.C. § 1605(a)(1)); *see also* ECT art. 26 (ECT awards fall under the Convention). The Russian Federation's argument to the contrary (SMJ Br. at 39-42) is based on: (i) the erroneous assertion that "courts will not find an implicit waiver . . . unless the arbitration is to be conducted in the United States" (*id.* at 41), *see Diag Human S.E. v. Czech Republic-Ministry of Health*, 64 F. Supp. 3d 22, 30 (D.D.C. 2014) ("the D.C. Circuit has found implied waivers" when "a foreign state has agreed to arbitration in another country"); and (ii) the claim that its arbitrability challenges show there was no arbitration agreement, which fails for the reasons set forth below.

jurisdiction for several independent reasons: (a) such arbitrability objections do not provide a

basis for challenging FSIA jurisdiction; (b) the Russian Federation's agreement to arbitrate

arbitrability requires that the Court defer to the Tribunal's ruling that the ECT's arbitration

clause applied here; and (c) the Tribunal properly found the dispute arbitrable.

**A.     Objections to Arbitrability Do Not Provide Grounds for Challenging the Arbitration Exception to Sovereign Immunity**

**1.     Petitioners Have Satisfied Their Burden of Establishing Subject Matter Jurisdiction Based on the Arbitration Exception**

Petitioners' burden to establish subject matter jurisdiction based on an exception to

sovereign immunity "is only a burden of production; the burden of persuasion rests with the

foreign sovereign claiming immunity, which must establish the absence of the factual basis by a

preponderance of the evidence." *Chevron Corp. v. Ecuador*, 795 F.3d 200, 204 (D.C. Cir. 2015).

Specifically, when subject matter jurisdiction is based on the arbitration exception to sovereign

immunity, a petitioner satisfies its burden by providing evidence of an agreement to arbitrate and

an award. *Id.* at 204 (finding petitioner "has met its burden of production by producing the BIT

[*i.e.*, a treaty with an arbitration clause], [petitioner]'s notice of arbitration against Ecuador, and

the tribunal's arbitration decision").  Petitioners have easily satisfied this burden by producing:

(i)     the ECT, an investment treaty signed by the Russian Federation which contains an arbitration clause (Gaillard Decl., Ex. G);

(ii)    the notices of arbitration (Banifatemi Decl., Ex. 1);

(iii)   a letter reflecting the Russian Federation's express and considered decision to submit to the jurisdiction of the Tribunal (*id.*, Ex. 3);

(iv)    the Terms of Appointment that were signed by all parties and the Tribunal at the outset and which agreed to the UNCITRAL Rules (*id.*, Ex. 5); and

(v)     the awards issued in the arbitrations (Gaillard Decl., Exs. A-F).

These materials, both individually and collectively, establish the "two jurisdictional facts" of

relevance to the arbitration exception.  *See Chevron*, 795 F.3d at 204 & n.2 (finding that if "two

jurisdictional facts are established" – namely, "a foreign state has agreed to arbitrate" and "there is an award based on that agreement" – then "the District Court has jurisdiction so long as the award 'is or *may be* governed by [the New York Convention]'") (emphasis in original).

> **2.      The Russian Federation Has Failed to Meet Its Burden of Showing the Absence of a Basis for the Arbitration Exception**

The Russian Federation's challenges to the ECT's arbitration clause rely on the erroneous proposition that the Court must conduct a *de novo* review of arbitrability to determine if it has subject matter jurisdiction under the arbitration exception. *See, e.g., id*. at 205-06 (finding that the argument "that the FSIA require[s] a *de novo* determination of arbitrability" improperly "conflates the jurisdictional standard of the FSIA with the standard for review under the New York Convention"); *BCB Holdings Ltd. v. Gov't of Belize*, No. 14-1123, 2015 WL 3896102, at *6 (D.D.C. June 24, 2015) ("Inquiring into the merits of whether this dispute was rightly submitted to arbitration is beyond the scope of the FSIA's jurisdictional framework.").

Because the Russian Federation does not and cannot dispute (much less disprove) the existence of the materials produced by Petitioners that demonstrate that there was an arbitration agreement and resulting award, it has not advanced a basis for defeating the arbitration exception to sovereign immunity. *See, e.g.*, *Chevron*, 795 F.3d at 204-05 (rejecting challenge to subject matter jurisdiction where "Ecuador does not dispute the existence of the BIT, Chevron's notice, or the tribunal's arbitration decision, but instead challenges the District Court's conclusion that the BIT (or the combination of the BIT and Chevron's notice of arbitration) is an arbitration agreement between Ecuador and Chevron"); *id*. at 207 ("The District Court correctly determined that the BIT and Chevron's notice to arbitrate satisfied the jurisdictional requirements of the FSIA.").  As the DC Circuit concluded based on reasoning that applies equally here:

> The BIT includes a standing offer to all potential U.S. investors to arbitrate investment disputes, which Chevron accepted in the manner required by the

treaty.  The FSIA therefore allows federal courts to exercise jurisdiction over Ecuador in order to consider an action to confirm or enforce the award.  The dispute over whether the lawsuits were 'investments' for purposes of the treaty is properly considered as part of review under the New York Convention.

*Id*. at 206.[5]  In short, arbitrability challenges – such as the Russian Federation's challenges to the ECT's arbitration clause – are not subject matter jurisdiction challenges.

The Russian Federation's argument to the contrary is based on a misinterpretation of *Chevron*.  The Russian Federation relies on: (i) the statement in *Chevron* that "[t]he jurisdictional task before the District Court was to determine whether Ecuador had sufficiently rebutted the presumption that the BIT and Chevron's notice of arbitration constituted an agreement to arbitrate"; and (ii) the *Chevron* court's finding that "it 'was error' for the district court to 'eschew[] making this determination as part of its jurisdictional analysis.'"  (SMJ Br. at 26 (quoting *Chevron*, 795 F.3d at 205 & n.3).)  The district court's "error," however, was very limited: the DC Circuit merely held that the district court had needed to find, as part of its subject matter jurisdiction analysis, that the petitioner had presented "prima facie evidence of an agreement to arbitrate between the parties" and that Ecuador had "failed to sufficiently rebut that evidence."  *Chevron*, 795 F.3d at 205 n.3.[6]  Indeed, after noting this limited "error," the DC Circuit found it inconsequential since the district court had made the required finding when addressing other arguments.  *Id*. ("There is no need to remand, however, because the District Court elsewhere found that the BIT and the notice of arbitration together constituted an

_____

[5] The DC Circuit explained that *BG Group, PLC v. Argentina*, 134 S. Ct. 1198 (2014) required treating a treaty "as if it were an ordinary contract between private parties" and had found that when a sovereign enters into a treaty that permits investor-State arbitration, it "thereby formed an agreement with all potential [covered] investors . . . to submit all investment-related disputes to arbitration." *Chevron*, 795 F.3d at 205-06.  The ECT is such a treaty and thus this analysis applies here.  Moreover, the requirement of an agreement to arbitrate is also satisfied by the Russian Federation's separate agreement to arbitrate issues of arbitrability, including the applicability of the ECT's arbitration clause.  (*See infra*, Section I.B.)

[6] The district court had found it sufficient for FSIA purposes that "the Award's own language indicates it was rendered pursuant to the BIT." *Chevron*, 795 F.3d at 204 (quoting the district court decision).

agreement between the parties.").  Moreover, *Chevron* proceeded to find that resolving

arbitrability challenges was *not* part of the "jurisdictional task" before the court, and instead

decided the matter by (i) noting there was a treaty with an investor-State arbitration clause, and

(ii) explaining that the Supreme Court's *BG Group* decision required enforcing such clauses.  *Id.*

at 206.  *Chevron* does not support the *de novo* determination of arbitrability that the Russian

Federation urges; quite to the contrary, *Chevron* squarely rules that such an inquiry is improper.

Likewise, none of the other authorities cited by the Russian Federation suggest that an

arbitrability determination is appropriate at this stage.  (SMJ Br. at 26-28.)  Several of the

decisions the Russian Federation relies on for this point *do not even concern subject matter*

*jurisdiction or sovereign immunity.*  (*Id*. at 27-28 (citing *Granite Rock Co. v. Teamsters*, 561

U.S. 287 (2010); *Nat'l R.R. Passenger Corp. v. Boston & Maine Corp.*, 850 F.2d 756 (D.C. Cir.

1988); *China Minmetals Materials Imp. & Exp. Co., Ltd. v. Chi Mei Corporation*, 334 F.3d 274

(3d Cir. 2003).)  These decisions address the circumstances under which courts should

independently decide arbitrability instead of deferring to the arbitrators' decision on the issue.

*See Granite Rock*, 561 U.S. at 299-300; *Nat'l R.R.*, 850 F.2d at 761; *China Minmetals*, 334 F.3d

at 288-89.  They do *not* address whether arbitrability should be considered at the subject matter

jurisdiction stage in FSIA cases, and thus are entirely consistent with *Chevron*'s holding that

such objections do not provide a basis for challenging the arbitration immunity exception.

Those cases cited by the Russian Federation that actually concern subject matter

jurisdiction involved factual disputes "the resolution of which [wa]s necessary to a ruling upon"

the issue.  *Phoenix Consulting Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000);

*Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 449 (D.C. Cir. 1990).[7]

---

[7] In *Phoenix*, the sovereign challenged the existence of a sales contract that included a waiver of
immunity by submitting a "sworn declaration that the signature on the written contract was a forgery."

Notably, neither *Phoenix* nor *Foremost-McKesson* involved the arbitration exception to sovereign immunity and thus are not instructive on the issue of which facts are relevant in this context.  As the DC Circuit teaches in the more recent and directly on-point *Chevron* decision, the key fact of relevance in assessing the arbitration exception is the existence of an agreement to arbitrate; in contrast, facts that are claimed to support a challenge to the arbitrability of the dispute under an arbitration agreement are not relevant.  *See Chevron*, 795 F.3d at 205-07.

In short, just as the DC Circuit found in *Chevron* with respect to Ecuador's arbitrability objections, this Court should find that the Russian Federation's arbitrability objections do not provide a basis for challenging subject matter jurisdiction, but instead are "properly considered as part of review under the New York Convention" and thus should be addressed when the Court later considers the Russian Federation's Article V challenges.  *Chevron*, 795 F.3d at 206.

### B. The Russian Federation's Agreement to Arbitrate Arbitrability Requires That the Court Defer to the Tribunal's Decision That the ECT's Arbitration Clause Applied to the Dispute

Even if the Court were to consider arbitrability now, the Russian Federation's challenges should be rejected in light of its agreement that the Tribunal would decide arbitrability.  The Russian Federation is not entitled to a second bite at the apple before this Court because "a court must defer to an arbitrator's arbitrability decision when the parties submitted that matter to arbitration."  *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995).

---

*Phoenix*, 216 F.3d at 39.  The *Phoenix* court found that, since the sovereign immunity exception in that case depended on the existence of a sales contract that the defendant had provided proof did not exist, the district court was required to resolve that factual dispute as part of the subject matter jurisdiction inquiry. *Id.* at 40-41.  The Russian Federation raises no comparable factual disputes here – for example, it does not and cannot challenge the existence or genuineness of the ECT, the notices of arbitration, or the resulting awards.  In *Foremost-McKesson*, the court's subject matter jurisdiction depended on whether a principal-agent relationship existed between a sovereign nation and a company.  The DC Circuit remanded "for further development on the record" after finding insufficient basis for determining whether, for the purposes of the FSIA, the sovereign "so dominated the [company's] operations . . . 'that a relationship of principal and agent [was] created.'"  905 F.2d at 440 (quoting *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 625-628 (1983)).  That holding has no bearing here.

The record is unequivocal that the Russian Federation agreed to arbitrate arbitrability, including any objections to the Tribunal's jurisdiction under the ECT's arbitration clause.  In July 2005, the Russian Federation sent a letter to the Tribunal acknowledging this agreement:

> It is true that the requests for arbitration in the above-referenced arbitrations have been in the possession of the Russian Federation for some time.  **The Russian Federation** during that time **has reached the determination to accept the jurisdiction of this Arbitral Tribunal to determine its own jurisdiction** and has participated fully in the process of constitution of the Arbitral Tribunal.

(Banifatemi Decl., Ex. 3 at 2.)  Indeed, that letter proceeds to state that one of its objections concerns the fact that it had not ratified the ECT, which it now argues as its lead arbitrability challenge before this Court.  (*Id.* (arguing that Petitioners' "Requests for Arbitration represent the first and unprecedented attempt" to arbitrate against a State "on the basis of a consent allegedly expressed in a treaty subject to ratification that the State in question has not ratified").)  Pursuant to its express agreement to "accept the jurisdiction of this Arbitral Tribunal" (*id.*), the Russian Federation proceeded to advance numerous arguments before the Tribunal challenging the applicability of the ECT's arbitration clause.  (*See, e.g.*, Petition ¶¶ 39-40; Interim Awards ¶¶ 71, 247-258, 271-279, 293-294, 346-364; *see also* Oct. 15, 2005 Statements of Defense, Banifatemi Decl., Ex. 4 ¶ 102 ("[T]he Russian Federation requests that the Tribunal issue an award (a) Determining that it has no jurisdiction over the Russian Federation or this dispute").)  There can be no serious question that the Russian Federation agreed to arbitrate arbitrability.

This conclusion is reinforced by the Russian Federation's adoption of the UNCITRAL Rules to govern the arbitrations.  The Russian Federation's assent to those rules is reflected both in the ECT (Article 26(4)(b)) and in the Terms of Appointment, which the Russian Federation signed at the outset of the arbitrations and which provide that "the proceedings shall be conducted in accordance with the UNCITRAL Rules" (Banifatemi Decl., Ex. 5 ¶ 4(a)).  Indeed, this is not in dispute: the Russian Federation acknowledges this agreement.  (Article V Br. at 4,

ECF No. 23 ("The parties and the Tribunal executed the Tribunal's Terms of Appointment, agreeing that the Arbitrations would be governed by the 1976 UNCITRAL Arbitration Rules.").)

It is well established that "[i]ncorporation of the UNCITRAL arbitration rules . . . constitutes clear and unmistakable evidence that the parties agreed to arbitrate arbitrability." *Chevron Corp. v. Ecuador*, 795 F.3d 200, 208 (D.C. Cir. 2015) (quoting *Oracle Am., Inc. v. Myriad Grp. A.G.*, 724 F.3d 1069, 1075 (9th Cir. 2013)).  This is because these rules expressly provide that "'[t]he arbitral tribunal shall have the power to rule on objections that it has no jurisdiction, **including any objections with respect to the existence or validity of the arbitration clause**,' and 'shall have the power to determine the existence or the validity of the contract of which an arbitration clause forms a part.'"  *Chevron*, 795 F.3d at 207-08 (quoting UNCITRAL Arbitration Rules, G.A. Res. 31/9[8] art. 21 (Dec. 15, 1976)) (emphasis added); *see also W & T Travel Servs., LLC v. Priority One Servs., Inc.*, 69 F. Supp. 3d 158, 167 (D.D.C. 2014) (finding that "an arbitration clause adopting the rules of the AAA makes the issue of arbitrability one for the arbitrator, not the court" because AAA rules provide that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction").

In accordance with its agreement to arbitrate arbitrability, the Russian Federation presented – and the Tribunal rejected – each of the challenges that it now makes before this Court.  (*See, e.g.*, Interim Awards ¶¶ 244-398 (addressing and rejecting argument that the Russian Federation's application of the ECT was only partial and excluded the arbitration clause); *id*. ¶¶ 399-435 (addressing and rejecting arguments that Petitioners could not arbitrate because they were not "Investors" who made "Investments" under the ECT, including argument that Petitioners do "not qualify for protection under the ECT since [they are] shell compan[ies] beneficially owned and controlled by Russian nationals"); Awards ¶¶ 1273-1374 (addressing and

rejecting arguments that "alleged illegal and bad faith conduct" by, or "attributable to," Petitioners "deprive[d] them of protection under the ECT"); *id.* ¶¶ 1385-1428 (addressing and rejecting arguments that Article 21 of the ECT rendered the dispute not arbitrable, including argument that the Tribunal was required to follow a tax dispute "referral mechanism" therein).)

Because the Russian Federation agreed that the Tribunal would decide arbitrability, the Court must defer to the Tribunal's ruling that the dispute was arbitrable under the ECT.  *See, e.g.*, *Chevron*, 795 F.3d at 207-08 ("The BIT is not silent on who decides arbitrability.  Article VI of the BIT provides that the investor company may submit a matter to arbitration 'in accordance with [UNCITRAL] Rules' . . . Ecuador therefore consented to allow the arbitral tribunal to decide issues of arbitrability . . . There was no need for the District Court to independently determine that Chevron's suits satisfied the BIT's parameters once it had concluded that the parties had delegated this task to the arbitrator."); *Schneider v. Kingdom of Thailand*, 688 F.3d 68, 72-73 (2d Cir. 2012) ("Thailand is not entitled to independent court adjudication of" arbitrability because "Thailand agreed in the Terms of Reference to use the UNCITRAL Arbitration Rules," which "is clear and unmistakable evidence of their intent to arbitrate issues of arbitrability"); *Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384, 394 (2d Cir. 2011) ("By signing the BIT, Ecuador agreed to resolve investment disputes through arbitration under the UNCITRAL rules. . . . Therefore, Ecuador consented to sending challenges to the 'validity' of the arbitration agreement to the arbitral panel.").[8]

---

[8] While this conclusion does not depend on the level of attention devoted to arbitrability in the arbitration, it is notable just how extensively such issues were litigated here.  The Tribunal dedicated an entire separate phase of the arbitration to arbitrability.  (Petition ¶ 39.)  During that phase, the Russian Federation submitted 400 pages of briefing, 805 exhibits, and 20 witness statements.  (Interim Awards ¶ 69.)  The Tribunal conducted a ten-day hearing on the Russian Federation's arbitrability challenges. (Petition ¶ 39.)  The Tribunal subsequently issued interim awards, each exceeding 200 pages in length, that explained in detail the Tribunal's rationale for rejecting each of those challenges.  (*Id.*)

Ignoring the authorities cited above, the Russian Federation asserts that it is "well-settled that *the Court* – not the arbitrators – decide whether an arbitration agreement was formed." (SMJ Br. at 27.)  But the very cases the Russian Federation cites in support of that assertion disprove it.  *See, e.g.*, *Nat'l R.R.*, 850 F.2d at 759 ("'[U]**nless the parties clearly and unmistakably provide otherwise**, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator.'") (quoting *AT&T Technologies, Inc. v. Comm. Workers of Am.*, 475 U.S. 643, 649 (1986)) (emphasis added); *see also BG Group*, 134 S. Ct. at 1207 (same).  The law is that (a) courts decide arbitrability *only absent an agreement providing otherwise* and (b) an agreement delegating such authority to arbitrators will be enforced when it is shown by "clear and unmistakable" evidence.  *See, e.g.*, *First Options*, 514 U.S. at 943-44.  As noted above, the Russian Federation's express "determination to accept the jurisdiction of [the] Tribunal" (Banifatemi Decl., Ex. 3) and its adoption of the UNCITRAL Rules "constitutes [such] clear and unmistakable evidence."  *Chevron*, 795 F.3d at 208.

Notably, the Supreme Court has established that the rule set forth above is the law with respect to *all* questions of arbitrability, including "gateway questions" such as whether an arbitration agreement was formed.  *See, e.g.*, *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 69-70 (2010) ("[P]arties can agree to arbitrate gateway questions of arbitrability, **such as whether the parties have agreed to arbitrate** or whether their agreement covers a particular controversy.") (emphasis added; internal quotation marks and citations omitted); *see also id*. at 69 n.1 (noting there is just "one caveat" to that principle, *i.e.*, that "[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so") (quoting *First Options*, 514 U.S. at 944).  The Russian Federation's "clear and unmistakable" agreement to arbitrate "the existence [and] validity of the arbitration

clause" in the ECT (UNCITRAL Rules art. 21) is "simply an additional, antecedent agreement."

*Rent-A-Center*, 561 U.S. at 69-70 (noting that "[a]n agreement to arbitrate a gateway issue is

simply an additional, antecedent agreement" and that this "merely reflects the principle that

arbitration is a matter of contract").  The Russian Federation has not challenged its "antecedent

agreement" to arbitrate arbitrability, nor could it, especially in light of its acknowledged

agreement to the UNCITRAL Rules (Article V Br. at 4, ECF No. 23).  The Russian Federation's

arbitrability challenges thus fail because, pursuant to this antecedent agreement, the Court must

defer to the Tribunal's rulings that the dispute was arbitrable under the ECT.

 Decisions applying *Rent-A-Center* reinforce this conclusion.  *Rent-A-Center* and its

progeny refer to antecedent agreements to arbitrate gateway questions as "delegation

agreements" – because they are agreements to delegate arbitrability questions to arbitrators – and

hold that such agreements are enforceable separate and apart from the validity of the underlying

arbitration clause to which they relate.  *See, e.g.*, *Parnell v. CashCall, Inc.*, No. 14-12082, 2015

WL 6504332, at *3 (11th Cir. Oct. 28, 2015) ("[P]arties may agree to commit even threshold

determinations to an arbitrator, such as whether an arbitration agreement is enforceable.  The

Supreme Court has upheld these so-called 'delegation provisions' as valid…and explained that

they are severable from the underlying agreement to arbitrate.") (citing *Rent-A-Center*, 561 U.S.

at 70).  Accordingly, a delegation agreement can be challenged only on grounds that are specific

to that agreement.  *See, e.g., Mercadante v. XE Servs., LLC*, 78 F. Supp. 3d 131, 140 (D.D.C.

2015) ("If a party challenges the validity of a delegation agreement, the district court 'must

consider the challenge before ordering compliance.'  The challenge, however, must be directed

specifically at the delegation agreement and not at 'another provision of the contract, or to the

contract as a whole.' . . . This calculus remains the same where the delegation agreement exists

by virtue of the incorporation of [arbitration] rules.") (quoting *Rent-A-Center*, 561 U.S. at 70).

Since the Russian Federation only challenges the ECT's arbitration clause and not the

separate agreement to delegate arbitrability to the Tribunal, *Rent-A-Center* requires that the

Court enforce that delegation agreement and reject the Russian Federation's ECT challenges as

foreclosed thereby. *See, e.g., Brennan v. Opus Bank*, 796 F.3d 1125, 1133 (9th Cir. 2015)

(distinguishing between an "Arbitration Clause" and a "Delegation Provision (*i.e.*, incorporation

of the AAA rules which delegates enforceability questions to the arbitrator)" and finding that,

because the respondent "failed to make any arguments specific to the delegation provision," the

court "need not consider" respondent's challenge to "the [Arbitration Clause] as a whole"

because "it is for the arbitrator to decide in light of the parties' 'clear and unmistakable'

delegation of that question") (citing *Rent-A-Center*, 561 U.S. at 72-74).[9]

---

[9] In support of its erroneous assertion that the Court must decide its arbitrability challenges, the Russian Federation quotes case law stating that disputes "over the formation of the parties' arbitration agreement" must be decided by courts. (SMJ Br. at 27-28.)  As the decisions cited by the Russian Federation explain, however, the type of dispute that a "court must resolve" concerns "whether the parties ever agreed to submit *anything* to arbitration in the first place." *Nat'l R.R.*, 850 F.2d at 761 (emphasis added).  These decisions are thus fully consistent with the *Rent-A-Center* line of cases, which stand for the proposition that "delegation agreements" (including those that arise as a result of incorporation of arbitration rules like UNCITRAL) reflect an agreement to submit *something* to arbitration and thus suffice to take a dispute out of the category of those that a "court must resolve" (unless there is a dispute over the formation of the delegation agreement itself, which is not the case here).  Indeed, the Supreme Court's decision in *First Options* involved parties who argued that they had not "agreed to arbitrate" because they "had not personally signed" the contract that contained the arbitration clause. 514 U.S. at 941-42.  The Supreme Court found that this formation dispute was a question of "arbitrability" that parties could delegate to arbitrators, if "there is 'clea[r] and unmistakabl[e]' evidence that they did so." *Id*. at 944-45; *see Consol. Rail Corp. v. Metro. Transp. Auth.*, No. 95-2142, 1996 WL 137587, at *6 (S.D.N.Y. Mar. 22, 1996) ("*First Options* deals only with the first category of arbitrability: formation."); *see also Schneider*, 688 F.3d at 72 (2d Cir. 2012) ("*[W]here there is no valid provision committing the issue to arbitration*, 'the court must resolve any issue that calls into question *the formation or applicability* of the specific arbitration clause.'") (quoting *Granite Rock*, 561 U.S. at 297) (emphasis added).

Moreover, even ignoring the impact of the Russian Federation's delegation agreement, its reliance on "formation" cases is misplaced because none of its challenges to the ECT's arbitration clause are "formation" challenges.  Formation challenges concern fundamental existential questions, such as whether an agreement was a forgery or whether a party was bound by an agreement it had not signed,

### C.   The Russian Federation's Arbitrability Objections Have No Merit

Even if this Court were to independently decide the Russian Federation's arbitrability challenges, it should – as the Tribunal did – reject each as meritless and find that the disputes were appropriately arbitrated under the ECT, especially in light of the heavy presumptions in favor of finding disputes arbitrable. *See, e.g., Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983) ("[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration."); *Pearce v. E.F. Hutton Grp., Inc.*, 828 F.2d 826, 829 (D.C. Cir. 1987) ("[T]he federal policy favoring arbitration counsels that doubts about the intended scope of an agreement to arbitrate be resolved in favor of the arbitral process.").[10]

### 1.   The Russian Federation's Argument That Its Obligations Under the ECT Did Not Include the ECT's Arbitration Clause Is Baseless

While the Russian Federation stresses that it did not ratify the ECT, it does not dispute that it signed the ECT and that the ECT contains unambiguous language requiring provisional application of the treaty by signatories, a well-established practice that creates legally enforceable obligations under international law. (Interim Awards ¶ 247; Vienna Convention on the Law of Treaties art. 25, http://www.state.gov/s/l/treaty/authorities/international/62785.htm.) Instead, the Russian Federation contends that (i) Article 45(1) of the ECT allows it to cease

---

which the Russian Federation does not and cannot argue here. *See, e.g., China Minmetals Materials Imp. & Exp. Co. v. Chi Mei Corp.*, 334 F.3d 274, 289 (3d Cir. 2003) (respondent raised formation question where it claimed that the purported arbitration agreement contained "a forged signature of a nonexistent [] employee as well as a forged corporate stamp"); *see also Schneider v. Kingdom of Thailand*, No. 10-2729, 2011 WL 12871599, at *5 (S.D.N.Y. Mar. 14, 2011) ("[T]his case does not concern a question of agreement formation. Instead, the issue at hand is a construction of the language of the agreement itself.") (internal quotation marks and citation omitted).

[10] Notably, this inquiry becomes necessary only if the Court finds both (a) that the Russian Federation's arbitrability challenges are properly addressed at this stage, and (b) that the Court may consider the merits of these challenges notwithstanding the Russian Federation's agreement to arbitrate arbitrability. For the reasons set forth above (*see supra*, Sections I.A, I.B), the Court should find that neither of these two prerequisites for independently deciding the Russian Federation's arbitrability challenges is met here.

applying any provision of the ECT that is at any time inconsistent with its domestic law, and

(ii) the ECT's arbitration clause conflicts with its laws.  It is wrong on both counts.[11]

The Russian Federation's interpretation of Article 45 is inconsistent with its plain

language.  Courts construe treaties according to contract interpretation principles.  *See, e.g.*, *BG*

*Group*, 134 S. Ct. at 1208-09.  Under these principles, "the plain and unambiguous meaning of

an instrument is controlling."  *WMATA v. Mergentime Corp.*, 626 F.2d 959, 960–61 (D.C. Cir.

1980).  The relevant provision here states that:

> Each signatory agrees to apply *this Treaty* provisionally pending its entry into
> force for such signatory in accordance with Article 44, to the extent that *such*
> *provisional application* is not inconsistent with its constitution, laws or
> regulations.

(ECT art. 45(1) (emphasis added).)

The Russian Federation argues, as it did before the Tribunal, that this language means

that any and all provisions of the treaty incompatible with the Russian Federation's laws are

inapplicable.  (SMJ Br. at 28-31; Interim Awards ¶¶ 293-94.)  Nothing in Article 45(1), however,

allows the Russian Federation to pick and choose the portions of the treaty to be provisionally

applied.  Rather, the plain language establishes that it is the principle of provisionally applying a

treaty that is subject to consistency with a signatory's laws.  In other words, if a signatory has a

law that prohibits the provisional application of treaties prior to ratification, then it may claim

that it is not provisionally bound by the ECT, as a whole, pending ratification (so long as it

provides appropriate notice to other ECT signatories under Article 45(2), *see infra*, n.16).

Article 45(1) does not modify the application of each and every individual treaty provision;

---

[11] This exact Article 45 argument was comprehensively presented and thoroughly addressed in the
arbitrations.  The Russian Federation devoted over 200 pages of briefing and 16 expert opinions and
witness statements to this issue.  Petitioners submitted more than 175 pages of briefing and five expert
opinions on the issue.  The Tribunal spent over five hearing days entertaining argument and testimony on
the issue.  The Russian Federation's Article 45 challenge here is nothing more than an impermissible
effort to re-litigate an issue it lost in arbitration, as is the case with all of its arbitrability challenges.

rather, as the Tribunal found, the words "such provisional application" refer only to "this Treaty," not to "any individual Treaty provision." (*See* Interim Awards ¶¶ 301-329.)[12]

This conclusion is further reinforced by Article 32(1), which provides that some signatories may "temporarily suspend full compliance with [their] obligations under [a limited number of] provisions of this Treaty." This specificity concerning the ECT articles certain signatories may "temporarily suspend" stands in stark contrast to Article 45(1)'s unqualified reference to "this Treaty," and shows that the drafters made clear when they intended provisions to modify the application of specific portions of the treaty, rather than the ECT as a whole.

Further, the Russian Federation's construction of Article 45(1) is starkly at odds with the object and purpose of the ECT, which was to promote investment in the energy sector by creating a transparent and stable investment environment. The Russian Federation's piecemeal interpretation of Article 45(1) would require every investor to conduct a thorough examination of a signatory's domestic laws before knowing what protections the investor may have under the ECT with respect to that State. Such an outcome is not only unsupported by the treaty text, but would eviscerate its objective of a transparent and stable investing environment. As the Tribunal found, the Russian Federation's interpretation "run[s] squarely against the object and purpose of the Treaty, and indeed against the grain of international law," which precludes States from pleading domestic laws as defenses to specific treaty obligations. (Interim Awards ¶¶ 316-20 (accepting testimony of Petitioners' experts who explained the "strong presumption of the separation of international from national law"); *see also id.* ¶¶ 312-16 (noting that the Russian Federation's interpretation "would create unacceptable uncertainty in international affairs" by "allow[ing] a State to make fluctuating, uncertain and un-notified assertions about the content of

---

[12] Other tribunals interpreting the ECT have reached the same conclusion. *See, e.g., Kardassopoulos v. Georgia*, Decision on Jurisdiction ¶ 250 (July 6, 2007) ("[P]rovisional application imported the application of *all* the treaty's provisions as if they were already in force"), Banifatemi Decl., Ex. 13.

its domestic law, after a dispute has already arisen").)  In short, Article 45(1) provides that a

State that has signed, but not ratified, the ECT is subject to the ECT in full on a provisional basis,

if the principle of provisionally applying a treaty is "not inconsistent" with that nation's laws.[13]

Russian law expressly provides that a treaty "may, prior to its entry into force, be applied

by the Russian Federation provisionally if the treaty itself so provides."  (Interim Awards ¶ 332

(quoting Russian Federal Law on International Treaties, Art. 23(1) (1995).)  As the Russian

Federation conceded in the arbitrations, "Russian law is of course familiar with the concept of

provisional application, and that was never in dispute."  (*Id.* ¶ 334.)  The Tribunal thus "ha[d] no

difficulty in concluding that the principle of provisional application is perfectly consistent with

the Constitution, laws and regulations of the Russian Federation."  (*Id.* ¶ 338; *see id.* ¶¶ 330-37.)

In any event, even if the Russian Federation's interpretation of Article 45(1) were correct

– *i.e.*, even if the article meant that any individual provision in the ECT that conflicted with

Russian law were inapplicable – its argument would still fail because the ECT's arbitration

provision (Article 26) is wholly consistent with Russian laws.  The Russian Federation argues

that "Russian law prohibits the arbitration of public law disputes, which encompasses most

disputes involving the government."  (SMJ Br. at 29.)  This fails for a number of reasons

including because (i) the laws cited by the Russian Federation solely concern arbitration within

its domestic legal system and are thus inapplicable to treaty disputes, and (ii) in any event, ECT

---

[13] The Russian Federation's claims concerning state practice do not undermine this conclusion.  (*See* SMJ Br. at 29.)  The Tribunal rejected these claims as failing to demonstrate that France, Germany, or the European Council "rel[ied] on . . . Article 45(1) in order to limit or reduce the scope of their provisional application obligation."  (Interim Awards ¶¶ 323-27.)  Austria, moreover, is among those ECT parties that gave notice of intent not to apply the Treaty – *as a whole* – on a provisional basis, thereby supporting Petitioners' (and the Tribunal's) interpretation.  (*Id.* ¶¶ 321-22.)  The Russian Federation further cites statements made by Japan and the U.S. during negotiations.  Given the unambiguous meaning of Article 45(1) based on its text and the object and purpose of the treaty, the Tribunal declined to consider such negotiation history.  (*Id.* ¶ 328.)  This Court should do the same.  Regardless, neither statement is indicative of the ECT parties' final agreement, since the U.S. is not a signatory to the ECT and Japan submitted a formal declaration declining to apply the ECT – *as a whole* – provisionally.  (*Id.* ¶ 255.)

disputes are not public law disputes. (*See* Interim Awards ¶¶ 360-397.) Moreover, the Russian Federation's extensive participation in treaties that incorporate arbitration provisions,[14] as well as public statements it issued prior to the arbitrations, indicate that this is merely a *post hoc* argument adopted for purposes of this dispute. For example, the Russian government issued an Explanatory Note when the ECT was submitted to its legislature, which – based upon a comprehensive review of Russian law – unequivocally stated not only that "[t]he provisions of the ECT *are consistent with Russian legislation*," but also that "its provision[] on provisional application w[as] in conformity with" Russian law and, "[f]or that reason, the Russian side did not make declarations as to its inability to accept provisional application."[15] Indeed, Russian law expressly provides that investment disputes may be resolved in "an arbitration court, or international arbitration." (Interim Awards ¶ 370 (quoting Russian statutes); *see id.* ¶¶ 366-73.)

> As the Tribunal concluded when the Russian Federation first made this argument:
>
> After having considered the totality of the Parties' submissions and having deliberated, the Tribunal concludes that Article 26 of the ECT is not inconsistent with the Constitution, laws or regulations of the Russian Federation. The terms of the Russian Federation's *Law on Foreign Investment* . . . are crystal clear. Investor-State disputes such as the present one are arbitrable under Russian law.

---

[14] *See, e.g.*, Russian Federation-Indonesia Investment Treaty, art. 8-9 (Sept. 6, 2007), Banifatemi Decl., Ex. 16; Russian Federation-Qatar Investment Treaty, art. 10 (Feb. 12, 2007), Banifatemi Decl., Ex. 19; United States-Russian Federation Investment Treaty, art. 7 (June 17, 1992), Banifatemi Decl., Ex. 17.

[15] Explanatory Note, "On Ratification of the Energy Charter Treaty and the Energy Charter Protocol on Energy Efficiency and Related Environmental Aspects," at 1, 4 (emphasis added), Banifatemi Decl., Ex. 7; *see also id.* ("The legal regime of foreign investments envisaged under the ECT is consistent with the provisions of the existing Law . . ., as well as with the amended version of the Law currently being discussed in the State Duma."); *id.* (the ECT "does not require the acknowledgement of any concessions or the adoption of any amendments to the abovementioned Law"). This consistency was reaffirmed in a January 2001 report prepared by a former member of Russia's ECT negotiating team and submitted to the Russian Parliament. Yuri A. Yershov, Report *The Energy Charter Treaty*, *in International Scientific Journal: Ecology – 21st Century* 23, 25 (2001) ("[U]nder the ECT, Russia grants foreign investors an energy investment regime acceptable to them that does not require any concessions on Russia's part beyond the framework of current law."), Banifatemi Decl., Ex. 8.

(*Id.*)  This Court should find the same.[16]

> ### 2. The Russian Federation's Arguments That Arbitration With Alleged "Fraudsters" or "Russian Nationals" Was Beyond the Scope of the ECT's Arbitration Clause Fail as a Matter of Law

Also meritless are the Russian Federation's arguments that its offer of arbitration to qualified investors in the ECT "implicitly" excluded Petitioners on the grounds that they are "shell companies" owned by alleged "fraudsters" and "Russian nationals."  (SMJ Br. at 31-36.) As an initial matter, like all of the arguments it makes in this Court, these were exhaustively presented to (and rejected by) the Tribunal.  Its argument in this Court is based on assertions that:

- "Oligarchs who beneficially own and control Petitioners cannot hide behind the veil of a corporate shell to conceal their ownership of Yukos shares"

- "the true owners were Russian nationals, who participated in the LFS collusion and own and control Petitioners today"

- Petitioners are "shell compan[ies] that do[ ] not engage in any substantial business activity in [their] respective place[s] of organization"

- "the ultimate beneficiaries that own and control Petitioners were at all relevant times Russian nationals, i.e., the Oligarchs"

(SMJ Br. at 33-36.)

These assertions are substantively identical to those it made in the arbitrations, including:

- "The Tribunal lacks jurisdiction . . . (a) because Claimants are shell companies, [and] (b) because Claimants are owned and controlled by Russian oligarchs, including Khodorkovsky, Lebedev and other Russian nationals"

- Petitioners "are totally dominated by the Russian oligarchs through multiple off-shore shells, for which no *bona fide* purpose is discernable"

---

[16] The Russian Federation's argument should also fail because it did not make the required formal notification.  (ECT art. 45(2)(a); *see* Interim Awards ¶ 247 ("Respondent signed the ECT on 17 December 1994 and made no declaration at that time or at any time thereafter under Article 45(2) or, for that matter, under Article 45(1).").)  While the Tribunal disagreed that a formal declaration under Article 45(2) was necessary, it acknowledged that the vast majority of the States that had declined to apply the ECT provisionally had either made such a formal declaration or provided some other form of notice.  (*Id.* ¶ 265.)  The Russian Federation's failure to do so should foreclose its argument that any part of the ECT was inapplicable provisionally (and is also further evidence that this is merely a *post hoc* argument).

- "one of the principal purposes of the complex legal structure adopted at the Russian oligarchs' behest was to render opaque, but preserve, the oligarchs' continuing *de facto* ownership and control of the Yukos shares"

- "The Treaty was never intended to protect Russian investors investing in Russia, and does not provide a remedy for host State nationals."

- "Mr. Khodorkovsky, his Group, and Bank Menatep acted in bad faith and 'probably illegally' in violation of the spirit and letter of Presidential Decree No. 889, which was the legal foundation of the Loans-For-Shares ('LFS') Program"

(Interim Awards ¶ 71; Awards ¶ 201.)[17]

These arguments fail as a matter of law for a simple reason: they have no impact on the arbitration agreement under the ECT's terms. *See, e.g.*, *BG Group*, 134 S. Ct. at 1208 (finding that a treaty should be treated as a contract and refusing to look beyond a treaty's language); *Am. Fed'n of Gov't Employees, Local 2924 v. Fed. Labor Relations Auth.*, 470 F.3d 375, 381 (D.C. Cir. 2006) ("Interpretation of a contract, like statutory and treaty interpretation, must begin with the plain meaning of the language. . . . 'And where the . . . language provides a clear answer, it ends there as well.'") (quoting *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999)).

### a.   The "Nationality" Argument Is Unsupported by the ECT

The ECT establishes a broad right to arbitrate "[d]isputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former, which concern an alleged breach of an obligation of the former under Part III."  (ECT art. 26(1).)  The Russian Federation's contention that its offer to arbitrate under the ECT "is not made to . . . mere shell companies controlled by the host State's own nationals" (SMJ Br. at 35) challenges Petitioners' status as "Investors of another Contracting Party."

---

[17] As an initial matter, for the Russian Federation to succeed on these arguments, the Court would have to make factual determinations on the allegations set forth in the Russian Federation's brief.  (SMJ Br. at 1-23.)  Challenges to those allegations are beyond the scope of this brief under the Oct. 22 Minute Order.

The Russian Federation in effect seeks – as it did before the Tribunal – to write additional requirements into the ECT's definition of "Investor."  (Interim Awards ¶¶ 413-417.)  "Investor" is defined as "a company or other organization organized in accordance with the law applicable in [a] Contracting Party."  (ECT art. 1(7).)  The Petitioners qualify, as each are corporations organized under the laws of either Cyprus (Hulley and VPL) or the Isle of Man (YUL).  (Petition ¶ 4; Interim Awards ¶ 404-05 (Cyprus and Isle of Man are each a "Contracting Party").)  As the Tribunal concluded when it found this requirement satisfied in the arbitrations:

> The Tribunal knows of no general principles of international law that would require investigating how a company or another organization operates when the applicable treaty simply requires it to be organized in accordance with the laws of a Contracting Party.  The principles of international law, which have an unquestionable importance in treaty interpretation, do not allow an arbitral tribunal to write new, additional requirements – which the drafters did not include – into a treaty, no matter how auspicious or appropriate they may appear.

(Interim Awards ¶ 415.)[18]

The text of the ECT, read as a whole, confirms its drafters' intent to exclude additional requirements from the definition of "Investor."  Additional ownership, control, and business activity requirements – absent from the definition of "Investor" – appear in Article 17, demonstrating that the drafters considered the relevance of such attributes but chose to exclude them from provisions concerning jurisdiction.  Contrary to the Russian Federation's argument, Article 17 does not show that "shell companies owned by the host State's own nationals" may not accept the offer to arbitrate in the ECT.  (SMJ Br. at 35.)  As the Tribunal found, Article 17 has no impact on arbitrability, but rather authorizes signatories to exercise their right to deny protections in Part III to certain entities, based on ownership, control, and business activity

---

[18] Further reflecting the absence of the "implicit" conditions to arbitration urged by the Russian Federation, Article 26(3)(a) provides that, "[s]ubject only to subparagraphs (b) and (c) [which are not relevant here], each Contracting Party hereby gives its **unconditional consent** to the submission of a dispute to international arbitration."  (ECT, Art. 26(3)(a) (emphasis added).)

considerations.  (ECT, Art. 17(1).)  The Russian Federation did not exercise its right to deny Part III protections to certain entities (Interim Awards ¶¶ 444-58) and, in any event, the agreement to arbitrate is in Part V of the ECT and thus is unaffected by Article 17 (*id*. ¶¶ 436-443).

In addition, the negotiating history of the ECT shows that the drafters consciously limited "Investor" to a place-of-incorporation definition, excluding additional criteria found in some other investments treaties.  *See, e.g.*, Russian Federation-Ethiopia Treaty, art. 1, Oct. 2, 2000 (defining "Investor" as "any legal person constituted or otherwise duly organized under the laws of that Contracting Party *and has its principal seat and economic activities in the territory of that same Contracting Party*") (emphasis added), Banifatemi Decl., Ex. 16.  During ECT negotiations, some delegations proposed adding ownership, control, and business activity requirements to the definition of "Investor."  *See, e.g.*, Canadian Proposal, Banifatemi Decl., Ex. 9 ¶ 1.32.  As the plain language of Article 1(7) reflects, these proposals were rejected.

Moreover, as the Tribunal noted, numerous other authorities have rejected arguments like those made by the Russian Federation here.  (Interim Awards ¶¶ 414-17; *see id*. ¶ 416 ("[I]n similar circumstances, other arbitral tribunals have . . . emphasized that . . . the State of incorporation is the most common method of defining the nationality of a company and that, in any event, once a treaty makes that choice in specific and unambiguous terms, any other method of assessing the company's nationality is ruled out.").)[19]

---

[19] For example, in *Plama v. Bulgaria*, the arbitral panel found that a party incorporated in Cyprus was an Investor under the ECT even though it had no substantial business activities on the island and was controlled by nationals of a different state.  (Interim Awards ¶ 416 (citing *Plama*, Decision on Jurisdiction ¶ 128 (Feb. 8, 2005) ("it is here irrelevant who owns or controls the Claimant at any material time"), Banifatemi Decl., Ex. 11); *see also Tokios v. Ukraine*, Decision on Jurisdiction ¶¶ 21, 28 (Apr. 29, 2004) (a Lithuanian company could bring a claim against Ukraine even though it was 99 percent owned by Ukrainian nationals because, "according to the ordinary meaning of the terms of the Treaty, the Claimant is an 'investor' of Lithuania" and "the Treaty contains no additional requirements for an entity to qualify as an 'investor'"), Banifatemi Decl., Ex. 10; *ADC v. Hungary*, Award ¶ 357 (Oct. 2, 2006) ("[I]nquiry

The U.S. Supreme Court has rejected an attempt, similar to the Russian Federation's, to add nonexistent requirements to a treaty definition. *See Sumitomo Shoji America, Inc. v. Avagliano*, 457 U.S. 176, 182-83 (1982) (finding, under the "literal language" of the U.S.-Japan Friendship, Commerce and Navigation Treaty that a party's status was defined solely by its "place of incorporation," and rejecting argument for a "control test"); *see also id*. at 185 n.11 ("Determining the nationality of a company by its place of incorporation is consistent with prior treaty practice. The place-of-incorporation rule also has the advantage of making determination of nationality a simple matter. On the other hand, application of a control test could certainly make nationality a subject of dispute.").

### b. The "Fraudsters" Argument Is Unsupported by the ECT

The Russian Federation alleges here, as it did extensively in the Arbitrations, that the Petitioners are "fraudsters" whose investment was the result of illegal activity in Russia and, due to this alleged "fraud and illegality," the Russian Federation did not offer or consent to arbitrate with the Petitioners. (SMJ Br. at 31-34.) Even if the Russian Federation's "fraudsters" allegations were true (which they are not), they have no impact on a tribunal's jurisdiction under the ECT's arbitration clause, as such jurisdiction is predicated on a claimant being an "Investor" as defined in Article 1(7) and not, as other treaties provide, on the legality of the investment.

This is confirmed, for example, by *Plama v. Bulgaria*, also decided under the ECT. In that case, the tribunal found that it had jurisdiction despite an allegation of fraud in the claimants' procurement of the investment, holding that "whatever the eventual merits of the Respondent's 'misrepresentation' case . . . it remains the case that the Claimant was an 'Investor' under Article 1(7) ECT." *Plama* Decision on Jurisdiction ¶ 128, Banifatemi Decl., Ex. 11.

---

stops upon establishment of the State of incorporation, and considerations of whence comes the company's capital and whose nationals . . . control it are irrelevant."), Banifatemi Decl., Ex. 12.)

While the *Plama* tribunal eventually agreed that the investment had been procured through fraud, that merits finding had no impact on the arbitrability of the dispute under the ECT, but rather "preclude[d] the application of the [substantive] protections of the ECT."  *Plama* Award ¶ 135 (Aug. 27, 2008), Banifatemi Decl., Ex. 14; *see also Plama* Decision on Jurisdiction ¶ 130 ("[N]ot only are the dispute settlement provisions of the ECT, including Article 26, autonomous and separable from Part III of that Treaty but they are independent of the entire [allegedly fraudulent] Nova Plama transaction; so even if [that transaction] is arguably invalid because of misrepresentation by the Claimant, the agreement to arbitrate remains effective.").  As in *Plama*, the Russian Federation's claims of wrongdoing are merits arguments, not arguments concerning the applicability or scope of the ECT's arbitration clause.

The Russian Federation's reframing of its unclean hands argument as a jurisdictional objection is a thinly veiled attempt to re-litigate issues that were thoroughly argued by the parties and resolved by the Tribunal.  (*See* Awards ¶¶ 1273-1374 (considering and rejecting, on various grounds, arguments that "alleged illegal and bad faith conduct" should "deprive [Petitioners] of protection under the ECT," including arguments concerning "conduct related to the acquisition of Yukos by Bank Menatep; and the so-called 'Oligarchs' and their subsequent consolidation of control and ownership over Yukos"); *see also id*. ¶ 1373 (finding "that Respondent's 'unclean hands' argument fails as a preliminary objection" and "does not operate to deprive the Tribunal of its jurisdiction in this arbitration, render inadmissible any of the [Petitioners'] claims or otherwise bar [Petitioners] from invoking the substantive protections of the ECT").)

\*       \*       \*

Arbitration clauses in investment treaties constitute "a standing offer to all potential [covered] investors to arbitrate investment disputes."  *Chevron*, 795 F.3d at 206.  With the exception of its erroneous argument that Petitioners were required to follow a "tax dispute

referral mechanism" (addressed in the next section), the Russian Federation does not argue that Petitioners failed to follow the procedures in the ECT necessary to accept that "standing offer." Further, the Russian Federation acknowledges that, "for an agreement to arbitrate under a treaty, there must be consent to arbitrate 'in accordance with the Treaty's terms.'"  (SMJ Br. at 32 (quoting *Chevron*, 638 F.3d at 392-93).)  Having made a standing offer to arbitrate to all parties fitting the express definition of "Investor" in the ECT, the Russian Federation cannot write in additional "implicit" requirements, nor can its arguments otherwise render the arbitration clause inapplicable.  *See, e.g., Sumitomo*, 457 U.S. at 179-83; *Chevron*, 795 F.3d at 206-07 (rejecting argument based on treaty definition of "investment" as contrary to the plain meaning of the text).

### 3. The Russian Federation's Argument That the Dispute Was Not Arbitrable Due to the Failure to Follow a "Mandatory Precondition" Is Baseless

The Russian Federation likewise cannot succeed in its claim that the dispute was not arbitrable under the ECT due to Petitioners and the Tribunal not obtaining an opinion from a "Competent Tax Authority" under Article 21(5).  (SMJ Br. at 36-38.)  The argument that this was a "precondition to the formation of consent" to arbitration (*id.*) fails for a number of reasons.

As a threshold matter, the argument presupposes that this is an appropriate issue for courts to resolve.  "As the Supreme Court has recently re-affirmed, however, arbitrators—not courts—must decide whether a condition precedent to arbitrability has been fulfilled."  *Chorley Enterprises, Inc. v. Dickey's Barbecue Restaurants, Inc.*, No. 14-1799, 2015 WL 4637967, at *8 (4th Cir. Aug. 5, 2015) (citing *BG Group*).  In *BG Group*, Argentina argued that an investor's failure to follow a treaty's local litigation requirement meant the arbitrators lacked jurisdiction. 134 S. Ct. at 1204.  The Supreme Court articulated the question before it as being "who—court or arbitrator—bears primary responsibility for interpreting and applying the local litigation requirement to an underlying controversy?"  *Id.* at 1204.  It concluded that, "[i]n our view, the

matter is for the arbitrators, and courts must review their determinations with deference," including because "the local litigation requirement is highly analogous to procedural provisions that both this Court and others have found are for arbitrators, not courts." *Id*. at 1207.

In so ruling, the Supreme Court rejected the argument that the local litigation requirement was "a condition on the State's consent to enter into an arbitration agreement," explaining:

> [T]he treaty before us does *not* state that the local litigation requirement is a "condition of consent" to arbitration. Thus, we need not, and do not, go beyond holding that, in the absence of explicit language in a treaty demonstrating that the parties intended a different delegation of authority, our ordinary interpretive framework applies. . . . And we apply our ordinary presumption that the interpretation and application of procedural provisions such as the provision before us are primarily for the arbitrators.

*Id*. at 1208-10.  The same analysis applies with even greater force here.  Indeed, the provision at issue in *BG Group* required investors to submit disputes "to the decision of the competent tribunal of the Contracting Party" before initiating arbitration and thus was *an actual precondition to arbitration*.  *Id*. at 1201.  The tax dispute referral provision of Article 21(5) cannot be a precondition to arbitration, as it expressly accounts for the possibility of an investor arbitrating under the ECT after failing to make such a referral.[20]  In short, *BG Group* requires that the Court defer to the Tribunal's ruling on this dispute.  134 S. Ct. at 1210.[21]

---

[20] ECT art. 21(5)(b)(i) (providing that an investor shall refer expropriation disputes to "the relevant Competent Tax Authority," but that, "[f]ailing such referral by the Investor . . ., bodies called upon to settle disputes pursuant to Article 26(2)(c) [i.e., arbitral tribunals] . . . shall make [the] referral"); *see also id*., Art. 26(3)(a) ("Subject only to subparagraphs (b) and (c), each Contracting Party hereby gives its **unconditional** consent to the submission of a dispute to international arbitration.") (emphasis added).

[21] As explained above (*see supra*, Section I.B), all of the Russian Federation's arbitrability challenges (including this one) are for the arbitrators, not the courts, for the independent reason that it clearly and unmistakably agreed to delegate arbitrability to the Tribunal.  *BG Group* stands for the proposition that disputes over preconditions are for the arbitrators even absent such a delegation agreement.  Indeed, *BG Group* noted that "[t]he question" before it was "whether the parties intended to give courts or arbitrators primary authority to interpret and apply a threshold provision in an arbitration contract—*when the contract is silent as to the delegation of authority*."  *BG Group*, 134 S. Ct. at 1212 (emphasis added); *see also id*. at 1206 (courts need to determine who decides "'threshold' questions about arbitration" only "[i]f the contract is silent on the matter"); *Chevron*, 795 F.3d at 207 (quoting *BG Group* on this point and then

The Court should thus defer to the Tribunal's considered rejection of the Russian Federation's argument that Article 21(5) required a referral to a "competent tax authority," including because, "[i]n this particular case," such a referral would have been "clearly futile." (Awards ¶¶ 1421, 1426.)  As the Tribunal found, it is well established under international law that certain prescribed procedures "may be dispensed with under circumstances where doing so clearly would not produce the result that the procedure seeks to achieve."  (Awards ¶ 1425 (citing various arbitral decisions and other authorities); *see also id.* ¶ 1424 ("A good faith interpretation of the provision leads to the conclusion that a referral cannot be required if following the referral procedure would clearly be futile under the circumstances of a specific case."); *id.* ¶ 1422 (the parties' arguments "have filled briefs adding up to thousands of pages, have relied on some 8,800 exhibits and were presented to the Tribunal in oral hearings scheduled over a six-week period" and thus "[i]t is inconceivable that the gist of this case, for either side, could have been reduced to a meaningful submission of a size and scope that might have been digested by the relevant tax authorities in a way that would have given them an opportunity to provide timely and pertinent guidance").)  Indeed, given the Tribunal's finding that Russian tax authorities were complicit in the wrongdoing at issue, it defies credibility to suggest that the Tribunal would have been influenced by their views.  (*Id.* ¶ 1435 ("[W]here the tax authorities of a State have participated in measures against an investor whose true purpose is unrelated to taxation, submitting these issues to . . . the same authorities would add little value.").)[22]

---

finding "[t]he BIT is not silent on who decides arbitrability" because, "[u]nder [UNCITRAL] rules, which the BIT incorporates by reference, '[t]he arbitral tribunal shall have the power to rule on . . . objections with respect to the existence or validity of the arbitration clause'") (quoting UNCITRAL Rules art. 21).

[22] The Tribunal's finding that there were no bona fide taxation measures at issue is another basis for rejecting this argument.  (*See, e.g.*, Awards ¶ 1444 ("The tax assessments levied against Yukos by the Russian Federation . . . were essentially aimed at paralyzing Yukos rather than collecting taxes."); *id.* ¶ 756 ("[T]he primary objective of the Russian Federation was not to collect taxes but rather to bankrupt

The Russian Federation's argument before this Court also fails because it is based on a mischaracterization of Article 21(5).  The Russian Federation claims that an opinion issued by the tax authorities would have been "binding" on the Tribunal.  (SMJ Br. at 36.)  Article 21(5)(b)(iii), however, states that arbitral tribunals "*may* take into account any conclusions arrived at by the Competent Tax Authorities regarding whether the tax is an expropriation." (ECT, Article 21(5)(b)(iii) (emphasis added).)  This is the relevant language since the Tribunal's liability ruling was based solely on "expropriation."  (*See* Awards ¶¶ 1548-93; *see also id.* ¶ 1427 ("[T]he Tribunal notes that neither Party disputes that, in the event of a referral, any determinations of the Competent Tax Authorities . . . relating to whether any tax was an expropriation would not have been binding on the Tribunal.  The wording of Article 21(5)(b)(iii) of the ECT is very clear: bodies such as the present Tribunal *may* take into account any conclusion arrived at by the Competent Tax Authorities.") (emphasis in original).)

Ignoring the relevant permissive language, the Russian Federation, without explanation, focuses on the next sentence of the same clause, which states that tribunals "*shall* take into account" tax authority conclusions relating to whether the tax is "discriminatory."  (SMJ Br. at 36-38 (citing ECT art. 25(1)(b)(iii)).)  That language is inapplicable here, since the Tribunal's liability ruling was not based on discriminatory treatment.  (*See* Awards ¶ 1582 (discrimination is "a question that was inconclusively argued between the Parties and need not be and has not been decided by this Tribunal").)  Moreover, even this language would not have made tax

---

Yukos and appropriate its valuable assets."); *id.* ¶¶ 756-57 (detailing aspects of the record, considered in ¶¶ 272-754 of the Awards, that supported the Tribunal's conclusions); *see also id.* ¶ 1435 (finding "the referral mechanism under Article 21(5) of the ECT" inapplicable on the ground that "the particular expertise of [tax] authorities does not extend to the question of whether an act that on its face appears to be a taxation measure is in reality implemented for improper reasons").)  Notably, other arbitral tribunals have made the same finding.  *Quasar* Award ¶ 128 (July 20, 2012) ("[T]he Russian Federation's goal was to expropriate Yukos, and not legitimately to collect taxes."), Banifatemi Decl., Ex. 15.

authority opinions about discrimination "binding" on the Tribunal; it only provides that tribunals "shall *take into account*" such conclusions.  Interpreting "shall take into account" to mean "shall be bound by" would impermissibly re-write the plain language of the clause.[23]

*      *      *

In short, while the Court should never get to the merits of the Russian Federation's arbitrability challenges (*see supra*, Sections I.A, I.B), even if it did, it should reject them for the reasons set forth above.  This is especially the case given the Tribunal's careful and reasoned rejection of each of these arguments based on a vastly more developed record.  The Russian Federation's brief reflects an attempt to re-argue – and have this Court re-decide – major issues submitted to the Tribunal.  That is simply inappropriate, well beyond the scope of this "summary" proceeding, and deeply inconsistent with the policies and presumptions that apply to court review of arbitration awards.  *See, e.g., BG Group*, 134 S. Ct. at 1206 ("on matters committed to arbitration," courts engage in "just the limited review needed to maintain arbitration's essential virtue of resolving disputes straightaway and to prevent it from becoming merely a prelude to a more cumbersome and time-consuming judicial review process"); *Zeiler v. Deitsch*, 500 F.3d 157, 169 (2d Cir. 2007) ("Confirmation under the Convention . . . is not

---

[23] Notably, the sole support the Russian Federation provides for its argument that a tax authority opinion "would have been ***binding*** on the Tribunal" is a cite to paragraph 225 of the opinion of its "expert," Professor Dolzer.  (SMJ Br. at 38 (emphasis in original).)  But Professor Dolzer's contribution on this point is merely a wholly conclusory, unsubstantiated assertion that repeats the Russian Federation's position.  (Dolzer ¶ 225 (asserting, without supporting analysis, that "any conclusions arrived at by the Competent Tax Authorities within the six-month period regarding whether the tax is discriminatory are binding upon the arbitral tribunal").)  Of course, an expert opinion supported by nothing more than "because I say so" (which is the basis for much of the "expert" opinion proffered by the Russian Federation) is improper.  *See, e.g., Thomas v. City of Chattanooga*, 398 F.3d 426 (6th Cir. 2005) ("[B]ecause [the expert's] affidavits provide no rationale for his conclusions, appellants are asking that we take their expert's 'word for it.'  We cannot."); *Clark v. Takata Corp.*, 192 F.3d 750, 757 (7th Cir. 1999) ("An expert must substantiate his opinion; providing only an ultimate conclusion with no analysis is meaningless."); *Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 424 (5th Cir. 1987) ("Without more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible.").

intended to involve complex factual determinations, other than a determination of the limited statutory conditions for confirmation or grounds for refusal to confirm.").

## II.   The Russian Federation's Argument that the Awards Do Not Arise Out of a Commercial Relationship Is Baseless

The Court should also reject the Russian Federation's argument that the arbitration exception to sovereign immunity is inapplicable because the Awards did not arise out of the "commercial relationship" required by the New York Convention.  (SMJ Br. at 43-44.)[24]  The governing arbitration clause *expressly provides* that this requirement is satisfied here.  Moreover, the arbitration was conducted under an investment treaty and arose out of actions taken by the Russian Federation to benefit its commercial interests in Rosneft at the expense of Petitioners' investment in a competing oil company.  These circumstances easily satisfy the commercial relationship requirement, especially in light of recent DC Circuit precedent adopting an expansive interpretation of "commercial" for New York Convention purposes.

### A.   The Express Terms of the Arbitration Clause Establish that the Awards Arise Out of a Commercial Relationship for Purposes of the New York Convention

The ECT expressly provides that awards issued in ECT arbitrations satisfy the New York Convention's commercial relationship requirement.  Article 26 provides in relevant part that:

> Any arbitration under this Article shall at the request of any party to the dispute be held in a state that is a party to the New York Convention.  Claims submitted to arbitration hereunder *shall be considered to arise out of a commercial relationship* or transaction for the purposes of article I of that Convention.

(ECT art. 26(5)(b) (emphasis added).)  This language alone forecloses the Russian Federation's argument that the Awards do not satisfy the New York Convention's commercial relationship

---

[24] Article I(3) of the Convention authorizes members to reserve its applicability "to differences arising out of legal relationships, whether contractual or not, which are considered as commercial under the national law of the State."  The United States adopted this reservation.  9 U.S.C. § 202 (an "arbitral award arising out of a legal relationship, whether contractual or not, which is considered as commercial, including a transaction, contract, or agreement described in section 2 of this title, falls under the Convention").

requirement.  *See, e.g., BG Group*, 134 S. Ct. at 1208 ("As a general matter, a treaty is a contract, though between nations.  Its interpretation normally is, like a contract's interpretation, a matter of determining the parties' intent [and] courts must give the specific words of the treaty a meaning consistent with the shared expectations of the contracting parties.") (citation omitted).[25]

Refusing to give force to this provision would have widespread repercussions given that this is standard language frequently used in similar agreements, including by the United States. For example, the arbitration clause in the North American Free Trade Agreement ("NAFTA") provides – using nearly identical language – that "[a] claim that is submitted to arbitration under this Section *shall be considered to arise out of a commercial relationship* or transaction for purposes of Article I of the New York Convention."  NAFTA, U.S.-Can.-Mex., art. 1136(7) (emphasis added); *see also* Bernard D. Reams & Jon S. Schultz, *The North American Free Trade Agreement (NAFTA): Documents and Materials Including a Legislative History of the North American Free Trade Agreement Implementation Act: Public Law 103-182*, 598 (1994) ("By declaring that claims submitted to NAFTA arbitration will be considered to arise out of a commercial relationship or transaction, paragraph seven satisfies the prerequisites of the New York Convention . . . for the enforcement of awards under those agreements."), Banifatemi

---

[25] It is widely recognized that the purpose of this provision was to ensure broad enforceability of ECT awards.  *See, e.g.*, Marina de Kwant, *Emerging Oil and Gas Economies: Mitigating Legal, Political and Economic Risks of Foreign Investors in the Russian Federation (Part B)*, 15 Int'l Trade & Bus. L. Rev. 78, 120 (2012) ("Under Article 26(5)(b) ECT, the parties to the arbitration may request that the arbitration takes place in a State which is a party to the New York Convention, thereby ensuring the enforceability of the future award.  The parties' enforcement rights are further protected by the last sentence of Article 26(5)(b) ECT which confirms that disputes submitted to arbitration under Article 26 fall within the scope of transactions set out in Article I New York Convention."), Banifatemi Decl., Ex. 25; Kenneth J. Vandevelde, *Arbitration Provisions in the BITS and the Energy Charter Treaty, in The Energy Charter Treaty: An East-West Gateway For Investment And Trade* 409, 418 (Thomas W. Wälde ed., 1996) ("This language was also included to ensure enforceability under the New York Convention, which permits states to declare that they will apply the Convention only to the arbitration of disputes arising out of commercial relationships."), Banifatemi Decl., Ex. 22; Thomas Roe, *Settlement of Investment Disputes Under the Energy Charter Treaty* 19, 154 (1972) (stating that Article 26(5)(b) "bring[s] any subsequent arbitral award within the scope of the Convention for enforcement purposes"), Banifatemi Decl., Ex. 24.

Decl., Ex. 21.  This provision is also included in numerous bilateral investment treaties between the United States and other nations.[26]  Indeed, the United States' own model bilateral investment treaty incorporates this provision.  *2012 U.S. Model Bilateral Investment Treaty* art. 34(10), http://www.state.gov/documents/organization/188371.pdf; *see also* Lee M. Caplan & Jeremy K. Sharpe, *United States*, *in Commentaries on Selected Model Investment Treaties* 755, 846-47 (Chester Brown ed., 2013) ("Article 34(10) provides certainty as to the status of an investor-State award under the New York Convention . . . By providing that arbitration claims under a US BIT are considered to 'arise out of a commercial relationship or transaction for purposes of Article I of the New York Convention . . . ', Article 34(10) ensures application of the relevant convention in the territories of the BIT Parties") (citation omitted), Banifatemi Decl., Ex. 26.[27]

If the Court rules that this provision is inoperative, the expectations of many nations that have relied on such clauses to ensure the enforceability of arbitral awards – including the United States – would be disrupted.  *Cf. BG Group*, 134 S. Ct. at 1211 (rejecting treaty interpretation that "is not consistent with our case law interpreting similar provisions"); *Sullivan v. Kidd*, 254

---

[26] *See, e.g.*, United States-Rwanda Investment Treaty, art. 34 (Feb. 19, 2008), http://investmentpolicyhub.unctad.org/Download/TreatyFile/2241; United States-Uruguay Investment Treaty, art. 34 (Nov. 4, 2005), http://investmentpolicyhub.unctad.org/Download/TreatyFile/2380; The Dominican Republic-Central America-United States Free Trade Agreement, art. 10.26 (Aug. 5, 2004), https://ustr.gov/trade-agreements/free-trade-agreements/cafta-dr-dominican-republic-central-america-fta/final-text; United States-Chile Free Trade Agreement, art. 10.25 (June 6, 2003), https://ustr.gov/trade-agreements/free-trade-agreements/chile-fta/final-text.  This provision is also widely used in treaties among foreign nations.  *See, e.g.,* Canada-Peru Investment Treaty, art. 45 (Nov. 14, 2006), http://investmentpolicyhub.unctad.org/Download/TreatyFile/626; Flávio S. Barboza, *Enforcement of International Investment Arbitral Awards*, 6 Revista Brasileira de Arbitragem, Issue 21, 5-6 (2009) ("[I]nvestment treaties frequently provide for a special clause establishing that the 'claim submitted to arbitration shall be considered to arise out of a commercial relationship or transaction for the purposes of the article I of the New York Convention.'"), Banifatemi Decl., Ex. 23.

[27] *See also* U.S. Dep't of State Office of the Spokesperson, *U.S. Concludes Review of Model Bilateral Investment Treaty* (Apr. 20, 2012), http://www.state.gov/r/pa/prs/ps/2012/04/188198.htm (the "United States negotiates BITS on the basis of a high-standard 'model' text that provides investors with . . . a mechanism to pursue binding international arbitration for breaches of the treaty").

U.S. 433, 442 (1921) (when construing treaties, courts "should be careful to see that international engagements are faithfully kept and observed").

In short, the Court should find that the New York Convention's commercial relationship requirement is satisfied based on the plain language of the governing arbitration clause. The Russian Federation's sole argument against that conclusion is that the ECT's arbitration clause is inapplicable under Article 45(1). (SMJ Br. at 43-44.) As explained above, this argument fails for several independent reasons. (*See supra*, Sections I.A, I.B, I.C.1.)

**B.  The Awards In Fact Arose Out of a Commercial Relationship For Purposes of the New York Convention**

Even without the express language in the ECT addressed above, the Awards here would satisfy the requirement of arising out of a commercial relationship. The important starting point for the analysis is that this requirement is construed expansively. The DC Circuit so held in a decision issued earlier this year in which it clarified that the term "commercial," as used in 9 U.S.C. § 202, merely "refers to matters which *have a connection to commerce*." *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 794 F.3d 99, 105 (D.C. Cir. 2015) (emphasis added); *see id.* at 104 ("[T]he full scope of 'commerce' and 'foreign commerce,' as those terms have been broadly interpreted, is available for arbitral agreements and awards."); *id.* ("A matter or relationship may be commercial even though it does not arise out of or relate to a contract, so long as it has a connection with commerce, whether or not that commerce has a nexus with the United States.") (citation omitted); *see also* Gary B. Born, *International Commercial Arbitration* 296 (2d. ed. 2014) ("[T]he contemporary 'requirement' of a commercial relationship in fact typically operates as a positive confirmation of the permissible – and expansive – breadth of international arbitration agreements, rather than a meaningful negative limitation."), Banifatemi Decl., Ex. 27.

The DC Circuit emphasized that its analysis was informed by how the term "commercial" is used in the "international arbitration context," as well as by the pro-enforcement policies of the Convention, and rejected the narrower definition of "commercial" used in the FSIA context:

> Belize's reliance on *Weltover* is misplaced.  Unlike with the FSIA, Congress was not codifying the restrictive theory of foreign sovereign immunity when it ratified and implemented the New York Convention.  Rather, the treaty concerns international arbitration.  We thus recognize that: (1) the Convention's purpose was to "encourage the recognition and enforcement of commercial arbitration agreements in international contracts"; (2) the word "commercial" is a "term of art"; and (3) in implementing the Convention, Congress intended that word to have the meaning generally attached to that term in the international commercial arbitration context.  As we discussed above, "commercial" in the context of international arbitration refers to matters which have a connection to commerce.

*Belize Soc. Dev.*, 794 F.3d at 105 (citation omitted).  The DC Circuit's expansive construction of the commercial relationship requirement is consistent with, and promotes, the "emphatic federal policy in favor of arbitral dispute resolution."  *Chevron*, 795 F.3d at 209 (quoting *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 631 (1985)).

The parties' relationship and the dispute that was arbitrated here had "a connection to commerce," thus satisfying the commercial relationship requirement.  The arbitration was conducted under an investment treaty (the ECT) that governs how signatories like the Russian Federation treat commercial investment, such as Petitioners' investment in Yukos.  (Petition ¶ 34.)  The Russian Federation's conduct had the effect of destroying the value of that investment.  (*Id.* ¶ 33.)  The Russian Federation cannot seriously contend that an investment treaty arbitration relating to a petitioner's commercial investment does not have "a connection to commerce."

Indeed, just last year the Supreme Court affirmed the propriety of confirming investment treaty awards under the New York Convention.  *See BG Group, PLC v. Republic of Argentina*, 134 S. Ct. 1198 (2014).  In *BG Group*, as here: (i) an investor brought a claim under an investment treaty concerning a foreign state's purported tax treatment of an investment made in

the energy sector (*id*. at 1203-04); (ii) the investor claimed in the arbitration, *inter alia*, that the foreign state had violated prohibitions against expropriation (*id*. at 1204);[28] and (iii) the arbitral tribunal ruled in favor of the investor and the investor sought confirmation of that award under the New York Convention (*id*. at 1205).  The Supreme Court rejected challenges to the award and remanded the case to the DC Circuit, which affirmed the district court's confirmation of the award.  *Id*.; *Republic of Argentina v. BG Group PLC*, 555 F. App'x 2, 3 (D.C. Cir. 2014).

In so ruling, the Supreme Court and the DC Circuit affirmed that awards issued in investor-State arbitrations under investment treaties are appropriately enforced under the New York Convention.  While the *BG Group* decisions did not expressly address the commercial relationship requirement, the necessary implication is that this requirement is satisfied under such circumstances, since it is a prerequisite for confirmation under the New York Convention.  Consistent with these decisions, the Court should find that where, as here, the underlying arbitration arose under an *investment* treaty, the matter and the parties' relationship had "a connection to commerce," thus satisfying the commercial relationship requirement.

Moreover, various other aspects of the dispute support finding that the commercial relationship requirement is satisfied here.  The dispute concerned Petitioners' investment in Yukos, a successful company that "engag[ed] in exploration, production, refining, marketing and distribution of crude oil, natural gas and petroleum products," employed thousands, and competed with the Russian Federation's state-owned oil company, Rosneft.  (Awards ¶¶ 71-73.) The Russian Federation engaged in the unlawful conduct at issue to benefit its commercial

---

[28] Indeed, the treaty at issue in *BG Group* had investor protection provisions similar to those in the ECT. *Compare, e.g.,* Agreement for the Promotion and Protection of Investments, Arg.-U.K., 1765 U.N.T.S. 38, art. 2(2) (Dec. 11, 1990) ("Investments of investors of each Contracting Party shall at all times be accorded fair and equitable treatment and shall enjoy protection and constant security") *with* ECT art. 10(1) (imposing on "[e]ach Contracting Party" "a commitment to accord at all times to Investments of Investors of other Contracting Parties fair and equitable treatment" and providing that "[s]uch Investments shall also enjoy the most constant protection and security").

interests in Rosneft, by destroying a competitor and transferring Yukos' oil producing assets to Rosneft.  (*Id*. ¶ 513; Petition ¶¶ 33, 59-60.)  These circumstances further support finding that the dispute and the parties' relationship had "a connection to commerce."

The Russian Federation's argument that this dispute was sovereign, not commercial, in nature because it involved "public law matters" such as "taxation" (SMJ Br. at 43) is unavailing. Even if the activities at issue had reflected a genuine exercise in tax collection, which the Tribunal found was not the case (*see supra*, n.22), recent DC Circuit precedent establishes that a nation's imposition of taxes on a company, like Yukos, has the requisite "connection to commerce."  *See Belize Soc. Dev.*, 794 F.3d at 104.  In *Belize Soc. Dev.*, the government of Belize sought to avoid the enforcement of an arbitral award arising out of its tax treatment of a claimant's investment by characterizing the dispute as involving sovereign, rather than commercial, activity.  *Id*. at 103-05 (considering Belize argument that "its actions were not commercial" because, "in granting [a company] certain tax and duty exemptions, it exercised 'powers peculiar to sovereigns'").  In rejecting Belize's argument, the DC Circuit held – after finding that the New York Convention merely requires "a connection with commerce" – that "[t]he taxes Belize levies against a company also have a connection with commerce, as do the duties Belize charges (or forgoes charging)."  *Id*. at 104 (citing *Commonwealth Edison Co. v. Montana*, 453 U.S. 609, 614-15 (1981) as "noting the impact taxes have on commerce").[29]  This ruling forecloses the Russian Federation's argument that disputes involving taxes or other

---

[29] This ruling is especially important in the investment treaty context.  Investor-State arbitrations often involve – as this case and *BG Group* reflect – claims that purported taxes imposed on an investor in fact reflected expropriation or discrimination in violation of a State's investment treaty obligations.  A ruling that such disputes do not satisfy the "commercial relationship" requirement would exempt a broad swath of investment treaty awards from enforcement under the New York Convention.  That would undermine the Convention's pro-enforcement policies and disrupt the expectations of the many nations (including the United States) that are parties to investment treaties, which often, like the ECT, expressly provide that treaty arbitration awards will be enforceable under the Convention.  (*See supra*, Section II.A.)

"public law matters" do not satisfy the commercial relationship requirement.

The Russian Federation's reliance on this Court's decision in *Diag* is also misplaced.  In *Diag Human S.E. v. Czech Republic-Ministry of Health*, 64 F. Supp. 3d 22 (D.D.C. 2014), this Court found that an arbitration award did not arise out of a commercial relationship with the sovereign respondent.  *Diag* is inapplicable for a variety of reasons.  The agreement to arbitrate in *Diag* was made *ad hoc*, as an alternative to tort litigation, and was not part of a preexisting contract or treaty, much less one that had a connection with commerce (*id.* at 29); in contrast, the arbitration agreement here was part of an investment treaty that concerned commercial investment.  *See Chevron*, 795 F.3d at 206 (recognizing that a treaty must be treated "as if it were an ordinary contract between private parties" and that arbitration clauses in investment treaties reflect "an agreement with all potential [covered] investors . . . to submit all investment-related disputes to arbitration") (citation omitted).  Moreover, the dispute in *Diag* involved a defamatory letter written by the State that had injured the petitioner (64 F. Supp. 3d at 25-26); here, in contrast, the dispute involves the Russian Federation's destruction of a commercial oil company (Yukos) for the purpose of benefitting its commercial interests as owner of a competitor (Rosneft) and in violation of obligations owed to Petitioners under an investment treaty (Petition ¶¶ 12-33).  Finally, the arbitration clause here, unlike in *Diag*, expressly provides that the commercial relationship requirement is satisfied.  (ECT art. 26(5)(b).)  *Diag* is thus wholly distinguishable and provides no basis for finding the New York Convention inapplicable.

## **CONCLUSION**

For these reasons, Petitioners respectfully request that the Court deny Respondent's Motion to Dismiss for Lack of Subject Matter Jurisdiction.

Dated:  November 23, 2015

Respectfully Submitted,


*/s/ Christopher Ryan*
Christopher Ryan (DC Bar No. 476661)
Keith R. Palfin (DC Bar No. 492618)
SHEARMAN & STERLING LLP
801 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2604
Telephone: (202) 508-8000
E-mail:   christopher.ryan@shearman.com
           kpalfin@shearman.com

Henry Weisburg
Richard Schwed
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, New York 10022-6069
Telephone: (212) 848-4000
E-mail:   hweisburg@shearman.com
           rschwed@shearman.com