# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| HULLEY ENTERPRISES LTD., YUKOS ) | |
| UNIVERSAL LTD., AND VETERAN ) | |
| PETROLEUM LTD., ) | |
| ) | |
| *Petitioners*, ) | |
| ) | |
| v. ) | Case No. 1:14-cv-01996-BAH |
| ) | |
| THE RUSSIAN FEDERATION, ) | |
| ) | |
| *Respondent*. ) | |
| _____ ) | |

# THE RUSSIAN FEDERATION'S REPLY
## IN SUPPORT OF ITS MOTION TO DISMISS THE PETITION TO CONFIRM ARBITRATION AWARDS FOR LACK OF SUBJECT MATTER JURISDICTION

**WHITE & CASE** LLP

Carolyn B. Lamm (D.C. Bar No. 221325)
Francis A. Vasquez, Jr. (D.C. Bar No. 442161)
Frank Panopoulos (D.C. Bar No. 459365)
Eckhard Robert Hellbeck (D.C. Bar No. 473619)
Chauncey Bratt (D.C. Bar No. 1018133)
701 Thirteenth Street, N.W.
Washington, D.C. 20005
Phone: (202) 626-3600
Fax:    (202) 639-9355

*Counsel for Respondent*

December 11, 2015

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................................1

ARGUMENT .........................................................................................................................3

I.     The Russian Federation Has Met Its Burden of Showing by a Preponderance of the Evidence that There Was No Agreement to Arbitrate ..................................................3

     A.     The Existence of an Arbitration Agreement Is a "Factual Predicate" to this Court's Subject Matter Jurisdiction Under 28 U.S.C. § 1605(a)(6) .......................4

     B.     The Determination of Whether an Arbitration Agreement Exists Cannot Be (and Was Not) Delegated Exclusively to the Arbitrators ..................................7

     C.     The Determination of Whether an Arbitration Agreement Exists Was Not Delegated Exclusively to the Arbitrators ..................................................................9

     D.     There Was No Agreement to Arbitrate in the Present Case ..................................11

           1.     The Russian Federation Made No Offer to Arbitrate, Because It Did Not Agree to Apply the ECT's Arbitration Clause Provisionally ............12

           2.     Petitioners Were Excluded from the Purported Class of Offerees ............17

                 a.     Petitioners' Cypriot and U.K. Nationality Must Be Disregarded Under "Veil-Piercing" Doctrine ..................................................18

                 b.     Petitioners Were Not Offerees Because They Acquired Their Investment Through Fraudulent and Illegal Acts ........................19

                 c.     Petitioners Were Not Offerees Because They Are Shell Companies, Beneficially Owned and Controlled by Russians ..... 20

           3.     Petitioners Failed to Accept the Purported Offer to Arbitrate ..................21

II.     The Awards Are Not Governed by the N.Y. Convention Because Petitioners' Awards Do Not Arise Out of a Legal Relationship Considered as Commercial ..............22

     A.     The Court Must Determine Whether the Awards Are Governed by the N.Y. Convention ...............................................................................................22

     B.     The Russian Federation's Relationship with Petitioners Was Regulatory ...........24

     C.     ECT Article 26(5)(b) Does Not Apply in U.S. Courts .........................................25

CONCLUSION....................................................................................................................25

# TABLE OF AUTHORITIES

## CASES                                                                 Page(s)

*Akinseye v. District of Columbia*,
   339 F.3d 970 (D.C. Cir. 2003) .................................................................................7

*Asociación de Reclamantes v. United Mexican States*,
   735 F. 2d 1517 (D.C. Cir. 1984) ............................................................................7

*Arbaugh v. Y&H Corp.*,
   546 U.S. 500 (2006) ...............................................................................................7

*Argentine Republic v. Amerada Hess Shipping Corp.*,
   488 U.S. 428 (1989) .............................................................................................10

*Barnhart v. Sigmon Coal Co., Inc.*,
   534 U.S. 438 (2002) .............................................................................................23

*Bautista v. Star Cruises*,
   396 F.3d 1289 (11th Cir. 2005) ...........................................................................25

*Belize Soc. Dev. Ltd. v. Gov't of Belize*,
   794 F.3d 99 (D.C. Cir. 2015) ...............................................................................24

*BG Group, PLC v. Republic of Argentina*,
   134 S. Ct. 1198 (2014) ................................................................................ *passim*

*Bullcreek v. Nuclear Regulatory Comm'n*,
   359 F.3d 536 (D.C. Cir. 2004) .............................................................................23

*California Fina Grp., Inc. v. Herrin*,
   379 F.3d 311 (5th Cir. 2004) ...............................................................................12

*Cargill Int'l S.A. v. M/T Pavel Dybenko*,
   991 F.2d 1012 (2d Cir. 1993) .................................................................................3

*Chevron Corp. v. Republic of Ecuador*,
   795 F.3d 200 (D.C. Cir. 2015) ................................................................... *passim*

*China Minmetals Materials Imp. & Exp. Co. v. Chi Mei Corp.*,
   334 F.3d 274 (3d Cir. 2003) ...........................................................................9, 10

*Chubb & Son, Inc. v. Asiana Airlines,*
  214 F.3d 301 (2d Cir. 2000) ................................................................................. 13, 17

*Citigroup Glob. Mkts. Inc. v. Abbar,*
  761 F.3d 268 (2d Cir. 2014) ........................................................................................ 12

*Cornejo v. Cty. of San Diego,*
  504 F.3d 853 (9th Cir. 2007) ...................................................................................... 20

*Creighton Ltd. v. Gov't of Qatar,*
  181 F.3d 118 (D.C. Cir. 1999) .................................................................................... 22

*Diag Human S.E. v. Czech Republic Ministry of Health,*
  64 F. Supp. 3d 22 (D.D.C. 2014) ............................................................................... 24

*DK Joint Venture 1 v. Weyand,*
  649 F.3d 310 (5th Cir. 2011) ...................................................................................... 10

*First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba,*
  462 U.S. 611 (1983) ..................................................................................................... 18

*First Options of Chicago, Inc. v. Kaplan,*
  514 U.S. 938 (1995) .................................................................................................. 9, 11

*Foremost-McKesson, Inc. v. Islamic Republic of Iran,*
  905 F.2d 438 (D.C. Cir. 1990) .................................................................................... 23

*Fujitsu Ltd. v. Federal Express Corp.,*
  247 F.3d 423 (2d Cir. 2001) ................................................................................... 13, 17

*Gonzalez Paredes v. Vila,*
  479 F. Supp. 2d 187 (D.D.C. 2007) ............................................................................ 20

*Granite Rock Co. v. Teamsters,*
  561 U.S. 287 (2010) ....................................................................................................... 4

*Logan v. Dupuis,*
  990 F. Supp. 26 (D.D.C. 1997) .............................................................................. 13, 20

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,*
  460 U.S. 1 (1983) ......................................................................................................... 12

*Nat'l Mining Ass'n v. Kempthorne,*
  512 F.3d 702 (D.C. Cir. 2008) ...................................................................................... 7

*Nat'l R.R. Passenger Corp. v. Boston & Maine Corp.,*
  850 F. 2d 756 (D.C. Cir. 1988) .................................................................................4, 9

*Nebraska Mach. Co. v. Cargotec Sols., LLC,*
  762 F.3d 737 (8th Cir. 2014) .......................................................................................10

*NetworkIP, LLC v. F.C.C.,*
  548 F.3d 116 (D.C. Cir. 2008) ......................................................................................7

*Oehme, van Sweden & Associates, Inc. v. Maypaul Trading & Servs. Ltd.,*
  902 F. Supp. 2d 87 (D.D.C. 2012) ...............................................................................10

*Pearce v. E.F. Hutton Grp., Inc.,*
  828 F.2d 826 (D.C. Cir. 1987) .....................................................................................12

*Permanent Mission of India to United Nations v. City of New York,*
  551 U.S. 193 (2007).......................................................................................................7

*Phoenix Consulting Inc. v. Republic of Angola,*
  216 F.3d 36 (D.C. Cir. 2000) ...................................................................................3, 23

*Photopaint Techs. LLC v. Smartlens Corp.,*
  335 F.3d 152 (2d Cir. 2003).........................................................................................23

*Rainbow Nav., Inc. v. Dep't of Navy,*
  686 F. Supp. 354 (D.D.C. 1988) ..................................................................................20

*Rent-A-Center, West, Inc. v. Jackson,*
  561 U.S. 63 (2010).......................................................................................................11

*Republic of Ecuador v. Chevron Corp.,*
  638 F.3d 384 (2d Cir. 2011)...........................................................................................5

*Riley Mfg. Co. v. Anchor Glass Container Corp.,*
  157 F.3d 775 (10th Cir. 1998) ................................................................................10, 12

*Rogers v. Royal Caribbean,*
  547 F.3d 1148 (9th Cir. 2008) .....................................................................................25

*Saviano v. Comm'r,*
  765 F.2d 643 (7th Cir. 1985) .......................................................................................25

*Senator Linie Gmbh & Co. Kg v. Sunway Line, Inc.,*
  291 F.3d 145 (2d Cir. 2002).........................................................................................20

*Thai-Lao Lignite (Thai.) Co. v. Gov't of the Lao People's Democratic Republic*, No.
    10-cv-5256-KMW, 2011 WL 3516154 (S.D.N.Y. Aug. 3, 2011)............................................9

*TI Fed. Credit Union v. Del Bonis*,
    72 F.3d 921 (1st Cir. 1995)...............................................................................................25

*UBS Fin. Servs., Inc. v. Carilion Clinic*,
    706 F.3d 319 (4th Cir. 2013) .............................................................................................12

*United States v. Alvarez-Machain*,
    504 U.S. 655 (1992)...........................................................................................................17

*United States v. Rauscher*,
    119 U. S. 407 (1886)..........................................................................................................17

*Weston v. Wash. Metro. Area Transit Auth.*,
    78 F.3d 682 (D.C. Cir. 1996).............................................................................................25

## STATUTES

9 U.S.C. § 202...................................................................................................... *passim*

28 U.S.C. § 1605(a)(6)........................................................................................... *passim*

## TREATIES

Convention for the Recognition and Enforcement of Foreign Arbitral Awards, June
    10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 38, codified at 9 U.S.C. §§ 201-208
    (2000)..................................................................................................... *passim*

Energy Charter Treaty, Dec. 17, 1994, 2080 U.N.T.S. 95, Reg. No. 36116. ....................... *passim*

Vienna Convention on the Law of Treaties, May 23, 1969, 1155 U.N.T.S. 331 ............................

## OTHER AUTHORITIES

Restatement (Third) of the Foreign Relations Law of the United States (1986)...............13, 20, 25

Restatement (Third) U.S. Law of Int'l Comm. Arb. § 1-1
    Tentative Draft no. 2 (Apr. 16, 2012) ................................................................................25

3 Singer & Singer, Statutes and Statutory Construction (2008) ....................................................23

Pursuant to the Court's October 22, 2015 Minute Order, the Russian Federation submits this Reply in support of its Motion to Dismiss for Lack of Subject Matter Jurisdiction ("Motion") and respectfully requests oral argument under the Court's Standing Order § 5(b) and LCvR 7(f).

## INTRODUCTION

Petitioners accuse the Russian Federation of "one of the largest acts of theft ever perpetrated."[1]   As the Russian Federation has demonstrated, however, it is ***Petitioners' principals***, the six Russian Oligarchs, who committed one of history's most egregious frauds—a conspiracy to defraud the Russian people out of property worth tens of billions of dollars during the 1995 Loans-for-Shares auctions.[2]   Based on the fruits of this deception, which was hidden from the Russian Federation and the arbitrators, Petitioners now demand more than US$ 50 billion—approximately 25% of the Russian Federation's annual revenue, or 20% of its annual spending.[3]   When given the opportunity,[4]   the Russian Federation will submit further documentary evidence and testimony as to the Oligarchs' illegal acts, conclusively establishing that Petitioners were not eligible offerees under the Energy Charter Treaty ("ECT") and thus had no right to arbitrate against the Russian Federation (which, in any event, never ratified the ECT).

The Russian Federation will also prove Petitioners' acts of deception during the arbitral proceedings.   Specifically, Petitioners made painstaking efforts to conceal the origin of their Yukos shares from the arbitrators.   As set forth in Annex A,[5] Petitioners systematically deceived the arbitrators into believing that their Yukos shares were purchased from unrelated third parties.

---

[1] Opp. 1 (ECF No. 63).

[2] Mot. 1-18 (ECF No. 24).

[3] *See* Prime Minister Dmitry Medvedev, Statement to Government House, Moscow, March 5, 2015 (R-548); Central Bank of the Russian Federation, Foreign Currency Market: Official Exchange Rates (R-549).

[4] Second Vasquez Decl., Dec. 11, 2015, Annex 1.

[5] In accordance with this Court's October 22, 2015 Minute Order, Respondent addresses only the legal issues raised on pages 25-44 of the Motion to Dismiss, and Petitioners' Opposition to the same.   Respondent emphasizes that it has further factual information concerning the investors' fraudulent and illegal activities, and reserves all rights to submit additional factual evidence after this Court has ruled upon the questions of law now before it.

In fact, Professor S.P. Kothari of MIT can now demonstrate that almost 100% of Petitioners' Yukos shares originated with the fraudulent Loans-for-Shares auctions, and were secretly routed through the Oligarchs' maze of offshore shell companies in violation of Russian law.[6]  Had these facts been disclosed during the ECT arbitration, as the arbitrators themselves stated explicitly, Petitioners would have been "***barred from seeking relief under the ECT***" in accordance with fundamental principles of international law.[7]

Now Petitioners argue that this Court is powerless to stop them.   According to Petitioners, the arbitrators were the Russian Federation's first, last, and only line of defense against the Oligarchs, because the Russian Federation purportedly delegated all "arbitrability challenges" exclusively to the arbitrators.[8]   But under international law, as conceded by Petitioners' own arbitration lawyers, Emmanuel Gaillard and Yas Banifatemi, and confirmed by Professor George A. Bermann, the relevant "competence-competence" language used by the Russian Federation "***by no means suggests***" (and was not understood to suggest) an agreement to deprive this Court of its responsibility "***to review the existence and validity of the arbitration agreement . . . at the end of the arbitral process***."[9]

As explained below, therefore, this Court must consider *de novo* each of the Russian Federation's jurisdictional challenges regarding the non-existence of any arbitration agreement under the Foreign Sovereign Immunities Act ("FSIA"), as well as the distinct question of whether the New York Convention ("N.Y. Convention") applies.

---

[6] Kothari Op. ¶ 45 (ECF No. 24-4); *see also* Second Asoskov Op. ¶¶ 35-52 (ECF No. 24-6).
[7] Hulley Final Award ¶¶ 1352, 1364-70 (ECF No. 30-8) (emphasis added).
[8] Opp. 15-21 (ECF No. 63).
[9] Emmanuel Gaillard & Yas Banifatemi, *Negative Effect of Competence-Competence: The Rule of Priority in Favour of the Arbitrators* 258, 261 (RLA-103) (emphasis added); *see also* Second Expert Opinion of Professor George A. Bermann ("Bermann II"), Dec. 11, 2015 ¶¶ 14-30; Expert Opinion of Professor Sean Murphy ("Murphy") ¶ 22; *Dallah v. Pakistan* [2010] UKSC 46 ¶¶ 25, 84 (ECF No. 55-12); *The Arab Republic of Egypt v. SPP Ltd*., Cour d'Appel of Paris, 12 July 1984 in 10 Y.B. COMM. ARB. 113 ¶ 10 (Pieter Sanders ed., 1985) (RLA-93); *Republic of Ecuador/Chevron Corp.*, Supreme Court of the Netherlands, HR 26 Sept. 2014, First Chamber No. 13/04679 EV/LZ (RLA-116).

**ARGUMENT**

Petitioners claim that this Court has subject matter jurisdiction under the FSIA's "agreement to arbitrate" exception at 28 U.S.C. § 1605(a)(6).[10]  The Court must evaluate the factual basis for FSIA exceptions by looking to evidence "beyond the pleadings"[11] and, "if necessary, may proceed to a trial . . . [to determine] whether an agreement to arbitrate actually exists."[12]

**I.      The Russian Federation Has Met Its Burden of Showing by a Preponderance of the Evidence that There Was No Agreement to Arbitrate**

In its Motion, the Russian Federation demonstrated that the FSIA's "agreement to arbitrate" exception does not apply, because no agreement to arbitrate ever existed between the parties.[13]  First, the Russian Federation specifically ***never offered*** to arbitrate, because the ECT's arbitration provisions are "inconsistent with [the Russian Federation's] constitution, laws or regulations" under the ECT's Article 45(1).[14]  Second, Petitioners were ***not eligible offerees*** because (i) their Cypriot and U.K. (Isle of Man) nationality was used to perpetuate and conceal the Oligarchs' acts of fraud, (ii) the Oligarchs acquired their Yukos shares fraudulently, and (iii) Petitioners are beneficially owned and controlled by Russian nationals (not foreign nationals).[15]  Third, Petitioners ***failed to accept any purported offer*** to arbitrate because they failed to refer this dispute to the proper decision-makers under the ECT's Article 21(5)(b)(i).[16]

In their Opposition, Petitioners devote considerable effort to re-characterizing the

---

[10] Opp. 3 (ECF No. 63).  In a footnote, Petitioners also argue that "the Russian Federation's agreement to arbitrate constitutes an implied waiver of immunity."  *Id.* at 10 n.4.  Because the Russian Federation never entered into an agreement to arbitrate, however, the Russian Federation also never waived its immunity under the FSIA.  *See* Mot. 39-42 (ECF No. 24).

[11] *Phoenix Consulting Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000).

[12] *Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1019 (2d Cir. 1993).

[13] Mot. 26-38 (ECF No. 24).

[14] *Id.* at 28-31.

[15] *Id.* at 31-36.

[16] *Id.* at 36-38.

Russian Federation's arguments as mere "arbitrability challenges."[17]    Petitioners then categorically assert that "arbitrability challenges . . . are not subject matter jurisdiction challenges," but rather "should be addressed when the Court later considers the Russian Federation's Article V challenges" separately under the N.Y. Convention.[18]  Petitioners further assert that, because the Russian Federation purportedly "agreed to arbitrate arbitrability," the Court "must defer to the Tribunal's ruling that the dispute was arbitrable."[19]    Petitioners' arguments are meritless.

Most fundamentally, Petitioners have completely ignored the well-established distinction between disputes as to "the *formation* of the parties' arbitration agreement" and other categories of arbitrability challenges, such as disputes as to "the *scope* of arbitral issues."[20]  Unlike other so-called "arbitrability challenges," challenges to the purported arbitration agreement's existence (based on the lack of an offer, offeree, or acceptance) give rise to jurisdictional consequences under the FSIA.[21]    Accordingly, each of the Russian Federation's challenges (i) defeats the Court's subject matter jurisdiction, (ii) cannot be delegated exclusively to the arbitrators and, in any event, (iii) never was delegated exclusively to the arbitrators in the present case.

A.     **The Existence of an Arbitration Agreement Is a "Factual Predicate" to this Court's Subject Matter Jurisdiction Under 28 U.S.C. § 1605(a)(6)**

As explained in *BG Group Plc v. Republic of Argentina*, a typical investment treaty contains the host State's "offer to arbitrate" with eligible foreign investors, which must "be accepted . . . through an investor's filing of a notice of arbitration" in order to conclude an

---

[17] *See* Opp. 10-38 (ECF No. 63).
[18] *Id.* at 13, 15.
[19] *Id.* at 17-18.
[20] *See Granite Rock Co. v. Teamsters*, 561 U.S. 287, 298-300 (2010) (emphasis added); *see also BG Grp., PLC v. Republic of Argentina*, 134 S. Ct. 1198, 1206 (2014) (distinguishing between disputes as to "whether the parties are bound by a given arbitration clause" and disputes as to "whether an arbitration clause . . . applies to a particular type of controversy"); *Nat'l R.R. Passenger Corp. v. Boston & Maine Corp.*, 850 F. 2d 756, 761 (D.C. Cir. 1988).
[21] *Chevron Corp. v. Republic of Ecuador*, 795 F.3d 200, 204-06 (D.C. Cir. 2015).

arbitration agreement.[22]   The acceptance must also be "in accordance with the [offer's] terms."[23]
The D.C. Circuit's principal case addressing the interaction between the FSIA and an arbitration
agreement's formation under an investment treaty is *Chevron v. Republic of Ecuador*.   As
explained therein, "*[i]f there is no arbitration agreement . . . , the District Court lacks
jurisdiction over the foreign state and the action must be dismissed*" under the FSIA.[24]

The *Chevron* court further explained that the existence of an arbitration agreement is
determined through a burden-shifting analysis.[25]   The alleged foreign investors (*i.e.*, Petitioners)
first must make "a *prima facie* showing that there was an arbitration agreement by producing [an
investment treaty] and the notice of arbitration."[26]   Subsequently, "the burden shift[s]" to the host
State (*i.e.*, the Russian Federation) "to demonstrate by a preponderance of the evidence that the
[investment treaty] and the notice to arbitrate did not constitute a valid arbitration agreement
between the parties.   The jurisdictional task before the District Court [is] to determine *whether
[the host State] ha[s] sufficiently rebutted the presumption that the [investment treaty] and the
notice of arbitration constituted an agreement to arbitrate*."[27]

Disregarding the explicit holding of *Chevron*, Petitioners argue that the Russian
Federation should be denied its opportunity to rebut Petitioners' *prima facie* evidence.[28]
Specifically, Petitioners proffer an assortment of "materials" which supposedly add up to an
agreement to arbitrate: (i) the ECT, an investment treaty which the Russian Federation never
ratified and which explicitly excludes arbitration where inconsistent with the Russian
Federation's domestic law; (ii) Petitioners' notices of arbitration, purporting to accept a standing

---

[22] *BG Group Plc v. Republic of Argentina*, 134 S. Ct. 1198, 1211 (2014).
[23] *Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384, 392-93 (2d Cir. 2011).
[24] *Chevron*, 795 F.3d at 204 (emphasis added).
[25] *Id.* at 204-05.
[26] *Id.* at 205.
[27] *Id.* (emphasis added).
[28] Opp. 11-12 (ECF No. 63).

offer for which Petitioners were not eligible; (iii) a letter wherein the Russian Federation "accept[ed] the jurisdiction of this Arbitral Tribunal to determine its own jurisdiction"; (iv) the arbitrators' Terms of Appointment; and (v) Petitioners' arbitral awards.[29]   According to Petitioners, "[b]ecause the Russian Federation does not and cannot dispute . . . the existence of the[se] materials," this Court's subject matter jurisdiction is established automatically.[30]

Petitioners ignore the *Chevron* court's actual reasoning.[31]   As the *Chevron* court explained, what matters under the FSIA is not whether a purported foreign investor can merely point to an investment treaty, a notice of arbitration, and other related "materials."  What matters is that such materials *actually* "constitute[] an agreement to arbitrate" after a full evaluation of both parties' evidence.[32]   Indeed, the *Chevron* court was not satisfied that it possessed subject matter jurisdiction until after concluding that the relevant treaty incorporated Ecuador's actual "standing offer" to arbitrate, that the plaintiffs were genuinely eligible offerees (*i.e.*, "potential U.S. investors"), and that "Chevron accepted [the standing offer] in the manner required by the treaty."[33]   All three findings were necessary before concluding that "the FSIA . . . allows federal courts to exercise jurisdiction over Ecuador in order to consider an action to confirm . . . the award."[34]   The *Chevron* court found Ecuador's specific arbitrability challenge irrelevant under the FSIA only because it related to the ***scope*** of the arbitration agreement, not its ***existence***.[35]

---

[29] *Id.* at 11-15.

[30] *Id.* at 11-12, 16.

[31] In fact, Petitioners' Opposition Brief is inconsistent on this question.  At one point, Petitioners actually *concede* that the Russian Federation's interpretation of *Chevron* is correct.  *See* Opp. 15 ("As the DC Circuit teaches in the more recent and directly on-point *Chevron* decision, *the key fact of relevance in assessing the arbitration exception is **the existence of an agreement to arbitrate**.*" (emphasis added)) (ECF No. 63).

[32] *See Chevron*, 795 F.3d at 205.

[33] *See id.* at 206-07.

[34] *See id.* at 206.

[35] *See id.* at 204-06.  The challenge raised by Ecuador presented the question of "whether the lawsuits were 'investments' for purposes of the treaty."  *Id.* at 206.  In other words, this was a question of whether Chevron's claims fell within the "scope of arbitral issues," not a question regarding "the formation of the parties' arbitration agreement."  *See Granite Rock*, 561 U.S. at 298-300; *BG Group*, 134 S. Ct. at 1206.  Considering in the alternative that the type of investment may

The Russian Federation challenges all three dimensions of the purported arbitration agreement's existence—the lack of an actual offer, eligible offeree, or adequate acceptance.[36] Under *Chevron*, therefore, the Russian Federation's challenges defeat this Court's subject matter jurisdiction under the FSIA.  The consequences of this conclusion are detailed below.

### B.     The Determination of Whether an Arbitration Agreement Exists Cannot Be (and Was Not) Delegated Exclusively to the Arbitrators

Petitioners argue that "in light of [the Russian Federation's] agreement that the Tribunal would decide arbitrability," this Court is bound by the arbitrators' findings.[37]   According to Petitioners, the Russian Federation delegated such authority exclusively to the arbitrators based on (i) a letter dated July 29, 2005, in which the Russian Federation "accept[ed] the jurisdiction of [the] Arbitral Tribunal to determine its own jurisdiction," (ii) the UNCITRAL Arbitration Rules, which are referenced in Article 26 of the ECT and Petitioners' Notices of Arbitration, and (iii) the arbitrators' Terms of Appointment.[38]

This Court, however, is under "*an independent obligation* to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party."[39]   Accordingly, "*no action of the parties* can confer subject-matter jurisdiction upon a federal court," where it does not otherwise exist.[40]  Similarly, under the international law governing sovereign immunity (codified by Congress under the FSIA),[41] it is the obligation of the "courts [to] determine *on*

---

have been a term of the offer to arbitrate (and thus a formation issue), the *Chevron* court determined that the plaintiff's lawsuits did constitute covered investments.  *Chevron*, 795 F.3d at 207.

[36] Mot. 28-38 (ECF No. 24).

[37] Opp. 15-21 (ECF No. 63).

[38] *Id.* at 11-17.

[39] *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006) (emphasis added); *Nat'l Mining Ass'n v. Kempthorne*, 512 F.3d 702, 706 (D.C. Cir. 2008).

[40] *NetworkIP, LLC v. F.C.C.*, 548 F.3d 116, 120 (D.C. Cir. 2008) (quoting *Akinseye v. District of Columbia*, 339 F.3d 970, 971 (D.C. Cir. 2003)).

[41] *See, e.g.*, *Permanent Mission of India to United Nations v. City of New York*, 551 U.S. 193, 199-201 (2007) (recognizing that the purpose of the FSIA was "codification of international law at the time of the FSIA's enactment" and examining relevant "international practice" as part of interpreting the FSIA); *Asociación de Reclamantes v. United Mexican States*,

*their own initiative* that the immunity of . . . other States . . . is respected," and thus to "refrain[] from exercising jurisdiction in a proceeding against another State" absent a sovereign immunity exception.[42]   Because this international legal obligation directly binds the United States (and its judicial organs), this Court cannot abdicate this responsibility or delegate it to the arbitrators.[43]

These principles are clearly reflected by the D.C. Circuit's analysis in *Chevron*. Specifically, in conducting its jurisdictional analysis under the FSIA in Part II of its opinion, the *Chevron* court did not consider whether Ecuador and the foreign investor had delegated the question of whether "the [investment treaty] and [the] notice of arbitration constituted an agreement to arbitrate" exclusively to the arbitrators.[44]   On the contrary, the *Chevron* court entirely disregarded the UNCITRAL Arbitration Rules in Part II of its opinion,[45] emphasizing instead that the FSIA "requires the District Court to *satisfy itself*" regarding the arbitration agreement's existence and that to "eschew[] making this determination as part of [the] jurisdictional analysis" is "error."[46]

Indeed, although the *Chevron* court expressly addressed the existence of an exclusive-delegation agreement with respect to the arbitration agreement's *scope* (in Part III of its opinion),[47] it rejected the possibility of delegation with respect to the arbitration agreement's *existence* (in Part II of its opinion).[48]   Contrary to Petitioners' assertions, therefore, *Chevron* prevents this Court from deferring to the arbitrators' conclusions regarding the formation and existence of an arbitration agreement.

---

735 F. 2d 1517, 1521 (D.C. Cir. 1984) (Scalia, J.) (same).
[42] Murphy Op. ¶ 22 (quoting ILC Articles on Sovereign Immunity, Art. 6(1)).
[43] *Id.* ¶¶ 22-27 ("[A] State, including its national courts, . . . will be responsible under international law if it denies immunity in circumstances where immunity exists.").
[44] *See Chevron*, 795 F.3d at 205-06.
[45] *Id.* at 203-07.
[46] *Id.* at 205 n.3.
[47] *Id.* at 207-08 (considering "whether Chevron had 'investments' within the meaning of the treaty").
[48] *Id.* at 203-07 & n.3.

### C.    The Determination of Whether an Arbitration Agreement Exists Was Not Delegated Exclusively to the Arbitrators

Even if jurisdictional questions under the FSIA could be delegated exclusively to the arbitrators (which they cannot), Petitioners have utterly failed to identify any "clear and unmistakable evidence" that the Russian Federation intended to delegate the question of the purported arbitration agreement's existence exclusively to the arbitrators.[49]

*First*, the Russian Federation's letter dated July 29, 2005, contains nothing more than an acknowledgment of the principle of Competence-Competence—the principle that an international arbitral tribunal inherently possesses "jurisdiction . . . to determine its own jurisdiction" *at the outset of arbitration*.[50]   In accordance with numerous authorities, including the Third Circuit's decision in *China Minmetals Materials v. Chi Mei*,[51] the ALI's Draft Restatement (Third), the U.K. Supreme Court, the French Supreme Court, the Netherlands Supreme Court,[52] and the published views of ***Petitioners' own arbitration lawyers***,[53] this principle does not affect the authority or responsibility of a national court to review arbitrability *after the arbitral award has been rendered*.[54]   The Russian Federation therefore did not agree (and was not understood by Mr. Gaillard or Ms. Banifatemi[55] to have agreed) in the letter dated July 29, 2005, to exclude post-arbitration judicial review of arbitrability by this Court.

*Second*, Petitioners' reliance on the references to the UNCITRAL Arbitration Rules in

---

[49] *See BG Group*, 134 S. Ct. at 1207; *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943-45 (1995); *Nat'l R.R.*, 850 F.2d at 759.

[50] Bermann II ¶¶ 14-30 (analyzing Letter dated July 29, 2005 (ECF No. 63-5)).

[51] *China Minmetals Materials Imp. & Exp. Co. v. Chi Mei Corp.*, 334 F.3d 274, 289 (3d Cir. 2003) ("Competence-competence is applied in slightly different ways around the world.  The one element common to all nations is the conferral of the power to decide jurisdiction on the arbitrators themselves.  It is important to note, however, that ***this principle says nothing about the role of judicial review***." (emphasis added)); *Thai-Lao Lignite (Thai.) Co. v. Gov't of the Lao People's Democratic Republic*, No. 10-cv-5256-KMW, 2011 WL 3516154, at *19 (S.D.N.Y. Aug. 3, 2011).

[52] Bermann II, Dec. 11, 2015 ¶¶ 14-30.

[53] Emmanuel Gaillard & Yas Banifatemi, *Negative Effect of Competence-Competence: The Rule of Priority in Favour of the Arbitrators* 257-261 (RLA-103); Banifatemi Decl. ¶ 1 ("Together with my partner Emmanuel Gaillard, I was lead counsel for Petitioners at all stages of the Arbitrations, including the jurisdictional and merits phase.") (ECF No. 63-2).

[54] Bermann II ¶¶ 14-30.

[55] *See* Letter dated July 29, 2005, at 4 (copying Emmanuel Gaillard and Yas Banifatemi) (ECF No. 63-5).

the ECT and Petitioners' Notices of Arbitration is foreclosed by well-established case law.   As numerous courts have held, including the U.S. Courts of Appeals for the Third, Fifth, and Eighth Circuits, references to arbitration rules in a purported agreement are "relevant *only if the parties actually agreed to [such arbitration rules'] incorporation*.   After all, a contract cannot give an arbitral body any power, much less the power to determine its own jurisdiction, *if the parties never entered into it*."[56]   This Court has held likewise.[57]   Since the ECT and Petitioners' Notices of Arbitration did not constitute an agreement, therefore, the UNCITRAL Arbitration Rules were not incorporated into any instrument binding on the Russian Federation.[58]   Moreover, as explained by Professor Bermann and confirmed by the UNCITRAL Arbitration Rules' drafting history, the language cited by Petitioners is not actually an exclusive-delegation agreement which could preclude this Court from determining its jurisdiction over a foreign sovereign.[59]

*Third*, the Terms of Appointment explicitly applied only to the then-ongoing "proceedings" before the arbitral tribunal, and thus have no legal effect on post-arbitration proceedings, such as this litigation.[60]   Moreover, because the Terms of Appointment provide that they are effective *only* "[p]ursuant to Article 26(4)(b) of the [ECT] and paragraph 14 of

---

[56] *China Minmetals*, 334 F.3d at 288-89 (emphasis added); *see also Nebraska Mach. Co. v. Cargotec Sols., LLC*, 762 F.3d 737, 741 n.2 (8th Cir. 2014) (rejecting the plaintiff's argument that "the arbitration provision incorporates the AAA's Commercial Rules of Arbitration, which vest an arbitrator with authority to determine its own jurisdiction," because such an argument effectively "puts the cart before the horse, as it presumes the arbitration provision formed part of the contract at issue"); *DK Joint Venture 1 v. Weyand*, 649 F.3d 310, 317 (5th Cir. 2011) (same); *see also Riley Mfg. Co. v. Anchor Glass Container Corp.*, 157 F.3d 775, 777 n.1, 780 (10th Cir. 1998) (finding no "clear and unmistakable evidence . . . . that the parties intended to submit the question of whether an agreement to arbitrate exists to an arbitrator" despite the incorporation of the AAA's Commercial Rules of Arbitration into the purported agreement).
[57] *See Oehme, van Sweden & Assocs., Inc. v. Maypaul Trading & Servs. Ltd.*, 902 F. Supp. 2d 87, 97 (D.D.C. 2012) ("Here, [the respondent] did not sign the Agreement incorporating the AAA Construction Rules . . . and she did not otherwise forfeit her right to judicial review of arbitrability. . . .   Because [the respondent] did not clearly and unmistakably agree to arbitrate arbitrability, the Court will independently decide whether she is bound to arbitrate under the Agreement.").
[58] Berman II ¶¶ 31-40.
[59] *Id.* ¶¶ 40-48 (analyzing Article 21(1) of the UNCITRAL Arbitration Rules); *see also Argentine Republic v. Amerada Hess Shipping Corp.* 488 U.S. 428, 443 (1989) (providing that the FSIA is the sole basis for obtaining jurisdiction over a foreign State).
[60] Bermann II ¶¶ 57-62; Terms of Appointment § 4 (ECF No. 63-7).

Claimant[s'] Notice[s] of Arbitration," they have no independent force with respect to the exclusive delegation of arbitrability questions.[61]   Accordingly, for precisely the same reasons that the ECT and Petitioners' Notices of Arbitration did not themselves form an agreement to delegate arbitrability questions exclusively to the arbitrators, the parties' Terms of Appointment likewise did not form such an agreement.

Petitioner's invocation of *Rent-A-Center, West, Inc. v. Jackson*, is therefore entirely misplaced.[62]   The contractual language considered by the Supreme Court in *Rent-A-Center* (explicitly vesting the arbitrators with "exclusive authority" and excluding "any federal, state, or local court" from conducting subsequent review) is plainly distinguishable from the mere references to "Competence-Competence" in the present case.[63]   Accordingly, even if jurisdictional questions under the FSIA could be delegated exclusively to the arbitrators (which they cannot), Petitioners have utterly failed to identify any "clear and unmistakable evidence" that the Russian Federation ever agreed to such an exclusive delegation.  Absent such evidence, as required by the Supreme Court under *First Options v. Kaplan*, no party can be held to have delegated arbitrability questions exclusively to the arbitrators.[64]

## D.      There Was No Agreement to Arbitrate in the Present Case

Petitioners argue that, "if this Court were to independently decide the Russian Federation's arbitrability challenges, it should . . . find that the disputes were appropriately arbitrated under the ECT . . . in light of the heavy presumptions in favor of finding disputes arbitrable."[65]   By their own terms, however, the cases cited by Petitioners address only the

---

[61] Berman II ¶ 60; Terms of Appointment § 4 (ECF No. 63-7).
[62] Opp. 19-21 (ECF No. 63).
[63] *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 66 (2010) (emphasis added).
[64] *See First Options*, 514 U.S. at 943-45.
[65] Opp. 22 (ECF No. 63).

"*scope* of an agreement to arbitrate."[66]  Because the Russian Federation disputes the *existence* of an arbitration agreement—not the *scope*—the presumption does not apply to any of the Russian Federation's challenges.[67]

### 1.    The Russian Federation Made No Offer to Arbitrate, Because It Did Not Agree to Apply the ECT's Arbitration Clause Provisionally

As established in its Motion, the Russian Federation **made no offer to arbitrate**, because it never ratified the ECT and its consent to the ECT's provisional application did not include the arbitration of public law disputes (including ECT disputes).[68]  Arbitration of such disputes would be "inconsistent with [the Russian Federation's] constitution, laws or regulations" under Article 45(1) of the ECT.[69]  Petitioners conclusory statements to the contrary are meritless both as to the interpretation of the ECT and the content of Russian law.

*First*, Petitioners misinterpret Article 45(1) of the ECT, which provides as follows:

> Each signatory agrees to apply this Treaty provisionally pending its entry into force for such signatory in accordance with Article 44, **to the extent that** such provisional application is not inconsistent with its constitution, laws or regulations.[70]

Arguing that the provision's plain meaning is controlling, Petitioners in fact ignore the plain meaning of the words, "to the extent that," and treat them as synonymous with the words, "if" or "where."[71]  Petitioners do not dispute that the plain meaning of those words refers to the

---

[66] *See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983) ("[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration."); *Pearce v. E.F. Hutton Grp., Inc.*, 828 F.2d 826, 829 (D.C. Cir. 1987) ("[D]oubts about the intended scope of an agreement to arbitrate be resolved in favor of the arbitral process.").

[67] *See Citigroup Glob. Markets Inc. v. Abbar*, 761 F.3d 268, 274 (2d Cir. 2014); *UBS Fin. Servs., Inc. v. Carilion Clinic*, 706 F.3d 319, 324 n.2 (4th Cir. 2013); *California Fina Grp., Inc. v. Herrin*, 379 F.3d 311, 316 n.6 (5th Cir. 2004); *Riley Mfg. Co.*, 157 F.3d at 779.

[68] Mot. 28-31 (ECF No. 24).

[69] ECT art. 45(1) (ECF No. 51-10).

[70] *Id.* (emphasis added).

[71] *See* Opp. 23 (ECF No. 63); *see also* Dolzer I ¶ 23 (ECF No. 24-8).

"range (as of inclusiveness or application) over which something extends."[72]   As Petitioners'

own expert witness, Professor Reisman, explains:

> If the intention in Article 45(1) had been to refer to permissibility of provisional
> application of a treaty as such, the phrase, "to the extent", would have been
> replaced with words such as "if" or "where".  The phrase, "to the extent", is
> meaningful only if it refers to the various obligations in the ECT.[73]

Petitioners' arguments rely exclusively on the Tribunal's erroneous reasoning,[74] failing to engage

with (let alone rebut) Professor Dolzer's detailed expert analysis of Article 45(1).  Professor

Dolzer's analysis shows that the Tribunal's interpretation of Article 45(1) failed to properly

apply the rule of treaty interpretation under international law, which must be applied to interpret

a treaty under the Vienna Convention on the Law of Treaties ("VCLT") (recognized as

customary international law in the United States).[75]

Petitioners' comparison of the language of Article 45(1) with that of Article 32(1) of the

ECT[76] shows merely that the application of Article 32(1) is limited to certain provisions of the

ECT enumerated therein.  The absence of any reference to specific provisions of the ECT in

Article 45(1) shows not that it can apply only to the ECT as a whole, but only that it may apply

to any of its various provisions (*i.e.*, which are inconsistent with Russian law).

*Second*, Petitioners distort, and thus fail to address, Respondent's argument that treaty

arbitration of public law disputes is contrary to Russian law unless the treaty has been ratified by

---

[72] *Extent*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE (1961) at 805 (ECF No. 52-16); Dolzer I ¶ 22 (ECF No. 24-8); Mot. 29 (ECF No. 24).
[73] Mahnoush H. Arsanjani & W. Michael Reisman, *Provisional Application of Treaties in International Law: The Energy Charter Treaty Awards*, *in* THE LAW OF TREATIES BEYOND THE VIENNA CONVENTION 86 (Enzo Cannizzaro ed. 2011) at 92 (ECF No. 52-13).
[74] Opp. 23-24 & n.13 (ECF No. 63).
[75] Dolzer I ¶¶ 9-88 (ECF No. 24-8); Vienna Convention on the Law of Treaties, May 23, 1969, 1155 U.N.T.S. 331 ("VCLT") (ECF No. 53-8).  Although the United States is not a party to the VCLT, the United States recognizes the VCLT "as a codification of customary international law" and "an authoritative guide to the customary international law of treaties." *Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 433 (2d Cir. 2001); *Chubb & Son, Inc. v. Asiana Airlines*, 214 F.3d 301, 308-09 (2d Cir. 2000); *see also Logan v. Dupuis*, 990 F. Supp. 26, 29 n.6 (D.D.C. 1997); Restatement (Third) of The Foreign Relations Law of The United States, Part III, introductory note (1986) (RLA-125).
[76] Opp. 24 (ECF No. 63).

the legislature; consequently, where, as here, the treaty itself provides that provisional application is subject to consistency with domestic law, provisional application is not sufficient to constitute the Russian Federation's consent to arbitrate in circumvention of Russian law.[77]

Petitioners' unsupported conclusion that the laws cited by Respondent "solely concern arbitration within its domestic legal system and are thus inapplicable to treaty disputes" is wrong.[78]   Petitioners ignore Professor Asoskov's extensive analysis of relevant Russian law, including Russian foreign investment laws that expressly refers to treaty arbitration.   Russian laws cited by Respondent establishing the principle of non-arbitrability of public law disputes cover not only domestic arbitration but also international arbitration involving the State and State bodies.[79]   None of these laws contains an exception granting foreign nationals the right to arbitrate disputes that would otherwise be non-arbitrable.   Petitioners once again ignore the language of Article 45(1) of the ECT, which expressly limits provisional application of Article 26 and the other provisions of the ECT "to the extent such provisional application is not inconsistent with [the Russian Federation's] constitution, laws or regulations."

Petitioners rely on the Tribunal's erroneous conclusion, unsupported by any analysis, that the terms of Article 10 of Russia's 1999 law on foreign investments provided for the arbitrability of disputes such as the present one.[80]   Yet, Petitioners fail to engage with Professor Asoskov's detailed analysis of Article 10.   Professor Asoskov explains that Article 10 contains merely a declaratory referral to other sources of law, namely treaties and federal statutes, and does not

---

[77] *Id.* 23-25 (ECF No. 63); Mot. 29-31 (ECF No. 24).
[78] Opp. 25 (ECF No. 63).
[79] *See* Law No. 5338-1 "On International Commercial Arbitration" (July 7, 1993), art. 1(2) (Ex. R-567); Federal Law No. 102-FZ "On Arbitral Tribunals in the Russian Federation" (July 24, 2002), art. 1(2) (Ex. 569); *see also* Asoskov I ¶¶ 11-24 (ECF No. 32-12).
[80] Opp. 26 (ECF No. 63); Interim Awards ¶ 370.

itself render a dispute arbitrable, which fully accords with relevant commentary.[81]   Professor

Asoskov's analysis of other Russian statutes relating to foreign investment reaches the same

conclusion.[82]   Accordingly, because Russian law does not provide for the arbitrability of public

law disputes arising under a treaty such as the ECT, it is necessary for the legislature first to

ratify the treaty in order to render such disputes arbitrable.[83]

Petitioners also are wrong in denying that the ECT dispute at issue here is a public law

dispute.[84]   In support of their assertion, Petitioners rely only on certain paragraphs of the

Tribunal's Interim Awards, but those paragraphs do not even contain any analysis of the issue.[85]

Moreover, Petitioners fail to rebut the expert reports of Professors Asoskov, Bermann, and

Dolzer, which confirm that the ECT dispute is a public law dispute.[86]

Petitioners' reliance on the Russian Federation's conclusion of Bilateral Investment

Treaties ("BITs") that contain arbitration provisions (relating to the exercise of the State's police

powers, taxation, and natural-resource concessions) is misplaced.[87]   As the Tribunal found, "the

BIT practice of the Russian Federation . . . is of little assistance" because "the BITs in force in

the Russian Federation have all been ratified . . . [and] therefore do little to advance Claimant's

position."[88]

In addition, Petitioners' selective quotes from the Explanatory Note issued by the Russian

Government when submitting the ECT to the legislature in 1996 and from a 2001 analysis

---

[81]  I.Z. Farhutdinov, A.A. Danelian, and M.Sh. Magomedov, *National Regulation of Foreign Investments in Russia*, 1
Zakon (2013) ("In substance, [Article 10] makes the investor's right to resolution of its dispute conditional upon the
existence of an international treaty or relevant provision of federal law.") (Ex. R-570); Asoskov I ¶ 92 (ECF No. 32-12).
[82]  Asoskov I ¶¶ 69-80, 96-102, 106 (ECF No. 32-12).
[83]  Expert Opinion of Prof. Baglay dated Feb. 26, 2006 at 5 (ECF No. 42-17); Expert Opinion of Prof. Avakiyan dated Feb.
21, 2006 ¶¶ 5-6 (ECF No. 42-11).
[84]  Opp. 25-26 (ECF No. 63).
[85]  Opp. 26 (ECF No. 63); Interim Awards ¶¶ 360-97.
[86]  Asoskov II ¶¶ 53-59 (ECF No. 24-6); Bermann I ¶¶ 32-33 (ECF No. 24-7); Dolzer I ¶¶ 90, 93 (ECF No. 24-8).
[87]  Opp. 26 & n.14 (ECF No. 63).
[88]  Interim Awards ¶ 376.

prepared by Mr. Yuri Yershov, a member of the Russian ECT delegation, also fail to support Petitioners' argument.[89]   Neither of these documents even mentions the question of ECT Article 26's consistency with Russian law.   The Note states only that ECT Article 45(1), providing for provisional application "to the extent that such provisional application is not inconsistent with [the Russian Federation's] constitution, laws or regulations," was in conformity with Russian law.[90]   Mr. Yershov's analysis is to the same effect.[91]   Petitioners also misinterpret the Note because they misunderstand its purpose.   Because Article 39 of the ECT expressly provides for ratification of the ECT, there was no question that the ECT was subject to ratification by the State Duma (which never occurred).   The Note therefore analyzed existing Russian laws from the perspective of considering whether, if the ECT were ratified by the State Duma, amendments would then need to be made to those laws to ensure the ECT's implementation.   Accordingly, and contrary to Petitioners' contention, the Note does not address at all the compatibility of the ECT, including its arbitration provisions, with Russian laws from a pre-ratification perspective.

Indeed, the negotiating history of the ECT shows that most signatories did not contemplate applying Article 26 provisionally.   The chairman of the Working Group that prepared the initial draft of the ECT stated to the chairman of the Plenary Session in 1994:

> I am not clear how paragraph 1 of [Article 45] applies . . . to international arbitration. . . . [M]ost national and subnational laws provide for disputes under those laws to go to the local courts, not through international arbitration unless there is a special provision.   Accordingly I imagine that ***provisional application does not, by and large, bind the signatory to [Article 26]***.[92]

---

[89] Opp. 26 & n.15 (ECF No. 63).

[90] Explanatory Note, "On Ratification of the Energy Charter Treaty and the Energy Charter Protocol on Energy Efficiency and Related Environmental Aspects," at 1 (ECF No. 63-9).

[91] Yuri A. Yershov, Report, *The Energy Charter Treaty*, in 1 *International Scientific Journal: Ecology – 21st Century* 23, 24 (2001), Banifatemi Decl., Ex. 8 ("Under the terms of the ECT, such provisional application is made to the extent that such provisional application is not inconsistent with [the respective country's] constitution, laws or regulations.").

[92] Facsimile from Sydney Fremantle to Charles Rutten dated Aug. 3, 1994 at 1 (emphasis added) (Ex. R-568).

## 2.        Petitioners Were Excluded from the Purported Class of Offerees

As established in the Russian Federation's Motion, Petitioners were ***not eligible offerees*** under the ECT because (i) their Cypriot and U.K./Manx nationality was used to perpetuate the Oligarchs' acts of fraud, (ii) the Oligarchs acquired their shares in Yukos through acts of fraud, and (iii) Petitioners are beneficially owned and controlled by the Oligarchs, who are Russian nationals (not nationals of Cyprus or the U.K./Isle of Man).[93]   Each of these three distinct limitations applies to the ECT under the fundamental principles of international law governing treaty interpretation.[94]

In their Opposition, Petitioners argue that these fundamental principles of international law regarding illegality and nationality should be ignored.[95]   It is well-established, however, that U.S. courts interpret treaties in accordance with "rules of customary international law," as set forth in the VCLT.[96]   Further, courts have "implied" terms into specific categories of treaties, where necessary, based on "the practice of nations with regard to [that specific category of] treaties."[97]   Indeed, throughout these proceedings, Petitioners have themselves consistently argued that the ECT must be interpreted in light of the "customary rules of international law" applicable to investment treaties under the VCLT.[98]   Under customary international law, as explained below, Petitioners were not eligible offerees.

---

[93] Mot. 31-34 (ECF No. 24).

[94] *See id.* 33.

[95] Opp. 28 (ECF No. 63).

[96] *Fujitsu Ltd. v. Fed. Exp. Corp.*, 247 F.3d 423, 433 (2d Cir. 2001) ("[W]e apply the rules of customary international law enunciated in the Vienna Convention on the Law of Treaties . . . ."); *Chubb & Son, Inc. v. Asiana Airlines*, 214 F.3d 301, 308 (2d Cir. 2000).

[97] *See United States v. Alvarez-Machain*, 504 U.S. 655, 659-660, 667 (1992) ("In *Rauscher*, we implied a term in the Webster-Ashburton Treaty because of the practice of nations with regard to extradition treaties." (analyzing *United States v. Rauscher*, 119 U. S. 407 (1886)).

[98] *See* Hulley Counter-Memorial on Jurisdiction  ¶ 136 (invoking "customary rules of international law as codified by the Vienna Convention on the Law of Treaties") (Ex. R-613); Hulley Rejoinder on Jurisdiction ¶ 108 ("There shall be taken into account [in the interpretation of treaties] any relevant rules of international law applicable in the relations between the parties.") (quoting VCLT, Art. 31(3) (emphasis added)) (ECF No. 48-17); Claimant's Memorial on the Merits ¶ 899 (invoking "customary rules of international law" to interpret the ECT) (Ex. R-614); see also Opp. 22 (citing the VCLT) (ECF No. 63).

a. **Petitioners' Cypriot and U.K. Nationality Must Be Disregarded Under "Veil-Piercing" Doctrine**

Petitioners have raised no persuasive rebuttal to the Russian Federation's argument that they were excluded from the purported class of offerees (*i.e.*, foreign investors) under the "veil-piercing" doctrine. According to Petitioners, they qualified as eligible offerees simply because they were each "corporations organized under the laws of either Cyprus (Hulley and VPL) or the Isle of Man (YUL)."[99] However, because their purpose was to perpetuate the Oligarchs' fraud, conceal assets, and evade taxes, these corporate entities' purportedly foreign nationality must be disregarded under international law.[100] Petitioners thus were not eligible to accept any offer of arbitration under the ECT.

As the U.S. Supreme Court held in *First National City Bank v. Banco Para El Comercio Exterior de Cuba*, the principle of "piercing the corporate veil" applies under international law.[101] Citing the International Court of Justice, the Supreme Court explained that "as a matter of international law, the separate status of an incorporated entity may be disregarded . . . 'to prevent misuse of the privileges of legal personality, as in certain cases of fraud or malfeasance.'"[102] Moreover, investor-State tribunals have ***uniformly*** supported application of veil-piercing principles to interpret investment treaties' provisions regarding the nationality of offerees.[103] Indeed, two decisions relied upon by Petitioners,[104] *ADC Affiliate Ltd. v. Hungary*

---

[99] Opp. 29 (ECF No. 63).

[100] *See* Dolzer I ¶¶ 153-66 (ECF No. 24-8).

[101] *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 628 n.20 (1983).

[102] *Id.* (quoting *Barcelona Traction*, 1970 I.C.J. Rep. 3, 39 ¶ 58 (ECF No. 49-12)).

[103] *See Saluka v. Czech Republic*, UNCITRAL, Partial Award (Mar. 17, 2006) ¶ 230 (explaining that courts and tribunals should "look behind the corporate structures of companies involved in proceedings before it … where corporate structures had been utilized to perpetrate fraud or other malfeasance") (ECF No. 58-1); *Aguas del Tunari v. Republic of Bolivia*, ICSID Case No. ARB/02/3, Decision on Jurisdiction (Oct. 21, 2005) ¶ 245 ("[T]he corporate form may be abused and that form may be set aside for fraud or on other grounds.") (ECF No. 57-25); *Rumeli Telekom A.S. et al. v. Republic of Kazakhstan*, ICSID Case No. ARB/05/16, Award (July 29, 2008) ¶ 328.

[104] *See* Opp. 30 n.19.

and *Tokios Tokeles v. Ukraine*, endorse precisely this conclusion.[105]

Finally, under the ECT, a purported offeree's nationality must be determined "in accordance with the law applicable in that Contracting Party."[106]  As explained by the Russian Federation's experts, the laws of Cyprus and the U.K. jurisdictions likewise disregard corporate forms used for "fraudulent or dishonest" purposes.[107]  Applying this principle, the evidence proffered by the Russian Federation demonstrates that Petitioners were not eligible offerees.[108]

### b.  Petitioners Were Not Offerees Because They Acquired Their Investment Through Fraudulent and Illegal Acts

Petitioners also argue—based on a citation to a single case, *Plama v. Bulgaria*—that the Oligarchs' fraud would not itself exclude Petitioners from the class of eligible offerees.[109]  But Petitioners have simply ignored the extensive international jurisprudence cited by Professor Dolzer, the overwhelming weight of which provides that a host State does not offer to arbitrate with investors who violate the host State's laws in obtaining their investment.[110] Indeed, as the arbitrators in the present case themselves recognized correctly, "*[a]n investor who has obtained an investment in the host State . . . in violation of the laws of the host state . . . should not be allowed to benefit from the Treaty.*"[111]  Petitioners have given no reason for this

---

[105] *See ADC Affiliate Limited et al. v. Hungary*, ICSID Case No. ARB/03/16, Award (Oct. 2, 2006) ¶ 358 (ECF No. 57-15) (confirming that corporate nationality must be disregarded "where the real beneficiary of the business misused corporate formalities in order to disguise its true identity and therefore to avoid liability"); *Tokios Tokeles v. Ukraine*, ICSID Case No. ARB/02/18, Decision on Jurisdiction (Apr. 29, 2004) ¶¶ 54-56 (ECF No. 57-23) (reasoning that corporate nationality will be disregarded when "the Claimant used its formal legal nationality for an improper purpose").

[106] *See* ECT art. 1(7) (ECF No. 51-10).

[107] *See Prest v Petrodel Resources Ltd* [2013] UKSC 34 ¶ 26 (R-563); *Apostolou v. Ioannou* (2012) 1 CLR 604 (citing *Ben Hashem v Al Shayif & Anor* [2008] EWHC 2380) (R-579); Michaelides ¶¶ 12-24; Hays ¶¶ 5.5-5.13; Santos-Costa ¶¶ 62-68.

[108] *See* Asoskov ¶¶ 35-48 (ECF No. 24-6); Kothari ¶¶ 22-45 (ECF No. 24-4); Anilionis ¶¶ 16-33 (ECF No. 24-1).

[109] *See* Opp. 31-33 (citing *Plama v. Bulgaria*, Decision on Jurisdiction ¶ 128 (Feb. 8, 2005)) (ECF No. 63).

[110] *See* Dolzer I ¶¶ 112-152 (ECF No. 24-8); *Ioannis Kardassopoulos v. Georgia*, ICSID Case No. ARB/05/18, Decision on Jurisdiction (July 6, 2007) ¶ 182 (ECF No. 58-3); *Inceysa Vallisoletana, S.L. v. Republic of El Salvador*, ICSID Case No. ARB/03/26, Award (August 2, 2006) ¶ 257 (ECF No. 56-2); *SAUR International S.A. v. Argentine Republic*, ICSID Case No. ARB/04/4, Decision on Jurisdiction and Liability (6 June 2012) ¶ 308 (ECF No. 57-1); *Phoenix Action, Ltd. v. The Czech Republic*, ICSID Case No. ARB/06/5, Award (April 15, 2009)¶¶ 101-12 (RLA-74) (ECF No. 58-9.

[111] *See* Hulley Final Award ¶ 1352 (emphasis added).

Court to deviate from this established principle of law and the weight of authority.

      c.    **Petitioners Were Not Offerees Because They Are Shell Companies, Beneficially Owned and Controlled by Russians**

Petitioners further argue that the ECT's Contracting Parties offered to arbitrate with offshore shell companies owned and controlled by their own nationals. As recently affirmed in *Occidental v. Ecuador*, however, "the dominant position in international law grants standing and relief to the owner of the beneficial interest – not to the nominee."[112]

Indeed, Petitioners have conceded that the ECT's "object and purpose" is critical to its interpretation under well-settled case law.[113] Petitioners also concede that the "object and purpose of the ECT is to promote *cross-border investment* and *cross-border cooperation*."[114] The arbitrators also agreed that "the ECT is directed towards the promotion of *foreign investment*, especially of investment by *Western sources* in the energy resources of the Russian Federation."[115] No rational State, seeking to promote *foreign investment*, would offer to arbitrate under international law before an international tribunal with a subcategory of its own citizens simply because they have routed their investment through offshore shells which (like Petitioners) do "not engage in *any substantial business activity in its place of organization (or elsewhere).*"[116] This interpretation of the ECT must therefore be rejected.

Notably, interpreting investment treaties as Petitioners do would subject the United States

---

[112] *Occidental Petroleum Corp. et al. v. Republic of Ecuador*, ICSID Case No. ARB/06/11, Decision on Annulment (Nov. 2, 2015) ¶¶ 259-62 (quoting David J. Bederman, *Beneficial Ownership of International Claims*, 38 Int'l & Comp. L.Q. 936 (1989)) (RLA-118); Dolzer II ¶¶ 13-16.

[113] Opp. 24, 25 n.13; Hulley Rejoinder on Jurisdiction ¶ 108; *see Gonzalez Paredes v. Vila*, 479 F. Supp. 2d 187, 191 (D.D.C. 2007); *Logan*, 990 F. Supp. at 29; *Rainbow Nav., Inc. v. Dep't of Navy*, 686 F. Supp. 354, 359 (D.D.C. 1988); *see also Cornejo v. Cty. of San Diego*, 504 F.3d 853, 861 (9th Cir. 2007); *Senator Line Gmbh & Co. Kg v. Sunway Line, Inc.*, 291 F.3d 145, 153 (2d Cir. 2002); VCLT, art. 31.1 ("A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose."); Restatement (Third) of Foreign Relations Law § 325(1) (1987) (same).

[114] Statement of Defense by Veteran, Hulley, and Yukos Universal Limited, Case No. 477160 2015/1, District Court of The Hague, May 20, 2015 ¶ 57 (ECF No. 43-11) (emphasis added).

[115] Hulley Interim Award ¶ 433 ("The Treaty is meant, as specified in the Secretariat's Introduction, to ensure 'the protection of foreign energy investments.'") (emphasis added) (ECF No. 30-7).

[116] Nov. 3, 2006 Letter to Tribunal from Petitioners (emphasis added) (ECF No. 48-19).

to claims under ***more than thirty investment treaties*** by U.S. nationals routing their investment through shell companies in Grenada, Trinidad and Tobago, Jamaica, or many other offshore jurisdictions.[117]   As the arbitrators (including former Judge Abner J. Mikva of the D.C. Circuit) concluded in *Loewen v. United States*, investment treaties were "not intended to and could not affect the rights of American investors in relation to practices of the United States."[118]   Like the *Loewen* tribunal, this Court must also resist endorsing an interpretation which would produce such absurd results.   The Russian Oligarchs—who beneficially own and actually control Petitioners' parent company, Group Menatep Limited—should not be permitted to use the façade of their shell companies' foreign nationality to make international claims against their own State.

### 3.   Petitioners Failed to Accept the Purported Offer to Arbitrate

Third, Petitioners ***failed to accept any purported offer*** to arbitrate because they did not refer this dispute to the proper decision-makers under the tax-referral mechanism set forth in the ECT's Article 21(5)(b)(i).[119]   Petitioners contend that use of the ECT's tax-referral mechanism was not a condition on accepting an offer under the ECT, and that it is indistinguishable from the claims-processing procedure addressed by the Supreme Court in *BG Group*.[120]

Petitioners' contention is incorrect.   As the Supreme Court held in *BG Group*, a precondition constitutes a procedural "claims-processing rule" rather than a "substantive" condition on consent only where the mechanism merely "concerns arbitration's timing" and "the arbitrators . . . need not give weight to the [alternative decision-maker's] decision."[121]   In stark contrast, the ECT's tax-referral mechanism must be considered by the arbitrators under some circumstances.   Specifically, the arbitrators "***shall*** take into account any conclusions arrived at

---

[117] *See* Dolzer I ¶ 210 & n.109 (analyzing thirty U.S. treaties concluded between 1986 and 1999) (ECF No. 24-8).
[118] *Loewen v. United States*, Award, ICSID Case No. ARB(AF)/98/3 ¶¶ 222-24 (June 26, 2003) (RLA-122).
[119] Mot. 36-38.
[120] Opp. 33-38.
[121] *BG Group*, 134 S. Ct. at 1211.

within [a] six-month period . . . regarding whether the tax is discriminatory" by the Competent

Tax Authorities—in this case, the Competent Tax Authorities of the United Kingdom, Cyprus,

and the Russian Federation.[122]   Under *BG Group*, therefore, the determination of whether this

substantive condition on consent is satisfied is for the Court—not for the arbitrator.[123]

By failing to comply with this substantive condition on consent, Petitioners failed to

accept any purported offer to arbitrate "in the manner required by the treaty."[124]   Accordingly,

for this reason also, no agreement to arbitrate was formed in this case.

## II. The Awards Are Not Governed by the N.Y. Convention Because Petitioners' Awards Do Not Arise Out of a Legal Relationship Considered as Commercial

Subject matter jurisdiction under § 1605(a)(6)(B) requires that the arbitral award "is or

may be governed by a treaty or other international agreement in force for the United States

calling for the recognition and enforcement of arbitral awards," such as the N.Y. Convention.[125]

To be governed by the N.Y. Convention, the arbitral award must "aris[e] out of a legal

relationship, whether contractual or not, which is considered as commercial."[126]   Petitioners'

awards are not governed by the N.Y. Convention because the legal relationship between them

and the Russian Federation was not commercial, but regulatory, as the dispute arose from the

State's imposition of tax penalties and regulation of its own natural resources.

### A. The Court Must Determine Whether the Awards Are Governed by the N.Y. Convention

Petitioners mistakenly rely on a dictum in *Chevron* to contend that the Court need not

determine whether Petitioners' awards are governed by the N.Y. Convention, so long as the

---

[122] *See* ECT art. 21(5)(iii) (ECF No. 51-10).
[123] *BG Group*, 134 S. Ct. at 1211 (explaining that a procedural condition precedent to arbitration "normally a matter for arbitrators to interpret," whereas substantive conditions on consent are "for courts to interpret").
[124] *See Chevron*, 795 F.3d at 206.
[125] *Creighton Ltd. v. Gov't of Qatar*, 181 F.3d 118, 123-24 (D.C. Cir. 1999).
[126] 9 U.S.C. § 202.

awards "may be" governed by the N.Y. Convention.[127]   Petitioners' reliance on this dictum is misplaced because they misinterpret the phrase, "may be," in the subordinate clause of § 1605(a)(6)(B).[128]   It is well settled that in interpreting a statute, "'if the statutory language is unambiguous and the statutory scheme is coherent and consistent,' the court's inquiry ceases."[129]

Specifically, Petitioners interpret the term "may be" as a counter-factual proposition, in the sense that the award may or may not be subject to the N.Y. Convention.   That is an erroneous interpretation because, contrary to the statute's language, Petitioners' are interpreting "may be" as "maybe."   The two terms are not synonymous.   "Maybe" is an adverb that means "perhaps"— either doing or not doing something.[130]   The context of "may be governed" in § 1605(a)(6)(B) is that of a requirement.   Petitioners' interpretation of "may be" vitiates and renders meaningless the express statutory requirement that an award be governed by the N.Y. Convention.   On Petitioners' interpretation, jurisdiction would exist whether or not the award was governed by the N.Y. Convention, which is an absurd proposition.

Petitioners' interpretation is further erroneous because it would vitiate the principal purpose of the FSIA—restricting foreign States' exposure to the "attendant burdens of litigation."[131]   Under Petitioners' interpretation, States would be subject to litigation on the basis of a mere allegation, which would severely "frustrate the significance and benefit of entitlement to immunity from suit."[132]   Accordingly, the Court must itself determine the jurisdictional

---

[127] Opp. 12 (quoting *Chevron*, 795 F.3d at n.2).

[128] The *Chevron* court did not fully consider the meaning of "may be" in the statute, because the parties in that case did not dispute the applicability of the N.Y. Convention. *Chevron*, 795 F.3d at n.2. That is not the case here.

[129] *Bullcreek v. Nuclear Regulatory Comm'n*, 359 F.3d 536, 541 (D.C. Cir. 2004) (quoting *Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 450, (2002)).

[130] *See Maybe*, Oxford English Dictionary (RLA-121). "May be" is a verbal phrase that means to be permitted or required. *May*, Black's Law Dictionary (10th ed. 2014); *see also Photopaint Techs. LLC v. Smartlens Corp.*, 335 F.3d 152, 157 (2d Cir. 2003); 3 Singer & Singer, Statutes and Statutory Construction (2008) § 57:3 at 27-28.

[131] *Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 443 (D.C. Cir. 1990).

[132] *See Phoenix Consulting*, 216 F.3d at 39 ("In order to preserve the full scope of [sovereign] immunity, the district court must make the 'critical preliminary determination' of its own jurisdiction as early in the litigation as possible; to defer the

propositions contained in § 1605(a)(6)(B).

### B.    The Russian Federation's Relationship with Petitioners Was Regulatory

Petitioners characterize their legal relationship with the Russian Federation as commercial based on the tautology that they made a "commercial investment."[133]  As discussed in the Russian Federation's Motion, however, Petitioners' claims arise from *a regulatory relationship,*[134] *i.e.*, the Russian Federation's imposition of tax penalties, conduct of bankruptcy proceedings, tendering of State-owned property, and regulation of natural resources.[135]

Petitioners' citation to *Belize Soc. Dev. Ltd. v. Gov't of Belize* is inapposite.[136]  *Belize* did not involve investment treaty arbitration or a regulatory relationship, but rather concerned *breach-of-contract claims* arising from a contractual relationship concerning the sale of real property and provision of telecommunication services.[137]  The present case is not remotely similar.  Petitioners' reliance on *BG Group* is equally misplaced.[138]  As Petitioners admit, *BG Group* did not even consider whether the N.Y. Convention was applicable.[139]  Moreover, contrary to Petitioners' erroneous assertion, *BG Group* did not concern "a foreign state's purported tax treatment of an investment,"[140] but rather involved the calculation of utility rates for gas distributors.[141]

---

question is to 'frustrate the significance and benefit of entitlement to immunity from suit.'").
[133] Opp. 42.
[134] *See Diag Human S.E. v. Czech Republic Ministry of Health,* 64 F. Supp. 3d 22, 29 (D.D.C. 2014) ("But it is the nature of the relationship between the parties, not the nature of their dispute, that determines whether the [commercial] requirement is satisfied.").
[135] Mot. 29-30; *see also* G. Van Harten, *Investment Treaty Arbitration and Public Law,* at 58-59, 65 (2007) (R-486); *see also* G.A. Res. 1803 (XVII), U.N. GAOR, 17th Sess., Supp. No. 17, U.N. Doc. A/5217, at 15, 16 ¶ 8 (Dec. 14, 1962) (RLA-124) ("States and international organizations shall strictly and conscientiously respect the sovereignty of peoples and nations over their natural wealth and resources in accordance with the Charter of the United Nations and the principles set forth in the present resolution.").
[136] Opp. at 41 (quoting *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 794 F.3d 99, 104-105 (D.C. Cir. 2015)).
[137] *Belize*, 794 F.3d at 100, 104.
[138] Opp. at 42-44.
[139] Opp. at 43. The only mention of the N.Y. Convention in the opinion is in passing.  *BG Group*, 134 S. Ct. at 1205, 1208.
[140] Opp. at 42 (ECF No. 63).
[141] *BG Group*, 134 S. Ct. at 1204.

Petitioners' interpretation of "commercial" in the context of this case is also not supported by the draft Restatement of the U.S. Law of International Commercial Arbitration. The Reporters' Notes to the definition of "commercial" in the draft Restatement recognize that the broad meaning given to the term "commercial" cannot be applied universally.[142]  Here, the context of the FSIA specifically requires that the term "commercial" be applied in the restrictive sense meant for the loss of sovereign immunity under the FSIA.[143]

### C.    ECT Article 26(5)(b) Does Not Apply in U.S. Courts

Finally, Petitioners argue that Article 26(5)(b) of the ECT conclusively renders the relationship in this dispute "commercial" under the N.Y. Convention, Article I.3, as codified under § 202.[144]  As Article I.3 of the N.Y. Convention provides, however, the relevant law for this purpose is "the national law of the State" where enforcement is sought, which is U.S. law in the present case.[145]  As is well established, parties "may not stipulate to the legal conclusions to be reached by the court" as to U.S. law,[146] whether in a treaty or any other instrument. Accordingly, because the United States is not a party to the ECT, this Court is not bound by Article 26(5)(b) of the ECT when interpreting the statutory term, "commercial," under § 202.

### CONCLUSION

For the reasons stated above and in the Russian Federation's Motion, the Petition should be dismissed for lack of subject matter jurisdiction under the FSIA.

---

[142] Restatement (Third) U.S. Law of Int'l Comm. Arb. § 1-1 Tentative Draft no. 2 (Apr. 16, 2012) ("[T]he term is not intended to provide a unified definition . . . .   Specific contexts may require the application of specialized definitions dictated by the particular treaty or statutory requirements in question.").

[143] Petitioners contend that the *Belize* court rejected the argument that the more limited definition of "commercial" under the FSIA circumscribes the broader definition of "commercial" under the N.Y. Convention.   But that portion of the *Belize* opinion is distinguishable from this case; in particular, the legal relationship between the petitioner and the State in the two cases are entirely dissimilar (one contractual in one, regulatory in the other).

[144] Opp. 38-41 (ECF No. 63).

[145] *Bautista v. Star Cruises*, 396 F.3d 1289, 1296 (11th Cir. 2005); *Rogers v. Royal Caribbean*, 547 F.3d 1148, 1153 (9th Cir. 2008).

[146] *Weston v. Wash. Metro. Area Transit Auth.*, 78 F.3d 682, 685 (D.C. Cir. 1996); *TI Fed. Credit Union v. Del Bonis*, 72 F.3d 921, 928 (1st Cir.1995); *Saviano v. Comm'r*, 765 F.2d 643, 645 (7th Cir. 1985)).

Date:  December 11, 2015                          Respectfully submitted,

                                                  **WHITE & CASE LLP**


                                                  _____/s/_____
                                                  Carolyn B. Lamm (D.C. Bar No. 221325)
                                                  Francis A. Vasquez, Jr. (D.C. Bar No. 442161)
                                                  Frank Panopoulos (D.C. Bar No. 459365)
                                                  Eckhard Robert Hellbeck (D.C. Bar No. 473619)
                                                  Chauncey Bratt (D.C. Bar No. 1018133)

                                                  701 Thirteenth Street, N.W.
                                                  Washington, D.C. 20005
                                                  Phone: (202) 626-3600
                                                  Fax:    (202) 639-9355

                                                  *Counsel for Respondent*

26