**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

---

| | | |
|---|---|---|
| HULLEY ENTERPRISES LTD., | ) | |
| YUKOS UNIVERSAL LTD., and | ) | Case No. 1:14-cv-01996-BAH |
| VETERAN PETROLEUM LTD., | ) | |
| | ) | |
| *Petitioners*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE RUSSIAN FEDERATION, | ) | |
| | ) | |
| *Respondent*. | ) | |
| | ) | |

---

**PETITIONERS' MEMORANDUM OF LAW**
**IN SUPPORT OF THEIR MOTION TO STAY**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................................1

RELEVANT BACKGROUND ...............................................................................................3

    A.    The Underlying Arbitrations..............................................................................3

    B.    ECT Article 45 ...................................................................................................4

    C.    Proceedings in the Dutch Lower Court.................................................................7

    D.    The Dutch Appellate Process...............................................................................7

ARGUMENT ..........................................................................................................................8

I.    Interests of Judicial Economy Strongly Support Staying This Action Pending the
Decision of the Court of Appeal of The Hague ..................................................................9

II.    Consideration of the Parties' Relative Hardships Strongly Supports Staying This
Action Pending the Decision of the Court of Appeal of The Hague ................................11

    A.    A Stay Would Not Prejudice the Russian Federation............................................12

    B.    Petitioners Have a Pressing Need for a Stay in Light of the Hardship and
Inequity That Would Otherwise Result .................................................................13

III.    Article VI of the New York Convention Provides an Independent Basis for Staying
This Action Pending the Decision of the Court of Appeal of The Hague ........................14

CONCLUSION.....................................................................................................................16

## <u>TABLE OF AUTHORITIES</u>

**Page**

**Cases**

*An Giang Agric. & Food Imp. Exp. Co. v. United States*, 350 F. Supp. 2d 1162 (C.I.T. 2004) ...............................................................................................................11

*Bay Area Surgical Group Inc. v. Aetna Life Insurance Co.*, No. 5:13-cv-05430, 2014 WL 2759571 (N.D. Cal. June 17, 2014) ...........................................................12

\* *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 668 F.3d 724 (D.C. Cir. 2012) ............................ *passim*

\* *EDF Int'l S.A. v. YPF S.A.*, 676 F. Supp. 2d 317 (D. Del. 2009) ...............................................14

*Europcar Italia, S.p.A. v. Maiellano Tours, Inc.*, 156 F.3d 310 (2d Cir. 1998) ...........................15

*Fairview Hosp. v. Leavitt*, No. 05-1065, 2007 WL 1521233 (D.D.C. May 22, 2007) ...........................................................................................................................12

*Fonville v. D.C.*, 766 F. Supp. 2d 171 (D.D.C. 2011) ...................................................................10

*G.E. Transp. S.P.A. v. Republic of Albania*, 693 F. Supp. 2d 132 (D.D.C. 2010)........................16

*Gold Reserve Inc. v. Bolivarian Republic of Venezuela*, No. 14-2014, 2015 WL 7428532 (D.D.C. Nov. 20, 2015)...................................................................................10, 15

*Hisler v. Gallaudet Univ.*, 344 F. Supp. 2d 29 (D.D.C. 2004) .......................................................8

\* *IBT/HERE Employee Representatives' Council v. Gate Gourmet Div. Americas*, 402 F. Supp. 2d 289 (D.D.C. 2005).....................................................................................8, 11

*Lamar Co., LLC v. Cont'l Cas. Co.*, No. CV-05-320, 2007 WL 81876 (E.D. Wash. Jan. 8, 2007)....................................................................................................12

\* *Landis v. N. Am. Co.*, 299 U.S. 248 (1936) .................................................................8, 11, 13

*Public Citizen v. U.S. Dist. Court for the Dist. of Columbia*, 486 F.3d 1342 (D.C. Cir. 2007) ...........................................................................................................................11

*Seneca Nation of Indians v. U.S. Dep't of Health & Human Servs.*, No. 14-1493, 2015 WL 7180514 (D.D.C. Nov. 13, 2015) ...............................................................11

\* *Telcordia Tech Inc. v. Telkom SA Ltd.*, 458 F.3d 172 (3d Cir. 2006)........................................15

*Weaver v. Pfizer, Inc.*, No. 14-0818, 2014 WL 2002212 (E.D. Cal. May 15, 2014)....................11

**Statutes**

9 U.S.C. § 207.................................................................................................................................14

28 U.S.C. § 1608(a)(4)....................................................................................................................13

**Treaties**

Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the
    "New York Convention"), June 10, 1958, 21 U.S.T. 2517......................................................14

Energy Charter Treaty, Dec. 17, 1991, 2080 U.N.T.S. 95................................................................4

Petitioners Hulley Enterprises Ltd., Yukos Universal Ltd., and Veteran Petroleum Ltd. respectfully submit this Memorandum of Law in Support of Their Motion to Stay.

## PRELIMINARY STATEMENT

The Court should stay this action pending the outcome of a foreign appeal that is likely to change and narrow the issues in this case.  Currently pending before this Court are (i) a Petition to enforce arbitral awards entered in Petitioners' favor; (ii) a fully briefed Russian Federation motion to dismiss for lack of subject matter jurisdiction; and (iii) a Russian Federation motion to deny enforcement on various grounds set forth in Article V of the New York Convention, which the Court ordered the parties not to brief pending its subject matter jurisdiction ruling (Minute Order, October 22, 2015).  On April 20, 2016, the District Court of The Hague issued a ruling setting aside the awards that Petitioners are seeking to enforce (the "Dutch Judgment").  Petitioners will be appealing that decision to the Court of Appeal of The Hague.  As the resolution of that appeal likely will have an impact on matters pending before this Court, Petitioners' motion for a stay pending appeal should be granted.

A stay will avoid the unnecessary waste of judicial and party resources.  The Russian Federation has argued that the Dutch Judgment requires the Court to dismiss for lack of subject matter jurisdiction and on the merits.  Petitioners disagree.  But there is no need for the Court to devote resources now to considering the implications of the Dutch set-aside ruling given that the Court of Appeal of The Hague may (and Petitioners believe will) reverse that decision.  If that happens, the Court never will have to consider such issues, and instead will have to decide a different set of issues based on a different legal standard.

A stay is especially warranted here given the nature of the Dutch appellate process.  The Court of Appeal of The Hague will not give any deference to the lower court; rather, it will conduct a fully *de novo* review of the Russian Federation's set-aside application and reach its

1

own independent conclusions.  And there are good reasons to believe that the appeal will be successful.  The Dutch Judgment – which reached conclusions contrary to findings of the arbitral tribunal – was based on public international law and Russian law, not Dutch law.  The Tribunal, three highly experienced public international law specialists, issued its unanimous rulings finding the dispute arbitrable after far more extensive proceedings, including testimony from numerous experts.  In short, in light of Petitioners' appeal, the Court risks expending resources on unnecessary, hypothetical rulings if it proceeds before it is known whether the Dutch Judgment will survive.

Denial of a stay would be extremely prejudicial to Petitioners.  Absent a stay, Petitioners likely will have to expend resources addressing the implications of the Dutch Judgment – resources that will have been wasted if the Court of Appeal of The Hague reverses that decision. Moreover, if this action were dismissed while the Dutch appeal is pending, Petitioners would need to file a new enforcement action with this Court at the conclusion of that appeal. Significantly, that would require Petitioners to re-serve the Russian Federation through diplomatic channels under the Foreign Sovereign Immunities Act's strict service requirements, which would only cause needless delay, as illustrated by the fact that it took approximately eight months for such service to be effected in this action.  Moreover, the Russian Federation might argue that such an action was untimely under the applicable limitations period in the Federal Arbitration Act.  While Petitioners do not believe such a challenge would have any merit, it nonetheless would require the Court and parties to expend resources to resolve, and could be avoided entirely by a stay.  In contrast, a stay would not result in any prejudice to the Russian Federation, and potentially would save it expense associated with addressing the implications of the Dutch Judgment.

Under these circumstances, a stay is more reasonable and prudent than deciding the pending motions on the basis of a contested lower court decision that will be given no deference on appeal.[1]

## **RELEVANT BACKGROUND**

### A.     The Underlying Arbitrations

Petitioners were the majority shareholders of Yukos, a Russian oil company.  (ECF No. 4 ("Petition") ¶ 11.)  The arbitrations concerned the Russian Federation's successful campaign to destroy Yukos and transfer its assets to State-owned oil company Rosneft.  (*Id.* ¶¶ 11-33.)  The Tribunal found that the Russian Federation had violated obligations under the Energy Charter Treaty (ECF No. 2 ("Gaillard Decl."), Ex. G (the "ECT")).   (Petition ¶¶ 55-64.)

Petitioners initiated the underlying proceedings in late 2004 under the ECT's arbitration clause.  (*Id.* ¶ 34.)  A highly distinguished three-member tribunal was constituted, consisting of two arbitrators nominated by the parties and a chairman.  (*Id.* ¶¶ 36-37.)  The Russian Federation's nominee, Judge Stephen M. Schwebel, had served as a judge of the International Court of Justice for three terms, including as President of the Court.  (*Id.* ¶ 37.)  He had also been a member of the United Nations International Law Commission and taught international law at institutions of higher learning all over the world, including Johns Hopkins, Cambridge, the Australian National University, and the Graduate Institute of International Studies in Geneva. (*Id.*)  Petitioners' nominee was renowned Swiss lawyer and arbitrator Dr. Charles Poncet, who publishes extensively on matters of international arbitration.  (*Id.*)  The third arbitrator and chairman was the Honorable L. Yves Fortier PC CC OQ QC, who had served as President of the

---

[1] While the Russian Federation objects to staying this action, it has agreed to stay the parallel action Petitioners brought in the United Kingdom to enforce the same awards.  Counsel for the Russian Federation has not explained why it is taking a different position in this Court.  Both this Court and the U.K. court have the same interest in avoiding unnecessary expenditure of judicial and party resources.

United Nations Security Council, Canada's Ambassador and Permanent Representative to the United Nations, President of the London Court of International Arbitration, Chairman of the World Bank's Sanctions Board, and President of the Canadian Bar Association.  (*Id*. ¶¶ 36-37.)

The Tribunal bifurcated the arbitrations into jurisdictional and merits phases.  (*Id*. ¶ 39.) In the jurisdictional phase, the Russian Federation submitted 400 pages of briefing, 805 exhibits, and 20 witness statements.  (Gaillard Decl., Exs. D-F (the "Interim Awards") ¶ 69.)  Petitioners submitted 337 pages of briefing, 1,094 exhibits, and 7 witness statements.  (*Id*.)  The Tribunal held a ten-day hearing on jurisdiction in late 2008, which included live testimony from seven expert witnesses.  (*Id*. ¶ 32.)  In November 2009, the Tribunal issued interim awards rejecting (or deferring until the next phase) each of the Russian Federation's arbitrability challenges.  (Petition ¶ 39.)  The awards were unanimous.  (*Id*.)

In the merits phase, the Russian Federation submitted 1,606 pages of pre-hearing briefing, 4,607 exhibits, and 15 expert reports.  (*Id*.)  Petitioners submitted 898 pages of pre-hearing briefing, 1,674 exhibits, nine fact witness statements, and four expert reports.  (*Id*.)  In late 2012, the Tribunal held a 21-day merits hearing, attended by over 50 party representatives, at which seven fact witnesses and three expert witnesses provided live testimony.  (*Id*. ¶ 47.)

On July 18, 2014, nearly ten years after the arbitrations had been commenced, the Tribunal issued final awards (the "Awards").  (Gaillard Decl., Exs. A-C.)  The Awards, which exceed 600 pages each, unanimously found that the Russian Federation violated obligations owed to Petitioners under the ECT.  (Petition ¶¶ 55-61.)

## B.    ECT Article 45

One of the many arbitrability challenges the Russian Federation unsuccessfully advanced in the arbitrations was that the Tribunal did not have jurisdiction under Article 45 of the ECT. The main focus was on the language of Article 45(1), which provides: "Each signatory agrees to

apply this Treaty provisionally pending its entry into force for such signatory in accordance with Article 44, to the extent that such provisional application is not inconsistent with its constitution, laws or regulations."  It is undisputed that Article 45(1) provides for provisional application of the ECT by signatory States, like the Russian Federation, that had signed but not ratified the treaty.  The Russian Federation's challenge concerned the scope of that provisional application.

Specifically, the Russian Federation argued that: (a) provisional application depended on a provision-by-provision inquiry into whether each provision of the ECT was consistent with the signatory's law; (b) a signatory could object to application of particular ECT provisions on this basis after an arbitration was commenced, even where (as here) the signatory had not provided any prior notice (or otherwise indicated in any way) that it believed that the provisions at issue were inconsistent with its laws; and (c) the ECT's arbitration clause was not consistent with Russian law.

Petitioners presented "a comprehensive rebuttal" to these arguments in the arbitrations. (Interim Awards ¶¶ 295-99; *see also* ECF No. 63 ("Petitioners' SMJ Br.") at 22-27 (explaining Petitioners' positions in more detail).)  Petitioners took the position that Article 45 provided that the ECT was provisionally applicable in its entirety to a signatory, unless the principle of applying a treaty provisionally was inconsistent with the signatory's laws.  It is undisputed that the principle of applying a treaty provisionally is consistent with Russian law.  Petitioners further took the position that even if Article 45 allowed the piecemeal approach urged by the Russian Federation, the Tribunal would still have jurisdiction because the ECT's arbitration clause was at all relevant times consistent with Russian law.

This dispute was extensively litigated in the arbitrations.  The Russian Federation devoted over 200 pages of briefing and 16 expert opinions and witness statements to Article 45

issues.  Petitioners submitted more than 175 pages of briefing and five expert opinions on these issues.  The Tribunal spent over five days hearing argument and testimony on these issues.

After carefully considering the extensive evidence, testimony and argument, the Tribunal unanimously rejected the Russian Federation's positions.  (Interim Awards ¶¶ 244-398.)  It concluded that, under the plain meaning of Article 45 and pursuant to principles of public international law, signatories were provisionally bound by the ECT as a whole unless the principle of provisionally applying a treaty was inconsistent with the signatory's laws.  (*Id*. ¶¶ 301-322.)  It also found that the piecemeal approach the Russian Federation advocated would undermine the object and purpose of the ECT, which was to promote investment in the energy sector by creating a transparent and stable investment environment.  (*Id*. ¶¶ 312-16 (noting that the Russian Federation's interpretation "would create unacceptable uncertainty in international affairs" by "allow[ing] a State to make fluctuating, uncertain and un-notified assertions about the content of its domestic law, after a dispute has already arisen").)  As the evidence proved that the principle of provisionally applying a treaty was consistent with Russian law (and indeed this was not disputed), the Tribunal concluded that the Russian Federation was bound by the ECT as a whole, including its arbitration clause.  (*Id*. ¶¶ 332-38.)

The Tribunal further found, in the alternative, that it would reach the same result under the Russian Federation's interpretation of Article 45 because the ECT's arbitration clause was consistent with Russian law.  (*Id*. ¶¶ 366-73.)  As with all of the Tribunal's findings, this conclusion was reached after considering extensive evidence on the issue, including Russian statutes, official documents submitted by the Russian Government to the State Duma of the Federal Assembly of the Russian Federation, opinions and articles authored by Russian legal

experts (including a member of the Russian delegation to the ECT negotiations), and expert testimony.  (*Id.* ¶¶ 370-90.)

### C.      Proceedings in the Dutch Lower Court

On November 10, 2014, the Russian Federation made a submission with the District Court of The Hague (the lowest court in the Dutch judicial system), requesting the setting aside of the Awards.  (Dutch Judgment, ECF No. 102-2 ¶ 1.1.)  The Russian Federation advanced various grounds for contesting the awards, which were predominantly arguments that it had made to, and lost before, the Tribunal, including its Article 45 arbitrability challenge.  Between May and December 2015, three submissions were made in this Dutch court action: Petitioners filed a statement of defense and rejoinder, and the Russian Federation filed a reply.  (*Id.*)

The District Court of The Hague held a hearing on February 9, 2016.  (*Id.*)   Each side was allotted two hours for oral argument.  (Declaration of Marnix Leijten ("Leijten Decl.") ¶ 6.)  No witnesses were examined.  (*Id.*)  Each side dedicated less than fifteen minutes of their allotted time to Article 45 issues.  (*Id.*)  The court asked no questions.  (*Id.*)

On April 20, 2016, fewer than two months after this hearing, the court issued its decision setting aside the awards.  The decision was based solely on Article 45; the court addressed no other issue.  The court concluded that Article 45 allowed the piecemeal approach to provisional application advocated by the Russian Federation and that the ECT's arbitration clause was inconsistent with Russian law.  Both conclusions were directly contrary to the findings of the Tribunal in the arbitrations.

### D.      The Dutch Appellate Process

Petitioners will appeal the Dutch Judgment to the Court of Appeal of The Hague. (Leijten Decl. ¶ 8.)  The appeal is available as of right.  (*Id.* ¶ 9.)  The nature of the appellate process in the Dutch courts, including the applicable standards of review and the scope of the

proceedings, differs significantly from the appellate process in U.S. courts.  The Court of Appeal

will give no deference to the lower court's findings; it reviews issues of both fact and law, and

reviews them completely *de novo*.  (*Id*. ¶ 10.)  The Court of Appeal is not limited by the scope of

argument or the evidence presented before the lower court.  (*Id*.)  The parties may present new

evidence, including new fact or expert testimony, and may petition the court to appoint its own

expert.  (*Id*.)  The Court of Appeal will issue a judgment on the Awards as a whole.  (*Id*. ¶ 12.)

There are no remands.  (*Id*.)  The proceedings before the Court of Appeal of The Hague in this

case are expected to take between 12 and 30 months.  (*Id*. ¶ 18; *see also id*. ¶ 16 (providing more

information on procedures and timing).)

     After the Court of Appeal issues its decision, the losing party may appeal to the Dutch

Supreme Court.  (*Id*. ¶¶ 15, 19.)  The Dutch Supreme Court engages in a limited review that

gives substantial deference to the Court of Appeal.  (*Id*.)

## ARGUMENT

     A court "has broad discretion to stay all proceedings in an action pending the resolution

of independent proceedings elsewhere."  *IBT/HERE Employee Representatives' Council v. Gate

Gourmet Div. Americas*, 402 F. Supp. 2d 289, 292 (D.D.C. 2005); *see also Landis v. N. Am. Co.*,

299 U.S. 248, 254 (1936) ("[T]he power to stay proceedings is incidental to the power inherent

in every court to control the disposition of the cases on its docket with economy of time and

effort for itself, for counsel, and for litigants."); *Hisler v. Gallaudet Univ.*, 344 F. Supp. 2d 29, 35

(D.D.C. 2004) ("Indeed, 'a trial court may, with propriety, find it is efficient for its own docket

and the fairest course for the parties to enter a stay of an action before it, pending resolution of

independent proceedings which bear upon the case.'") (citation omitted).

     The determination of whether to grant a stay generally requires "the district court, in 'the

exercise of judgment,' to 'weigh competing interests and maintain an even balance,' between the

court's interests in judicial economy and any possible hardship to the parties." *Belize Soc. Dev.*

*Ltd. v. Gov't of Belize*, 668 F.3d 724, 732-33 (D.C. Cir. 2012) (internal citations omitted).  These

considerations strongly support issuance of a stay here.  Additionally, as explained below,

Article VI of the New York Convention provides an alternative and independent basis for the

Court to stay this action.

**I.      Interests of Judicial Economy Strongly Support Staying This Action Pending the Decision of the Court of Appeal of The Hague**

Interests of judicial economy strongly support granting the stay Petitioners seek.  The

Russian Federation has suggested that the Dutch Judgment affects this action in two ways: (i) it

provides a basis for finding that the Court lacks subject matter jurisdiction (ECF No. 102 at 1-3);

and (ii) it provides a basis for dismissal under Article V(1)(e) of the New York Convention (*id.*

at 3).  Petitioners disagree.  (*See* ECF No. 104 ¶¶ 1-3.)  There are thus disputes about the

implications of the Dutch Judgment that would require this Court to expend resources to resolve

if it were to consider these matters now.

There is a significant risk that any resources the Court devotes to these disputes will have

been wasted.  Specifically, if Petitioners succeed in their appeal of the Dutch Judgment, any

decision this Court had issued in the meantime analyzing the implications of that then-voided

judgment would be rendered unnecessary.  This risk is heightened here given the nature of the

Dutch appellate process, in which the Court of Appeal of The Hague essentially re-reviews the

dispute from scratch, affording the lower court decision no deference.  (*See supra*, Relevant

Background, Section D.)  Indeed, not only will the Court of Appeal review the dispute fully *de*

*novo*, but the proceeding can involve the presentation of new evidence.  (*Id.*)  Further, the Court

of Appeal will resolve the Russian Federation's entire challenge to the Awards.  (*Id.*)

The nature of the Dutch Judgment demonstrates that Petitioners have strong grounds for their appeal, making the risk of the Court expending resources unnecessarily very real.  The Dutch lower court did not set aside the Awards based on issues of Dutch law.  Rather, its decision was based solely on Article 45 of the ECT, which involved issues of public international law and Russian law.  The Dutch lower court reached a variety of conclusions under those bodies of law that were directly contrary to conclusions reached by the Tribunal in the arbitrations.  The Tribunal had been comprised of three highly experienced public international law specialists.  (*See id.* Section A.)  All of the Tribunal's rulings were made unanimously, including by the arbitrator that had been nominated by the Russian Federation.  Moreover, the Tribunal's rulings – made over the course of arbitration proceedings that lasted nearly a decade – were made after extensive proceedings involving a substantial volume of evidence, including testimony from numerous experts.  (*Id.*)  The proceedings before the Dutch court were far less extensive.  (*Id.* Section C.)

There is thus a real chance that staying these proceedings would obviate the need for this Court to ever consider the implications of the Dutch court setting aside the Awards.  The Court of Appeal of The Hague may (and Petitioners believe will) reject the conclusions of the lower court and order that the Awards are enforceable.  Such a ruling would narrow the issues to be considered by this Court and simplify this case.  That is especially true given that the standards and nature of this Court's review will differ depending on the outcome of the Dutch appeal.[2]

---

[2] Absent a decision to set aside at the seat of the arbitration, an action to enforce awards under the New York Convention is a summary proceeding involving strong presumptions in favor of enforceability.  *See, e.g., Belize Soc. Dev.*, 668 F.3d at 727 ("Consistent with the 'emphatic federal policy in favor of arbitral dispute resolution,' . . . the FAA affords the district court little discretion in refusing or deferring enforcement of foreign arbitral awards."); *Gold Reserve Inc. v. Bolivarian Republic of Venezuela*, No. 14-2014, 2015 WL 7428532, at *4 (D.D.C. Nov. 20, 2015) ("[T]he showing required to avoid summary confirmation is high.").

A stay pending the Dutch Court of Appeal decision is thus strongly supported by interests of judicial economy. *See, e.g., Fonville v. D.C.*, 766 F. Supp. 2d 171, 174 (D.D.C. 2011) ("[A] stay is warranted because resolution of pending litigation . . . will likely 'narrow the issues in the pending cases and assist in the determination of the questions of law involved.'") (quoting *Landis*, 299 U.S. at 253); *IBT/HERE*, 402 F. Supp. 2d at 293 (granting "the plaintiff's motion to hold this case in abeyance pending the arbitrator's decision," despite the fact that "defendants may be correct that the court no longer has jurisdiction over this case," because the arbitrator's ruling may "have a measurable [e]ffect on the scope of future litigation" and "may eliminate the need for this court to entertain the defendants' motion to dismiss");[3] *An Giang Agric. & Food Imp. Exp. Co. v. United States*, 350 F. Supp. 2d 1162, 1166 (C.I.T. 2004) (ordering stay pending outcome in related action where the effect "might be to narrow and sharpen the issues in this action by permitting all parties to more carefully tailor their arguments in light of the outcome").

## II.   Consideration of the Parties' Relative Hardships Strongly Supports Staying This Action Pending the Decision of the Court of Appeal of The Hague

Where, as here, a party seeks a stay without a definite end date (since it is unknown exactly when the Dutch Court of Appeal will make its decision), the issuance of such "an indefinite stay order must be supported by 'a balanced finding that such need overrides the injury to the party being stayed.'" *Belize Soc. Dev.*, 668 F.3d at 732-33 (citation omitted); *see also Landis*, 299 U.S. at 255 ("[T]he suppliant for a stay must make out a clear case of hardship or inequity in being required to go forward, **if** there is even a fair possibility that the stay for which

---

[3] As *IBT/HERE* reflects, it is well established that a court may issue a stay before determining its own jurisdiction. *See, e.g., Seneca Nation of Indians v. U.S. Dep't of Health & Human Servs.*, No. 14-1493, 2015 WL 7180514, at *3 (D.D.C. Nov. 13, 2015) (finding the court could issue a stay "without first determining that it has subject matter jurisdiction" because whether to grant a stay involves "non-merits, nonjurisdictional issues") (citing *Public Citizen v. U.S. Dist. Court for the Dist. of Columbia*, 486 F.3d 1342, 1348 (D.C. Cir. 2007)); *Weaver v. Pfizer, Inc.*, No. 14-0818, 2014 WL 2002212, at * 2 (E.D. Cal. May 15, 2014) ("As a stay is not a decision on the merits, there is no bar to considering the question before considering the jurisdictional questions presented.").

he prays will work damage to some one else.") (emphasis added).  A stay is warranted here because there is not even a "fair possibility" that it would prejudice the Russian Federation and, even if there were, Petitioners have a pressing need for a stay in light of the hardship they would incur and the inequity that would result if this action were dismissed.

### A.       A Stay Would Not Prejudice the Russian Federation

A stay of this action would not prejudice the Russian Federation.  The mere risk of delay does not create a fair possibility of damage.  *See, e.g., Bay Area Surgical Group Inc. v. Aetna Life Insurance Co.*, No. 5:13-cv-05430, 2014 WL 2759571, at *5 (N.D. Cal. June 17, 2014) (finding plaintiffs' opposition to a stay that "focuse[d] mainly on delay" to be "unpersuasive in the context of a *Landis*-based inquiry because the level of prejudice attributable to delay under these circumstances is minimal, at best"); *Lamar Co., LLC v. Cont'l Cas. Co.*, No. CV-05-320, 2007 WL 81876, at *3 (E.D. Wash. Jan. 8, 2007) (rejecting defendant's argument that it would be "prejudiced if [plaintiff's] legal malpractice claims against him . . . were allowed to linger unresolved for months or years until all appeals are exhausted in the KEC Lawsuit" because "[t]he court is not persuaded these mere allegations make for a 'fair possibility' that the stay would work damage on [defendant]" and, "[a]s such, it is not necessary for [movants] to demonstrate a 'clear case of hardship or inequity'" under *Landis*).[4]

As *Lamar* reflects, courts have found that where, as here, a stay would not cause prejudice, the movant need not show any special hardship.  *See, e.g.*, *Fairview Hosp. v. Leavitt*, No. 05-1065, 2007 WL 1521233, at *2 (D.D.C. May 22, 2007) ("While defendant argues that the plaintiffs have not demonstrated that hardship or inequity would result if the case is not stayed,

---

[4] The *Lamar* court proceeded to note that, "[a]s a result, what takes on additional significance is the 'orderly course of justice' which will promote economy of time and effort for the court, counsel, and for the litigants," *Lamar*, 2007 WL 81876, at *3, factors which strongly support a stay here.  (*See supra*, Section I (judicial economy favors stay); *infra*, Section II.B (litigant economy favors stay).)

these considerations are not limitations upon a court's power to stay proceedings. This is

especially so where simultaneous litigation may settle questions of law and simplify the

proceedings.") (citing *Landis*, 299 U.S. at 255).[5] In any event, as explained below, Petitioners

have established the hardship necessary to obtain a stay.

**B.      Petitioners Have a Pressing Need for a Stay in Light of the Hardship and Inequity That Would Otherwise Result**

There are at least three concrete ways in which denying a stay would result in hardship

and inequity for Petitioners, showing the pressing need for a stay. *First*, denial of a stay would

mean that Petitioners (and the Russian Federation) would have to expend further resources now

addressing the implications of the Dutch Judgment. (*See* Russian Federation Notice of

Supplemental Authority, ECF No. 102 at 3 (informing the Court that it intends to file a motion to

dismiss under Article V(1)(e) of the New York Convention based on the Dutch Judgment).) The

resources that the parties would have to devote to these disputes would never need to be

expended if this matter was stayed and Petitioners succeed before the Court of Appeal of The

Hague.

*Second*, if this action is dismissed on the basis of the Dutch Judgment, Petitioners would

be required to initiate a new enforcement action in this Court after the Court of Appeal of The

Hague ruled in its favor. That would require Petitioners to re-serve the Russian Federation

through diplomatic channels under the strict requirements set forth in the Foreign Sovereign

Immunities Act ("FSIA"). *See* 28 U.S.C. § 1608(a)(4); ECF No. 13 (explaining why Petitioners

---

[5] While the D.C. Circuit has found that delay can qualify as prejudice under *Landis*, the circumstances of that decision illustrate that this finding is inapplicable here. *See Belize Soc. Dev.*, 668 F.3d at 732. The D.C. Circuit found there that delay caused by a stay would be prejudicial *to a petitioner who was seeking to enforce an arbitration award. Id.* In other words, a stay would delay the petitioner's efforts to obtain satisfaction of the judgment it had been awarded in the arbitration – a concrete harm. *Belize Soc. Dev.* does not support finding that a respondent in a New York Convention enforcement action, who lost in the underlying arbitrations and has no claim on which it is seeking to recover, suffers prejudice by delay.

must effect service under § 1608(a)(4)).  This likely would be a lengthy process, as service under

the FSIA took approximately eight months in this action.  (*See* ECF No. 17.)  A stay would thus

avoid the expense and significant delay that would be caused by having to re-serve the Russian

Federation.

*Third*, if this action is dismissed, the re-filing of the action after the Dutch appeal is

resolved could give rise to unnecessary statute of limitations disputes.  An action to enforce a

foreign arbitral award under the New York Convention must be brought "[w]ithin three years

after an arbitral award falling under the Convention is made."  9 U.S.C. § 207.  The Awards here

were made in July 2014.  If the Court dismisses this action and Petitioners bring a new action

after their Dutch appeal has been resolved, the Russian Federation might argue that the new

action was untimely if brought after July 2017.  While Petitioners disagree that any such action

should be found time-barred (including in light of equitable tolling principles), there would

nonetheless be an additional dispute to resolve, which would require the parties to expend

resources and would involve at least some risk of an adverse result for Petitioners.  A stay would

obviate that risk entirely.  At least one court has found that this exact concern warranted staying

a New York Convention enforcement action pending the resolution of foreign set-aside

proceedings.  *See EDF Int'l S.A. v. YPF S.A.*, 676 F. Supp. 2d 317, 320 (D. Del. 2009) (entering

a stay "until the conclusion of the Argentine annulment proceedings" after finding that a "stay is

more appropriate than outright dismissal" because the petitioner "may be barred from enforcing

the arbitration award if the Argentinean appeals process takes longer than three years").

III.  **Article VI of the New York Convention Provides an Independent Basis for Staying This Action Pending the Decision of the Court of Appeal of The Hague**

A stay is also independently appropriate under Article VI of the New York Convention.

Article VI provides in relevant part that, "[i]f an application for the setting aside or suspension of

the award has been made to a competent authority [in the seat of the arbitration], the authority

before which the award is sought to be relied upon may, if it considers it proper, adjourn the

decision on the enforcement of the award."  The only gateway requirement under the Convention

for granting such a stay is that a set-aside application must have been filed with a "competent

authority" at the seat of the arbitration, which is satisfied here by the Russian Federation's set-

aside action in the Dutch courts.  *See, e.g., Belize Soc. Dev.*, 668 F.3d at 733 (finding a stay

improper because "no 'application for the setting aside or suspension of the award' had been

made to a 'competent authority'"); *cf. Telcordia Tech Inc. v. Telkom SA Ltd.*, 458 F.3d 172, 181

(3d Cir. 2006) ("Although the arbitral award may have been 'literally' set aside by the High

Court, the fact that an appeal is currently outstanding before the South African Supreme Court

means that functionally an application for setting aside the award is still pending.  As such, the

District Court's invocation of Article V(1)(e) is premature.").  For the reasons set forth above,

the Court should "consider[] it proper" to enter a stay.

　　　Courts in this district have generally applied the factors articulated by the Second Circuit

when deciding whether to grant an Article VI stay.  *See, e.g., Gold Reserve Inc. v. Bolivarian

Republic of Venezuela*, No. 14-2014, 2015 WL 7428532, at *16 (D.D.C. Nov. 20, 2015) (citing

*Europcar Italia, S.p.A. v. Maiellano Tours, Inc.*, 156 F.3d 310, 317 (2d Cir. 1998)).  Although

the individual *Europcar* factors as a whole do not fit well here, as they are designed for the

situation where the respondent has sought a stay, the fundamental interests at the core of the

*Europcar* balancing approach strongly support granting Petitioners' stay motion.  *See, e.g.,

Europcar*, 156 F.3d at 317 ("A stay of confirmation should not be lightly granted lest it

encourage abusive tactics *by the party that lost in arbitration*.") (emphasis added).  This Court

has recognized that *Europcar* aims to "balance the Convention's policy favoring confirmation

15

o[f] arbitral awards," which normally supports denial of a stay, "against the principle of international comity," which supports issuing a stay pending the outcome of foreign set-aside proceedings so as to prevent inconsistent adjudications. *G.E. Transp. S.P.A. v. Republic of Albania*, 693 F. Supp. 2d 132, 138 (D.D.C. 2010) (citation omitted). Here, the two fundamental interests that *Europcar* is designed to balance are not in conflict. A stay in this case: (a) is not being requested by "the party that lost in arbitration" in an effort to delay enforcement, and granting a stay thus would promote the "policy favoring confirmation" by facilitating prompt resolution of the U.S. enforcement action after the Court of Appeal of The Hague issues its decision; and (b) would promote international comity by ensuring that this Court does not issue a decision that ends up being inconsistent with the ultimate treatment of the Awards by the Dutch courts.

\* \* \*

In short, a stay is amply warranted in this case. The Russian Federation urges the Court to rush to decision on the implications of a contested foreign decision subject to a fully *de novo* appeal. There is no good cause for doing so. The Russian Federation will not be prejudiced by this Court staying the action pending the resolution of the Dutch appeal. And this course of action makes eminent sense as it would: (a) prevent the Court and parties from expending resources on issues that may be rendered moot as a result of the Dutch appeal; and (b) protect Petitioners from unnecessary expense and legal risks that would follow from dismissal.

## CONCLUSION

For these reasons, Petitioners respectfully request that the Court stay this action pending the decision by the Court of Appeal of The Hague.

Dated:  May 16, 2016

Respectfully Submitted,

/s/ Christopher Ryan
Christopher Ryan (D.C. Bar No. 476661)
Keith R. Palfin (D.C. Bar No. 492618)
SHEARMAN & STERLING LLP
401 9th St., N.W., Suite 800
Washington, D.C. 20004-2128
Telephone: (202) 508-8000
E-mail:   christopher.ryan@shearman.com
          kpalfin@shearman.com

Henry S. Weisburg (admitted *pro hac vice*)
Richard F. Schwed (admitted *pro hac vice*)
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, New York 10022-6069
Telephone: (212) 848-4000
E-mail:   hweisburg@shearman.com
          rschwed@shearman.com