# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| HULLEY ENTERPRISES LTD. *et al.*, | |
| Petitioners, | Civil Action No. 14-1996 (BAH) |
| v. | Chief Judge Beryl A. Howell |
| THE RUSSIAN FEDERATION, | |
| Respondent. | |

## MEMORANDUM OPINION

The Petitioners Hulley Enterprises, Ltd., Yukos Universal Ltd., and Veteran Petroleum Ltd. (collectively, the "Shareholders") seek a stay of these proceedings pending a decision by the Court of Appeal of The Hague. Pet'rs' Mot. Stay, ECF No. 105. That court has been asked to consider the validity of three arbitral awards (the "Awards"), totaling over $50,000,000,000 in United States Dollars, which the Shareholders won after nearly ten years of arbitration proceedings against the Respondent, the Russian Federation. *Id.*; Petition to Confirm Arbitration Awards ("Pet.") ¶ 1, ECF No. 1. The Russian Federation opposes the stay, arguing that this Court may not issue a stay without first determining its subject matter jurisdiction over the action, and, in any event, that a stay is not warranted in this case. Resp't's Mem. P. & A. Opp'n Pet'rs' Mot. Stay ("Resp't's Opp'n Mot. Stay"), ECF No. 127. For the reasons set out below, the Shareholders' motion for a stay is granted.

## I.     BACKGROUND

The Shareholders were the majority shareholders of Yukos, a Russian oil company that became that nation's largest and first fully privatized oil company following the dissolution of the Soviet Union. Pet. ¶ 11. According to the Shareholders, in 2003, the Russian Federation

"began a campaign devised to bankrupt Yukos, appropriate the company's assets, and silence the company's head, Mikhail Khodorkovsky," out of concern about Khodorkovsky's support for political parties not aligned with President Vladimir Putin and Yukos's plans to merge with Western oil interests. *Id.* "[A]lleging that Yukos had engaged in a series of tax-avoidance schemes," the Russian Federation aggressively investigated Yukos, conducting raids of its offices and the homes of Yukos employees. *Id.* ¶ 15. Ultimately, the Russian Federation arrested, charged, and tried two high-ranking Yukos officers, including Khodorkovsky, resulting in lengthy sentences of incarceration. *Id.* ¶ 16. Following Khodorkovsky's arrest in October 2003, numerous Yukos personnel left Russia fearing the possibility of continued harassment or prosecution; the Russian Federation's extradition requests to their countries of flight were "uniformly rejected." *Id.* ¶ 18.

While its investigation and charging of Yukos and its employees was ongoing, the Russian Federation also began "levying a series of tax reassessment judgments against [the company]." *Id.* ¶ 24. From December 2003 to December 2004, the Russian Federation ordered Yukos to pay a total of over $20,000,000,000 in United States Dollars for tax liabilities between the years 2000 and 2003, and then, to satisfy those alleged debts, auctioned off Yukos's "core asset," YNG, for a "fraction of [its] value." *Id.* ¶¶ 25–30. Shortly after the auction, the entity that acquired YNG was itself acquired by the state-owned oil company, Rosneft, *id.* ¶ 30, described as a "creature of President Putin's entourage," *id.* ¶ 59. "Gutt[ed] . . . of its most profitable asset," and after a series of transactions also involving Rosneft, Yukos was placed under supervision for bankruptcy proceedings. *Id.* ¶¶ 31–32. In July 2006, its creditors voted to declare Yukos bankrupt. *Id.* ¶ 32.

Seeking to recoup the losses suffered as a result of these events, in November 2004, the Shareholders notified the Russian Federation of alleged violations of the Energy Charter Treaty (the "ECT"), to which the Russian Federation was a signatory. Pet., Ex. A to Decl. Emmanuel Gaillard, Hulley Final Award, ECF No. 2-1; Pet., Ex. B to Decl. Emmanuel Gaillard, Yukos Final Award, ECF No. 2-2; Pet., Ex. C to Decl. Emmanuel Gaillard, VPL Final Award, ECF No. 2-3 (collectively, "Final Awards") ¶ 9.[1] The ECT requires every "Contracting Party" to "accord . . . fair and equitable treatment" to "Investors of other Contracting Parties," ECT, Art. 10(1), and prohibits "nationalization or expropriation" of "Investments of Investors," except where such nationalization is in the public interest, nondiscriminatory, carried out under due process of law, and accompanied by appropriate compensation, ECT Art. 13(1). After failing to settle the dispute amicably within the three-month period required by the ECT, the Shareholders initiated arbitration proceedings pursuant to Article 26 of the ECT. Final Awards ¶ 10.

In accordance with Article 26 of the ECT, a three-member arbitral tribunal (the "Tribunal") was assembled, composed of Judge Stephen M. Schwebel, appointed by the Russian Federation; Dr. Charles Poncet, appointed by the Shareholders; and The Honorable L. Yves Fortier, appointed by the Permanent Court of Arbitration. Id. ¶ 12. On August 1, 2005, the parties agreed that The Hague would be the seat of the arbitration. Id. ¶ 13. Near the outset of the arbitration proceedings, the Russian Federation challenged the Tribunal's jurisdiction over the matter on a number of grounds, which the Tribunal addressed first before turning to the merits of the Shareholders' claims. Id. ¶¶ 14–21. After hundreds of pages of filings and a ten-day hearing on the question of jurisdiction, in November 2009, the Tribunal rendered "Interim Awards" dismissing or deferring decision on each of the Russian Federation's jurisdictional

---

[1] The Russian Federation was a signatory of the ECT from December 1994 to October 2009. Pet. ¶¶ 34, 40. The Awards tribunal determined that investments made during that time period are protected by the ECT. Id. ¶ 40.

challenges.  *Id.* ¶ 21.  Relevant here, the Tribunal unanimously rejected the Russian Federation's argument that it never accepted the ECT's arbitration provision and thus never agreed to the arbitration proceedings before the Tribunal.  Pet. ¶ 40; *see* Final Awards ¶ 21.

Proceeding to the merits stage, the Tribunal then considered thousands of pages of filings, evidence and arguments presented at a twenty-one day hearing, and the parties' commentary on developments in other legal proceedings relating to Yukos.  Final Awards ¶¶ 41–62.  After nearly ten years of "mammoth" proceedings, *id.* ¶ 4, on July 18, 2014, the Tribunal unanimously rendered three substantially similar "Final Awards," consisting of over 600 pages each.  Pet. ¶ 55.  The Tribunal determined that while Yukos "was vulnerable on some aspects of its tax optimization scheme," the Russian Federation had "taken advantage of that vulnerability by launching a full assault on Yukos and its beneficial owners in order to bankrupt Yukos and appropriate its assets while, at the same time, removing Mr. Khodorkovsky from the political arena."  Final Awards ¶ 515.  Consequently, the Tribunal concluded that the Russian Federation had violated the ECT, *id.* ¶ 1580, and awarded the Shareholders a combined $50,020,867,798 in damages, plus interest, as well as $60,000,000 in attorneys' fees and €4,240,000 in arbitration costs, plus interest.  Pet. ¶¶ 62–63.

Following the issuance of the Awards, the Shareholders began efforts to collect by initiating confirmation and enforcement proceedings in Belgium, France, Germany, India, the United Kingdom, and the United States.  *See* Resp't's Opp'n Mot. Stay, Ex. 2, Decl. Expert Op. Dr. Andrey Kondakov ¶ 26, ECF No. 127-2.  The Shareholders initiated the instant proceeding on November 25, 2014, pursuant to the Federal Arbitration Act (the "FAA"), which provides for confirmation of arbitral awards falling under the Convention on the Recognition and

Enforcement of Foreign Arbitral Awards of June 10, 1958 (the "New York Convention"), *see* 9 U.S.C. § 201–207.[2]  *See* Pet. ¶ 3.

Meanwhile, the Russian Federation began efforts to set aside the Awards.  On November 10, 2014—fifteen days before the initiation of the instant confirmation proceedings—the Russian Federation submitted a request to set aside the Awards to the District Court of The Hague. Resp't's Mot. Dismiss, Ex. R-328, Writ of Summons ("Writ of Summons") at 2, ECF No. 43-8. By the terms of the New York Convention, confirmation and enforcement of the Awards "may be refused" if the Awards have been set aside by courts at the seat of the arbitration.  N.Y. Convention, art. V(1)(e).  In support of its request, the Russian Federation advanced several arguments, including repeating its argument that the Tribunal did not have jurisdiction to issue the Awards because the Russian Federation had never agreed to arbitrate its dispute with the Shareholders.  Writ of Summons at 46–93.  Specifically, the Russian Federation contended that because it never ratified the ECT, only certain provisions of the ECT applied to the Russian Federation, and the ECT's arbitration provision, which constitutes a standing offer by parties to the ECT to arbitrate disputes arising under the treaty, was not among those that applied.  *Id.*

While the set aside proceedings were pending, on October 20, 2015, the Russian Federation moved for this Court to deny the Shareholders' request for confirmation of the Awards, Resp't's Mot. Deny Pet., ECF No. 23, and to dismiss the Petition for lack of subject matter jurisdiction, invoking the Russian Federation's entitlement to sovereign immunity under the Foreign Sovereign Immunities Act (the "FSIA"), 28 U.S.C. §§ 1330, 1602–1611, Resp't's

---

[2]       Under the FAA, a district court "shall confirm" an award "falling under the [New York] Convention . . . unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention." 9 U.S.C. § 207.  An award "fall[s] under" the New York Convention if it is "rendered within the jurisdiction of a signatory country." *Creighton Ltd. v. Gov't of State of Qatar*, 181 F.3d 118, 121 (D.C. Cir. 1999). The Hague, the Russian Federation, and the United States are members of the New York Convention. *See* New York Arbitration Convention, Contracting States, http://www.newyorkconvention.org/countries (last visited Sept. 29, 2016).

Mot. Dismiss, ECF No. 24.  In those filings, the Russian Federation characterizes the Shareholders as "shell companies that are owned, controlled and operated by . . . criminal oligarchs," including Khodorkovsky.  Resp't's Mem. Mot. Dismiss at 1, ECF. No. 24; *see also* Resp't's Mem. Mot. Deny Pet. at 2, ECF. No. 23.  Suggesting that the Awards were rendered improperly on the merits, the Russian Federation avers that the Shareholders "were not candid with the arbitration tribunal," *i.e.,* "did not disclose . . . their participation in . . . fraud" or "correct [certain] misimpression[s] of the Tribunal" about the companies.  Resp't's Mem. Mot. Dismiss at 2.[3] Not surprisingly, the Shareholders oppose dismissal.  *See* Pet'rs' Mem. Law Opp'n Resp't's Mot. Dismiss Lack Sub. Matter Juris., ECF No. 63.

On April 20, 2016, the District Court of The Hague issued its decision on the Russian Federation's request to set aside the Awards.  *See* Resp't's Notice Suppl. Auth., Ex. 2, Dist. Ct. The Hague Judgment 20 April 2016 (Eng. Trans.) ("Dutch Judgment"), ECF No. 102-2.  That court agreed with the Russian Federation that the Awards should be set aside, concluding the Tribunal lacked jurisdiction to issue the Awards because the Russian Federation had never agreed to arbitrate its disputes under the ECT. Dutch Judgment ¶ 5.96.  The Russian Federation filed a notice of this decision with the Court, *see* Resp't's Notice Suppl. Auth., ECF No. 102, and shortly thereafter filed a supplement to its motion to dismiss, arguing that the Dutch Judgment supports its position that this Court lacks subject matter jurisdiction over the action.  Resp't's Suppl. Mot. Dismiss, ECF No. 108.

---

[3]     In its Proposed Sur-Reply, the Russian Federation argues that in a recent letter from the Shareholders' counsel, Tim Osborne, published in the *American Lawyer*, "Mr. Osborne appeared to acknowledge openly that the Oligarchs' 2002 agreements . . . were indeed sham contracts with an underlying fraudulent purpose."  Resp't's Proposed Sur-Reply Opp'n Pet'rs' Mot. Stay ("Resp't's Sur-Reply") at 4, ECF No. 147-1.  Whether this is the proper inference to draw from the letter, as well as the potential accompanying consequences, may be relevant to the merits of this confirmation action but are not pertinent to the motion to stay.

Pending before the Court is the Shareholders' motion for a stay of the instant action during the pendency of its appeal of the Dutch Judgment to the Court of Appeal of The Hague. Pet'rs' Mot. Stay.[4] In view of the Shareholders' arguments that the current procedural posture of the case presents a need for a stay and deferral of consideration of the Russian Federation's motions to dismiss, the Court turns to that motion, which is now ripe for consideration.

## II.   LEGAL STANDARD

"[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936); *see also Enelow v. New York Life Ins. Co.*, 293 U.S. 379, 382 (1935) (recognizing that a district court may stay a case "pending before it by virtue of its inherent power to control the progress of the cause so as to maintain the orderly processes of justice"). In choosing "how to manage their dockets . . . the decision to grant a stay, like the decision to grant an evidentiary hearing, is 'generally left to the sound discretion of district courts.'" *Ryan v. Gonzales*, 133 S. Ct. 696, 708 (2013) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)). Thus, the decision whether to grant a stay

---

[4]    Nine additional motions remain pending in this case. Six of these motions are resolved as follows: (1) the Petitioners' Motion to Strike Respondent's Supplemental Motion to Dismiss, ECF No. 123, is denied, since, contrary to the Shareholders' argument that the Supplemental Motion "is an unauthorized brief" supporting the original motion, the Supplemental Motion was prompted by the changed circumstance of the Dutch Judgment and the additional grounds for dismissal presented by that changed circumstance, *see Williamsburg Wax Museum, Inc. v. Historic Figures, Inc.*, 810 F.2d 243, 251 (D.C. Cir. 1987) (explaining "[a] subsequent motion for summary judgment based on an expanded record is always permissible"); (2) the Petitioners' Motion to Suspend Briefing on Respondent's Supplemental Motion to Dismiss, ECF No. 125, is granted in light of the stay issued with this Memorandum Opinion; (3) the Respondent's Motion for Leave to File a Sur-Reply Opposing Petitioners' Motion to Strike, ECF No. 136, is granted for the same reason stated, *supra* in paragraph (1); (4) the Respondent's two Motions for Leave to Amend the Supplemental Motion to Dismiss, ECF Nos. 139, 142, are granted, since there is no reason to doubt the Russian Federation's good faith, nor any evidence of prejudice to the Shareholders—a conclusion supported by the Shareholders' puzzling opposition to this motion, given its argument that the amended pleading "does little more than add cites . . . to assertions that the Russian Federation had already made," Pet'rs' Opp'n Resp't's Amended Mot. Amend Suppl. Mot. Dismiss at 1, ECF No. 149 (emphasis omitted); (5) the Respondent's Motion for Leave to File a Sur-Reply in Opposition to Petitioners' Motion to Stay, ECF No. 147, is granted, to give full consideration to this sovereign party's arguments for denial of the Shareholders' request for a stay.

"calls for the exercise of judgment [by the district court], which must weigh competing interests and maintain an even balance" between "[b]enefit and hardship." *Landis*, 299 U.S. at 254–55, 259.

That power to issue a stay may be appropriately exercised where a separate proceeding bearing upon the case is pending. *See Air Line Pilots Ass'n v. Miller*, 523 U.S. 866, 879 n.6 (1998) (noting "district courts' discretion to defer . . . proceedings pending the prompt conclusion of arbitration" (citing *Landis*, 299 U.S. at 254–55)); *Leyva v. Certified Grocers of California, Ltd.*, 593 F.2d 857, 863 (9th Cir. 1979) ("A trial court may, with propriety, find it is efficient for its own docket and the fairest course for the parties to enter a stay of an action before it, pending resolution of independent proceedings which bear upon the case."). "This rule applies whether the separate proceedings are judicial, administrative, or arbitral in character, and does not require that the issues in such proceedings are necessarily controlling of the action before the court." *Leyva*, 593 F.2d at 863–64 (citing, *Landis*, 299 U.S. at 254–55); *see also Landis*, 299 U.S. at 254 ("[W]e find ourselves unable to assent to the suggestion that before proceedings in one suit may be stayed to abide the proceedings in another, the parties to the two causes must be shown to be the same and the issues identical.").

In the case of independent proceedings, a stay may be warranted where the resolution of other litigation will likely "narrow the issues in the pending cases and assist in the determination of the questions of law involved." *Landis*, 299 U.S. at 253. Nevertheless, "[a] stay is immoderate and hence unlawful unless so framed in its inception that its force will be spent within reasonable limits, so far at least as they are susceptible of prevision and description." *Id.* at 257. Put another way, "[t]he scope of the stay and the reasons for its issuance determine whether a stay is immoderate." *Belize Soc. Dev. Ltd. v. Gov't of Belize (Belize I)*, 668 F.3d 724,

732 (D.C. Cir. 2012). For example, "a court abuses its discretion in ordering a stay 'of indefinite duration in the absence of a pressing need.'" *Id*. at 731–32 (quoting *Landis*, 299 U.S. at 255). A stay pending resolution of other proceedings may be deemed indefinite where it "includes no provision for status updates or further review." *Id*. at 732.

## III.   DISCUSSION

The Russian Federation vehemently opposes any action by this Court, including the issuance of a stay, unless and until a ruling on its motion to dismiss for lack of subject matter jurisdiction has been made. Resp't Opp'n Mot. Stay at 7.[5] As an alternative basis for denial, the Russian Federation contends that issuing a stay would constitute an abuse of discretion. *Id*. at 13. The Shareholders counter that this Court has inherent power to issue a stay, without first resolving jurisdictional challenges, Pet'rs' Reply Supp. Mot. Stay ("Pet'rs' Reply") at 4, ECF No. 138, and that the exercise of this power is warranted here "pending the outcome of a foreign appeal that is likely to change and narrow the issues in this case," Pet'rs' Mem. Law Supp. Mot. Stay ("Pet'rs' Mem. Mot. Stay") at 1, ECF No. 105-1.

The Russian Federation's argument that no stay may issue until resolution of its challenge to subject matter jurisdiction will be addressed first, before turning to consideration of whether issuing a stay of this action is appropriate.

---

[5]   The Shareholders aver that "[w]hile the Russian Federation objects to staying this action, it has agreed to stay the parallel action [the Shareholders] brought in the United Kingdom to enforce the same awards. Counsel for the Russian Federation has not explained why it is taking a different position in this Court." Pet'rs' Mem. Law Supp. Mot. Stay ("Pet'rs' Mem. Mot. Stay") at 3 n.1, ECF No. 105-1. While the Russian Federation has emphasized that "there is not a single instance during the course of [the Shareholders'] worldwide post-arbitration litigation where any court has stayed its proceedings *over the Russian Federation's objections*," notably, it has offered no explanation whatsoever for the country's different position opposing a stay in this action. Resp't's Sur-Reply at 3 (emphasis added). Furthermore, while the Russian Federation notes the Shareholders' "refus[al] to terminate their asset-seizure proceedings in Belgium and France," Resp't's Sur-Reply at 3, it fails to provide the critical additional context that the courts in those jurisdictions confirmed the Awards, which confirmations the Russian Federation now appeals, *see* Pet'rs' Reply, Ex. 3 to Decl. of Christopher M. Ryan, Ivan Tkachev et al., *Russia Has Established a Single Command Centre to Battle YUKOS Shareholders*, RBC: Economics (Oct. 28, 2015), ECF No. 138-4 ("In Belgium and in France, the former YUKOS shareholders obtained court orders . . . for the enforcement of The Hague award . . . . Russia is in the process of appealing those orders and the hearings will take place in 2016.").

### A.     A STAY MAY ISSUE PRIOR TO RULING ON SUBJECT MATTER JURISDICTION

As a threshold matter, the Russian Federation contends that this Court is "prohibit[ed]" from staying proceedings in an action before determining its subject matter jurisdiction over the action. Resp't's Opp'n Mot. Stay at 7. According to the Russian Federation, this position reflects a fundamental principle supported by the "weight of authority," and obtains even more strongly where, as here, one of the parties challenges jurisdiction on the basis of sovereign immunity under the FSIA. *Id.* at 7 ("[T]his Court must address the crucial 'gateway issue' of sovereign immunity prior to even considering Petitioners' Motion to Stay." (quoting *Practical Concepts, Inc. v. Republic of Bolivia*, 811 F.2d 1543, 1544 (D.C. Cir. 1987))). For their part, the Shareholders criticize the Russian Federation for basing its "argument entirely on misleading quotes from inapposite cases," Pet'rs' Reply at 6, when, instead, "[t]his Court and other courts have . . . held that stays may be granted in cases where subject matter jurisdiction has been challenged because granting a stay does not involve ruling on the merits," *id.* at 4. The Shareholders are correct.

Indisputably, courts must establish jurisdiction to hear a case before considering questions relating to the merits of a case. *See Foster v. Chatman*, 136 S. Ct. 1737, 1745 (2016) ("Before turning to the merits of [the] claim, we address a threshold issue. Neither party contests our jurisdiction to review [petitioner]'s claims, but we 'have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party.'" (quoting *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006))). The cases relied upon by the Russian Federation reflect no more than this fundamental legal principle barring consideration of the *merits* of a matter until jurisdiction is determined. *See* Resp't's Opp'n Mot. Stay at 7–11 (discussing, *inter alia, U.S. Catholic Conference v. Abortion Rights Mobilization,*

*Inc.*, 487 U.S. 72, 79 (1988) (holding that a court may not order "discovery on the merits of the litigation" before determining it has subject matter jurisdiction); *Christopher v. Stanley-Bostitch, Inc.*, 240 F.3d 95, 100 (1st Cir. 2001) ("[W]hatever incidental power the court retains cannot go to the merits of the underlying action. Rather, orders relating to the merits of the underlying action are void if issued without subject matter jurisdiction."); *NML Capital Ltd. v. Republic of Argentina*, No. 04-0197 (CKK), 2005 U.S. Dist. LEXIS 47027, at \*54–55 (D.D.C. 2005) ("[a]llowing for a stay against the removal or dissipation of a sovereign's assets would constitute an attachment," *i.e.*, an action on the merits, which a court cannot undertake if it lacks jurisdiction)); Resp't's Sur-Reply Opp'n Pet'rs' Pet'rs' Mot. Stay ("Resp't's Sur-Reply") at 6–13, ECF No. 147-1 (discussing *Stati v. Republic of Kazakhstan*, No. 14-1638 (ABJ), 2016 WL 4191540, at \*2 (D.D.C. Aug. 5, 2016) ("Before the Court may turn to the merits of petitioners' argument that the arbitral award in this case should not be confirmed in the United States under the New York Convention, it must first ensure that it has jurisdiction to hear this case.")).[6] While those cases reflect an emphasis on deciding questions of jurisdiction early in the course of litigation where possible, the Russian Federation has failed to identify a single case *requiring*

---

[6] The other cases cited by the Russian Federation in its opposition to the motion to the stay—none of which is binding on this Court—are inapposite. Four of these cases involve the unique circumstance presented by actions removed from state court, emphasizing the critical importance of remand where a federal court lacks jurisdiction over a state court matter. *See Dahiya v. Talmidge Int'l, Ltd.*, 371 F.3d 207, 209–10 (5th Cir. 2004) (declining appellate jurisdiction over denial of stay because remand orders are by statute unreviewable and "[a]ny order remanding for lack of subject matter jurisdiction necessarily denies all other pending motions," including motions to stay); *Pennsylvania v. Tap Pharm. Prods. Inc.*, 415 F. Supp. 2d 516, 521 (E.D. Pa. 2005) (noting Multi-District Litigation Rule 1.5, *inter alia*, "contemplate[s] a district court will act to resolve threshold jurisdictional concerns" such as federal court's subject matter jurisdiction over action removed from state court); *Witherspoon v. Bayer Healthcare Pharmaceuticals Inc.*, No. 4:13CV01912 ERW, 2013 WL 6069011, at \*3–4 (E.D. Mo. 2013) (explaining "even if it is unclear whether this Court has the duty to decide [subject matter jurisdiction for] the Motion to Remand, it is certainly clear it has the authority"); *Minnesota v. Pharmacia Corp.*, No. 05-1394 PAM/JSM, 2005 WL 2739297 (D. Minn. 2005) (citing approvingly *Tap Pharm Prods. Inc.*). Another case relied upon by the Russian Federation suggests nothing more than that once a court has determined it lacks subject matter jurisdiction, it cannot take any other action. *See Gov't of Guam v. Am. President Lines, Ltd.*, 809 F. Supp. 150, 152 n.2 (D.D.C. 1993) ("If this Court has no jurisdiction of the action in the first place, then the case must be dismissed and the issue of a stay is never reached.").

that a court establish jurisdiction before taking measures pursuant to its inherent power to manage its docket.

The Russian Federation heavily relies on *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36 (D.C. Cir. 2000). Resp't's Opp'n Mot. Stay, *passim*.[7] Yet, that case simply does not support the categorical bar on the exercise of the Court's inherent power to manage its docket urged by this party. In *Phoenix Consulting, Inc.*, the D.C. Circuit considered the "question of law" whether "a sovereign defendant's factual challenge to the court's subject matter jurisdiction under the FSIA" may be resolved by accepting as true "the plaintiff's allegations of jurisdictional facts." *Id.* at 39. The Court answered this question negatively, explaining that a "factual dispute material to its subject matter jurisdiction" must be resolved as part of "the critical preliminary determination of its own jurisdiction as early in the litigation as possible." *Id.* at 39, 41 (internal quotation marks omitted). Thus, "in order to preserve the significance and benefit of a foreign sovereign's immunity from suit under the FSIA, the court could not postpone the determination of subject matter jurisdiction until some point during or after trial," when all the factual disputes related to the merits of the case are under scrutiny. *Id.* at 41 (internal quotation marks omitted). As the Shareholders correctly observe, *Phoenix Consulting, Inc.* "stands for the unremarkable proposition that a court must determine its subject matter jurisdiction under the FSIA *before considering the merits*." Pet'rs' Reply at 6 (emphasis in original).[8]

---

[7]     The Russian Federation cites several times *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1127 (D.C. Cir. 2004), primarily because that opinion contains quotes from *Phoenix Consulting, Inc.* In any event, in *Kilburn*, the D.C. Circuit merely reiterated its admonition that courts confronted with challenges to subject matter jurisdiction based on sovereign immunity resolve that issue prior to reaching the merits. *Id.* at 1127.

[8]     The Russian Federation also references repeatedly *Practical Concepts, Inc. v. Republic of Bolivia*, 811 F.2d 1543 (D.C. Cir. 1987), for the proposition that a foreign sovereign's challenge to jurisdiction under the FSIA is "a gateway issue" to be addressed prior to any other decision, *see* Resp't's Opp'n Mot. Stay at 7–8, but this case did not go so far. In *Practical Concepts, Inc.*, the D.C. Circuit concluded that the district court, which had granted default judgment against the Republic of Bolivia, "correctly entertained Bolivia's post-judgment jurisdictional objection," although it incorrectly "upheld the objection." *Id.* at 1548. Notably, no criticism was leveled at the district court for acting on the plaintiff's motion for default, and granting the default judgment, prior to consideration

The Supreme Court has expressly held that a court may, for the sake of efficiency, decline to determine its subject matter jurisdiction prior to deciding a "threshold, nonmerits issue" presented by a case. *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 433 (2007). In *Sinochem*, the Court concluded that a court could defer its jurisdictional determination and first make a *forum non conveniens* determination, even though that determination may "involve a brush with factual and legal issues of the underlying the dispute." *Id*. at 432–33 (internal quotation marks omitted). The Court explained, "The critical point here, rendering a *forum non conveniens* determination a threshold, nonmerits issue in the relevant context, is simply this: Resolving a *forum non conveniens* motion does not entail any assumption by the court of substantive 'law-declaring power.'" *Id*. at 433.

Indeed, the D.C. Circuit recognizes that "certain nonmerits, nonjurisdictional issues may be addressed preliminarily, because '[j]urisdiction is vital only if the court proposes to issue a judgment on the merits.'" *Pub. Citizen v. U.S. Dist. Court for the Dist. of Columbia*, 486 F.3d 1342, 1348 (D.C. Cir. 2007) (quoting *Sinochem*, 549 U.S. at 431) (alterations in original); *see also Seneca Nation of Indians v. U.S. Dep't of Health & Human Servs.,* 144 F. Supp. 3d 115, 118–19 (D.D.C. 2015) (granting stay of action, prior to ruling on subject matter jurisdiction, pending the outcome of agency proceedings relating to the same issues between the same parties, noting that "[a]s long as the Court does not wield 'substantive law declaring power,' 'certain non-merits, nonjurisdictional issues may be addressed preliminarily, because jurisdiction is vital only if the court proposes to issue a judgment on the merits'" (quoting *Sinochem*, 549 U.S. at

---

of the FSIA jurisdictional issue. To the contrary, the Court found nothing "that casts genuine doubt on the district court's determination" since "Bolivia could wait until after execution of the judgment was under way to raise its jurisdictional point, so long as it bore the risks associated with that tactic." *Id*. at 1547–48 (internal quotation marks omitted). In other words, the *Practical Concepts, Inc.* Court imposed no obligation on the district court to consider the proper exercise of jurisdiction under the FSIA before acting on the motion for default judgment.

433; then quoting *Pub. Citizen*, 486 F.3d at 1348 (quoting *Sinochem*, 549 U.S. at 431) (internal

quotation marks omitted))); *accord Furniture Brands Int'l, Inc. v. ITC*, 804 F. Supp. 2d 1, 5–7

(D.D.C. 2011) (rejecting party's position that the district court must first resolve open challenges

to subject matter jurisdiction before invoking the "first to file" doctrine, which allows a district

court to transfer, stay, or dismiss a complaint when a similar complaint has been filed in another

district court, as contrary to *Sinochem*, 549 U.S. at 431, since relying on the first-to-file rule is

not a decision on the merits). A stay of proceedings in this case is exactly the type of nonmerits

action the *Sinochem* decision contemplates.

The Russian Federation's position that the requested stay is prohibited unless and until

this Court determines it has subject matter jurisdiction over the case is rejected. Nevertheless,

that a court is not categorically barred from issuing a stay prior to determining its jurisdiction to

hear the merits of a case does not resolve the question whether a stay is, in fact, appropriate. The

parties' arguments for and against a stay are addressed next.

### B.    ISSUANCE OF A STAY IS WARRANTED IN THIS CASE

As the primary basis for their motion for a stay, the Shareholders invoke "the power

inherent in every court to control the disposition of the cases on its docket with economy of time

and effort." *See Landis*, 299 U.S. at 254. Before exercising this power, a court must "weigh

competing interests and maintain an even balance" between them, *id*. at 255, taking into

consideration the benefits of a stay, the hardship to the movant of denying a stay, and any injury

to the nonmovant from issuing a stay.

With regard to benefits flowing from a stay, the parties fundamentally disagree about the

extent to which the proceedings in The Hague will affect the resolution of the instant action. The

Shareholders argue that "the standards and nature of this Court's review will differ depending on

the outcome of the Dutch appeal," Pet'rs' Mem. Mot. Stay at 10, and note that in the Russian

Federation's Supplemental Motion to Dismiss, ECF No. 108, the Russian Federation "devoted

*18 pages* to arguing the various ways that the Dutch Judgment supported its opposition to this

Court's subject matter jurisdiction," Pet'rs' Reply at 13 (emphasis in original). The Russian

Federation counters that a stay would offer no benefit "with respect to judicial economy" since

"no foreign court can provide definitive answers to any of the jurisdictional questions now before

this Court." Resp't's Opp'n Mot. Stay at 14, 18. The Russian Federation identifies two such

jurisdictional questions, stating, first, that "[o]nly this Court will ever address the question of

whether the arbitration awards arise out of a commercial relationship under the national law of

the United States." *Id*. at 15. The second such jurisdictional question is whether an arbitration

agreement exists. The Russian Federal explains that "it is well established that this Court may

not defer to the conclusions of foreign courts at the seat of arbitration regarding the existence of

an arbitration agreement" and instead must conduct its own *de novo* analysis of the question. *Id*.

Thus, the Russian Federation reasons that "there is nothing to be gained by staying these

proceedings until the Dutch courts have finally rendered their decisions." *Id*. at 17.

From the outset, the Russian Federation's current position regarding the virtual

irrelevance of the Dutch proceedings is difficult to reconcile with its arguments for dismissing

the action for lack of subject matter jurisdiction and declining to confirm the Awards. Following

the issuance of the Dutch Judgment setting aside the Awards, the Russian Federation filed a

supplemental memorandum supporting its motion to dismiss that emphasized the persuasive

value of the Dutch Judgment, issued by "the court of the 'primary jurisdiction'" for the

arbitration. Resp't's Mem. P. & A. Supp. Suppl. Mot. Dismiss 6–23, ECF No. 108. Indeed,

even if the Dutch proceedings do not resolve every jurisdictional and merits issue presented in

the instant case, the Russian Federation expressly concedes that "the Dutch Courts' reasoning may be persuasive as to certain issues relevant to this Court's jurisdiction under the FSIA, such as the non-existence of an agreement to arbitrate," and that "the final result reached in the Dutch courts may ultimately be conclusive with respect to the Russian Federation's challenge under [the New York Convention]." Resp't's Opp'n Mot. Stay at 3.

In any event, the Russian Federation's strained effort to characterize the outcome of the annulment proceedings as virtually irrelevant to the jurisdictional questions before this Court is simply incorrect. First, the Russian Federation presses its entitlement to sovereign immunity under the FSIA on the ground that the exception for a commercial relationship, which would bring the Awards within the scope of the FSIA and the New York Convention under 28 U.S.C. § 1605(a)(6) and 9 U.S.C. § 202, does not apply. *Id*. at 14–15. Yet, determining whether a "commercial relationship" existed may be intertwined with the question whether the parties agreed to arbitrate under the ECT, in view of that treaty's express provision that "[c]laims submitted to arbitration hereunder shall be considered to arise out of a commercial relationship or transaction for purposes of [the New York Convention]." *See* ECT, art. 26(5)(b). Thus, to the extent the Dutch proceedings are relevant to this Court's determination of whether an agreement to arbitrate existed, they may be relevant to the "commercial relationship" determination as well.

Second, while the Russian Federation argues that, regardless of the outcome of the Dutch proceedings, the question whether the parties had an arbitration agreement is subject to an "inevitable *de novo*" review by this Court, the cases relied upon for this proposition fall short of establishing that such an analysis would be required here. Resp't's Opp'n Mot. Stay at 15–17. Critically, none of the cited cases involved review of an arbitration award that had been set aside by a court in the country with "primary," or exclusive, jurisdiction to annul the award, but

16

instead involved arbitration awards that had been *confirmed* by courts in the country of the arbitral situs.[9]

The D.C. Circuit has explained, "[a] judgment whether to recognize or enforce an award that has not been set aside in the State in which it was made is quite different from a judgment whether to disregard the action of a court of competent authority in another State." *TermoRio S.A. E.S.P. v. Electranta S.P. (TermoRio II)*, 487 F.3d 928, 937 (D.C. Cir. 2007). Primary jurisdiction courts may annul an award on grounds inconsistent with the laws of a secondary jurisdiction country, but nonetheless that annulment decision may not be "routinely second-guess[ed]" and, "[w]hen a competent foreign court has nullified a foreign arbitration award, United States courts should not go behind that decision absent extraordinary circumstances . . . ." *Id.* at 937–38 (internal quotation marks omitted; brackets in original). Consequently, when an "arbitration award was lawfully nullified by the country in which the award was made," parties seeking to enforce the award "have no cause of action in the United States to seek enforcement of the award under the FAA or the New York Convention." *Id.* at 930. In other words, the Russian Federation is insisting that this Court make a subject matter jurisdiction determination now in the context of this arbitration enforcement action, despite the fact that this may be a

---

[9]        The Fifth Circuit has adopted the following helpful nomenclature in describing the two-tiered framework set out in the New York Convention for review and enforcement of international arbitral award: the court in a country in which, or under the law of which, the award was made has "primary jurisdiction" over an arbitral award and exclusive authority to set aside or annul that award, while courts in other countries with "secondary jurisdiction" are limited to deciding whether the award may be enforced in that country and may refuse enforcement only on the grounds specified in Article V of the New York Convention. *See, e.g., First Inv. Corp. v. Fujian Mawei Shipbuilding, Ltd.,* 703 F.3d 742, 748–49 (5th Cir. 2012); *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara,* 364 F.3d 274, 287–88 (5th Cir. 2004*); see also Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara,* 500 F.3d 111, 115 n.1 (2d Cir. 2007) (explaining that "the Convention does not restrict the grounds on which primary-jurisdiction courts may annul an award, thereby leaving to a primary jurisdiction's local law the decision whether to set aside an award[; c]onsequently, even though courts of a primary jurisdiction may apply their own domestic law when evaluating an attempt to annul or set aside an arbitral award, courts in countries of secondary jurisdiction may refuse enforcement only on the limited grounds specified in Article V" (quoting *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara,* 335 F.3d 357, 364 (5th Cir. 2003))).

fruitless exercise, since depending on the outcome of the Dutch proceedings, the Shareholders may have "no cause of action." *Id*. This is a paradigm example of a case warranting a stay where the legal viability of claims may rest on determinations in another legal proceeding.

The cases cited by the Russian Federation simply do not grapple with the question of what import to ascribe to a decision at the court of primary jurisdiction setting aside an arbitral award for lack of any agreement to arbitrate. For example, the Russian Federation points to the decision in *Sarhank Grp. v. Oracle Corp.*, 404 F.3d 657 (2d Cir. 2005). Resp't's Opp'n Mot. Stay at 15–16. There, the Second Circuit determined that, notwithstanding confirmation of the arbitration award against the defendant by Egyptian courts with primary jurisdiction, under American law, the defendant could not be found to be a party to the arbitration agreement merely because the defendant's subsidiary was a signatory to the agreement, noting that the "practice of dealing through a subsidiary is entirely appropriate and essential to our nation's conduct of foreign trade." *Sarhank Grp.*, 404 F.3d at 662. On remand, the district court was instructed to determine in the first instance whether the defendant had agreed to arbitrate by applying American law rather than deferring to application of Egyptian law reflecting a different public policy. *Id*. at 662–63. Had the award been set aside by the Egyptian courts, the Second Circuit may never have reached the question of the existence of an arbitration agreement under American law.

Similarly, in *Chevron Corp. v. Ecuador*, 795 F.3d 200, 203–06 (D.C. Cir. 2015), also relied upon by the Russian Federation, Resp't's Opp'n Mot. Stay at 16–17, the D.C. Circuit considered an argument that no agreement to arbitrate existed in a case involving an award that had been confirmed by the foreign court of primary jurisdiction. Noting that the party seeking enforcement of the arbitral award had presented the applicable treaty containing an arbitration

provision and notice of arbitration, the Court concluded this was sufficient *prima facie* evidence of an agreement to arbitrate to satisfy the FSIA jurisdictional requirement. *Id.* at 205 n.3. The Court had no occasion to consider the consequences, if any, of a determination at the seat of the arbitration that no agreement to arbitrate existed and the concomitant setting aside of the award.

In sum, given the current posture of the Dutch proceedings, neither *Sarhank Grp.* nor *Chevron Corp.* persuade this Court that an analysis of whether an agreement to arbitrate existed between the parties to this lawsuit would be either inevitable or *de novo*.

Two points critical to the stay analysis emerge from review of these arguments, as well as the legal issues implicated by them. First, in the absence of a stay, this Court will be required to determine the appropriate consideration—if not, strictly speaking, deference—for purposes of its jurisdictional analysis to give to the factual conclusion of the District Court of The Hague regarding the existence of an arbitration agreement, while being mindful that those findings and conclusions are subject to reversal by the Court of Appeal of The Hague. *See Chevron Corp.*, 795 F.3d at 204 ("If there is no arbitration agreement or no award to enforce, the District Court lacks jurisdiction over the foreign state and the action must be dismissed.").

Second, more significantly, assuming this Court has jurisdiction, the decision whether to confirm the Awards would require consideration of whether the Awards have been set aside by the courts of The Hague, which has the primary jurisdiction. Although the FAA and New York Convention "afford[] the district court little discretion in refusing or deferring enforcement of foreign arbitral awards," they expressly contemplate refusal for awards that have been set aside. *Belize I*, 668 F.3d at 727; *see* N.Y. Convention, art. V(1)(e). As it stands, the Awards have been set aside, and thus this Court may be obligated to decline to confirm the Awards, even though the Court of Appeal of The Hague could reinstate them. *See TermoRio II*, 487 F.3d at 936 ("[A]n

arbitration award does not exist to be enforced in other [parties to the New York Convention] if it has been *lawfully* 'set aside' by a competent authority in the State in which the award was made." (emphasis added)); *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara,* 500 F.3d 111, 124 (2d Cir. 2007) ("Under the Convention, a jurisdiction may decline to enforce a foreign arbitral award if it has 'been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made.'" (quoting N.Y. Convention art. V(1)(e))); *Corporación Mexicana de Mantenimiento Integral. S. de R.L. de C.V. v. Pemex Exploración y Producción (Corporación Mexicana)*, No. 10-4656-cv, 2012 WL 9346475, at *1 (2d Cir. Feb. 16, 2012) (remanding case to "the District Court to address in the first instance whether enforcement of the award should be denied because it 'has been set aside or suspended by a competent authority of the country in which, or under the law of which, the award was made'" (quoting New York Convention, art. V(1)(e))); *Stati*, 2016 WL 4191540, at *11 ("[T]he Court is mindful that if respondent is successful in the set-aside proceeding, confirmation of the award will be unlikely."); *In re Arb. of Certain Controversies Between Getma Int'l & Republic of Guinea*, No. 14-1616 (RBW), 2016 WL 3211808 (D.D.C. June 9, 2016) (declining to enforce foreign arbitration award where it had been set aside by a court of competent authority); *cf. Termorio S.A. E.S.P. v. Electrificadora Del Atlantico S.A. E.S.P. (Termorio I)*, 421 F. Supp. 2d 87, 93 (D.D.C. 2006) ("[T]he New York Convention (codified in U.S. law) provides that recognition of a foreign award *may* be refused if it has been nullified by a foreign court. . . . To establish a rule that a U.S. court *must* dismiss a case because a foreign court nullified an arbitral award would violate the New York Convention provision," noting that otherwise "foreign judgments obtained fraudulently, for example, would be unremediable in U.S.

courts." (emphasis in original)), *aff'd sub nom. TermoRio S.A. E.S.P. v. Electranta S.P. (TermoRio II),* 487 F.3d 928 (D.C. Cir. 2007).

Framed in this way, it is clear that the outcome of the judicial proceedings in The Hague may affect this Court's determinations, at a minimum, by virtue of the persuasive value of the reasoning in the Dutch decisions. Moreover, the parties' requests and arguments to the Court will be shaped by the Dutch decisions. Should the Court proceed and place any reliance on the Dutch Judgment, as the Russian Federation urges in its pending motions, any decision issued would be undercut if that Judgment is reversed on appeal in the Netherlands—that is, a determination by the Court of Appeal of The Hague that an agreement to arbitrate *was* formed. *See* Pet'rs' Mem. Mot. Stay at 9 (noting that if the Dutch Judgment is reversed, "any decision this Court had issued in the meantime analyzing the implications of that then-voided judgment [for its subject matter jurisdiction or merits determination] would be rendered unnecessary"). This change in circumstances would likely prompt the parties to seek reconsideration and, if this case were on appeal, would likely result in remand to this Court for further consideration. *See Corporación Mexicana,* 2012 WL 9346475, at *1 (remanding case after primary jurisdiction court annulled award).

In contrast, if the Dutch Judgment is affirmed on appeal, the Shareholders may choose to stipulate to dismissal of this action in view of this Court's questionable ability to confirm an award that has been "lawfully 'set aside' by a competent authority in the State in which the award was made." *TermoRio II,* 487 F.3d at 936. Should the Shareholders choose to proceed, this Court would have to consider interests in international comity and the avoidance of conflicting judgments as part of its analysis as to whether any such agreement existed. *See Laker Airways Ltd. v. Sabena, Belgian World Airlines,* 731 F.2d 909, 937 (D.C. Cir. 1984) ("[T]he

central precept of comity teaches that, when possible, the decisions of foreign tribunals should be given effect in domestic courts, since recognition fosters international cooperation and encourages reciprocity, thereby promoting predictability and stability through satisfaction of mutual expectations. . . . However, . . . [n]o nation is under an unremitting obligation to enforce foreign interests which are fundamentally prejudicial to those of the domestic forum."); Restatement (Third) U.S. Law of Int'l Comm. Arb., Tentative Draft No. 4, app. E, § 4-8 (Am. Law Inst. 2015) ("In deciding whether to grant post-award relief, a court may reexamine a matter decided at an earlier stage of the proceedings by a court within the United States or by a foreign court, to the extent consistent with the forum's applicable principles governing the law of the case, claim and issue preclusion, and recognition of foreign judgments."). These myriad considerations amply demonstrate that issuance of a stay would avoid potentially "fractured and disorderly" and unnecessary litigation and best preserve judicial and parties' resources. *Seneca Nation of Indians,* 144 F. Supp. 3d at 119.

Having assessed the benefits to staying this action, the relative hardships must now be identified and considered. As is evident from the above discussion, in the absence of a stay, the parties will be required to litigate this action with reference to the Dutch Judgment, which remains subject to reversal by the Court of Appeal and, depending on the outcome of that appeal, could prompt additional rounds of briefing and review of the merits. As the Shareholders point out, "if this action is dismissed on the basis of the Dutch Judgment" and then "the Court of Appeal of The Hague ruled in [the Shareholders'] favor," the Shareholders would face difficulties related to initiating a new enforcement action in this Court. *Id*. at 13–14. This is an obvious hardship to the Shareholders that would be avoided by a stay.

For its part, the Russian Federation contends that simply remaining a party to this litigation poses a hardship counseling against a stay, asserting a "grave affront to [its] national sovereignty and an injury to the Russian Federation's standing abroad," as well as "substantial economic harm . . . to the credit ratings of both the Russian Federation and potentially millions of private borrowers in the Russian Federation" resulting from the "contingent liabilit[y]" created by this action to confirm the Awards. Resp't's Opp'n Mot. Stay at 18–20. Characterizing the Shareholders' efforts to confirm the Awards as a "flagrantly abusive campaign of worldwide asset seizures," the Russian Federation urges that "granting a stay would implicitly confer undue legitimacy" on those efforts. *Id.* at 18. The Shareholders dispute these alleged harms on several fronts, attacking the Russian Federation's expert on the question of harm and its inconsistency in consenting to a stay in the United Kingdom, but objecting to a stay in this case; citing the minimal attention given the Awards by the Russian Federation's Ministry of Finance, as well as Moody's, in their assessments of the Russian Federation's economy; and noting the "ancillary" nature of the present confirmation proceedings, relative to the harm caused by the mere existence of the Awards and continued litigation over their validity in The Hague. *See* Pet'rs' Reply at 16–21. In any event, to the extent that the Russian Federation claims hardship from the potential liability posed by the Awards, the Shareholders also suffer the hardship of not being paid monies that the Awards say they are owed. *See Gold Reserve, Inc. v. Bolivarian Republic of Venez.*, 146 F. Supp. 3d 112, 136 (D.D.C. 2015) (finding that country's "primary hardship" from arbitral award burdening public treasury is "at least as significant" for party granted arbitral award and owed the funds).

The Shareholders have the better of the argument. Even assuming some harm to the Russian Federation, the harms alleged follow inevitably from the Russian Federation's being the

losing party in an indisputably high-stakes arbitration and a party to ongoing, multi-jurisdictional litigation relating to the validity of the Awards. Such harm to the Russian Federation does not outweigh the benefits of the requested stay and the hardships attendant to denying one. *See Landis*, 299 U.S. at 255 (emphasizing a court's need to "maintain an even balance" between "competing interests").

Having not yet ruled on its jurisdiction, the Court is not in a position to issue a stay pursuant to the New York Convention. *Cf. Stati*, 2016 WL 4191540, at *1 (issuing stay under the New York Convention after ruling on its subject matter jurisdiction). Nevertheless, the New York Convention expressly contemplates staying an action to confirm an arbitral award in the case of ongoing proceedings in the originating country to set aside the award. *See* N.Y. Convention, art. VI. In this regard, the factors set out in *Europcar Italia, S.p.A. v. Maiellano Tours, Inc.*, 156 F.3d 310, 317 (2d Cir. 1998), to evaluate the appropriateness of staying an action pursuant to Article VI are instructive. *See Gold Reserve Inc.*, 146 F. Supp. 3d at 134 (collecting cases applying the "*Europcar* factors"). Those factors are:

> (1) the general objectives of arbitration—the expeditious resolution of disputes and the avoidance of protracted and expensive litigation;
>
> (2) the status of the foreign proceedings and the estimated time for those proceedings to be resolved;
>
> (3) whether the award sought to be enforced will receive greater scrutiny in the foreign proceedings under a less deferential standard of review;
>
> (4) the characteristics of the foreign proceedings including (i) whether they were brought to enforce an award (which would tend to weigh in favor of a stay) or to set the award aside (which would tend to weigh in favor of enforcement); (ii) whether they were initiated before the underlying enforcement proceeding so as to raise concerns of international comity; (iii) whether they were initiated by the party now seeking to enforce the award in federal court; and (iv) whether they were initiated under circumstances indicating an intent to hinder or delay resolution of the dispute;

(5) A balance of the possible hardships to the parties, keeping in mind that . . . under Article V of the Convention, an award should not be enforced if it is set aside or suspended in the originating country . . . ; and

(6) Any other circumstance that could tend to shift the balance in favor of or against adjournment  . . . .

*Europcar*, 156 F.3d at 317–18.

Notably, *Europcar* did not involve the situation, presented here, in which an award has already been set aside by a court of primary jurisdiction and the stay is sought by a party seeking to confirm the award, rather than the party seeking to avoid the award.  Nor did the *Europcar* court consider whether a stay was warranted where, as here, a party challenges the confirming court's subject matter jurisdiction.   Consequently, the *Europcar* factors are not squarely applicable to the circumstances presented in this case.  Nevertheless, the interests reflected in the *Europcar* factors—those at play "when a district court is asked to adjourn enforcement proceedings to await the outcome of parallel foreign proceedings"—apply forcefully in the instant action.  *Id*. at 318.

Consideration of those factors reveals an underlying principle: a court's overarching need to "balance the Convention's policy favoring confirmation of arbitral awards against the principle of international comity embraced by the Convention" when considering a request for a stay of an action to confirm an arbitral award.  *Four Seasons Hotels and Resorts, B.V. v. Consorcio Barr S.A.*, 377 F.3d 1164, 1172 (11th Cir. 2004); *see also G.E. Transp. S.P.A. v. Republic of Albania*, 693 F. Supp. 2d 132, 138 (D.D.C. 2010).  In this case, both "the Convention's policy favoring confirmation of arbitral awards" and "the principle of international comity" weigh in favor of a stay, obviating any need to "balance" those considerations.  As it stands now, the Awards have been set aside and, in this status, confirmation is unlikely.  *See TermoRio II*, 487 F.3d at 936.  As a result, staying this action pending further proceedings in The

Hague promotes the policy in favor of confirmation of arbitral awards. Moreover, comity considerations support granting a stay: the foreign proceedings were initiated prior to the instant action, and the foreign court has already taken action on the merits. *Cf. Sumitomo Corp. v. Parakopi Compania Maritima, S.A.*, 477 F. Supp. 737, 741–42 (S.D.N.Y.1979) (noting "Greek courts have not yet had to review the merits of the dispute" in denying stay), *aff'd*, 620 F.2d 286 (2d Cir. 1980).

For these reasons, the *Europcar* approach counsels in favor of granting the Shareholders' requested stay. *See Telcordia Techs., Inc. v. Telkom SA, Ltd.*, 95 F. App'x 361, 362–63 (D.C. Cir. 2004) (affirming district court decision to adjourn case pursuant to New York Convention, where foreign set-aside proceeding was underway); *In Re Arb. of Certain Controversies Between Getma Int'l & Republic of Guinea*, 142 F. Supp. 3d 110, 116–17 (D.D.C. 2015) (considering *Europcar* factors and granting stay of arbitration award action pending resolution of foreign proceeding seeking annulment of award and noting the possibility that the award will be set aside favors granting a stay); *Higgins v. SPX Corp.*, No. 05-CV-846, 2006 WL 1008677, at *4 (W.D. Mich. Apr. 18, 2006) ("[C]omity and efficient use of judicial resources does strongly favor staying this action to await the decision of the Brazilian courts as to the nullification action.").

The Russian Federation cites the D.C. Circuit's decision in *Belize I* as support for its desired result of denying the stay request, but this case is easily distinguishable. In *Belize I*, the district court stayed a petition to confirm an arbitral award pending the resolution of proceedings in the Belize Supreme Court to block enforcement of the award. In disapproving the stay, the D.C. Circuit noted that "no articulation of need, pressing or otherwise, accompanied the stay order." 668 F.3d at 732. Consideration of the facts of *Belize I* reveal three critical differences between that case and the instant action: in *Belize I*, (1) the party seeking the stay was the party

against whom the award was to be enforced; (2) proceedings in Belize formed the basis for the requested stay, but "the courts of England [were] the competent authority with primary jurisdiction over the [award]"; and (3) "the record fail[ed] to show either what a 'resolution' of [the Belize] case would entail or when such a resolution is likely to be reached." *Id.* at 731–32. In contrast, the Shareholders who successfully obtained the Awards seek a stay, not the Russian Federation, which stands liable under the Awards for about $50,000,000,000 United States Dollars; the foreign proceedings are underway at the seat of the arbitration and have, so far, resulted in setting aside the Awards; and the record reflects that those proceedings should conclude within two and a half years of the filing of the notice of appeal, which was due on July 20, 2016, *see* Pet'rs' Mot. Stay, Ex. 2, Decl. Marnix Leijten ¶¶ 16, 18, ECF No. 105-2; Pet'rs' Reply at 14–15, and, at that time, may establish definitively whether the Awards stand or have been set aside.[10]

Accordingly, this action is stayed pending the resolution of the proceedings to set aside the Awards in the Court of Appeal of The Hague (the "Set-Aside Proceedings"). In consideration of the need for a "provision for status updates or further review," lest the stay become "immoderate" in the face of protracted proceedings in The Hague, *see Belize I*, 668 F.3d at 732, and on the basis of the Shareholders' representation that those proceedings will conclude within two and a half years, the stay of these proceedings is granted until January 21, 2019,

---

[10] The record reflects that the Court of Appeal's decision may be reviewed in the Dutch Supreme Court. The Petitioners have indicated that "[t]he Dutch Supreme Court engages in a limited review that gives substantial deference to the Court of Appeal," Pet'rs' Mem. Mot. Stay at 8, and has not requested a stay encompassing review proceedings in the Dutch Supreme Court, *see* Pet'rs' Reply at 15 (explaining the Shareholders "seek a stay only through [the Court of Appeal] ruling"). For these reasons, the stay issued herein is limited in scope to the proceedings in the Court of Appeal.

unless the Set-Aside Proceedings conclude earlier.  The parties must, every six months, jointly file a status report advising the Court of the status of the Set-Aside Proceedings.[11]

## IV.    CONCLUSION

For the foregoing reasons, the Shareholders' Motion for a Stay is granted.

Date: September 30, 2016

_____
BERYL A. HOWELL
Chief Judge

---

[11]    Since seven of the ten pending motions are resolved in this Memorandum Opinion, only the following three motions are subject to the stay: (1) the Respondent's Motion to Deny Confirmation of Arbitration Awards Pursuant to New York Convention, ECF No. 23; (2) the Respondent's Motion to Dismiss the Petition to Confirm Arbitration Awards for Lack of Subject Matter Jurisdiction, ECF No. 24; and (3) the Respondent's Supplemental Motion to Dismiss the Petition to Confirm Arbitration Awards Under the Foreign Sovereign Immunities Act and the New York Convention, ECF No. 108.