## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

---

|  |  |  |
|---|---|---|
| HULLEY ENTERPRISES LTD., | ) | |
| YUKOS UNIVERSAL LTD., AND | ) | Case No. 1:14-cv-01996-BAH |
| VETERAN PETROLEUM LTD., | ) | |
| | ) | |
| *Petitioners*, | ) | Chief Judge Beryl A. Howell |
| | ) | |
| v. | ) | |
| | ) | |
| THE RUSSIAN FEDERATION, | ) | |
| | ) | |
| *Respondent*. | ) | |

---

## STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF
## THE RUSSIAN FEDERATION'S MOTION TO EXTEND
## THIS COURT'S STAY OF LITIGATION

**WHITE & CASE** LLP

Carolyn B. Lamm (D.C. Bar No. 221325)
Nicolle Kownacki (D.C. Bar No. 1005627)
David P. Riesenberg (D.C. Bar No. 1033269)
Eric Chung (D.C. Bar No. 1027439)
701 Thirteenth Street, NW
Washington, DC 20005
Phone: (202) 626-3600
Fax: (202) 639-9355
clamm@whitecase.com

*Counsel for the Russian Federation*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................................................................... 1

BACKGROUND ................................................................................................................... 6

ARGUMENT ........................................................................................................................ 9

I.    The Original Reasons for the Stay Ruling Remain True and Are Even More
      Compelling Today .................................................................................................. 10

      A.    As the Court Already Held, a Stay Is Needed to Avoid Unnecessary and
            Disorderly Parallel Litigation ...................................................................... 10

      B.    As the Court Already Held, a Stay Is Needed to Show Due Respect for
            International Comity ..................................................................................... 16

      C.    As the Court Already Held, a Stay Is Needed Based Upon the Balance of
            Hardships to the Parties ............................................................................... 20

II.   The *Europcar* Factors Also Continue to Weigh in Favor of the Stay ........................... 24

CONCLUSION ................................................................................................................... 28

## TABLE OF AUTHORITIES

**Cases**                                                                                                          **Page(s)**

*Alto Mar Girassol v. Lumbermens Mut. Cas. Co.*,
    No. 04-CV-7731, 2005 U.S. Dist. LEXIS 7479 (N.D. Ill. Apr. 12, 2005) ...................... 14

*Caribbean Trading & Fid. Corp. v. Nigerian Nat'l Petroleum Corp.*,
    No. 90-CV-4169(JFK), 1990 U.S. Dist. LEXIS 17198 (S.D.N.Y. Dec. 18, 1990) .......... 19

*Consorcio Rive S.A. de C.V. v. Briggs of Cancun, Inc.*,
    No. 99-CV-2204, 2000 U.S. Dist. LEXIS 899 (E.D. La. Jan. 25, 2000) .......................... 19

*Corporación Mexicana de Mantenimiento Integral. S. de R.L. de C.V. v.*
    *Pemex Exploración y Producción*,
    No. 10-4656-cv, 2012 U.S. App. LEXIS 27054 (2d Cir. Feb. 16, 2012) ........................ 13

*CPConstruction Pioneers Baugesellschaft Anstalt  v. Gov't of Republic of Ghana*,
    578 F. Supp. 2d 50 (D.D.C. 2008) ................................................................... 19, 23

\* *Europcar Italia, S.P.A. v. Maiellano Tours*,
    156 F.3d 310 (2d Cir. 1998) ...............................................................................*passim*

*Fertilizer Corp. of India v. IDI Mgmt., Inc.*,
    517 F. Supp. 948 (S.D. Ohio 1981) .................................................................. 19

*Getma Int'l v. Republic of Guinea*,
    142 F. Supp. 3d 110 (D.D.C. 2015) ...................................................................*passim*

*Gretton Ltd. v. Republic of Uzb.*,
    No.18-1755, 2019 U.S. Dist. LEXIS 18990 (D.D.C. Feb. 6, 2019) ................................ 14,
    22, 27

*IBT/HERE Empl. Reps.' Council v. Gate Gourmet Div. Ams.*,
    402 F. Supp. 2d 289 (D.D.C. 2005) ................................................................... 6, 10

*InterDigital Comms., Inc. v. Huawei Invest. & Holding Co.*,
    166 F. Supp. 3d 463 (S.D.N.Y. 2016) ............................................................... 10, 27

*Jorf Lasfar Energy Co., S.C.A. v. AMCI Exp. Corp.*,
    No. 05-CV-0423, 2005 U.S. Dist. LEXIS 34969 (W.D. Pa. Dec. 22, 2005) ................... 14, 20

*Laker Airways Ltd. v. Sabena, Belgian World Airlines*,
    731 F.2d 909 (D.C. Cir. 1984) ............................................................................ 6, 16

\* *Landis v. N. Am. Co.*,
    299 U.S. 248 (1936) .......................................................................................... 9, 28

*Masdar Solar & Wind Coop. U.A. v. Kingdom of Spain*,
   397 F. Supp. 3d 34 (D.D.C. 2019) ................................................................*passim*

*Naegele v. Albers*,
   355 F. Supp. 2d 129 (D.D.C. 2005) ............................................................ 5, 10

*Nat'l Shopmen Pension Fund v. Folger Adam Sec., Inc.*,
   274 B.R. 1 (D.D.C.  2002) .......................................................................... 10

\* *Novenergia II-Energy & Env't (SCA) v. Kingdom of Spain*,
   No. 18-cv-01148, 2020 U.S. Dist. LEXIS 12794 (D.D.C. Jan. 27, 2020) ....................*passim*

*Seneca Nation of Indians v. U.S. Dep't of Health & Human Servs.*,
   144 F. Supp. 3d 115 (D.D.C. 2015) ............................................................ 9, 10

*Stati v. Republic of Kaz.*,
   199 F. Supp. 3d 179 (D.D.C. 2016) .................................................... 12, 24, 26

*TermoRio S.A. E.S.P. v. Electranta S.P.*,
   487 F.3d 928 (D.C. Cir. 2007) ............................................................ 3, 7, 11

*Thai-Lao Lignite (Thail.) Co. v. Gov't of the Lao People's Democratic Republic*,
   864 F.3d 172 (2d Cir. 2017)................................................................ 4, 13

\* *Unión Fenosa Gas, S.A. v. Arab Republic of Egypt*,
   No. 18-2395, 2020 U.S. Dist. LEXIS 98645 (D.D.C. June 4, 2020)............................*passim*


Other Authorities

*Electrabel v. Hungary*, Award ........................................................................ 17

New York Convention ................................................................ 1, 11,
12, 24

*Russia is in 7th place as to COVID-19 pandemic intensity*, TASS
   Russian News Agency (June 10, 2020), https://tass.com/world/1166507 ................... 5, 23

\* *indicates authority on which counsel chiefly relies*

iii

The Russian Federation respectfully moves this Court to extend the stay of litigation imposed by its Memorandum Opinion (the "Stay Ruling") (ECF No. 154) and Minute Order of October 10, 2019, until the final resolution of the ongoing proceedings before the Dutch Supreme Court to set aside the arbitral awards in this case (the "Awards").

This Motion is supported by the declarations of Professor Albert Jan van den Berg ("Van den Berg Decl."), Mr. Rob Meijer ("Meijer Decl."), and Sir Nicholas Forwood QC ("Forwood Decl.").

## PRELIMINARY STATEMENT

As the Court is aware, three substantive Motions (ECF Nos. 23, 24, and 108)[1] were pending in 2016 and thus have been subject to the Stay Ruling. These Motions raise the Russian Federation's defenses to subject-matter jurisdiction under the Foreign Sovereign Immunities Act ("FSIA") and defenses against confirmation under the 1958 Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("New York Convention").

As illustrated in Table 1 below, these Motions raise many of the same issues that are pending in the Dutch Supreme Court in Case No. 20/01595. *See* Pet. for Appeal in Cassation ("Cassation Pet.") (ECF No. 176-2); Van den Berg Decl. ¶¶ 7–8, 11; Meijer Decl. ¶¶ 23, 26.

| Table 1 – Overlapping Issues in the Dutch and U.S. Litigation | | |
|---|---|---|
| **Overlapping Issue** | **Dutch Litigation** | **U.S. Litigation** |
| Whether the Russian Federation offered to arbitrate under Articles 26 and 45(1) of the Energy Charter Treaty ("ECT") | ECF No. 176-2, ¶¶ 11-96 | ECF No. 23, pp. 13; ECF No. 24, pp. 28-34; ECF No. 108, pp. 12-22 |

---

[1] Resp't Mot. Den., Oct. 20, 2015, ECF No. 23; Resp't Mot. Dismiss Pet., Oct. 20, 2015, ECF No. 24; Resp't Suppl. Mot. Dismiss Pet., June 5, 2016, ECF No. 108. The parties acknowledge, in principle, that lifting the stay would require re-submission of updated briefs in light of developments since 2016. Joint Status Report, ECF No. 176.

| | | |
|---|---|---|
| Whether Petitioners were eligible offerees under Articles 1(6), 1(7), and 26 of the ECT | ECF No. 176-2, ¶¶ 97-141 | ECF No. 23, pp. 13; ECF No. 24, pp. 34-36; ECF No. 108, pp. 23-33 |
| Whether Petitioners failed to accept any purported offer of arbitration by violating mandatory preconditions set forth under Article 21 of the ECT | ECF No. 176-2, ¶¶ 180-207 | ECF No. 23, pp. 39; ECF No. 24, pp. 36-38 |
| Whether the Awards are invalid based upon grave violations of due process during the arbitration, including Petitioners' fraudulent withholding of documents and fraudulent statements to the arbitral tribunal | ECF No. 176-2, ¶¶ 1-10 | ECF No. 23, pp. 14-16; ECF No. 108, pp. 26-27 |
| Whether the arbitrators' assessment of damages is invalid and unenforceable | ECF No. 176-2, ¶¶ 270-279 | ECF No. 23, pp. 28-33 |
| Whether the Awards are invalid based upon the irregular composition of the arbitral tribunal | ECF No. 176-2, ¶¶ 208-220 | ECF No. 23, pp. 33-38 |
| Whether the Awards are invalid under public policy based upon Petitioners' participation in bribery, fraud, and money laundering | ECF No. 176-2, ¶¶ 142-179 | ECF No. 23, pp. 16-21; ECF No. 24, pp. 31-34; ECF No. 108, pp. 33-39 |

In summary, there is an extensive degree of overlap between the issues raised in the Dutch litigation and the U.S. litigation—both of which involve Petitioners' same claims against the Russian Federation for more than US$ 50 billion.  Van den Berg Decl. ¶¶ 7–8.  Both the Dutch litigation and the U.S. litigation raise complex legal questions pertaining to the interpretation of the ECT (a multilateral treaty to which the United States is not a party), the application of international law, Russian law, and transnational public policy, as well as complex factual questions pertaining to Petitioners' bribery, fraud, and money laundering.  Van den Berg Decl. ¶¶ 5, 12, 17; *see also* Meijer Decl. ¶ 27 ("[T]his case involves numerous legal issues that are 'unprecedented' within the Dutch Supreme Court's previous jurisprudence.").

As explained in the Stay Ruling, however, if the Dutch courts rule in favor of the Russian Federation on any of these grounds, then the Awards will be set aside and Petitioners will have "'no cause of action'" in the U.S. litigation.  Stay Ruling 18–20 ("'[An] arbitration award does not exist to be enforced . . . if it has been lawfully 'set aside' by a competent authority in the State in which the award was made.'" (quoting *TermoRio S.A. E.S.P. v. Electranta S.P.*, 487 F.3d 928, 936 (D.C. Cir. 2007)); *see also* Cassation Petition ¶¶ 270-279 ("If the [Dutch Supreme Court] sustains any of the 'individual' grievances . . . , the consequence is that the CoA's upholding of the Tribunal's damages award [of US$ 50 billion] cannot stand anymore and will be quashed as well.").

The Court thus should extend the Stay Ruling because all of the Court's original reasons for imposing the stay remain equally true and applicable today—and are even more compelling—including with respect to the "legal viability" of Petitioners' claims, the principle of "international comity," and the balance of the "relative hardships."  Stay Ruling 17–22.  Indeed, the balance of hardships today weighs even more heavily in favor of staying the U.S. litigation based upon the extraordinary administrative and economic hardships imposed by the intervening COVID-19 pandemic and public health crisis.

As detailed further below, this case remains "a paradigm example of a case warranting a stay [because] the legal viability" of the Awards will "rest on determinations in another legal proceeding."  Stay Ruling 18 (emphasis added).  Only the Dutch Supreme Court—where the Awards are now under review—can "establish definitively whether the Awards stand or have been set aside," because only the Dutch judicial system possesses "primary jurisdiction" in this case.  *Id.* at 17–19, 27.  This is not disputed between the parties.  *E.g.*, Letter of Aug. 2, 2005 (ECF No. 78-2) (recognizing the Netherlands to be the "legal seat" for the arbitration).

Significantly, the Dutch appellate court's most recent ruling (the "2020 Dutch Judgment") (ECF No. 176-1) is not a final, unreviewable judgment within the Dutch legal system. As detailed in the Russian Federation's Cassation Petition, the 2020 Dutch Judgment is based upon numerous <u>legal</u> errors, which remain subject to mandatory review by the Dutch Supreme Court and anticipated referral to the European Union ("EU") Court of Justice. Meijer Decl. ¶¶ 6, 26; Forwood Decl. ¶ 18 ("[T]he Dutch Supreme Court is obliged to refer the potentially dispositive questions of EU law pertaining to the interpretation of the ECT to the EU Court of Justice for a preliminary ruling under Article 267 of the TFEU.").[2] Just as in 2016, therefore, "in the absence of a stay, the parties will be required to litigate this action with reference to the Dutch Judgment, which remains subject to reversal . . . and, depending on the outcome of that appeal, could prompt additional rounds of briefing and review of the merits." Stay Ruling 22.

Fundamentally, if the Stay Ruling is not extended and this Court proceeds toward enforcement, the entire proceeding will be a waste of the Court's and parties' limited resources (during a public health crisis) in the event that the Dutch Supreme Court and/or the EU Court of Justice rules in favor of the Russian Federation. "More expensive litigation involving more complex issues would result from such a situation." *Getma Int'l v. Republic of Guinea*, 142 F. Supp. 3d 110, 114 (D.D.C. 2015); *see, e.g.*, *Thai-Lao Lignite (Thail.) Co. v. Gov't of the Lao People's Democratic Republic*, 864 F.3d 172, 189 (2d Cir. 2017) (upholding vacatur of a judgment enforcing a Malaysian arbitral award, which had been set aside by Malaysian courts after the U.S. enforcement, under Rule 60(b)(5) of the Federal Rules of Civil Procedure). Any

---

[2] Forwood Declaration, Annex B ("Proposed List of Questions for Referral by the Supreme Court of the Netherlands to the Court of Justice of the European Union for a Preliminary Ruling under Article 267 of the Treaty on the Functioning of the European Union").

amounts paid to Petitioners or property seized by Petitioners would then be subject to restitution, which would lead to even further litigation and further burden the Court's and parties' limited resources.   Such a prospect would pose "a grave risk" of substantial harm to the Russian Federation (as well as to third parties) because Petitioners are merely shell companies with no assets or funds of their own, and thus cannot provide "any guaranty of restitution."   Van den Berg Decl. ¶ 32 (quoting the Paris Court's 2015 ruling).

The unnecessary burden on the Court and on the parties would only be exacerbated, in the present circumstances, due to the seriousness of the COVID-19 pandemic both in the District of Columbia and in the Russian Federation.  *Unión Fenosa Gas, S.A. v. Arab Republic of Egypt*, No. 18-2395, 2020 U.S. Dist. LEXIS 98645, at *14–15 (D.D.C. June 4, 2020) (staying proceedings to enforce an arbitral award worth US$ 2 billion in light of "uncertainties regarding an unprecedented global pandemic").   Both jurisdictions will be dealing with the resulting administrative and economic burdens for years to come.   With respect to "the overall number of COVID-19 cases" worldwide, the United States and the Russian Federation were recently reported as having the "first" and "third" highest total number of cases.  *See Russia is in 7th place as to COVID-19 pandemic intensity*, TASS Russian News Agency (June 10, 2020), https://tass.com/world/1166507; *see also* Standing Order No. 20-29, May 26, 2020 (Howell, C.J.) (describing "the seriousness of the pandemic in this region as of this date" based on order of the Mayor of the District of Columbia).

Fundamentally, as courts in this Circuit have repeatedly emphasized, "'litigating essentially the same issues in two separate forums is not in the interest of judicial economy or in the parties' best interests.'"  *E.g., Masdar Solar & Wind Coop. U.A. v. Kingdom of Spain*, 397 F. Supp. 3d 34, 40 (D.D.C. 2019) (quoting *Naegele v. Albers*, 355 F. Supp. 2d 129, 141 (D.D.C.

2005)); *IBT/HERE Empl. Reps.' Council v. Gate Gourmet Div. Ams.*, 402 F. Supp. 2d 289, 293

(D.D.C. 2005) (same).  Moreover, the "central precept of comity" requires this Court to give

effect to the <u>final</u> decision of the Dutch courts in Case No. 20/01595, which cannot be done until

after that final decision has actually been issued.  *See Laker Airways Ltd. v. Sabena, Belgian*

*World Airlines*, 731 F.2d 909, 937 (D.C. Cir. 1984); *see also Novenergia II-Energy & Env't*

*(SCA) v. Kingdom of Spain*, No. 18-cv-01148, 2020 U.S. Dist. LEXIS 12794, at *14–15 (D.D.C.

Jan. 27, 2020) (agreeing "that international comity requires a stay because the issues [of the

ECT's interpretation] are important to the European Union and should be resolved within the

Union's judicial system").

    As detailed further below, therefore, this Court's Stay Ruling should be maintained until

the Dutch judicial system's final resolution of Case No. 20/01595.

## BACKGROUND

    In 2016, as the Court is aware, the Dutch district court set aside (or "annulled") the

Awards on the basis that the Russian Federation had never offered to arbitrate with Petitioners

under Articles 26 and 45(1) of the Energy Charter Treaty ("ECT").  Stay Ruling 6.  Because this

conclusion entailed the annulment of the Awards in their entirety, the Dutch district court never

addressed the Russian Federation's alternative defenses.  Van den Berg Decl. ¶ 20.  Those

alternative defenses are summarized above in Table 1, and are further detailed in the Russian

Federation's Cassation Petition (ECF No. 176-2) and substantive Motions (ECF Nos. 23, 24,

108) pending before this Court.

    Immediately after the Dutch district court annulled the Awards, Petitioners appealed the

Dutch district court's decision (the "2016 Dutch Judgment") (ECF No. 117-10) and moved to

stay their parallel U.S. lawsuit.  Stay Ruling 1, 7.  As Petitioners argued at the time, it would be

an "unnecessary waste of judicial and party resources" and contrary to "international comity,"

for this Court to "issue a decision that ends up being inconsistent with the ultimate treatment of the Awards by the Dutch courts."  Pet'rs' Mot. 1, 16 (ECF No. 105-1).  The Russian Federation opposed the stay based upon its view that the Court had to first determine its subject-matter jurisdiction under the FSIA and due to, among other considerations, the inevitable length of the Dutch proceedings.  Resp.'s Opp'n 1 & n.3 (ECF No. 127).  The parties both acknowledged that "no final decision that is no longer subject to appeal" in the Dutch courts would likely "be made before six to nine years."  Resp.'s Opp'n 1 & n.3 (quoting Pet'rs' Br. to the Belgian court, ECF No. 117-4).  The Court declined to determine subject-matter jurisdiction until it reached the merits and, after balancing the relevant considerations in the exercise of its inherent power, ordered a stay of the U.S. litigation.  Stay Ruling 14, 27.

As the Court explained, the Stay Ruling was necessary because, if the Russian Federation ultimately prevails in the Dutch proceedings, then Petitioners will have "'no cause of action'" in the U.S. litigation.  Stay Ruling 18–20 ("'[An] arbitration award does not exist to be enforced . . . if it has been lawfully 'set aside' by a competent authority in the State in which the award was made.'" (quoting *TermoRio*, 487 F.3d at 936).  The Court further concluded that "international comity and the avoidance of conflicting judgments" weigh in favor of staying the U.S. litigation until the resolution of the Dutch proceedings.  Stay Ruling 21–22.  Finally, the Court noted the hardships that necessarily result from litigating in reference to a moving target.  "[I]n the absence of a stay, the parties will be required to litigate this action with reference to the Dutch Judgment, which remains subject to reversal . . . and, depending on the outcome of that appeal, could prompt additional rounds of briefing and review of the merits."  *Id.* at 22.  The Court thus stayed the U.S. litigation to await the "outcome of the Dutch proceedings."  *Id.* at 18.

That "outcome," however, is still unknown in 2020 because the Dutch proceedings remain ongoing.  On February 18, 2020, the Dutch appellate court reversed the decision of the Dutch district court.  Joint Status Report (ECF No. 176).  The Russian Federation has submitted a timely "appeal in cassation" to the Dutch Supreme Court.  Meijer Decl. ¶ 23.  The Dutch Supreme Court has already established a briefing schedule and requested the Advocate General to make an initial submission in this proceeding (Case No. 20/01595) on June 19, 2020.  Meijer Decl. ¶ 24.  Petitioners are obligated to make a first administrative appearance on June 26, 2020, and the parties' next round of pleadings will likely be submitted to the Dutch Supreme Court in October 2020.  Meijer Decl. ¶ 24.  The proceeding is expected to conclude in approximately 2022—*i.e.*, within "six to nine years," as originally predicted in 2016.  Resp.'s Opp'n 1 & n.3 (ECF No. 127) (quoting Pet'rs' Br. to the Belgian court, ECF No. 117-4).

The 2020 Dutch Judgment therefore remains "subject to reversal," just as was the 2016 Dutch Judgment.  Stay Ruling 19, 22.  The Dutch Supreme Court may "review . . . questions of law," as Petitioners' Dutch counsel has acknowledged.  Leijten Decl. 4 ¶ 15 (ECF No. 105-2).  The Dutch Supreme Court shows no deference to the lower courts on questions of law.  Meijer Decl. ¶¶ 10, 29.  The EU Court of Justice likewise will not show any deference regarding the interpretation of Articles 1(6), 1(7), 21, 26, or 45(1) of the ECT, or on the interpretation of the EU public policy against illegal bribery, collusion, and money laundering.  Forwood Decl. ¶ 9.  It is significant, moreover, that this case involves numerous issues of first impression arising under the ECT and EU public policy, which the Dutch Supreme Court and the EU Court of Justice have never examined previously.   It is also significant that, on the central question of whether the Russian Federation offered to arbitrate under Articles 26 and 45(1) of the ECT, the three adjudicative bodies in this case—the arbitrators, the Dutch district court, and the Dutch appellate

court—have come to <u>three completely different conclusions</u>.  Van den Berg Decl. ¶ 41.  The final answer for purposes of the Dutch legal system, therefore, can only be determined by the Dutch Supreme Court after seeking, if relevant and potentially dispositive, a preliminary ruling from the EU Court of Justice.

Inexplicably, however, with Case No. 20/01595 already in progress in the Dutch Supreme Court and the final outcome unknown, Petitioners are now prematurely urging this Court to ignore its previous holding and rationale.  As reflected in the Joint Status Report (ECF No. 176), Petitioners seek to restart the U.S. litigation based upon the 2020 Dutch Judgment— *i.e.*, yet another interim decision that remains "subject to reversal."  Stay Ruling 19, 22.

Petitioners evidently want to seize any benefit they can from a favorable—but non-final and potentially short-lived—interim ruling by the Dutch appellate court.  They are thus asking this Court to terminate the stay (which Petitioners themselves had originally requested) and resume this litigation in parallel with the ongoing Dutch proceedings.  Joint Status Report (ECF No. 176).  This would be the type of "'fractured and disorderly' and unnecessary litigation" already rejected by this Court.  Stay Ruling 21–22 (quoting *Seneca Nation of Indians v. U.S. Dep't of Health & Human Servs.*, 144 F. Supp. 3d 115, 119 (D.D.C. 2015)).

## ARGUMENT

The Court's consideration of whether to stay litigation results from "the power inherent in every court to control the disposition of the cases on its docket with economy of time and effort."  Stay Ruling 7 (quoting *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936)); *Novenergia II*, 2020 U.S. Dist. LEXIS 12794, at *5.  Further, under Article VI of the New York Convention, the Court may consider "the interests reflected in the *Europcar* factors" as "instructive."  Stay Ruling 24–25 (analyzing *Europcar Italia, S.P.A. v. Maiellano Tours*, 156 F.3d 310, 317 (2d Cir. 1998)).  Under either of these standards, the grounds for staying this U.S. litigation, now the law

of the case, are fundamentally unchanged from the Court's prior Stay Ruling.  The stay of this litigation therefore should remain in place.

**I.**     **The Original Reasons for the Stay Ruling Remain True and Are Even More Compelling Today**

    **A.**     **As the Court Already Held, a Stay Is Needed to Avoid Unnecessary and Disorderly Parallel Litigation**

As this Court repeatedly has explained, "'litigating essentially the same issues in two separate forums is not in the interest of judicial economy or in the parties' best interests.'" *Unión Fenosa Gas*, 2020 U.S. Dist. LEXIS 98645, at *12 (quoting *Novenergia II*, 2020 U.S. Dist. LEXIS 12794, at *7); *Masdar Solar*, 397 F. Supp. 3d at 40 (same); *Naegele*, 355 F. Supp. 2d at 141 (same); *IBT/HERE Empl. Reps.' Council*, 402 F. Supp. 2d at 293(same); *Nat'l Shopmen Pension Fund v. Folger Adam Sec., Inc.*, 274 B.R. 1, 3 (D.D.C.  2002) (same); *see also InterDigital Comms., Inc. v. Huawei Invest. & Holding Co.*, 166 F. Supp. 3d 463, 471 (S.D.N.Y. 2016) (staying litigation under the New York Convention in order to avoid "duplication and delay" while set-aside litigation was already pending in the primary jurisdiction).

This basic principle is even more compelling "where the legal viability of claims may rest on determinations in another legal proceeding," such as where the foreign court with "primary jurisdiction" is considering whether to set aside the same arbitral awards submitted to this Court for enforcement.  Stay Ruling at 18.  The Stay Ruling therefore should be extended in order to prevent the type of "'fractured and disorderly' and unnecessary litigation" attempted by Petitioners from 2015 to 2017, and to "preserve judicial and parties' resources."  Stay Ruling 21–22 (quoting *Seneca Nation of Indians*, 144 F. Supp. 3d at 119).  Most fundamentally the parties agreed to the Hague as the situs of the arbitration giving the Courts in the Netherlands the primary jurisdiction.  *E.g.*, Letter of Aug. 2, 2005 (ECF No. 78-2) (recognizing the Netherlands to be the "legal seat" for the arbitration).  In light of the extensive overlap of issues between the

Dutch litigation and the U.S. litigation (as illustrated above in Table 1), litigating this parallel U.S. lawsuit while Case No. 20/01595 is still ongoing before the Dutch Supreme Court would be inefficient and wasteful from three different perspectives.

First, as the Stay Ruling emphasized, "[t]his is a paradigm example of a case warranting a stay where the legal viability of claims may rest on determinations in another legal proceeding" in the Dutch courts.  Stay Ruling 18.  The basis for this sound conclusion is Article V(1)(e) of the New York Convention, which states as follows:

> Recognition and enforcement of [an] award may be refused, at the request of the party against whom it is invoked . . . if . . . [t]he award . . . has been set aside . . . by a competent authority of the country in which, or under the law of which, that award was made.

Interpreting this provision of the New York Convention, the D.C. Circuit provided the following explanation in *TermoRio*, 487 F.3d at 935–36:

> Pursuant to [Article V(1)(e)] of the Convention, a secondary Contracting State normally <u>may not enforce</u> an arbitration award that has been lawfully set aside by a "competent authority" in the primary Contracting State. . . .
>
> [A]n arbitration award <u>does not exist to be enforced</u> in other Contracting States if it has been lawfully "set aside" by a competent authority in the State in which the award was made.

*TermoRio*, 487 F.3d at 935–36 (emphasis added).

Accordingly, if the Russian Federation is ultimately successful before the Dutch Supreme Court in Case No. 20/01595, including after a potential referral to the EU Court of Justice for a preliminary ruling on issues of EU law, then the Awards thereafter will "not exist to be enforced" in the United States.  *Id.*  In other words, as this Court previously observed, "depending on the outcome of the Dutch proceedings, the Shareholders may have 'no cause of action'" whatsoever in the United States.  Stay Ruling 17–18 (quoting *TermoRio*, 487 F.3d at 930).  In those circumstances, this Court would not be obligated to address any of the

overlapping issues summarized above in Table 1, because the case would be decided on the straightforward basis of Article V(1)(e) of the New York Convention.  Stay Ruling 17–18.

For the moment, however, the ultimate "outcome of the Dutch proceedings" is unknown and uncertain.  The 2020 Dutch Judgment relies upon multiple unprecedented legal conclusions—all of which are subject to mandatory *de novo* review by the Dutch Supreme Court. Meijer Decl. ¶¶ 6, 10, 29; Van den Berg Decl. ¶¶ 40–45.  Sir Nicholas Forwood also explains that many of the questions fall within the jurisdiction of the EU Court of Justice, and thus provide the basis for a preliminary ruling under the treaties governing the EU's integrated justice system.  Forwood Decl. ¶¶ 9, 13–14, 21–23.  Much like the Dutch Supreme Court, the EU Court of Justice also will approach these questions *de novo*, and will not show any deference to national courts on the interpretation of the ECT or on questions of EU public policy.  Forwood Decl. ¶ 9.  Accordingly, the Awards can yet be annulled in the Dutch judicial system based upon the many different potential grounds identified above in Table 1 and in the Cassation Petition.

The original reasoning of the Stay Ruling thus necessitates awaiting the Dutch Supreme Court's decision in Case No. 20/01595.  *See also Stati v. Republic of Kaz.*, 199 F. Supp. 3d 179, 193 (D.D.C. 2016) ("[T]he possibility that the pending set-aside proceeding could have a dramatic impact on the petition to confirm the arbitration award [justifies this Court's] exercise of its discretion . . . [to] stay this confirmation proceeding.").

Second, and relatedly, "[s]hould the Court proceed and place any reliance on" the 2020 Dutch Judgment, then "any decision issued would be undercut if that Judgment is reversed on [cassation] in the Netherlands" by the Dutch Supreme Court.  Stay Ruling 21.  Indeed, "[t]his change in circumstances would likely prompt the parties to seek reconsideration and, if this case were on appeal, would likely result in remand to this Court for further consideration."  *Id.*

This possibility (*i.e.*, set aside <u>after</u> enforcement) is not merely a hypothetical problem. Indeed, this is exactly what occurred during the seven-year history of *Thai-Lao Lignite*, 864 F.3d at 189.  In 2010, the petitioners in that case requested that the U.S. district court recognize a Malaysian arbitration award under the New York Convention.  *Id.* at 175–76, 178.  The U.S. district court issued a judgment granting the recognition in 2011, which was upheld by the Second Circuit in 2012.  *Id.* at 179.  Five months later, a Malaysian first-instance court rendered a judgment setting aside the arbitral award under Malaysian law.  *Id.* at 180.  The Malaysian appellate court subsequently affirmed the first-instance judgment in early 2014.  *Id.*  This change in circumstances then obligated the U.S. district court to vacate its prior judgment recognizing the Malaysian arbitral award under Rule 60(b)(5) of the Federal Rules of Civil Procedure.  *Id.* at 180–81.  The Second Circuit finally affirmed, although not until after the *Thai-Lao Lignite* proceeding had regrettably wasted the U.S. courts' time and resources for <u>seven years</u>.  *Id.* at 191.

This Court's decision in the Stay Ruling sought (presciently) to avoid the type of cautionary tale reflected in the *Thai-Lao Lignite* litigation.  Stay Ruling 20–21 (noting that the Second Circuit had remanded a case after the courts of the primary jurisdiction annulled an arbitral award while the U.S. appeal was still pending in *Corporación Mexicana de Mantenimiento Integral. S. de R.L. de C.V. v. Pemex Exploración y Producción*, No. 10-4656-cv, 2012 U.S. App. LEXIS 27054, at *1 (2d Cir. Feb. 16, 2012)).

Indeed, this Court and other U.S. district courts have routinely followed this same prudent approach.  *See Getma Int'l*, 142 F. Supp. 3d at 114 ("Although a stay would immediately delay the resolution of the parties' dispute, it would still 'likely [be] shorter than the possible delay that would occur if this [C]ourt were to confirm the award and the [court of the primary

jurisdiction were to] . . . then set it aside.' . . . 'More expensive litigation involving more complex issues would result from such a situation.'" (quoting *Jorf Lasfar Energy Co., S.C.A. v. AMCI Exp. Corp.*, No. 05-CV-0423, 2005 U.S. Dist. LEXIS 34969, at *8 (W.D. Pa. Dec. 22, 2005))); *Unión Fenosa Gas*, 2020 U.S. Dist. LEXIS 98645, at *9–10 (same); *Novenergia II*, 2020 U.S. Dist. LEXIS 12794, at *10 (same); *Masdar Solar*, 397 F. Supp. 3d at 39 (same). *Cf. Gretton Ltd. v. Republic of Uzb.*, No.18-1755, 2019 U.S. Dist. LEXIS 18990, at *11 (D.D.C. Feb. 6, 2019) ("If the Court were to side with [one of the parties] now and then [the other party] were to win on appeal in [the primary jurisdiction], [the parties] could well be back in a U.S. court . . . litigating some of the issues raised in this case all over again.  That is hardly the kind of efficient dispute resolution that arbitration is meant to serve."); *Alto Mar Girassol v. Lumbermens Mut. Cas. Co.*, No. 04-CV-7731, 2005 U.S. Dist. LEXIS 7479, at *11–12 (N.D. Ill. Apr. 12, 2005) ("[T]his delay is likely shorter than the possible delay that would occur if this Court confirms the award and the . . . [foreign] court ultimately sets the award aside resulting in further litigation likely involving more complex issues.  Waiting for the . . . [foreign] court to rule will also likely aid in the avoidance of more expensive additional litigation that could arise.").

Third, and finally, by seeking to revive the instant proceeding before the Dutch litigation has reached a final outcome, Petitioners apparently are resuming their fractured and disorderly approach to New York Convention litigation.  This ultimately does not serve the interests of the parties or the courts in any jurisdiction.

After the arbitrators issued the Awards in 2014, Petitioners commenced an aggressive strategy to seize the property of the Russian Federation—and the property of numerous third parties—all over the world.  Van den Berg Decl. ¶¶ 21, 30.  According to their own estimate, Petitioners attached more than US$ 1 billion in property.  *Id.* ¶ 22.  This included countless items

of real property, receivables, funds, and securities relating to diplomatic, religious, cultural, and scientific activities, including a significant number of assets that were ultimately adjudged to belong to third parties.  *Id.* ¶¶ 22–24, 28.  As a result, Petitioners' enforcement measures led to (at least) seventy-five separate judicial proceedings before dozens of different courts in Belgium, France, Germany, India, the United Kingdom, and the United States.  *Id.* ¶¶ 21, 27.  This was ultimately a tremendous burden on the courts of these jurisdictions, as well as a significant waste of the parties' resources.  Van den Berg Decl. ¶ 30.  In the final stages of Petitioners' enforcement proceedings, the courts of Belgium, France, and Germany all awarded costs to the Russian Federation and the other third parties who had been impacted adversely by Petitioners' aggressive enforcement strategy, although this amount was far below the actual litigation costs. Van den Berg Decl. ¶ 30.

As a result of Petitioners' tactics, countless attachments needed to be litigated individually—even though every single one of Petitioners' attachment proceedings was ultimately unsuccessful.  Van den Berg Decl. ¶ 27.  Eventually, each of Petitioners' attachments was withdrawn, stayed, or abandoned in the aftermath of 2016 Dutch Judgment or the Paris Court's proposal to refer this case to the EU Court of Justice.  Van den Berg Decl. ¶¶ 28, 34. Indeed, as explained above, based on Petitioners' status as an offshore shell company, permitting Petitioners to pursue seizures of property—in the absence of any final, unreviewable ruling from the Dutch Supreme Court—poses a "grave risk" to the Russian Federation and third parties.  Van den Berg Decl. ¶ 32.  This is precisely what the Paris Court of Appeal concluded in 2015, when it held that Petitioners' attachments of property lacked any "guaranty of restitution."  Van den Berg Decl. ¶ 32 (quoting the Paris Court's 2015 ruling).  This risk is exacerbated by Petitioners' history of participating in the Russian Oligarchs' money-laundering activities.  Not only were

Petitioners created by known money-launderers (Valmet Group  and Curtis & Co), Petitioners have routinely been used to conceal the Russian Oligarchs' illegal activities and *de facto* control over the YUKOS shares.    Indeed, Petitioners do not dispute that the Russian Oligarchs remain Petitioners' ultimate beneficial owners and thus will receive more than 99% (and likely the full 100%) of any payments made to Petitioners.  *Hulley Enters. Ltd. v. The Russian Federation*, UNCITRAL, PCA Case No. AA 226, Transcript of Day 7 of Merits Hearing at 206:24-207:2 (Oct. 18, 2012), ECF No. 76-23; *Hulley Enters. Ltd. v. The Russian Federation*, UNCITRAL, PCA Case No. AA 226, Statement of Vladimir Dubov ¶ 8 (Sept. 15, 2010), ECF No. 74-4..

In light of the sound concerns expressed in the Stay Ruling regarding the need to avoid "unnecessary litigation" and "preserve judicial and parties' resources," Petitioners' approach to litigation under the New York Convention is inappropriate and should not be facilitated by this Court's resumption of parallel U.S. proceedings.  Stay Ruling 22.   As this Court held originally, therefore, this aspect of the *Landis* analysis weighs heavily in favor of extending the stay.

### B.    As the Court Already Held, a Stay Is Needed to Show Due Respect for International Comity

The Stay Ruling was also premised on the need to "consider interests in international comity and the avoidance of conflicting judgments."  Stay Ruling 21.  As the D.C. Circuit explained in *Laker Airways Ltd.*:

> [T]he central precept of comity teaches that, when possible, the decisions of foreign tribunals should be given effect in domestic courts, since recognition fosters international cooperation and encourages reciprocity, thereby promoting predictability and stability through satisfaction of mutual expectations.

731 F.2d at 937.

Here, Petitioners are asking this Court to decide whether the Russian Federation agreed to arbitrate with Petitioners under Article 26 of the ECT, which is one of the same issues now before the Dutch Supreme Court in Case No. 20/01595.  To date, the Dutch district court and the

Dutch appellate court have given diametrically opposing answers to this question.  Van den Berg Decl. ¶¶ 19, 39.  Within the Dutch judicial system, the final answer can only come from the Dutch Supreme Court and, depending on the basis for its disposition, pursuant to further guidance from the EU Court of Justice.  Meijer Decl. ¶¶ 10, 25, 28–30; Forwood Decl. ¶¶ 5–9.  It thus would be contrary to the precept of international comity for this Court to "wade into this territory unnecessarily."  *Masdar Solar*, 397 F. Supp. 3d at 40.  Maintaining the stay would avoid such conflict.

As this Court explained in *Novenergia II*, the interpretation of the ECT is specifically an issue "of importance to the EU and better suited for initial review in their courts."  *Novenergia II*, 2020 U.S. Dist. LEXIS 12794, at *12.  For its part, the United States is not even a signatory to the ECT—whereas the Netherlands and the EU have been ECT Contracting Parties since 1994, as have nearly all EU Member States.  Forwood Decl. ¶¶ 10–13.

Indeed, "as a matter of legal, political and economic history, the European Union was the determining actor in the creation of the ECT."  Forwood Decl. ¶¶ 11–12 & n.11 (quoting *Electrabel v. Hungary*, Award, paras. 4.131–4.132).  In an *amicus curiae* submission to another court in this Circuit in the *Novenergia* case, the European Commission itself explained as follows:

> [T]he ECT was essentially the brainchild of the EU.  The ECT was concluded on the initiative of the EU, based on the European Energy Charter prepared by the EU, at an energy conference convened and funded by the EU. . . .  The ECT was thus an instrument of the EU's external energy policy, in which the EU and its Member States acted as a single block. . . .  The ECT was signed by the EU as well as its Member States . . . .

Forwood Decl. ¶ 12 (quoting Novenergia II – Energy & Env't (SCA) v. The Kingdom of Spain, No. 1:18-cv-1148 (D.D.C.), Br. of the Eur. Comm'n as Amicus Curiae  (Feb. 28, 2019), ECF No. 30-1 at 6-7).

And, in a 2004 article, Professor Thomas Wälde confirmed this understanding:

17

The ECT is largely a product of EU external political, economic and energy policy. It is meant to integrate the formerly Communist countries, provides an ante-chamber and preparation area for EU accession for many of them; it is intended to promote EU investment in these countries and energy flows from these countries to the EU. It is therefore linked more closely to EU integration, accession to the EU and EU external relations law than the 'run-of the mill' [treaty concerning foreign investment].

Forwood Decl. ¶ 12 (quoting Thomas W. Wälde, *Arbitration in the Oil, Gas and Energy Field: Emerging Energy Charter Treaty Practice* (2004) 2 Transnat'l Disp. Mgmt. 1, 4 (2004).).

Finally, the ECT's importance for the EU's "political, economic, and energy policy" is further confirmed by the 2017 and 2019 decisions of the Paris Court of Appeal (including in litigation between Petitioners and the Russian Federation) to refer aspects of interpreting the ECT's Article 26 to the EU Court of Justice for a preliminary ruling. Forwood Decl. ¶¶ 12, 16–17 & n.27 ("The questions proposed by the Paris Court of Appeal in 2017 also concerned Articles 1(6), 1(7), 21, 26, and 45(1) of the ECT . . . .  More recently, in late 2019, the Paris Court of Appeal did refer questions pertaining to the interpretation of the ECT under Article 267 TFEU for a preliminary ruling . . . ."); Van den Berg Decl. ¶¶ 33–34.

Based on the ECT's importance for the EU's energy policy, this Court explicitly held in *Novenergia II* that "the more prudent course of action is to allow courts within the EU to first decide the issues" of the ECT's interpretation. *Novenergia II*, 2020 U.S. Dist. LEXIS 12794, at *12, 14–15 (agreeing with Spain's argument "that international comity requires a stay because the issues [of the ECT's interpretation] are important to the European Union and should be resolved within the Union's judicial system"). Here, that interest will plainly be upheld if the stay is maintained while the Dutch Supreme Court refers Case No. 20/01595 to the EU Court of Justice for a preliminary ruling.

Indeed, U.S. district courts routinely apply this same approach to international comity. Specifically, if the primary jurisdiction's courts are faced with deciding questions of their own

law, international comity militates against U.S. courts' premature intervening in the same question during litigation under the New York Convention.  *CPConstruction Pioneers Baugesellschaft Anstalt  v. Gov't of Republic of Ghana*, 578 F. Supp. 2d 50, 54 (D.D.C. 2008) (staying litigation under the New York Convention because "it would have to decide an intricate point of Ghana law that is more properly decided by a Ghana court"), *amended by* 578 F. Supp. 2d 48, 49 (D.D.C. 2008); *Consorcio Rive S.A. de C.V. v. Briggs of Cancun, Inc.*, No. 99-CV-2204, 2000 U.S. Dist. LEXIS 899, at *10 (E.D. La. Jan. 25, 2000) ("The Mexican action to nullify the award involves issues of Mexican law, which the Mexican courts are better situated than this Court to resolve. This action should be stayed pending the outcome of the Mexican proceedings."); *Caribbean Trading & Fid. Corp. v. Nigerian Nat'l Petroleum Corp.*, No. 90-CV-4169(JFK), 1990 U.S. Dist. LEXIS 17198, at *20–21 (S.D.N.Y. Dec. 18, 1990) (staying potential confirmation and enforcement of arbitral award because "[t]he contract is governed by the law of Nigeria, and the Nigerian courts are better equipped than this Court to determine the proper application of that law"); *Fertilizer Corp. of India v. IDI Mgmt., Inc.*, 517 F. Supp. 948, 962 (S.D. Ohio 1981) ("[I]n order to avoid the possibility of an inconsistent result, this Court has determined to adjourn its decision on enforcement of the . . . [a]ward until the Indian courts decide with finality whether the award is correct under Indian law.").

Accordingly, because the United States is not a Contracting Party to the ECT, whereas both the Netherlands and the European Union are Contracting Parties, it is undeniable that comity considerations support granting a stay until the Dutch Supreme Court has rendered the final decision in Case No. 20/01595 with guidance from the EU Court of Justice.  *See Gretton Ltd.*, 2019 U.S. Dist. LEXIS 18990, at *15.

### C.     As the Court Already Held, a Stay Is Needed Based Upon the Balance of Hardships to the Parties

Finally, the Court also premised its Stay Ruling on a balancing of "the relative hardships" to the parties and to the Court itself.  Stay Ruling 22 (citing *Landis*, 299 U.S. at 254).

*First*, the Russian Federation would be heavily burdened if unjustifiably compelled to pay more than US\$ 50 billion—the largest amount ever awarded by any arbitral tribunal in history.   Van den Berg Decl. ¶ 13.   A set aside under any of the multiple grounds (*e.g.*, Grievances 1 through 7) asserted would eliminate the Russian Federation's liability for any damages.  Cassation Petition ¶¶ 270-279 ("If the [Dutch Supreme Court] sustains any of the 'individual' grievances . . . , the consequence is that the CoA's upholding of the Tribunal's damages award [of US\$ 50 billion] cannot stand anymore and will be quashed as well.").  In the present case, the sheer "enormity of the award" weighs profoundly in favor of a stay.  *Unión Fenosa Gas*, 2020 U.S. Dist. LEXIS 98645, at *12–13 (concluding, with respect to an award of only US\$ 2 billion, that "[t]he Court is loath to plunge so deeply into a sovereign's treasury . . . if there is a chance that the award might be set aside or mitigated to some extent").

In this regard, courts in this Circuit also repeatedly have emphasized the danger resulting from potential seizures of a foreign State's assets during any potential execution phase.  *Getma*, 142 F. Supp. 3d at 118 ("The Court finds that 'there would be very real harm to [the foreign sovereign State] were [this Court] to confirm the award, [the petitioners] were take action to execute on the judgment, and the . . . [the primary jurisdiction's] court were to later determine that the award was improper.'" (quoting *Jorf*, 2005 U.S. Dist. LEXIS 34969, at *10)); *Novenergia II*, 2020 U.S. Dist. LEXIS 12794, at *10 ("[T]he risk of premature enforcement could result in Spain trying to recover assets seized during this action if it were to prevail in the [primary jurisdiction].");  *Masdar Solar*, 397 F. Supp. 3d at 40 (noting the hardship to a foreign

State arising from "ultimately having to recover assets seized during this action should the annulment proceeding go its way").

Indeed, any attempts to recover assets seized by Petitioners during the subsequent potential execution phase would face an additional problem.  As explained by the Paris Court of Appeal in 2015, the fact that Petitioners are offshore shell companies with no assets or genuine business activities creates a "grave risk" of injury to the Russian Federation or third-party entities whose assets may be attached in satisfaction of the Awards in the absence of any "guaranty of restitution."   Van den Berg Decl. ¶ 32 (quoting 2015 Paris ruling).  As this Court is aware, Petitioners are three offshore shell companies based in Cyprus and the Isle of Man.  Petitioners admit that they do "not engage in any substantial business activity in [their] place[s] of organization (or elsewhere) other than the holding of investments in other entities." Letter of Nov. 3, 2006, ECF No. 48-19.  Petitioners' documented history of participating in the Russian Oligarchs' money-laundering activities and other deceptive schemes thus creates even further risks to those affected by seizures of assets.

*Second*, the hardship considered most extensively in the Stay Ruling is completely unchanged:

> [I]n the absence of a stay, the parties will be required to litigate this action with reference to the Dutch Judgment, which remains subject to reversal . . . and, depending on the outcome of that appeal, could prompt additional rounds of briefing and review of the merits.

Stay Ruling at 22.

As explained above, there is a likelihood that either the Dutch Supreme Court or the EU Court of Justice will agree with the Dutch district court (rather than with the Dutch appellate court).  Meijer Decl. ¶¶ 29–30; Forwood Decl. ¶¶ 18, 23.  The Dutch Supreme Court might also reverse the 2020 Judgment on another basis.  Meijer Decl. ¶¶ 26, 30.  Analyzing, briefing, or

ultimately placing any reliance on this moving target would create an unnecessary hardship for the Court and both parties.  As this Court previously ruled, that hardship cannot be eliminated unless this parallel U.S. lawsuit is stayed.  Stay Ruling at 22.  Indeed, the final outcome of this dispute remains uncertain in the Netherlands, particularly in light of the three conflicting decisions rendered so far in the arbitration and the Dutch proceedings, as well as the confirmation by the Paris Court of Appeal that this case raises numerous questions of law that may be referred to the EU Court of Justice.  Van den Berg Decl. ¶¶ 33, 41.

For these reasons, courts have noted that a foreign sovereign State would "undeniably be burdened by having to attack the validity of the arbitral award in two forums," particularly where the foreign court (and not the U.S. court) exercises primary jurisdiction.  *Masdar Solar*, 397 F. Supp. 3d at 40; *Unión Fenosa Gas*, 2020 U.S. Dist. LEXIS 98645, at *12 (same); *see also Novenergia II*, 2020 U.S. Dist. LEXIS 12794, at *10 ("Balancing the hardships to each party also favors a stay. Litigating the validity of arbitral awards in two forums would burden Spain . . . ."); *Gretton*, 2019 U.S. Dist. LEXIS 18990, at *19 (noting "the unfairness to Uzbekistan of having to defend itself simultaneously in two fora"); *Getma*, 142 F. Supp. 3d at 118 ("Moreover, as explained above, a premature confirmation and enforcement of the award would essentially eviscerate [the respondent's] bargained-for right to have the arbitral award reviewed by [the courts of the primary jurisdiction].").

*Third*, another court in this Circuit has noted that the current "uncertainties regarding [the] unprecedented global pandemic" likewise weigh in favor of staying litigation against foreign sovereign States pending the resolution of the annulment proceeding.  *Unión Fenosa Gas*, 2020 U.S. Dist. LEXIS 98645, at *12–13.  In that case, it was noted that the COVID-19 crisis has created "immense uncertainty" for the world economy, thus necessitating caution in

multibillion-dollar litigation against foreign sovereign States.  *Id.*  As the Russian Government has reported last week, "493,657 coronavirus cases have been confirmed in Russia," which is the third-highest total of any country worldwide. *See Russia is in 7th place as to COVID-19 pandemic intensity*, TASS Russian News Agency (June 10, 2020), https://tass.com/world/1166507.  Notably, the District of Columbia is also facing significant burdens during this time of uncertainty.  *See* Standing Order No. 20-29, May 26, 2020 (Howell, C.J.) (describing "the seriousness of the pandemic in this region as of this date" based on order of the Mayor of the District of Columbia).  Under the circumstances, the global pandemic also weighs heavily in favor of staying this parallel litigation to conserve resources while the annulment litigation is concluded in the Netherlands.

*Fourth*, as similarly situated litigants often do, Petitioners can be expected to assert a purported "interest in expeditiously collecting an award."  *Masdar Solar*, 397 F. Supp. 3d at 40. When balanced against the other relevant factors and hardships, however, other courts in this Circuit have attributed little weight to this element, *id.*, particularly because post-award interest can easily compensate for delay.  Accordingly, "[f]ar from being at odds with the nature of arbitration confirmation proceedings, adjournments pending the completion of set-aside proceedings are an integral part of such proceedings."  *Novenergia II*, 2020 U.S. Dist. LEXIS 12794, at *8 (quoting *CPConstruction Pioneers*, 578 F. Supp. 2d at 54).  Indeed, during the arbitration proceedings, Petitioners were advised by experienced arbitration counsel who fully understood this aspect of arbitration.

Most recently, this Court addressed this issue comprehensively in *Novenergia II*, where it concluded as follows:

> The court acknowledges that this dispute has dragged on for over four years and a ruling in the Swedish court may not be imminent. The parties anticipated a

> decision sometime in 2019 and a referral to the EU Court of Justice could extend the proceedings into 2021 or 2022. . . . [Petitioner] argues that the delay from the Swedish proceedings weighs heavily against a stay . . . . However, the length of delay is not the only consideration here. . . . [Moreover,] if Novenergia ultimately prevails it will be compensated for any delay because the award includes interest. . . . Thus, the hardship to Spain, which could be significant, outweighs the hardship to Novenergia.

2020 U.S. Dist. LEXIS 12794, at *9–11.

Following the same reasoning, therefore, this Court must conclude that the balance of hardships weighs in favor of extending the Stay Ruling.

## II.    The *Europcar* Factors Also Continue to Weigh in Favor of the Stay

Article VI of the New York Convention provides that a court "may, if it considers it proper, adjourn the decision on the enforcement of the award" in situations where "an application for the setting aside or suspension of the award has been made to a competent authority referred to in article V(1)(e)."  New York Convention, Art. VI.  In deciding whether to issue a stay of enforcement under Article VI, this Court usually weighs the factors outlined in the Second Circuit's decision in *Europcar*, 156 F.3d at 317–18.  *E.g.*, *Stati*, 199 F. Supp. 3d at 192.

In *Europcar*, the Second Circuit identified the following non-exhaustive list of factors for consideration when evaluating whether to stay proceedings under the New York Convention:

> (1) the general objectives of arbitration—the expeditious resolution of disputes and the avoidance of protracted and expensive litigation;

> (2) the status of the foreign proceedings and the estimated time for those proceedings to be resolved;

> (3) whether the award sought to be enforced will receive greater scrutiny in the foreign proceedings under a less deferential standard of review;

> (4) the characteristics of the foreign proceedings including (i) whether they were brought to enforce an award (which would tend to weigh in favor of a stay) or to set the award aside (which would tend to weigh in favor of enforcement); (ii) whether they were initiated before the underlying enforcement proceeding so as to raise concerns of international comity; (iii) whether they were initiated by the party now seeking to enforce the award in federal court; and (iv) whether they

24

were initiated under circumstances indicating an intent to hinder or delay resolution of the dispute;

(5) a balance of the possible hardships to the parties . . .; and

(6) any other circumstance that could tend to shift the balance in favor of or against adjournment . . .

*Europcar*, 156 F.3d at 317–18.

As noted in *Novenergia II*, there is significant overlap between the "inherent authority" analysis under *Landis* and "[t]he first and fifth *Europcar* factors," because both frameworks entail consideration of "judicial economy and balanc[ing] hardships between the parties." *Novenergia II*, 2020 U.S. Dist. LEXIS 12794, at \*12.  Accordingly, the first and fifth *Europcar* factors have already been addressed in Part I, *supra*.  To summarize, much as in the *Novenergia II* case, "while a stay here will delay the resolution, it promotes judicial economy, and the balance of the hardships favors [the Russian Federation]."  *See id.*

The remaining analysis, therefore, must focus on the unique issues raised by the second, third, and fourth *Europcar* factors.  As detailed below, these factors also weigh in favor of staying Petitioners' U.S. lawsuit until the completion of the Dutch proceedings.

**The Second *Europcar* Factor – Estimated Time to Resolution.**  Considering the full context of this dispute, the second *Europcar* factor weighs in favor of a stay.  This is because the cassation proceedings before the Dutch Supreme Court represent the final phase of the Dutch proceedings.  Even if the Dutch Supreme Court issues an interim decision referring questions to the EU Court of Justice for a preliminary ruling, it will ultimately be the Dutch Supreme Court that decides Case No. 20/01595.  Meijer Decl. ¶ 20; Forwood Decl. ¶¶ 32–33.  Accordingly, because the Dutch proceedings are necessarily closer to finishing now than in 2016, a stay during this phase of the proceeding is necessarily even more justified than during the previous appellate phase.

Notably, in the *Stati* litigation, this Court did not distinguish between the appellate litigation before the Swedish appellate court and the cassation proceedings before the Swedish Supreme Court.  Min. Order Aug. 15, 2017, Stati v. Republic of Kaz. (D.D.C. 2016) (No. 1:14-cv-01638).   To the contrary, after originally imposing a stay during the Swedish courts' intermediate appeal, this Court simply extended the original stay ruling during the Swedish cassation proceeding in a short minute order:

> Petitioners' motion to lift the stay is denied, largely for the reasons set forth in the Court's August 5, 2016 memorandum opinion. While the Court recognizes petitioners' frustration with the continued delay of these proceedings, the Court finds, in an exercise of its discretion, that the Europcar factors favor a continued stay until the Swedish Supreme Court proceedings have concluded. . . . [T]he parties shall notify the Court within a week of any ruling by the Swedish Supreme Court . . . .

Min. Order Aug. 15, 2017, Stati v. Republic of Kaz. (No. 1:14-cv-01638).

This same approach would be appropriate in the present case.  Indeed, as this Court explained in *Novenergia II,* even if "a ruling . . . may not be imminent," it is important to recognize that "the length of delay is not the only consideration here."   *Novenergia II*, 2020 U.S. Dist. LEXIS 12794, at *9.

**The Third *Europcar* Factor – Scrutiny of the Awards in the Foreign Proceedings.**  This third factor "is at least neutral if it does not favor the stay."  *Stati*, 199 F. Supp. 3d at 192.  This is because, as explained by Professor van den Berg, both the Dutch arbitration law and the New York Convention require application of the same *de novo* standard of review with respect to whether the parties agreed to arbitrate.  Van den Berg Decl. ¶¶ 7, 18.

**The Fourth *Europcar* Factor – Characteristics of the Foreign Proceeding.**  Finally, the fourth factor also weighs in favor of a stay because the Russian Federation initiated the Dutch annulment proceeding in 2014, which was "before the underlying enforcement proceeding" under the New York Convention was commenced in this Court.  *Europcar*, 156 F.3d at 317–18.

Even more fundamentally, as this Court explained in *Gretton*, the essential purpose of the fourth *Europcar* factor is to ensure that unsuccessful parties in arbitration do not attempt to cause "frivolous delay" in the enforcement proceedings by initiating meritless set-aside proceedings. *Gretton*, 2019 U.S. Dist. LEXIS 18990, at \*14; *see also InterDigital Communs.*, 166 F. Supp. 3d at 473 (finding that the fourth *Europcar* weighed in favor of a stay because there was "no evidence that . . . [the] Annulment Action [wa]s intended to hinder or delay resolution, is frivolous, or is an abusive tactic by [the respondent] to forestall the resolution" of the New York Convention litigation).

In the present case, the Dutch district court's 2016 decision and the French appellate court's 2017 decision both have amply demonstrated that the Russian Federation's arguments are neither frivolous nor abusive.  Van den Berg Decl. ¶¶ 19, 33; Forwood Decl. ¶¶ 16–18.  To the contrary, these arguments reflect the Russian Federation's consistent position since 2005 that the arbitrators lacked jurisdiction because the Russian Federation was not a Contracting Party and never agreed to arbitrate with Petitioners under the ECT's Article 26.  Van den Berg Decl. ¶¶ 11–12, 19.

Indeed, as further explained in the Cassation Petition, the merit of the Russian Federation's objections is reflected in the fact that even the Dutch appellate court did not agree with the arbitrators regarding the interpretation of Article 45(1) of the Energy Charter Treaty. Van den Berg Decl. ¶ 41.  To the contrary, the Dutch appellate court explicitly rejected the arbitrators' approach, and adopted a new argument that was never raised by Petitioners during the ten-year arbitration (in contravention of Dutch law).  Van den Berg Decl. ¶ 41.  The Russian Federation's "consistent argument regarding jurisdiction in fact weighs in favor of a stay." *Novenergia II*, 2020 U.S. Dist. LEXIS 12794, at \*8.

\*      \*      \*

Accordingly, whether this case is evaluated under *Landis*, 299 U.S. at 254, or *Europcar*, 156 F.3d at 317, this Court should extend the Stay Ruling based on efficiency, international comity, and the balance of hardships.

## CONCLUSION

For the reasons stated above, the Russian Federation respectfully requests that the Court extend the stay of this U.S. litigation pending resolution of the set-aside proceedings before the Dutch Supreme Court in Case No. 20/01595.

Date:  June 15, 2019                                   Respectfully submitted,

**WHITE & CASE** LLP

/s/ Carolyn B. Lamm
Carolyn B. Lamm (D.C. Bar No. 221325)
Nicolle Kownacki (D.C. Bar No. 1005627)
David P. Riesenberg (D.C. Bar No. 1033269)
Eric Chung (D.C. Bar No. 1027439)
701 Thirteenth Street, NW
Washington, DC 20005
Phone: (202) 626-3600
Fax: (202) 639-9355
clamm@whitecase.com

*Counsel for the Russian Federation*