# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

HULLEY ENTERPRISES LTD., *et al.,*

          Petitioners,

          v.

THE RUSSIAN FEDERATION,

          Respondent.

Civil Action No. 14-1996 (BAH)

Chief Judge Beryl A. Howell

## MEMORANDUM OPINION

Over four years ago, proceedings in this case were stayed, at the request of petitioners Hulley Enterprises Ltd. ("Hulley"), Yukos Universal Ltd. ("Yukos"), and Veteran Petroleum Ltd. ("VPL") (collectively, the "Shareholders"), who had initiated this lawsuit almost two years earlier to enforce three arbitral awards (the "Awards"), awarding them over $50,000,000 from respondent the Russian Federation, due to the latter's alleged expropriation of Yukos Oil Company ("Yukos"), a large Russian oil company, in which the Shareholders were the majority owners. *See* Order (Sept. 30, 2016) ("2016 Stay Order"), ECF No. 153 (granting stay); *Hulley Enters. Ltd. v. Russian Fed'n* ("*Hulley*"), 211 F. Supp. 3d 269, 280–88 (D.D.C. 2016) (explaining reasons for stay). The stay was to extend until the earlier of "January 21, 2019, or until resolution of proceedings in the Netherlands" initiated by the Russian Federation just fifteen days before the filing of this confirmation lawsuit, "to set aside the arbitral awards at issue (the 'Set-Aside Proceedings')." 2016 Stay Order at 2. After two extensions jointly requested by the parties, *see* Joint Mot. Extend Stay (Dec. 27, 2018), ECF No. 171 (jointly requesting stay extension until Jan. 21, 2020); Joint Status Report (Oct. 10, 2019), ECF No. 175 (jointly requesting stay extension until May 20, 2020), were granted, *see* Min. Order (Dec. 27,

2018); Min. Order (Oct. 10, 2019), the stay lapsed on May 20, 2020, though the Dutch set-aside proceedings, which warranted the original stay, remain ongoing, having now progressed to the highest court in that country.

Now, in an about-face, the Russian Federation, which vehemently opposed the 2016 Stay Order, seeks a second stay pending the Dutch Supreme Court's review of the judgment rendered by the Dutch Court of Appeal in February 2020.  Resp't Russian Fed'n's Mot. Extend Stay of Litig. ("Resp't's Mot."), ECF No. 179; Resp't's Mem. P. & A. Supp. Mot. Extend Stay of Litig. ("Resp't's Mem.") at 1, 8, ECF No. 179-1.  The Shareholders vigorously oppose any further stay as unwarranted and, if a second stay is imposed, request that the Russian Federation be required to post "suitable security."  Pet'rs' Opp'n Resp't's Mot. Extend Stay Litig. ("Pet'rs' Opp'n") at 11–37, 38–45, ECF No. 181.  Despite the obvious irony in the parties' flipped positions and palpable frustration on the part of the Shareholders in further delay in resolving this matter, as explained below, considerations of judicial economy, the balance of hardships and international comity require that the Russian Federation's motion to impose a second stay be granted.

## I.    BACKGROUND

Familiarity with the procedural history of this case, as previously detailed, *see Hulley*, 211 F. Supp. 3d at 272–75, is assumed and only briefly summarized before describing the relevant factual events that occurred after imposition of the first stay in 2016.

### A.    Factual Background

In November 2004, the Shareholders initiated arbitration proceedings against the Russian Federation under the Energy Charter Treaty ("ECT"), Pet. to Confirm Arb. Awards ("Pet.") ¶ 34, ECF No. 1, to which the Russian Federation was a signatory between December 1994 and October 2009, *id.* ¶¶ 34, 40; *see* Energy Charter Treaty ("ECT") Annex T, Dec. 17, 1994, 2080 U.N.T.S. 95.  The ECT requires every "Contracting Party" to "accord . . . fair and equitable

treatment" to "investors of other Contracting Parties," ECT art. 10(1), and prohibits "nationalization or expropriation" of "Investments of Investors," except where nationalization is in the public interest, nondiscriminatory, carried out under due process of law, and accompanied by appropriate compensation, *id.* art. 13(1).  The Shareholders alleged that the Russian Federation violated these treaty provisions by devising "a campaign . . . to bankrupt Yukos, appropriate the company's assets, and silence the company's head, Mikhail Khodorkovsky," out of concern for Khodorkovsky's support for political parties not aligned with President Vladimir Putin and the company's plans to merge with Western oil interests.  Pet. ¶ 12.  According to the Shareholders, from about February 2003 through 2004, the Russian Federation engaged in adverse actions against the Shareholders that led to the auction of Yukos' "core asset," oil production company Yuganskneftegaz ("YNG"), *id.* ¶¶ 13, 28, to a company called Baikal Finance Group for a "fraction of YNG's value," *id.* ¶ 30.  Baikal was subsequently acquired by Russian-owned oil company Rosneft in an "arm's length asset sale."  *Id.*  "Gutt[ed] . . . of its most profitable asset," Yukos was placed under supervision for bankruptcy proceedings and declared bankrupt by July 2006.  *Id.* ¶ 31; *see also id.* at ¶¶ 31–32.

### B.    Arbitral History

Pursuant to Article 26 of the ECT, which "provides that disputes between investors such as Petitioners and ECT signatories such as the Russian Federation must be submitted to arbitration*," id.* ¶ 34, the parties engaged in a decade-long arbitration in the Netherlands, which is a member of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958 (the "New York Convention"), *id.* ¶ 35; *see* 9 U.S.C. §§ 201–07.  Ultimately, on July 18, 2014, the Arbitral Tribunal, after considering the parties' extensive filings and arguments presented at a three-week merits hearing, *id.* ¶¶ 42–51, issued three "substantially identical" Final Awards, *id.* ¶ 55, that determined the Russian Federation had "violated its

obligations under the ECT," *id.* ¶ 61, and owed the Shareholders $50,020,867,798 in damages, *id.* ¶ 62, plus interest, $60,000,000 in attorneys' fees, and €4,240,000 in arbitration costs, *id.* ¶ 63.  The Shareholders thereafter brought a number of confirmation, attachment, and enforcement proceedings in Belgium, France, Germany, India, the United Kingdom and the United States to collect on the Awards.  *See* Resp't's Mot., Attach., Fifth Decl. of Prof. Albert Jan Van den Berg ("Fifth Van den Berg Decl.") ¶ 3, ECF No. 180; Fifth Van den Berg Decl. Annex B: Petitioners' Parallel Litigation, ECF No. 180-2; Resp't's Reply Supp. Mot. Extend Court's Stay of Litig. ("Resp't's Reply"), Sixth Decl. of Prof. Albert Jan Van den Berg ("Sixth Van den Berg Decl.") ¶ 6, ECF No. 182-1.  According to the Russian Federation, in reliance on the Awards, the Shareholders have "seized or attempted to seize" more than $1,000,000,000 in property in Belgium and France alone.  Fifth Van den Berg Decl. ¶ 22.

## C.   Subsequent Proceedings in Dutch and U.S. Courts

Four months after issuance of the Awards, the Russian Federation, on November 10, 2014, petitioned the District Court of the Hague ("Dutch District Court") to set the Awards aside. Pet. ¶ 52; Resp't's Mot. Dismiss Pet. Confirm Arb. Awards for Lack of Subject Matter Juris. ("Resp't's MTD"), Ex. R-328, Writ of Summons at 2, 46–93, ECF No. 43-8.  Two weeks later, on November 25, 2014, the Shareholders filed the instant action in this Court seeking confirmation of the Awards.  After effecting service on the Russian Federation in July 2015, the parties spent the rest of that year engaged in substantive briefing on the Russian Federation's motions seeking to dismiss the petition for lack of jurisdiction and to deny confirmation of the Awards, *see* Resp't's Mot. Deny Confirmation Arb. Awards ("Resp't's Mot. Deny Pet."), ECF

No. 23; Resp't's MTD, ECF No. 24, which motions were supplemented in June 2016, *see* Resp't's Suppl. Mot. Dismiss ("Resp't's Suppl. MTD"), ECF No. 108, and remain unresolved.[1]

On April 20, 2016, the Dutch District Court set aside the Awards based on its determination that the Arbitral Tribunal lacked jurisdiction to issue the Awards because the Russian Federation had never agreed to arbitrate its disputes under the ECT.  *See* Resp't's Not. Suppl. Auth. ("Resp't's 2016 Not.") (Apr. 22, 2016), Ex. 1, Vonnis, Rb.-Gravenhage 20 april 2016 ¶ 5.96 [Judgment, District Court of The Hague, Apr. 20, 2016], rolnr. C/09/477160 (The Russian Federation / Hulley Enterprises Limited et al.) (Neth.) ("2016 Judgment"), ECF No. 102-1, *translated in* Resp't's 2016 Not., Ex. 2, ECF No. 102-2.  Quickly thereafter, on April 22, 2020, the Russian Federation filed a notice of the set-aside decision with this Court.  *See* Resp't's 2016 Not., ECF No. 102.  Given the serious setback of the set-aside decision, the Shareholders sought, on May 16, 2016, to stay this action pending their appeal of the Dutch District Court's set-aside decision to the Court of Appeal of The Hague ("Dutch Court of Appeal").  Pet'rs' Mot. Stay at 1, ECF No. 105.  On September 30, 2016, as noted, this stay was granted, over the Russian Federation's objection.[2]  *See* 2016 Stay Order.

Between 2016 and 2020, the Dutch Court of Appeal issued a series of decisions. Specifically, on September 25, 2018, the Dutch Court of Appeal rejected the Russian Federation's challenge to the Awards, based on alleged procedural fraud perpetrated by the Shareholders in the arbitration.  *See* Uitspraak, Hof's-Gravenhage 25 sept 2018 [Ruling, Court of

---

[1]    During the briefing on these still-pending motions filed by the Russian Federation, this case was reassigned to the undersigned Judge.  *See* Min. Entry (Nov. 19, 2015).

[2]    As summarized in *Hulley*, "only the following three motions are subject to the stay: (1) the Respondent's Motion to Deny Confirmation of Arbitration Awards Pursuant to New York Convention, ECF No. 23; (2) the Respondent's Motion to Dismiss the Petition to Confirm Arbitration Awards for Lack of Subject Matter Jurisdiction, ECF No. 24; and (3) the Respondent's Supplemental Motion to Dismiss the Petition to Confirm Arbitration Awards Under the Foreign Sovereign Immunities Act and the New York Convention, ECF No. 108."  211 F. Supp. 3d at 288 n.11.

Appeal of The Hague, Sept. 25, 2018], znr. 200.197.079/01 (The Russian Federation / Hulley

Enterprises Limited et al.) (Neth.), *unofficially translated in* Fourth Status Report, Ex. A, ECF

No. 167-1.[3]  Most recently, on February 18, 2020, the Dutch Court of Appeal issued a judgment

"reversing the 2016 Dutch District Court Judgment and rejecting additional arguments by the

Russian Federation," Joint Status Report (May 20, 2020) at 2, ECF No. 176; *see also id.*, Ex. A,

Arrest, Hof's-Gravenhage 18 februari 2020 [Judgment, Court of Appeal of The Hague, Feb. 18,

2020], nr. 200.197.079/01 (The Russian Federation / Hulley Enterprises Limited et al.) (Neth.)

(Certified Eng. Trans.) ("2020 COA Judgment"), ECF No. 176-1.  Some of these decisions are

based on legal grounds and consequently are subject to *de novo* review before the Dutch

Supreme Court.  Fifth Van den Berg Decl. ¶ 37.

The Russian Federation submitted a timely appeal of the 2020 COA Judgment to the

Dutch Supreme Court, which is poised to consider the following five issues: (1) whether the

Russian Federation offered to arbitrate under Articles 26 and 45(1) of the ECT; (2) whether the

Shareholders were eligible offerees under Articles 1(6), 1(7), and 26 of the ECT; (3) whether the

Awards are invalid based upon grave violations of due process during the arbitration; (4) whether

the Awards are invalid based upon the irregular composition of the arbitral tribunal; and (5)

whether the Awards are invalid under public policy based upon the Shareholders' participation in

bribery, fraud, and money laundering.  *See* Resp't's Mem. at 1–2; Pet'rs' Opp'n at 2; *see also*

Resp't's Mot., Attach. 6, Decl. of Rob S. Meijer ("Meijer Decl.") ¶ 23, ECF No. 180-6 (tracking

---

[3]      During the litigation before the Dutch Court of Appeal, the Shareholders tried to involve this Court
tangentially by seeking production of documents from counsel to Rosneft to "show efforts by the Russian Federation
to manipulate Armenian courts so as to influence proceedings before the Dutch courts."  *Hulley Enters. v. Baker
Botts LLP (In re Application for an Order Pursuant to 28 U.S.C. § 1782 to Conduct Discovery for Use in a Foreign
Proceeding)*, No. 17-1466 (BAH), 2017 U.S. Dist. LEXIS 142969, at *17 (D.D.C. Aug. 18, 2017) (denying
Shareholders' application for an order to compel production of documents); *Hulley Enters. v. Baker Botts LLP (In re
Application for an Order Pursuant to 28 U.S.C. § 1782 to Conduct Discovery for Use in a Foreign Proceeding)*, 286
F. Supp. 3d 1, 12 (D.D.C. 2017) (denying Shareholders' motion for reconsideration).

the Russian Federation's course from the Dutch Court of Appeal to the Dutch Supreme Court).[4]

The parties agree that embedded in four out of five of these issues are legal questions to be

addressed *de novo* by the Dutch Supreme Court.  *See* Resp't's Mem. at 12; Pet'rs' Opp'n at 2, 14

(acknowledging that one basis of the Dutch Court of Appeals' reasoning regarding whether the

Russian Federation offered to arbitrate under the ECT was based on petitioners' interpretation of

the Limitation Clause, a legal question), 19; Pet'rs' Surreply Opp'n to Resp't's Mot. ("Pet'rs'

Surreply"), at 2, ECF No. 186.  That proceeding is currently pending and is expected, according

to the Russian Federation, to conclude in "2021 or 2022, depending on whether the Dutch

Supreme Court will put preliminary questions to the European Union Court of Justice."  Meijer

Decl. ¶ 25; *see also* Resp't's Mem. at 8.  The Shareholders dispute this time estimate of about

two years, positing that the Dutch Supreme Court is unlikely to issue a ruling until five years

from now.  *See* Pet'rs' Opp'n at 32.  In addition, the Russian Federation has applied to the Dutch

Supreme Court, pursuant to the Dutch Code of Civil Procedure, to suspend enforcement of the

Awards.  *See* Resp't's Not. Suppl. Auth. (Sept. 28, 2020) ("Resp't's 2020 Not."), Ex. A,

Beschikking ¶ 1, HR 25 september 2020 [Decision, Supreme Court of the Netherlands, Sept. 25,

2020], nr. 20/01892 (The Russian Federation / Hulley Enterprises Limited et al.) (Neth.) (Eng.

Trans.) ("2020 Decision"), ECF No. 190-1.  The Dutch Supreme Court, on September 25, 2020,

concluded that the court "has jurisdiction to hear" the application, *id.* at 5, and further advised

the parties it has "the aim of rendering a decision" on the application to suspend enforcement

"before the end of December 2020," Pet'rs' Resp. to Resp't's 2020 Not. ("Pet'rs' 2020 Not.

Resp."), Ex. A, Email from T. Tisseur, Court Secretary, Supreme Court of the Netherlands, to

---

[4]      The Dutch Court of Appeal addressed two additional issues that have not been appealed to the Dutch
Supreme Court: (1) whether petitioners failed to accept any purported offer or arbitration by violating mandatory
preconditions set forth under Article 21 of the ECT; and (2) whether the arbitrators' assessment of damages is
invalid and unenforceable.  *See* Pet'rs' Opp'n at 2; Pet'rs' Surreply at 2.

R.S. Meijer, R.R. Verkerk, Counsel for Respondents, and T. Cohen Jehoram, J. de Bie Leuveling

Tjeenk and B.M.H. Fleuren, Counsel for Petitioners (Unofficial Translation), ECF 191-1.[5]

Set against that backdrop—and the setback to the Russian Federation of the current status

of the reinstated Awards—the Russian Federation has moved to impose a second stay of the

instant action, "pending the resolution of the Dutch set-aside proceedings in Case No. 20/01595

of the Dutch Supreme Court, where the erroneous legal rulings made by the Court of Appeal of

The Hague on February 18, 2020, are currently on review."  Resp't's Mot. at 1.  The

Shareholders challenge this move and instead want to restart this litigation, based upon their win

reinstating the awards, in February 2020, before the Dutch Court of Appeal or, in the alternative,

to have the Russian Federation submit suitable security in the amount of at least $7,000,000,000.

Pet'rs' Opp'n at 1, 38.

Following the conclusion of briefing on the pending stay motion, with the filing of

surreplies, additional exhibits and, on October 5, 2020, the last of the parties' supplemental

submissions regarding the Dutch Supreme Court's most recent decision to exercise jurisdiction

under Dutch law to suspend the Awards during the Russian Federation's ongoing appeal, this

motion is ripe for resolution.[6]

---

[5]       The Shareholders initially contended, prior to September 25, 2020, that the Dutch Supreme Court "has no jurisdiction even to consider a request to suspend" the Awards.  *See* Pet'rs' Opp'n at 10 (emphasis in original); *id.* at 29 (insisting that "the Supreme Court lacks jurisdiction even to consider this extraordinary and unprecedented request [to suspend enforcement of the Awards].").  In the face of that court's decision to exercise jurisdiction, the Shareholders acknowledge the Dutch Supreme Court "will consider the merits of the Russian Federation's request to suspend Petitioners' enforcement of the Arbitral Awards . . . during the Russian Federation's appeal . . . ."  Pet'rs' 2020 Not. Resp. at 1.

[6]       The parties' briefing on whether imposition of a second stay is warranted has been extensive, and even excessive, totaling nearly 2,500 pages.  Collectively, the parties filed five briefs, including two surreplies, fifteen declarations and seventy-seven exhibits between June 15, 2020 and August 29, 2020, *see* ECF Nos. 179–82, 186, 189, and then supplemented these materials, with additional briefing and exhibits, *see* ECF Nos. 190–92. Given this ample briefing exhaustively addressing the issues raised by the pending stay motion, the Shareholders request for oral argument on the motion to stay, *see* Pet'rs' Opp'n at 1, is denied.  *See* D.D.C. LCvR 7(f) ("A party may in a motion or opposition request an oral hearing, but its allowance shall be within the discretion of the Court.").

## II.    LEGAL STANDARD

The Court's authority to order a stay is well-settled.  "The power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936); *see also Am. Life Ins. Co. v. Stewart*, 300 U.S. 203, 215 (1937) ("In the exercise of a sound discretion [the court] may hold one lawsuit in abeyance to abide the outcome of another, especially where the parties and the issues are the same." (citing *Landis*, 299 U.S. at 248)); *Enelow v. N.Y. Life Ins. Co.*, 293 U.S. 379, 382 (1935) (recognizing that district courts may stay a case "pending before it by virtue of its inherent power to control the progress of the cause so as to maintain the orderly processes of justice"); *accord Dietz v. Bouldin*, 136 S. Ct. 1885, 1892–93 (2016) ("This Court has also held that district courts have the inherent authority to manage their dockets and courtrooms with a view toward the efficient and expedient resolution of cases." (citing *Landis*, 299 U.S. at 254)).  When arbitration between the parties is required or ongoing, the court "may order a stay of the judicial proceedings pending completion of the arbitration process." *Bledsoe v. Crowley*, 849 F.2d 639, 645 (D.C. Cir. 1988); *see Air Line Pilots Ass'n v. Miller*, 523 U.S. 866, 879 n.6 (1998) (noting "district courts' discretion to defer . . . proceedings pending the prompt conclusion of arbitration" (citing *Landis*, 299 U.S. at 254–55)).

When exercising the power to stay a case, courts must "'weigh competing interests and maintain an even balance' between the court's interests in judicial economy and any possible hardship to the parties." *Belize Social Dev. Ltd. v. Gov't of Belize*, 668 F.3d 724, 733 (D.C. Cir. 2012) (quoting *Landis*, 299 U.S. at 254–55).  Identifying and weighing these "competing interests" of "possible hardship[s]," and "judicial economy," *id.*, requires the court to "make

such determinations in the light of the particular circumstances of the case."  *SEC v. Dresser Indus., Inc.*, 628 F.2d 1368, 1375 (D.C. Cir. 1980).  The party seeking the stay bears the burden of "mak[ing] out a clear case of hardship or inequity in being required to go forward, if there is even a fair possibility that the stay for which he prays will work damage to some one else." *Landis*, 299 U.S. at 255.

## III.    DISCUSSION

Notwithstanding their prior position seeking a stay until "resolution" of the Dutch set aside litigation, *see* 2016 Stay Order, the Shareholders object to the imposition of another stay because the Awards are now in a posture of enforcement and the pending Dutch Supreme Court appeal may take another five years.[7]  The Russian Federation counters that a stay is equally appropriate now, and for the same reasons, as when the first stay was granted.  The Russian Federation is correct.  As discussed more fully below, a stay strongly serves the interests of judicial economy and the balance of hardships plainly weigh in favor of the stay.

Although this Court has not ruled on its jurisdiction in this case and thus is "not in a position to issue a stay pursuant to the New York Convention," *Hulley*, 211 F. Supp. 3d at 286, the considerations employed to assess the appropriateness of a stay under that Convention's provision expressly authorizing "staying an action to confirm an arbitral award in the case of ongoing proceedings in the originating country to set aside the award," *id.* (citing New York

---

[7]       The Shareholders, in 2016, sought a stay of this case "only through [the Dutch Court of Appeal] ruling" and did not request "a stay encompassing review proceedings in the Dutch Supreme Court," *Hulley*, 211 F. Supp. 3d at 288 n.10, predicated on their assumption that "[t]he Dutch Supreme Court engages in a limited review that gives substantial deference to the [Dutch] Court of Appeal," *id.* (quoting Pet'rs' Mem. Supp. Mot. Stay at 8, ECF No. 105-1).  Even if that assumption were generally correct, the Shareholders do concede that at least some issues currently before the Dutch Supreme Court trigger *de novo* review, *see, e.g.*, Pet'rs' Opp'n at 2 (acknowledging "[d]e novo review of ECT" and "of the issue of procedural default" by Dutch Supreme Court); and that the Dutch Supreme Court is now exercising jurisdiction to consider whether to suspend enforcement of the Awards pending the appeal, Pet'rs' 2020 Not. Resp. at 1, which suspension, if directed, would put the Shareholders back into a similar position as in 2016, when they sought the 2016 Stay Order to avoid proceeding with this enforcement action against suspended Awards.

Convention art. VI), are nonetheless instructive here.[8]  The following six factors, originally set out in *Europcar Italia, S.p.A. v. Maiellano Tours, Inc.*, 156 F.3d 310, 317 (2d Cir. 1998), to guide a stay decision under the New York Convention, are widely-accepted in these particular circumstances to evaluate the appropriateness of a stay:  "(1) the general objective of arbitration—the expeditious resolution of disputes and the avoidance of protracted and expensive litigation; (2) the status of the foreign proceedings and the estimated time for those proceedings to be resolved; (3) whether the award sought to be enforced will receive greater scrutiny in the foreign proceedings under a less deferential standard of review; (4) the characteristics of the foreign proceedings including (i) whether they were brought to enforce an award (which would tend to weigh in favor of a stay) or to set the award aside (which would tend to weigh in favor of enforcement); (ii) whether they were initiated before the underlying enforcement proceeding so as to raise concerns of international comity; (iii) whether they were initiated by the party now seeking to enforce the award in federal court; and (iv) whether they were initiated under circumstances indicating to hinder or delay resolution of the dispute; (5) a balance of the possible hardships to the parties . . . ; and (6) any other circumstances that could tend to shift the balance in favor of or against adjournment."  *Europcar*, 156 F.3d at 317–18.

While the D.C. Circuit has not opined about this "widely-accepted . . . test" for "determining whether a stay is warranted under the New York Convention," *Novenergia II — Energy & Env't (SCA) v. Kingdom of Spain*, Civ. A. No. 18-01148 (TSC), 2020 U.S. Dist. LEXIS 12794, at *6 (D.D.C. Jan. 27, 2020), the *Europcar* factors neatly comport with and

---

[8]     Article VI of the New York Convention provides, in pertinent part: "If an application for the setting aside or suspension of the award has been made to a competent authority referred to in article V(1)(e), [namely, the country in which or under the law of which, that award was made], the authority before which the award is sought to be relied upon may, if it considers it proper, adjourn the decision on the enforcement of the award and may also, on the application of the party claiming enforcement of the award, order the other party to give suitable security."  New York Convention art VI.

explicate the more general considerations guiding the exercise of the Court's inherent authority to issue a stay in the context of an arbitral award enforcement action.  To be more precise, the first four *Europcar* factors focus on considerations of "economy of time and effort for [the court], for counsel and for the litigants," *Landis*, 299 U.S. at 254, and the fifth and sixth factors highlight the "benefit and hardship" to the parties, *id*. at 259.

Considerations of judicial economy are addressed first before turning to the hardships identified by the Shareholders should a second stay be imposed and whether their request for security should be granted.[9]

### A.      Judicial Economy Favors A Stay

In 2016, *Hulley* weighed the competing interests of the benefits of a stay and the hardship to the then-movant Shareholders of denying the stay, and any injury to the Russian Federation from issuing a stay, and found these considerations, on balance, favored a stay.  *Hulley*, 211 F. Supp. 3d at 272, 280–86.  In addressing the judicial economy factors, several considerations were highlighted.  First, "even if the Dutch proceedings do not resolve every jurisdictional and merits issue presented in the instant case," *id*. at 281, the Dutch proceedings may be persuasive as to certain issues relevant to this Court's jurisdiction under the Foreign Sovereign Immunities Act ("FSIA")," 28 U.S.C. §§ 1602–1611, including "whether an agreement to arbitrate existed"

---

[9]      The Shareholders organize their argument around the assertion that the applicable legal standard under *Landis* requires the Russian Federation to demonstrate a "pressing need" for the stay, Pet'rs' Opp'n at 11–12, which is the applicable standard for a stay of "indefinite duration," *Landis*, 299 U.S. at 255.  Notwithstanding that the original stay lasted from September 20, 2016 until May 20, 2020, and the second stay under consideration may last another two years, or more, the Russian Federation is not proposing an indefinite stay.  The Shareholders suggest a second stay would amount to being indefinite because the Dutch Supreme Court appeal could take five years or more if a requested referral by the Russian Federation to the Court of Justice of the European Union ("CJEU") is granted.  *See* Pet'rs' Opp'n at 11.  While the requested stay may be of *significant* duration, the conclusion of the stay has a clear end date "pending resolution of the set-aside proceedings before the Dutch Supreme Court," Resp't's Mem. at 28, and thus is not so "immoderate," *Landis*, 299 U.S. at 257, as to require the Russian Federation to make a showing of a "pressing need."  *Cf. Belize*, 668 F.3d at 732 (finding a stay indefinite because "the record fails to show either what a 'resolution' of that case would entail or when such a resolution is likely to be reached," meaning that the stay had "'the legal effect of preventing [petitioner] from proceeding with [its] claims in federal court for an indefinite period of time.'" (quoting *King v. Cessna Aircraft Co.*, 505 F.3d 1160, 1169 (11th Cir. 2007))).

and whether a "commercial relationship" existed, *id*. at 281–82.  Second, if the Dutch courts,

which have primary jurisdiction, set aside the Awards, resolving jurisdictional issues in this case

"may be a fruitless exercise" since "the Shareholders may have 'no cause of action,'" *id.* at 282

(quoting *TermoRio S.A. E.S.P. v. Electranta S.P* ("*TermoRio II*"), 487 F.3d 928, 930 (D.C. Cir.

2007)), making this case "a paradigm example of a case warranting a stay where the legal

viability of claims may rest on determinations in another legal proceeding," *id*.  Third, "[s]hould

the Court proceed and place any reliance on the Dutch [District Court] Judgment, . . . any

decision issued would be undercut if that Judgment is reversed on appeal in the Netherlands—

that is, a determination by the Court of Appeal of The Hague that an agreement to arbitrate *was*

formed," *id*. at 284—"a change in circumstances [that] would likely prompt the parties to seek

reconsideration and, if this case were on appeal, would likely result in remand to this Court for

further consideration," *id*.  In sum, the Court concluded that the lack of finality in the Dutch

proceedings regarding resolution of issues highly pertinent in this case "amply demonstrate[d]

that issuance of a stay would avoid potentially 'fractured and disorderly' and unnecessary

litigation and best preserve judicial and parties' resources," *id*. at 285 (quoting *Seneca Nation of

Indians v. U.S. Dep't of Health & Hum. Servs.*, 144 F. Supp. 3d 115, 119 (D.D.C. 2015)), as well

as avoid the possibility of conflicting legal conclusions in the respective courts, which implicates

interests in efficiency and international comity, *see id.* (citing *Laker Airways Ltd. v. Sabena,

Belgian World Airlines*, 731 F.2d 909, 937 (D.C. Cir. 1984)).

These same considerations persuade this Court that, given the current status of

proceedings in the Dutch Supreme Court, imposition of a second stay would clearly serve the

interests of "economy of time and effort for itself, for counsel and for litigants."  *Landis*, 299

U.S. at 254.  At the outset, it bears emphasizing that the parties agreed to proceed with the

arbitration tribunal seated in The Hague, Pet. ¶¶ 35–36, meaning that the parties agreed to make the Dutch court system the primary jurisdiction for this action.[10]  "[T]he policy favoring arbitration 'is at bottom a policy guaranteeing the enforcement of private contractual arrangements.'"  *In re Arbitration of Certain Controversies Between Getma Int'l & Guinea*, ("*Getma*"), 142 F. Supp. 3d 110, 114 (D.D.C. 2015) (quoting *Polimaster Ltd. v. RAE Sys., Inc.*, 623 F.3d 832, 840 (9th Cir. 2010) (internal quotation marks omitted)).  Since "the Court cannot 'overlook agreed-upon arbitral procedures' in favor of the enforcement of an arbitration award," *id.* (quoting *Polimaster Ltd.*, 623 F.3d at 840) (internal quotation marks omitted)), the presence here of an agreement between the parties to resolve the dispute in the Dutch judicial system favors awaiting the conclusions of those Dutch set-aside proceedings.

If this litigation to confirm the Awards is restarted based on the current status of the most recent findings in the last Dutch court to fully consider the matter, any conclusion reached may be upended by contrary findings by the Dutch Supreme Court.  As the Russian Federation points out, the parties would then likely seek reconsideration in this Court of any decision predicated even remotely on the 2020 COA Judgment, Resp't's Mem. at 12, and that would necessarily result in more litigation than otherwise would occur if the instant proceedings were halted pending the outcome of Dutch litigation.  *See, e.g.*, *Gretton Ltd. v. Republic of Uzbekistan*, Civ. A. No. 18-1755 (JEB), 2019 U.S. Dist. LEXIS 18990, at *11 (D.D.C. Feb. 6, 2019) ("If the

---

[10]     "[T]he court in a country in which, or under the law of which, the award was made has 'primary jurisdiction' over an arbitral award and exclusive authority to set aside or annul that award, while courts in other countries with 'secondary jurisdiction' are limited to deciding whether the award may be enforced in that country and may refuse enforcement only on the grounds specified in Article V of the New York Convention."  *Hulley*, 211 F. Supp. 3d at 282 n.9 (citing *First Inv. Corp. v. Fujian Mawei Shipbuilding, Ltd.*, 703 F.3d 742, 748–49 (5th Cir. 2012); *Karaha Bodas Co. v. Perusahaan Pertumbangan Minyak Dan Gas Bumi Negara*, 364 F.3d 274, 287–88 (5th Cir. 2004); *Karaha Bodas Co. v. Perusahaan Pertumbangan Minyak Dan Gas Bumi Negara*, 500 F.3d 111, 115 n.1 (2d Cir. 2007)); Resp't's Mem. at 10 (citing Letter from L. Yves Fortier, Arbitral Tribunal Member, to Prof. Emmanuel Gaillard, Robert T. Greig, Yas Banifatemi, Philippe Pinsolle, Counsel to Claimants, and Claudia Annacker, Counsel to Respondent (Aug. 2, 2005), ECF No. 78-2).

Court were to side with [one of the parties] now and then [the other party] were to win on appeal in [the primary jurisdiction], [the parties] could well be back in a U.S. court . . . litigating some of the issues raised in this case all over again.  That is hardly the kind of efficient dispute resolution that arbitration is meant to serve.").

If the Russian Federation receives an adverse determination from this Court, and then later receives a favorable ruling in the Dutch Supreme Court, not only would reconsideration litigation potentially arise here, but also litigation would proliferate over steps the Shareholders would likely take, in the wake of a decision from this Court to affirm the Awards, to attach and seize the Russian Federation's property in the United States.  The Shareholders have already sought to attach and seize a number of the Russian Federation's assets in at least six different countries based on the Awards, Fifth Van den Berg Decl. ¶¶ 22–23, 27, which apparently resulted in costly proceedings to retrieve the property when the Awards were set aside by the Dutch District Court in 2016, *see* Resp't's Mem. at 14–15 ("Eventually, each of [the Shareholders'] attachments was withdrawn, stayed, or abandoned in the aftermath of 2016 Dutch Judgment or the Paris Court's proposal to refer this case to the EU Court of Justice"); *see also* Fifth Van den Berg Decl. ¶ 30 (identifying that Belgian, French and German courts awarded the Russian Federation "almost EUR 1 million in litigation costs" in response the Shareholders' enforcement and attachment cases).[11]  Absent a stay, history may be forced to repeat itself with yet additional litigation to retrieve seized property.  To put it simply, this is a litigation quagmire that a stay would forestall, fully in keeping with important aspects of *Europcar's* first and second

---

[11]     Petitioners' discount the risk of additional litigation due to attachment proceedings, suggesting that, since the Russian Federation initiated the complained-of protective proceedings, the additional litigation was of the Russian Federation's own making.  Pet'rs' Opp'n at 4. This argument sidesteps the main issue: the Russian Federation undertook protective proceedings in response to earlier enforcement actions initiated by the Shareholders, squarely pointing to the Shareholders as the originating source of the additional litigation, *see* Sixth Van den Berg Decl. ¶ 6; Resp't's Reply, Attach. 17, Decl. of Andrea Pinna ("Pinna Decl.") ¶¶ 3–6, ECF 182-17, even if such litigation was a perfectly legitimate exercise of their right to recover payment on the Awards.

factors to avoid protracted and expensive litigation, in light of the status of the foreign

proceedings.  *See CEF Energia*, 2020 WL 4219797, at *6 (observing that first two factors "can

be read together to pertain to the timing of foreign proceedings in relation to the general

objective of arbitration, which is to resolve disputes expeditiously.").

Even though resolution in the Dutch Supreme Court may consume two years or more—

an unfortunate delay that frustrates speedy resolution of this case, which has already been

pending on the docket of this Court for almost six years—this time period awaiting a decision of

a foreign court is only one consideration in measuring judicial economy.  Much more significant

is the fact that the Dutch Supreme Court is the court of primary jurisdiction and could suspend or

vacate the Awards on a "permanent or provisional" basis.  2020 Decision ¶¶ 3.3.1–3.5.  As

observed in another case in analogous circumstances, "[a]lthough a stay would immediate[ly]

delay the resolution of the  parties' dispute, it would still 'likely be shorter than the possible

delay that would occur if this court were to confirm the award and the [foreign court were to] . . .

then set it aside.'"  *Getma*, 142 F. Supp. 3d at 114 (D.D.C. 2015) (quoting *Jorf Lasfar Energy

Co., S.C.A. v. AMCI Exp. Corp.*, No. Civ. A. 05-0423, 2005 WL 3533128, at *3 (W.D. Pa. Dec.

22, 2005)); *see CEF Energia*, 2020 WL 4219797, at *6.  The Dutch Supreme Court's recent

declaration that it "has jurisdiction to adjudicate applications for both permanent and provisional

suspensions [of the arbitral award]," Resp't's 2020 Not., Ex. B, Conclusie ¶ 3.20, HR 11 sept

2020 [Opinion, Supreme Court of the Netherlands, Sept. 11, 2020], nr. 20/01892 (The Russian

Federation / Hulley Enterprises Limited et al.) (Neth.) (Eng. Trans.), and that it will "rule on [the

Russian Federation's] suspension request before the end of December 2020," Pet'rs' 2020 Not.

Resp. at 1, only confirms that the enforceability of the arbitral award is in flux to such a degree

that a stay is warranted.  As noted, *supra* p. 10 n.7, in the event that the Dutch Supreme Court

suspends enforcement of the Award, the Shareholders would be put back into a similar position as in 2016, when they sought the 2016 Stay Order rather than proceed with this enforcement action against suspended Awards.

Denying the stay would also risk the possibility of inconsistent results in the primary and secondary jurisdictions, which would undermine important international comity interests highlighted in *Europcar*'s third and fourth factors. Specifically, the Awards sought to be enforced in this case will receive "greater scrutiny" in the Dutch proceedings, as the primary jurisdiction, than the more deferential standard of review to be applied in this Court. *See* Resp't's Mem. at 12; Pet'rs' Opp'n at 2, 14, 19; *see also Europcar*, 156 F.3d at 317 (explaining that the New York Convention instructs courts of secondary jurisdiction to engage in a "limited scope of review" that "favors deference to proceedings in the originating country that involve less deferential standards of review"). Further, the Russian Federation initiated the set aside proceedings prior to the instant Shareholders' suit to enforce the Awards, and no suggestion has been made that the Dutch litigation was brought merely to "hinder or delay resolution of the dispute." *Europcar*, 156 F.3d at 318 (discussing fourth factor). As *Hulley* explained, "comity considerations support granting a stay: the foreign proceedings were initiated prior to the instant action, and the foreign court has already taken action on the merits." 211 F. Supp. 3d at 287 (citing *Sumitomo Corp. v. Parakopi Compania Maritima, S.A.*, 477 F. Supp. 737, 741–42 (S.D.N.Y. 1979), *aff'd*, 620 F.2d 286 (2d Cir. 1980)); *see also Laker Airways Ltd.*, 731 F.2d at 937 ("[W]hen possible, the decisions of foreign tribunals should be given effect in domestic courts" to promote "predictability and stability through satisfaction of mutual expectations.").

The Russian Federation also points out another aspect of international comity militating in favor of a stay to allow the primary jurisdiction to reach a final judgment, namely, that the

Dutch Supreme Court may resolve issues concerning the proper interpretation and application of the ECT, to which the United States is not a signatory but which is important to the law of the European Union.  *See* Resp't's Mem. at 18–19; *see also* Meijer Decl. ¶¶ 25–29 (noting that appeal before Dutch Supreme Court involves numerous "legal questions of first impression, as to which the Dutch Supreme Court does not show any deference to the lower courts").  United States courts generally and appropriately defer to the foreign courts selected by the parties as the primary jurisdiction to determine relevant issues according to their own law.  *See Animal Sci. Prods., Inc. v. Hebei Welcome Pharm. Co. Ltd.*, 138 S. Ct. 1865, 1868 (2018) (emphasizing that, "in the spirit of 'international comity' . . . a federal court should carefully consider a foreign state's views about the meaning of its own laws" (quoting *Société Nationale Industrielle Aerospatiale v. U.S. Dist. Court for S. Dist. of Iowa*, 482 U.S. 522, 543 & n.27 (1987)); *Laker Airways Ltd.*, 731 F.2d at 937 ("[N]o nation can expect its laws to reach further than its jurisdiction . . . [thus] comity compels national courts to act at all times to increase the international legal ties that advance the rule of law within and among nations"); *see also* Resp't's Mem. at 18–19 (citing *CP Construction Pioneers Baugesellschaft Anstalt v. Gov't of Republic of Ghana*, 578 F. Supp. 2d 50, 54 (D.D.C. 2008), *amending* 578 F. Supp. 2d 48 (D.D.C. 2008); *Consorcio Rive S.A. de C.V. v. Briggs of Cancun, Inc.*, Civ. A. No. 99-2204, 2000 U.S. Dist. LEXIS 899, at *10 (E.D. La. Jan. 25, 2000); *Caribbean Trading & Fid. Corp. v. Nigerian Nat'l Petroleum Corp.*, No. 90 Civ. 4169 (JFK), 1990 U.S. Dist. LEXIS 17198, at *20–21 (S.D.N.Y. Dec. 18, 1990); *Fertilizer Corp. of India v. IDI Mgmt., Inc.,* 517 F. Supp. 948, 962 (S.D. Ohio 1981)).  Thus, the interest of international comity and orderly litigation are best served by imposing a stay pending final judgment in the primary jurisdiction on a set aside proceeding, even if the current status of the Awards is that they have been reinstated.  *See Stati*, 199 F. Supp.

3d at 193 ("Given the fact that a decision by the Swedish court is expected in the coming
months, and the possibility that the pending set-aside proceeding could have a dramatic impact
on the petition to confirm the arbitration award, the Court will, in an exercise of its discretion,
stay this confirmation proceeding"); *Unión Fenosa Gas S.A. v. Arab Republic of Egypt*, Civ. A.
No. 18-2395 (JEB), 2020 U.S. Dist. LEXIS 98645, at *5–6, *15 (D.D.C. June 4, 2020) (granting
stay where Egypt's "application to annul the award in the ICSID" was pending).

The Shareholders disagree that the stay would promote judicial economy, Pet'rs' Opp'n
at 12, for three reasons, none of which is persuasive.  First, the Shareholders downplay any risk
of inconsistent decisions or that a decision here could prematurely enforce Final Awards later
annulled because they believe the Dutch Supreme Court is unlikely to reverse the 2020 COA
Judgment.  They base this reasoning on their view that the Dutch Supreme Court is highly
deferential to the Dutch Court of Appeal on the kinds of issues presented on appeal, which issues
are predicated on factual findings given deference, *id.* at 18–20, and questions dealing with "the
content of Russian law," *id.* at 17.  As support for their view that reversal is unlikely, the
Shareholders examine the five issues raised on appeal before the Dutch Supreme Court to
explain why each falls short of grounds for reversal.  For example, the Shareholders assert the
Dutch Court of Appeal's decision that the Russian Federation offered to arbitrate under the
ECT's Articles 26 and 45(1) has a "vanishingly small chance of reversal," *id.* at 15, because this
particular finding may only be reviewed for "procedural or reasoning" errors, *id.* (citing Pet'rs'
Opp'n, Attach. 43, Decl. of T. Cohen Jehoram ("Jehoram Decl.") ¶ 99, ECF No. 181-43), and
such errors are unlikely to be found in the Dutch Court of Appeal's "comprehensive, sixty-five
paragraph discussion" on the topic.  As another example, the Shareholders suggest that reversal
on the question of whether the Shareholders were eligible offerees under the ECT's Articles 1(6),

1(7) and 26 is unlikely because the Russian Federation's proffered definition of the legal term

"investor," was rejected by both the Dutch Court of Appeal and the Russian Federation's own

expert, who disagrees with the Russian Federation on this legal question.  *See* Pet'rs' Opp'n at

16–17.

The Shareholders' assessment of the merits of the Russian Federation's appeal may be

correct but this Court is not the appropriate forum to make that call, let alone make it first, before

the Dutch Supreme Court has opined.  Moreover, the Dutch Supreme Court will be reviewing

certain questions of law *de novo*, which is not, by definition, a deferential review standard and

*could* result in a reversal.  *See* Pet'rs' Opp'n at 17, 19; *see also* Fifth Van den Berg Decl. ¶ 24.

In view of this matter's procedural history, with reversals already occurring at each level of

review—with the original arbitral Awards reversed by the Dutch District Court, and then

reinstated by the Dutch Court of Appeals—a reversal by the Dutch Supreme Court is within the

realm of possibility, demonstrating that a stay is "the best way to ensure orderly, efficient

litigation with a foreseeable endpoint."  *Seneca Nation*, 144 F. Supp. 3d at 120.

Second, the Shareholders contend that the "'possibility of multiple judicial proceedings

on the same legal issues' affords the district court no justification for the stay" when, as here, the

arbitration award at issue has not been set aside in the primary jurisdiction.  Pet'rs' Opp'n at 12

(quoting Resp't's Mem. Opp'n Pet'rs' Mot. Stay ("Resp't's Opp'n to Stay") at 17, ECF No.

127).  This position oversimplifies the current circumstances.  Unlike in *Belize*, where no

"proceedings for setting aside or suspending the Final Award" in the "primary jurisdiction over

the Final Award" were in progress, 668 F.3d at 186, Dutch court proceedings to set aside the

Awards have been ongoing since 2014, Pet. ¶ 52, and, on at least one court review, resulted in annulment of the Awards.[12]

Finally, the Shareholders suggest that the Russian Federation intends to "re-litigate" any "overlapping issues" that the Dutch Supreme Court affirms in this Court, Pet'rs' Opp'n at 21, making a stay unhelpful for judicial economy.  The Shareholders' prediction of the Russian Federation's posture in this case may very well be correct.  Nonetheless, resolution of any repeat litigation issues here will be informed by the considered judgment of the Dutch Supreme Court. Moreover, the Shareholders' overall position in this litigation might be strengthened by a stay, for once the Dutch Supreme Court issues a final decision, "assuming this Court has jurisdiction, the decision whether to confirm the Awards would require consideration of whether the Awards have been set aside by the courts of The Hague, which has the primary jurisdiction." *Hulley*, 211 F. Supp. 3d at 283.  As such, even if the Russian Federation seeks to relitigate in this forum issues resolved in the Dutch proceedings, a strong presumption toward enforcement of Awards would apply by confirmation in the primary jurisdiction.  *Belize*, 668 F.3d at 727.

### B.      The Balance of Hardships to the Parties Favors a Stay

The balancing of hardships to each party, which encompasses the fifth and sixth *Europcar* factors, favors imposition of a second stay, again, for some of the same reasons

---

[12]      Just as the Russian Federation previously relied on *Chevron Corp. v. Republic of Ecuador*, 949 F. Supp. 2d 57 (D.D.C. 2015), *aff'd*, 795 F.3d 200 (D.C. Cir. 2015), in objecting to the 2016 Stay Order, *Hulley*, 211 F. Supp. 3d at 283, the Shareholders now rely on this case to argue that no stay is necessary even when set-aside proceedings are underway in foreign jurisdiction.  *See* Pet'rs' Opp'n at 13 (noting that in *Chevron* "this District denied Ecuador's request for a stay" while set-aside proceedings were pending appeal in The Hague).  In *Chevron*, however, the risk of inconsistent rulings was significantly lower than in the instant case because each adjudicative body in the primary jurisdiction had, after consideration, reached the same conclusion recognizing the award, providing sufficient *prima facie* evidence of an agreement to arbitrate to satisfy the FSIA jurisdictional requirement.  *Hulley*, 211 F. Supp. 3d at 283 (citing *Chevron Corp.*, 795 F.3d 200, 205 n.3 (D.C. Cir. 2015)).  By contrast, two courts in the primary jurisdiction have, so far, reached opposite conclusions on whether the Russian Federation "agreed to arbitrate with investors when it signed the ECT in 1994," Pet'rs' Opp'n at 15; *see also id.*, Decl. of Steven Shephard ("Shepard Decl."), Ex. A, Pet'rs' Summ. of Dutch Court of Appeal Decision ("Court of Appeal Summ.") ¶ 10, ECF No. 181-27, with final resolution of this issue pending before the Dutch Supreme Court.  The "lack of finality" in these two cases is thus not comparable.

explained in *Hulley* to grant the Shareholders' motion to stay.  In *Hulley*, the Court determined that the identified harms to then-non-movant Russian Federation from denying the stay did "not outweigh the benefits of the requested stay and the hardships attendant to denying one."  *Hulley,* 211 F. Supp. 3d at 286.  The hardships identified were, first, "the outcome of [the Dutch Court of Appeal] could prompt additional rounds of briefing and review of the merits" and might even force "[the Shareholders to] face difficulties related to initiating a new enforcement action in this Court."  *Id.* at 285.  Second, the Russian Federation "claim[ed] hardship from the potential liability posed by the Awards" and having to defend its assets from "the Shareholders' efforts to confirm the Awards," including a "campaign of worldwide asset seizures."  *Id.*  This Court concluded that the Russian Federation's identified hardship stemmed from being "the losing party in an indisputably high-stakes arbitration and a party to ongoing, multi-jurisdictional litigation relating to the validity of the awards," rather than any stay decision, *id.* at 286, and, in any event, roughly balanced the Shareholders' "hardship of not being paid monies that the Awards say they are owed," *id.* (citing *Gold Reserve, Inc. v. Bolivarian Republic of Venez.*, 146 F. Supp. 3d 112, 136 (D.D.C. 2015)).

In support of its current request for a second stay, the Russian Federation outlines the following hardships that would result from denial of the stay and moving forward with this enforcement action.  First, the Russian Federation claims that the global pandemic presents a hardship because COVID-19 raises "uncertainties" which weigh in favor of staying the litigation. *See* Resp't's Mem. at 22 (citing *Unión Fenosa Gas*, 2020 U.S. Dist. LEXIS 98645, at \*12–13). The global pandemic has certainly created unprecedented uncertainty for the economies of some countries and their administrative operations across the world.  The Russian Federation's singular reliance on *Unión Fenosa Gas*, which found the pandemic to weigh in favor of a stay of

an arbitral award enforcement action, is easily distinguished, however, since there the sovereign nation subject to the arbitral award was facing near economic collapse. *See Unión Fenosa Gas*, 2020 U.S. Dist. LEXIS 98645, at *12–13 (granting stay, in part, because Egypt "faces a massive fiscal crisis exacerbated by the ongoing global COVID-19 pandemic").  By contrast, the Shareholders call out a number of the Russian Federation's activities in the last nine months, including ongoing filings in the Dutch Supreme Court as well as development and cultural activities taking place within the Russian Federation, to suggest that the Russian Federation does not face a similar fiscal crisis. *See* Pet'rs' Opp'n at 25.  While perhaps probative, this evidence is not dispositive as to whether the pandemic has so adversely affected the fiscal stability of the Russian Federation to warrant a stay. At the same time, the burden rests on the Russian Federation, as movant, to establish this fiscal hardship and the record, extensive as it is, sheds little light on the fiscal hardship caused by the pandemic to the Russian Federation necessitating a stay here.  Thus, the Russian Federation has not sustained its burden on this ground to obtain a stay.  The other hardships identified by the Russian Federation, however, are persuasive.

Second, the Russian Federation claims it would be "heavily burdened if unjustifiably compelled to pay" the "more than $50 billion" at issue.  Resp't's Mem. at 20.  Given that the Awards represent the largest arbitral tribunal award in history, Fifth Van den Berg Decl. ¶ 13, the Russian Federation's claim that *unjustifiable* payment presents a hardship carries significant weight.  Indeed, the sheer "enormity of [the] Award" that may be enforced against a sovereign's treasury weighs in favor of the stay when "there is a chance that the award might be set aside." *Unión Fenosa Gas*, 2020 U.S. Dist. LEXIS 98645, at *12–13.  The Shareholders invoke *Hulley* to posit that now, as in 2016, the Russian Federation's present claims of hardship are of the ilk that "'follow inevitably' from losing a 'high-stakes arbitration'" and so should not be read to

favor the Russian Federation's position.  Pet'rs' Opp'n at 26 (quoting *Hulley*, 211 F. Supp. 3d at 286).  Functionally, the Shareholders use this portion of *Hulley* to argue that "risk[s] to assets" should be afforded little weight in balancing hardships categorically.  *Id*.  The finding in *Hulley*, however, was narrower than what the Shareholders suggest.  *Hulley* determined that the Russian Federation's claims of hardship arising from "simply remaining a party to this litigation," *Hulley*, 211 F. Supp. 3d at 285, was tied merely to being "a party to ongoing, multi-jurisdictional litigation relating to the validity of the Awards," *id*. at 286, and simply did "not outweigh the benefits of the requested stay," *id*.  Here, again, a stay is appropriate, as the Russian Federation points to the enormity of the Awards, the procedural posture of the set-aside proceedings in the primary jurisdiction, and the attendant difficulties that may arise should conclusions by this Court lead to the premature seizure of a concomitant value of Russian Federation property that might subsequently be subject to restoration.  *See* Respt's Mem. at 20.

Third, the Russian Federation echoes the determination in *Hulley* that denial of a stay could result in incongruous outcomes that would produce repetitive and unnecessary briefing, urging that "there is a likelihood that either the Dutch Supreme Court of the EU Court of Justice will agree with the Dutch district court (rather than with the Dutch appellate court)," which makes the current status of the Dutch proceedings a "moving target" that cannot be reasonably relied upon.  Resp't's Mem. at 21–22.  The Russian Federation's position on this point is equally as persuasive as the point was in *Hulley*, which determined that unnecessary additional filings would be an "obvious hardship . . . that would be avoided by a stay."  *Hulley*, 211 F. Supp. 3d at 285.

Finally, the Russian Federation notes that "litigating essentially the same issue in two separate forums is not in the interest of judicial economy or in the parties' best interests."

Resp't's Mem. at 10 (quoting *Masdar Solar & Wind Coop. U.A. v. Kingdom of Spain*, 397 F.

Supp. 3d 34, 40 (D.D.C. 2019) (citing *Naegele v. Albers*, 355 F. Supp. 2d 129, 141 (D.D.C.

2005) (internal quotation marks omitted))).   Denial of the requested stay could easily give way to

a "potentially 'fractured and disorderly'" result that would deplete "judicial and parties'

resources," *Hulley*, 211 F. Supp. 3d at 285, posing a threat of hardship to both the Russian

Federation and the Shareholders, and subjecting this Court to burdensome litigation seeking

reconsideration of any issues resolved, all of which weighs decidedly in favor of the stay.

The Shareholders dispute that the claimed hardships presented by the Russian Federation

weigh in favor of the stay, arguing, *inter alia*, that the Russian Federation could avoid the

litigation burdens of defending its assets from attachment by "providing an adequate *supersedeas*

bond." Pet'rs' Opp'n at 26.   Yet, this position merely skirts the reality that the posting of a bond

does not eliminate the possibility of the Russian Federation being "unjustifiably compelled to

pay" based upon an adverse decision from this Court, when that decision may be subject to

reconsideration should the Dutch Supreme Court later decide in the Russian Federation's favor.

Resp't's Mem. at 20; *see* Resp't's Reply at 16.   Stays have generally been found warranted to

avoid this litigation quagmire of recovering payments a party has been ordered to make.  *See,*

*e.g., Masdar*, 397 F. Supp. 3d at 37, 40 (granting stay while respondent was seeking annulment

of the Arbitral Tribunal's award to "avoid[] cross-border, piecemeal litigation"); *Unión Fenosa*

*Gas*, 2020 U.S. Dist. LEXIS 98645, at *1, *5 (granting stay while annulment committee in

primary jurisdiction was considering respondent's petition to annul the award).

The Shareholders also claim that a further stay is inappropriate because they never agreed

to a stay beyond the decision of the Dutch Court of Appeal. Pet'rs' Opp'n at 21–22.  That may

be so, but a non-movant party's consent is simply not a prerequisite for a stay, nor is such

consent even cited as a factor for exercise of a court's inherent power to stay an action or among

the *Europcar* factors.  That being said, increasing an already long delay until resolution of an

arbitral award enforcement action could be injurious to the Shareholders, but the Shareholders'

lack of agreement to a longer stay does not create a hardship in itself.  *See id.* at 21–23.  In any

event, the prior stay was granted with a predicted end date of "six to nine years," Resp't's Mem.

at 8 (citing Resp't's Opp'n to Stay at 1 & n.3, ECF No. 127), or between 2022 and 2025.  This

estimate appears to have held steady, with the predicted end date between two to five years for

the purposes of this stay.  *See id.* (estimating the proceeding will conclude in 2022); Pet'rs'

Opp'n at 32 (noting the "estimated time" for the proceedings to be resolved is "up to five

years").  Either way, the distance to resolution is necessarily closer than it was in 2016,

undercutting the Shareholders' contention that a further stay would create such a hardship the

stay request must be denied.  *See* Resp't's Mem. at 25 (". . . because the Dutch proceedings are

necessarily closer to finishing now than in 2016, a stay during this phase of the proceeding is

necessarily even more justified than during the previous appellate phase"); *see also* Jehoram

Decl. ¶ 88 (predicting final judgments from the Dutch Supreme Court as early as September and

December 2021).  The imminence of a decision, well before the five-year maximum estimate, is

highlighted by the upcoming scheduled hearings in the Dutch Supreme Court.  *See* Pet'rs' 2020

Not. Resp. at 2 (" . . . the Dutch Supreme Court informed counsel . . . that the court will hear

argument on the merits of the Cassation Appeal on February 5, 2021 . . ."); *cf. Stati*, 199 F. Supp.

3d at 191 (granting stay where hearing was scheduled to occur "in the coming months").

The Shareholders further complain that "there are now more judgment creditors seeking

to execute on the Russian assets than there were in 2014" and that "delay . . . gives [the Russian

Federation] more time to remove assets from the United States; to hide them; or to disguise them

as assets immune from execution."  Pet'rs' Opp'n at 23.  In this regard, the Shareholders point to two instances: one, in 2015, when the Russian Federation "deleted all data in its public registry related to Russian Federation-owned properties located abroad;" and two, around the same time, when it "affixed diplomatic plates on buildings in France and in Belgium []immediately after attachments had taken place." *Id.*  The occurrences the Shareholders cite in support of this argument, however, occurred prior to 2016 when the last stay was granted, at the Shareholders' request.  Absent any additional proof that challenges to execution are mounting, this purported hardship about increasing the difficulties faced by the Shareholders in executing on Russian Federation assets is unconvincing.

Finally, the Shareholders' claim that a further stay would deprive them of monies owed. This hardship is tempered, however, by the fact, as the Russian Federation points out, that post-award interest will compensate for any delay.  Resp't's Mem. at 23 (citing *Masdar Solar*, 397 F. Supp. 3d at 40).  Indeed, long delays in proceedings, alone, are rarely adequate reason to deny a stay where the party seeking to enforce the award will be compensated after the fact.  *See, e.g.*, *Novenergia II*, 2020 U.S. Dist. LEXIS 12794, at *11 (finding hardship to Spain outweighed hardship to petitioner from "continued delay in recovering its award" because "if [petitioner] ultimately prevails it will be compensated for any delay because the award includes interest"); *Unión Fenosa Gas*, 2020 U.S. Dist. LEXIS 98645, at *14 (justifying stay in part because "Plaintiff 'will be compensated for any delay because the award includes interest'" (citing *Novenergia II*, 2020 U.S. Dist. LEXIS 12794, at *4)).  The Shareholders' complaint about delay in the Russian Federation paying the Awards is also outweighed by the potential waste of time and resources to the parties if this action is allowed to proceed, with the possibility of enforcement of the Awards and the proliferation of attachment and seizure proceedings that may

have to be undone should the Dutch Supreme Court reverse, in whole or in part, the decision of the Dutch Court of Appeal.

*     *     *

In sum, balancing considerations of judicial economy for the Court and the parties and avoiding inconsistent legal conclusions with the primary jurisdiction, with the harms to the Shareholders from further delay, which also may adversely affect their ability to collect on the Awards, compared to the Russian Federation's potential hardship in premature enforcement of the massive Awards totaling more than $50,000,000,000, the factors weigh decidedly in favor of the stay.

### C.    The Russian Federation Will Not Be Required to Post Security

The Shareholders request, if a second stay is imposed, that the Russian Federation be required to post suitable security in the amount of $7,000,000,000.  *See* Pet'rs' Opp'n at 38. According to the Shareholders, this request as particularly important because the Russian constitution has recently been updated in a manner interpreted by the Shareholders to mean the Russian Federation would refuse to pay the Awards, a change the Shareholders characterize as the Russian Federation 'never pay' policy.  *See* Pet'rs' Opp'n at 7.  Citing the Russian Federation's failure to pay Yukos €1.9 billion in response to an order of the European Court of Human Rights and $122 million in civil contempt sanctions in response to an order imposed by this Court, *see* Order, *Agudas Chasidei Chabad of U.S. v. Russian Fed'n*, Civ. A. No. 05-1548 - RCL (D.D.C. Dec. 20, 2019), ECF No. 201, the Shareholders argue that the Russian Federation "does not deserve the presumption, which this District has accorded to other sovereigns, that it 'will comply with legitimate orders issued by courts in this country,'" Pet'rs' Opp'n at 41 (citing *Novenergia II*, 2020 WL 417794, at *6).

28

The Shareholders raise troubling points about the Russian Federation's respect for, and compliance with, orders issued by courts here and abroad that would weigh heavily in favor of requiring a bond, as they request.  Yet, as the parties' arguments about whether a security bond is permissible under the FSIA highlight, the authority and mechanisms to order the Russian Federation to post security in the vast amount of billions of dollars, faces a significant obstacle when this Court has not resolved threshold jurisdictional issues under the FSIA or New York Convention.  Indeed, the Shareholders' reliance on the New York Convention provision expressly authorizing a stay with posting of a bond, *see* Pet'rs' Opp'n at 38, is not applicable here since the Court is relying on its inherent authority to control its docket by issuing a second stay.

Moreover, courts "generally have not required foreign sovereigns to post security because they are 'presumably solvent . . .'"  *Novenergia II*, 2020 U.S. Dist. LEXIS 12794, at *16 (quoting *DRC, Inc. v. Republic of Honduras,* 774 F. Supp. 2d 66, 76 (D.D.C. 2011)).  The Shareholders' contention that this presumption should not apply to the Russian Federation because of its alleged failure to pay awards or sanctions in other cases is not so extreme as to warrant disregarding existing precedent.  The Russian Federation, as acknowledged by the Shareholders, has significant assets in the United States.  *See* Pet'rs' Opp'n at 43; Resp't's Reply at 24.  Indeed, the Russian Federation is a sovereign country with economic tendrils that cross the globe, not an insecure potential debtor that must be required to post security lest there be no assets to seize at a later date.

Accordingly, this action is stayed pending resolution of the proceedings to set aside the Awards in the Dutch Supreme Court.  In consideration of the need for a "provision for status updates or further review," lest the stay become "immoderate," *see Belize*, 668 F.3d at 732, and

on the basis of the parties' representations that the proceedings will conclude within two to five

years, the stay of these proceedings is granted until November 18, 2022, unless the proceedings

before the Dutch Supreme Court conclude earlier.  The parties must, every six months, jointly

file a status report advising the Court of the status of the Dutch proceeding.

## IV.     CONCLUSION

For the foregoing reasons, the Russian Federation's motion to stay this matter is

GRANTED, and this case will be STAYED until the earlier of November 18, 2022 or the

conclusion of the proceedings to set aside the Awards in the Dutch Supreme Court.  The parties

are further directed to jointly file a status report advising the Court of the status of the Dutch set-

aside proceedings.

Date:  November 20, 2020

_____
BERYL A. HOWELL
Chief Judge