Exhibit 2



Neutral Citation Number: [2021] EWHC 894 (Comm)

Case No: CL-2015-000396

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**

Royal Courts of Justice
Rolls Building, Fetter Lane,
London, EC4A 1NL

Date: 14/04/2021

**Before** :
**THE HONOURABLE MR JUSTICE HENSHAW**
- - - - - - - - - - - - - - - - - - - -
**Between :**

**(1) HULLEY ENTERPRISES LIMITED**
**(a company incorporated in Cyprus)**

**(2) YUKOS UNIVERSAL LIMITED**
**(a company incorporated in the Isle of Man)**

**(3) VETERAN PETROLEUM LIMITED**
**(a company incorporated in Cyprus)**          **Claimants**

**- and -**

**THE RUSSIAN FEDERATION**          **Defendant**

- - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - -

**Jonathan Crow QC, Paul McGrath QC, Alison Macdonald QC, David Peters and Naomi Hart** (instructed by **Stephenson Harwood LLP**) for the **Claimants**
**Laurence Rabinowitz QC, Christopher Harris QC, Henry Hoskins,  Mark Wassouf and Cameron Miles** (instructed by **White & Case LLP**) for the **Defendant**

Hearing dates: 8–11 March 2021
Draft judgment circulated to the parties: 3 April 2021

# Approved Judgment

- - - - - - - - - - - - - - - - - - - -

**Covid-19 Protocol:  This judgment was handed down by the judge remotely by circulation to the parties' representatives by email and release to Bailii.  The date and time for hand-down is deemed to be 14 April 2021 at 10:00 am**

## Mr Justice Henshaw:

(A) INTRODUCTION ............................................................................................................3

(B) FACTUAL BACKGROUND .........................................................................................4

(C) THE CASSATION APPEAL .........................................................................................5

(1) The Cassation Appeal ....................................................................................................5

(2) Procurator General's Opinion .......................................................................................7

(3) Suspension Judgment ..................................................................................................11

(D) RUSSIA'S CLAIM TO STATE IMMUNITY ...........................................................12

(E) APPLICABLE PRINCIPLES .......................................................................................13

(F) OVERVIEW OF THE PARTIES' SUBMISSIONS ....................................................21

(1) Lifting the Stay ............................................................................................................21

(2) Security .......................................................................................................................23

(G) WHETHER THE STAY SHOULD BE LIFTED ........................................................25

(1) Realistic prospect of success ......................................................................................25

(a) Ground 1: fraud on Tribunal ......................................................................................25
(b) Ground 2: lack of jurisdiction under ECT Article 45 ................................................29
(i) Article 45 ....................................................................................................................29
(ii) Consistency with Russian law ...................................................................................33
(c) Ground 3: scope of persons entitled to invoke the ECT .............................................36
(d) Other grounds of appeal ...........................................................................................43
(e) Conclusion on prospects of success ...........................................................................43

(2) Bona fide challenge/delaying tactics ...........................................................................44

(a) General ......................................................................................................................44
(b) Public statements ......................................................................................................47
(c) Threats of diplomatic reprisals ................................................................................51
(d) Response to ECtHR Yukos decision ...........................................................................54
(e) International arbitration awards ...............................................................................55
(f) Changes to Russian Constitution and laws ...............................................................56
(g) Russia's conduct in the international sphere .............................................................57
(h) Conclusions to be drawn ...........................................................................................58

(3) Delay and prejudice ....................................................................................................58

(a) Prejudice to the Claimants from the Stay remaining .................................................58
(b) Prejudice to Russia from lifting the Stay ..................................................................64
(i) Legal prejudice ...........................................................................................................64
(ii) Risk of dissipation by Claimants ..............................................................................67

(4) Overall consideration ..................................................................................................70

(H) SECURITY ..................................................................................................................71

(1) Whether the power under section 103(5) of the 1996 Act arises .................................71

(2) Discretion ....................................................................................................................81

(I) CONCLUSION ..............................................................................................................84

## (A) INTRODUCTION

1.      This application arises in  proceedings brought under the Arbitration Act 1996 (the "***1996 Act***") for the recognition and enforcement of certain arbitral awards made against the Defendant ("***Russia***") and subject to the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "***New York Convention***").  The application is to lift a stay of the proceedings imposed by an order of Leggatt J dated 8 June 2016 (the "***Stay***").

2.      The Claimants are entities incorporated in Cyprus (the First and Third Claimants) and the Isle of Man (Second Claimant).  They are former shareholders in OAO Yukos Oil Company ("***Yukos***"), which was an oil company based in Russia.  By final arbitration awards of the Permanent Court of Arbitration dated 18 July 2014 (the "***Final Awards***") the Claimants were awarded over US$50 billion in compensation, arising out of allegations that Yukos' assets were unlawfully expropriated by Russia.

3.      Since the Final Awards, no payment has been made and over US$7 billion in interest has accrued.  Russia is challenging the Final Awards and previous interim awards on admissibility and jurisdiction dated 30 November 2009, together the "***Awards***", in the courts of the arbitral seat, the Netherlands.  On 20 April 2016 Russia was successful before the District Court of The Hague (the "***Hague District Court***").  On 18 February 2020 the Court of Appeal of The Hague (the "***Hague Court of Appeal***") reinstated the Awards.  An appeal to the Supreme Court of the Netherlands (the "***Dutch Supreme Court***") is pending.

4.      The present proceedings, seeking recognition and enforcement of the Awards under the 1996 Act, were issued on 30 January 2015.  By the Stay, they were stayed pending the judgment of the Hague Court of Appeal, with liberty to apply following that decision.

5.      The Claimants now exercise that liberty, and apply to lift a stay of these proceedings in order to progress enforcement of the Awards.  If (contrary to that primary submission) the court considers that it would be more appropriate for the proceedings to remain in abeyance pending determination of the appeal to the Dutch Supreme Court, then the Claimants ask the court to (a) adjourn the proceedings under s. 103(5) of the 1996 Act, and (b) order that the adjournment be conditional upon Russia providing security in an appropriate amount: which the Claimants submit would be US$ 7 billion.

6.      Russia's position is that these proceedings ought to remain subject to an unconditional stay or adjournment until the final resolution of the appeal to the Dutch Supreme Court (including any reference to the Court of Justice of the European Union ("***CJEU***") made in the course of that appeal).

7.      For the reasons set out below, I have come to the conclusion that the Claimants' application should be dismissed, and that the Stay should continue, without the provision of security, pending the final outcome of the proceedings in the Netherlands.

## (B) FACTUAL BACKGROUND

8.     Following the collapse of the Soviet Union, Yukos was incorporated in 1993 as a joint stock company, and most of the shares were privatised between 1995 and 1996.  This privatisation was of considerable benefit to those who came to own the majority of shares in Yukos.  Although the Claimants before me are companies, it is Russia's case that they are ultimately owned and controlled by a small number of Russian nationals (the *"Individuals"*).

9.     From 2003 to 2006 the Russian tax authorities issued a series of large tax reassessments for the years 2000-2004 in respect of Yukos, purportedly because of Yukos' misuse of low-tax jurisdictions inside Russia.  By the time the Russian tax authorities issued the last of these demands, Yukos faced a tax bill of more than US$24 billion, from a combination of revenue-based taxes, VAT-related taxes, interest and fines.

10.    Yukos was sold at auction on 19 December 2004 for US$9.37 billion to a newly incorporated entity, Baikal Finance Group, which was in turn quickly bought by Rosneft, a company owned by the Russian state.  On 4 August 2006 Yukos was declared bankrupt.  Nearly all its remaining assets were acquired by two state-owned oil companies, Gazprom and Rosneft.  On 21 November 2007 Yukos was liquidated and struck off the register of legal entities.

11.    Following the sale of Yukos, the Claimants in February 2005 initiated arbitration proceedings in the Permanent Court of Arbitration in The Hague (the "***Tribunal***") under the Energy Charter Treaty ("***ECT***") alleging that

        "the Russian authorities were conducting 'a ruthless campaign to destroy Yukos, appropriate its assets and eliminate Mr. Khodorkovsky as a political opponent.'"

12.    In its Final Award, the Tribunal concluded exactly that, quoting the above passage in its decision.

13.    As noted above, the present proceedings were issued on 30 January 2015.  On 20 July 2015 Russia acknowledged service and indicated that it would dispute the court's jurisdiction.  An application to do so followed on 25 September 2015 (the "***Jurisdiction Application***").  On 29 January 2016 Mr Justice Leggatt gave directions for the hearing of the Jurisdiction Application, to be listed for hearing in November 2016.

14.    However, by its judgment of 20 April 2016 the Hague District Court set the Awards aside, and the Claimants filed an appeal to the Hague Court of Appeal.  The Claimants at that stage, in May 2016, wrote stating that "*the only appropriate course now is to stay the English proceedings in their entirety*" since the proceedings in the Netherlands "*may render the entire argument in England nugatory*".  Russia agreed, and on 8 June 2016 Mr Justice Leggatt ordered (by consent) the Stay, giving both parties liberty to apply to lift the Stay following the judgment of the Court of Appeal "*without showing a change of circumstances*".  That reflected a compromise, Russia having proposed that the proceedings be stayed until the final outcome of the proceedings in the Netherlands, and the Claimants that the Stay should remain in place only until the judgment of the Hague Court of Appeal.

15.     On 18 February 2020 the Hague Court of Appeal, after considering the matter *de novo*, handed down judgment quashing the Hague District Court's decision and reinstating the Awards.  On 17 April 2020 the Claimants requested leave to enforce the Awards in the Netherlands, which was granted on 28 April 2020.

16.     On 15 May 2020 the Defendant initiated a cassation appeal before the Dutch Supreme Court (the "***Cassation Appeal***").  This was declared admissible on 19 June 2020.

17.     The Defendant also applied to suspend enforcement of the Awards in the Netherlands pending the outcome of the Cassation Appeal (the "***Suspension Application***").  On 13 November 2020 Procurator General Vlas issued an Opinion recommending the Suspension Application be dismissed (the "***PG Opinion***").  The Dutch Supreme Court denied the Suspension Application on 4 December 2020 (the "***Suspension Judgment***").

18.     It is common ground between the Dutch law experts that the Dutch Supreme Court is likely to hand down judgment in the Cassation Appeal by the end of 2021/early 2022.  There is the potential for a reference to the CJEU to be required, in which case final judgment following that reference would not be handed down for the best part of 3 to 4 years.

19.     In the present English proceedings, the Claimants on 11 June 2020 wrote to Russia proposing that the Stay be lifted by consent.  This was refused on 19 June 2020.

20.     On 6 July 2020 the Claimants filed and served the present application.  They ask the court to order that the Stay be lifted and the proceedings continue.  Alternatively, they ask that any continuation of the Stay be made conditional on Russia providing security in an appropriate amount, which they propose should be US$7 billion.  Russia submits that that stay should continue pending the outcome of the Cassation Appeal, and that no security can or should be ordered.

## (C) THE CASSATION APPEAL

21.     It is necessary, for reasons that will become apparent, to set out in some detail the grounds of appeal in the Cassation Appeal.  At this stage I do so only in overview.

### (1) The Cassation Appeal

22.     In the Cassation Appeal Russia relies on seven main grounds.

23.     First, Russia says the Awards were procured by a fraud on the Tribunal by the Claimants, including false evidence given before the Tribunal and failure to disclose key documents.  These alleged frauds are said to have come to light after the Hague District Court's judgment.  The Dutch Supreme Court is asked to assume these allegations to be true, and to determine whether that would be grounds to set aside the Awards under Dutch law.

24.     This ground raises an issue of Dutch procedural law.  Dutch law contains provision for 'revocation' proceedings under Article 1068 of the Dutch Code of Civil Procedure ("***DCCP***"), which have a time limit of three months from the discovery of the fraud and fall under the unique jurisdiction of the Court of Appeal.  The proceedings on foot in The Hague, however, are 'setting-aside' proceedings under Article 1065 DCCP, with a

different time limit and procedural track.  The Hague Court of Appeal held that it would side-step the different procedural requirements if Russia's fraud claim could be raised in the present setting-aside proceedings.

25.    Secondly, Russia contends that the Tribunal had no jurisdiction because Russia did not ratify the ECT.  It agreed only to apply it on a provisional basis under Article 45(1) of the ECT, and pursuant to that Article the ECT's provisions apply to Russia only *"to the extent that such provisional application is not inconsistent with its constitution, laws or regulations*."  Russia argues that the dispute resolution provision in ECT Article 26, pursuant to which the Awards were made, is inconsistent with Russian law, including because disputes of a public law nature cannot be arbitrated in Russia.  The Hague District Court accepted this argument.

26.    Thirdly, Russia argues that the Claimants are not "*investors*" for the purposes of the relevant provisions of the ECT, and their interests in Yukos are not "*investments*", because the Claimants are shell companies or proxies for Russian nationals (the Individuals) who invested Russian money into a Russian business.  The ECT, it is argued, has no applicability to this situation, where no foreign capital was invested into Russia.

27.    Fourthly, Russia says the Claimants acquired their shares in Yukos illegally following the collapse of the Soviet Union, and that their investments are not protected by the ECT.  The Tribunal therefore had no jurisdiction, and in any event the Awards are contrary to Dutch public policy which does not permit the Claimants to benefit from their own wrong.  Russia alleges four categories of wrongdoing by the Individuals, said to be closely related to their ownership and control of the Claimants, taking the form of illegal acquisition of Yukos by the Individuals, by tax evasion and obstruction of justice.  Russia argues that the Hague Court of Appeal was wrong to hold:

   i)    that the Claimants' investments in Yukos were *prima facie* protected by the ECT notwithstanding these allegations of wrongdoing (which it did not determine): Russia says it cannot have been the intention of the contracting states to confer protection on illegal investments, noting that the purposes of the ECT are to promote "*long-term cooperation in the energy field, based on complementarities and mutual benefits*" and "*to strengthen the rule of law*", and citing a statement by the European Commission that "*Investment*" within the ECT includes all investments "*made in accordance with the applicable law and the domestic law of the host Contract Party*";

   ii)    that there was insufficient link between the Individuals' alleged wrongdoing and the Claimants' acquisition of shares in Yukos: Russia says the Hague Court of Appeal wrongly focused only on the final prior transaction by which the Claimants acquired their shares even though each stage in the chain of transactions was controlled by the Individuals, and even though (according to Russia) the main motivation for incorporating two of the Claimants in Cyprus was to evade tax; and

   iii)    that the alleged unlawful conduct did not justify setting aside the Awards as contrary to Dutch and EU law public policy because it was too distant from the Claimants' acquisition of shares in Yukos.

28.     Fifthly, Russia argues that the Tribunal failed to refer any of the issues in dispute in the arbitration to the relevant Competent Tax Authorities within the meaning of ECT Article 21(5)(b)(i), and therefore exceeded its mandate. The Tribunal accepted that Article 21(5)(b)(i) was engaged, but refused to make such a reference on the basis that any such reference would be "*an exercise in futility*".  The Hague Court of Appeal considered that failure not to be sufficiently serious to justify setting aside the Awards. I should record in this context a specific point made by the Claimants, namely that Russia has chosen *not* to challenge the Hague Court of Appeal's conclusion that Article 21 is not a provision that qualifies Russia's offer to arbitrate, and is therefore incapable of affecting the Tribunal's jurisdiction under the ECT.  On that basis, the Claimants submit that any argument over the precise meaning of Article 21 is academic for the purposes of the Cassation Appeal.

29.     Sixthly, Russia says the Tribunal violated its mandate and was irregularly composed because essential parts of its role were improperly delegated to an informal 'assistant', including the drafting of parts of the Awards.

30.     Seventhly, Russia contends that the Tribunal wrongly overlooked evidence that Yukos used sham companies located in the low tax region of Mordovia in Russia to evade taxes, and that the Hague Court of Appeal proceeded on an incorrect reading of the Awards, the evidence and the parties' consensus in rejecting this argument.

**(2) Procurator General's Opinion**

31.     The evidence includes a sworn English translation of the PG Opinion dated 13 November 2020 relating to the Suspension Application.   The opinion includes commentary on the merits of Russia's substantive grounds of appeal, applying the relevant test for suspension of enforcement under Dutch law.  Throughout this judgment where I refer to documents whose originals are in Dutch, I use the translations provided to the court by the parties.

32.     As regards the level of review and test to be applied, the Procurator General states:

> "3.3 As regards the assessment of the suspension application, therefore, the standard to be applied breaks down into two independent elements of which the suspension court will have to form a picture.  First of all, the court will need to assess the probability of success of the claim for setting aside.  Secondly, the court must balance the parties' interests. I will discuss these two elements in succession.
>
> …
>
> 3.5 Accordingly, the suspension court must exercise reticence in its provisional decision.  A comparison can be made with the test to be applied in assessing whether the leave to enforce an arbitral award should be refused (Article 1063(1) DCCP).  The purpose of that provision, too, is to prevent an arbitral award that might be set aside from being enforced without the court having to conduct an extensive examination to that end.  Article 1063(1) DCCP read[s] as follows:

'1. The president of the District Court may only refuse enforcement of an arbitral award if the award, or the manner in which it was made, manifestly violates public policy or good morals (…)'

It follows from the legislative history of this provision that the examination to be conducted by the president must be 'summary'. The violation of public policy or good morals will need to be *prima facie* evident from the arbitral award. This is also apparent from the use of the word 'manifestly' in the provision quoted. With effect from 1 January 2015, Article 1063(1) DCCP was amended. This amendment was not intended as a substantive change, but was an attempt to express the summary nature of the examination in the legislative text as well. Article 1063(1) (new) DCCP currently read as follows:

'1 The Preliminary Relief Judge of the District Court may only refuse enforcement of the arbitral award if a *summary* examination has led him to conclude that it is *likely* that the award will be set aside on one of the grounds mentioned in Article 1065(1), (…)' (my italics, Advocate General)

3.6 How does the fact-finding court perform the assessment of Article 1066 DCCP? In case law, the assessment of Article 1066 DCCP and that of Article 1063 DCCP are fairly in tandem. For example, in a 1993 judgment, the Groningen District Court used as its point of departure that the assessment of a suspension application must go into the question of 'to what extent the claim to set aside the arbitral award has any probability of success, in which respect the District Court may confine itself to a summary estimation of the probability of success'. The Court of Appeal of The Hague assessed whether the applicant had 'provisionally, had plausibly' that its claim for setting aside had 'a high probability of success'. According to the Court of Appeal, this was not the case because a very complex issue was presented in the setting-aside proceedings that concerned a special situation without precedents. Another aspect taken into consideration was that one of the positions argued by the applicant had already been examined *and* rejected by various arbitral tribunals and a judicial body. The Amsterdam Court of Appeal did consider a suspension application eligible for award, because the arbitral award had not been signed by all arbitrators and a new page had been added to the award after it had been rendered, regarding which it was unclear whether all arbitrators had agreed to it. The Breda District Court granted a suspension application because no reasons whatsoever were stated for a specific division. In these latter two cases, the flaws in the arbitral award could be established in a summary examination.

"3.7 The probability of success of the setting-aside claim should therefore not be examined thoroughly in the context of a

suspension application; only whether the reliance on a setting-aside ground already appears justified at first glance needs to be considered … suspension will only be an option when it is plausible that setting aside will follow, in other words where there is a high probability of setting aside.  There is no reason for the suspension in the event that the grounds put forward for setting aside pertain to a position that was already previously rejected in the proceedings or in the event of a very complex issue that cannot be assessed without thorough examination." (footnotes omitted)

The Dutch Supreme Court set the test out in slightly shorter form in its suspension judgment:

"3.3.2  The suspension application on the basis of Article 1066(2) (old) DCCP is aimed at obtaining a provisional measure. In its decision on that suspension application, the court must make a provisional assessment of the claim for setting aside the arbitral award and, in addition, balance the interests of the parties.  In making this provisional assessment, the court will have to assume that the claim for setting aside can only succeed if a ground for setting aside as referred to in Article 1065 (old) DCCP is present.

If, in the setting aside proceedings, the court in the previous instance has already rendered a decision on the claim for setting aside, the court that decides on the suspension application must take that decision into account.  This entails that in the event that the court in the setting aside proceedings denied the claim for setting aside, the court deciding on the suspension application must observe more restraint than in the case in which the court in the setting aside proceedings has not yet given a decision." (footnotes omitted)

33.  The PG Opinion highlights two further constraints relevant to the suspension decision.

34.  The first concerns statutory restrictions on the powers of the Dutch Supreme Court in relation to the substantive Cassation Appeal itself, imposed by Article 79(1) of the Judiciary (Organisation) Act.  Unlike the Court of Appeal in the Netherlands, which considers cases on a full *de novo* basis, there are significant limits on the Dutch Supreme Court's jurisdiction.  In particular, it has very limited jurisdiction to consider questions of fact as opposed to law.  Questions of foreign law are classified for these purposes as questions of fact.  As a result, the Supreme Court can review the Court of Appeal's decision on questions of Russian law or other questions of fact only to the extent that:

i)  the Court of Appeal's reasoning is internally inconsistent or incomprehensible, for example where the reasoning is based on a logical fallacy such as a *non sequitur*, where the established facts and circumstances allowed one irrefutable conclusion to be drawn, or where the Court of Appeal wrongly assumed that certain facts or arguments compelled or precluded a certain conclusion;

ii)      the Court of Appeal's reasoning contains an obvious mistake; or

iii)     the Court of Appeal failed to address essential arguments advanced by the parties.

35.    The Procurator General notes that in general, complaints about the interpretation of the arbitration agreement are closely related to the facts, which means complaints on findings of fact will not have a high probability of success in cassation proceedings.

36.    Secondly, when ruling on a suspension application the Dutch Supreme Court has to take into account whether reliance on a certain ground of appeal will succeed even following any necessary remittal of the matter to the lower courts.  It is not only the Cassation Appeal whose merits are being provisionally assessed, but the likely end result of the claim were that appeal to be successful.

37.    I refer in more detail later to the Procurator General's opinion in relation to Russia's grounds 1-3, but here give a very brief overview of his provisional assessment of all seven grounds of appeal.  In short, he concluded that none of the grounds of appeal could provisionally be regarded as having sufficient strength as to justify suspension of enforcement of the Awards.

38.    On Ground 1, the Procurator General offers the provisional opinion that "*the existence of separate revocation proceedings with its own time limits indeed indicates that these proceedings must be followed exclusively*" (§ 4.15).  He adds that:

> "I believe that the matter is irrelevant in the context of the assessment of the suspension application, as the issue at hand is not whether fraud is a setting-aside ground … but whether such reliance would have been successful and would have led to the setting aside of the arbitration awards. Nothing can be said on this provisionally, because the Court of Appeal did not assess this matter at all. For that reason as well, it is not provisionally plausible that this part has a high probability of success."

39.    The Procurator General notes that ground 2 concerns complex matters of treaty interpretation, and so is not suitable for provisional and summary examination. In addition, it raises issues of Russian law decided by the Court of Appeal, with the result that "*When examining these complaints, the limits of Article 79(1) Judiciary (Organisation) Act soon come into view, so that their probability of success does not seem high.*"

40.    The Procurator General deals with Grounds 3 and 4 together, noting that "*the issues raised by these parts are complex to such an extent that they are not suitable for a provisional and summary decision within the context of the assessment of the suspension application*".  Both grounds raise issues of interpretation of the ECT.  The Procurator General states that the Hague Court of Appeal discussed these issues and in his view applied the right standard, and concludes that it is not '*provisionally plausible*' that these grounds '*will have a high probability of success*'.

41.    On Ground 5, the Procurator General states that Russia put it in terms of the statutory gateway in Article 1065(1)(c) DCCP, viz that the Tribunal violated its mandate.  The

Procurator General notes that a court should be reticent in its assessment of whether the Tribunal violated its mandate, and there is a careful balance of interests which is the reserve of the fact-finding court, which means cassation appeals on this gateway will not readily succeed. Insofar as Russia makes allegations of bias and deprivation of the right to be heard, the Procurator General states that these have been "*insufficiently elaborated*", and there is not a provisional high probability of success.

42.     As to Ground 6, the Procurator General states of its three sub-complaints that, respectively, there is "*no interest in this cassation complaint*", it is not "*well-founded*", and it is based on a finding of fact which "*in principle, cannot be challenged in cassation*".

43.     The Procurator General considers that Ground 7 lacks a high probability of success because reasons were given by the Hague Court of Appeal, with references to the context in which the Tribunal delivered the Final Awards.

**(3) Suspension Judgment**

44.     I was provided with a sworn English translation of the Suspension Judgment of 4 December 2020. This sets out provisional views on the merits of the Cassation appeal, which I consider in more detail later in relation to Grounds 1 to 3. In very brief overview, the court's provisional assessments were that:

i)      <u>Ground One</u>: the Supreme Court notes the Hague Court of Appeal's reasoning on the different time limits and competent courts under the two procedures, and that the procedural mechanisms would be circumvented by allowing the additional fraud claim to proceed; it concludes that the probability that this complaint will succeed and lead subsequently to setting aside the Awards is not sufficient to justify suspension of the enforcement;

ii)     <u>Ground Two</u>: bearing in mind that Article 79 prevents the Supreme Court from annulling the Court of Appeal's findings as to Russian law, this Ground is assessed provisionally as not having the requisite probability of success to suspend the awards;

iii)    <u>Ground Three</u>: the Court of Appeal provisionally did not incorrectly interpret the ECT, and provisionally its judgment is not incomprehensible;

iv)     <u>Ground Four</u>: the Hague Court of Appeal gave two independent reasons as to why illegal conduct at the time of acquiring Yukos' shares did not lead to a lack of jurisdiction on the part of the Tribunal;

v)      <u>Ground Five</u>: it is not "*plausible*" that Russia suffered a disadvantage because matters were not referred to the Russian tax authorities; as to referrals to the UK and Cyprus tax authorities, the Hague Court of Appeal decided that these were not "*relevant*" tax authorities, a finding not challenged on cassation;

vi)     <u>Ground Six</u>: the Court of Appeal assumed that the assistant had written some of the award, but that does not mean they were involved in the decision-making; and

vii)   Ground Seven: the Court of Appeal provided two grounds on which it based its conclusion, and it cannot be said that the Court of Appeal's judgment did not provide a valid explanation for rejecting Russia's contention that Yukos used low-tax jurisdictions to evade tax.

## (D) RUSSIA'S CLAIM TO STATE IMMUNITY

45.   Russia when acknowledging service of these proceedings indicated that it would dispute the court's jurisdiction to hear the Claimants' claims under the 1996 Act; and (following an extension of time) Russia issued its jurisdiction challenge on 25 September 2015.  Some evidence was served, and Leggatt J on 29 January 2016 gave directions for a hearing listed for November 2016 to determine the jurisdiction challenge.  The parties agreed a list of the issues to be resolved in that connection.

46.   The Stay stayed all proceedings in the case, and set aside the directions given by Leggatt J pending further order of the court following a lifting of the Stay.

47.   Russia relies on section 1 of the State Immunity Act 1978 ("*SIA*"):

> "(1) A State is immune from the jurisdiction of the courts of the United Kingdom except as provided in the following provisions of this Part of this Act."

48.   The Claimants rely on the exception in SIA section 9(1):

> "Where a State has agreed in writing to submit a dispute which has arisen, or may arise, to arbitration, the State is not immune as respects proceedings in the courts of the United Kingdom which relate to the arbitration."

49.   Russia submits that it did not agree in writing to submit the present dispute to arbitration because:

i)   Russia did not ratify the ECT but agreed to apply it provisionally under Article 45(1) to the extent that such provisional application was not inconsistent with Russian law.  The dispute settlement clause in ECT Article 26 is inconsistent with Russian law, which does not permit the arbitration of disputes involving issues of public law or tax.  Russia therefore did not agree to arbitrate;

ii)   the Claimants are not "*Investors*" and their acquisition of Yukos did not involve "*Investments*" within the meaning of ECT Articles 1(6) and 1(7), and there is not a dispute "*between a Contracting Party and an Investor of another Contracting Party*" under Article 26, because the Claimants are shell company proxies for the Individuals and they did not inject any foreign capital into Russia in acquiring Yukos; and

iii)   the Tribunal had no jurisdiction pursuant to ECT Article 21(1), which provides that "*Except as otherwise provided in this Article, nothing in this Treaty shall create rights or impose obligations with respect to Taxation Measures of the Contracting Parties*".  Key issues in the arbitration involved considering whether Russia's actions in assessing and enforcing Yukos' tax liabilities were

legitimate, and the arbitration therefore fell outside the scope of the ECT.   The issues in the Arbitration fall outside the exception provided for in Article 21(5); alternatively, if *prima facie* within that provision, the jurisdiction of the Tribunal was conditional on it referring questions to the relevant tax authorities, which it failed to do.  (Article 21(5) applies the expropriation bar in Article 13 to taxes, but goes on to provide a mechanism for referral of issues to the relevant competent tax authorities whenever an issue arises under Article 13 as to whether a tax constitutes an expropriation or whether a tax alleged to constitute an expropriation is discriminatory.)

50.    It will be obvious that these grounds involve substantial overlap with Russia's challenge to the Award in the Dutch courts.  Arguments (i) and (ii) above are (as the Claimants accept) the same as Russia's Grounds 2 and 3 in the Cassation Appeal.  Argument (iii) overlaps with Ground 5.

51.    It is the Claimants' position that the Dutch Court of Appeal's decision, in substance by reason of issue estoppel, precludes Russia from advancing arguments (i) and (ii) as objections to the jurisdiction of the English court; and (as emerged during oral submissions) that if the English court accedes to that submission and assumes jurisdiction over Russia, then it should make no difference if the Dutch Supreme Court later reverses the Court of Appeal on the relevant issues.  In relation to argument (iii), the Claimants' position is that Russia has not appealed from the Dutch Court of Appeal's decision that the measures imposed on Yukos were not *bona fide* taxation measures, so it would be an abuse of process for Russia to seek to relitigate that issue in this court.

52.    The Claimants propose that the first thing that should take place in this court following listing of the Stay should be a case management hearing to give directions for a hearing to determine which issues Russia is permitted to argue on its jurisdiction challenge; and that *"[i]n light of its findings at that hearing, the Court proceed to resolve the Jurisdiction Application, summarily for issues which [Russia] is precluded from re-arguing and upon a full hearing (or hearings) of the other issues raised in the Jurisdiction Application)"*.

## (E) APPLICABLE PRINCIPLES

53.    Much of the law before me was common ground.  The parties cited authorities relating to both the court's general case management powers under CPR 3.1, and the court's power to adjourn proceedings for the recognition or enforcement of an arbitration award, with or without security, under section 103(5) of the 1996 Act.

54.    As to the legal basis for the Stay and the decision whether or not to lift it, the Claimants submit that:

i)      the court has a general power under CPR rule 3.1(7) to vary the 8 June Order so as to lift the Stay;

ii)     the manner in which that power ought to be exercised necessarily depends on the relevant circumstances in which it was made, namely that (a) the Stay was agreed on the basis that it was to be imposed pending the Hague Court of Appeal decision, and (b) that decision having been made, the Awards have been

reinstated and are presently enforceable (and are being enforced) in the arbitral seat;

iii)   as a result, the substance of the issues now before the court is identical to that which would arise upon a defendant's application for an adjournment under section 103(5).  The question is whether proceedings to enforce an arbitration award in this jurisdiction ought to be put on hold (either generally, or subject to a condition that the defendant put up appropriate security) by reason of an unresolved challenge to that award in the courts of the seat;

iv)   as an alternative to lifting the Stay and allowing proceedings to continue, the court has the power under section 103(5) of the 1996 Act to keep the proceedings in abeyance and to require the provision of security as the price for doing so;

v)   although section 103(5) is a power to "*adjourn*" enforcement proceedings, there is no reason of syntax or principle to treat that wording as being inapplicable where the court is considering whether to continue an existing adjournment rather than whether to impose a new one;

vi)   there is also no significance to be attributed to the distinction between a "*stay*" and an "*adjournment*".  Given that section 103(5) gives effect in English law to the provisions of the New York Convention (which were not drafted with peculiarities of English procedure in mind), it would be inappropriate to adopt a construction which resulted in the applicability of the section being dependent upon the precise procedural route by which the relevant issue of substance happens to come before this court;

vii)   once section 103(5) is engaged (which it is in this case), the court has the power to order security "*on the application of the party claiming recognition or enforcement*" (i.e. the Claimants), and such an application is before the court; and

viii)   alternatively, the court can and should arrive at a position which is materially identical to that which would have arisen on an application under section 103(5): if it concludes that any continuation of the Stay ought (in principle) to be conditional upon the provision of security, then it should (a) lift the Stay; and (b) if requested to do so by Russia, immediately adjourn these proceedings under section 103(5), conditional upon Russia providing appropriate security.

55.   Russia submits that, by reason of its unresolved claim to state immunity, the court's powers under section 103(5) are not available, and indeed for Russia to involve them by seeking an adjournment would be likely to amount to a submission to the jurisdiction.  The correct legal analysis is therefore that the court is exercising its general case management powers in the context of proceedings in which Russia has challenged the jurisdiction based on state immunity.

56.   I consider later, in the context of the power to order security, whether section 103(5) is engaged or not.  For present purposes, however, it is common ground between the parties that the case law on section 103(5) is of assistance at least by way of analogy or

guidance when considering whether or not to lift the Stay on whatever basis that might occur.

57.     Section 103 of the 1996 Act reads:

> **"103.— Refusal of recognition or enforcement.**
>
> (1)   Recognition or enforcement of a New York Convention award shall not be refused except in the following cases.
>
> (2)   Recognition or enforcement of the award may be refused if the person against whom it is invoked proves—
>
> (a)  that a party to the arbitration agreement was (under the law applicable to him) under some incapacity;
>
> (b)  that the arbitration agreement was not valid under the law to which the parties subjected it or, failing any indication thereon, under the law of the country where the award was made;
>
> (c)  that he was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or was otherwise unable to present his case;
>
> (d)  that the award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration or contains decisions on matters beyond the scope of the submission to arbitration (but see subsection (4));
>
> (e)  that the composition of the arbitral tribunal or the arbitral procedure was not in accordance with the agreement of the parties or, failing such agreement, with the law of the country in which the arbitration took place;
>
> (f)  that the award has not yet become binding on the parties, or has been set aside or suspended by a competent authority of the country in which, or under the law of which, it was made.
>
> (3)   Recognition or enforcement of the award may also be refused if the award is in respect of a matter which is not capable of settlement by arbitration, or if it would be contrary to public policy to recognise or enforce the award.
>
> …
>
> (5)  Where an application for the setting aside or suspension of the award has been made to such a competent authority as is mentioned in subsection (2)(f), the court before which the award is sought to be relied upon may, if it considers it proper, adjourn the decision on the recognition or enforcement of the award.

> It may also on the application of the party claiming recognition or enforcement of the award order the other party to give suitable security."

58.     Section 103 reflects Articles V and VI of the 1958 New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards.  The 1996 Act as a whole gives effect to the New York Convention, and comprises an overall scheme for the facilitation of the enforcement of arbitration awards. The scheme reflects a "*pro-enforcement bias*" (*IPCO (Nigeria) Ltd v. Nigerian National Petroleum Corp* [2005] EWHC 726 (Comm), [2005] 1 CLC 613 §§ 9-16 *per* Gross J ("*IPCO*"); *Diag Human SE v. The Czech Republic* [2014] EWHC 1639 (Comm) ("*Diag*") §§ 10-15 *per* Eder J; and *PAO Tatneft v. Ukraine* [2020] EWHC 3161 (Comm) § 72 (Sir Andrew Smith).  A creditor to a New York Convention award "*has a prima facie right to recognition and enforcement*" (*Yukos Oil Company v. Dardana Limited* [2002] EWCA Civ 543, [2002] CLC 1120, per Mance LJ at [10]).  The Claimants point out that by abolishing "*double exequatur*" (the principle that an arbitral award must have been enforced by the courts of the seat in order for it to be enforceable in other jurisdictions), the New York Convention eschews an approach based on automatic deference to the courts of the seat, in favour of one where the award creditor is presumptively entitled to enforcement, unless the award debtor is able to demonstrate that the case falls into any of the specific categories identified in Article V  (which categories are themselves to be construed narrowly: see *Diag* § 12).

59.     The strength of the presumption in favour of enforcement is underlined by the approach underlying the Convention and hence the 1996 Act:

i)      Recognition and enforcement are mandatory, subject only to the stated exceptions (as emphasised in *Gater Assets Ltd v. Nak Naftogaz Ukrainiy* [2007] EWCA Civ 988 § 11 *per* Rix LJ).

ii)     Even where one of the exceptions exhaustively set out in Article V applies, the enforcing court has the power but not the obligation to refuse enforcement (see also *IPCO* § 11).

iii)    Even where there is an unresolved challenge to the award in the court of the seat, Article VI of the NY Convention provides that the enforcing court (a) *"may, if it considers it proper"* adjourn recognition/enforcement; and (b) *"may also … order [the award debtor] to give suitable security"*.  Thus the existence of an extant challenge to the relevant award in the court of the seat is not determinative as to whether there should be an adjournment.

60.     The principles relevant to granting a stay under section 103(5) were summarised by Gross J in *IPCO* at [14]-[15] (references removed):

> "s.103(5) achieves a compromise between two equally legitimate concerns. On the one hand, enforcement should not be frustrated merely by the making of an application in the country of origin; on the other hand, pending proceedings in the country of origin should not necessarily be pre-empted by rapid enforcement of the award in another jurisdiction. Pro-enforcement assumptions are sometimes outweighed by the

respect due to the courts exercising jurisdiction in the country of origin—the venue chosen by the parties for their arbitration.

… the Act does not furnish a threshold test in respect of the grant of an adjournment and the power to order the provision of security in the exercise of the court's discretion under s.103(5). In my judgment, it would be wrong to read a fetter into this understandably wide discretion (echoing, as it does, Art. VI of the New York Convention). Ordinarily, a number of considerations are likely to be relevant:

(i) whether the application before the court in the country of origin is brought bona fide and not simply by way of delaying tactics;

(ii) whether the application before the court in the country of origin has at least a real (i.e., realistic) prospect of success (the test in this jurisdiction for resisting summary judgment);

(iii) the extent of the delay occasioned by an adjournment and any resulting prejudice.

Beyond such matters, it is probably unwise to generalise; all must depend on the circumstances of the individual case. As it seems to me, the right approach is that of a sliding scale, in any event embodied in the decision of the *Court of Appeal in Soleh Boneh v Uganda Government* [1993] 2 Ll Rep 208 *[(*"**Soleh Boneh**"*)]* in the context of the question of security:

'… two important factors must be considered on such an application, although I do not mean to say that there may not be others. The first is the strength of the argument that the award is invalid, as perceived on a brief consideration by the Court which is asked to enforce the award while proceedings to set it aside are pending elsewhere. If the award is manifestly invalid, there should be an adjournment and no order for security; if it is manifestly valid, there should either be an order for immediate enforcement, or else an order for substantial security. In between there will be various degrees of plausibility in the argument for invalidity; and the Judge must be guided by his preliminary conclusion on the point.

The second point is that the Court must consider the ease or difficulty of enforcement of the award, and whether it will be rendered more difficult … if enforcement is delayed. If that is likely to occur, the case for security is stronger; if, on the other hand, there are and always will be insufficient assets within the jurisdiction, the case for security must necessarily be weakened.'"

61.    In assessing the merits of any appeal before the curial court, the English court should exercise its discretion in accordance with the English authorities and the 'sliding scale' set out in *IPCO* and *Soleh Boneh*, which spans '*manifestly invalid*' to '*manifestly valid*'. The question of whether to stay English enforcement proceedings as a matter of English law does not depend on the approach of the curial courts to staying foreign proceedings; rather, it requires the Court to "*exercise [its] discretion in accordance with the English authorities*": see *National Joint Stock Co Naftogaz of Ukraine v Public Joint Stock Co Gazprom* [2019] EWHC 658 (Comm) ("***Naftogaz***") §§ 18-21 (Sir Michael Burton).

62.    My attention was drawn also to further factors that courts have previously considered when exercising the discretion under section 103(5) of the 1996 Act, particularly in the context of prejudice to either party arising from there being parallel proceedings ongoing in the courts of the seat. Again, the parties differ on their relevance and weight in the present case. These factors include:

i)     The risk of inconsistent or conflicting decisions: it has been emphasised several times that "*[i]f possible, the court should avoid the risk of conflicting decisions, which would occur if the English court enforces the award and the [curial] court subsequently decides to set it aside*" (*Travis Coal Restructured Holdings LLC v Essar Global Fund Ltd* [2014] EWHC 2510 (Comm) ("***Travis Coal***") § 73; see also *Stati v Kazakhstan* [2015] EWHC 2542 (Comm) ("***Stati***") § 3; [2015] 9 WLUK 5 [3]; and *AIC Limited v The Federal Airports Authority of Nigeria* [2019] EWHC 2212 (TCC) ("***AIC***") § 54).

ii)    Avoiding inconvenience and inefficacy: for example, a stay was held to be appropriate in Stati in light of "*not only the interests of the parties but the interests of other court users and the efficient use of court resources*", in circumstances where the English proceedings "*may turn out to be unnecessary or may be the subject of duplication*" and may "*result in considerable waste of time and costs*" (§§ 2-5)*.

iii)   Whether there is a significant overlap of issues between the English and the foreign proceedings in the court of the seat, particularly where those issues are more suitable for determination by the curial court. For example, in *Stati* where one issue concerned the interpretation of the SCC arbitration rules and the Swedish courts were the curial courts, this court noted that the English Court "*may very well be assisted by what the [curial] court has to say on those issues*" (§ 3); and in *IPCO* the court stated that "*proper deference, going beyond lip service, must be shown to the pending [curial] proceedings*" (§ 52).

iv)    As well as assessing the difficulty of enforcing the award, consideration may also be given to the difficulty of the Defendant being unable to recover the security it has given if the award is set aside (*IPCO* at § 52). It is for the court to assess the extent of any such prejudice by reference to the evidence before it (*Soleh Boneh* § 52). However, the court does not require detailed evidence as to the existence of assets and their likely dissipation – see, for example (a) *Soleh Boneh*, where security was awarded in the reduced sum of US$5 million against an award of US$29 million; (b) *IPCO*, in which the existence of assets within the jurisdiction was assumed from the claimants' trading activities (§ 52(vi)); and (c) *AIC*, in which the possible (but disputed) existence of third-party debtors led to the conclusion that the court was "*not satisfied*" that "*there are no assets*"

*within the jurisdiction*" for enforcement purposes.  Despite only having limited evidence, the court in *AIC* considered it was "*more than likely*" that there were assets (in the form of debtors) (§ 51).

v)      Delay in enforcing the award is an important factor (see, e.g., *Dowans Holding SA v. Tanzania Electric Supply Co Ltd* [2011] EWHC 1957 (Comm) ("**Dowans**") § 46 referring to the "*considerable delay*" in *Soleh Boneh*). *Dowans* also indicates that the relevance of delay is not dependent upon establishing that it is the intended consequence of a deliberate step (§ 47).  In *Travis Coal*, the relatively short period of delay pending resolution of the challenge before the New York courts was one of the factors which persuaded the court to grant an adjournment on terms that security be provided in the full amount of the award.  One way of assessing the level of prejudice is the amount of interest on the award (for example, the remarks of the High Court in *AIC* at [45], and of Burton J in *Naftogaz* at [2]).

vi)     When considering any prejudice to the claimant, an award of interest can "*both act as an incentive for the Defendant to cooperate in speedy resolution and as some substantial compensation for the claimant*" (*Naftogaz* § 22).

vii)    However, entitlement to such interest is not necessarily an answer to any prejudice caused by delay.  Russia refers to *Prifti v Musini Sociedad Anonima de Seguros y Reaseguros* [2005] EWHC 832 (Comm) ("**Prifti**"), a non-arbitration case where Christopher Clarke J did not regard delay in payment as a ground for refusing a stay, given that the relevant party if successful would recover interest, and simple interest would be sufficient compensation for the delay (§§ 29-30).  In *Reichhold Norway ASA v Goldman Sachs International* [2000] 1 WLR 173 ("**Reichhold**") (stay of proceedings pending arbitration), Lord Bingham MR quoted with apparent approval the first instance judge's statement that

"the only prejudice which Reichhold is likely to suffer if this action is stayed is a delay of about a year. Since delay of that kind can be compensated by an award of interest if Reichhold is ultimately successful, that might be considered a small price to pay for the prospect of avoiding complex and costly litigation." (p.181)

On other hand, in the arbitration enforcement case *IPCO* Gross J said:

"Given the size of the award, it may be inferred that any delay in enforcement is likely to prejudice IPCO. Very few commercial entities would not be prejudiced by delay in the availability of US$152 million. It must be right to seek to minimise any such prejudice, so far as it is practicable and appropriate to do so." (§ 52(v))

Similarly, in *Continental Transfer Technique v. Nigeria* [2010] EWHC 780 (Comm) Hamblen J said "*given the very large amounts at stake, it is apparent that any delay in being able to obtain the fruits of the judgment is likely to cause significant prejudice*" (§ 28).

Thus a right to interest can be viewed as merely a quantification of one form of prejudice which the award creditor suffers as a result of delay to payment of its award.

63.   In assessing prejudice, *"[t]he comparison must be between the position of the would-be enforcing party if he were allowed to enforce immediately, and his position if any steps by way of enforcement were delayed as a result of the grant of an adjournment"*: *Dowans* § 49 (Burton J).  Prejudice is not limited to enforcement against assets in England (ibid. § 50).

64.   Though their relevance is disputed for the reasons considered later, it is convenient to refer here also to the principles applicable where the court exercises its power to grant a stay pursuant to its general case management powers under the CPR.

65.   The approach applying standard case management considerations would be to lift the Stay "*if that is in accordance with the overriding objective (CPR 1.1) and if it is in accordance with the requirements of justice*": *King Felix Sunday Bebor Berebon & Ors v The Shell Petroleum Development Company of Nigeria* [2017] EWHC 1579 (TCC) § 48.

66.   A case management stay may be justified where there are related parallel proceedings in a foreign jurisdiction: see e.g. *Unwired Planet International Ltd v Huawei Technologies (UK) Co Ltd* [2020] UKSC 37 § 99 *per* Lord Reed:

> "The English courts have wide case management powers, and they include the power to impose a temporary stay on proceedings where to do so would serve the Overriding Objective: see CPR 1.2(a) and 3.1(2)(f).  … A temporary stay may be ordered where there are parallel proceedings in another jurisdiction, raising similar or related issues between the same or related parties, where the earlier resolution of those issues in the foreign proceedings would better serve the interests of justice than by allowing the English proceedings to continue without a temporary stay [see *Reichhold Norway ASA v Goldman Sachs International* [2000] 1 WLR 173.  But this would be justified only in rare or compelling circumstances …"

67.   Factors identified in the cases as justifying a case management stay in the context of parallel proceedings include the following:

i)    The risk of inconsistent decisions in proceedings in different jurisdictions is "*always capable of amounting to a very strong reason for granting a stay, as the cases … show and emphasise*": *Bundeszentralamt v Heis* [2019] EWHC 705 (Ch) § 113; *Ferrexpo AG v Gilson Investments Ltd* [2012] EWHC 721 (Comm) § 155.

ii)   The "*costs and inconvenience of duplicated proceedings*" to the parties, the court and other court users may favour a stay: *Citigroup Global Markets Ltd v Amatra Leveraged Feeder Holdings Ltd* [2012] EWHC 1331 (Comm) § 76; *Reichhold* at p.182; *Department of Trade and Industry v British Aerospace plc and Rover Group Holdings plc* [1991] 1 CMLR 165 §§ 12-13.

iii)   The existence of issues that are more appropriate for determination in the foreign proceedings is a factor favouring a stay.  For example:

   a)   In *Bundeszentralamt*, Hildyard J granted a stay pending parallel litigation in Germany involving issues of systemic importance to German law, holding that:

      "[T]he 'potential disaster from a legal point of view', as in *The El Amria* … Brandon LJ (as he then was) described the risk of inconsistent decisions in concurrent proceedings in different jurisdictions, is the more acute when in one of the jurisdictions the issue is a systemic one, or may be decided in a manner which has systemic consequences." (§ 116)

   b)   In *Department of Trade and Industry v British Aerospace plc*, the validity of a decision of the EC Commission was regarded as more appropriate for determination by the CJEU than by the English court (§§ 12-13).

   c)   In *Prifti* it was held to be "*inherently inappropriate*" for the English court to determine questions of Spanish law bearing on the validity of the first instance Spanish judgment while a Spanish appeal remained pending (§ 22).

iv)   A stay is more likely to be appropriate where there is a greater degree of overlap of issues between the English proceedings and the foreign proceedings, or where the foreign proceedings are likely to be determinative of all or part of the English proceedings: *Department of Trade and Industry v British Aerospace* §§ 12-13; *Prifti* §§ 21 and 34.

v)   The grant of a stay is more likely where any prejudice to the party resisting a stay can adequately be compensated by an award of interest, or is outweighed by the prejudice which would be caused by refusing a stay: *Prifti* § 34; *Reichhold* p.181 (see § 62.vii) above).

## (F) OVERVIEW OF THE PARTIES' SUBMISSIONS

### (1) Lifting the Stay

68.   The Claimants submit that the Stay should be lifted because (in outline):

   i)   The New York Convention and the 1996 Act are pro-enforcement.  The Stay was in place until the Hague Court of Appeal judgment.  That judgment has been handed down, and the awards can be and are being enforced in the arbitral seat.

   ii)   The Claimants have suffered and continue to suffer prejudice by being kept out of their very substantial Awards for an extended period of time.

   iii)   Russia has taken a public stance of refusing to pay the Awards.  It has a history of non-payment of previous awards against it relating to Yukos, including non-payment of just satisfaction awarded by the European Court of Human Rights.

It has also sent *notes verbales* to the Governments of France, Belgium and the United States threatening diplomatic measures if the Awards were enforced by their states' courts. The Claimants submit that Russia "*will stop at nothing to avoid paying the Awards*", and so "*would be unlikely to have any reservations about taking steps to dissipate or conceal assets, so as to render them immune from enforcement*". Extending the Stay would give it a further opportunity to do so.

iv)     Russia's prospects of success in the Cassation Appeal are slim, though the Claimants accept it is not manifestly bound to fail. This is indicated by the refusal to stay enforcement of the Awards in the Netherlands, and what the Claimants describe as the structural difficulties with Russia's appeal (arising in part from the limited scope of review by the Dutch Supreme Court) and the breadth of issues on which it will need to win.

v)      As Russia has no intention of paying the award, it cannot be said that the Cassation Appeal is truly for the purpose of discovering its legal obligations in good faith. The appeal is therefore not brought *bona fide*, and is a delaying tactic.

vi)     Though there is a risk of inconsistent judgments, that will inevitably arise in these types of circumstances and is not prohibited by the New York Convention. Further, Russia has in correspondence refused to accept that it will consider itself bound by the findings in the Cassation Appeal for the purpose of the present proceedings here. In essence, it is reserving its right to argue *for* inconsistent judgments at a later date.

69.   Russia submits in outline as follows:

i)      Its Cassation Appeal has at the very least a real prospect of success. The test for staying enforcement in Dutch law is 'obvious error' in the appealed judgment. The Procurator General said a stay would only be justified in the Netherlands if there were a 'considerable likelihood' the Awards would be set aside; and found that four of Russia's grounds of appeal involved questions too complex to be assessed at the preliminary stage (Grounds 1-4). That is a different test to the one I have to apply. Further, the fact the Cassation Appeal was declared admissible indicates that it has some merit.

ii)     The Cassation Appeal is not simply a delaying tactic. It has reasonable prospects of overturning the Awards, and Russia is seeking in good faith to pursue its legal remedies in the Netherlands. Moreover, Russia's grounds of appeal raise a number of legal issues of first impression for the Dutch Supreme Court, including novel and important questions of Dutch procedure, Dutch public policy and the interpretation of various provisions of the ECT. Since EU law requires a uniform interpretation of the ECT, these novel points may merit a preliminary reference to the CJEU. The Paris Court of Appeal in parallel proceedings between the parties raised of its own motion the prospect of referring eight questions to the CJEU, which overlap substantially with Grounds 2, 3, 4 and 5 of Russia's appeal to the Dutch SC (although the Claimants then withdrew those proceedings and no reference was made).

iii)    Russia's second ground of appeal has already been accepted by an experienced panel of three judges in the Hague District Court, which found in Russia's favour that there was no valid arbitration agreement pursuant to Article 45(1) of the ECT.  The interpretation of that provision has now been determined on three occasions in these proceedings – by the Tribunal, the Hague District Court, and the Hague Court of Appeal – and on each occasion a different interpretation has been adopted.  Russia has at least a real prospect of persuading the Dutch Supreme Court to adopt the same approach as the Hague District Court, and that alone would be sufficient to overturn the Awards.

iv)    Russia's jurisdiction challenge under SIA section 1 still remains to be determined.  The arguments it will advance in the Cassation Appeal overlap substantially with its English jurisdiction application.  This is inefficient and creates a risk of inconsistent judgments on the same issues.  The validity of the Awards is more appropriate for the curial courts to decide, and for the English court to decide before the Dutch Supreme Court on the Awards' validity would raise serious issues of comity.

v)    It appears that the Claimants will argue that all three grounds of Russia's challenge to jurisdiction are barred by issue estoppel arising out of the Hague Court of Appeal judgment.  If the Stay is lifted, there is a real risk that Russia will be precluded from advancing part of its immunity case based on the decision of the Hague Court of Appeal, which is liable to be overturned by the Dutch Supreme Court.  If that were to happen, Russia's justified immunity before this court would have been removed on a false basis, which would cause Russia to suffer irremediable prejudice if (as may be the case) that immunity can no longer be restored.

vi)    If enforcement of the awards is granted in England and then the Awards are overturned, Russia will be unlikely to be able to recover any moneys paid.  The Claimants are part of a complex offshore structure in opaque jurisdictions, and there is a real risk of dissipation by the Claimants.

vii)    There is no significant delay.  The Cassation Appeal judgment is likely to be handed down at the end of 2021 or beginning of 2022.  Any reference to the CJEU will extend the proceedings to late 2024 or early 2025, but a reference will indicate Russia's appeal has significant merit.  In any event, interest would be sufficient compensation for the delay.

viii)    Russia has been on notice of these proceedings for six years.  It has had ample time to dissipate any assets but has not done so.  There is no risk of dissipation.  Russia intends to fight these awards using all *legal* means. There is no intention not to pay, if that is what is required by law.  The *notes verbales* contain no intention to dissipate assets, and were a proportionate response to attachment of diplomatic assets and premises, not to enforcement *per se*.

**(2) Security**

70.    The Claimants confirmed that, in the alternative to the lifting of the Stay, they seek security only under section 103(5) of the 1996 Act (as opposed to the CPR).  They submit, briefly, that:

i)  The court has jurisdiction to require security under that provision because these are proceedings under the 1996 Act, within which there is a question about state immunity. Section 103(5) is a form of case management power, using which the court would decide when to have that argument about state immunity.  An adjournment with security under section 103(5) would not violate Russia's sovereign immunity, because such an order is not akin to an order mandating money be paid into court, or to a freezing injunction: it would simply state the price of the Stay or adjournment continuing.  That would not limit Russia's access to this court or assertion of immunity.

ii)  Security should be imposed as 'the price of the Stay', for essentially the same reasons as the Claimants give for lifting the Stay, in order to protect the Claimants' legitimate interests and to give effect to the principles underlying the New York Convention and the 1996 Act.

iii)  If the court lacks the power to order security, so that one compromise which the court could normally arrive at between enforcement and awaiting the outcome of the challenge in the curial court is unavailable, then that should be a factor in favour of lifting the Stay.

71.  Russia submits, in outline, as follows:

i)  Russia's assertion of state immunity is a threshold issue, to be decided before any part of the substantive action can proceed, including making an order for the provision of security.  Whether Russia is immune from suit is a prior question to whether the section 103(5) power arises at all.

ii)  Russia has not so far challenged the recognition or enforcement of an arbitration award.  It has only asserted immunity.  There is thus no relevant challenge for the purpose of section 103(2)(f), which is a threshold condition for the application of section 103(5).

iii)  Further, in the circumstances of the present case a requirement for security under section 103(5) would (by reason of the issue estoppel point) in substance make security the price for the hearing of a properly arguable challenge, as opposed to merely the price of an adjournment.  The authorities make clear that the provision cannot be used in that way.

iv)  In any event, the court should not order security even if it has jurisdiction to do so for the same reasons it should not lift the Stay.  The Cassation Appeal is not an abuse of process, and has a real prospect of success.  A continued stay would not make enforcement more difficult or be prejudicial to the Claimants.  On the contrary, the lifting of the Stay would result in an inappropriate opportunistic advantage for the Claimants.

## (G) WHETHER THE STAY SHOULD BE LIFTED

### (1) Realistic prospect of success

72.   I begin by considering whether Russia's grounds of challenge to the Award in the Cassation Appeal have a realistic prospect of success, focussing in particular on Grounds 1 to 3.

### *(a) Ground 1: fraud on Tribunal*

73.   Russia contends that it came to light in 2016, after the Hague District Court had set aside the Award, that the Claimants had made secret payments to one of their key witnesses of fact (Dr Andrei Illarionov) in exchange for giving evidence in the arbitration, and that the Claimants had withheld documents that the Tribunal had ordered be disclosed.  Russia contends that the Awards should be set aside under Article 1065(1)(e) DCCP, which provides that an award may be set aside where "*the award, or the manner in which it was made, violates public policy*".  Article 1065 is part of the section of the Code dealing with enforcement of arbitration awards.  Article 1064 states that:

> "1   Only the legal remedies of setting aside and revocation pursuant to this section are available against a full or partial final award that is not subject to arbitral appeal or that has been made on arbitral appeal.
>
> 2  A claim for setting aside will be presented to the District Court at whose registry the original of the award must be filed in accordance with Article 1058(1).
>
> 3 A party may present a claim for setting aside as soon as the award has acquired res judicata effect. The right to do so lapses three months after the day the award was filed at the registry of the District Court. If, however, the award with leave for enforcement is served on the other party, then that party may, notwithstanding the expiry of the time limit of three months mentioned in the previous sentence, still present a claim for setting aside within three months of such service.
>
> …".

74.   Article 1065 as a whole provides:

> "1  Setting aside of the award can take place only on one or more of the following grounds:
>
> a. absence of a valid arbitration agreement;
>
> b. the arbitral tribunal was constituted in violation of the applicable rules;
>
> c. the arbitral tribunal has not complied with its mandate;

> d. the award is not signed in accordance with the provisions of Article 1057 or does not provide reasoning;
>
> e. the award, or the manner in which it was made, violates public policy or good morals.
>
> 2   The ground referred to in paragraph (1)(a) above cannot constitute a ground for setting aside in the case referred to in Article 1052(2).
>
> 3   The ground referred to in paragraph (1)(b) above cannot constitute a ground for setting aside in the cases referred to in Article 1052(3).
>
> 4   The ground referred to under c of the first paragraph, cannot lead to the setting aside if the party invoking this ground took part in the proceedings without putting this forward, even though it was known to it that the arbitral tribunal did not comply with its mandate.
>
> 5   If the arbitral tribunal has made an award in excess of, or different from, the relief sought, the arbitral award will be partially set aside, insofar as that which is in excess of or different from the relief sought may be separated from the remaining part of the award.
>
> 6   If and insofar as the arbitral tribunal has not rendered judgment on one or more matters presented to it, the claim for setting aside on the ground referred to in paragraph (1)(c) above will be admissible only if an additional award referred to in Article 1061(1) has been made, or the request for an additional award referred to in Article 1061(1) has been wholly or partially denied.
>
> 7   At variance with the provisions of the second sentence of Article 1064(3), the time limit for presenting a claim for setting aside referred to in the preceding paragraph will expire three months after the day of the filing at the registry of the District Court of the additional award or of the copy of the notice of denial referred to in Article 1061(5)."

75.   Article 1065(1)(e) appears to reflect the provision in Article V.2(b) of the New York Convention, pursuant to which recognition and enforcement of an award may be refused if the competent authority in the country where recognition and enforcement is sought finds that *"[t]he recognition or enforcement of the award would be contrary to the public policy of that country"*.

76.   Article 1066 provides *inter alia* that:

> "1   The claim to set aside does not suspend the enforcement of the award.

> 2 However, the court which decides on a claim to set aside may, at the request of any party, if there are grounds to do so, suspend enforcement until a final decision has been made on the claim to set aside.
>
> …
>
> 5 In the event that the request is granted, the court may order the petitioner to provide security. In the event that the request is rejected, the court may order the other party to provide security.
>
> …"

77.    Article 1068 provides *inter alia* that:

> "1 Revocation can only take place on one or more of the following grounds:
>
> a. the award is wholly or partially based on fraud discovered after the award was made and committed during the arbitral proceedings by or with the knowledge of the other party;
>
> b. the award is wholly or partially based on documents which, after the award was made, are discovered to have been forged;
>
> c. after the award was made, a party obtains documents which would have had an influence on the decision of the arbitral tribunal and which were withheld as a result of the acts of the other party.
>
> 2 A claim for revocation will be brought before the Court of Appeal that would have jurisdiction to decide on the setting-aside claim on appeal, referred to in Article 1064, with analogous application of Article 1064(3) or, if the resulting date is later, within three months of the fraud or forgery of documents becoming known or of the new documents being obtained by a party. ...
>
> 3 If the court finds the ground or grounds for revocation presented to have merit, it will set aside the award in whole or in part. ..."

78.    The Hague Court of Appeal declined to consider or determine the substance of Russia's fraud allegation, instead rejecting this argument on a point of Dutch procedure.  It held that allegations of a fraud on the Tribunal were inadmissible in the existing set-aside proceedings under Article 1065(2)(e), and could be advanced only by bringing new revocation proceedings under Article 1068.  It appears such proceedings would now be out of time.  The Procurator General summarised the Hague Court of Appeal's decision on this point as being that both the applicable time limits and the exclusive jurisdiction of the Court of Appeal would be circumvented if an allegation of fraud were nonetheless put forward in setting-aside proceedings.

79.     Russia contends that the Hague Court of Appeal was wrong on the basis that:

i)      a fraud on the Tribunal is a serious violation of public policy which merits setting aside the award, and therefore falls within Article 1065(1)(e), a proposition said to be supported by Dutch authority  and by the approach of a number of other legal systems;

ii)     there is a well-established principle of Dutch law that, where two statutory remedies are on the face of it capable of applying to the same facts, a party is free to choose between them unless the contrary is explicitly stated or follows inevitably from their meaning and effect; and

iii)    the Hague Court of Appeal's approach would have required Russia to bring new proceedings under Article 1068, even though evidence of the Claimants' fraud was not uncovered until Russia's existing proceedings to set aside the Awards under Article 1065 were already underway and had succeeded at first instance. Indeed, because the Hague District Court had at that stage already set the Award aside, there was arguably no extant Award in relation to which an Article 1068 revocation application could be commenced.

80.     The Procurator General, applying the standard referred to in § 32 above, formed the provisional view that the existence of a separate revocation procedure with its own time limits indicated that it must be followed exclusively.   The Supreme Court similarly, and applying the same standard, formed the provisional assessment that Russia's prospects of success on this point were not such as to justify suspension of the Award.

81.     This is an issue of Dutch procedural law, on which this court should be particularly reluctant to express a view, particularly when a Dutch court has already reached a conclusion on the point.  It is nonetheless necessary to form a provisional view of the appeal's prospects, as part of the process of deciding whether or not to lift the Stay.

82.     The evidence of Russia's witness on Dutch law, Mr Meijer, is that:

"many previous judicial decisions by the Dutch Supreme Court, the Parliamentary history of both the DCCP and the Dutch Civil Code, and a number of leading commentaries, when the Dutch legal system provides for two or more alternative statutory remedies, the party seeking to rely on the relevant remedy – whether claimant or defendant – is free to choose between them unless "exclusivity" is explicitly stated in these statutory provisions or follows inevitably from their purport."

83.     One can envisage a counter-argument being made to the effect that the separate *fora* and timetables provided for in Articles 1065 and 1068 do "*inevitably*" lead to the conclusion that they provide for exclusive remedies.  At the same time, it seems possible that the Dutch Supreme Court will conclude that (i) Article 1065 parallels (and may be designed to implement) Articles IV and V of the New York Convention, an international treaty, and (ii) it would therefore be inappropriate to treat circumstances that would fall within Article V.2(b) of the New York Convention (*"[t]he recognition or enforcement of the award would be contrary to the public policy of that country"*) as nonetheless not constituting grounds for refusal of recognition or enforcement under

the corresponding provision in Article 1065.  The Supreme Court might also form the view that during a period when an award has, as in the present case, been set aside by the court of the seat of the arbitration – here, the Hague District Court – the remedy under Article 1068 is unavailable, with the result that a party can on appeal from that court's decision rely in the alternative on all available grounds under Article 1065. With all due diffidence when attempting to assess the effect of another country's procedural provisions, and giving full weight to the Hague Court of Appeal's decision, I conclude that (applying the English law standard for stays/adjournments summarised earlier) Russia's appeal on this issue should be regarded as having a realistic prospect of success.

*(b) Ground 2: lack of jurisdiction under ECT Article 45*

*(i) Article 45*

84.   Russia has signed but not ratified the ECT.  ECT Article 45(1) provides that in these circumstances:

> "Each signatory agrees to apply this Treaty provisionally pending its entry into force for such signatory in accordance with Article 44, to the extent that such provisional application is not inconsistent with its constitution, laws or regulations."

85.   Russia argues that the investor-state dispute settlement provision in ECT Article 26, pursuant to which the Claimants' arbitration claims were brought, is inconsistent with Russian law for a number of reasons, including because Russian law does not permit arbitration for disputes involving issues of public law or taxation.

86.   The Hague District Court accepted that argument, rejecting the Tribunal's view that Article 45 requires signatory States to apply the whole of the ECT unless the concept of provisional application of an unratified treaty is itself inconsistent with their constitution, law or regulations.  The Hague District Court considered that Article 45 aims to achieve a balance between giving effect to the ECT and respecting national constitutional arrangements for the ratification of treaties.  The court also had regard to Article 45(2), which provides:

> "(2) (a)  Notwithstanding paragraph (1) any signatory may, when signing, deliver to the Depository a declaration that it is not able to accept provisional application. The obligation contained in paragraph (1) shall not apply to a signatory making such a declaration. Any such signatory may at any time withdraw that declaration by written notification to the Depository.
>
> (b)  Neither a signatory which makes a declaration in accordance with subparagraph (a) nor Investors of that signatory may claim the benefits of provisional application under paragraph (1).
>
> (c)  Notwithstanding subparagraph (a), any signatory making a declaration referred to in subparagraph (a) shall apply Part VII provisionally pending the entry into force of the Treaty for such signatory in accordance with Article 44, to the extent that such

29

provisional application is not inconsistent with its laws or regulations."

87.    Part VII of the ECT, referred to in Article 45(2)(c), deals with ECT structure and institutions, including (for example) provision for signatory states to participate in Energy Charter Protocols and Declarations in order to pursue the objectives and principles of the ECT.   Article 45(2)(c) arguably envisages that the provisional application of part only of the Treaty may be consistent with a signatory state's constitution, laws or regulations.  Such a possibility would sit uneasily with the notion that *"such provisional application"* refers solely to the situation where provisional application of an unratified treaty is *per se* inconsistent with national law.  Moreover, the words *"to the extent"* in their natural meaning imply that, for any given signatory state, provisional application may be inconsistent with national law in some instances but not in others.

88.    The Hague District Court also noted that whereas Article 45(1) refers to inconsistency with a state's *"constitution, laws or regulations"*, Article 45(2)(c) refers only to the state's *"laws or regulations"*.   It considered it inconceivable that a ban on the provisional application of a treaty at all, given its fundamental nature, would be laid down in delegated legislation.

89.    The Hague Court of Appeal, reversing the Hague District Court, did not support the Tribunal's approach but instead concluded that Article 45(1) required Russia to apply the ECT provisionally "*except to the extent that provisional application of one or more provisions of the ECT is inconsistent with national law in the sense that the laws or regulations of that state preclude provisional application of the Treaty for certain treaty provisions (or types or categories of provisions)"* (§ 4.5.33).   The Hague Court of Appeal indicated that it favoured the Claimants' alternative position on Article 45 (Judgment § 4.5.33), which was that:

        "even if it should be assumed that the Limitation Clause does not relate to the principle of provisional application, the question is in any event whether the provisional application of one or more provisions of the ECT is incompatible with national law, not whether any provision of the ECT is in itself inconsistent with national law." (as recorded in § 4.5.4).

90.    It thus appears that on the Hague Court of Appeal's approach, the application of Article 45 depends on *"whether there are provisions of national law that exclude the provisional application of certain (categories or types of) treaty provisions"* (Judgment § 4.5.12) or, in other words, *"what the national rules on provisional application of treaties are … and to what extent they preclude provisional application of the ECT"* (§ 4.5.27).  Hence, the Hague Court of Appeal noted:

        "If national law makes provisional application of certain types of treaty provisions impossible, this leads to a limited provisional application, specifically to the extent that the provisions of the treaty are not covered by that prohibition.  This interpretation is also in accordance with the words 'regulations' in 'constitution, laws or regulations'.  A large number of states with a variety of legal regimes and legal traditions are party to the ECT.  It

> certainly cannot be excluded in advance that rules that exclude certain (categories of) treaty provisions from provisional application may (in any case in part) be found in regulations of a lower hierarchy than a statute adopted by parliament, for example in (lower) regulations based on such a statute.  Until recently, an example of this could be found in Spanish law, where the provisional application of treaties was regulated by a Decree of the Minister of Foreign Affairs until 2014." (§ 4.5.13)

91.    Russia contends on this issue that the correct interpretation of Article 45 is that it requires states to apply only such provisions of the ECT as are not inconsistent with their national law.  It argues that:

    i)     that interpretation is consistent with the wording of Article 45(1), whereas the Hague Court of Appeal's approach involves reading into Article 45(1) a reference to 'specific categories of treaty provision' that is not found in the text;

    ii)    the Hague District Court's interpretation gives the words "*to the extent that such provisional application is not inconsistent with …*" a consistent interpretation as between Articles 45(1) and 45(2), where the same words are repeated in identical form; by contrast, the Court of Appeal's  approach requires those words to be given a different meaning in these two consecutive sub-clauses of Article 45; and

    iii)    the interpretation favoured by the Hague District Court is also consistent with the purpose of Article 45, namely to achieve a balance between giving effect to the ECT and respecting national constitutional arrangements for the ratification of treaties.  That principle is supported by the drafting history and state practice in relation to this provision.  By contrast, the Hague Court of Appeal's interpretation would result in Russia being bound by the Article 26 dispute settlement provision even if that provision is inconsistent with Russian law.

92.    The Procurator General, applying the standard referred to in § 32 above, said on this issue that:

> "… this element of the ground for cassation concerns a complex matter of interpretation of a treaty provision.  This matter is not suitable for a provisional and summary examination in the context of the assessment of this suspension application."

93.    The Supreme Court did not make any provisional assessment of this issue, because it (provisionally) considered it unnecessary to do so in the light of the second issue discussed below.

94.    Were the Dutch Supreme Court to conclude, on considering the matter fully, that this issue does need to be addressed, then in my view there is a realistic prospect that it would conclude that Russia is correct.  It appears well arguable that it is too narrow an interpretation of Article 45(1) to conclude that it requires non-ratifying signatory states to apply ECT provisions save only when inconsistent with the specific parts of the state's national legal order that deal with provisional application of treaties.  Such an approach would appear to exclude reliance on other parts of the state's national law,

including its substantive legal provisions and its constitutional arrangements for the regulation of matters arising between citizens and the state.  It is arguable that such an approach would not adequately give effect to the balance to which the Hague District Court referred.

95.    The Hague Court of Appeal accepted a submission by the Claimants that Russia's interpretation of Article 45 was inconsistent with its natural meaning:

> "4.5.11 … HVY rightly point out that in the interpretation of the Russian Federation and the District Court the words 'such provisional application' have no meaning, or a meaning other than that which follows from the ordinary meaning of these words.  According to the Russian Federation, the question is whether one or more treaty provisions are inconsistent with national law.  If the contracting parties had intended this, it would have been obvious that the Limitation Clause [Article 45] would have read: "to the extent that one or more provisions of this Treaty are not inconsistent with its constitution, laws or regulations", but this is not how the Limitation Clause reads. The wording of the Limitation Clause, as it does read, clearly indicates that the issue is whether 'such provisional application' is irreconcilable with the law of a contracting party.
>
> 4.5.12   The alternative statement of HVY concerning the interpretation of the Limitation Clause is that the question is whether the *provisional application* of any provision of the ECT is incompatible with a rule of national law, not whether any provision of the ECT is in itself inconsistent with national law. According to HVY, it should be examined whether there are provisions of national law that exclude the provisional application of certain (categories or types of) treaty provisions. HVY refer in this respect to the opinions of Professor Schrijver, Professor Klabbers and Professor Pellet, who remark that some countries exclude the provisional application of treaties altogether, but that it is also possible that the exclusion of provisional application relates only to certain types of treaty provisions…" (emphasis in original)

and the Hague Court of Appeal went on to accept that alternative construction.

96.    However, it might cogently be argued that the words "*such provisional application*" in the second sub-clause of Article 45(1) are used simply as a matter of drafting convenience to refer back to the concept set out in the first sub-clause of each signatory applying the ECT provisionally pending its entry to force: rather than entailing some kind of particular focus on the *provisional* nature of the application of the treaty.  On that basis, the preceding words *"to the extent"* would naturally be capable of referring to the position where one treaty provision is inconsistent with (any aspect of) the signatory state's national law even if another treaty provision is not.  It is true that the wording could instead have been *"to the extent that one or more provisions of this Treaty are not inconsistent with its constitution, laws or regulations"*, but there is no obvious reason why the wording actually used achieves any different result.

97.     The Hague Court of Appeal also expressed concern that Russia's approach might give rise to uncertainty, in circumstances where provisional application could continue for years (§§ 4.5.26 and 27).  However, a counter-argument might be made that where a state has not yet ratified the treaty, a degree of uncertainty is inherent in (and a price which has to be paid for) the ECT's arrangements for provisional application.

98.     I would therefore conclude that Russia would have a realistic prospect of success on this issue.

*(ii) Consistency with Russian law*

99.     The second issue arises from this ground of challenge because the Hague Court of Appeal went on to consider, in the alternative, whether Russia's arguments would succeed even if the court were wrong about the interpretation of Article 45.  The Claimants contend, drawing support from passages in the provisional assessments of the Procurator General and the Dutch Supreme Court's suspension decision, that the Hague Court of Appeal's conclusions on this second issue concern matters of Russian law and are thus not susceptible to challenge in the Dutch Supreme Court (see § 34 above).  The second issue itself includes two aspects.

100.    The first aspect ("*public law nature*") is that the Hague Court of Appeal concluded that a dispute between a foreign investor and the host country is not of a public law nature, therefore Russia's point that Russian law does not permit arbitration of public law matters, only civil disputes, did not assist it (§ 4.7.35).  Russia's cassation document makes the point that that conclusion was based on academic sources considering international investment treaties with arbitration clauses; it contends that the argument is thus circular, since it assumes that the Claimants' dispute is arbitrable under ECT Article 26, that being the matter to be decided (§ 66).

101.    The second aspect ("*inconsistency*") is that the Hague District Court concluded that even if the dispute were of a public law nature, international arbitration under Article 26 is not 'inconsistent' with Russian law.  In reaching that view, the Court of Appeal took as its *"point of departure"* that:

> "the meaning of the term 'inconsistent' should be interpreted as any case where a treaty provision and a specific rule of national law cannot be simultaneously applicable because application of one rule constitutes a violation of the other, and that a possible other inconsistency depends on the context (see para. 4.5.48)." (§ 4.7.33)

102.    On that basis, the Hague Court of Appeal found there to be no inconsistency:

> "Article 26 ECT provides for international arbitration in accordance with the UNCITRAL rules in investment disputes related to violation of the rules of the ECT.  An arbitral tribunal appointed pursuant to Article 26 ECT should decide a dispute put before it "in accordance with this Treaty and applicable rules and principles of international law".  It cannot be seen why, and it does not follow from the Russian Federation's statements that, such a form of international arbitration cannot exist alongside the

legal provisions referred to by the Russian Federation.  The fact that Russian law, in purely domestic situations, only provides for the option of arbitration in civil law disputes is not inconsistent with the circumstance that the ECT, in cases regulated by the ECT, does provide for international arbitration besides and in addition to the options offered under Russian national law.  The fact that Russian law can readily exist side by side with international investment arbitration is confirmed, moreover, by the fact that the Russian Federation is party to many bilateral investment treaties ('bilateral investment treaties' or 'BITs') in which international arbitration is agreed as a (possible) form of dispute resolution.  The model BITs from 1992 and 2001/2002 drawn up by the Russian Federation, which it uses as a point of reference in its negotiations on bilateral investment treaties with other states, include international arbitration in accordance with the UNCITRAL rules or the ICSID rules as one of the options for resolving disputes between an investor and the host state (Article 6 and 8, respectively, of those model BITs).  The BITs referred to earlier and those model BITs impose no limitations as to the nature (either civil or public law) of which types of dispute may be subjected to arbitration, nor can any limitation to the effect that arbitrators should only be allowed to decide on the amount of damages be read into them.  The Russian Federation's approach to treaties thus shows no hesitation in respect of the international arbitration of disputes about investment treaties. The Russian Federation's argument that said BITs were ratified and, as such, constitute derogations by federal law from the supposed injunction on arbitration of public law disputes, is contrived in addition to missing the point.  A state that regularly agrees to the international arbitration of investment disputes and explicitly takes that form of dispute resolution as a point of departure in its negotiations with other states cannot credibly maintain that this form of arbitration is incompatible with the provisions of national law that limit such arbitration to civil law disputes or is otherwise inconsistent with Russian law." (§ 4.7.37, footnotes omitted)

103.    Russia contends, as regards this second aspect, that the Hague Court of Appeal was wrong because:

i)      it was based on an incorrect interpretation of the word "*inconsistent*" used in Article 45: the correct approach is that taken by the Hague District Court, which held that a provision of the ECT is inconsistent with Russian law where "*there is no legal basis for*" it, or "*it does not harmonise with the legal system or is irreconcilable with the starting points and principles*";

ii)     it proceeded on the basis that Russia had signed the ECT and therefore Article 26 was a part of Russian law, which was a circular argument: the correct approach is to proceed on the basis that the ECT (including Article 26) is *not* a

part of Russian law, and then to ask whether there is an inconsistency between Russian law and Article 26; and

iii)     (if necessary) the Hague Court of Appeal's findings on Russian law were incomprehensible and should be set aside on that ground.

104.    The Procurator General observes, in relation to the second issue as a whole, that *"some complaints … are directed at the Court of Appeal's decision on Russia law (para. 4.7 of the final judgment).  When examining these complaints, the limits of Article 79(1) Judiciary (Organisation) Act soon come into view, so that their probability of success does not seem high"* (§ 4.9).

105.    The Dutch Supreme Court in its suspension ruling said:

> "3.7.2 The Court of Appeal rejected the Russian Federation's argument presented above in 3.7.1, based on the consideration that the dispute between HVY and the Russian Federation is not of a public law nature (para. 4.7.35). The Court of Appeal then, superfluously, assessed whether – if it is assumed that under Russian law arbitration is only possible for civil law disputes and that the present dispute is not of a civil law nature – arbitration under Article 26 ECT is 'inconsistent' with Russian law, and answered this question in the negative (paras. 4.7.36-4.7.58).

> In the provisional assessment of the Supreme Court, these considerations of the Court of Appeal also relate to the interpretation and application of Russian law. On the basis of Article 79(1), opening words and (b) of the Judiciary Organisation Act, the Supreme Court cannot annul the Court of Appeal's judgments on account of violation of Russian law. This rule also bars reasoning complaints that cannot be assessed without also assessing the correctness of the Court of Appeal's decision on the substance and interpretation of Russian law. Also considered in this light, the Supreme Court provisionally does not consider the probability that the complaints referred to above in 3.7.1 will succeed to be such that this justifies the suspension of the enforcement of the Yukos Awards."

106.    Those provisional views suggest that Russia faces some significant hurdles in relation to this ground of appeal.  Nonetheless, I consider there to be a realistic prospect that the Dutch Supreme Court (or CJEU) will ultimately reach a different conclusion from the Hague Court of Appeal.  I consider it arguable that:

i)      there is an element of circularity in the view that the application of Article 26 would not result in arbitration of a dispute of a public law nature because investor-state disputes are not so regarded (including in the Russian Federation): a coherent argument could be made that, in testing the consistency issue, it is appropriate to leave aside the fact (assuming it to be such) that where an investor-state treaty *is* fully in force, dispute resolution thereunder is regarded as falling outside the purview of public law;

    ii)    the point made in (i) above, insofar as it might be regarded as relating to Russian law, concerns what might be argued to be a logical fallacy in relation to which the Dutch Supreme Court would be permitted to review the Hague Court of Appeal's conclusions;

    iii)    the correctness of the Hague Court of Appeal's conclusions as to inconsistency (on the footing that the dispute *would* be of a public law nature) are not merely findings as to Russian law but also turn critically on the meaning of "*inconsistent*" which the court adopted, that being a question not of Russian law but of the interpretation of the ECT; and

    iv)    the Hague Court of Appeal's stated test for inconsistency was too narrow, and that adopted by the Hague District Court should be preferred.

107.    On that basis, although Russia's case faces some significant hurdles, I consider that it should be regarded as having a realistic prospect of success.

*(c) Ground 3: scope of persons entitled to invoke the ECT*

108.    Russia argues that the Tribunal and the Hague Court of Appeal erred in law by finding that the Tribunal had jurisdiction: the correct analysis is that the Claimants did not make a foreign "*investment*" and are not foreign "*investors*" within the meaning of ECT Articles 1(6), 1(7) so as to fall within Article 26.

109.    ECT Article 1(6) defines *"Investment"* as:

> "every kind of asset, owned or controlled directly or indirectly by an Investor and includes:
>
> (a) tangible and intangible, and movable and immovable, property, and any property rights such as leases, mortgages, liens, and pledges;
>
> (b) a company or business enterprise, or shares, stock, or other forms of equity participation in a company or business enterprise, and bonds and other debt of a company or business enterprise;
>
> (c) claims to money and claims to performance pursuant to contract having an economic value and associated with an Investment;
>
> (d) Intellectual Property;
>
> (e) Returns;
>
> (f) any right conferred by law or contract or by virtue of any licences and permits granted pursuant to law to undertake any Economic Activity in the Energy Sector.
>
> …"

110.    ECT Article 1(7) defines *"Investor"* as:

"(a) with respect to a Contracting Party:

(i) a natural person having the citizenship or nationality of or who is permanently residing in that Contracting Party in accordance with its applicable law;

(ii) a company or other organisation organised in accordance with the law applicable in that Contracting Party;

(b) with respect to a "third state", a natural person, company or other organisation which fulfils, mutatis mutandis, the conditions specified in subparagraph (a) for a Contracting Party."

111.    Article 26, the dispute resolution provision, is headed *"Settlement of Disputes between an Investor and a Contracting Party",* and makes provision for the resolution of *"[d]isputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former which concern an alleged breach of an obligation of the former …".*

112.    Russia notes that the preamble to the ECT confirms that its subject-matter is cross-border cooperation and investment, referring as it does to *"the objective of progressive liberalisation of international trade and … the principle of avoidance of discrimination in international trade as enunciated in the Agreement Establishing the World Trade Organization and as otherwise provided for in this Treaty".* Similar concepts are reflected in the language of Article 10(1):

"Each Contracting Party shall, in accordance with the provisions of this Treaty, encourage and create stable, equitable, favourable and transparent conditions for Investors of other Contracting Parties to make Investments in its Area. Such conditions shall include a commitment to accord at all times to Investments of Investors of other Contracting Parties fair and equitable treatment. Such Investments shall also enjoy the most constant protection and security and no Contracting Party shall in any way impair by unreasonable or discriminatory measures their management, maintenance, use, enjoyment or disposal. In no case shall such Investments be accorded treatment less favourable than that required by international law, including treaty obligations. Each Contracting Party shall observe any obligations it has entered into with an Investor or an Investment of an Investor of any other Contracting Party."

113.    Russia's essential thesis is that this is not a dispute between Russia and an Investor of another contracting party, as required by Article 26: it is in substance a domestic dispute between Russia and a group of Russian nationals (the Individuals), concerning Yukos, a Russian oil company. Russia says the Claimants are part of an offshore structure through which shares in Yukos were ostensibly controlled by trustees, but in reality were controlled by and for the benefit of the Individuals. The Claimants were merely

corporate vehicles used by the Individuals to acquire shares in Yukos at a time when they were living and working in Russia.  Further, if the Claimants paid anything at all for those shares, they did so using funds originating from the Individuals; and have not contributed foreign investment to the Russian economy.

114.  The Hague Court of Appeal took the view that the ECT's provisions left no room for any such argument:

> "5.1.7.2  … the ECT opted for "the law of the country under the laws of which the investor is organised" in order to determine the nationality of an investor. This is a common criterion in investment treaties, which is easy to apply and predictable. A drawback of this criterion is that the place of incorporation does not guarantee that the investor has a genuine link with the country under whose law the company is incorporated. There are therefore investment treaties in which the siège social, i.e. the place where the activities take place, is used as a connecting factor for determining the nationality of companies. And there are investment treaties that use additional criteria or conditions to determine the nationality of a company, such as the criterion of who controls the company or the requirement that a company actually conducts business activities in the country of which it is a national. These criteria, combined with the internal affairs doctrine and the siège social, may ultimately contribute towards limiting the scope of the treaty to companies which have a genuine link with the country in which they are established. The drafters of the ECT could have chosen to include such additional conditions in Article 1(7) ECT which would have made it possible to determine whether HVY have a genuine link with Cyprus or Isle of Man, respectively. They did not do so.
>
> 5.1.7.3 As regards the Russian Federation's reliance on the purpose of the Treaty, the Court of Appeal considers as follows. Indeed, the purpose of the ECT includes (also) - as the Russian Federation rightly argues - (in short) the promotion of international cooperation in the field of energy and the protection of international investments. Contrary to what the Russian Federation assumes, however, the ECT determines exactly when there is an investor and an investment and when an investment dispute has an international character that falls within the scope of Article 26 ECT. It follows from the wording of Article 26 ECT that this is the case if the legal person making the investment is incorporated under the law of one (contracting) state and the investment referred to in Article 1(6) ECT takes place in another (contracting) state. …" (footnotes omitted)

115.  The court also discussed ECT Article 17, cited by Russia in this context, under which:

> "Each Contracting Party reserves the right to deny the advantages of this Part to:

> (1) a legal entity if citizens or nationals of a third state own or
> control such entity and if that entity has no substantial business
> activities in the Area of the Contracting Party in which it is
> organized. …"

stating that:

> "… Article 17 ECT gives contracting parties the right to deny
> the protection of part of the treaty to a well-defined category of
> investors, i.e. investors who are established in a contracting state
> only on formal grounds, but are to a large extent materially
> linked to a non-contracting state. This circumstance does not
> mean that Article 1 [sc. 17] ECT is to be understood as meaning
> that it is to be read as an exception for another category of
> investors, namely sham companies and/or investors controlled
> by nationals of the contracting party in which they make
> investments." (§ 5.1.8.4)

116.    The Hague Court of Appeal further rejected Russia's reliance on what it said was a rule
of customary international law prohibiting a national from bringing an international law
action against his own state, and also applying to companies in which nationals of the
defendant state have a controlling interest.  Russia suggested that that rule had been
confirmed by several arbitral tribunals.  The Hague Court of Appeal said:

> "5.1.8.6  The Court of Appeal rejects the statement that there is
> a rule of customary international law in the sense referred to by
> the Russian Federation. The arbitral awards cited by the Russian
> Federation do not sufficiently support this statement. The awards
> cited by the Russian Federation cover situations in which the
> claimant in the international arbitration proceedings has acquired
> a foreign investment in the with the (primary) purpose of gaining
> access to international arbitration, or equivalent situations in
> which a domestic investment acquires an international character
> after the conflict with the state where the investment was made
> has already arisen. …
>
> It has neither been stated nor shown that HVY acquired their
> investments with the main object of bringing international
> arbitration under the ECT. …"

117.    The court concluded that there is no general principle of law according to which
investment treaties do not provide protection to companies wholly owned by nationals
of the host country, and insufficient basis to conclude that the ECT requires the foreign
investor to have made an economic contribution to the host state.

118.    Russia argues that the Hague Court of Appeal was wrong thus to conclude that it was
irrelevant to consider the nationality of the ultimate owners and controllers of the
Claimants in determining whether the Claimants were "*an Investor of another
Contracting Party*" within the meaning of Article 26; and to hold that a dispute can fall
within Article 26 even if it involves no contribution of economic value to the host state.
Russia notes that three similar questions – concerning the extent to which Articles 1(6),

1(7) and 26 require foreign investment in the host state – are already pending before the CJEU in Case C-741/19 *Republic of Moldova v Komstroy.*

119.    Russia also asserts that the Claimants are part of an offshore structure to facilitate and conceal the Individuals' illegal activity – such as tax evasion, the payment of bribes, and money laundering – and should not be permitted to rely on that same structure to seek the protection of the ECT. It contends that the Hague Court of Appeal's approach is inconsistent with the principles of international law and EU law to the effect that the corporate veil can be lifted where this is necessary to prevent a party benefitting from his own wrong.

120.    The Procurator General's provisional assessment was as follows:

> "4.12 The issues raised by these parts are complex to such an extent that they are not suitable for a provisional and summary decision within the context of the assessment of the suspension application. That this is complex subject matter is also evident here from the Russian Federation's position that questions about the interpretation of the ECT should be referred to the ECJ for a preliminary ruling. That is why these parts cannot provisionally be said to have a high probability of success. With regards to part 3, the Court of Appeal, for example in paras. 5.1.7.1 through 5.1.8.11 of the final judgment, also extensively dealt with the question of how the terms 'investment' and 'investor' should be interpreted in the context of the ECT. The Court of Appeal also considered in that respect whether 'U-turn investments' enjoy ECT protection and extensively discussed the Russian Federation's argument on this point. In para. 4.2.1 *et seq.*, the Court of Appeal also provided a description of the standards to be applied in the interpretation of the ECT in accordance with Articles 31 and 32 of the Vienna Convention on the Law of Treaties, including the terms of the treaty considered in their context, and its object and purpose. In doing so, the Court of Appeal applied the right standard. It is therefore not provisionally plausible that the complaints of part 3 about the treaty interpretation and the standards applied in that respect will have a high probability of success. The same applies to the complaints of part 4 regarding the question of whether 'illegal investments' fall within the scope of the term 'investment'". (footnote omitted)

121.    The interpretative principles to which the Procurator General refers, as set out by the Hague Court of Appeal, include the following points arising from the Vienna Convention on the Law of Treaties:

> "4.2.1 …
>
> "**Article 31**
>
> *General rule of interpretation*

1. A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose.

2. The context for the purpose of the interpretation of a treaty shall comprise, in addition to the text, including its preamble and annexes:

...

3. There shall be taken into account, together with the context:

…

(c) any relevant rules of international law applicable in the relations between the parties.

…

### Article 32

*Supplementary means of interpretation*

Recourse may be had to supplementary means of interpretation, including the preparatory work of the treaty and the circumstances of its conclusion, in order to confirm the meaning resulting from the application of Article 31, or to determine the meaning when the interpretation according to Article 31:

(a) leaves the meaning ambiguous or obscure; or

(b) leads to a result which is manifestly absurd or unreasonable."

4.2.2 When applying the rules set out in these provisions, the Court of Appeal takes the following guidelines as a starting point.  Interpretation of a treaty is always aimed at discerning the contracting parties' intention, to the extent that this intention is adequately expressed in the text of the treaty. Textual interpretation has the most important role in the interpretative process, because the wording is deemed to be an authentic expression of the intention of the parties. The International Court of Justice (hereafter: ICJ) has therefore considered that treaty interpretation should be based 'above all upon the text of the treaty'.

4.2.3 This does not mean that treaty interpretation is merely a grammatical exercise. The text of a treaty must be understood in its context as well as in light of its object and purpose, in respect of which Article 31(2) VCLT defines how (in any case) the context of the treaty is to be understood. The interpretation of a treaty provision in accordance with the treaty's 'object and

purpose' may not result in an interpretation that is contrary to the clear text of the provision in question. Article 31(1) VCLT prescribes one rule of interpretation comprised of three integral elements (text, context, and 'object and purpose'); interpretation is a process in which these elements are applied - in good faith - in one joint exercise. That the interpretation must be performed in good faith means that it must comply with the fundamental principle of reasonableness and must not lead to a meaning that is manifestly absurd or unreasonable.

…

4.2.4 … Pursuant to Article 31(3)(c) VCLT, it is also necessary to take into account any 'relevant rules of international law' applicable in the relations between the contracting parties. The rules of international law as referred to in Article 31(3)(c)VCLT include (in any event) the law of treaties, customary international law and internationally recognised principles of law."

(footnotes omitted)

122.   The Dutch Supreme Court, after summarising the Hague Court of Appeal's findings on this ground, said:

"3.10.3 These decisions do not provisionally reveal an incorrect interpretation of the law. The fact that the Russian Federation argues a different position on the interpretation of Article 26 ECT or Article 1 (6) and (7) ECT does not change this. Furthermore, the extensive assessments of the Court of Appeal are provisionally not incomprehensible, also in light of the arguments put forward in the suspension application on this point.

In view of this, in the provisional assessment of the Supreme Court, the probability that the complaints presented above in 3.10.1 will succeed – and that after referral this will lead to the setting aside of the Yukos Awards – is not such that this justifies the suspension of the enforcement of the Yukos Awards."

123.   In considering this matter, I remind myself that the Procurator General and Dutch Supreme Court were at this stage, in their opinion and decision respectively, applying the provisional assessment standard as indicated in § 32 above.

124.   It appears to me arguable, notwithstanding the careful consideration given to the matter by the Hague Court of Appeal, that the Dutch Supreme Court (or CJEU) will ultimately conclude that the ECT on its true construction does not apply to investments that in commercial substance are made by nationals of a signatory state, through corporate entities located elsewhere but which have no other business of their own (assuming, for present purpose, those to be the facts in the present case), even in circumstances where on a strict application of the law of trusts the entities are not owned by the nationals in question.  It is arguable that that situation falls outside the evident *"object and purpose"*

of the provisions of the ECT relating to cross-border investment and the avoidance of discrimination against investors from other contracting states; and that the operative provisions should be construed in that light, taking a 'substance over form' approach in this context.

125.     It further appears arguable that, whilst on one view ECT Article 17 could be regarded as an exhaustive statement of the extent to which the framers of the ECT permitted the withholding of benefits from entities lacking a real connection with a contracting state, it might alternatively be viewed as merely an expression of the broader point that the treaty aims to protect genuine cross-border investment between nationals of different contracting states.  The case for excluding claims by entities owned or controlled by nationals of the 'host state' might be regarded as being at least as strong as that in relation to third country nationals.

126.     In addition, Russia's argument based on a rule of customary international law, regarding relations between nationals and their home states, may be broader than the principle on which the Hague Court of Appeal focussed (which related to cases where a foreign investment is acquired with the main object of being able to bring an investor-state claim).  Russia's argument appears, rather, to concern basic distinctions which international law *prima facie* draws between a state's relations with aliens on the one hand and its own nationals on the other.

127.     I do not of course purport to state any firm conclusions on any of these matters, and it is not for me to do so.  I also take into account the fact that a very eminent panel of arbitrators, with great experience of international law, has found against Russia on this issue.  However, it nonetheless appears to me, applying the standard referred to earlier, that Russia has a realistic prospect of success on this ground of appeal.

*(d) Other grounds of appeal*

128.     On the basis that I have concluded that Russia has a realistic prospect of success on each of its first three grounds of appeal, it is not necessary for me to go on to seek to assess its remaining grounds of appeal.

*(e) Conclusion on prospects of success*

129.     For the reasons set out under subheadings (a), (b) and (c) above, I consider there to be a realistic prospect that Russia will ultimately prevail in the Dutch Supreme Court (or, should the matter proceed that far, the CJEU).  Further, I do not accept the Claimants' characterisation of the prospects as falling toward the lower end of the scale.  I have considered above, provisionally, the extent to which the prospects of appeal are weakened by the need to challenge alternative findings made by the Hague Court of Appeal on questions of Russian law.  Even taking that factor into account, for the reasons given earlier I regard Russia's arguments on the three grounds of appeal that I have considered as having a degree of cogency that places them distinctly above the lower end of the scale.

### (2) Bona fide challenge/delaying tactics

#### (a) General

130.    The Claimants submit that the evidence makes clear that:

i)      Russia regards this dispute as having a political significance going well beyond its (very substantial) financial value;

ii)     Russia is absolutely determined not to pay a penny to the Claimants, and will use any and all means at its disposal to avoid having to do so;

iii)    Russia is therefore resisting enforcement of the Awards, not pursuant to any *bona fide* desire for an adjudication of the parties' rights and obligations, but simply to delay the point at which its determination to avoid paying the Awards, and its contempt for any foreign court that does not do as it wishes, become apparent; and

iv)     Russia's intentions in relation to the Awards is a factor which weighs heavily in favour of allowing the Claimants to continue with these proceedings.

131.    The Claimants' essential point is that Russia has no intention of paying the Awards, even if ordered to do so by this (or any other) court. They say Russia has not denied that allegation, and its evidence is silent on its intentions concerning the Awards. The Claimants wrote to Russia on 30 November 2020 seeking *inter alia* express confirmation of its intentions relating to payment of the Awards:

> "Our clients are due to file and serve their reply to the Evidence by 4pm on 15 January 2021. In order to effectively prepare that reply evidence, our clients require clarification on a number of aspects of your client's case. This is because in a number of material respects, your Evidence asserts disagreement with our clients' evidence, but does not explain what your client's case is.
>
> Clarification of the Evidence
>
> Paragraphs 79-129 of the First Witness Statement of Rosamund Prince dated 6 July 2020 ("Prince 1") in support of the Application make clear that our clients' case is that your client has no intention of voluntarily paying the sums due under the arbitration awards that are the subject of these proceedings (the "Awards"), even if your client's current cassation appeal to the Dutch Supreme Court (the "Cassation Appeal") fails.
>
> Your Evidence (at paragraph 99 of Mr Goldberg's third witness statement) states that our clients "would not suffer any significant prejudice from being kept out of money for a limited period" and that "any such prejudice which may arise could readily be compensated by an award of interest in due course". This statement only makes sense on the basis that your client (a) will pay the sums due under the Awards if its Cassation Appeal

fails (and an order enforcing the Awards in England is made in due course), and (b) has sufficient assets (against which no sovereign immunity is or will be asserted) to pay the sums due under the Awards plus accrued interest.

However, none of your Evidence explains your client's position on either of these questions. It is silent on both points.

Accordingly, please clarify your client's position on the following:

1   Is your client willing to confirm that if its Cassation Appeal fails, and the English Court grants an order for recognition and enforcement, your client will comply with that order and make payment?

…

7   Please confirm whether it is your client's position that, if its Cassation Appeal fails:

   7.1   Your client's application dated 25 September 2015 to challenge the jurisdiction of the English Court would necessarily fall to be dismissed.  …

   7.2   In relation to these English enforcement proceedings generally, your client agrees that it would not be permitted to re-run any point which had been determined against it in the Cassation Appeal (or before the Dutch Court of Appeal in so far as your client has chosen not to appeal those determinations).  If so, is it willing to accept now that all matters finally determined in the Dutch setting-aside proceedings should stand as res judicata and that your client will not challenge any of those matters in England?"

132.    In their response, Russia's solicitors said:

"For the avoidance of doubt, nothing in this letter should be read as a submission to the jurisdiction of the English Court or waiver of immunity, whether within the meaning of section 2 or section 9 of the State Immunity Act 1978 or otherwise. Russia maintains its objection to the jurisdiction of the English Court in full.

We refer to your letter of 30 November 2020, in which you request various information which you assert is required in order for your clients to prepare their reply evidence.

We do not accept you are entitled to the information you seek, nor that it is required in order for your clients to prepare their reply evidence. Our client's position is set out clearly and in detail in its evidence. Your clients appear to be seeking

> information that they would like to have, not information that
> they actually require in order to respond to our client's evidence.
>
> …
>
> The remainder of your questions do not address factual matters
> at all, but instead ask us to confirm now what our client's future
> instructions will be, based on a series of hypothetical
> assumptions which may never materialise. An example is
> paragraph 7, where you assert that it is "not possible properly to
> address" our client's evidence without understanding our client's
> position as to the effect of a decision in the Cassation Appeal in
> the Netherlands. We do not accept that contention. Instead, the
> questions at paragraphs 1, 4 and 7 appear intended to induce our
> client to take a particular position now in respect of future
> hypothetical circumstances which may never arise. That is
> neither necessary nor appropriate."

133.   The Claimants say that response was disingenuous: what had been sought was
clarification from Russia as to its intentions, which are a matter of present fact.  They
also refer to an answer given by Russia's Dutch counsel in a hearing before the Dutch
Supreme Court on 30 October 2020:

> "The RF has been asked three times if it will pay if the Awards
> are upheld. …. I recall what my history teacher once said about
> the beginning of the First World War.  France was asked at that
> time whether it would mobilise or wait.  The answer came: La
> France s'inpirera de ses intérêts - France will always act in its
> own interests.  In our case, too, the answer to the question posed
> will only become apparent when the moment is at hand."

134.   The Claimants invite the inference that Russia is determined not to pay the Awards,
regardless of what any court may say on the subject.

135.   The Claimants draw attention to the fact that, in the list of factors set out in *IPCO* (§ 60
above), the question "*whether the application before the court in the country of origin
is brought bona fide and not simply by way of delaying tactics*" is a free-standing one,
separate from the question of the challenge's prospects of success.

136.   One reason why those factors might be distinct is that even where a challenge is
considered to have fairly modest prospects of success, it may still be a relevant
consideration that it is brought in good faith and not merely as a delaying tactic.  It is
perhaps less obvious that, in the converse case, a challenge with a good prospect of
success might nonetheless be regarded as being brought otherwise than in good faith.
Moreover, if the award respondent genuinely considers the challenge to have good
prospects of success, then it is not easy to see how the challenge could be regarded as
being brought *"simply"* by way of delaying tactics.

137.   More generally, it is not unusual for defendants or award respondents to be unwilling
to pay unless and until forced to do so, even following a final judgment or award against
them.  That is (along with inability to pay) one of the reasons why enforcement

processes are necessary.  Whilst any such attitude is, to say the least, regrettable, I am not sure it is accurate to conclude that it means that any challenge such a party may make – even one brought on reasonable grounds and with a genuine belief in its prospects – is to be regarded as made in bad faith.

138.    However, I will assume for present purposes that lack of good faith in the sense the Claimants allege, viz a settled intention not to satisfy an award come what may, is at least a relevant factor to be taken into account when considering whether or not to stay or adjourn enforcement proceedings pending the final outcome of a challenge in the court of the seat of an arbitration.

139.    In addition to the statements cited above, the Claimants rely on further evidence said to show that Russia is determined not to pay the Awards, and is not merely expressing a desire to avail itself of all its legitimate legal rights to challenge them.

*(b) Public statements*

140.    The first category of further evidence comprises public statements made by a number of senior Russian officials.

141.    An article from *"Kommersant"* dated 29 July 2014, shortly after the Awards were issued, quotes Pavel Zavalny, then Deputy Chairman of the Committee of the State Duma on Energy and President of the Russian Gas Society, as saying:

> "We have to defend ourselves. If they start arresting our assets, there will be countermeasures. There are Western assets in our territory. To introduce sanctions against us, to demand no one knows what, to impose penalties for a breach of a charter to which we have not acceded - it is an outrage."

142.    An article dated 28 October 2014 from "*Sovershenno Sekretno*" entitled *"According to the 'Noga' Recipe"* reported statements made by, among others, Victor Khrekov, then press secretary for the Department of Presidential Affairs, following the Awards. Under the heading "*Fighting in the legal arena*", the article reported:

> "Russian government officials who are responsible for protecting foreign government assets are calm so far. Thus, the press secretary of the head of the Department of Presidential Affairs of the RF, Viktor Khrekov, explained to "Sovershenno Sekretno" that the Kremlin will start discussing how to save their assets when ex-Yukos shareholders "make their claims clear". "As they get started, then we will discuss it. But we are ready to defend our property." The fact is that Russian assets abroad are divided into three parts (jurisdictionally – ed. note).
>
> The main thing is the Ministry of Foreign Affairs. These are embassy institutions to which no lawsuit applies. Then there's the Ministry of Economic Development, which owns foreign trade areas and other property, and the Administrative Department, on whose balance there are about a thousand objects, mostly real estate. And we are ready to defend assets in

the jurisdiction of each of the countries where the lawsuits will be filed. After all, these shareholders' lawyers will have to appeal to courts in each country, and Themis will make her decision." As the official added, in any case, this situation will not be similar to the "Not case", when lawyers were hired to hunt for any Russian assets abroad and immediately tried to seize them.

…

By the way, when the Hague court delivered its unprecedented decision in a lawsuit by ex-Yukos shareholders, some Russian politicians even considered it a veiled sanction against Russia (it was good timing). Thus, the head of the Federation Council Committee on Constitutional Legislation, Andrei Klishas, stated that the decision in The Hague was "politically motivated." According to his assessment, the arbitrators rushed to get into the general outline "anti-Russian sanctions in the wake of anti-Russian propaganda." As the senator expected, the judges can even come to their senses and cancel their decision.

"Hopefully, they will move away from political demagogy and return to the legal field," the parliamentarian suggested."

143.  On 26 May 2015, Reuters reported:

"Russia is increasing its gold holdings because gold is a reserve asset that is free from legal and political risks, a senior central banker said on Tuesday.

The comments by Dmitry Tulin, who manages monetary policy at the central bank, reflect Russian fears that the country's overseas assets could be frozen as part of a possible toughening of Western sanctions over the Ukraine crisis.

"As you know we are increasing our gold holdings, although this comes with market risks," Tulin told lawmakers in the lower house of parliament.

"The price of it (gold) swings, but on the other hand it is a 100 percent guarantee from legal and political risks."

According to central bank data, Russia's gold reserves rose to 40.1 million troy ounces as of May 1 compared with 39.8 million ounces a month earlier.

Russia increased its gold holdings for many months in a row last year, as shown by central bank and International Monetary Fund figures.

Western sanctions imposed because of Russia's actions in Ukraine have not targeted government assets abroad, but Russia has been reducing its holdings of assets such as U.S. Treasury bills, fueling speculation that it regards them as vulnerable.

Russia also faces over $50 billion in claims from former shareholders of oil company Yukos, who have vowed to target Russian state assets in the West.

…"

The Claimants invite the inference that although the main focus of the article is on Russia's response to sanctions, their own claim, referred to in the final paragraph quoted above, is one of the legal and political risks in response to which Russia reduced its overseas assets in favour of gold holdings.

144.  In an article dated 18 June 2015, TASS (a state-owned Russian news agency) reported that the Russia's Economic Development Minister (Mr Ulyukaev) had categorically ruled out the possibility of Russia paying anything in respect of the Awards.  The article included the following:

"Russia completely rules out the possibility of paying compensation under a lawsuit of former Yukos shareholders, Economic Development Minister Alexey Ulyukayev said on Thursday.

"I completely rule this out," he said.

The economy minister said, however, risks existed that claims to Russia's property as enforcement of the European court's ruling in the Yukos case might be presented not only in Belgium and France but also in some other countries.

"Indeed, we may also expect this sort of unfriendly actions in other jurisdictions. We must assess the risks and we believe this risk exists," the economy minister said.

At the same time, the volume of Russia's state assets seized abroad was insignificant but this very fact was unpleasant, the economy minister said.

The Kremlin gave no comment on Belgium's move to seize some Russian assets as part of the procedure for enforcing the court ruling on the Yukos case.

Kremlin spokesman Dmitry Peskov said lawyers and the government were now dealing with this issue.

"The corresponding unit in the Russian government and also, in the first place, lawyers are now dealing with this matter and so I wouldn't like to comment on anything," the Kremlin spokesman said.

"We still need to clarify some details to get a full picture," he added.

"No doubt, we're now carefully and attentively learning all the circumstances of this lawsuit," Peskov said.

…

Russia, which signed but did not ratify the Energy Charter Treaty, has repeatedly said it categorically disagrees with the Hague tribunal's ruling.

The Russian Finance Ministry said in late July last year the conclusions by the Arbitration Tribunal ran counter to the conclusions of the European Court of Human Rights.

"The European Court of Human Rights has concluded twice that Yukos committed large-scale tax evasion and its management was aware of violations, that all extra tax payments required from Yukos were lawful and legitimate and that Yukos was not discriminated against and the actions by the Russian authorities were not politically motivated," the Russian Finance Ministry said in a statement at that time.

Also, the Hague Arbitration Court had no jurisdiction to examine issues raised before it, the Russian Finance Ministry said.

…"

145.    The Claimants make the point that Russia's responsive evidence on this point is limited to a suggestion by Russia's solicitor that Mr Ulyukayev's comments might have been taken out of context.  However, they say, if Mr Ulyukayev, a senior official of the Russian Government, had misspoken or had been misquoted then it was well within Russia's power to provide evidence in these proceedings saying so, and confirming what its intentions in relation to Awards actually are.

146.    On 18 February 2020, in response to the Hague Court of Appeal Judgment, Mr Andrey Kondakov, the Director General of the International Centre for Legal Protection (the body that assists Russia in defending investment treaty disputes), stated that *"anything paid to the former majority Yukos shareholders will mean they commit further theft against Russian taxpayers"*.  However, it is fair to say that the general tenor of the article was that Russia will pursue the legal process and believes that the Dutch Supreme Court will reach the correct decision.  The opening paragraphs stated:

"The Russian Federation will vigorously appeal the decision of The Hague Court of Appeal to reinstate the annulled arbitration awards in favour of the former majority Yukos shareholders, which had held the Russian Federation liable for US$50 billion in damages plus interest.

> The Russian Federation believes that The Hague Court of Appeal has erred in its decision, and will avail itself of all its rights to pursue justice in this case. The Hague District Court took the correct approach when it annulled the awards - correctly applying Russian law - and the Russian Federation is confident that the Supreme Court of the Netherlands will reinstate this decision upon appeal"

and that was also the context of Mr Kondakov's comment:

> "We are very disappointed with the Dutch Court's decision but strongly believe that it will only give short-lived relief to the former Yukos shareholders, because the Supreme Court of the Netherlands will no doubt reverse this finding riddled with legal flaws. The former Yukos shareholders … must not be permitted to hold the Russian people to ransom with these fatally flawed arbitration awards. We will appeal the decision because anything paid to the former majority Yukos shareholders will mean they commit further theft against Russian taxpayers."

147.   On 20 February 2020, a spokesperson for the Russian Foreign Ministry (Ms Zakharova) stated, following the Hague Court of Appeal's decision:

> "We raised the political alarm long ago and not only over this matter. As you know, Russia has stated more than once that the International Arbitration Court does not have the power to hear this case, and its decision is politically motivated and has been adopted in violation of the legal procedure. We have announced that we will appeal against it at the Supreme Court of the Netherlands. Our lawyers are analysing the means of giving a practical form to our concerns."

The Claimants say the assertion that the Tribunal's decision was politically motivated was scandalous.   Absent any responsive evidence, the Claimants submit that Ms Zakharova's comments provide an accurate reflection of the contempt with which Russia regards any foreign tribunal or court which has the temerity to find against it in relation to these claims.

148.   An article from *"Russia Today"* dated 3 December 2020 reported Russia's Justice Minister, Konstantin Chuychenko, as having stated on the *Rossiya-24* news channel, in the context of proceedings in Washington, DC and the Dutch courts in connection with the present case, that:

> "The situation is very difficult and serious. Indeed, a legal war has been declared on Russia.  Russia must adequately defend itself, and sometimes even attack back."

*(c) Threats of diplomatic reprisals*

149.   The Claimants provide evidence of threats by Russia of diplomatic reprisals against countries whose courts might take steps to enforce the Awards, including *Notes*

*Verbales* sent to the Governments of France, Belgium and the USA. The Claimants say each of those documents threatened that the enforcement of the Awards against property of Russia would be treated as a ground for taking action against these states as well as their citizens and legal entities.

150. The Note addressed to France, dated 6 March 2015, said:

> "The decisions of the International court of arbitration in the Hague of 18 July 2014 on the claims of "Hulley Enterprises LTD", "Yukos Universal LTD", and "Veteran Petroleum LTD", against the Russian Federation constitute an unjust and politically motivated act, rendered in obvious violation of applicable legal norms and are incompatible with the ideas of law and cause damage to the ideas of the rule of law, independent, impartial and professional international justice.
>
> In relation to this, the Russian Federation has initiated proceedings aimed at setting it aside before the competent court.
>
> The Hague arbitral tribunal did not have jurisdiction to hear this dispute. The decisions were rendered on the basis of an international treaty to which the Russian Federation was not a party, and with respect to a dispute which does not fall within the scope of that treaty. During their examination of the case, the arbitrators committed numerous grave mistakes, which included denial of the fundamental right to due process.
>
> In light of the above, the Ministry considers that the recognition and enforcement of the abovementioned verdicts on the territory of the French Republic would be contrary to the spirit and wording of the New York convention on the recognition and enforcement of foreign arbitral awards of 1958, and may adversely affect [NB: literally in Russian "shake"] the authority of the respected French court.
>
> Any attempts to perform interim or enforcement measures with respect to Russian property located on the territory of the French Republic will be considered by the Russian Federation as a ground for taking adequate and proportionate responsive measures against the French Republic, its citizens, and its legal entities.
>
> The Ministry would be grateful for the content of this note to be communicated to the competent French court."

This Note appears to have been sent after the commencement of proceedings in France to recognise the Awards, but before any enforcement steps. Later, in June 2015 and January 2016, two of the Claimants obtained attachments over assets which the French courts subsequently held to be either subject to sovereign immunity (including a state cathedral near the Eiffel Tower) or funds belonging to third party entities.

151.  The Note addressed to Belgium, dated 18 June 2015, was sent the day after the Second Claimant had attached, among other assets, the accounts of the Russian Embassy in Belgium, and Russia's permanent missions to the EU and NATO in Brussels.  The Note stated:

> "On June 18, the Foreign Ministry summoned Alex Van Meuwen, Ambassador Extraordinary and Plenipotentiary of the Kingdom of Belgium to Russia, to hand him a letter of protest over freezing the accounts of the Russian Embassy in Belgium, Russia's permanent missions to the EU and NATO in Brussels, as well as several other Russian organisations in Belgium.
>
> The Belgian Ambassador has been notified that Russia considers these actions by the Belgian authorities to be openly unfriendly and in direct violation of the generally accepted standards of international law, and that it demands that the Belgian authorities take immediate measures to restore the sovereign rights of the Russian Federation, which have been disregarded in Belgium, and to provide for the normal operation of Russian organisations and legal entities. Otherwise, Russia will be forced to consider an appropriate response with regard to the property of the Kingdom of Belgium in Russia, including the property of the Belgian Embassy in Moscow and Belgian legal entities."

The word *"unfriendly"*, which the Note thus deployed to characterise the Belgian authorities' actions, is normally used in diplomatic language to refer to a threat of armed hostilities.

152.  The Claimants say that by the date of the Note to Belgium, they had merely filed a petition for recognition, and the Belgian court did not issue any exequatur until 24 June 2015, after the Note had been sent.  It is, though, apparent from the text of the Note that some form of steps had apparently been taken to freeze diplomatic accounts.

153.  On 15 July 2015 the Russian Ministry of Foreign Affairs sent a diplomatic Note to the US Embassy in Moscow stating (in the US State Department's informal translation):

> "The awards of the Hague International Court of Arbitration of July 18, 2014, regarding the claims of *Hulley Enterprises LTD, Yukos Universal LTD,* and *Veteran Petroleum LTD* against the Russian Federation constitute an unjust and politically motivated act rendered in overt violation of applicable legal provisions and are incompatible with the ideas of the rule of law, independent, impartial and professional international justice.
>
> In this regard the Russian Federation initiated proceedings in the competent court of The Hague with a view to reverse the above awards. The Hague arbitration tribunal had no jurisdiction to consider the dispute related to decisions taken on the basis of an international agreement to which the Russian Federation is not a party. Moreover, that international agreement does not apply to the above dispute.

> Investigating the case, the arbitrators committed numerous gross violations, including denial of the fundamental right to appropriate legal procedure.
>
> In view of the foregoing, the Ministry believes that recognition and enforcement of these awards in the United States would not comply with the letter and spirit of the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards of 1958, and could seriously undermine the credibility of a reputable American court.
>
> The Ministry also considers it appropriate to emphasize that if, in spite of the aspects outlined above, the legal proceedings initiated in the Federal Court for the District of Columbia over recognition and enforcement in the United States of The Hague arbitration awards are supported by U.S. government authorities, US-Russia bilateral relations will once again suffer a heavy blow.
>
> Any attempt to use injunctive remedies or execution measures against Russian property in the USA will be considered by the Russian Federation as grounds for taking adequate and proportionate retaliatory steps in relation to the USA, its citizens, and legal entities.
>
> The Ministry would be grateful if you would bring the contents of this note to the attention of the competent American court."

154. The Claimants point out that France, Belgium and the USA are all countries with advanced legal systems which recognise the concept of sovereign immunity. Had Russia simply been seeking to vindicate its legal rights, then the proper course would have been to participate in those proceedings – and to make such arguments (including arguments about sovereign immunity) as were available to it in those jurisdictions. The Claimants submit that the fact that Russia also resorted to threats is consistent only with its intention to use any and all means at its disposal (both fair and foul) to impede the enforcement of the Awards; and the fact that Russia specifically asked for the Notes Verbales sent to France and the USA to be brought to the attention of their courts only confirms that Russia intended to exert pressure on those courts. Moreover, there had been no enforcement efforts in France or the USA prior to the Notes sent to those countries, and in any event the appropriate response to any overzealous efforts by the Claimants to execute the Awards against sovereign assets would have been to participate in the enforcement proceedings (as Russia did) and object to the steps in question.

### (d) Response to ECtHR Yukos decision

155. By a judgment which became final on 15 December 2014, the European Court of Human Rights ("*ECtHR*") ordered Russia to pay €1,866,104,634 to the former shareholders of Yukos. That judgment remains unsatisfied, aside from a sum of €300,000 in respect of legal costs belatedly paid in December 2017, and after a strongly

worded further Interim Resolution adopted by the Committee of Ministers on 1 October 2020.  Russia's evidence in the present case states:

> "As recently as 3 July 2020, the Russian Ministry of Justice has further confirmed that, in accordance with the decisions of the ECtHR and the Constitutional Court, Russia is seeking "*to find a legitimate compromise*" regarding the payment of additional amounts to YUKOS minority shareholders. The Russian authorities have publicly committed "*to searching additionally for mutually acceptable solutions*" as soon as possible." (footnotes omitted)

156. The Claimants point out that they are majority shareholders in Yukos, so that even the stated search for a *"compromise"* does not apply to them; in any event, the judgment of the ECtHR is a binding obligation, not a starting point for negotiations.  They provide evidence of a series of statements by senior Russian officials the gist of which is that Russia has no intention of complying with the ECtHR's judgment in their favour.  Moreover, in its submissions to the Dutch Supreme Court before the hearing of its request to suspend enforcement of the Awards in the Netherlands, Russia stated that it *"is not authorised to pay as that ECtHR judgment was found to be contrary to the Russian Constitution by decision of the Russian Constitutional Court of 19 January 2017"*.

157. The evidence of Mr Galperin, Russia's Deputy Minister of Justice, is that Russia has complied with almost all of the ECtHR's decisions, and in 2019, for example, paid approximately €15.7 million as compensation under ECtHR decisions.  He exhibits statistics on the amounts paid as compensation under the ECtHR decisions on the basis of the Ministry of Justice's files.

158. Against that, the Claimants refer to an article in April 2020 referring to data from the European Implementation Network showing that during the period from 2010 to 2019 Russia did not comply with 89% (218) of the ECtHR's rulings on 'leading' cases.  (The articles goes on to say that *"...data on the implementation of judgments on leading cases until 2016 show the Russia almost always approaches individual measures by publishing the ECHR's decision and paying compensation to the victims (a high profile exception being the Yukos case)".*)

*(e) International arbitration awards*

159. Ms Prince of Stephenson Harwood, the Claimants' solicitor, states in evidence that she is *"not aware of the Defendant ever voluntarily [paying] an investment treaty arbitration award"*.  The Claimants also refer to the Global Arbitration Review's statement that Russia "*appears to have failed to honor all of the awards in the public domain that have been rendered against it. It has challenged awards in local courts at the seat of arbitration (eg, in Swedish courts in the case of RosInvestCo v Russian Federation), and has vigorously resisted the seizure of its assets by foreign courts pursuant to arbitral awards against it (eg, in German and Swedish courts in the case of Sedelmayer v Russian Federation)*".

160. For Russia, Mr Galperin states in his witness statement that he is *"aware of at least 4 cases in which payment has been settled. This is in addition to numerous cases in which*

*the relevant award has ultimately been set aside, or payment has not been required for other reasons".* I am not in a position to resolve that conflict of evidence.

161. There is also evidence about arbitration claims brought against Russia by Compagnie Noga D'Importation et D'Exportation SA and Franz Sedelmayer. In both cases, awards were made against Russia. The Claimants' evidence is that Noga eventually became bankrupt, having been unsuccessful in attempts over many years to enforce the award. Sedelmayer succeeded in recovering the sums due only after many years of enforcement efforts. Mr Galperin says these cases illustrate that "*Russia has no policy of improperly frustrating enforcement of arbitral awards [and] Russia's resistance of the enforcement of these awards was undertaken on legitimate grounds and used ordinary legal means*". However, it is evident in both cases that Russia refused to pay arbitration awards against it, the award claimants both had to spend large amounts of time and money seeking to enforce the awards, and one claimant became insolvent without ever having obtained payment.

### (f) Changes to Russian Constitution and laws

162. The Claimants submit that there have been recent amendments to the Russian Constitution which have been widely interpreted as being prompted by the Yukos case among others, and which have set its Constitutional Court on a collision course with Russia's international obligations and the decisions of international courts and tribunals. The Claimants' evidence includes reference to:

   i) a statement reportedly made on 14 July 2015 by Mr Sergei Marvin, a member of Russia's Constitutional Court, that *"[s]hould Russia's Constitutional Court find a decision by the Strasbourg-based court to be in violation of the Constitution, it will not be enforced"*;

   ii) amendments to the Federal Law on the Constitutional Court signed by President Putin on 14 December 2015 in order to establish a procedure pursuant to which the Constitutional Court can declare decisions of international courts unenforceable;

   iii) a ruling on 19 January 2017 by the Constitutional Court (C/98/A4084-A4115), following a referral made by Russian Ministry of Justice, that Russia was not bound to enforce the ECtHR judgment and stating that

   "payment of such a huge monetary sum, awarded by the European Court of Human Rights, to former shareholders of a company having built illegal schemes of evasion of taxation, their heirs and legal successors from the budget system ... in itself contradicts constitutional principles of equality and justice in tax relations...";

   iv) official documents recording comments made at a working group on 26 February 2020, just after the Hague Court of Appeal's decision in the present case, made by the Chairman of the Federation Council Committee on International Affairs (Mr Konstantin Kosachev) and endorsed by President Putin, which were critical of the Tribunal's decision and (it appears) that of the Hague Court of Appeal upholding it; and

v)   Constitutional amendments signed by President Putin on 14 March 2020 granting the Russian Constitutional Court the power "*to decide ... on the possibility of enforcing a binding decision by a foreign or international (interstate) court or arbitration, if this decision contradicts the tenets of public order in the Russian Federation*" and stating that "*decisions taken by supranational bodies in keeping with the provisions of the Russian Federation's international treaties shall not be enforced in the Russian Federation if they contradict the Constitution of the Russian Federation*".   These amendments have been widely viewed as being directed at the Awards in the present case.

163.   The Claimants accept that these amendments would have no effect on enforcement of the Awards outside Russia, but note that if the Claimants were to seek to enforce the Awards in Russia, then they would give the courts of Russia the opportunity to override the decisions of both the Tribunal and the Hague Court of Appeal.

164.   The Claimants also refer to Russia's Federal Law No. 297-F3 on Jurisdictional Immunities of a Foreign State and the Property of a Foreign State in the Russian Federation, which restricts the ability of a foreign state to invoke state immunity before Russian courts if the foreign state's courts had previously failed to uphold legal immunity claimed by Russia.   The Law came into force on 1 January 2016.   The Claimants suggest that it was introduced in response to their efforts to enforce the Awards in France and Belgium.   Professor Alexei Avtonomov, in an expert's report provided on behalf of Russia, points out that the Law had been in contemplation since 2005, and follows the pattern of other countries' legislation on state immunity (including as to reciprocity).   It moves from the Soviet principle of absolute immunity to the position set out in the United Nations Convention on Jurisdictional Immunities of States and their Property 2004.

165.   However, the Claimants' expert witness, Associate Professor Ekaterina Mishina, highlights differences between the 2005 draft law and the Law passed in 2016.   One of these derives from Article 4(2) of the Law, which provides that "*conclusions on the issues of provision of jurisdictional immunities to the Russian Federation and to the property thereof in a foreign state*" are given by the "*federal executive authority, in charge of performing the functions of developing and implementing state policy and legal regulation with respect to international relations of the Russian Federation*", which is the Russian Ministry of Foreign Affairs. The accompanying procedural legislation states that the "*relationship between the scope of jurisdictional immunities provided to the Russian Federation in a foreign state and the jurisdictional immunity provided to the foreign state in the Russian Federation shall be determined by the court on the basis of the evidence submitted by the parties and the opinions of government agencies*".   Accordingly, the opinions of the Russian Ministry of Foreign Affairs will play a significant role in the court's evaluation of the evidence and its decision whether to apply the reciprocity principle.

*(g) Russia's conduct in the international sphere*

166.   The Claimants cite "*numerous examples of [Russia] acting with complete disregard for some of the most fundamental norms of international law*", including in relation to Crimea, Alexander Litvinenko, Sergey and Yulia Skripal, a cyber operation against the Organisation for the Prohibition of Chemical Weapons and persons said to have been paid by Russia to obstruct the investigation into the crash of flight MH17.   The

Claimants submit that in considering whether (and/or on what terms) to continue the Stay, the court needs to consider whether Russia is the type of party likely to take illegitimate steps to frustrate enforcement of the Awards, and that *"[Russia's] persistent disregard for fundamental norms of international law provides powerful support for an inference that it is just such a party"*.

### (h) Conclusions to be drawn

167.    As a preliminary point, in assessing some (though far from all) of the evidence summarised above, it is relevant to bear in mind that public statements may have been made at least in part for domestic or international political reasons.   It cannot automatically be assumed that they reflect official Russian policy or Russia's actual intentions in the event of a final adverse decision against it in the present or other cases.

168.    Viewing these matters in the round, it appears to me that the following conclusions can be drawn from the evidence summarised above.  First, to the extent that the statements cited above are taken at face value, Russia has a strong belief in the merits, including the legal merits, of its position and intends to seek to vindicate it using the legal processes available.  Secondly, Russia's strength of feeling may well be such that Russia would not proffer payment in response to a final adverse decision on the merits: there is a significant risk that payment would be forthcoming only in the event of successful enforcement measures.  Thirdly, the Notes Verbales and the statements referred to at §§ 141 and 148 above give reason to believe that enforcement measures could give rise to retaliation.

169.    The impact of these matters on the question of good faith is in my view mixed.  I consider the evidence to indicate that Russia is pursuing its challenge to the Awards in good faith in the sense that it believes the challenge to be justifiable and to have prospects of success.  It thus also lends some support to the view that the challenge is not in my view being brought *"simply by way of delaying tactics"*.  Conversely, the indications that Russia is unlikely to proffer payment, and may even retaliate in the event of enforcement measures, provide reason to believe Russia is not acting in good faith in a broader sense: it wishes to pursue what it considers to be a well-founded challenge by legal process, but is unwilling to accept the result if it loses.  A lack of good faith in that sense may be regarded as one stage further removed from the equation than the question of good faith belief in the challenge itself.  Nonetheless, it is, as I have already indicated, a factor which the court can take into account as part of its overall assessment of the question of whether to grant an adjournment (or, in the present case, to lift the Stay).

## (3) Delay and prejudice

### (a) Prejudice to the Claimants from the Stay remaining

170.    The Claimants submit that they are likely to suffer very substantial prejudice as a result of these proceedings being kept on hold.

171.    <u>First</u>, the Claimants refer to the direct financial consequences of the delay, reflected in the accrual of interest on the Awards.  They make the following points:

i)   The principal value of the Awards is enormous. As a result, the interest accruing on them is larger than the sums at stake in the vast majority of cases which come before this court.

ii)  Interest under the Awards is calculated and compounded annually, by reference to the prevailing yield on 10-year US Treasury Bonds.  Over the 6 years from 15 January 2015 to 14 January 2021, approximately US$7 billion of interest has accrued on the Awards.

iii) Russia's responsive evidence asserts that the Claimants can be compensated for any delay by "*an award of interest in due course*".   However, that is only the case if Russia has both the intention and the ability to pay the full value of the Awards, plus all accrued interest.  The Claimants have asked the Russia to confirm whether this is the case, and have been rebuffed.  The court ought therefore to proceed on the basis that further delay to these proceedings will prejudice the Claimants in an amount not less than the value of the interest which would accrue on the Awards during any delay.  Given the figures set out above, that prejudice will be worth many billions of US dollars.

172.  I do not accept the Claimants' submission that the possibility of an award of interest should be disregarded on the basis that Russia has indicated no intention to satisfy any part of an award or judgment (including interest).  The question is what prejudice arises from maintaining the Stay, taking into account the prospects of enforcement action against Russia.  If no recovery will ever be made, then the Stay makes no difference.  Equally, if the Claimants are eventually able to enforce any award/judgment against Russian assets, then (subject only to the question of risk of dissipation considered below) there is no reason to believe that such enforcement would not be equally successful in relation to the interest element of the award or judgment.

173.  However, I do accept the Claimants' broader submission that delay in the ability to seek to enforce an Award is itself a form of prejudice, regardless of whether or not it can be compensated by an award of interest, and quite apart from any question of risk of dissipation of assets.

174.  It is common ground that the Dutch Supreme Court is likely to issue its decision later this year or early next year, thus within about the next 10 months.  There will be a further delay of uncertain duration if the Supreme Court decides to remit issues to the Court of Appeal.  If the Dutch Supreme Court decides to refer any question(s) to the CJEU, then both parties would expect a decision by late 2024 or early 2025, i.e. about an additional 3 years' delay.  That will occur only if the Dutch Supreme Court has concluded that there is a point of law which is not *acte clair* and which needs to be resolved in order to decide the case.  It will not follow that Russia's challenge should then necessarily be regarded as more cogent: merely that there is a point of law worthy of reference.

175.  Against that, there is some force in Russia's point that such a delay would not be inordinate in the context of investor-state arbitrations generally, or in the context of the overall duration of the present case.  It also remains relevant in principle that delay can to a degree be compensated by an award of interest (see § 62 above).  Further, there is no suggestion that the Claimants are lacking in means such that the delay would cause

hardship, nor evidence that delay will cause specific business opportunities to be irretrievably lost.

176.   Secondly, the Claimants submit there is the risk that Russia might, during any continuing delay to these proceedings, take steps in relation to its assets that would make it harder for the Claimants to enforce the Awards.  The relevant case law does not require the Claimants to be able to set out their case on potential dissipation with specificity.  Given Russia's coyness about its asset position, the Claimants say, it would be unrealistic to expect the Claimants to do so.  Nevertheless, the Claimants have identified in their evidence a potentially large pool of assets of Russia in the United Kingdom, held in a form that would appear to allow those assets to be readily dissipated.  Russia disputes the Claimants' interpretation of the relevant document but has refused to provide any information about its assets in England.

177.   The evidence in question is a spreadsheet downloaded on 18 June 2020 from the website of the Bank of Russia entitled *"Portfolio Investment Assets Of The Russian Federation in SDDS Plus format (as of end December 2019) (in millions of U.S. dollars)"*, stated to have been updated on 11 June 2020.  The spreadsheet divides assets by type and jurisdiction.  In relation to the United Kingdom, it refers to almost US$ 9 billion in assets, being US$ 125 million in equities and US$8,806,000,000 in debt securities.

178.   Mr Galperin explains that the spreadsheet sets out data collected as part of the Coordinated Portfolio Investment Survey conducted on behalf of the International Monetary Fund ("**IMF**"), and that it includes securities issued by non-resident and owned by residents of Russia.  In response, Ms Prince attaches a spreadsheet from the IMF website which appears to provide a further breakdown of the figures, by sector of holder.  This breakdown indicates that Russia has not provided information splitting the value of assets held in the UK across the categories for holdings by central bank, other financial corporations and other holders; and provides no information in the "General Government" column.  Instead, the annotation "C" appears in these places, which *"reflect[s] data that was suppressed by the reporting economy to preserve confidentiality"*.  By deduction from the overall declared total, however, it is possible to see that a total of approximately US$2.2 billion of funds are thus referred to as confidential.

179.   The Claimants submit as follows:

   i)   It cannot realistically be doubted that Russia is likely to have very substantial assets in this jurisdiction.

   ii)   For reasons considered in section (G)(2) above, the court can and should proceed on the basis that (a) Russia will stop at nothing to avoid paying the Awards; (b) it would be unlikely to have any reservations about taking steps to dissipate or conceal assets, so as to render them immune from enforcement; and (c) the sheer scale of the Awards provides Russia with a considerable financial incentive to do so.

   iii)   Russia's determination not to pay the Awards, combined with its coyness about its assets, in themselves give reason to infer a risk of dissipation should Russia be given further time to do so by reason of the Stay remaining in place.

iv)     An illustration of Russia taking steps to avoid enforcement measures is Ms Prince's evidence, from information provided by Shearman & Sterling (who represent the Claimants in France), that after two of the Claimants attached certain properties in France and Belgium, Russia "*affixed diplomatic plates to some of these properties in order to render legitimate enforcement efforts against these properties significantly more difficult*".

v)      Russia has not, in its evidence to this court, denied any intention to dissipate assets.

vi)     It is therefore legitimate to infer a sufficient risk that the Claimants' ability to enforce the Awards is likely to be materially prejudiced by any further delay to these proceedings.

180.    Russia makes the point that it has been on notice of the present proceedings for six years since they were issued on 30 January 2015.  The evidence relied on by the Claimants to support their allegation that Russia has dissipated assets, discussed mainly in section (G)(2) above, does not indicate that any dissipation of assets has occurred, nor any threat of dissipation.  The fact that Russia has properly resisted enforcement efforts does not amount to dissipation.  Indeed, even if and to the extent that Russia's resistance to enforcement might merit criticism, it still does not amount to dissipation of assets.  Russia notes that the US District Court of the DC Circuit, as part of its ruling (after the Hague Court of Appeal decision though prior to the suspension opinion and decision) refusing the Claimants' application to lift a stay of proceedings in that court, stated that "*[a]bsent any additional proof that challenges to execution are mounting, this purported hardship about increasing the difficulties faced by the Shareholders in executing on Russian Federation assets is unconvincing*" (*Hulley Enters. v. Russian Fed'n*, Civil Action No. 14-1996 (BAH) 2020 U.S. Dist. LEXIS 219208, at [39] (D.D.C. Nov. 20, 2020)).

181.    Russia cites, by way of analogy, *Holyoake v Candy* [2017] EWCA Civ 92, where the defendants had been on notice of the proceedings for months before a freezing injunction was sought, and the Court of Appeal held that this "*stable door*" point was a "*powerful factor militating against any conclusion of a real risk of dissipation*" because "*it was inherently unlikely that the defendants would unjustifiably dissipate their assets in the future, having not done so by this point*" (§ 62): see also *St Vincent European General Partner v Bruce Robinson* [2017] EWHC 3267 (Comm) §§ 70-71.  The mere fact that Russia may have assets in the United Kingdom which "*could be*" moved or restructured so as to avoid enforcement does not suffice: "*the mere possibility*" of a party dissipating assets does not equate to a risk of dissipation (*Holyoake* § 59).

182.    The Claimants submit that in an arbitration enforcement case, the defendants will always have prior notice of potential enforcement proceedings if only by reason of the award itself.  Further, the freezing order cases (which at best provide no more than an analogy) make clear that delay is not a complete answer to an application for an injunction.  For example, in *Madoff Securities International Ltd v Raven* [2011] EWHC 3102 (Comm) Flaux J said:

> "It seems to me that the following principles relevant to the present application can be discerned from those two cases. (1) The mere fact of delay in bringing an application for a freezing

> injunction or that it has first been heard inter partes, does not, without more, mean there is no risk of dissipation. If the court is satisfied on other evidence that there is a risk of dissipation, the court should grant the order, despite the delay, even if only limited assets are ultimately frozen by it. (2) The rationale for a freezing injunction is the risk that a judgment will remain unsatisfied or be difficult to enforce by virtue of dissipation or disposal of assets (see further the citation from *Congentra AG v Sixteen Thirteen Marine SA, The Nicholas M* [2008] EWHC 1615 (Comm), [2009] 1 All ER (Comm) 479 below). In that context, the order for disclosure of assets normally made as an adjunct to a freezing injunction is an important aspect of the relief sought, in determining whether assets have been dissipated, and, if so, what has become of them, aiding subsequent enforcement of any judgment. (3) Even if delay in bringing the application demonstrates that the claimant does not consider there is a risk of dissipation, that is only one factor to be weighed in the balance in considering whether or not to grant the injunction sought." (§ 156)

Similarly, in *Ras Al Khaimah Investment Authority v Bestfort Development LLP* [2017] EWCA Civ 1014 the Court of Appeal said:

> "Delay on the part of a party applying for a freezing injunction gives rise to rather more elusive considerations. It can be said that any serious delay means that an applicant does not genuinely believe there is any risk of dissipation or conversely (and more cynically) that, if a defendant is prone to dissipate his assets, such dissipation will have already occurred by the time a court is asked to intervene. This latter argument assumes that a defendant is already of dubious probity and it is a curious principle that would allow such a defendant to rely on his own dubious probity to avoid an order being made against him. The former argument is also open to the objection that it is the fact of the risk rather than a claimant's apprehension of it that should govern the court's decision." (§ 55)

183. Those considerations do not, however, make delay irrelevant to the question of fact of whether, given the events to date, there is a realistic prospect of assets being dissipated. Events to date may shed light on that question, without any need to make any adverse assumption as to the defendant's probity, both in a freezing order case and in an arbitration case. Thus, for example, Popplewell J in his second ruling in *Stati*, declining to order security in connection with a section 103(5) adjournment, noted *inter alia* that:

> "There is no basis for inferring that during the period of the adjournment, the defendant would seek to dissipate those assets or remove them from the jurisdiction in order to seek to defeat enforcement or would otherwise deal with the assets other than by way of normal trading.  Indeed, were the defendant to be minded to deal with assets so as to avoid execution pursuant to an English Judgment, it has had ample opportunity to do so prior

to this hearing, which it envisaged would proceed to a resolution of its application, and the possibility of that application being dismissed." (§ 15)

184.    The Claimants submit that while the Stay has been in place, Russia has had no immediate incentive to make itself enforcement-proof.  Now that it has lost in the Hague Court of Appeal, it knows that failure in the Dutch Supreme Court will mean the Claimants will immediately resume vigorous enforcement efforts.  One would not have expected Russia yet to have removed its financial assets from the UK, a major financial centre, but the assets could be moved very quickly and should therefore be regarded as being at risk.

185.    At the same time, the Claimants accept (and it is part of their case on prejudice to Russia: see § 193 below) that were the Stay to be lifted, no enforcement steps could be taken for some months.  There would need to be a directions hearing, followed by a hearing to determine Russia's claim to sovereign immunity, before any question of enforcement could occur.

186.    I am not persuaded that the continuation of the Stay, pending the final outcome of Russia's challenge in the Dutch courts (including any reference to the CJEU) would materially increase the risk of Russia dissipating assets in order to avoid ultimate enforcement of the Awards.  The evidence does not in my view indicate that there has to date been any such dissipation, as distinct from resistance to enforcement measures.  Moreover, the Claimants' evidence and arguments tend to suggest that, if and to the extent that such a risk arises, it is more likely to occur after the lifting of the Stay rather than as a result of its continuation.  This is not, of course, an application for a freezing order.  The question before the court (at this stage of the argument) is whether the *continuation* of the Stay would create a risk, or an augmented risk, of difficulty in enforcement.

187.    The Claimants made the further point in oral argument that the risk of increased difficulty in enforcement is not limited to steps taken in order to avoid enforcement of the Awards (a proposition which in principle I would accept).  For example, Russia's current behaviour in relation to Mr Alexei Navalny might lead to the imposition of sanctions, which might in turn lead Russia to take steps to move assets.  On the other hand, the Claimants' evidence is that following the annexation of Crimea and part of Ukraine, since 2014 both the European Union and the United States of America have imposed economic sanctions on Russia.  It is of course possible that the Navalny issue, or other events over time, could lead to further sanctions, and that those could in turn lead to movements of assets detrimental to the Claimants.  It would though be entirely speculative to anticipate that such events could have an incremental effect, over and above that of the existing sanctions, in causing Russia to take steps that would make it harder for the Claimants to enforce the Awards.  At most it can be said that events of this kind, or other events occurring over a period of time, could have such an effect.

*(b) Prejudice to Russia from lifting the Stay*

*(i) Legal prejudice*

188.    Russia submits that lifting the Stay pending the outcome of its challenge to the Awards would create a risk of serious prejudice, inconvenience and inefficiency, for the following reasons.

189.    First, there is a risk of inconsistent judgments being given by the English courts and the Dutch Supreme Court, the curial court, on the same issues.  As noted earlier, the risk of inconsistent judgments has been described as a "*potential disaster from a legal point of view*",  and is "*always capable of amounting to a very strong reason for granting a stay*", whether in the context of the Court's case management powers under the CPR (see *Bundeszentralamt* § 116; *Prifti* § 22; *Citigroup* § 76; *Ferrexpo* § 199) or of an adjournment under Arbitration Act section 103(5) (see *Travis* § 73; *Stati* § 3; and *AIC* § 54).  In the present case, both the state immunity issues and any application for recognition and enforcement of the Awards are likely to involve the English court determining issues that will also be determined by the Dutch courts.  Moreover, it is particularly important to avoid creating a risk of inconsistent judgments in circumstances where the question of the validity of the Awards is more appropriate for determination by the Dutch courts as the curial courts: see *IPCO* § 51(iii); *British Aerospace* § 13; *Bundeszentralamt* §116 and *Prifti* § 22.

190.    Secondly, there is a risk of inconvenience and inefficiency for the parties, the court and other court users if the Stay is lifted now.  Significant time and expense would be spent by the parties in the present proceedings to determine issues which will in large part be finally determined by the curial court in the Dutch proceedings in any event (cf *Bundeszentralamt* § 113).  This is a paradigm case where the English proceedings "*may turn out to be unnecessary or may be the subject of duplication*" and may "*result in considerable waste of time and costs*", which should be avoided "*not only the interests of the parties but the interests of other court users and the efficient use of court resources*": *Stati* §§ 2 and 5.  The more efficient course is for the English proceedings to await the outcome of the Dutch proceedings, at which point the English Court "*may very well be assisted by what the [curial] court has to say on those issues*" (ibid.).

191.    Thirdly, lifting the Stay of the English proceedings now would give rise to a real risk of serious prejudice to Russia in the circumstances of this case, in light of the arguments that the Claimants appear to be advancing on issue estoppel.  As noted earlier, the Claimants' position is that all three grounds of Russia's state immunity challenge are barred by issue estoppel or the doctrine of abuse of process, and can therefore be determined summarily in the Claimants' favour if the Stay is lifted.  There is therefore a real risk that, if the Claimants' arguments on issue estoppel are accepted, Russia will be precluded from advancing part of its state immunity case, based on a decision of the Hague Court of Appeal that is liable to be overturned by the Dutch Supreme Court (and/or the CJEU).  Although Russia has reserved its position on issue estoppel, the standard components for an issue estoppel appear to be present.  If Russia's immunity claim were rejected in the English courts, even in part, as a result of issue estoppel based on the judgment of the Hague Court of Appeal, it may not be able to resurrect that immunity even if that court's decision is later reversed.  That would create real unfairness, and it cannot be consistent with the policy of the SIA for any state to be placed in that invidious position.

192.   The Claimants have a number of responses to these points.  The first is that the risk of procedural inefficiency and/or inconsistent judgments is one which inevitably arises in any case where enforcement proceedings are pursued while there is an outstanding challenge in the courts of the seat.  If those risks were, without more, sufficient to justify a stay, then both Article VI of the New York Convention and Arbitration Act section 103(5) would be framed in mandatory, rather than discretionary, terms.  Russia's complaints of procedural inefficiency therefore go no further than establishing that the <u>threshold</u> conditions for the potential exercise of the court's discretion under section 103(5) are satisfied (which the Claimants do not dispute): they do not establish that the discretion ought in fact to be exercised.  The general philosophy of the New York Convention and the Arbitration Act remain pro-enforcement.

193.   As to issue estoppel, the Claimants say the risk which Russia highlights arises only if the English court were to decide on the immunity issues before the Dutch Supreme Court issued its decision.  That may well not happen, bearing in mind that, following the lifting of the Stay, there would first need to be a directions hearing, and the hearing on the immunity issues themselves would no doubt be some months later.  I do not, however, think it appropriate to determine the current application on the basis that the immunity issues *might* not proceed here in the meantime.  Moreover, if the Dutch Supreme Court were either to remit issues to the Hague Court of Appeal or to refer a question to the CJEU, then there would be a high chance of the jurisdiction issue having to be determined in England while the challenge in the curial court remained pending.  It does not appear logical to me to lift the Stay now, only to reimpose it in the event that the English court reaches the jurisdiction issue before the final outcome in the curial court.

194.   The Claimants do not suggest that a Dutch Supreme Court judgment reversing the Hague Court of Appeal's decision would unwind any decision that the English court had reached in the meantime based on an issue estoppel created by the latter court's decision.  It is thus common ground between the parties that there would be at least a risk that Russia would be bound by an adverse determination based on such an estoppel, even if the Dutch Supreme Court (or CJEU) were later to conclude that Russia was right about the relevant issues.

195.   The Claimants submit that no unfairness could thereby arise because:

   i)     if the English court were to find against Russia on state immunity, by reason of an issue estoppel or otherwise based on the Hague Court of Appeal's decision, then that would simply reflect the proper application of English laws on issue estoppel and/or abuse of process; and

   ii)    the English court could 'factor in' any such risk of unfairness as part of the process of determining the immunity issue (including its decision on any issue estoppel or abuse of process argument).

196.   I do not consider either of those points to provide a sufficient answer to the concerns referred to in § 191 above.  As to (i) above, the effect of determining the immunity issues on the basis of the Hague Court of Appeal's decision, without awaiting the outcome of Russia's appeal, would be to reach a final decision in England based on what might turn out to be only the interim position in the curial court.  It is true that that would, if it occurred, be the result of the proper application of English law on issue

estoppel and/or abuse of process. However, the whole point of an adjournment under section 103(5) of the 1996 Act, or (by extension) a case management stay in circumstances such as those of the present case, is to await the outcome in the curial court, in preference to proceeding to recognition and enforcement based on an award that is indeed currently binding but may be set aside. The situation is in principle no different where an adverse decision in the curial court remains subject to a viable appeal. In the present case, there is an appeal on foot with realistic prospects of success, and a very significant area of overlap between the appeal issues and state immunity questions. In those circumstances, considerations of both comity and fairness press against the English court at this stage making determinations on state immunity issues that may remain binding even if the curial court ultimately reaches the opposite view on the same issues.

197.  As to point (ii) above, it is reasonable to anticipate that if the Stay is lifted at this stage, the English court will *not* at the next substantive hearing consider all over again whether there should be a stay or adjournment pending the outcome of the Dutch proceedings. Rather, the court can be expected to proceed to determine the immunity issue by applying the substantive law. The substantive law cannot be expected to reflect or incorporate the same considerations as arise when considering, as a matter of discretion, whether to await the ultimate decision in the curial court. The question of whether to await that outcome arises now, on the present application, and it would be wrong in my view to assume that the matter can be revisited later.

198.  The Claimants submit that Russia's arguments on these matters are unsustainable in the light of the correspondence and statements referred to in §§ 131-134 above. They say Russia is playing an obvious tactical game: it is raising the spectre of inconsistent judgments as a reason to stay or adjourn the enforcement proceedings here, whilst at the same time reserving the right to argue that this court is not bound by any ruling by the Dutch Supreme Court that Russia does not like. By seeking to leave open the possibility of arguing that the issues to be determined by the Dutch Supreme Court will have to be decided *de novo* in this jurisdiction, Russia undermines the integrity of any argument that these proceedings should be put on hold in order to avoid a risk of inconsistent judgments.

199.  I do not, however, read the correspondence referred to earlier as seeking to reserve any particular right to attempt to re-open in this court issues that the Dutch courts have determined. I have not heard argument as to whether such a course would be permissible. It seems likely that there must be (to put it at its lowest) a risk that Russia would not be permitted to reopen issues in that way. In my view it remains necessary for this court to consider (and reasonable for Russia to advance submissions about) whether considerations of comity and fairness make it appropriate to await the final outcome in the curial court before proceeding to determine Russia's immunity challenge.

200.  The Claimants further rely on the fact that in the Suspension Ruling, the Dutch Supreme Court has decided to permit enforcement to continue in its own jurisdiction notwithstanding the risk (which Russia also urged upon the Dutch Supreme Court) of procedural inefficiency and/or inconsistent judgments. A continuing stay or adjournment of these proceedings would therefore, the Claimants say, lead to a peculiar and inappropriate situation in which this court would be giving greater weight to the existence of an unresolved challenge to the Awards in the courts of the seat of the

arbitration than the courts of that seat themselves.  However, as set out earlier in this judgment, the Dutch court applies a fairly high bar in the context of suspension applications, staying enforcement only in the event that a provisional review indicates the appeal has a high probability of success, and where the existence of complex issues makes it likely that the court will not conclude such a probability exists.  The English court has to apply its own law as to whether to grant an adjournment (or, in this case, a stay), which applies a different standard.

201.    The Claimants make the further point that these are very substantial awards.  In the circumstances, the cost and inconvenience of pressing on with these proceedings is *de minimis* when considered in the context of the overall amounts at stake.  There is some force in that view so far as concerns cost and inconvenience for the parties; but it leaves out of account the interests of other court users, comity and, as between the parties, the fairness considerations discussed above.

202.    Finally, the Claimants say the court ought to view Russia's current submissions with scepticism, given that Russia was not seeking a stay when these proceedings were first commenced in 2015.  It is true that Russia could have sought a stay, during the period between September 2015 when it issued its jurisdiction challenge and April 2016 when the Hague District Court handed down its judgment.  It is not clear why it did not do so, though it is possible that the legal landscape was seen as being different: at that stage, unlike now, Russia could have advanced its state immunity arguments with a 'clean slate', unburdened by the prospect of issue estoppel/abuse of process arguments based on an adverse court decision in the Netherlands.  In any event, I am not persuaded that that factor should materially affect the court's consideration of whether to lift the Stay in the circumstances that now exist.

203.    For the reasons given above, I consider that the risk of inconsistent judgments, including specifically the risk of Russia being the subject of a final adverse decision, based on conclusions by the Hague Court of Appeal on issues central to Russia's state immunity challenge that are later overturned, is a factor which weighs significantly in favour of continuing the Stay pending the final outcome of the challenge in the curial court.

*(ii) Risk of dissipation by Claimants*

204.    Russia contends that lifting the Stay would create a risk of the Claimants ultimately enforcing the Awards against Russia in circumstances where Russia would be unable to recover that money should the Awards later be overturned by the Dutch Supreme Court.  That risk is said to apply both to any sums obtained by the Claimants through enforcement, and to any security paid into court by Russia and then released to the Claimants at the conclusion of enforcement proceedings.

205.    The Claimants make the threshold point that the risk cannot in practice arise because even if the Stay is lifted now, the proceedings will take time and they do not expect to enforce against Russia's assets until the summer of 2022 at the earliest.  Russia counters that according to the authorities, it is relevant to consider prejudice to both parties at the outset in deciding whether to grant a stay or adjournment.   For example, in *IPCO*, Gross J held that that the prejudice in refusing a stay of the application for recognition and enforcement included the "*very substantial risk that the monies thus paid out would be irrecoverable – even if [the defendant] succeeded in setting the award aside*".  Gross

J did not dismiss that risk as a matter to be considered at a later stage. Moreover, the Dutch proceedings might not (particularly in the event of remission or a reference) be concluded by summer 2022, and it would not be sensible for the court to lift the Stay and allow parallel proceedings to continue, then at some later stage to re-impose a stay and await the outcome of the Dutch proceedings because of the risk of dissipation. Instead, the court should consider the overall balance of prejudice at the outset so that – where appropriate – parallel proceedings can be avoided altogether.

206. As to the existence of the risk, Russia notes that according to the authorities:

  i)    factual findings of other courts or arbitral tribunals that a party has carried out unlawful schemes involving concealment or dissipation of assets can provide strong evidence of a risk of dissipation: see *Great Station Properties v UMS Holding Limited* [2017] EWHC 3330 (Comm) §§ 7, 10-11 and 51; *ArcelorMittal USA LLC v Essar Steel Ltd* [2019] EWHC 724 (Comm) § 38; *Ras Al Khaimah Investment Authority v Bestfort Development LLP* [2017] EWCA Civ 1014 §§ 25 and 54; *Madoff Securities International Ltd v Raven* [2011] EWHC 3102 (Comm) §§ 169 and 180-181; and

  ii)   the fact that a party has "*links to complex and offshore complex structures and the potential to transfer value rapidly and invisibly through corporate reorganization could contribute*" to a risk of dissipation alongside other evidence of such a risk: see *Holyoake* § 59; *VTB Capital Plc v Nutritek International Corp* [2012] EWCA Civ 808 §§ 174 and 178; *Madoff Securities* §§ 174-181.

207. Russia cites findings by courts in various jurisdictions to the effect that the Individuals, the Claimants and other companies in the wider corporate structure of which they form part have participated in unlawful tax evasion schemes, in particular:

  i)    the Moscow High Court's finding in 2005 that Yukos had operated an unlawful tax evasion scheme using numerous special purpose entities in low tax jurisdictions, which had allowed it to evade tax by falsely accounting for income as though it had been earned in certain low tax regions of Russia;

  ii)   the ECtHR's conclusion in 2012 that the above scheme was "*obviously aimed at evading the requirements of the Tax Code*" by the use of "*letter-box companies in domestic tax havens in Russia*", and "*unilateral gifts between the trading companies and the applicant company through its subsidiaries, which were incompatible with the rules governing the relations between independent legal entities*" (*OAO Neftyanya Kompaniya Yukos v Russian Federation*, ECtHR App No 14902/04 (Judgment, 20 September 2011));

  iii)  the conclusion by a second chamber of the ECtHR in 2013 that the same arrangements involved tax evasion, and that two of the Individuals knowingly submitted false data in order to reduce the overall tax burden of the company (*Khodorkovskiy & Lebedev v Russian Federation*, ECtHR App Nos 11082/06 & 13772/05 (Judgment, 25 October 2013));

  iv)   the Amsterdam Court of Appeal's decision in 2017, after examining evidence of the schemes mentioned above, held that "*[i]t has been established and*

> *explained by the ECHR that there has been large-scale and long-term tax evasion in respect of the profit tax using legal entities without actual activities (the sham entities, hereinafter also referred to as front subsidiaries), which only served to facilitate and conceal the conduct of Yukos Oil"* (judgment dated 9 May 2017 in case numbers 200.002.097/02 and 200.002.104/02); and

> v)   the finding of the Tribunal in the present case that the First Claimant *"appears to the Tribunal to have falsely declared on Cypriot withholding tax forms that 'income' - dividends from Yukos – 'was not connected with activities carried on in the Russian Federation' despite Mr. Lebedev's activities in Moscow"* (Award § 1620).

208.   Russia also relies on evidence that during a tax investigation in Russia, Yukos in March 2002 instructed employees to delete documents relating to the shell companies in low-tax jurisdictions controlled by Yukos; and that in January 2004 a Yukos executive falsely claimed that those shell companies were independent of Yukos and that their income should not be treated as revenues of Yukos.  Russia further makes reference to (a) a report that in 1998 the Individuals had threatened to transfer the ownership of Yukos's assets to offshore shell companies unless minority shareholders sold their stakes to them at a discount; (b) more recent reports in the US suggesting that the same structure of offshore companies may have been used to hide Yukos dividends improperly extracted from Russia; (c) a 1994 CIA report suggesting that Bank Menatep, at the time owned and controlled by the Individuals, had links to Russian organised crime involved in the violation of international sanctions; (d) evidence to the effect that the Individuals used four shell companies to rig the outcome of two public auctions by which they acquired more than 78% of Yukos at a fraction of its true value; and (e) evidence that documents belonging to Bank Menatep were driven into the River Volga to destroy evidence of fraud.

209.   Russia cites the finding by  the Paris Court of Appeal of a risk of dissipation, in the context of parallel enforcement proceedings brought by the Claimants in France, in three decisions dated 17 December 2015, holding that because the Claimants are:

> "established in Cyprus [and the Isle of Man], being notably … indirect subsidiar[ies] of GML Limited, a company registered in Gibraltar, which is itself owned directly or indirectly by the managers of seven trusts in Guernsey, the Russian Federation rightly claims the absence of a guarantee that property likely to be seized will be returned if the enforcement orders are overturned and thus has justified the risk of severe prejudice to its rights if the award[s] is enforced [in France]…"

210.   This last point leads on to the Claimants' short answer to Russia's concerns under this heading.  The solution adopted by the court in Paris was to subject the enforcement of the Award to conditions, ordering Hulley to deposit all amounts paid and/or recovered from Russia, or by garnishee orders, at the Caisse de Dépôts et Consignations as such payments were received, designating that body as the legal trustee of those amounts until the Paris Court of Appeal ruled on the validity of the enforcement order, and ordering that unless that were done then enforcement would be immediately stayed.  Thus, the Claimants say, it would be open to the English court at the appropriate stage to adopt a similar solution, requiring all enforcement proceeds to be paid into court

pending the final outcome of the proceedings. In those circumstances, the Claimants say it is unnecessary for them to respond to the allegations advanced by Russia outlined above. The Claimants add, for completeness, that notwithstanding the various findings against them listed above, no prosecution has been commenced against any of the Individuals in Russia.

211.     Russia responds to the suggestion that moneys could be deposited in court that that would place a burden on the court and give rise to a number of logistical problems. Such a route might provide a solution in circumstances where there were no other reason to adjourn award enforcement proceedings, but that is not the position in the present case.

212.     In my view the matters relied on by Russia, particularly the findings of the ECtHR, provide at least some basis on which to believe a risk of dissipation would exist. However, I agree with the Claimants that it is very likely that a solution could be found involving the deposit of all recoveries either into court or (perhaps more likely) some form of escrow arrangement. In those circumstances, I am not persuaded that this factor represents a weighty one against the lifting of the Stay.

### (4) Overall consideration

213.     I have to weigh up the competing considerations for and against the lifting of the Stay, including the following:

i)      the fact that the Claimants have secured Awards for very large sums, which have been upheld by the Hague Court of Appeal;

ii)      the pro-enforcement philosophy underlying the New York Convention and the 1996 Act;

iii)     the prejudice to the Claimants arising from being kept out of their money, or at least delayed in the enforcement steps they could otherwise take in England and Wales (or overseas but in reliance on an English judgment), possibly for several more years;

iv)     the fact that any risk of dissipation by the Claimants could probably be overcome by paying any recoveries into court or escrow;

v)      conversely, the fact that I am not persuaded that continuation of the Stay will create or materially increase the risk of dissipation of assets by Russia, or of other events that would likely make enforcement more difficult, though it is always possible that events over time could have such an effect (see e.g. § 187 above);

vi)     the fact that Russia's appeal to the curial court has, in my view, realistic prospects of success, and is not being pursued merely as a delaying tactic;

vii)    the evidence of lack of good faith in the broader sense I identify in § 169 above;

viii)   the advantages, where a challenge in the curial court has a realistic prospect of success, of allowing that process to run its course, in the interests of comity, avoidance of inconsistent decisions and efficiency;

ix)     the specific risk of unfairness that would arise if Russia were to be unable to advance (or to fail in) its full case on state immunity as a result of the binding effect of the decision of the Hague Court of Appeal on essentially the same issues, only for that decision to be later reversed by the Dutch Supreme Court (with or without a reference to the CJEU); and

x)      the fact that, as I conclude later, I could and would not order security as a condition of continuing the Stay, therefore the Claimants would lack that element of protection or advantage.

214.    Viewing the matter in the round, I have come to the conclusion that the Stay should be continued.  I consider that the prejudice to the Claimants arising from further delay in potential enforcement measures, without security in the meantime, is outweighed in the present case by the advantages referred to in § 213.viii) and 213.ix) above of awaiting the ultimate outcome of the viable challenge which Russia is bringing in the courts of the Netherlands.

## (H) SECURITY

215.    The Claimants submit that, if the Court would otherwise be minded to continue the Stay, then it should (1) lift the Stay, but (2) adjourn the proceedings under section 103(5) of the 1996 Act, and (3) order Russia to provide security (or make the adjournment conditional on security being provided), pursuant to that provision, by payment into court in the sum of US$7 billion.

216.    Russia contends that the court presently has no power to order an adjournment or security under section 103(5), because Russia's claim to state immunity has not yet been determined, and it is that application which is presently stayed.  Moreover, Russia submits that the present case is not one in which security would be appropriate in any event.

### (1) Whether the power under section 103(5) of the 1996 Act arises

217.    The Claimants submit that:

i)      an order for security under section 103(5) would not violate Russia's sovereign immunity because it could not be treated as analogous to an injunction, citing *Soleh Boneh* at p. 213;

ii)     an order for security is simply the price of an indulgence which a defendant wishes the court to grant, namely an adjournment of the relevant enforcement proceedings.  Here, the question of security only arises because Russia wishes these proceedings to be kept on hold pending the determination of the Cassation Appeal.  Russia cannot ask this court to exercise a discretion in its favour, whilst simultaneously asserting immunity in respect of the proper price of that exercise of discretion;

iii)    such an order would not limit Russia's access to this court or impede its ability to assert sovereign immunity: if Russia were ordered to provide security as the price of an adjournment but failed to do so, then these proceedings would

continue and the first matter requiring determination would then be Russia's challenge to the jurisdiction based on its assertion of sovereign immunity;

iv)    despite the fact that a number of cases decided under section 103(5) have involved awards against sovereign states, the Claimants are unaware of any recorded example of an order for security under that section being refused on the grounds of sovereign immunity;

v)    *ad hoc* committees considering annulment applications under the ICSID Convention have similarly not refrained, on sovereign immunity grounds, from conditioning stays of enforcement on the provision of security; and

vi)    in any event, even if Russia were right on this point, it would leave the court with a stark choice between no adjournment, and an unconditional adjournment. If the court is forced into that position, then (a) the balance of prejudice between the parties becomes decisive; and (b) that balance falls decisively in the Claimants' favour.

218.    The Claimants expressly do not invite the court to order security, or to make continuation of the Stay conditional on the payment of security, on any basis other than section 103(5) of the 1996 Act.

219.    By way of elaboration of points (i) and (ii) above, the Claimants submit that the present situation falls squarely within the terms of section 103(5). Section 103 as a whole applies where recognition or enforcement is sought of a New York Convention award, and section 103(5) provides:

> "Where an application for the setting aside or suspension of the award has been made to such a competent authority as is mentioned in subsection (2)(f), the court before which the award is sought to be relied upon may, if it considers it proper, adjourn the decision on the recognition or enforcement of the award.
>
> It may also on the application of the party claiming recognition or enforcement of the award order the other party to give suitable security."

220.    The present proceedings have been brought in order to obtain the recognition and/or enforcement of New York Convention awards, and *"an application for the setting aside or suspension of the award has been made to such a competent authority as is mentioned in subsection (2)(f)"*, namely the courts of the Netherlands. The pre-conditions for an order for security under section 103(5) have thus arisen, and in substance such an order would merely make the adjournment Russia seeks conditional on payment of security (rather than necessarily operating as a mandatory order to pay).

221.    I am unable to accept those submissions. In my view, any exercise of powers under section 103 would constitute the assertion of adjudicative jurisdiction over Russia which the court has not yet held to exist. There can be no question of exercising any such powers unless and until Russia's claim to state immunity has been determined and rejected.

Hulley Enterprises and others v Russian Federation

222.   SIA section 1 provides:

> "(1) A State is immune from the jurisdiction of the courts of the
> United Kingdom except as provided in the following provisions
> of this Part of this Act.
>
> (2) A court shall give effect to the immunity conferred by this
> section even though the State does not appear in the proceedings
> in question."

223.   Thus, pending any finding that one of the exceptions in the Act applies, the immunity
is from the court's jurisdiction in general, adjudicative as well as enforcement.

224.   It is well established that where a question of state immunity arises it must be decided
as a preliminary issue.  In *JH Rayner (Mincing Lane) Ltd v Department of Trade and
Industry* [1989] Ch 72, an international organisation, the International Tin Council
(ITC), entered into contracts with brokers on the London Metal Exchange and
concluded loan agreements with a number of banks.  When the ITC went insolvent, a
number of the creditors sought to enforce arbitration awards against foreign states that
were constituent members of the ITC, in respect of the ITC's liabilities.  The court held
that there was no contract between the creditors and the member states, and rejected
alternative claims based on concurrent/secondary liability, as well as agency.  The court
also held that, had the claims been legitimate, the states would not have had immunity
from them under the SIA.  However, in the course of dealing with that issue members
of the court made certain important observations in response to an argument that the
court could proceed with the case provided that the claimants had a good arguable case
that the relevant states lacked immunity.  Kerr LJ stated:

> "However, in the end I was persuaded that the judge's conclusion
> in favour of a good arguable case could not be supported.
> Although not a decision under the Act of 1978, that was the
> conclusion of Robert Goff J. in *I Congreso del Partido* [1978]
> Q.B. 500, 535-537, in a similar context of an issue as to the
> court's jurisdiction in the face of a claim to sovereign immunity.
> Mr. Pollock also pointed to the complications which would arise
> if a "good arguable case" in favour of an exception to immunity
> under, say, section 3 were then to lead directly to a trial of the
> merits of the action, as Mr. Kentridge contends. The defendant
> state could in that event not defend the substantive claims
> without taking steps in the proceedings, which would involve a
> submission to the jurisdiction under section 2(3)(b).
>
> In the upshot, therefore, I am persuaded that whenever the
> question arises under the Act of 1978 whether a defendant state
> is immune by virtue of section 1 or not immune by virtue of one
> of the exceptions, then this question must be decided as a
> preliminary issue in favour of the plaintiff, in whatever form and
> by whatever procedure the court may consider appropriate,
> before the substantive action can proceed." (p.194)

Ralph Gibson LJ said:

> "If a state claims immunity then, in my view, the statute requires that the issue be determined before the court can try the proceedings. It was objected that Parliament cannot have intended that there be what, in some cases, would amount to the trial of the action before the plaintiff could be permitted to go to trial. I do not think that there is any substance in that objection. I would accept Mr. Pollock's submission that, if proof of the exception to state immunity turned upon issues of fact - as in this case upon the matters dealt with by Staughton J. it did not - the court could give directions for the trial of those issues, including directions for discovery, for the calling of witnesses, and for cross-examination of witnesses upon affidavits. The sovereign state could not be placed under any sanction with reference to discovery but, in deciding issues of fact, the court could have due regard to any failure to disclose relevant documents. I see no reason why issues of fact, such as whether the foreign state is shown to have entered into a commercial transaction, should not be disposed of by trial of the issue in this way. If the plaintiff succeeds on the issue then any remaining issues, such as breach of contract and damages, would be tried thereafter in the normal manner." (p.252)

225.    Similarly, the Court of Appeal in *ETI Euro Telecom International NV v Republic of Bolivia* [2009] EWCA Civ 880 made clear that (even if the defendant takes no part in the proceedings) the court "*must consider and decide the question of state immunity at as early a stage on the proceedings as practicable*", reflecting the fact that state immunity is "*a matter of the greatest importance*" (see § 110 per Lawrence Collins LJ and § 128 per Stanley Burnton LJ).

226.    Hence in *A Company Ltd v B Company Ltd and anor* (Commercial Court, 1 April 1993), Saville J held that by challenging the court's jurisdiction *inter alia* on *forum non conveniens* grounds, the first defendant state had submitted to the jurisdiction.  He stated as follows, in a passage which I think it is necessary to set out in full:

> "Mr Joseph for the State submitted that this was not so. In his submission the Plaintiffs' argument confused two separate kinds of jurisdiction, namely the jurisdiction to decide whether jurisdiction exists and the jurisdiction to try the matter on the merits. In his submission both the forum non conveniens question and the State Immunity question involved only the exercise of the first type of jurisdiction, so that there could be no question of the State submitting or being deemed to submit to the second type of jurisdiction.
>
> In support of his argument Mr Joseph relied upon the decision of the House of Lords in *William & Glyn's Bank v Astro Dinamico Compania Naviera SA* [1984] 1 All ER 760, [1984] 1 Lloyd's Rep 453. In that case the Plaintiffs had brought proceedings in this country on guarantees allegedly provided by foreign Defendants which contained English law and jurisdiction clauses. The Defendants denied the validity of the guarantees

and contended that since they were invalid the English Court lacked jurisdiction over them; and they applied to set aside service of the proceedings on them on this ground. The Defendants had themselves brought proceedings in Greece against the Plaintiffs which raised the same issues as to the validity of the alleged guarantees. The Defendants relied upon these latter proceedings in support of a simultaneous application to stay the English proceedings until the outcome of the proceedings in Greece. Bingham J (as he then was) considered that he could not entertain the latter application before dealing with the former, for to do so would be to assume a jurisdiction which, if the Defendants were right on their first application, did not exist.

Both the Court of Appeal and the House of Lords disagreed with this view on the grounds that in dealing with the second application the Court would not be assuming a jurisdiction to deal with the merits of the claim, but merely exercising the jurisdiction to decide whether the Court did have jurisdiction to deal with the merits. In considering whether or not to stay the proceedings pending the outcome in Greece the Court was merely deciding at what stage it would be appropriate to consider the challenge to the jurisdiction -- and not in any way exercising or assuming a jurisdiction to try the case on the merits. For the same reasons the House of Lords rejected the argument that by applying for a stay the Defendants had waived their objection to the "merits" jurisdiction of the Court. In the view of the House of Lords, the error into which Bingham J had fallen was to confuse two quite different types of jurisdiction, namely "jurisdiction" jurisdiction and "merits" jurisdiction.

In my judgment it is the argument advanced by the State and not that of the Plaintiffs which contains a very similar error, by confusing the jurisdiction of the English Court to decide whether a State is immune from its process with another quite different kind of "jurisdiction" jurisdiction. If under the State Immunity Act a foreign sovereign is immune from the jurisdiction of the United Kingdom Courts, that is the end of the matter. In such a case the Court has no power to decide whether or not, for example, England is the convenient forum, nor any other questions (whether of jurisdiction or otherwise) that might arise in the context of litigation between non-sovereign bodies. Unlike the circumstances in the case cited, the forum non conveniens application cannot be described as being part and parcel of the exercise of the relevant jurisdiction, for the question whether a State is immune from suit has nothing whatever to do with the question whether England is the proper forum for the resolution of the dispute between the parties.

It is for this reason that I concluded in *A v Republic of X* [1990] 2 Lloyd's Rep 520 at 524-525, that when a question of state immunity arises it must be finally determined at the outset, relying on the decision of the Court of Appeal in *JH Rayner v Department of Trade* [1989] Ch 72, [1988] 3 All ER 257. It is not permissible to proceed on the basis that the point can be determined later, for if immunity in fact exists the Court would ex hypothesi be purporting to exercise powers which it does not possess.

In view of the foregoing it seems to me to be clear that (leaving aside the original Order 12 rule 8 Summons itself) the State, by thereafter making and pursuing its applications for the forum non conveniens question to be dealt with before the State Immunity question, has taken a step in the proceedings otherwise than for the purpose only of claiming immunity. Of course, by making such applications, the State has not submitted to the "merits" jurisdiction of the Court, nor did the Plaintiffs suggest that it had, since the applications concern a different challenge to the jurisdiction, but that is not the point. By applying to the Court to deal first with this other jurisdictional challenge the State, as expressly appears from the answer to the questions I posed, is necessarily accepting that the Court has power over the State in this regard and is asking the Court to exercise this power. In my judgment it inevitably follows that the State has done something by way of a step in the proceedings which cannot be described as only for the purpose of claiming State Immunity." (pp. 3-5)

227. The question of whether a *forum non conveniens* challenge made at the same time as an immunity challenge amounted to a submission was further considered in *Kuwait Airways Corp v Iraqi Airways Co* [1995] 1 Lloyd's Rep. 25, but that specific issue does not affect Saville J's general point that until questions of state immunity have been determined, the court has no power to determine other questions, whether of jurisdiction or otherwise, over and above the court's 'jurisdiction' to decide the immunity issue.

228. The same principle also appears from the cases holding that where a defendant claims state immunity, the court has no jurisdiction to make a freezing order against it without first deciding the question of immunity: see *A Co Ltd v Republic of X* [1990] 2 Lloyd's Rep 520, 524–525 (Saville J), and *ETI Euro Telecom International NV & Anor v Republic of Bolivia* [2008] EWHC 1689 (Comm) §§ 32-33 (Andrew Smith J)).

229. The jurisdiction to order security under section 103(5) was referred to by Popplewell J in *X v E and F* as "*part of the range of remedies which are available to the court as part of the court's toolkit when it is being asked to recognise or enforce the award, and as an adjunct to such an application*". That range of remedies under the 1996 Act is available, in my view, only if and when the court has determined that the defendant state lacks immunity, so that the court can assume jurisdiction over it. To purport to apply section 103(5), including by ordering security or granting an adjournment conditionally upon the payment of security, would be to exercise powers which the court does not, pending an adverse immunity decision, possess. The position is clearly distinguishable from that in *William & Glyn's Bank* (cited by Saville J in the passage

quoted above), where the court by staying its proceedings was doing no more than "*deciding at what stage it would be appropriate to consider the challenge to the jurisdiction*".

230.   It follows that in my view the court's power to grant or continue the existing Stay does not derive from section 103(5).   Rather, it derives from the court's general case management powers so far as applicable when resolving a question of state immunity. It makes no difference that, based solely on the language of section 103, the preconditions for the exercise of section 103(5) might be thought to have arisen.   The reality is that those powers are not at present available and are not being exercised.

231.   That conclusion is not in my view affected by the reasoning in *Soleh Boneh*.   The court there adjourned proceedings to enforce an award, contingently upon the defendant state, Uganda, providing security.   Staughton LJ said:

> "Section 13(2)(a) of this Act provides:
>
> > ... relief shall not be given against a State by way of injunction or order for specific performance or for the recovery of land or other property.
>
> Mr. Burton submits that the order of the Deputy Judge in this case did grant relief by way of an injunction. He points to the fact that a copy of the order was endorsed with a penal notice, directed at the High Commissioner of Uganda in the United Kingdom personally.
>
> Mr. Brodie submits that the order is plainly not an injunction and that is the end of the point. Had he elaborated his robust submission, he might have added that  O.23 of the Rules of the Supreme Court enables the Court to order a plaintiff to give security for costs, and is not a sub-head of O.29 which deals with interlocutory injunctions.
>
> In the context of s. 13(2)(a), and despite the doubts of Sir John Donaldson M.R. in the *SPP (Middle East) Ltd*. case, I would not hold that a simple order for the payment of money from no specified source is an injunction. It is no different from a monetary judgment.  But in case I am wrong on that, l would vary the form of the Deputy Judge's order. He ordered (1) that the proceedings be adjourned for three months, and (2) that the employers provide security in the sum of $29m. within four weeks, I would substitute an order that, unless the employers provide security in the sum of $5m. within four weeks there be leave to enforce the award as a judgment; and that if security is so provided, there be liberty to apply in the Queen's Bench Division after a further period of nine months has elapsed. There should be no penal notice." (p.213)

232.   However, the only claimed immunity at issue in *Soleh Boneh* was the 'procedural privilege' (in the words of the heading to the section) under SIA section 13 from the

grant of relief by way of injunction against a state. *Soleh Boneh* did not address the situation in the present case where an unresolved claim has been made to immunity from the court's jurisdiction in general.

233.   The lack of any recorded example of an order for security under section 103(5) being refused on the grounds of sovereign immunity is, as Russia says, unsurprising, as a state requesting an adjournment under section 103(5) would risk being deemed to have taken a step in the proceedings otherwise than for the purposes of claiming immunity, leading to a potential waiver within the meaning of SIA section 2(3)(b). It is equally true that the parties have not cited any decision where an order for security under section 103(5) *has* been made where a state's immunity from the English court's adjudicative jurisdiction remained undetermined.

234.   I agree with Russia that the Claimants' reference to ICSID *ad hoc* committee decisions does not assist. As a matter of public international law, *"[t]he rules of State immunity are procedural in character and are confined to determining whether or not the courts of one State may exercise jurisdiction in respect of another state"*: *Jurisdictional Immunities of the State (Germany v Italy; Greece intervening)* [2012] ICJ Rep 99 § 93. ICSID *ad hoc* committees are international tribunals, exercising appellate jurisdiction, to which the law of state immunity does not apply. Further, in the cases the Claimants cite, it was the state who had instituted proceedings before the *ad hoc* committee, thereby waiving any relevant immunity.

235.   The Claimants made the further points in oral submissions that:

   i)    section 103 is intended to reflect Article VI of the New York Convention, so questions of English procedural law cannot affect the test or the power to order security, and

   ii)   the state immunity issue is merely the first issue which arises in the Claimants' arbitration claim, and the court has the power to case manage the proceedings as a whole, including by requiring security as a condition of a stay or adjournment.

236.   However:

   i)    the lack of jurisdiction referred to above derives not from English procedural rules but from the SIA (which itself reflects international conventions); and

   ii)   it is true that the court can case manage the resolution of state immunity issues, but it does not follow that in doing so it is exercising or can exercise the powers set out in section 103(5) of the 1996 Act.

237.   Given my conclusions above, it is not strictly necessary to consider two further contentions which Russia advances, but I do so briefly for completeness.

238.   Russia argues that the jurisdiction to order security under section 103(5) is not available in any event because Russia has not brought any challenge to enforcement under section 103(2)(f), which is a threshold condition for the application of section 103(5). Popplewell J held in *X v E* that the jurisdiction to order security under section 103(5) *"does not confer a freestanding jurisdiction which arises whenever an award had been*

*challenged before the competent court"* and is *"only applicable where there is a challenge to the recognition or enforcement under s 103(2)(f)"* by the judgment debtor (§ 52). Popplewell J went on to say:

> "Were it otherwise, the construction for which Mr. Sprange contends would have at least two curious consequences. The first is that the court would have power to grant security irrespective of whether an application had ever been made for enforcement of the award under s.101. If s.103(5) is to be interpreted as a freestanding provision whose only prerequisite is that an application has been made to the competent court to set aside the award, it would not be necessary for the court to be asked to recognise or enforce the award under s.101 before it could exercise a power to order a defendant to give security for the award. That would be a surprising consequence. Secondly, if Mr. Sprange were right, then the court would have power to grant security under s.105(3), where an award were enforced pursuant to s.101 without challenge, including circumstances in which a judgment was entered in the terms of the award pursuant to s.101(3). That would involve the court having the power to grant security in relation to a judgment which had been entered in the terms of the award by way of recognition and enforcement, thereby bypassing all other enforcement procedures with all their safeguards, including jurisdictional safeguards. In that respect, the court would be doing more in support of a judgment given to enforce a New York Convention award obtained abroad than that which it would be prepared to do by way of post-judgment enforcement of a judgment which it had given itself, having decided the merits of a dispute over which it had substantive jurisdiction. The grant of security in favour of a judgment entered on an award in that way would be contrary to principle. It would be to grant security for a judgment, rather than the most which the courts will do by way of post-judgment freezing order, which is to restrain assets for the purposes of assisting enforcement processes." (§ 53)

239.  I make the preliminary observation that the reference in *X v E* to a challenge *"under s 103(2)(f)"* may be a shorthand for (or at least include) a request for an adjournment under section 103(5) by reference to an overseas challenge which, if successful, would provide grounds for a challenge under section 103(2)(f). Section 103(2)(f) itself applies only where the award has in fact been set aside by the overseas court.

240.  The Claimants make the point that in *X v E*, no application had yet been made to set aside the court's without notice order under section 101(2) giving permission to enforce the award in the same manner as a judgment. In substance, therefore, all Popplewell J held was that the mere existence of a challenge in the curial court was insufficient to bring section 103(5) into operation. Here, by contrast, Russia *is* seeking to challenge enforcement: it merely so happens that the first ground of challenge is state immunity.

241.  The position on this issue is affected by the fact that in the later case *Stati*, Popplewell J proceeded on the basis that security could be ordered even where the award defendant

was not seeking an adjournment, but rather the claimant was seeking one (as in *Dardana v Yukos*) or the court of its own motion granting one (as in *Stati* itself).  In *Stati* Popplewell J stated, at § 7, that the prerequisite of the grant of security under section 103(5) was (simply) that there be an adjournment.

242.   In these circumstances, I consider that Russia's further contention in reality leads back to the first question I have already considered, namely whether section 103 is in play at all.  In my view it is not: the matter which the court presently has power to determine, and is determining, is not whether there should be an adjournment under section 103 but whether the proceedings should remain stayed under general case management powers, given Russia's state immunity claim and the impact on it of the proceedings in the Netherlands.  It is for that reason that the pre-conditions to a grant of security under section 103(5) have not arisen.

243.   Russia's other further contention is that security cannot be ordered as the price of a defendant being entitled to oppose enforcement.  It can be ordered only as the price of an adjournment of the decision on enforcement: see the Supreme Court's judgment in *IPCO (Nigeria) Limited v Nigerian National Petroleum Corporation* [2017] UKSC 16 at §§ 30, 41 and 43.  The point made there by Lord Mance (with whom the other members of the court agreed) was that Articles V and VI of the New York Convention provide an internationally-agreed balancing of interests between the *prima facie* right to enforce an award and rights of challenge.  Taken together, they exclude requiring security for a properly arguable challenge under one of the grounds set out in Article V (which include, at (e), where *"[t]he award ... has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made"*); and instead allow security to be required only where Article VI applies (viz, where the court asked to enforce an award adjourns its decision following a mere *application* of the kind referred to in Article V(1)(e) i.e. to the curial court).

244.   In the present case, the Claimants contend that if the Stay is lifted, Russia will be barred by issue estoppel from pursuing all or part of its case on immunity by virtue of the decision of the Hague Court of Appeal.  In contrast, if the Stay is maintained and the decision of the Hague Court of Appeal is overturned by the Dutch Supreme Court, no such issue estoppel would arise and Russia would be entitled to maintain its case on state immunity in full.

245.   Thus, Russia argues, an order for payment of security would in substance amount to requiring security as the price for advancing a properly arguable case under Article V based on lack of arbitral jurisdiction.  It would have to choose between paying security and maintaining the Stay, or to allow the stay to lapse with the result that – on the Claimants' case – Russia would be barred by issue estoppel from pursuing all or part of its case on immunity.

246.   As an argument going to jurisdiction, I am not persuaded by Russia's submission.  In principle any order for security, or making security a condition, under section 103(5) would make security the price of an adjournment.  It is the operation of the substantive law of issue estoppel (and/or abuse of process), if anything, that would mean that resumption of the proceedings might result in Russia being bound by findings made by the Hague Court of Appeal.  In my view, these considerations go to questions of discretion – whether it is appropriate to continue the Stay and (should such a power

exist) to require security – rather than to the question of whether a power to require security exists at all.

247.   However, for the reasons already given, I conclude that the court does not have the power to require security under section 103(5) as the price of continuing the Stay.

248.   As the Claimants submit, the result is that the court has a stark choice between no adjournment, and an unconditional adjournment.  I do not though agree with the Claimants' further submission that the balance of prejudice between the parties then becomes decisive and falls clearly in the Claimants' favour.  In reaching my decision as to whether the Stay should be continued, I have already taken account of the fact that (in my view) there is no power to require security.  Moreover, for the reasons set out below, I would not in the present case have required security even had the power under section 103(5) been available.

### (2) Discretion

249.   I consider in this section whether it would be appropriate to require security if, contrary to my conclusion above, the power under section 103(5) were available.

250.   The Claimants submit that the authorities show that an adjournment without security is an exceptional course, and there is nothing which warrants its adoption in this case.  A continuation of the Stay will cause significant prejudice to the Claimants in the form of (a) irrecoverable interest accruing on the Awards; and (b) the possibility of Russia taking steps to render enforcement more difficult whilst these proceedings remain on hold.  Further, Russia's evidence that it "*has no immediately available funds to pay US$7bn+ security*" fails to provide anything like sufficient information about its assets to allow the court properly to assess the position.  In their letter of 30 November 2020, the Claimants sought further information from Russia about its asset position, but Russia has refused to provide any such information.  Further, the evidence indicates that Russia has access to very substantial resources over and above those referred to in its evidence.

251.   As to quantum, the Claimants submit that:

i)      it follows from Russia's own submission, that the prejudice to the Claimants being kept out of their money can be compensated by an award of interest, that interest is a legitimate means of measuring at least some of that prejudice;

ii)     Russia is, taking account of the prospect of a reference to the CJEU, seeking a delay to these proceedings of approximately 4 years;

iii)    according to Russia, US$7 billion of interest accrued on the Awards in the five years from 2015 to 2020 – equivalent to about US$1.4 billion a year – which would suggest that further interest in the sum of around US$5 billion would have accrued by the conclusion of the Cassation Appeal;

iv)     the court should subject this sum to an uplift to reflect the clear risk that Russia will take steps to make enforcement more difficult during the period of the delay, and considering everything in the round the figure of US$7 billion is appropriate;

v) although that is a very large amount of money, it represents a relatively modest proportion of the total sums at stake (amounting to just over 12% of the total sums currently due to the Claimants under the Awards); and

vi) if the Court decides to keep these proceedings on hold, then it ought to do so only on the basis that Russia pay a sum of US$7 billion into court.

252. In response, Russia makes the following points:

i) The section 103(5) security power is permissive, like the corresponding wording in Article VI of the New York Convention.

ii) Section 103(5) gives a wide discretion to the enforcing court to determine whether enforcement proceedings should be adjourned and/or security ordered: *Soleh Boneh* (above). Each case must turn on its own facts, "*[t]here is certainly no question of granting security automatically*" (*J (Lebanon) v K (Kuwait)* [2019] EWHC 899 (Comm) § 60), and the award creditor must demonstrate a "*need*" for security (*Yukos Oil Company v Dardana Ltd* [2002] EWCA Civ 543, § 35-37).

iii) In every case on which the Claimants rely aside from *Soleh Boneh*, the award debtor's challenge in the curial courts was found by the English court in the relevant part to be hopeless or subject to serious obstacles. In *Soleh Boneh*, the Court of Appeal regarded the challenge as seriously arguable. However, the challenge in the Swedish curial court had been commenced some 19 years previously, and remained unresolved. The Court of Appeal felt that the claimants could understandably feel aggrieved by the lack of progress there, even though it had been partly their fault, and "*could reasonably expect the English Court to attempt to inject some sense of urgency*" (p. 212 rhc). It is not surprising in those circumstances that the court decided to order security in a significant sum to "*provide a real incentive for the [defendants] to proceed with their Swedish application expeditiously, and also some protection for the [claimants] against any deterioration of their prospects of enforcement here*" (p.213 lhc).

iv) The *travaux préparatoires* to Article VI of the New York Convention reflect the same concerns as motivated the Departmental Advisory Committee in respect of section 70(7), namely to "*avoid the risk that while the appeal is pending, the ability of the losing party to honour the award may (by design or otherwise) be diminished*". Moreover, the Chairman of the Working Group defined the purpose of what became Article VI as:

"to permit the enforcement authority to adjourn its decision if it was satisfied that an application for annulment of the award or for its suspension was made for good reason in the country where the award was given. At the same time, to prevent an abuse of that provision by the losing party which may have started annulment proceedings without a valid reason purely to delay or frustrate the enforcement of the award, the enforcement authority should in such a case have the right either to enforce the award forthwith or to adjourn its enforcement only on the

condition that the party opposing enforcement deposits suitable security."

v) The same objective – to permit the grant of security as a mechanism to prevent abusive and dilatory challenges in the curial courts – is reflected in the test stated in *Soleh Boneh* set out at the end of the quotation in § 60 above, focussing on the strength of the challenge as perceived on a brief consideration, and whether delay is likely to make enforcement more difficult e.g. by movement of assets or improvident trading.

vi) In the present case the court should not require security, because (a) Russia's appeal to the Dutch Supreme Court has substantial prospects (and at the very least a real prospect) of success, and (b) continuation of the Stay is not likely to render enforcement of the Awards more difficult or otherwise prejudice the Claimants – on the contrary, to require security would simply improve the Claimants' position on enforcement compared to the present position.

253. I accept the Claimants' submission that limited assistance can be obtained from comparing the facts of the present case to those of other cases where a requirement for security has or has not been granted. Further, I agree there is no threshold requirement that the prospects of the challenge be weak. For example, security was required in *Dowans* even though the prospects were considered *"not fanciful"* (albeit the case would be considered as *"towards the lower end of the sliding scale"* (§ 44)); and in *Stati* Popplewell J was prepared to contemplate requiring security even though he adjourned of his own motion (§ 1), the challenge was in good faith and not merely a delaying tactic (§ 12), there was no basis to infer a risk of dissipation during the stay (§ 15) and the delay was only 4-6 months (§ 16). I would not, on the other hand, accept the Claimants' submission that the authorities indicate that a stay without security is in any sense an exceptional or extreme course.

254. I accept the Claimants' submission that such evidence as Russia has put forward as to inability to pay is inadequate, and would not amount to a reason for declining to order security.

255. However, I would have concluded that security should not be ordered in the circumstances of the present case, taken in combination. I bear in mind that, as set out earlier in the context of lifting the Stay, the Claimants are having to wait a considerable time to enforce very substantial Awards, upheld by the Hague Court of Appeal, in the context of a regime with a presumption in favour of enforcement. Nonetheless I consider that other factors would have tipped the balance against requiring security. Briefly:

i) at least some of Russia's grounds of challenge have a realistic prospect of success;

ii) I do not consider that Russia is advancing its challenge in bad faith or simply as a delaying tactic, though I note the evidence of lack of good faith in the broader sense identified earlier;

iii) the evidence does not indicate, in my view, that the continuation of the Stay creates a risk or augmented risk of dissipation of assets, or of other events that

would likely make enforcement more difficult, though (as also noted earlier) there is always a chance that events over time could have that effect.  Rather, a requirement for security would probably in effect give the Claimants the bonus of a significant enforcement advantage; and

iv)     to require security would in substance force Russia to put up security in order to be able to advance its full case on state immunity with a 'clean slate', i.e. without the potentially conclusive adverse effect of the conclusions reached in the proceedings in the Netherlands as they currently stand pending Russia's appeal to the Dutch Supreme Court.

256.    I mention only for completeness that there also appears in my view to be some force in the view that where an award defendant has a properly arguable challenge that goes to the jurisdiction of the tribunal, then an analogy may be drawn with challenges under section 67 of the 1996 Act.  In that context, section 70(7) permits the court to order that any money payable under the award be brought into court or otherwise secured pending the determination of the application or appeal.  In that situation it has been held that security should be ordered only where the challenge is "*flimsy*" and any delay caused by the challenge will prejudice enforcement of the award, and security should not be used simply to help the claimant enforce the award (see *Peterson Farms Inc v C&M Farming Ltd* [2003] EWHC 2298 (QB) § 30,  *IPCO* (Supreme Court) § 43 and *X v Y* [2013] EWHC 1104 (Comm) § 32).

257.    The analogy seems appropriate, because in a case like the present one where state immunity is claimed based on lack of arbitral jurisdiction, the court makes a *de novo* decision without presuming the award to be valid, just as it does on a section 67 jurisdiction challenge (see e.g. *Gold Reserve Inc v Bolivarian Republic of Venezuela* [2016] EWHC 153 (Comm) § 12, cf *GPF GP Sarl v Republic of Poland* [2018] EWHC 409 (Comm) §§ 63-70).  However, Russia did not in oral submissions press the analogy in the context of section 103(5) and I do not think it appropriate to comment further on it.

## (I) CONCLUSION

258.    For the reasons set out above, the Claimants' application to lift the Stay will be dismissed.