Exhibit 3

**SWORN TRANSLATION**
**The English text is a sworn translation of the**
**Dutch original. In case of any discrepancies, the**
**Dutch original shall prevail.**

# PROCURATOR GENERAL

## AT THE

# SUPREME COURT OF THE NETHERLANDS

**Number**   20/01595
**Hearing**:   23 April 2021

## OPINION

### P. Vlas



In the case of
The Russian Federation, having its seat in Moscow, Russian Federation,

v.

1.   Hulley Enterprises Limited, having its registered office in Nicosia, Cyprus,
(hereinafter: Hulley),

2.   Veteran Petroleum Limited, having its registered office in Nicosia, Cyprus,
(hereinafter: VPL),

3.   Yukos Universal Limited, having its registered office in Douglas, Isle of Man,
(hereinafter: YUL),

(hereinafter jointly: HVY)

**SWORN TRANSLATION**
The English text is a sworn translation of the
Dutch original. In case of any discrepancies, the
Dutch original shall prevail.

**Table of contents[1]**

| | | |
|---|---|---|
| 1. | Introduction | 1.1 |
| 2. | Facts and course of proceedings | 2.1 |
| 3. | Discussion of the principle appeal for cassation | 3.1 |
| | Ground 1: violation of procedural public policy/exclusivity of Article 1068 DCCP | 3.2 |
| | Ground 2 – interpretation of Article 45(1) ECT | 3.9 |
| | Introductory remarks | 3.11 |
| | Ground 2.2: Article 26 ECT | 3.20 |
| | Ground 2.3: jurisdiction of the Tribunal | 3.23. |
| | Ground 2.4: Limitation Clause | 3.31 |
| | Ground 2.5: "not inconsistent" in Article 45(1) ECT | 3.54 |
| | Ground 2.6: Article 26 ECT inconsistent with Russian law? | 3.58 |
| | Ground 2.7: referral to the ECJ for a preliminary ruling? | 3.60 |
| | Ground 2.8: complaint building on the previous grounds | 3.75 |
| | Ground 3: interpretation of Article 1(6) and (7) (investment and investor) | 3.76 |
| | Ground 3: introductory remarks | 3.77 |
| | Ground 3.2: | 3.84 |
| | Ground 3.3: actual economic contribution to host economy | 3.115 |
| | Ground 3.4: "piercing the corporate veil" | 3.120 |
| | Ground 3.5: referral of questions about Article 1(6) and (7) and Article 26 ECT for a preliminary ruling? | 3.130 |
| | Ground 4: interpretation of Article 1(6) and (7) ECT (legality of investments) | 3.132 |
| | Ground 4.2: existence of legality requirement | 3.136 |
| | Ground 4.3: illegal conduct | 3.142 |
| | Ground 4.4: incompatibility with public policy | 3.147 |
| | Ground 4.5: referral of questions about Article 1(6) and Article 26 ECT for a preliminary ruling? | 3.152 |
| | Ground 5: Article 21(5) ECT | 3.155 |
| | Ground 5: introductory remarks | 3.157 |
| | Ground 5.2: mandatory nature of Article 21 (5) ECT | 3.161 |
| | Ground 6: the role of the secretary of the Arbitration Tribunal | 3.180 |
| | Ground 6.2: delegation to Secretary of the Tribunal | 3.182 |
| | Ground 6.2: introductory remarks | 3.183 |
| | Ground 6.2.1-6.2.3: discussion of complaints | 3.188 |
| | Ground 7: lack of reasons? | 3.202 |

---

[1]    Reference is made to the paragraph numbers of this statement.



**SWORN TRANSLATION**
**The English text is a sworn translation of the**
**Dutch original. In case of any discrepancies, the**
**Dutch original shall prevail.**

| | Ground 7: introductory remarks | 3.203 |
|---|---|---|
| | Ground 7.2: discussion of complaints | 3.206 |
| | Ground 8: sweep grievance | 3.215 |
| | Conclusion in the principal appeal | 3.217 |
| 4. | Discussion of the ground for conditional cross-appeal in cassation | 4.1 |
| 5. | Conclusion | 5 |

## 1.      Introduction

1.1     In arbitral proceedings, the Russian Federation was ordered to pay damages to HVY for breach of its obligations under the Energy Charter Treaty (hereinafter: ECT).[2] The Russian Federation brought a claim for setting aside the relevant arbitral awards (hereinafter also the 'Yukos Awards') before the Dutch court. The District Court awarded the claim on the grounds of the absence of a valid arbitration agreement. On appeal, the Court of Appeal annulled the District Court's judgment and as yet rejected the Russian Federation's claims. The Russian Federation has lodged an appeal in cassation against the judgment of the Court of Appeal.

1.2     This case is still governed by the old arbitration law, i.e. by the Fourth Book ("Arbitration") of the Dutch Code of Civil Procedure, as in force until the implementation of the Arbitration Law Modernisation Act on 1 January 2015.[3] The references in this opinion are always to the old law, unless stated otherwise. For an introduction to the setting aside proceedings of Article 1064 et seq. DCCP, I refer to my opinion on the application for suspension of the enforcement that was filed by the Russian Federation.[4] The Supreme Court denied this request in its decision of 4 December 2020.[5]

1.3     In large part the complaints relate to the interpretation of ECT provisions. The Russian Federation argues in cassation that the Court of Appeal based its conclusion, that the dispute between HVY and the Russian Federation is covered by the ECT, on an incorrect interpretation of the relevant treaty provisions, so that its finding that there is a valid basis for arbitration is incorrect. This concerns in particular the interpretation of the terms 'investor' and 'investment' of the ECT, and the scope of Article 45(1) ECT, which provides for the provisional application of the ECT by a state that has signed the ECT, but for which this treaty has not yet entered into force. In this introduction, I will briefly discuss the purpose and the genesis of the ECT and the possibilities that the ECT offers for the settlement of investment disputes. The interpretation of specific provisions of the ECT will subsequently be discussed

[2]   Energy Charter Treaty, with Annexes, Treaty Series 1995, 108 (English and French texts, with corrections in Treaty Series 1995, 250), and Treaty Series 1995, 250 (Dutch translation).
[3]   Act of 2 June 2014, Bulletin of Acts and Decrees 2014, 200, entered into force on 1 January 2015 (Bulletin of Acts and Decrees 2014, 254). Transitional law is provided for in Article IV (4) in conjunction with Article IV (2) of that Act.
[4]   Case no. 20/01892, ECLI:NL:PHR:2020:1082, nos. 3.10-3.18.
[5]   ECLI:NL:HR:2020:1952, *RvdW* 2021/2; *JOR* 2021/79, annotated by M.A. Broeders.



**SWORN TRANSLATION**
The English text is a sworn translation of the
Dutch original. In case of any discrepancies, the
Dutch original shall prevail.

in more detail when examining the various parts of the principal appeal in cassation.

1.4    The ECT was concluded in Lisbon on 17 December 1994 with the aim of achieving cooperation in the energy sector, in particular between the Member States of the then European Economic Community (EEC, now the European Union) and states in Central and Eastern Europe, including the current Russian Federation.[6] This political wish had already previously been expressed in the non-binding European Energy Charter of 1991. In the ECT, the agreements in the Energy Charter are laid down in a binding instrument. The ECT entered into force on 16 April 1998 after it was ratified by thirty states, including the Netherlands (see Article 44(1) ECT). The ECT has now been ratified by 51 states as well as by the European Union.[7] The Russian Federation signed the ECT on 17 December 1994, but did not ratify it.[8] On 20 August 2009, the Russian Federation informed the depositary of the ECT (Portugal) that it no longer intended to ratify the ECT. Since then, the Russian Federation has no longer been required to provisionally apply the ECT, with the exception of the provisions relating to investment protection and dispute resolution, in so far as it concerns investments already made (Article 45(3)(a) and (b) ECT).

1.5    Substantively, the provisions of Part III of the ECT, which pertain to "Promotion, Protection and Treatment of Investments", are the most relevant in this case. These provisions offer protection to investors who have made an investment in the energy sector in one of the contracting parties. They include the right to fair treatment and non-discrimination (Article 10 ECT) as well as protection against expropriation (Article 13 ECT).[9]

1.6    The ECT also provides for a mechanism allowing investors to enforce compliance with these rights.[10] Article 26 ECT provides that investors may submit a dispute about an alleged breach of one of the provisions of Part III of the ECT by a contracting party to (inter alia) an arbitral tribunal. Article 26(4) ECT mentions three possibilities for dispute resolution:

   a)    arbitration at the International Centre for Settlement of Investment Disputes (ICSID) in Washington, on the basis of the ICSID Convention[11], provided that both ECT states concerned

---

[6]    In this respect, see Thomas W. Wälde, International Investment under the 1994 Energy Charter Treaty. Legal, Negotiating and Policy Implications for International Investors with Western and Commonwealth of Independent States/Eastern European Countries, in: Thomas W. Wälde (ed.), The Energy Charter Treaty. An East-West Gateway for Investment and Trade, The Hague: Kluwer International 1996, p. 251 et seq.; Thomas Roe & Matthew Happold, Settlement of Investment Disputes under the Energy Charter Treaty, Cambridge: Cambridge University Press 2011, p. 7-13 (these authors erroneously state that the ECT was opened for signature on 17 December 1995); Crina Baltag, The Energy Charter Treaty. The notion of investor, Alphen aan den Rijn: Kluwer Law International 2012, pp. 6-13; Kaj Hobér, The Energy Charter Treaty. A Commentary, Oxford: OUP 2020, pp. 13-24.

[7]    See overheid.nl/verdragenbank, as well as the website of the Secretariat of the ECT (https://www.energycharter.org/who-we-are/members-observers).

[8]    The Russian Federation signed the ECT without making the declaration of Article 45(2) ECT. Other states (Australia, Norway and Iceland) did declare at the time of signing that they would not apply the ECT provisionally.

[9]    In this respect, see Hobér, op. cit., p. 6; Roe & Happold, op. cit., pp. 13-18; Wälde, op cit., p. 286 et seq.

[10]   See Laurent Gouiffès, The Dispute Settlement Mechanisms of the Energy Charter Treaty, in: Clarisse Ribeiro (ed.), Investment Arbitration and the Energy Charter Treaty, New York: JurisNet 2006, pp. 22-29.

[11]   Convention on the Settlement of Investment Disputes between States and Nationals of other States, Washington, 18 March 1965, Treaty Series 1981, 191.



SWORN TRANSLATION
The English text is a sworn translation of the
Dutch original. In case of any discrepancies, the
Dutch original shall prevail.

are parties to the ICSID Convention (or, if one of the states concerned is party to the ICSID Convention, on the basis of the Additional Facility Rules to that Convention);

b) arbitration by a single arbitrator or an ad hoc tribunal established in accordance with the Arbitration Rules of the United Nations Commission on International Trade Law (UNCITRAL), as has been done in the present case;

c) arbitration at the arbitration institute of the Stockholm Chamber of Commerce (SCC).

1.7     Disputes on rights under the ECT can therefore be brought before various arbitration tribunals. This opinion discusses various decisions by these tribunals. The question arises as to what significance should be attached to those decisions, regarding which I note the following in this introduction.

1.8     According to the Vienna Convention on the Law of Treaties (hereinafter referred to as "VCLT"),[12] arbitral case law is not a source of interpretation in respect of treaties. However, this case law can provide insight into the manner in which a treaty is applied in practice.[13] Arbitral case law can be used to demonstrate the existence of a principle of customary international law, which must be taken into account in the interpretation of a treaty pursuant to Article 31(3) VCLT. Of course, there must be a general state practice which is extensive and virtually uniform, and there must be a legal conviction that this practice is required by international law.[14]

1.9     Arbitration tribunals are not bound by each other's rulings because the principle of binding precedents *(stare decisis)* is lacking.[15] Decisions may therefore differ from one another (which, of course, can also be explained by the facts and the manner in which the proceedings were conducted). One must be wary of drawing conclusions on the basis of only one decision or a few decisions. Furthermore, unanimous decisions are given more weight than decisions in which dissenting opinions were written.[16]

1.10    The ICSID Convention provides for a procedural framework for the resolution of international investment disputes between states and investors[17] and does not relate to disputes between states and their own nationals.[18] The ICSID Convention does not determine when there is an international investment, but leaves this to the ICSID arbitral tribunals, which will also base their decision on this on the investment treaty (often a bilateral investment treaty (BIT)) underlying the dispute. The approach of an arbitration tribunal in a case under the ICSID Convention is therefore dependent on the underlying investment treaty. ICSID tribunals will only assume jurisdiction if the investment also falls within the scope of

---

12   Convention of 23 May 1969, Treaty Series 1985, 79.
13   Inter alia Baltag, op. cit., p. 24.
14   André Nollkaemper, Kern van het internationaal publiekrecht, The Hague: Bju 2019, pp. 127-134.
15   Hobér, op. cit., p. 39 et seq.; Baltag, op. cit., p. 24 et seq.
16   Hobér, op. cit., p. 40.
17   See Roe & Happold, op. cit., p. 4; Anna Turinov, "Investment" and "Investor" in Energy Charter Treaty Arbitration: Uncertain Jurisdiction, Journal of International Arbitration 2009, p. 4.
18   See, inter alia, Article 25 (1) ICSID Convention: "The jurisdiction of the Centre shall extend to any legal dispute arising directly out of an investment, between a Contracting State (...) and a national of *another* Contracting State" (my italics, Advocate General).



**SWORN TRANSLATION**
The English text is a sworn translation of the
Dutch original. In case of any discrepancies, the
Dutch original shall prevail.

protection of the ICSID Convention.[19] In practice, ICSID tribunals therefore sometimes impose stricter requirements than the underlying investment treaties themselves, in particular with regard to the concept of 'investment'.[20] These requirements can also be stricter than those of other (commercial) arbitral tribunals, which do not base their jurisdiction on the ICSID Convention.[21]

1.11    The foregoing is relevant because the ground for cassation refers to ICSID judgments in a number of places to substantiate the statement that it presents a generally accepted principle of international investment law (see ground 3 of the principal ground for cassation). When assessing this statement, it must be taken into account that the ICSID Convention sets its own requirements in some respects, which may be stricter than the requirements imposed in investment treaties. It is also the case with all arbitral case law that it will always have to be considered whether the approach taken therein is of general validity or is based on the specific wording of the underlying investment treaty.

1.12    After this introduction, I will proceed to present the facts and the course of the proceedings and the discussion of the principal ground for cassation.

## 2.    The facts and the course of the proceedings

2.1    Briefly summarised, the issue in the present matter is the following.[22] HVY are, or at least were, shareholders in Yukos Oil Company (hereinafter: Yukos), an oil company based in the Russian Federation, which was declared bankrupt on 1 August 2006 and struck off the Russian Commercial Register on 21 November 2007.

2.2    HVY initiated arbitration proceedings against the Russian Federation under Article 26 ECT in 2004. They stated that the Russian Federation had expropriated their investments in Yukos in violation of the ECT and had failed to protect those investments. HVY claimed that the Russian Federation be ordered to pay damages. The place of arbitration was The Hague.

2.3    The arbitral tribunal appointed pursuant to the UNCITRAL Arbitration Rules (hereinafter: the Tribunal) ruled in three separate Interim Awards on Jurisdiction and Admissibility of 30 November 2009

---

[19]  See, for example, *ST-AD GmbH v. The Republic of Bulgaria* (Award on Jurisdiction), UNCITRAL, PCA Case No. 2011-06,18 July 2013, para. 408: "It is settled jurisprudence that a national investment cannot give rise to an *ICSID arbitration*, which is reserved to international investments" (my italics, Advocate General). See also Stephen Jagusch & Anthony Sinclair, The Limits of Protection for Investments under the Energy Charter Treaty, in: Clarisse Ribeiro (ed.), Investment Arbitration and the Energy Charter Treaty, New York: Jurisnet, 2006, pp. 75-77; Turinov, op. cit., p. 6; Roe & Happold, op. cit., p. 49; Baltag, op. cit., pp. 106-107.

[20]  This approach was worded as follows in *Phoenix Action, Ltd v. The Czech Republic*, ICSID Case No. ARB/06/5, 15 April 2009, para. 96: "At the outset, it should be noted that BITs, which are bilateral arrangements between two States parties, cannot contradict the definition of the ICSID Convention. In other words, they can confirm the ICSID notion or restrict it, but they cannot expand it in order to have access to ICSID. A definition included in a BIT being based on a test agreed between two States cannot set aside the definition of the ICSID Convention, which is a multilateral agreement. As long as it fits within the ICSID notion, the BIT definition is acceptable, it is not if it falls outside of such definition. (...)".

[21]  Turinov, op. cit., p. 6.

[22]  The presentation of the facts is derived from paras. 2.2-2.6 of the final judgment of the Court of Appeal of The Hague of 18 February 2020, ECLI:NL:GHDHA:2020:234, as challenged in cassation. Also see my opinion (ECLI:NL:PHR:2020:1082) at paras. 2.1-2.31 prior to the Supreme Court's decision of 4 December 2020, ECLI:NL:HR:2020:1952, *RvdW* 2021/2.



SWORN TRANSLATION
The English text is a sworn translation of the
Dutch original. In case of any discrepancies, the
Dutch original shall prevail.

(hereinafter: the Interim Awards) on a number of preliminary defences raised by the Russian Federation, including in relation to the Tribunal's jurisdiction. In the Interim Awards, the Tribunal rejected certain defences on jurisdiction and admissibility and ruled with respect to other preliminary defences that the decision on them would be stayed until the merits phase of the proceedings.

2.4    In three separate Final Awards of 18 July 2014,[23] the Tribunal rejected the Russian Federation's remaining defences on jurisdiction and/or admissibility, found that the Russian Federation had breached its obligations under Article 13(1) ECT, and ordered the Russian Federation to pay HVY damages amounting to USD 8,203,032,751 (to VPL), USD 1,846,000,687 (to YUL) and USD 39,971,834,360 (to Hulley), respectively, plus interest and costs. The Tribunal ruled, briefly stated, that the Russian Federation, by taking a number of tax and recovery measures against Yukos, had aimed at the bankruptcy of Yukos, with no other purpose than to eliminate Mr Mikhail Khodorkovsky, the chairman of Yukos and one of its shareholders (hereinafter: Khodorkovsky), as a potential political opponent of President Putin and to acquire Yukos' assets.

2.5    By separate summons of 10 November 2014, the Russian Federation summoned Hulley, VPL and YUL before the District Court of The Hague and requested the District Court to set aside the Interim Awards and Final Awards rendered by the Tribunal in each of their cases. These three cases were consolidated by the District Court at the request of the Russian Federation.

2.6    On 20 April 2016, in one judgment rendered in the three consolidated cases, the District Court set aside the Interim Awards and the Final Awards because of the absence of a valid arbitration agreement.[24] HVY filed an appeal against this judgment with the Court of Appeal of The Hague.

2.7    In an interim judgment of 11 October 2016, the Court of Appeal ordered an appearance of the parties, which took place on 16 January 2017.

2.8    In its interim judgment of 25 September 2018, the Court of Appeal assessed a number of HVY's preliminary objections to the discussion of certain of the Russian Federation's statements.[25] These included (in so far as relevant here) the Russian Federation's statement that HVY had committed fraud in the arbitration proceedings by filing false statements and withholding documents (paras. 5.1-5.2). HVY objected to this, *inter alia* on the grounds that fraud should have been addressed in separate revocation proceedings based on Article 1068 DCCP (para. 5.3 (b)).

2.9    The Court of Appeal allowed HVY's objection. To that end, the Court of Appeal held, briefly stated, that the alleged fraud could only be addressed in revocation proceedings based on Article 1068 DCCP, and

[23]   *Hulley Enterprises Limited (Cyprus)/The Russian Federation*, UNCITRAL, PCA Case No. AA 226, Final Award; *Veteran Petroleum Limited (Cyprus)/The Russian Federation*, UNCITRAL, PCA Case No. 2005-05/AA228, Final Award; *Yukos Universal Limited (Isle of Man)/The Russian Federation*, UNCITRAL, PCA Case No. 2005-04/AA227, Final Award.
[24]   ECLI:NL:RBDHA:2016:4229.
[25]   ECLI:NL:GHDHA:2018:2476, *JBPr* 2019/9, annotated by C.L. Schleijpen.



**SWORN TRANSLATION**
The English text is a sworn translation of the
Dutch original. In case of any discrepancies, the
Dutch original shall prevail.

not (at a later stage) in setting-aside proceedings based on Article 1065 DCCP. Although both proceedings can indeed result in the setting aside of the arbitral award, they are subject to different time limits and they belong to the jurisdiction of different courts. Revocation proceedings can be initiated within three months of discovery of the fraud, even if more than three months have passed since the arbitral award attained binding force. In addition, there is only a single fact-finding instance in revocation proceedings (the Court of Appeal). Both the applicable time limits and the Court of Appeal's exclusive jurisdiction would be side-stepped if it were possible to put forward an allegation of fraud (by means of an increase of claim) at a later stage in setting-aside proceedings. Such an outcome is not acceptable (para. 5.7).

2.10    In its interim judgment of 18 December 2018, the Court of Appeal took several decisions on the further course of the proceedings.[26]

2.11    The Court of Appeal dealt with the merits of the case in the final judgment of 18 February 2020.[27]

2.12    HVY, among other things, submitted grounds of appeal against the District Court's decision that the Tribunal lacked jurisdiction because Article 26 ECT – which makes arbitration possible – is inconsistent with Russian law. The Court of Appeal assessed these grounds of appeal in paras. 4.4 et seq.

*Interpretation of the Limitation Clause*

2.13    The Court of Appeal assessed whether the parties had concluded a valid arbitration agreement (Article 1065(1)(a) DCCP) and held that this depends on the interpretation of Articles 26 and 45 ECT in light of the law of the Russian Federation (para. 3.1.2). The Russian Federation's position, briefly stated, is that although it did sign the ECT, it never ratified it. While Article 45(1) ECT provides that each signatory shall "provisionally" apply the treaty, this applies only "to the extent that such provisional application is not inconsistent with its constitution, laws or regulations" (hereinafter: the Limitation Clause). According to the Russian Federation, the arbitration provision of Article 26 ECT is inconsistent with the Russian Constitution and several statutory provisions which entail that disputes of a public law nature are not arbitrable.

2.14    Principally, HVY have adopted the position that the matter at issue in the interpretation of Article 26 ECT is whether the *principle* of provisional treaty application is inconsistent with Russian law. On appeal, HVY argued in the alternative that the issue is whether the *provisional application* of one or more ECT provisions is incompatible with the law of a contracting state, and thus not whether a specific ECT provision is inconsistent with that law (paras. 3.3.2 and 4.2.2).

2.15    The Court of Appeal held in paras. 4.4.3-4.4.7 that it could base its decision on HVY's alternative position on the interpretation of Article 26 ECT, despite the fact that this argument was not advanced in

---

[26]    ECLI:NL:GHDHA:2018:3437.
[27]    ECLI:NL:GHDHA:2020:234. The judgment was also published in *NJ* 2020/360 with Supreme Court 25 September 2020, ECLI:NL:HR:2020:1511 and in TvA 2020/31, *JOR* 2020/164, annotated by N. Peters.



SWORN TRANSLATION
The English text is a sworn translation of the
Dutch original. In case of any discrepancies, the
Dutch original shall prevail.

the arbitration proceedings and the Tribunal had therefore not based its jurisdiction on it. Any other interpretation would result in an arbitral award having to be set aside because the Tribunal assumed jurisdiction on incorrect grounds, even though the state court found that the Tribunal did have jurisdiction on other grounds. This is inconsistent with the principle that the state court has the final say on this issue.

2.16    The Court of Appeal subsequently assessed HVY's alternative position (paras. 4.5.8-4.5.48). In para. 4.5.48, the Court of Appeal concluded that the Limitation Clause is to be interpreted as meaning that a signatory which has not made the declaration referred to in Article 45(2)(a) ECT is obliged to apply the ECT provisionally, except to the extent that provisional application of one or more provisions of the ECT is inconsistent with national law, in the sense that the laws or regulations of that state preclude the provisional application of a treaty for certain treaty provisions or types or categories of such provisions. According to the Court of Appeal, it was not shown that provisional application of Article 26 ECT is inconsistent with Russian law (para. 4.6.1). Superfluously, the Court of Appeal examined whether, based on the Russian Federation's interpretation of the Limitation Clause, Article 26 ECT was inconsistent with any provisions of Russian law (paras. 4.6.2-4.7.65). The Court of Appeal answered that question in the negative.

2.17    According to the Court of Appeal, HVY's grounds of appeal were therefore well-founded, in part, and the District Court's reasoning could not justify its decision that no valid arbitration agreement had been concluded (para. 4.9.1). Given the devolutive effect of appeal, the Court of Appeal assessed whether the Russian Federation's other statements in support of its claim that the Tribunal had no jurisdiction are well-founded, i.e. the statements pertaining to (i) the interpretation of Article 1(6) and (7) ECT[28] (the terms "investment" and "investor"), (ii) the interpretation of Article 1(6) and (7) ECT (the legality of the investments), (iii) the taxation measures imposed by the Russian Federation, which are a legitimate exercise of the authority of the Russian Federation falling within the scope of Article 21(1) ECT.

*(i) Interpretation of Article 1(6) and (7) ECT (investment and investor)*

2.18    The Russian Federation has argued that the requirement set by Article 26 ECT, i.e. that there be an "investment" within the meaning of Article 1(6) ECT, has not been met and that HVY are not "investors" within the meaning of Article 1(7) ECT, given that they are merely sham companies beneficially owned and controlled by Russian citizens. No foreign capital was invested – only Russian (paras. 3.3.2 and 5.1.3).

2.19    The Court of Appeal decided in para. 5.1.7.3 that if a legal entity incorporated under the law of one contracting state makes an investment in another contracting state, this qualifies as an investment within the meaning of Article 26 ECT. The ECT opts for "the law of the country under the laws of which

---

[28]    Strictly speaking, Article 1 does not have paragraphs, but elements ("points"). In this statement, however, I follow the terminology ("paragraphs" ["*leden*"]) used by the Court of Appeal and the initiating document.



**SWORN TRANSLATION**
The English text is a sworn translation of the
Dutch original. In case of any discrepancies, the
Dutch original shall prevail.

the investor is organised" in order to determine the nationality of an investor. The drafters of the ECT did not wish to impose any further requirements on the international nature of the investments. The ECT does not, therefore, require the investor to have a genuine link with the country under the laws of which it is organised (para. 5.7.1.2). Furthermore, it does not follow from Article 17 ECT that investments such as those made by HVY fall outside the protection of the ECT because they are so-called "U-turn investments" (para. 5.1.8.1 et seq.).

*(ii) Interpretation of Article 1(6) and (7) ECT (legality of the investments)*

2.20    The Court of Appeal assessed the Russian Federation's position that the ECT does not protect investments made in breach of the law of the host state (paras. 3.2.3 and 5.1.11.1). According to the Court of Appeal, Article 1(6) ECT does not contain an explicit requirement of legality. It does not explicitly require that an investment must have been made in accordance with the law of the host state. Nor does the text of the ECT contain any restrictions on access to arbitration as referred to in Article 26 ECT (para. 5.1.11.5). The Court of Appeal held that the Russian Federation's reliance on Article 1(6) and (7) ECT failed.

*(iii) Taxation measures (Article 21 ECT)*

2.21    The Court of Appeal held that Article 21 ECT does not contain any reference to the jurisdiction of arbitrators, but merely states that the ECT does not create any rights or impose any obligations in relation to taxation measures. The Tribunal's jurisdiction is determined solely by Article 26 ECT. According to the Court of Appeal, the conditions of Article 26 ECT have been fulfilled, which means that the provision of Article 21(1) ECT cannot lead to the conclusion that the Tribunal would lack jurisdiction if a situation covered by Article 21(1) ECT arises (para. 5.2.5). The Court of Appeal also held that Article 21(1) ECT only concerns *bona fide* taxation measures. The Tribunal concluded that there had been no *bona fide* taxation, given that the measures taken by the Russian Federation were not exclusively intended to collect taxes but rather to provoke the bankruptcy of Yukos and remove Khodorkovsky from the political arena (paras. 5.2.15 and 5.2.16).

2.22    The Court of Appeal concluded that none of the grounds argued by the Russian Federation for the absence of a valid arbitration agreement support such a conclusion, so that there is no reason to set aside the Yukos Awards pursuant to Article 1065(1)(a) DCCP (para. 5.3.1).

2.23    The Court of Appeal then addressed, in para. 6.1 et seq., the Russian Federation's statements in connection with the setting-aside ground of violation of the mandate (Article 1065(1)(c) DCCP): (a) noncompliance with Article 21(5) ECT, (b) determination of the damages by the Tribunal, (c) the Tribunal engaged in decision by guesswork and went beyond the ambit of the legal dispute, (d) the role of the assistant to the Tribunal, and (e) the lack of reasoning.

*(a) Violation of the mandate (Article 1065(1)(c) DCCP) by noncompliance with Article 21(5) ECT (para. 6.3).*



**SWORN TRANSLATION**
The English text is a sworn translation of the
Dutch original. In case of any discrepancies, the
Dutch original shall prevail.

2.24    In paras. 6.1 et seq., the Court of Appeal addressed the statement that the Tribunal had failed to refer
the dispute to the relevant competent tax authorities, in violation of Article 21(5) ECT. According to the
Court of Appeal, this failure was not sufficiently serious to justify setting aside the arbitral award, given
that it had not become plausible that the Russian Federation had suffered any disadvantage as a result
(para. 6.3.2). According to the Court of Appeal, it must be assumed that during the extensive handling of
the dispute by the Tribunal, the Russian Federation put forward or was able to put forward all relevant
information which the Tribunal could also have obtained by seeking the opinion of the Russian tax
authorities. It is difficult to see what additional information the Tribunal could have obtained from the
Russian tax authorities that would have led to a different decision on the "allocation of the income of the
shell trading companies (...) to Yukos" (para. 6.3.3).

2.25    The Russian Federation also argued that the dispute ought to have been referred to the tax authorities
of Cyprus and the United Kingdom. This statement does not hold, according to the Court of Appeal, as
Article 21(5) ECT only requires an opinion to be sought from the "relevant competent tax authority" if the
question concerned is "whether a tax constitutes an expropriation". However, HVY did not argue that
taxation measures taken by Cyprus or the United Kingdom constitute an expropriation (para. 6.3.4).
Furthermore, the Court of Appeal held that the Tribunal's conduct was not contrary to the so-called
prognosis prohibition, as argued by the Russian Federation (para. 6.3.4).

        *(b) Determination of the damages*

2.26    In paras. 6.4.1-6.4.27, the Court of Appeal paid extensive attention to the Russian Federation's
statement that the Tribunal had violated its mandate by awarding damages on the basis of its own new
and extremely flawed method of calculation, which differed from the debate between the parties and on
which the parties had not been heard, thus leading to a surprise decision. The Court of Appeal
concluded that there had been no surprise decision (para. 6.4.23) and that the manner in which the
Tribunal had determined the amount of damages does not constitute a violation of the Tribunal's
mandate.

        *(c) Decision by guesswork, going beyond the ambit of the legal dispute*

2.27    In paras. 6.5.1-6.5.15, the Court of Appeal assessed the Russian Federation's argument that the
Tribunal had based its decision on speculation of its own about what the Russian Federation might have
done in a fictitious scenario rather than on what it actually did. The Court of Appeal concluded that the
Russian Federation's arguments failed and that the Tribunal had not violated its mandate in this respect,
nor had it failed to provide sound reasoning for its decision. It had not violated public policy either (para.
6.5.15).

        *(d) The role of the assistant to the Tribunal*

2.28    In paras. 6.6.1-6.6.15, the Court of Appeal addressed the Russian Federation's argument that the
Yukos Awards should be set aside due to the disproportionate involvement of Martin Valasek, the



SWORN TRANSLATION
The English text is a sworn translation of the
Dutch original. In case of any discrepancies, the
Dutch original shall prevail.

assistant to the Tribunal, in their drafting (para. 6.6.1). According to the Russian Federation, this involvement violated the principle that arbitrators must personally perform the task assigned to them, meaning that the Tribunal had failed to comply with its mandate (Article 1065(1)(c) DCCP). In addition, Valasek's involvement is said to mean that there effectively had been a "fourth arbitrator", meaning that the Tribunal's composition was inconsistent with the applicable rules (Article 1065(1)(d) DCCP).

2.29    The Court of Appeal rejected this argument. Although the Court of Appeal presumed that Valasek had made significant contributions to the drafting of parts of the text (para. 6.6.5), this did not mean that he had independently taken decisions which are part of the essential task of the arbitrators (para. 6.6.10). The fact that the Final Awards were signed by the three arbitrators implies, that it was they who rendered them, which means there was not an even number of arbitrators (para. 6.6.13). If the Russian Federation's statement that Valasek was only introduced as an assistant and contact person is assumed, by way of presumption, to be correct, it can be concluded that the Tribunal failed to fully inform the parties on this point of the nature of Valasek's work. However, under the circumstances, this does not constitute such a serious violation of the mandate that it should lead to the setting aside of the arbitral awards (para. 6.6.14.2).

*(e) The lack of reasoning*

2.30    In paras. 8.4.1-8.4.17, the Court of Appeal addressed the Russian Federation's argument that the arbitral awards lack sound reasoning (Article 1065(1)(d) DCCP) where they address the Russian Federation's statement that Yukos' Mordovian companies were sham companies. The Tribunal concluded that no proof could be found for this in "the massive record", referring to the record that was the subject of the tax proceedings that Yukos had conducted in Russia. According to the Court of Appeal, this was about the lack of evidence in that record and that the Russian Federation's numerous references to evidence submitted by it in the arbitration proceedings were therefore irrelevant (para. 8.4.13). The Court of Appeal concluded that the complaint about the reasoning of the decision that no evidence had been provided to show that the Mordovian companies are sham companies, failed (para. 8.4.17).

2.31    The Court of Appeal concluded that HVY's grounds of appeal succeeded at least in part and that the Tribunal had jurisdiction to hear and decide on HVY's claims. The other grounds for setting aside put forward by the Russian Federation cannot lead to the setting aside of the Yukos Awards (para. 10.1). The Court of Appeal annulled the judgment of the District Court and, adjudicating the matter anew, rejected the Russian Federation's claims (para. 10.3 and operative part).

2.32    The Russian Federation lodged an appeal in cassation (within the time limit) against the interim judgment of 25 September 2018 and the final judgment of 18 February 2020, hereinafter referred to as the interim judgment and the final judgment, respectively. HVY conducted a defence and lodged a conditional cross-appeal in cassation. The parties submitted written pleadings and orally argued their



SWORN TRANSLATION
The English text is a sworn translation of the
Dutch original. In case of any discrepancies, the
Dutch original shall prevail.

positions on 5 February 2021, followed by written reply and rejoinder.

2.33 The Russian Federation filed an application in the context of its appeal in cassation for (*inter alia*) the suspension of enforcement of the Yukos Awards and for HVY to be ordered to provide security. By decision of 25 September 2020, the Supreme Court decided that it has jurisdiction to hear this application.[29] By decision of 4 December 2020, the Supreme Court rejected the Russian Federation's application.[30]

## 3. Discussion of the principal appeal for cassation

3.1 The principal appeal for cassation consists of eight grounds, which are divided into various sub-grounds.

### *Ground 1: Violation of procedural public policy/exclusivity of Article 1068 DCCP*

3.2 Ground 1 is directed against the Court of Appeal's decision in paras. 5.6-5.8 of the interim judgment and paras. 9.7 of the final judgment. There, the Court of Appeal held, briefly put, that the Russian Federation's objections regarding HVY's alleged fraud in the arbitration can only be raised by means of a claim for revocation on the basis of Article 1068 DCCP. The complaints argue that the Court of Appeal therewith failed to recognise that such fraud should also be able to lead to the setting aside of the arbitral award on the basis of Article 1065(1)(e) DCCP (violation of public policy).

3.3 In the discussion of this ground, I put the following first and foremost. There is no doubt that if an arbitral award came into being as a result of fraud or deceit by one of the parties to the proceedings, this manner of formation is contrary to public policy. After all, in such event there has been no fair trial.[31] Sanders therefore rightly writes that the grounds for revocation of Article 1068(1) DCCP lead to "an equal number of instances of violation of public policy."[32]

3.4 Though the legislature has provided for separate revocation proceedings in which fraud can be raised, this does not mean that these proceedings should be followed exclusively. It does not in any way follow from the legislative history that the legislature wanted to limit the possibilities of raising fraud by instituting these separate proceedings. After all, the claim for revocation ensues from general law of civil procedure,[33] and it may also overlap with the ordinary legal remedies, such as appeal. Revocation of a court decision (Article 382 DCCP) is an extraordinary legal remedy, which enables imputable conduct

29   ECLI:NL:HR:2020:1511, *NJ* 2020/360.
30   ECLI:NL:HR:2020:1952, *RvdW* 2021/2; *JOR* 2021/79, annotated by M.A. Broeders.
31   H. Kronke et al (ed.), Recognition and Enforcement of Foreign Arbitral Awards, A Global Commentary on the New York Convention, Alphen aan den Rijn: Kluwer Law International 2010, p. 374. In the context of the recognition and enforcement of civil judgments, inter alia, Monique Hazelhorst, Free Movement of Civil Judgments in the European Union and the Right to a Fair Trial, The Hague: TMC Asser Press 2017, pp. 299-300.
32   P. Sanders, Het Nederlandse arbitragerecht, Deventer: Kluwer 2001, p. 199.
33   See A.J. van den Berg et al., Nederlands Arbitragerecht, Zwolle: W.E.J. Tjeenk Willink 1992, pp. 136-138; Sanders, op. cit., pp. 203-210; *Parliamentary Documents II*1983-84,18 464, no. 3 (Explanatory Memorandum), p. 31.



SWORN TRANSLATION
The English text is a sworn translation of the
Dutch original. In case of any discrepancies, the
Dutch original shall prevail.

by the other party, such as fraud, to be addressed.[34] If an ordinary legal remedy is still available in such case, the ordinary legal remedy takes precedent. This is because the revocation claim can only be lodged if the relevant judgment has become final and conclusive, specifically within three months after the fraud has been discovered (Article 383(1) DCCP).[35] Consequently, in respect of ordinary civil proceedings, fraud need not exclusively be addressed by means of a revocation claim. The added value of revocation proceedings is that the adversely affected party has the option to still submit the fraud to the court after the end of the ordinary time limit for legal remedies. Revocation thus complements the existing ordinary remedies.

3.5   There are no indications that the legislature wanted to see revocation proceedings in arbitration law (Article 1068 DCCP) as the exclusive remedy for fraud in the proceedings.[36] This cannot be inferred from the fact that the legislature set up separate proceedings for that purpose, because in ordinary civil procedural law, too, the revocation claim exists alongside other legal remedies. The fact that the revocation procedure has only one instance, also does not indicate that those proceedings should be followed exclusively. The legislative history does not provide any pointers for this. It can rightly be argued that the party that chooses to submit the fraud to the court in the setting aside proceedings, thereby 'acquires an additional instance.[37] On the other hand, this party must immediately put forward the fraud as a ground in the setting aside writ of summons (Article 1064(5) DCCP), within the applicable period of three months after the arbitral award is deposited at the court registry (Article 1064(3) DCCP). This party will therefore not be able to benefit from the "additional" time limit of three months after discovery of the fraud as provided in Article 1068(2) DCCP.[38] This means that the risk identified by the Court of Appeal, that fraud is as yet submitted in the setting aside proceedings more than three months after it has been discovered, is not realistic. After all, the rule of Article 1064 (5) DCCP opposes this.[39]

[34]   G. Snijders, Groene Serie Burgerlijke Rechtsvordering, Article 382 DCCP, note 3 (P.J.M. von Schmidt auf Altenstadt).
[35]   See Groene Serie Burgerlijke Rechtsvordering, Article 382 DCCP, note 7 (P.J.M. von Schmidt auf Altenstadt); Th. B. ten Kate & E.M. Wesseling-van Gent, Herroeping, verbetering en aanvulling van burgerrechtelijke uitspraken, Deventer: Kluwer 2013, no. 1.1.4. It follows from this requirement that a claim for revocation only comes into play if the fraud was not discovered until after the judgment and could not reasonably have been discovered earlier (Supreme Court 18 May 2018, ECLI:NL:HR:2018:727, NJ 2018/250, para. 3.5). In the exceptional case that the fraud is discovered after the judgment but during the current legal remedy time limit, the aggrieved party has the free choice (Groene Serie Burgerlijke Rechtsvordering, Article 382 DCCP, note 8.2 (P.J.M. von Schmidt auf Altenstadt)).
[36]   Regarding the reasons for the introduction of revocation proceedings in the Arbitration Act, the legislative history (Parliamentary Documents II 1983-84,18 464, no. 3 (Explanatory Memorandum), p. 31) merely notes: "The last article of the fifth section on the setting aside of the arbitral award introduces the civil law request on the somewhat modified grounds referred to in Article 382 (1)°, 7° and 8C. In arbitration law as it currently stands, these grounds, likewise amended, can be found in Article 649 nos. 8-10. Although used infrequently, and mostly on the ground set out at (a) of this Article, this final possibility to challenge an arbitral award is indispensable."
[37]   Or at least under the old law applicable here, because the setting aside proceedings are now limited to a single fact-finding instance (Article 1064a (new) DCCP).
[38]   This also means that fraud can only be brought up in setting aside proceedings in exceptional cases, namely if it is discovered after the judgment but within the current period for a setting aside claim. If fraud was discovered during the proceedings or could reasonably have been discovered by investigation on the part of the defrauded party, this must be submitted to the arbitral tribunal during the arbitration proceedings (cf. regarding a claim for revocation Supreme Court 20 June 2003, ECLI:NL:HR:2003:AF6207, NJ 2004/569, annotated by H.J. Snijders).
[39]   Sanders has argued that this requirement should not be set where a setting-aside claim is based on a violation of public policy (op. cit., pp. 189-190). However, also according to Sanders himself, this is contrary to the system of the law. See also



**SWORN TRANSLATION**
**The English text is a sworn translation of the**
**Dutch original. In case of any discrepancies, the**
**Dutch original shall prevail.**

3.6     I will now proceed to discuss the complaints. According to the ground, the Court of Appeal wrongly
        decided, or at least without adequate substantiation, that factual assertions that could have justified
        reliance on revocation within the meaning of Article 1068 DCCP cannot justify the assertion that an
        arbitral award obtained by means of a fraudulent statement, bribed witnesses and the withholding of
        essential documents, must be set aside due to violation of public policy (Article 1065 (1)(e) DCCP). The
        Court of Appeal wrongly deprived the Russian Federation of its possibility to freely choose between a
        claim pursuant to Article 1065 (1)(e) DCCP and a claim based on Article 1068 DCCP, so argues the
        ground.

3.7     In para. 5.7, the Court of Appeal held that fraud can only be raised in the revocation proceedings of
        Article 1068 DCCP, because otherwise, among other things, it might be possible to circumvent the time
        limit it prescribes. It follows from the foregoing that this point of departure is in general incorrect.
        However, this does not entail that the Court of Appeal's ultimate decision is also incorrect. According to
        the Russian Federation, the alleged fraud was discovered after the District Court's judgment (of 20 April
        2016).[40] It is established that this was first invoked in the Defence on Appeal.[41] The rule of Article
        1064(5) DCCP that all grounds for setting aside must be presented in the writ summons on pain of
        forfeiture of the right to do so entails that the alleged fraud could no longer be submitted in the setting
        aside proceedings that were already pending. After all, this should have been done in the originating
        summons on pain of forfeiture of the right to do so. For that reason, as the Court of Appeal held, the
        fraud asserted here could indeed only be raised in revocation proceedings, and could not be submitted
        in the defence on appeal in the setting aside proceedings.

3.8     The foregoing means that ground 1 fails.

        ***Ground 2: interpretation of Article 45(1) ECT***

3.9     Ground 2 is directed against the Court of Appeal's interpretation of Article 45(1) ECT. This interpretation
        is contained in paras. 4.5.1 through 4.5.48 of the final judgment. The ground is divided into eight
        sub-grounds.

3.10    Ground 2 in essence argues that there is no valid arbitration agreement in this case, as required by
        Article 1065(1)(a) DCCP. According to the ground, though Article 26 ECT provides that disputes on
        rights ensuing from the ECT may be submitted to arbitration, the Russian Federation is not bound by
        this provision. The Russian Federation did sign the ECT, but never ratified it. Article 45(1) ECT provides
        for provisional application of the ECT by states that have signed the treaty, but only to the extent that

---

        the objection by H.J. Snijders (Groene Serie Burgerlijke Rechtsvordering, Article 1064 DCCP, note 2): "More in general,
        (...) an arbitral award that is contrary to public policy - e.g. where the principle of the right to be heard has been violated -
        must still be challenged within a certain time limit, in this case the statutory time limit for setting aside: legal certainty is a
        great good and 'lites finiri oportet.'"
40      Initiating document, no. 2.
41      See para. 5.1 of the interim judgment, not challenged in cassation.



**SWORN TRANSLATION**
The English text is a sworn translation of the
Dutch original. In case of any discrepancies, the
Dutch original shall prevail.

such provisional application is not inconsistent with their internal legal order. According to the Russian Federation, the Court of Appeal applied an incorrect standard on this issue by deciding that it is not about whether Article 26 ECT as such is inconsistent with Russian law, but whether the provisional application of Article 26 ECT is inconsistent with it.

*Introductory remarks*

3.11    Before discussing the complaints of ground 2, I will make some comments about the provisional application of treaties in general and about the provisional application of the ECT in particular. Provisional application of a treaty entails the application of the treaty before it enters into force by ratification. Article 25(1) VLCT allows a treaty to be applied provisionally if the treaty so provides, or if the states that have participated in the negotiations have in some other manner so agreed. According to Article 25(2) VLCT, unless the treaty otherwise provides or the states that have participated in the negotiations have otherwise agreed, the provisional application of a treaty or a part of a treaty with respect to a state shall be terminated if that state notifies the other states between which the treaty is being applied provisionally of its intention not to become a party to the treaty. Provisional application can achieve the desired effects of the treaty taking effect without first having passed through the (often lengthy) national ratification procedures.[42] Provisional application is also subject to criticism, because it can conflict with national ratification procedures and thus with the separation of powers.[43]

3.12    As stated, Article 45 ECT provides for the provisional application of the ECT.[44] This provision reads as follows in the authentic English text (Treaty Series 1995, 108) and in the Dutch translation (Treaty Series 1995, 250):

**Article 45 Provisional application**

1. Each signatory agrees to apply this Treaty provisionally pending its entry into force for such signatory in accordance with Article 44, to the extent that such provisional application is not inconsistent with its constitution, laws or regulations.

2. a) Notwithstanding paragraph 1 any signatory may, when signing, deliver to the Depository a declaration that it is not able to accept provisional application. The obligation contained in paragraph 1 shall not apply to a signatory making such a declaration. Any such signatory may at any time withdraw that declaration by written notification to the Depository.

   b) Neither a signatory which makes a declaration in accordance with subparagraph a nor Investors of that signatory may claim the benefits of provisional application under paragraph 1.

   c) Notwithstanding subparagraph a), any signatory making a declaration referred to in subparagraph a shall apply Part VII provisionally pending the entry into force of the Treaty for such signatory in

---

[42]    See Heike Krieger, in: Oliver Dörr, Kirsten Schmalenbach, Vienna Convention on the Law of Treaties. A Commentary, Berlin/Heidelberg: Springer 2018, pp. 441-446; Denise Mathy, in: Olivier Corten, Pierre Klein (eds.), The Vienna Convention on the Law of Treaties, A Commentary, Volume I, Oxford: OUP 2011, pp. 640-654.

[43]    In this respect, see Krieger, op. cit., p. 445.

[44]    In this respect, see Baltag, op. cit., pp. 31-55; Roe & Happold, op. cit., pp. 67-77; Hobér, op. cit., pp. 513-530; Antonio Morelli, in: Rafael Leal-Arcas (ed.), Commentary on the Energy Charter Treaty, Cheltenham: Edward Elgar 2018, pp. 477-481; W. Michael Reisman, The provisional application of the Energy Charter Treaty, in: Graham Coop & Clarisse Ribeiro (eds.), Investment Protection and the Energy Charter Treaty, New York: JurisNet 2008, pp. 47-61.



**SWORN TRANSLATION**
The English text is a sworn translation of the
Dutch original. In case of any discrepancies, the
Dutch original shall prevail.

accordance with Article 44, to the extent that such provisional application is not inconsistent with its laws or regulations.

3. a) Any signatory may terminate its provisional application of this Treaty by written notification to the Depository of its intention not to become a Contracting Party to the Treaty. Termination of provisional application for any signatory shall take effect upon the expiration of 60 days from the date on which such signatory's written notification is received by the Depositary.

b) In the event that a signatory terminates provisional application under subparagraph a, the obligation of the signatory under paragraph 1 to apply Parts III and V with respect to any Investments made in its Area during such provisional application by Investors of other signatories shall nevertheless remain in effect with respect to those Investments for twenty years following the effective date of termination, except as otherwise provided in subparagraph c).

c) Subparagraph b) shall not apply to any signatory listed in Annex PA. A signatory shall be removed from the list in Annex PA effective upon delivery to the Depositary of its request therefor.

4. Pending the entry into force of this Treaty the signatories shall meet periodically in the provisional Charter Conference, the first meeting of which shall be convened by the provisional Secretariat referred to in paragraph 5 not later than 180 days after the opening date for signature of the Treaty as specified in Article 38.

5. The functions of the Secretariat shall be carried out on an interim basis by a provisional Secretariat until the entry into force of this Treaty pursuant to Article 44 and the establishment of a Secretariat.

6. The signatories shall, in accordance with and subject to the provisions of paragraph 1 or subparagraph 2c as appropriate, contribute to the costs of the provisional Secretariat as if the signatories were Contracting Parties under Article 37(3). Any modifications made to Annex B by the signatories shall terminate upon the entry into force of this Treaty.

7. A state or Regional Economic Integration Organization which, prior to this Treaty's entry into force, accedes to the Treaty in accordance with Article 41 shall, pending the Treaty's entry into force, have the rights and assume the obligations of a signatory under this Article.

**Artikel 45 Voorlopige toepassing**

1. Elke Ondertekenende Partij stemt ermee in dit Verdrag voorlopig toe te passen in afwachting van de inwerkingtreding voor deze Ondertekenende Partij krachtens artikel 44, voor zover deze voorlopige toepassing niet strijdig is met haar constitutie, wetten of voorschriften.

2. a. Ongeacht het eerste lid kan een Ondertekenende Partij op het tijdstip van ondertekening bij de Depositaris een verklaring indienen dat zij niet kan instemmen met voorlopige toepassing. De in het eerste lid vermelde verplichting geldt niet voor een Ondertekenende Partij die een dergelijke verklaring aflegt. Die Ondertekenende Partij kan te allen tijde haar verklaring intrekken door middel van een schriftelijke kennisgeving aan de Depositaris.

b. Een Ondertekenende Partij die een verklaring aflegt als bedoeld in het tweede lid, letter a, en investeerders van die Ondertekenende Partij kunnen geen aanspraak maken op de voordelen van voorlopige toepassing krachtens het eerste lid.

c. Ongeacht het tweede lid, letter a, moet een Ondertekenende Partij die een verklaring aflegt als bedoeld in het tweede lid, letter a, Deel VII voorlopig toepassen in afwachting van de inwerkingtreding van het Verdrag voor de Ondertekenende Partij overeenkomstig artikel 44, voor zover die voorlopige toepassing niet strijdig is met haar wetten of voorschriften.

3. a. Een Ondertekenende Partij kan de voorlopige toepassing van dit Verdrag beëindigen door middel van een schriftelijke kennisgeving aan de Depositaris van haar voornemen geen partij bij het Verdrag te



**SWORN TRANSLATION**
The English text is a sworn translation of the
Dutch original. In case of any discrepancies, the
Dutch original shall prevail.

worden. De beëindiging van de voorlopige toepassing wordt voor een Ondertekenende Partij van kracht na het verstrijken van zestig dagen na de datum waarop de schriftelijke kennisgeving van die Ondertekenende Partij door de Depositaris is ontvangen.

b. Ingeval een Ondertekenende Partij de voorlopige toepassing van dit Verdrag beëindigt overeenkomstig het derde lid, letter a, blijft de krachtens het eerste lid op die Ondertekenende Partij rustende verplichting om Deel III en Deel V toe te passen ten aanzien van investeringen die tijdens die voorlopige toepassing op haar grondgebied zijn gedaan door investeerders van andere Ondertekenende Partijen, evenwel van toepassing voor die investeringen gedurende twintig jaar na de datum van beëindiging, tenzij anders bepaald in het derde lid, letter c.

c. Het bepaalde in het derde lid, letter b, geldt niet voor de in bijlage PA vermelde Ondertekenende Partijen. Een Ondertekenende Partij wordt van de lijst in bijlage PA geschrapt zodra zij bij de Depositaris een verzoek daartoe indient.

4. In afwachting van de inwerkingtreding van dit Verdrag komen de Ondertekenende Partijen op geregelde tijdstippen bijeen in het kader van de voorlopige Conferentie van het Handvest, waarvan de eerste vergadering uiterlijk 180 dagen na de in artikel 38 vermelde datum van openstelling voor ondertekening van dit Verdrag door het in het vijfde lid bedoelde voorlopige Secretariaat wordt bijeengeroepen.

5. Tot de inwerkingtreding van dit Verdrag overeenkomstig artikel 44 en de oprichting van een Secretariaat worden de taken van het Secretariaat op tijdelijke basis verricht door een voorlopig Secretariaat.

6. In overeenstemming met dan wel onder voorbehoud van de bepalingen van het eerste lid of het tweede lid, letter c, al naar gelang het geval, dragen de Ondertekenende Partijen bij in de kosten van het voorlopige Secretariaat alsof zij Verdragsluitende Partijen in de zin van artikel 37, derde lid, waren. Eventuele door de Ondertekenende Partijen in bijlage B aangebrachte wijzigingen vervallen bij de inwerkingtreding van dit Verdrag.

7. Een Staat of regionale organisatie voor economische integratie die, vóór de inwerkingtreding van dit Verdrag, overeenkomstig artikel 41 tot het Verdrag toetreedt, heeft in afwachting van de inwerkingtreding van het Verdrag de rechten en verplichtingen van een Ondertekenende Partij krachtens dit artikel.

3.13    The objective pursued by provisional application does not follow from the ECT. It is mentioned in the literature that provisional application is provided for so as to be able to already set up the ECT's institutional framework and create momentum for the energy cooperation for which the ECT is intended.[45]

3.14    In the case at issue in cassation, the question arises as to how the phrase "to the extent that such provisional application is not inconsistent with its constitution, laws or regulations" of Article 45(1) ECT should be interpreted. Three different interpretations of Article 45(1) ECT were considered in these proceedings.[46]

3.15    The *first* view is basically that Article 45(1) ECT means that there is no room for provisional application of the ECT if *the principle of provisional application of a treaty* as such is inconsistent with the laws of the

---

[45]    Hobér, op. cit., p. 515: Baltag, op. cit., p. 35.

[46]    With regard to the various views, see also: Hobér, op. cit., p. 520 et seq.; Baltag, op. cit., p. 39 et seq.; Reisman, op. cit., p. 56, argues that "the inability in Article 45(2)(a) refers to an inability arising from an inconsistency between the provisional application regime and 'its constitution, laws or regulations'." It is not clear whether this author believes that this must concern inconsistency between the principle of provisional application and the internal legal order, or inconsistency between the provisions to be applied provisionally and the internal legal order.



**SWORN TRANSLATION**
The English text is a sworn translation of the
Dutch original. In case of any discrepancies, the
Dutch original shall prevail.

signatory (in this case Russian law). This view was primarily defended by HVY in the first instance (see para. 4.5.4 of the final judgment). This interpretation is referred to, also by the Court of Appeal, as the "all or nothing" approach (para. 4.5.10 of the final judgment). This view is primarily based on the use of the word "such", which refers back to the first half of the sentence: "Each signatory agrees to apply this Treaty provisionally".[47] In addition, Article 45(1) ECT mentions provisional application of "this Treaty" and not just a part of it.[48] This view was followed by the Tribunal.[49]

3.16    In the *second* view, which is defended by the Russian Federation, Article 45(1) ECT is interpreted in such a way that the issue is whether a *specific provision* of the ECT is contrary to the laws of the signatory. In this view, Article 26 ECT is contrary to Russian law (para. 4.5.3 of the final judgment). An argument particularly in favour of the second view is that in the "all or nothing" interpretation, the words "to the extent" in Article 45(1) ECT are effectively rendered meaningless.[50] Those words indicate that variation is possible in the extent to which states provisionally apply the ECT.[51] On the other hand, the second view implies that it must always be examined whether any provision of the law of a signatory is contrary to the ECT,[52] while there are no indications that the treaty authors intended this.[53] In part on the basis of this argument, the Tribunal concurred with the first view in the Interim Awards. In addition, the Tribunal pointed to the principle of international law (laid down in Article 27 VCLT) that states may not invoke their national law to justify their failure to perform a treaty.[54] The District Court followed this second view in the setting-aside proceedings (see para. 5.23 of the judgment of 20 April 2016).

3.17    The *third* view entails that Article 45(1) ECT must be interpreted in such a way that the ECT must be provisionally applied by the signatory, unless provisional application of one or more ECT provisions is inconsistent with national law.[55] This view therefore does not concern the question as to whether an ECT provision is contrary to national law, but rather the question of whether the provisional application of a specific provision is inconsistent with the national law of the signatory. HVY took this position (as an alternative) in the appeal of the setting aside proceedings (para. 4.5.4 of the final judgment). The Court of Appeal concurred with this view (paras. 4.5.14, 4.5.33 and 4.5.48 of the final judgment). According to the Court of Appeal, this interpretation does justice both to the words "to the extent" and "such provisional application", and thus to the objections raised against the other two interpretations.

---

[47]  Also see the Interim Awards, para. 304; Baltag, op. cit., p. 41.
[48]  Also see the decision in ICSID arbitration: *Ioannis Kardassopoulos v. The Republic of Georgia,* ICSID Case No. ARB/05/18, Decision on Jurisdiction, para. 210; Interim Awards, para. 307 et seq.
[49]  Also see the Interim Awards, para. 311 et seq.
[50]  See, for example, the Russian Federation's position as presented in para. 294 of the Interim Awards.
[51]  Roe & Happold, pp. 72-76; *alternatively:* Baltag, pp. 46-48.
[52]  This was also identified by Hobér, op. cit., p. 520.
[53]  Baltag, op. cit., pp. 41-42.
[54]  Interim Awards, paras. 312-315.
[55]  Thomas Wälde, 'Investment Arbitration Under the Energy Charter Treaty - From Dispute Settlement to Treaty Implementation', Arbitration International 1996, p. 462 et seq., is of the view that the purpose of the Limitation Clause is to prevent states from being bound by provisions by the mere signing that may conflict with their national law and which require legislative amendments in order to enter into force.



SWORN TRANSLATION
The English text is a sworn translation of the
Dutch original. In case of any discrepancies, the
Dutch original shall prevail.

3.18    After this exposition, I return to the various complaints in the ground.

3.19    Ground 2.1 only contains an introduction and no complaint.

        *Ground 2.2: Article 26 ECT*

3.20    Ground 2.2 is directed against para. 4.3 (in particular para. 4.3.4) of the final judgment. In that judgment, the Court of Appeal ruled that the Russian Federation unambiguously agreed to arbitration. The ground complains that this decision is incorrect. Article 26 ECT provides that "each Contracting Party", i.e. every contracting state, unambiguously agrees to arbitration. However, the Russian Federation never became a contracting party because it only signed the ECT and did not ratify it. As it is unclear whether Article 26 ECT also pertains to states that have only signed the treaty ("signatories"), there can be no clear and unambiguous consent, according to the ground.

3.21    Contrary to what the ground argues, the Court of Appeal did not fail to recognise that an arbitration clause must be agreed unambiguously. After all, in para. 4.3.4 the Court of Appeal clearly tested against that standard. Furthermore, contrary to what the ground argues, the Court of Appeal did not fail to recognise that Article 26 ECT only creates obligations for contracting parties and not for signatories as well. Nor did the Court of Appeal confuse these terms, as the Court of Appeal inferred from Article 45(1) ECT, which provides that signatories are required to provisionally apply the ECT provisions, that Article 26 ECT also creates obligations for signatories. Whether that interpretation of Article 45(1) ECT is correct is addressed in more detail by grounds 2.4 et seq. The Court of Appeal's finding that "the scope of the Limitation Clause and its application in the light of the national law of the Russian Federation can be subject to debate", should not be interpreted in such a way that it is therefore unclear to what extent a signatory is bound by Article 26 ECT. After all, on the basis of an analysis of Article 45(1) ECT, the Court of Appeal finds that signatories are required to provisionally apply Article 26 ECT (para. 4.5.48).

3.22    It follows from the above that ground 2.2 has been proposed in vain.

        *Ground 2.3: jurisdiction of the Tribunal*

3.23    Ground 2.3 is directed against paras. 4.4.3-4.4.6 of the final judgment. The essence of those findings is that there is no reason to set aside an arbitral award if, although the arbitral tribunal declared itself to have jurisdiction on incorrect grounds, the state court decides on different grounds that the decision on jurisdiction was correct. According to the Court of Appeal, it is unacceptable that the state court would nevertheless have to decide on the parties' dispute, while a valid arbitration agreement exists, for the sole reason that the arbitral tribunal, which in this regard precisely does not have the final say, used incorrect reasoning in its decision on jurisdiction (para. 4.4.3, last sentences). The ground complains that the statutory system of setting aside proceedings does not allow this. HVY were not free to present new grounds for jurisdiction in the setting aside proceedings, at least not only on appeal, so argues the



**SWORN TRANSLATION**
The English text is a sworn translation of the
Dutch original. In case of any discrepancies, the
Dutch original shall prevail.

ground.

3.24    The point of departure is that the state court should not exercise restraint in respect of the arbitral tribunal's jurisdiction,[56] unlike with other setting aside grounds of Article 1065(1) DCCP. The reason for this is that by agreeing to arbitration, the parties waive the fundamental right of access to the state court (Article 6 ECHR).[57] That is why the state court is ultimately charged with answering the question as to whether a valid arbitration agreement was concluded. Not the arbitral tribunal, but the state court has the final say in this respect.[58] After all, the question is *whether* the arbitral tribunal has jurisdiction and not on which grounds the arbitral tribunal based its jurisdiction.[59]

3.25    So it is ultimately the state court that gives the final decision on whether or not the arbitral tribunal had jurisdiction.[60] The state court may conclude that the arbitral tribunal did have jurisdiction, but on grounds other than those on which the arbitral tribunal based its decision on jurisdiction itself. The ground effectively defends the view that the court should only be allowed to assess whether the arbitral tribunal assumed jurisdiction on the correct grounds and should set aside the arbitral award if that is not the case,[61] while it is clear that the arbitral tribunal had jurisdiction on other grounds. That interpretation of the law is incorrect and contrary to the right of access to the court guaranteed by Article 6 ECHR, from which it follows that the state court may examine the arbitral tribunal's jurisdiction. This also does justice to the parties' intention to submit their dispute to arbitration and prevents the parties from having to litigate before the state court nevertheless, while they did not wish to do so.[62]

3.26    The court may therefore supplement the grounds for the arbitral tribunal's jurisdiction,[63] but must of course do so while respecting the rules on the supplementation of legal grounds. In that respect, the Russian Federation argued that the Court of Appeal should not have taken into account the basis for jurisdiction of the Tribunal proposed by HVY, because HVY put forward this ground for the first time on appeal.[64] In so doing, the Russian Federation fails to recognise that the Court of Appeal was required,

---

[56]   Supreme Court 9 January 2004, ECLI:NL:HR:2004:AK8380, *NJ* 2005/190, annotated by H.J. Snijders, para. 3.5.2, with reference to Supreme Court 17 January 2003, ECLI:NL:HR:2003:AE9395, *NJ* 2004/384, annotated by H.J. Snijders. See Sanders, op. cit., pp. 186-188; H.J. Snijders, Arbitragerecht, Deventer: Wolters Kluwer 2018, no. 9.3.1.2 (= Groene Serie Burgerlijke Rechtsvordering, art. 1065 DCCP, note 1.2); Van den Berg et al., op. cit., p. 132.

[57]   Snijders, op.cit., 2018, no. 1.1.3.

[58]   Supreme Court 26 September 2014, ECLI:NL:HR:2014:2837, *NJ* 2015/318 annotated by H.J. Snijders, para. 4.2.

[59]   See at para. 2.36 of the opinion of Advocate General Wesseling-van Gent (ECLI:NL:PHR:2009:BG4003) prior to Supreme Court 27 March 2009, ECLI:NL:HR:2009:BG4003, *NJ* 2010/169, annotated by H.J. Snijders in *NJ* 2010/170.

[60]   Supreme Court 9 January 1981, ECLI:NL:HR:1981:AG4130, *NJ* 1981/203, annotated by W.H. Heemskerk. See Sanders, op. cit., pp. 23 and 33; Snijders, op. cit., 2018, no. 6.4.1; G.J. Meijer, Overeenkomst tot arbitrage - bezien in het licht van het bewijsvoorschrift van artikel 1021 Rv, Deventer: Kluwer 2011, p. 860; N. Peters, IPR, Proces & Arbitrage. Over grondslagen en rechtspraktijk, Apeldoorn: Maklu 2015, p. 274.

[61]   The ground refers to an opinion by Prof. H.J. Snijders (Exhibit RF-D9), submitted on appeal, which argues that the supplementation of grounds for jurisdiction by the state court is contrary to the finality and effectiveness of the arbitration proceedings. Snijders also mentions the objection that no debate can have taken place at the arbitral tribunal in respect of the ground for jurisdiction applied by the state court.

[62]   See also para. 4.4.4 of the Court of Appeal's final judgment in this case.

[63]   In the same sense, Peters, op. cit., p. 274 and at para. 7 of his annotation in *JOR* 2020/164 to the Court of Appeal's final judgment.

[64]   Initiating document, no. 27(c).



SWORN TRANSLATION
The English text is a sworn translation of the
Dutch original. In case of any discrepancies, the
Dutch original shall prevail.

within the limits of the scope supplied by the grounds of appeal, to supplement the legal grounds of its own initiative if necessary (Article 25 DCCP).[65] It is not disputed that HVY's grounds of appeal are directed at the manner in which the District Court interpreted Article 45(1) ECT. The Court of Appeal was therefore free to investigate how this provision should be interpreted and to take new legal arguments into account in doing so.[66] I point out that the Court of Appeal qualified the interpretation put forward by HVY in para. 4.4.6 of the final judgment as a purely legal argument.[67] That qualification has not been challenged in cassation. Contrary to what the ground argues, the Court of Appeal was therefore allowed to take account of this legal ground that HVY for the first time put forward on appeal.

3.27    Furthermore, it cannot be said that paragraphs 4 and 5 of Article 1052 DCCP preclude this supplementing of grounds for jurisdiction.[68] Article 1052(4) DCCP provides that the arbitral tribunal's decision on jurisdiction can only be challenged using the legal remedies of Article 1064(1) DCCP if this is done together with a challenge of the subsequent full or partial final award. Article 1052(5) DCCP pertains to the case in which the arbitral tribunal has declined jurisdiction, after which the ordinary court has jurisdiction to hear the case. It follows from Article 1052(5) DCCP that the arbitral tribunal's decision that it has no jurisdiction is a final decision that cannot be challenged before the state court.[69] The Supreme Court held that the combination of Articles 1052 and 1065 DCCP serves

> "to ensure that, if a party wishes to contest the jurisdiction of the arbitral tribunal because of the absence of a valid arbitration agreement, the arbitral tribunal can make a decision on the matter at an early stage of the proceedings, thus avoiding as far as possible unnecessary procedural steps if a reliance made later (in the arbitral proceedings or before the ordinary courts) on the absence of a valid arbitration agreement would nevertheless lead to the decision that the arbitral tribunal has no jurisdiction."[70]

Whether new factual or legal statements may be put forward in the setting-aside proceedings will have to be assessed in each specific case, also in view of the requirements of due process.[71]

3.28    I would like to note as an aside that the explanatory notes to Article 1065a (new) DCCP, in so far as relevant, do not state that the court cannot correct an incorrect decision on jurisdiction (in the sense that it can refer the case back to the arbitral tribunal on that ground). The point is that the court will not refer the case back (remission) if it decides that there is no valid arbitration agreement,[72] as referring the case back would serve no purpose in that case.

[65]  Asser Procesrecht/Bakels, Hammerstein & Wesseling-Van Gent 4 2018/171.
[66]  Cf. Supreme Court 27 March 2009, ECLI:NL:HR:2009:BG4003, NJ 2010/169, annotated by H.J. Snijders, in which it was held that the party invoking setting aside may also provide further factual or legal substantiation of the grounds put forward on appeal, provided that the purport of Article 1064(5) DCCP is respected. See also no. 2.16 of the opinion of Advocate General Wesseling-van Gent prior to this judgment (ECLI:NL:PHR:2009:BG4003).
[67]  See Peters' assent at para. 8 of his annotation in JOR 2020/164.
[68]  Initiating document, no. 27(a).
[69]  See Parliamentary Documents II 1983-84, 18 464, no. 3 (Explanatory Memorandum), p. 22; Meijer, op. cit., 2011, p. 860; Van den Berg et al., op. cit., p. 99.
[70]  See Supreme Court 27 March 2009, ECLI:NL:HR:2009:BG6443, NJ 2010/170, annotated by H.J. Snijders, para. 3.4.1.
[71]  See para. 3.4.2 of the Supreme Court judgment cited in the previous note.
[72]  G.J. Meijer et al., Parliamentary History of the Arbitration Act 2015/1.77.3.



**SWORN TRANSLATION**
**The English text is a sworn translation of the**
**Dutch original. In case of any discrepancies, the**
**Dutch original shall prevail.**

3.29   The ground (no. 28) also argues that the Court of Appeal's decision in para. 4.4.6 of the final judgment, that HVY should have put forward its new position during the arbitration proceedings, or at least at first instance, is incomprehensible. It follows from the foregoing that this complaint fails.

3.30   The conclusion is that ground 2.3 fails in its entirety.

   *Ground 2.4: Limitation Clause*

3.31   Ground 2.4 complains that the Court of Appeal's interpretation of the Limitation Clause of Article 45(1) ECT is legally incorrect. The ground (at 2.4.1) summarises this interpretation applied by the Court of Appeal and formulates a number of complaints (at 2.4.2).

3.32   In para. 4.2.1 et seq. of the final judgment, the Court of Appeal set out its preliminary assumption – which has not been challenged in cassation – regarding the manner in which treaties are interpreted. This may be briefly summarised as follows. Articles 31 and 32 VCLT provide guidelines for the interpretation of treaty provisions. Interpretation of a treaty is always aimed at discerning the contracting parties' intention. The text of the relevant treaty provision is guiding in that process (para. 4.2.2).[73] The text must be understood in its context as well as in light of the treaty's object and purpose. Pursuant to Article 31(1) VCLT, this interpretation must be performed in good faith (para. 4.2.3). According to Article 31(3)(b) VCLT, together with the context, any subsequent practice in the application of the treaty which establishes agreement on the interpretation of the treaty must be taken into account (para. 4.2.4). Finally, according to Article 32 VCLT, the treaty's preparatory works ("*travaux préparatoires*") can be considered. However, these are supplementary means, which can only be used to confirm the interpretation arrived at through the application of Article 31 VCLT or can be used if the interpretation leads to a result that is ambiguous or unreasonable (para. 4.2.5).

3.33   The ground (no. 34) complains that the Court of Appeal's interpretation is not in line with the ordinary meaning of the wording of Article 45(1) ECT. According to the Court of Appeal, assessment is required of whether the law of a signatory precludes provisional application of certain treaty provisions or categories of such provisions. According to the complaint, there is nothing in the wording of Article 45(1) ECT that suggests this.

3.34   It is evident from para. 4.5.10 that the Court of Appeal based this interpretation on the ordinary meaning of the words "to the extent" in the text of Article 45(1) ECT. As the Court of Appeal held, in first instance HVY defended the position that, pursuant to Article 45(1) ECT, it must be assessed whether the principle of provisional application of a treaty as such is inconsistent with the law of the signatory. In para. 4.5.10 et seq., the Court of Appeal held that this interpretation does not do justice to the ordinary

---

[73]   See ICJ *Territorial Dispute (Libya v. Chad)*, 3 February 1994, para. 41, where the International Court of Justice notes: "Interpretation must be based above all upon the text of the treaty"; see Oliver Dörr, in: Oliver Dörr, Kirsten Schmalenbach, Vienna Convention on the Law of Treaties. A Commentary, Berlin/Heidelberg: Springer 2018, p. 580.



**SWORN TRANSLATION**
The English text is a sworn translation of the
Dutch original. In case of any discrepancies, the
Dutch original shall prevail.

meaning of the words "to the extent" from that provision. That is because, according to the Court of Appeal, those words indicate that there are gradations possible to the extent that the ECT is not provisionally applicable on grounds of inconsistency with national law. Contrary to the argument put forward in the complaint, the ordinary meaning of the wording of Article 45(1) ECT supports the Court of Appeal's interpretation. Since the complaint does not clarify why the ordinary meaning of this wording as established by the Court of Appeal would be incorrect, the complaint fails.

3.35    The ground also complains (no. 35) that the interpretation is inconsistent with the context in which the wording "to the extent" is used. The ground points out that Article 45(2)(c) ECT uses identical wording, which however pertains in that respect to specific parts of the ECT, as the Court of Appeal allegedly endorses in para. 4.5.19. Consequently, the interpretation of Article 45(1) ECT would not be consistent, according to the complaint.

3.36    Contrary to the argument put forward in the complaint, there is no inconsistency. In para. 4.5.19, the Court of Appeal endorsed the District Court's decision that the wording "to the extent" of Article 45(1) and Article 45(2)(c) ECT argue against the "all or nothing" approach primarily defended by HVY. The Court of Appeal thus consistently interpreted the two provisions. In so far as the intention behind the complaint is to argue that the words "to the extent" in Article 45(2)(c) ECT should be interpreted such that they pertain to specific parts of the ECT, and that the Court of Appeal endorsed this, the complaint is based on an incorrect reading of the challenged decision.

3.37    The ground also complains (nos. 36-37) that the Court of Appeal failed to recognise the rationale for limiting the scope of provisional application. According to the ground, the rationale of the provisional application is to "provide a solution for government officials who wish to commence international cooperation and simultaneously wish to respect internal ratification procedures". Hence, Article 45 ECT aligns with the ECT's purpose to shape and expand international cooperation based on the ECT as swiftly as possible and, on the other hand, to establish (in due time) a secure and binding international legal basis for such a cooperation, in which respect the ground refers to a passage from the Preamble to the ECT.

3.38    This complaint pertains to the manner in which the Court of Appeal interpreted Article 45(1) ECT in light of the ECT's object and purpose. In para. 4.5.22 et seq., the Court of Appeal held as follows in this respect. The ECT has the objective of attracting investment through a stable and secure investment environment and by promoting transparency, legal certainty and investment protection. The purpose of the provisional application of the ECT is to ensure that the obligation to create the desired investment conditions would arise immediately upon signature (para. 4.5.26). According to the Court of Appeal, the interpretation defended by the Russian Federation is less compatible with this objective, because an investor would always have to take into account that the provisions of the ECT are impaired by national laws and regulations (para. 4.5.26). HVY's primary and alternative positions on the interpretation of



**SWORN TRANSLATION**
The English text is a sworn translation of the
Dutch original. In case of any discrepancies, the
Dutch original shall prevail.

Article 45(1) ECT are not disadvantaged by such unclarity and unpredictability, according to the Court of Appeal (para. 4.5.27).

3.39    The complaint does not in itself challenge this description of the ECT's object and purpose, but in fact argues that the purpose of provisional application of the ECT should also have been taken into account, namely to enable government officials to sign the ECT and also to respect the national ratification procedures. The passage from the ECT's Preamble (4th paragraph) cited by the complaint reads as follows:

> "Recalling that all signatories to the Concluding Document of the Hague Conference undertook to pursue the objectives and principles of the European Energy Charter and implement and broaden their cooperation as soon as possible by negotiating in good faith an Energy Charter Treaty and Protocols, and desiring to place the commitments contained in that Charter on a secure and binding international legal basis".

3.40    In itself, it is correct that the Preamble to a treaty is relevant for determining the object and purpose of that treaty.[74] In order to determine what purpose is expressed in the Preamble, the Preamble must be interpreted in accordance with the rules of Article 31 et seq. VCLT. The complaint apparently assumes that the cited passage from the Preamble expresses the notion that one of the ECT's objectives would be to allow governments the time to create a binding legal basis in their own legal system (by ratification). This view cannot be accepted. The final sentence of the fourth paragraph of the Preamble relates to the desire to place the commitments contained in the ECT "on a secure and binding *international* legal basis" (my italics, Advocate General). Those words refer to the ECT itself and not to its ratification by the signatories. This is confirmed by the context in which these words are used, as the ECT constitutes the binding legal basis for obligations already included in the non-binding European Energy Charter.[75] Neither the Preamble nor the provisions of the ECT show that an aspect of the ECT's object and purpose would be the desire to allow government officials the time to create a binding internal legal basis. Even if the Preamble did have to be interpreted in the manner defended by the complaint, the Court of Appeal took this possibility into account in para. 4.5.34 et seq, since, in those paragraphs, the Court of Appeal superfluously held, on the basis of the *travaux préparatoires,* that Article 45(1) ECT aims to prevent signatories from being bound, through provisional application, by obligations for which ratification is required under their national law. On that basis, the Court of Appeal decided that Article 45(1) ECT only precludes provisional application if that application is incompatible with national law for certain ECT provisions or categories of such provisions. Thus, the Court of Appeal took account of the objective of the ECT, or at least of Article 45(1), to give signatories scope to apply the ECT provisionally, with the exception of those provisions that, according to signatories' national law, can only bind them after ratification. The complaint fails due to the above.

---

[74]   Dörr, op.cit., p. 585.
[75]   See Rafael Leal-Arcas, Introduction, in: Rafael Leal-Arcas (ed.), Commentary on the Energy Charter Treaty, Cheltenham: Edward Elgar 2018, pp. 1 and 9.



**SWORN TRANSLATION**
**The English text is a sworn translation of the**
**Dutch original. In case of any discrepancies, the**
**Dutch original shall prevail.**

3.41    The ground (no. 37) complains that the Court of Appeal wrongly mentioned "transparency" as one of the purposes of the ECT. According to the complaint, Article 45(1) ECT says nothing about transparency and HVY's statements to that effect have already been rejected.[76]

3.42    The complaint fails to recognise that paras. 4.5.22-4.5.27 do not relate to the purpose of Article 45(1) ECT, but to the purpose of the ECT as a whole. In para. 4.5.23, the Court of Appeal substantiated with references to the treaty text that transparency of the ECT is one of the purposes. As Article 45(1) ECT must be interpreted in light of the ECT's purpose,[77] it cannot be said that it would be incorrect for the Court of Appeal to have included the purpose of transparency in the interpretation of that provision.

3.43    The ground (nos. 38-42) complains about the Court of Appeal's decision that there was insufficient evidence of (established) state practice from which an interpretation other than its own allegedly follows (paras. 4.5.28-4.5.33). The complaint refers to various statements, which the Court of Appeal failed to recognise, from which such state practice allegedly follows.

3.44    Article 31(3)(b) VCLT provides that, together with the context, "any subsequent practice in the application of the treaty which establishes the agreement of the parties regarding its interpretation" must be taken into account. This requires all contracting parties to have accepted that practice, either explicitly or implicitly, in the application of the relevant treaty. [78] Further, state practice is important if it developed after the conclusion of the treaty ('subsequent practice').

3.45    The complaint refers to various statements which allegedly imply a state practice that is incompatible with the interpretation of Article 45(1) ECT advocated by the Court of Appeal. For example, reference is made to a declaration by the European Council, the European Commission and the then Member States from 1994 (the "1994 EU Joint Statement"), which states that Article 45 ECT "(...) does not create any commitment beyond what is compatible with the existing order of the Signatories". The Court of Appeal discussed this declaration in para. 4.5.29 and held that it is not incompatible with HVY's alternative interpretation. The ground complains that this interpretation of the Court of Appeal is incorrect and that Article 45(1) ECT must be interpreted in such a way that the Russian Federation's interpretation is the right one.

3.46    Contrary to what the Russian Federation argues, the Joint Statement can be read to mean that Article 45(1) ECT does not create any commitment that is incompatible with the internal legal order of signatories, in the sense that there can be no provisional application of ECT provisions if this is incompatible with that internal legal order. Even if the Joint Statement should in fact be interpreted as

---

[76]   Incidentally, the District Court's decision in para. 5.28 of its judgment, to which the complaint refers in no. 37, is rendered in a different setting. There, the District Court rejected HVY's position that Article 45(1) ECT requires transparency in the sense that it would require signatories to clarify by means of a prior declaration or notification which treaty provisions cannot be provisionally applied under their national law.

[77]   According to Article 31(1) and (2) VCLT, and the (rightly unchallenged) representation and discussion thereof by the Court of Appeal in para. 4.2.1 et seq.

[78]   Nollkaemper, op. cit., no. 243; Dörr, op. cit., pp. 598-599.



**SWORN TRANSLATION**
The English text is a sworn translation of the
Dutch original. In case of any discrepancies, the
Dutch original shall prevail.

advocated by the Russian Federation, the fact remains that this is merely a statement by the then EC Member States. It does not show that all (former, let alone current) ECT contracting parties endorse this interpretation. I would also point out that, strictly speaking, the Joint Statement was made *before* the date of the ECT's conclusion, for which reason alone it cannot be considered "subsequent practice". The complaint therefore fails.

3.47   The sub-ground complains (no. 41) that, in paras. 4.5.31 and 4.5.32, the Court of Appeal wrongly and/or incomprehensibly found that – briefly stated – the interpretation of Article 45 ECT applied by the Court of Appeal was compatible with declarations of Dutch officials, of the Finnish Government, and of the Minister for Foreign Affairs of the United Kingdom.

3.48   This complaint does not hold either. The Court of Appeal's finding on the declaration by the Finnish Government is correct in light of the aforementioned rule that state practice is only relevant if it is endorsed by all contracting parties. The same goes for the Court of Appeal's findings regarding comments by Dutch officials. Contrary to what the complaint argues,[79] the Court of Appeal did not decide that these statements are compatible with the interpretation of Article 45(1) ECT endorsed by the Russian Federation, but (rightly) decided that they do not refer to state practice as referred to in Article 31(3)(b) VCLT. The Court of Appeal rightly held that these statements (including those of the Minister of Foreign Affairs of the United Kingdom) do not fall under state practice, but under the *travaux préparatoires*, which was taken into account in that context.

3.49   The ground (no. 42) also argues that the interpretation accepted by the Court of Appeal essentially means that some EC Member States must provisionally apply the ECT in its entirety. According to that interpretation, argues the ground, representatives of those states therefore exceeded their internal powers.

3.50   The ground effectively argues that, for certain contracting parties, the interpretation of Article 45(1) ECT accepted by the Court of Appeal would have consequences that are incompatible with the internal law of those states. This argument cannot be accepted. In paras. 4.5.9-4.5.33, the Court of Appeal interpreted Article 45(1) ECT on the basis of the standard of Article 31 VCLT. Starting from the ordinary meaning of the text, the Court of Appeal considered that provision in its context and in the light of the object and purpose of the ECT. The question of whether the interpretation achieved through application of Article 31 VCLT is incompatible with the internal legal order of contracting parties is not part of the rule of interpretation of Article 31 VCLT. However, Article 32(b) VCLT does contain the possibility to interpret a treaty provision on the basis of the *travaux préparatoires* in the event that the application of Article 31 VCLT leads to a manifestly absurd or unreasonable result. In so far as the ground should be taken to mean that the Court of Appeal's interpretation is absurd or unreasonable, the Court of Appeal substantiated its interpretation in para. 4.5.34 et seq. with references to the *travaux préparatoires*.

---

[79]   See no. 41 of the initiating document, footnote 92.



**SWORN TRANSLATION**
**The English text is a sworn translation of the**
**Dutch original. In case of any discrepancies, the**
**Dutch original shall prevail.**

3.51    The ground (nos. 43-49) complains about paras. 4.5.34-4.5.40, in which the Court of Appeal discussed the *travaux préparatoires* to the ECT.

3.52    In para. 4.5.35, the Court of Appeal superfluously decided that the *travaux préparatoires* confirm its decision regarding the interpretation of Article 45(1) ECT. According to Article 32 VCLT, the *travaux préparatoires* do not come into play unless the interpretation reached on the basis of Article 31 VCLT is manifestly absurd or unreasonable. That is not the case, according to the Court of Appeal. As the complaints about the application of Article 31 VCLT fail, the Court of Appeal did not need to examine the *travaux préparatoires*, which means that the decision in that respect in para. 4.5.35 was rendered superfluously. Consequently, the complaints directed against this lack interest.

3.53    The conclusion is that all the complaints in ground 2.4 fail.

*Ground 2.5: "not inconsistent" in Article 45(1) ECT*

3.54    Ground 2.5 pertains to the interpretation of the words "not inconsistent" in Article 45(1) ECT. The ground argues that, in addition to its own treaty interpretation, the Court of Appeal developed an alternative interpretation in paras. 4.5.41-4.5.47 and 4.7 of the final judgment. According to the ground, that alternative interpretation entails that (contrary to what the Court of Appeal found in paras. 4.5.1-4.5.40) within the context of Article 45(1) ECT, an assessment should be made of whether ECT provisions are inconsistent with the internal legal order of the signatory, in which respect the ECT must already be considered part of that legal order. According to the ground, that interpretation is incorrect, because the Court of Appeal wrongly assumed that Article 26 ECT is applicable in the Russian legal order. By way of example, reference is made to para. 4.7.49, in which the Court of Appeal held that the question as to the Tribunal's jurisdiction should be assessed on the basis of Article 26 ECT, rather than based on Russian law. In so holding, the Court of Appeal allegedly assumed that arbitration can be based on Article 26 ECT and that this provision is therefore applicable in the Russian legal order, which, however, still has to be proven.

3.55    The Court of Appeal held as follows in para. 4.5.41:

> "The meaning of the words 'not inconsistent' follows from the Court of Appeal's interpretation of the Limitation Clause. This interpretation concerns whether national laws or regulations exist that exclude provisional application for certain treaty provisions or types or categories of such provisions. If the latter is the case, provisional application of those treaty provisions, or types or categories of such provisions, is 'inconsistent' with national law."

3.56    In para. 4.5.42 et seq., the Court of Appeal superfluously discussed the debate conducted by the parties on the question of how to interpret "(not) inconsistent", based on the Russian Federation's interpretation of Article 45(1) ECT, which requires an assessment of whether an ECT provision is inconsistent with the law of a signatory. In para. 4.5.48, the Court of Appeal concluded that Article 45(1) ECT is to be



**SWORN TRANSLATION**
The English text is a sworn translation of the
Dutch original. In case of any discrepancies, the
Dutch original shall prevail.

interpreted as meaning that a signatory which has not made the declaration referred to in Article 45(2)(a) ECT is obliged to apply the ECT provisionally except to the extent that provisional application of one or more provisions of the ECT is inconsistent with national law, in the sense that the laws or regulations of that state preclude provisional application of a treaty for certain treaty provisions or types or categories of such provisions. Based on this interpretation, the Court of Appeal decided that the provisional application of Article 26 ECT is not inconsistent with the "constitution, laws or regulations" of the Russian Federation (para. 4.6.1). Para. 4.6.2 shows that the Court of Appeal examined, superfluously, in para. 4.7 whether Article 26 ECT is inconsistent with the law of the Russian Federation, on the basis of the interpretation given by the Russian Federation to the Limitation Clause of Article 45(1) ECT.

3.57    The Court of Appeal rendered paras. 4.5.42-4.5.47 superfluously, given that these paragraphs were only included for the purpose of para. 4.7. et seq. – also superfluously included. As a result, the complaints in ground 2.5 fail for lack of interest.

        *Ground 2.6: Article 26 ECT inconsistent with Russian law?*

3.58    Ground 2.6 is directed against para. 4.7, in which the Court of Appeal discussed the question of whether Article 26 ECT is inconsistent with the law of the Russian Federation.

3.59    In the discussion of ground 2.5, I already noted that para. 4.7 was included superfluously, as evident from para. 4.6.2. The complaints in the ground therefore lack interest and need not be discussed. Also, the complaints in part relate to the interpretation and application of Russian law and are barred by the provisions of Article 79(1) opening words and (b) of the Judiciary (Organisation) Act, as well as the complaints in respect of reasoning that cannot be assessed without also taking into account the correctness of the Court of Appeal's decision on the substance and interpretation of Russian law.[80]

        *Ground 2.7: referral to the ECJ for a preliminary ruling?*

3.60    Ground 2.7 does not contain an independent complaint, but argues that the Supreme Court should refer questions to the ECJ for a preliminary ruling on the interpretation of Article 45(1) ECT and Article 26 ECT. According to the ground, the Court of Appeal should have concluded that the Russian Federation's clear and unambiguous consent to arbitration is lacking, for which reference is made to grounds 2.2, 2.4, 2.5 and 2.6. The ground also considers it contrary to EU law for a judicial body of a Member State to accept an interpretation of a mixed agreement (such as the ECT) that is inconsistent with the joint interpretation of the Commission, the Council and the Member States. As different interpretations of Article 45(1) ECT are possible, there is no "'*acte clair*" or "*acte éclairé*", according to the ground.

---

[80]    Cf. Supreme Court 4 December 2020, ECLI:NL:HR:2020:1952, *RvdW* 2021/2, para. 3.7.2.



**SWORN TRANSLATION**
The English text is a sworn translation of the
Dutch original. In case of any discrepancies, the
Dutch original shall prevail.

3.61    A mixed agreement is a treaty concluded by both the EU and the Member States on the basis of shared
        competence (see Article 4 TFEU). Both the EU and the individual EU Member States are parties to the
        ECT, as some of the topics regulated in the ECT are subject to the competence of the Member States.[81]
        It is established case law that an international agreement concluded by the EU constitutes an act of one
        of the institutions of the EU within the meaning of Article 267, first paragraph, at b, TFEU, which means
        that the ECJ has jurisdiction to give a ruling on the interpretation of such an agreement. The provisions
        of such an agreement form an integral part of the Union's legal order.[82]

3.62    The question arises whether the ECJ has jurisdiction to interpret a mixed agreement in its entirety or that
        jurisdiction is limited to certain subjects of that agreement, and if so, what the delineation criterion is. It
        can be derived from ECJ case law that a question referred about a mixed agreement must relate to a
        subject regarding which the EU has exercised its internal powers to a sufficient degree. I will explain this
        in more detail below.

3.63    The ECJ has deemed itself competent to interpret mixed agreements in various judgments. However, it
        was not always clear in which cases the Court of Justice's involvement was necessary. The Court of
        Justice clarified this in *Merck Genéricos* by finding that the Court of Justice's preliminary jurisdiction with
        regard to mixed agreements only concerns those areas in which the EU has exercised its internal
        powers to a sufficient degree.[83]

3.64    The ECJ built on this case law in its judgment in *Lesoochranarske VLK*.[84] This case concerned the
        question of whether a provision of the Aarhus Convention[85] had direct effect, which raised the question
        of whether the Court of Justice had jurisdiction to render a preliminary ruling on the relevant provision.
        The Court of Justice held as follows:

        "30. The Aarhus Convention was signed by the Community and subsequently approved by Decision
        2005/370. Therefore, according to settled case-law, the provisions of that convention now form an integral
        part of the legal order of the European Union (see, by analogy, Case C-344/04 *IATA and ELFAA* [2006]
        ECR I-403, paragraph 36, and Case C-459/03 *Commission v Ireland* [2006] ECR I-4635, paragraph 82).
        Within the framework of that legal order the Court therefore has jurisdiction to give preliminary rulings
        concerning the interpretation of such an agreement (see, inter alia, Case 181/73 *Haegeman* [1974] ECR

⁸¹   See also 'Statement submitted by the European Communities to the Secretariat of the Energy Charter pursuant to Article
     26(3)(b)(ii) of the Energy Charter Treaty', *OJ* L 69/115.
⁸²   See ECJ 30 April 1974, Case C-181/73, ECLI:EU:C:1974:41, *Jur.* 1974, p. 00449 (*Haegemari*), points 3-6; ECJ 11
     September 2007, Case C-431/05, ECLI:EU:C:2007:496, *Jur.* 2007, p. 1-07001 (*Merck Genéricos*), point 31; ECJ 8 March
     2011, Case C-240/09, ECLI:EU:C:2011:125, *Jur.* 2011, p. 1-01255 (*Lesoochranarske VLK*), point 30; ECJ 16 May 2017,
     Opinion 2/15, ECLI:EU:C:2017:376 (*EU-Singapore Free Trade Agreement*), point 29; ECJ 7 June 2018, Case C-83/17,
     ECLI:EU:C:2018:408 (*KP*), point 24. See also K. Lenaerts, P. van Nuffel, Europees Recht, Antwerpen: Intersentia 2017, p.
     492; G. de Baere and J. Meeusen, Grondbeginselen van het recht van de Europese Unie, Antwerpen: Intersentia 2020, p.
     345 et seq.
⁸³   ECJ 11 September 2007, Case C-431/05, ECLI:EU:C:2007:496, *Jur.* 2007, p. 1-07001 (*Merck Genéricos*), point 46. This
     judgment builds on the previous judgments ECJ 16 June 1998, Case C-53/96, ECLI:EU:C: 1998:292, *Jur.* 1998, p. I-03603
     (*Hermès*); ECJ 14 December 2000, joined Cases C-300/98 and C-392/98, ECLI:EU:C:2000:688, *Jur.* 2000, p. 1-11307
     (*Dior and Assco*).
⁸⁴   ECJ 8 March 2011, Case C-240/09, ECLI:EU:C:2011:125, *Jur.* 2011, p. I-01255 (*Lesoochranarske VLK*). See in this
     regard, inter alia, De Baere and Meeusen, op. cit., p. 347.
⁸⁵   Convention on Access to Information, Public Participation in Decision-making and Access to Justice in Environmental
     Matters, concluded in Aarhus on 25 June 1998.



**SWORN TRANSLATION**
The English text is a sworn translation of the
Dutch original. In case of any discrepancies, the
Dutch original shall prevail.

449, paragraphs 4 to 6, and Case 12/86 *Demirel* [1987] ECR 3719, paragraph 7).

*31. Since the Aarhus Convention was concluded by the Community and all the Member States on the basis of joint competence, it follows that where a case is brought before the Court in accordance with the provisions of the EC Treaty, in particular Article 234 EC thereof, the Court has jurisdiction to define the obligations which the Community has assumed and those which remain the sole responsibility of the Member States in order to interpret the Aarhus Convention* (see, by analogy, Joined Cases C-300/98 and C-392/98 *Dior and Others* [2000] ECR I-11307, paragraph 33, and Case C-431/05 *Merck Genéricos – Produtos Farmacêuticos* [2007] ECR I-7001, paragraph 33).

*32. Next, it must be determined whether, in the field covered by Article 9(3) of the Aarhus Convention, the European Union has exercised its powers and adopted provisions to implement the obligations which derive from it. If that were not the case, the obligations deriving from Article 9(3) of the Aarhus Convention would continue to be covered by the national law of the Member States.* In those circumstances, it would be for the courts of those Member States to determine, on the basis of national law, whether individuals could rely directly on the rules of that international agreement relevant to that field or whether the courts must apply those rules of their own motion. In that case, EU law does not require or forbid the legal order of a Member State to accord to individuals the right to rely directly on a rule laid down in the Aarhus Convention or to oblige the courts to apply that rule of their own motion (see, by analogy, *Dior and Others*, paragraph 48 and *MerckGenéricos – Produtos Farmacêuticos*, paragraph 34).

33. However, if it were to be held that the European Union has exercised its powers and adopted provisions in the field covered by Article 9(3) of the Aarhus Convention, EU law would apply and it would be for the Court of Justice to determine whether the provision of the international agreement in question has direct effect.

*34. Therefore, it is appropriate to examine whether, in the particular field into which Article 9(3) of the Aarhus Convention falls, the European Union has exercised its powers and adopted provisions to implement obligations deriving from it* (see, by analogy, *MerckGenéricos – Produtos Farmacêuticos*, paragraph 39).

35. In that connection, it must be observed first of all, that, in the field of environmental protection, the European Union has explicit external competence pursuant to Article 175 EC, read in conjunction with Article 174(2) EC (see, *Commission v Ireland*, paragraphs 94 and 95).

36. Furthermore, the Court has held that *a specific issue which has not yet been the subject of EU legislation is part of EU law, where that issue is regulated in agreements concluded by the European Union and the Member State and it concerns a field in large measure covered by it* (see, by analogy, Case C-239/03 *Commission v France* [2004] ECR I-9325, paragraphs 29 to 31)."

(my italics, Advocate General)

3.65    It follows from this case law that if the EU has adopted provisions to implement a mixed agreement, the ECJ has jurisdiction to interpret the agreement.[86] In such a case, there apparently is a need for uniform interpretation of the relevant EU law and for clarity about the division of powers between the EU and the Member States. It is beyond dispute that the ECJ has jurisdiction to comment on its own jurisdiction.

3.66    For the case at issue in cassation, it is important to what extent EU legislation exists that implements the ECT or its specific provisions. Although there is extensive EU legislation in the field of energy that mainly provides for the organisation of the internal market for gas and electricity, networks and other infrastructure, energy efficiency and renewable energy, there is no EU legislation that intends to provide investment protection to companies in the energy sector, including oil companies.[87] As far as I know,

---

[86]  See also the opinion by Advocate General Tanchev of 2 July 2020, ECLI:EU:C:2020:512, points 130 et seq., before ECJ 8 September 2020, Case C-265/19, ECLI:EU:C:2020:677 *(Recorded Artists Actors Performers)*.

[87]  See Leigh Hancher, European Energy Law - From Market to Union?, in: Pieter Jan Kuijper et al. (eds)., *The Law of the European Union*, Alphen aan den Rijn: Wolters Kluwer 2018, p. 1097 et seq.



**SWORN TRANSLATION**
The English text is a sworn translation of the
Dutch original. In case of any discrepancies, the
Dutch original shall prevail.

only one instrument was adopted in response to the ECT, namely the now lapsed Council Regulation (EC) No 701/97 of 14 April 1997 amending a programme to promote international cooperation in the energy sector ('Synergy programme').[88] The purpose of this Regulation was to streamline the international cooperation of the EC with third countries in the field of energy. The Regulation did not contain any indications that this would implement substantive provisions from the ECT for (what is now) the EU.

3.67   In its judgment of 6 March 2018 (*Slovakia/Achmea*), the ECJ decided that Article 8 (the arbitration provision) of the bilateral investment treaty between the Netherlands and Slovakia is inconsistent with Articles 267 and 344 TFEU.[89] To that end, the Court of Justice held that arbitration proceedings on the basis of the BIT can also involve questions of interpretation or application of EU law. As EU law is part of the law applicable in the Member States, an arbitral tribunal established pursuant to Article 8 BIT will have to apply EU law. According to the Court of Justice, there is inconsistency with Articles 267 and 344 TFEU if such arbitral tribunals could not refer questions to the Court of Justice for a preliminary ruling because they are not part of the judicial organisation of the Member States. The *Slovak/Achmea* judgment only relates to investment arbitrations in which a Member State is a defendant. The outcome of the judgment is that Member States may no longer agree in advance to arbitration on the basis of a BIT and thus waive the jurisdiction of their own state courts. As a result of the *Slovakia/Achmea* judgment, the basis for intra-EU investment arbitration has ceased to exist.[90]

3.68   On 15 January 2019, 22 EU Member States issued a statement on the significance of the *Achmea* judgment for arbitration under the ECT.[91] In that statement, they stated, among other things, that arbitration between an EU Member State and an investor from another EU Member State is inconsistent with EU law as a result of this judgment.[92] In the context of the ongoing negotiations on the modernisation of the ECT, the European Commission made a proposal for amendment of Articles 26 and 27 ECT. In response, Belgium requested an opinion from the ECJ pursuant to Article 218(11) TFEU on whether arbitration between Member States pursuant to Article 26 ECT is compatible with Union law.[93] Both the January 2019 statement and Belgium's request for an opinion relate to the proposals for

---

[88]   See OJ 1997, no. L 104/1.
[89]   ECJ 6 March 2018, case C-284/16, ECLI:EU:C:2018:158 *(Slovakia/Achmea), NJ* 2019/353, annotated by H.J. Snijders; AA 2018, p. 527, annotated by P.J. Slot; AA 2018, p. 732, annotated by A.S. Hartkamp.
[90]   See also in this regard: B.J. Drijber, Nous d'abord: Beleggingsarbitrage na 'Achmea', NJB 2019/473, pp. 588-595.
[91]   Declaration of the representatives of the governments of the Member States of 15 January 2019 on the legal consequences of the judgment of the Court of Justice in Achmea and on investment protection in the European Union, available on https://ec.europa.eu/info/sites/info/files/business economy euro/banking and finance/documents/190117-bilateral-investment-treaties en.pdf.
[92]   See the aforementioned statement, p. 2.
[93]   Request for an opinion 1/20, received by the ECJ on 2 December 2020. See also the press release 'Belgium requests an opinion on the intra-European application of the arbitration provisions of the future modernised Energy Charter Treaty', 3 December 2020, https://diplomatie.belgium.be/en/newsroom/news/2020/belgium requests opinion intra european application arbitration provisions: 'By submitting this question, Belgium is seeking legal clarification from the Court on the compatibility under Union law of the dispute settlement mechanism provided for in the draft modernised Energy Charter Treaty, in view of the fact that this mechanism could be interpreted as allowing its application intra- European Union, i.e. between an investor who is a national of EU Member States only and an EU Member State'.



**SWORN TRANSLATION**
The English text is a sworn translation of the
Dutch original. In case of any discrepancies, the
Dutch original shall prevail.

a new, modernised ECT. In the present case, the ECT as adopted in December 1994 applies, and
therefore neither the January 2019 statement nor the request for an opinion of December 2020 are
presently relevant.

3.69   It is further worth noting that the Paris *Cour d'appel* in 2017 intended to submit questions to the ECJ on
the interpretation of (*inter alia* Article 1(6) of) the ECT in a case related to the present arbitration.[94] With
regard to the jurisdiction of the ECJ, the *Cour d'appel* in its judgment limited itself by finding that mixed
treaties are part of the European legal order.[95] However, these proceedings before the *Cour d'appel*
were withdrawn.[96]

3.70   By order for reference of 24 September 2019, the Paris *Cour d'appel* in another case *(Republic of
Moldova/Komstroy)* put questions to the ECJ about the interpretation of Article 1(6) and Article 26(1)
ECT.[97] These questions had arisen in connection with the question of whether an *ad hoc* arbitral tribunal
established pursuant to Art. 26(3) ECT has jurisdiction to settle a financial dispute about payment of a
claim in connection with an agreement regarding the sale of electricity. Briefly put, the facts of this case
are the following. In 1999, a Ukrainian electricity producer (Ukrenergo) sold electricity to the company
Energoalians, a Ukrainian electricity distributor, which then resold the electricity to Derimen, a company
based in the British Virgin Islands. In turn, Derimen resold the electricity to Moldtranselectro, a
Moldovan state-owned company. The electricity volumes to be supplied were determined on a monthly
basis between Moldtranselectro and Ukrenergo and supply took place at the Ukrainian side of the
Ukrainian-Moldovan border. Energoalians had to be paid for the supplied electricity by Derimen, which
itself had to receive a payment from Moldtranselectro. Moldtranselectro's debt to Derimen on 1 January
2000 amounted to more than USD 18 million. Moldtranselectro only partially satisfied its payment
obligation towards Derimen, so that a debt of more than USD 16 million remained. Derimen transferred
its claim against Moldtranselectro to Energoalians, which attempted to collect the claim against
Moldtranselectro and initiated proceedings to that end before the Moldovan court and later before the
Ukrainian court. Energoalians took the position that Moldova had violated certain obligations of the ECT
and therefore initiated arbitration proceedings pursuant to Article 26(3) ECT. The company Komstroy is
the legal successor of Energoalians. The *ad hoc* arbitral tribunal in Paris ruled that Moldova had failed to
fulfil its obligations under the ECT and ordered it to pay a certain amount. Moldova subsequently lodged
an appeal before the French court to set aside the arbitral award on account of violation of public policy,
namely the jurisdiction of the *ad hoc* arbitral tribunal. Finally, the *Cour d'appel*[98] put the following

---

[94]   Paris *Cour d'appel* 17 June 2017, Russian Federation/Hulley Enterprises Limited, available on
https://www.italaw.com/sites/default/files/case-documents/italaw9023 O.pdf.
[95]   "Considérant que les accords mixtes conclus par l'Union et les Etats membres avec des tiers sont au nombre des actes
pris par les institutions, organes ou organismes de l'Union (CJCE 30 sept. 1987, aff. 12/86 Demirel; CJUE 18 juil. 2013, aff.
C 414/11 Sanofi-Aventis Deutschland) (...)."
[96]   Initiating document, no. 91.
[97]   The case is registered with the ECJ under no. C-741/19.
[98]   By judgment of 12 April 2016, the *Cour d'appel* set aside the arbitral award, which judgment was annulled by the *Cour de
cassation* on 28 March 2018. After annulling the judgment, the *Cour de cassation* referred the case back to the *Cour*



**SWORN TRANSLATION**
The English text is a sworn translation of the
Dutch original. In case of any discrepancies, the
Dutch original shall prevail.

questions to the ECJ:

> "Must Article 1.6 of the Energy Charter Treaty be interpreted as meaning that a claim which arose from a contract for the sale of electricity and which did not involve any contribution on the part of the investor in the host State can constitute an 'investment' within the meaning of that article?
>
> Must Article 26(1) of the Energy Charter Treaty be interpreted as meaning that the acquisition, by an investor of a Contracting Party, of a claim established by an economic operator which is not from one of the States that are Parties to that Treaty constitutes an investment?
>
> Must Article 26(1) of the Energy Charter Treaty be interpreted as meaning that a claim held by an investor, which arose from a contract for the sale of electricity supplied at the border of the host State, can constitute an investment made in the area of another Contracting Party, in the case where the investor does not carry out any economic activity in the territory of that latter Contracting Party?"

3.71    Advocate General Szpunar delivered his opinion in this case on 3 March 2021. [99] Firstly, the Advocate General addressed the jurisdiction of the ECJ and noted that it "could be the subject of discussion, as it concerns the interpretation of an international treaty within the context of a dispute that in any event at first glance has all the characteristics of a situation that can be designated 'purely external'". Advocate General Szpunar concluded that the ECJ has jurisdiction to answer the preliminary questions, because the provisions of the ECT of which interpretation is requested may also apply in situations that fall within the legal order of the Union, and for that reason the Union has an interest in a uniform interpretation of the relevant provisions. [100] Incidentally, Advocate General Szpunar notes that he "must qualify this statement" (para. 46) and asks the Court of Justice to consider clarifying the consequences of the *Achmea* judgment on the applicability of Article 26 ECT (para. 48). He considers that it is not an established fact that as a result of the *Achmea* judgment Article 26 ECT can never be applied within the EU, because questions about the compatibility of ECT provisions with Union law can also arise in national court proceedings (para. 90). Regarding the jurisdiction of the Court of Justice, Advocate General Szpunar concludes that Article 26 ECT is not compatible with Union law in so far as this provision provides for resort to an arbitral tribunal, as a result of which such a system for dispute resolution cannot be applied within the legal order of the Union (para. 98). The Advocate General considers that it cannot be ruled out that the substantive provisions of the ECT, including Article 1(6) ECT (the term "investment"), and Article 26 ECT may apply within the legal order of the Union (para. 99). It is otherwise striking, that Advocate General Szpunar has not paid attention to the case law of the ECJ, in which it was decided that the Court of Justice has jurisdiction to interpret a mixed agreement if the EU has adopted provisions for implementation.

3.72    In the remainder of his opinion, Advocate General Szpunar concentrated on the question of whether a claim arising from an agreement for the supply of electricity can be considered an investment within the meaning of Article 1(6) ECT, as that provision imposes further conditions for it. The Advocate General

---

*d'appel*, which then by the aforementioned decision of 24 September 2019 referred the questions to the ECJ for a preliminary ruling.
[99]    ECLI:EU:C:2021:164.
[100]    Opinion of Advocate General Szpunar, points 37-45.



**SWORN TRANSLATION**
**The English text is a sworn translation of the**
**Dutch original. In case of any discrepancies, the**
**Dutch original shall prevail.**

concluded that this is not the case in *Moldova/Komstroy*.[101] An electricity supply agreement is a simple commercial transaction that does not fall under the term 'investment' within the meaning of Article 1(6) ECT and does not arise from an agreement related to an investment.[102]

3.73    Assuming that the ECJ adopts the opinion of Advocate General Szpunar and decides that it has jurisdiction to examine questions of interpretation of the ECT – and I repeat that it is up to the ECJ to decide on its own jurisdiction – what continues to apply in full is that referring questions for a preliminary ruling must also be necessary for the settlement of the complaints. For the present case, I am of the opinion that referring questions is not necessary to settle the complaints in ground 2. I will explain this as follows. Grounds 2.2 and 2.3 pertain to questions of Dutch arbitration law and civil procedural law. Grounds 2.5 and 2.6 are directed at findings by the Court of Appeal in the final judgment that were rendered superfluously, and fail for that reason alone. Ground 2.4 relates to the interpretation of Article 45(1) ECT. The ground contains complaints that, although formulated as complaints on an issue of law, are in fact complaints in respect of reasoning about the manner in which the Court of Appeal dealt with certain arguments. As I discussed in this opinion, these complaints fail because they are based on an incorrect interpretation of the challenged judgment (see the discussion of ground 2.4.2). I have also shown that the complaints in the ground relating to the failure to recognise state practice fail because no such state practice has become apparent. Complaints (see no. 42 et seq. of the initiating document) are also directed at a superfluous finding. It follows from all this that referring questions for a preliminary ruling is not necessary for the outcome of the decision on ground 2.4. I would add that in international law, a provision on provisional application of a treaty (such as Article 45 ECT) is a regularly occurring provision, on which there is generally no EU legislation. Nor does the present dispute concern the provisional application of the ECT in (a Member State of) the EU, but in the Russian Federation.

3.74    The conclusion is that referring questions to the ECJ for a preliminary ruling is not necessary for the settlement of the Russian Federation's complaints in cassation.

3.75    Ground 2.8 reiterates the position that the Russian Federation's clear and unambiguous consent to arbitration is lacking. The ground does not contain a separate complaint and builds on the preceding grounds, and therefore does not need to be discussed separately.

### Ground 3: interpretation of Article 1(6) and (7) ECT (investment and investor)

3.76    Ground 3 is directed against para. 5.1 of the final judgment, in which the Court of Appeal interpreted the terms 'investment' and 'investor' within the meaning of Article 1(6) and (7) ECT. According to the ground, this interpretation is incorrect. According to the Russian Federation, HVY are not genuine foreign investors and their investments do not qualify as foreign investments, but are so-called "U-turn

---

[101] Opinion of Advocate General Szpunar, point 101 et seq.
[102] Opinion of Advocate General Szpunar, points 110, 118.



**SWORN TRANSLATION**
The English text is a sworn translation of the
Dutch original. In case of any discrepancies, the
Dutch original shall prevail.

constructions": investments made by investors who are in fact controlled by nationals of the host country, in this case the Russian Federation. The ground directs a large number of complaints against the Court of Appeal's rejection of the Russian Federation's position.

*Introductory remarks*

3.77    I would like to make a few introductory remarks before discussing the complaints in this ground. In so far as relevant, Article 1(6) and (7) ECT reads as follows in the authentic English text:

**Article 1 Definitions**
As used in this Treaty:
(...)
6.  "Investment" means every kind of asset, owned or controlled directly or indirectly by an Investor and includes:

a)  tangible and intangible, and movable and immovable, property, and any property rights such as leases, mortgages, liens, and pledges;

b)  a company or business enterprise, or shares, stock, or other forms of equity participation in a company or business enterprise, and bonds and other debt of a company or business enterprise;

c)  claims to money and claims to performance pursuant to contract having an economic value and associated with an Investment;

d)  Intellectual Property;

e)  Returns;

f)  any right conferred by law or contract or by virtue of any licences and permits granted pursuant to law to undertake any Economic Activity in the Energy Sector.

(...)
7.  "Investor" means:
a)  with respect to a Contracting Party:

(i)  a natural person having the citizenship or nationality of or who is permanently residing in that Contracting Party in accordance with its applicable law;

(ii)  company or other organization organized in accordance with the law applicable in that Contracting Party;

b)  with respect to a "third state", a natural person, company or other organization which fulfils, mutatis mutandis, the conditions specified in subparagraph a) for a Contracting Party;

In the Dutch translation:

**Artikel 1 Definities**
In dit Verdrag wordt verstaan onder:
(...)
6.  "investering": elke vorm van activa die een investeerder in eigendom heeft of waarover hij direct of indirect zeggenschap heeft, met inbegrip van:

a.  lichamelijke en onlichamelijke en roerende en onroerende zaken alsook andere rechten, zoals huur-, hypotheek-, retentie- en pandrechten;

b.    een vennootschap of onderneming, of aandelen of andere vormen van vermogensdeelneming in, en obligaties en andere schuldbewijzen van een vennootschap of onderneming;

c.  aanspraken op geld en aanspraken op prestaties volgens een contract met een economische waarde en in verband met een investering;

d.  intellectuele eigendom;

e.  opbrengsten;

f.  een bij wet of contract of uit hoofde van overeenkomstig de wet verleende licenties en vergunningen verleend recht een economische activiteit in de energiesector te ondernemen.

(...)
7.  "investeerders":



SWORN TRANSLATION
The English text is a sworn translation of the
Dutch original. In case of any discrepancies, the
Dutch original shall prevail.

a. van een Verdragsluitende Partij,
  i. natuurlijke personen die het staatsburgerschap of de nationaliteit bezitten van of permanent
  verblijven op het grondgebied van die Verdragsluitende Partij conform haar toepasselijke
  wetgeving;
  ii. vennootschappen of andere organisaties opgericht conform op het grondgebied van die
  Verdragsluitende Partij toepasselijke wetgeving;
b. uit een derde land, natuurlijke personen, vennootschappen of andere organisaties die mutatis
mutandis voldoen aan de onder a. aan Verdragsluitende Partijen gestelde voorwaarden;

3.78    Article 1(6) ECT contains, strictly speaking, no definition of the term "investment", but provides that
"every kind of asset" can be considered an investment, and sets out a non-exhaustive list of assets that
are to be regarded as investments in any event.[103] The definition of "investor" in Article 1(7) ECT is
linked to that of "investment"[104]: an investor is a natural person or legal entity that owns or controls such
an investment.[105] Where the investor is a legal entity, that entity is required to be organized in
accordance with the law of a contracting state.[106] This test is referred to as the "incorporation test", and
is distinguished from other aspects supporting the "nationality" of a legal entity, such as the place where
the board of the legal entity is incorporated, or the nationality of the shareholders.[107] As Article 1(6) ECT
qualifies shares as an investment, shareholders are also protected by the ECT, even if the company in
which they invested is not itself considered an investor.[108]

3.79    Article 26 ECT builds on the concepts of investment and investor.[109] This article provides that arbitration
is available in "disputes between a Contracting Party and an Investor in another Contracting Party
relating to an Investment of the latter in the Area of the former (...)" ([Dutch translation:] "Geschillen
tussen een Verdragsluitende Partij en een investeerder van een andere Verdragsluitende Partij over
een investering van deze laatste op het grondgebied van eerstgenoemde Partij (...)"). Article 26 ECT
therefore requires, *first*, that there is an investment, *second*, that it was made by an investor established
in a contracting state, and *third* that said investment was made in the Area of a contracting state other
than that in which the investor is established.

3.80    In essence, the question raised in ground 3 is whether the ECT contains even more requirements with
regard to investments or their cross-border character than are evident from Article 1(6) and (7) and
Article 26 ECT. For example, the ground (at 3.2.3) argues, inter alia, that the ECT only protects

[103] See Dylan Geraets & Leonie Reins, in: Rafael Leal-Arcas (ed.), Commentary on the Energy Charter Treaty, 2018, pp.
25-29; Hobér, op. cit., pp. 73-78; Baltag, op. cit., pp. 167-183; Roe & Happold, op. cit., pp. 48-64; Jagusch & Sinclair, op.
cit., pp. 74-87; Juliet Blanch, Andy Moody & Nicholas Lawn, 'Access to Dispute Resolution Mechanisms under Article 26 of
the Energy Charter Treaty', in: Coop & Ribeiro (eds.), Investment Protection and the Energy Charter Treaty, New York:
JurisNet 2008, p. 5; Emmanuel Gaillard, 'Investments and Investors Covered by the Energy Charter Treaty', in: Clarisse
Ribeiro (ed.), Investment Arbitration and the Energy Charter Treaty, pp. 58-66.
[104] See Baltag, op. cit., p. 18.
[105] See Hobér, op. cit., pp. 78-84; Blanch, Moody & Lawn, op. cit., pp. 3-4.
[106] Hobér, op. cit., pp. 116-119; Baltag, op. cit., pp. 103-107; Roe & Happold, op. cit., pp. 64-65; Jagusch & Sinclair, pp. 89-93;
Blanch, Moody & Lawn, loc cit.; Gaillard, op. cit., pp. 67-73.
[107] Inter alios Hobér, loc cit. See also Asser/Kramer & Verhagen 10-111 2015/1, as well as P. Vlas, *Rechtspersonen*,
Praktijkreeks IPR, part 9, Maklu: Apeldoorn-Antwerpen, 2017, no. 126, with an overview of investment treaties and the
description included therein for legal entities that fall under the protection of the relevant investment treaty.
[108] Hobér, op.cit., pp. 129-132.
[109] See Hobér, op. cit., pp. 78-84, 417-420; Roe & Happold, pp. 45-67.



**SWORN TRANSLATION**
**The English text is a sworn translation of the**
**Dutch original. In case of any discrepancies, the**
**Dutch original shall prevail.**

international investments and therefore does not protect "U-turn constructions" or investments made by investors with no substantial link with the state in which they have their place of incorporation ("letterbox companies"). Furthermore, not only should the investor's place of incorporation be assessed, but the party controlling the investor should also be identified *('piercing the corporate veil'* ground 3.4). According to ground 3.3, one can only speak of an investment if the investor made an actual economic contribution to the host state.

3.81    The Court of Appeal's approach can be summarised as follows. According to the Court of Appeal, it is not in dispute that HVY are companies that are "organized in accordance with the law applicable in that Contracting Party". Thus, from a textual point of view, the requirements set out in Article 1(7) ECT for an investor within the meaning of the ECT have been met (para. 5.1.6). The shares in Yukos, which are owned by HVY, qualify as an 'investment' within the meaning of the ECT, as 'investment' is understood to mean "every kind of asset, owned or controlled directly or indirectly by an Investor", while shares are included in the non-exhaustive list of assets in Article 1(6) ECT. Finally, the Court of Appeal held that the requirement set out in Article 26 ECT that there be a dispute between a Contracting Party (the Russian Federation) and investors from another Contracting Party (HVY, companies incorporated under the laws of Cyprus and the Isle of Man) "relating to an Investment of the latter in the Area of the Former" has, from a textual point of view, been satisfied (para. 5.1.6). According to the Court of Appeal, there is no reason to interpret these provisions as imposing further requirements on the international character of the investments. The object and purpose of the ECT do not result in a different ruling, according to the Court of Appeal (para. 5.1.7.3).

3.82    Following these introductory remarks, I will now resume discussion of the ground and the complaints included therein.

3.83    Ground 3.1 is an introduction and contains no complaints.

        *Ground 3.2: "U-turn construction"*

3.84    Ground 3.2 is directed against the Court of Appeal's decision in paras. 5.1.5-5.1.8 and argues that the ECT does not protect domestic investments, even if the investments in question were made by sham companies (via a "U-turn construction"). This ground is divided into four sub-grounds (3.2.1-3.2.4).

3.85    Ground 3.2.1 is a summary of the Court of Appeal's assessment and does not contain a complaint.

3.86    Ground 3.2.2 complains that the Court of Appeal wrongly interpreted the terms 'investment' and 'investor' based on a purely grammatical interpretation of only a part of the relevant text of the ECT, namely only on the definitions of Article 1(6) and (7) ECT. According to the ground, such an interpretation is in violation of Article 31(1) VCLT.

3.87    This complaint has no factual basis. The Court of Appeal did not interpret the terms 'investor' and



**SWORN TRANSLATION**
The English text is a sworn translation of the
Dutch original. In case of any discrepancies, the
Dutch original shall prevail.

'investment' based on a purely grammatical interpretation of Article 1(6) and (7) ECT. In para. 5.1.6, the Court of Appeal held that the text of these provisions, with the ordinary meaning that accrues to the wording, serves as the point of departure for the interpretation. In so doing, the Court of Appeal applied the correct standard in accordance with Article 31(1) VCLT. In paras. 5.1.7.1-5.1.7.4, the Court of Appeal then discussed the Russian Federation's arguments on the context in which Article 1(6) and (7) ECT should be considered, and on the object and purpose of the ECT. In so doing, the Court of Appeal likewise applied the correct standard in accordance with Article 31 VCLT. The fact that the Court of Appeal applied the elements of context, object and purpose of the ECT on the basis of the arguments put forward by the Russian Federation is logical and does not indicate that the Court of Appeal did not regard these elements as equivalent to the textual interpretation.

3.88    The ground also complains that, in para. 5.1.8.11, the Court of Appeal attributed little weight to subsequent state practice, to wit the fact that a large number of ECT contracting parties have in subsequent investment treaties excluded investments via the U-turn construction from the scope of application.

3.89    The Court of Appeal's decision is correct because (as the Court of Appeal also held) the circumstances do not relate to the implementation or interpretation of the ECT, but to choices made by states in concluding new treaties. Article 31 VCLT does not pertain to such choices.[110] Consequently, this complaint also fails.

3.90    Ground 3.2.3 directs a number of complaints against the Court of Appeal's interpretation of the terms 'investment' and 'investor'.

3.91    The ground (at nos. 111-112) argues that, by assigning significance to the definition of the term 'investment' in Article 1(6) ECT, the Court of Appeal failed to recognise the ordinary meaning of that term (and thus of the term 'investor'). According to that ordinary meaning, an investment only exists if a party makes an economic contribution (in the host country, in this case the Russian Federation) and runs a certain risk during a certain time period. That was not the case here, according to the ground. The Court of Appeal rejected this position in paras. 5.1.9.1-5.1.9.5. Ground 3.3 is also directed against this rejection (see below).

---

[110] The reason being that the practice in question must occur in the context of the relevant treaty. Oliver Dörr, Vienna Convention on the Law of Treaties, op. cit, writes as follows on p. 598: "Practice of the parties is only relevant under lit b if it occurs **"in the application"** of the treaty, which plainly indicates that, just as for the development of international customary law, a subjective link is required under lit b: the parties whose practice is under consideration must regard their conduct to fall within the scope of application of the treaty concerned and in principle to be required under that treaty. They must act the way they do for the purpose of fulfilling their treaty obligations, *i.e.* their subsequent conduct must be motivated by the treaty obligation.' The sources mentioned in footnote 255 of the initiating document do not show that the choices made by contracting parties regarding other, subsequent treaties, are to be taken into account in the interpretation of an earlier treaty. These sources, too, always pertain to state practice in the implementation of the relevant treaty. See, for example, the cited decision in *Mobil Investments Canada Inc. v. Canada*, ICSID Case No. ARB/15/6, Decision on Jurisdiction, para. 158: "such an approach has clearly been rejected by all three NAFTA Parties in their practice subsequent to the adoption of NAFTA".



SWORN TRANSLATION
The English text is a sworn translation of the
Dutch original. In case of any discrepancies, the
Dutch original shall prevail.

3.92    The complaint fails to recognise that, according to Article 31(4) VCLT, special meaning accrues to the
        definition of a term in a treaty for the purpose of interpreting that term. Article 31(4) VCLT provides:

        A special meaning shall be given to a term if it is established that the parties so intended.

        A term from a treaty can therefore be understood as bearing a special (as opposed to an ordinary)
        meaning if it has been established that the contracting parties intended to give that term a special
        meaning. The most obvious evidence of such an intention is the inclusion of a definition.[111] It is therefore
        possible for a treaty to give a certain term a definition that differs from the term's ordinary meaning. In
        that case, interpretation must be based on that definition and not on the ordinary meaning, as evidenced
        by Article 31(4) VCLT. The Court of Appeal was therefore right in this case to use the definition of the
        term 'investment' in Article 1(6) ECT as a basis. The case law referred to in the ground is not relevant, as
        it does not relate to the ECT but to other investment treaties and to the ICSID Treaty.[112] In so far as it
        would even be possible to derive any ordinary meaning of the term 'investment' from the case law in
        question, that meaning would not apply to the ECT, as that treaty has its own definition of the term
        'investment'. The complaints fail for this reason.

3.93    The ground (at nos. 113-115) also complains that the Court of Appeal failed to recognise the object and
        purpose of the ECT when interpreting the terms 'investment' and 'investor'. The ground notes that the
        object and purpose of the ECT was to promote international investments. The Court of Appeal decided
        in para. 5.1.7.3, allegedly wrongly, that it cannot be inferred from this that the ECT imposes further
        requirements as to the foreign character of an investment.

3.94    In para. 5.1.7.3, the Court of Appeal held that the ECT's purpose does indeed (also) include the
        promotion of international cooperation in the field of energy and the protection of international
        investments. However, according to the Court of Appeal, this does not mean that further requirements
        must be imposed on the foreign nature of an investment, which requirements do not follow from the
        wording of Article 26 ECT and Article 1(6) and (7) ECT. According to the Court of Appeal, the wording of
        those provisions is sufficiently clear in itself: that wording implies that an investment falls within the
        scope of Article 26 ECT if the legal person making the investment is incorporated under the law of one
        contracting state[113] and the investment referred to in Article 1(6) ECT takes place in another contracting

---

111 Dörr, op. cit., p. 614; Richard K. Gardiner, Treaty Interpretation, Oxford: OUP 2008, p. 164.
112 *Saba Fakes v. Republic of Turkey,* ICSID Case No. ARB/07/20, para. 107 et seq. (Netherlands-Turkey BIT); *KT Asia
    Investment Group B.V. v. Republic of Kazakhstan,* ICSID Case No. ARB/09/8, para. 161 et seq. (Netherlands- Kazakhstan
    BIT); *MNSS B.V. and Recupero Credito Acciaio N.V. v. Montenegro, ICSID Case No. ARB(AF)/12/8, para. 189*
    (Montenegro-Netherlands BIT); *Christian Doutremepuich and Antoine Doutremepuich v. Republic of Mauritius,* PCA Case
    No. 2018-37, Award on Jurisdiction, para. 111 et seq. (France-Mauritius BIT); *Romak S.A. (Switzerland) v. The Republic of
    Uzbekistan,* UNCITRAL, PCA Case No. AA280, Award, para. 173 et seq. (Switzerland-Uzbekistan BIT); *GEA Group
    Aktiengesellschaft v. Ukraine,* ICSID Case No. ARB/08/16, para. 137 et seq. (Germany-Ukraine BIT).
113 The literature frequently endorses the position that, pursuant to Article 1(7) ECT, determination of the nationality of a legal
    entity, and thus determination of whether this entity can be considered an investor, is based exclusively on this formalistic
    test. See Blanch, Moody & Lawn, op. cit., p. 4 ("In including within the definition of an Investor "companies or other
    organizations organized in accordance with applicable law", it would appear to be clear that the "nationality" test for



SWORN TRANSLATION
The English text is a sworn translation of the
Dutch original. In case of any discrepancies, the
Dutch original shall prevail.

state. The decision of the Court of Appeal does not demonstrate an incorrect interpretation of the law, since the requirement to interpret a treaty provision taking into account the treaty's object and purpose does not mean that the object and purpose can serve as the basis for an interpretation that is not supported by the wording of the treaty provision. While the object and purpose serve as a means to determine the meaning of the wording of a provision (which wording is paramount), the object and purpose are not more important than that wording; they cannot negate it.[114] Consequently, the Court of Appeal could decide that, although the ECT's purpose is partly to protect international investments, the wording of the relevant provisions does not support the view that additional requirements are therefore imposed on the international character of the investments or the nationality of an investor. This complaint of the ground fails for that reason.

3.95    The ground (no. 114) complains that the Court of Appeal failed to take the context of Article 1(6) and (7) ECT into account correctly. According to the ground, Articles 10, 13, 17 and 26 ECT and the Understanding with respect to Article 1(6) ECT show that letterbox companies without substantial activities (in the state in which they have their place of incorporation) are not entitled to protection under the ECT in the event that these letterbox companies are controlled by foreign investors from a third state. According to the complaint, a fortiori, investments made by a host country's own nationals must also fall outside the scope of the ECT.

3.96    The complaint refers to Article 10(3) ECT in support of the argument. In Article 10(3) ECT, a clear distinction is made between the foreign investors and a contracting party's 'own investors', according to the ground. I quote Article 10(3) ECT and, for a proper understanding thereof, paragraph 2 of that article as well, in the authentic English text and in the Dutch translation:

### Article 10 Promotion, protection and treatment of investments

2. Each Contracting Party shall endeavour to accord to Investors of other Contracting Parties, as regards the Making of Investments in its Area, the Treatment described in paragraph 3.
3. For the purposes of this Article, "Treatment" means treatment accorded by a Contracting Party which is no less favourable than that which it accords to its own Investors or to Investors of any other Contracting Party or any third state, whichever is the most favourable.

### Artikel 10 Bevordering, bescherming en behandeling van investeringen

2. Elke Verdragsluitende Partij streeft ernaar investeerders van andere Verdragsluitende Partijen wat betreft het doen van investeringen op haar grondgebied de in het derde lid omschreven behandeling toe te kennen.
3. In dit artikel wordt onder "behandeling" verstaan een behandeling toegekend door een Verdragsluitende Partij die niet minder gunstig is dan die welke zij toekent aan haar eigen investeerders of aan de investeerders van een andere Verdragsluitende Partij of een derde staat, al naar gelang welke behandeling het gunstigst is.

---

companies is a purely formalistic one that looks to the company or other organisation's place of incorporation"); Baltag, op. cit., pp. 16-17, 106; Roe & Happold, op. cit., pp. 64-65; Hobér, op. cit., p. 116; Geraets & Reins, 'Definitions', in: Leal-Arcas (ed.), op. cit. p. 39; Jagusch & Sinclair, op. cit., p. 89 et seq.
[114]  Gardiner, op. cit., p. 190; Dörr, op. cit., pp. 586-587.



**SWORN TRANSLATION**
The English text is a sworn translation of the
Dutch original. In case of any discrepancies, the
Dutch original shall prevail.

As argued in the ground, this Article does indeed distinguish between a Contracting Party's own investors and investors of any other Contracting Party or any third country. In that sense, this provision only protects cross-border investments. However, it is not evident from the provision that different requirements should therefore be imposed on the international character of an investment or the nationality of an investor than the requirements ensuing from Article 1(6) and (7) ECT. The ground does not explain this in greater detail either.

3.97    The complaint also refers to Article 13 ECT in support of the statement that only cross-border investments are protected by the ECT. Article 13 ECT protects investments against expropriation, except in specific cases where expropriation is justified. Like Article 10 ECT, Article 13(1) ECT provides that this protection applies to "Investments of Investors of a Contracting Party in the Area of any other Contracting Party". While it is thus clear from the provision that the purpose is to protect cross-border investments, it does not contain any indications to the effect that additional requirements should therefore be imposed on the international character of an investment or an investor.

3.98    The complaint also refers to the Understanding with respect to Article 1(6) ECT.[115] This reads as follows:

> "For greater clarity as to whether an Investment made in the Area of one Contracting Party is controlled, directly or indirectly, by an Investor of any other Contracting Party, control of an Investment means control in fact, determined after an examination of the actual circumstances in each situation. In any such examination, all relevant factors should be considered, including the Investor's
> (a)  financial interest, including equity interest, in the Investment;
> (b)  ability to exercise substantial influence over the management and operation of the Investment; and
> (c)  ability to exercise substantial influence over the selection of members of the board of directors or any other managing body.
> Where there is doubt as to whether an Investor Controls, directly or indirectly, an Investment, an Investor claiming such control has the burden of proof that such control exists".

This Understanding builds on Article 1(6) ECT, which defines an investment as "every kind of asset, owned or controlled directly or indirectly by an Investor". The Understanding therefore offers the party applying the ECT further guidelines to determine who controls a certain investment. The Understanding plays no role when it is clear that an asset is owned by an investor. As the Court of Appeal held in para. 5.1.7.4, it is established in this case that the Yukos shares are owned by HVY. There was therefore no reason to further investigate, on the basis of the Understanding, who controls the shares.

3.99    Article 17 ECT, to which the complaint also refers, is what is known as the 'denial of benefits clause'. The clause provides for the non-application of Part III of the ECT (regarding the promotion of protection and

---

[115]  See https://www.energychartertreaty.org/provisions/part-i-definitions-and-purpose/article-1-definitions/. These "Understandings" are texts drawn up during the ECT negotiations on which the negotiators had reached agreement, but they do not form part of the text of the ECT. They can therefore be used to interpret the treaty text, according to the ECT Secretariat (Energy Charter Secretariat, The Energy Charter Treaty – A Reader's Guide, 2002, pp. 61-62). See, in a similar vein, Roe & Happold, op. cit., p. 20. According to Geraets & Reins, op. cit., p. 17, the Understandings cannot expand or change the text of the ECT, as they do not form part of the treaty text.



**SWORN TRANSLATION**
The English text is a sworn translation of the
Dutch original. In case of any discrepancies, the
Dutch original shall prevail.

the treatment of investments) under certain circumstances. In so far as relevant, Article 17 reads as follows in the authentic English text:

> Each Contracting Party reserves the right to deny the advantages of this Part to:
> 1 .a legal entity if citizens or nationals of a third state own or control such entity and if that entity has no substantial business activities in the Area of the Contracting Party in which it is organized;
> (...).

In the Dutch translation:

> Elke Verdragsluitende Partij behoudt zich het recht voor de voordelen van dit Deel te ontzeggen aan:
> 1. een rechtspersoon, indien staatsburgers of onderdanen van een derde staat eigenaar zijn van of zeggenschap hebben over een dergelijke rechtspersoon en indien die rechtspersoon geen wezenlijke zakelijke activiteiten heeft op het grondgebied van de Verdragsluitende Partij waar hij is opgericht, (...).

As the Court of Appeal held in para. 5.1.8.4, Article 17 ECT gives contracting states the right to deny the protection of a large part of the treaty to a precisely defined category of investors, i.e. investors who are established in a contracting state only on formal grounds, but are to a large extent materially linked to a non-contracting state.[116] Contrary to the argument put forward in the complaint, Article 17 ECT does not provide that the protection of the ECT *must* be denied to such investors, but rather entails that, in principle, those investors are protected by the ECT *unless* a contracting state decides otherwise.[117] Thus, Article 17 ECT does not contain a rule entailing that investments that are not genuinely international, but only international in formal terms, are not entitled to ECT protection.

3.100    The ground also complains (at nos. 115-117) that the Court of Appeal wrongly decided that the state practice the Russian Federation had invoked carried "little weight", because that state practice does not concern the interpretation and application of the ECT, but the choices made afterwards, when concluding new treaties. The complaint argues that this decision is incorrect for various reasons: (i) the Court of Appeal's decision was based on an incorrect, merely grammatical interpretation of the ECT, (ii) meaning can indeed be attributed to the conclusion of treaties concluded after the ECT was signed, and (iii) the Court of Appeal ignored the desire of the contracting states to clarify the ECT.

3.101    The Court of Appeal rejected the Russian Federation's reliance on state practice, because the meaning of Article 1(6) and (7) ECT is already clear and does not exclude U-turn investments. This decision can independently support the Court of Appeal's conclusion. According to the VCLT's standard for interpretation, state practice is only at issue in the event that the treaty text and the context lead to an unclear outcome. As that was not the case here, the Court of Appeal did not need to address state practice. I note that the sources mentioned in the ground (at no. 116) to substantiate state practice are

---

[116]  Regarding this definition, see: Hobér, op. cit., pp. 325-345; Jagusch & Sinclair, op. cit., pp. 17-20; Baltag, op. cit., pp. 147-149; Apurva Mudliar, in: Leal-Arcas, op. cit., p. 249 et seq.

[117]  Baltag, op. cit., p. 153 et seq.



SWORN TRANSLATION
The English text is a sworn translation of the
Dutch original. In case of any discrepancies, the
Dutch original shall prevail.

not examples thereof, since they concern arbitral case law, an investigation report and a motion by the Dutch House of Representatives to exclude letterbox companies from trade agreements.[118] These documents do not show that the contracting states structurally interpret the ECT in such a way that U-turn constructions are denied protection. In all other respects the complaint builds on earlier complaints, and fails for that reason.

3.102   The ground (at nos. 117-120) also invokes recent proposals by the ECT Secretariat and by the European Commission to clarify Article 1(6) and (7) ECT. According to the ground, these proposals are relevant for the interpretation of those provisions, because they concern clarifying those provisions rather than changing them. The ground reiterates that letterbox companies without substantive activities in their country of origin do not fall within the definition of 'investment'.

3.103   As already noted, a state practice can only be taken into account in the interpretation of a treaty if the practice in question developed in the context of the relevant treaty.[119] The proposals invoked by the ground pertain to a possible new treaty, and are therefore, in principle, irrelevant.[120] Furthermore, Article 31 VCLT requires, in any event, a state practice to have been implicitly accepted by all contracting states. That is not the case here either, as the relevant proposals were made by the European Commission and the European Council, which do not represent all of the parties to the ECT. Against that backdrop, the observations in the documents referred to in the ground cannot be considered an indication that the terms 'investment' and 'investor' are already interpreted in said (proposed) manner at this time such that the documents would merely amount to a codification of that interpretation.[121] The documents more readily show that the European Commission and the European Council are of the opinion that the current ECT no longer suffices, and warrants modernisation to bring it into line with changed principles of investment protection. For example, the European Commission states in its Recommendation:

> "Since the 1990s (most of) the ECT provisions have not been revised. This became particularly problematic in the context of the ECT provisions on the protection of investment, which do not correspond to modern standards as reflected in the EU's reformed approach on investment protection. Those outdated provisions are no longer sustainable or adequate for the current challenges; yet it is today the most litigated investment agreement in the world."[122]

In the European Council's negotiating directives the following can be read:

> "The negotiations should bring the ECT provisions on investment protection in line with the modern

[118]   See footnotes 270, 271 and 272 of the initiating document (pp. 63-64).

[119]   Dörr, op.cit., p. 598.

[120]   Dörr, op. cit., pp. 598-599.

[121]   The comment at the end of the passage from the European Council's negotiating directives cited below is particularly relevant.

[122]   Recommendation for a Council Decision authorising the entering into negotiations on the modernisation of the Energy Charter Treaty, COM(2019) 231 final, available at http://trade.ec.europa.eu/doclib/docs/2019/mav/tradoc_157884.pdf,



SWORN TRANSLATION
The English text is a sworn translation of the
Dutch original. In case of any discrepancies, the
Dutch original shall prevail.

standards of recently concluded agreements by the EU and its Member States and adjust the ECT to new political and economic global changes (including in the energy sector).

The Investment Protection standards under the Modernised ECT should continue to aim at a high level of investment protection, with provisions affording legal certainty for investors and investments of Parties in each other's market.

The modernised ECT should provide clear definitions of covered investments and investors. The definition of investor should explicitly exclude investors and businesses that are lacking substantive business activities in their country of origin, in order to clarify that mailbox companies cannot bring disputes under the ECT."[123]

A Working Document dated 20 April 2020 includes the following proposal to amend Article 1(7) ECT:

'(7) "Investor" means:
(a) with respect to a Contracting Party:
(i) a natural person having the citizenship or nationality of or who is permanently residing in that Contracting Party in accordance with its applicable law [Footnote 1];
(ii) a company or other organisation organised in accordance with the law applicable in that Contracting Party and engaged in substantive business activities [Footnote 2] in the territory of that Contracting Party;

[Footnote 1: (...)]

[Footnote 2: In line with its notification of the Treaty establishing the European Community to the WTO (WT/REG39/1), the European Union understands that the concept of "effective and continuous link" with the economy of a Member State of the European Union enshrined in Article 54 of the TFEU is equivalent to the concept of "substantive business activities"]'.[124]

3.104    These documents do not indicate an established state practice entailing that additional requirements are imposed on 'investors' and 'investments' within the meaning of the ECT. They rather point in the direction that such requirements currently do not yet apply, but according to the EU Member States should be imposed in the future.

3.105    The ground (no. 121) complains that the Court of Appeal failed to appreciate clear rules and fundamental principles of international law. According to the ground, this concerns a principle of investment law entailing that international investment treaties are intended to (i) protect international investments and (ii) offer protection to actual investors and not to those who are only investors "on paper". This is the case if the actual economic investor is a national of a host state, so that it is essentially a domestic investment. The Russian Federation has substantiated the existence of this principle with references to arbitral case law. In paras. 5.1.8.6-5.1.8.10, the Court of Appeal discussed the arbitral awards invoked by the Russian Federation and decided that no principle of investment law can be derived from them, as defended by ground (no. 122).

3.106    It is correct that, pursuant to Article 31(3)(c) VCLT, principles of international law can play a role in treaty

---

[123] Negotiating Directives for the Modernisation of the Energy Charter Treaty, doc. 10745/19, p. 3, see https://data.consilium.europa.eu/doc/document/ST-10745-2019-ADD-1/en/pdf.

[124] Working Document of the European Council entitled "ECT Modernisation: Revised Draft EU proposal' (WK 3937/2020 UNIT), see https://www.euractiv.com/wp-content/uploads/sites/2/2020/04/EU-Proposal-for-ECT- Modernisation-V2.pdf.



SWORN TRANSLATION
The English text is a sworn translation of the
Dutch original. In case of any discrepancies, the
Dutch original shall prevail.

interpretation. The purpose of this provision is to be able to interpret the treaty against the backdrop of the system of international law of which it forms part.[125] This may involve rules from other treaties or customary international law.[126] Of course, the rule must be relevant to the interpretation of the relevant treaty. This may be the case, for example, if the rule to be considered originates from a treaty to which all states that are parties to the treaty to be interpreted are also parties or if that rule can be considered customary international law.[127] General principles of law ("general principles of law recognized by civilized nations") as referred to in Article 38(1)(c) of the Statute of the International Court of Justice may also be relevant. An example in this respect is the principle of good faith.[128] The wording used may have a meaning that has been accepted in customary international law or according to general principles of law.[129]

3.107   The Russian Federation substantiated the position that the Court of Appeal failed to appreciate international law by invoking a principle of international investment law, the existence of which was allegedly evident from the aforementioned arbitral case law. This principle allegedly entails that only truly international investments deserve protection, and that it is therefore insufficient that the investor is formally established in a state other than the state where the investment was made (the host state), and it must be determined instead whether the "actual, economic investor" is a national of that host state (in which case there is a U-turn investment). It follows from this that this principle (to the extent it exists) can only be relevant if a principle of customary international law is involved, or a rule of treaty law that is relevant to the interpretation of the ECT. In my opinion, neither is the case. I will elaborate this below.

3.108   As the Court of Appeal held, part of the arbitral case law was rendered on the basis of the ICSID Convention. As I wrote in my introduction (no. 1.10), the ICSID Convention has its own scope of application. The ICSID Convention explicitly pertains to international investments, leaving it to the ICSID tribunals to flesh out this term in more detail. In practice, ICSID tribunals sometimes impose stricter requirements than the underlying investment treaties themselves, in particular with regard to the term 'investment' (see the discussion of ground 3.3).[130] These requirements may also be stricter than

[125] Dörr, op. cit., pp. 603-604.

[126] Dörr, op. cit., pp. 605-609; Gardiner, op. cit., pp. 266-267.

[127] See International Law Commission (ILC), Yearbook of the International Law Commission, Vol. II: Report of the Commission to the General Assembly on the work of its fifty-eighth session (Document A/61/10), 2006, p. 180 (at no. 21): "Article 31, paragraph (3)(c) also requires the interpreter to consider other treaty-based rules so as to arrive at a consistent meaning. Such rules are of particular relevance where parties to the treaty under interpretation are also parties to the other treaty, where the treaty rule has passed into or expresses customary international law or where they provide evidence of the common understanding of the parties as to the object and purpose of the treaty under interpretation or as to the meaning of a particular term".

[128] Dörr, op. cit., p. 609.

[129] ILC, op. cit., pr. 180 (at no. 20): "Customary international law and general principles of law are of particular relevance to the interpretation of a treaty under article 31, paragraph 3(c), especially where (...) the terms used in the treaty have a recognized meaning under customary international law or under general principles of law (...)".

[130] This approach was worded as follows in *Phoenix Action, Ltd v. The Czech Republic*, ICSID Case No. ARB/06/5, 15 April 2009, para. 96: "At the outset, it should be noted that BITs, which are bilateral arrangements between two States parties,



**SWORN TRANSLATION**
The English text is a sworn translation of the
Dutch original. In case of any discrepancies, the
Dutch original shall prevail.

those of other (commercial) arbitral tribunals, which do not base their jurisdiction on the ICSID Convention.[131] All this means that to the extent that in certain cases ICSID tribunals have imposed stricter requirements on the international nature of an investment than the ECT, this does not mean that the ECT should therefore also be interpreted more strictly. After all, those stricter requirements ensue from the ICSID Convention and/or from the underlying bilateral investment treaty. It also follows from the fact that all these treaties impose different requirements on the international nature of an investment[132] that it is not possible to speak of a rule of customary international law.[133] Nor is it clear therefore that the ECT should be interpreted in accordance with the rules from the ICSID Convention or from other investment treaties. On the contrary, the various treaties have their own definitions, which in practice may also give rise to different outcomes. Incidentally, in the award in *Plama/Bulgaria* rendered on the basis of the ECT, the ICSID tribunal decided in line with Article 1(7) ECT (see no. 3.110 below).

3.109   In so far as stricter requirements with regard to the international nature of an investment can be derived from the various arbitral awards (the Court of Appeal consistently rejected that argument), those requirements are not relevant to the ECT because the relevant case law pertains to other treaties. That is the case with most of the awards referred to in the ground. For example, the *Loewen/United States of America* judgment pertains to the NAFTA treaty [134], and *Phoenix/Czech Republic* [135], *Occidental/Ecuador*[136], *TSA Spectrum de Argentina S.A./Argentina*[137] and *ST-AD GmbH/Bulgaria* [138] on the ICSID Treaty and various bilateral investment treaties. *Lemire/Ukraine* relates to the BIT between the United States and Ukraine.[139] These arbitral awards are not relevant to the interpretation of the ECT.

3.110   Incidentally, in para. 5.1.8.10 the Court of Appeal took into account arbitration case law (put forward by HVY) that has in fact been rendered pursuant to the ECT. In *Plama/Bulgaria*, the ICSID tribunal decided that, in accordance with the definition of Article 1(7) ECT, it is irrelevant who is the owner of the investing

---

cannot contradict the definition of the ICSID Convention. In other words, they can confirm the ICSID notion or restrict it, but they cannot expand it in order to allow access to ICSID. A definition included in a BIT being based on a test agreed between two States cannot set aside the definition of the ICSID Convention, which is a multilateral agreement. As long as it fits within the ICSID notion, the BIT definition is acceptable, it is not if it falls outside of such definition. (...)".

[131] Turinov, op. cit., p. 6.

[132] For an overview of the requirements, see Turinov, op. cit., pp. 12-13; Jagusch & Sinclair, op. cit., 2006, pp. 90-93.

[133] See Nollkaemper, op. cit., pp. 127-134.

[134] *The Loewen Group Inc. v. United States of America*, ICSID Case No. ARB(AF)/98/3, 26 June 2003, para. 223 et seq.

[135] *Phoenix Action, Ltd v. The Czech Republic*, cited above, in particular para. 135 et seq.

[136] *Occidental Petroleum Corporation v. The Republic of Ecuador* (Decision on Annulment), ICSID Case No. ARB/06/11, 2 November 2015, para. 259 et seq.

[137] *TSA Spectrum de Argentina S.A. v. Argentine Republic*, ICSID Case No. ARB/05/5, 19 December 2008; ICSID *National Gas S.A.E. v. Arab Republic of Egypt*, ICSID Case No. ARB/11/7, 3 April 2014, para. 136. See also para. 5.1.8.9 of the Final Judgment, unchallenged in cassation.

[138] *ST-AD GmbH v. The Republic of Bulgaria* (Award on Jurisdiction), UNCITRAL, PCA Case No. 2011-06, 18 July 2013, para. 408 et seq.

[139] *Lemire v. Ukraine*, ICSID Case No. ARB/06/18, 28 March 2011, para. 55 et seq.



SWORN TRANSLATION
The English text is a sworn translation of the
Dutch original. In case of any discrepancies, the
Dutch original shall prevail.

company and/or by whom it is controlled. According to the tribunal, it was only relevant that the investing company (Plama Consortium) was incorporated under the laws of Cyprus.[140] According to the Court of Appeal, the arbitral awards in *Charanne/Spain*[141] and *Isolux/Spain*[142] are in line with that (see paras. 5.1.8.8 and 5.1.8.10). Although according to the Court of Appeal the award in *Alapli/Turkey* indicates that U-turn constructions do not deserve protection, given the dissent between the arbitrators on this point it does not evidence a generally accepted principle to that effect.[143] This interpretation of the various arbitral awards is not challenged by the ground for cassation.

3.111   It follows from the foregoing that the complaint that the Court of Appeal failed to appreciate international law fails. I note, superfluously, that the literature on the ECT I consulted also does not support the Russian Federation's view that additional requirements should be set for the international nature of the investments.[144] The ICSID tribunal also decided in the *Plama/Bulgaria* award referred to above that no such further requirements are imposed. It was pointed out in the literature that although the consequence of that judgment is that letterbox companies can claim protection under the ECT, contracting states can on the other hand limit that protection on the basis of Article 17 ECT (the 'denial of benefits' clause) to investors that have a substantial connection with the country where they are established, and can thus exclude letterbox companies from that protection.[145] As long as contracting states have not made use of this possibility, letterbox companies also fall within the scope of the ECT.[146]

3.112   Ground 3.2.4 complains about para. 5.1.8.8, in which the Court of Appeal held that it has been

---

[140]   *Plama Consortium Limited v. Republic of Bulgaria* (Decision on Jurisdiction), ICSID Case No. ARB/03/24, 8 February 2005, para. 128, in which the tribunal held: "it remains the case that the Claimant [Plama Consortium, Advocate General] was an "Investor" under Article 1 (7) ECT : it is here irrelevant who owns or controls the Claimant at any material time. The definition of "Investment" under Article 1 (6) refers to the Investor's investment, in other words it is again here irrelevant who owns or controls the Claimant at any material time; (...)". See also Turinov, op. cit., p. 16.

[141]   *Charanne B.V. v. The Kingdom of Spain* (Final Award), Stockholm Chamber of Commerce (SCC) Arbitration No. 062/2012, 21 January 2016.

[142]   SCC *Isolux Infrastructure Netherlands, B.V. v. Kingdom of Spain,* Arbitration Case No. V2013/153, 12 July 2016.

[143]   *Alapli Elektrik B.V. v. Republic of Turkey*, ICSID Case No. ARB/08/13, 16 July 2012.

[144]   In addition to the contributions mentioned in the following footnotes, the following sources have been consulted: Turinov, op. cit., pp. 12-13; Hobér, op. cit., p. 116; Baltag, op. cit., pp. 141-146; Roe & Happold, op. cit., pp. 64-65; Jagusch & Sinclair, op. cit., p. 93; Blanch, Moody & Lawn, op. cit., pp. 3-4; Engela C. Schlemmer, 'Investment, Investor, Nationality, and Shareholders', in: Peter T. Muchlinski et al. (eds.), The Oxford Handbook of International Investment Law, Oxford: OUP 2015, pp. 77-78.

[145]   See Wälde, op.cit., p. 274, who states that 'incorporating just for the sake of Treaty protection' is not sufficient, referring to Article 17 ECT.

[146]   Anthony C. Sinclair, 'The substance of nationality requirements in investment treaty arbitration', ICSID Review - Foreign Investment Law Journal 2005, p. 378 et seq. (in a similar sense the same author in 'Investment Protection for "Mailbox Companies" under the 1994 Energy Charter Treaty', Transnational Dispute Management 2005). In *Plama/Bulgaria* (cited above, para. 147 et seq.), the ICSID tribunal decided that contracting states will have to inform investors in advance of a decision pursuant to Article 17 ECT, and that states may not resort to this as late as in arbitration proceedings in order to achieve inadmissibility of the investor's claim. See also Sinclair, op. cit., ICSID Review 2005, p. 387: "The decision in *Plama* on the right-to-deny-benefits provision has practical consequences. It follows that ECT Article 17 can offer a good defence for host States to claims brought by 'mailbox' companies, but a State must exercise its right prior to the time the investment is made."



SWORN TRANSLATION
The English text is a sworn translation of the
Dutch original. In case of any discrepancies, the
Dutch original shall prevail.

insufficiently explained why Khodorkovsky et al. should be deemed 'beneficial owners' of the Yukos shares and why HVY only hold the shares on behalf of Khodorkovsky et al. The ground argues that, in light of Articles 149 and 154 DCCP, this decision is erroneous, or at least incomprehensible, because the parties allegedly agree on this.

3.113  The complaint fails for a lack of interest. This is because the challenged legal finding does not exclusively pertain to the question of whether Khodorkovsky et al. are the 'beneficial owners' of the Yukos shares and of HVY, but primarily relates to the question of whether this is relevant for the application of the ECT. In this finding, the Court of Appeal rejected the Russian Federation's statement that the ECT makes a distinction between the formal and material owner, in the sense that only the latter has legal standing (see para. 5.1.8.7). The Court of Appeal concluded that such a rule does not exist, and substantiated that conclusion by referring to *Charanne/Spain*. Incidentally, the ground does not challenge that conclusion.

3.114  I conclude that all complaints in ground 3.2 fail.

*Ground 3.3: actual economic contribution to economy of host country*

3.115  Ground 3.3 is directed against paras. 5.1.9.1-5.1.9.5 and complains that the Court of Appeal wrongly rejected the Russian Federation's position that HVY's shares in Yukos cannot be considered an 'investment' under the ECT because HVY did not make an actual economic contribution to the Russian Federation. The ground complains that the Court of Appeal wrongly ruled that the Russian Federation failed to demonstrate the existence of such an internationally recognised principle of investment law (no. 126) and that the Court of Appeal wrongly based its ruling on a merely grammatical interpretation of the terms 'investment' and 'investor' from the ECT (no. 127). According to the ground, the Court of Appeal wrongly ruled that the requirement of the economic contribution only applies to an investment within the meaning of the ICSID Convention and not to the ECT (no. 129).

3.116  In so far as the complaints build on earlier grounds, they share the same fate. As regards the complaint in no. 129, I repeat that the ICSID Convention has its own scope of application, which led to the ICSID tribunal formulating criteria in the *Salini Costruttori SpA/Morocco*[147] award for determining whether an investment is involved. These Salini criteria are stricter than those of the ECT.[148] One of those criteria is that the investment makes a contribution to the economic development of the host state (see para. 5.1.9.2 et seq. of the Final Judgment). Given the existence of the differences between the *Salini* criteria and the ECT criteria, investors who believe that their rights under the ECT have been violated should carefully consider whether they wish to submit their claim to the ICSID, because there is a risk that the

[147] *Salini Costruttori S.p.A. and Italstrade S.p.A. v. Kingdom of Morocco* (Decision on Jurisdiction), ICSID Case No. ARB/00/4, 23 July 2001, International Legal Materials 2003, pp. 609-624.
[148] See in this regard Baltag, op. cit., pp. 211-219; Jagusch & Sinclair, op. cit., p. 75 et seq.; Turinov, op. cit., p.5 et seq.; Roe & Happold, op. cit., pp. 57-63; Hobér, op. cit., pp. 69-73.



SWORN TRANSLATION
The English text is a sworn translation of the
Dutch original. In case of any discrepancies, the
Dutch original shall prevail.

ICSID will decline jurisdiction.[149] It is therefore clear and accepted in practice that the ICSID Convention is interpreted differently to the ECT. There are also no indications in the text of the ECT that the definition of 'investor' (or other terms) of the ECT should be interpreted in conformity with that of the ICSID Treaty.

3.117    As I have already noted, the ECT does not offer a real definition of the term, 'investment', but instead offers a non-exhaustive list of assets designated as such. This raises the question of how to assess whether assets that are not included in the list of Article 1(6) ECT should be considered an investment. In this respect, it has been noted in the literature that interpretations of the term 'investment' that developed outside the ECT, as in the context of the ICSID Treaty, could be of use.[150] There are also a number of decisions in ECT cases in which the definition of 'investor' was had been aligned with the *Salini* case law under the ICSID Treaty.[151] For example, the majority of the arbitrators in *Alapli/Turkey* decided that the ECT requires "a meaningful contribution" by the investor in the host state. This was not the case in their opinion, because the claimant had not invested its own money, but had only acted as a "conduit".[152] One of the other arbitrators challenged this view in a dissenting opinion on the ground that no such a criterion can be found in the ECT.[153] In other case law, it was explicitly decided that the *Salini* criteria cannot play a role in the context of the ECT. In *Anatolie Stati and Others/Kazakhstan*, the tribunal held that the ECT has an "extremely broad definition" of the term 'investment' and that if an asset is covered by Article 1(6) ECT, criteria developed in the context of another treaty no longer have any significance:

> "806. (...) Guidelines and tests of criteria developed in this jurisprudence on the ICSID Convention and similar treaties, therefore, cannot be used as long as any right or activity is clearly covered by the wording of the above definition in ECT cases. Therefore, the so-called *Salini* test, controversial and much discussed both by the Parties in this case and otherwise in ICSID and similar arbitrations, even if applied as a flexible guideline rather than as a strict jurisdictional requirement, cannot be used for the definition of investment under the ECT or, likewise, in the present case. The Tribunal, thus, sees no need to examine the various criteria discussed for the *Salini* test."[154]

---

[149] Baltag, op. cit., p. 219: "A diligent Investor will have to take into consideration all relevant criteria, including the chances for an ECT dispute to be dismissed by an ICSID tribunal because of failure to fulfil the investment requirement under Article 25(1) of the ICSID Convention"; Jagusch & Sinclair, op. cit., p. 87; Turinov, op. cit., pp. 19-22; Roe & Happold, op. cit., p. 49. The latter point out that it is generally accepted that the Salini criteria 'are not jurisdictional hurdles which must each be surmounted but, rather, typical characteristics of investments' (p. 57).

[150] Roe & Happold, op. cit., p. 57 et seq.

[151] See the aforementioned judgments *Alapli/Turkey* and *Isolux/Spain*; Hobér, pp. 73-78 (in particular p. 75).

[152] *Alapli/Turkey*, cited above, paras. 337-350. See Geraets & Reins, op. cit., pp. 35-36.

[153] *Alapli/Turkey*, *Dissenting Opinion* of Marc Lalonde, para. 9.

[154] *Anatolie Stati, Gabriel Stati, Ascom Group SA and Terra Raf Trans Traiding Ltd v. Kazakhstan*, SCC (Stockholm Chamber of Commerce) Case No. V 116/2010, 19 December 2013, para. 806. In a similar sense, *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Jurisdiction, para. 157: "The definition of investment must be interpreted according to article 31 of the Vienna Convention on the Law of Treaties and not in accordance with tests, criteria or guidelines beyond the terms, the context or the object and purpose of the ECT. There is no test, set of criteria or guidelines that can or should be relied upon in



SWORN TRANSLATION
The English text is a sworn translation of the
Dutch original. In case of any discrepancies, the
Dutch original shall prevail.

3.118   The conclusion is that ICSID case law, in particular regarding *Salini*, does not indicate the existence of a principle of international investment law that should also be taken into account when interpreting the ECT. Arbitration case law is too divergent for that. Moreover, this position was taken only in a few decisions (one of which is non-unanimous), and therefore no decisive significance can be assigned to it. I also refer to what I noted at 1.8 of this opinion regarding the significance of arbitral case law in the context of the interpretation of treaties.

3.119   I conclude that the complaints in ground 3.3 fail.

   *Ground 3.4: piercing the corporate veil*

3.120   Ground 3.4 is directed against paras. 5.1.8-5.1.11 and complains that the Court of Appeal and the Tribunal should have looked "past the mere formal corporate structure" of HVY, because these companies were only incorporated for the purpose of committing and concealing illegal acts, including tax evasion. It is a principle of international law that if companies have been abused in such a way, it is necessary to look past their corporate structure (*piercing/lifting the corporate veil*). According to the ground, the consequence in this case is that HVY cannot be considered an investor within the meaning of the ECT because they cannot be considered to have been incorporated under the laws of Cyprus and the Isle of Man, respectively, as is required by Article 1(7) ECT.

3.121   The Court of Appeal rejected this argument by the Russian Federation on three grounds. First, according to the Court of Appeal, there is no evidence of such a principle (paras. 5.1.10.1-5.1.10.2). Second, there are no indications that Article 1(7) ECT provides a basis for applying this doctrine in the sense advocated by the Russian Federation. Third, the doctrine of piercing the corporate veil pertains to the determination of liability and cannot be used to challenge the jurisdiction of the Tribunal (para. 5.1.10.4).

3.122   The complaints take as a factual starting point that HVY were established solely to conceal illegal activities. This has not been established.[155] Therefore, as a hypothetical factual basis, the starting point in cassation will be that HVY were indeed incorporated to conceal said illegal activities.

3.123   The complaints of the ground are based on the doctrine of *piercing/lifting the corporate veil*. As the Court of Appeal considered, this term is indeed primarily significant in the context of liability of legal entities. Piercing the corporate veil means that it is necessary to 'pierce through' the legal entity so that the

---

international law to restrict or replace the definition that exists in the ECT".

[155] In para. 5.1.11.6, on the basis of the Tribunal's award, the Court of Appeal rejected the statement that there was illegal conduct at the time of the making of the investment by HVY (in other words, HVY's acquisition of shares in Yukos). Ground 3.4 pertains to other alleged illegal activities, which took place later, including the evasion of dividend tax, the payment of bribes, money laundering and the diversion of Yukos' assets from Russia (no. 131).



**SWORN TRANSLATION**
The English text is a sworn translation of the
Dutch original. In case of any discrepancies, the
Dutch original shall prevail.

shareholders can be held liable instead of only the legal entity itself.[156] The term sometimes acquires a broader meaning and is used to denote other situations in which the legal entity is disregarded and those who control it are considered instead.[157] For example, the ECT includes the principle of piercing the corporate veil in this broad sense: Article 26(7) ECT allows the legal protection of Article 26 ECT to be extended to investors established in the country where the investment was made, provided that they are controlled by investors from another contracting state. In that case, therefore, the decisive factor is not who the investor is and where it is established, but under whose control the investor actually is. [158] In this manner we look past the investor/company, but this time – unlike in the view just described – in favour of those who control it.

3.124   The ground relies on an interpretation of the term *piercing the corporate veil* in international law allegedly entailing that courts and arbitral tribunals must look past corporate entities that have been abused for illegal conduct. Those entities should allegedly be denied protection under investment treaties for that reason. Strictly speaking, there is no piercing the corporate veil in that case, because according to that view, we are not looking past the company at the shareholders; rather, the company is deemed not to exist at all, without it being further relevant who controls it. However, the part invokes a principle of international law to that effect.

3.125   In support of the existence of such a principle, the ground refers to the judgment of the International Court of Justice (ICJ) in *Barcelona Traction.*[159] At issue in that case was whether Belgium could institute proceedings at the ICJ against Spain for the benefit of Belgian shareholders of Barcelona Traction, a Canadian company. The ICJ therefore had to assess, *inter alia*, whether the shareholders of a company could engage in litigation on the basis of alleged unlawful acts against the company. The ICJ took the company's independence vis-à-vis its shareholders as a starting point, but also held that exceptions could be made to this under certain circumstances, in particular in the event that the company has proved unable to defend the interests of those who have entrusted their financial resources to it.[160] In such situations, according to the ICJ, an exception is made to the principle of independence of the company:

> "56. (...) Here, then, as elsewhere, the law, confronted with economic realities, has had to provide protective measures and remedies in the interests of those within the corporate entity as well as of those outside who have dealings with it: the law has recognized that the independent existence of the legal entity cannot be treated as an absolute. It is in this context that the process of "lifting the corporate veil" or "disregarding the legal entity" has been found justified and equitable in certain circumstances or for

---

[156] See, for example, Karen Vandekerckhove, Piercing the corporate veil, Alphen aan den Rijn: Kluwer Law International 2007, pp. 1 and 11 ; Asser/Maeijer/Van Solinge & Nieuwe Weme 2-II* 2009, no. 834 et seq., with further references.

[157] Baltag, op.cit., p. 115. See also regarding the various forms: R.C. van Dongen, Identificatie in het rechtspersonenrecht, Uitgaven vanwege het Instituut voor Ondernemingsrecht, no. 22, Deventer: Kluwer, 1995.

[158] Baltag, loc. cit.

[159] ICJ, *Case concerning the Barcelona Traction, Light and Power Company, Limited (new application: 1962) (Belgium v. Spain)*, 5 February 1970.

[160] ICJ *Barcelona Traction*, paras. 37 et seq.



SWORN TRANSLATION
The English text is a sworn translation of the
Dutch original. In case of any discrepancies, the
Dutch original shall prevail.

certain purposes. The wealth of practice already accumulated on the subject in municipal law indicates that the veil is lifted, for instance, to prevent the misuse of the privileges of legal personality, as in certain cases of fraud or malfeasance, to protect third persons such as a creditor or purchaser, or to prevent the evasion of legal requirements or of obligations."

The ICJ held that such an exception could also play a role under international law. The ICJ did however emphasise the exceptional nature of the process involved in *lifting the veil*.

"58. In accordance with the principle expounded above, the process of lifting the veil, being an exceptional one admitted by municipal law in respect of an institution of its own making, is equally admissible to play a similar role in international law. It follows that on the international plane also there may in principle be special circumstances which justify the lifting of the veil in the interest of shareholders."

3.126   The ICJ has acknowledged the existence under international law of the possibility of piercing the corporate veil, among other reasons "to prevent the misuse of the privileges of legal personality, as in certain cases of fraud or malfeasance", but also held that there is room for this only in exceptional circumstances. The ICJ did not therefore go as far as the ground (no. 132) argues, given that the decision does not state that courts and arbitral tribunals are "obligated" to lift the corporate veil of companies that have been misused for purposes of "fraud or malfeasance". Moreover, the decision does not indicate that a company could also be disregarded in its entirety, as the ground argues.

3.127   From the ICSID arbitral awards to which the ground (and the Court of Appeal) refer (in the cases *Cementownia v. Turkey*[161], *Phoenix v. Czech Republic* and *Alapli v.Turkey*), no rule emerges either by which arbitral tribunals are obligated to lift the corporate veil of companies in the event that they have been misused for illegal activities. Those decisions have more limited implications. They imply that, under certain circumstances, the protections offered by the ECT can be denied to claimants who have acquired shares in companies for the sole purpose of gaining access to the arbitration procedure. In that case, the claimant company is not "disregarded" because it was allegedly not incorporated under the laws of a contracting state, but there is no investment within the meaning of Article 1(6) ECT. [162]

In addition, although the ICSID tribunal held in these cases that acquiring shares in a foreign company in order to gain access to investment arbitration can be unacceptable, it also held that a distinction should be made between *bona fide* transactions, and that this is highly dependent on the circumstances of the case.[163] This ICSID case law therefore acknowledges, to a certain extent, the doctrine of *piercing the corporate veil*, although it has only applied it to date in a specific situation that does not appear in the

---

[161] *Cementownia "Nowa Huta" S.A. v. Republic of Turkey*, ICSID Case No. ARB(AF)06/2, 17 September 2009.

[162] See *Phoenix v. Czech Republic*, para. 143: "Although, at first sight, the operation by Phoenix looks like an investment, numerous factors converge to demonstrate that the apparent investment is not a protected investment. (...). It is the conclusion of the Tribunal that the whole "investment" was an artificial transaction to gain access to ICSID", and *Alapli v. Turkey*, para. 404: "All the elements of the file and the particular circumstances of the case prove the investment was manipulated to appear as a foreign investment".

[163] *Alapli v. Turkey*, paras. 401 et seq.; *Phoenix v. Czech Republic*, paras. 142-143; *Cementownia v. Turkey*, paras. 154-156, with reference to *Tokios Tokelés v. Ukraine*, ICSID Case No. ARB/02/18 (Decision on Jurisdiction), paras. 53-56.



**SWORN TRANSLATION**
The English text is a sworn translation of the
Dutch original. In case of any discrepancies, the
Dutch original shall prevail.

case at issue in cassation.[164]

3.128   As the Court of Appeal rightly held, Article 1(7) ECT provides no basis to "lift the corporate veil" in the manner that the ground contends. I reiterate that Article 1(7) ECT merely imposes the formal requirement that a company must be incorporated under the laws of a contracting state. This wording provides no basis to "disregard" a company incorporated under the laws of a contracting state by not qualifying it as an investor (because it was incorporated for illegal purposes or for any other reason).[165] The ground (no. 137) goes on to argue that Article 1(7) ECT provides an explicit basis for the application of the doctrine of piercing the corporate veil that exists under the law of Cyprus and the Isle of Man (where HVY have their registered office), but does not argue that this doctrine is, under the law of those States, fleshed out in the manner that the ground contends. In so far as the ground intends to complain that the Court of Appeal applied foreign law incorrectly on this point, the complaint fails based on the provisions of Article 79(1)(b) of the Judiciary (Organisation) Act or due to a lack of factual basis, given that this matter was apparently not brought up at the fact-finding instances (the ground does not refer to sources in the procedural documents where positions were allegedly taken in that respect).

3.129   The conclusion is that the complaints in ground 3.4 fail.

*Ground 3.5: referral of questions about Article 1(6) and (7) and Article 26 ECT for a preliminary ruling?*

3.130   Ground 3.5 argues that the Court of Appeal's interpretation is incompatible with EU law. According to the ground, the Court of Appeal should have submitted questions to the ECJ for a preliminary ruling on the interpretation of Article 1(6) and (7) and Article 26 ECT, addressing, in this respect, all the issues that have been raised in this case.

3.131   I refer to what I noted in the discussion of ground 2.7. There is no reason to submit questions for a preliminary ruling if the answer to those questions is not necessary to the assessment of the dispute. This is also the case with ground 3. The various complaints contained in this ground fail for a variety of reasons: partly due to the lack of a factual basis, partly because they rely on sources that, according to the VCLT's rules of interpretation, are not relevant to the interpretation of the ECT, and partly because the complaints are complaints in respect of reasoning, for which reason they fail.

**Ground 4: interpretation of Article 1(6) and (7) ECT (the legality of the investments)**

3.132   Ground 4 also refers to the interpretation of the terms 'investment' and 'investor' in Article 1(6) and (7) ECT, arguing that they do not cover illegal investments, and that the Tribunal therefore lacked

---

[164] This also applies to the other judgments cited on appeal (see Defence on Appeal, no. 712). These decisions acknowledge the existence of the doctrine of *piercing the corporate veil*, but place it in the context of liability. They give no indication that the doctrine should be applied in the way that the ground contends. See *ADC Affiliate Ltd v. Hungary*, ICSID Case No. ARB/03/16, 6 October 2006, para. 358; *Rumeli Telekom AS et al. v. Kazakhstan*, ICSID Case No. ARB/05/1, 29 July 2008, para. 328; *Saluka Investments v. Czech Republic*, Partial Award, UNCITRAL, 17 March 2006, para. 230.
[165] See, specifically, Baltag, op. cit., pp. 141-146.



**SWORN TRANSLATION**
**The English text is a sworn translation of the Dutch original. In case of any discrepancies, the Dutch original shall prevail.**

jurisdiction to take cognisance of HVY's claims. In addition, the ground argues that the Tribunal's decision is contrary to public policy, as it ensures that HVY will be able to benefit from illegal conduct. The ground is divided into four sub-grounds.

3.133 Ground 4.1 contains no complaints, but gives an overview of the illegal acts allegedly committed by HVY. The Russian Federation has stated the following in that regard:

1) HVY acquired the shares in Yukos illegally, namely by manipulating auctions and paying bribes (ground 4.1.2);
2) Hulley and VPL were incorporated for the evasion of dividend tax, in which YUL also participated (ground 4.1.3);
3) Yukos evaded tax in the Russian Federation by using sham companies in free tax regions (ground 4.1.4);
4) HVY impeded the course of justice in response to this illegal conduct by destroying evidence and channelling funds abroad (ground 4.1.5).

3.134 The Russian Federation has argued that the Tribunal should have declined jurisdiction because of the illegality of HVY's investments. In investment arbitration, according to the Russian Federation, it is generally accepted that the protection under the treaty does not extend to investments made in breach of the law of the host state, even if the treaty in question does not contain a provision expressly excluding such investments from the scope of the ECT.[166]

3.135 The Court of Appeal held, in summary, that there is indeed a principle of international investment law which entails that international investments made in breach of the law of the host state do not deserve protection. This applies, however, only to cases in which illegal acts were committed when initiating the investment, not afterwards (para. 5.1.11.2). Where this can be established, according to the Court of Appeal a distinction should be made between the consequences of (a) investment treaties in which the definition of the term 'investment' includes a phrase to the effect that the investment must have been made "in accordance with the law" or words of a similar nature, and (b) investment treaties in which this is not the case. In the first category of treaties, illegal investment falls entirely outside the scope of the treaty: in that case, there is no investment. The ECT contains no such explicit legality requirement. For such treaties, there is no generally accepted principle of law which implies that an arbitral tribunal should decline jurisdiction in the case of an illegal investment (paras. 5.1.11.4-5.1.11.5). According to the Court of Appeal, the wording of Article 1(6) and Article 26 ECT is decisive. Given that no explicit legality requirement is to be found there, it cannot be decided that if an investment turns out to be illegal, the arbitral tribunal lacks jurisdiction. It could be decided that the investment cannot be allowed to benefit from the material protection of the ECT, but that is a separate matter. The Court of Appeal

[166] This characterisation of the Russian Federation's position is derived from para. 5.1.11.1 of the final judgment.

A.J.B. Burrough beëdigd vertaler - Wbtv nr. 1963

SWORN TRANSLATION
The English text is a sworn translation of the
Dutch original. In case of any discrepancies, the
Dutch original shall prevail.

referred superfluously to the Tribunal's decision entailing that the unlawful conduct in the privatisation of Yukos is too far removed from the acquisition of the shares in Yukos by HVY. Therefore, according to the Court of Appeal, it cannot be established that there was an illegal investment.

*Ground 4.2: existence of legality requirement*

3.136   Ground 4.2 complains that the Court of Appeal failed to recognise that (the definition of investment in) the ECT contains an implied legality requirement given that the ECT does not protect investments that are illegally obtained and held. The ground relies on the ordinary meaning of the term 'investment' as well as on the context, object and purpose of the ECT and arbitral case law.

3.137   The Court of Appeal held in para. 5.1.11.5 that the ECT does not include an explicit legality requirement, such as a phrase to the effect that the investment must have been made "in accordance with the law" or words of a similar nature. The ground does not argue that such words are to be found in the ECT,[167] but defends the position that they are implied there, referring (in no. 154) to, *inter alia*, an introduction to the ECT by the ECT Secretariat.[168] In para. 5.1.11.2, the Court of Appeal held that there is a principle of international investment law which entails that illegal investments made in violation of the laws of the host country do not deserve protection. In para. 5.1.11.3 (read in conjunction with para. 5.1.11.5), the Court of Appeal decided that the definition of 'investment' in the ECT does not include a phrase to the effect that the investment must have been made "in accordance with the law". According to the Court of Appeal, this is of no consequence to the Tribunal's jurisdiction to hear claims based on the ECT due to the distinction made earlier between treaties that do and treaties that do not contain an explicit legality requirement. The ground does not dispute that such a distinction must be made, and the ground therefore fails to that extent.

3.138   Nor does arbitration case law give any indication that the Court of Appeal's decision is incorrect. It can be inferred from arbitral case law that the ECT contains an implicit legality requirement, but not that this should lead to a lack of jurisdiction on the part of the arbitral tribunal.[169] Relevant in this context are, *inter alia*, the decisions of the ICSID tribunal in the aforementioned case *Plama v. Bulgaria*, which the Court of Appeal discussed in para. 5.1.11.4. In those proceedings, Bulgaria argued that there was no investment within the meaning of the ECT because the investor had concealed who was controlling it. The tribunal rejected this argument in the context of the assessment of its jurisdiction, and decided that the definition in Article 1(6) ECT has been met if there is a right of ownership or a contractual claim, even if this right or entitlement is "defeasible".[170] The tribunal then went on to address this argument anyway

---

[167]   See e.g. Hobér, op. cit., p. 99: "(...) the ECT does not have any provision requiring that an investment be in conformity with a particular law, neither municipal law nor international law."

[168]   Baltag, op. cit., pp. 197-198, writes that this introduction cannot play any role in interpreting the ECT, *inter alia*, because it does not fall under the sources that are deemed relevant under Articles 31 and 32 VCLT.

[169]   Regarding this case law, see also Hobér, op. cit., pp. 99-105.

[170]   *Plama v. Bulgaria* (Jurisdiction), para. 128: "The definition of "Investment" under Article 1 (6) refers to the Investor's



SWORN TRANSLATION
The English text is a sworn translation of the
Dutch original. In case of any discrepancies, the
Dutch original shall prevail.

in the assessment of the claim on the merits. There, the tribunal held, *inter alia*, that the ECT does not protect investments made in breach of the law. The claim was thereupon denied.[171] This approach was also taken in the decision of the arbitral tribunal in the case *Blusun v. Italy*, which also involved the ECT (see para. 5.1.11.4), as well as in the decision of the arbitral tribunal in the case *Anatolie Stati and others v. Kazakhstan.*[172]

3.139   There are also arbitral decisions in which a different approach was taken, but those cases do not pertain to the ECT. Moreover, some of those decisions pertain to treaties that contain an explicit legality requirement.[173] Therefore, no general rule can be inferred from this case law entailing that an arbitral tribunal should always decline jurisdiction in the event of an illegal investment, even if the treaty in question does not contain an explicit legality requirement. It is true that some arbitral decisions have held without further ado that illegality implies a lack of jurisdiction on the part of the arbitral tribunal[174], but it is required in that case that illegal acts must have been committed in the making of the investment, for example because of fraud when submitting a tender.[175] According to the arbitral tribunal in *Phoenix v. Czech Republic*, however, only evident illegality results in a lack of jurisdiction.[176] In *Mamidoil Jetoil v. Albania*, the arbitral tribunal held that, in principle, states do not have to accept the jurisdiction of an arbitral tribunal in the case of illegal investments, but that this is otherwise if the state in question has expressed its willingness to legalise the investments.[177] It was also held in *SAUR International v. Argentina* that illegal investments are not protected, but that the consequences thereof are not a lack of jurisdiction.[178]

3.140   It follows from the above that there are conflicting answers to the question of whether the illegality of an

investment, in other words it is again here irrelevant who owns or controls the Claimant at any material time; and as already noted above, the definition is broad, extending to "any right conferred by law or contract". That definition would be satisfied by a contractual or property right even if it were defeasible." See also *Plama v. Bulgaria* (Award), 27 August 2008, para. 112.

171   *Plama v. Bulgaria* (Award), para. 139.
172   *Anatolie Stati v. Kazakhstan*, cited above, para. 812.
173   See the following cases: *Fraport AG Frankfurt Airport Services Worldwide v. The Republic of the Philippines*, ICSID Case No. ARB/11/12, 10 December 2014, paras. 322 et seq. (BIT Germany-Philippines); *Inceysa Vallisoletana, S.L. v. Republic of El Salvador*, ICSID Case No. ARB/03/26, 2 August 2006, paras. 195 et seq. (BIT El Salvador-Spain); *Gustav F W Hamester GmbH & Co KG v. Republic of Ghana*, ICSID Case No. ARB/07/24, 18 June 2010, para. 126 (BIT Germany-Ghana); *Phoenix v. Czech Republic*, cited above, paras. 56 and 101 (BIT Czech Republic-Israel).
174   *Ampal-American Israel Corporation and others v. Arab Republic of Egypt*, ICSID Case No. ARB/12/11, 1 February 2016 (Decision on Jurisdiction), paras. 301 et seq. See also *Alasdair Ross Anderson v. Republic of Costa Rica*, ICSID Case No. ARB(AF)/07/3, 19 May 2010, paras. 55 et seq.; UNCITRAL, *Oxus Gold pic v. The Republic of Uzbekistan*, 17 December 2015 (Award), paras. 706 et seq.
175   As in, for example, the case *Inceysa Vallisoletana, S.L. v. Republic of El Salvador*, cited above, paras. 235-237, in particular.
176   *Phoenix v. Czech Republic*, paras. 102-104. Similarly: *David Minnotte and Robert Lewis v. Republic of Poland*, ICSID Case No. ARB(AF)/10/1, 16 May 2014, paras. 131-132.
177   *Mamidoil Jetoil Greek Petroleum Products Société S.A. v. Republic of Albania*, ICSID Case No. ARB/11/24, 30 March 2015, paras. 492-495.
178   *SAUR International S.A. v. Argentine Republic*, ICSID Case No. ARB/04/4, 6 June 2012, para. 308.



**SWORN TRANSLATION**
The English text is a sworn translation of the
Dutch original. In case of any discrepancies, the
Dutch original shall prevail.

investment should lead to the arbitral tribunal's lack of jurisdiction (in cases in which there is no legality requirement in the relevant treaty). Some arbitral tribunals answer this question in the affirmative, while others take a more nuanced approach. However, it is decisive that there are no decisions where the ECT was interpreted in such a way that the illegality of an investment led to a lack of jurisdiction. It has also been emphasised in the literature that the ECT does not have a legality requirement with potential consequences for the jurisdiction of an arbitral tribunal to assess claims based on the ECT.[179] Therefore, in my opinion, there is no generally accepted principle of law which implies that an arbitral tribunal should decline jurisdiction in the case of an illegal investment. In the context of the ECT, it has been consistently held that the illegality of an investment can, at best, play a role in the assessment of the case on the merits.

3.141   It follows from the above that ground 4.2 fails.

*Ground 4.3: illegal conduct*

3.142   Ground 4.3 is divided into two grounds, and it contends that illegal conduct has to be taken into account.

3.143   Ground 4.3.1 is directed against paras. 5.1.11.7-5.1.11.9 and paras. 9.8.5-9.8.10, in which the Court of Appeal rendered decisions on fraud and corruption in the acquisition of a majority interest in Yukos. Briefly stated, the ground complains that the Court of Appeal proceeded on the basis of an incorrect interpretation of the law or rendered an incomprehensible decision, having considered only the transactions by which HVY acquired the shares in Yukos. According to the ground, when answering the question of whether an investment had been obtained legally, the Court of Appeal should not have limited itself to an assessment of the last transaction in a chain of transactions, but should have also considered the events that preceded HVY's acquisition of the shares. According to the ground, it is of importance, amongst other things, that bribes were paid to Yukos' directors before it was privatised (the so-called *Red Directors*), and that the illegally acquired Yukos shares were transferred from one (sham) company to the other in order to conceal their illegal acquisition.

3.144   The ground lacks interest, given that it follows from para. 5.1.11.6 that paras. 5.1.11.7-5.1.11.9 were rendered superfluously. The complaint also fails in all other respects, given that the circumstance that an investment was made in breach of the law of the host country is only relevant if that breach pertains to the making of the investment.[180] The Court of Appeal therefore rightly adopted this as a starting point

[179] Baltag, op. cit., pp. 196-199; Roe & Happold, pp. 87-88; Gaillard, in: Ribeiro (ed.), Investment Arbitration and the Energy Charter Treaty, op. cit., p. 62, which in fact points out the following: "In line with the existing case law and the clear language of the ECT, it is fair to assume that (...) there would be no jurisdictional restriction with respect to a contract or license terminated on the basis of an alleged non-compliance: the termination of a contract or a license, the validity of which is challenged by the host State and thus constitutes precisely the issue to be decided on the merits by the arbitral tribunal, cannot provide sufficient ground for a host State to deny the benefit of access to dispute resolution to an otherwise covered investment"; Blanch, Moody & Lawn, op. cit., p. 5.

[180] See, inter alia, *Oxus Gold plc v. Uzbekistan,* cited above, para. 707 (with references to *Gustav F W Hamester v. Ghana*



**SWORN TRANSLATION**
**The English text is a sworn translation of the**
**Dutch original. In case of any discrepancies, the**
**Dutch original shall prevail.**

in para. 5.1.11.2. The Court of Appeal was therefore right to assess whether there was evidence of illegal conduct by HVY at the time they made their investment (para. 5.1.11.8) and not, in addition, the actions of others in acquiring the shares in Yukos in 1995/1996. The Court of Appeal's decision is, moreover, not incomprehensible. For the record, I would note that the Court of Appeal did assess the statement that YUL had been involved in the payment of bribes to the Red Directors, rejecting it as irrelevant. The Court of Appeal's decision that only the acquisition of the shares in Yukos by HVY, and not any earlier transactions, need be considered, implies a rejection of the statement that HVY helped conceal the earlier illegal acquisition of those shares. The ground thus fails.

3.145    Ground 4.3.2 is directed against the Court of Appeal's decision that illegal conduct by HVY after having made the investment is not relevant to the Tribunal's jurisdiction.

3.146    This ground, too, fails, given that the Court of Appeal's starting point, i.e. that only illegal conduct at the time the investment was made can lead to a lack of jurisdiction on the part of the Tribunal, is correct. The arbitral decision in the case *Hesham Talaat M. Al-Warraq v. Indonesia* to which the ground refers (no. 164 and footnote 341) does not lead to another conclusion. That judgment concerns an investment treaty that, unlike most investment treaties, contains an explicit provision that requires investors to respect the laws of the host country.[181] Consequently, no general rule can be inferred from this to imply that illegal conduct after the investment is made can also lead to a lack of jurisdiction on the part of an arbitral tribunal.

*Ground 4.4: violation of public policy*

3.147    Ground 4.4 is directed against paras. 9.8.5-9.8.10, in which the Court of Appeal rejected the Russian Federation's argument that the Final Awards were contrary to public policy because in consequence thereof, the aforementioned illegal acts are protected. After an introduction (in 4.4.1), the ground complains (in 4.4.2) that the Court of Appeal failed to recognise that it is contrary to national and international public policy to offer protection to treaty claims which concern investments that have been illegally acquired or exploited, or that the Court of Appeal's decision is at any rate insufficiently substantiated.

3.148    According to established case law, it is only possible to set aside an arbitral award on the basis of Article 1065(1)(e) DCCP if the content or execution of the award would be contrary to mandatory law of such a

and *Inceysa Vallisoletana v. El Salvador*, cited above). The judgment of the ECJ, 14 March 2019, case C-724/17, ECLI:EU:C:2019:204 (*Vantaan kaupunki v Skanska Industrial Solutions Oy and others*), para. 46, that the ground cites (no. 159, footnote 337), is irrelevant in this respect because the judgment pertains to the specific context of corporate liability for violations of EU competition rules.

[181]    *Hesham Talaat M. Al-Warraq v. Republic of Indonesia*, UNCITRAL, 15 December 2014 (Final Award), paras. 631 et seq. The ground mistakenly refers to the award on jurisdiction of 21 June 2012 in that case, sub-chapters 634-637, although that award does not have sub-chapters 634-637, which means that the probable intention was to refer to the Final Award of 15 December 2014.



**SWORN TRANSLATION**
The English text is a sworn translation of the
Dutch original. In case of any discrepancies, the
Dutch original shall prevail.

fundamental nature that compliance with it may not be obstructed by limitations of a procedural nature.[182] In essence, the ground argues that the Final Award violated a fundamental rule of mandatory law which entails that no protection is due to goods or rights obtained as a result of illegal acts. The Russian Federation put forward this argument in the arbitral proceedings under the heading of "unclean hands". In support of this, the ground refers to (arbitral) case law, including the ruling by the Paris *Cour d'appel* in the case *Kyrgyzstan v. Belokon*, in which enforcement of an arbitral award was refused because the alleged investor was guilty of money laundering.[183] The ground also refers to various anti-corruption and money laundering treaties and to literature in which it is argued that corruption is contrary to international public policy.[184]

3.149    The ground disregards the essence of the Court of Appeal's decision in para. 9.8.5 et seq. and likewise the essence of the Tribunal's decision as summarised by the Court of Appeal.[185] The Court of Appeal did not fail to recognise that the protection of goods or rights obtained as a result of illegal conduct (such as corruption) can constitute a violation of international public policy. The essence of the Court of Appeal's decision is that, in so far as such illegal acts took place, they cannot be attributed to HVY, or they are not at any rate related to their investments. The illegal acts had, after all, taken place in part after HVY made the investment, and were committed in part by others before HVY became a Yukos shareholder. In addition, there is no evidence whatsoever of a connection between HVY's illegal conduct and HVY's investment, according to the Tribunal and the Court of Appeal. According to this decision, therefore, there was no illegal conduct, such as corruption or money laundering, on the part of HVY itself when the investment was made. It cannot be inferred from the sources to which the ground refers that illegal conduct is relevant even if the investor was not involved or it was not committed at the time of the making of the investment. For example, the judgment in the case *World Duty Free v. Kenya* to which the ground refers (no. 166) involved the bribery of the Kenyan president by the investor's chief executive officer[186], and the decision in *Kyrgyzstan v. Acquisition* involving alleged money laundering on the part of the investor. The ground's complaints fail on the basis of the foregoing.

3.150    Ground 4.4.3 is directed against para. 9.8.8, in which the Court of Appeal discussed sub-chapter 1370 Final Awards. The Court of Appeal held that the Tribunal had decided that a number of the alleged illegal actions took place before HVY became a shareholder and that, as a result, they had been carried out by other parties, such as Bank Menatep and Khodorkovsky et al. According to the Court of Appeal, the Tribunal had thus decided nothing more than that Bank Menatep and Khodorkovsky et al. were other legal entities or persons than HVY, and that HVY could not be held liable for actions carried out by

---

[182] Supreme Court 21 March 1997, ECLI:NL:HR:1997:AA4945, *NJ* 1998/207, annotated by H.J. Snijders, para. 4.2.

[183] Cour d'appel de Paris, *République du Kirghizistan c. M. Valeriy Belokon*, 21 February 2017.

[184] Emmanuel Gaillard, The emergence of transnational responses to corruption in international arbitration, Arbitration International 2019/35, pp. 1-19.

[185] *Hulley Enterprises Limited (Cyprus) v. The Russian Federation, Final Award*, para. 1370 (identical to the other Final Awards).

[186] *World Duty Free Company v Republic of Kenya*, ICSID Case No. ARB/00/7, 4 October 2006.



SWORN TRANSLATION
The English text is a sworn translation of the
Dutch original. In case of any discrepancies, the
Dutch original shall prevail.

others before HVY became a shareholder. According to the Court of Appeal, this decision is correct and it has not been challenged by the Russian Federation, or at least not with sufficient substantiation. The ground complains that this decision is incomprehensible because the Russian Federation did indeed dispute the Tribunal's decision with substantiation. The ground argues, furthermore, that the Court of Appeal should have investigated this issue *ex officio* because it concerns a possible violation of international public policy.

3.151   In discussing this complaint, I note that the Court of Appeal did not render its own decision in para. 9.8.8, but established what the Tribunal had held. The Court of Appeal was thus responding to a complaint by the Russian Federation about the Tribunal's decision. According to the Court of Appeal, that complaint lacks a factual basis because the Tribunal's decision needs to be interpreted differently. The Court of Appeal's finding that the Tribunal's decision is correct and has not been challenged was therefore rendered superfluously, which is what the Court of Appeal also held ("in so far as it could even be tested in the present setting-aside proceedings"). The ground already fails entirely for this reason. I note that the substance of the complaints also fails in all other respects. The Tribunal's decision, with which the Court of Appeal concurs (in the uncontested view of the Court of Appeal), merely implies that a number of the alleged illegal actions took place before HVY became a shareholder and that, as a result, these actions had been carried out by other parties, such as Bank Menatep and Khodorkovsky et al. The statements that the ground enumerates basically imply that HVY were controlled by Khodorkovsky et al. These statements do not themselves do anything to detract from the Tribunal's factual determination. The Court of Appeal was therefore able to decide that the Russian Federation had not challenged the decision, or at least not with sufficient substantiation. The ground (nos. 177 and 178) also points out certain alleged inconsistencies in the Final Awards. The Tribunal had allegedly taken into consideration at various places that Khodorkovsky et al. owned the shares in Yukos indirectly. In para. 9.8.9, the Court of Appeal has given an explanation for this, which entails that this was not incompatible with the determination that HVY and Khodorkovsky et al. are separate legal entities. That decision is not incomprehensible because the Court of Appeal was thus expressing that HVY need to be distinguished, as companies, from those who control them.

*Ground 4.5: referral of questions about Article 1(6) and Article 26 ECT for a preliminary ruling?*

3.152   Ground 4.5 argues that the Court of Appeal's interpretation of Articles 1(6) and 26 ECT is contrary to EU law, and that the Supreme Court should refer questions to the ECJ for a preliminary ruling on the issues raised in grounds 4.2, 4.3, and 4.4.

3.153   Referring to what I noted with regard to ground 2.7, I believe, also with regard to ground 4, that referring questions for a preliminary ruling is not essential to the outcome of the cassation proceedings. Ground 4.2 fails, after all, because it essentially fails to challenge the Court of Appeal's decision and because it relies on a generally accepted legal principle, the existence of which has not been demonstrated.



**SWORN TRANSLATION**
The English text is a sworn translation of the
Dutch original. In case of any discrepancies, the
Dutch original shall prevail.

Ground 4.3 merely comprises complaints in respect of reasoning. Ground 4.4 pertains to Dutch arbitration law, i.e. Article 1065(1)(e) DCCP, and it is based, moreover, on an incorrect reading of the Court of Appeal's decision.

3.154    The conclusion is that ground 4 fails entirely.

### Ground 5: Article 21(5) ECT

3.155    Ground 5 is divided into four sub-grounds and complains about para. 6.3 of the final judgment, in which the Court of Appeal held that it does not attach any consequences to the fact that the Tribunal did not consult the relevant (Russian) tax authorities. According to the ground, the Tribunal was required to do so under Article 21(5) ECT. By not consulting the tax authorities, the Tribunal violated its mandate and the arbitral awards must therefore be set aside on the basis of Article 1065(1)(c) DCCP. This too causes the arbitral awards to be contrary to public policy (Article 1065(1)(e) DCCP), according to the ground.

3.156    The Tribunal held that referral of the case to the Russian tax authorities would be "an exercise in futility" because the parties had already been given a very extensive opportunity to submit their views, on whether the taxation measures entailed an expropriation, to the Tribunal.[187] In para. 6.3, the Court of Appeal held that, in principle, Article 21(5) ECT mandatorily prescribes that the tax authorities must be consulted, but that the Tribunal's failure was insufficiently grievous to warrant setting aside the Final Awards because the Russian Federation did not suffer any disadvantage, given that it was able to present, at length, all relevant information.

*Introductory remarks*

3.157    HVY have argued in their written pleadings that the complaints in ground 5 lack interest. They have pointed out that the Court of Appeal decided in paras. 5.2.11 et seq., without challenge, that Article 21 ECT does not at all apply the measures raised by HVY in the arbitration proceedings. According to the Court of Appeal in paras. 5.2.16 et seq., the taxation measures cannot be considered *bona fide*, whereas Article 21(1) ECT pertains only to *bona fide* measures. Given that the rule of Article 21(1) (the "carve-out" for taxation measures) does not apply, the exception thereto in Article 21(5) ECT (the "claw-back") is also irrelevant, according to HVY.[188] Although HVY rightly point to the Court of Appeal's decision on Article 21(1) ECT, it cannot be said that the complaints about the interpretation of Article 21(5) ECT lack interest. This is because the findings on the applicability of Article 21(1) ECT do not form the basis of the decision as to whether the Tribunal violated its mandate by failing to comply with the obligation arising from Article 21(5) ECT. The findings on Article 21(1) ECT are situated in a different context, namely the question of whether Article 21(1) ECT has consequences for the jurisdiction of the

---

[187]  *Final Awards*, paras. 1421-1422.
[188]  Written pleadings HVY, nos. 690 et seq.



**SWORN TRANSLATION**
The English text is a sworn translation of the
Dutch original. In case of any discrepancies, the
Dutch original shall prevail.

Tribunal (which the Court of Appeal answered in the negative in paras. 5.2.4. et seq.). For this reason, the complaints in ground 5 will be discussed.

3.158    On the basis of Article 1065(1)(c) DCCP, there can be a violation of the mandate, *inter alia*, if the Tribunal has acted in violation of the agreed procedural rules or statutory arbitration rules. [189] The violation of mandate must be serious enough to justify setting aside, as is implied by the general requirement of reticence. [190] The decisive question is whether the decision would have turned out otherwise if the arbitrators had complied with their mandate. [191] The court enjoys discretion when assessing whether the violation of mandate is serious enough to justify the setting aside of the arbitral award.

3.159    With regard to the setting-aside ground of Article 1065(1)(e) DCCP (violation of public policy), the following applies. [192] Public policy has a substantive and a procedural side. A violation of substantive public policy occurs where the content of the arbitral award violates rules of mandatory law of such a fundamental nature that compliance with such rules may not be obstructed by restrictions of a procedural nature. [193] This standard already shows that this ground for setting aside must be applied with reticence. A violation of procedural public policy occurs where the manner in which the award has come into being is contrary to fundamental principles of procedural law, for example in the event that the principle of the right to be heard has been violated [194], or if it turns out that (one of) the arbitrators has/have not been impartial or independent. [195] On this point as well, the court, of necessity, has discretion.

3.160    Grounds 5.1. and 5.1.1 contain an introduction and no complaint.

*Ground 5.2: mandatory nature of Article 21(5) ECT*

3.161    Ground 5.2 raises various complaints against para. 6.3 and is broken down into six grounds (grounds 5.2.1-5.2.6).

---

[189] Snijders, op. cit., 2018, nos. 9.3.4.2.4 and 9.3.4.2.7 (= Groene Serie Burgerlijke Rechtsvordering, Article 1065 DCCP, notes 4.2.4 and 4.2.7). See also Supreme Court 17 January 2003, ECLI:NL:HR:2003:AE9395, *NJ* 2004/384, annotated by H.J. Snijders.

[190] This is currently laid down in Article 1065(4) DCCP (see Parliamentary History of the Arbitration Act 2015/1.76.3) but already applied to old law: see Van den Berg et al., op. cit., p. 134 and Snijders, op. cit., no. 9.3.4.3 (= Groene Serie Burgerlijke Rechtsvordering, Article 1065 DCCP, note 4.3).

[191] *T&C Burgerlijke Rechtsvordering*, Article 1065 DCCP, note 4 (G.J. Meijer); Snijders, *op. cit.*, no. 9.3.1.2 (= Groene Serie Burgerlijke Rechtsvordering, Article 1065 DCCP, note 1.2).

[192] See also no. 3.18 of my opinion prior to Supreme Court 4 December 2020, ECLI:NL:HR:2020:1952, *RvdW* 2021/2.

[193] Supreme Court 21 March 1997, ECLI:NL:HR:1997:AA4945, *NJ* 1998/207, annotated by H.J. Snijders, para. 4.2.

[194] For example Supreme Court 18 June 1993, ECLI:NL:HR:1993:ZC1003, *NJ* 1994/449, annotated by H.J. Snijders, para. 3.3.

[195] Inter alia Supreme Court 18 February 1994, ECLI:NL:HR:1994:ZC1266, *NJ* 1994/765, annotated by H.J. Snijders, para. 3.8.



**SWORN TRANSLATION**
The English text is a sworn translation of the
Dutch original. In case of any discrepancies, the
Dutch original shall prevail.

3.162   Ground 5.2.1 complains that in para. 6.3, the Court of Appeal wrongly disregarded the mandatory nature
of the referral obligation in Article 21(5)(b) ECT or failed to recognise that no "futility exception" applies
to it. The Court of Appeal thus failed, *inter alia*, to properly apply the rules of interpretation of Articles 31
and 32 VCLT.

3.163   Regarding this ground, I note the following. Article 21 ECT pertains to taxation measures.[196] Article 21
ECT reads as follows in the authentic English text and the Dutch translation:

### Article 21 Taxation

1. Except as otherwise provided in this Article, nothing in this Treaty shall create rights or impose
obligations with respect to Taxation Measures of the Contracting Parties. In the event of any inconsistency
between this Article and any other provision of the Treaty, this Article shall prevail to the extent of the
inconsistency.

2. Article 7(3) shall apply to Taxation Measures other than those on income or on capital, except that
such provision shall not apply to:

a) an advantage accorded by a Contracting Party pursuant to the tax provisions of any convention,
agreement or arrangement described in subparagraph (7)(a)(ii); or

b) any Taxation Measure aimed at ensuring the effective collection of taxes, except where the
measure of a Contracting Party arbitrarily discriminates against Energy Materials and Products
originating in, or destined for the Area of another Contracting Party or arbitrarily restricts benefits
accorded under Article 7(3).

3. Article 10(2) and (7) shall apply to Taxation Measures of the Contracting Parties other than those on
income or on capital, except that such provisions shall not apply to:

a) impose most favoured nation obligations with respect to advantages accorded by a Contracting
Party pursuant to the tax provisions of any convention, agreement or arrangement described in
subparagraph (7)(a)(ii) or resulting from membership of any Regional Economic Integration
Organization; or

b) any Taxation Measure aimed at ensuring the effective collection of taxes, except where the
measure arbitrarily discriminates against an Investor of another Contracting Party or arbitrarily restricts
benefits accorded under the Investment provisions of this Treaty.

4. Article 29(2) to (6) shall apply to Taxation Measures other than those on income or on capital.

5. a) Article 13 shall apply to taxes.

b) Whenever an issue arises under Article 13, to the extent it pertains to whether a tax constitutes an
expropriation or whether a tax alleged to constitute an expropriation is discriminatory, the following
provisions shall apply:

(i) The Investor or the Contracting Party alleging expropriation shall refer the issue of whether the
tax is an expropriation or whether the tax is discriminatory to the relevant Competent Tax Authority.
Failing such referral by the Investor or the Contracting Party, bodies called upon to settle disputes
pursuant to Article 26(2)(c) or 27(2) shall make a referral to the relevant Competent Tax Authorities;

---

[196] Regarding this provision, see Hobér, op. cit., p. 354 et seq.; Gloria Alvarez, Article 21. Taxation, in Leal-Arcas (ed.), op. cit.,
pp. 288-298; William W. Park, Tax arbitration and investor protection, in Coop & Ribeiro (eds.), Investment Protection and
the Energy Charter Treaty, op. cit., p. 115-145.



**SWORN TRANSLATION**
**The English text is a sworn translation of the**
**Dutch original. In case of any discrepancies, the**
**Dutch original shall prevail.**

(ii)  The Competent Tax Authorities shall, within a period of six months of such referral, strive to resolve the issues so referred. Where non-discrimination issues are concerned, the Competent Tax Authorities shall apply the non-discrimination provisions of the relevant tax convention or, if there is no non-discrimination provision in the relevant tax convention applicable to the tax or no such tax convention is in force between the Contracting Parties concerned, they shall apply the non-discrimination principles under the Model Tax Convention on Income and Capital of the Organisation for Economic Cooperation and Development;

(iii)  Bodies called upon to settle disputes pursuant to Article 26(2)(c) or 27(2) may take into account any conclusions arrived at by the Competent Tax Authorities regarding whether the tax is an expropriation. Such bodies shall take into account any conclusions arrived at within the six-month period prescribed in subparagraph (b)(ii) by the Competent Tax Authorities regarding whether the tax is discriminatory. Such bodies may also take into account any conclusions arrived at by the Competent Tax Authorities after the expiry of the six-month period;

(iv)  Under no circumstances shall involvement of the Competent Tax Authorities, beyond the end of the six-month period referred to in subparagraph (b)(ii), lead to a delay of proceedings under Articles 26 and 27.

6.  For the avoidance of doubt, Article 14 shall not limit the right of a Contracting Party to impose or collect a tax by withholding or other means.

7.  For the purposes of this Article:

a)  The term "Taxation Measure" includes:

(i)  any provision relating to taxes of the domestic law of the Contracting Party or of a political subdivision thereof or a local authority therein; and

(ii)  any provision relating to taxes of any convention for the avoidance of double taxation or of any other international agreement or arrangement by which the Contracting Party is bound.

b)  There shall be regarded as taxes on income or on capital all taxes imposed on total income, on total capital or on elements of income or of capital, including taxes on gains from the alienation of property, taxes on estates, inheritances and gifts, or substantially similar taxes, taxes on the total amounts of wages or salaries paid by enterprises, as well as taxes on capital appreciation.

c)  A "Competent Tax Authority" means the competent authority pursuant to a double taxation agreement in force between the Contracting Parties or, when no such agreement is in force, the minister or ministry responsible for taxes or their authorized representatives.

d)  For the avoidance of doubt, the terms "tax provisions" and "taxes" do not include customs duties.

In the Dutch translation:

### Artikel 21 Belastingen

1.  Behalve als bepaald in dit artikel worden door geen enkele bepaling van dit Verdrag rechten verleend of verplichtingen opgelegd met betrekking tot belastingmaatregelen van de Verdragsluitende Partijen. In geval van onverenigbaarheid met dit artikel met andere bepalingen van dit Verdrag heeft dit artikel, wat de onverenigbaarheid betreft, de voorrang.

2.  Artikel 7, derde lid, is van toepassing op andere belastingmaatregelen dan belastingen op inkomen of kapitaal, met dien verstande dat de bepalingen van die artikelen niet van toepassing zijn op:

a.  een  voordeel  dat  een  Verdragsluitende  Partij  heeft  toegekend  overeenkomstig  de



**SWORN TRANSLATION**
The English text is a sworn translation of the
Dutch original. In case of any discrepancies, the
Dutch original shall prevail.

belastingbepalingen van een verdrag, overeenkomst of regeling als bedoeld in het zesde lid, letter a), onder ii), van dit artikel; of

b. een belastingmaatregel die ten doel heeft de doeltreffende inning van belastingen te waarborgen, behalve indien die maatregel van een Verdragsluitende Partij een willekeurige discriminatie tussen energiegrondstoffen en energieprodukten van een andere Verdragsluitende Partij of een willekeurige beperking van de krachtens de betreffende bepalingen van artikel 7, derde lid, toegekende voordelen inhoudt.

3. Artikel 10, tweede en zevende lid, zijn van toepassing op andere belastingmaatregelen van de Verdragsluitende Partijen dan belastingen op inkomen of kapitaal, met dien verstande dat geen van deze bepalingen:

a. ertoe strekt dat verplichtingen tot toepassing van het meestbegunstigingsbeginsel worden opgelegd met betrekking tot voordelen die een Verdragsluitende Partij heeft toegekend overeenkomstig de belastingbepalingen van een verdrag, overeenkomst of regeling als bedoeld in het zevende lid, letter a), onder ii), van dit artikel of als uitvloeisel van het lidmaatschap van een regionale organisatie voor economische integratie; of

b. van toepassing is op een belastingmaatregel die ten doel heeft de doeltreffende inning van belastingen te waarborgen, behalve indien de maatregel een willekeurige discriminatie tussen investeerders van de Verdragsluitende Partijen of een willekeurige beperking van de krachtens de investeringsbepalingen van dit Verdrag toegekende voordelen inhoudt.

4. Artikel 29, tweede tot en met zesde lid, is van toepassing op andere belastingmaatregelen dan belastingen op inkomen of kapitaal.

5.      a. Artikel 13 is van toepassing op belastingen.

b. Wanneer in het kader van artikel 13 een geschil rijst, voor zover het betrekking heeft op de vraag of een belasting een onteigening vormt, dan wel of een belasting waarvan wordt beweerd dat deze een onteigening vormt, discriminerend is, geldt het volgende:

i. De investeerder of de Verdragsluitende Partij die aanvoert dat er sprake is van onteigening legt het geschil over de vraag of de maatregel een onteigening dan wel discriminerend is, voor aan de bevoegde belastingautoriteiten. Laat de investeerder of de Verdragsluitende Partij dit na, dan leggen de instanties die worden verzocht geschillen te beslechten overeenkomstig artikel 26, tweede lid, letter c), of artikel 27, tweede lid, het geschil voor aan de bevoegde belastingautoriteiten.

ii. De bevoegde belastingautoriteiten streven ernaar om het aldus voorgelegde geschil binnen een periode van zes maanden te regelen. Indien het gaat om een geschil inzake non-discriminatie, passen de bevoegde belastingautoriteiten de bepalingen inzake non- discriminatie van het relevante belastingverdrag toe, of passen zij, indien er geen non- discriminatiebepaling voorkomt in het op de belasting van toepassing zijnde relevante belastingverdrag of indien er geen belastingverdrag tussen de betrokken Verdragsluitende Partijen van kracht is, de non-discriminatiebeginselen overeenkomstig het modelverdrag van de OESO betreffende belastingen op inkomen en kapitaal toe.

iii. De instanties die worden verzocht geschillen te regelen overeenkomstig artikel 26, tweede lid, letter c), of artikel 27, tweede lid, kunnen rekening houden met eventuele conclusies van de bevoegde belastingautoriteiten over de vraag of de belasting een onteigening is. Die instanties houden rekening met eventuele binnen de bij letter b), onder ii), voorgeschreven termijn van zes maanden door de bevoegde belastingautoriteiten getrokken conclusies over de vraag of de belasting discriminerend is. Deze instanties kunnen ook rekening houden met eventuele na het verstrijken van de voorgeschreven periode van zes maanden door de bevoegde belastingautoriteiten getrokken conclusies.



**SWORN TRANSLATION**
The English text is a sworn translation of the
Dutch original. In case of any discrepancies, the
Dutch original shall prevail.

iv. In geen geval mag de betrokkenheid van de bevoegde belastingautoriteiten na het einde van de bij letter b), onder ii), bedoelde periode van zes maanden leiden tot een vertraging van de procedures ingevolge de artikelen 26 en 27.

6. Voor alle duidelijkheid wordt bepaald dat artikel 14 het recht van een Verdragsluitende Partij om een belasting op te leggen of te innen via bronheffing of andere middelen niet beperkt.

7. Voor de toepassing van dit artikel:

a. omvat de term „belastingmaatregel":

i.   de bepalingen betreffende belastingen van de interne wetgeving van de Verdragsluitende Partij of van een staatsrechtelijke onderverdeling of een plaatselijke autoriteit ervan; en

ii.  de bepalingen betreffende belastingen van verdragen ter voorkoming van dubbele belasting en van internationale overeenkomsten of regelingen waaraan de Verdragsluitende Partij gebonden is.

b. worden als belastingen op het inkomen en het vermogen beschouwd alle belastingen die worden geheven op het gehele inkomen, op het gehele vermogen of op bestanddelen van het inkomen of vermogen, met inbegrip van belastingen op winsten uit de vervreemding van eigendom, onroerend-zaakbelasting, successierechten, belastingen op schenkingen of in wezen soortgelijke belastingen, belastingen op het totaalbedrag van de door ondernemingen betaalde lonen of salarissen, alsmede belastingen op de waardevermeerdering van vermogen.

c. wordt onder „bevoegde belastingautoriteit" verstaan de bevoegde autoriteit overeenkomstig een overeenkomst inzake dubbele belasting tussen de Verdragsluitende Partijen, of, bij ontstentenis van een van kracht zijnde overeenkomst de/het voor belastingen bevoegde minister of ministerie of hun gemachtigde vertegenwoordigers.

d. voor alle duidelijkheid wordt bepaald dat de termen „belastingbepalingen" en „belastingen" geen betrekking hebben op douanerechten.

3.164   Article 21(1) ECT provides that the ECT does not affect the powers of the contracting states to impose taxation measures. Therefore, such measures fall, in principle, outside the substantive scope of the ECT (which is why it is also referred to as a "carve-out"). However, there are exceptions to this rule (so-called "clawbacks"). One of them, which is set out in Article 21(5) ECT, entails that taxation measures may not constitute an expropriation that is contrary to the conditions of Article 13 ECT. In that case, a taxation measure can indeed constitute a violation of the ECT.[197] Article 13 ECT pertains to expropriations and reads as follows in the authentic English text and in the Dutch translation:

**Article 13 Expropriation**

1. Investments of Investors of a Contracting Party in the Area of any other Contracting Party shall not be nationalized, expropriated or subjected to a measure or measures having effect equivalent to nationalization or expropriation (hereinafter referred to as "Expropriation") except where such Expropriation is:

a) for a purpose which is in the public interest;

b) not discriminatory;

---

[197]   With regard to the foregoing, see Hobér, op. cit., p. 357.



SWORN TRANSLATION
The English text is a sworn translation of the
Dutch original. In case of any discrepancies, the
Dutch original shall prevail.

c) carried out under due process of law; and

d) accompanied by the payment of prompt, adequate and effective compensation.

Such compensation shall amount to the fair market value of the Investment expropriated at the time immediately before the Expropriation or impending Expropriation became known in such a way as to affect the value of the Investment (hereinafter referred to as the "Valuation Date").

Such fair market value shall at the request of the Investor be expressed in a Freely Convertible Currency on the basis of the market rate of exchange existing for that currency on the Valuation Date. Compensation shall also include interest at a commercial rate established on a market basis from the date of Expropriation until the date of payment.

2. The Investor affected shall have a right to prompt review, under the law of the Contracting Party making the Expropriation, by a judicial or other competent and independent authority of that Contracting Party, of its case, of the valuation of its Investment, and of the payment of compensation, in accordance with the principles set out in paragraph (1).

3. For the avoidance of doubt, Expropriation shall include situations where a Contracting Party expropriates the assets of a company or enterprise in its Area in which an Investor of any other Contracting Party has an Investment, including through the ownership of shares.

In the Dutch translation:

### Artikel 13 Onteigening

1. Investeringen van investeerders van een Verdragsluitende Partij op het grondgebied van een andere Verdragsluitende Partij mogen niet worden genationaliseerd, onteigend of onderworpen aan maatregelen met een soortgelijk effect als nationalisatie of onteigening (hierna te noemen "onteigening"), behalve wanneer de onteigening:

a. geschiedt in het algemeen belang;

b. niet discriminerend is;

c. geschiedt met inachtneming van een behoorlijke rechtsgang; en

d. gepaard gaat met de betaling van prompte, adequate en doeltreffende compensatie.

Die compensatie is gelijk aan de billijke marktwaarde van de onteigende investering op het tijdstip vlak voordat de onteigening of op handen zijnde onteigening zodanig bekend werd dat de investeringswaarde werd beïnvloed (hierna te noemen: de „datum van de waardebepaling").

Deze billijke marktwaarde wordt op verzoek van de investeerder berekend in een vrij inwisselbare valuta volgens de voor die valuta op de datum van de waardebepaling geldende marktwisselkoers. De compensatie omvat tevens rente over de periode tussen de onteigenings- en de betalingsdatum, welke berekend wordt tegen een commercieel, op marktbasis vastgesteld tarief.

2. De betrokken investeerder heeft recht op onverwijlde toetsing, krachtens het recht van de Verdragsluitende Partij die de onteigening verricht, van zijn zaak, de waardebepaling van zijn investeringen en de betaling van compensatie overeenkomstig de beginselen neergelegd in het eerste lid, door een gerechtelijke of andere onafhankelijke bevoegde instantie van die Partij.

3. Voor alle duidelijkheid wordt bepaald dat onteigening ook de gevallen omvat waarin een Verdragsluitende Partij de activa onteigent van een vennootschap of onderneming op haar grondgebied waarin een investeerder van een andere Verdragsluitende Partij een investering, ook indien via



**SWORN TRANSLATION**
The English text is a sworn translation of the
Dutch original. In case of any discrepancies, the
Dutch original shall prevail.

aandelenbezit, heeft.

3.165    Article 21(5)(b)(i) ECT assigns a role to the tax authorities of the contracting state concerned ("the
relevant Competent Tax Authority") in assessing whether the taxation measures taken constitute a
prohibited expropriation within the meaning of Article 13 ECT. The investor or contracting state
concerned shall refer the issue to the relevant tax authorities. If they fail to do so, the body called upon
to settle the dispute (as, in this case, the Tribunal) must refer the question of whether there is a
prohibited expropriation within the meaning of Article 13 ECT to the relevant tax authorities. The text of
Article 21(5)(b)(i) ECT refers to "shall make a referral", which indicates an obligation on the part the
body called upon.[198] This wording does not show that the body has freedom of choice in this respect.[199]
However, Article 21(5) ECT does not attach any consequences to a refusal to consult the tax
authorities.[200]

3.166    However, Article 25(1) ECT clearly provides that the body that settles the dispute is not bound by the
conclusions of the tax authorities. According to Article 25(1)(b)(iii), the authority "*may* take into account"
the tax authorities' conclusions regarding the issue whether the tax is an expropriation. As regards the
issue whether the tax is discriminatory, the body "*shall* take into account" the conclusions of the tax
authorities when forming its opinion, but it does not require these conclusions to be adopted. The final
assessment of whether the taxation measure is an expropriation or is discriminatory, is for the body
called upon to settle the dispute.[201] Article 21(5)(b)(iv) ECT also provides that the opinion of the tax
authorities need not be awaited if it has not yet been received after six months. A referral to the tax
authorities may under no circumstances lead to a delay in the dispute resolution, according to this
provision. It has been pointed out in the literature that all this indicates is that the role of the tax
authorities lies in facilitating the decision-making of the body called upon and that the words "shall make
a referral" of Article 21(5)(b)(i) ECT are intended to give the relevant tax authorities the opportunity to
give their views, but not to raise additional jurisdiction or admissibility thresholds.[202] Failure to make a
referral to the tax authorities cannot lead to the termination or interruption of the dispute resolution.[203]

3.167    It is clear that in this case, even if it had made a referral to the relevant tax authorities, the Tribunal would
not have been bound by the findings of those authorities. It follows from the text of Article 21(5)(b)(iii)
and (iv) ECT that an arbitral tribunal does not need to await the opinion of the tax authorities if this leads
to a delay in the proceedings. It is therefore unlikely that a referral to the tax authorities would have led
to a different decision of the Tribunal. Invoking setting aside on account of a violation of the mandate

---

[198]  Cf. the (also authentic) French text of Article 21(5)(b)(i): '(...) les organes appelés à trancher le différend (...) renvoient
l'affaire aux autorités fiscales compétentes'.
[199]  See Hobér, op. cit., p. 371.
[200]  See Hobér, op. cit., p. 373.
[201]  See Roe & Happold, op. cit., p. 193.
[202]  Decisions in arbitration case law are inconsistent in this respect, see Hobér, op. cit., p. 369 et seq.
[203]  Hobér, op. cit., p. 373.



SWORN TRANSLATION
The English text is a sworn translation of the
Dutch original. In case of any discrepancies, the
Dutch original shall prevail.

therefore cannot succeed. The obligation to make a referral to the tax authorities is not so serious or mandatory that arbitrators seriously violate their mandate if they do not comply with said obligation when (as in this case) they consider themselves sufficiently informed. The issue whether Article 21(5) ECT includes a "futility exception"[204] therefore does not need to be discussed separately.

3.168    Ground 5.2.1 completely fails based on the above.

3.169    Ground 5.2.2 is directed against para. 6.3.2 of the final judgment, where the Court of Appeal finds that the Russian Federation did not suffer any disadvantage from the Tribunal's refusal to refer the case to the tax authorities. The ground complains that this reasoning is speculative and incorrect.

3.170    The Court of Appeal held in para. 6.3.2 that the Russian Federation, in itself, rightly pointed out that the referral obligation of Article 21(5) ECT is mandatory for the Tribunal. As follows from the discussion of ground 5.2.1, that obligation is not so compelling that a refusal to comply with that obligation automatically constitutes a serious violation of the mandate. The issue of whether the Russian Federation suffered a disadvantage from the Tribunal's refusal to submit the matter to the Russian tax authorities therefore need not be discussed. Moreover, the complaints put forward in this respect are based on the assumption that a referral to the tax authorities could or should have led to a different decision by the Tribunal. However, as I noted above, the Tribunal would not have been bound by the findings of the tax authorities and would not be obliged to take the conclusions on whether there is an expropriation into account. Therefore, ground 5.2.2 fails.

3.171    Ground 5.2.3 is directed against para. 6.3.3, in which the Court of Appeal held, inter alia, that the information that the Tribunal could have obtained by a referral to the Russian tax authorities would probably not have led to a different decision. According to the ground, this decision is impermissibly speculative, also in light of the Russian Federation's position that the tax authorities would have supported its view.

3.172    As I have already explained, the complaint fails to recognise that Article 21(5) ECT does not require an arbitral tribunal to follow the findings obtained from the tax authorities. Moreover, the Court of Appeal cannot rightly be accused of having rendered a "speculative" decision. As part of the assessment of Article 1065(1)(c) DCCP, the Court of Appeal had to assess whether the Tribunal would have arrived at a different decision. That decision can only come about by speculating on what the Tribunal would have decided if it had had more or different information. For that reason as well, the ground fails.

3.173    Ground 5.2.4 complains about para. 6.3.4, in which the Court of Appeal decided that there was no reason to also refer the dispute to the tax authorities in Cyprus and the UK (where HVY have its registered office). According to the Court of Appeal, it has not been argued that taxation measures

---

[204] The ground refers to the Tribunal's finding in para. 1421 of the Final Awards stating that consulting the tax authorities would be 'an exercise in futility'.



SWORN TRANSLATION
The English text is a sworn translation of the
Dutch original. In case of any discrepancies, the
Dutch original shall prevail.

taken by Cyprus or the UK constitute an expropriation, while Article 21(5) ECT prescribes that the tax authorities concerned must be consulted in those cases only. With this decision, the Court of Appeal went beyond the ambit of the legal dispute and furthermore decided contrary to Article 21 ECT, according to the ground.

3.174    It does not follow from Article 21 ECT that referrals must be made to the tax authorities of all the countries involved. After all, Article 21(5)(b)(i) ECT provides that a referral shall be made to the "relevant Competent Tax Authority" or "relevant Competent Tax Authorities". Which authorities are "relevant" is not further defined. In view of the context in which the term is used, it is obvious, as the Court of Appeal held in para. 6.4.3, to interpret "relevant" as "the ability to provide information about the issue as to whether there is a (discriminatory) expropriation". Moreover, it is obvious that it is up to an arbitral tribunal to assess in a specific case which tax authorities are relevant. The background of the referral to "Competent Tax Authorities" (plural) in Article 21(5)(b)(ii) and (iv) is that the definition of "Competent Tax Authority" in Article 21(7) ECT refers to "a double taxation agreement", i.e. treaties to prevent double taxation. In such cases, it is obvious that both the authorities from the investor's country of establishment and those of the host country are consulted (in order to solve the tax problems between these authorities). It therefore does not follow from Article 21(5) ECT that the tax authorities of all the States concerned should always be consulted, even if they are not considered "relevant" in a specific case. By interpreting and applying Article 21(5) ECT ex officio, the Court of Appeal did not go beyond the ambit of the legal dispute. For the rest, the ground builds on earlier complaints and shares the fate of those complaints. Therefore, ground 5.2.4 fails.

3.175    Ground 5.2.5 complains that the Court of Appeal rejected the Russian Federation's reliance on (an analogy with) the prognosis prohibition originating from Dutch civil procedural law. According to the ground, the Tribunal violated this prognosis prohibition by deciding in advance that consulting the Russian tax authorities would be futile.

3.176    It has not been established that the Tribunal was bound by such a prognosis prohibition. With regard to being bound by the prognosis prohibition, the ground provides no substantiation other than a reference to the obligation of Article 21(5) ECT, but it cannot be inferred from that provision that it contains a prognosis prohibition. Nor does the ground explain this in greater detail. The complaint of the ground fails for that reason.

3.177    Ground 5.2.6 argues that the Supreme Court should refer a question to the ECJ for a preliminary ruling on the correct interpretation of Article 21(5)(b)(i) ECT.

3.178    With reference to what I noted with regard to ground 2.7, I do not consider referring a question to the ECJ for a preliminary ruling on the interpretation of Article 21 ECT necessary for the outcome of the proceedings in cassation with regard to ground 5 either. After all, in the challenged judgment, the Court of Appeal decided in line with the Russian Federation's argument that the Tribunal acted contrary to



**SWORN TRANSLATION**
The English text is a sworn translation of the
Dutch original. In case of any discrepancies, the
Dutch original shall prevail.

Article 21(5) ECT. However, the Court of Appeal did not find this violation of the mandate sufficiently serious that the *Yukos Awards* should be set aside. Whether or not the complaints in cassation regarding that decision are successful is not therefore dependent on the interpretation of Article 21(5) ECT but on the question of whether the Court of Appeal's findings in the context of Article 1065(1)(c) DCCP are comprehensible. There is therefore no need to refer questions for a preliminary ruling.

3.179    The conclusion is that ground 5 fails.

**Ground 6: the role of the secretary of the Tribunal**

3.180    Ground 6 is broken down into two sub-grounds, and pertains, briefly put, to the involvement of the assistant (secretary) to the Tribunal, Valasek, in drafting the arbitral awards. According to the Russian Federation, this involvement violates the principle that arbitrators must personally perform the task assigned to them, as a consequence of which the Tribunal has failed to comply with its mandate (Article 1065(1)(c) DCCP). In addition, Valasek's involvement is said to mean that there effectively was a "fourth arbitrator", as a consequence of which the Tribunal's composition was in violation of the applicable rules (Article 1065(1)(d) DCCP). The Court of Appeal rejected these arguments in paras. 6.6.1-6.6.15.

3.181    Ground 6.1 does not contain any complaints but sketches the background of the complaints and summarises the challenged decision of the Court of Appeal.

*Ground 6.2: delegation to Secretary of the Tribunal*

3.182    Ground 6.2 comprises three complaints: (i) a complaint (at 6.2.1) about the Court's rejection of the Russian Federation's offer of witness evidence in respect of Valasek's contributions to the decision-making process, (ii) a complaint (at 6.2.2) that the Court of Appeal's decision is contrary to Article 1065(1)(b) DCCP in conjunction with Article 1026(1) DCCP, which provide that an arbitral award may not be rendered by an even number of arbitrators, and (iii) a complaint (at 6.2.3) that the Court of Appeal failed to recognise various (unwritten) procedural rules in its decision.

*Introductory remarks*

3.183    The ground raises the question of the extent to which the arbitrators are able to delegate (parts of) their work to a secretary or assistant without, in the process, neglecting the basic principle that they are required to perform their duties personally[205], and without the secretary serving, in fact, as a "fourth arbitrator". In concrete terms, the question arises as to the extent to which a secretary is allowed to draft the decisive or supporting parts of the judgment.

---

[205] See Snijders, Nederlands arbitragerecht, 2018, no. 4.14.2; Gary B. Born, International Commercial Arbitration. Vol. II: International Arbitral Procedures, Alphen aan den Rijn: Kluwer Law International 2014, p. 1999; M.P.J. Smakman, De rol van de secretaris van het scheidsgerecht belicht, TvA 2007/2, at 4; Constantine Partasides, The Fourth Arbitrator? The Role of Secretaries to Tribunals in International Arbitration, Arbitration International 2002, pp. 147-163.



SWORN TRANSLATION
The English text is a sworn translation of the
Dutch original. In case of any discrepancies, the
Dutch original shall prevail.

3.184   There are different views on this issue.[206] Some authors have pointed out that there is a risk that the secretary can end up being involved in the arbitral tribunal's decision-making in an impermissible manner if this is not carefully monitored.[207] Nevertheless, Born concludes:

> "the better view is that there is no per se prohibition on secretaries or junior lawyers performing such tasks, provided that the members of the tribunal carefully review and make appropriate use of any preparatory work."[208]

Peters concurs with this, and is of the opinion that it is not a problem if secretaries write (parts of) an arbitral award, provided this is done in accordance with the instructions of and under the responsibility of the arbitral tribunal, and that the latter does not adopt the texts indiscriminately.[209] Smakman took a similar position.[210] Sanders is of the opinion that "the reasoning of the award or parts thereof (...) is solely the task of the arbitral tribunal, and it does so in its own words."[211] Von Hombracht-Brinkman distinguishes between cases in which the arbitral tribunal consists (partly) of lawyers and cases in which that is not the case, and considers the drafting of an award by a secretary to be acceptable only in the latter case.[212] Partasides thinks it undesirable (but not unacceptable, per se) that the draft decision be left to a secretary, but also writes that this is strongly dependent on the circumstances. Moreover, decisions in this regard are up to the arbitrator.[213] Polkinghorne and Rosenberg are outspoken: in their opinion, it is impermissible for the secretary to write substantive sections of the judgment.[214]

3.185   There is no generally accepted rule or practice to imply that it is unacceptable in all cases for the drafting of substantive portions of an arbitral award to be assigned to a secretary.[215] For that, it also has to be established in this respect that lines have been crossed ensuing from the principle of the proper performance of the duties of arbitrators. That could be the case, for example, if it turns out that the

---

[206] In addition to the literature referred to below, the initiating document (no. 212, p. 109) refers to the contribution of F.J.M. de Ly, Kroniek internationale arbitrage, TvA 2012/84. As opposed to the ground, I do not read there that De Ly is of the opinion that secretaries are not allowed to draft judgments. Although De Ly writes that "Decisions and other essential duties may still not be delegated to a secretary and memoranda written by secretaries may not lead to arbitrators not personally considering the case and not writing award", this describes the practice followed under the (new) ICC memorandum of 1 August 2012 for the appointment, duties and remuneration of administrative secretaries in the context of ICC arbitration.

[207] Born, op. cit., p. 2000; Partasides, op. cit., p. 148 et seq.

[208] Born, op. cit., p. 2000. In a similar sense, Peters, op. cit., at 13.

[209] See Peters' annotation to the Court of Appeal's final judgment, *JOR* 2020/16, at point 13.

[210] Smakman, op. cit., at 4.

[211] P. Sanders, De secretaris van het scheidsgerecht, TvA 2007/29, at 2.

[212] F.D. von Hombracht-Brinkman, Er zijn secretarissen en secretarissen! Response to *prof. mr.* P. Sanders' article, 'De secretaris van het scheidsgerecht', TvA 2008/17.

[213] Partasides, op. cit., p. 158.

[214] Michael Polkinghorne & Charles B. Rosenberg, The Role of the Tribunal Secretary in International Arbitration: A Call for a Uniform Standard, Dispute Resolution International, Vol. 8, 2014, pp. 107-128. In their contribution, these authors call attention to the role of the secretary in various arbitration regulations, and make a number of recommendations ('standards'). One of those standards entails that the secretary may not prepare "substantive portions of awards" and may not be assigned any "decision-making functions" (p. 127).

[215] The initiating document also refers to a number of articles that have been submitted as exhibits, from which, in my opinion, no generally accepted interpretation can be inferred. Some contributions (exhibits RF-396 and RF-405) discuss specific arbitration regulations, whereas the authors of other contributions defend their own views while acknowledging that differing views do exist (Exhibits RF-400, RF-403, RF-404).



**SWORN TRANSLATION**
The English text is a sworn translation of the
Dutch original. In case of any discrepancies, the
Dutch original shall prevail.

arbitral tribunal has adopted texts written by the secretary without further ado, or if the secretary was improperly involved in the decision-making. The burden of proof for such facts lies with the party that invokes the alleged violation of mandate on the part of the arbitrators, as is the case when relying on any of the grounds for setting aside in Article 1065 DCCP.[216] It will not be easy to prove such facts, although this is justified by the fact that the arbitrators are facing serious accusations (neglecting their individual duties), and by the restraint that must generally be observed when relying on Article 1065(1)(c) DCCP.

3.186　The lack of a generally accepted rule on this matter explains why some arbitration regulations have specific rules in this regard. The Court of Appeal held – unchallenged in cassation – that the applicable UNCITRAL Rules in this case do not contain any provisions on this point (para. 6.6.14.1), and that the extent to which the arbitrators delegate certain duties to their secretary is therefore left to their discretion, while respecting the personal fulfilment of their tasks as a basic principle. According to the Court of Appeal, it has not been demonstrated that the arbitrators violated this basic principle, and that even if Valasek did provide drafts of the supporting parts of the award, this does not necessarily imply that he himself took decisions as well (para. 6.6.14.1, last sentences). According to the Court of Appeal, it has not been demonstrated that the taking of substantive decisions relevant to the arbitral awards was delegated to Valasek, or that Valasek had ultimate responsibility for (certain parts of) the awards. Therefore, according to the Court of Appeal, there is no question of a violation of mandate within the meaning of Article 1065(1)(c) DCCP.

3.187　After this explanation, I will discuss the three complaints in the ground.

*Ground 6.2.1: rejection of Russian Federation's tender of evidence*

3.188　Ground 6.2.1 complains about para. 6.6.5, in which the Court of Appeal disregarded the Russian Federation's tender of evidence. The Russian Federation offered to have Valasek testify about "the hours he claimed and his contributions to the Tribunal's decision-making process' and furthermore to have two witness experts testify.[217]

3.189　The Court of Appeal rejected this tender of evidence because it assumed for the sake of argument that Valasek "made significant contributions to the drafting of Chapters IX, X and XII of the Final Award by providing (draft) texts that the arbitrators have incorporated, in whole or in part, in the arbitral awards". Therefore, the tender of evidence was no longer at stake. The complaint apparently intends to argue that the Court of Appeal should nonetheless have allowed the tender of evidence because of the possibility that Valasek had also influenced the ultimate decisions of the Tribunal by providing said texts. The ground in fact complains that the Court of Appeal interpreted the Russian Federation's tender

---

[216]　Supreme Court 23 April 2010, ECLI:NL:HR:2010:BK8097, *NJ* 2011/475, annotated by H.J. Snijders, para. 3.5.3.
[217]　Defence on Appeal no. 991.



**SWORN TRANSLATION**
The English text is a sworn translation of the
Dutch original. In case of any discrepancies, the
Dutch original shall prevail.

of evidence too narrowly. Such a complaint must fail, however, as interpreting the procedural documents is a matter reserved for the Court of Appeal.[218]

*Ground 6.2.2: even number of arbitrators?*

3.190   Ground 6.2.2 complains that in para. 6.6.13, the Court of Appeal rejected the reliance on Article 1065(1)(b) DCCP in conjunction with Article 1026(1) DCCP. That reliance entails that, as a result of Valasek's involvement, the Yukos Awards were, in fact, rendered not by three but by four arbitrators, which is a violation of the aforementioned provisions. The Court of Appeal held that the Yukos Awards were signed by the three appointed arbitrators, thus fulfilling the requirements under those provisions. The Court of Appeal therefore interpreted those provisions too narrowly, given that they are also meant to prevent a fourth person from, in fact, serving as arbitrator, according to the ground.

3.191   Article 1026(1) DCCP provides that the arbitral tribunal must consist of an odd number of arbitrators. Article 1065(1)(b) DCCP then provides that an arbitral award can be set aside if the arbitral tribunal is not validly composed. The ground argues that Article 1026(1) DCCP not only sets the formal requirement that the arbitral tribunal must consist of an odd number of arbitrators, but also aims to prevent a fourth person from being involved in the decision-making. There are no indications in the literature and legislative history that this provision should indeed be understood this way.[219] In principle, it can be assumed that it can be deduced from the signing of an arbitral award which arbitrators rendered the award, as is also evident from the signing of a court decision in government case law which judges rendered that decision.[220] If the signing shows that the award was rendered by an odd number of arbitrators, the requirement of Article 1026(1) DCCP has thus been satisfied. All this obviously does not set aside that it is undesirable for a fourth person to act as a *de facto* arbitrator by exerting influence on the decision in the arbitration proceedings. The Court of Appeal did not fail to recognise this, but evidently investigated in para. 6.6.14 et seq. whether the arbitrators delegated part of their personal mandate to Valasek. The complaint fails due to the above.

*Ground 6.2.3: role of the secretary*

3.192   Ground 6.2.3 raises five complaints (referred to by the letters a through e). I will briefly discuss these complaints.

3.193   The first complaint (at a) is directed against the rejection by the Court of Appeal of the Russian

[218] Asser Procesrecht/Korthals Altes & Groen 7 2015/157; A.E.H. van der Voort Maarschalk, De toetsing in cassatie, in B.T.M. van der Wiel (ed.), Cassatie, Deventer: Kluwer 2019, no. 68.
[219] See Sanders, *Het Nederlandse arbitragerecht*, op. cit., p. 60; Van den Berg et al., *Arbitragerecht*, op. cit., p. 46; Snijders, *Nederlands arbitragerecht*, op. cit., nos. 4.4.1 and 9.3.3; G.J. Meijer et al., Parliamentary History of the Arbitration Act 2015/III.8.3.
[220] Cf., for example. Supreme Court 18 November 2016, *NJ* 2017/202, annotated by H.B. Krans and P. van Schilfgaarde *(Meavita)*, para. 3.2.5.



SWORN TRANSLATION
The English text is a sworn translation of the
Dutch original. In case of any discrepancies, the
Dutch original shall prevail.

Federation's argument that there is a (unwritten) rule entailing that a secretary is not allowed to write substantive parts of an arbitral award. According to the complaint, the Court of Appeal failed to recognise that such substantive tasks may only be delegated to a secretary after the parties' express consent. The second complaint (at b) is directed against the Court of Appeal's decision in para. 6.6.14.2 that by not "fully" informing the parties of Valasek's drafting task, the Tribunal did not seriously violate its mandate.

3.194   The two complaints can be discussed jointly. As I have already mentioned, there is no unwritten rule. In so far as both complaints argue that the Court of Appeal failed to recognise the importance of transparency by the Tribunal in delegating substantive tasks, the Court of Appeal acknowledged in para. 6.6.14.2 that the Tribunal should have fully informed the parties on this point, but decided that this violation of the mandate was not serious enough to justify setting aside the arbitral awards. The two complaints fail for this reason. For the rest, the Court of Appeal's decision is not incomprehensible.

3.195   The third complaint (at c) argues that the Court of Appeal wrongly decided in para. 6.6.14.1 that only a specific provision in the applicable arbitration rules can preclude arbitrators from delegating substantive tasks to an assistant.

3.196   This complaint is based on an incorrect interpretation of para. 6.6.14.1, as the Court of Appeal did not find that the authority of arbitrators to delegate tasks is limited solely by the arbitration rules. According to the Court of Appeal, in the absence of any concrete party agreements and as long as the substantive decisions are taken by the arbitrators themselves, it is left to the Tribunal's discretion to what extent an assistant or secretary is used for the drafting of the arbitral award. The arbitrators must therefore always respect the principle of personal performance of one's duties. The Court of Appeal evidently investigated whether the actions taken conflict with this principle, and answered that question in the negative. The complaint fails for that reason.

3.197   The fourth complaint (at d) is directed against para. 6.6.14.1 and complains about the decision that there can only be a (sufficiently serious) violation of the mandate if the arbitrators entirely left the taking of substantive decisions or the ultimate responsibility for the award to their assistant.

3.198   In light of the positions in the literature described above, the Court of Appeal's decision is neither incorrect nor incomprehensible, so that the complaint fails.

3.199   The fifth complaint (at e) entails that the principle of personal performance of one's duties would be reduced to nil if arbitrators were able to fully delegate the writing of their awards to a secretary, with the proof that they themselves performed their duties consisting only of the fact that they signed the award.

3.200   The complaint builds on the previous complaints. The fact that the arbitrators signed the award can serve as proof that the arbitral tribunal was properly composed, but it does not automatically prove that the principle of personal performance of one's duties was respected. That principle continues to apply in



**SWORN TRANSLATION**
The English text is a sworn translation of the
Dutch original. In case of any discrepancies, the
Dutch original shall prevail.

full, on the understanding that it must be established that it has not been complied with in a specific case. As follows from my discussion of this ground, there is no violation of the principle of personal performance of one's duties merely because a secretary wrote substantive parts of the arbitral award. All complaints in ground 6.2.3 fail for that reason.

3.201    The conclusion is that ground 6 fails.

### Ground 7: lack of reasoning?

3.202    Ground 7 is divided into two sub-grounds and is directed against paras. 8.4.13 and 8.4.16 of the final judgment. These paragraphs pertain to the argument that the arbitral awards lack sound reasoning where they address the Russian Federation's statement that Yukos' Mordovian companies were shams. The Tribunal concluded that there was no evidence for this in 'the massive record'. According to the Court of Appeal, with this the Tribunal referred to the record that was the subject of the tax proceedings conducted by Yukos in Russia (para. 8.4.13). According to the ground, this 'attempt at reparation' is contrary to Articles 19 and 24 DCCP, and moreover incomprehensible.

*Introductory remarks*

3.203    Before I discuss the complaints, I note the following (also see the Court of Appeal's unchallenged assumption in para. 8.1.2). The Russian Federation invoked the setting-aside ground that is included in Article 1065(1)(d) DCCP. Setting aside on this ground is only possible in the absence of reasoning, and is thus not possible in cases of inadequate reasoning, according to the Supreme Court.[221] After all, examining the adequacy of the reasoning of the arbitral award can boil down to a substantive reassessment of that award, for which the court does not have jurisdiction. There may, however, be cases in which, while reasons have been stated, no well-founded explanation for the relevant decision can be identified.[222] Setting aside on the basis of Article 1065(1)(d) DCCP is then justified, even if the court must exercise this power with reticence, in the sense that it should only intervene in arbitral decisions in clear-cut cases.[223] Setting aside on the basis of Article 1065(1)(d) DCCP is therefore subject to a high threshold.

3.204    Briefly put, the context of the complaints in ground 7 is as follows (for a more detailed representation, see para. 8.4.2 et seq. of the final judgment). In the arbitration proceedings, HVY argued that the additional tax assessment imposed on Yukos had been fabricated and was basically an expropriation. The Russian Federation argued that HVY could have known that the way Yukos used tax exemption in

---

[221] Supreme Court 25 February 2000, ECLI:NL:HR:2000:AA4947, *NJ* 2000/508, annotated by H.J. Snijders, para. 3.3.
[222] Supreme Court 9 January 2004, ECLI:NL:HR:AK8380, *NJ* 2005/190, annotated by H.J. Snijders, para. 3.5.2. See also Advocate General Bakels' opinion prior to the judgment of the Supreme Court of 25 February 2000 referred to in the previous footnote, in which he argues that a lack of reasoning should also be understood to include 'reasoning that is so flawed that it can be equated with a complete absence of reasoning in terms of information and power of persuasion'.
[223] Supreme Court 22 December 2006, ECLI:NL:HR:2006:AZ1593, *NJ* 2008/4, annotated by H.J. Snijders, para. 3.3.



SWORN TRANSLATION
The English text is a sworn translation of the
Dutch original. In case of any discrepancies, the
Dutch original shall prevail.

low-tax regions (including Mordovia) was inconsistent with the applicable bad faith taxpayer doctrine. The Tribunal assessed whether evidence had been provided that there was bad faith. The Tribunal subsequently decided that "the massive record" contains no evidence of the statement that Yukos' Mordovian companies were shams (sub-chapter 639 *Final Awards)*. In the setting-aside proceedings, the Russian Federation argued that this decision was insufficiently substantiated because such evidence had actually been submitted in the arbitration proceedings. The Court of Appeal rejected this argument because, according to the Court of Appeal, it is clear that with "the massive record", the Tribunal referred to the record at issue in the tax proceedings conducted by Yukos in Russia (para. 8.4.13). The Court of Appeal further substantiated this in paras. 8.4.1.4-8.4.16 by pointing out that the Tribunal's decision focusses on the question of whether there was due process in the Russian tax proceedings.

3.205 Ground 7.1 contains an introduction and no complaints. Ground 7.2 is divided into four sub-grounds with complaints.

*Ground 7.2.1: incompatibility with Articles 19 and 24 DCCP?*

3.206 According to ground 7.2.1, the Court of Appeal's decision is incompatible with Articles 24 and 19 DCCP, because the Court of Appeal's interpretation that "the massive record" refers to the tax record and not to the arbitration file was not defended by either party.

3.207 This complaint fails. After all, the Court of Appeal had to address the question of how the relevant decision of the Tribunal should be understood. That is why the Court of Appeal was also free to interpret this decision differently to how it was defended by the parties. As such, that defended interpretation is not a fact, but is precisely the issue on which a judgment is requested from the Court of Appeal. Consequently, there is no prohibited supplement to the factual basis (Article 24 DCCP) or a violation of the principle of the right to be heard (Article 19 DCCP).

*Ground 7.2.2: evidence in tax proceedings*

3.208 Ground 7.2.2 complains about the Court of Appeal's finding at the end of para. 8.4.13 that the Russian Federation did not argue that the evidence it submitted in the arbitration proceedings had already been submitted in the tax proceedings. According to the ground, there was no reason for the Russian Federation to argue this, because it is an "obvious fact". Furthermore, according to the ground, it was clear that various supporting documents submitted in the arbitration proceedings originated from the tax proceedings.

3.209 The findings challenged by the ground build on the rejection by the Court of Appeal of the Russian Federation's argument that evidence of bad faith on the part of Yukos/HVY had been provided in the arbitration proceedings. In line with this, the Court of Appeal decided that said supporting documents



SWORN TRANSLATION
The English text is a sworn translation of the
Dutch original. In case of any discrepancies, the
Dutch original shall prevail.

were irrelevant, as the issue was whether they had been submitted in the tax proceedings, which the Russian Federation did not assert. Without the Russian Federation's statements in this respect, the Court of Appeal was not required to independently investigate whether certain supporting documents had also been submitted in the tax proceedings. If the Court of Appeal had done so, the Court of Appeal would have gone beyond the ambit of the legal dispute and, moreover, supplemented the factual basis by establishing facts itself and taking them into account. The complaint fails for this reason.

*Ground 7.2.3: significance of tax record*

3.210    Ground 7.2.3 argues that on points other than the Mordovian sham companies (namely, the use of sham companies in Lesnoy and Trekghomy), the Tribunal concurred with the audit reports and decisions of the Russian tax authorities and did not attach any significance to the tax record, as such. According to the ground, the Tribunal also did not have the Russian tax records. Moreover, there are several tax records, so that there is no single 'massive record' (singular). That is why the Court of Appeal's interpretation of this decision is incomprehensible, according to the complaint.

3.211    Even after repeated reading of the ground it is still unclear to me what the ground wants to argue. In so far as the ground intends to argue that the Court of Appeal failed to recognise that the Tribunal's decision is incomprehensible and therefore does not meet the requirements of Article 1065(1)(d) DCCP, the complaint fails because this argument was not raised at the fact-finding instances (after all, it was argued at the time that the lack of reasoning was that evidence had actually been provided in the arbitration proceedings). In so far as the ground intends to argue that the Court of Appeal's interpretation in para. 8.4.13 is illogical, because with 'the massive record' Tribunal could not refer to the tax record, this complaint also fails because these reasons were not put forward at the fact-finding instances (after all, a different argument was put forward at the time). Furthermore, the Court of Appeal extensively substantiated its interpretation in paras. 8.4.14-8.4.16 with arguments. These findings are unchallenged.

3.212    Lastly, ground 7.2.4 is directed against para. 8.4.16. This ground assumes that in that finding, the Court of Appeal gave an alternative reasoning for its rejection of the reliance on Article 1065(1)(e) DCCP, 'brushing aside' its earlier rejection (para. 8.4.13 et seq.) in the process.

3.213    The ground fails to recognise that the Court of Appeal does not provide "alternative" reasoning in the challenged finding, but superfluously finds that even if the Russian Federation's interpretation of sub-chapter 639 of the *Final Awards* is correct, this does not affect the Tribunal's ultimate conclusion. That this is a superfluous finding is shown by the fact that in para. 8.4.13, the Court of Appeal explicitly based itself on a different interpretation of the Tribunal's decision. The complaints fail for this reason.

3.214    It follows from the above that the complaints in ground 7 were presented in vain.



**SWORN TRANSLATION**
**The English text is a sworn translation of the**
**Dutch original. In case of any discrepancies, the**
**Dutch original shall prevail.**

### Ground 8: catch-all ground for cassation

3.215   Ground 8 of the grounds for cassation contains a catch-all ground that builds on grounds 1 through 7. The ground argues that if one or more of grounds 1 through 7 succeed, the damages awarded by the Tribunal to HVY and upheld by the Court of Appeal cannot be upheld.

3.216   As grounds 1 through 7 fail, this catch-all ground does not need to be discussed.

### Conclusion regarding the principal appeal

3.217   The conclusion is that the principal appeal must be rejected.

### 4.   Discussion of the conditional cross-appeal in cassation

4.1   HVY lodged a conditional cross-appeal in cassation against both the interim judgment and the final judgment. The cross-appeal in cassation contains three grounds, all of which were raised on condition that one or several of the Russian Federation's complaints in principal appeal were successful. As the principal appeal in cassation fails, the conditional cross-appeal in cassation does not need to be discussed.

### 5.   Conclusion

The opinion is that the principal appeal in cassation must be rejected.

> The Procurator General at the
> Supreme Court of the
> Netherlands
>
> Advocate General



**SWORN TRANSLATION**
The English text is a sworn translation of the
Dutch original. In case of any discrepancies, the
Dutch original shall prevail.

# Signing of Opinion by the Procurator General

## Signatures

Vlas, Prof. *mr*. P.





**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| |
|---|
| **HULLEY ENTERPRISES LTD.,** **YUKOS UNIVERSAL LTD., and** **VETERAN PETROLEUM LTD.,** |
| *Petitioners,* |
| v. |
| **THE RUSSIAN FEDERATION,** |
| *Respondent.* |

**Case No. 1:14-cv-01996-BAH**

## CERTIFICATION

I, Alexander Jan Boenish Burrough, translator for the English language sworn in before the District Court of The Hague, the Netherlands, and registered in the public register pursuant to the Dutch Act on Sworn Interpreters and Translators Wbtv (*Wet beëdigde tolken en vertalers "Wbtv"*) under number 1963, do hereby certify, to the best of my knowledge and belief, that the attached English translation is a true, complete, and accurate translation of the Dutch source document listed below:

- Opinion of the Procurator General at the Supreme Court of the Netherlands, dated 23 April 2021, Case Number 20/01595, in the case of *Veteran Petroleum Limited, Yukos Universal Limited, and Hulley Enterprises Limited v. The Russian Federation*

I have prepared this document, at the request of Bart Fleuren of De Brauw Blackstone Westbroek N.V., for submission to this Court and other legal proceedings in English. I affirm that I am competent to translate documents from Dutch to English and review such translations. I am not a relation to any of the parties in the source document.

A.J.B. Burrough, Sworn Translator

Dated: May 11, 2021

_____

Signature, Notary Public


_____

Stamp, Notary Public


A P O S T I L L E

(Convention de La Haye du 5 octobre 1961)

1.  Country: THE NETHERLANDS
    This public document
2.  has been signed by **A.J.B. Burrough**
3.  acting in the capacity of sworn translator
4.  bears the seal/stamp of aforesaid translator

Certified

5.  in Amsterdam          6.   on 11-05-2021
7.  by the registrar of the district court of Amsterdam
8.  no.      024839

9.  Seal/stamp:          10. Signature:

                         T.R.t. Snel

# PROCUREUR-GENERAAL

## BIJ DE

# HOGE RAAD DER NEDERLANDEN

**Nummer**  20/01595
**Zitting**  23 april 2021

## CONCLUSIE

### P. Vlas

In de zaak

De Russische Federatie, zetelende te Moskou, Russische Federatie,

tegen

1. Hulley Enterprises Limited, gevestigd te Nicosia, Cyprus
(hierna: Hulley),
2. Veteran Petroleum Limited, gevestigd te Nicosia, Cyprus
(hierna: VPL),
3. Yukos Universal Limited, gevestigd te Douglas, Isle of Man
(hierna: YUL)
(hierna gezamenlijk: HVY)



20/01595

## Inhoudsopgave[1]

| 1. | Inleiding | 1.1 |
|---|---|---|
| 2. | Feiten en procesverloop | 2.1 |
| 3. | Bespreking van het principale cassatiemiddel | 3.1 |
| | Onderdeel 1: schending procedurele openbare orde/exclusiviteit art. 1068 Rv | 3.2 |
| | Onderdeel 2: uitleg art. 45 lid 1 ECT | 3.9 |
| | Inleidende opmerkingen | 3.11 |
| | Onderdeel 2.2: art. 26 ECT | 3.20 |
| | Onderdeel 2.3: bevoegdheid van het Scheidsgerecht | 3.23 |
| | Onderdeel 2.4: Limitation Clause | 3.31 |
| | Onderdeel 2.5: 'not inconsistent' in art. 45 lid 1 ECT | 3.54 |
| | Onderdeel 2.6: art. 26 ECT in strijd met Russisch recht? | 3.58 |
| | Onderdeel 2.7: prejudiciële vragen aan HvJEU? | 3.60 |
| | Onderdeel 2.8: voortbouwende klacht | 3.75 |
| | Onderdeel 3: uitleg art. 1 leden 6 en 7 (investering en investeerder) | 3.76 |
| | Onderdeel 3: inleidende opmerkingen | 3.77 |
| | Onderdeel 3.2: 'U-bochtinstructie' | 3.84 |
| | Onderdeel 3.3: daadwerkelijke economische bijdrage aan economie gastland | 3.115 |
| | Onderdeel 3.4: 'piercing the corporate veil' | 3.120 |
| | Onderdeel 3.5: prejudiciële vragen over art. 1 leden 6 en 7 en art. 26 ECT? | 3.130 |
| | Onderdeel 4: uitleg art. 1 leden 6 en 7 ECT (legaliteit van investeringen) | 3.132 |
| | Onderdeel 4.2: bestaan van legaliteitsvereiste | 3.136 |
| | Onderdeel 4.3: illegaal handelen | 3.142 |
| | Onderdeel 4.4: strijd met de openbare orde | 3.147 |
| | Onderdeel 4.5: prejudiciële vragen over art. 1 lid 6 en art. 26 ECT? | 3.152 |
| | Onderdeel 5: art. 21 lid 5 ECT | 3.155 |
| | Onderdeel 5: inleidende opmerkingen | 3.157 |
| | Onderdeel 5.2: dwingend karakter art. 21 lid 5 ECT | 3.161 |
| | Onderdeel 6: de rol van de secretaris van het Scheidsgerecht | 3.180 |
| | Onderdeel 6.2: delegatie aan secretaris van het Scheidsgerecht | 3.182 |
| | Onderdeel 6.2: inleidende opmerkingen | 3.183 |
| | Onderdeel 6.2.1-6.2.3: bespreking klachten | 3.188 |
| | Onderdeel 7: ontbreken motivering? | 3.202 |
| | Onderdeel 7: inleidende opmerkingen | 3.203 |
| | Onderdeel 7.2: bespreking klachten | 3.206 |

---

[1]   Verwezen wordt naar de paragraafnummers van deze conclusie.



20/01595

| | | |
|---|---|---|
| | Onderdeel 8: veegklacht | 3.215 |
| | Slotsom principaal beroep | 3.217 |
| 4. | Bespreking van het voorwaardelijk incidentele middel | 4.1 |
| 5. | Conclusie | 5 |

## 1.     Inleiding

1.1     De Russische Federatie is in een arbitrale procedure veroordeeld tot betaling van schadevergoeding aan HVY wegens schending van haar verplichtingen uit het Verdrag inzake het Energiehandvest (*Energy Charter Treaty*, hierna: ECT).[2] De Russische Federatie heeft bij de Nederlandse rechter een vordering tot vernietiging van de desbetreffende arbitrale vonnissen (hierna ook de 'Yukos Awards') aanhangig gemaakt. De rechtbank heeft de vordering toegewezen op grond van het ontbreken van een geldige arbitrageovereenkomst. In hoger beroep heeft het hof het vonnis van de rechtbank vernietigd en de vorderingen van de Russische Federatie alsnog afgewezen. De Russische Federatie heeft tegen het arrest van het hof beroep in cassatie ingesteld.

1.2     Deze zaak wordt nog door het oude arbitragerecht beheerst, dat wil zeggen door het Vierde Boek ('Arbitrage') van het Wetboek van Burgerlijke Rechtsvordering, zoals dit gold tot aan de invoering van de Wet Modernisering Arbitragerecht op 1 januari 2015.[3] In deze conclusie wordt, tenzij anders vermeld, telkens verwezen naar het oude recht. Voor een inleiding op de vernietigingsprocedure van art. 1064 e.v. Rv verwijs ik naar mijn conclusie inzake het verzoek tot schorsing van de tenuitvoerlegging dat de Russische Federatie heeft ingediend.[4] In zijn beschikking van 4 december 2020 heeft de Hoge Raad dit verzoek afgewezen.[5]

1.3     De klachten hebben voor een groot deel betrekking op de interpretatie van bepalingen uit de ECT. De Russische Federatie betoogt in cassatie dat het hof zijn conclusie dat het geschil tussen HVY en de Russische Federatie door de ECT wordt bestreken, heeft gebaseerd op een onjuiste interpretatie van de relevante verdragsbepalingen, zodat zijn oordeel dat een geldige basis voor arbitrage bestaat onjuist is. Het gaat dan met name om de interpretatie van de begrippen 'investeerder' en 'investering' uit de ECT, en om de reikwijdte van art. 45 lid 1 ECT, dat voorziet in de voorlopige toepassing van de ECT door een staat die de ECT wel heeft ondertekend, maar waarvoor dit verdrag nog niet in werking is getreden. In deze inleiding ga ik kort in op het doel en de totstandkoming van de ECT en op de mogelijkheden

---

[2]   Verdrag inzake het Energiehandvest, met Bijlagen, Trb. 1995, 108 (Engelse en Franse teksten, met correcties in Trb. 1995, 250) en Trb. 1995, 250 (Nederlandse vertaling).

[3]   Wet van 2 juni 2014, Stb. 2014, 200, in werking getreden op 1 januari 2015 (Stb. 2014, 254). Het overgangsrecht is geregeld in art. IV lid 4 in verbinding met art. IV lid 2 van die wet.

[4]   Zaaknr. 20/01892, ECLI:NL:PHR:2020:1082, nrs. 3.10-3.18.

[5]   ECLI:NL:HR:2020:1952, RvdW 2021/2; JOR 2021/79, m.nt. M.A. Broeders.

20/01595

die de ECT biedt tot beslechting van investeringsgeschillen. Bij de bespreking van de verschillende onderdelen van het principale cassatiemiddel zal vervolgens nader worden ingegaan op de uitleg van specifieke bepalingen van de ECT.

1.4   De ECT is op 17 december 1994 te Lissabon gesloten met als doel samenwerking in de energiesector te bewerkstelligen, met name tussen de lidstaten van de toenmalige Europese Economische Gemeenschap (EEG, thans de Europese Unie) en staten in Centraal- en Oost-Europa, waaronder de huidige Russische Federatie.[6] Deze politieke wens was reeds eerder geuit in het niet-bindende Europees Energiehandvest uit 1991. In de ECT zijn de afspraken uit het Energiehandvest neergelegd in een bindend instrument. De ECT is op 16 april 1998 in werking getreden, nadat het door dertig staten, waaronder Nederland, is geratificeerd (zie art. 44 lid 1 ECT). Thans is de ECT geratificeerd door 51 staten alsmede door de Europese Unie.[7] De Russische Federatie heeft de ECT op 17 december 1994 ondertekend, maar niet geratificeerd.[8] Op 20 augustus 2009 heeft de Russische Federatie de depositaris van de ECT (Portugal) bericht niet langer voornemens te zijn de ECT te ratificeren. Sindsdien is de Russische Federatie niet langer gehouden de ECT voorlopig toe te passen, met uitzondering van de bepalingen die betrekking hebben op investeringsbescherming en geschillenbeslechting, voor zover het gaat om reeds gedane investeringen (art. 45 lid 3, onder a en b, ECT).

1.5   Inhoudelijk zijn in deze zaak de bepalingen uit Deel III van de ECT, die zien op 'Bevordering, bescherming en behandeling van investeringen', het meest relevant. Deze bepalingen bieden bescherming aan investeerders die in één van de verdragsstaten een investering in de energiesector hebben gedaan. Zij omvatten het recht op eerlijke behandeling en non-discriminatie (art. 10 ECT) evenals bescherming tegen onteigening (art. 13 ECT).[9]

---

[6]   Zie hierover Thomas W. Wälde, International Investment under the 1994 Energy Charter Treaty. Legal, Negotiating and Policy Implications for International Investors with Western and Commonwealth of Independent States/Eastern European Countries, in: Thomas W. Wälde (ed.), The Energy Charter Treaty. An East-West Gateway for Investment and Trade, The Hague: Kluwer International 1996, p. 251 e.v.; Thomas Roe & Matthew Happold, Settlement of Investment Disputes under the Energy Charter Treaty, Cambridge: Cambridge University Press 2011, p. 7-13 (deze schrijvers vermelden abusievelijk dat de ECT op 17 december 1995 voor ondertekening is opengesteld); Crina Baltag, The Energy Charter Treaty. De notion of investor, Alphen aan den Rijn: Kluwer Law International 2012, p. 6-13; Kaj Hobér, The Energy Charter Treaty. A Commentary, Oxford: OUP 2020, p. 13-24.

[7]   Zie overheid.nl/verdragenbank, alsmede de website van het Secretariaat van de ECT (https://www.energycharter.org/who-we-are/members-observers).

[8]   De Russische Federatie heeft de ECT ondertekend zonder de verklaring van art. 45 lid 2 ECT af te leggen. Andere staten (Australië, Noorwegen en IJsland) hebben ten tijde van hun ondertekening wel verklaard de ECT niet voorlopig te zullen toepassen.

[9]   Zie hierover Hobér, a.w., p. 6; Roe & Happold, a.w., p. 13-18; Wälde, a.w., p. 280 e.v.

20/01595

1.6   De ECT voorziet verder in een mechanisme waarmee investeerders de naleving van deze
      rechten kunnen afdwingen.[10] Art. 26 ECT bepaalt dat investeerders een geschil over een
      vermeende schending van een van de bepalingen uit Deel III van de ECT door een
      verdragsstaat aan (onder meer) een arbitragetribunaal kunnen voorleggen. Art. 26 lid 4 ECT
      noemt drie mogelijkheden van geschillenbeslechting:

   a) arbitrage bij het *International Centre for Settlement of Investment Disputes* (ICSID)
      in Washington, op basis van het ICSID-verdrag[11], mits beide betrokken ECT-staten
      partij zijn bij het ICSID-verdrag (of, als één van de betrokken staten partij is bij het
      ICSID-verdrag, op basis van de 'Additional Facility Rules' bij dat verdrag);
   b) arbitrage door één arbiter of bij een *ad hoc*-tribunaal, opgericht volgens de *Arbitration
      Rules of the United Nations Commission on International Trade Law* (UNCITRAL),
      zoals in de onderhavige zaak is gebeurd;
   c) arbitrage bij het arbitrageinstituut van de Stockholm Chamber of Commerce (SCC).

1.7   Geschillen over rechten uit de ECT kunnen dus bij verschillende arbitragetribunalen
      aanhangig worden gemaakt. In deze conclusie komen verschillende uitspraken van deze
      tribunalen aan de orde. De vraag rijst welke betekenis aan die uitspraken moet worden
      gehecht, waarover ik in deze inleiding het volgende opmerk.

1.8   Volgens het Verdrag van Wenen inzake het verdragenrecht (hierna WVV)[12] is arbitrale
      rechtspraak geen bron van interpretatie van verdragen. Wel kan deze rechtspraak inzicht
      geven in de wijze waarop een verdrag in de praktijk wordt toegepast.[13] Arbitrale rechtspraak
      kan worden gebruikt om het bestaan van een beginsel van internationaal gewoonterecht aan
      te tonen, dat op grond van art. 31 lid 3 WVV bij de interpretatie van een verdrag in acht moet
      worden genomen. Daarbij geldt uiteraard dat sprake moet zijn van een algemene
      statenpraktijk die omvangrijk en vrijwel uniform moet zijn, waarbij de rechtsovertuiging geldt
      dat deze praktijk door het internationaal recht wordt vereist.[14]

1.9   Arbitragetribunalen zijn niet gebonden aan elkaars uitspraken, omdat het beginsel van de
      binding aan precedenten (*stare decisis*) ontbreekt.[15] Uitspraken kunnen daarom onderling
      afwijken (wat uiteraard ook verklaard kan worden door de feiten en de wijze waarop is
      geprocedeerd). Er moet voor worden gewaakt conclusies te trekken op basis van slechts

---

[10] Zie Laurent Gouiffès, The Dispute Settlement Mechanisms of the Energy Charter Treaty, in: Clarisse Ribeiro
     (ed.), Investment Arbitration and the Energy Charter Treaty, New York: JurisNet 2006, p. 22-29.
[11] Convention on the Settlement of Investment Disputes between States and Nationals of other States, Washington,
     18 maart 1965, Trb. 1981, 191.
[12] Verdrag van 23 mei 1969, Trb. 1985, 79.
[13] Onder meer Baltag, a.w., p. 24.
[14] André Nollkaemper, Kern van het internationaal publiekrecht, Den Haag: BJu 2019, p. 127-134.
[15] Hobér, a.w., p. 39 e.v.; Baltag, a.w., p. 24 e.v.



20/01595

één uitspraak of enkele uitspraken. Verder geldt dat aan unanieme uitspraken meer gewicht toekomt dan aan uitspraken waarin *dissenting opinions* zijn geschreven.[16]

1.10    Het ICSID-verdrag voorziet in een processueel kader voor het beslechten van internationale investeringsgeschillen tussen staten en investeerders[17] en heeft geen betrekking op geschillen tussen staten en hun eigen onderdanen.[18] Het ICSID-verdrag bepaalt niet wanneer sprake is van een internationale investering, maar laat dit over aan de ICSID-arbitragetribunalen, die het oordeel daarover mede zullen baseren op het investeringsverdrag (veelal een *bilateral investment treaty* (BIT)) dat aan het geschil ten grondslag ligt. De benadering van een arbitragetribunaal in een zaak onder het ICSID-verdrag is dus afhankelijk van het onderliggende investeringsverdrag. ICSID-tribunalen zullen slechts rechtsmacht aannemen als de investering ook valt binnen het beschermingsbereik van het ICSID-verdrag.[19] In de praktijk stellen ICSID-tribunalen daarom soms strengere eisen dan de onderliggende investeringsverdragen zelf, in het bijzonder waar het gaat om het begrip 'investering'.[20] Ook kunnen deze eisen strenger zijn dan die van andere (commerciële) arbitragetribunalen, die hun rechtsmacht niet baseren op het ICSID-verdrag.[21]

1.11    Het voorgaande is van belang, omdat het cassatiemiddel op een aantal plaatsen verwijst naar ICSID-uitspraken ter onderbouwing van de stelling dat daarin een algemeen geaccepteerd beginsel van internationaal investeringsrecht is weergegeven (zie onderdeel 3 van het principale middel). Bij de beoordeling van deze stelling moet in aanmerking worden genomen dat het ICSID-verdrag op sommige punten eigen eisen stelt, die strenger kunnen zijn dan de eisen die in investeringsverdragen worden gesteld. Ook geldt voor alle arbitrale rechtspraak dat steeds zal moeten worden bezien of de daarin gevolgde benadering

---

[16]   Hobér, a.w., p. 40.

[17]   Zie Roe & Happold, a.w., p. 4; Anna Turinov, "Investment" and "Investor" in Energy Charter Treaty Arbitration: Uncertain Jurisdiction, Journal of International Arbitration 2009, p. 4.

[18]   Zie o.a. art. 25 lid 1 ICSID-verdrag: 'The jurisdiction of the Centre shall extend to any legal dispute arising directly out of an investment, between a Contracting State (…) and a national of *another* Contracting State' (mijn curs., A-G).

[19]   Zie bijvoorbeeld *ST-AD GmbH v. The Republic of Bulgaria* (Award on Jurisdiction), UNCITRAL, PCA Case No. 2011-06, 18 juli 2013, para. 408: 'It is settled jurisprudence that a national investment cannot give rise to *an ICSID arbitration*, which is reserved to international investments' (mijn curs., A-G). Zie ook Stephen Jagusch & Anthony Sinclair, The Limits of Protection for Investments under the Energy Charter Treaty, in: Clarisse Ribeiro (ed.), Investment Arbitration and the Energy Charter Treaty, New York: Jurisnet, 2006, p. 75-77; Turinov, a.w., p. 6; Roe & Happold, a.w., p. 49; Baltag, a.w., p. 106-107.

[20]   Deze benadering is als volgt onder woorden gebracht in *Phoenix Action, Ltd v. The Czech Republic*, ICSID Case No. ARB/06/5, 15 april 2009, para. 96: 'At the outset, it should be noted that BITs, which are bilateral arrangements between two States parties, cannot contradict the definition of the ICSID Convention. In other words, they can confirm the ICSID notion or restrict it, but they cannot expand it in order to have access to ICSID. A definition included in a BIT being based on a test agreed between two States cannot set aside the definition of the ICSID Convention, which is a multilateral agreement. As long as it fits within the ICSID notion, the BIT definition is acceptable, it is not if it falls outside of such definition.

[21]   Turinov, a.w., p. 6.

20/01595

algemene gelding heeft of is gebaseerd op de specifieke bewoordingen van het daaraan ten grondslag liggende investeringsverdrag.

1.12    Na deze inleiding ga ik over tot een weergave van de feiten en het procesverloop en de bespreking van het principale cassatiemiddel.

## 2.    Feiten en procesverloop

2.1    Het gaat in deze zaak, kort samengevat, om het volgende.[22] HVY zijn, althans waren, aandeelhouder in Yukos Oil Company (hierna: Yukos), een in de Russische Federatie gevestigde oliemaatschappij, die op 1 augustus 2006 failliet is verklaard en op 21 november 2007 uit het Russische handelsregister werd geschrapt.

2.2    HVY hebben in 2004 een arbitrageprocedure aanhangig gemaakt tegen de Russische Federatie op de voet van art. 26 ECT. Zij hebben gesteld dat de Russische Federatie in strijd met de ECT hun investeringen in Yukos heeft onteigend en heeft nagelaten deze investeringen te beschermen. HVY hebben gevorderd dat de Russische Federatie veroordeeld wordt schadevergoeding te betalen. De plaats van de arbitrage was Den Haag.

2.3    Het ingevolge het UNCITRAL-arbitragereglement benoemde scheidsgerecht (hierna: het Scheidsgerecht) heeft in drie afzonderlijke *Interim Awards on Jurisdiction and Admissibility* van 30 november 2009 (hierna: de *Interim Awards*) geoordeeld over een aantal preliminaire verweren die de Russische Federatie had opgeworpen, onder meer met betrekking tot de bevoegdheid van het Scheidsgerecht. In de *Interim Awards* heeft het Scheidsgerecht bepaalde bevoegdheids- en ontvankelijkheidsverweren verworpen en ten aanzien van andere preliminaire verweren beslist dat het oordeel daarover zou worden aangehouden tot de inhoudelijke fase ('the merits phase') van het geding.

2.4    In drie afzonderlijke *Final Awards* van 18 juli 2014[23] heeft het Scheidsgerecht de nog resterende bevoegdheids- en/of ontvankelijkheidsverweren van de Russische Federatie verworpen, geoordeeld dat de Russische Federatie haar verplichtingen onder art. 13 lid 1 ECT heeft geschonden en de Russische Federatie veroordeeld aan HVY schadevergoeding te betalen van respectievelijk USD 8.203.032.751 (aan VPL), USD 1.846.000.687 (aan YUL) en USD 39.971.834.360 (aan Hulley), vermeerderd met rente en kosten. Het Scheidsgerecht heeft, kort gezegd, geoordeeld dat de Russische Federatie door het nemen van een aantal

---

[22]    De weergave van de feiten is ontleend aan rov. 2.2-2.6 van het in cassatie bestreden eindarrest van het hof Den Haag van 18 februari 2020, ECLI:NL:GHDHA:2020:234. Zie ook mijn conclusie (ECLI:NL:PHR:2020:1082) onder 2.1-2.31 vóór de beschikking van de Hoge Raad van 4 december 2020, ECLI:NL:HR:2020:1952, RvdW 2021/2.

[23]    *Hulley Enterprises Limited (Cyprus)/The Russian Federation*, UNCITRAL, PCA Case No. AA 226, Final Award; *Veteran Petroleum Limited (Cyprus)/The Russian Federation*, UNCITRAL, PCA Case No. 2005-05/AA228, Final Award; *Yukos Universal Limited (Isle of Man)/The Russian Federation*, UNCITRAL, PCA Case No. 2005-04/AA227, Final Award.

Pagina 7 van 89

20/01595

belasting- en invorderingsmaatregelen jegens Yukos, heeft aangestuurd op het faillissement van Yukos met geen ander doel dan de uitschakeling van de heer Mikhail Khodorkovsky, de chairman van Yukos en één van haar aandeelhouders, als potentiële politieke tegenstander van president Poetin en het verwerven van de activa van Yukos.

2.5   De Russische Federatie heeft bij afzonderlijke dagvaardingen van 10 november 2014 Hulley, VPL en YUL voor de rechtbank Den Haag gedaagd en gevorderd dat de rechtbank de door het Scheidsgerecht in ieder van hun zaken gewezen *Interim Awards* en *Final Awards* vernietigt. Deze drie zaken zijn op vordering van de Russische Federatie door de rechtbank gevoegd.

2.6   Op 20 april 2016 heeft de rechtbank in één vonnis, gewezen in de drie gevoegde zaken, de *Interim Awards* en de *Final Awards* vernietigd wegens het ontbreken van een geldige arbitrageovereenkomst.[24] HVY hebben tegen dit vonnis hoger beroep ingesteld bij het hof Den Haag.

2.7   Bij tussenarrest van 11 oktober 2016 heeft het hof een comparitie van partijen gelast, die heeft plaatsgevonden op 16 januari 2017.

2.8   Bij tussenarrest van 25 september 2018 heeft het hof een aantal preliminaire bezwaren van HVY tegen de behandeling van bepaalde stellingen van de Russische Federatie beoordeeld.[25] Het gaat onder meer (voor zover thans nog van belang) om de stelling van de Russische Federatie dat HVY in de arbitrageprocedure fraude zouden hebben gepleegd door het indienen van valse verklaringen en het achterhouden van documenten (rov. 5.1-5.2). HVY hebben hiertegen bezwaar gemaakt, onder meer op de grond dat het bedrog aan de orde had moeten worden gesteld in een aparte procedure tot herroeping op de voet van art. 1068 Rv (rov. 5.3 onder (b)).

2.9   Het hof heeft het bezwaar van HVY gehonoreerd. Daartoe heeft het hof, kort samengevat, overwogen dat het beweerdelijke bedrog alleen in een herroepingsprocedure op de voet van art. 1068 Rv aan de orde kan worden gesteld, en niet (alsnog) in een procedure tot vernietiging op grond van art. 1065 Rv. Beide procedures resulteren weliswaar in vernietiging van het arbitrale vonnis, maar zij kennen verschillende termijnen en verschillende bevoegde rechterlijke instanties. Een herroepingsprocedure kan binnen drie maanden na ontdekking van het bedrog aanhangig worden gemaakt, ook als reeds meer dan drie maanden zijn verstreken nadat het arbitrale vonnis gezag van gewijsde heeft gekregen. De herroepingsprocedure kent verder slechts één feitelijke instantie (het gerechtshof). Zowel de geldende termijnen als deze exclusieve bevoegdheid van het gerechtshof zouden worden omzeild indien gesteld bedrog (door middel van een eisvermeerdering) alsnog in de

---

[24]   ECLI:NL:RBDHA:2016:4229.
[25]   ECLI:NL:GHDHA:2018:2476, JBPr 2019/9, m.nt. C.L. Schleijpen.



20/01595

vernietigingsprocedure zou kunnen worden voorgelegd. Een dergelijke consequentie is niet aanvaardbaar (rov. 5.7).

2.10   Bij tussenarrest van 18 december 2018 heeft het hof enkele beslissingen genomen over het verdere verloop van de procedure.[26]

2.11   Bij eindarrest van 18 februari 2020 heeft het hof de zaak inhoudelijk beoordeeld.[27]

2.12   HVY hebben onder meer grieven gericht tegen het oordeel van de rechtbank dat het Scheidsgerecht onbevoegd was, omdat art. 26 ECT – dat arbitrage mogelijk maakt – in strijd is met het Russische recht. Het hof heeft deze grieven in rov. 4.4 e.v. beoordeeld.

*Uitleg van de Limitation Clause*

2.13   Het hof heeft beoordeeld of tussen partijen een geldige arbitrageovereenkomst tot stand is gekomen (art. 1065 lid 1, onder a, Rv) en overwogen dat dit afhangt van de uitleg van art. 26 en 45 ECT in het licht van het recht van de Russische Federatie (rov. 3.1.2). Het standpunt van de Russische Federatie komt er, kort gezegd, op neer dat zij de ECT wel heeft ondertekend, maar nooit heeft bekrachtigd. Art. 45 lid 1 ECT staat weliswaar toe dat iedere partij die de ECT heeft ondertekend dit 'voorlopig' toepast, maar enkel 'to the extent that such provisional application is not inconsistent with its constitution, laws or regulations' (hierna: de *Limitation Clause*). Volgens de Russische Federatie is de arbitragebepaling van art. 26 ECT in strijd met de Russische Grondwet en met meerdere wettelijke bepalingen die inhouden dat geschillen van publiekrechtelijke aard niet arbitrabel zijn.

2.14   HVY hebben zich primair op het standpunt gesteld dat het bij de uitleg van art. 26 ECT erom gaat of het *beginsel* van voorlopige verdragstoepassing in strijd is met Russisch recht. In hoger beroep hebben HVY, subsidiair, betoogd dat het erom gaat of *voorlopige toepassing* van een of meer bepalingen van de ECT onverenigbaar is met het recht van een verdragsstaat, en niet om de vraag of een specifieke bepaling van de ECT met dat recht in strijd is (rov. 3.3.2 en 4.2.2).

2.15   Het hof heeft in rov. 4.4.3-4.4.7 overwogen dat het zijn oordeel mag baseren op dit subsidiaire standpunt van HVY over de uitleg van art. 26 ECT, ondanks dat dit in de arbitrageprocedure niet naar voren is gebracht, en het Scheidsgerecht zijn bevoegdheid dus niet daarop heeft gebaseerd. Een andere opvatting zou ertoe leiden dat een arbitraal vonnis moet worden vernietigd omdat het Scheidsgerecht op onjuiste gronden bevoegdheid heeft aangenomen, terwijl de overheidsrechter van oordeel is dat het Scheidsgerecht op andere

---

[26]   ECLI:NL:GHDHA:2018:3437.
[27]   ECLI:NL:GHDHA:2020:234. Het arrest is ook gepubliceerd in NJ 2020/366, bij HR 25 september 2020, ECLI:NL:HR:2020:1511 en in TvA 2020/31, JOR 2020/164, m.nt. N. Peters.

20/01595

gronden wel bevoegd was. Dit is in strijd met het beginsel dat de overheidsrechter op dit punt het laatste woord heeft.

2.16   Vervolgens heeft het hof het subsidiaire standpunt van HVY beoordeeld (rov. 4.5.8-4.5.48). In rov. 4.5.48 is het hof tot de slotsom gekomen dat de *Limitation Clause* aldus moet worden uitgelegd, dat een ondertekenende staat die niet de verklaring als bedoeld in art. 45 lid 2, onder a, ECT heeft afgelegd, gehouden is de ECT voorlopig toe te passen, behoudens voor zover voorlopige toepassing van een of meer bepalingen van de ECT strijdig is met nationaal recht, in die zin dat de wet- of regelgeving van die staat voorlopige toepassing van een verdrag voor bepaalde (soorten of categorieën van) verdragsbepalingen uitsluit. Volgens het hof is niet gebleken dat voorlopige toepassing van art. 26 ECT in strijd is met Russisch recht (rov. 4.6.1). Het hof heeft ten overvloede onderzocht of, uitgaande van de uitleg die de Russische Federatie aan de *Limitation Clause* geeft, art. 26 ECT met bepalingen van Russisch recht in conflict komt (art. 4.6.2-4.7.65). Het hof heeft die vraag ontkennend beantwoord.

2.17   Volgens het hof zijn de grieven van HVY dus deels gegrond en kan de door de rechtbank gegeven motivering haar oordeel dat geen geldige overeenkomst tot arbitrage tot stand is gekomen, niet dragen (rov. 4.9.1). Op grond van de devolutieve werking van het hoger beroep heeft het hof beoordeeld of de andere stellingen gegrond zijn die de Russische Federatie heeft aangevoerd om te betogen dat het Scheidsgerecht onbevoegd is. Het betreft de stellingen die betrekking hebben op (i) de uitleg van art. 1 leden 6 en 7 ECT[28] (de begrippen 'investering' en 'investeerder'), (ii) de uitleg van art. 1 leden 6 en 7 ECT (legaliteit van de investeringen), (iii) de door de Russische Federatie genomen belastingmaatregelen die een legitieme uitoefening van de bevoegdheid van de Russische Federatie zijn en die vallen onder het bereik van art. 21 lid 1 ECT.

*(i) Uitleg van art. 1 leden 6 en 7 ECT (investering en investeerder)*

2.18   De Russische Federatie heeft aangevoerd dat niet is voldaan aan het vereiste van art. 26 ECT dat sprake is van een 'investment' (investering) in de zin van art. 1 lid 6 ECT en dat HVY geen 'investors' (investeerders) zijn in de zin van art. 1 lid 7 ECT, omdat zij slechts schijnvennootschappen zijn die economisch eigendom zijn en onder zeggenschap staan van Russische staatsburgers. Ook is geen buitenlands, maar Russisch kapitaal geïnvesteerd (rov. 3.3.2 en 5.1.3).

2.19   Het hof is in rov. 5.1.7.3 tot het oordeel gekomen dat van een investering in de zin van art. 26 ECT sprake is wanneer een rechtspersoon die volgens het recht van de ene verdragsluitende staat is opgericht een investering doet in een andere verdragsluitende

---

[28]   Strikt genomen heeft art. 1 geen leden, maar onderdelen ('punten'). In deze conclusie volg ik echter de terminologie ('leden') die door het hof en de procesinleiding is gebruikt.

staat. Om de nationaliteit van een investeerder te bepalen is in de ECT gekozen voor 'het recht van het land volgens de wetten waarvan de investeerder is georganiseerd'. De opstellers van de ECT hebben geen nadere eisen willen stellen aan het internationale karakter van de investeringen. De ECT vereist dus niet dat de investeerder een daadwerkelijke band heeft met het land volgens de wetten waarvan zij is georganiseerd (rov. 5.7.1.2). Voorts volgt uit art. 17 ECT niet dat investeringen als door HVY gedaan buiten de bescherming van de ECT vallen, omdat zij zgn. 'U-bochtinvesteringen' zouden zijn (rov. 5.1.8.1 e.v.).

*(ii) Uitleg van art. 1 leden 6 en 7 ECT (legaliteit van de investeringen)*

2.20 Het hof heeft het standpunt van de Russische Federatie beoordeeld dat de ECT geen bescherming biedt aan investeringen die in strijd met het recht van het gastland zijn gedaan (rov. 3.2.3 en 5.1.11.1). Volgens het hof is in art. 1 lid 6 ECT geen expliciete legaliteitseis opgenomen. Het is niet uitdrukkelijk vereist dat een investering moet zijn gedaan in overeenstemming met het recht van het gastland. Ook voor de toegang tot arbitrage als bedoeld in art. 26 ECT bevat de tekst van de ECT op dit punt geen beperkingen (rov. 5.1.11.5). Het hof heeft overwogen dat het beroep van de Russische Federatie op art. 1 leden 6 en 7 ECT faalt.

*(iii) Belastingmaatregelen (art. 21 ECT)*

2.21 Het hof heeft overwogen dat art. 21 ECT geen verwijzingen bevat naar de bevoegdheid van arbiters, maar enkel bepaalt dat de ECT geen rechten verleent of verplichtingen oplegt met betrekking tot belastingmaatregelen. De bevoegdheid van het Scheidsgerecht wordt uitsluitend bepaald door art. 26 ECT. Volgens het hof is aan de voorwaarden van art. 26 ECT voldaan, zodat het bepaalde in art. 21 lid 1 ECT niet tot de conclusie kan leiden dat het Scheidsgerecht onbevoegd zou zijn indien zich een situatie voordoet die door art. 21 lid 1 ECT wordt bestreken (rov. 5.2.5). Het hof heeft verder overwogen dat art. 21 lid 1 ECT uitsluitend ziet op *bona fide* belastingmaatregelen. Het Scheidsgerecht heeft geconcludeerd dat van een *bona fide* belastingheffing geen sprake was, omdat de door de Russische Federatie genomen maatregelen niet uitsluitend bedoeld waren om belasting te innen, maar veeleer om het faillissement van Yukos uit te lokken en Khodorkovsky uit de politieke arena te verwijderen (rov. 5.2.15 en 5.2.16).

2.22 Het hof heeft geconcludeerd dat alle gronden die de Russische Federatie heeft aangevoerd om te betogen dat een geldige arbitrageovereenkomst ontbreekt die gevolgtrekking niet kunnen dragen, zodat er geen aanleiding bestaat de *Yukos Awards* te vernietigen op de voet van art. 1065 lid 1, onder a, Rv (rov. 5.3.1).

2.23 Het hof heeft vervolgens in rov. 6.1 e.v. de stellingen besproken die de Russische Federatie heeft aangevoerd in verband met de vernietigingsgrond van schending van de opdracht (art. 1065 lid 1, onder c, Rv): (a) niet-naleving van art. 21 lid 5 ECT; (b) vaststelling van de schadevergoeding door het Scheidsgerecht, (c) het Scheidsgerecht heeft beslist door te

beëdigd vertaler - Wbtv nr. 1963

gissen en buiten de rechtsstrijd te treden, (d) de rol van de assistent in het Scheidsgerecht, en (e) het ontbreken van motivering.

*(a) Schending van opdracht (art. 1065 lid 1, onder c, Rv) door niet-naleving van art. 21 lid 5 ECT (rov. 6.3).*

2.24    In rov. 6.1 e.v. heeft het hof de stelling besproken dat het Scheidsgerecht in strijd met art. 21 lid 5 ECT heeft nagelaten om het geschil aan de relevante bevoegde belastingautoriteiten voor te leggen. Volgens het hof is dit verzuim niet voldoende ernstig om vernietiging van het arbitrale vonnis te rechtvaardigen, omdat niet aannemelijk is geworden dat de Russische Federatie daarvan enig nadeel heeft ondervonden (rov. 6.3.2). Volgens het hof moet worden aangenomen dat de Russische Federatie tijdens de uitvoerige behandeling van het geschil door het Scheidsgerecht alle relevante informatie naar voren heeft gebracht of heeft kunnen brengen die het Scheidsgerecht ook zou hebben kunnen verkrijgen door de Russische belastingautoriteiten om advies te vragen. Niet goed valt in te zien welke aanvullende informatie het Scheidsgerecht van de Russische belastingautoriteiten had kunnen verkrijgen die tot een ander oordeel over de 'toerekening van inkomsten van de lege handelsmaatschappijen (…) aan Yukos' had kunnen leiden (rov. 6.3.3).

2.25    De Russische Federatie heeft nog aangevoerd dat het geschil ook aan de belastingautoriteiten van Cyprus en van het Verenigd Koninkrijk had moeten worden voorgelegd. Volgens het hof gaat deze stelling niet op, omdat art. 21 lid 5 ECT slechts voorschrijft dat advies aan de 'relevant competent tax authority' moet worden gevraagd indien het gaat om de vraag 'whether a tax constitutes an expropriation'. HVY hebben echter niet aangevoerd dat belastingmaatregelen van Cyprus of van het Verenigd Koninkrijk een onteigening inhouden (rov. 6.3.4). Voorts heeft het hof overwogen dat de handelwijze van het Scheidsgerecht niet in strijd is met het prognoseverbod, zoals betoogd door de Russische Federatie (rov. 6.3.5).

*(b) Vaststelling schadevergoeding*

2.26    Het hof heeft in rov. 6.4.1-6.4.27 uitvoerig aandacht besteed aan de stelling van de Russische Federatie dat het Scheidsgerecht zijn opdracht heeft geschonden door een schadevergoeding toe te kennen op basis van een eigen nieuwe en uiterst gebrekkige berekeningsmethode, die afweek van het partijdebat en waarover partijen niet zijn gehoord, zodat sprake is van een verrassingsbeslissing. Het hof heeft geconcludeerd dat van een verrassingsbeslissing geen sprake is (rov. 6.4.23) en dat de wijze waarop het Scheidsgerecht de schadevergoeding heeft bepaald, geen schending van de opdracht van het Scheidsgerecht vormt.

*(c) Beslissen door te gissen en te treden buiten de rechtsstrijd*

2.27    Het hof heeft in rov. 6.5.1-6.5.15 de stelling van de Russische Federatie beoordeeld dat het Scheidsgerecht zich voor zijn beslissing heeft gebaseerd op eigen speculaties over wat de Russische Federatie in een fictief scenario mogelijk zou hebben gedaan in plaats van op wat

20/01595

zij daadwerkelijk heeft gedaan. Het hof is tot de slotsom gekomen dat de argumenten van de Russische Federatie geen hout snijden en dat het Scheidsgerecht in dit opzicht zijn opdracht niet heeft geschonden noch heeft verzuimd een steekhoudende motivering voor zijn oordeel te geven. Ook is geen sprake van schending van de openbare orde (rov. 6.5.15).

*(d) De rol van de assistent in het Scheidsgerecht*

2.28    In rov. 6.6.1-6.6.15 heeft het hof het betoog van de Russische Federatie besproken dat de *Yukos Awards* moeten worden vernietigd wegens de onevenredig grote betrokkenheid van de assistent van het scheidsgerecht Martin Valasek bij het concipiëren daarvan (rov. 6.6.1). Volgens de Russische Federatie levert deze betrokkenheid strijd op met het beginsel dat de arbiters de hun opgedragen taak persoonlijk moeten vervullen, zodat het Scheidsgerecht zich niet aan zijn opdracht heeft gehouden (art. 1065 lid 1, onder c, Rv). Daarnaast zou door de betrokkenheid van Valasek in feite sprake zijn van een 'vierde arbiter', zodat het Scheidsgerecht in strijd met de daarvoor geldende regels is samengesteld (art. 1065 lid 1, onder d, Rv).

2.29    Het hof heeft dit betoog verworpen. Het hof heeft veronderstellenderwijs aangenomen dat Valasek grote bijdragen heeft geleverd aan het concipiëren van delen van de tekst (rov. 6.6.5), maar dit betekent niet dat hij zelfstandig beslissingen heeft genomen die tot de wezenlijke taak van de arbiters behoren (rov. 6.6.10). Uit het feit dat de *Final Awards* door de drie arbiters zijn ondertekend, volgt dat zij die hebben gewezen, zodat geen sprake is van een even aantal arbiters (rov. 6.6.13). Als veronderstellenderwijs wordt uitgegaan van de juistheid van de stelling van de Russische Federatie dat Valasek enkel als assistent en contactpersoon is geïntroduceerd, kan worden geconstateerd dat het Scheidsgerecht heeft verzuimd partijen op dit punt volledig in te lichten over de aard van de werkzaamheden van Valasek. Dit levert in de gegeven omstandigheden echter geen zodanige ernstige schending van de opdracht op dat dit moet leiden tot vernietiging van de arbitrale vonnissen (rov. 6.6.14.2).

*(e) Het ontbreken van motivering*

2.30    Het hof heeft in rov. 8.4.1-8.4.17 het betoog van de Russische Federatie besproken dat de arbitrale vonnissen ondeugdelijk zijn gemotiveerd (art. 1065 lid 1, onder d, Rv) waar het gaat om de stelling van de Russische Federatie dat Yukos' Mordovische vennootschappen schijnvennootschappen waren. Het Scheidsgerecht is tot de slotsom gekomen dat hiervoor in 'het omvangrijke dossier' geen bewijs is te vinden, waarbij het gaat om het dossier dat voorlag in de fiscale procedures die Yukos in Rusland heeft gevoerd. Volgens het hof gaat het om het ontbreken van bewijs in dat dossier en zijn de talrijke verwijzingen van de Russische Federatie naar bewijsmateriaal dat zij in de arbitrageprocedure heeft overgelegd dus niet relevant (rov. 8.4.13). Het hof heeft geconcludeerd dat de klacht over de motivering van het oordeel dat geen bewijs is geleverd dat de Mordovische vennootschappen schijnvennootschappen zijn, faalt (rov. 8.4.17).

20/01595

2.31    Het hof is tot de slotsom gekomen dat de grieven van HVY in ieder geval deels slagen, en het Scheidsgerecht bevoegd was om van de vorderingen van HVY kennis te nemen en daarop te beslissen. De overige door de Russische Federatie aangedragen vernietigingsgronden kunnen niet tot vernietiging van de *Yukos Awards* leiden (rov. 10.1). Het hof heeft het vonnis van de rechtbank vernietigd en, opnieuw rechtdoende, de vorderingen van de Russische Federatie afgewezen (rov. 10.3 en dictum).

2.32    De Russische Federatie heeft (tijdig) beroep in cassatie ingesteld tegen het tussenarrest van 25 september 2018 en het eindarrest van 18 februari 2020, hierna verder aan te duiden als het tussenarrest onderscheidenlijk het eindarrest. HVY hebben verweer gevoerd en voorwaardelijk incidenteel cassatieberoep ingesteld. Partijen hebben schriftelijke toelichtingen ingediend en hun standpunten mondeling bepleit op 5 februari 2021, gevolgd door schriftelijke re- en dupliek.

2.33    De Russische Federatie heeft in het kader van haar cassatieberoep een verzoekschrift ingediend tot (onder meer) schorsing van de tenuitvoerlegging van de *Yukos Awards* en tot het bevelen van zekerheidstelling door HVY. Bij beschikking van 25 september 2020 heeft de Hoge Raad geoordeeld dat hij bevoegd is van dit verzoek kennis te nemen.[29] Bij beschikking van 4 december 2020 heeft de Hoge Raad het verzoek van de Russische Federatie afgewezen.[30]

## 3.    Bespreking van het principaal cassatiemiddel

3.1    Het principaal cassatiemiddel bestaat uit acht onderdelen, die in diverse subonderdelen uiteenvallen.

### *Onderdeel 1: schending procedurele openbare orde/exclusiviteit art. 1068 Rv*

3.2    Onderdeel 1 is gericht tegen het oordeel van het hof in rov. 5.6-5.8 van het tussenarrest en rov. 9.7 van het eindarrest. Daarin heeft het hof, kort gezegd, overwogen dat de bezwaren van de Russische Federatie over het beweerdelijk bedrog door HVY in de arbitrageprocedure alleen door middel van een vordering tot herroeping op grond van art. 1068 Rv aan de orde kunnen worden gesteld. De klachten houden in dat het hof hiermee heeft miskend dat dergelijk bedrog ook zou moeten kunnen leiden tot vernietiging van het arbitrale vonnis op grond van art. 1065 lid 1, onder e, Rv (strijd met de openbare orde).

3.3    Bij de bespreking van dit onderdeel stel ik het volgende voorop. Het lijdt geen twijfel dat wanneer een arbitraal vonnis tot stand is gekomen als gevolg van fraude of bedrog door een van de procespartijen, deze wijze van totstandkoming in strijd is met de openbare orde. Er

---

[29]   ECLI:NL:HR:2020:1511, NJ 2020/360.
[30]   ECLI:NL:HR:2020:1952, RvdW 2021/2; JOR 2021/79, m.nt. M.A. Broeders.



20/01595

heeft in dat geval immers geen eerlijk proces plaatsgevonden.[31] Sanders schrijft dan ook terecht dat de gronden voor herroeping van art. 1068 lid 1 Rv 'evenzovele gevallen van strijd met de openbare orde' opleveren.[32]

3.4     Hoewel de wetgever heeft voorzien in een afzonderlijke herroepingsprocedure waarin bedrog aan de orde kan worden gesteld, betekent dit niet dat deze procedure exclusief zou moeten worden gevolgd. Uit de wetsgeschiedenis volgt geenszins dat de wetgever door het inrichten van die afzonderlijke procedure de mogelijkheden om bedrog aan de orde te stellen heeft willen beperken. De herroepingsvordering komt immers voort uit het algemene burgerlijk procesrecht[33], en kan ook daarin overlappen met de gewone rechtsmiddelen zoals hoger beroep. Herroeping van een rechterlijke uitspraak (art. 382 Rv) is een buitengewoon rechtsmiddel, waarmee een verwijtbare gedraging van de wederpartij, zoals bedrog, aan de orde kan worden gesteld.[34] In het geval dat nog een gewoon rechtsmiddel open staat, heeft het gewone rechtsmiddel voorrang. De herroepingsvordering kan namelijk pas worden ingesteld indien de desbetreffende uitspraak in kracht van gewijsde is gegaan, en wel binnen drie maanden nadat het bedrog is ontdekt (art. 383 lid 1 Rv). [35] Voor de gewone civiele procedure geldt dus dat bedrog niet exclusief door middel van een herroepingsvordering aan de orde behoeft te worden gesteld. De toegevoegde waarde van de herroepingsprocedure is dat daarin de benadeelde partij de mogelijkheid heeft om het bedrog na afloop van de gewone rechtsmiddeltermijn nog aan de rechter voor te leggen. Herroeping vormt op die manier een aanvulling op de bestaande gewone rechtsmiddelen.

3.5     Er zijn geen aanwijzingen dat de wetgever de herroepingsprocedure in het arbitragerecht (art. 1068 Rv) als de exclusieve remedie voor bedrog in de procedure heeft willen zien.[36] Dit

---

[31]   Zie in het kader van arbitrage bijvoorbeeld Dirk Otto & Omaia Elwan, in: Herbert Kronke e.a., Recognition and Enforcement of Foreign Arbitral Awards: A Global Commentary on the New York Convention, Alphen aan den Rijn: Kluwer Law International 2010, p. 374. Zie in het kader van de erkenning en tenuitvoerlegging van civiele vonnissen o.a. Monique Hazelhorst, Free Movement of Civil Judgments in the European Union and the Right to a Fair Trial, Den Haag: TMC Asser Press 2017, p. 299-300.

[32]   P. Sanders, Het Nederlandse arbitragerecht - nationaal en internationaal, Deventer: Kluwer 2001, p. 199.

[33]   Zie A.J. van den Berg e.a., Nederlands Arbitragerecht, Zwolle: W.E.J. Tjeenk Willink 1992, p. 136-138; Sanders, a.w., p. 203-210; Kamerstukken II 1983-84, 18 464, nr. 3 (MvT), p. 31.

[34]   Groene Serie Burgerlijke Rechtsvordering, art. 382 Rv, aant. 3 (P.J.M. von Schmidt auf Altenstadt).

[35]   Zie Groene Serie Burgerlijke Rechtsvordering, art. 382 Rv, aant. 7 (P.J.M. von Schmidt auf Altenstadt); Th. B. ten Kate en E.M Wesseling-van Gent, Herroeping, verbetering en aanvulling van burgerrechterlijke uitspraken, Deventer: Kluwer 2013, nr. I.1.4. Uit deze eis volgt dat de herroepingsvordering alleen in beeld komt wanneer het bedrog pas na de uitspraak is ontdekt, en redelijkerwijze niet eerder had kunnen worden ontdekt (HR 18 mei 2018, ECLI:NL:HR:2018:727, NJ 2018/250, rov. 3.5). In het uitzonderlijke geval dat het bedrog na de uitspraak maar tijdens de lopende rechtsmiddeltermijn wordt ontdekt, heeft de benadeelde partij de vrije keuze (Groene Serie Burgerlijke Rechtsvordering, art. 382 Rv, aant. 8.2 (P.J.M. von Schmidt auf Altenstadt)).

[36]   Over de redenen voor invoering van de herroepingsprocedure in de Arbitragewet is in de wetsgeschiedenis (Kamerstukken II 1983-84, 18 464, nr. 3 (MvT), p. 31) slechts opgemerkt: 'Het laatste artikel van de vijfde afdeling over de vernietiging van het arbitrale vonnis introduceert het request-civiel op de enigszins aangepaste gronden genoemd in artikel 382 onder 1°, 7° en 8C. In het huidige arbitragerecht zijn deze gronden, eveneens aangepast,

20/01595

kan niet worden afgeleid uit het feit dat de wetgever daarvoor een aparte procedure heeft ingericht, omdat ook in het gewone civiele procesrecht de herroepingsvordering naast andere rechtsmiddelen bestaat. Het feit dat de herroepingsprocedure slechts één instantie kent, wijst er evenmin op dat die procedure exclusief zou moeten worden gevolgd. De wetsgeschiedenis geeft daarvoor geen aanknopingspunten. Met recht kan worden betoogd dat de partij die ervoor kiest het bedrog in de vernietigingsprocedure aan de rechter voor te leggen, hiermee een extra instantie 'verkrijgt'.[37] Daar staat tegenover dat deze partij het bedrog meteen in de vernietigingsdagvaarding als grond naar voren moet brengen (art. 1064 lid 5 Rv), binnen de daarvoor geldende termijn van drie maanden na nederlegging van het arbitrale vonnis ter griffie (art. 1064 lid 3 Rv). Deze partij zal dus niet kunnen profiteren van de 'extra' termijn van drie maanden na ontdekking van het bedrog zoals is bepaald in art 1068 lid 2 Rv.[38] Dit betekent dat door het hof gesignaleerde risico dat bedrog langer dan drie maanden nadat het is ontdekt alsnog bij eiswijziging in de vernietigingsprocedure wordt voorgelegd, niet reëel is. De regel van art. 1064 lid 5 Rv verzet zich immers daartegen.[39]

3.6    Hiermee kom ik toe aan de bespreking van de klachten. Volgens het onderdeel heeft het hof ten onrechte althans zonder toereikende motivering beslist dat feitelijke stellingen die een beroep op herroeping in de zin van art. 1068 Rv zouden hebben kunnen rechtvaardigen, niet de stelling kunnen rechtvaardigen dat een arbitraal vonnis dat is verkregen met behulp van een bedrieglijke verklaring, omgekochte getuigen en het achterhouden van wezenlijke stukken, moet worden vernietigd wegens schending van de openbare orde (art. 1065 lid 1, onder e, Rv). Het hof heeft ten onrechte de Russische Federatie de haar toekomende mogelijkheid van een vrije keuze ontnomen tussen een vordering op de voet van art. 1065 lid 1, onder e, Rv en een vordering op de voet van art. 1068 Rv, aldus het onderdeel.

3.7    Het hof heeft in rov. 5.7 overwogen dat bedrog uitsluitend in een herroepingsprocedure van art. 1068 Rv aan de orde kan worden gesteld, omdat anders onder meer de daarin gegeven

---

te vinden in artikel 649 nrs. 8-10. Hoewel niet vaak voorkomend en dan meest op de onder a van dit artikel genoemde grond, kan dit sluitstuk op de aantasting van het arbitrale vonnis niet worden gemist'.

[37]    Althans omdat het hier toepasselijke oude recht, want inmiddels is de vernietigingsprocedure beperkt tot één feitelijke instantie (art. 1064a (nieuw) Rv).

[38]    Dit betekent ook dat bedrog slechts in uitzonderlijke gevallen in een vernietigingsprocedure aan de orde kan worden gesteld, namelijk als het na de uitspraak, maar binnen de lopende termijn voor een vernietigingsvordering wordt ontdekt. Wanneer bedrog tijdens de procedure is ontdekt of bij redelijkerwijs van de bedrogene te verwachten onderzoek had kunnen worden ontdekt, dan moet dit tijdens de arbitrageprocedure aan het scheidsgerecht worden voorgelegd (vgl. over een vordering tot herroeping HR 20 juni 2003, ECLI:NL:HR:2003:AF6207, NJ 2004/569, m.nt. H.J. Snijders).

[39]    Door Sanders is verdedigd dat deze eis niet zou moeten worden gesteld wanneer een vernietigingsvordering wordt gebaseerd op strijd met de openbare orde (a.w., p. 189-190). Dit is echter, ook volgens Sanders zelf, in strijd met het wettelijk systeem. Zie ook de tegenwerping van H.J. Snijders (Groene Serie Burgerlijke Rechtsvordering, art. 1064 Rv, aant. 2): 'Meer in het algemeen zal (…) een arbitraal vonnis dat in strijd is met de openbare orde – men denke bijvoorbeeld aan gevallen van schending van het beginsel van hoor en wederhoor – toch binnen een zekere termijn, in casu de wettelijke termijn voor vernietiging, aangevallen dienen te worden: rechtszekerheid is een groot goed en 'lites finiri oportet'.'

20/01595

termijn zou kunnen worden omzeild. Uit het voorgaande volgt dat dit uitgangspunt in zijn algemeenheid onjuist is. Dit brengt echter niet mee dat het uiteindelijke oordeel van het hof ook onjuist is. Volgens de Russische Federatie is het beweerdelijke bedrog namelijk ná het vonnis van de rechtbank (van 20 april 2016) ontdekt. [40] Vast staat dat daarop eerst bij memorie van antwoord in appel een beroep is gedaan.[41] De regel van art. 1064 lid 5 Rv dat alle gronden tot vernietiging op straffe van verval van het recht daartoe in de dagvaarding moeten worden voorgedragen, brengt mee dat het beweerdelijke bedrog niet langer in de reeds lopende vernietigingsprocedure kon worden voorgelegd. Dat had immers, op straffe van verval van het recht daartoe, in de inleidende dagvaarding moeten gebeuren. Om die reden kon het hier gestelde bedrog inderdaad, zoals het hof heeft overwogen, nog slechts in een herroepingsprocedure aan de orde worden gesteld, en niet bij memorie van antwoord in de vernietigingsprocedure worden voorgelegd.

3.8     Het voorgaande leidt ertoe dat onderdeel 1 faalt.

### Onderdeel 2: uitleg van art. 45 lid 1 ECT

3.9     <u>Onderdeel 2</u> is gericht tegen de uitleg van het hof van art. 45 lid 1 ECT. Deze uitleg is vervat in rov. 4.5.1 t/m 4.5.48 van het eindarrest. Het onderdeel valt uiteen in acht subonderdelen.

3.10    Onderdeel 2 betoogt in de kern dat in dit geval geen sprake is van een geldige arbitrageovereenkomst, zoals art. 1065 lid 1, onder a, Rv vereist. Volgens het onderdeel bepaalt art. 26 ECT weliswaar dat geschillen over rechten die voortvloeien uit de ECT aan arbitrage kunnen worden onderworpen, maar de Russische Federatie is aan deze bepaling niet gebonden. De Russische Federatie heeft de ECT wel ondertekend, maar nooit geratificeerd. Art. 45 lid 1 ECT voorziet in voorlopige toepassing van de ECT door staten die het verdrag hebben ondertekend, maar slechts voor zover die voorlopige toepassing niet strijdig is met hun interne rechtsorde. Volgens de Russische Federatie heeft het hof op dit punt een verkeerde maatstaf toegepast door te oordelen dat het niet erom gaat of art. 26 ECT als zodanig in strijd is met het Russische recht, maar of voorlopige toepassing van art. 26 ECT daarmee in strijd is.

#### Inleidende opmerkingen

3.11    Voordat ik de klachten van onderdeel 2 bespreek, maak ik enige opmerkingen over de voorlopige toepassing van verdragen in het algemeen en over de voorlopige toepassing van de ECT in het bijzonder. Voorlopige toepassing van een verdrag houdt in dat het verdrag wordt toegepast voordat het door ratificatie in werking treedt. Art. 25 lid 1 WVV staat toe dat

---

40   Procesinleiding, nr. 2.
41   Zie rov. 5.1 van het tussenarrest, onbestreden in cassatie.



een verdrag voorlopig wordt toegepast, indien het verdrag zulks bepaalt, of indien de staten die hebben deelgenomen aan de onderhandelingen op een andere wijze aldus zijn overeengekomen. Volgens art. 25 lid 2 WVV houdt, tenzij het verdrag anders bepaalt of de staten die aan de onderhandelingen hebben deelgenomen anders zijn overeengekomen, de voorlopige toepassing van een verdrag of een deel van een verdrag voor een staat op, als deze staat de andere staten waartussen het verdrag voorlopig wordt toegepast, in kennis stelt van zijn voornemen geen partij te worden bij het verdrag. Met voorlopige toepassing kan worden bereikt dat de wenselijke effecten van het verdrag intreden zonder dat eerst (vaak langdurige) nationale ratificatieprocedures zijn doorlopen.[42] Voorlopige toepassing wordt ook wel bekritiseerd, omdat deze kan conflicteren met de nationale ratificatieprocedures en daarmee met de scheiding der machten.[43]

3.12 Zoals gezegd, voorziet art. 45 ECT in de voorlopige toepassing van de ECT.[44] Deze bepaling luidt in de authentieke Engelse tekst (Trb. 1995, 108) en in de Nederlandse vertaling (Trb. 1995, 250) als volgt:

**Article 45 Provisional application**

1. Each signatory agrees to apply this Treaty provisionally pending its entry into force for such signatory in accordance with Article 44, to the extent that such provisional application is not inconsistent with its constitution, laws or regulations.

2. a) Notwithstanding paragraph 1 any signatory may, when signing, deliver to the Depositary a declaration that it is not able to accept provisional application. The obligation contained in paragraph 1 shall not apply to a signatory making such a declaration. Any such signatory may at any time withdraw that declaration by written notification to the Depositary.
b) Neither a signatory which makes a declaration in accordance with subparagraph a nor Investors of that signatory may claim the benefits of provisional application under paragraph 1.
c) Notwithstanding subparagraph a), any signatory making a declaration referred to in subparagraph a shall apply Part VII provisionally pending the entry into force of the Treaty for such signatory in accordance with Article 44, to the extent that such provisional application is not inconsistent with its laws or regulations.

3. a) Any signatory may terminate its provisional application of this Treaty by written notification to the Depositary of its intention not to become a Contracting Party to the Treaty. Termination of provisional application for any signatory shall take effect upon the expiration of 60 days from the date on which such signatory's written notification is received by the Depositary.
b) In the event that a signatory terminates provisional application under subparagraph a, the obligation of the signatory under paragraph 1 to apply Parts III and V with respect to any Investments made in its Area during such provisional application by Investors of other signatories

---

[42] Zie Heike Krieger, in: Oliver Dörr, Kirsten Schmalenbach, Vienna Convention on the Law of Treaties. A Commentary, Berlin/Heidelberg: Springer 2018, p. 441-446; Denise Mathy, in: Olivier Corten, Pierre Klein (eds.), The Vienna Convention on the Law of Treaties, A Commentary, Volume I, Oxford: OUP 2011, p. 640-654.

[43] Zie hierover Krieger, a.w., p. 445.

[44] Zie hierover Baltag, a.w, p. 31-55; Roe & Happold, a.w., p. 67-77; Hobér, a.w., p. 513-530; Antonio Morelli, in: Rafael Leal-Arcas (ed.), Commentary on the Energy Charter Treaty, Cheltenham: Edward Elgar 2018, p. 477-481; W. Michael Reisman, The provisional application of the Energy Charter Treaty, in: Graham Coop & Clarisse Ribeiro (eds.), Investment Protection and the Energy Charter Treaty, New York: JurisNet 2008, p. 47-61.

A. B. Burrough beëdigd vertaler - Wbtv nr. 1063

20/01595

shall nevertheless remain in effect with respect to those Investments for twenty years following the effective date of termination, except as otherwise provided in subparagraph c).

c) Subparagraph b) shall not apply to any signatory listed in Annex PA. A signatory shall be removed from the list in Annex PA effective upon delivery to the Depositary of its request therefor.

4. Pending the entry into force of this Treaty the signatories shall meet periodically in the provisional Charter Conference, the first meeting of which shall be convened by the provisional Secretariat referred to in paragraph 5 not later than 180 days after the opening date for signature of the Treaty as specified in Article 38.

5. The functions of the Secretariat shall be carried out on an interim basis by a provisional Secretariat until the entry into force of this Treaty pursuant to Article 44 and the establishment of a Secretariat.

6. The signatories shall, in accordance with and subject to the provisions of paragraph 1 or subparagraph 2c) as appropriate, contribute to the costs of the provisional Secretariat as if the signatories were Contracting Parties under Article 37(3). Any modifications made to Annex B by the signatories shall terminate upon the entry into force of this Treaty.

7. A state or Regional Economic Integration Organization which, prior to this Treaty's entry into force, accedes to the Treaty in accordance with Article 41 shall, pending the Treaty's entry into force, have the rights and assume the obligations of a signatory under this Article.

**Artikel 45 Voorlopige toepassing**

1. Elke Ondertekenende Partij stemt ermee in dit Verdrag voorlopig toe te passen in afwachting van de inwerkingtreding voor deze Ondertekenende Partij krachtens artikel 44, voor zover deze voorlopige toepassing niet strijdig is met haar constitutie, wetten of voorschriften.

2. a. Ongeacht het eerste lid kan een Ondertekenende Partij op het tijdstip van ondertekening bij de Depositaris een verklaring indienen dat zij niet kan instemmen met voorlopige toepassing. De in het eerste lid vermelde verplichting geldt niet voor een Ondertekenende Partij die een dergelijke verklaring aflegt. Die Ondertekenende Partij kan te allen tijde haar verklaring intrekken door middel van een schriftelijke kennisgeving aan de Depositaris.

b. Een Ondertekenende Partij die een verklaring aflegt als bedoeld in het tweede lid, letter a, en investeerders van die Ondertekenende Partij kunnen geen aanspraak maken op de voordelen van voorlopige toepassing krachtens het eerste lid.

c. Ongeacht het tweede lid, letter a, moet een Ondertekenende Partij die een verklaring aflegt als bedoeld in het tweede lid, letter a, Deel VII voorlopig toepassen in afwachting van de inwerkingtreding van het Verdrag voor de Ondertekenende Partij overeenkomstig artikel 44, voor zover die voorlopige toepassing niet strijdig is met haar wetten of voorschriften.

3. a. Een Ondertekenende Partij kan de voorlopige toepassing van dit Verdrag beëindigen door middel van een schriftelijke kennisgeving aan de Depositaris van haar voornemen geen partij bij het Verdrag te worden. De beëindiging van de voorlopige toepassing wordt voor een Ondertekenende Partij van kracht na het verstrijken van zestig dagen na de datum waarop de schriftelijke kennisgeving van die Ondertekenende Partij door de Depositaris is ontvangen.

b. Ingeval een Ondertekenende Partij de voorlopige toepassing van dit Verdrag beëindigt overeenkomstig het derde lid, letter a, blijft de krachtens het eerste lid op die Ondertekenende Partij rustende verplichting om Deel III en Deel V toe te passen ten aanzien van investeringen die tijdens die voorlopige toepassing op haar grondgebied zijn gedaan door investeerders van andere Ondertekenende Partijen, evenwel van toepassing voor die investeringen gedurende twintig jaar na de datum van beëindiging, tenzij anders bepaald in het derde lid, letter c.

c. Het bepaalde in het derde lid, letter b, geldt niet voor de in bijlage PA vermelde Ondertekenende Partijen. Een Ondertekenende Partij wordt van de lijst in bijlage PA geschrapt zodra zij bij de Depositaris een verzoek daartoe indient.

20/01595

4. In afwachting van de inwerkingtreding van dit Verdrag komen de Ondertekenende Partijen op geregelde tijdstippen bijeen in het kader van de voorlopige Conferentie van het Handvest, waarvan de eerste vergadering uiterlijk 180 dagen na de in artikel 38 vermelde datum van openstelling voor ondertekening van dit Verdrag door het in het vijfde lid bedoelde voorlopige Secretariaat wordt bijeengeroepen.

5. Tot de inwerkingtreding van dit Verdrag overeenkomstig artikel 44 en de oprichting van een Secretariaat worden de taken van het Secretariaat op tijdelijke basis verricht door een voorlopig Secretariaat.

6. In overeenstemming met dan wel onder voorbehoud van de bepalingen van het eerste lid of het tweede lid, letter c, al naar gelang het geval, dragen de Ondertekenende Partijen bij in de kosten van het voorlopige Secretariaat alsof zij Verdragsluitende Partijen in de zin van artikel 37, derde lid, waren. Eventuele door de Ondertekenende Partijen in bijlage B aangebrachte wijzigingen vervallen bij de inwerkingtreding van dit Verdrag.

7. Een Staat of regionale organisatie voor economische integratie die, vóór de inwerkingtreding van dit Verdrag, overeenkomstig artikel 41 tot het Verdrag toetreedt, heeft in afwachting van de inwerkingtreding van het Verdrag de rechten en verplichtingen van een Ondertekenende Partij krachtens dit artikel.

3.13    Uit de ECT volgt niet welk doel met voorlopige toepassing wordt nagestreefd. In de literatuur wordt genoemd dat in voorlopige toepassing is voorzien om het institutionele kader van de ECT reeds te kunnen inrichten, en momentum te creëren voor de samenwerking op energiegebied waarvoor de ECT is bedoeld.[45]

3.14    In de zaak die in cassatie aan de orde is, rijst de vraag hoe de zinsnede 'to the extent that such provisional application is not inconsistent with its constitution, laws or regulations' uit art. 45 lid 1 ECT moet worden uitgelegd. In deze procedure zijn drie verschillende interpretaties van art. 45 lid 1 ECT overwogen.[46]

3.15    De *eerste* opvatting komt erop neer dat art. 45 lid 1 ECT inhoudt dat voor voorlopige toepassing van de ECT geen plaats is als *het beginsel van voorlopige toepassing van een verdrag* als zodanig in strijd is met het recht van de Ondertekenende Partij (in dit geval met Russisch recht). Deze opvatting is in eerste aanleg primair door HVY verdedigd (zie rov. 4.5.4 eindarrest). Deze uitleg wordt, ook door het hof, aangeduid als de 'alles of niets'-benadering (rov. 4.5.10 eindarrest). Deze opvatting is vooral gebaseerd op het gebruik van het woord 'such', dat terugverwijst naar de eerste helft van de zin: 'Each signatory agrees to apply this Treaty provisionally'.[47] Daarnaast spreekt art. 45 lid 1 ECT van voorlopige

---

[45]  Hobér, a.w., p. 515: Baltag, a.w., p. 35.

[46]  Zie over de verschillende opvattingen ook: Hobér, a.w., p. 520 e.v.; Baltag, a.w., p. 39 e.v.; Reisman, a.w., p. 56 betoogt dat 'the inability in Article 45(2)(a) refers to an inability arising from an inconsistency between the provisional application regime and "its constitution, laws or regulations".' Niet duidelijk is of deze auteur meent dat het moet gaan om inconsistentie tussen het beginsel van voorlopige toepassing en de interne rechtsorde, of om inconsistentie tussen de voorlopig toe te passen bepalingen met de interne rechtsorde.

[47]  Zie ook de *Interim Awards*, para. 304; Baltag, a.w., p. 41.

20/01595

toepassing van 'this Treaty' en niet slechts van een deel daarvan.[48] Deze opvatting is gevolgd door het Scheidsgerecht.[49]

3.16    In de *tweede* opvatting, die door de Russische Federatie wordt verdedigd, wordt art. 45 lid 1 ECT aldus uitgelegd dat het erom gaat of een *afzonderlijke bepaling* van de ECT in strijd is met het recht van de Ondertekenende Partij. In deze visie is art. 26 ECT in strijd met Russisch recht (rov. 4.5.3 eindarrest). Voor de tweede opvatting pleit vooral dat in de 'alles of niets'-uitleg de woorden 'to the extent' uit art. 45 lid 1 ECT in feite betekenisloos worden gemaakt.[50] Die woorden duiden erop dat variatie mogelijk is in de mate waarin staten de ECT voorlopig toepassen.[51] De tweede opvatting brengt daarentegen mee dat steeds moet worden onderzocht of enige bepaling uit het recht van een Ondertekenende Partij in strijd is met de ECT[52], terwijl er geen aanwijzingen zijn dat de verdragsopstellers dit hebben bedoeld.[53] Mede op basis van dit argument heeft het Scheidsgerecht zich in de *Interim Awards* aangesloten bij de eerste opvatting. Daarnaast heeft het Scheidsgerecht gewezen op het beginsel van internationaal recht (neergelegd in art. 27 WVV) dat staten zich niet op hun nationale recht mogen beroepen om te rechtvaardigen dat zij een verdrag niet ten uitvoer leggen.[54] De rechtbank heeft in het vernietigingsgeding deze tweede opvatting gevolgd (zie rov. 5.23 van het vonnis van 20 april 2016).

3.17    De *derde* opvatting houdt in dat art. 45 lid 1 ECT aldus moet worden uitgelegd dat de ECT door de Ondertekenende Partij voorlopig moet worden toegepast, tenzij voorlopige toepassing van een of meer bepalingen van de ECT onverenigbaar is met nationaal recht.[55] In deze opvatting gaat het dus niet om de vraag of een bepaling van de ECT in strijd is met nationaal recht, maar om de vraag of de voorlopige toepassing van een concrete bepaling in strijd is met het nationale recht van de Ondertekenende Partij. HVY hebben zich (subsidiair) in het hoger beroep van het vernietigingsgeding op dit standpunt gesteld (rov. 4.5.4 eindarrest). Deze opvatting is door het hof gevolgd (rov. 4.5.14, 4.5.33 en 4.5.48 eindarrest). Volgens het hof doet deze uitleg zowel recht aan de woorden 'to the extent' als 'such

---

[48]   Zie ook de beslissing in ICSID-arbitrage: *Ioannis Kardassopoulos v. The Republic of Georgia*, ICSID Case No. ARB/05/18, Decision on Jurisdiction, para. 210; *Interim Awards*, para. 307 e.v.

[49]   Zie ook de *Interim Awards*, para. 311 e.v.

[50]   Zie bijvoorbeeld het standpunt van de Russische Federatie zoals weergegeven in para. 294 van de *Interim Awards*.

[51]   Roe & Happold, p. 72-76; *anders*: Baltag, p. 46-48.

[52]   Dit is ook gesignaleerd door Hobér, a.w., p. 520.

[53]   Baltag, a.w., p. 41-42.

[54]   *Interim Awards*, para. 312-315.

[55]   Thomas Wälde, 'Investment Arbitration Under the Energy Charter Treaty – From Dispute Settlement to Treaty Implementation', Arbitration International 1996, p. 462 e.v., meent dat het doel van de *Limitation Clause* is te voorkomen dat staten door de enkele ondertekening gebonden worden aan bepalingen die kunnen conflicteren met hun nationale recht en die wetswijzigingen vereisen om in werking te kunnen treden.

20/01595

provisional application', en dus aan de bezwaren die tegen de andere twee interpretaties zijn ingebracht.

3.18    Na deze uiteenzetting keer ik terug naar de verschillende klachten van het onderdeel.

3.19    Onderdeel 2.1 bevat slechts een inleiding en geen klacht.


*Onderdeel 2.2: art. 26 ECT*

3.20    Onderdeel 2.2 is gericht tegen rov. 4.3 (in het bijzonder rov. 4.3.4) van het eindarrest. Daarin heeft het hof geoordeeld dat de Russische Federatie ondubbelzinnig met arbitrage heeft ingestemd. Het onderdeel klaagt dat dit oordeel onjuist is. Art. 26 ECT bepaalt dat 'each Contracting Party', oftewel iedere verdragsluitende staat, ondubbelzinnig met arbitrage instemt. De Russische Federatie is echter nimmer een verdragsluitende partij geworden, omdat zij de ECT slechts heeft ondertekend en niet geratificeerd. Nu niet duidelijk is of art. 26 ECT ook betrekking heeft op staten die het verdrag slechts hebben ondertekend ('Ondertekenende Partijen'), kan van duidelijke en ondubbelzinnige instemming geen sprake zijn, aldus het onderdeel.

3.21    Anders dan het onderdeel betoogt, heeft het hof niet miskend dat een arbitrageclausule ondubbelzinnig moet zijn overeengekomen. Het hof heeft in rov. 4.3.4 immers kenbaar aan die maatstaf getoetst. Verder heeft het hof, anders dan het onderdeel betoogt, niet miskend dat art. 26 ECT uitsluitend verplichtingen creëert voor verdragsluitende staten en niet ook voor Ondertekenende Partijen. Ook heeft het hof deze begrippen niet met elkaar verward. Dat art. 26 ECT ook verplichtingen creëert voor Ondertekenende Partijen leidt het hof immers af uit art. 45 lid 1 ECT, dat bepaalt dat Ondertekenende Partijen gehouden zijn de bepalingen van de ECT voorlopig toe te passen. Of die uitleg van art. 45 lid 1 ECT juist is, wordt nader aan de orde gesteld door de onderdelen 2.4 e.v. De overweging van het hof, dat 'verschil van inzicht mogelijk is over de strekking van de Limitation Clause en de toepassing daarvan in het licht van het recht van de Russische Federatie', moet niet zo worden opgevat dat het volgens het hof dus onduidelijk is in hoeverre een Ondertekenende Partij is gebonden aan art. 26 ECT. Het hof komt immers, op grond van een analyse van art. 45 lid 1 ECT, tot het oordeel dat Ondertekenende Partijen gehouden zijn art. 26 ECT voorlopig toe te passen (rov. 4.5.48).

3.22    Uit het bovenstaande volgt dat onderdeel 2.2 vergeefs is voorgesteld.

*Onderdeel 2.3: bevoegdheid van het Scheidsgerecht*

3.23    Onderdeel 2.3 is gericht tegen rov. 4.4.3-4.4.6 van het eindarrest. De kern van die overwegingen is dat geen aanleiding bestaat voor de vernietiging van een arbitraal vonnis, indien het scheidsgerecht weliswaar op onjuiste gronden bevoegdheid heeft aangenomen,

20/01595

maar de overheidsrechter op andere gronden tot het oordeel komt dat dat
bevoegdheidsoordeel juist was. Volgens het hof is het onaanvaardbaar dat de
overheidsrechter alsnog tot beoordeling van het geschil zou moeten overgaan, terwijl er een
geldige arbitrageovereenkomst is, enkel omdat het scheidsgerecht, dat in dit opzicht juist niet
het laatste woord heeft, een onjuiste motivering heeft gebruikt voor zijn bevoegdheidsoordeel
(rov. 4.4.3, slot). Het onderdeel klaagt dat het wettelijk systeem van de
vernietigingsprocedure dit niet toestaat. Het stond HVY niet vrij om in de
vernietigingsprocedure nieuwe bevoegdheidsgronden aan te dragen, althans niet pas in
hoger beroep, aldus het onderdeel.

3.24   Uitgangspunt is dat de overheidsrechter op het punt van de bevoegdheid van het
scheidsgerecht, anders dan bij andere vernietigingsgronden van art. 1065 lid 1 Rv[56], geen
terughoudendheid moet betrachten. De reden daarvoor is dat partijen door arbitrage overeen
te komen afstand doen van het fundamentele recht op toegang tot de overheidsrechter (art.
6 EVRM).[57] Daarom is de beantwoording van de vraag of een geldige arbitrageovereenkomst
is gesloten, uiteindelijk aan de overheidsrechter opgedragen. Niet het scheidsgerecht, maar
de rechter heeft in dit verband het laatste woord.[58] Het gaat immers om de vraag óf het
scheidsgerecht bevoegd is en niet om de vraag op welke grondslag het scheidsgerecht zijn
bevoegdheid heeft gebaseerd.[59]

3.25   Het is dus uiteindelijk de overheidsrechter die definitief beslist of het scheidsgerecht bevoegd
was of niet.[60] De overheidsrechter kan tot het oordeel komen dat het scheidsgerecht
weliswaar bevoegd was, maar op andere gronden dan het scheidsgerecht zelf aan zijn
bevoegdheidsoordeel ten grondslag heeft gelegd. Het onderdeel verdedigt in feite de
opvatting dat de rechter slechts zou mogen toetsen of het scheidsgerecht zich op de juiste
gronden bevoegd heeft verklaard en het arbitrale vonnis zou moeten vernietigen als dat niet
zo is[61], terwijl duidelijk is dat het scheidsgerecht op andere gronden bevoegd was. Die

[56] HR 9 januari 2004, ECLI:NL:HR:2004:AK8380, NJ 2005/190, m.nt. H.J. Snijders, rov. 3.5.2, onder verwijzing
naar HR 17 januari 2003, ECLI:NL:HR:2003:AE9395, NJ 2004/384, m.nt. H.J. Snijders. Zie Sanders, a.w., p.
186-188; H.J. Snijders, Arbitragerecht, Deventer: Wolters Kluwer 2018, nr. 9.3.1.2 (= Groene Serie Burgerlijke
Rechtsvordering, art. 1065 Rv, aant. 1.2); Van den Berg e.a., a.w., p. 132.
[57] Snijders, a.w., 2018, nr. 1.1.3.
[58] HR 26 september 2014, ECLI:NL:HR:2014:2837, NJ 2015/318, m.nt. H.J. Snijders, rov. 4.2.
[59] Zie onder 2.36 van de conclusie van A-G Wesseling-van Gent (ECLI:NL:PHR:2009:BG4003) vóór HR 27 maart
2009, ECLI:NL:HR:2009:BG4003, NJ 2010/169, m.nt. H.J. Snijders onder NJ 2010/170.
[60] HR 9 januari 1981, ECLI:NL:HR:1981:AG4130, NJ 1981/203, m.nt. W.H. Heemskerk. Zie Sanders, a.w., p. 23
en 33; Snijders, a.w., 2018, nr. 6.4.1; G.J. Meijer, Overeenkomst tot arbitrage - bezien in het licht van het
bewijsvoorschrift van artikel 1021 Rv, Deventer: Kluwer 2011, p. 860; N. Peters, IPR, Proces & Arbitrage. Over
grondslagen en rechtspraktijk, Apeldoorn: Maklu 2015, p. 274.
[61] Het onderdeel verwijst naar een in hoger beroep overgelegde opinie van prof. H.J. Snijders (productie RF-D9),
waarin wordt verdedigd dat het aanvullen van bevoegdheidsgronden door de overheidsrechter in strijd is met de
finaliteit en effectiviteit van de arbitrageprocedure. Ook noemt Snijders het als een bezwaar dat bij het
scheidsgerecht geen debat heeft kunnen plaatsvinden over de bevoegdheidsgrond die door de overheidsrechter
is toegepast.

20/01595

rechtsopvatting is onjuist en in strijd met het door art. 6 EVRM gewaarborgde recht op toegang tot de rechter, waaruit volgt dat de overheidsrechter de bevoegdheid van het scheidsgerecht mag onderzoeken. Daarmee wordt ook recht gedaan aan de bedoeling van partijen om hun geschil aan arbitrage te onderwerpen en wordt voorkomen dat partijen alsnog bij de overheidsrechter moeten gaan procederen terwijl zij dat niet hebben gewild.[62]

3.26    De rechter mag de gronden voor de bevoegdheid van het scheidsgerecht dus aanvullen[63], maar heeft daarbij uiteraard de regels over de aanvulling van rechtsgronden in acht te nemen. In dat verband heeft de Russische Federatie aangevoerd dat het hof geen acht mocht slaan op de door HVY voorgestelde grondslag voor bevoegdheid van het Scheidsgerecht, omdat HVY deze grondslag voor het eerst in hoger beroep hebben aangedragen.[64] Daarmee miskent de Russische Federatie dat het hof gehouden was om, binnen de grenzen van het door de grieven ontsloten gebied, zo nodig ambtshalve de rechtsgronden aan te vullen (art. 25 Rv).[65] Niet bestreden is dat de grieven van HVY zich richten tegen de wijze waarop de rechtbank art. 45 lid 1 ECT heeft uitgelegd. Het stond het hof daarom vrij om te onderzoeken hoe deze bepaling moet worden uitgelegd en daarbij nieuwe juridische argumenten in acht te nemen.[66] Ik wijs erop dat het hof de door HVY naar voren gebrachte uitleg in rov. 4.4.6 van het eindarrest als zuiver juridisch argument heeft gekwalificeerd.[67] Die kwalificatie is in cassatie niet bestreden. Anders dan het onderdeel aanvoert, mocht het hof dus acht slaan op deze door HVY voor het eerst in hoger beroep aangevoerde rechtsgrond.

3.27    Voorts is niet in te zien dat de leden 4 en 5 van art. 1052 Rv aan deze aanvulling van bevoegdheidsgronden in de weg staan.[68] Art. 1052 lid 4 Rv bepaalt dat het bevoegdheidsoordeel van het scheidsgerecht slechts tegelijk met een daaropvolgend geheel of gedeeltelijk eindvonnis met de rechtsmiddelen van art. 1064 lid 1 Rv kan worden bestreden. Art. 1052 lid 5 Rv betreft het geval dat het scheidsgerecht zich onbevoegd heeft verklaard, waarna de gewone rechter bevoegd is van de zaak kennis te nemen. Uit art. 1052 lid 5 Rv vloeit voort dat het oordeel van het scheidsgerecht dat het onbevoegd is, een

---

[62]  Zie ook rov. 4.4.4 van het eindarrest van het hof in deze zaak.

[63]  In gelijke zin Peters, a.w., p. 274 en onder 7 van zijn noot in JOR 2020/164 bij het eindarrest van het hof.

[64]  Procesinleiding, randnummer 27 onder c.

[65]  Asser Procesrecht/Bakels, Hammerstein & Wesseling-van Gent 4 2018/171.

[66]  Vgl. HR 27 maart 2009, ECLI:NL:HR:2009:BG4003, NJ 2010/169, m.nt. H.J. Snijders, waarin is overwogen dat ook de partij die zich op vernietiging beroept de daartoe aangevoerde gronden in hoger beroep van een nadere feitelijke of juridische onderbouwing mag voorzien, mits de strekking van art. 1064 lid 5 Rv wordt geëerbiedigd. Zie ook nr. 2.16 van de conclusie van A-G Wesseling-van Gent vóór dit arrest (ECLI:NL:PHR:2009:BG4003).

[67]  Zie instemmend Peters onder 8 van zijn reeds genoemde noot in JOR 2020/164.

[68]  Zie procesinleiding, nr. 27 onder a.

20/01595

definitief oordeel is dat niet bij de overheidsrechter kan worden aangevochten.[69] De Hoge
Raad heeft overwogen dat het samenstel van art. 1052 en 1065 Rv ertoe strekt

> 'te bewerkstelligen dat, indien een partij de bevoegdheid van het scheidsgerecht wil betwisten
> vanwege het ontbreken van een geldige overeenkomst tot arbitrage, daarover door het
> scheidsgerecht in een vroeg stadium van de procedure een beslissing kan worden genomen,
> waardoor zoveel mogelijk voorkomen wordt dat onnodige proceshandelingen verricht zouden
> worden indien een later (in het arbitraal geding of bij de gewone rechter) gedaan beroep op het
> ontbreken van een geldige overeenkomst tot arbitrage, alsnog zou moeten leiden tot het oordeel
> dat het scheidsgerecht onbevoegd is'.[70]

Of in de vernietigingsprocedure nieuwe feitelijke of juridische stellingen mogen worden
aangevoerd, zal in ieder concreet geval moeten worden beoordeeld, mede gelet op de eisen
van een goede procesorde.[71]

3.28    Terzijde wijs ik erop dat in de toelichting bij art. 1065a (nieuw) Rv, voor zover relevant, niet
is te lezen dat de rechter een onjuist bevoegdheidsoordeel niet kan corrigeren (in die zin dat
het de zaak op die grond naar het scheidsgerecht kan terugwijzen). Het gaat erom dat de
rechter de zaak niet zal terugwijzen (*remission*) als hij tot het oordeel komt dat een geldige
arbitrageovereenkomst ontbreekt.[72] In dat geval heeft terugwijzing immers geen zin.

3.29    Het onderdeel (nr. 28) betoogt nog dat onbegrijpelijk is het oordeel van het hof in rov. 4.4.6
van het eindarrest, dat HVY haar nieuwe standpunt tijdens de arbitrageprocedure, althans in
eerste aanleg naar voren hadden moeten brengen. Uit het voorafgaande volgt dat deze
klacht faalt.

3.30    De slotsom luidt dat onderdeel 2.3 in zijn geheel faalt.

*Onderdeel 2.4: Limitation Clause*

3.31    Onderdeel 2.4 klaagt dat de uitleg die het hof heeft gegeven aan de *Limitation Clause* van
art. 45 lid 1 ECT, rechtens onjuist is. Het onderdeel (onder 2.4.1) vat deze door het hof
gehanteerde uitleg samen en formuleert (onder 2.4.2) een aantal klachten.

3.32    In rov. 4.2.1 e.v. van het eindarrest heeft het hof een – in cassatie niet bestreden –
vooropstelling gegeven over de wijze van uitleg van verdragen. Ik vat deze kort samen. Art.
31 en 32 WVV geven richtsnoeren voor de uitleg van verdragsbepalingen. Uitleg van een
verdrag is steeds gericht op het achterhalen van de intentie van de verdragspartijen. Daarbij

---

[69]  Zie *Kamerstukken II* 1983-84, 18 464, nr. 3 (MvT), p. 22; Meijer, a.w., 2011, p. 860; Van den Berg e.a., a.w., p.
    99.
[70]  Zie HR 27 maart 2009, ECLI:NL:HR:2009:BG6443, NJ 2010/170, m.nt. H.J. Snijders, rov. 3.4.1.
[71]  Zie rov. 3.4.2 van het in de vorige noot aangehaalde arrest van de Hoge Raad.
[72]  G.J. Meijer e.a., Parl. Gesch. Arbitragewet 2015/I.77.3.

20/01595

is de tekst van de desbetreffende verdragsbepaling leidend (rov. 4.2.2).[73] De tekst moet worden beschouwd in zijn context, alsmede in het licht van voorwerp en doel ('object and purpose') van het verdrag. Deze uitleg moet krachtens art. 31 lid 1 WVV te goeder trouw plaatsvinden (rov. 4.2.3). Volgens art. 31 lid 3, onder b, WVV moet, naast de context, ook rekening worden gehouden met ieder later gebruik ('subsequent practice') in de toepassing van het verdrag waardoor overeenstemming over de uitleg van het verdrag is ontstaan (rov. 4.2.4). Tot slot kan volgens art. 32 WVV worden gekeken naar de voorbereidende werkzaamheden van het verdrag ('travaux préparatoires'). Dit is echter een aanvullend hulpmiddel, waaraan slechts wordt toegekomen om de uitleg volgens art. 31 WVV te bevestigen of als de uitleg leidt tot een onduidelijke of onredelijke uitkomst (rov. 4.2.5).

3.33    Het onderdeel (nr. 34) klaagt dat de uitleg van het hof in strijd is met de gewone betekenis van de bewoordingen van art. 45 lid 1 ECT. Volgens het hof moet worden bezien of het recht van een Ondertekenende Partij voorlopige toepassing van (een bepaalde categorie van) bepaalde verdragsbepalingen uitsluit. Volgens de klacht is er niets in de bewoordingen van art. 45 lid 1 ECT dat hierop duidt.

3.34    Uit rov. 4.5.10 blijkt dat het hof deze uitleg heeft gebaseerd op de gewone betekenis van de woorden 'voor zover' ('to the extent') in de tekst van art. 45 lid 1 ECT. Zoals het hof heeft overwogen, hebben HVY in eerste aanleg verdedigd dat op grond van art. 45 lid 1 ECT moet worden getoetst of het beginsel van voorlopige toepassing van een verdrag als zodanig in strijd is met het recht van de Ondertekenende Partij. In rov. 4.5.10 e.v. heeft het hof overwogen dat die uitleg geen recht doet aan de gewone betekenis van de woorden 'voor zover' uit die bepaling. Die woorden geven namelijk aan, aldus het hof, dat gradaties mogelijk zijn in de mate waarin de voorlopige toepassing van de ECT buiten toepassing moet worden gelaten wegens onverenigbaarheid met het nationale recht. Anders dan de klacht betoogt, ondersteunt de gewone betekenis van de bewoordingen van art. 45 lid 1 ECT de uitleg van het hof. De klacht maakt niet duidelijk waarom de door het hof vastgestelde gewone betekenis van deze bewoordingen onjuist zou zijn, zodat de klacht faalt.

3.35    Ook klaagt het onderdeel (nr. 35) dat de uitleg in strijd is met de context waarin de bewoordingen 'voor zover' worden gebruikt. Het onderdeel wijst erop dat art. 45 lid 2, onder c, ECT dezelfde bewoordingen gebruikt, die in dat verband echter verwijzen naar specifieke delen van de ECT, hetgeen het hof in rov. 4.5.19 ook zou onderschrijven. De uitleg van art. 45 lid 1 ECT zou daarmee niet consistent zijn, aldus de klacht.

---

[73]  Zie IGH *Territorial Dispute (Libya v Chad)*, 3 februari 1994, para. 41, waar het Internationaal Gerechtshof opmerkt: 'Interpretation must be based above all upon the text a the treaty'; zie Oliver Dörr, in: Oliver Dörr, Kirsten Schmalenbach, Vienna Convention on the Law of Treaties. A Commentary, Berlin/Heidelberg: Springer 2018, p. 580.

20/01595

3.36    Anders dan de klacht aanvoert, is geen sprake van inconsistentie. Het hof heeft in rov. 4.5.19 het oordeel van de rechtbank onderschreven dat de bewoordingen 'voor zover' van art. 45 lid 1 en art. 45 lid 2, onder c, ECT pleiten tegen de 'alles of niets'-benadering die HVY primair hebben verdedigd. Het hof heeft de beide bepalingen dus consistent uitgelegd. Voor zover de klacht bedoelt aan te voeren dat de woorden 'voor zover' in art. 45 lid 2, onder c, ECT zo zouden moeten worden uitgelegd dat zij verwijzen naar specifieke delen van de ECT, en dat het hof dit zou hebben onderschreven, berust de klacht op een onjuiste lezing van de bestreden overweging.

3.37    Het onderdeel (nr. 36-37) klaagt verder dat het hof de ratio om de reikwijdte van voorlopige toepassing te beperken, heeft miskend. Volgens het onderdeel is de ratio van de voorlopige toepassing gelegen in het bieden van 'een voorziening voor regeringsfunctionarissen die internationale samenwerking vorm willen geven en tegelijkertijd de interne bekrachtigingsprocedures willen respecteren'. Hiermee past art. 45 ECT binnen het doel van de ECT om internationale samenwerking op grond van de ECT zo snel mogelijk vorm te geven en anderzijds (te zijner tijd) een deugdelijke en bindende internationale rechtsgrondslag voor die samenwerking te vestigen, waarbij het onderdeel verwijst naar een passage uit de Preambule van de ECT.

3.38    Deze klacht ziet op de wijze waarop het hof art. 45 lid 1 ECT heeft uitgelegd in het licht van voorwerp en doel van de ECT. In rov. 4.5.22 e.v. heeft het hof daarover het volgende overwogen. Het doel van de ECT is om investeringen aan te trekken door een stabiel en veilig investeringsklimaat en door het bevorderen van transparantie, rechtszekerheid en investeringsbescherming. De voorlopige toepassing van de ECT heeft als doel ervoor te zorgen dat de verplichting om de gewenste investeringscondities in het leven te roepen terstond na ondertekening zou ontstaan (rov. 4.5.26). Volgens het hof verdraagt de uitleg die de Russische Federatie heeft verdedigd zich minder goed met dit doel, omdat een investeerder steeds ermee rekening zou moeten houden dat aan de bepalingen van de ECT afbreuk wordt gedaan door nationale wet- en regelgeving (rov. 4.5.26). De primair en subsidiair voorgestelde uitleg van HVY van art. 45 lid 1 ECT kennen dat nadeel van onduidelijkheid en onvoorspelbaarheid niet, aldus het hof (rov. 4.5.27).

3.39    De klacht bestrijdt deze weergave van voorwerp en doel van de ECT op zichzelf niet, maar betoogt in feite dat ook het doel van voorlopige toepassing van de ECT had moeten worden meegewogen, namelijk om regeringsfunctionarissen in staat te stellen de ECT te ondertekenen en tevens de nationale ratificatieprocedures te respecteren. De door de klacht aangehaalde passage uit de Preambule (4e alinea) van de ECT luidt (in de Nederlandse vertaling) als volgt:

'Eraan herinnerend dat alle ondertekenaars van het Slotdocument van de Conferentie van 's-Gravenhage zich ertoe verbonden hebben zich in te zetten voor de doelstellingen en beginselen van het Europees Energiehandvest en hun samenwerking zo snel mogelijk vorm te geven en uit te breiden door te goeder trouw te onderhandelen over een Verdrag inzake een Energiehandvest,

Pagina 27 van 89

20/01595

> met protocollen, en geleid door de wens de in dat Handvest neergelegde verplichtingen op een deugdelijke en bindende internationale rechtsgrondslag te vestigen'.

3.40    Op zichzelf is het juist dat de Preambule van een verdrag relevant is voor het vaststellen van voorwerp en doel van dat verdrag. [74] Om vast te stellen welk doel in de Preambule tot uitdrukking wordt gebracht, moet de Preambule worden uitgelegd volgens de regels van art. 31 e.v. WVV. Kennelijk gaat de klacht er vanuit dat met de aangehaalde passage van de Preambule wordt uitgedrukt dat het een doel van de ECT zou zijn om regeringen de tijd te geven (door ratificatie) een bindende rechtsgrondslag in hun eigen rechtsorde te creëren. Deze opvatting kan niet worden aanvaard. De slotzinsnede van de vierde alinea van de Preambule heeft betrekking op de wens de in de ECT neergelegde verplichtingen 'op een deugdelijke en bindende *internationale* rechtsgrondslag te vestigen' (mijn curs., A-G). Die woorden doelen op de ECT zelf en niet op de ratificatie daarvan door de ondertekenende staten. Dat wordt bevestigd door de context waarin deze woorden staan: de ECT vormt immers de bindende rechtsgrondslag voor verplichtingen die reeds in het niet-bindende Europees Energiehandvest waren opgenomen.[75] Noch uit de Preambule noch uit de bepalingen van de ECT volgt dat een onderdeel van voorwerp en doel van de ECT zou zijn dat regeringsfunctionarissen de tijd wordt gegeven een bindende interne rechtsgrondslag te creëren. Zelfs wanneer de Preambule wel op de wijze moet worden uitgelegd zoals door de klacht wordt verdedigd, geldt nog dat het hof daarmee in rov. 4.5.34 e.v. rekening heeft gehouden. In die rechtsoverwegingen heeft het hof immers ten overvloede, op grond van de *travaux préparatoires*, overwogen dat art. 45 lid 1 ECT als doel heeft te voorkomen dat ondertekenende staten door voorlopige toepassing worden gebonden aan verplichtingen waarvoor volgens hun nationale recht ratificatie noodzakelijk is. Op basis daarvan is het hof tot het oordeel gekomen dat art. 45 lid 1 ECT voorlopige toepassing slechts uitsluit, indien die toepassing voor bepaalde (categorieën van) bepalingen van de ECT onverenigbaar is met het nationale recht. Aldus heeft het hof ermee rekening gehouden dat de ECT, althans art. 45 lid 1, tot doel heeft Ondertekenende Partijen de ruimte te bieden de ECT voorlopig toe te passen, met uitzondering van die bepalingen die de Ondertekenende Partijen volgens hun nationale recht pas na ratificatie kunnen verbinden. Op het voorgaande stuit de klacht af.

---

[74]   Dörr, a.w., p. 585.
[75]   Zie Rafael Leal-Arcas, Introduction, in: Rafael Leal-Arcas (ed.), Commentary on the Energy Charter Treaty, Cheltenham: Edward Elgar 2018, p. 1 en 9.

20/01595

3.41    Het onderdeel (nr. 37) klaagt dat het hof ten onrechte 'transparantie' als één van de doelen van de ECT heeft genoemd. Volgens de klacht zegt art. 45 lid 1 ECT niets over transparantie en zijn stellingen van HVY met die strekking reeds verworpen.[76]

3.42    De klacht miskent dat rov. 4.5.22-4.5.27 geen betrekking hebben op het doel van art. 45 lid 1 ECT, maar op het doel van de ECT als geheel. In rov. 4.5.23 heeft het hof met verwijzingen naar de verdragstekst onderbouwd dat transparantie van de ECT één van de doelen is. Nu art. 45 lid 1 ECT in het licht van het doel van de ECT moet worden uitgelegd[77], valt niet in te zien waarom het onjuist zou zijn dat het hof het doel van transparantie heeft betrokken bij de uitleg van die bepaling.

3.43    Het onderdeel (nr. 38-42) klaagt over het oordeel van het hof dat onvoldoende is gebleken van een (gevestigde) statenpraktijk waaruit een andere uitleg dan de zijne zou volgen (rov. 4.5.28-4.5.33). De klacht wijst op verschillende verklaringen, die door het hof zijn miskend, waaruit een dergelijke statenpraktijk zou volgen.

3.44    Art. 31 lid 3, onder b, WVV bepaalt dat behalve met de context ook rekening dient te worden gehouden met 'ieder later gebruik in de toepassing van het verdrag waardoor overeenstemming van de partijen inzake de uitlegging van het verdrag is ontstaan' ('any subsequent practice in the application of the treaty which establishes the agreement of the parties regarding its interpretation'). Daarvoor is noodzakelijk dat alle verdragsluitende partijen die praktijk in de toepassing van het desbetreffende verdrag, uitdrukkelijk dan wel impliciet, hebben geaccepteerd.[78] Verder is de statenpraktijk van belang, wanneer deze zich heeft ontwikkeld na het sluiten van het verdrag ('subsequent practice').

3.45    De klacht wijst op verschillende verklaringen waaruit een statenpraktijk zou volgen die onverenigbaar is met de door het hof voorgestane uitleg van art. 45 lid 1 ECT. Zo wordt gewezen op een verklaring van de Europese Raad, de Europese Commissie en de toenmalige lidstaten uit 1994 (de '1994 EU Joint Statement'), waarin is verklaard dat art. 45 ECT '(…) does not create any commitment beyond what is compatible with the existing order of the Signatories'. Het hof heeft deze verklaring in rov. 4.5.29 besproken en overwogen dat die niet onverenigbaar is met de subsidiaire uitleg van HVY. Het onderdeel klaagt dat deze

---

[76]  Het oordeel van de rechtbank in rov. 5.28 van haar vonnis, waarnaar de klacht in nr. 37 verwijst, staat overigens in een andere sleutel. De rechtbank heeft op die plaats het standpunt van HVY verworpen dat art. 45 lid 1 ECT transparantie zou eisen in die zin dat het de eis zou stellen dat Ondertekenende Partijen door middel van een voorafgaande verklaring of kennisgeving duidelijk moeten maken welke verdragsbepalingen volgens hun nationale recht niet voorlopig kunnen worden toegepast.

[77]  Aldus art. 31 lid 1 en 2 WVV, en de (terecht onbestreden) weergave en bespreking daarvan door het hof in rov. 4.2.1 e.v.

[78]  Nollkaemper, a.w., nr. 243; Dörr, a.w., p. 598-599.

20/01595

uitleg van het hof onjuist is en dat art. 45 lid 1 ECT zo moet worden uitgelegd dat de interpretatie van de Russische Federatie de juiste is.

3.46  Anders dan de Russische Federatie betoogt, kan de Joint Statement aldus worden gelezen dat art. 45 lid 1 ECT geen verplichting schept die onverenigbaar is met de interne rechtsorde van Ondertekenende Partijen, in die zin dat voorlopige toepassing van bepalingen van de ECT die met die interne rechtsorde onverenigbaar zijn, is uitgesloten. Zelfs in het geval dat de Joint Statement wel zou moeten worden geïnterpreteerd zoals door de Russische Federatie wordt voorgestaan, geldt dat het slechts gaat om een verklaring van de toenmalige EG-lidstaten. Daaruit blijkt niet dat alle (toenmalige, laat staan huidige) verdragsluitende staten van de ECT deze interpretatie onderschrijven. Ik wijs er nog op dat strikt genomen de Joint Statement is afgelegd vóór de datum van de totstandkoming van de ECT, zodat reeds om die reden niet kan worden gesproken van 'subsequent practice'. De klacht faalt dus.

3.47  Het onderdeel (nr. 41) klaagt nog dat het hof in rov. 4.5.31 en 4.5.32 ten onrechte en/of zonder begrijpelijke motivering heeft overwogen dat – kort gezegd – uitlatingen van Nederlandse ambtenaren, van de Finse regering en van de Minister van Buitenlandse Zaken van het Verenigd Koninkrijk, verenigbaar zouden zijn met de door het hof gehanteerde uitleg van art. 45 ECT.

3.48  Ook deze klacht snijdt geen hout. De overweging van het hof over de verklaring van de Finse regering is juist in het licht van de reeds genoemde regel dat een statenpraktijk slechts relevant is wanneer die door alle verdragsstaten wordt onderschreven. Hetzelfde geldt voor hetgeen het hof heeft overwogen over opmerkingen van Nederlandse ambtenaren. Anders dan de klacht aanvoert[79], heeft het hof niet geoordeeld dat deze verklaringen verenigbaar zouden zijn met de uitleg van art. 45 lid 1 ECT die de Russische Federatie onderschrijft, maar (terecht) geoordeeld dat zij niet duiden op een statenpraktijk als bedoeld in art. 31 lid 3, onder b, WVV. Het hof heeft terecht overwogen dat deze verklaringen (waaronder ook die van de Minister van Buitenlandse Zaken van het Verenigd Koninkrijk) niet onder de statenpraktijk vallen, maar onder de *travaux préparatoires*, waarmee in die context rekening is gehouden.

3.49  Het onderdeel (nr. 42) voert nog aan dat de uitleg die het hof heeft aanvaard, erop neerkomt dat sommige EG-lidstaten de ECT in zijn geheel voorlopig moeten toepassen. Volgens die uitleg, aldus het onderdeel, zouden vertegenwoordigers van die staten dus hun interne bevoegdheden hebben overschreden.

3.50  Het onderdeel betoogt in feite dat de door het hof aanvaarde uitleg van art. 45 lid 1 ECT in bepaalde verdragsstaten consequenties zou hebben die onverenigbaar zijn met het interne

---

[79]  Zie nr. 41 van de procesinleiding, voetnoot 92.



20/01595

recht van die staten. Dit betoog kan niet worden aanvaard. In rov. 4.5.9-4.5.33 heeft het hof art. 45 lid 1 ECT uitgelegd aan de hand van de maatstaf van art. 31 WVV. Het hof heeft die bepaling, uitgaande van de gewone betekenis van de tekst, beschouwd in haar context en in het licht van voorwerp en doel van de ECT. De vraag of de met toepassing van art. 31 WVV bereikte uitleg onverenigbaar is met de interne rechtsorde van verdragsstaten, maakt geen deel uit van de uitlegregel van art. 31 WVV. Wel is het op grond van art. 32, onder b, WVV mogelijk dat een verdragsbepaling aan de hand van de *travaux préparatoires* wordt uitgelegd in het geval dat de toepassing van art. 31 WVV tot een duidelijk ongerijmd of onredelijk resultaat leidt. Voor zover het onderdeel zo zou moeten worden gelezen dat de uitleg van het hof ongerijmd of onredelijk is, geldt dat het hof zijn uitleg in rov. 4.5.34 e.v. met verwijzingen naar de *travaux préparatoires* heeft onderbouwd.

3.51    Het onderdeel (nr. 43-49) klaagt over rov. 4.5.34-4.5.40, waarin het hof aandacht heeft besteed aan de *travaux préparatoires* bij de ECT.

3.52    In rov. 4.5.35 heeft het hof ten overvloede overwogen dat de *travaux préparatoires* zijn oordeel over de uitleg van art. 45 lid 1 ECT bevestigen. Volgens art. 32 WVV wordt aan de *travaux préparatoires* pas toegekomen, wanneer de uitleg die op grond van art. 31 WVV is bereikt, duidelijk ongerijmd of onredelijk is. Daarvan is volgens het hof geen sprake. Nu de klachten over de toepassing van art. 31 WVV falen, behoefde het hof niet toe te komen aan onderzoek naar de *travaux préparatoires*, zodat het oordeel daarover in rov. 4.5.35 ten overvloede is gegeven. Dat betekent dat de daartegen gerichte klachten belang missen.

3.53    De slotsom is dat alle klachten van onderdeel 2.4 falen.

        *Onderdeel 2.5: 'not inconsistent' in art. 45 lid 1 ECT*

3.54    Onderdeel 2.5 ziet op de uitleg van de woorden 'not inconsistent' in art. 45 lid 1 ECT. Het onderdeel voert aan dat het hof, naast zijn eigen verdragsuitleg, een alternatieve uitleg zou hebben ontwikkeld in rov. 4.5.41-4.5.47 en 4.7 van het eindarrest. Die alternatieve uitleg houdt volgens het onderdeel in dat (anders dan het hof in rov. 4.5.1-4.5.40 heeft overwogen) in het kader van art. 45 lid 1 ECT zou moeten worden getoetst of bepalingen uit de ECT in strijd zijn met de interne rechtsorde van de Ondertekenende Partij, waarbij de ECT reeds als onderdeel van die rechtsorde moet worden gezien. Die uitleg is volgens het onderdeel onjuist, omdat het hof er ten onrechte vanuit is gegaan dat art. 26 ECT van toepassing is in de Russische rechtsorde. Als voorbeeld wordt gewezen op rov. 4.7.49, waarin het hof heeft overwogen dat de vraag of het Scheidsgerecht bevoegd is, moet worden beoordeeld aan de hand van art. 26 ECT en niet aan de hand van het Russische recht. Het hof zou daarmee hebben aangenomen dat arbitrage op art. 26 ECT kan worden gebaseerd en die bepaling dus van toepassing is in de Russische rechtsorde, hetgeen echter nog bewezen moet worden.

3.55    Het hof heeft in rov. 4.5.41 het volgende overwogen:

20/01595

'De betekenis van de woorden 'not inconsistent' volgt uit de uitleg die het hof geeft aan de Limitation Clause. Het gaat er in die interpretatie om of er nationale wet- of regelgeving is die voorlopige toepassing voor bepaalde (soorten of categorieën van) verdragsbepalingen uitsluit. Is dat laatste het geval, dan is voorlopige toepassing van die (soorten of categorieën van) verdragsbepalingen 'inconsistent' met nationaal recht.'

3.56    Het hof heeft in rov. 4.5.42 e.v. ten overvloede aandacht besteed aan het debat dat partijen hebben gevoerd over de vraag hoe '(not) inconsistent' moet worden uitgelegd, uitgaande van de uitleg die de Russische Federatie aan art. 45 lid 1 ECT heeft gegeven, waarbij moet worden onderzocht of een bepaling van de ECT in strijd is met het recht van een Ondertekenende Partij. Het hof is in rov. 4.5.48 tot de conclusie gekomen dat art. 45 lid 1 ECT aldus moet worden uitgelegd dat een ondertekenende staat die niet de verklaring van art. 45 lid 2, onder a, ECT heeft afgelegd, gehouden is de ECT voorlopig toe te passen, behoudens voor zover voorlopige toepassing van een of meer bepalingen van de ECT strijdig is met nationaal recht, in die zin dat de wet- of regelgeving van die staat voorlopige toepassing van een verdrag voor bepaalde (soorten of categorieën van) verdragsbepalingen uitsluit. Op grond van deze uitleg heeft het hof geoordeeld dat de voorlopige toepassing van art. 26 ECT niet in strijd is met de 'constitution, laws or regulations' van de Russische Federatie (rov. 4.6.1). Uit rov. 4.6.2 blijkt dat het hof ten overvloede in rov. 4.7 heeft onderzocht of in het geval dat wordt uitgegaan van de uitleg die de Russische Federatie aan de Limitation Clause van art. 45 lid 1 ECT heeft gegeven, art. 26 ECT in strijd is met het recht van de Russische Federatie.

3.57    Het hof heeft rov. 4.5.42-4.5.47 ten overvloede gegeven, omdat zij slechts zijn opgenomen ten behoeve van de – eveneens ten overvloede opgenomen – rov. 4.7. e.v. Daarmee falen de klachten van onderdeel 2.5 bij gebrek aan belang.

*Onderdeel 2.6: art. 26 ECT in strijd met Russisch recht?*

3.58    Onderdeel 2.6 is gericht tegen rov. 4.7, waarin het hof de vraag behandelt of art. 26 ECT in strijd is met het recht van de Russische Federatie.

3.59    Bij de bespreking van onderdeel 2.5 heb ik reeds opgemerkt dat rov. 4.7 ten overvloede is opgenomen, wat blijkt uit rov. 4.6.2. De klachten van het onderdeel missen daarom belang en behoeven geen bespreking. Overigens hebben de klachten mede betrekking op de uitleg en toepassing van het Russische recht en stuiten zij af op het bepaalde in art. 79 lid 1, aanhef en onder b, RO, evenals de motiveringsklachten die zich niet laten beoordelen zonder daarbij ook de juistheid van het oordeel van het hof over de inhoud en uitleg van Russisch recht te betrekken.[80]

*Onderdeel 2.7: prejudiciële vragen aan HvJEU?*

---

[80]    Vgl. HR 4 december 2020, ECLI:NL:HR:2020:1952, RvdW 2021/2, rov. 3.7.2.



20/01595

3.60 <u>Onderdeel 2.7</u> bevat geen zelfstandige klacht, maar voert aan dat de Hoge Raad prejudiciële vragen aan het HvJEU moet stellen over de uitleg van art. 45 lid 1 ECT en art. 26 ECT. Volgens het onderdeel had het hof moeten concluderen dat duidelijke en ondubbelzinnige instemming van de Russische Federatie met arbitrage ontbreekt, waarvoor wordt verwezen naar de onderdelen 2.2, 2.4, 2.5 en 2.6. Ook acht het onderdeel het in strijd met het EU-recht, indien een rechterlijke instantie van een lidstaat een interpretatie van een gemengd verdrag (zoals de ECT) aanvaardt die niet strookt met de gezamenlijke interpretatie van de Commissie, de Raad en de lidstaten. Nu verschillende interpretaties van art. 45 lid 1 ECT mogelijk zijn, is geen sprake van een 'acte clair' of een 'acte éclairé', aldus het onderdeel.

3.61 Een gemengde overeenkomst ('mixed agreement') is een verdrag dat krachtens een gedeelde bevoegdheid (zie art. 4 VWEU) door zowel de EU als de lidstaten is gesloten. Bij de ECT zijn zowel de EU als de afzonderlijke EU-lidstaten partij, omdat de in de ECT geregelde onderwerpen voor een deel behoren tot de bevoegdheid van de lidstaten.[81] Het is vaste rechtspraak dat een internationale overeenkomst die door de EU is gesloten een handeling van een van de instellingen van de EU vormt in de zin van art. 267, eerste alinea, onder b, VWEU, zodat het HvJEU bevoegd is om uitspraak te doen over de uitleg van een dergelijke overeenkomst. De bepalingen van zo'n overeenkomst maken integrerend deel uit van de rechtsorde van de Unie.[82]

3.62 De vraag rijst of het HvJEU bevoegd is een gemengde overeenkomst in zijn geheel uit te leggen of dat de bevoegdheid is beperkt tot bepaalde onderwerpen van die overeenkomst, en zo ja, wat dan het afbakeningscriterium is. Uit de rechtspraak van het HvJEU kan worden afgeleid dat een prejudiciële vraag die over een gemengde overeenkomst is gesteld, betrekking moet hebben op een onderwerp waarover de EU in voldoende mate haar bevoegdheden op intern vlak heeft uitgeoefend. In het navolgende licht ik dit nader toe.

3.63 Het HvJEU heeft zich in verschillende uitspraken bevoegd geacht om gemengde overeenkomsten te interpreteren. Niet steeds was echter duidelijk in welke gevallen betrokkenheid van het Hof noodzakelijk is. Daarover heeft het Hof duidelijkheid gegeven in de zaak *Merck Genéricos* door te overwegen dat de prejudiciële bevoegdheid van het Hof

---

[81] Zie ook 'Statement submitted by the European Communities to the Secretariat of the Energy Charter pursuant to Article 26(3)(b)(ii) of the Energy Charter Treaty', PbEG L 69/115.

[82] Zie HvJEG 30 april 1974, zaak C-181/73, ECLI:EU:C:1974:41, Jur. 1974, p. 00449 (*Haegeman*), punten 3-6; HvJEG 11 september 2007, zaak C-431/05, ECLI:EU:C:2007:496, Jur. 2007, p. I-07001 (*Merck Genéricos*), punt 31; HvJEU 8 maart 2011, zaak C-240/09, ECLI:EU:C:2011:125, Jur. 2011, p. I-01255 (*Lesoochranárske* VLK), punt 30; HvJ EU 16 mei 2017, advies 2/15, ECLI:EU:C:2017:376 (*Vrijhandelsovereenkomst EU-Singapore*), punt 29; HvJEU 7 juni 2018, zaak C-83/17, ECLI:EU:C:2018:408 (*KP*), punt 24). Zie ook K. Lenaerts, P. van Nuffel, Europees Recht, Antwerpen: Intersentia 2017, p. 492; G. de Baere en J. Meeusen, Grondbeginselen van het recht van de Europese Unie, Antwerpen: Intersentia 2020, p. 345 e.v.

20/01595

ten aanzien van gemengde overeenkomsten alleen de gebieden betreft waarop de EU in voldoende mate haar bevoegdheden op intern vlak heeft uitgeoefend.[83]

3.64    Het HvJEU heeft in zijn arrest inzake *Lesoochranárske VLK* op deze rechtspraak voortgebouwd.[84] In deze zaak ging het om de vraag of een bepaling uit het Verdrag van Aarhus[85] rechtstreekse werking had, waardoor de vraag is gerezen of het Hof wel bevoegd was een prejudiciële beslissing over de desbetreffende bepaling te geven. Het Hof heeft als volgt overwogen:

> '30. Het Verdrag van Aarhus is door de Gemeenschap ondertekend en vervolgens bij besluit 2005/370 goedgekeurd. Daarmee vormen de bepalingen van dat verdrag volgens vaste rechtspraak thans een bestanddeel van de rechtsorde van de Unie (zie naar analogie onder meer arresten van 10 januari 2000, IATA en ELFAA, C-344/04, Jurispr. blz. I-403, punt 36, en 30 mei 2006, Commissie/Ierland, C-459/03, Jurispr. blz. I-4635, punt 82). Bijgevolg is het Hof in het kader van die rechtsorde bevoegd, bij wijze van prejudiciële beslissing uitspraak te doen over de uitlegging ervan (zie onder meer arresten van 30 april 1974, Haegeman, 181/73, Jurispr. blz. 449, punten 4-6, en 30 september 1987, Demirel, 12/86, Jurispr. blz. 3719, punt 7).
> 31. Daar het Verdrag van Aarhus door de Gemeenschap en al haar lidstaten is gesloten op grond van een gedeelde bevoegdheid, vloeit daaruit voort dat het Hof, wanneer het overeenkomstig de bepalingen van het Verdrag, inzonderheid artikel 234 EG, wordt geadieerd, *bevoegd is om een scheidslijn aan te brengen tussen de verplichtingen die de Unie op zich neemt en die ten laste van de lidstaten en om de bepalingen van het Verdrag van Aarhus uit te leggen* (zie naar analogie arresten van 14 december 2000, Dior e.a., C-300/98 en C-392/98, Jurispr. blz. I-11307, punt 33, en 11 september 2007, Merck Genéricos – Produtos Farmacêuticos, C-431/05, Jurispr. blz. I-7001, punt 33).
> 32. Bijgevolg moet worden vastgesteld of de Unie op het gebied dat onder artikel 9, lid 3, van het Verdrag van Aarhus valt, haar bevoegdheden heeft uitgeoefend en bepalingen heeft vastgesteld ter uitvoering van de verplichtingen die daaruit voortvloeien. Mocht dit niet het geval zijn, dan zijn de verplichtingen die uit artikel 9, lid 3, van het Verdrag van Aarhus voortvloeien nog steeds onderworpen aan het nationale recht van de lidstaten. In dat geval staat het aan de rechterlijke instanties van die staten om naar nationaal recht vast te stellen of particulieren zich rechtstreeks op de voorschriften van deze internationale overeenkomst op dit gebied kunnen beroepen en of deze rechterlijke instanties deze ambtshalve moeten toepassen. Het recht van de Unie verlangt immers niet, maar sluit evenmin uit, dat de rechtsorde van een lidstaat particulieren het recht toekent om zich rechtstreeks op dit voorschrift te beroepen, of de rechter verplicht deze bepaling ambtshalve toe te passen (zie naar analogie de reeds aangehaalde arresten Dior e.a., punt 48, en Merck Genéricos – Produtos Farmacêuticos, punt 34).
> 33. Indien daarentegen wordt vastgesteld dat de Unie haar bevoegdheden heeft uitgeoefend en bepalingen heeft vastgesteld op het gebied dat onder artikel 9, lid 3, van het Verdrag van Aarhus valt, is het recht van de Unie van toepassing en staat het aan het Hof, te bepalen of de betrokken bepaling van de internationale overeenkomst rechtstreekse werking heeft.
> 34. Bijgevolg moet worden onderzocht of de Unie op het specifieke gebied dat onder artikel 9, lid 3, van het Verdrag van Aarhus valt, haar bevoegdheden heeft uitgeoefend en bepalingen heeft vastgesteld ter uitvoering van de daaruit voortvloeiende verplichtingen* (zie naar analogie arrest Merck Genéricos – Produtos Farmacêuticos, reeds aangehaald, punt 39).

---

[83]  HvJEG 11 september 2007, zaak C-431/05, ECLI:EU:C:2007:496, Jur. 2007, p. I-07001 (*Merck Genéricos*), punt 46. Dit arrest bouwt voort op de eerdere arresten HvJEG 16 juni 1998, zaak C-53/96, ECLI:EU:C:1998:292, Jur. 1998, p. I-03603 (*Hermès*); HvJEG 14 december 2000, gevoegde zaken C-300/98 en C-392/98, ECLI:EU:C:2000:688, Jur. 2000, p. I-11307 (*Dior* en *Assco*).

[84]  HvJEU 8 maart 2011, zaak C-240/09, ECLI:EU:C:2011:125, Jur. 2011, p. I-01255 (*Lesoochranárske* VLK). Zie hierover o.a. De Baere en Meeusen, a.w., p. 347.

[85]  Verdrag betreffende toegang tot informatie, inspraak in besluitvorming en toegang tot de rechter inzake milieuaangelegenheden, gesloten te Aarhus op 25 juni 1998.

20/01595

> 35. Dienaangaande moet om te beginnen worden opgemerkt dat de Unie krachtens artikel 175 EG juncto artikel 174, lid 2, EG op milieugebied een uitdrukkelijke externe bevoegdheid heeft (zie arrest Commissie/Ierland, reeds aangehaald, punten 94 en 95).
> 36. Daarnaast heeft het Hof overwogen dat *een specifiek vraagstuk waarover nog geen regelgeving van de Unie bestaat, onder het recht van de Unie valt wanneer dit vraagstuk wordt geregeld in overeenkomsten die door de Unie en haar lidstaten zijn gesloten en het een materie betreft die in ruime mate daaronder valt* (zie naar analogie arrest van 7 oktober 2004, Commissie/Frankrijk, C-239/03, Jurispr. blz. I-9325, punten 29-31).'
> (mijn curs., A-G)

3.65    Uit deze rechtspraak volgt dat, indien de EU bepalingen heeft vastgesteld ter implementatie van een gemengde overeenkomst, het HvJEU bevoegd is om de overeenkomst uit te leggen.[86] In een dergelijk geval bestaat immers behoefte aan uniforme uitleg van het desbetreffende EU-recht, en aan duidelijkheid over de bevoegdheidsverdeling tussen de EU en de lidstaten. Buiten kijf staat dat het HvJEU bevoegd is zich uit te laten over zijn eigen bevoegdheid.

3.66    Voor de zaak die in cassatie aan de orde is, is van belang in hoeverre EU-wetgeving bestaat die de ECT of specifieke bepalingen daarvan implementeert. Er bestaat weliswaar omvangrijke EU-wetgeving op het energiegebied die met name voorziet in ordening van de interne markt voor gas en elektriciteit, netwerken en andere infrastructuur, energie-efficiëntie en duurzame energie, maar er is geen EU-wetgeving die investeringsbescherming beoogt te bieden aan bedrijven in de energiesector, met inbegrip van oliemaatschappijen.[87] Bij mijn weten is naar aanleiding van de ECT slechts één instrument vastgesteld, namelijk de inmiddels vervallen Verordening (EG) nr. 701/97 van de Raad van 14 april 1997 tot vaststelling van een programma ter bevordering van de internationale samenwerking in de energiesector ('Synergy-programma').[88] Deze Verordening had als doel de internationale samenwerking van de EG met derde landen op het terrein van energie te stroomlijnen. De Verordening hield geen aanwijzingen in dat daarmee materiële bepalingen uit de ECT voor (thans) de EU werden geïmplementeerd.

3.67    Het HvJEU heeft in zijn arrest van 6 maart 2018 (*Slowakije/Achmea*) geoordeeld dat art. 8 (de arbitragebepaling) van het bilaterale investeringsverdrag tussen Nederland en Slowakije in strijd is met art. 267 en 344 VWEU.[89] Het Hof heeft daartoe overwogen dat in arbitrale procedures op grond van het BIT ook vragen van uitlegging of toepassing van EU-recht kunnen spelen. Aangezien het EU-recht deel uitmaakt van het in de lidstaten geldende recht, zal een op de voet van art. 8 BIT ingesteld scheidsgerecht EU-recht moeten toepassen.

---

[86]    Zie ook de conclusie van A-G Tanchev van 2 juli 2020, ECLI:EU:C:2020:512, punten 130 e.v., vóór HvJEU 8 september 2020, zaak C-265/19, ECLI:EU:C:2020:677 (*Recorded Artists Actors Performers*).
[87]    Zie Leigh Hancher, European Energy Law - From Market to Union?, in: Pieter Jan Kuijper e.a. (eds), The Law of the European Union, Alphen aan den Rijn: Wolters Kluwer 2018, p. 1097 e.v.
[88]    Zie PbEG 1997, nr. L 104/1.
[89]    HvJEU 6 maart 2018, zaak C-284/16, ECLI:EU:C:2018:158 (*Slowakije/Achmea*), NJ 2019/353, m.nt. H.J. Snijders; AA 2018, p. 527, m.nt. P.J. Slot; AA 2018, p. 732, m.nt. A.S. Hartkamp.

20/01595

Volgens het Hof is er sprake van strijd met art. 267 en 344 VWEU, wanneer dergelijke scheidsgerechten geen prejudiciële vragen aan het Hof zouden kunnen stellen, omdat zij geen deel uitmaken van de rechterlijke organisatie van de lidstaten. Het arrest *Slowakije/Achmea* heeft uitsluitend betrekking op investeringsarbitrages waarbij een lidstaat verweerder is. De uitkomst van het arrest is dat lidstaten niet langer op grond van een BIT op voorhand mogen instemmen met arbitrage en daarmee dus afstand doen van de bevoegdheid van de eigen overheidsrechters. Door het arrest *Slowakije/Achmea* is de grondslag voor intra-EU-investeringsarbitrage komen te vervallen.[90]

3.68   Op 15 januari 2019 hebben 22 lidstaten van de EU een verklaring uitgebracht over de betekenis van het *Achmea*-arrest voor arbitrage op grond van de ECT.[91] Daarin hebben zij onder meer uitgesproken dat arbitrage tussen een EU-lidstaat en een investeerder uit een andere EU-lidstaat als gevolg van dit arrest in strijd is met het EU-recht.[92] In het kader van de lopende onderhandelingen over de modernisering van de ECT heeft de Europese Commissie een voorstel gedaan voor wijziging van art. 26 en 27 ECT. Naar aanleiding daarvan heeft België het HvJEU op de voet van art. 218 lid 11 VWEU om advies gevraagd of arbitrage tussen lidstaten op de voet van art. 26 ECT verenigbaar is met het Unierecht.[93] Zowel de verklaring van januari 2019 als de adviesaanvraag van België hebben betrekking op de voorstellen voor een nieuwe, gemoderniseerde ECT. Voor de onderhavige zaak geldt de ECT zoals vastgesteld in december 1994, zodat noch de verklaring van januari 2019 noch de adviesaanvraag van december 2020 thans van belang zijn.

3.69   Vermeldenswaardig is nog dat de Cour d'appel van Parijs in 2017 het voornemen had vragen aan het HvJEU voor te leggen over de interpretatie van (onder meer art. 1 lid 6 van) de ECT in een zaak die verband houdt met de onderhavige arbitrage.[94] Over de bevoegdheid van het HvJEU heeft de Cour d'appel in zijn uitspraak slechts volstaan met de overweging dat

---

[90]   Zie hierover ook: B.J. Drijber, Nous d'abord: investeringsarbitrage na 'Achmea', NJB 2019/473, p. 588-595.

[91]   Declaration of the representatives of the governments of the Member States of 15 January 2019 on the legal consequences of the judgment of the Court of Justice in Achmea and on investment protection in the European Union,                    te                    vinden                    op https://ec.europa.eu/info/sites/info/files/business_economy_euro/banking_and_finance/documents/190117-bilateral-investment-treaties_en.pdf.

[92]   Zie de genoemde verklaring, p. 2.

[93]   Advies 1/20, ingekomen bij het HvJEU op 2 december 2020. Zie ook het persbericht 'Belgium requests an opinion on the intra-European application of the arbitration provisions of the future modernised Energy Charter Treaty', 3 december                                                                                                    2020, https://diplomatie.belgium.be/en/newsroom/news/2020/belgium_requests_opinion_intra_european_application_arbitration_provisions: 'By submitting this question, Belgium is seeking legal clarification from the Court on the compatibility under Union law of the dispute settlement mechanism provided for in the draft modernised Energy Charter Treaty, in view of the fact that this mechanism could be interpreted as allowing its application intra-European Union, i.e. between an investor who is a national of EU Member States only and an EU Member State'.

[94]   Cour d'appel Parijs 17 juni 2017, Russische Federatie/Hulley Enterprises Limited, te raadplegen op https://www.italaw.com/sites/default/files/case-documents/italaw9023_0.pdf.

20/01595

gemengde verdragen deel uitmaken van de Europese rechtsorde.[95] Deze procedure bij de Cour d'appel is echter ingetrokken.[96]

3.70   Bij verwijzingsbeschikking van 24 september 2019 heeft de Cour d'appel van Parijs in een ander geding (*Republiek Moldavië/Komstroy*) vragen aan het HvJEU gesteld over de uitleg van art. 1 lid 6 en art. 26 lid 1 ECT.[97] Deze vragen zijn gerezen in het kader van de vraag of een krachtens art. 26 lid 3 ECT opgericht ad-hoc-scheidsgerecht bevoegd is om een financieel geschil te beslechten over de betaling van een vordering in verband met een overeenkomst inzake de verkoop van elektriciteit. De feiten van deze zaak zijn, kort weergegeven, de volgende. In 1999 heeft een Oekraïense elektriciteitsproducent (Ukrenergo) elektriciteit verkocht aan de vennootschap Energoalians, een Oekraïense distributeur van elektriciteit, die de elektriciteit vervolgens heeft doorverkocht aan Derimen, een vennootschap gevestigd op de Britse Maagdeneilanden. Derimen heeft de elektriciteit op haar beurt weer doorverkocht aan Moldtranselectro, een Moldavisch overheidsbedrijf. De te leveren elektriciteitsvolumes werden maandelijks vastgesteld tussen Moldtranselectro en Ukrenergo en levering geschiedde tot aan de Oekraïense kant van de Oekraïens-Moldavische grens. Energoalians moest voor de geleverde elektriciteit worden betaald door Derimen, die zelf weer een betaling moest ontvangen van Moldtranselectro. De schuld van Moldtranselectro aan Derimen bedroeg op 1 januari 2000 ruim 18 miljoen USD. Moldtranselectro heeft slechts gedeeltelijk aan haar betalingsverplichting jegens Derimen voldaan, zodat nog een schuld resteerde van ruim 16 miljoen USD. Derimen heeft haar vordering op Moldtranselectro overgedragen aan Energoalians, die heeft getracht de vordering op Moldtranselectro te innen en daartoe procedures heeft ingeleid bij de Moldavische rechter en later bij de Oekraïense rechter. Energoalians heeft zich op het standpunt gesteld dat Moldavië bepaalde verplichtingen van de ECT heeft geschonden en heeft daartoe een arbitrageprocedure gestart op de voet van art. 26 lid 3 ECT. De vennootschap Komstroy is de rechtsopvolger van Energoalians. Het ad-hoc-scheidsgerecht in Parijs heeft geoordeeld dat Moldavië haar verplichtingen uit de ECT niet is nagekomen en haar tot betaling van een bepaald bedrag veroordeeld. Vervolgens heeft Moldavië bij de Franse rechter een beroep tot vernietiging van het arbitrale vonnis ingesteld wegens schending van de openbare orde, namelijk de bevoegdheid van het ad-hoc-scheidsgerecht. Uiteindelijk heeft de Cour d'appel[98] de volgende vragen aan het HvJEU gesteld:

---

[95]  'Considérant que les accords mixtes conclus par l'Union et les Etats membres avec des tiers sont au nombre des actes pris par les institutions, organes ou organismes de l'Union (CJCE 30 sept. 1987, aff. 12/86 Demirel; CJUE 18 juil. 2013, aff. C 414/11 Sanofi-Aventis Deutschland) (…).'

[96]  Procesinleiding, nr. 91.

[97]  De zaak is bij het HvJEU geregistreerd onder nr. C-741/19.

[98]  Bij arrest van 12 april 2016 heeft de Cour d'appel het arbitrale vonnis vernietigd, welk arrest door de Cour de cassation op 28 maart 2018 is vernietigd. Na vernietiging heeft de Cour de cassation de zaak weer teruggewezen naar de Cour d'appel, die vervolgens bij de genoemde beslissing van 24 september 2019 de prejudiciële vragen aan het HvJEU heeft gesteld.

20/01595

'Moet artikel 1, punt 6, van het Verdrag inzake het Energiehandvest aldus worden uitgelegd dat een vordering die voortvloeit uit een contract voor de verkoop van elektriciteit en die geen bijdrage van de investeerder in de staat van ontvangst inhoudt, een ,investering' in de zin van dit artikel kan vormen?

Moet artikel 26, lid 1, van het Verdrag inzake het Energiehandvest aldus worden uitgelegd dat de verwerving door een investeerder van een verdragsluitende partij, van een vordering van een marktdeelnemer die niet afkomstig is uit een van de staten die partij zijn bij dat verdrag, een investering vormt?

Moet artikel 26, lid 1, van het Verdrag inzake het Energiehandvest aldus worden uitgelegd dat een vordering van een investeerder die voortvloeit uit een contract voor de verkoop van elektriciteit die aan de grens van de staat van ontvangst wordt geleverd, een investering kan vormen die op het grondgebied van een andere verdragsluitende partij wordt gedaan, wanneer de investeerder op het grondgebied van die andere verdragsluitende partij geen enkele economische activiteit heeft uitgeoefend?'

3.71   In deze zaak heeft A-G Szpunar op 3 maart 2021 conclusie genomen.[99] De A-G is in de eerste plaats ingegaan op de bevoegdheid van het HvJEU en heeft opgemerkt dat daarover 'zou kunnen worden gediscussieerd, aangezien het gaat om de uitlegging van een internationaal verdrag in het kader van een geschil dat in elk geval op het eerste gezicht alle kenmerken heeft van een situatie die kan worden aangeduid als "louter extern"'. A-G Szpunar heeft geconcludeerd dat het HvJEU bevoegd is om de prejudiciële vragen te beantwoorden, omdat de bepalingen van de ECT waarvan uitlegging wordt verzocht, ook van toepassing kunnen zijn in situaties die binnen de rechtsorde van de Unie vallen en de Unie om die reden belang heeft bij uniforme uitlegging van de desbetreffende bepalingen.[100] Overigens geeft A-G Szpunar aan dat hij deze vaststelling 'meteen weer (moet) afzwakken' (punt 46) en geeft hij het Hof in overweging duidelijkheid te scheppen over de gevolgen van het *Achmea*-arrest voor de toepasselijkheid van art. 26 ECT (punt 48). Hij oordeelt dat het geen uitgemaakte zaak is dat art. 26 ECT als gevolg van het *Achmea*-arrest nooit binnen de EU kan worden toegepast, omdat vragen naar de verenigbaarheid van bepalingen van de ECT met het Unierecht zich ook in nationale rechterlijke procedures kunnen voordoen (punt 90). A-G Szpunar komt over de bevoegdheid van het Hof tot de conclusie dat art. 26 ECT niet verenigbaar is met het Unierecht voor zover deze bepaling voorziet in een beroep op een scheidsgerecht, zodat een dergelijk stelsel voor geschillenbeslechting niet kan worden toegepast binnen de rechtsorde van de Unie (punt 98). De A-G meent dat niet kan worden uitgesloten dat de materiële bepalingen van de ECT, waaronder art. 1 lid 6 ECT (het begrip 'investering'), en art. 26 ECT van toepassing kunnen zijn binnen de rechtsorde van de Unie (punt 99). Het is overigens opvallend dat A-G Szpunar geen aandacht heeft besteed aan de rechtspraak van het HvJEU, waarin is beslist dat het Hof bevoegd is een gemengde overeenkomst uit te leggen, indien de EU bepalingen heeft vastgesteld ter implementatie.

3.72   In het vervolg van zijn conclusie heeft A-G Szpunar zich geconcentreerd op de vraag of een vordering uit een overeenkomst tot levering van elektriciteit kan worden aangemerkt als

---

[99]   ECLI:EU:C:2021:164.
[100]  Conclusie A-G Szpunar, punt 37-45.



investering in de zin van art. 1 lid 6 ECT, nu die bepaling daaraan nadere voorwaarden stelt. De A-G is tot de conclusie gekomen dat daarvan in de zaak *Moldavië/Komstroy* geen sprake is.[101] Een overeenkomst tot levering van elektriciteit is een eenvoudige handelstransactie die niet valt onder het begrip 'investering' in de zin van art. 1 lid 6 ECT en niet voortvloeit uit een overeenkomst die verband houdt met een investering.[102]

3.73    Aangenomen dat het HvJEU de conclusie van A-G Szpunar volgt en oordeelt dat het bevoegd is om kennis te nemen van vragen van uitleg van de ECT – en ik herhaal dat het aan het HvJEU is om over zijn eigen bevoegdheid te oordelen –, dan geldt nog steeds onverkort dat het stellen van prejudiciële vragen ook noodzakelijk moet zijn voor de afdoening van de klachten. Voor de huidige zaak ben ik van mening dat het stellen van prejudiciële vragen voor de afdoening van de klachten van onderdeel 2 niet noodzakelijk is. Ik licht dit als volgt toe. Onderdelen 2.2 en 2.3 hebben betrekking op vragen van Nederlands arbitragerecht en burgerlijk procesrecht. De onderdelen 2.5 en 2.6 zijn gericht tegen overwegingen van het hof in het eindarrest, die ten overvloede zijn gegeven en reeds om die reden falen. Onderdeel 2.4 heeft betrekking op de uitleg van art. 45 lid 1 ECT. Het onderdeel bevat klachten die weliswaar zijn geformuleerd als rechtsklachten maar in feite motiveringsklachten zijn over de wijze waarop het hof met bepaalde argumenten is omgegaan. Zoals ik in deze conclusie heb besproken falen deze klachten, omdat zij uitgaan van een onjuiste interpretatie van het bestreden arrest (zie de bespreking van onderdeel 2.4.2). Ook heb ik aangetoond dat de klachten van het onderdeel die betrekking hebben op het miskennen van de statenpraktijk falen, omdat van een dergelijke statenpraktijk niet is gebleken. Ook zijn klachten (zie nr. 42 e.v. van de procesinleiding) gericht tegen een overweging ten overvloede. Uit dit alles volgt dat voor de uitkomst van het oordeel over onderdeel 2.4 het stellen van prejudiciële vragen niet noodzakelijk is. Ik voeg hieraan nog toe dat in het internationaal recht een bepaling over voorlopige toepassing van een verdrag (zoals art. 45 ECT) een regelmatig voorkomende bepaling is, waarover in het algemeen ook geen EU-wetgeving bestaat. Het onderhavige geschil gaat ook niet over de voorlopige toepassing van de ECT in (een lidstaat van) de EU, maar in de Russische Federatie.

3.74    De slotsom is dat het stellen van prejudiciële vragen aan het HvJEU niet noodzakelijk is voor de afdoening van de klachten van de Russische Federatie in cassatie.

3.75    Onderdeel 2.8 herhaalt het standpunt dat duidelijke en ondubbelzinnige instemming van de Russische Federatie met arbitrage ontbreekt. Het onderdeel bevat geen afzonderlijke klacht en bouwt voort op de voorafgaande onderdelen, zodat afzonderlijke bespreking achterwege kan blijven.

---

[101] Conclusie A-G Szpunar, punt 101 e.v.
[102] Conclusie A-G Szpunar, punt 110, 118.



20/01595

### *Onderdeel 3: uitleg van art. 1 leden 6 en 7 ECT (investering en investeerder)*

3.76    <u>Onderdeel 3</u> is gericht tegen rov. 5.1 van het eindarrest, waarin het hof de begrippen 'investering' en 'investeerder' in de zin van art. 1 leden 6 en 7 ECT heeft uitgelegd. Volgens het onderdeel is deze uitleg onjuist. Volgens de Russische Federatie zijn HVY niet werkelijk buitenlandse investeerders en gelden hun investeringen niet als buitenlandse investeringen, maar gaat het om zogenoemde 'U-bochtconstructies': investeringen gedaan door investeerders die in feite onder zeggenschap staan van staatsburgers van het gastland, in dit geval de Russische Federatie. Het onderdeel richt een groot aantal klachten tegen de afwijzing door het hof van het standpunt van de Russische Federatie.

*Inleidende opmerkingen*

3.77    Voorafgaand aan de bespreking van de klachten van dit onderdeel maak ik enkele inleidende opmerkingen. Voor zover relevant, luidt art. 1 leden 6 en 7 ECT in de authentieke Engelse tekst als volgt:

> **Article 1 Definitions**
> As used in this Treaty:
> (...)
> 6. "Investment" means every kind of asset, owned or controlled directly or indirectly by an Investor and includes:
>> a) tangible and intangible, and movable and immovable, property, and any property rights such as leases, mortgages, liens, and pledges;
>> b) a company or business enterprise, or shares, stock, or other forms of equity participation in a company or business enterprise, and bonds and other debt of a company or business enterprise;
>> c) claims to money and claims to performance pursuant to contract having an economic value and associated with an Investment;
>> d) Intellectual Property;
>> e) Returns;
>> f) any right conferred by law or contract or by virtue of any licences and permits granted pursuant to law to undertake any Economic Activity in the Energy Sector.
> (...)
> 7. "Investor" means:
>> a) with respect to a Contracting Party:
>>> (i) a natural person having the citizenship or nationality of or who is permanently residing in that Contracting Party in accordance with its applicable law;
>>> (ii) company or other organization organized in accordance with the law applicable in that Contracting Party;
>> b) with respect to a "third state", a natural person, company or other organization which fulfils, mutatis mutandis, the conditions specified in subparagraph a) for a Contracting Party;

In de Nederlandse vertaling:

> **Artikel 1 Definities**
> In dit Verdrag wordt verstaan onder:
> (...)
> 6. „investering": elke vorm van activa die een investeerder in eigendom heeft of waarover hij direct of indirect zeggenschap heeft, met inbegrip van:
>> a. lichamelijke en onlichamelijke en roerende en onroerende zaken alsook andere rechten, zoals huur-, hypotheek-, retentie- en pandrechten;

Pagina 40 van 89

20/01595

b. een vennootschap of onderneming, of aandelen of andere vormen van vermogensdeelneming in, en obligaties en andere schuldbewijzen van een vennootschap of onderneming;

c. aanspraken op geld en aanspraken op prestaties volgens een contract met een economische waarde en in verband met een investering;

d. intellectuele eigendom;

e. opbrengsten;

f. een bij wet of contract of uit hoofde van overeenkomst de wet verleende licenties en vergunningen verleend recht een economische activiteit in de energiesector te ondernemen.

(…)

7. „investeerders":

a. van een Verdragsluitende Partij,

i. natuurlijke personen die het staatsburgerschap of de nationaliteit bezitten van of permanent verblijven op het grondgebied van die Verdragsluitende Partij conform haar toepasselijke wetgeving;

ii. vennootschappen of andere organisaties opgericht conform op het grondgebied van die Verdragsluitende Partij toepasselijke wetgeving;

b. uit een derde land, natuurlijke personen, vennootschappen of andere organisaties die mutatis mutandis voldoen aan de onder a. aan Verdragsluitende Partijen gestelde voorwaarden;

3.78    Art. 1 lid 6 ECT bevat strikt genomen geen definitie van het begrip investering, maar bepaalt dat 'every kind of asset' ('elke vorm van activa') als investering kan gelden en geeft een niet uitputtende lijst van vermogensbestanddelen die in ieder geval als investering worden aangemerkt.[103] De definitie van 'investeerder' in art. 1 lid 7 ECT is gekoppeld aan die van 'investering'[104]: een investeerder is een (rechts)persoon die een dergelijke investering bezit of daarover zeggenschap heeft.[105] Wanneer de investeerder een rechtspersoon is, is vereist dat die rechtspersoon volgens het recht van een verdragsluitende staat is opgericht.[106] Deze toets wordt wel aangeduid als 'the incorporation test' ('de incorporatieleer'), en wordt onderscheiden van andere aanknopingspunten voor de 'nationaliteit' van een rechtspersoon, zoals de plaats waar het bestuur van de rechtspersoon gevestigd is, of de nationaliteit van de aandeelhouders.[107] Art. 1 lid 6 ECT bestempelt aandelen als investering, zodat ook aandeelhouders door de ECT worden beschermd, ook als de vennootschap waarin zij hebben geïnvesteerd zelf niet als investeerder wordt aangemerkt.[108]

[103] Zie Dylan Geraets & Leonie Reins, in: Rafael Leal-Arcas (ed.), Commentary on the Energy Charter Treaty, 2018, p. 25-29; Hobér, a.w., p. 73-78; Baltag, a.w., p. 167-183; Roe & Happold, a.w., p. 48-64; Jagusch & Sinclair, a.w., p. 74-87; Juliet Blanch, Andy Moody & Nicholas Lawn, 'Access to Dispute Resolution Mechanisms under Article 26 of the Energy Charter Treaty', in: Coop & Ribeiro (eds.), Investment Protection and the Energy Charter Treaty, New York: JurisNet 2008, p. 5; Emmanuel Gaillard, 'Investments and Investors Covered by the Energy Charter Treaty', in: Clarisse Ribeiro (ed.), Investment Arbitration and the Energy Charter Treaty, p. 58-66.

[104] Zie Baltag, a.w., p. 18.

[105] Zie Hobér, a.w., p. 78-84; Blanch, Moody & Lawn, a.w., p. 3-4.

[106] Hobér, a.w., p. 116-119; Baltag, a.w., p. 103-107; Roe & Happold, a.w., p. 64-65; Jagusch & Sinclair, p. 89-93; Blanch, Moody & Lawn, t.a.p.; Gaillard, a.w., p. 67-73.

[107] Onder meer Hobér, t.a.p. Zie ook Asser/Kramer & Verhagen 10-III 2015/1, alsmede P. Vlas, Rechtspersonen, Praktijkreeks IPR, deel 9, Maklu: Apeldoorn-Antwerpen, 2017, nr. 126, met een overzicht van investeringsverdragen en de daarin opgenomen omschrijving voor rechtspersonen die onder de bescherming van het desbetreffende investeringsverdrag vallen.

[108] Hobér, a.w., p. 129-132.

20/01595

3.79    Art. 26 ECT bouwt voort op de begrippen investering en investeerder.[109] Dit artikel bepaalt
        dat arbitrage open staat in 'disputes between a Contracting Party and an Investor in another
        Contracting Party relating to an Investment of the latter in the Area of the former (…)'
        ('Geschillen tussen een Verdragsluitende Partij en een investeerder van een andere
        Verdragsluitende Partij over een investering van deze laatste op het grondgebied van
        eerstgenoemde Partij (…)'). Art. 26 ECT vereist dus in de *eerste plaats* dat sprake is van een
        investering, in de *tweede plaats* dat die is verricht door een investeerder die in een
        verdragsstaat is gevestigd, en in de *derde plaats* dat die investering is gedaan op het
        grondgebied van een andere verdragsstaat dan die waar de investeerder is gevestigd.

3.80    De vraag die onderdeel 3 in de kern aan de orde stelt is of in de ECT nog meer vereisten
        besloten liggen ten aanzien van investeringen of van het grensoverschrijdende karakter
        daarvan dan uit art. 1 leden 6 en 7 en art. 26 ECT blijkt. Zo betoogt het onderdeel (onder
        3.2.3) onder meer dat de ECT uitsluitend internationale investeringen beschermt en dus geen
        'U-bochtconstructies', en evenmin investeringen gedaan door investeerders die geen
        wezenlijke band hebben met de staat waar zij gevestigd zijn ('brievenbusvennootschappen').
        Verder zou niet alleen getoetst moeten worden waar de investeerder is gevestigd, maar ook
        door wie zij wordt gecontroleerd ('*piercing the corporate veil*', onderdeel 3.4). Van een
        investering zou slechts kunnen worden gesproken indien de investeerder daadwerkelijk een
        economische bijdrage heeft geleverd in het gastland (onderdeel 3.3).

3.81    De benadering van het hof kan als volgt worden samengevat. Volgens het hof is niet in
        geschil dat HVY vennootschappen zijn die zijn 'organised in accordance with the law
        applicable in that Contracting Party'. Daarmee is teksteel gezien voldaan aan de eisen die
        art. 1 lid 7 ECT stelt aan een investeerder in de zin van de ECT (rov. 5.1.6). De aandelen in
        Yukos, die HVY in eigendom hebben, kwalificeren als 'investment' in de zin van de ECT.
        Onder 'investering' wordt namelijk verstaan 'every kind of asset, owned or controlled directly
        or indirectly by an Investor', terwijl aandelen ('shares') deel uitmaken van de niet limitatieve
        opsomming van 'assets' in art. 1 lid 6 ECT. Het hof heeft verder overwogen dat, teksteel
        gezien, is voldaan aan de eis van art. 26 ECT dat sprake is van een geschil tussen een
        'Contracting Party' (de Russische Federatie) en investeerders uit 'another Contracting Party'
        (HVY, vennootschappen naar het recht van Cyprus en de Isle of Man) 'relating to an
        Investment of the latter in the Area of the Former' (rov. 5.1.6). Volgens het hof is er geen
        aanleiding om deze bepalingen zo uit te leggen, dat nadere eisen zouden moeten worden
        gesteld aan het internationale karakter van de investeringen. Voorwerp en doel van de ECT
        leiden niet tot een ander oordeel, aldus het hof (rov. 5.1.7.3).

---

[109]  Zie Hobér, a.w., p. 78-84, 417-420; Roe & Happold, p. 45-67.



20/01595

3.82    Na deze inleidende opmerkingen keer ik terug naar de bespreking van het onderdeel en de daarin opgenomen klachten.

3.83    Onderdeel 3.1 is een inleiding en bevat geen klachten.

*Onderdeel 3.2: 'U-bochtconstructie'*

3.84    Onderdeel 3.2 is gericht tegen het oordeel van het hof in rov. 5.1.5-5.1.8 en betoogt dat de ECT geen binnenlandse investeringen beschermt, ook niet als deze investeringen door schijnvennootschappen (via een 'U-bochtconstructie') hebben plaatsgevonden. Dit onderdeel valt in vier subonderdelen (3.2.1-3.2.4) uiteen.

3.85    Onderdeel 3.2.1 is een samenvatting van de beoordeling van het hof en bevat geen klacht.

3.86    Onderdeel 3.2.2 klaagt dat het hof zijn uitleg van de begrippen 'investment' en 'investor' ten onrechte heeft gebaseerd op een louter grammaticale uitleg van slechts een gedeelte van de desbetreffende tekst van het ECT, namelijk alleen op de definities van art. 1 leden 6 en 7 ECT. Volgens het onderdeel is een dergelijke uitleg in strijd met art. 31 lid 1 WVV.

3.87    Deze klacht mist feitelijke grondslag. Het hof heeft zijn uitleg van de begrippen 'investor' en 'investment' niet gebaseerd op een louter grammaticale uitleg van art. 1 leden 6 en 7 ECT. Het hof heeft in rov. 5.1.6 overwogen dat de tekst van deze bepalingen, in de gewone betekenis daarvan, tot uitgangspunt dient bij de interpretatie. Het hof heeft hiermee overeenkomstig art. 31 lid 1 WVV de juiste maatstaf gehanteerd. In rov. 5.1.7.1-5.1.7.4 heeft het hof vervolgens argumenten van de Russische Federatie behandeld over de context waarin art. 1 leden 6 en 7 ECT moet worden beschouwd, en over voorwerp en doel van de ECT. Daarmee heeft het hof eveneens overeenkomstig art. 31 WVV de juiste maatstaf gehanteerd. Dat het hof de elementen van context, voorwerp en doel van de ECT heeft gehanteerd aan de hand van de argumenten die de Russische Federatie heeft aangedragen, is logisch en wijst er niet op dat het hof deze elementen niet als gelijkwaardig aan de tekstuele uitleg heeft gezien.

3.88    Het onderdeel klaagt ook dat het hof in rov. 5.1.8.11 weinig gewicht heeft toegekend aan de latere statenpraktijk, die inhoudt dat een groot aantal partijen bij de ECT in latere investeringsverdragen investeringen via de U-bochtconstructie van de werkingssfeer heeft uitgesloten.

3.89    Het oordeel van het hof is juist, omdat (zoals het hof ook heeft overwogen) het hier niet gaat om een statenpraktijk ten aanzien van de uitvoering of de interpretatie van de ECT, maar om



20/01595

keuzes die staten hebben gemaakt bij het sluiten van nieuwe verdragen. Daarop heeft art. 31 WVV niet het oog.[110] Ook deze klacht faalt dus.

3.90    Onderdeel 3.2.3 richt een aantal klachten tegen de uitleg van de begrippen 'investering' en 'investeerder' door het hof.

3.91    Het onderdeel (nr. 111-112) betoogt dat het hof door betekenis toe te kennen aan de definitie van het begrip 'investering' in art. 1 lid 6 ECT, de gewone betekenis van dat begrip (en daarmee van het begrip 'investeerder') heeft miskend. Volgens die gewone betekenis is van een investering slechts sprake als een partij gedurende een bepaalde tijd een economische bijdrage levert (in het gastland, in dit geval de Russische Federatie) en een zeker risico loopt. Daarvan was in dit geval geen sprake, aldus het onderdeel. Het hof heeft dit standpunt verworpen in rov. 5.1.9.1-5.1.9.5. Daartegen is ook onderdeel 3.3 gericht (zie hierna).

3.92    De klacht miskent dat de definitie van een begrip in een verdrag volgens art. 31 lid 4 WVV bijzondere betekenis toekomt bij de uitleg van dat begrip. Dat artikellid bepaalt:

> Een term dient in een bijzondere betekenis verstaan te worden als vaststaat, dat dit de bedoeling van de partijen is geweest.

Een begrip uit een verdrag kan dus in een bijzondere (dat wil zeggen een andere dan de gewone) betekenis worden verstaan, indien vaststaat dat de verdragspartijen die bijzondere betekenis aan dat begrip hebben willen geven. Het meest voor de hand liggende bewijs van een degelijke bedoeling is het opnemen van een definitie.[111] Het kan dus voorkomen dat een verdrag een definitie geeft van een bepaald begrip dat afwijkt van de gewone betekenis daarvan. In dat geval moet van die definitie en niet van de gewone betekenis worden uitgegaan, zo blijkt uit art. 31 lid 4 WVV. Het hof is in deze zaak dan ook terecht uitgegaan van de definitie van het begrip 'investering' in art. 1 lid 6 ECT. De door het onderdeel genoemde jurisprudentie is niet relevant, omdat deze geen betrekking heeft op de ECT, maar

---

[110] Het moet immers gaan om handelen binnen de context van het desbetreffende verdrag. Oliver Dörr, Vienna Convention on the Law of Treaties, a.w., p. 598, schrijft: 'Practice of the parties is only relevant under lit b if it occurs **"in the application"** of the treaty, which plainly indicates that, just as for the development of international customary law, a subjective link is required under lit b: the parties whose practice is under consideration must regard their conduct to fall within the scope of application of the treaty concerned and in principle to be required under that treaty. They must act the way they do for the purpose of fulfilling their treaty obligations, *i.e.* their subsequent conduct must be motivated by the treaty obligation'. Uit de bronnen die in voetnoot 255 van de procesinleiding worden genoemd blijkt evenmin dat de keuzes die verdragspartijen bij andere, latere verdragen hebben gemaakt meewegen voor de uitleg van een eerder verdrag. Ook deze bronnen zien steeds op de statenpraktijk in de uitvoering van het desbetreffende verdrag. Zie bijvoorbeeld de geciteerde uitspraak in *Mobil Investments Canada Inc. v. Canada*, ICSID Case No. ARB/15/6, Decision on Jurisdiction, para 158: 'such an approach has clearly been rejected by all three NAFTA Parties in their practice subsequent to the adoption of NAFTA'.

[111] Dörr, a.w., p. 614; Richard K. Gardiner, Treaty Interpretation, Oxford: OUP 2008, p. 164.

20/01595

op andere investeringsverdragen en op het ICSID-verdrag.[112] Voor zover al uit die rechtspraak een gewone betekenis van het begrip 'investering' zou kunnen worden afgeleid, geldt die betekenis niet voor de ECT, nu dat verdrag een eigen definitie van het begrip 'investering' kent. Daarop stuiten de klachten af.

3.93    Het onderdeel (nr. 113-115) klaagt verder dat het hof bij de uitleg van de begrippen 'investering' en 'investeerder' het voorwerp en doel van de ECT heeft miskend. Het onderdeel wijst erop dat het voorwerp en doel van de ECT zijn gelegen in het stimuleren van internationale investeringen. Het hof zou in rov. 5.1.7.3 ten onrechte hebben geoordeeld dat hieruit niet kan worden afgeleid dat de ECT nadere eisen stelt aan het buitenlandse karakter van een investering.

3.94    In rov. 5.1.7.3 heeft het hof overwogen dat het doel van de ECT inderdaad (mede) omvat de bevordering van de internationale samenwerking op het terrein van energie en de bescherming van internationale investeringen. Dit betekent volgens het hof echter niet dat nadere eisen moeten worden gesteld aan het buitenlandse karakter van een investering, welke eisen niet uit de bewoordingen van art. 26 ECT en art. 1 leden 6 en 7 ECT voortvloeien. De bewoordingen van die bepalingen zijn volgens het hof op zichzelf duidelijk genoeg: volgens die bewoordingen valt een investering binnen de reikwijdte van art. 26 ECT indien de rechtspersoon die de investering doet, is opgericht volgens het recht van de ene verdragsluitende staat[113] en de investering als bedoeld in art. 1 lid 6 ECT plaatsvindt in een andere verdragsluitende staat. Met dit oordeel heeft het hof geen blijk gegeven van een onjuiste rechtsopvatting. Bij de uitleg van een verdragsbepaling moet immers rekening worden gehouden met voorwerp en doel van dat verdrag, maar dat betekent niet dat op basis van voorwerp en doel een uitleg kan worden bereikt die niet door de bewoordingen van de verdragsbepaling wordt ondersteund. Voorwerp en doel dienen als middel om de betekenis van de bewoordingen van een bepaling (die leidend zijn) vast te stellen, maar zijn niet

---

[112] *Saba Fakes v. Republic of Turkey*, ICSID Case No. ARB/07/20, para. 107 e.v. (BIT Nederland-Turkije); *KT Asia Investment Group B.V. v. Republic of Kazakhstan*, ICSID Case No. ARB/09/8, para. 161 e.v. (BIT Nederland-Kazachstan); *MNSS B.V. and Recupero Credito Acciaio N.V. v. Montenegro*, ICSID Case No. ARB(AF)/12/8, para. 189 (BIT Montenegro-Nederland); *Christian Doutremepuich and Antoine Doutremepuich v. Republic of Mauritius*, PCA Case No. 2018-37, Award on Jurisdiction, para. 111 e.v. (BIT Frankrijk-Mauritius); *Romak S.A. (Switzerland) v . The Republic of Uzbekistan*, UNCITRAL, PCA Case No. AA280, Award, para. 173 e.v. (BIT Zwitserland-Oezbekistan); *GEA Group Aktiengesellschaft v. Ukraine*, ICSID Case No. ARB/08/16, para. 137 e.v. (BIT Duitsland-Oekraïne).

[113] In de literatuur is veelvuldig onderschreven dat op grond van art. 1 lid 7 ECT voor het vaststellen van de nationaliteit van een rechtspersoon, en daarmee voor de vraag of deze als investeerder kan worden aangemerkt, uitsluitend deze formele test geldt. Zie Blanch, Moody & Lawn, a.w., p. 4 ('In including within the definition of an Investor "companies or other organizations organized in accordance with applicable law" it would appear to be clear that the "nationality" test for companies is a purely formalistic one that looks to the company or other organisation's place of incorporation'); Baltag, a.w., p. 16-17, 106; Roe & Happold, a.w., p. 64-65; Hober, a.w., p. 116; Geraets & Reins, 'Definitions', in: Leal-Arcas (ed.), a.w., p. 39; Jagusch & Sinclair, a.w., p. 89 e.v.

20/01595

belangrijker dan die bewoordingen; zij kunnen die bewoordingen niet teniet doen.[114] Dat betekent dat het hof kon oordelen dat, hoewel het doel van de ECT mede is om internationale investeringen te beschermen, de bewoordingen van de relevante bepalingen geen steun bieden voor de opvatting dat daarom ook extra eisen worden gesteld aan het internationale karakter van de investeringen of aan de nationaliteit van een investeerder. Daarop stuit deze klacht van het onderdeel af.

3.95   Het onderdeel (nr. 114) klaagt dat het hof de context van artikel 1 leden 6 en 7 ECT heeft miskend. Volgens het onderdeel blijkt uit art. 10, 13, 17 en 26 ECT alsmede uit de *Understanding* bij art. 1 lid 6 ECT, dat brievenbusvennootschappen zonder wezenlijke activiteiten (in de staat waar zij gevestigd zijn) geen bescherming onder de ECT toekomt in het geval dat deze brievenbusvennootschappen onder zeggenschap staan van buitenlandse investeerders uit een derde staat. Volgens de klacht dienen ook a fortiori investeringen van de eigen onderdanen van een gastland buiten de reikwijdte van de ECT te vallen.

3.96   Ter ondersteuning van het betoog wijst de klacht op art. 10 lid 3 ECT. Art. 10 lid 3 ECT maakt een duidelijk onderscheid tussen de buitenlandse investeerders en de 'eigen investeerders' van een verdragsluitende partij, aldus het onderdeel. Ik citeer art. 10 lid 3 ECT, en voor een goed begrip daarvan ook lid 2 van dat artikel, in de authentieke Engelse tekst en in de Nederlandse vertaling:

**Article 10 Promotion, protection and treatment of investments**

2. Each Contracting Party shall endeavour to accord to Investors of other Contracting Parties, as regards the Making of Investments in its Area, the Treatment described in paragraph 3.
3. For the purposes of this Article, "Treatment" means treatment accorded by a Contracting Party which is no less favourable than that which it accords to its own Investors or to Investors of any other Contracting Party or any third state, whichever is the most favourable.

**Artikel 10 Bevordering, bescherming en behandeling van investeringen**

2. Elke Verdragsluitende Partij streeft ernaar investeerders van andere Verdragsluitende Partijen wat betreft het doen van investeringen op haar grondgebied de in het derde lid omschreven behandeling toe te kennen.
3. In dit artikel wordt onder „behandeling" verstaan een behandeling toegekend door een Verdragsluitende Partij die niet minder gunstig is dan die welke zij toekent aan haar eigen investeerders of aan de investeerders van een andere Verdragsluitende Partij of een derde staat, al naar gelang welke behandeling het gunstigst is.

Zoals het onderdeel betoogt, maakt dit artikel inderdaad een onderscheid tussen de eigen investeerders van een Verdragsluitende Partij, en investeerders van andere Verdragsluitende Partijen of van derde landen. In die zin beschermt deze bepaling uitsluitend grensoverschrijdende investeringen. Uit deze bepaling blijkt echter niet dat daarom andere eisen zouden moeten worden gesteld aan het internationale karakter van een investering of

---

[114] Gardiner, a.w., p. 190; Dörr, a.w., p. 586-587.



Pagina 46 van 89

20/01595

de nationaliteit van een investeerder dan de eisen die voortvloeien uit art. 1 leden 6 en 7 ECT. Het onderdeel licht dat ook niet nader toe.

3.97   Ook wijst de klacht op art. 13 ECT ter onderbouwing van de stelling dat uitsluitend grensoverschrijdende investeringen door de ECT worden beschermd. Art. 13 ECT beschermt investeringen tegen onteigening, behalve in specifieke gevallen waarin onteigening gerechtvaardigd is. Art. 13 lid 1 ECT bepaalt, evenals art. 10 ECT, dat deze bescherming geldt voor 'Investments of Investors of a Contracting Party in the Area of any other Contracting Party'. De bepaling maakt dus duidelijk dat het doel is grensoverschrijdende investeringen te beschermen, maar bevat evenmin aanwijzingen dat daarom aanvullende eisen aan het internationale karakter van een investering of een investeerder zouden moeten worden gesteld.

3.98   De klacht wijst nog op de *Understanding* bij art. 1 lid 6 ECT.[115] Deze luidt als volgt:

> 'For greater clarity as to whether an Investment made in the Area of one Contracting Party is controlled, directly or indirectly, by an Investor of any other Contracting Party, control of an Investment means control in fact, determined after an examination of the actual circumstances in each situation. In any such examination, all relevant factors should be considered, including the Investor's
> (a) financial interest, including equity interest, in the Investment;
> (b) ability to exercise substantial in influence over the management and operation of the Investment; and
> (c) ability to exercise substantial in influence over the selection of members of the board of directors or any other managing body.
> Where there is doubt as to whether an Investor controls, directly or indirectly, an Investment, an Investor claiming such control has the burden of proof that such control exists'.

Deze *Understanding* bouwt voort op art. 1 lid 6 ECT, dat een investering definieert als 'every kind of asset, owned or controlled directly or indirectly by an Investor'. De *Understanding* biedt de toepasser van de ECT dus nadere handvatten om na te gaan wie zeggenschap ('control') heeft over een bepaalde investering. De *Understanding* speelt geen rol wanneer duidelijk is dat een *asset* eigendom is van ('owned by') een investeerder. Zoals het hof in rov. 5.1.7.4 heeft overwogen staat in dit geval vast dat de aandelen Yukos eigendom zijn van HVY. Er was dus geen aanleiding om aan de hand van de *Understanding* verder te onderzoeken wie zeggenschap over de aandelen heeft.

---

[115] Zie   https://www.energychartertreaty.org/provisions/part-i-definitions-and-purpose/article-1-definitions/.   Deze 'Understandings' zijn teksten die tijdens de onderhandelingen over de ECT zijn opgesteld en waarover de onderhandelaars overeenstemming hebben bereikt, maar maken geen deel uit van de tekst van de ECT. Zij kunnen daarom gebruikt worden om de verdragstekst te interpreteren, aldus het Secretariaat van de ECT (Energy Charter Secretariat, The Energy Charter Treaty - A Reader's Guide, 2002, p. 61-62). In gelijke zin Roe & Happold, a.w., p. 20. De Understandings kunnen de tekst van de ECT niet uitbreiden of veranderen, omdat zij geen deel uitmaken van de verdragstekst, aldus Geraets & Reins, a.w., p. 17.

20/01595

3.99   Art. 17 ECT, waarnaar eveneens in de klacht wordt verwezen, is de zogenoemde *denial of benefits clause*. De bepaling voorziet onder bepaalde omstandigheden in de niet-toepassing van Deel III van de ECT (inzake de bevordering en de bescherming en de behandeling van investeringen). Art. 17 luidt, voor zover relevant, in de authentieke Engelse tekst als volgt:

> Each Contracting Party reserves the right to deny the advantages of this Part to:
> 1.a legal entity if citizens or nationals of a third state own or control such entity and if that entity has no substantial business activities in the Area of the Contracting Party in which it is organized;
> (…).

In de Nederlandse vertaling:

> Elke Verdragsluitende Partij behoudt zich het recht voor de voordelen van dit Deel te ontzeggen aan:
> 1. een rechtspersoon, indien staatsburgers of onderdanen van een derde staat eigenaar zijn van of zeggenschap hebben over een dergelijke rechtspersoon en indien die rechtspersoon geen wezenlijke zakelijke activiteiten heeft op het grondgebied van de Verdragsluitende Partij waar hij is opgericht, (…).

Zoals het hof in rov. 5.1.8.4 heeft overwogen, geeft art. 17 ECT verdragsstaten het recht om aan een nauwkeurig omschreven categorie van investeerders de bescherming van een groot deel van de ECT te ontzeggen, te weten aan investeerders die op formele gronden zijn gevestigd in een verdragsstaat, maar materieel in overwegende mate zijn verbonden met een niet-verdragsstaat.[116] Anders dan de klacht betoogt, bepaalt art. 17 ECT niet dat de bescherming van de ECT aan dergelijke investeerders *moet* worden ontzegd, maar houdt de bepaling in dat die investeerders in beginsel door de ECT worden beschermd, *tenzij* een verdragsstaat anders beslist.[117] Art. 17 ECT bevat dus niet een regel die inhoudt dat investeringen die niet werkelijk, maar slechts formeel gezien internationaal zijn, geen bescherming onder de ECT toekomen.

3.100   Het onderdeel (nr. 115-117) klaagt ook dat het hof ten onrechte heeft geoordeeld dat aan de statenpraktijk waarop de Russische Federatie een beroep heeft gedaan 'weinig gewicht' toekomt, omdat die statenpraktijk niet de uitleg en toepassing van de ECT betreft, maar de keuzes die nadien bij het sluiten van nieuwe verdragen zijn gemaakt. De klacht betoogt dat dit oordeel om verschillende redenen onjuist is: (i) het hof is uitgegaan van een onjuiste, slechts grammaticale uitleg van de ECT, (ii) aan het sluiten van verdragen die zijn gesloten ná de ondertekening van de ECT kan wel degelijk betekenis toekomen, en (iii) het hof is voorbijgegaan aan de wens van de verdragsstaten om de ECT te verduidelijken.

---

[116] Zie over deze definitie: Hobér, a.w., p. 325-345; Jagusch & Sinclair, a.w., p. 17-20; Baltag, a.w., p. 147-149; Apurva Mudliar, in: Leal-Arcas, a.w., p. 249 e.v.
[117] Baltag, a.w., p. 153 e.v.

20/01595

3.101   Het hof heeft het beroep van de Russische Federatie op de statenpraktijk afgewezen, omdat
de betekenis van art. 1 leden 6 en 7 ECT reeds duidelijk is en U-bochtinvesteringen daarin
niet worden uitgesloten. Dit oordeel kan de conclusie van het hof zelfstandig dragen. Volgens
de uitlegmaatstaf van het WVV komt de statenpraktijk pas aan de orde in het geval dat de
verdragstekst en de context tot een onduidelijke uitkomst leiden. Daarvan is in dit geval geen
sprake, zodat het hof niet aan de statenpraktijk behoefde toe te komen. Ik merk op dat de
bronnen die het onderdeel (nr. 116) ter adstructie van de statenpraktijk noemt, geen
voorbeelden daarvan zijn, omdat het gaat om arbitrale rechtspraak, een onderzoeksrapport
en een motie van de Tweede Kamer over het uitsluiten van brievenbusvennootschappen van
handelsakkoorden.[118] Uit deze stukken blijkt niet dat de verdragsstaten de ECT structureel
zodanig uitleggen dat U-bochtconstructies niet worden beschermd. Voor het overige bouwt
de klacht voort op eerdere klachten. De klacht faalt derhalve.

3.102   Het onderdeel (nr. 117-120) doet ook een beroep op recente voorstellen van het ECT-
secretariaat en van de Europese Commissie om art. 1 leden 6 en 7 ECT te verduidelijken.
Deze voorstellen zijn relevant voor de interpretatie van die bepalingen, aldus het onderdeel,
omdat het gaat om een verduidelijking daarvan en niet om een wijziging. Het onderdeel
herhaalt dat brievenbusvennootschappen zonder wezenlijke activiteiten in het land waar zij
gevestigd zijn niet onder de definitie van 'investering' vallen.

3.103   Zoals reeds opgemerkt, kan een statenpraktijk alleen meewegen bij de interpretatie van een
verdrag als het gaat om een praktijk die in het kader van het desbetreffende verdrag is
ontwikkeld.[119] De voorstellen waarop het onderdeel een beroep doet, zien op een mogelijk
nieuw verdrag, en zijn daarom in beginsel niet relevant.[120] Verder vereist art. 31 WVV dat
een statenpraktijk door alle verdragsstaten in elk geval impliciet is aanvaard. Ook daarvan is
hier geen sprake, nu het gaat om voorstellen van de Europese Commissie en de Europese
Raad, die slechts een deel van de partijen bij de ECT vertegenwoordigen. Tegen die
achtergrond kunnen de opmerkingen in de door het onderdeel genoemde documenten niet
worden beschouwd als een aanwijzing dat de begrippen 'investering' en 'investeerder' op dit
moment reeds op die (voorgestelde) wijze worden uitgelegd, zodat het slechts zou gaan om
een codificatie van die uitleg.[121] Uit de documenten blijkt eerder dat de Europese Commissie
en de Europese Raad van mening zijn dat de huidige ECT niet langer voldoet en
modernisering verdient om aan te sluiten bij veranderde uitgangspunten van
investeringsbescherming. Zo stelt de Europese Commissie in zijn Aanbeveling:

---

[118] Zie voetnoten 270, 271 en 272 van de procesinleiding (p. 63-64).

[119] Dörr, a.w., p. 598.

[120] Dörr, a.w., p. 598-599.

[121] Het gaat dan met name om de opmerking aan het slot van het hierna geciteerde gedeelte van de
onderhandelingsrichtsnoeren van de Europese Raad.

20/01595

'Since the 1990s (most of) the ECT provisions have not been revised. This became particularly problematic in the context of the ECT provisions on the protection of investment, which do not correspond to modern standards as reflected in the EU's reformed approach on investment protection. Those outdated provisions are no longer sustainable or adequate for the current challenges; yet it is today the most litigated investment agreement in the world.' [122]

In de onderhandelingsrichtsnoeren van de Europese Raad valt onder meer het volgende te lezen:

'The negotiations should bring the ECT provisions on investment protection in line with the modern standards of recently concluded agreements by the EU and its Member States and adjust the ECT to new political and economic global changes (including in the energy sector).
The Investment Protection standards under the Modernised ECT should continue to aim at a high level of investment protection, with provisions affording legal certainty for investors and investments of Parties in each other's market.
The modernised ECT should provide clear definitions of covered investments and investors. The definition of investor should explicitly exclude investors and businesses that are lacking substantive business activities in their country of origin, in order to clarify that mailbox companies cannot bring disputes under the ECT.' [123]

In een Werkdocument van 20 april 2020 is het volgende voorstel voor aanpassing van art. 1 lid 7 ECT opgenomen:

'(7) "Investor" means:
(a) with respect to a Contracting Party:
(i) a natural person having the citizenship or nationality of or who is permanently residing in that Contracting Party in accordance with its applicable law [Footnote 1] ;
(ii) a company or other organisation organised in accordance with the law applicable in that Contracting Party and engaged in substantive business activities [Footnote 2] in the territory of that Contracting Party;

[Footnote 1: (…)]

[Footnote 2: In line with its notification of the Treaty establishing the European Community to the WTO (WT/REG39/1), the European Union understands that the concept of "effective and continuous link" with the economy of a Member State of the European Union enshrined in Article 54 of the TFEU is equivalent to the concept of "substantive business activities"]'. [124]

3.104 Deze documenten wijzen niet op een gevestigde statenpraktijk die inhoudt dat aanvullende eisen worden gesteld aan 'investeerders' en 'investeringen' in de zin van de ECT. Zij wijzen eerder in de richting dat dergelijke eisen op dit moment nog niet gelden, maar volgens de EU-lidstaten in de toekomst wel gesteld zouden moeten worden.

---

[122] Recommendation for a Council Decision authorising the entering into negotiations on the modernisation of the Energy Charter Treaty, COM(2019) 231 final, te raadplegen op http://trade.ec.europa.eu/doclib/docs/2019/may/tradoc_157884.pdf,

[123] Negotiating Directives for the Modernisation of the Energy Charter Treaty, doc. 10745/19, p.3, zie https://data.consilium.europa.eu/doc/document/ST-10745-2019-ADD-1/en/pdf.

[124] *Working Document* van de Europese Raad met als onderwerp 'ECT Modernisation: Revised Draft EU proposal (WK 3937/2020 UNIT), zie https://www.euractiv.com/wp-content/uploads/sites/2/2020/04/EU-Proposal-for-ECT-Modernisation-V2.pdf.

20/01595

3.105   Het onderdeel (nr. 121) klaagt dat het hof duidelijke regels en fundamentele beginselen van internationaal recht heeft miskend. Volgens het onderdeel gaat het om een beginsel van investeringsrecht, dat inhoudt dat internationale investeringsverdragen bedoeld zijn om (i) internationale investeringen te beschermen en (ii) daadwerkelijke investeerders bescherming te bieden en niet aan diegenen die slechts 'op papier' investeerder zijn. Daarvan is sprake als de werkelijke, economische investeerder onderdaan van een gastland is, zodat in wezen sprake is van een binnenlandse investering. De Russische Federatie heeft het bestaan van dit beginsel onderbouwd met verwijzingen naar arbitrale rechtspraak. In rov. 5.1.8.6-5.1.8.10 heeft het hof de arbitrale vonnissen waarop de Russische Federatie zich heeft beroepen, besproken en geoordeeld dat daaruit geen beginsel van investeringsrecht is af te leiden, zoals door het onderdeel (nr. 122) wordt verdedigd.

3.106   Het is juist dat beginselen van internationaal recht op grond van art. 31 lid 3, onder c, WVV een rol kunnen spelen bij verdragsinterpretatie. Doel van deze bepaling is om het verdrag te kunnen interpreteren tegen de achtergrond van het systeem van internationaal recht waarvan het verdrag deel uitmaakt.[125] Het kan daarbij gaan om regels uit andere verdragen of van internationaal gewoonterecht.[126] Uiteraard moet de regel relevant zijn voor de interpretatie van het desbetreffende verdrag. Dat kan bijvoorbeeld het geval zijn als de in aanmerking te nemen regel afkomstig is uit een verdrag waarbij alle staten partij zijn die ook partij zijn bij het te interpreteren verdrag of als die regel als internationaal gewoonterecht is aan te merken.[127] Ook kunnen algemene rechtsbeginselen ('general principles of law recognized by civilized nations') als bedoeld in art. 38 lid 1, onder c, van het Statuut van het Internationaal Gerechtshof van belang zijn. Te denken valt aan het beginsel van goede trouw (good faith).[128] De gebruikte bewoordingen kunnen een betekenis hebben die in het internationaal gewoonterecht of volgens algemene rechtsbeginselen is aanvaard.[129]

3.107   Het standpunt dat het hof het internationaal recht heeft miskend, heeft de Russische Federatie onderbouwd door zich te beroepen op een beginsel van internationaal investeringsrecht, waarvan het bestaan zou blijken uit de eerder genoemde arbitrale

---

[125] Dörr, a.w., p. 603-604.

[126] Dörr, a.w., p. 605-609; Gardiner, a.w., p. 266-267.

[127] Zie International Law Commission (ILC), Yearbook of the International Law Commission, Vol. II: Report of the Commission to the General Assembly on the work of its fifty-eighth session (Document A/61/10), 2006, p. 180 (onder nr. 21): 'Article 31, paragraph (3)(c) also requires the interpreter to consider other treaty-based rules so as to arrive at a consistent meaning. Such rules are of particular relevance where parties to the treaty under interpretation are also parties to the other treaty, where the treaty rule has passed into or expresses customary international law or where they provide evidence of the common understanding of the parties as to the object and purpose of the treaty under interpretation or as to the meaning of a particular term'.

[128] Dörr, a.w., p. 609.

[129] ILC, a.w., pr. 180 (onder nr. 20): 'Customary international law and general principles of law are of particular relevance to the interpretation of a treaty under article 31, paragraph 3 ( c ), especially where (...) the terms used in the treaty have a recognized meaning under customary international law or under general principles of law (...)'.

20/01595

rechtspraak. Dit beginsel zou inhouden dat slechts werkelijk internationale investeringen bescherming verdienen, zodat onvoldoende is dat de investeerder formeel in een ander land is gevestigd dan het land waar de investering is gedaan (het gastland), maar moet worden vastgesteld of de 'werkelijke, economische investeerder' onderdaan van dat gastland is (in dat geval is sprake van een U-bochtinvestering). Hieruit vloeit voort dat dit beginsel (voor zover dat bestaat) slechts relevant kan zijn als het gaat om een beginsel van internationaal gewoonterecht of om een regel van verdragsrecht die relevant is voor de interpretatie van de ECT. Naar mijn mening is van geen van beide sprake. In het navolgende werk ik dit uit.

3.108   Zoals het hof heeft overwogen, is een deel van de arbitrale rechtspraak gewezen op grond van het ICSID-verdrag. Zoals ik in mijn inleiding (nr. 1.10) heb geschreven, kent het ICSID-verdrag een eigen toepassingsbereik. Het ICSID-verdrag heeft uitdrukkelijk betrekking op internationale investeringen, waarbij het aan de ICSID-tribunalen is overgelaten dit begrip nader in te vullen. In de praktijk stellen ICSID-tribunalen soms strengere eisen dan de onderliggende investeringsverdragen zelf, in het bijzonder waar het gaat om het begrip 'investering' (zie de bespreking van onderdeel 3.3).[130] Ook kunnen deze eisen strenger zijn dan die van andere (commerciële) arbitragetribunalen, die hun rechtsmacht niet baseren op het ICSID-verdrag.[131] Dit alles betekent dat voor zover ICSID-tribunalen in bepaalde gevallen strengere eisen hebben gesteld aan het internationale karakter van een investering dan de ECT, dit niet meebrengt dat de ECT daarom ook strenger zou moeten worden uitgelegd. Die strengere eisen komen immers voort uit het ICSID-verdrag en/of uit het onderliggende bilaterale investeringsverdrag. Uit het feit dat al deze verdragen verschillende eisen stellen aan het internationale karakter van een investering[132], vloeit ook voort dat niet van een regel van internationaal gewoonterecht kan worden gesproken.[133] Evenmin is daarom duidelijk dat de ECT overeenkomstig de regels uit het ICSID-verdrag of uit andere investeringsverdragen zou moeten worden geïnterpreteerd. Integendeel, de verschillende verdragen kennen hun eigen definities, wat in de praktijk ook aanleiding kan geven tot verschillende uitkomsten. Overigens oordeelde het ICSID-tribunaal in het op grond van de ECT gewezen vonnis inzake *Plama/Bulgarije* in lijn met art. 1 lid 7 ECT (zie nr. 3.110, hierna).

3.109   Voor zover dus al uit de verschillende arbitrale uitspraken strengere eisen ten aanzien van het internationale karakter van een investering kunnen worden afgeleid (het hof heeft dat

---

[130] Deze benadering is als volgt onder woorden gebracht in *Phoenix Action, Ltd v. The Czech Republic*, ICSID Case No. ARB/06/5, 15 april 2009, para. 96: 'At the outset, it should be noted that BITs, which are bilateral arrangements between two States parties, cannot contradict the definition of the ICSID Convention. In other words, they can confirm the ICSID notion or restrict it, but they cannot expand it in order to have access to ICSID. A definition included in a BIT being based on a test agreed between two States cannot set aside the definition of the ICSID Convention, which is a multilateral agreement. As long as it fits within the ICSID notion, the BIT definition is acceptable, it is not if it falls outside of such definition. (…)'.

[131] Turinov, a.w., p. 6.

[132] Zie voor een overzicht van de eisen: Turinov, a.w., p. 12-13; Jagusch & Sinclair, a.w., 2006, p. 90-93.

[133] Zie Nollkaemper, a.w., p. 127-134.

20/01595

argument steeds verworpen), geldt dat die eisen niet relevant zijn voor de ECT, omdat de desbetreffende rechtspraak op andere verdragen betrekking heeft. Dat is met de meeste door het onderdeel genoemde uitspraken het geval. Zo ziet de uitspraak inzake *Loewen/United States of America* op het NAFTA-verdrag[134], en de zaken *Phoenix/Tsjechië*[135], *Occidental/Ecuador*[136], *TSA Spectrum de Argentina S.A./Argentinië*[137] en *ST-AD GmbH/Bulgarije*[138] op het ICSID-verdrag en verschillende bilaterale investeringsverdragen. De zaak *Lemire/Oekraïne* heeft betrekking op het BIT tussen de Verenigde Staten en Oekraïne.[139] Deze arbitrale beslissingen zijn niet van belang voor de uitleg van de ECT.

3.110  Overigens heeft het hof in rov. 5.1.8.10 acht geslagen op (door HVY aangedragen) arbitrale rechtspraak die wél is gewezen op grond van de ECT. In de zaak *Plama/Bulgarije* heeft het ICSID-tribunaal geoordeeld dat het overeenkomstig de definitie van art. 1 lid 7 ECT irrelevant is wie de eigenaar van de investerende vennootschap is en/of door wie deze wordt gecontroleerd. Volgens het tribunaal was uitsluitend relevant dat de investerende vennootschap (Plama Consortium) was opgericht overeenkomstig het recht van Cyprus.[140] Volgens het hof zijn daarmee de arbitrale vonnissen inzake *Charanne/Spanje*[141] en *Isolux/Spanje*[142] in lijn (zie rov. 5.1.8.8 en 5.1.8.10). Het vonnis in de zaak *Alapli/Turkije* wijst er volgens het hof weliswaar op dat U-bochtconstructies geen bescherming verdienen, maar geeft gezien de verdeeldheid van de arbiters op dit punt geen blijk van een algemeen geaccepteerd beginsel van die strekking.[143] Deze lezing van de verschillende arbitrale vonnissen wordt door het middel niet bestreden.

3.111  Uit het voorgaande volgt dat de klacht faalt dat het hof het internationaal recht heeft miskend. Ik merk ten overvloede nog op dat ook in de door mij geraadpleegde literatuur over de ECT

[134] *The Loewen Group Inc. v. United States of America*, ICSID Case No. ARB(AF)/98/3, 26 juni 2003, para. 223 e.v.
[135] *Phoenix Action, Ltd v. The Czech Republic*, reeds aangehaald, met name para. 135 e.v.
[136] *Occidental Petroleum Corporation v. The Republic of Ecuador* (Decision on Annulment), ICSID Case No. ARB/06/11, 2 november 2015, para. 259 e.v.
[137] *TSA Spectrum de Argentina S.A. v. Argentine Republic*, ICSID Case No. ARB/05/5, 19 december 2008; *National Gas S.A.E. v. Arab Republic of Egypt*, ICSID Case No. ARB/11/7, 3 april 2014, para 136. Zie ook rov. 5.1.8.9 van het eindarrest, onbestreden in cassatie.
[138] *ST-AD GmbH v. The Republic of Bulgaria* (Award on Jurisdiction), UNCITRAL, PCA Case No. 2011-06, 18 juli 2013, para. 408 e.v.
[139] *Lemire v. Ukraine*, ICSID Case No. ARB/06/18, 28 maart 2011, para. 55 e.v.
[140] *Plama Consortium Limited v. Republic of Bulgaria* (Decision on Jurisdiction), ICSID Case No. ARB/03/24, 8 februari 2005, para. 128, waar het tribunaal overwoog: '(…) it remains the case that the Claimant [Plama Consortium, A-G] was an "Investor" under Article 1(7) ECT: it is here irrelevant who owns or controls the Claimant at any material time. The definition of "Investment" under Article 1(6) refers to the Investor's investment, in other words it is again here irrelevant who owns or controls the Claimant at any material time; (…)'. Zie ook Turinov, a.w., p. 16.
[141] *Charanne B. V. v. The Kingdom of Spain* (Final Award), Stockholm Chamber of Commerce (SCC) Arbitration No. 062/2012, 21 januari 2016.
[142] SCC *Isolux Infrastructure Netherlands, B.V. v. Kingdom of Spain*, Arbitration Case No. V2013/153, 12 juli 2016.
[143] *Alapli Elektrik B.V. v. Republic of Turkey*, ICSID Case No. ARB/08/13, 16 juli 2012.

Pagina 53 van 89

20/01595

geen steun valt te vinden voor de opvatting van de Russische Federatie dat extra eisen aan het internationale karakter van de investeringen moeten worden gesteld.[144] Ook het ICSID-tribunaal heeft in de reeds genoemde uitspraak *Plama/Bulgarije* geoordeeld dat dergelijke nadere eisen niet worden gesteld. In de literatuur is erop gewezen dat de consequentie van die uitspraak weliswaar is dat brievenbusvennootschappen aanspraak kunnen maken op bescherming onder de ECT, maar dat hiertegenover staat dat verdragsstaten die bescherming op grond van art. 17 ECT (de *denial of benefits clause*) kunnen beperken tot investeerders die een substantiële band hebben met het land waar zij gevestigd zijn en zo brievenbusvennootschappen van die bescherming kunnen uitsluiten.[145] Zolang verdragsstaten van die mogelijkheid geen gebruik hebben gemaakt, vallen ook brievenbusvennootschappen onder de reikwijdte van de ECT.[146]

3.112   Onderdeel 3.2.4 klaagt over rov. 5.1.8.8, waarin het hof heeft overwogen dat onvoldoende is toegelicht waarom Khodorkovsky c.s. zijn te beschouwen als 'beneficial owners' van de Yukosaandelen en waarom HVY de aandelen slechts houden ten behoeve van Khodorkovsky c.s. Het onderdeel betoogt dat dit oordeel gelet op art. 149 en 154 Rv onjuist is, althans onbegrijpelijk, omdat partijen het hierover eens zouden zijn.

3.113   De klacht faalt bij gebrek aan belang. De bestreden rechtsoverweging ziet immers niet uitsluitend op de vraag of Khodorkovsky c.s. de 'beneficial owners' zijn van de Yukosaandelen en van HVY, maar heeft primair betrekking op de vraag of dit relevant is voor de toepassing van de ECT. Het hof heeft in deze overweging de stelling van de Russische Federatie verworpen dat de ECT een onderscheid maakt tussen de formele en de materiële eigenaar, in die zin dat alleen de laatste procesbevoegdheid heeft (zie rov. 5.1.8.7). Het hof heeft geconcludeerd dat een dergelijke regel niet bestaat, en die conclusie onderbouwd met een verwijzing naar de zaak *Charanne/Spanje*. Het onderdeel bestrijdt die conclusie overigens niet.

---

[144] Geraadpleegd zijn, naast de in de volgende voetnoten genoemde bijdragen: Turinov, a.w., p. 12-13; Hobér, a.w., p. 116; Baltag, a.w., p. 141-146; Roe & Happold, a.w., p. 64-65; Jagusch & Sinclair, a.w., p. 93; Blanch, Moody & Lawn, a.w., p. 3-4; Engela C. Schlemmer, 'Investment, Investor, Nationality, and Shareholders', in: Peter T. Muchlinski e.a. (eds.), The Oxford Handbook of International Investment Law, Oxford: OUP 2015, p. 77-78.

[145] Zie Wälde, a.w., p. 274, die stelt dat 'incorporating just for the sake of Treaty protection' niet voldoet, waarbij verwezen wordt naar art. 17 ECT.

[146] Anthony C. Sinclair, 'The substance of nationality requirements in investment treaty arbitration', ICSID Review - Foreign Investment Law Journal 2005, p. 378 e.v. (in gelijke zin dezelfde auteur in 'Investment Protection for "Mailbox Companies" under the 1994 Energy Charter Treaty', Transnational Dispute Management 2005). In *Plama/Bulgarije* (reeds aangehaald, para. 147 e.v.) oordeelde het ICSID-tribunaal dat verdragsstaten investeerders van tevoren zullen moeten informeren van een besluit op grond van art. 17 ECT, en dat staten hierop niet pas tijdens een arbitrale procedure beroep kunnen doen om zo de niet-ontvankelijkheid van de claim van de investeerder te bewerkstelligen. Zie ook Sinclair, a.w., ICSID Review 2005, p. 387: 'The decision in *Plama* on the right-to-deny-benefits provision has practical consequences. It follows that ECT Article 17 can offer a good defence for host States to claims brought by "mailbox" companies, but a State must exercise its right prior to the time the investment is made'.

20/01595

3.114   Ik kom tot de slotsom dat alle klachten van onderdeel 3.2 falen.

*Onderdeel 3.3: daadwerkelijke economische bijdrage aan economie gastland*

3.115   Onderdeel 3.3 is gericht tegen rov. 5.1.9.1-5.1.9.5 en klaagt dat het hof ten onrechte het standpunt van de Russische Federatie heeft verworpen dat de aandelen van HVY in Yukos niet als 'investering' onder de ECT kunnen worden aangemerkt, omdat HVY geen daadwerkelijke economische bijdrage hebben geleverd aan de Russische Federatie. Het onderdeel klaagt dat het hof ten onrechte heeft overwogen dat de Russische Federatie het bestaan van een dergelijk internationaal erkend rechtsbeginsel van investeringsrecht niet heeft aangetoond (nr. 126) en dat het hof ten onrechte is uitgegaan van een louter grammaticale uitleg van de begrippen 'investering' en 'investeerder' uit de ECT (nr. 127). Volgens het onderdeel heeft het hof ten onrechte overwogen dat het vereiste van de economische bijdrage slechts geldt voor een investering als bedoeld in het ICSID-verdrag en niet voor de ECT (nr. 129).

3.116   Voor zover de klachten voortbouwen op eerdere onderdelen, delen zij het lot daarvan. Wat de klacht in nr. 129 betreft, herhaal ik dat het ICSID-verdrag een eigen toepassingsbereik kent, hetgeen ertoe heeft geleid dat het ICSID-tribunaal in de uitspraak inzake *Salini Costruttori SpA/Marokko*[147] criteria heeft geformuleerd om vast te stellen of sprake is van een investering. Deze *Salini*-criteria zijn strenger dan die van de ECT.[148] Een van die criteria is dat met de investering een bijdrage wordt geleverd aan de economische ontwikkeling van het gastland (zie rov. 5.1.9.2 e.v. van het eindarrest). Gelet op het bestaan van de verschillen tussen de *Salini*-criteria en de criteria van de ECT, dienen investeerders die menen dat hun rechten onder de ECT zijn geschonden, zorgvuldig af te wegen of zij hun claim aan het ICSID willen voorleggen, omdat het risico bestaat dat het ICSID rechtsmacht afwijst.[149] Het is dus duidelijk en in de praktijk geaccepteerd, dat het ICSID-verdrag anders wordt uitgelegd dan de ECT. Er zijn in de tekst van de ECT ook geen aanwijzingen dat de definitie van 'investeerder' (of van andere begrippen) uit de ECT conform die van het ICSID-verdrag zou moeten worden uitgelegd.

3.117   Zoals ik reeds heb opgemerkt, biedt de ECT geen echte definitie van het begrip 'investering', maar in plaats daarvan een niet uitputtende lijst van vermogensbestanddelen die als zodanig

---

[147] *Salini Costruttori S.p.A. and Italstrade S.p.A. v. Kingdom of Morocco* (Decision on Jurisdiction), ICSID Case No. ARB/00/4, 23 juli 2001, International Legal Materials 2003, p. 609-624.

[148] Zie hierover Baltag, a.w., p. 211-219; Jagusch & Sinclair, a.w., p. 75 e.v.; Turinov, a.w., p.5 e.v.; Roe & Happold, a.w., p. 57-63; Hobér, a.w., p. 69-73.

[149] Baltag, a.w., p. 219: 'A diligent Investor will have to take into consideration all relevant criteria, including the chances for an ECT dispute to be dismissed by an ICSID tribunal because of failure to fulfil the investment requirement under Article 25(1) of the ICSID Convention'; Jagusch & Sinclair, a.w., p. 87; Turinov, a.w., p. 19-22; Roe & Happold, a.w., p. 49. De laatsten wijzen erop dat het algemeen aanvaard is dat de Salini-criteria 'are not jurisdictional hurdles which must each be surmounted but, rather, typical characteristics of investments' (p. 57).

20/01595

worden aangemerkt. Dit roept de vraag op hoe moet worden beoordeeld of vermogensbestanddelen die niet op de lijst van art. 1 lid 6 ECT staan, als investering moeten worden aangemerkt. In dit verband is in de literatuur opgemerkt dat opvattingen van het begrip 'investering' die buiten de ECT zijn ontwikkeld, zoals in het kader van het ICSID-verdrag, van dienst zouden kunnen zijn.[150] Ook zijn er enkele uitspraken in ECT-zaken waarin voor de definitie van 'investeerder' werd aangesloten bij de *Salini*-rechtspraak onder het ICSID-verdrag.[151] Zo oordeelde de meerderheid van de arbiters in de zaak *Alapli/Turkije*, dat de ECT 'a meaningful contribution' door de investeerder in de gaststaat vereist. Daarvan was volgens hen geen sprake, omdat de eiser geen eigen geld had geïnvesteerd, maar slechts als 'doorgeefluik' had gefungeerd.[152] Door een van de andere arbiters werd deze opvatting in een *dissenting opinion* bestreden op de grond dat een dergelijk criterium in de ECT niet te vinden is.[153] In andere rechtspraak werd uitdrukkelijk geoordeeld dat de *Salini*-criteria geen rol kunnen spelen in het kader van de ECT. In *Anatolie Stati e.a./Kazachstan* overwoog het tribunaal dat de ECT een 'extremely broad definition' van het begrip 'investering' kent en dat wanneer een vermogensbestanddeel door art. 1 lid 6 ECT wordt bestreken, geen betekenis meer toekomt aan criteria die in het kader van een ander verdrag zijn ontwikkeld:

> '806. (…) Guidelines and tests of criteria developed in this jurisprudence on the ICSID Convention and similar treaties, therefore, cannot be used as long as any right or activity is clearly covered by the wording of the above definition in ECT cases. Therefore, the so-called *Salini* test, controversial and much discussed both by the Parties in this case and otherwise in ICSID and similar arbitrations, even if applied as a flexible guideline rather than as a strict jurisdictional requirement, cannot be used for the definition of investment under the ECT or, likewise, in the present case. The Tribunal, thus, sees no need to examine the various criteria discussed for the *Salini* test.'[154]

3.118   De conclusie luidt dat de ICSID-rechtspraak, in het bijzonder inzake *Salini*, niet duidt op het bestaan van een beginsel van internationaal investeringsrecht dat ook bij interpretatie van de ECT in acht zou moeten worden genomen. Daarvoor loopt de arbitrale rechtspraak teveel uiteen. Bovendien zijn er slechts enkele uitspraken (waarvan één niet-unanieme) waarin dit standpunt is ingenomen, zodat daaraan geen doorslaggevende betekenis kan worden

---

[150] Roe & Happold, a.w., p. 57 e.v.

[151] Zie de reeds vermelde uitspraken *Alapli/Turkije* en *Isolux/Spanje*; Hobér, p. 73-78 (i.h.b. p. 75).

[152] *Alapli/Turkije, reeds aangehaald*, para. 337-350. Zie Geraets & Reins, a.w., p. 35-36.

[153] *Alapli/Turkije, Dissenting Opinion* of Marc Lalonde, para. 9.

[154] *Anatolie Stati, Gabriel Stati, Ascom Group SA and Terra Raf Trans Traiding Ltd v. Kazakhstan*, SCC (Stockholm Chamber of Commerce) Case No. V 116/2010, 19 december 2013, para. 806. In gelijke zin *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Jurisdiction, para. 157:'The definition of investment must be interpreted according to article 31 of the Vienna Convention on the Law of Treaties and not in accordance with tests, criteria or guidelines beyond the terms, the context or the object and purpose of the ECT. There is no test, set of criteria or guidelines that can or should be relied upon in international law to restrict or replace the definition that exists in the ECT.'

20/01595

toegekend. Ik verwijs verder naar hetgeen ik onder 1.8 van deze conclusie heb opgemerkt over de betekenis van arbitrale rechtspraak in het kader van de uitleg van verdragen.

3.119    Ik kom tot de slotsom dat de klachten van onderdeel 3.3 falen.

*Onderdeel 3.4: piercing the corporate veil*

3.120    Onderdeel 3.4 is gericht tegen rov. 5.1.8-5.1.11 en klaagt dat het hof en het Scheidsgerecht 'door de louter formele vennootschappelijke structuur' van HVY heen hadden moeten kijken, omdat deze vennootschappen slechts zijn opgericht om illegale handelingen, waaronder belastingontduiking, te kunnen plegen en te verhullen. Het is een beginsel van internationaal recht dat waar vennootschappen op dergelijke wijze zijn misbruikt, door de vennootschappelijke structuur heen moet worden gekeken (*piercing/lifting the corporate veil*). In dit geval heeft dit tot consequentie dat HVY niet als investeerder in de zin van de ECT kunnen gelden, omdat zij niet kunnen worden beschouwd als te zijn opgericht conform het recht van Cyprus respectievelijk het Isle of Man, zoals art. 1 lid 7 ECT vereist, aldus het onderdeel.

3.121    Het hof heeft dit betoog van de Russische Federatie verworpen op een drietal gronden. Ten eerste is volgens het hof van een dergelijk beginsel niet gebleken (rov. 5.1.10.1-5.1.10.2). Ten tweede zijn er geen aanwijzingen dat art. 1 lid 7 ECT een grondslag biedt voor toepassing van dit leerstuk in de door de Russische Federatie bepleite zin. Ten derde ziet het leerstuk van *piercing the corporate veil* op het vaststellen van aansprakelijkheid en kan het niet worden gebruikt om de bevoegdheid van het Scheidsgerecht aan te vechten (rov. 5.1.10.4).

3.122    De klachten nemen tot feitelijk uitgangspunt dat HVY uitsluitend zijn opgericht om illegale activiteiten te verhullen. Dit is niet komen vast te staan.[155] In cassatie zal daarom, bij wijze van hypothetisch feitelijke grondslag, als uitgangspunt worden genomen dat HVY inderdaad zijn opgericht om genoemde illegale activiteiten te verhullen.

3.123    De klachten van het onderdeel zijn geënt op het leerstuk van *piercing/lifting the corporate veil*. Deze term heeft inderdaad, zoals het hof overweegt, primair betekenis in de context van aansprakelijkheid van rechtspersonen. *Piercing the corporate veil* betekent dat door de rechtspersoonlijkheid 'heen moet worden gekeken' zodat de aandeelhouders aansprakelijk

---

[155]    Het hof heeft in rov. 5.1.11.6, op basis van uitspraak van het Scheidsgerecht, de stelling verworpen dat sprake was van illegaal handelen ten tijde van het doen van de investering door HVY (dat wil zeggen, de verwerving van aandelen in Yukos door HVY). Onderdeel 3.4 ziet op andere vermeende illegale activiteiten, die later hebben plaatsgevonden, waaronder het ontduiken van dividendbelasting, het betalen van steekpenningen, witwaspraktijken en het wegsluizen van vermogen van Yukos uit Rusland (nr. 131).

20/01595

kunnen worden gesteld in plaats van uitsluitend de rechtspersoon zelf.[156] De term krijgt soms een bredere betekenis en wordt gebruikt om andere situaties aan te duiden waarin de rechtspersoon wordt weggedacht en in plaats daarvan wordt bezien wie daarover zeggenschap hebben.[157] Zo kent de ECT het beginsel *piercing the corporate veil* in deze brede betekenis: art. 26 lid 7 ECT maakt het mogelijk de rechtsbescherming van art. 26 ECT uit te breiden tot investeerders die gevestigd zijn in het land waar de investering is gedaan, mits zij onder zeggenschap staan van investeerders uit een andere verdragsstaat. In dat geval is dus niet beslissend wie de investeerder is en waar deze is gevestigd, maar onder wiens zeggenschap de investeerder feitelijk staat.[158] Op die manier wordt door de investeerder/vennootschap heen gekeken, maar ditmaal – anders dan in de zojuist beschreven opvatting – ten gunste van degenen die daarover zeggenschap hebben.

3.124   Het onderdeel doet een beroep op een invulling van het begrip *piercing the corporate veil* in het internationale recht, die zou inhouden dat rechters en scheidsgerechten door vennootschappelijke entiteiten heen moeten kijken die zijn misbruikt voor illegaal handelen. Daarom zou aan de entiteiten bescherming onder (investerings)verdragen moeten worden ontzegd. Strikt genomen is er in dat geval geen sprake van *piercing the corporate veil*, omdat in die opvatting niet door de vennootschap wordt heen gekeken naar de aandeelhouders, maar de vennootschap wordt geacht in het geheel niet te bestaan zonder dat verder relevant is wie daarover zeggenschap heeft. Het onderdeel beroept zich echter op een beginsel van internationaal recht van die strekking.

3.125   Het onderdeel verwijst ter onderbouwing van het bestaan van een dergelijk beginsel naar de uitspraak van het Internationaal Gerechtshof (IGH) inzake *Barcelona Traction*.[159] In die zaak was aan de orde of België bij het IGH een procedure aanhangig kon maken tegen Spanje, ten behoeve van Belgische aandeelhouders van Barcelona Traction, een Canadese vennootschap. Het IGH moest daarom onder meer beoordelen of aandeelhouders van een vennootschap kunnen procederen op grond van beweerdelijk onrechtmatig handelen jegens de vennootschap. Het IGH nam de zelfstandigheid van de vennootschap ten opzichte van haar aandeelhouders tot uitgangspunt, maar overwoog ook dat hierop onder bepaalde omstandigheden uitzonderingen kunnen worden gemaakt, met name in het geval dat de vennootschap niet in staat is gebleken de belangen van degenen die hun financiële middelen aan de vennootschap hebben toevertrouwd, te beschermen.[160] In dergelijke situaties, aldus

---

[156] Zie bijvoorbeeld Karen Vandekerckhove, Piercing the corporate veil, Alphen aan den Rijn: Kluwer Law International 2007, p. 1 en 11; Asser/Maeijer/Van Solinge & Nieuwe Weme 2-II* 2009, nr. 834 e.v., met verdere verwijzingen.

[157] Baltag, a.w., p. 115. Zie ook over de verschillende verschijningsvormen: R.C. van Dongen, Identificatie in het rechtspersonenrecht, Uitgaven vanwege het Instituut voor Ondernemingsrecht, nr. 22, Deventer: Kluwer, 1995.

[158] Baltag, t.a.p.

[159] IGH, *Case concerning the Barcelona Traction, Light and Power Company, Limited (new application: 1962) (Belgium v. Spain)*, 5 februari 1970.

[160] IGH *Barcelona Traction*, para. 37 e.v.

Pagina 58 van 89

20/01595

het IGH, wordt een uitzondering gemaakt op het beginsel van onafhankelijkheid van de vennootschap:

> '56. (…) Here, then, as elsewhere, the law, confronted with economic realities, has had to provide protective measures and remedies in the interests of those within the corporate entity as well as of those outside who have dealings with it: the law has recognized that the independent existence of the legal entity cannot be treated as an absolute. It is in this context that the process of "lifting the corporate veil" or "disregarding the legal entity" has been found justified and equitable in certain circumstances or for certain purposes. The wealth of practice already accumulated on the subject in municipal law indicates that the veil is lifted, for instance, to prevent the misuse of the privileges of legal personality, as in certain cases of fraud or malfeasance, to protect third persons such as a creditor or purchaser, or to prevent the evasion of legal requirements or of obligations.'

Het IGH heeft overwogen dat een dergelijke uitzondering ook een rol kan spelen in het internationaal recht. Wel benadrukte het IGH het uitzonderlijke karakter van het proces van *lifting the veil*:

> '58. In accordance with the principle expounded above, the process of lifting the veil, being an exceptional one admitted by municipal law in respect of an institution of its own making, is equally admissible to play a similar role in international law. It follows that on the international plane also there may in principle be special circumstances which justify the lifting of the veil in the interest of shareholders.'

3.126   Het IGH heeft in het internationaal recht het bestaan van de mogelijkheid van *piercing the corporate veil* erkend, onder meer 'to prevent the misuse of the privileges of legal personality, as in certain cases of fraud or malfeasance', maar tevens overwogen dat hiervoor slechts in uitzonderlijke omstandigheden ruimte is. Het IGH is dus niet zo ver gegaan als het onderdeel (nr. 132) betoogt, want in de uitspraak is niet te lezen dat rechters en scheidsgerechten 'verplicht' zijn om door vennootschappen heen te kijken die zijn misbruikt voor '*fraud or malfeasance*'. Bovendien blijkt uit de uitspraak niet dat een vennootschap ook in het geheel zou kunnen worden weggedacht, zoals door het onderdeel wordt betoogd.

3.127   Uit de arbitrale ICSID-uitspraken waarnaar door het onderdeel (en het hof) wordt verwezen (in de zaken *Cementownia/Turkije*[161], *Phoenix/Tsjechië* en *Alapli/Turkije)* blijkt evenmin van een regel dat scheidsgerechten verplicht zijn om door vennootschappen heen te kijken in het geval dat deze zijn misbruikt voor illegale activiteiten. Deze uitspraken hebben een beperktere betekenis. Zij houden in dat onder omstandigheden bescherming onder de ECT kan worden ontzegd aan eisers die aandelen in vennootschappen hebben verworven met als enig doel toegang te verkrijgen tot de arbitrageprocedure. In dat geval wordt niet de eisende vennootschap 'weggedacht', omdat die niet conform het recht van een verdragsstaat zou zijn opgericht, maar is er geen sprake van een investering in de zin van art. 1 lid 6 ECT.[162]

---

[161] *Cementownia "Nowa Huta" S.A. v. Republic of Turkey*, ICSID Case No. ARB(AF)06/2, 17 september 2009.
[162] Zie *Phoenix/Tsjechië*, para. 143: 'Although, at first sight, the operation by Phoenix looks like an investment, numerous factors converge to demonstrate that the apparent investment is not a protected investment. (…) It is

20/01595

Daarnaast heeft het ICSID-tribunaal in deze zaken weliswaar overwogen dat het verwerven van aandelen in een buitenlandse vennootschap teneinde toegang tot investeringsarbitrage te verkrijgen onaanvaardbaar kan zijn, maar ook overwogen dat een onderscheid moet worden gemaakt met *bona fide* transacties, en dat dit sterk van de omstandigheden van het geval afhangt.[163] Deze ICSID-rechtspraak erkent dus, tot op zekere hoogte, het leerstuk van *piercing the corporate veil*, maar heeft dit tot op heden slechts toegepast in een specifieke situatie, die zich niet voordoet in de zaak die in cassatie aan de orde is.[164]

3.128   Zoals het hof terecht heeft overwogen, biedt art. 1 lid 7 ECT geen grondslag om vennootschappen 'weg te denken' op de door het onderdeel verdedigde wijze. Ik herhaal dat art. 1 lid 7 ECT slechts de formele eis stelt dat een vennootschap is opgericht volgens het recht van een verdragsstaat. Deze bewoordingen bieden geen grondslag om een vennootschap die volgens het recht van een verdragsstaat is opgericht 'weg te denken' door deze niet als investeerder aan te merken (omdat deze voor illegale doeleinden is opgericht, of om een andere reden).[165] Het onderdeel (nr. 137) voert nog aan dat art. 1 lid 7 ECT een expliciete grondslag biedt voor de toepassing van het leerstuk van *piercing the corporate veil* dat bestaat in het recht van Cyprus en het Isle of Man (waar HVY gevestigd zijn), maar stelt niet dat dit leerstuk volgens het recht van die staten op de door het onderdeel verdedigde wijze wordt ingevuld. Voor zover het onderdeel bedoelt te klagen dat het hof het vreemde recht op dit punt verkeerd zou hebben toegepast, faalt de klacht op grond van het bepaalde in art. 79 lid 1, onder b, RO, dan wel bij gebrek aan feitelijke grondslag, omdat deze vraag in feitelijke instanties kennelijk niet aan de orde is geweest (het onderdeel verwijst niet naar vindplaatsen in de processtukken waar hierover stellingen zouden zijn ingenomen).

3.129   De slotsom luidt dat de klachten van onderdeel 3.4 falen.

*Onderdeel 3.5: prejudiciële vragen over art. 1 leden 6 en 7 en art. 26 ECT?*

3.130   <u>Onderdeel 3.5</u> betoogt dat de uitleg van het hof onverenigbaar is met het EU-recht. Volgens het onderdeel had het hof over de uitleg van art. 1 leden 6 en 7 en art. 26 ECT prejudiciële

---

the conclusion of the Tribunal that the whole "investment" was an artificial transaction to gain access to ICSID', en *Alapli/Turkije*, para. 404: 'All the elements of the file and the particular circumstances of the case prove the investment was manipulated to appear as a foreign investment'.

[163] *Alapli/Turkije*, para. 401 e.v.; *Phoenix/Tsjechië*, para. 142-143; *Cementownia/Turkije*, para. 154-156, met verwijzing naar *Tokios Tokelés/Oekraïne*, ICSID Case No. ARB/02/18 (Decision on Jurisdiction), para. 53-56.

[164] Dit geldt ook voor de andere in hoger beroep genoemde uitspraken (zie memorie van antwoord, nr. 712). Deze uitspraken erkennen het bestaan van het leerstuk van *piercing the corporate veil*, maar plaatsen dit in de context van aansprakelijkheid. Zij bieden geen aanwijzing dat het leerstuk moet worden toegepast zoals door het onderdeel wordt verdedigd. Zie *ADC Affiliate Ltd./Hongarije*, ICSID Case No. ARB/03/16, 8 oktober 2006, para. 358; *Rumeli Telekom AS c.s./Kazachstan*, ICSID Case No. ARB/05/1, 29 juli 2008, para. 328; *Saluka Investments/Tsjechië*, Partial Award, UNCITRAL,17 maart 2006, para. 230.

[165] Zie uitdrukkelijk Baltag, a.w., p. 141-146.

20/01595

vragen aan het HvJEU moeten stellen en in dit verband alle kwesties moeten betrekken die in deze zaak aan de orde zijn gesteld.

3.131   Ik verwijs naar hetgeen ik heb opgemerkt bij de bespreking van onderdeel 2.7. Voor het stellen van prejudiciële vragen bestaat geen aanleiding, indien het antwoord op die vragen niet noodzakelijk is voor de beoordeling van het geschil. Ook daarvan is ten aanzien van onderdeel 3 sprake. De verschillende klachten van dit onderdeel falen om uiteenlopende redenen: deels wegens gebrek aan feitelijke grondslag, deels omdat zij een beroep doen op bronnen die volgens de uitlegregels van het WVV niet relevant zijn voor de uitleg van de ECT, en deels omdat de klachten motiveringsklachten zijn die falen.

**Onderdeel 4: uitleg van art. 1 leden 6 en 7 ECT (legaliteit van de investeringen)**

3.132   Onderdeel 4 ziet eveneens op de uitleg van de begrippen 'investering' en 'investeerder' van art. 1 leden 6 en 7 ECT en betoogt dat illegale investeringen daar niet onder vallen, zodat het Scheidsgerecht niet bevoegd was om van de claims van HVY kennis te nemen. Daarnaast betoogt het onderdeel dat het oordeel van het Scheidsgerecht strijdig is met de openbare orde, omdat het ervoor zorgt dat HVY kunnen profiteren van onrechtmatig handelen. Het onderdeel valt in vier subonderdelen uiteen.

3.133   Onderdeel 4.1 bevat geen klachten, maar geeft een overzicht van de illegale handelingen waaraan HVY zich schuldig zouden hebben gemaakt. De Russische Federatie heeft op dat punt het volgende gesteld:

      1) HVY hebben de aandelen in Yukos op illegale wijze verkregen, namelijk door manipulatie van veilingen en het betalen van steekpenningen (onderdeel 4.1.2);

      2) Hulley en VPL zijn opgericht om dividendbelasting te ontduiken, waaraan ook YUL heeft meegewerkt (onderdeel 4.1.3);

      3) Yukos heeft in de Russische Federatie belasting ontdoken door middel van het gebruik van schijnvennootschappen in vrije belastingregio's (onderdeel 4.1.4);

      4) HVY hebben de rechtsgang naar aanleiding van dit illegale handelen belemmerd door bewijs te vernietigen en gelden weg te sluizen naar het buitenland (onderdeel 4.1.5).

3.134   De Russische Federatie heeft betoogd dat het Scheidsgerecht zich, vanwege de illegaliteit van de investeringen van HVY, onbevoegd had moeten verklaren. In investeringsarbitrages wordt, aldus de Russische Federatie, algemeen aanvaard dat de verdragsbescherming zich niet uitstrekt tot investeringen die in strijd met het recht van de gaststaat zijn gedaan, ook al


Pagina 81 van 89

20/01595

bevat het desbetreffende verdrag geen bepaling die dergelijke investeringen uitdrukkelijk uitsluit van de werkingssfeer van de ECT.[166]

3.135    Het hof heeft, samengevat, overwogen dat inderdaad een beginsel van internationaal investeringsrecht bestaat, dat inhoudt dat investeringen die zijn gedaan in strijd met het recht van het gastland niet beschermd worden. Het moet dan wel gaan om gevallen waarin illegaal is gehandeld bij het doen van de investering, niet daarna (rov. 5.1.11.2). In het geval dat dit komt vast te staan, moet volgens het hof voor de gevolgen een onderscheid worden gemaakt tussen (a) investeringsverdragen met in de definitie van de term 'investering' een zinsnede die inhoudt dat de investering moet zijn gedaan 'in accordance with the law' of woorden van soortgelijke strekking, en (b) investeringsverdragen waarin dat niet het geval is. Bij de eerstgenoemde categorie van verdragen valt een illegale investering in het geheel buiten de reikwijdte van het verdrag: er is dan geen sprake van een investering. De ECT bevat niet een zodanige uitdrukkelijke legaliteitseis. Voor dergelijke verdragen bestaat geen algemeen aanvaard rechtsbeginsel, dat inhoudt dat een scheidsgerecht zich in het geval van een illegale investering onbevoegd zou moeten verklaren (rov. 5.1.11.4-5.1.11.5). Volgens het hof zijn die bewoordingen van art. 1 lid 6 en art. 26 ECT doorslaggevend. Nu daarin geen expliciete legaliteitseis te lezen is, kan niet worden geoordeeld dat wanneer blijkt van een illegale investering, dit leidt tot onbevoegdheid van het scheidsgerecht. Wel kan mogelijk worden geoordeeld dat de investering niet kan profiteren van de materiële bescherming van de ECT, maar dat is iets anders. Ten overvloede heeft het hof gewezen op het oordeel van het Scheidsgerecht, dat inhoudt dat het illegale handelen bij de privatisering van Yukos en de acquisitie van de aandelen in Yukos door HVY in een te ver verwijderd verband staan. Er is dus volgens het hof niet komen vast te staan dat van een illegale investering sprake is.

*Onderdeel 4.2: bestaan van legaliteitsvereiste*

3.136    <u>Onderdeel 4.2</u> klaagt dat het hof heeft miskend, dat in (de definitie van investering in) de ECT een legaliteitseis besloten ligt, omdat de ECT geen investeringen beschermt die illegaal verkregen en behouden zijn. Het onderdeel doet een beroep op de gewone betekenis van het begrip 'investering', alsmede op context, voorwerp en doel van de ECT en op arbitrale rechtspraak.

3.137    Het hof heeft in rov. 5.1.11.5 overwogen dat in de ECT geen uitdrukkelijk legaliteitsvereiste is opgenomen, zoals een zinsnede inhoudend dat de investering moet zijn gedaan 'in accordance with the law', of woorden van soortgelijke strekking. Het onderdeel betoogt niet dat dergelijke woorden wel in de ECT zouden zijn opgenomen[167], maar verdedigt het

---

[166] Deze beschrijving van het standpunt van de Russische Federatie is ontleend aan rov. 5.1.11.1 van het eindarrest.
[167] Zie o.a. Hobér, a.w., p. 99: '(…) the ECT does not have any provision requiring that an investment be in conformity with a particular law, neither municipal law nor international law'.

20/01595

standpunt dat een en ander in de ECT besloten ligt en verwijst (in nr. 154) onder meer naar een introductie bij de ECT van het ECT-Secretariaat.[168] Het hof heeft in rov. 5.1.11.2 overwogen dat een beginsel van internationaal investeringsrecht bestaat dat inhoudt dat illegale investeringen die zijn gedaan in strijd met het recht van het gastland geen bescherming verdienen. Het hof heeft in rov. 5.1.11.3 (in samenhang met rov. 5.1.11.5) geoordeeld dat in de ECT in de definitie van 'investering' geen zinsnede is opgenomen dat de investering moet zijn gedaan 'in accordance with the law'. Volgens het hof heeft dit geen gevolgen voor de bevoegdheid van het Scheidsgerecht om kennis te nemen van claims op grond van de ECT vanwege het eerder gemaakte onderscheid tussen verdragen die wel en die niet een uitdrukkelijke legaliteitseis bevatten. Het onderdeel bestrijdt niet dat een dergelijk onderscheid moet worden gemaakt, zodat het onderdeel in zoverre faalt.

3.138   Ook uit de arbitrale rechtspraak blijkt niet dat het oordeel van het hof onjuist is. Uit de arbitrale rechtspraak kan worden afgeleid dat de ECT een impliciete legaliteitseis bevat, maar niet dat die zou moeten leiden tot onbevoegdheid van het scheidsgerecht.[169] Relevant in dit kader zijn onder meer de uitspraken van het ICSID-tribunaal in de reeds genoemde zaak *Plama/Bulgarije*, die het hof in rov. 5.1.11.4 heeft besproken. In die procedure heeft Bulgarije gesteld dat niet kon worden gesproken van een investering in de zin van de ECT, omdat de investeerder verborgen had gehouden onder wiens zeggenschap zij stond. Het tribunaal heeft dit argument verworpen in het kader van de beoordeling van zijn bevoegdheid en geoordeeld dat aan de definitie van art. 1 lid 6 ECT is voldaan wanneer sprake is van een eigendomsrecht of een contractuele aanspraak, ook als dit recht of die aanspraak aanvechtbaar ('defeasible') is.[170] Vervolgens heeft het tribunaal dit argument alsnog behandeld bij de beoordeling van de claim ten gronde. Het tribunaal heeft daarin onder meer overwogen dat de ECT geen investeringen beschermt die zijn gedaan in strijd met de wet. De vordering is vervolgens afgewezen.[171] Ook in de beslissing van het scheidsgerecht in de zaak *Blusun/Italië*, die eveneens op de ECT betrekking heeft, is deze benadering gevolgd (zie rov. 5.1.11.4), evenals in de beslissing van het scheidsgerecht in de zaak *Anatolie Stati e.a./Kazachstan*.[172]

3.139   Er zijn ook arbitrale beslissingen waarin een andere benadering is gevolgd, maar die zaken hebben geen betrekking op de ECT. Bovendien zien sommige van die beslissingen op

---

[168] Baltag, a.w., p. 197-198, schrijft dat deze introductie geen rol kan spelen bij de interpretatie van de ECT, onder meer omdat deze niet valt onder de bronnen die volgens art. 31 en 32 WVV relevant zijn.

[169] Zie over deze rechtspraak ook Hobér, a.w., p. 99-105.

[170] *Plama/Bulgarije* (Jurisdiction), para. 128: 'The definition of "Investment" under Article 1(6) refers to the Investor's investment, in other words it is again here irrelevant who owns or controls the Claimant at any material time; and as already noted above, the definition is broad, extending to "any right conferred by law or contract". That definition would be satisfied by a contractual or property right even if it were defeasible'. Zie ook *Plama/Bulgarije* (Award), 27 augustus 2008, para. 112.

[171] *Plama/Bulgarije* (Award), para. 139.

[172] *Anatolie Stati/Kazakhstan*, reeds aangehaald, para. 812.

20/01595

verdragen die een uitdrukkelijke legaliteitseis bevatten.[173] Daarom is uit deze rechtspraak geen algemene regel af te leiden die inhoudt dat een scheidsgerecht zich steeds onbevoegd zou moeten verklaren in het geval van een illegale investering, ook wanneer het desbetreffende verdrag geen uitdrukkelijke legaliteitseis bevat. Het is juist dat in sommige arbitrale uitspraken zonder meer is overwogen dat illegaliteit onbevoegdheid van het scheidsgerecht meebrengt[174], maar dan is vereist dat illegaal is gehandeld bij het doen van de investering, bijvoorbeeld omdat gefraudeerd is bij het inschrijven voor een aanbesteding.[175] Volgens het scheidsgerecht in de zaak *Phoenix/Tsjechië* leidt echter alleen evidente illegaliteit tot onbevoegdheid.[176] In de zaak *Mamidoil Jetoil/Albania* heeft het scheidsgerecht overwogen dat staten in beginsel geen rechtsmacht van een arbitraal tribunaal behoeven te accepteren wanneer het gaat om illegale investeringen, maar dat dit anders is wanneer deze staat zich bereid heeft getoond de investeringen te legaliseren.[177] In *SAUR International/Argentinië* is eveneens overwogen dat illegale investeringen niet beschermd worden, maar is daaraan niet de consequentie van onbevoegdheid verbonden.[178]

3.140   Uit het voorgaande volgt dat in de arbitrale rechtspraak de vraag of de illegaliteit van een investering tot onbevoegdheid van het scheidsgerecht moet leiden (in de gevallen waarin geen legaliteitseis in het relevante verdrag is opgenomen), verschillend wordt beantwoord. Sommige scheidsgerechten beantwoorden deze vraag bevestigend, andere arbitrale tribunalen volgen een meer genuanceerde benadering. Doorslaggevend is echter dat er geen uitspraken zijn waarin de ECT aldus is uitgelegd dat illegaliteit van een investering tot onbevoegdheid leidt. Ook in de literatuur is benadrukt dat de ECT geen legaliteitseis kent, die gevolgen zou kunnen hebben voor de bevoegdheid van een scheidsgerecht om claims op grond van de ECT te beoordelen.[179] Naar mijn mening kan daarom niet worden gesproken

[173] Zie de volgende zaken: *Fraport AG Frankfurt Airport Services Worldwide v. The Republic of the Philippines*, ICSID *Case No. ARB/11/12*, 10 december 2014, para. 322 e.v. (BIT Duitsland-Filippijnen); *Inceysa Vallisoletana, S.L. v. Republic of El Salvador*, ICSID Case No. ARB/03/26, 2 augustus 2006, para. 195 e.v. (BIT El Salvador-Spanje); *Gustav FW Hamester GmbH & Co KG v. Republic of Ghana*, ICSID Case No. ARB/07/24, 18 juni 2010, para. 126 (BIT Duitsland-Ghana); *Phoenix/Tsjechië*, reeds aangehaald, para. 56 en 101 (BIT Tsjechië-Israël).
[174] *Ampal-American Israel Corporation and others v. Arab Republic of Egypt*, ICSID Case No. ARB/12/11, 1 februari 2016 (Decision on Jurisdiction), para. 301 e.v. Zie ook *Alasdair Ross Anderson v. Republic of Costa Rica*, ICSID Case No. ARB(AF)/07/3 19 mei 2010, para. 55 e.v.; UNCITRAL, *Oxus Gold plc v. The Republic of Uzbekistan*, 17 december 2015 (Award), para. 706 e.v.
[175] Zoals bijvoorbeeld in de zaak *Inceysa Vallisoletana, S.L. v. Republic of El Salvador*, reeds aangehaald, met name para. 235-237.
[176] *Phoenix/Tsjechië*, para. 102-104. In gelijke zin: *David Minnotte and Robert Lewis v. Republic of Poland*, ICSID Case No. ARB(AF)/10/1, 16 mei 2014, para. 131-132.
[177] *Mamidoil Jetoil Greek Petroleum Products Societe S.A. v. Republic of Albania*, ICSID Case No. ARB/11/24, 30 maart 2015, para. 492-495.
[178] *SAUR International S.A. v. Argentine Republic*, ICSID Case No. ARB/04/4, 6 juni 2012, para. 308.
[179] Baltag, a.w., p. 196-199; Roe & Happold, p. 87-88; Gaillard, in: Ribeiro (ed.), Investment Arbitration and the Energy Charter Treaty, a.w., p. 62, die nog op het volgende wijst: 'In line with the existing case law and the clear language of the ECT, it is fair to assume that (…) there would be no jurisdictional restriction with respect to a

Pagina 64 van 89

van een algemeen aanvaard rechtsbeginsel dat inhoudt dat een scheidsgerecht zich onbevoegd moet verklaren in het geval van een illegale investering. In het kader van de ECT is steeds overwogen dat illegaliteit van een investering hooguit een rol kan spelen bij de beoordeling van de zaak ten gronde.

3.141 Uit het bovenstaande volgt dat onderdeel 4.2 faalt.

*Onderdeel 4.3: illegaal handelen*

3.142 Onderdeel 4.3 valt in twee onderdelen uiteen en verdedigt dat illegaal handelen in aanmerking moet worden genomen.

3.143 Onderdeel 4.3.1 is gericht tegen rov. 5.1.11.7-5.1.11.9 en rov. 9.8.5-9.8.10, waarin het hof heeft geoordeeld over fraude en corruptie bij de verkrijging van een meerderheidsbelang in Yukos. Het onderdeel klaagt, kort gezegd, dat het hof van een onjuiste rechtsopvatting is uitgegaan, dan wel een onbegrijpelijk oordeel heeft gegeven, waar het alleen heeft gekeken naar de transacties waarmee HVY de aandelen in Yukos hebben verkregen. Volgens het onderdeel had het hof zich bij de beantwoording van de vraag of een investering legaal is verkregen niet moeten beperken tot een beoordeling van de laatste transactie in een keten van transacties, maar had het hof ook acht moeten slaan op hetgeen aan de verkrijging van de aandelen door HVY vooraf is gegaan. Van belang is onder meer dat steekpenningen zijn betaald aan de bestuurders van Yukos voordat zij werd geprivatiseerd (de zogenoemde *Red Directors*), en dat de op illegale wijze verkregen Yukosaandelen van de ene naar de andere (schijn)vennootschap zijn verplaatst om de illegale verkrijging ervan te verhullen, aldus het onderdeel.

3.144 Het onderdeel mist belang, omdat uit rov. 5.1.11.6 blijkt dat rov. 5.1.11.7-5.1.11.9 ten overvloede zijn gegeven. Ook overigens faalt de klacht, omdat de omstandigheid dat een investering in strijd met de wet van het gastland is gedaan, alleen relevant is indien die strijdigheid verband houdt met het doen van de investering.[180] Het hof heeft dit dan ook terecht in rov. 5.1.11.2 tot uitgangspunt genomen. Het is dus juist dat het hof heeft beoordeeld of gebleken is van illegaal handelen door HVY ten tijde van hun investering (rov. 5.1.11.8) en niet ook het handelen bij de verwerving van de aandelen in Yukos door anderen

---

contract or license terminated on the basis of an alleged non-compliance: the termination of a contract or a license, the validity of which is challenged by the host State and thus constitutes precisely the issue to be decided on the merits by the arbitral tribunal, cannot provide sufficient ground for a host State to deny the benefit of access to dispute resolution to an otherwise covered investment'; Blanch, Moody & Lawn, a.w., p. 5.

180 Zie onder meer *Oxus Gold plc/Uzbekistan*, reeds aangehaald, para. 707 (met verwijzingen naar *Gustav FW Hamester/Ghana* en *Inceysa Vallisoletana/El Salvador*, reeds aangehaald). De in het onderdeel (nr. 159, voetnoot 337) genoemde uitspraak van het HvJEU 14 maart 2019, zaak C-724/17, ECLI:EU:C:2019:204 (*Vantaan kaupunki v Skanska Industrial Solutions Oy e.a.*), punt 46, is in dit verband niet relevant, omdat deze uitspraak staat in de specifieke context van aansprakelijkheid van ondernemingen voor het schenden van de Europese mededingingsregels.

A.J.P. Burrough beëdigd vertaler - Wbtv nr. 1063

20/01595

in 1995/1996. Het oordeel van het hof is bovendien niet onbegrijpelijk. Voor de goede orde merk ik nog op dat het hof de stelling dat YUL betrokken was bij het betalen van steekpenningen aan de *Red Directors* heeft beoordeeld en als irrelevant heeft verworpen. In het oordeel van het hof dat uitsluitend moet worden gekeken naar de acquisitie van de aandelen in Yukos door HVY, en niet naar eerdere transacties, ligt een verwerping besloten van de stelling dat HVY de eerdere illegale verwerving van die aandelen hebben helpen verhullen. Het onderdeel faalt dus.

3.145 Onderdeel 4.3.2 is gericht tegen het oordeel van het hof dat illegaal handelen door HVY na het doen van de investering niet relevant is voor de bevoegdheid van het Scheidsgerecht.

3.146 Ook dit onderdeel faalt, omdat het uitgangspunt van het hof juist is dat alleen illegaal handelen ten tijde van het doen van de investering tot onbevoegdheid van het Scheidsgerecht leidt. De arbitrale uitspraak in de zaak *Hesham Talaat M. Al-Warraq/Indonesië* waarnaar het onderdeel (nr. 164 en voetnoot 341) verwijst, leidt niet tot een andere conclusie. Die uitspraak heeft namelijk betrekking op een investeringsverdrag dat, anders dan de meeste investeringsverdragen, een expliciete bepaling bevat die investeerders gebiedt de wetten van het gastland te respecteren.[181] Hieruit kan dus geen algemene regel worden afgeleid, die inhoudt dat ook illegaal handelen ná het doen van de investering tot onbevoegdheid van een scheidsgerecht leidt.

*Onderdeel 4.4: strijd met de openbare orde*

3.147 Onderdeel 4.4 is gericht tegen rov. 9.8.5-9.8.10, waarin het hof het betoog van de Russische Federatie heeft verworpen dat de Final Awards strijdig zijn met de openbare orde, omdat het resultaat daarvan is dat de hiervoor genoemde illegale handelingen worden beschermd. Na een inleiding (onder 4.4.1) klaagt het onderdeel (onder 4.4.2) dat het hof heeft miskend dat het in strijd is met de nationale en internationale openbare orde dat op een verdrag gebaseerde vorderingen ter zake van een illegaal verkregen of illegaal geëxploiteerde investering voor bescherming in aanmerking zouden komen, althans dat het oordeel van het hof onvoldoende is gemotiveerd.

3.148 Naar vaste rechtspraak is vernietiging van een arbitraal vonnis op grond van art. 1065 lid 1, onder e, Rv slechts mogelijk, indien de inhoud of uitvoering van het vonnis strijd oplevert met dwingend recht van een zo fundamenteel karakter dat de naleving ervan niet door beperkingen van procesrechtelijke aard mag worden verhinderd.[182] Het onderdeel betoogt in

---

[181] *Hesham Talaat M. Al-Warraq v. Republic of Indonesia*, UNCITRAL, 15 December 2014 (Final Award), para. 631 e.v. Het onderdeel verwijst abusievelijk naar het vonnis inzake bevoegdheid van 21 juni 2012 in deze zaak, paragrafen 634-637, maar dat vonnis bevat geen paragrafen 634-637, zodat vermoedelijk bedoeld zal zijn te verwijzen naar de Final Award van 15 december 2014.
[182] HR 21 maart 1997, ECLI:NL:HR:1997:AA4945, NJ 1998/207, m.nt. H.J. Snijders, rov. 4.2.

20/01595

de kern dat met de *Final Award* een fundamentele regel van dwingend recht is geschonden, die inhoudt dat geen bescherming toekomt aan goederen of rechten die door illegaal handelen zijn verkregen. Dit argument heeft de Russische Federatie in de arbitrale procedure aangedragen onder de noemer '*unclean hands'*. Het onderdeel verwijst ter onderbouwing naar (arbitrale) rechtspraak, waaronder de uitspraak van de *Cour d'appel* van Parijs in de zaak *Kirgizië/Belokon*, waarin tenuitvoerlegging van een arbitraal vonnis is geweigerd omdat de vermeende investeerder zich schuldig had gemaakt aan witwassen.[183] Ook verwijst het onderdeel naar verschillende verdragen tegen corruptie en witwassen, en naar literatuur waarin is betoogd dat corruptie in strijd is met de internationale openbare orde.[184]

3.149    Het onderdeel gaat voorbij aan de kern van het oordeel van het hof in rov. 9.8.5 e.v. en eveneens aan de door het hof samengevatte kern van het oordeel van het Scheidsgerecht.[185] Het hof heeft niet miskend dat het beschermen van goederen of rechten, die door illegaal handelen (zoals corruptie) zijn verkregen, strijd met de internationale openbare orde kan opleveren. De kern van het oordeel van het hof is dat, voor zover dergelijke illegale handelingen hebben plaatsgevonden, deze niet aan HVY kunnen worden verweten, althans niet in verband staan met hun investeringen. De illegale handelingen hebben immers deels plaatsgevonden nadat de investering door HVY was gedaan en zijn deels door anderen gepleegd voordat HVY aandeelhouder in Yukos werden. Ook overigens is niet gebleken van een verband tussen het illegale handelen en de investering van HVY, aldus het Scheidsgerecht en het hof. Volgens dit oordeel is dus geen sprake van illegaal handelen, zoals corruptie of witwassen, door HVY zélf bij de totstandkoming van de investering. Uit de door het onderdeel genoemde bronnen kan niet worden afgeleid dat ook illegaal handelen relevant is waarbij de investeerder niet betrokken of niet begaan is bij het doen van de investering. Zo heeft de door het onderdeel (nr. 166) genoemde uitspraak in de zaak *World Duty Free/Kenia* betrekking op omkoping van de Keniaanse president door de *chief executive officer* van de investeerder[186], en de uitspraak inzake *Kirgizië/Belokon* op vermeende witwaspraktijken door de investeerder. De klachten van het onderdeel stuiten op het voorgaande af.

3.150    Onderdeel 4.4.3 is gericht tegen rov. 9.8.8, waarin het hof paragraaf 1370 *Final Awards* heeft besproken. Het hof heeft overwogen dat het Scheidsgerecht heeft geoordeeld dat een aantal van de gestelde illegale gedragingen zich heeft voorgedaan voordat HVY aandeelhouder werden en dat deze dientengevolge zijn verricht door anderen, zoals Bank Menatep en Khodorkovsky c.s. Volgens het hof heeft het Scheidsgerecht dus niet méér beslist dan dat

---

[183]   Cour d'appel de Paris, *République du Kirghizistan c. M. Valeriy Belokon*, 21 februari 2017.

[184]   Emmanuel Gaillard, The emergence of transnational responses to corruption in international arbitration, Arbitration International 2019/35, p. 1-19.

[185]   *Hulley Enterprises Limited (Cyprus)/The Russian Federation, Final Award*, para. 1370 (gelijkluidend in de andere *Final Awards*).

[186]   *World Duty Free Company v Republic of Kenya*, ICSID Case No. ARB/00/7, 4 oktober 2006.

20/01595

Bank Menatep en Khodorkovsky c.s. andere (rechts)personen zijn dan HVY en dat aan HVY geen gedragingen kunnen worden tegengeworpen die zijn verricht door anderen voordat HVY aandeelhouder werden. Dit oordeel is volgens het hof juist en is door de Russische Federatie niet, althans onvoldoende gemotiveerd, bestreden. Het onderdeel klaagt dat dit oordeel onbegrijpelijk is, omdat de Russische Federatie het oordeel van het Scheidsgerecht wel degelijk gemotiveerd heeft betwist. Het onderdeel voert verder aan dat het hof deze kwestie ambtshalve had moeten onderzoeken, omdat het gaat om een mogelijke schending van de internationale openbare orde.

3.151    Bij de bespreking van deze klacht merk ik op dat het hof in rov. 9.8.8 geen eigen oordeel heeft gegeven, maar heeft vastgesteld wat het Scheidsgerecht heeft overwogen. Het hof heeft daarmee gereageerd op een klacht van de Russische Federatie over het oordeel van het Scheidsgerecht. Volgens het hof mist die klacht feitelijke grondslag omdat het oordeel van het Scheidsgerecht anders moet worden begrepen. De overweging van het hof dat het oordeel van het Scheidsgerecht juist is en niet is bestreden, is daarom ten overvloede gegeven, hetgeen het hof ook heeft overwogen ('voor zover het in dit vernietigingsgeding al aan de orde zou kunnen komen'). Hierop stuit het onderdeel reeds geheel af. Voor het overige merk ik op dat de klachten ook inhoudelijk falen. Het oordeel van het Scheidsgerecht waarbij het hof zich aansluit, houdt (in de niet bestreden weergave van het hof) slechts in dat een aantal van de gestelde illegale gedragingen zich heeft voorgedaan voordat HVY aandeelhouder werden en dat deze gedragingen dientengevolge zijn verricht door anderen, zoals Bank Menatep en Khodorkovsky c.s. De door het onderdeel genoemde stellingen komen erop neer dat HVY door Khodorkovsky c.s. werden gecontroleerd. Deze stellingen doen op zichzelf niet af aan de feitelijke vaststelling van het Scheidsgerecht. Het hof kon dus oordelen dat de Russische Federatie het oordeel niet, althans onvoldoende gemotiveerd, heeft bestreden. Het onderdeel (nr. 177 en 178) wijst nog op enige vermeende inconsistenties in de *Final Awards*. Het Scheidsgerecht zou op verschillende plaatsen in aanmerking hebben genomen dat Khodorkovsky c.s. de aandelen in Yukos indirect bezaten. Het hof heeft hiervoor in rov. 9.8.9 een verklaring gegeven, die inhoudt dat dit niet onverenigbaar is met de vaststelling dat HVY en Khodorkovsky c.s. aparte juridische entiteiten zijn. Dat oordeel is niet onbegrijpelijk, omdat het hof hiermee tot uitdrukking heeft gebracht dat HVY als vennootschappen moeten worden onderscheiden van degenen onder wiens zeggenschap zij staan.

*Onderdeel 4.5: prejudiciële vragen over art. 1 lid 6 en art. 26 ECT?*

3.152    Onderdeel 4.5 betoogt dat de uitleg van het hof van art. 1 lid 6 en art. 26 ECT in strijd is met het EU-recht en dat de Hoge Raad prejudiciële vragen aan het HvJEU moet stellen over de in de onderdelen 4.2, 4.3 en 4.4 opgeworpen kwesties.

3.153    Onder verwijzing naar hetgeen ik heb opgemerkt ten aanzien van onderdeel 2.7, ben ik ook ten aanzien van onderdeel 4 van oordeel dat het stellen van prejudiciële vragen niet

20/01595

noodzakelijk is voor de uitkomst van het geding in cassatie. Onderdeel 4.2 faalt immers omdat het in wezen het oordeel van het hof niet bestrijdt en omdat het een beroep doet op een algemeen aanvaard rechtsbeginsel waarvan het bestaan niet is gebleken. Onderdeel 4.3 bevat slechts motiveringsklachten. Onderdeel 4.4 heeft betrekking op het Nederlandse arbitragerecht, namelijk op art. 1065 lid 1, onder e, Rv, en gaat bovendien uit van een onjuiste lezing van het oordeel van het hof.

3.154    De slotsom is dat onderdeel 4 in zijn geheel faalt.

**Onderdeel 5: art. 21 lid 5 ECT**

3.155    Onderdeel 5 valt in vier subonderdelen uiteen en klaagt over rov. 6.3 van het eindarrest, waarin het hof heeft overwogen dat het geen gevolg verbindt aan het feit dat het Scheidsgerecht de relevante (Russische) belastingautoriteiten niet heeft geraadpleegd. Volgens het onderdeel was het Scheidsgerecht hiertoe op grond van art. 21 lid 5 ECT verplicht. Door de belastingautoriteiten niet te raadplegen heeft het Scheidsgerecht zijn opdracht geschonden, zodat de arbitrale vonnissen op de voet van art. 1065 lid 1, onder c, Rv moeten worden vernietigd. Ook zijn hierdoor de arbitrale vonnissen in strijd met de openbare orde (art. 1065 lid 1, onder e, Rv), aldus het onderdeel.

3.156    Het Scheidsgerecht heeft overwogen dat verwijzing van de zaak naar de Russische belastingautoriteiten 'an exercise in futility' zou zijn, omdat partijen reeds zeer uitgebreid de gelegenheid hadden gekregen hun standpunten over de vraag of de belastingmaatregelen een onteigening inhielden, aan het Scheidsgerecht voor te leggen.[187] Het hof heeft in rov. 6.3 overwogen dat art. 21 lid 5 ECT in beginsel dwingend voorschrijft dat de belastingautoriteiten moeten worden geraadpleegd, maar dat het verzuim van het Scheidsgerecht onvoldoende ernstig is om de *Final Awards* te vernietigen, omdat de Russische Federatie hierdoor geen nadeel heeft geleden, nu zij alle relevante informatie uitvoerig naar voren heeft kunnen brengen.

*Inleidende opmerkingen*

3.157    HVY hebben in hun schriftelijke toelichting aangevoerd dat de klachten van onderdeel 5 belang missen. Zij hebben erop gewezen, dat het hof in rov. 5.2.11 e.v. onbestreden heeft geoordeeld dat art. 21 ECT in het geheel niet van toepassing is op de maatregelen die HVY in de arbitrageprocedure aan de orde hebben gesteld. De belastingmaatregelen kunnen, aldus het hof in rov. 5.2.16 e.v., namelijk niet als *bona fide* worden aangemerkt, terwijl art. 21 lid 1 ECT uitsluitend het oog heeft op *bona fide* maatregelen. Nu de regel van art. 21 lid 1 (de 'carve-out' voor belastingmaatregelen) niet van toepassing is, is de uitzondering daarop

---

[187]    *Final Awards*, para. 1421-1422.



20/01595

van art. 21 lid 5 ECT (de 'claw-back') evenmin relevant, zo stellen HVY.[188] Hoewel HVY
terecht wijzen op het oordeel van het hof over art. 21 lid 1 ECT, kan niet gezegd worden dat
de klachten over de uitleg van art. 21 lid 5 ECT zonder belang zijn. De overwegingen over
de toepasselijkheid van art. 21 lid 1 ECT liggen namelijk niet ten grondslag aan het oordeel
over de vraag of het Scheidsgerecht zijn opdracht heeft geschonden door niet te voldoen
aan de verplichting van art. 21 lid 5 ECT. De overwegingen over art. 21 lid 1 ECT staan in
een andere context, namelijk die van de vraag of art. 21 lid 1 ECT gevolgen heeft voor de
bevoegdheid van het Scheidsgerecht (welke vraag het hof in rov. 5.2.4. e.v. ontkennend
heeft beantwoord). Daarom wordt toegekomen aan bespreking van de klachten van
onderdeel 5.

3.158   Op grond van art. 1065 lid 1, onder c, Rv kan van een schending van de opdracht onder
meer sprake zijn als het Scheidsgerecht in strijd met de overeengekomen procesregels of
wettelijke arbitrageregels heeft gehandeld.[189] De schending van de opdracht zal ernstig
genoeg moeten zijn om vernietiging te kunnen rechtvaardigen, hetgeen volgt uit de in het
algemeen in acht te nemen terughoudendheid.[190] Bepalend is of de beslissing anders zou
zijn uitgevallen als de arbiters zich aan hun opdracht hadden gehouden.[191] Bij de beoordeling
of de schending van de opdracht ernstig genoeg is om vernietiging van het arbitrale vonnis
te rechtvaardigen, komt de rechter beoordelingsvrijheid toe.

3.159   Ten aanzien van de vernietigingsgrond van art. 1065 lid 1, onder e, Rv (strijd met de
openbare orde) geldt het volgende.[192] De openbare orde heeft een materiële en een
processuele kant. Van strijd met de materiële openbare orde is sprake, wanneer de inhoud
van het arbitraal vonnis in strijd is met dwingend recht dat van een zodanig fundamenteel
karakter is dat de naleving ervan niet door beperkingen van procesrechtelijke aard mag
worden verhinderd.[193] Uit deze maatstaf blijkt reeds dat deze vernietigingsgrond
terughoudend moet worden toegepast. Van strijd met de processuele openbare orde is
sprake indien de wijze waarop het vonnis tot stand is gekomen in strijd is met fundamentele
beginselen van procesrecht, bijvoorbeeld in het geval dat het beginsel van hoor en
wederhoor is geschonden,[194] of als blijkt dat (een van) de arbiters niet onpartijdig of

---

[188] Schriftelijke toelichting HVY, nrs. 690 e.v.

[189] Snijders, a.w., 2018, nr. 9.3.4.2.4 en 9.3.4.2.7 (= Groene Serie Burgerlijke Rechtsvordering, art. 1065 Rv, aant.
4.2.4 en 4.2.7). Zie ook HR 17 januari 2003, ECLI:NL:HR:2003:AE9395, NJ 2004/384, m.nt. H.J. Snijders.

[190] Dit is thans vastgelegd in art. 1065 lid 4 Rv (zie Parl. Gesch. Arbitragewet 2015/I.76.3) maar gold reeds voor het
oude recht: zie Van den Berg e.a., a.w., p. 134 en Snijders, a.w., nr. 9.3.4.3 (= Groene Serie Burgerlijke
Rechtsvordering, art. 1065 Rv, aant. 4.3).

[191] T&C Burgerlijke Rechtsvordering, art. 1065 Rv, aant. 4 (G.J. Meijer); Snijders, a.w., nr. 9.3.1.2 (= Groene Serie
Burgerlijke Rechtsvordering, art. 1065 Rv, aant. 1.2).

[192] Zie ook nr. 3.18 van mijn conclusie vóór HR 4 december 2020, ECLI:NL:HR:2020:1952, RvdW 2021/2.

[193] HR 21 maart 1997, ECLI:NL:HR:1997:AA4945, NJ 1998/207, m.nt. H.J. Snijders, rov. 4.2.

[194] Bijvoorbeeld HR 18 juni 1993, ECLI:NL:HR:1993:ZC1003, NJ 1994/449, m.nt. H.J. Snijders, rov. 3.3.

20/01595

onafhankelijk (is) zijn geweest.[195] Ook op dit punt heeft de rechter noodzakelijkerwijs beoordelingsvrijheid.

3.160    De onderdelen 5.1. en 5.1.1 bevatten een inleiding en geen klacht.

*Onderdeel 5.2: dwingend karakter art. 21 lid 5 ECT*

3.161    Onderdeel 5.2 voert diverse klachten aan tegen rov. 6.3 en valt in zes onderdelen uiteen (onderdelen 5.2.1-5.2.6).

3.162    Onderdeel 5.2.1 klaagt dat het hof in rov. 6.3 ten onrechte voorbij is gegaan aan het dwingende karakter van de verwijzingsverplichting uit art. 21 lid 5, onder b, punt (i), ECT dan wel heeft miskend dat daarvoor geen 'nutteloosheidsuitzondering' geldt. Hiermee heeft het hof onder meer verzuimd de uitlegregels van art. 31 en 32 WVV naar behoren toe te passen.

3.163    Over dit onderdeel merk ik het volgende op. Art. 21 ECT heeft betrekking op belastingmaatregelen.[196] Art. 21 ECT luidt in de authentieke Engelse tekst en in de Nederlandse vertaling als volgt:

**Article 21 Taxation**

1. Except as otherwise provided in this Article, nothing in this Treaty shall create rights or impose obligations with respect to Taxation Measures of the Contracting Parties. In the event of any inconsistency between this Article and any other provision of the Treaty, this Article shall prevail to the extent of the inconsistency.

2. Article 73 shall apply to Taxation Measures other than those on income or on capital, except that such provision shall not apply to:

a) an advantage accorded by a Contracting Party pursuant to the tax provisions of any convention, agreement or arrangement described in subparagraph 7a)(ii); or

b) any Taxation Measure aimed at ensuring the effective collection of taxes, except where the measure of a Contracting Party arbitrarily discriminates against Energy Materials and Products originating in, or destined for the Area of another Contracting Party or arbitrarily restricts benefits accorded under Article 73.

3. Article 102 and 7 shall apply to Taxation Measures of the Contracting Parties other than those on income or on capital, except that such provisions shall not apply to:

a) impose most favoured nation obligations with respect to advantages accorded by a Contracting Party pursuant to the tax provisions of any convention, agreement or arrangement described in subparagraph 7a)(ii) or resulting from membership of any Regional Economic Integration Organization; or

---

[195] Onder meer HR 18 februari 1994, ECLI:NL:HR:1994:ZC1266, NJ 1994/765, m.nt. H.J. Snijders, rov. 3.8.
[196] Zie over deze bepaling Hobér, a.w., p. 354 e.v.; Gloria Alvarez, Article 21 Taxation, in Leal-Arcas (ed.), a.w., p. 288-298; William W. Park, Tax arbitration and investor protection, in Coop & Ribeiro (eds.), Investment Protection and the Energy Charter Treaty, a.w., p. 115-145.

20/01595

b) any Taxation Measure aimed at ensuring the effective collection of taxes, except where the measure arbitrarily discriminates against an Investor of another Contracting Party or arbitrarily restricts benefits accorded under the Investment provisions of this Treaty.

4. Article 292 to 6 shall apply to Taxation Measures other than those on income or on capital.

5. a) Article 13 shall apply to taxes.

b) Whenever an issue arises under Article 13, to the extent it pertains to whether a tax constitutes an expropriation or whether a tax alleged to constitute an expropriation is discriminatory, the following provisions shall apply:

(i) The Investor or the Contracting Party alleging expropriation shall refer the issue of whether the tax is an expropriation or whether the tax is discriminatory to the relevant Competent Tax Authority. Failing such referral by the Investor or the Contracting Party, bodies called upon to settle disputes pursuant to Article 26(2)c) or 27(2) shall make a referral to the relevant Competent Tax Authorities;

(ii) The Competent Tax Authorities shall, within a period of six months of such referral, strive to resolve the issues so referred. Where non-discrimination issues are concerned, the Competent Tax Authorities shall apply the non-discrimination provisions of the relevant tax convention or, if there is no non-discrimination provision in the relevant tax convention applicable to the tax or no such tax convention is in force between the Contracting Parties concerned, they shall apply the non-discrimination principles under the Model Tax Convention on Income and Capital of the Organisation for Economic Cooperation and Development;

(iii) Bodies called upon to settle disputes pursuant to Article 26(2)c) or 27(2) may take into account any conclusions arrived at by the Competent Tax Authorities regarding whether the tax is an expropriation. Such bodies shall take into account any conclusions arrived at within the six-month period prescribed in subparagraph b)(ii) by the Competent Tax Authorities regarding whether the tax is discriminatory. Such bodies may also take into account any conclusions arrived at by the Competent Tax Authorities after the expiry of the six-month period;

(iv) Under no circumstances shall involvement of the Competent Tax Authorities, beyond the end of the six-month period referred to in subparagraph b)(ii), lead to a delay of proceedings under Articles 26 and 27.

6. For the avoidance of doubt, Article 14 shall not limit the right of a Contracting Party to impose or collect a tax by withholding or other means.

7. For the purposes of this Article:

a) The term "Taxation Measure" includes:

(i) any provision relating to taxes of the domestic law of the Contracting Party or of a political subdivision thereof or a local authority therein; and

(ii) any provision relating to taxes of any convention for the avoidance of double taxation or of any other international agreement or arrangement by which the Contracting Party is bound.

b) There shall be regarded as taxes on income or on capital all taxes imposed on total income, on total capital or on elements of income or of capital, including taxes on gains from the alienation of property, taxes on estates, inheritances and gifts, or substantially similar taxes, taxes on the total amounts of wages or salaries paid by enterprises, as well as taxes on capital appreciation.

c) A "Competent Tax Authority" means the competent authority pursuant to a double taxation agreement in force between the Contracting Parties or, when no such agreement is in force, the minister or ministry responsible for taxes or their authorized representatives.

20/01595

d) For the avoidance of doubt, the terms "tax provisions" and "taxes" do not include customs duties.

In de Nederlandse vertaling:

### Artikel 21 Belastingen

1. Behalve als bepaald in dit artikel worden door geen enkele bepaling van dit Verdrag rechten verleend of verplichtingen opgelegd met betrekking tot belastingmaatregelen van de Verdragsluitende Partijen. In geval van onverenigbaarheid van dit artikel met andere bepalingen van dit Verdrag heeft dit artikel, wat de onverenigbaarheid betreft, de voorrang.

2. Artikel 7, derde lid, is van toepassing op andere belastingmaatregelen dan belastingen op inkomen of kapitaal, met dien verstande dat de bepalingen van die artikelen niet van toepassing zijn op:

a. een voordeel dat een Verdragsluitende Partij heeft toegekend overeenkomstig de belastingbepalingen van een verdrag, overeenkomst of regeling als bedoeld in het zesde lid, letter a), onder ii), van dit artikel; of

b. een belastingmaatregel die ten doel heeft de doeltreffende inning van belastingen te waarborgen, behalve indien die maatregel van een Verdragsluitende Partij een willekeurige discriminatie tussen energiegrondstoffen en energieprodukten van een andere Verdragsluitende Partij of een willekeurige beperking van de krachtens de betreffende bepalingen van artikel 7, derde lid, toegekende voordelen inhoudt.

3. Artikel 10, tweede en zevende lid, zijn van toepassing op andere belastingmaatregelen van de Verdragsluitende Partijen dan belastingen op inkomen of kapitaal, met dien verstande dat geen van deze bepalingen:

a. ertoe strekt dat verplichtingen tot toepassing van het meestbegunstigingsbeginsel worden opgelegd met betrekking tot voordelen die een Verdragsluitende Partij heeft toegekend overeenkomstig de belastingbepalingen van een verdrag, overeenkomst of regeling als bedoeld in het zevende lid, letter a), onder ii), van dit artikel of als uitvloeisel van het lidmaatschap van een regionale organisatie voor economische integratie; of

b. van toepassing is op een belastingmaatregel die ten doel heeft de doeltreffende inning van belastingen te waarborgen, behalve indien de maatregel een willekeurige discriminatie tussen investeerders van de Verdragsluitende Partijen of een willekeurige beperking van de krachtens de investeringsbepalingen van dit Verdrag toegekende voordelen inhoudt.

4. Artikel 29, tweede tot en met zesde lid, is van toepassing op andere belastingmaatregelen dan belastingen op inkomen of kapitaal.

5.     a. Artikel 13 is van toepassing op belastingen.

b. Wanneer in het kader van artikel 13 een geschil rijst, voor zover het betrekking heeft op de vraag of een belasting een onteigening vormt, dan wel of een belasting waarvan wordt beweerd dat deze een onteigening vormt, discriminerend is, geldt het volgende:

i. De investeerder of de Verdragsluitende Partij die aanvoert dat er sprake is van onteigening legt het geschil over de vraag of de maatregel een onteigening dan wel discriminerend is, voor aan de bevoegde belastingautoriteiten. Laat de investeerder of de Verdragsluitende Partij dit na, dan leggen de instanties die worden verzocht geschillen te beslechten overeenkomstig artikel 26, tweede lid, letter c), of artikel 27, tweede lid, het geschil voor aan de bevoegde belastingautoriteiten.

ii. De bevoegde belastingautoriteiten streven ernaar om het aldus voorgelegde geschil binnen een periode van zes maanden te regelen. Indien het gaat om een geschil inzake

20/01595

non-discriminatie, passen de bevoegde belastingautoriteiten de bepalingen inzake non-discriminatie van het relevante belastingverdrag toe, of passen zij, indien er geen non-discriminatiebepaling voorkomt in het op de belasting van toepassing zijnde relevante belastingverdrag of indien er geen belastingverdrag tussen de betrokken Verdragsluitende Partijen van kracht is, de non-discriminatiebeginselen overeenkomstig het modelverdrag van de OESO betreffende belastingen op inkomen en kapitaal toe.

iii. De instanties die worden verzocht geschillen te regelen overeenkomstig artikel 26, tweede lid, letter c), of artikel 27, tweede lid, kunnen rekening houden met eventuele conclusies van de bevoegde belastingautoriteiten over de vraag of de belasting een onteigening is. Die instanties houden rekening met eventuele binnen de bij letter b), onder ii), voorgeschreven termijn van zes maanden door de bevoegde belastingautoriteiten getrokken conclusies over de vraag of de belasting discriminerend is. Deze instanties kunnen ook rekening houden met eventuele na het verstrijken van de voorgeschreven periode van zes maanden door de bevoegde belastingautoriteiten getrokken conclusies.

iv. In geen geval mag de betrokkenheid van de bevoegde belastingautoriteiten na het einde van de bij letter b), onder ii), bedoelde periode van zes maanden leiden tot een vertraging van de procedures ingevolge de artikelen 26 en 27.

6. Voor alle duidelijkheid wordt bepaald dat artikel 14 het recht van een Verdragsluitende Partij om een belasting op te leggen of te innen via bronheffing of andere middelen niet beperkt.

7. Voor de toepassing van dit artikel:

a. omvat de term „belastingmaatregel":

i. de bepalingen betreffende belastingen van de interne wetgeving van de Verdragsluitende Partij of van een staatsrechtelijke onderverdeling of een plaatselijke autoriteit ervan; en

ii. de bepalingen betreffende belastingen van verdragen ter voorkoming van dubbele belasting en van internationale overeenkomsten of regelingen waaraan de Verdragsluitende Partij gebonden is.

b. worden als belastingen op het inkomen en het vermogen beschouwd alle belastingen die worden geheven op het gehele inkomen, op het gehele vermogen of op bestanddelen van het inkomen of vermogen, met inbegrip van belastingen op winsten uit de vervreemding van eigendom, onroerend-zaakbelasting, successierechten, belastingen op schenkingen of in wezen soortgelijke belastingen, belastingen op het totaalbedrag van de door ondernemingen betaalde lonen of salarissen, alsmede belastingen op de waardevermeerdering van vermogen.

c. wordt onder „bevoegde belastingautoriteit" verstaan de bevoegde autoriteit overeenkomstig een overeenkomst inzake dubbele belasting tussen de Verdragsluitende Partijen, of, bij ontstentenis van een van kracht zijnde overeenkomst de/het voor belastingen bevoegde minister of ministerie of hun gemachtigde vertegenwoordigers.

d. voor alle duidelijkheid wordt bepaald dat de termen „belastingbepalingen" en „belastingen" geen betrekking hebben op douanerechten.

3.164   Art. 21 lid 1 ECT bepaalt dat de ECT de bevoegdheden van de verdragsluitende staten om belastingmaatregelen te treffen, niet beïnvloedt. Dergelijke maatregelen vallen dus in beginsel buiten de materiële reikwijdte van de ECT (daarom wordt ook wel gesproken van een 'carve-out'). Op deze regel bestaan echter uitzonderingen (zogenoemde 'claw-backs'). Eén daarvan, neergelegd in art. 21 lid 5 ECT, houdt in dat belastingmaatregelen geen onteigening mogen inhouden die in strijd is met de voorwaarden uit art. 13 ECT. In dat geval

20/01595

kan een belastingmaatregel wél een schending van de ECT opleveren.[197] Art. 13 ECT heeft betrekking op onteigeningen en luidt in de authentieke Engelse tekst en in de Nederlandse vertaling als volgt:

### Article 13 Expropriation

1. Investments of Investors of a Contracting Party in the Area of any other Contracting Party shall not be nationalized, expropriated or subjected to a measure or measures having effect equivalent to nationalization or expropriation (hereinafter referred to as "Expropriation") except where such Expropriation is:

   a) for a purpose which is in the public interest;

   b) not discriminatory;

   c) carried out under due process of law; and

   d) accompanied by the payment of prompt, adequate and effective compensation.

Such compensation shall amount to the fair market value of the Investment expropriated at the time immediately before the Expropriation or impending Expropriation became known in such a way as to affect the value of the Investment (hereinafter referred to as the "Valuation Date").

Such fair market value shall at the request of the Investor be expressed in a Freely Convertible Currency on the basis of the market rate of exchange existing for that currency on the Valuation Date. Compensation shall also include interest at a commercial rate established on a market basis from the date of Expropriation until the date of payment.

2. The Investor affected shall have a right to prompt review, under the law of the Contracting Party making the Expropriation, by a judicial or other competent and independent authority of that Contracting Party, of its case, of the valuation of its Investment, and of the payment of compensation, in accordance with the principles set out in paragraph 1.

3. For the avoidance of doubt, Expropriation shall include situations where a Contracting Party expropriates the assets of a company or enterprise in its Area in which an Investor of any other Contracting Party has an Investment, including through the ownership of shares.

In de Nederlandse vertaling:

### Artikel 13 Onteigening

1. Investeringen van investeerders van een Verdragsluitende Partij op het grondgebied van een andere Verdragsluitende Partij mogen niet worden genationaliseerd, onteigend of onderworpen aan maatregelen met een soortgelijk effect als nationalisatie of onteigening (hierna te noemen „onteigening"), behalve wanneer de onteigening:

   a. geschiedt in het algemeen belang;

   b. niet discriminerend is;

   c. geschiedt met inachtneming van een behoorlijke rechtsgang; en

   d. gepaard gaat met de betaling van prompte, adequate en doeltreffende compensatie.

---

[197] Zie over het voorgaande Hobér, a.w., p. 357.



20/01595

> Die compensatie is gelijk aan de billijke marktwaarde van de onteigende investering op het tijdstip vlak voordat de onteigening of op handen zijnde onteigening zodanig bekend werd dat de investeringswaarde werd beïnvloed (hierna te noemen: de „datum van de waardebepaling").
>
> Deze billijke marktwaarde wordt op verzoek van de investeerder berekend in een vrij inwisselbare valuta volgens de voor die valuta op de datum van de waardebepaling geldende marktwisselkoers. De compensatie omvat tevens rente over de periode tussen de onteigenings- en de betalingsdatum, welke berekend wordt tegen een commercieel, op marktbasis vastgesteld tarief.
>
> 2. De betrokken investeerder heeft recht op onverwijlde toetsing, krachtens het recht van de Verdragsluitende Partij die de onteigening verricht, van zijn zaak, de waardebepaling van zijn investeringen en de betaling van compensatie overeenkomstig de beginselen neergelegd in het eerste lid, door een gerechtelijke of andere onafhankelijke bevoegde instantie van die Partij.
>
> 3. Voor alle duidelijkheid wordt bepaald dat onteigening ook de gevallen omvat waarin een Verdragsluitende Partij de activa onteigent van een vennootschap of onderneming op haar grondgebied waarin een investeerder van een andere Verdragsluitende Partij een investering, ook indien via aandelenbezit, heeft.

3.165    Art. 21 lid 5, onder b, punt (i), ECT kent de belastingautoriteiten van de betrokken verdragsstaat ('the relevant Competent Tax Authority') een rol toe bij de beoordeling van de vraag of de getroffen belastingmaatregelen een verboden onteigening in de zin van art. 13 ECT opleveren. De betrokken investeerder of de verdragsstaat dienen de relevante belastingautoriteiten te raadplegen. Laten zij dat na, dan moet de instantie die is verzocht het geschil te beslechten (zoals, in dit geval, het Scheidsgerecht) de kwestie of sprake is van een verboden onteigening in de zin van art. 13 ECT verwijzen naar de relevante belastingautoriteiten. De tekst van art. 21 lid 5, onder b, punt (i), ECT spreekt van 'shall make a referral', hetgeen duidt op een verplichting van de aangezochte instantie.[198] Uit deze bewoordingen blijkt niet dat de instantie hierin keuzevrijheid heeft.[199] Aan een weigering om de belastingautoriteiten te raadplegen, verbindt art. 21 lid 5 ECT echter geen consequenties.[200]

3.166    Wel is in art. 25 lid 1 ECT duidelijk bepaald dat de instantie die het geschil beslecht niet gebonden is aan de conclusies van de belastingautoriteiten. Volgens art. 25 lid 1, onder b, punt (iii) *kan* de instantie de conclusies van de belastingautoriteiten over de vraag of de maatregelen een onteigening inhouden, in overweging nemen ('may take into account'). Waar het gaat om de vraag of maatregelen discriminerend zijn, geldt dat de instantie de bevindingen van de belastingautoriteiten in aanmerking moet nemen bij het vormen van zijn oordeel ('shall take into account'), maar wordt niet de eis gesteld dat deze bevindingen moeten worden overgenomen. De uiteindelijke beoordeling of de belastingmaatregel een onteigening inhoudt dan wel discriminerend is, is aan de instantie die voor de beslechting

---

[198] Vgl. de (eveneens authentieke) Franse tekst van art. 21 lid 5, onder b, punt (i): '(…) les organes appelés à trancher le différend (…) renvoient l'affaire aux autorités fiscales compétentes'.

[199] Zie Hobér, a.w., p. 371.

[200] Zie Hobér, a.w., p. 373.

20/01595

van het geschil is aangezocht.[201] Ook bepaalt art. 21 lid 5, onder b, punt (iv), ECT dat het advies van de belastingautoriteiten niet behoeft te worden afgewacht in het geval dat dit na zes maanden nog niet is ontvangen. Het raadplegen van de belastingautoriteiten mag onder geen beding leiden tot vertraging van de geschilbeslechting, aldus deze bepaling. In de literatuur is erop gewezen dat dit alles erop duidt dat de rol van de belastingautoriteiten is gelegen in het faciliteren van de besluitvorming van de aangezochte instantie en dat de woorden 'shall make a referral' van art. 21 lid 5, onder b, punt (i), ECT tot doel hebben de betrokken belastingautoriteiten in de gelegenheid te stellen hun zienswijze te geven, maar niet om extra bevoegdheids- of ontvankelijkheidsdrempels op te werpen.[202] Een nalaten om de belastingautoriteiten te raadplegen kan niet leiden tot het beëindigen of onderbreken van de geschilbeslechting.[203]

3.167   Duidelijk is dat het Scheidsgerecht in deze zaak, ook als het de relevante belastingautoriteiten had geraadpleegd, niet aan de bevindingen van die autoriteiten gebonden zou zijn geweest. Uit de tekst van art. 21 lid 5, onder b, punten (iii) en (iv), ECT volgt dat een scheidsgerecht het advies van de belastingautoriteiten niet behoeft af te wachten wanneer dit tot vertraging van de procedure leidt. Het is dus niet aannemelijk dat het raadplegen van de belastingautoriteiten tot een ander oordeel van het Scheidsgerecht zou hebben geleid. Een beroep op vernietiging wegens schending van opdracht kan daarom niet slagen. De verplichting tot het raadplegen van de belastingautoriteiten is niet zo zwaarwegend of dwingend dat arbiters een ernstige schending van hun opdracht begaan wanneer zij hieraan niet voldoen, wanneer zij zich (zoals in dit geval) reeds voldoende voorgelicht achten. De vraag of art. 21 lid 5 ECT een 'nutteloosheidsuitzondering'[204] kent, behoeft daarom geen afzonderlijke bespreking.

3.168   Op het voorgaande stuit onderdeel 5.2.1 geheel af.

3.169   Onderdeel 5.2.2 is gericht tegen rov. 6.3.2 van het eindarrest. Daarin heeft het hof overwogen dat de Russische Federatie geen nadeel heeft ondervonden van de weigering van het Scheidsgerecht om de zaak naar de belastingautoriteiten te verwijzen. Het onderdeel klaagt dat deze motivering speculatief en onjuist is.

3.170   Het hof heeft in rov. 6.3.2 overwogen dat de Russische Federatie er op zichzelf terecht op heeft gewezen dat voor het Scheidsgerecht de verwijzingsverplichting van art. 21 lid 5 ECT dwingend is. Zoals uit de bespreking van onderdeel 5.2.1 volgt, is die verplichting niet zo dwingend dat een weigering om daaraan te voldoen zonder meer een ernstige schending

---

[201] Zie Roe & Happold, a.w., p. 193.
[202] Daarover is in de arbitrale rechtspraak wisselend geoordeeld, zie Hobér, a.w., p. 369 e.v.
[203] Hobér, a.w., p. 373.
[204] Het onderdeel verwijst naar de overweging van het Scheidsgerecht in para. 1421 van de Final Awards dat het raadplegen van de belastingautoriteiten een zinloze exercitie ('an exercise in futility') zou zijn.

20/01595

van de opdracht oplevert. De kwestie of de Russische Federatie nadeel heeft ondervonden van de weigering van het Scheidsgerecht om de kwestie aan de Russische belastingautoriteiten voor te leggen, behoeft daarom geen bespreking. De in dit verband aangedragen klachten nemen bovendien tot uitgangspunt dat raadpleging van de belastingautoriteiten tot een andere beslissing van het Scheidsgerecht hadden kunnen of moeten leiden. Zoals ik hiervoor heb opgemerkt, zou het Scheidsgerecht echter niet gebonden zijn geweest aan de bevindingen van de belastingautoriteiten en niet verplicht om de conclusies over de vraag of sprake is van een onteigening in overweging te nemen. Onderdeel 5.2.2 faalt dus.

3.171   Onderdeel 5.2.3 is gericht tegen rov. 6.3.3, waarin het hof onder meer heeft overwogen dat de informatie die het Scheidsgerecht door middel van een verwijzing naar de Russische belastingautoriteiten had kunnen verkrijgen, vermoedelijk niet tot een ander oordeel had geleid. Volgens het onderdeel is dit oordeel ontoelaatbaar speculatief, mede in het licht van het standpunt van de Russische Federatie dat de belastingautoriteiten haar visie zouden hebben ondersteund.

3.172   De klacht miskent dat, zoals ik reeds uiteen heb gezet, art. 21 lid 5 ECT niet vereist dat een scheidsgerecht de van de belastingautoriteiten verkregen bevindingen volgt. Bovendien kan het hof niet met recht verweten worden een 'speculatief' oordeel te hebben gegeven. Het hof moest in het kader van de beoordeling van art. 1065 lid 1, onder c, Rv immers beoordelen of het Scheidsgerecht tot een ander oordeel zou zijn gekomen. Dat oordeel kan niet anders worden gevormd dan door te speculeren over de vraag wat het Scheidsgerecht zou hebben beslist als het meer of andere informatie had gehad. Ook daarom faalt het onderdeel.

3.173   Onderdeel 5.2.4 klaagt over rov. 6.3.4, waarin het hof heeft geoordeeld dat er geen aanleiding was het geschil ook voor te leggen aan de belastingautoriteiten in Cyprus en het Verenigd Koninkrijk (waar HVY gevestigd zijn). Volgens het hof is niet aangevoerd dat belastingmaatregelen van Cyprus of het Verenigd Koninkrijk een onteigening inhouden, terwijl art. 21 lid 5 ECT slechts voor die gevallen voorschrijft dat de betrokken belastingautoriteiten moeten worden geraadpleegd. Het hof is met dit oordeel buiten de grenzen van de rechtsstrijd getreden en heeft bovendien in strijd met art. 21 ECT geoordeeld, aldus het onderdeel.

3.174   Uit art. 21 ECT volgt niet dat steeds de belastingautoriteiten van alle betrokken landen moeten worden aangezocht. Art. 21 lid 5, onder b, punt (i), ECT bepaalt immers dat de 'relevant Competent Tax Authority' resp. 'relevant Competent Tax Authorities' moeten worden geraadpleegd. Welke autoriteiten 'relevant' zijn, wordt niet nader gedefinieerd. Gelet op de context waarin het begrip wordt gebruikt, ligt het voor de hand om, zoals het hof in rov. 6.4.3 heeft overwogen, 'relevant' te interpreteren als 'in staat om informatie te geven over de vraag of sprake is van een (discriminerende) onteigening'. Bovendien ligt het voor de hand dat het aan een scheidsgerecht is om in een concreet geval te beoordelen welke

Pagina 78 van 89

20/01595

belastingautoriteiten relevant zijn. De verwijzing naar 'Competent Tax Authorities' (meervoud) in art. 21 lid 5, onder b, punten (ii) en (iv) heeft als achtergrond dat bij de definitie van 'Competent Tax Authority' in art. 21 lid 7 ECT wordt verwezen naar 'a double taxation agreement', dat wil zeggen naar verdragen ter voorkoming van dubbele belasting. In dergelijke gevallen ligt het voor de hand dat zowel de autoriteiten uit het vestigingsland van de investeerder, als die van het gastland worden geraadpleegd (met als doel tussen deze autoriteiten een oplossing van de belastingproblemen te bereiken). Uit art. 21 lid 5 ECT volgt dus niet dat steeds de belastingautoriteiten van alle betrokken staten zouden moeten worden geraadpleegd, ook wanneer die in een concreet geval niet 'relevant' worden geacht. Door art. 21 lid 5 ECT ambtshalve uit te leggen en toe te passen, is het hof niet buiten de grenzen van de rechtsstrijd getreden. Voor het overige bouwt het onderdeel voort op eerdere klachten en deelt het onderdeel het lot daarvan. Onderdeel 5.2.4 faalt dus.

3.175   Onderdeel 5.2.5 klaagt dat het hof het beroep van de Russische Federatie heeft verworpen op (een analogie met) het uit het Nederlandse burgerlijk procesrecht afkomstige prognoseverbod. Volgens het onderdeel zou het Scheidsgerecht dit prognoseverbod hebben geschonden door bij voorbaat te oordelen dat het raadplegen van de Russische belastingautoriteiten zinloos zou zijn.

3.176   Niet is komen vast te staan dat het Scheidsgerecht aan een dergelijk prognoseverbod was gebonden. Het onderdeel geeft voor de binding aan het prognoseverbod geen andere onderbouwing dan een verwijzing naar de verplichting van art. 21 lid 5 ECT, maar uit die bepaling is niet af te leiden dat daarin een prognoseverbod besloten ligt. Het onderdeel licht dat ook niet nader toe. Daarop stuit de klacht van het onderdeel af.

3.177   Onderdeel 5.2.6 betoogt dat de Hoge Raad een prejudiciële vraag aan het HvJEU moet stellen over de juiste uitleg van art. 21 lid 5, onder b, punt (i), ECT.

3.178   Onder verwijzing naar hetgeen ik ten aanzien van onderdeel 2.7 heb opgemerkt, acht ik ook ten aanzien van onderdeel 5 het stellen van een prejudiciële vraag aan het HvJEU over de uitleg van art. 21 ECT niet noodzakelijk voor de uitkomst van het geding in cassatie. Het hof heeft in het bestreden arrest immers in lijn met het betoog van de Russische Federatie geoordeeld dat het Scheidsgerecht in strijd met art. 21 lid 5 ECT heeft gehandeld. Het hof heeft echter deze schending van de opdracht niet voldoende ernstig gevonden dat tot vernietiging van de *Yukos Awards* moet worden overgegaan. Het al dan niet slagen van de cassatieklachten over dat oordeel hangt daarmee niet af van de uitleg van art. 21 lid 5 ECT, maar van de vraag of de overwegingen van het hof in het kader van art. 1065 lid 1, onder c, Rv begrijpelijk zijn. Voor het stellen van prejudiciële vragen bestaat daarom geen noodzaak.

3.179   De slotsom is dat onderdeel 5 faalt.

**Onderdeel 6: de rol van de secretaris van het Scheidsgerecht**



20/01595

3.180    Onderdeel 6 valt uiteen in twee subonderdelen en ziet, kort gezegd, op de betrokkenheid van de assistent (secretaris) van het Scheidsgerecht, Valasek, bij het concipiëren van de arbitrale vonnissen. Volgens de Russische Federatie levert deze betrokkenheid strijd op met het beginsel dat de arbiters de hun opgedragen taak persoonlijk moeten vervullen, zodat het Scheidsgerecht zich niet aan zijn opdracht heeft gehouden (art. 1065 lid 1, onder c, Rv). Daarnaast zou door de betrokkenheid van Valasek in feite sprake zijn van een 'vierde arbiter', zodat het Scheidsgerecht in strijd met de daarvoor geldende regels is samengesteld (art. 1065 lid 1, onder d, Rv). Het hof heeft dit betoog in rov. 6.6.1-6.6.15 verworpen.

3.181    Onderdeel 6.1 bevat geen klachten, maar beschrijft de achtergrond van de klachten en vat het bestreden oordeel van het hof samen.

*Onderdeel 6.2: delegatie aan secretaris van het Scheidsgerecht*

3.182    Onderdeel 6.2 bevat drie klachten: (i) een klacht (onder 6.2.1) over de afwijzing door het hof van het aanbod van de Russische Federatie om de bijdrage van Valasek aan het besluitvormingsproces te bewijzen door middel van het horen van getuigen, (ii) een klacht (onder 6.2.2) dat het oordeel van het hof in strijd is met art. 1065 lid 1, onder b, Rv jo. art. 1026 lid 1 Rv, die bepalen dat een arbitraal vonnis niet door een even aantal arbiters mag worden gewezen, en (iii) een klacht (onder 6.2.3) dat het hof bij zijn oordeel verschillende (ongeschreven) procedureregels heeft miskend.

*Inleidende opmerkingen*

3.183    Het onderdeel stelt de vraag aan de orde in hoeverre arbiters (delen van) hun werkzaamheden kunnen delegeren aan een secretaris of assistent, zonder dat daarbij het uitgangspunt dat zij hun taken persoonlijk moeten vervullen[205], geweld wordt aangedaan en zonder dat de secretaris in feite als een 'vierde arbiter' gaat optreden. Concreet rijst de vraag in hoeverre een secretaris de beslissende of dragende delen van het vonnis mag concipiëren.

3.184    Over deze kwestie bestaan verschillende opvattingen.[206] Sommige auteurs hebben erop gewezen dat het risico bestaat dat de secretaris op ontoelaatbare wijze wordt betrokken bij

---

[205] Zie Snijders, Nederlands arbitragerecht, 2018, nr. 4.14.2; Gary B. Born, International Commercial Arbitration. Vol. II: International Arbitral Procedures, Alphen aan den Rijn: Kluwer Law International 2014, p. 1999; M.P.J. Smakman, De rol van de secretaris van het scheidsgerecht belicht, TvA 2007/2, onder 4; Constantine Partasides, The Fourth Arbitrator? The Role of Secretaries to Tribunals in International Arbitration, Arbitration International 2002, p. 147-163.

[206] Naast de hierna te noemen literatuur verwijst de procesinleiding (nr. 212, p. 109) naar de bijdrage van F.J.M. de Ly, Kroniek internationale arbitrage, TvA 2012/84. Daarin lees ik, anders dan het onderdeel, niet dat De Ly van mening is dat secretarissen geen vonnissen mogen schrijven. Weliswaar schrijft De Ly: 'Nog steeds mogen

20/01595

de besluitvorming door het scheidsgerecht, indien hierop niet zorgvuldig toezicht wordt gehouden.[207] Niettemin concludeert Born:

'the better view is that there is no per se prohibition on secretaries or junior lawyers performing such tasks, provided that the members of the tribunal carefully review and make appropriate use of any preparatory work.'[208]

Peters sluit zich hierbij aan en meent dat het geen probleem is als secretarissen (delen van) een arbitraal vonnis schrijven, mits dat gebeurt naar instructies en onder verantwoordelijkheid van het scheidsgerecht en dit de teksten niet klakkeloos overneemt.[209] Smakman heeft een soortgelijk standpunt ingenomen.[210] Sanders meent dat 'de motivering van het vonnis of onderdelen ervan (…) uitsluitend de taak (is) van het scheidsgerecht dat dit in eigen bewoording zal doen'.[211] Von Hombracht-Brinkman maakt een onderscheid tussen gevallen waarin het scheidsgerecht (deels) uit juristen bestaat, en gevallen waarin dit niet zo is, en acht het schrijven van een vonnis door een secretaris enkel in het laatste geval acceptabel.[212] Partasides acht het onwenselijk (maar niet per definitie onacceptabel) dat het schrijven van een concept van de beslissing aan een secretaris wordt overgelaten, maar schrijft ook dat dit sterk van de omstandigheden afhangt. Het is bovendien aan de arbiter om hierover beslissingen te nemen.[213] Polkinghorne en Rosenberg zijn uitgesproken: volgens hen is het niet toelaatbaar dat de secretaris inhoudelijke onderdelen van het vonnis schrijft.[214]

3.185   Er is geen sprake van een algemeen aanvaarde regel of praktijk die inhoudt dat het in alle gevallen onacceptabel is als het concipiëren van inhoudelijke delen van een arbitraal vonnis aan een secretaris wordt opgedragen.[215] Daarvoor zal ook moeten komen vast te staan dat

---

beslissingen of andere wezenlijke taken van arbiters niet aan een secretaris gedelegeerd worden en mogen notities van secretarissen er niet toe leiden dat arbiters de zaak niet persoonlijk bekijken en geen vonnissen schrijven', maar dit is een beschrijving van de praktijk onder de (nieuwe) ICC-notitie van 1 augustus 2012 die wordt gevolgd ten aanzien van de benoeming, de taken en de bezoldiging van administratieve secretarissen in het kader van ICC arbitrage.

[207] Born, a.w., p. 2000; Partasides, a.w., p. 148 e.v.

[208] Born, a.w., p. 2000. In gelijke zin Peters, a.w., onder 13.

[209] Zie de noot van Peters bij het eindarrest van het hof, JOR 2020/16, onder punt 13.

[210] Smakman, a.w., onder 4.

[211] P. Sanders, De secretaris van het scheidsgerecht, TvA 2007/29, onder 2.

[212] F.D. von Hombracht-Brinkman, Er zijn secretarissen en secretarissen! Reactie op het artikel van prof. mr. P. Sanders, 'De secretaris van het scheidsgerecht', TvA 2008/17.

[213] Partasides, a.w., p. 158.

[214] Michael Polkinghorne & Charles B. Rosenberg, The Role of the Tribunal Secretary in International Arbitration: A Call for a Uniform Standard, Dispute Resolution International, Vol. 8, 2014, p. 107-128. Deze auteurs besteden in hun bijdrage aandacht aan de rol van de secretaris in verschillende arbitragereglementen en doen een aantal aanbevelingen ('standards'). Eén van die 'standards' is dat de secretaris 'substantive portions of awards' niet mag voorbereiden en geen 'decision-making functions' mag hebben (p. 127).

[215] De procesinleiding verwijst voorts nog naar een aantal als producties overgelegde artikelen, waaruit naar mijn mening evenmin een algemeen geaccepteerde opvatting is af te leiden. Sommige bijdragen (producties RF-396 en RF-405) bespreken een specifiek arbitragereglement, terwijl auteurs van andere bijdragen een eigen opvatting verdedigen maar ook laten zien dat uiteenlopende opvattingen bestaan (producties RF-400, RF-403, RF-404).

20/01595

hierbij grenzen zijn overschreden die voortvloeien uit het beginsel van behoorlijke taakvervulling door arbiters. Dat kan bijvoorbeeld het geval zijn als blijkt dat het scheidsgerecht de door de secretaris geschreven teksten zonder meer heeft overgenomen, of als de secretaris op ongeoorloofde wijze bij de besluitvorming is betrokken. De bewijslast ten aanzien van dergelijke feiten ligt, zoals geldt voor ieder beroep op één van de vernietigingsgronden van art. 1065 Rv, bij degene die zich op de vermeende schending van de opdracht door de arbiters beroept.[216] Het bewijzen van dergelijke feiten zal niet eenvoudig zijn, maar dit wordt gerechtvaardigd doordat de arbiters een zwaar verwijt wordt gemaakt (het veronachtzamen van hun persoonlijke taak), en door de terughoudendheid die in het algemeen bij een beroep op art. 1065 lid 1, onder c, Rv in acht moet worden genomen.

3.186   Het ontbreken van een algemeen aanvaarde regel over deze kwestie verklaart dat daarover in sommige arbitragereglementen specifieke regels zijn opgenomen. Het hof heeft – in cassatie onbestreden – overwogen dat het in deze zaak toepasselijke UNCITRAL-reglement op dit punt geen regels bevat (rov. 6.6.14.1), zodat het aan de discretie van arbiters is overgelaten in hoeverre zij bepaalde taken aan hun secretaris delegeren, waarbij zij het uitgangspunt van persoonlijke vervulling van hun taken moeten eerbiedigen. Volgens het hof is niet gebleken dat arbiters dit uitgangspunt hebben geschonden en dat ook in het geval dat Valasek conceptteksten heeft aangeleverd voor de dragende delen van het vonnis, dit nog niet betekent dat hij ook zelf beslissingen heeft genomen (rov. 6.6.14.1, slot). Volgens het hof is niet gebleken dat het nemen van voor de arbitrale vonnissen relevante inhoudelijke beslissingen aan Valasek zou zijn gedelegeerd, of dat Valasek de eindverantwoordelijkheid voor (bepaalde onderdelen van) de vonnissen zou hebben gehad. Daarom kan volgens het hof niet van een schending van opdracht in de zin van art. 1065 lid 1, onder c, Rv worden gesproken.

3.187   Na deze uiteenzetting bespreek ik de drie klachten van het onderdeel.

*Onderdelen 6.2.1: afwijzing bewijsaanbod Russische Federatie*

3.188   Onderdeel 6.2.1 klaagt over rov. 6.6.5, waarin het hof het bewijsaanbod van de Russische Federatie heeft afgewezen. De Russische Federatie heeft aangeboden Valasek te laten horen over 'de door hem gedeclareerde uren en zijn bijdragen aan het 'decision-making process' van het Scheidsgerecht', en verder om twee getuigen-deskundigen te laten horen.[217]

3.189   Het hof heeft dit bewijsaanbod afgewezen, omdat het veronderstellenderwijs heeft aangenomen dat Valasek 'grote bijdragen heeft geleverd aan het concipiëren van de

---

[216] HR 23 april 2010, ECLI:NL:HR:2010:BK8097, NJ 2011/475, m.nt. H.J. Snijders, rov. 3.5.3.
[217] Memorie van antwoord, nr. 991.



20/01595

Hoofdstukken IX, X en XII van de Final Award, doordat hij daartoe (concept)teksten heeft aangeleverd die arbiters geheel of gedeeltelijk in de arbitrale vonnissen hebben verwerkt'. Daardoor was bewijslevering niet langer aan de orde. De klacht wil kennelijk betogen dat het hof desondanks alsnog bewijslevering had moeten toestaan, omdat de mogelijkheid bestaat dat Valasek door het aanleveren van bedoelde teksten ook de uiteindelijke beslissingen van het Scheidsgerecht heeft beïnvloed. In feite klaagt het onderdeel dat het hof het bewijsaanbod van de Russische Federatie te beperkt heeft opgevat. Een dergelijke klacht moet echter falen, nu de uitleg van de gedingstukken aan het hof is voorbehouden.[218]

*Onderdeel 6.2.2: even aantal arbiters?*

3.190   Onderdeel 6.2.2 klaagt dat het hof in rov. 6.6.13 het beroep op art. 1065 lid 1, onder b, Rv jo. art. 1026 lid 1 Rv heeft verworpen. Dat beroep houdt in dat de Yukos Awards door de betrokkenheid van Valasek in feite niet door drie, maar door vier arbiters zouden zijn gewezen, hetgeen strijd oplevert met de genoemde bepalingen. Het hof heeft overwogen dat de Yukos Awards door de drie aangestelde arbiters zijn ondertekend, zodat aan de eisen van deze bepalingen is voldaan. Het hof heeft daarmee een te beperkte uitleg gegeven aan die bepalingen, omdat deze er ook op zien te voorkomen dat niet een vierde persoon feitelijk als arbiter optreedt, aldus het onderdeel.

3.191   Art. 1026 lid 1 Rv bepaalt dat het scheidsgerecht uit een oneven aantal arbiters moet bestaan. Art. 1065 lid 1, onder b, Rv bepaalt vervolgens dat een arbitraal vonnis kan worden vernietigd als het scheidsgerecht niet geldig is samengesteld. Het onderdeel betoogt dat art. 1026 lid 1 Rv niet enkel de formele eis stelt dat het scheidsgerecht uit een oneven aantal arbiters moet bestaan, maar ook beoogt te voorkomen dat een vierde persoon bij de besluitvorming betrokken is. Er zijn geen aanwijzingen in de literatuur en wetsgeschiedenis dat deze bepaling inderdaad op deze wijze moet worden verstaan.[219] In beginsel kan worden aangenomen dat uit de ondertekening van een arbitraal vonnis kan worden afgeleid welke arbiters het vonnis hebben gewezen, zoals ook bij overheidsrechtspraak uit de ondertekening van de rechterlijke beslissing blijkt welke rechters deze beslissing hebben gewezen.[220] Als uit de ondertekening blijkt dat het vonnis door een oneven aantal arbiters is gewezen, is daarmee voldaan aan de eis van art. 1026 lid 1 Rv. Dat alles neemt uiteraard niet weg dat het onwenselijk is dat een vierde persoon in feite als arbiter optreedt door invloed uit te oefenen op de beslissing in de arbitrageprocedure. Het hof heeft dit niet miskend, maar

---

[218] Asser Procesrecht/Korthals Altes & Groen 7 2015/157; A.E.H. van der Voort Maarschalk, De toetsing in cassatie, in B.T.M. van der Wiel (red.), Cassatie, Deventer: Kluwer 2019, nr. 68.

[219] Zie Sanders, Het Nederlandse arbitragerecht, a.w., p. 60; Van den Berg e.a., Arbitragerecht, a.w., p. 46; Snijders, Nederlands arbitragerecht, a.w., nrs. 4.4.1 en 9.3.3; G.J. Meijer e.a., Parl. Gesch. Arbitragewet 2015/II, 8.3.

[220] Vgl. bijvoorbeeld HR 18 november 2016, NJ 2017/202, m.nt. H.B. Krans en P. van Schilfgaarde (Meavita), rov. 3.2.5.

20/01595

in rov. 6.6.14 e.v. kenbaar onderzocht of de arbiters een deel van hun persoonlijke opdracht aan Valasek hebben gedelegeerd. Op het voorgaande stuit de klacht af.

*Onderdeel 6.2.3: rol secretaris*

3.192   Onderdeel 6.2.3 voert vijf klachten aan (aangeduid met de letters a tot en met e). Ik bespreek deze klachten kort.

3.193   De eerste klacht (onder a) is gericht tegen de verwerping door het hof van het betoog van de Russische Federatie dat er een (ongeschreven) regel bestaat die meebrengt dat een secretaris geen inhoudelijke delen van een arbitraal vonnis mag schrijven. Volgens de klacht heeft het hof miskend dat een dergelijke delegatie van inhoudelijke taken aan een secretaris alleen na uitdrukkelijke toestemming van partijen mag gebeuren. De tweede klacht (onder b) is gericht tegen de beslissing van het hof in rov. 6.6.14.2 dat door partijen niet 'geheel' te informeren over de concipieertaak van Valasek, het Scheidsgerecht zijn opdracht niet ernstig heeft geschonden.

3.194   De beide klachten kunnen gezamenlijk worden besproken. Zoals ik reeds heb vermeld, is geen sprake van een ongeschreven regel. Voor zover de beide klachten betogen dat het hof het belang van transparantie door het Scheidsgerecht bij het delegeren van inhoudelijke taken heeft miskend, geldt dat het hof in rov. 6.6.14.2 heeft erkend dat het Scheidsgerecht partijen op dit punt volledig had moeten inlichten, maar heeft geoordeeld dat deze schending van de opdracht niet ernstig genoeg is om vernietiging van de arbitrale vonnissen te rechtvaardigen. Hierop stuiten de beide klachten af. Het oordeel van het hof is voor het overige niet onbegrijpelijk.

3.195   De derde klacht (onder c) voert aan dat het hof in rov. 6.6.14.1 ten onrechte heeft beslist dat alleen een specifieke bepaling in het toepasselijke arbitragereglement in de weg kan staan aan het delegeren van inhoudelijke taken door arbiters aan een assistent.

3.196   Deze klacht gaat uit van een onjuiste lezing van rov. 6.6.14.1. Het hof heeft immers niet overwogen dat de bevoegdheid van arbiters om taken te delegeren enkel door het arbitragereglement wordt beperkt. Volgens het hof is het, bij gebreke van concrete partijafspraken en zolang de inhoudelijke beslissingen door de arbiters zelf worden genomen, aan de discretie van het Scheidsgerecht overgelaten in hoeverre voor het concipiëren van het arbitrale vonnis gebruik wordt gemaakt van een assistent of secretaris. De arbiters moeten dus steeds het uitgangspunt van persoonlijke taakvervulling eerbiedigen. Het hof heeft kenbaar onderzocht of de gang van zaken daarmee in conflict komt, en heeft die vraag ontkennend beantwoord. De klacht faalt derhalve.

3.197   De vierde klacht (onder d) is gericht tegen rov. 6.6.14.1 en klaagt over het oordeel dat van een (voldoende ernstige) schending van de opdracht slechts sprake kan zijn indien arbiters

20/01595

het nemen van inhoudelijke beslissingen of de eindverantwoordelijkheid over het vonnis in het geheel aan hun assistent hebben overgelaten.

3.198    Het oordeel van het hof is in het licht van de hiervoor beschreven standpunten in de literatuur niet onjuist en evenmin onbegrijpelijk, zodat de klacht faalt.

3.199    De vijfde klacht (onder e) houdt in dat het beginsel van persoonlijke taakvervulling tot nihil zou worden gereduceerd als arbiters het schrijven van hun vonnissen in het geheel aan een secretaris zouden kunnen delegeren, waarbij het bewijs dat zij hun taak zelf hebben verricht slechts kan bestaan uit het feit dat zij het vonnis hebben ondertekend.

3.200    De klacht bouwt voort op de voorgaande klachten. Dat de arbiters het vonnis hebben ondertekend kan bewijs opleveren dat het scheidsgerecht op de juiste wijze was samengesteld, maar bewijst niet zonder meer dat het beginsel van persoonlijke taakvervulling is geëerbiedigd. Dat uitgangspunt blijft onverkort gelden, met dien verstande dat moet komen vast te staan dat daaraan in een concreet geval niet is voldaan. Zoals uit mijn bespreking van dit onderdeel volgt, is van schending van het beginsel van persoonlijke taakvervulling niet reeds sprake in het geval dat inhoudelijke delen van het arbitraal vonnis door een secretaris zijn geschreven. Hierop stuiten alle klachten van onderdeel 6.2.3 af.

3.201    De slotsom is dat onderdeel 6 faalt.

**Onderdeel 7: ontbreken van motivering?**

3.202    Onderdeel 7 valt uiteen in twee onderdelen en is gericht tegen rov. 8.4.13 en 8.4.16 van het eindarrest. Deze overwegingen zien op het betoog dat de arbitrale vonnissen ondeugdelijk zijn gemotiveerd waar het gaat om de stelling van de Russische Federatie dat Yukos' Mordovische vennootschappen schijnvennootschappen ('shams') waren. Het Scheidsgerecht is tot de slotsom gekomen dat hiervoor in 'het omvangrijke dossier' geen bewijs is te vinden. Volgens het hof heeft het Scheidsgerecht daarmee gedoeld op het dossier dat voorlag in de fiscale procedures die Yukos in Rusland heeft gevoerd (rov. 8.4.13). Volgens het onderdeel is deze 'reparatiepoging' in strijd met art. 19 en 24 Rv, en bovendien onbegrijpelijk.

*Inleidende opmerkingen*

3.203    Voorafgaand aan de bespreking van de klachten merk ik het volgende op (zie ook de onbestreden vooropstelling van het hof in rov. 8.1.2). De Russische Federatie heeft een beroep gedaan op de vernietigingsgrond uit art. 1065 lid 1, onder d, Rv. Vernietiging op deze grond is slechts mogelijk wanneer motivering ontbreekt, en dus niet in gevallen van



20/01595

ondeugdelijke motivering, aldus de Hoge Raad.[221] Het controleren van de deugdelijkheid van de motivering van het arbitrale vonnis kan immers neerkomen op een inhoudelijke herbeoordeling van dat vonnis, waartoe de rechter niet bevoegd is. Wel kunnen zich gevallen voordoen waarin weliswaar een motivering is gegeven, maar daarin enige steekhoudende verklaring voor de desbetreffende beslissing niet valt te onderkennen.[222] Vernietiging op grond van art. 1065 lid 1, onder d, Rv is dan gerechtvaardigd, ook al moet de rechter van deze bevoegdheid terughoudend gebruik maken, in die zin dat hij slechts in sprekende gevallen dient in te grijpen in arbitrale beslissingen.[223] Voor vernietiging op grond van art. 1065 lid 1, onder d, Rv geldt dus een hoge drempel.

3.204    De context van de klachten van onderdeel 7 is, kort gezegd, de volgende (zie voor een uitgebreidere weergave rov. 8.4.2 e.v. van het eindarrest). In de arbitrageprocedure hebben HVY aangevoerd dat de belastingnaheffing die aan Yukos is opgelegd gefabriceerd was en neerkwam op een onteigening. De Russische Federatie heeft betoogd dat HVY hadden kunnen weten dat de wijze waarop Yukos gebruik maakte van belastingvrijstelling in lage-belastingregio's (waaronder Mordovië) in strijd was met de geldende 'bad faith taxpayer doctrine'. Het Scheidsgerecht heeft beoordeeld of het bewijs is geleverd dat sprake was van kwade trouw. Het Scheidsgerecht heeft vervolgens geoordeeld dat 'the massive record' geen bewijs bevat van deze stelling dat Yukos' Mordovische vennootschappen 'shams' (schijnvennootschappen) waren (paragraaf 639 *Final Awards*). In de vernietigingsprocedure heeft de Russische Federatie aangevoerd dat dit oordeel onvoldoende is gemotiveerd, omdat in de arbitrageprocedure wel degelijk bewijsmateriaal is overgelegd. Het hof heeft dit betoog verworpen, omdat volgens het hof duidelijk is dat het Scheidsgerecht met 'the massive record' (het omvangrijke dossier) duidt op het dossier dat voorlag in de fiscale procedures die Yukos in Rusland heeft gevoerd (rov. 8.4.13). Het hof heeft dit in rov. 8.4.1.4-8.4.16 nader onderbouwd door erop te wijzen dat het oordeel van het Scheidsgerecht in het teken staat van de vraag of in de Russische belastingprocedure sprake was van 'due process'.

3.205    Onderdeel 7.1 bevat een inleiding en geen klachten. Onderdeel 7.2 valt uiteen in vier subonderdelen met klachten.

   *Onderdeel 7.2.1: onverenigbaarheid met art. 19 en 24 Rv?*

---

[221] HR 25 februari 2000, ECLI:NL:HR:2000:AA4947, NJ 2000/508, m.nt. H.J. Snijders, rov. 3.3.

[222] HR 9 januari 2004, ECLI:NL:HR:AK8380, NJ 2005/190, m.nt. H.J. Snijders, rov. 3.5.2. Zie ook de conclusie van A-G Bakels vóór het in de vorige voetnoot genoemde arrest van de Hoge Raad van 25 februari 2000, waarin hij bepleit dat onder het ontbreken van een motivering ook zou moeten worden verstaan 'een motivering die zó gebrekkig is, dat zij naar informatief gehalte en overtuigingskracht, met een geheel ontbrekende motivering op één lijn is te stellen'.

[223] HR 22 december 2006, ECLI:NL:HR:2006:AZ1593, NJ 2008/4, m.nt. H.J. Snijders, rov. 3.3.

20/01595

3.206 Volgens onderdeel 7.2.1 is het oordeel van het hof onverenigbaar met art. 24 en 19 Rv, omdat de uitleg van het hof dat 'the massive record' verwijst naar het belastingdossier en niet naar het arbitragedossier, door geen van beide partijen is verdedigd.

3.207 Deze klacht faalt. Bij het hof lag immers de vraag voor hoe het desbetreffende oordeel van het Scheidsgerecht moest worden begrepen. Daarom had het hof ook de vrijheid dit oordeel anders uit te leggen dan door partijen verdedigd. Die verdedigde uitleg is als zodanig geen feit, maar vormt juist de kwestie waarover een uitspraak van het hof wordt gevraagd. Er is dan ook geen sprake van verboden aanvulling van de feitelijke grondslag (art. 24 Rv) of van een schending van het beginsel van hoor en wederhoor (art. 19 Rv).

*Onderdeel 7.2.2: bewijsmateriaal in fiscale procedure*

3.208 Onderdeel 7.2.2 klaagt over de overweging van het hof aan het slot van rov. 8.4.13, dat de Russische Federatie niet heeft aangevoerd dat het bewijsmateriaal dat zij in de arbitrageprocedure heeft overgelegd ook reeds in de belastingprocedure was overgelegd. Volgens het onderdeel was er voor de Russische Federatie geen reden om dit aan te voeren, omdat dit een 'evident feit' is. Verder was, aldus het onderdeel, duidelijk dat verschillende in de arbitrageprocedure overgelegde bewijsstukken afkomstig waren uit de belastingprocedure.

3.209 De door het onderdeel bestreden overwegingen bouwen voort op de verwerping door het hof van het betoog van de Russische Federatie, dat in de arbitrageprocedure bewijs is geleverd van kwade trouw bij Yukos/HVY. Het hof heeft in lijn hiermee geoordeeld dat bedoelde bewijsstukken niet relevant zijn, nu het erom ging of zij in de belastingprocedure waren ingediend, wat de Russische Federatie niet heeft gesteld. Het hof behoefde niet zonder daarop gerichte stellingen van de Russische Federatie, zelfstandig te onderzoeken of bepaalde bewijsstukken ook in de belastingprocedure waren ingediend. Zou het hof dat wel hebben gedaan, dan had het hof de grenzen van de rechtsstrijd overschreden en bovendien de feitelijke grondslag aangevuld door zelf feiten vast te stellen en deze in aanmerking te nemen. De klacht stuit hierop af.

*Onderdeel 7.2.3: betekenis belastingdossier*

3.210 Onderdeel 7.2.3 voert aan dat het Scheidsgerecht zich op andere punten dan de Mordovische schijnvennootschappen (namelijk het gebruik van schijnvennootschappen in Lesnoy en Trekghorny) heeft aangesloten bij 'Audit Reports' en 'Decisions' van de Russische belastingautoriteiten en geen betekenis heeft gehecht aan het belastingdossier als zodanig. Volgens het onderdeel beschikte het Scheidsgerecht ook niet over de Russische belastingdossiers. Er bestaan bovendien meerdere belastingdossiers, zodat geen sprake is van één 'massive record' (enkelvoud). Daarom zou de uitleg van dit oordeel door het hof onbegrijpelijk zijn, aldus de klacht.

20/01595

3.211  Ook na herhaalde lezing van het onderdeel is mij niet duidelijk geworden wat het onderdeel wil betogen. Voor zover het onderdeel bedoelt te betogen dat het hof heeft miskend dat het oordeel van het Scheidsgerecht niet begrijpelijk is en daarom niet voldoet aan de eisen van art. 1065 lid 1, onder d, Rv, faalt de klacht, omdat dit betoog in feitelijke instanties niet is gevoerd (toen werd immers aangevoerd dat het motiveringsgebrek erin was gelegen dat in de arbitrageprocedure wel degelijk bewijs was geleverd). Voor zover het onderdeel bedoelt te betogen dat de lezing van het hof in rov. 8.4.13 onlogisch is, omdat het Scheidsgerecht met 'the massive record' niet op het belastingdossier kon doelen, faalt ook deze klacht, omdat deze redenen in feitelijke instanties niet zijn aangedragen (toen werd immers een ander betoog gevoerd). Verder geldt dat het hof zijn lezing in rov. 8.4.14-8.4.16 uitvoerig met argumenten heeft onderbouwd. Deze overwegingen worden niet bestreden.

3.212  Onderdeel 7.2.4, ten slotte, is gericht tegen rov. 8.4.16. Dit onderdeel gaat er vanuit dat het hof in die overweging een 'subsidiaire' motivering voor zijn afwijzing van het beroep op art. 1065 lid 1, onder e, Rv heeft gegeven, daarbij zijn eerdere afwijzing (rov. 8.4.13 e.v.) 'terzijde schuivend'.

3.213  Het onderdeel miskent dat het hof in de bestreden overweging geen 'subsidiaire' motivering geeft, maar ten overvloede overweegt dat ook als de door de Russische Federatie verdedigde lezing van paragraaf 639 van de *Final Awards* juist is, dit de uiteindelijke conclusie van het Scheidsgerecht onverlet laat. Dat het gaat om een overweging ten overvloede blijkt eruit dat het hof in rov. 8.4.13 uitdrukkelijk van een andere lezing van het oordeel van het Scheidsgerecht is uitgegaan. Hierop stuiten de klachten af.

3.214  Uit het voorgaande volgt dat de klachten van onderdeel 7 vergeefs zijn voorgesteld.

**Onderdeel 8: veegklacht**

3.215  Onderdeel 8 van het middel bevat een veegklacht die voortbouwt op de onderdelen 1 t/m 7. Het onderdeel betoogt dat bij het slagen van een of meer onderdelen 1 t/m 7 de door het hof gesauveerde schadevergoeding die het Scheidsgerecht aan HVY heeft toegekend, niet in stand kan blijven.

3.216  Nu de onderdelen 1 t/m 7 falen, behoeft deze veegklacht geen bespreking.

**Slotsom principaal beroep**

3.217  De slotsom is dat het principale beroep dient te worden verworpen.

**4.     Bespreking van het voorwaardelijk incidentele cassatiemiddel**

4.1    HVY hebben voorwaardelijk incidenteel cassatieberoep ingesteld tegen zowel het tussenarrest als het eindarrest. Het incidentele cassatiemiddel bevat drie onderdelen, die alle zijn ingesteld onder de voorwaarde dat één of meer van de klachten van het principale

20/01595

cassatiemiddel van de Russische Federatie slaagt. Nu het principale cassatieberoep niet slaagt, behoeft het voorwaardelijk ingestelde incidentele cassatieberoep geen bespreking.

**5.        Conclusie**

De conclusie strekt tot verwerping van het principaal cassatieberoep.

De Procureur-Generaal bij de
Hoge Raad der Nederlanden

A-G



20/01595

# Ondertekening Conclusie P.G.

## Handtekeningen

Vlas, prof. mr. P.

