# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

_____
                                     )

|  |  |
|---|---|
| HULLEY ENTERPRISES LTD., ) | |
| YUKOS UNIVERSAL LTD., AND ) | Case No. 1:14-cv-01996-BAH |
| VETERAN PETROLEUM LTD., ) | |
| ) | |
| *Petitioners*, ) | Chief Judge Beryl A. Howell |
| ) | |
| v. ) | |
| ) | |
| THE RUSSIAN FEDERATION, ) | |
| ) | |
| *Respondent*. ) | |

_____ )

## STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF
## THE RUSSIAN FEDERATION'S MOTION TO EXTEND THE STAY

**WHITE & CASE**LLP

Carolyn B. Lamm (D.C. Bar No. 221325)
Nicolle Kownacki (D.C. Bar No. 1005627)
David P. Riesenberg (D.C. Bar No. 1033269)
701 Thirteenth Street, NW
Washington, DC 20005
Phone: (202) 626-3600
Fax: (202) 639-9355
clamm@whitecase.com

*Counsel for the Russian Federation*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ....................................................................... ii

PRELIMINARY STATEMENT ................................................................ 1

BACKGROUND ...................................................................................... 4

ARGUMENT ............................................................................................ 12

I.      The "Same Reasons" that Justified the 2016 Stay and 2020 Stay Also Justify
        Extending the Stay ........................................................................ 13

        A.      Judicial Economy and International Comity Favor Extending the Stay ............. 13

        B.      The Balance of Hardships Favors Extending the Stay ........................................ 18

II.     This Court's Previous Decision Not to Order Prejudgment Security Was Correct ........ 22

        A.      Prejudgment Security Is Prohibited by the FSIA ................................................. 22

        B.      Prejudgment Security Is Not Legally Appropriate or Necessary ........................ 24

CONCLUSION ........................................................................................ 26

# TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page(s)**

*Alto Mar Girassol v. Lumbermens Mut. Cas. Co.*,
   No. 04-CV-7731, 2005 U.S. Dist. LEXIS 7479,
   (N.D. Ill. Apr. 12, 2005) ....................................................................................... 16

*CEF Energia, B.V. v. Italian Republic*,
   No. 19-CV-3443, 2020 U.S. Dist. LEXIS 130291,
   (D.D.C. July 23, 2020) ........................................................................ 12, 15, 23, 25

*Corporación Mexicana de Mantenimiento Integral. S. de R.L. de C.V. v. Pemex*
   *Exploración y Producción*, No. 10-4656-cv, 2012 U.S. App. LEXIS 27054,
   (2d Cir. Feb. 16, 2012) ......................................................................................... 17

*CPConstruction Pioneers Baugesellschaft Anstalt (Liechtenstein) v. Republic of*
   *Ghana, Ministry of Roads & Transp.*,
   578 F. Supp. 2d 50 (D.D.C. 2008) ....................................................................... 21

*De Sousa v. Embassy of Angola.*,
   229 F. Supp. 3d 23 (D.D.C. 2017) ....................................................................... 24

*Europcar Italia, S.p.A. v. Maiellano Tours, Inc.*,
   156 F.3d 310 (2d Cir. 1998) ................................................................................. 17

*Flanagan v. Islamic Republic of Iran*,
   190 F. Supp. 3d 138 (D.D.C. 2016) ............................................................... 23, ,25

*\*Getma Int'l v. Republic of Guinea*,
   142 F. Supp. 3d 110 (D.D.C. 2015) ...................................................... 2, 12, 15, 18, 20

*Gretton Ltd. v. Republic of Uzbekistan*,
   No. 18-CV-1755, 2019 U.S. Dist. LEXIS 18990,
   (D.D.C. Feb. 6, 2019) ............................................................................. 12, 15, 20

*Jorf Lasfar Energy Co., S.C.A. v. AMCI Exp. Corp.*,
   No. 05-0423, 2005 U.S. Dist. LEXIS 34969,
   (W.D. Pa. Dec. 22, 2005) ...................................................................................... 19

*\*Landis v. N. Am. Co.*,
   299 U.S. 248 (1936) .............................................................................................. 12

*Masdar Solar & Wind Coop. U.A. v. Kingdom of Spain*,
   397 F. Supp. 3d 34 (D.D.C. 2019) ......................................................... 15, 19, 20, 21

*NextEra Energy Glob. Holdings B.V. v. Spain*,
   No. 19-CV-1618, 2020 U.S. Dist. LEXIS 180119,
   (D.D.C. Sept. 30, 2020) ......................................................................................... 12

*\*Novenergia II – Energy & Env't (SCA) v. Kingdom of Spain*,
   No. 18-cv-01148, 2020 U.S. Dist. LEXIS 12794,
   (D.D.C. Jan. 27, 2020) ....................................................................................... *passim*

*Pine Top Receivables of Ill., LLC v. Banco de Seguros del Estado*,
   771 F.3d 980 (7th Cir. 2014) ............................................................................ 22, 23

*Stati v. Republic of Kazakhstan*,
   199 F. Supp. 3d 179 (D.D.C. 2016) ................................................................... 12, 14

*Stephens v. Nat'l Distillers*,
   69 F.3d 1226 (2d Cir. 1995) ............................................................................. 22, 23

*Sumitomo Corp. v. Parakopi Compania Maritima, S.A.*,
   477 F. Supp. 737 (S.D.N.Y. 1979) ......................................................................... 17

*TermoRio S.A. E.S.P. v. Electranta S.P.*,
   487 F.3d 928 (D.C. Cir. 2007) ..................................................................... 2, 13, 14

*\*Thai-Lao Lignite (Thail.) Co. v. Gov't of the Lao People's Democratic Republic*,
   864 F.3d 172 (2d Cir. 2017) ........................................................................... 2, 16

*Unión Fenosa Gas S.A. v. Arab Republic of Egypt*,
   No. 1:18-CV-2395, 2020 U.S. Dist. LEXIS 98645,
   (D.D.C. June 4, 2020) ....................................................... 12, 15, 18, 20, 21

## **Statutes**

28 U.S.C. § 1609 ..................................................................................................... 22-23

28 U.S.C. § 1610 ..................................................................................................... 23-24

## **Other Authorities**

Convention on the Recognition and Enforcement of Foreign Arbitral Awards,
   June 10, 1958, 21 U.S.T. 2517 ............................................................................. 13

   Article VI ......................................................................................................... 22-23

*FKP Sojuzplodoimport v. Hulley Enters. Ltd.*,
   Hague Dist. Ct., Judgment, October 27, 2020,
   ECLI:NL:RBDHA:2020:10708 (The Netherlands) ............................................... 18

*\*indicates authority on which counsel chiefly relies*

## PRELIMINARY STATEMENT

The Russian Federation respectfully moves this Court to extend the stay of this litigation imposed by the Memorandum Opinion and Order of November 11, 2020 (the "Second Stay Ruling") until resolution of the ongoing proceedings before the Amsterdam Court of Appeal to set aside the arbitral awards (the "Awards") at issue in this case.  *See* Seventh Decl. of Prof. Albert Jan van den Berg ¶ 2 ("Seventh Van den Berg Decl.") (describing the proceedings recently scheduled for January 4, 2022, in the Amsterdam Court of Appeal).  As this Court previously observed in 2020, "a stay is equally appropriate now, and for the same reasons, as when the first stay was granted."  Second Stay Ruling 10 (ECF 194).

In its judgment of November 5, 2021 in the Dutch cassation proceedings (the "Dutch Cassation Judgment"), the Dutch Supreme Court explicitly "set[] aside the judgments of the Court of Appeal of The Hague dated 25 September 2018 and 18 February 2020," and sustained the Russian Federation's first ground for cassation, while denying the other grounds for cassation.  Dutch Cassation Judgment §§ 7.1, 8 (ECF 199-1).  As explained by Dutch counsel, therefore, the result is that the Awards are now once again set aside (annulled in 2016) and cannot be enforced, including because the Awards "no longer exist as a matter of Dutch law." Seventh Van den Berg Decl. ¶ 5.

Accordingly, as was precisely the situation when this Court granted the stay in 2016 and extended the stay in 2020, "the Dutch set-aside proceedings, which warranted the original stay, remain ongoing . . . ."  Second Stay Ruling 2.  Petitioners' most recent Status Report thus acknowledged that the Dutch Supreme Court has remanded "'the case to the Amsterdam Court of Appeal' for 'further examination and decision'" on the factual and legal questions relating to "the Russian Federation's . . . allegations of [Petitioners'] fraud during the arbitration."

Petitioners' Status Report ¶ 5 (ECF 198) (quoting the Dutch Cassation Judgment §§ 7.2, 8). Notably, in an analogous and related decision to stay enforcement litigation rendered in April 2021, the English High Court also concluded that the Russian Federation's arguments "on this issue should be regarded as having a realistic prospect of success."  English Judgment ¶¶ 73–83 (ECF 197-2) (summarizing the Russian Federation's contentions that Petitioners had "withheld documents that the Tribunal had ordered to be disclosed" and "made secret payments to one of their key witnesses of fact" during the arbitration).

As a result of the Dutch Supreme Court's decision to remand the case on November 5, 2021, therefore, the Awards no longer exist to be enforced and this Court's previous analysis as to "the lack of finality in the Dutch proceedings regarding resolution of issues highly pertinent in this case" remains fully applicable.  Second Stay Ruling 13.  Ultimately, "if the Dutch courts, which have primary jurisdiction" maintain or reaffirm the annulment of the Awards, then Petitioners will have nothing to enforce.  Further action at this juncture by this Court therefore "'may be a fruitless exercise' since 'the Shareholders may have 'no cause of action,' . . . making this case 'a paradigm example of a case warranting a stay where the legal viability of claims may rest on determinations in another legal proceeding.'"  *Id.* (quoting *TermoRio S.A. E.S.P. v. Electranta S.P. ("TermoRio II")*, 487 F.3d 928, 930 (D.C. Cir. 2007), and First Stay Ruling 17–18 (ECF 154)).

Moreover, if the stay is not extended and this Court proceeds toward enforcement prematurely, then the entire proceeding will be a waste of the Court's and parties' limited resources in the event that the Dutch courts ultimately rule in favor of the Russian Federation. "More expensive litigation involving more complex issues would result from such a situation." *Getma Int'l v. Republic of Guinea*, 142 F. Supp. 3d 110, 114 (D.D.C. 2015); *see, e.g.*, *Thai-Lao*

*Lignite (Thail.) Co. v. Gov't of the Lao People's Democratic Republic*, 864 F.3d 172, 189 (2d Cir. 2017) (upholding Rule 60(b)(5) vacatur of a U.S. judgment enforcing a Malaysian arbitral award, which had by that time been set aside by Malaysian courts after the U.S. court's enforcement of the same Malaysian arbitral award).  Any amounts paid to Petitioners or property seized by Petitioners then would be subject to restitution, which would lead to even further litigation and also burden the Court's and parties' limited resources.

This concern is also heavily impacted by "the sheer 'enormity'" of the Awards, as this Court previously found, given that the "more than $50 billion" is at issue.  Second Stay Ruling 23.  If Awards of this magnitude are enforced prematurely, then a considerable amount of wasteful litigation would be required to unwind any attachment or execution measures in the event of an annulment in the primary jurisdiction.  *Id.* at 15 ("Absent a stay, history may be forced to repeat itself with yet additional litigation to retrieve seized property.  To put it simply, this is a litigation quagmire that a stay would forestall . . . .").  In this particular case, such a prospect would also pose "a grave risk" of substantial harm to the Russian Federation, as well as to third parties—including significant waste of resources and unproductive expense, as well as the risk of non-restitution—because Petitioners are merely shell companies with no assets or funds of their own, and thus cannot provide "any guaranty of restitution."  Fifth Van den Berg Decl. ¶ 32 (ECF 180) (quoting the 2015 ruling by the Paris Court of Appeal in this case).

On these grounds, an extension of the stay is justified pursuant to the same considerations of judicial economy, international comity, and the balance of hardships that previously weighed in favor of staying this litigation in 2016 and 2020.  This Court's stay should be maintained— without any imposition of security—until the Dutch judicial system's final resolution of the set-aside proceedings.

## **BACKGROUND**

In 2017, as this Court is aware, the Russian Federation submitted its Statement of Defense in the Dutch set-aside proceedings and petitioned the Court of Appeal of The Hague to set aside the Awards on a number of grounds, including that Petitioners had committed a series of procedural frauds during the arbitration in violation of public policy under Article 1065(1)(e) of the Dutch Code of Civil Procedure ("DCCP") and transnational public policy (analogous to U.S. public policy as applied under Article V(2)(b) of the New York Convention). *E.g.*, Petitioners' Status Report ¶ 7 (ECF 166) (describing the Russian Federation's argument that "the Petitioners committed fraud in the arbitrations by making false statements and withholding documents, thereby violating a procedural order of the tribunal"); Russian Federation's Status Report ¶ 7 (ECF 167) (describing "the Russian Federation's arguments with respect to Petitioners' fraud on the international arbitrators").

In broad terms, this category of the Russian Federation's arguments are summarized (although "not exhaustively") in the Russian Federation's petition for cassation dated May 15, 2020. Cassation Petition ¶ 3 (ECF 176-2) (explaining that Petitioners "relied on . . . fraudulent statements," "withheld essential documents from the Tribunal," and made secret payments to a "'key' fact witness, Dr. A. Illarionov""); *see also* English Judgment ¶¶ 73–83 (ECF 197-2) (summarizing the Russian Federation's contentions that Petitioners had "withheld documents that the Tribunal had ordered to be disclosed" and "made secret payments to one of their key witnesses of fact" during the arbitration). Petitioners' commission of these procedural frauds violated Petitioners' duty of candor in the arbitration, and deprived the Tribunal with a sufficient and accurate factual record to adjudicate issues of the Tribunal's own jurisdiction, the admissibility of Petitioners' claims, and the merits of the dispute. The invalid Awards—which

direct the Russian Federation to pay billions of U.S. dollars in illegitimate compensation to Petitioners—arise directly from these procedural frauds, and thus are unenforceable.

No court or tribunal in the Netherlands, nor in any other jurisdiction, has yet adjudicated any factual or legal issues relating to Petitioners' procedural frauds during the arbitration.  This is because the Russian Federation prevailed in the Dutch District Court on different grounds, and, subsequently, as this Court has acknowledged, "on September 25, 2018, the Dutch Court of Appeal [in The Hague] rejected the Russian Federation's challenge to the Awards, based on alleged procedural fraud perpetrated by the Shareholders in the arbitration" based upon a misinterpretation of Dutch law.  Second Stay Ruling 5 (citing Judgment of the Court of Appeal of The Hague (ECF 167-1)).  Three years later, in its judgment of November 5, 2021, the Dutch Supreme Court agreed that in 2017, during the Dutch set-aside proceedings before the Court of Appeal of The Hague, the Russian Federation had properly raised its challenge with respect to fraud on the tribunal as a potential violation of public policy, and therefore reversed the 2018 judgment of the Court of Appeal.  Dutch Cassation Judgment §§ 5.1.8, 5.1.12.

Accordingly, as Petitioners have acknowledged, the Dutch Supreme Court has now remanded "'the case to the Amsterdam Court of Appeal' for 'further examination and decision'" on the factual and legal questions relating to "the Russian Federation's . . . allegations of [Petitioners'] fraud during the arbitration."  Petitioners' Status Report ¶ 5 (ECF 198) (quoting the Dutch Cassation Judgment § 8).  Over the course of 2022, therefore, the Amsterdam Court of Appeal will be faced with adjudicating—for the first time in any jurisdiction—at least the non-exhaustive categories of Petitioners' procedural frauds (set forth below) in relation to the invalidity of the Awards at issue in this case.

The Russian Federation reserves all rights to supplement this list as appropriate in the anticipated proceedings before the Amsterdam Court of Appeal, before this U.S. District Court, or before any other relevant court or tribunal.

*First*, during the arbitration, Petitioners falsely represented to the Tribunal that an independent trustee named Kelvin M. Hudson has "the power to exercise voting rights" with respect to the shares of Group Menatep Limited ("GML"), which is Petitioners' parent company. Petitioners' Rejoinder ¶ 384 (ECF 71-16).   In support of this fraudulent misrepresentation, Petitioners also caused an expert witness, Mr. Brian Green QC, to submit erroneous analysis of the relevant trust structures and trust documentation based upon false and incomplete information.   Second Green Op. ¶ 9(7), 22 (ECF 74-2) ("[T]he Trustees (and no other person) '*control*' the GML shares incontrovertibly vested in them – [because] under the Trusts the Trustees (and no other person) have the right to exercise the voting rights attaching to the GML shares. . . . [T]here is no doubt that the Trustees have 'meaningful control' over the voting rights attaching the GML shares – no other party does.").   As a result of Petitioners' false statements and erroneous expert testimony, the Tribunal explicitly adopted this false understanding with respect to the trustees' authority over GML.   *E.g.*, *Hulley Enterprises v. Russian Federation*, Interim Award (ECF 2-4) ("Mr. Green notes that . . . the Trustees retain voting powers . . . .   On this issue, the Tribunal finds Claimant's expert more convincing than Respondent's. . . . [P]rovisions exempting the Trustee from the duty to interfere . . . do not import that the Trustee loses the right to do so.").

At all relevant times, however, Petitioners were aware that the trustee, Kelvin M. Hudson, actually did <u>not</u> exercise GML's voting rights.   This is because, on April 3, 2003, the trustee had executed a Deed of Accession transferring GML's voting rights from the trustee to

one of the Russian Oligarchs, Mr. Platon Lebedev.  *See* Deed of Accession, dated Apr. 3, 2003, Declaration of Carolyn B. Lamm ("Lamm Decl.") Ex. 1 ("[W]e hereby transfer to Mr. Platon L. Lebedev voting rights on shares in Group MENATEP with regard to the issues concerning shareholding of YUKOS shares, including voting on YUKOS shares, and all issues relating to YUKOS activity whenever such activity is connected to executing of voting rights on stock in enterprises directly or indirectly held by Group MENATEP.").  Significantly, Petitioners never disclosed this 2003 Deed of Accession executed by the trustee, although Petitioners were subject to a continuing obligation of disclosure based upon the Tribunal's ruling on the Russian Federation's document requests.  *E.g.*, Procedural Order 12 (ECF 75-19) (granting the Russian Federation's Requests 4.3, 4.7, and 4.8).  It is also significant that Petitioners' representative throughout the arbitration was Mr. Timothy Osborne, who was a director of both Hulley Enterprises Limited and Yukos Universal Limited since 2008, and a director of GML since 2004. Osborne First Decl. ¶ 3 (Lamm Decl. Ex. 2).  At all relevant times, Mr. Osborne was necessarily aware that Petitioners' statements and Mr. Green's expert testimony regarding GML's voting rights were false and misleading.  Mr. Osborne, however, never made any attempt to correct the misunderstandings of the Tribunal or Petitioner's expert, Mr. Green, or to disclose the relevant information to the Russian Federation.

Petitioner's fraud prevented the Russian Federation from making its case with respect to the relationship between Petitioners and the Russian Oligarchs—including Mr. Lebedev, who evidently exercised voting rights with respect to Petitioners' parent company, GML.  This is reflected, in particular, in Paragraphs 1369-1370 of the 2014 Final Awards.  In those passages, the Tribunal incorrectly characterized Petitioners as "separate from" the Russian Oligarchs— whereas, in reality, the Russian Oligarchs owned and controlled Petitioners in all meaningful

respects, even exercised *de jure* control over the voting rights of GML, Petitioners' parent company.  *See, e.g.*, *Hulley Enterprises Ltd v. Russian Federation*, Final Award ¶ 1370 (ECF 2-1) (concluding that "Respondent has failed to demonstrate" a sufficient connection between Petitioners and "the Oligarchs," who were supposedly "separate from" Petitioners).

*Second*, in addition to the 2003 Deed of Accession with the trustee regarding GML's voting rights, as described above, Petitioners also withheld (at least) dozens of material documents pertaining to a wide range of other issues arising in the arbitration—including issues relating to the Tribunal's jurisdiction, the admissibility of Petitioners' claims, and the merits of the dispute with the Russian Federation.

For example, in relation to the merits, Petitioners were instructed to disclose all "minutes of meetings of . . . corporate bodies" relating to a pair of Yukos-related entities known as Stichting Administratiekantoor Financial Performance Holdings and Stichting Administratiekantoor Yukos International.  Procedural Order 12 (ECF 75-19) (granting the Russian Federation's Document Request 7.5, ECF 87-15).  Petitioners were evidently in possession of <u>more than thirty sets</u> of meeting minutes relating to these entities, but failed to disclose any of these documents during the arbitration.  *E.g.*, Minutes of the Thirty-Fourth Meeting of the Board of Directors (Lamm Decl. Ex. 15)); Minutes of the Twenty-Fifth Meeting of the Board of Directors (Lamm Decl. Ex. 14).  The role of these two entities (the "Stichtings") in transferring the illegally-obtained funds out of the Russian Federation and concealing the Russian Oligarchs' assets was extensively disputed during the arbitration and discussed by the Tribunal.  *E.g.*, *Hulley Enterprises Ltd v. Russian Federation*, Final Award ¶¶ 1141-46, 1810 (ECF 2-1) ("The Tribunal notes that even after the tax assessments at issue in the present arbitration were issued, Claimants and their owners were able to divert money earned by Yukos

8

out of Yukos, and into the two Stichtings, and therefore away from the tax authorities." (emphasis added)).  By depriving the Russian Federation of access to these dozens of material documents relating to the activities of the two Dutch Stichtings, Petitioners thus impaired the Russian Federation's ability to make its case on the merits.

Similarly, in relation to issues of jurisdiction and admissibility, Petitioners likewise concealed (at least) dozens of additional documents relating to the Russian Oligarchs' direct and indirect control over GML and Petitioners.  These documents included numerous items of correspondence, minutes of meetings, and contracts reflecting the intervention of the Russian Oligarchs in Petitioners' key business decisions—frequently involving transactions worth millions of U.S. dollars.  *E.g.*, Contracts between GML and Konstantin Kagalovsky dated Jan. 18, 2004, Lamm Decl. Ex. 3 (documenting two multimillion-dollar transactions entered into by the Russian Oligarch, Leonid Nevzlin, on behalf of Petitioners' parent company, GML, with an individual named Konstantin Kagalovsky); Notes of a Meeting Between GML and Leonid Nevzlin dated Dec, 12, 2003 (Lamm Decl. Ex. 4) (documenting Leonid Nevzlin's approval of GML's payments of more than US$ 740 million—to be made by Petitioner Yukos Universal Limited—to an entity in the BVI called Tempo Finance Limited, controlled by former Russian public officials involved in the Oligarchs' original illegal acquisition of their shares of Yukos Oil); Correspondence between GML and Excel-Serve Management Ltd., dated Jan. 19, 2004 (Lamm Decl. Ex. 5) (explaining that GML had retained a Cypriot firm that would provide "front runners to the Cyprus companies of the group, *i.e.* to provide individuals who . . . appear to be managing the companies by administering their bank accounts and signing all agreements," even though actual control would be retained continuously by the Russian Oligarchs).

Petitioners' concealment of these numerous documents (and many others) further impaired the Russian Federation's ability to demonstrate the factual and legal connection between Petitioners and the Russian Oligarchs, which directly contributed to the Tribunal's erroneous conclusions at Paragraphs 1369-1370 of the 2014 Final Awards regarding the admissibility of Petitioners' claims.  *E.g.*, *Hulley Enterprises Ltd v. Russian Federation*, Final Award ¶¶ 1370 (ECF 2-1)

*Third*, Petitioners evidently arranged for a secret payment of $200,000 to be made as an incentive for a key fact witness, Dr. Andrey Illarionov, to give testimony in favor of Petitioners' case on the merits.  *See* Transcript of Deposition of David Godfrey 269-270 (Lamm Decl. Ex. 6) (explaining that the "a contribution" was made by one of the Dutch Stichtings to a think tank in Washington, D.C., where Dr. Andrey Illarionov was (formerly) a senior research fellow, in exchange for Dr. Illarionov's "testimony" specifically because Dr. Illarionov had "asked for" this "donation"); Transcript of Witness Interview of Dmitry Merinson 10-11, (Lamm Decl. Ex. 7) ("In March 2013, there was a payment routed through the companies from among the Dutch Stichting structure in the amount of 200 thousand US dollars to A.N. Illarionov for the 'assistance' he rendered when testifying in the Dutch arbitration against the Russian Federation on the so-called 50-bln case."); *see also* Cassation Petition ¶ 3 (ECF 176-2) (explaining that "from a witness statement of Yukos' former General Legal Counsel (David Godfrey) in a US case between third parties, it follows that Dr. Illarionov had been paid out of Yukos funds hundreds of thousands US dollars, disguised as a donation to an institution.").

Petitioners never disclosed this secret payment in any of their statements of costs and expenses during the arbitration—even though Petitioners had disclosed millions of US dollars in other categories of payments made to their attorneys and expert witnesses. *See* Petitioners'

Submission on Costs ¶¶ 60, 63 (ECF 72-13) (itemizing more than US$ 10 million paid to expert witnesses during the arbitration, but omitting any reference to payments made to Dr. Illarionov). The concealment of this secret payment impaired the Russian Federation's ability to cross-examine Dr. Illarionov regarding a key factor affecting the credibility of his factual testimony. Significantly, the Tribunal explicitly "found Dr. Illarionov to be a credible and convincing witness," and observed that the Russian Federation's attorneys had not successfully "impeached" the credibility of Dr. Illarionov's testimony during the arbitration. *Hulley Enterprises Ltd v. Russian Federation*, Final Award ¶¶ 799 (ECF 2-1). The Tribunal also relied extensively on the testimony of Dr. Illarionov, as reflected in multiple references throughout the Final Awards regarding a variety of issues. It is evident, therefore, that Petitioners' failure to disclose the secret payments made to Dr. Illarionov amounted to a procedural fraud that undermined the Russian Federation's ability to make its case on the merits during the arbitration.

Accordingly, the Amsterdam Court of Appeal will be faced with deciding a number of factual and legal issues pertaining to the Russian Federation's arguments regarding Petitioners' commission of procedural frauds during the arbitration. None of the Russian Federation's arguments on these issues have previously been adjudicated by the Dutch courts or any other court. As explained by Dutch counsel, these proceedings "before the Amsterdam Court of Appeal can be expected to take at least one further additional year, as it is highly likely that the Amsterdam Court of Appeal will render an interim decision with respect to evidentiary matters" in accordance with Dutch law. Seventh Van den Berg Decl. ¶ 9. After the Amsterdam Court has issued a final judgment in relation to these issues, "either Petitioners or the Russian Federation may ultimately seek further review before the Dutch Supreme Court of Appeal by pursuing a second cassation appeal." *Id.* ¶ 8.

## ARGUMENT

The Court's authority "'to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants.'"  Second Stay Ruling 9 (quoting *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936)).

Indeed, as Petitioners themselves confirmed in the now-terminated mandamus proceedings before the D.C. Circuit (Case No. 20-7113), this Court's decisions in the 2016 and 2020 stay rulings were fully in line with the reasoning applied in 73% of similar cases that have come before this Court.  *See* Addendum B to Final Br. for Appellants, *Hulley Enterprises. v. Russian Federation,* No. 20-7113 (D.C. Cir. Aug. 4, 2021) (Doc. #1909009) (Lamm Decl. Ex. 8) (presenting a chart of D.D.C. stay decisions); *see also NextEra Energy Glob. Holdings B.V. v. Spain*, No. 19-CV-1618, 2020 U.S. Dist. LEXIS 180119, at *6–7 (D.D.C. Sept. 30, 2020) (granting stay of arbitral award enforcement against a foreign sovereign during parallel annulment proceedings); *CEF Energia, B.V. v. Italian Republic*, No. 19-CV-3443, 2020 U.S. Dist. LEXIS 130291, at *13–14, 24 (D.D.C. July 23, 2020) (same); *Unión Fenosa Gas S.A. v. Arab Republic of Egypt*, No. 1:18-CV-2395, 2020 U.S. Dist. LEXIS 98645, at *13–15 (D.D.C. June 4, 2020) (same); *Gretton Ltd. v. Republic of Uzbekistan*, No. 18-CV-1755, 2019 U.S. Dist. LEXIS 18990, at *7–20 (D.D.C. Feb. 6, 2019) (same); *Stati v. Republic of Kazakhstan*, 199 F. Supp. 3d 179, 193 (D.D.C. 2016) (same); *Getma*, 142 F. Supp. 3d at 114 (same).

The reasons for extending the stay, which this Court previously outlined in 2016 and 2020, remain equally persuasive—if not more so—in the aftermath of the Dutch Supreme Court's 2021 judgment.  Significantly, that judgment was not a final resolution of the Dutch annulment litigation and further underscores the uncertainty of the ultimate validity of these

Awards.  At present, the Awards do not exist to be enforced under Dutch law.  Seventh Van den Berg Decl. ¶ 5 (collecting Dutch legal authorities).  An extension of the stay is therefore justified pursuant to the same considerations of judicial economy, international comity, and the balance of hardships that previously weighed in favor of staying this litigation.

I.   **The "Same Reasons" that Justified the 2016 Stay and 2020 Stay Also Justify Extending the Stay**

A. **Judicial Economy and International Comity Favor Extending the Stay**

As this Court explained previously and consistently in 2016 and 2020, "[t]his is a paradigm example of a case warranting a stay where the legal viability of claims may rest on determinations in another legal proceeding" in the Dutch courts.  First Stay Ruling 18; Second Stay Ruling 13.  This observation as to judicial economy remains fully applicable at the current stage of litigation.

*First*, if the Russian Federation prevails in the Amsterdam proceedings—or in any subsequent proceedings before the Dutch Supreme Court, in the event that either party pursues a further cassation appeal—then the Awards thereafter will "not exist to be enforced" in the United States, as they will have been set aside with finality.  First Stay Ruling 20.  The basis for this sound conclusion is Article V(1)(e) of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 38 (the "New York Convention"), which the D.C. Circuit has explained as follows:

> Pursuant to [Article V(1)(e)] of the Convention, a secondary Contracting State normally <u>may not enforce</u> an arbitration award that has been lawfully set aside by a "competent authority" in the primary Contracting State. . . .

> [A]n arbitration award <u>does not exist to be enforced</u> in other Contracting States if it has been lawfully "set aside" by a competent authority in the State in which the award was made.

*TermoRio II*, 487 F.3d at 935–36 (emphasis added).

13

In other words, as this Court previously observed, "depending on the outcome of the Dutch proceedings, the Shareholders may have 'no cause of action'" whatsoever in the United States. First Stay Ruling 17–18 (quoting *TermoRio II*, 487 F.3d at 930). In those circumstances, the case before this Court would likely be subject to resolution on the straightforward basis of Article V(1)(e) of the New York Convention. *Id.* This stands in stark contrast to the course ahead if the Awards are not annulled, which would require this Court to proceed to evaluate its jurisdiction under the Foreign Sovereign Immunities Act ("FSIA") in light of complex issues of treaty interpretation, as well as considerations—among other issues—of whether the Awards are void as a matter of U.S. public policy under Article V(2)(b) of the New York Convention.

For the moment, however, the ultimate "outcome of the Dutch proceedings" remains unknown and uncertain, whereas the Awards presently "do not exist as a matter of Dutch law." Seventh Van den Berg Decl. ¶ 5. The Dutch Supreme Court specifically held that the Russian Federation is entitled to a full hearing as to whether the Awards were fraudulently procured and thus unenforceable as contrary to public policy. Dutch Cassation Judgment §§ 5.1.4, 5.1.19. The original reasoning of the Stay Ruling thus necessitates awaiting the Dutch courts' decision. *See Stati*, 199 F. Supp. 3d at 193 ("[T]he possibility that the pending set-aside proceeding could have a dramatic impact on the petition to confirm the arbitration award [justifies this Court's] exercise of its discretion [to] stay this confirmation proceeding.").

Accordingly, as this Court explained in both 2016 and 2020, a stay provides the best means of preserving judicial economy and avoiding a "litigation quagmire":

> If the Russian Federation receives an adverse determination from this Court, and then later receives a favorable ruling in the Dutch Supreme Court, not only would reconsideration litigation potentially arise here, but also litigation would proliferate over steps the Shareholders would likely take, in the wake of a decision from this Court to affirm the Awards, to attach and seize the Russian Federation's property in the United States. The Shareholders have already sought

> to attach and seize a number of the Russian Federation's assets in at least six different countries . . . , which apparently resulted in costly proceedings to retrieve the property when the Awards were set aside by the Dutch District Court in 2016 . . . .   Absent a stay, history may be forced to repeat itself with yet additional litigation to retrieve seized property.   To put it simply, this is a litigation quagmire that a stay would forestall . . . .

Second Stay Ruling 15 (citations omitted).   These same concerns remain valid at the present stage of this litigation.

**Second**, and relatedly, this Court further observed that staying these proceedings would provide the best means of litigating the present dispute efficiently and effectively, despite the temporary delay.   "'[A]lthough a stay would immediate[ly] delay the resolution of the parties' dispute, it would still 'likely be shorter than the possible delay that would occur if this court were to confirm the award and the [foreign court were to] . . . then set it aside' . . .   [T]he enforceability of the arbitral award is therefore in flux to such a degree that a stay is warranted." Second Stay Ruling at 16 (quoting *Getma*, 142 F. Supp. 3d at 114).

Many other courts have made the same observation in analogous cases.   *See CEF Energia*, 2020 U.S. Dist. LEXIS 130291, at *19 (observing that a stay pending set-aside in parallel litigation facilitates "the general objective of arbitration, which is to resolve disputes expeditiously"); *Unión Fenosa Gas*, 2020 U.S. Dist. LEXIS 98645, at *11 (noting the "merit in pausing" enforcement proceedings where set-aside proceedings are ongoing); *Novenergia II – Energy & Env't (SCA) v. Kingdom of Spain*, No. 18-cv-01148, 2020 U.S. Dist. LEXIS 12794, at *10 (D.D.C. Jan. 27, 2020) ("A hasty resolution resulting in inconsistent rulings is not in the interest of judicial economy."); *Masdar Solar & Wind Coop. U.A. v. Kingdom of Spain*, 397 F. Supp. 3d 34, 39–40 (D.D.C. 2019) (acknowledging that the consequences of premature enforcement are "precisely the opposite of what arbitration attempts to promote: the swift and (relatively) simple disposition of litigation"); *Gretton*, 2019 U.S. Dist. LEXIS 18990, at *11 ("If

the Court were to side with [one of the parties] now and then [the other party] were to win on appeal in [the primary jurisdiction], [the parties] could well be back in a U.S. court . . . litigating some of the issues raised in this case all over again.  That is hardly the kind of efficient dispute resolution that arbitration is meant to serve."); *Alto Mar Girassol v. Lumbermens Mut. Cas. Co.*, No. 04-CV-7731, 2005 U.S. Dist. LEXIS 7479, at *11–12 (N.D. Ill. Apr. 12, 2005) ("[T]his delay is likely shorter than the possible delay that would occur if this Court confirms the award and the [foreign] court ultimately sets the award aside resulting in further litigation likely involving more complex issues.  Waiting for the [foreign] court to rule will also likely aid in the avoidance of more expensive additional litigation that could arise.").

Indeed, this possibility (*i.e.*, set-aside <u>after</u> enforcement) is not merely a hypothetical problem.  This is exactly what occurred, for example, during the seven-year history of *Thai-Lao Lignite*, 864 F.3d at 189.  In 2010, the petitioners in that case requested that the U.S. district court recognize a Malaysian arbitration award under the New York Convention.  *Id.* at 175–76, 178.  The U.S. district court issued a judgment granting the recognition in 2011, which was upheld by the Second Circuit in 2012.  *Id.* at 179.  Five months later, a Malaysian first-instance court rendered a judgment setting aside the arbitral award under Malaysian law.  *Id.* at 180.  The Malaysian appellate court subsequently affirmed the first-instance judgment in early 2014.  *Id.* This change in circumstances then obligated the U.S. district court to vacate its prior judgment recognizing the Malaysian arbitral award under Rule 60(b)(5) of the Federal Rules of Civil Procedure.  *Id.* at 180–81.  The Second Circuit finally affirmed, although not until after the *Thai-Lao Lignite* proceeding had regrettably wasted the U.S. courts' time and resources for <u>seven years</u>.  *Id.* at 191.

This Court's prior stay rulings prudently avoided this scenario and the resulting consequences of premature enforcement.  First Stay Ruling 20–21 (noting that the Second Circuit had remanded a case after the courts of the primary jurisdiction annulled an arbitral award while the U.S. appeal was still pending in *Corporación Mexicana de Mantenimiento Integral. S. de R.L. de C.V. v. Pemex Exploración y Producción*, No. 10-4656-cv, 2012 U.S. App. LEXIS 27054 (2d Cir. Feb. 16, 2012)); Second Stay Ruling 15–16 (listing the consequences of set-aside after enforcement).  This Court should once again extend the stay for the same reasons.

***Third***, staying this litigation to await the Dutch courts' final decision would also best ensure respect for international comity.  "Denying the stay would also risk the possibility of inconsistent results in the primary and secondary jurisdictions, . . . the Russian Federation initiated the set aside proceedings prior to the instant Shareholders' suit to enforce the Awards, and no suggestion has been made that the Dutch litigation was brought merely to 'hinder or delay resolution of the dispute.'"  Second Stay Ruling 17 (quoting *Europcar Italia, S.p.A. v. Maiellano Tours, Inc.*, 156 F.3d 310, 318 (2d Cir. 1998)).  As this Court explained, "comity considerations support granting a stay: the foreign proceedings were initiated prior to the instant action, and the foreign court has already taken action on the merits."  First Stay Ruling 25–26 (citing *Sumitomo Corp. v. Parakopi Compania Maritima, S.A.*, 477 F. Supp. 737, 741–42 (S.D.N.Y. 1979), *aff'd*, 620 F.2d 286 (2d Cir. 1980)).

Accordingly, the concerns for staying these proceedings remain fundamentally unchanged from the Court's prior Stay Rulings.  Because Petitioners' enforcement claims rest or "will be informed" by the determinations made by the Amsterdam Court of Appeal or the Dutch Supreme Court in any subsequent proceedings, both judicial economy and international comity

continue to weigh heavily in favor of extending the stay.  *See* Second Stay Ruling 21.

### B.  The Balance of Hardships Favors Extending the Stay

Further, as the Court also previously determined, the balance of hardships also "weigh[s] decidedly in favor of the stay."  Second Stay Ruling 28.

*First*, as this Court previously found with respect to "the sheer 'enormity'" of the Awards, the Russian Federation "would be 'heavily burdened if unjustifiably compelled to pay" the "more than $50 billion" at issue. . . .  Given that the Awards represent the largest arbitral tribunal award in history, . . . the Russian Federation's claim that *unjustifiable* payment presents a hardship carries significant weight."  Second Stay Ruling 23; *see also Unión Fenosa Gas*, 2020 U.S. Dist. LEXIS 98645, at *12–13 (concluding, with respect to a US$ 2 billion award, that "[t]he Court is loath to plunge so deeply into a sovereign's treasury . . . if there is a chance that the award might be set aside or mitigated to some extent").

In this regard, Petitioners have consistently demonstrated[1] that, if the stay is not extended, they will resume their aggressive strategy to seize the property of the Russian Federation—and the property of numerous third parties—regardless of the status of the Dutch proceedings. Courts in this Circuit repeatedly have emphasized the danger resulting from potential seizures of a foreign State's assets during any potential execution phase if the validity of the award remains in flux.  *Getma*, 142 F. Supp. 3d at 118 ("The Court finds that 'there would be very real harm to [the foreign sovereign State] were [this Court] to confirm the award, [the petitioners] were take

---

[1]  *E.g.*, First Witness Statement of Tobias Cohen Jehoram, Ex. H ¶ 120 (ECF 181-51) (noting that in May 2020, Petitioners attached vodka trademarks belonging to a third-party registered in The Netherlands.  A Dutch court subsequently concluded that the attachments were unlawful and dissolved them.  *See FKP Sojuzplodoimport v. Hulley Enters. Ltd.*, Hague Dist. Ct., Judgment, October 27, 2020, ECLI:NL:RBDHA:2020:10708 ¶ 5.1 (Neth.) ("lift[ing] the attachment imposed by [Appellants] on the trademarks referred to" (attorney translation)) https://uitspraken.rechtspraak.nl/inziendocument?id=ECLI:NL:RBDHA:2020:10708.

action to execute on the judgment, and the . . . [the primary jurisdiction's] court were to later determine that the award was improper.'") (quoting *Jorf Lasfar Energy Co., S.C.A. v. AMCI Exp. Corp.*, No. 05-0423, 2005 U.S. Dist. LEXIS 34969, at *10 (W.D. Pa. Dec. 22, 2005); *Novenergia II*, 2020 U.S. Dist. LEXIS 12794, at *10 ("[T]he risk of premature enforcement could result in Spain trying to recover assets seized during this action if it were to prevail in the [primary jurisdiction]."); *Masdar Solar*, 397 F. Supp. 3d at 40 (noting the hardship to a foreign State arising from "ultimately having to recover assets seized during this action should the annulment proceeding go its way").

Indeed, any attempts to recover assets seized by Petitioners during the subsequent potential execution phase would face an additional problem. As explained by the Paris Court of Appeal in 2015, the fact that Petitioners are offshore shell companies with no assets or genuine business activities creates a "grave risk" of injury to the Russian Federation or third-party entities whose assets may be attached in satisfaction of the Awards in the absence of any "guaranty of restitution." Fifth Van den Berg Decl. ¶ 32 (quoting 2015 Paris ruling). As this Court is aware, Petitioners are three offshore shell companies based in Cyprus and the Isle of Man. Petitioners admit that they do not engage "in any substantial business activity in [their] respective place[s] of organization (or elsewhere) other than the holding of investments in other entities." Letter of Nov. 3, 2006 (ECF 48-19). Petitioners' documented history of participating in the Russian Oligarchs' money-laundering activities and other deceptive schemes thus creates even further risks to those affected by seizures of assets. *See* Sixth Van den Berg Decl. ¶¶ 29–36 (ECF 182-1) (documenting repeated instances of kickback payments, misappropriation of funds, obstruction of tax inquiries, destruction of evidence, and false statements regarding the control of various legal entities).

**Second**, both parties agree that the courts in the Netherlands have primary jurisdiction over the Awards.  *See, e.g.*, Letter of Aug. 2, 2005 (ECF 78-2) (recognizing the Netherlands to be the "legal seat" for the arbitration).  Both parties have availed themselves of the legal and procedural protections afforded under Dutch law and continue to do so.  As explained above, the Amsterdam Court of Appeal must decide a number of factual and legal issues pertaining to the Russian Federation's arguments regarding Petitioners' commission of procedural frauds during the arbitration.  None of these issues have previously been adjudicated by the Dutch courts or  by any other court.  Seventh Van den Berg Decl. ¶¶ 2, 9.  If the Amsterdam Court of Appeal accepts and confirms the Russian Federation's arguments on procedural fraud, then the Awards will "not exist to be enforced" in the United States.  *Id.* ¶ 5.  Attempting to anticipate the results of the Amsterdam proceedings would create an unnecessary hardship for the Court and both parties.  As this Court previously ruled, that hardship cannot be eliminated unless this parallel U.S. lawsuit is stayed.  First Stay Ruling 22.  "[D]enial of a stay could result in incongruous outcomes that would produce repetitive and unnecessary briefing." Second Stay Ruling 24.

For these reasons, courts have noted that a foreign sovereign State would "undeniably be burdened by having to attack the validity of the arbitral award in two forums," particularly where the foreign court (and not the U.S. court) exercises primary jurisdiction.  *Masdar Solar*, 397 F. Supp. 3d at 40; *Unión Fenosa Gas*, 2020 U.S. Dist. LEXIS 98645, at *12 (same); *see also Novenergia II*, 2020 U.S. Dist. LEXIS 12794, at *10 ("Balancing the hardships to each party also favors a stay. Litigating the validity of arbitral awards in two forums would burden Spain . . . ."); *Gretton*, 2019 U.S. Dist. LEXIS 18990, at *19 (noting "the unfairness to Uzbekistan of having to defend itself simultaneously in two fora"); *Getma*, 142 F. Supp. 3d at 118 ("Moreover, as explained above, a premature confirmation and enforcement of the award would essentially

eviscerate [the respondent's] bargained-for right to have the arbitral award reviewed by [the courts of the primary jurisdiction].").

*Third*, Petitioners can be expected to argue once again a purported "interest in expeditiously collecting an award." *Masdar Solar*, 397 F. Supp. 3d at 40.  When balanced against the other relevant factors and hardships, however, other courts in this Circuit have attributed little weight to this element, *id.*, particularly because post-award interest can easily compensate for delay.  Accordingly, "[f]ar from being at odds with the nature of arbitration confirmation proceedings, adjournments pending the completion of set-aside proceedings are an integral part of such proceedings." *Novenergia II*, 2020 U.S. Dist. LEXIS 12794, at *8 (quoting *CPConstruction Pioneers Baugesellschaft Anstalt (Liechtenstein) v. Republic of Ghana, Ministry of Roads & Transp.*, 578 F. Supp. 2d 50, 54 (D.D.C. 2008)).  Indeed, during the arbitration proceedings, Petitioners were advised by experienced arbitration counsel who fully understood this aspect of arbitration.

Most recently, this Court addressed this issue comprehensively in *Novenergia II*, where it concluded as follows:

> The court acknowledges that this dispute has dragged on for over four years and a ruling in the Swedish court may not be imminent. The parties anticipated a decision sometime in 2019 and a referral to the EU Court of Justice could extend the proceedings into 2021 or 2022.  . . .  [Petitioner] argues that the delay from the Swedish proceedings weighs heavily against a stay . . . .  However, the length of delay is not the only consideration here. . . . [Moreover,] if Novenergia ultimately prevails it will be compensated for any delay because the award includes interest. . . . Thus, the hardship to Spain, which could be significant, outweighs the hardship to Novenergia.

2020 U.S. Dist. LEXIS 12794, at *9–11.

It is well established that "the length of delay is not the only consideration," *id.* at *9, and, if Petitioners prevail, they "will be compensated for any delay because the award includes interest." *Unión Fenosa Gas, S.A.*, 2020 U.S. Dist. LEXIS 98645, *14 (quoting *Novenergia II*,

2020 U.S. Dist. LEXIS 12794, at *9–11).   Moreover, Petitioners have never cited any more particularized harm resulting from delay.   Nor can they do so with respect to Petitioners themselves (offshore shell companies with no expenses) or Petitioners' principals (Russian Oligarchs with personal assets worth billions of dollars).   *Cf.* Sixth Van den Berg Decl. ¶¶ 12, 29 (ECF 182-1).

Following the same reasoning, therefore, this Court must conclude that the balance of hardships weighs in favor of extending the Stay Ruling.

**II.   This Court's Previous Decision Not to Order Prejudgment Security Was Correct**

As a condition of the stay in 2020, Petitioners requested "suitable security" under Article VI of the N.Y. Convention.   *See* Petitioners' Opp'n 38 (ECF 181).   This Court properly denied that request and further observed that, in any event, Article VI is not applicable to the present case.   Second Stay Ruling 29 ("Indeed, the Shareholders' reliance on the New York Convention provision expressly authorizing a stay with posting of a bond . . . is not applicable here since the Court is relying on its inherent authority to control its docket by issuing a second stay." (emphasis added)).   To the extent Petitioners again seek security as a condition of the stay, that relief should again be denied.

**A.  Prejudgment Security Is Prohibited by the FSIA**

Imposition of security as a condition of the stay would violate the Russian Federation's immunity from pre-judgment attachment under the Foreign Sovereign Immunities Act ("FSIA"), as codified at 28 U.S.C. § 1609.   *See Pine Top Receivables of Ill., LLC v. Banco de Seguros del Estado*, 771 F.3d 980, 984 (7th Cir. 2014); *Stephens v. Nat'l Distillers*, 69 F.3d 1226, 1229 (2d Cir. 1995).   As this Court previously emphasized, "the authority and mechanisms to order the Russian Federation to post security . . . face[] a significant obstacle when this Court has not

resolved threshold jurisdictional issues under the FSIA or New York Convention."  Second Stay Ruling 29.

In this regard, other judges of this Court have routinely declined requests for foreign sovereigns to post prejudgment security—particularly when unresolved jurisdictional issues under the FSIA remain for decision.  *See e.g., Flanagan v. Islamic Republic of Iran*, 190 F. Supp. 3d 138, 183 n.30 (D.D.C. 2016) (rejecting a request for a foreign sovereign to post security); *see also CEF Energia*, 2020 U.S. Dist. LEXIS 130291, at *23 ("[T]his Court has not yet determined whether it has jurisdiction [over Italy]; therefore, it is not clear that it has the authority to order the posting of security pursuant to [Article VI of the New York] Convention."); *Novenergia II*, 2020 U.S. Dist. LEXIS 12794, at *16 (explaining that courts "generally have not required foreign sovereigns to post security because they are 'presumably . . . solvent'") (internal citations omitted).  The District Court in *Thai-Lao Lignite* also rejected a request for security and was upheld by the Second Circuit.  *See* 864 F.3d at 190 ("The District Court made clear that even if the FSIA did not preclude it from entering such an order, it would decline in its discretion to do so.").

As these precedents reflect, the FSIA expressly grants immunity from prejudgment security.  Two circuit courts have thus ruled expressly that a "prejudgment security requirement" constitutes an "attachment" prohibited under § 1609, absent an exception or explicit waiver under 28 U.S.C. § 1610: "'There is . . . no significant distinction between [a prejudgment] security requirement and an attachment of the property.'"  *Pine Top Receivables of Ill.*, 771 F.3d at 984 (quoting in full *Stephens*, 69 F.3d at 1229).  Indeed, Petitioners conceded this point at an earlier stage of this litigation, as they must.  Petitioners' Opp'n 39 n.34 (ECF 181) ("The

statutory reference to 'attachment prior to the entry of judgment' includes orders to post security.").

Immunity from prejudgment security is not abrogated under the FSIA unless "the foreign state has <u>explicitly</u> waived its immunity from attachment prior to judgment."  28 U.S.C. § 1610(d)(1) (emphasis added).  An explicit waiver "must demonstrate unambiguously the foreign state's intention to waive its immunity from prejudgment attachment in [the United States]."  *De Sousa v. Embassy of Angola.*, 229 F. Supp. 3d 23, 27 (D.D.C. 2017) (collecting cases).  Petitioners have never identified any such explicit waiver by the Russian Federation.

### B.  Prejudgment Security Is Not Legally Appropriate or Necessary

Even if this Court had jurisdiction under the FSIA to require prejudgment security during a stay (which it does not), such security is not appropriate or necessary here.

*First*, the Dutch Supreme Court's Judgment presents no circumstances that justify a departure from the Court's sound reasoning that Petitioners' prior request for prejudgment security was unwarranted.  Second Stay Ruling 28–29 (observing that Petitioners' contentions were "not so extreme as to warrant disregarding existing precedent" rejecting prejudgment security against foreign sovereigns).  Indeed, this Court correctly found that "the Russian Federation is a sovereign country . . . , not an insecure potential debtor that must be required to post security lest there be no assets to seize at a later date."  *Id.* at 29.  Petitioners do not (and cannot) point to anything that undermines this Court's previous findings on this point.

*Second*, as multiple judges of this Court have previously observed, foreign sovereigns are presumptively solvent. *See, e.g.*, *Novenergia II,* 2020 U.S. Dist. LEXIS 12794, at *16 ("[C]ourts in this Circuit generally have not required foreign sovereigns to post security because they are

24

'presumably solvent . . . .'") (internal citations omitted); *CEF Energia*, 2020 U.S. Dist. LEXIS 130291, at *23 (same).

      This understanding, moreover, is confirmed by data published by the U.S. Government concerning Russian trade and investment flows, including data included with Petitioners' own previous submissions.  Petitioners' Opp'n 44 (ECF 181); U.S. Census Bureau, "Trade in Goods with Russia" 2 (ECF 181-33) (indicating that the United States imported US$ 22.3 billion worth of goods from the Russian Federation in 2019).  The public data confirms the same situation today.  *See, e.g.*, U.S. Census Bureau, "Trade in Goods with Russia" (Lamm Decl., Ex. 9) (indicating imports of US$ 25 billion worth of goods from the Russian Federation, year-to-date October 2021); World Bank Group, "Russia's Economic Recovery Gathers Pace, Says New World Bank Report," May 26, 2021 (Lamm Decl., Ex. 10).  Further, independent reports published by the International Monetary Fund ("IMF") and the World Bank Group ("WBG") reflect the Russian Federation's economic strength and stable position. *See* IMF Country Report No. 21/36 at 2 (February 2021) (Lamm Decl., Ex. 11); WBG Russia Economic Report at 12, 14 (December 2021) (Lamm Decl., Ex. 12) (reporting that "Russia saw strong growth in 2021"). Petitioners cannot present any evidence of financial insecurity that would justify a departure from this Court's previous decision and other established authority concerning sovereign defendants.  In this regard, it is significant that another judge of this Court has expressly rejected the argument previously made by Petitioners that a stay is justified by an alleged "risk that [a sovereign respondent] may not satisfy the judgment."  *Flanagan*, 190 F. Supp. 3d at 183 n.30.

      Accordingly, to the extent Petitioners again seek security as a condition of the stay, that relief should be denied as both contrary to the FSIA and inappropriate in the present case.

## **CONCLUSION**

For these reasons, the Russian Federation respectfully requests that the Court grant the

Motion to Extend the Stay.

Date:  December 10, 2021                        Respectfully submitted,

**WHITE & CASE**LLP

*/s/ Carolyn B. Lamm*
Carolyn B. Lamm (D.C. Bar No. 221325)
Nicolle Kownacki (D.C. Bar No. 1005627)
David P. Riesenberg (D.C. Bar No. 1033269)
701 Thirteenth Street, NW
Washington, DC 20005
Phone: (202) 626-3600
Fax: (202) 639-9355
clamm@whitecase.com

*Counsel for the Russian Federation*

26