UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

HULLEY ENTERPRISES LTD.,
YUKOS UNIVERSAL LTD., and
VETERAN PETROLEUM LTD.,

                    *Petitioners,*

v.

THE RUSSIAN FEDERATION,

                    *Respondent.*

Case No. 1:14-cv-01996-BAH

**PETITIONERS' SUR-REPLY BRIEF IN OPPOSITION TO THE RUSSIAN FEDERATION'S MOTION TO EXTEND THE STAY**

# TABLE OF CONTENTS

NECESSITY FOR THIS SUR-REPLY BRIEF ...............................................................................1

ARGUMENT .....................................................................................................................................2

    I.    The Remaining Proceedings in the Amsterdam Court of Appeal Are Irrelevant to the Sovereign Immunity Defense .......................................................2

        A.    The Russian Federation's "Overlapping Issues" Are Irrelevant ..................2

        B.    "Ground for Cassation 4" Cannot Be Reconsidered, And Is Irrelevant to the Sovereign Immunity Defense In Any Event .....................3

    II.    "International Comity" Does Not Require this Court to Wait—For Years—For Some *Other* Case to Reach the Court of Justice of the European Union .................................................................................................4

    III.    Resolving Sovereign Immunity Will Not Entail A Significant "Burden" on the Court or the Parties .......................................................................................5

    IV.    The Russian Federation's Likelihood of Success, in the Remaining Dutch Proceedings, Is Extremely Low ..................................................................7

        A.    The Reply Misrepresents the April 2021 English High Court Ruling ...........................................................................................................7

        B.    The Russian Federation Misrepresents the Standard that the Amsterdam Court of Appeal Will Apply .....................................................8

        C.    The Russian Federation Has No Evidence that Petitioners Committed Any Impropriety Whatsoever During the Arbitrations .................................................................................................9

            1.    The Deed of Accession Proves Nothing .........................................9

            2.    The *Littop v. Ukraine* Arbitral Award Is Inadmissible ..................10

            3.    The Merinson "Protocol of Witness Interview" Is Inadmissible .....................................................................................10

    V.    The Reply Misstates the Dutch Media Reports and Misattributes Statements to the Dutch Judiciary ............................................................................11

CONCLUSION ..................................................................................................................................13

## NECESSITY FOR THIS SUR-REPLY BRIEF

The Russian Federation's 23-page Reply Brief, and its *four* declarations, contain much that is new. Most of the new submissions are misleading or, worse still, misrepresent the documents. This sur-reply brief is limited to specific rebuttals of the new material and the correction of false statements contained in the Reply.

For instance, the Reply makes the outrageous claim that "Petitioners now concede" that "Petitioners told false statements" to the Arbitral Tribunal. Dkt. 208 ("Reply"), at 4 (citing nothing). Petitioners made no such concession. Another example is the Reply's misrepresentation of Dutch media reports as having quoted the Dutch Supreme Court's "press justice" as stating that the Russian Federation is "not obliged to pay" and that "Russian state property abroad cannot be seized." *Id.* at 5 & 19. The Dutch documents (which the Reply did not translate) do not contain these quotations.

It is telling that the Reply relies on false statements and misrepresentations of untranslated documents. This conduct further demonstrates that there is no legitimate justification for the Russian Federation's request that this Court delay its resolution, of the Russian Federation's sovereign immunity defense, until the decision of the Amsterdam Court of Appeal (as the Russian Federation now requests).[1]

---

[1] The Russian Federation originally sought a stay "pending the final resolution of the Dutch set-aside proceedings for the arbitral awards." Dkt. 201-2 (Proposed Order). The Reply now limits its request to a stay pending "resolution of the proceedings before the Amsterdam Court of Appeal." Reply, at 23.

1

# ARGUMENT

I. **The Remaining Proceedings in the Amsterdam Court of Appeal Are Irrelevant to the Sovereign Immunity Defense**

   A. **The Russian Federation's "Overlapping Issues" Are Irrelevant**

The Reply contains a table of five supposedly "overlapping issues," and contends that these are "factual questions to be decided by the Amsterdam Court" that are relevant to the sovereign immunity defense. Reply, at 2-3.

This list of "overlapping issues" is a work of fiction. No substantive submissions, in which the parties set out their position as to the issues to be decided, have yet been filed in the Amsterdam Court of Appeal. *See* Dkt. 204-2 (Second Cohen Jehoram Decl.) ¶ 45. The Russian Federation's only cited authority, for the proposition that the Amsterdam Court may take up its wish-list of "issues," is paragraph 27 of the Eighth van den Berg Declaration. *See* Reply, at 2 (citing Dkt. 212 ¶ 27). But that paragraph (and the rest of van den Berg's Declaration) provides no authority or analysis. This new "list" is pure *ipse dixit*, intended to delay the proceedings before this Court.

In any event, none of these five "issues" has anything to do with "the existence of an arbitration agreement," which is the *only* element of the FSIA's "arbitration exception" that has ever been in dispute in this proceeding. *LLC SPC Stileks v. Republic of Moldova*, 985 F.3d 871, 877 (D.C. Cir. 2021) (stating the elements of the "arbitration exception").

The Reply now contends that three of these supposedly "overlapping issues" somehow relate to the arbitrability of *this specific* dispute. *See* Reply, at 9. But this "arbitrability" defense is irrelevant to the FSIA's "arbitration exception." In *Stileks*, Moldova tried just this argument: It contended that the petitioner "was not a qualifying investor" under the ECT. 985 F.3d at 878. In other words, Moldova argued that "[a]lthough the ECT may establish that Moldova agreed to arbitrate certain disputes, it does not prove that it agreed to arbitrate this *particular* dispute." *Id.*

This is the Russian Federation's new argument, here. *Stileks* squarely rejected it: "The arbitrability of a dispute is not a jurisdictional question under the FSIA. . . . The FSIA's arbitration exception therefore applies and we reject Moldova's immunity claim." *Id.* (cleaned up). The D.C. Circuit reached a similar conclusion in *Chevron v. Ecuador*, holding that Ecuador's defense—that the lawsuits at issue were not "investments" within the meaning of the bilateral investment treaty—was irrelevant to the FSIA's "arbitration exception." 795 F.3d 200, 205 (D.C. Cir. 2015).

> B. **"Ground for Cassation 4" Cannot Be Reconsidered, And Is Irrelevant to the Sovereign Immunity Defense In Any Event**

In an effort to find *some* issue relevant to sovereign immunity, still pending in the Dutch courts, van den Berg pivots to another challenge that the Russian Federation lost in the Dutch Supreme Court: "Ground for cassation 4." Dkt. 212 (van den Berg Eighth Decl.), ¶¶ 30-34.

For three reasons, Ground for Cassation 4 is irrelevant to this Court's resolution of the sovereign immunity defense. *First*, none of the arguments in that Ground have anything to do with the elements of the FSIA's "arbitration exception," because none of them have the slightest bearing on whether the ECT contains an "agreement to arbitrate." The Reply cites no authority. Settled D.C. Circuit is squarely to the contrary. *Stileks*, 985 F.3d at 878 (listing the three "elements" of the "arbitration exception," none of which concerns the alleged "illegality" of the investment); *Chevron*, 795 F.3d at 206 (same).

*Second*, Ground for Cassation 4 was *rejected* by the Dutch Supreme Court and cannot be further reconsidered by the Amsterdam Court of Appeal. Dkt. 204-8 (Second Cohen Jehoram Decl.) ¶ 44. Neither of the new declarations, attached to the Reply Brief, cites any Dutch case law or other authority for the proposition that the Amsterdam Court of Appeal may revisit a Ground for Cassation that the Dutch Supreme Court rejected.

3

*Third*, the Reply misrepresents the basis for the Hague Court of Appeal's decision. That court—after receiving into evidence many of the documents now attached to the Russian Federation's Stay Motion, and after hearing all of the allegations now made by the Russian Federation—still found no "public policy" violation, *even assuming that the Russian Federation's allegations were all true*:

> The court of appeal concluded that there is insufficient connection between the alleged illegal acts in 1995/1996 and the investment [in Yukos] by HVY. This finding was based on a consideration and evaluation of *the facts put forward by the Russian Federation in this regard, which the court of appeal presumed for the sake of argument to be correct.*

Dkt. 204-8 (Dutch Supreme Court Judgment) ¶ 5.4.4. In other words—even if one were to "presume[] for the sake of argument" that the "facts put forward by the Russian Federation" *in the Dutch courts* (regardless of whether those facts were also presented to the Tribunal), were "correct," the Awards still do not violate "public policy."

## II. "International Comity" Does Not Require this Court to Wait—For Years—For Some *Other* Case to Reach the Court of Justice of the European Union

The Reply makes another new argument as to why this Court should stay its resolution of the sovereign-immunity defense. Relying on the declaration of Sir Nicholas Forwood—an attorney at the law firm of White & Case, which represents the Russian Federation here—the Reply contends that "international comity" requires this Court to refrain from "wad[ing] . . . into" the interpretation of what constitutes an "investment" under the ECT. Reply, at 10. Instead, the Russian Federation argues, this Court should wait—for years? for decades?—until the Court of Justice of the European Union (the "CJEU") provides further "guidance." *See* Reply, at 9-10.

Forwood concedes that the CJEU will not provide any further "guidance" in this particular case. Dkt. 210 (Forwood Decl.) ¶ 3. Instead, Forwood argues that the Dutch Supreme Court got it wrong, and speculates that the CJEU might one day reach a different decision "*if . . . the EU Court of Justice has occasion*" to consider the question in some *other* case. *Id.* ¶ 13 (emphasis added).

4

Forwood does not identify any specific case in which the CJEU is likely to address the question; does not offer any prediction as to when such a case might reach the CJEU; and does not assert that the Amsterdam Court of Appeal will consider this question. *See generally id.*

Neither the Reply nor Forwood cites any authority for the proposition that this Court should stay its hand *indefinitely* pending the outcome of some *other* unspecified case. There is no "pressing need" that would justify such an "immoderate" stay. *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 668 F.3d 724, 732 (D.C. Cir. 2012) (granting writ of mandamus, and directing district court to lift "indefinite" stay, where the award-debtor had "fail[ed] to show . . . when such a resolution [by the foreign court] is likely to be reached").

### III. Resolving Sovereign Immunity Will Not Entail A Significant "Burden" on the Court or the Parties

The Reply now contends that even *briefing* the Russian Federation's sovereign-immunity defense would entail an "onerous burden," because it might "involve an inquiry into numerous issues of foreign law . . . and jurisdictional facts" that would require "evidentiary hearings and cross-examination of witnesses." Reply, at 7-8. This concern is greatly overstated. It is settled law that confirmation proceedings, like this one, are "summary" in nature. *Argentine Republic v. Nat'l Grid Plc*, 637 F.3d 365, 369 (D.C. Cir. 2011).

The Reply is also wrong when it contends that "collateral estoppel is inapplicable to litigation under the New York Convention." Reply, at 9 n.3. On the contrary, the Restatement (Third) of The U.S. Law of International Commercial Arbitration makes clear that "a U.S. court," when "requested to grant post-award relief"—such as the confirmation sought here—should "give[] issue preclusive effect to those findings [of the foreign set-aside courts] that are relevant to challenges to the award in the recognition and enforcement proceeding." Restatement (Third)

U.S. Law of Int'l Comm. Arb. § 4.8 cmt. c(ii) (2019)[2]; *see also Reddy v. Buttar*, 2020 WL 2134191, at *8-9 (W.D.N.C. May 5, 2020) (confirming arbitral award under the New York Convention, and giving preclusive effect to arbitral tribunal's rejection of respondent's challenge to personal jurisdiction).

One of the reasons this Court gave, for entering previous stays, was that the Dutch proceedings would simplify the issues to be resolved—including specifically the question of whether the ECT contains an agreement to arbitrate. Dkt. 194, at 12-13 (Mem. Op.) (Nov. 20, 2020); *see also id.* at 17-18 (noting the Russian Federation's argument that "the Dutch Supreme Court may resolve issues concerning the proper interpretation and application of the ECT," and further noting that "United States courts generally and appropriately defer to the foreign courts selected by the parties as the primary jurisdiction to determine relevant issues according to their own law.").

The Reply cites no D.C. Circuit authority holding that issue preclusion does not apply to confirmation proceedings under the New York Convention. In *Chevron v. Ecuador*—the sole D.C. Circuit case cited for this proposition in the Reply—the D.C. Circuit was not asked to consider,[3] and did not consider *sua sponte*,[4] whether the findings of the Dutch courts had issue-preclusive effect. The district court, in the *Chevron* case, issued its judgment confirming the arbitral awards

---

[2] The most recent version of the Restatement (Third) is the Proposed Final Draft, released on April 24, 2019. Shortly after that Draft was released, the American Law Institute (ALI) formally approved it as final. ALI, Press Release, *Restatement of The U.S. Law of International Commercial and Investor-State Arbitration Is Approved* (May 20, 2019), https://www.ali.org/news/articles/restatement-us-law-international-commercial-and-investorstate-arbitration-approved/.
[3] *Chevron v. Ecuador*, Brief of Appellees, No. 13-7103, 2014 WL 4160858, *36-*43 (D.C. Circuit) (not invoking issue preclusion based on Dutch courts' findings, and instead arguing that "[t]he existence of an arbitration agreement by Ecuador is . . . uncontested").
[4] *See Arizona v. California*, 530 U.S. 392, 412 (2013) (federal appellate courts should not "raise" preclusion defenses "sua sponte," absent "special circumstances").

before the Dutch set-aside proceedings had concluded and without any reference to issue preclusion. *Chevron Corp. v. Republic of Ecuador*, 949 F. Supp. 2d 57, 61 (D.D.C. 2013) (noting that Ecuador's "appeal[]" of the "Dutch District Court's judgment" "remains pending"). The Second Circuit cases, cited in the Reply, are distinguished because they addressed *claim preclusion* rather than *issue preclusion*.[5]

## IV. The Russian Federation's Likelihood of Success, in the Remaining Dutch Proceedings, Is Extremely Low

The Reply's new arguments, regarding the Russian Federation's likelihood of success at the Amsterdam Court of Appeal, are also misleading.

### A. The Reply Misrepresents the April 2021 English High Court Ruling

The Reply misrepresents the English High Court's April 2021 ruling, which denied Petitioners' motion to lift the stay of that confirmation proceeding. Specifically, the Reply claims that the English High Court "explained" that the Russian Federation has a "realistic prospect of success in vacating the awards based upon Petitioners' alleged fraud in the arbitration." Reply, at 4; *see also id.* at 12. That is false.

The English High Court's ruling did not address the *merits* of the Russian Federation's claims of procedural fraud. The ruling was rendered well before the Dutch Supreme Court's decision, and it addressed only the *procedural* issue pending before the Dutch Supreme Court— i.e., whether allegations of procedural fraud may only be brought under revocation proceedings

---

[5] *VRG Linhas Aereas S/A v. MatlinPatterson Global Opportunities Partners II L.P.*, 605 F. App'x 59 (2d Cir. 2015), is a nonprecedential summary order. One sentence of the order rejects the petitioner's attempt to apply *claim preclusion*, that is, to "directly enforce or give preclusive effect to *the judgments* of the Brazilian courts." *Id.* at 60 (emphasis added). The *VRG* order did not hold that *issue preclusion* was inapplicable in New York Convention cases. Similarly, *Sarhank Group v. Oracle Corp.*, 404 F.3d 657 (2d Cir. 2005), does not concern *issue preclusion*. Rather, *Sarhank* held that a judgment of the Egyptian courts, based on Egyptian law, did not have a *claim preclusive* effect, given that "the arbitrators' conclusion that Oracle was bound to arbitrate as a non-signatory was based solely upon Egyptian law." *Id.* at 662.

7

under DCCP Article 1068, and not in set-aside proceedings under DCCP Article 1065(1)(e). *See* Dkt. 197-2 (English High Court Judgment) ¶ 78 ("The Hague Court of Appeal declined to consider or determine the substance of Russia's fraud allegation, instead rejecting this argument on a point of Dutch procedure."); *see also id.* ¶ 83 ("With all due diffidence when attempting to assess the effect of another country's *procedural provisions* . . . I conclude that . . . Russia's appeal on this issue should be regarded as having a realistic prospect of success." (emphasis added)). The Reply misrepresents the High Court's ruling when it claims that the High Court made any decision relating to the likelihood that the Russian Federation would ultimately succeed in *setting aside the Awards* based on allegations of procedural fraud.

### B. The Russian Federation Misrepresents the Standard that the Amsterdam Court of Appeal Will Apply

The Reply also misrepresents the standard that the Amsterdam Court of Appeal will apply in the remaining proceedings. The Reply is misleading in two ways. *First*, the Reply confusingly states that the Amsterdam Court of Appeal "will be examining the procedural fraud issue *de novo*." Reply, at 12. It is of course true that the Amsterdam Court of Appeal will make *factual findings* without deference to previous decisions of the Dutch courts. After all, no Dutch court has yet made any ruling on the merits of the Russian Federation's claims of procedural fraud—because the Russian Federation waited, until its appellate response brief, to even make these claims. *See* Opp'n, at 9. But the Amsterdam court's power to make *factual findings* has nothing to do with the *legal* standard that the Russian Federation must meet in order to set aside the Awards.

That legal standard is extremely demanding. The Russian Federation must demonstrate that "the content or execution of the award conflicts with peremptory law of such a fundamental nature that compliance with it may not be obstructed by restrictions of a procedural nature." Dkt. 204-8 (Dutch Supreme Court Judgment) ¶ 5.4.9 (describing this standard as "settled . . . law"). The Dutch

8

Supreme Court cautioned that this "public policy" ground, for setting aside arbitral awards, may not be used to transform a set-aside proceeding into "a disguised form of appeal," and further warned that "the civil courts should intervene in arbitral awards only in clear cases." *Id.*

*Second*, the Reply misleadingly cites Dutch case law in *revocation* proceedings, which are brought under a separate provision of Dutch law. Reply, at 13; Dkt. 212 (Eighth van den Berg Decl.) ¶¶ 15-16 & nn. 8-9. The remand to the Amsterdam Court of Appeal is *not* a revocation proceeding. Instead, the Russian Federation is seeking to set aside the Awards on the basis of a supposed violation of "public policy." And to show a "public policy" violation, the Russian Federation would have to meet the extremely demanding legal standard set out above.

    **C.    The Russian Federation Has No Evidence that Petitioners Committed Any Impropriety Whatsoever During the Arbitrations**

        **1.    The Deed of Accession Proves Nothing**

The Reply makes new and unfounded allegations about the "Deed of Accession" (Dkt. 202-1), a document that the Russian Federation claims should have been produced by Petitioners during the Arbitrations. Reply, at 13-14. But there is no evidence that Petitioners ever possessed this document. Moreover, the Russian Federation fails to explain when, and under what circumstances, the Russian Federation obtained it. There can be no discovery violation (much less, a "fraud") in the absence of any evidence that (1) Petitioners even possessed the document, and (2) that the Russian Federation had not obtained it, or could not obtain it, from other sources during the Arbitrations.

The Reply now contends that this "Deed of Accession" somehow proves that Petitioners' pleadings to the arbitral tribunal were "false." Reply, at 3, 13-14. This contention is outrageous. Tellingly, the Russian Federation neither cites nor quotes any specific supposed "false statement" by Petitioners. That is because there was no false statement.

9

The Reply does not attempt to rebut the Petitioners' evidence, indicating that the content of the Deed of Accession was *a matter of public knowledge* in April 2003.[6] Instead, the Russian Federation simply refers to its own pleadings made in the Arbitrations. *See* Reply, at 14 (citing Russian Federation's Memorial of January 31, 2007 (Dkt. No. 71-15)). This only proves that these matters, which the Russian Federation now attempts to present as "new," were in fact extensively briefed, argued, and ruled upon—first in the Arbitrations, and then again in the Dutch courts.

### 2. The *Littop v. Ukraine* Arbitral Award Is Inadmissible

The Reply attaches a heavily redacted document that appears to be an arbitral award rendered last year, in the matter of *Littop v. Ukraine*. Reply, at 15 (citing Dkt. 209-2).

This document is *not*, as the Russian Federation's counsel's declaration claims, a "true and correct copy" of the *Littop* award. Dkt. 209 ¶ 4. Most of the tribunal's findings, regarding the issues of illegality and "control," are redacted.[7] Without access to the full text of this Award, there is no basis for the Reply's claim that *Littop* has any relevance here.

### 3. The Merinson "Protocol of Witness Interview" Is Inadmissible

The other new supposed "evidence," submitted with the Reply, is what is alleged to be a different Russian-language version of the "protocol" of Dmitry Merinson's witness interview by Russian criminal prosecutors. Dkt. 209-1. This new version (unlike the version submitted with the opening brief) now contains some illegible signatures.

---

[6] Brunswick UBS Warburg Global Equity Research, *"Yukos: The GEM supermajor,"* Apr. 10, 2003, at 15. This document was introduced in evidence at the Arbitrations as Exhibit Number NAV-398.

[7] *See, e.g.*, Dkt 209-2, ¶¶ 364-97 (all paragraphs describing the "Key factual allegations relied on by [Ukraine]" are redacted); ¶¶ 459-84 (all but two of the paragraphs, explaining why the tribunal found a "link" between the bribes and the investments, are redacted); *id.* ¶¶ 494-535 (all paragraphs under the heading "2003-2004 Gaining Control of Ukrnafta Management" are redacted).

The new document is still inadmissible. It is neither a sworn statement nor made under penalty of perjury. *See* 28 U.S.C. § 1746; LCvR 5.1(f); *Humane Soc'y Int'l v. United States Fish & Wildlife Serv.*, No. CV 16-720 (TJK), 2021 WL 1197726, at *4 (D.D.C. Mar. 29, 2021) (excluding declarations that "were not made under the penalty of perjury"). Moreover, the Reply still fails to explain how the Russian Federation's attorneys came to possess this document, which appears to have been obtained from an open criminal investigation. Nor does the Reply explain either the circumstances under which the document was created; nor when, by whom, and under what circumstances it was signed.

## V. The Reply Misstates the Dutch Media Reports and Misattributes Statements to the Dutch Judiciary

In their Opposition, Petitioners explained why the Arbitral Awards continue to exist following the Dutch Supreme Court Judgment. *See* Opp'n Br., at 29-31; Dkt. 204-2 (Second Cohen Jehoram Decl.) ¶¶ 47-71. The Reply makes no meaningful response to the substance of Petitioners' argument, or to the authorities cited in the Second Cohen Jehoram Declaration.

Instead, the Reply makes false new claims about what the Dutch media reported regarding the Dutch Supreme Court's "press justice" statements. Specifically, the Reply states:

> [T]he Dutch Supreme Court has explicitly confirmed—and Petitioners have not denied—that "Russia is for now not obliged to pay [US$] 50 billion in damages to the three former shareholders of Yukos," such that "Russian state property abroad cannot be seized." *E.g.*, Third Meijer Decl. ¶ 4 (quoting Dutch media reports of the explanations given by the press judge, Justice Edgar Du Perron) (emphasis added).

Reply, at 5.

> [A]s confirmed by the public statements of Justice Edgar Du Perron on behalf of the Dutch Supreme Court, the current status quo is that "Russia is for now not obliged to pay [US$] 50 billion in damages to the three former shareholders of Yukos," such that "Russian state property abroad cannot be seized." Seventh Van den Berg Decl. ¶ 6 (quoting and translating . . . (ECF 203-3)); *see also* Third Meijer Decl. ¶ 4 ("As Petitioners do not dispute, these observations were made on behalf of the Dutch Supreme Court by a sitting press judge, Justice Edgar Du Perron . . . .").

11

*Id.* at 19.

These are misrepresentations—by the Russian Federation's U.S. counsel, and by its Dutch lawyers—about what these "Dutch media reports" actually state. (It is also untrue that Petitioners "do not dispute" the Russian Federation's distortions.) Tellingly, the Russian Federation did not provide English translations of the Dutch media reports for this Court's review.

Petitioners attach hereto Exhibit 7 to the accompanying Second Shepard Declaration (an English translation of Dkt. 203-2) and Exhibit 8 to the accompanying Second Shepard Declaration (an English translation of Dkt. 203-3). As those translations make clear, the *only* quotation of Justice du Perron, made by the Dutch media, was the following: "[N]o obligation to pay follows from the judgment." Second Shepard Decl., Ex. 7 (translation of Dkt. 203-2). That statement is correct, as explained in the Second Cohen Jehoram Declaration. Dkt. 204-2 ¶ 71. The Dutch Supreme Court Judgment does not mention any payment obligation.

The Russian Federation, and its Dutch lawyers, are now claiming that Justice du Perron stated something very different, namely, that "Russia is for now not obliged to pay" and "Russian state property abroad cannot be seized." There are no such quotations in either of these media reports. *See* Second Shepard Decl., Ex. 7, Ex. 8. What the Reply now claims to be a statement by "Justice du Perron" is, instead, merely the text of the news articles themselves, *not* a quotation.

Ultimately, what the "press justice" said is irrelevant.[8] But the Russian Federation's efforts to mislead this Court should not be lightly passed over. The Russian Federation submitted the Dutch media reports to this Court without English translations. Its Dutch lawyers then submitted

---

[8] The *only* probative document, regarding the meaning of the Dutch Supreme Court's decision, is the judgment itself: "A judge speaks through his judgment." Dkt. 204-2 (Second Cohen Jehoram Decl.) ¶¶ 67-70 (citing Dutch Supreme Court decisions, the Press Guidelines of the Dutch Judiciary, and an email from the Dutch Supreme Court).

12

unofficial "translations" of those media reports, in their declarations, which falsely implied quotations where no quotations existed. And the Reply then claimed that Petitioners "do not dispute" this misdirection. No party should be permitted to mischaracterize documents in this way. This conduct is well beyond the permissible bounds of zealous advocacy. *See* Fed. R. Civ. P. 11(b)(3) ("By presenting to the court a . . . written motion," an attorney "certifies" that "the factual contentions have evidentiary support").

## CONCLUSION

None of the new materials and arguments, contained in the Reply, provide any legitimate reason for further delay of the Russian Federation's sovereign-immunity defense. That "threshold issue" is unrelated to any of the remaining proceedings in the Dutch courts.

Dated: January 11, 2022

Respectfully submitted,

*/s/ Steven M. Shepard*
Steven Shepard (*Pro Hac Vice*)
Jacob W. Buchdahl (*Pro Hac Vice*)
Zachary B. Savage (*Pro Hac Vice*)
Susman Godfrey L.L.P.
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019-6023
Telephone: (212) 336-8330
Facsimile: (212) 336-8340
sshepard@susmangodfrey.com
jbuchdahl@susmangodfrey.com
zsavage@susmangodfrey.com

Richard W. Hess
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 1500
Houston, TX 77002
Telephone: (713) 653-7839
rhess@susmangodfrey.com

*Counsel for Petitioners*

## CERTIFICATE OF SERVICE

I certify that on February 24, 2022, the foregoing document was filed electronically and served upon all counsel of record via the Court's CM/ECF filing system in accordance with the Federal Rules of Civil Procedure.

*s/ Steven M. Shepard*
Steven M. Shepard