UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| HULLEY ENTERPRISES LTD., *et al.*, <br><br> Petitioners, <br><br> v. <br><br> THE RUSSIAN FEDERATION, <br><br> Respondent. | Civil Action No. 14-1996 (BAH) <br><br> Chief Judge Beryl A. Howell |

**MEMORANDUM OPINION**

For the fifth time since 2016, one of the parties in this long-running litigation to confirm an arbitral award of over $50,000,000,000 against respondent, the Russian Federation, seeks to stay this litigation pending resolution in the Netherlands of set-aside proceedings, which were initiated almost eight years ago and are now on remand from the Dutch Supreme Court before the Amsterdam Court of Appeal. The most recent stay lapsed in November 2021 with the resolution of proceedings in the Dutch Supreme Court. *See* Order (Nov. 20, 2020) ("2020 Stay Order"), ECF No. 193; Min. Order (Dec. 2, 2021). As in 2020, when this Court last entered a stay order, the Russian Federation is again the party seeking the stay, in this instance until the conclusion of remand proceedings ongoing since January 2022 in the Amsterdam Court of Appeal. Resp't's Mot. to Extend Stay of Litigation ("Resp't's Mot."), ECF No. 201; Resp't's Mem. Supp. of Mot. to Extend Stay ("Resp't's Mem."), ECF No. 201-1; *see also* Resp't's Mot. to Stay, ECF No. 179 (June 2020 request for stay).

Despite the Dutch Supreme Court's rejection of all but one of its arguments seeking to invalidate the arbitral award at issue, *see* Resp't's Mem. at 1; Pet'rs' Opp'n to Resp't's Mot. to Stay ("Pet'rs' Opp'n"), Ex. 4 (November 2021 Dutch Supreme Court Decision), at 36, ECF No.

1

204-8, the Russian Federation insists that a stay remains necessary because, on remand, "the Amsterdam Court of Appeal will be faced with adjudicating[,] for the first time in any jurisdiction[,]" the Russian Federation's allegations that "procedural frauds" took place during the arbitration that gave rise to the award, Resp't's Mem. at 5.  Petitioners Hulley Enterprises Ltd., Yukos Universal Ltd., and Veteran Petroleum Ltd. (collectively, the "Shareholders") vigorously oppose extension of the stay, emphasizing that "[t]his seven-year-old confirmation proceeding has not yet taken its very first step, which is to resolve the Russian Federation's defense of sovereign immunity," Pet'rs' Opp'n at 1, and that—should they succeed on the merits of this confirmation action—"[f]inding and executing on [Russian Federation] assets [in the United States] will be far more difficult as a result of the[] sanctions" and other economic measures enacted against the Russian Federation following its invasion of Ukraine, Pet'rs' Resp. to Status Report at 2, ECF No. 225.[1]

    Notwithstanding the focus of the ongoing Dutch proceedings on only the Russian Federation's allegations of procedural fraud, the protracted nature of this litigation, recent D.C. Circuit precedent directing prompt resolution of sovereign immunity claims in the arbitral context, and concerns about asset liquidation in the wake of the Russian Federation's war against Ukraine, all counsel—for reasons more fully explained below—against granting a further stay in

---

[1]     As petitioners point out, a district court may not, "in considering a petition to confirm an arbitral award against a foreign sovereign . . . order the sovereign to brief the merits before resolving a colorable assertion of immunity" under the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602-1611.  *Process & Indus. Dev. (P&ID) v. Fed. Republic of Nigeria*, 962 F.3d 576, 579 (D.C. Cir. 2020); *see* Pet'rs' Opp'n at 13 ("After the D.C. Circuit's recent holding in *P&ID*, the Russian Federation now has the right to delay this Court's consideration of its other, non-jurisdictional defenses until this Court first resolves the question of sovereign immunity.").  Here, however, the Russian Federation already filed both its jurisdictional and non-jurisdictional, merits defense briefs concurrently in 2015.  *See* Resp't's Mot. to Den. Confirmation of Arbitration Awards Pursuant to the N.Y. Convention, ECF No. 23; Resp't's Mot. to Dismiss for Lack of Jurisdiction, ECF No. 24.  These motions are still pending, and the motion to dismiss for lack of subject matter jurisdiction is also fully briefed, though the parties may want an opportunity to supplement those submissions with any updates.

this case. Accordingly, the Russian Federation's second motion to stay is denied. At a minimum, the Russian Federation's still-pending—and already fully briefed—motion to dismiss this confirmation action for lack of jurisdiction must proceed to resolution.

## I.   BACKGROUND

The history underlying this litigation has been recounted in this Court's previous decisions resolving two earlier motions to stay. *See Hulley Enterprises Ltd. v. Russian Federation* ("*Hulley II*"), 502 F. Supp. 3d 144, 148-152, (D.D.C. 2020); *Hulley Enterprises Ltd. v. Russian Federation* ("*Hulley I*"), 211 F. Supp. 3d 269, 272-276 (D.D.C. 2016). Only the factual and procedural developments relevant to resolving the Russian Federation's instant motion to stay are thus addressed here.

This case traces its origins to a decade-long arbitration in the Netherlands that the Shareholders initiated in November 2004 under the Energy Charter Treaty ("ECT"), "to which the Russian Federation was a signatory between December 1994 and October 2009." *Hulley II*, 502 F. Supp. 3d at 148.[2] The Shareholders were the majority owners of Yukos Oil Company ("Yukos"), "a Russian . . . company that became the nation's largest and first fully privatized oil company following the dissolution of the Soviet Union." *Hulley I*, 211 F. Supp. 3d at 272. At the arbitration, the Shareholders claimed that the Russian Federation violated the ECT through a series of adverse measures intended to "bankrupt Yukos, appropriate the company's assets, and silence the company's head, Mikhail Khodorkovsky," due to Khodorkovsky's support for political parties opposed to President Vladimir Putin and the company's proposed integration with Western oil interests. *Hulley II*, 502 F. Supp. 3d at 148. On July 18, 2014, following a

---

[2] The Energy Charter Treaty is a "multilateral agreement signed by governments on both sides of the old Iron Curtain" of the Soviet Union intended to "encourage and protect cross-border investment in the energy industry." *LLC SPC Stileks v. Republic of Moldova*, 985 F.3d 871, 874 (D.C. Cir. 2021).

three-week hearing, an Arbitral Tribunal issued three final awards determining that, by engaging in such adverse measures, "the Russian Federation had violated its obligations under the ECT, and [thus] owed the Shareholders $50,020,867,798 in damages, plus interest, $60,000,000 in attorneys' fees, and €4,240,000 in arbitration costs."  *Id.*

About four months later, on November 10, 2014, the Russian Federation "petitioned the District Court of the Hague ('Dutch District Court') to set the [a]wards aside," which was followed promptly by the Shareholders' filing of a petition in this Court to confirm the awards on November 25, 2014.  *Id.* at 149.  The parties thereafter completed a round of briefing in this Court in connection with the "Russian Federation's motions seeking to dismiss the petition for lack of jurisdiction and to deny confirmation of the [a]wards."  *Id.*[3]

Upon the Shareholders' request and over the Russian Federation's objection, this matter was first stayed in September 2016 pending the Shareholders' appeal of an April 2016 Dutch District Court ruling setting aside the awards.  *Id.*[4]  That 2016 Stay Order paused proceedings "until January 21, 2019, or until resolution of proceedings in the Netherlands to set aside [the Awards], whichever date occurs earlier."  Order (Sept. 30, 2016) ("2016 Stay Order"), ECF No. 153.

More than two years later, on December 27, 2018, the parties jointly moved to extend the 2016 Stay Order until January 21, 2020, citing that the Court of Appeal of The Hague was not

---

[3]  Given the continuing set-aside litigation in the Netherlands, prompting four orders incrementally staying this case since 2016, these pending motions remain unresolved.  *See* Resp't's Mot. to Den. Confirmation of Arbitration Awards Pursuant to N.Y. Convention, ECF No. 23; Resp't's Mot. to Dismiss the Pet. to Confirm Arbitration Awards for Lack of Subject Matter Jurisdiction, ECF No. 24; Resp't's Suppl. Mot. to Dismiss the Pet. to Confirm Arbitration Awards Under the Foreign Sovereign Immunities Act and the N.Y. Convention, ECF No. 108. This case was reassigned to the undersigned Chief Judge during the briefing of these still-pending motions.  *See* Min. Entry (Nov. 19, 2015).

[4]  The Dutch District Court set aside the awards based on its determination that, because the Russian Federation had never agreed to arbitrate its disputes under the ECT, the Arbitral Tribunal accordingly lacked jurisdiction to issue the awards.  *Hulley II*, 502 F. Supp. 3d at 149.

4

anticipated to issue its decision on the Shareholders' appeal of the set-aside judgment until "either late 2019 or early 2020." Parties' Joint Mot. to Extend Stay at 3, ECF No. 171. This motion was granted that same day. Min. Order (Dec. 27, 2018). Again, on October 10, 2019, the parties jointly moved to extend the 2016 Stay Order until May 20, 2020, upon being notified that the Court of Appeal of The Hague would be rendering its decision regarding the Shareholders' appeal of the set-aside judgment on February 18, 2020. *See* Joint Status Report, ECF No. 175; This second joint extension request was also granted. Min. Order (Oct. 10, 2019).

On February 18, 2020, almost four years after the original 2016 Stay Order took effect, the Court of Appeal of The Hague "issued a judgment reversing the 2016 Dutch District Court Judgment and rejecting additional arguments by the Russian Federation" seeking to invalidate the awards. *Hulley II*, 502 F. Supp. 3d at 150. Following the lifting of the 2016 Stay Order in May 2020, the Russian Federation promptly moved, on June 15, 2020, to impose a second stay in this action pending its appeal to the Dutch Supreme Court of the February 2020 Court of Appeal of The Hague decision. *Id.* at 150-151. After extensive briefing on this motion was completed on October 5, 2020, the Russian Federation's motion was granted on November 20, 2020 and this case stayed "until the earlier of November 18, 2022 or the conclusion of the proceedings to set aside the Awards in the Dutch Supreme Court." *Id.* at 164; *see also* 2020 Stay Order at 1. In so doing, the Court concluded, *inter alia*, "that the enforceability of the arbitral award [was] in flux to such a degree that a stay is warranted," *Hulley II*, 502 F. Supp. 3d at 157, and expressed concern that "any conclusion reached [in this Court] may be upended by contrary findings by the Dutch Supreme Court," *id.* at 155.

Dissatisfied with the continued pause in their efforts to confirm the awards in the United States now that developments in the Dutch courts had turned to their favor, the Shareholders

appealed the 2020 Stay Order to the D.C. Circuit, *see* Notice of Appeal, ECF No. 195, which heard oral argument on October 15, 2021. Less than three weeks later, however, on November 5, 2021, the Dutch Supreme Court rendered a decision on the Russian Federation's appeal that automatically lifted the 2020 Stay Order. *See* 2020 Stay Order at 1 (staying proceedings "until November 18, 2022, or until resolution of proceedings in the Dutch Supreme Court"). Consequently, the Shareholders consented to dismiss their appeal of the 2020 Stay Order. *See* Consent Mot. to Dismiss, Case No. 20-7113 (D.C. Cir. Nov. 17, 2021). Following the D.C. Circuit's granting of the Shareholders' consent motion to dismiss their appeal, the mandate remanding the case to this Court issued on December 1, 2021. *See* Mandate, ECF No. 200.

The next day, on December 2, 2021, after noting "that the stay imposed on November 20, 2020 is now lifted with 'resolution of proceedings in the Dutch Supreme Court,'" this Court directed the parties to brief whether this case should be subject to a stay "pending resolution of proceedings on remand from the Dutch Supreme Court." Min. Order (Dec. 2, 2021) (quoting 2020 Stay Order). In addition to responding to this order, the Russian Federation filed the pending motion to stay this litigation for the duration of the current remand proceedings before the Amsterdam Court of Appeal, *see* Resp't's Mot.; Resp't's Mem. at 1, which is the third opposed motion for a stay to be considered by this Court since 2016, *see* Pet'rs' Opp'n; Pet'rs' Sur-Reply in Opp'n to Resp't's Mot. to Extend Stay ("Pet'rs' Sur-Reply"), ECF No. 221.[5]

On March 16, 2022, based on the Russian Federation's characterization as "baseless" of the Shareholders' expressed concern that armed conflict between the Russian Federation and

---

[5] While the Shareholders argue, persuasively, against any further stay, they presented an alternative request should the Court "grant[] a further stay of this confirmation proceeding:" that the Russian Federation be ordered "to provide security, in the amount of $7 billion, by deposit into the registry of the Court." Pet'rs' Mot. for Security at 1, ECF No. 205. This alternative request for security need not be addressed and is denied as moot since no extension of the stay is granted.

6

Ukraine may lead to the unavailability of Russian Federation assets in the United States, Resp't's Reply in Supp. Mot. to Stay ("Resp't's Reply"), at 5-6, ECF No. 208, the Court directed the Russian Federation to advise of any "material developments affecting arguments it previously presented regarding the propriety of a stay or prejudgment security in this case following the Russian Federation's invasion of Ukraine beginning on February 24, 2022," Min. Order (March 16, 2022). In response, the Russian Federation explained that its invasion of Ukraine is an "evolving situation provid[ing] yet another reason to stay these proceedings during the ongoing parallel set-aside litigation in Amsterdam and while steps are taken to locate available and acceptable substitute Counsel for the Russian Federation." Resp't's Status Report at 1, ECF No. 224. In any event, the Russian Federation represented that it is "not aware of any foreseeable risk of [Russian Federation] assets leaving the United States" as the result of sanctions or other economic measures flowing from the war. *Id.* at 2. The Shareholders disagree with these representations, stating that the "unprecedented sanctions" being imposed on the Russian Federation "almost daily" will make "[f]inding and executing on assets . . . far more difficult," Pet'rs' Resp. to Status Report at 1-2, ECF No. 225, such that further delay in this litigation "would in effect reward the Russian Federation for invading Ukraine in violation of international law," *id.* at 2 (citing March 16, 2022 International Court of Justice ruling ordering the "Russian Federation to "suspend the military operations that it commenced on 24 February 2022 in the territory of Ukraine").[6]

With the briefing on both the pending stay motion and the supplemental submissions in response to the Court's March 16, 2022 Minute Order completed on March 25, 2022, this matter is now ripe for resolution.

---

[6] The International Court of Justice's ruling is available at https://www.icj-cij.org/public/files/case-related/182/182-20220316-ORD-01-00-EN.pdf.

7

## II.     LEGAL STANDARD

"District courts have the inherent authority to manage their dockets and courtrooms with a view toward the efficient and expedient resolution of cases." *Dietz v. Bouldin*, 579 U.S. 40, 47 (2016). This inherent authority "to control the disposition of the cases on its docket with economy of time and effort for itself, for counsel, and for litigants" is long settled. *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936). When arbitration proceedings between the parties are required or ongoing, the court "may order a stay of the judicial proceedings pending completion of the arbitration process." *Bledsoe v. Crowley*, 849 F.2d 639, 645 (D.C. Cir. 1988); *see Air Line Pilots Ass'n v. Miller*, 523 U.S. 866, 879 n.6 (1998) (noting "district courts' discretion to defer . . . proceedings pending the prompt conclusion of arbitration" (citing *Landis*, 299 U.S. at 254-255)). Nevertheless, a "stay is immoderate and hence unlawful unless so framed in its inception that its force will be spent within reasonable limits, so far at least as they are susceptible of prevision and description." *Landis*, 299 U.S. at 257. Ordering a stay of "'indefinite duration in the absence of a pressing need'" would amount to an abuse of discretion. *Belize Social Dev. Ltd. v. Gov't of Belize*, 668 F.3d 724, 732 (D.C. Cir. 2012) (quoting *Landis*, 299 U.S. at 255).

When exercising the power to stay a case, courts must thus "'weigh competing interests and maintain an even balance' between the court's interests in judicial economy and any possible hardship to the parties." *Id.* at 732-733 (quoting *Landis*, 299 U.S. at 254-255). Identifying and weighing these "competing interests" of "possible hardship[s]" and "judicial economy," *id.*, requires the court to "make such determinations in . . . light of the particular circumstances of the case." *SEC v. Dresser Indus., Inc.*, 628 F.2d 1368, 1375 (D.C. Cir. 1980). The party seeking the stay bears the burden of "mak[ing] out a clear case of hardship or inequity in being required to

go forward, if there is even a fair possibility that the stay for which [they] pray[] will work damage to some one else." *Landis*, 299 U.S. at 255.

## III.   DISCUSSION

Notwithstanding that remand proceedings before the Amsterdam Court of Appeal are limited to assessing only "whether the Awards were fraudulently procured and thus unenforceable as contrary to [Dutch] public policy," Resp't's Mem. at 14, the Russian Federation insists that the reasons for a stay first articulated by this Court in 2016 and 2020 "remain equally persuasive . . . in the aftermath of the Dutch Supreme Court's 2021 judgment," *id.* at 12; *see also* Resp't's Reply at 16 (arguing there "is no basis now . . . for this Court to reconsider its previous analysis").  Not so.  The march of time alters the equities that courts are required to weigh in assessing the appropriateness of pausing litigation.  Proceedings before the Amsterdam Court of Appeal will extend, per both parties' estimations, for at least another year, after which the losing party likely will again appeal to the Dutch Supreme Court and in so doing extend the set-aside litigation until sometime beyond 2024.  *See* Pet'rs' Opp'n at 10.  The hardship to the Shareholders—which prevailed in a decade-long arbitration that concluded in 2014—only increases with each passing year and is today further compounded by the evolving risk that Russian Federation assets in the United States may be liquidated or otherwise become inaccessible due to "unprecedented sanctions" imposed following the Federation's invasion of Ukraine.  *See generally* Pet'rs' Resp. to Status Report, ECF No. 225.  The Court thus agrees with the Shareholders that, given these circumstances, imposition of a renewed stay is neither warranted nor appropriate.

As previously held, absent a ruling on the Russian Federation's jurisdictional defense, this Court is "not in a position to issue a stay pursuant to the New York Convention." *Hulley II*,

502 F. Supp. 3d at 153 (quoting *Hulley I*, 211 F. Supp. 2d at 286); *see also CC/Devas (Mauritius) Ltd. v. Republic of India*, No. 21-cv-106-RCL, 2022 WL 873620, at *4 (D.D.C. Mar. 24, 2022) ("Because the Court's own jurisdiction has yet to be established, the Court is not in a position to issue a stay under the Convention.") (citations omitted).[7]  In issuing the prior stays in this case, reliance was placed on the multi-factor assessment devised in *Europcar Italia, S.p.A. v. Maiellano Tours, Inc.*, 156 F.3d 310, 317 (2d Cir. 1998), to inform a stay decision under the New York Convention since those guideposts are "widely-accepted in these particular circumstances to evaluate the appropriateness of a stay." *Hulley II*, 502 F. Supp. 3d at 153.  These factors consider: "(1) the general objective of arbitration—the expeditious resolution of disputes and the avoidance of protracted and expensive litigation; (2) the status of the foreign proceedings and the estimated time for those proceedings to be resolved; (3) whether the award sought to be enforced will receive greater scrutiny in the foreign proceedings under a less deferential standard of review; (4) the characteristics of the foreign proceedings . . . (5) a balance of the possible hardships to the parties . . . ; and (6) any other circumstances that could tend to shift the balance in favor of or against adjournment." *Europcar*, 156 F.3d at 317-318.

Several months after this Court's entry of the last 2020 Stay Order, the D.C. Circuit addressed the *Europcar* framework for the first time in *LLC SPC Stileks v. Republic of Moldova*, 985 F.3d 871 (D.C. Cir. 2021).  Although recognizing that the "*Europcar* approach . . . has been influential in the district court," *Stileks* expressed "doubt that a six-factor balancing test— enforced by appellate review—is consistent with the district court's 'broad discretion to stay

---

[7]  Article VI of the New York Convention authorizes a stay of litigation to confirm an arbitral award and provides, in pertinent part: "If an application for the setting aside or suspension of the award has been made to a competent authority referred to in article V(1)(e), [*i.e.*, the country in which or under the law of which, that award was made], the authority before which the award is sought to be relied upon may, if it considers it proper, adjourn the decision on the enforcement of the award and may also, on the application of the party claiming enforcement of the award, order the other party to give suitable security." New York Convention art. VI.

10

proceedings as an incident to its power to control its own docket.'" 985 F.3d at 880 (quoting *Clinton v. Jones*, 520 U.S. 681, 706 (1997)). While not endorsing all six-factors undergirding the *Europcar* standard, the D.C. Circuit emphasized that "a district court would abuse its discretion if it failed to consider the first and second factors," *id.*—namely, "(1) the general objective of arbitration [in] the expeditious resolution of disputes and the avoidance of protracted and expensive litigation" and "(2) the status of the foreign proceedings and the estimated time for those proceedings to be resolved," *Europcar*, 156 F.3d at 317. Upon finding that the district court had properly considered these two factors—and without addressing the other four—the D.C. Circuit affirmed the district court's denial of a motion to stay enforcement of an arbitral award. *See Stileks*, 985 F.3d at 880-881; *id.* at 880 ("We thus focus our attention on the district court's analysis of the first two factors."). The parties do not dispute that *Stileks* requires focus on the first two *Europcar* factors. *See, e.g.*, Resp't's Reply at 11 (noting that, in *Stileks*, the "D.C. Circuit also adopted the first two *Europcar* factors into its stay analysis"); Pet'rs' Opp'n at 11 (citing *Stileks* for the proposition that "[t]he two most important factors in deciding whether to stay a confirmation proceeding" are the first two *Europcar* factors).

Consistent with *Stileks*, the Russian Federation's pending motion to stay this confirmation action, and the implications of a stay now for judicial economy and hardship to the parties, is analyzed using the first two *Europcar* factors—expeditious dispute resolution without protracted litigation, which also has important implications for judicial economy, and the significance of delays due to foreign litigation, with concomitant anticipated hardships to the parties. *See Belize Social Dev. Ltd.*, 668 F.3d at 733 (explaining that stay determinations must "weigh competing interests and maintain an even balance between the court's interests in judicial economy and any possible hardship to the parties").

### A.     General Objectives of Arbitration

The first factor—arbitration's aim of expeditious dispute resolution and avoidance of protracted and expensive litigation—firmly militates against entry of another stay.  In the context of arbitral award enforcement, the Supreme Court has directed that assertions of sovereign immunity be decided "as near to the outset of the case as is reasonably possible." *Process & Indus. Dev. (P&ID) v. Fed. Republic of Nigeria*, 962 F.3d 576, 584 (D.C. Cir. 2020) (quoting *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312, 1317 (2017)).

The Shareholders initiated arbitration proceedings against the Russian Federation almost eighteen years ago, in November 2004, and prevailed a decade later with the issuance of awards in July 2014.  *Hulley II*, 502 F. Supp. 3d at 148.  The Shareholders then initiated their confirmation action in this Court close to eight years ago, in November 2014.  *Id.* at 149.  Since then, this litigation has been largely stayed.  *See* 2016 Stay Order (granting Shareholders' motion to stay); Min. Order (Dec. 27, 2018) (granting parties' joint request to extend 2016 Stay Order); Min. Order (Oct. 10, 2019) (same); 2020 Stay Order (granting Russian Federation's motion to stay).  The "very first step" in this litigation—resolving the Russian Federation's sovereign immunity defense—remains pending almost seven years after the Russian Federation invoked that defense.  Pet'rs' Opp'n at 1; *see also* Resp't's Mot. to Dismiss for Lack of Jurisdiction, ECF No. 24 (filed on October 20, 2015).  Though the long pendency of this motion without resolution has largely been with the Russian Federation's consent and at its request, this is hardly an example of "expeditious resolution" consistent with the aims of arbitration.  *Stileks*, 985 F.3d at 880 (citations omitted).  Accordingly, this first factor does not support an additional stay and instead favors swift adjudication, at a minimum, of the Russian Federation's sovereign immunity defense.

B.      **Status of Foreign Proceedings**

The second *Europcar* factor—the status of foreign proceedings and estimated timeline for their resolution—likewise disfavors a stay.

The status of the set-aside proceedings initiated by the Russian Federation is undisputed, with that case now on remand from the Dutch Supreme Court before the Amsterdam Court of Appeal as of January 2022. The remand task is limited to examining only, and in the first instance, whether the awards were fraudulently procured and are thus unenforceable as contrary to Dutch public policy. *See* Resp't's Status Report at 1, ECF No. 199 (explaining that the Dutch Supreme Court "sustain[ed] the Russian Federation's first ground for cassation" concerning allegations of procedural fraud "while denying the other grounds for cassation"); Resp't's Mem. at 20 ("[T]he Amsterdam Court of Appeal must decide a number of issues . . . pertaining to the Russian Federation's arguments regarding [the Shareholders'] commission of procedural frauds during the arbitration.").[8] The Russian Federation accuses the Shareholders of engaging in three forms of procedural fraud during the arbitration, alleging that the Shareholders "relied on fraudulent statements, withheld essential documents from the Tribunal, and made secret payments to a key fact witness, Dr. A. Illarionov." Resp't's Mem. at 4.

More specifically, according to the Russian Federation, the Shareholders (1) misrepresented information and submitted erroneous analysis regarding the ownership structure

---

[8] Before the Dutch Supreme Court, the Russian Federation raised six other issues in an effort to annul the awards, including: (1) whether "the Russian Federation [was] required by art. 45 [of the] ECT to apply art. 26 [of the] ECT provisionally;" Pet'rs' Opp'n, Ex. 4 (November 2021 Dutch Supreme Court Decision), at 14; (2) whether the Shareholders "ma[d]e an [i]nvestment" within the meaning of the ECT, *id.* at 23; (3) whether "alleged illegal acts" by the Shareholders had "consequences for the annullability of the arbitral awards," *id.* at 29; (4) whether the "arbitral tribunal violate[d] its mandate by failing to make a referral to relevant tax authorities" under art. 21 (5) of the ECT, *id.* at 32; (5) whether conduct by the "assistant to the arbitral tribunal . . . constitute[d] grounds for annulment," *id.* at 35; and (6) whether the "arbitral tribunal's decisions on [Yukos Universal LTD's] alleged abusive use of sham companies" were erroneous, *id.* at 35. The Dutch Supreme Court did not find any of these issues to support "cassation," or annulment, of the awards. *Id.* at 36 (concluding the aforementioned issues "cannot result in cassation").

13

and corporate governance of the Shareholders' parent company, Group Menatep Limited, which misinformation precluded the Arbitral Tribunal from ascertaining the relationship between the Shareholders and "Russian Oligarchs," *see id.* at 6-7; *id.* at 7 ("[T]he Tribunal incorrectly characterized Petitioners as 'separate from' the Russian Oligarchs—whereas, in reality, the Russian Oligarchs owned and controlled Petitioners in all meaningful respects."); (2) "withheld (at least) dozens of material documents pertaining to a wide range of other issues arising in the arbitration—including issues relating to the Tribunal's jurisdiction, the admissibility of Petitioners' claims, and the merits of the dispute with the Russian Federation," *id.* at 8, which "further impaired the Russian Federation's ability to demonstrate the factual and legal connection between Petitioners and the Russian Oligarchs" and "directly contributed to the [Arbitral] Tribunal's erroneous conclusions . . . regarding the admissibility of Petitioners' claims," *id.* at 10; and (3) "arranged for a . . . payment of $200,000 to be made as an incentive for a key fact witness, Dr. Andrey Illarionov, to give testimony in favor of Petitioners' case on the merits," and never disclosed this payment in the Shareholders' "statements of costs and expenses the arbitration," *id.* Since none of these allegations has "previously been adjudicated by the Dutch courts or any other court," Resp't's Mem. at 11, the Russian Federation explains that the Amsterdam Court of Appeal will conduct "a full *de novo* trial of these fraud issues," Resp't's Reply at 1, and anticipates that the Amsterdam Court of Appeal "will render an interim decision with respect to evidentiary matters" pertaining to these allegations before issuing its final judgment, Resp't's Mem. at 11. *See also* Resp't's Reply at 12 ("[I]t is particularly significant that the Amsterdam Court of Appeal will be examining the procedural fraud issue *de novo* and for the first time in the entirety of the Dutch litigation."). The concededly fact-intensive nature of these issues before the Amsterdam Court of Appeal as a matter of first

14

impression raises the significant concern that this remand—with anticipated discovery, testimonial hearings or trial, and the need for fact-finding and legal conclusions—may take even longer than earlier proceedings before the Dutch appellate tribunals.

Without disputing the potential duration of the remand proceedings and concomitant duration of a renewed stay, the Russian Federation again claims denial of a stay would result in hardship due to the prospect of a "litigation quagmire" and "incongruous outcomes that would produce repetitive and unnecessary briefing" should proceedings in this forum resume while Dutch set-aside litigation continues. Resp't's Mem. at 14, 20. The Russian Federation explains that, because its allegations of procedural fraud are relevant to its jurisdictional defense, this Court should wait for the Amsterdam Court of Appeal to first rule on those allegations. *See, e.g.,* Resp't's Reply 5 ("[I]t would be highly impractical to commence litigation of the FSIA issues before the conclusion of the Amsterdam litigation, given the considerable overlap between the factual issues in both proceedings."); *id.* at 9 ("If this Court goes forward now in deciding the FSIA issues, many of the factual issues that will be brought to light in the coming months in the Amsterdam Court simultaneously will be litigated in the United States.").[9] Yet, ironically, the Russian Federation undercuts its own argument to let the Dutch courts go first in ruling on these fraud allegations by representing that these same allegations will have to be examined *de novo* by this Court, too, to determine "—among other issues—[] whether the Awards are void as a matter of U.S. public policy." Resp't's Mem. at 14; *see also* Resp't's Sur-Surreply Supp. Mot. to Extend Stay ("Resp't's Sur-Surreply"), at 4-5, ECF No. 222 (explaining that fraud allegations

---

[9] The Shareholders counter that these fraud allegations have "no relevance to the Russian Federation's sovereign immunity defense" given that the jurisdictional inquiry will focus on whether a valid agreement to arbitrate existed under the ECT. Pet'rs' Opp'n at 1. The parties' dispute on this issue will not be resolved in connection with the instant motion to stay, but the airing of this dispute sufficiently shows that the Dutch courts are not the only judicial forum to be asked to opine on both the merits of the fraud allegations and the bearing of these allegations on other legal issues raised in this litigation.

regarding ownership and control over the Shareholders implicate the jurisdictional inquiry as to "whether [the Shareholders] were or were not eligible to accept any offer of arbitration under the ECT"). In other words, the Russian Federation's fraud allegations now subject to review before a Dutch court may have to be confronted and dealt with here, too, and thus waiting for this foreign litigation to conclude would simply delay, not eliminate, the need for this Court's consideration of the issues.

The Russian Federation emphasizes that if its procedural fraud argument "prevails in the Amsterdam proceedings—or in any subsequent proceedings before the Dutch Supreme Court . . . then the Awards thereafter will not exist to be enforced in the United States." Resp't's Mem. at 13. Maybe, but not necessarily so. *See Getma Int'l v. Republic of Guinea*, 862 F.3d 45, 48 (D.C. Cir. 2017) (noting that U.S. courts may enforce annulled award "if the annulment is repugnant to fundamental notions of what is decent and just in the United States") (citations omitted); *TermoRio S.A. E.S.P. v. Electranta S.P.*, 487 F.3d 928, 935 (D.C. Cir. 2007) (explaining that, under N.Y. Convention, an arbitral award set aside in a primary jurisdiction "normally *may* not" be enforced in another jurisdiction (emphasis added)). The remand proceedings are focused on whether the Russian Federation's fraud allegations are true and, if so, whether confirmation of the arbitral awards would offend Dutch public policy. *See* Resp't's Reply at 13. What may offend *Dutch* public policy, however, does not automatically dictate the outcome under the *American* federal legal regime. *See Tatneft v. Ukraine*, 21 F.4th 829, 838 (D.C. Cir. 2021) ("[T]he U.S. does not have a policy against enforcing arbitral awards predicated on underlying violations of foreign law."). Under either scenario—with the Dutch courts rejecting or affirming the fraud allegations—the Russian Federation's arguments fail to provide sufficient reason at this point to prolong the pause of these proceedings.

Moreover, in an opinion issued last month after conclusion of the instant round of briefing in this case, the D.C. Circuit held that "a foreign court's order ostensibly setting aside an arbitral award has *no* bearing on the district court's jurisdiction and is instead an affirmative defense properly suited for consideration at the merits stage." *Process & Indus. Dev. (P&ID) v. Fed. Republic of Nigeria*, 27 F.4th 771, 772 (D.C. Cir. 2022) (emphasis added).[10]  This recent and binding guidance from the D.C. Circuit makes clear that the "the validity or enforceability of an arbitral award is a merits question" and district courts "need not determine the validity of the arbitral award as part of [their] jurisdictional inquiry," *P&ID*, 27 F.4th at 776, and therefore, at a minimum, assessment of this Court's jurisdiction is independent of any Dutch court ruling to set-aside—or not—the award.  Indeed, the Russian Federation's motion to dismiss on sovereign immunity grounds is fully briefed and ripe for resolution, unless the parties wish to supplement their briefing afresh.  *See* Resp't's Mot. to Dismiss for Lack of Jurisdiction, ECF No. 24; Pet'rs' Opp'n to Mot. to Dismiss for Lack of Jurisdiction, ECF No. 63; Resp't's Reply in Supp. Mot. to Dismiss for Lack of Jurisdiction, ECF No. 64.  Such supplemental briefing is neither required nor necessary, leaving the Russian Federation with little identifiable hardship by proceeding to, at least, the threshold jurisdictional issue.  At most, then, the Russian Federation will have an opportunity to update its submissions in support of its pending motion to dismiss and that "is hardly an onerous burden" justifying an additional prolonged pause of these proceedings to the Shareholders' detriment.  Pet'rs' Opp'n at 18.

Weighed against this *de minimis* burden, if any, on the Russian Federation by proceeding with this litigation, a continued stay would carry significant hardship for the Shareholders.  Due

---

[10]   The parties addressed this decision in supplemental notices filed with the Court *sua sponte* following submission of their briefs.  *See* Pet'rs' Notice of Suppl. Authority, ECF No. 223; Resp't's Response to Notice of Suppl. Authority, ECF No. 227.

17

to economic sanctions and other penalties imposed by the international community against the Russian Federation following its invasion of Ukraine, the Shareholders posit that their "ability to locate and execute on Russian Federation assets" in the United States to satisfy a favorable judgment in this confirmation action will be impaired—a situation that may well deteriorate "during the years that an additional stay would last [if] the Russian Federation . . . engage[s] in other conduct that incurs yet further international sanctions." Pet'rs' Opp'n at 16; *see also* Pet'rs' Response to Status Report at 2, ECF No. 225 ("Finding and executing on assets will be far more difficult as a result of these sanctions."). A weighing of the relative hardships between the parties in the current posture of foreign proceedings militates strongly against a stay.

Tuning to the other component of *Europcar's* second factor—the estimated timeline for resolution of the Dutch proceedings—the parties agree that duration of the remand before the Amsterdam Court of Appeal will extend at least until 2023. *See, e.g.*, Resp't's Sur-Surreply at 3 (noting that Amsterdam Court of Appeal ruling is "anticipated" by the end of 2023); Pet'rs' Opp'n at 10 (estimating that "proceedings before the Amsterdam Court of Appeal will likely take between 1.5 and 2 years"). These projections do not account for the prospect of a second cassation appeal to the Dutch Supreme Court, which may last for an additional 1.5 to 2 years—in line with the 20-month duration of the Russian Federation's recently concluded first appeal to that court. *See* Pet'rs' Opp'n at 10. Altogether, this suggests that Dutch proceedings may conclude in late 2023 at the earliest but could stretch well into 2025 (or even 2026) upon a second cassation appeal to the Dutch Supreme Court.

In the last go-round of Dutch legal proceedings, the time from decision in a different intermediate appellate court, the Court of Appeal of The Hague, to a decision from the Dutch Supreme Court took over four years. *See* Resp't's Mem. at 1-4 (explaining that proceedings

before the Court of Appeal of The Hague began in 2017 and concluded in September 2018, followed by an appeal to the Dutch Supreme Court which finalized in November 2021).  The D.C. Circuit in *Stileks* determined that a stay of four years during an "appeal-reversal-remand round" in foreign set-aside proceedings could not be further extended as it would have "forced" the petitioner in that case to "sit on its award for several additional years." 985 F.3d at 880.  The same is true here.  Appellate set-aside proceedings in the Dutch courts are now entering their fifth year.  *See* Resp't's Mem. at 4 (noting that the first appeal in the Netherlands, before the Court of Appeal of The Hague, began in 2017).  A continued stay while the remand before the Amsterdam Court of Appeal and a possible second appeal to the Dutch Supreme Court unfold over another few years will preclude the Shareholders "from proceeding with their claims in federal court," *Belize Social Dev. Ltd.*, 668 F.3d at 732 (quoting *King v. Cessna Aircraft Co.*, 505 F.3d 1160, 1169 (11th Cir. 2007)), and consequently "force[]" them "to sit on [their] award for several additional years" with no ascertainable end in sight for set-aside proceedings in the Netherlands, *Stileks*, 985 F.3d at 880.  *Stileks* strongly suggests that a stay in these circumstances is unjustifiable.  *See id.*  The second *Europcar* factor therefore does not support a lengthened stay.

***

In sum, the interest in judicial economy and relative hardships to the parties, assessed through the lens of the first two *Europcar* factors in accordance with the D.C. Circuit's recent guidance in *Stileks*, 985 F.3d at 880-881, do not favor a stay.  The delay in this case has already been substantial: the arbitration underlying this litigation was initiated almost two decades ago and the Dutch set-aside proceedings that started in 2014 have yet to be resolved eight years later, with no evident resolution in the horizon.  Eight years after their initiation, with the economic

response to war in Ukraine increasingly compromising the Shareholders' ability to access Russian Federation assets in the United States in the event of succeeding in this action, the confirmation proceedings in this forum must proceed.

## IV.     CONCLUSION

For the foregoing reasons, the Russian Federation's motion to stay, ECF No. 201, is DENIED, and the Shareholders' motion for security, ECF No. 205, in connection with a third stay is DENIED AS MOOT.  Should the parties wish to supplement their prior submissions, the Russian Federation may do so by **April 27, 2022**, and the Shareholders by **May 11, 2022.**  An order consistent with this Memorandum Opinion will be filed contemporaneously.

Date:  April 13, 2022

_____
BERYL A. HOWELL
Chief Judge