# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

---

|  |  |  |
|---|---|---|
| HULLEY ENTERPRISES LTD., | ) | |
| YUKOS UNIVERSAL LTD., AND | ) | Case No. 1:14-cv-01996-BAH |
| VETERAN PETROLEUM LTD., | ) | |
| | ) | |
| *Petitioners*, | ) | Chief Judge Beryl A. Howell |
| | ) | |
| v. | ) | |
| | ) | |
| THE RUSSIAN FEDERATION, | ) | |
| | ) | |
| *Respondent*. | ) | |

---

### SUPPLEMENTAL SUBMISSION IN SUPPORT OF RESPONDENT'S
### MOTION TO DISMISS UNDER THE FOREIGN SOVEREIGN IMMUNITIES ACT

**WHITE & CASE**LLP

Carolyn B. Lamm (D.C. Bar No. 221325)
Nicolle Kownacki (D.C. Bar No. 1005627)
David P. Riesenberg (D.C. Bar No. 1033269)
701 Thirteenth Street, NW
Washington, DC 20005
Phone: (202) 626-3600
Fax: (202) 639-9355
clamm@whitecase.com

*Counsel for Respondent*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................... ii

PRELIMINARY STATEMENT .................................................. 1

ARGUMENT .................................................................. 6

I.    This Court Lacks Subject-Matter Jurisdiction Under the FSIA Because Respondent Never Offered or Agreed to Arbitrate with Petitioners.............................. 6

    A.    This Court Must Determine *De Novo* Whether Respondent Clearly and Unambiguously Offered to Arbitrate with Petitioners............................. 6

    B.    Respondent Never Unambiguously Offered to Arbitrate by Provisionally Applying the ECT Under Article 45(1) ............................................... 11

    C.    Respondent Never Unambiguously Offered to Arbitrate with Petitioners, Who Are Proxies for Russian Nationals and Who Never Made Any Lawful Foreign Investment.................................................................. 16

II.    Respondent Did Not Waive Its Immunity from this Action ........................... 27

    A.    Any Purported Waiver of Sovereign Immunity Must Be Clear and Unambiguous................................................................... 28

    B.    Signing the New York Convention Does Not Independently Constitute a Waiver in the Absence of Any Agreement to Arbitrate ........................ 30

CONCLUSION................................................................ 31

## TABLE OF AUTHORITIES

**Cases**                                                                                                      **Pages(s)**

*Animal Sci. Prods. v. Hebei Welcome Pharm. Co.*,
    138 S. Ct. 1865 (2018)........................................................................................2, 12, 13, 14

*Argentine Republic v. Amerada Hess Shipping Corp.*,
    488 U.S. 428 (1989)........................................................................................................28

*BG Grp. PLC v. Republic of Argentina*,
    572 U.S. 25 (2014)........................................................................................................6, 7

*Chevron Corp. v. Republic of Ecuador*,
    795 F.3d 200 (D.C. Cir. 2015)......................................................................................8

*Creighton Ltd. v. Gov't of Qatar*,
    181 F.3d 118 (D.C. Cir. 1999).............................................................................. *passim*

*DDK Hotels, LLC v. Williams-Sonoma, Inc.*,
    6 F.4th 308 (2d Cir. 2021) ............................................................................................9

*De Csepel v. Hungary*,
    859 F.3d 1094 (D.C. Cir. 2017)..................................................................................31

*Erie R.R. v. Tompkins*,
    304 U.S. 64 (1938)..................................................................................................12, 13

*First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*,
    462 U.S. 611 (1983)..................................................................................................4, 20

*First Options of Chicago, Inc. v. Kaplan*,
    514 U.S. 938 (1995)......................................................................................................11

*Frolova v. U.S.S.R.*,
    761 F.2d 370 (7th Cir. 1985) .......................................................................................29

*Hulley Enters. v. Russian Fed'n*,
    211 F. Supp. 3d 269 (D.D.C. 2016) ..............................................................................9

*Ivanenko v. Yanukovich*,
    995 F.3d 232 (D.C. Cir. 2021) ....................................................................................29

*KenAmerican Res., Inc. v. Int'l Union, United Mine Workers of Am.*,
    99 F.3d 1161 (D.C. Cir. 1996) ......................................................................................8

*Khochinsky v. Republic of Poland*,
    1 F.4th 1 (D.C. Cir. 2021)......................................................................................28, 30

*LLC SPC Stileks v. Republic of Moldova*,
   985 F.3d 871 (D.C. Cir. 2021) ..................................................................................10

*Maritime Int'l Nominees Establishment v. Republic of Guinea*,
   693 F.2d 1094 (D.C. Cir. 1982) ................................................................................28

*Process & Indus. Devs. Ltd. v. Fed. Republic of Nigeria*,
   27 F.4th 771 (D.C. Cir. 2022) ..................................................................................30

*Process & Indus. Devs. Ltd. v. Federal Republic of Nigeria*,
   962 F.3d 576 (D.C. Cir. 2020) ........................................................................1, 30, 31

*Saiyed v. Council on Am.-Islamic Rels. Action Network, Inc.*,
   346 F. Supp. 3d 88 (D.D.C. 2018) ............................................................................12

*Sarhank Grp. v. Oracle Corp.*,
   404 F.3d 657 (2d Cir. 2005) ........................................................................................8

*Tatneft v. Ukraine*,
   771 F. App'x 9 (D.C. Cir. 2019) ...............................................................................31

*VRG Linhas Aereas S/A v. MatlinPatterson Global Opportunities Partners II L.P.*,
   605 F. App'x 59 (2d Cir. 2015) ..............................................................................8-9

*Wainwright v. Goode*,
   464 U.S. 78 (1983) ................................................................................................2, 12

*\*World Wide Minerals, LTD. v. Republic of Kazakhstan*,
   296 F.3d 1154 (D.C. Cir. 2002) ......................................................................... *passim*

## Statutes and Rules

28 U.S.C § 1605(a)(1) ..................................................................................... 5, 27, 28, 31

28 U.S.C § 1605(a)(6) ................................................................................................... 6

## Other Authorities

*ADC Affiliate Ltd. v. Republic of Hungary*,
   ICSID Case No. ARB/03/16, Award (Oct. 2, 2006)...................................................21

*Aguas del Tunari, S.A. v. Republic of Bolivia*,
   ICSID Case No. ARB/02/3, Decision on Jurisdiction (Oct. 21, 2005)......................21

*Barcelona Traction, Light And Power Co., Ltd.*,
   1970 I.C.J. Rep. 3 ...........................................................................................4, 20, 22

*Case Concerning Certain Questions of Mutual Assistance in Criminal Matters (Djibouti v. France)*, Judgment, 2008 I.C.J. 177 (June 4)..................................................................11, 16

*Inceysa Vallisoletana, S.L. v. Republic of El Salvador*,
  ICSID Case No. ARB/03/26, Award (Aug. 2, 2006)..................................................27

*Littop Enterprises Ltd. v. Ukraine*,
  Final Award, SCC Case No. V 2015/092 .................................................4, 5, 17, 20

*Metal-Tech Ltd. v. Republic of Uzbekistan,*
  ICSID Case No. ARB/10/3, Award (Oct. 4, 2013)..................................................27

Restatement of U.S. Law on International Commercial and Investor-State Arbitration
  (Am. L. Inst., Proposed Final Draft 2019).................................................................8

*Rumeli Telekom A.S. v. Republic of Kazakhstan*,
  ICSID Case No. ARB/05/16, Award (July 29, 2008)...............................................21

*Saluka Invs. BV (The Netherlands) v. Czech Republic*,
  UNCITRAL, Partial Award (Mar. 17, 2006)...........................................................21

*SAUR Int'l S.A. v. Argentine Republic*,
  ICSID Case No. ARB/04/4,
  Décision sur la Compétence et sur la Responsabilité (June 6, 2012) ...............22, 23

*Tokios Tokelés v. Ukraine*,
  ICSID Case No. ARB/02/18, Decision on Jurisdiction (Apr. 29, 2004) ................21

U.N. GAOR, 23d Sess, Supp. 16 U.N. Doc. A/7216 (Feb. 26, 1968)..........................30

U.N. G.A. Res. 61/33 (Dec. 18, 2006).........................................................................30

*Yukos Capital S.A.R.L. v. the Russian Federation*,
  PCA Case No. 2013-31, Dissenting Opinion of Prof. Brigitte Stern
  on the Interim Award (Dec. 22, 2016)................................................................2, 15

*****indicates authority which counsel chiefly relies*

## PRELIMINARY STATEMENT

As explained in Respondent's pending Motion to Dismiss (ECF No. 24) ("Mot. to Dismiss), Respondent's Reply in Support of the Motion to Dismiss (ECF No. 64) ("Reply"), and Respondent's Supplemental Motion to Dismiss (ECF No. 108, amended by ECF No. 139-3 and ECF No. 142-2) ("Suppl. Mot."), this case must be dismissed on the basis of Respondent's immunity from suit under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602-1611.   Respondent has never offered—let alone entered into any unambiguous agreement—to arbitrate with Petitioners under the Energy Charter Treaty ("ECT") (ECF No. 2-7).   Nor has Respondent otherwise waived its sovereign immunity in any respect.   This Court thus lacks subject-matter jurisdiction under the FSIA.   All arguments raised under the ECT and FSIA in Respondent's 2015 and 2016 submissions (ECF No. 24, 64, 108, 142-2) are hereby reasserted and maintained in full.[1]

In accordance with this Court's Order (ECF No. 228), this Supplemental Submission now provides an updated analysis regarding further legal authorities and factual evidence relating to Respondent's FSIA defenses.   Without prejudice to the other issues addressed previously in the pending 2015 and 2016 submissions, this Supplemental Submission will address three categories of issues.

***First***, Respondent never offered to arbitrate with Petitioners.   Respondent did not ratify the ECT but only signed it—thus agreeing under the ECT's Article 45(1) only to apply the ECT provisionally "to the extent that such provisional application is not inconsistent with

---

[1] Respondent respectfully reserves all defenses arising under the Convention for the Recognition and Enforcement of Foreign Arbitral Awards ("New York Convention") until after the full adjudication and determination of Respondent's FSIA defenses, in accordance with the Minute Orders of Apr. 25, 2022 and Oct. 22, 2015, as required under *Process & Indus. Devs. Ltd. v. Nigeria*, 962 F.3d 576 (D.C. Cir. 2020) ("*P&ID I*").

[Respondent's] constitution, laws, or regulations."  Mot. to Dismiss 28-31; *see also* Declaration of Professor A.S. Avtonomov ("Avtonomov Declaration"), May 10, 2022 (attaching and reaffirming his First, Second, and Third Expert Reports).  Significantly, the arbitration provisions set forth under the ECT's Article 26 are incompatible with Russian law, as Professor Avtonomov explains based upon the decisions of the Supreme Court of the Russian Federation (Avtonomov Ex. ASA-063) and the Constitutional Court of the Russian Federation (Avtonomov Annex 6).  These rulings by Respondent's highest courts are binding on this Court in relation to determining questions of Russian law, in accordance with the U.S. Supreme Court's decision in *Animal Sci. Prods. v. Hebei Welcome Pharm. Co.* (analyzing Chinese law and concluding that "if the relevant state law is established by a decision of 'the State's highest court,' that decision is '<u>binding on the federal courts.</u>'"  138 S. Ct. 1865, 1874 (2018) (quoting *Wainwright v. Goode*, 464 U. S. 78, 84 (1983)) (emphasis added)).

Even if these rulings by Respondent's highest courts were not binding on this Court in the present context (which they are), further support for this Respondent's analysis is also provided in the opinion of the prominent arbitrator, Professor Brigitte Stern.  *See Yukos Capital S.A.R.L. v. the Russian Federation*, PCA Case No. 2013-31, Dissenting Opinion of Prof. Brigitte Stern on the Interim Award (Dec. 22, 2016) ¶ 56 ("Stern Op."), Ex. 1 to Decl. of Carolyn Lamm, May 11, 2022 ("Lamm Decl.), the eminent Russian law expert, Professor A.S. Avtonomov, and the 2016 decision of the District Court of The Hague.   *See* Hague J. (ECF No. 102-2) (setting aside the Award for the lack of any agreement to arbitrate).  At a minimum, these authorities powerfully demonstrate that Respondent's provisional application of the ECT cannot be construed as a clear and unambiguous offer to arbitrate, as required to abrogate sovereign immunity under the FSIA.

**Second**, Respondent has also demonstrated that Petitioners were not eligible offerees (*i.e.*, foreign investors) under Article 26 of the ECT by virtue of their Russian nationality and, separately, Petitioners' fraudulent and illegal conduct—when considered in light of the text, purpose, and structure of the ECT, as well as applicable principles of corporate veil-piercing. *See* Suppl. Mot. 23-38.  As recognized by the arbitrators in *Loewen v. United States*, including former Chief Judge Abner J. Mikva of the D.C. Circuit, "it is inconceivable that sovereign nations would negotiate treaties to supplement or modify domestic law as it applies to their own residents" without a clear and express statement of such intent. *Loewen Group, Inc. v. United States*, ICSID Case No. ARB(AF)/98/3, Award, ¶¶ 222-24 (June 26, 2003) (ECF No. 68-32).  Petitioners thus were not lawfully able to accept any purported offer of arbitration.

Petitioners' status as offshore proxies for a group of seven Russian Oligarchs has recently been further demonstrated by the discovery of additional documents, including but not limited to the 2003 Deed of Accession (ECF No. 202-1), which demonstrates these Russian Oligarchs' secret exercise of "control in fact" as to Petitioners. *See* Suppl. Mot. 26 ("A determination of 'control in fact' must be reached 'after an examination of the actual circumstances in each situation,' including 'the investor's . . . ability to exercise substantial influence over the management and operation of the investment.'" (quoting Final Act of the European Energy Charter Conference ("ECT Final Act"), Understandings IV.3, Dec. 17, 1994 (ECF No. 51-9)).  Significantly, Petitioners never disclosed this 2003 Deed of Accession, although Petitioners were subject to a continuing obligations of disclosure based upon the Tribunal's rulings on Respondent's document requests in Procedural Order No. 4 and Procedural Order No. 12.[2]

---

[2] *E.g.*, Procedural Order No. 4 ¶¶ 9-10 (ECF 75-10) (granting Respondent's request for "any amendments to the trust agreements," which would necessarily have included the Deed of

During the course of the litigation in the Netherlands, multiple further documents have been discovered recently, demonstrating the Russian Oligarchs' indisputable "control in fact" with respect to Petitioners' key business decisions.  *E.g.*, Contracts between GML and Konstantin Kagalovsky dated Jan. 18, 2004 (ECF No. 202-3) (documenting two multimillion-dollar transactions entered into by the Russian Oligarch, Leonid Nevzlin, on behalf of Petitioners' parent company, GML, with an individual named Konstantin Kagalovsky).  These documents are particularly relevant with respect to the veil-piercing analysis recognized by the U.S. Supreme Court and the International Court of Justice with respect to the interpretation and application of international law.  Suppl. Mot. 33-39 (analyzing *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 628 n.20 (1983); *Barcelona Traction, Light And Power Co., Ltd.*, 1970 I.C.J. Rep. 3, 39 ¶¶ 56-58 (Feb. 5) (ECF No. 49-12)).

In addition to this factual evidence, Respondent's argument on this point also has been further confirmed by new legal authorities, including the decision in *Littop Enterprises Ltd. v. Ukraine* ("*Littop*"), Final Award, SCC Case No. V 2015/092 (ECF No. 215-2), which held that "it is clear that the ECT was not designed to protect the interest of domestic investors against their State." *Littop* ¶ 614.  Based *inter alia* on this "clear" finding, *Littop* held that the relevant respondent state had never offered (or agreed) to arbitrate under the ECT with three "special purpose vehicles" established offshore in Cyprus to hold shares on behalf of two oligarchs, Igor Kolomoisky and Gennadiy Bogoliubov, who were themselves nationals of the same respondent state. *Id.* ¶¶ 613-614.  In other words, *Littop* analyzed a factual situation that was essentially

_____

Accession, because this document abrogated § 4.4 of the First Schedule of the Palmus Trust Settlement); Procedural Order No. 12 (granting Russia's Requests 4.3, 4.7, and 4.8) (ECF No. 75-19); Respondent's First Merits Request for Documents, Requests 4.3, 4.7, 4.8 (June 17, 2011) (ECF No. 87-15).

identical to the present case (*i.e.*, claims brought by "round-trip" investors via offshore intermediaries against their own state of nationality) and found the absence of any offer or agreement to arbitrate under the ECT.

The *Littop* decision is particularly striking, not only because it considered similar facts under the same treaty—but also because it was decided by <u>one of the same arbitrators</u>, L. Yves Fortier. *See, e.g.*, Lisa Bohmer, *IAReporter* (Lamm Decl. Ex. 5) (observing that "the reasoning of the *Littop* tribunal appear[ed] to diverge drastically" from the reasoning in "the 'Yukos shareholders cases' – in which Mr. Fortier sat as chair"). Respectfully, a treaty that is given two wholly divergent interpretations[3]—especially by the same arbitrator—cannot be considered "unambiguous." This conclusion is fatal to Petitioners' arguments in regard to Respondent's sovereign immunity.

***Third***, contrary to Petitioners' contention, Respondent's signature of the New York Convention does not itself reflect any freestanding waiver of Respondent's sovereign immunity under 28 U.S.C § 1605(a)(1), absent an agreement to arbitrate. The D.C. Circuit thus concluded in 1999 that a waiver of sovereign immunity occurs only where <u>two conjunctive requirements</u> are <u>both</u> satisfied: (1) "the defendant sovereign was . . . signatory to the [New York] Convention" <u>and also</u> (2) "agreed . . . to arbitrate in the territory of another signatory." *Creighton Ltd. v. Gov't of Qatar*, 181 F.3d 118, 122-23 (D.C. Cir. 1999). The New York Convention itself never references sovereign immunity and thus does not effectuate any freestanding waiver. In addition to the

---

[3] In the present case, the tribunal found that Petitioners were "organized in accordance with the law applicable" in Cyprus and the Isle of Man, and therefore qualified as an "Investor" under the ECT, "irrespective of who might own or control the Investor." *Hulley* Interim Award ¶¶ 413-417 (ECF No. 2-4). By contrast, as explained above, the *Littop* tribunal found that "although Claimants are incorporated in Cyprus they were ultimately owned or controlled by" nationals of the respondent state, such that the nationality of the ultimate beneficial owners disqualified them from pursuing arbitration against the respondent state. *Littop* ¶ 613.

*Creighton* decision, which is binding precedent, the U.S. Government has also recently rejected Petitioners' "waiver" theory in an *amicus curiae* submission before the D.C. circuit.   *See* U.S. Amicus Br. 9, 15 (Lamm Decl. Ex. 6) ("Traditional canons of statutory construction suggest that the arbitration exception was intended to displace the waiver exception, at least for arbitration agreements and arbitral awards that come within its ambit. . . .  Taking the position that the United States has implicitly waived its sovereign immunity [by signing the New York Convention] could disfavor the United States as a litigant, particularly in those countries that may otherwise provide for foreign sovereign immunity in such circumstances.").

As further detailed below, therefore, Respondent respectfully asks this Court to dismiss this case for lack of subject-matter jurisdiction under the FSIA.

## ARGUMENT

I.   **This Court Lacks Subject-Matter Jurisdiction Under the FSIA Because Respondent Never Offered or Agreed to Arbitrate with Petitioners**

A.   **This Court Must Determine *De Novo* Whether Respondent Clearly and Unambiguously Offered to Arbitrate with Petitioners**

As Respondent explained in its 2015 and 2016 Motions to Dismiss under the FSIA, the ECT is not itself an "agreement to arbitrate," as required to abrogate Respondent's sovereign immunity under 28 U.S.C. § 1605(a)(6).  To the contrary, the ECT contains a series of treaty provisions under Article 26(1), 26(2), and 26(3), whereby the "Contracting Parties" have offered to arbitrate certain categories of disputes with an open class of eligible offerees ("Investor[s] of another Contracting Party").  *See* ECT, Art. 26 (ECF No. 2-7); Expert Op. of Professor Rudolf Dolzer, Oct. 20, 2015 ("Dolzer Op.") 28-32 (ECF No. 24-8).

The ECT is thus "an investment treaty" containing "a dispute-resolution provision" applicable to certain categories of disputes between any one of the Contracting Parties and "an investor from . . . [an]other" Contracting Party.  *BG Grp. PLC v. Republic of Argentina*, 572 U.S.

25, 28 (2014).[4]  The U.S. Supreme Court first analyzed such a treaty in the *BG Group* case in 2014, where all three opinions—majority, concurrence, and dissent—confirmed unanimously that an "investment treaty" is typically <u>not</u> an agreement to arbitrate between the disputing parties.  To the contrary, as *BG Group* explained, an investment treaty typically contains a respondent State's standing "offer" to arbitrate, which the claimant investor may "accept" by submitting a notice of arbitration—thus concluding the arbitration agreement at the same moment that the arbitration commences.  *See BG Grp.*, 572 U.S. at 42 (explaining "how <u>an offer to arbitrate</u> in an investment treaty can be <u>accepted</u>, such as through an investor's filing of a notice of arbitration") (emphasis added); *see also id.* at 46 (Sotomayor, J., concurring in part) ("[T]he treaty is <u>not an already agreed-upon arbitration provision</u> between known parties, but rather a nation state's <u>standing offer to arbitrate</u> with an amorphous class of private investors.") (emphasis added); *id.* at 53 (Roberts, C.J., dissenting) (explaining that the BIT's arbitration clause "constitutes only a <u>unilateral standing offer</u> . . . an offer to submit to arbitration where certain conditions are met") (emphasis added).

As Respondent further explained in its 2015 and 2016 Motions to Dismiss under the FSIA, this Court cannot defer to the conclusions of the Dutch courts or the arbitrators but rather must evaluate *de novo* the existence of any alleged offer or agreement to arbitrate.  Mot. to Dismiss 27-28; Suppl. Mot. 7.  Specifically, as codified by the FSIA, international law requires the courts of the United States to "'determine <u>on their own initiative</u> that the immunity of [the] other State . . . is respected,'" and thus whether any exception to sovereign immunity is applicable under 28 U.S.C. § 1605.   Reply 3-11 (ECF No. 64) (emphasis added); Expert Opinion of Professor Sean Murphy ¶¶ 22-26, Dec. 11, 2015 (ECF No. 65-6) (collecting international legal authorities).

---

[4] As detailed below in Parts I-B and I-C, Respondent was not a "Contracting Party" and Petitioners were not "Investor[s] of <u>another</u> Contracting Party."

The same obligation is reflected in binding precedent, including in the context of a purported agreement to arbitrate. "'[I]f the parties disagree as to whether they ever entered into any arbitration agreement at all, the court must resolve that dispute.'" Suppl. Mot. 7 (quoting *KenAmerican Res., Inc. v. Int'l Union, United Mine Workers of Am.*, 99 F.3d 1161, 1163 (D.C. Cir. 1996) (emphasis added)). As confirmed by the parties' most recent briefing of the issue, and as acknowledged in the Restatement (Third) on the U.S. Law of International Commercial Arbitration, there is no support in applicable case law for Petitioners' suggestion that collateral estoppel should apply in the context of the arbitration exception under the FSIA. Sur-Surreply in Support of Mot. to Stay 9-10 (ECF No. 222); Restatement (Third) § 4.8, Reporters' Note c(iii) (2019) ("There is little case law addressing precisely the preclusive effect of a foreign judgment that recognizes or enforces an arbitral award.").

To the contrary, rather than applying any form of collateral estoppel, both the D.C. Circuit and the Second Circuit have consistently disregarded the conclusions of foreign courts as to the purported existence of arbitration agreements, while confirming U.S. courts' obligation to address the issue *de novo* "as part of [the] jurisdictional analysis." *Chevron Corp. v. Republic of Ecuador*, 795 F.3d 200, 205 n.3 (D.C. Cir. 2015) (disregarding the prior conclusions of the Dutch courts, and explaining that the FSIA "requires the District Court to satisfy itself" regarding the existence of an agreement to arbitrate, because to "eschew[] making this determination as part of [the] jurisdictional analysis . . . [is] error" (emphasis added)); *Sarhank Grp. v. Oracle Corp.*, 404 F.3d 657, 661 (2d Cir. 2005) (instructing the lower court to disregard the prior conclusions of the Egyptian courts, and explaining that "whether a party has consented to arbitrate is an issue to be decided by the [c]ourt in which enforcement of an award is sought" (emphasis added)); *see also VRG Linhas Aereas S/A v. MatlinPatterson Global Opportunities Partners II L.P.*, 605 F. App'x

8

59, 60 (2d Cir. 2015) (finding that the defendant "did not agree to arbitrate," and disregarding the prior conclusions of the Brazilian courts in the same case). Indeed, this Court previously addressed these same precedents in its 2016 Memorandum Opinion and recognized that neither the D.C. Circuit nor the Second Circuit had deferred to the foreign courts regarding the existence of an agreement to arbitrate in those cases. *See Hulley Enters. v. Russian Fed'n*, 211 F. Supp. 3d 269, 283 (D.D.C. 2016) (analyzing *Sarhank* and *Chevron*).

Similarly, as Respondent further explained in its Motions to Dismiss in 2015 and 2016, this Court likewise owes no deference to the arbitral tribunal because the parties never agreed "to delegate questions of arbitrability exclusively to the arbitrators." Suppl. Mot. 7-11. As the Second Circuit recently confirmed in a 2021 decision addressing whether the adoption of institutional arbitration rules reflects an exclusive delegation to decide arbitrability: "context matters." *DDK Hotels, LLC v. Williams-Sonoma, Inc.*, 6 F.4th 308, 318-19 (2d Cir. 2021) ("Incorporation of such [institutional arbitration] rules into an arbitration agreement does not, *per se*, demonstrate clear and unmistakable evidence of the parties' intent to delegate threshold questions of arbitrability to the arbitrator . . . .").

As Respondent has explained, in the present case the relevant "context" includes Petitioners' own conduct before the courts of Belgium, France, Germany, India, the Netherlands, or the United Kingdom. That is, during eight years of litigating around the world, "Petitioners never even suggested" before any of those courts "that the Russian Federation entered into 'an agreement to delegate arbitrability to the tribunal' exclusively . . . ." Fifth Van den Berg Decl. ¶ 5, 18 (ECF No. 180). Further context is provided by the published writings of Petitioners' own arbitration lawyers, which explain unequivocally that "competence-competence" provisions, such as Article 21(1) of the UNCITRAL Arbitration Rules, do not exclusively delegate analysis of the

existence of an arbitration agreement to the arbitral tribunal. Emmanuel Gaillard & Yas Banifatemi, *Negative Effect of Competence-Competence* 258-61 (ECF No. 118-4) ("[R]ecognising the arbitrators' priority in the determination of their jurisdiction . . . <u>by no means suggests</u> that domestic courts relinquish the existence and validity of an arbitration agreement. . . . [C]ourts leave it to the arbitrators to rule on the question and <u>recover their power of full scrutiny</u> at the end of the arbitral process, after the award is rendered by the arbitral tribunal." (emphases added)).

Further context is provided by Respondent's domestic law and the law of Cyprus (where two of the Petitioners are incorporated). Both the Russian Federation and Cyprus have adopted the 1985 Model Law on International Commercial Arbitration of the United Nations Commission on International Trade Law ("UNCITRAL Model Law"). Status: UNCITRAL Model Law on International Commercial Arbitration (1985), with amendments as adopted in 2006, (Lamm Decl. Ex. 2); The 1985 Model Law on International Commercial Arbitration of the United Nations Commission on International Trade Law, U.N. Doc. A/40/17, Annex I, June 21, 1985 (Lamm Decl. Ex. 3). Article 16 of this model statute addresses the "[c]ompetence of [the] arbitral tribunal to rule on its jurisdiction," and confirms that "[t]he arbitral tribunal may rule on its own jurisdiction, including any objections with respect to the existence or validity of the arbitration agreement." *Id.* art. 16. At the same time, the UNCITRAL Model Law also explicitly preserves the availability of judicial review—both during "setting aside" under Article 34 and when considering "recognition or enforcement" under Article 36. *Id.* at arts. 34, 36.

Accordingly, regardless of what Article 21(1) of the UNCITRAL Arbitration Rules may potentially have meant for other parties in other cases, *e.g.*, *LLC SPC Stileks v. Republic of Moldova*, 985 F.3d 871, 879 (D.C. Cir. 2021), the context surrounding the arbitration in the present case shows that neither Respondent nor Petitioners (nor Petitioners' arbitration lawyers, *see* ECF

No. 118-4) understood Article 21(1) to preclude judicial review.  The present case therefore does not show "clear and unmistakable evidence" that the parties intended to delegate the question of the arbitrators' competence exclusively to the arbitrators under *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 115 S. Ct. 1920, 131 L. Ed. 2d 985, 944 (1995).  This Court must therefore exercise its "power of full scrutiny" in evaluating whether Respondent offered to arbitrate with Petitioners.

Specifically, this Court must determine whether Respondent has "clearly and unambiguously" offered to arbitrate with Petitioners.  This is the standard applicable under international law, as well as the standard applied by the D.C. Circuit under the FSIA.  *See World Wide Minerals, LTD. v. Republic of Kazakhstan*, 296 F.3d 1154, 1162 & n.11, 15 (D.C. Cir. 2002) (explaining that "[a] foreign sovereign will not be found to have waived its immunity unless it has <u>clearly and unambiguously</u> done so," including where a claimant in arbitration alleges that "the state has agreed to arbitrate" (emphasis added)); Case Concerning Certain Questions of Mutual Assistance in Criminal Matters (Djibouti v. France), Judgment, 2008 I.C.J. 177, ¶ 62 (June 4) (Lamm Decl. Ex. 4) (explaining that "the attitude of the respondent State 'must be capable of being regarded as an '<u>unequivocal</u> indication' of the desire of that State to accept the Court's jurisdiction in a 'voluntary and <u>indisputable</u>' manner'" (collecting cases, emphasis added)).

In accordance with this framework, therefore, this Court must analyze whether Respondent has or has not unambiguously offered to arbitrate or otherwise waived its sovereign immunity under the ECT and FSIA.  As detailed below, this standard cannot be satisfied in the present case.

### B.    Respondent Never Unambiguously Offered to Arbitrate by Provisionally Applying the ECT Under Article 45(1)

As explained in Respondent's 2015 and 2016 Motions to Dismiss under the FSIA, Respondent never offered to arbitrate with Petitioners because Respondent never ratified the ECT,

but rather merely applied the ECT provisionally "to the extent that such provisional application is not inconsistent with its constitution, laws, or regulations." Mot. to Dismiss 28-31 (quoting Article 45(1) of the ECT); Suppl. Mot. 12-18. The arbitration provisions under Article 26 of the ECT were incompatible with existing Russian statutory law, as explained in detail by the District Court of The Hague (ECF No. 102-2), the respected arbitrator, Brigitte Stern (Lamm Decl. Ex. 1), and multiple respected experts on Russian law. *E.g.*, Avtonomov Declaration (attaching and reaffirming his First, Second, and Third Expert Opinions). Accordingly, Respondent's signature of the ECT did not commit Respondent to arbitrate, as required to establish this Court's subject-matter jurisdiction under the FSIA. *See* Mot. to Dismiss 28-31 (quoting Article 45(1) of the ECT); Suppl. Mot. 12-18.

In any event, although this question has been the subject of extensive debate since 2005—which Petitioners will likely now attempt to revive—that debate is now at an end for the purposes of this Court's analysis. As the U.S. Supreme Court recently explained in a 2018 decision addressing the evaluation of foreign law under Rule 44.1 of the Federal Rules of Civil Procedure, "[i]f the relevant state law is established by a decision of 'the State's highest court,' that decision is '<u>binding on the federal courts</u>.'" *Animal Sci. Prods.*, 138 S. Ct. at 1874 (quoting *Wainwright v. Goode*, 464 U.S. 78, 84 (1983) (emphasis added)). Specifically, in this passage from the *Animal Science Products* decision, the parties were disputing a question of Chinese law. The U.S. Supreme Court thus concluded that the longstanding rule applicable to judicial decisions rendered by state courts (*i.e.*, States of the Union) under *Erie R.R. v. Tompkins*, 304 U.S. 64 (1938), also obligates this Court to show conclusive deference to the highest courts of foreign states as to the interpretation of their own law. *See e.g.*, *Saiyed v. Council on Am.-Islamic Rels. Action Network, Inc.*, 346 F. Supp. 3d 88, 94 (D.D.C. 2018) (identifying *Animal Science Products*, 138 S. Ct. at

1874, as an application of the *Erie* doctrine and confirming that "the Court is bound by the decisions of the state's highest court interpreting that state's law").

Applying the framework adopted by the U.S. Supreme Court in *Animal Science Products*, therefore, this Court must reject Petitioners' arguments regarding the relationship between Article 45(1) of the ECT and Russian law.  This conclusion is mandated by a 2009 decision of the Supreme Court of the Russian Federation regarding the broader category of unratified treaties (whether such treaties are in force or merely provisionally applicable), as well as a more recent 2020 decision by the Constitutional Court of the Russian Federation (addressing the ECT specifically).  As the Supreme Court of the Russian Federation explained in Cassation Ruling No. 59-O09-35 dated December 29, 2009:

> By virtue of the hierarchy of legal acts, priority over the laws of the Russian Federation is accorded to international treaties of the Russian Federation concluded on behalf of the Russian Federation (interstate treaties), consent to be bound by which was given in the form of a federal law . . .
>
> Since the Government of the Russian Federation is not entitled to adopt, amend or abrogate the provisions of criminal laws or laws on criminal procedure, the provisions of the non-ratified Treaty between the Government of the Russian Federation and the Government of the Chinese People's Republic on the Russian-Chinese Border Regime dated November 9, 2006, to the extent it provides for rules different from those provided for by the [federal statutes] shall not apply in the Russian Federation.

Avtonomov Declaration (Ex. ASA-063).

In this passage, the Supreme Court of the Russian Federation explained that the Executive Branch of the Russian Federation cannot supersede or preempt the statutes enacted by the Parliament of the Russian Federation by signing unratified treaties with conflicting provisions. Thus, although the Government may unilaterally promulgate decisions and orders with normative legal force, such decisions and orders necessarily remain subordinate to federal statutes enacted by the Parliament.  As Professor Avtonomov explains, this reasoning applies regardless of whether

the unratified treaty is in force or only provisionally applicable.  First Avtonomov Expert Report ¶ 38 (Avtonomov Annex 2); Third Avtonomov Expert Report ¶ 11 (Avtonomov Annex 4).

More recently, on December 24, 2020, the Russian Constitutional Court directly addressed the conflict between Russian law and the ECT's Article 26, under which the "Contracting Parties" (and not the mere "signatories," such as Respondent) offer to arbitrate with foreign investors. Avtonomov Declaration (Annex 6).  As the Constitutional Court explained, Respondent's election to provisionally apply the ECT "to the extent" permitted by Russian law, in accordance with Article 45(1), did not contemplate any offer to arbitrate under Article 26:

> [T]he fact of signing an international treaty, which is subject to ratification and envisages provisional application, on behalf of the Russian Federation by decision of the Russian Federation Government, cannot obviously imply the Russian Federation Government's consent to extend provisional application to its provisions affecting the exclusive powers of the federal parliament.
>
> To do otherwise would mean, counter to [the Constitution], that the Russian Federation Government, without the consent of the Federal Assembly and in breach of the separation of powers principle, could change the legal regulation of relationships which are governed by federal law and can under no circumstances be taken out of the area directly regulated by federal law.

 Avtonomov Declaration (Annex 6).

In this 2020 decision, the Constitutional Court thus confirmed the Russian Constitution's respect for a "separation of powers" approach—as already reflected, *inter alia*, in the 2009 decision of the Russian Supreme Court described above (Ex. ASA-063)—and explicitly rejected the assertion that the ECT's Article 26 obligates Respondent to arbitrate in contravention of Respondent's applicable statutory law.  Avtonomov Declaration (Annex 6).

These two rulings by the highest courts of the Russian legal system are binding on this Court under *Animal Science Products*, 138 S. Ct. at 1874.  Even if this Court were not bound to defer to these rulings, this Court should nonetheless reach the same result in accordance with longstanding Russian legal principles, as Professor Avtonomov explains in further detail in his

Expert Reports.  *See* Avtonomov Declaration (Annex 2, Annex 3, Annex 4).  At a minimum, this Court must conclude that the convoluted relationship between Russian law and the ECT's Article 45(1) cannot establish that Respondent "clearly and unambiguously" offered to arbitrate with Petitioners.

Indeed, even accepting Petitioners' own affirmative case, Petitioners' theory of interpretation is highly ambiguous, as explained by the prominent arbitrator, Professor Brigitte Stern.  Stern Op. (Lamm Decl. Ex. 1) ¶ 69 (describing the "circularity" of the claimants' reasoning under the ECT's Article 45(1)).  Specifically, Petitioners have relied upon a theory of <u>double</u> <u>renvoir</u>, such that the ECT's reference to domestic law under Article 45(1) fully incorporates the <u>mutually contradictory reference back</u> to "international treaties" under Article 15(4) of the Russian Constitution and similar Russian statutory provisions.  *Id.*  Like the District Court of The Hague, Professor Stern thus concludes that the ECT's conflict provision should prevail over any mutually contradictory provisions found in Russian law, thus defeating consent to arbitration.[5]  After all, unambiguous consent to arbitration cannot be established by double *renvoir*, where the treaty "makes a *renvoi* to national law [and] national law makes a *renvoi* to the treaty, which creates . . . circularity."  Stern Op. (Lamm Decl. Ex. 1) ¶ 69 ("[I]f the treaty says that it does not apply if it is inconsistent with the national legal order, so be it.");  *see also* Avtonomov Declaration (Annex 3,

---

[5] Specifically, in its Judgment of Apr. 20, 2016, the District Court of The Hague agreed that the reference to "international treaties and agreements" in Article 15(4) of the Russian Constitution does not include unratified treaties, such as the ECT.  Hague J. ¶ 5.91 (ECF No. 102-2) ("A different interpretation of [Article 15(4)] of the Constitution would allow treaties not approved by the legislature to form part of Russian law and also supersede legislation not compatible with such treaties.  Such interpretation cannot be reconciled with the principle of separation of powers.");  *see also* Stern Op. ¶ 56 (Lamm Decl. Ex. 1)  ("A reference to an international treaty, without specification, is, in my view, a reference to a treaty which is in force following a consent given by the different methods accepted by international law.").

Second Expert Report ¶¶ 11-20) ("[C]onflict rules are interpreted not to refer to other conflict rules.").

Fundamentally, even Petitioners' affirmative case on double *renvoi* (which is wrong in any event)[6] cannot establish clear and unambiguous consent to arbitrate. Accordingly, the applicable standard for the abrogation of sovereign immunity under the FSIA and international law is not satisfied. *See World Wide Minerals*, 296 F.3d at 1162 & n.11, 15 (explaining that "[a] foreign sovereign will not be found to have waived its immunity unless it has clearly and unambiguously done so," including where a claimant in arbitration alleges that "the state has agreed to arbitrate" (emphasis added)); *Djibouti* J. at 62 (Lamm Decl. Ex. 4) (explaining that "the attitude of the respondent State 'must be capable of being regarded as an 'unequivocal indication' of the desire of that State to accept the Court's jurisdiction in a 'voluntary and indisputable' manner" (collecting cases, emphasis added)).

## C.   Respondent Never Unambiguously Offered to Arbitrate with Petitioners, Who Are Proxies for Russian Nationals and Who Never Made Any Lawful Foreign Investment

As explained in Respondent's previous submissions, Petitioners were not eligible offerees (*i.e.*, foreign investors) under Article 26 of the ECT by virtue of their Russian nationality and fraudulent conduct, and thus could not accept any purported offer of arbitration. Mot. to Dismiss 31-37; Suppl. Mot. 23-42. This conclusion is justified in three ways.

---

[6] To be sure, Professor Avtonomov explains why this case does not create a true double *renvoi*, in any event. That is, although the ECT's Article 45(1) does refer to the Russian Constitution, neither Article 15(4) of the Russian Constitution nor the equivalent statutory provisions actually refer back to unratified treaties, such as the ECT. This is because unratified treaties will never prevail over Russian statutes in the event of a conflict, as confirmed by both the Supreme Court and Constitutional Court of the Russian Federation. Avtonomov Declaration (Annex 3, Second Expert Report ¶¶ 21-36).

*First*, under Article 26 of the ECT, the Contracting Parties' offer to arbitrate contemplates only "an Investor of <u>another</u> Contracting Party" as a potential offeree. As far as Respondent is concerned, however, Petitioners are not nationals "of another Contracting Party" because their effective nationality is to be assessed in accordance with the criterion of "control in fact." *See* ECT Final Act, Understanding IV.3, Dec. 17, 1994 (ECF No. 51-9). This legal analysis has been confirmed, most recently, by the *Littop* decision, which held that "it is clear that the ECT was not designed to protect the interest of domestic investors against their State." *Littop* ¶ 614 (ECF No. 215-2). The *Littop* tribunal therefore disqualified three Cypriot shell companies—similar to Petitioners, who are likewise offshore shell companies based in Cyprus and the Isle of Man—from bringing "round-trip" claims on behalf of certain oligarchs, Igor Kolomoisky and Gennady Bogoliubov, against these oligarchs' own state of nationality (Ukraine) under Article 26 of the ECT. *Id.* ¶¶ 612-614.

Applying the criterion of "control in fact," it is evident that Petitioners are actually Russian nationals and not "Investor[s] of <u>another</u> Contracting Party," since the Russian Oligarchs exercise control in fact as to Petitioners. This is confirmed by the documents summarized in the Supplemental Motion, which demonstrated that Leonid Nevzlin and Mikhail Brudno—and not Kelvin Hudson, the Guernsey trustee—have consistently exercised *de facto* control with respect to all of Petitioners' business affairs. *See* Suppl. Mot. 28-33.

The precise mechanism underlying this *de facto* control has been revealed even more clearly with the discovery of the Deed of Accession of April 3, 2003 (ECF No. 202-1).[7] During

---

[7] As explained previously, Petitioners' allegation that the Deed of Accession was "a matter of public knowledge" in 2003 are incorrect. *See* Sur-Surreply in Support of the Mot. to Stay 13-14 (ECF No. 222); Ninth Van den Berg Decl. ¶ 18. Petitioners are attempting to confuse matters by citing references to a distinct entity known as the "Palmus Foundation of Liechtenstein" – an entity

the arbitration, Petitioners falsely represented to the Tribunal that an independent trustee named Kelvin M. Hudson has "the power to exercise voting rights" with respect to the shares of Group Menatep Limited ("GML"), which is Petitioners' parent company. Petitioners repeated this false representation many times from 2007 to 2008.[8] Petitioners were secretly aware, however, that Mr. Hudson did not actually exercise GML's voting rights.

---

distinct from the Palmus Trust of Guernsey, which ceased to exist after April 2003 an thus has no relevance to the issue of GML's voting rights after April 2003. See 2009 *Yukos Universal Limited* Interim Award ¶¶ 463, 475 (ECF 2-5) ("The Palmus Trust was established [in Guernsey] on 5 March 2003. Its Settlor was the Palmus Foundation of Lichtenstein."). It is ironic that Petitioners are now attempting to confuse the Liechtenstein foundation with the Guernsey trust, given Petitioners' emphatic statements distinguishing the two entities during the arbitration. See Hearing Transcript 20 (ECF 76-9) (Petitioners' counsel: "The Palmus Foundation ceased to exist in March 2003. So in May 2003 the Palmus Trust was created." Petitioners' expert: "On 5th March 2003, Palmus Trust was established. The Palmus Foundation, as of that date, no longer held any shares in GML.").

[8] *See, e.g.*, Arbitral Tribunal Nov. 29, 2008 (*Hulley Enters. Ltd. v. Russian Federation*), Hr'g Tr. 53-54, 56, 69-70 (29 Nov. 2008) (ECF No. 76-13) (Closing Statement of HVY's Counsel) ("[O]ne aspect which is, we submit, extremely relevant of the discretion of the trustees is the exercise of voting rights here. Because that's part of their discretion. . . . [V]oting rights are important for ascertaining control . . . . [W]e have trustees who . . . exercise the voting right in their discretion; nobody is entitled to tell them how to do that; . . . they vote the shares in their discretion. . . . [T]he vote is with the trustees, and nobody can control the vote by the trustees. . . . And there are no documents in this arbitration which would suggest that in fact it's happening otherwise than in the trust instrument. . . . We have nothing which suggests that the exercise of the voting right was carried out by the trustees otherwise than in accordance with the trust instrument."); First Expert Op. of Brian Green QC (4 May 2007) ¶¶ 106, 133 (ECF No. 73-23) ("[A]s regards the exercise of voting rights in particular . . . the Trustees do indeed retain voting power. . . . [W]hen it comes to the exercise of voting and any other rights attaching to the GML shares, the Trustees (and no other persons) are entitled to exercise them."); Second Expert Op. of Brian Green QC (Sept. 29, 2008) ¶¶ 7, 22, 40 (ECF No. 74-2) ("[T]he Trustees (and no other person) 'control' the GML shares . . . . [U]nder the Trusts the Trustees (and no other person) have the right to exercise the voting rights attaching to the GML share . . . . [A]nalysis of the 'control' issue from a trust law standpoint has to be focused on the Trustees' voting rights over the GML shares . . . . [T]here is no doubt that the Trustees have 'meaningful control' over the voting rights attaching to the GML shares – no other party does. . . . [T]he Trustees clearly hav[e] a power to vote the GML shares . . . .").

In fact, on April 3, 2003, Mr. Hudson had secretly executed a Deed of Accession transferring voting rights from the trustee to one of the Russian Oligarchs, Mr. Platon Lebedev. This document provided explicitly: "[W]e hereby transfer to Mr. Platon L. Lebedev voting rights on shares in Group MENATEP with regard to the issues concerning shareholding of YUKOS shares, including voting on YUKOS shares, and all issues relating to YUKOS activity whenever such activity is connected to executing of voting rights on stock in enterprises directly or indirectly held by Group MENATEP." Deed of Accession of April 3, 2003 (ECF No. 202-1). Significantly, Petitioners never disclosed this 2003 Deed of Accession to the tribunal, although Petitioners were subject to a continuing obligation of disclosure based upon the Tribunal's ruling on Respondent's document requests.[9]

Petitioners likewise concealed dozens of additional documents relating to the Russian Oligarchs' direct and indirect control over GML and Petitioners. These documents included numerous items of correspondence, minutes of meetings, and contracts reflecting the intervention of the Russian Oligarchs in Petitioners' key business decisions—frequently involving transactions worth millions of U.S. dollars. *E.g.*, Contracts between GML in person of Nevzlin L.B. and Konstantin Kagalovsky dated Jan. 18, 2004 (ECF No. 202-3) (documenting two multimillion-dollar transactions entered into by the Russian Oligarch, Leonid Nevzlin, on behalf of Petitioners' parent company, GML, with an individual named Konstantin Kagalovsky); Notes of a Meeting Between GML and Leonid Nevzlin dated Dec, 12, 2003 (ECF No. 202-4) (documenting Leonid

---

[9] *E.g.*, Procedural Order No. 4 ¶¶ 9-10 (ECF 75-10) (granting Respondent's request for "any amendments to the trust agreements," which would necessarily have included the Deed of Accession, because this document abrogated § 4.4 of the First Schedule of the Palmus Trust Settlement); Procedural Order No. 12 (granting Russia's Requests 4.3, 4.7, and 4.8) (ECF No. 75-19); Respondent's First Merits Request for Documents, Requests 4.3, 4.7, 4.8 (June 17, 2011) (ECF No. 87-15).

Nevzlin's approval of GML's payments of more than US$ 740 million—to be made by Petitioner Yukos Universal Limited—to an entity in the BVI called Tempo Finance Limited, controlled by former Russian public officials involved in the Oligarchs' original illegal acquisition of their shares of Yukos Oil); Correspondence between GML and Excel-Serve Management Ltd., dated Jan 19, 2004 (ECF No. 202-5) (explaining that GML had retained a Cypriot firm that would provide "front runners to the Cyprus companies of the group, i.e. to provide individuals who . . . appear to be managing the companies by administering their bank accounts and signing all agreements," even though actual control would be retained continuously by the Russian Oligarchs).

Together with the documents exhibited before this Court in 2016, these additional documents show a consistent pattern from 2003 to as late as 2015, whereby the Russian Oligarchs—rather than Petitioners, GML, or the Guernsey trusts—actually exercised "control in fact" in circumvention of the Guernsey trustees and all other corporate officers.  In accordance with the text, purpose, and structure of the ECT, as well as the drafters' understanding of the significance of "control in fact" (ECF No. 51-9) and the reasoning of the *Littop* tribunal (ECF No. 215-2 ¶ 614), Petitioners therefore were not eligible to accept any offer of arbitration (purportedly) extended by Respondent under the ECT's Article 26.

**Second**, as further explained in the Motion to Dismiss 27, 33-35 and Suppl. Mot. 33-35, the above reasoning is further buttressed by the veil-piercing principle recognized as an integral element of customary international law by the U.S. Supreme Court and the International Court of Justice. *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 628 n.20 (1983) ("*Bancec*"); *Barcelona Traction, Light And Power Co., Ltd.*, 1970 I.C.J. Rep. 3, 39 ¶¶ 56-58 (Feb. 5) (ECF No. 49-12) ("[T]he veil is lifted, for instance, to prevent the misuse of the privileges of legal personality, as in certain cases of fraud or malfeasance . . . .").  As a matter of

international law, U.S. courts therefore "recognize[] . . . that an incorporated entity—described by Chief Justice Marshall as 'an artificial being, invisible, intangible, and existing only in contemplation of law'—is not to be regarded as legally separate from its owners in all circumstances. Thus, where a corporate entity is <u>so extensively controlled</u> by its owner that a relationship of principal and agent is created," it is incumbent upon this Court to "refuse[] to give effect to the corporate form where it is interposed to defeat legislative policies." *Bancec*, 462 U.S. at 628-630 (emphasis).

That principle is directly implicated by the "policies" underlying the ECT and investor-State arbitration generally.  As the arbitrators themselves accepted in this case—and as further underscored by Mr. Fortier's decision in the *Littop* case—"the ECT is directed towards the promotion of foreign investment, especially of investment by Western sources in the energy resources of the Russian Federation and other successor States of the USSR."  *Hulley* Interim Award ¶ 433 (ECF No. 2-4).  Even if the Dutch courts have disregarded this veil-piercing principle, this Court is bound to apply it under *Bancec*.  Indeed, numerous investor-State tribunals have likewise confirmed that the nationality of a corporate entity used for illegal or fraudulent purposes must be disregarded, such that only the nationality of the corporate entity's principals becomes relevant to the entity's status as an eligible offeree under an investment treaty.[10]

Accordingly, because Petitioners' principals are the Russian Oligarchs, Petitioners' illegal activities (summarized below) thus disqualify them as potential foreign investors in any dispute

---

[10] *Tokios Tokelés v. Ukraine*, ICSID Case No. ARB/02/18, Decision on Jurisdiction ¶¶ 54-56 (Apr. 29, 2004) (ECF No. 57-23); *Saluka Invs. BV (The Netherlands) v. Czech Republic*, UNCITRAL, Partial Award ¶ 230 (Mar. 17, 2006) (ECF No. 58-1); *Aguas del Tunari, S.A. v. Republic of Bolivia*, ICSID Case No. ARB/02/3, Decision on Jurisdiction ¶ 245 (Oct. 21, 2005) (ECF No. 57-25); *Rumeli Telekom A.S. v. Republic of Kazakhstan*, ICSID Case No. ARB/05/16, Award ¶ 328 (July 29, 2008) (ECF No. 58-7); *ADC Affiliate Ltd. v. Republic of Hungary*, ICSID Case No. ARB/03/16, Award ¶ 358 (Oct. 2, 2006) (ECF No. 57-15).

against the Russian Federation, such that they were unable to accept any purported offer to arbitrate under Article 26 of the ECT.  This conclusion is only further corroborated by Petitioners' concealment of the 2003 Deed of Accession during the arbitration, as well as the numerous other documents reflecting Petitioners' control in fact, as well as the instances of the Russian Oligarchs' illegal conduct described below.

*Third*, and finally, the Russian Oligarchs' illegal acquisition of the shares of OAO Yukos Oil Company during the Loans-for-Shares auctions in 1995 and 1996 likewise renders Petitioners ineligible as potential offerees under the well-established principle of international law recognized by the arbitrators themselves: "An investor who has obtained an investment in the host State . . . in violation of the laws of the host state . . . should not be allowed to benefit from the Treaty." *Hulley* Final Award ¶ 1352 (ECF 2-1).

This principle has consequences for the veil-piercing analysis described above, *e.g.*, *Barcelona Traction* ¶¶ 56-58 (Feb. 5) (ECF No. 49-12) ("[T]he veil is lifted, for instance, to prevent the misuse of the privileges of legal personality, as in certain cases of <u>fraud or malfeasance</u> . . . ." (emphasis)).  This principle also has a freestanding application under international law, disqualifying Petitioners as offerees.  Dolzer Op. at ¶¶ 33-47 (ECF No. 24-8).  As explained by the tribunal in *SAUR v. Argentina*, which the arbitrators quoted with approval, "[t]he condition of not committing a serious violation of the legal order is a tacit condition, inherent to any [investment treaty] as, in any event, it is incomprehensible that a State offer the benefit of protection through arbitration if the investor, in order to obtain such protection, has acted contrary to the law."  *Hulley* Final Award ¶ 1352 n. 1773(ECF No. 2-1).

Indeed, in paragraph 1370 of the arbitrators' awards, the arbitrators recognized and accepted that the illegalities committed during the Loans-for-Shares auctions in 1995 and 1996

would have precluded any offer of arbitration from being accepted, but for the arbitrators' mistaken belief that "Bank Menatep and the Oligarchs" were "an entity and persons separate from [Petitioners]." *SAUR Int'l S.A. v. Argentine Republic*, ICSID Case No. ARB/04/4, Décision sur la Compétence et sur la Responsabilité ¶ 308 (June 6, 2012) (ECF No. 57-1); see also *Hulley* Final Award ¶ 1351 n. 1773 (ECF No. 2-1) (providing translation of *SAUR* ¶ 308).  In light of Petitioners' misrepresentations to the arbitrators and concealment of documents relating to the Russian Oligarchs' "control in fact," discussed above, as well as the proper application of the veil-piercing doctrine, it is clear that the arbitrators' finding under paragraph 1370 is unsustainable. In reality, Petitioners are legally and practically indistinguishable from the Oligarchs.

As detailed in the Supplemental Motion, Petitioner Yukos Universal Limited channeled millions of dollars to a group of Russian public officials (the so-called "Red Directors") who had been the Government-appointed managers of Yukos prior to its privatization.  These payments constituted acts of bribery, such that Petitioners are disqualified from seeking arbitration under the principles described above.  Suppl. Mot. 33-39.

As Respondent has explained, in the mid-1990s, the so-called "Loans-for-Shares" auctions were held to avoid the threat of the Russian state bankruptcy.  Mot. to Dismiss 1, 7-14; Suppl. Mot. 34-39.  These included auctions of the shares of OAO Yukos Oil Company.  In the Arbitrations, the Russian Federation documented that these auctions had been fraudulently manipulated by the Russian Oligarchs in violation of President Yeltsin's Decree 889 of August 31, 1995, which required genuine competition amongst bidders. *E.g.*, First Memorial on Jurisdiction, ¶¶ 148-153, 21 n. 8 (ECF No. 71-7).  The Yukos privatization was therefore void ab initio, including because of the bribery described below.  Through their illegal actions, the Russian Oligarchs obtained the shares in Yukos for a fraction (at most USD 160 million) of their fair value (USD 6.9 billion). *See*

Market Data, Trade Results by Security for Yukos from Jan. 1, 1997 to Dec. 31, 2007, RTS Exchange, p. 3 (Lamm Decl. Ex. 12).

A financial institution controlled by the Russian Oligarchs, known as Bank Menatep, acted as the auction organizer. Mot. to Dismiss 8. Instead of allowing genuine competition amongst bidders (as required by President Yeltsin's Decree), Bank Menatep allowed only their own controlled sham companies (Laguna, Regent, Monblan) to participate in the auctions with pre-coordinated bids. Meeting of Tender Commission for Investment Tender in Respect of Shares of Yukos Protocol No. 1, dated Dec. 8, 1995 (Lamm Decl. Ex. 13); Meeting of Tender Committee on Summary of the Investment Tender Protocol No. 2, dated Dec. 8, 1995 (awarding the tender to Laguna), (Lamm Decl. Ex. 14). The Russian Oligarchs also received help from the so-called Red Directors. The Red Directors, who were led by Sergey Muravlenko, were Russian government officials who ran Yukos at the time and played an important role in the privatization of Yukos. *E.g.*, Resolution No. 354 on Founding Yukos dated Apr. 15, 1993 (Lamm Decl. 16) (appointing Muravlenko); Cabinet of Ministers Resolution No. 383-r dated Mar. 6, 1993 (Lamm Decl. 17) (appointing Muravlenko). As the Russian Federation explained to the Tribunal in 2011, the Russian Oligarchs motivated the Red Directors by promising to pay "a kickback" in exchange "for helping [the Russian Oligarchs] acquire Yukos during the [privatization] program." Respondent's Counter-Memorial ¶ 36 (ECF No. 72-2).

Specifically, the Red Directors assisted the Russian Oligarchs in three concrete ways. First, one of the Red Directors, Sergey Muravlenko, persuaded the Russian Government to restructure the Yukos privatization to ensure that a single bidder would win approximately 78% of the Yukos shares (rather than two separate bidders obtaining a 45% block and 33% block). Letter from S.V. Muravlenko to A.B. Chubais, dated Sept. 27, 1995 (including a handwritten notation reflecting

approval in the Protocol No. 2 of Oct. 12, 1995), (Lamm Decl. Ex. 8); Protocol No. 2 of the Auction Committee on the LFS auctions, dated Oct. 23, 1995, 251 (adopting "the offer of the company" set forth in Muravlenko's letter of Sept. 27, 1995), (Lamm Decl. 9).

Second, the Red Directors' secretary, M.F. Yudin,  assisted the Russian Oligarchs by writing a report on the disqualification of the only independent, rival bidder (a company called Babyevskoye), which the auction committee adopted.   Protocol No. 3 of the YUKOS Board of Directors (identifying M.F. Yudin as a subordinate of Sergey Muravlenko), (Lamm Decl. Ex. 10); Report by M.F. Yudin, dated Dec. 5, 1995 (disqualifying a rival company from participating in the privatization) (Lamm Decl. Ex. 15).

Third, the Red Directors' associate, Sergey Generalov, assisted the Red Directors by casting multiple votes in favor of the Russian Oligarchs' shell companies during successive stages of the Yukos privatization.  This included an "advisory" vote during the 1995 competition and a full vote (as a "Member of the Commission") during the 1996 competition.   Meeting of Tender Commission for Investment Tender in Respect of Shares of Yukos Protocol No. 1, dated Dec. 8, 1995 (adopting Yudin's report and reflecting Generalov's advisory vote) (Lamm Decl. Ex. 14); Protocol No. 2 of the Session of the Tender Commission Conducting Commercial Tender with Investment Terms dated 23 Dec. 1996 (Lamm Decl. Ex. 18) (reflecting Generalov's full vote).

Even more generally, the Red Directors' silence was necessary to conceal the Russian Oligarchs' secret control of the sham companies bidding against one another in the Yukos privatization in 1995 and 1996.   Two of the Red Directors, Muravlenko and Ivanenko, thus later provided testimony explicitly confirming that the Russian Oligarchs needed their help to win the auctions.  *See* Transcript of Sergey V. Muravlenko's Witness Hearing, May 14, 2007, 9 (ECF No. 116-7) ("Khodorkovsky verbally promised that our material interests, i.e. mine, as well as those of

Ivanenko, Kazakov, and Golubev will be taken into consideration.  We agreed to cooperate with him . . . . Then one the employees of the legal department of the legal department came to me and offered to sign a contract with 'Hinchley Limited,' a foreign company, for consulting services.  I agreed.  Under the agreement, I received . . . 8,040,000 rubles in 1999, and 8,349,000 rubles in 2000"); Transcript of Ivanenko V. Valentinovich Witness Hearing, May 11, 2007, 4, (Lamm Decl. Ex. 11).

In exchange, the Russian Oligarchs made a secret oral promise to pay financial benefits to the Red Directors, as the Red Directors also testified.   Ultimately, in exchange for their help in enabling the illegal acquisition of Yukos, the Red Directors were paid at least USD 613.5 million by the Russian Oligarchs during the subsequent eight years.   At the time, one of the Russian Oligarchs (Khodorkovsky) did not want to reveal the real reason for these payments to the Red Directors because "if he told the real reason why the money was paid, he risked imprisonment." Khodorkovsky has also confirmed publicly (in a 2016 Facebook post, Lamm Decl. Ex. 19) that these payments made from 1996 to 2003 were all made pursuant to an oral bargain concluded before the privatization in 1995.

To disguise the corrupt oral bargain, the Russian Oligarchs made payments to the Red Directors used a range of at least six sham contracts concluded amongst shell companies based in the Isle of Man and the British Virgin Islands.   Two of these sham contracts were concluded with Yukos Universal Limited ("YUL"), one of the claimants in this arbitration.  Hundreds of millions of dollars were thus paid through YUL's bank account to a shell company of the Red Directors. As detailed below, Petitioners have never provided any convincing rebuttal to the points described above.  Nor have Petitioners ever convinced any Tribunal or court that the Yukos privatization was lawful.

As the investor-State tribunal explained in *Metal-Tech v. Uzbekistan* with respect to the relationship between bribery and investor-State arbitration: "[T]he rights of the investor against the host State, including the right of access to arbitration, [will] not be protected [where] the investment was tainted by illegal activities, specifically corruption. The law is clear – and rightly so – that in such a situation the investor is deprived of protection and, consequently, the host State avoids any potential liability." *Metal-Tech Ltd. v. Republic of Uzbekistan,* ICSID Case No. ARB/10/3, Award, ¶ 422 (Oct. 4, 2013) (ECF No. 56-9).  Likewise, as concluded in *Insceysa v. El Salvador*, "the foreign investor cannot seek to benefit from an investment effectuated by means of one or several illegal acts and, consequently, enjoy the protection granted by the host State, such as access to international arbitration to resolve disputes . . . ." *Inceysa Vallisoletana, S.L. v. Republic of El Salvador*, ICSID Case No. ARB/03/26, Award, ¶ 242 (Aug. 2, 2006) (ECF No. 56-2).

Accordingly, on the basis of three separate grounds—(1) the Russian Oligarchs' control in fact, (2) the application of the veil-piercing principle, and (3) the illegal actions by which Petitioners obtained their YUKOS shares—Petitioners were not eligible to accept any offer of arbitration under the ECT.  This Court must therefore dismiss Petitioners' action for lack of jurisdiction under the FSIA.

## II.   Respondent Did Not Waive Its Immunity from this Action

The FSIA's waiver exception provides that a foreign state shall not be immune from the jurisdiction of U.S. courts if it "has waived its immunity either explicitly or by implication[.]"  28 U.S.C. § 1605(a)(1).  The exception does not apply in this case because Petitioners have offered no basis to conclude that Respondent has waived its sovereign immunity explicitly or implicitly.

### A.    Any Purported Waiver of Sovereign Immunity Must Be Clear and Unambiguous

In the D.C. Circuit, both explicit and implicit waivers are construed "narrowly."  *World Wide Minerals*, 296 F.3d at 1162 ("[E]xplicit waivers of sovereign immunity are narrowly construed in favor of the sovereign and are not enlarged beyond what the language requires.") (citations and quotations marks omitted); *Creighton,* 181 F.3d at 122 (observing that implicit waivers are likewise construed narrowly).

Explicit waivers require a clear and unambiguous expression of the foreign sovereign's intent to waive sovereign immunity.  *World Wide Minerals*, 296 F.3d at 1162 ("[A] foreign sovereign will not be found to have waived its immunity unless it has clearly and unambiguously done so."); *see also Maritime Int'l Nominees Establishment v. Guinea*, 693 F.2d 1094, 1100 n. 10 (D.C. Cir. 1982) (holding that under the FSIA, Congress contemplated waivers of a "specific and explicit nature").  Petitioners have pointed to no such clear and unambiguous expression of intent by Respondent.  As explained in Mot. to Dismiss 39-40, the ECT does not contain an express waiver by a contracting state of its immunity from suit.  *See Argentina v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 442–43 (1989) ("[W]e do not see how a foreign state can waive its immunity under § 1605(a)(1) by signing an international agreement that contains no mention of a waiver of immunity to suit in United States courts or even the availability of a cause of action in the United States.").  Petitioners have otherwise not pointed to <u>any</u> statement by Respondent—let alone a clear and unambiguous one—waiving its sovereign immunity in this case.  Mot. to Dismiss 40.

Implicit waivers likewise require "strong evidence" of the sovereign's intention to waive immunity.  *See Khochinsky v. Poland*, 1 F.4th 1, *8 (D.C. Cir. 2021) (citations omitted).  The D.C. Circuit has recently confirmed that only "three circumstances" can provide the requisite evidence of a foreign state's intent to effect an implied waiver of sovereign immunity: (1) waiver by

arbitration agreement, (2) waiver by choice-of-law provision, and (3) waiver by answering a complaint without asserting sovereign immunity. *Id.* at \*8–9; *see also Ivanenko v. Yanukovich*, 995 F.3d 232, 239 (D.C. Cir. 2021) (same); *World Wide Minerals*, 296 F.3d at 1161 n.11 ("[C]ourts have been reluctant to stray beyond these examples when considering claims that a nation has implicitly waived its defense of sovereign immunity.") (citation and quotation marks omitted).

Courts have also construed these three examples to require a nexus to the United States in order to find an implicit waiver of immunity from U.S. jurisdiction. *See Creighton*, 181 F.3d at 122–23. With respect to agreements to arbitrate, courts will not find an implicit waiver unless the arbitration is to be conducted in the United States. *Id.* at 122 (quoting *Frolova v. U.S.S.R.*, 761 F.2d 370, 377 (7th Cir. 1985)) ("Most courts have refused to find an implicit waiver of immunity to suit in American courts from a contract clause providing for arbitration in a country other than the United States.").

Petitioners have not and cannot identify any of these three scenarios demonstrating Respondent's implicit waiver of immunity from suit in the United States. First, Respondent has never agreed to arbitrate with Petitioners, whether in the United States or anywhere else. As explained in its Motion to Dismiss, Respondent never ratified the ECT, and the treaty's dispute resolution mechanism is not applicable absent ratification. *See* Mot. to Dismiss 28–31; Suppl. Mot. 12-18. Even if the ECT did apply, Respondent could not and did not consent to arbitrate with Russian nationals with respect to an investment obtained through fraud and in violation of Russian law. Mot. to Dismiss at 31–36. In any event, Petitioners also have failed to comply with the mandatory dispute referral mechanism required to submit their claims to arbitration under the ECT. *Id.* at 36–38. Second, Respondent has never agreed that U.S. law would govern the arbitration or the alleged arbitration agreement with Petitioners. Third, Respondent has not implicitly waived

its immunity by appearing or filing any responsive pleading in the U.S. litigation at issue that does not preserve its sovereign immunity.

**B.      Signing the New York Convention Does Not Independently Constitute a Waiver in the Absence of Any Agreement to Arbitrate**

Petitioners have suggested that Respondent's signing of the New York Convention constitutes an implicit waiver of sovereign immunity.  *See, e.g.*, Pet'rs' Opp'n to Mot. to Stay 15-17 (arguing that Respondent waived sovereign immunity in the context of pre-judgment attachment) (ECF No. 204); Pet'rs' Opp'n to Mot. to Stay 38 (ECF No. 181) (same).  Whether in the context of immunity from pre-judgment attachment or immunity from suit, this argument is untenable.  The Convention does not even <u>mention</u> sovereign immunity, let alone waiver. Moreover, the fundamental purpose of the Convention is to facilitate "<u>commercial</u> arbitration" involving commercial entities, not sovereign entities entitled to immunity.  G.A. Res. 61/33 (Dec. 18, 2006) (ECF No. 68-4) (emphasis added); *see also* U.N. GAOR, 23d Sess, Supp. 16 U.N. Doc. A/7216 ¶ 40 (Feb. 26, 1968) (Lamm Decl. Ex. 7).  In this context, signing the Convention is far from constituting "strong evidence" of Respondent's intent to implicitly waive immunity.  *See Khochinsky*, 1 F.4th at *8 (citations omitted).  Certainly, it also does not constitute a "clear[] and unambiguous[]" expression of intent required to effectuate an explicit waiver.  *See World Wide Minerals*, 296 F.3d at 1162.

Indeed, if joining the New York Convention itself waived the State parties' sovereign immunity, such a waiver would apply equally to the United States' own immunity from suit, which would present "significant policy concerns."  *Process & Indus. Devs. Ltd. v. Nigeria*, 27 F.4th 771, 775 n.3 (D.C. Cir. 2022) ("*P&ID II*") (citing to the United States' submission as amicus curiae). The D.C. Circuit has accordingly declined to hold that signing the New York Convention by itself constitutes a waiver of sovereign immunity.  *P&ID I*, 962 F.3d at 585; *P&ID II*, 27 F.4th at 776.

The *P&ID* decisions thus refused to follow *dicta* in the recent *Tatneft* case, suggesting that signing the New York Convention (without more) constitutes a waiver of sovereign immunity. *Tatneft v. Ukraine*, 771 F. App'x 9, 10 (D.C. Cir. 2019) (unpublished disposition). The D.C. Circuit further emphasized that "*Tatneft* was an unpublished disposition, so it does not bind future panels." *P&ID I*, 962 F.3d at 585.

In any event, *Tatneft* did not and could not abrogate the earlier holding in *Creighton* that signing the New York Convention alone is insufficient to constitute an implicit waiver of sovereign immunity absent an agreement to arbitrate. *See De Csepel v. Hungary*, 859 F.3d 1094, 1105 (D.C. Cir. 2017) ("[I]n cases of intracircuit conflict we are bound to follow the earlier decision."). The D.C. Circuit's prior holding in *Creighton*, 181 F.3d at 122–23, clarifies that the waiver exception under § 1605(a)(1) requires that a state <u>agreed to arbitrate</u> as a separate and distinct jurisdictional element under the FSIA. In particular, *Creighton* recognized that a waiver of sovereign immunity occurs only where two requirements are satisfied: (1) "the defendant sovereign was . . . signatory to the [New York] Convention" <u>and also</u> (2) "agreed . . . to arbitrate in the territory of a state that had signed the New York Convention." *Id.* Here, as explained above in Part I-B and I-C, Respondent never agreed to arbitrate with Petitioners. Respondent's signing of the New York Convention thus cannot result in any waiver under the FSIA.

Accordingly, this Court should reject Petitioners' invocation of Respondent's purported waiver of foreign sovereign immunity under § 1605(a)(1).

## <u>CONCLUSION</u>

For these reasons, Respondent respectfully asks this Court to dismiss this case for lack of subject-matter jurisdiction under the FSIA.

Date:  May 11, 2022                    Respectfully submitted,

**WHITE & CASE**LLP

*/s/ Carolyn B. Lamm*
Carolyn B. Lamm (D.C. Bar No. 221325)
Nicolle Kownacki (D.C. Bar No. 1005627)
David P. Riesenberg (D.C. Bar No. 1033269)
701 Thirteenth Street, NW
Washington, DC 20005
Phone: (202) 626-3600
Fax: (202) 639-9355
clamm@whitecase.com

*Counsel for Respondent*