UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

|  |  |
|---|---|
| HULLEY ENTERPRISES LTD., YUKOS UNIVERSAL LTD., AND VETERAN PETROLEUM LTD., <br><br>                *Petitioners*, <br><br> v. <br><br> THE RUSSIAN FEDERATION, <br><br>                *Respondent*. | Case No. 1:14-cv-01996-BAH <br><br> Chief Judge Beryl A. Howell |

**RESPONDENT'S MOTION FOR AN
EVIDENTIARY HEARING TO CROSS-EXAMINE PETITIONERS' WITNESSES**

Respondent respectfully moves this Court for an evidentiary hearing to allow cross-examination of Petitioners' four witnesses regarding the testimony proffered in support of Petitioners' allegations at Parts IV-D, IV-E, and IV-F of their Supplemental Submission (ECF 239) concerning jurisdictional facts under the Foreign Sovereign Immunities Act ("FSIA").[1]

Specifically, Petitioners have now proffered <u>seven</u> witness statements totaling <u>more than 100 pages</u> collectively (ECF 241-02, 241-05, 241-06, 241-07, 241-08, 241-16, 241-28) authored by four individuals: Timothy Osborne, Kelvin Hudson, Leonid Nevzlin, and Vladimir Dubov.

---

[1] Petitioners have advised that they do not consent to the relief sought in this Motion.

This Motion is accompanied by the Third Declaration of Dr. Andrey Kondakov, who describes the status of proceedings in the Netherlands and Respondent's efforts to obtain new U.S. counsel to replace White & Case LLP. In light of the complex and fact-intensive nature of the current phase of proceedings (following termination of the stay in April 2022, ECF 228, 229), the undersigned have been unable to withdraw from this representation without material adverse effect on this litigation.

White & Case has advised Respondent that it will file a Motion to Withdraw as Counsel as soon as possible under the ethical rules.

These witness statements are together cited sixteen times in the Supplemental Submission at 32, 34, 35 & n.29, 38, 42 & n.39 (ECF 239). The cross-examination of Petitioners' witnesses is therefore critically important to the disputed issues of material fact concerning this Court's subject-matter jurisdiction under the FSIA.

This is the first opportunity for Respondent to request this relief. Prior to the termination of this Court's stay (ECF 228, 229) and Petitioners' last-minute decision to proffer these four witnesses in support of the Supplemental Submission, Respondent had not received notice of the specific testimonial evidence that Petitioners would rely upon in this U.S. litigation. For the reasons explained below in **Part I**, Respondent is entitled to conduct depositions and cross-examine these four witnesses regarding the proffered testimony, which directly implicates three different categories of disputed issues of material fact.

Respondent therefore respectfully requests, as further explained in **Part II** below, that an evidentiary hearing regarding jurisdictional facts under the FSIA should be scheduled during October 2022, or at another date convenient to the Court.[2] This will allow Petitioners' four witnesses to comply with Respondent's limited and proportionate requests for documents implicated by the proffered testimony (within the next 30 days) and depositions (within the subsequent 30 days), in accordance with the standard deadlines applicable under the Federal Rules of Civil Procedure.[3]

Taking the depositions of Petitioners' four witnesses in advance will help to narrow the scope of the evidentiary hearing and ensure that the Court's time is used most efficiently.

---

[2] Respondent's counsel is unavailable from September 16 to 30, 2022, due to scheduling conflicts.
[3] Respondent reserves the right to seek reasonable changes to this schedule, if Petitioners' witnesses fail to cooperate with the requests for documents and depositions.

### I. Respondent Is Entitled to an Evidentiary Hearing and Depositions Regarding Jurisdictional Facts Under the FSIA

This Court routinely holds evidentiary hearings or permits cross-examination via depositions in order to determine jurisdictional facts under the FSIA. *E.g.*, *Manouchehr Mohammadi v. Islamic Republic of Iran*, 947 F. Supp. 2d 48, 60 (D.D.C. 2013) (Howell, C.J.) (rejecting subject-matter jurisdiction under the FSIA after holding "an evidentiary hearing" to address "the basis for the Court's subject-matter jurisdiction over this action"); *see also de Csepel v. Republic of Hungary*, 75 F. Supp. 3d 380, 387 (D.D.C. 2014) ("The scheduled fact depositions could clarify this issue in a way that would support . . . jurisdictional arguments [under the FSIA]. In short, the Court believes that fact depositions 'could produce [facts] that would affect [its] jurisdictional analysis.'" (quoting *Goodman Holdings v. Rafidain Bank*, 26 F.3d 1143, (D.C. Cir. 1994))).

Indeed, this practice of allowing cross-examination is mandated by the consistent precedents of the D.C. Circuit and multiple other U.S. Courts of Appeals. *See Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 40-41 (D.C. Cir. 2000) (vacating and remanding the lower court's ruling under the FSIA because "[w]hen the defendant has . . . challenged the factual basis of the court's jurisdiction . . . , the court may not . . . assum[e] the truth of the facts alleged by the plaintiff . . . . The district court [is] required to resolve th[e] factual dispute material to its subject matter jurisdiction . . . ."); *see also Richardson v. Donovan*, 673 F. App'x 246, 249 (3d Cir. 2016) (reversing and remanding for an evidentiary hearing regarding jurisdictional facts under the FSIA); *Reiss v. Societe Centrale Du Groupe Des Assurances Nationales*, 235 F.3d 738, 747-49 (2d Cir. 2000) (reversing and remanding to permit "the depositions of [key witnesses] to assist the court in undertaking an FSIA jurisdiction analysis[,]" because it was "essential for the district court to

3

afford the parties the opportunity to present evidentiary material at a hearing on the question of FSIA jurisdiction").

In the present case, as Respondent has explained, this Court's subject-matter jurisdiction under the FSIA is contingent upon determining whether Petitioners did or did not fall within the "standing offer to all potential . . . investors" to arbitrate under Article 26 of the Energy Charter Treaty ("ECT"). *See Chevron Corp. v. Republic of Ecuador*, 795 F.3d 200, 206 (D.C. Cir. 2015) (describing the interpretation of this "standing offer" as implicating a jurisdictional question under the FSIA); *see also Al-Waleed v. Saudi Arabian Oil Co.*, 19 F.4th 794, 802 (5th Cir. 2021) (dismissing for lack of subject-matter jurisdiction "[b]ecause there exists no agreement among the parties to arbitrate" such that "this FSIA exception does not apply" (emphasis added)). Any facts affecting whether Petitioners did or did not fall within the class of eligible offerees under the ECT's Article 26 are therefore jurisdictional facts under the FSIA.

As detailed below, Petitioners' witnesses have testified about matters that affect three different categories of jurisdictional facts under the FSIA and the ECT's Article 26. These facts are disputed, and therefore must be tested by cross-examination before Petitioners can be deemed to have supposedly carried their burden of proof.

*First*, Petitioners' witnesses have testified as to disputed issues concerning whether the Russian Oligarchs (*e.g.*, Leonid Nevzlin and Vladimir Dubov) abused Petitioners' corporate formalities, and whether the Guernsey trustee (Kelvin Hudson) and GML director (Timothy Osborne) facilitated or acquiesced in this abuse of corporate formalities.

As Respondent has explained, the abuse of Petitioners' corporate formalities would require this Court to disregard Petitioners' corporate status when applying the ECT's Article 26 in accordance with principles of piercing the corporate veil. This is because the ECT, like any

4

international treaty, "shall" be interpreted in accordance with all "relevant rules of international law," including rules governing whether a sovereign consents to jurisdiction.  *See* Restatement (Fourth) of Foreign Relations Law § 306(3)(c), Cmt. d & Reporter's Note 5 (explaining that "the interpretation of a treaty shall consider any relevant rules of international law," as required by Article 31(3)(c) of the Vienna Convention on the Law of Treaties ("VCLT") (ECF 240-6) (emphasis added)); *see also* Pet'rs' Suppl. Submission 14-17, 30 (citing Restatement (Fourth) of Foreign Relations Law § 306 and VCLT's Article 31 as authoritative).

These "relevant rules of international law" include the veil-piercing principles recognized by the U.S. Supreme Court and the D.C. Circuit with reference to the decision of the U.N. International Court of Justice in the *Barcelona Traction* case.  *See First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 628 n.20 (1983) ("'[T]he veil is lifted, for instance, to prevent the misuse of the privileges of legal personality, as in certain cases of fraud or malfeasance . . . .'" (quoting *Barcelona Traction, Light And Power Co., Ltd.*, 1970 I.C.J. Rep. 3, 39 ¶¶ 56-58 (Feb. 5) (ECF No. 49-12)); *McKesson Corp. v. Islamic Republic of Iran*, 52 F.3d 346, 352 (D.C. Cir. 1995) (citing *Barcelona Traction* for the principle that "separate corporate existence" can be overcome by evidence of "sufficient control" under "international law").[4]

As further explained in the Proposed Supplemental Reply, filed separately today, neither Petitioners nor the Dutch courts identified any valid legal basis to disregard the veil-piercing analysis under international law, the ECT, or the FSIA.  *See* Suppl. Reply 18-20; Suppl.

---

[4] *See also KT Asia Investment Group B.V. v. Republic of Kazakhstan*, ICSID Case No. ARB/09/8, Award (Oct. 17, 2013) ¶ 134, Lamm Decl. Ex. 16 ("Relying primarily on *Barcelona Traction*, certain cases, including *ADC*, *Rumeli* and *Tokios Tokeles*, have indeed acknowledged the possibility of piercing the corporate veil to 'prevent the misuse of the privileges of legal personality' or where the 'real beneficiary of the business misused corporate formalities in order to disguise its true identity and to avoid liability.'").

5

Submission 20-21 (ECF 232).  Instead, Petitioners contest this argument exclusively based on factual assertions made by their four witnesses—Leonid Nevzlin, Timothy Osborne, and Kelvin Hudson—who testify that the Russian Oligarchs supposedly did not abuse Petitioners' corporate formalities.  *See* Suppl. Submission 33-35 (ECF 239), citing (ECF 241-5; 241-6, 241-2).  Petitioners are thus asking this Court to accept these witnesses' allegations as supposedly demonstrating that Petitioners' corporate veils should not be pierced under international law, such that Petitioners would therefore retain the status of offerees under the ECT's Article 26.

As explained in Part IV of the Proposed Supplemental Reply, however, these four witnesses' testimony cannot be accepted without cross-examination—indeed, these witnesses' testimony is contradicted by many contemporaneous documents.

For example, one of the Russian Oligarchs, Leonid Nevzlin, signed two multimillion-dollar contracts <u>on GML's behalf</u>, and thereby appointed an individual named Konstantin Kagalovsky to protect <u>Petitioners'</u> "interests" as "owners . . . of YUKOS shares" (*see* ECF 202-3 at 5).  GML subsequently implemented the contract with Kagalovsky by paying multiple invoices to third-party consultants at Kagalovsky's instructions.  *See* E-mails between GML, Kagalovsky, Hunter, and Welu (Feb. 27 to May 14, 2004) (Supplemental Index of Documents ("SID") Ex. 5).[5]  GML's consultants at APCO likewise learned within 24 hours that Nevzlin had "appointed" Kagalovsky to coordinate the strategy to protect Petitioners' interests, and thus provided a detailed memo to Kagalovsky by the following day.  APCO Emails (Jan. 18, 2004) (SID Ex. 2); APCO Memo to Kagalovsky (Jan. 19, 2004) (SID Ex. 3).  GML ultimately paid US$ 6 million to APCO for this work.  See GML Resolutions (April 2004) (SID Ex. 6).  These documents thus establish a genuine

---

[5] The Supplemental Index of Documents is submitted herewith as an annex to the Third Declaration of Dr. Andrey Kondakov.

dispute as to whether Nevlin abused Petitioners' corporate formalities by intervening directly in Petitioners' most critical business decisions.

Accordingly, to facilitate this Court's veil-piercing analysis, Respondent is entitled to cross-examine Petitioners' witnesses—including Nevzlin, Dubov, Osborne, and Hudson—regarding the disputed issue of material fact arising in relation to the Russian Oligarchs' abuse of Petitioners' corporate formalities.

***Second***, in regard to a separate but related disputed issue of material fact, Petitioners' witness testimony also concerns whether Petitioners were genuinely "foreign" investors under the ECT's Article 26.  Suppl. Reply 20-22; Suppl. Submission 17-20 (ECF 232).  The ECT must be read in "good faith" under the VCLT's Article 31(1), *see* Restatement (Fourth) of Foreign Relations Law § 306, and in accordance with the ECT signatories explicit understanding regarding the criterion of "control in fact."  This question is therefore determinative of whether Petitioners fell within the class of eligible offerees who could pursue arbitration. In particular, Petitioners' witnesses have also provided testimony concerning the question of whether the Russian Oligarchs (Nevzlin and Dubov) exercise "control in fact" over Petitioners and their parent company, GML, or whether, as Petitioners allege, such control is supposedly exercised only by the Guernsey trustee (Hudson) and GML's director (Osborne).

This question, however, also cannot be accepted by this Court without cross-examination. For example, Petitioners make numerous arguments regarding the 2003 Deed of Accession (ECF 202-1), which explicitly transferred the "voting rights" pertaining to the shares of Petitioners' parent company, GML, from the Guernsey trustee to one of the Russian Oligarchs (Platon Lebedev).  Leonid Nevzlin likewise testifies that "the trustees of the trusts . . . act completely independently from my former partners and me" and that he supposedly has "never intervened

7

with any of the decisions taken by the trustees, nor have I tried to influence any of their decisions or to circumvent them in any manner." *See* Ex. 8 to Cotlick Decl. 8 (ECF 241-8).

Contradicting these assertions, however, two of Nevzlin's associates—Eric Wolf and David Godfrey—have both testified that Nevzlin and another Russian Oligarch, Mikhail Brudno, exercised a *de facto* veto and had the power to appoint negotiators to conclude transactions on behalf of GML regarding Petitioners' interests as recently as 2015. *See* Tr. of Eric Wolf Deposition 122 (ECF 118-2) (reflecting Mr. Wolf's admission that he was authorized to conduct settlement negotiations by the "[b]eneficiaries of the trust that are shareholders of GML," including Nevzlin, rather than Hudson or Osborne); Tr. of David Godfrey Deposition 433-35 (ECF 202-6) (explaining that Nevzlin and Brudno are "principals in the group we . . . call core shareholders, so the people behind Menatep or GML," who exercised a veto over "effort[s] to settle . . . disputes with Rosneft"); Eric Wolf Email Copying Leonid Nevzlin 1 (Aug. 28, 2015) (ECF 116-10) (explaining that "the beneficiaries," including "Leonid and his former partners," gave Wolf "the mandate" to negotiate); Eric Wolf Email to Tim Osborne 4-5 (July 10, 2015) (ECF 117-01) (showing Osborne's knowledge that Wolf conducted "several months of negotiations . . . on behalf of the beneficiaries"); *see also* Suppl. Mot. to Dismiss 3, 30-31 (ECF 108).

Accordingly, to facilitate this Court's analysis of the "control in fact" criterion—*i.e.*, in relation to whether Petitioners were proper offerees under the ECT's Article 26—Respondent is entitled to cross-examine Nevzlin (as well as Osborne, Hudson, and Dubov) regarding their testimony relating to the Russian Oligarchs' exercise of control over Petitioners' activities in circumvention of the Guernsey trustees and GML directors.

***Third***, Petitioners' witness testimony relates to the question of whether Petitioners were really "investors" within the ordinary meaning of that term, or rather were merely offshore vehicles

8

used by the Russian Oligarchs for illegal purposes, including tax evasion, money laundering, and the payment of bribes. Based on well-established principles of international law, Petitioners were not entitled to pursue arbitration before an international tribunal, as Respondent has explained. Suppl. Reply 17-20; Suppl. Submission 22-27 (ECF 232); *see e.g.*, *Littop Enterprises Limited v. Ukraine*, SCC Case No. V 2015/092 (ECF 215-2) ¶ 440 (interpreting the ECT by applying the fundamental principle of international law that "a party cannot benefit from its own wrongdoing"). This question has freestanding applicability under the ECT's Article 26 (*e.g.*, *Littop* ¶ 440), but also relates to the veil-piercing analysis in light of the criterion of "'fraud or malfeasance.'" *See Bancec*, 462 U.S. at 628 n.20 (quoting *Barcelona Traction*, 1970 I.C.J. Rep. at 39 ¶¶ 56-58 (ECF 49-12)).

For example, Petitioners rely on Dubov's testimony to re-characterize certain multimillion-dollar payments made by Petitioner Yukos Universal Limited and other shell companies to a group of Russian public officials, the so-called "Red Directors." *See* Suppl. Submission 40-42 (ECF 239), citing (ECF 241-28 ¶¶ 60-64). To bolster Dubov's credibility, Nevzlin also testifies explicitly that he adopts Dubov's characterization of these payments. Ex. 8 to Cotlick Decl. ¶ 32 (ECF 241-5).

Both Dubov and Nevzlin thus deny that Petitioner Yukos Universal Limited's payments were intended to bribe the Red Directors in exchange for assisting to manipulate the YUKOS privatization. *See* Ex. 28 to Cotlick Decl. ¶ 67 (ECF 241-28). As Dubov and Nevzlin admit, however, these payments were made pursuant to "oral agreements" between the Red Directors and the Russian Oligarchs concluded in 1995—when the Red Directors were employed by the Government, and nearly a year before the completion of the YUKOS privatization in December 1996. *Compare* Ex. 28 to Cotlick Decl. ¶¶ 43-45, 60-65 (ECF 241-28) (describing oral agreements

made pursuant to negotiations beginning "in the summer of 1995"); *Id.* ¶¶ 57-59 (confirming that the YUKOS privatization was not concluded until December 1996). It is undisputed that the Red Directors and their subordinates were directly involved in multiple stages of the YUKOS privatization and were legally "representatives of state government authorities of the Russian Federation" throughout this period. *E.g.*, ECF 233-8, 233-16, 241-28 (describing the Government's appointment of Sergey Muravlenko, and reflecting Muravlenko's letter to the Government regarding the structuring of the YUKOS privatization).

To facilitate this Court's analysis of whether Petitioners were genuine "investors" or merely offshore vehicles used for illegal purposes, Respondent is entitled to cross-examine Dubov and Nevzlin regarding their testimony on this issue.

As explained in the Proposed Supplemental Reply and Respondent's previous submissions (ECF 232), Petitioners have failed to identify any legal basis to disregard the materiality of these three categories of factual issues. Indeed, Petitioners have never responded to Respondent's veil-piercing argument at all. This is why Petitioners have relied so heavily on the witness testimony proffered in support of their case at Parts IV-D, IV-E, and IV-F of their Supplemental Submission and why, therefore, Respondent must be permitted to cross-examine Petitioners' witnesses.

## II. Timing of the Evidentiary Hearing

Respectfully, the evidentiary hearing should be scheduled in October 2022, or at another date convenient to the Court, after Petitioners' witnesses have provided the limited requested documents (during the next 30 days) and depositions (during the subsequent 30 days). The reasons why are explained below.

Respondent is serving five narrow and proportionate document requests on Petitioners in relation to specific factual issues that Petitioners' witnesses have addressed in their testimony:

10

- **Document Request #1**: "Any agreement, deed, or other instrument post-dating the 2003 Deed of Accession that directs, determines, or otherwise affects how the 'voting rights' pertaining to GML's shares are exercised, and by whom." Ex. 1 to Lamm Decl., Dec. 10, 2021 (ECF 202-1).

- **Document Request #2**: "Documents or communications relating to the 'voting rights' referenced in the 2003 Deed of Accession or any subsequent agreement, deed, or instrument that affected the 'voting rights' pertaining to GML's shares." Ex. 1 to Lamm Decl., Dec. 10, 2021 (ECF 202-1).

- **Document Request #3**: "Any agreement, deed or other instrument relating to the 'collective arrangement' and 'right to manage the entire matter' referenced by Leonid Nevzlin in the January 2005 interview with Vedomosti (Exhibit R-0443), and any communications relating thereto."

- **Document Request #4**: "Documents or communications reflecting the Russian Oligarchs' meetings or discussions with Kelvin Hudson or Timothy Osborne regarding termination or appointment of GML's directors, or compensation paid to GML's directors."

- **Document Request #5**: "Documents or communications reflecting the Russian Oligarchs' meetings or discussions with Kelvin Hudson or Timothy Osborne regarding GML's payment of dividends to the Guernsey trusts."

These documents are within the possession, custody, or control of Petitioners, or in possession of their four witnesses: Osborne, Hudson, Nevzlin, and Dubov.

The record demonstrates that "the relationship is such that [Petitioners] can secure documents" of GML, the Guernsey trusts, or the Russian Oligarchs wherever "helpful for use in litigation." *United States ITC v. ASAT, Inc.*, 411 F.3d 245, 254 (D.C. Cir. 2005); *see also In re Polygon Glob. Partners LLP*, No. 21-mc-007 WES, 2021 U.S. Dist. LEXIS 90143, at *8 (D.R.I. May 11, 2021) ("[T]he recipient has 'control' over the documents in certain circumstances, including where the recipient 'can secure documents of the [related entity] to meet its own business needs and documents helpful for use in litigation . . . .'" (citation omitted)); *In re Mushroom Direct Purchaser Antitrust Litig.*, No. 06-620, 2012 U.S. Dist. LEXIS 204641, at *51-52 (E.D. Pa. Aug. 1, 2012) ("Courts also have found control where a corporation can obtain documents 'helpful for

11

use in litigation' from its affiliate.") (citation omitted); *Addamax Corp. v. Open Software Found.*, 148 F.R.D. 462, 465 (D. Mass. 1993) ("Where the relationship is thus such that the agent-subsidiary can secure documents of the principal-parent to meet its own business needs and documents helpful for use in litigation, the courts will not permit the agent-subsidiary to deny control for purposes of discovery by an opposing party." (quoting *Gerling Int'l Ins. Co. v. Comm'r of Internal Revenue*, 839 F.2d 131, 141 (3d Cir. 1988))).

Indeed, the record shows that Petitioners have previously obtained such documents in numerous instances. Wherever "helpful for use" in this dispute, Petitioners' lawyers have freely collected documents—and, indeed, voluminous testimony—from the principal director of GML (Osborne), the principal manager of the Guernsey trusts (Hudson), and the Russian Oligarchs themselves (*e.g.*, Nevzlin and Dubov). *E.g.*, Cotlick Decl. ¶¶ 1, 8-9 (Aug. 22, 2018) (SID Ex. 9) (acknowledging that Petitioners' lawyers collected three categories of documents from Platon Lebedev, who is one of the Russian Oligarchs); Letters from Kelvin Hudson to Shearman & Sterling LLP (Dec. 19, 2006) (SID Ex. 8) (describing documents collected from the Guernsey trusts for the arbitration).[6]

In accordance with Federal Rule of Civil Procedure 34(a)(2)(A), Petitioners must produce the requested documents within 30 days. Respondent will then depose Petitioners' four witnesses during the subsequent 30 days, in order to ensure that the Court's time is used most efficiently and effectively during the evidentiary hearing. *See de Csepel*, 75 F. Supp. 3d at 387 (allowing the "scheduled fact depositions" to go forward in relation to "jurisdictional arguments" under the FSIA).

\* \* \*

---

[6] Petitioners submitted Hudson's letters as Annex C-1239-HEL/YUL during the arbitration.

Accordingly, allowing 30 days for limited document requests and 30 further days for proportionate depositions, Respondent respectfully moves this Court to schedule an evidentiary hearing during October 2022, or at another subsequent date convenient to the Court, in order to permit cross-examination of Petitioners' four witnesses and facilitate prompt decision of the sovereign immunity issue under the FSIA.

Date:  July 13, 2022						Respectfully submitted,

**WHITE & CASE** LLP

*/s/ Carolyn B. Lamm*
Carolyn B. Lamm (D.C. Bar No. 221325)
Nicolle Kownacki (D.C. Bar No. 1005627)
David P. Riesenberg (D.C. Bar No. 1033269)
701 Thirteenth Street, NW
Washington, DC 20005
Phone: (202) 626-3600
clamm@whitecase.com

*Counsel for Respondent*