STAMP - Copy in execution of the
Judicial Code
Exempt from duties Art. 280-2° C.

| Directory Number | **Certified Copy** | | |
|---|---|---|---|
| **2021/8540** | Delivered to | Delivered to | Delivered to |
| Date of Pronouncement | | | |
| **16 NOV. 2021** | on<br>€<br>CIV | on<br>€<br>CIV | on<br>€<br>CIV |
| Docket Number | | | |
| **2020/AR/252** | | | |

☐            Not to be communicated to the recipient

Final Judgment

# Court of Appeal
# of Brussels

# Judgment
## 17th Chamber
## Civil cases

| Presented on |
|---|
| |
| Not to be registered |
| |

**In the case of:**

**REPUBLIC OF KAZAKHSTAN,** represented by its Minister of Justice, whose Ministry is established at 010000 ASTANA - KAZAKHSTAN, Left Bank, Mangilik El Street 8, House of Ministries 13,

Appellant Party,

represented by Maîtres NUYTS Arnaud, HOUBBEN Michaël and DEGROOF Julien, attorneys at 1000 BRUSSELS, Boulevard de l'Empereur 3,

Pleading attorneys: Maîtres NUYTS Arnaud and HOUBBEN Michaël,

**Versus:**

1. **STATI, Anatolie,** domiciled at CHISINAU, MD-2008-MOLDAVIA, Dragomina Street, 20,

2. **STATI, Gabriel,** domiciled at CHISINAU, MD-2008- MOLDAVIA, Ghioceilor Street, 1 A,

3. **ASCOM GROUP S.A.,** incorporated under foreign law whose registered office is established at CHISINAU, MD-2009 - MOLDAVIA, Mateevici Street, 75 A,

4. **TERRA RAF TRANS TRAIDING LTD,** incorporated under foreign law whose registered office is established at GIBRALTAR, Line Wall Road, 13/1

Responding Parties,

represented by Maîtres JACMAIN Sophie, van DROOGHENBROECK François and BRIJS Stan, attorneys at 1000 BRUXELLES, Chaussée de La Hulpe, 120,

Pleading attorneys: Maîtres van DROOGHENBROECK François and JACMAIN Sophie.

Having regard to the exhibits in the proceedings, particularly:

- the Exequatur Order, rendered by the French-speaking Court of First Instance of Brussels dated 11 December 2017;
- the Third-Party Opposition Summons of 2 February 2018;
- the Judgment, rendered by the French-speaking Court of First Instance of Brussels dated 20 December 2019;
- the Appeal Petition, filed with the Court's Registry dated 17 February 2020;
- the Interim Judgment of 17 November 2020;
- the filed exhibits.

The dispute essentially concerns the annulment of the Exequatur Order of 11 December 2017.

The Republic of Kazakhstan (hereinafter Kazakhstan) asked (in summary) to:
- find that the Arbitral Award of 19 December 2013, rectified by the Award of 17 January 2014 could not and cannot be recognized or enforced in Belgium;
- order the annulment and withdrawal of the Exequatur Order of 11 December 2017;
- declare the Statis' Cross-Appeal unfounded;
- order the Statis to bear the costs for both stages of the proceedings, including a procedural indemnity of 13,000 Euros per state of proceedings.

The Stati parties, the Ascom Group Company and the Terra Raf Trans Traiding Company, (hereinafter the Statis) request:

"- *In principal order: to reject Kazakhstan's principal appeal and allow the Statis' Cross-Appeal;*
- *In subsidiary order: to reject Kazakhstan's principal appeal;*
- *In any event therefore:*
  • *Whether by substitution of own grounds or by total or partial confirmation of the Judgment under Appeal, fully confirm the Exequatur of 11 December 2017;*
  • *condemn Kazakhstan to costs in both cases,*

*Expenses:*

- *Fees for Notification of the Exequatur Order: EUR 19,946.87*

Case 1:14-cv-01996-BAH   Document 245-1   Filed 07/14/22   Page 4 of 32

Court of Appeal Brussels - 2020/AR/252 – Pg. 4

- *Procedural Indemnity in first instance: EUR 36,000*

- *Fees for Notification of Judgment under Appeal of 20 December 2019: EUR 4,105.30*

- *Procedural Indemnity on appeal: EUR 39,000*

  *TOTAL: EUR 99,052.17"*


## 1.    The Grounds of inadmissibility raised by the Statis


### 1.1.    The Res Judicata enjoyed by the Arbitral Award


The current dispute does not call the Arbitral Award into question. The Court does not conduct a review on the merits of the Award.

Contrary to what the Statis claim, Kazakhstan's appeal does not seek to set aside or review the Award, but to deny the Exequatur. The subject-matter of this application essentially differs from those made by Kazakhstan in the context of the proceedings brought before the arbitral tribunal.

It also differs fundamentally from the subject-matter of the dispute that resulted in the Judgment of this Court of 29 June 2021 wherein the Court did not rule on the issue of the exequatur.

The *res judicata* enjoyed by the Award does not therefore preclude the Court from examining the grounds for refusal of the exequatur and doing so independently from what other courts have decided in respect of the application for annulment of the Arbitral Award or of a request for the recognition and enforcement of the Arbitral Award.


With regard to decisions in matters of exequatur, the Statis state, in this respect: "*Yet, the decisions relating to the recognition or refusal of an exequatur have binding effect only in the jurisdiction where the exequatur has been requested. The other courts - including the Belgian courts - are not therefore bound by this English judgment ("exequatur over exequatur is not valid")."*

It is obvious that this consequence is equally valid for exequatur decisions in other countries.


The court's control as the exequatur judge does not concern (the intrinsic value of) the Arbitral Award, which - in the event of refusal of the exequatur and therefore of refusal to

FILED: NEW YORK COUNTY CLERK 05/16/2022 09:42 PM

NYSCEF DOC. NO. 44

INDEX NO. 652522/2020

RECEIVED NYSCEF: 05/16/2022

Case 1.14-cv-01996-BAH   Document 245-1   Filed 07/14/22   Page 5 of 32

Court of Appeal Brussels - 2020/AR/252 – Pg. 5

integrate the Arbitral Award into the Belgian legal order, which is in no way irreconcilable with the *res judicata* of the Arbitration Award - will remain unchanged.

The Statis' argument that the arbitral tribunal is required to investigate the fraud alleged by one of the parties and that it must itself take the initiative when the documents that are produced during the proceedings are of such a nature as to suggest that they involve fraudulent acts that are contrary to international public order, implies necessarily that the arbitrators were  properly informed, and that if audited financial statements are produced and their reliability is highlighted, they are assured that they can rely on them and examine the arguments of the parties in light of such information that is presented as correct.

It is obvious that, if it turns out afterwards that the arbitrators were deceived by one of the parties, this finding entails a violation of the rights of defense of the party who was unable to prepare its defense with the relevant knowledge before the arbitral tribunal.

As for the fact that the arbitrators did not use *expressis verbis* the term "*audited financial statements"*, it does not mean that it can be concluded that the arbitrators would not have given any importance to the circumstance that the financial statements which have been produced had been audited. Since the financial statements were presented as audited, the arbitrators did not need to question this matter: They could consider them as such and base their analysis of the merits of the case on those financial statements which they had understood to be reliable and correct.

As for the fact that the exequatur judge must respect the conclusions of the arbitral tribunal and its sovereign assessment regarding a possible fraud arising in the arbitration proceedings, it does not prevent the exequatur judge, as part of these proceedings which are independent from the arbitration proceedings and from the subsequent annulment proceedings, to examine whether fraudulent manoeuvres and/or new elements which were unknown to the arbitrators and which have been deliberately withheld by one of the parties, could have had an important impact on the arbitral tribunal's decision to the point that [the judge] should deny exequatur.

It follows from the foregoing that this ground of inadmissibility cannot be accepted.

1.2.    The *Res Judicata* Effect of the Swedish Decisions

FILED: NEW YORK COUNTY CLERK 05/16/2022 09:42 PM
INDEX NO. 652522/2020
NYSCEF DOC. NO. 44
RECEIVED NYSCEF: 05/16/2022

Case 1:14-cv-01996-BAH   Document 245-1   Filed 07/14/22   Page 6 of 32

Court of Appeal Brussels - 2020/AR/252 – Pg. 6

The referenced Swedish decisions are the following:
- the Judgment of the Svea Court of Stockholm, hereinafter "*the Svea Court*", of 9 December 2016,
- the Judgment of the Supreme Court of 24 October 2017,
- the Judgment of the Svea Court of 9 March 2020,
- the Judgment of the Supreme Court of 18 May 2020.

Kazakhstan invokes Article 2 of the Code of Private International Law (COPIL) as the basis for its argument that the provisions of the COPIL should not apply in this case.

For the rightful and correct reasons set out in Section 3.2.a of the lower Judgment, at pp. 15-16, which are deemed by the Court to be reproduced here with regard to the 4 aforementioned decisions relating to the annulment of the Arbitral Award, the first judge has decided that the suppletive rules provided for by the COPIL are applicable.

This finding does not prevent the exequatur judge from exercising her control over the question of the exequatur of the Arbitral Award in Belgium.

The *res judicata* effect of the Swedish decisions does not extend to the issues which have not been the subject of the judicial debate. Moreover, the application to annul a decision is not the same as the application to seek the enforcement of the same decision.

The fact that an application for annulment of an Arbitral Award has been declared unfounded and that an application for revision of the decision denying the annulment of the Arbitral Award has been rejected in the country of the seat of the arbitration, does not imply that the Arbitration Award must automatically be granted exequatur in Belgium. It does not deprive the exequatur judge, who has the obligation to determine - taking into account the concrete circumstances of the case - whether there are grounds for refusal of exequatur in Belgium, of his power to review whether the Arbitral Award and/or its enforcement are contrary to public order (see Article 1723.2° BJC applicable).

The court that decides on the exequatur of the Arbitral Award is not bound by a foreign decision rejecting the annulment of this same Award.

The 2016 and 2017 decisions predate the discovery of the new evidence which are "*recognized as false*" and/or of the fraudulent acts put forward by Kazakhstan in the context of the current proceedings.

It is thus established that in these decisions, the Swedish courts did not rule on the existence of fraudulent acts which have been discovered afterwards.

As for the Swedish decisions of 2020, they also do not rule on the new evidence of illicit and fraudulent acts invoked by Kazakhstan which came to its knowledge after the Award.

In its Judgment of 9 March 2020, the Svea Court rejected the second application for annulment of the Arbitral Award after having considered that the information provided by Kazakhstan shows that the action is based on circumstances that could have been invoked in the prior proceedings ("*circumstances which could have been relied on in the prior case*", Statis' Exhibit 2.9), which establishes that the Svea Court was unaware of the 2019 KPMG correspondence, including in particular

- the decision of KPMG to consider the audit reports that it had drawn up as relating to financial statements in respect of which no reliance can be placed,
- the express request from KPMG to "*immediately take all the necessary steps to prevent any further, or future, reliance on the following audit reports issued by KPMG*" (Kazakhstan Exhibit 9.10)
- The witness deposition of Mr. Artur Lungu of 2019 (see Kazakhstan Exhibit 8).

Moreover, the Statis have also knowingly concealed, in the Swedish annulment proceedings, the truth with regard to:

- The worrying concerns from KPMG that had already been expressed in its letter of 26 February 2016 (Kazakhstan Exhibit 9.2.), which led KPMG to request explanations and supporting evidence regarding the following issues:

"*1. As presented by Ascom Group S.A. during the court hearings, costs of the construction of the LPG Plant, as recorded in the financial statements of TNG, among other things, included management fee of USD 43,852,108 charged by Perkwood Investments Ltd ("Perkwood") which was the main supplier of materials and equipment for the constructions of the LPG Plant.*
*2. As represented by Ascom Group S.A. during the court hearings [in Sweden], Perkwood is a related party for TNG being part of Ascom Group S.A. and controlled by you.*
*3. Perkwood was not an operating entity submitting dormant accounts and the actual supplier of the equipment for the LPG Plant was TGE Gas GmbH and costs for such equipment are significantly different from the corresponding cost charged to TNG by Perkwood*".
reserving the right "*to prevent future reliance on our audit reports*

*and in particular to withdraw our audit reports and to inform about such withdrawal all parties who are still, in our view, relying on these reports, including but not limited, Ministry of Justice of the Republic of Kazakhstan and the Svea Court of Appeals"*

- and the response [from the Statis] raising a list of questions that are not related to the merits but to KPMG's sources of information, communications about the problems raised by KPMG in its previous letter, while at the same time - in no uncertain terms – reminding KPMG of its *"professional obligations and duties owed to [its] (your) clients"* and raising a threat of holding KPMG liable *"should you choose not to co-operate with us and/or to proceed to withdraw your audit reports"* (Kazakhstan Exhibit 9.3), a response in respect of which there was no follow up from the Statis with the consequence that KPMG was never provided the requested information.

- This response clearly demonstrates that the Statis were aware of the significance of KPMG's audit reports for the safeguarding of the credibility of their arguments that they had developed in the Swedish annulment proceedings of 2016 (Statis Exhibit 2.1, pp. 21 and 24).

Through their actions, the Statis have firstly deceived KPMG during the drawing up of the audit reports for the financial statements produced in the arbitration proceedings, but also the Swedish courts which the Statis had led to believe that KPMG had all the correct and necessary information for the purpose of the drawing up TNG's annual financial statements, and that [KPMG] was aware of Perkwood's real status.

It follows that - even if the Swedish courts did not set aside the Arbitral Award and dismissed on purely procedural grounds the applications for review brought by Kazakhstan - these decisions do not prevent this Court from examining the grounds relating to exequatur raised by Kazakhstan and in respect of which no debate was held before the Swedish courts that did not rule thereon.

KPMG's decision to "*withdraw*" its audit reports has not been taken into account by the arbitral tribunal and by the Svea Court as this information was unknown at the time. They have also been deprived of the opportunity to consider the deception of the Statis who have deliberately misled the Swedish courts and which – purposefully - prevented these jurisdictions from ruling on the matter on the basis of all the information and evidence available.

The Statis –argue - in primary order - that it is not for this Court to "*review*" the decisions of the Swedish courts. This statement is neither disputed nor disputable.

The current dispute does not concern the annulment of the Arbitration Award. It has a different purpose: The Court adjudicates as an appeal judge the grounds for refusal of exequatur.

Contrary to what the Statis claim, the *res judicata* effect of the Swedish decisions does not lead to the conclusion that this Court, as the exequatur judge, is prevented from proceeding to examine the grounds for refusal of exequatur, and even less so insofar as these grounds are specifically based on evidence that is of capital importance and which was purposefully concealed by the Statis so that neither the arbitrators, nor the Swedish courts, were ever able to take it into account.

As for the so-called "*crucial*" importance of the Swedish decisions for this Court's assessment of the grounds for refusal of exequatur raised by Kazakhstan, the Court emphasizes that this argument, based on *"the most authoritative doctrine in matters of international arbitration"* and recognized in *"many other court decisions"*, does not imply that – in light of the specific circumstances of the case - this Court is unable to come to the conclusion that the exequatur in Belgium must be denied on the basis of all the exhibits and submissions made before the Court, some of which are new.

In this regard, the Court shall particularly note the following:

The Statis pretend that no court has ever ruled that there had been fraud and that *"to the contrary, the Svea Court (whose Judgment of 9 December 2016 enjoys res judicata effect), the Swedish Supreme Court on two occasions, the Court of Appeal of Rome, the Court of the District of Columbia, the Court of Appeal of Amsterdam, the two Belgian Judges of Exequatur and Attachment all rejected Kazakhstan's allegations of fraud"* (Statis's final Submissions, p. 157, Point 549).

However, it should be noted as follows:

1) It is by a letter of 21 August 2019 (Kazakhstan Exhibit 9.11) that KPMG informed Kazakhstan of its decision to "*withdraw*" its audit reports, and it is by a letter of the same date (Kazakhstan Exhibit 9.10) that [KPMG] wrote to the Statis to order them to immediately take all the necessary steps to prevent any further, or future, reliance on the Audit Reports issued by KPMG, which implies that anyone who received a copy of the relevant financial statements and audit reports is made aware of these facts, and it is only subsequently - in October 2019 - that Kazakhstan was able to obtain a copy of the correspondence exchanged between the Statis and KPMG in 2016 and 2019,

FILED: NEW YORK COUNTY CLERK 05/16/2022 09:42 PM

NYSCEF DOC. NO. 44

INDEX NO. 652522/2020

RECEIVED NYSCEF: 05/16/2022

Case 1:14-cv-01996-BAH  Document 245-1  Filed 07/14/22  Page 10 of 32

Court of Appeal Brussels - 2020/AR/252 – Pg. 10

and that the Statis never produced this correspondence from 2016 before the annulment judges in the proceeding which was the only one where the application for annulment of the Arbitral Award has been examined (Statis Exhibit 2.1), as in the three subsequent proceedings there has never been a new examination of the case on the basis of the evidence of fraud discovered subsequently (Statis Exhibits 2.2, 2.9 and 2.11);

As for this decision form, which the Statis contest, KPMG emphasized the total lack of cooperation on the part of the Statis, which led [KPMG]to proceed with the "*complete withdrawal*" of the audit reports: Kazakhstan Exhibit 9.16, a decision which is described by PricewaterhouseCoopers (PwC) as the *"last resort"* for an auditor, which is made only in extremely rare circumstances when the financial statements are entirely unreliable: Kazakhstan Exhibit 12.8.

2) the English exequatur judge has decided that *prima facie* there was sufficient evidence that the Award had been obtained by fraud: Kazakhstan Exhibits 5.8 and 5.9, §92, according to the English judge, the Svea Court was unlikely to have considered the issue of the indirect impact of the fraud on the Award, and "*The evidence of the alleged fraud could not with reasonable diligence have been discovered before the Award*" (Kazakhstan Exhibits 5.8 and 5.9, §79).

In view of the next stages of the proceedings - in which the Statis were required to produce a large volume of documents - the Statis were led to withdraw their exequatur application in England, which led the High Court in London to consider firstly that "*the real reason for the notice of discontinuance is that the Statis do not wish to take the risk that the trial may lead to findings against them and in favour of the State*" (Kazakhstan Exhibits 5.16, §25), and then to allow the Statis to discontinue the exequatur proceedings in England on the condition that they are definitively precluded from seeking again to enforce the Award in England: Kazakhstan Exhibits 5.21 ;

3) As to the exequatur proceedings in Luxembourg, the Statis refer to the judgment of the Court of Appeal of Luxembourg of 19 December 2019. This judgment does not support the Statis' case insofar as this judgment was quashed by a judgment of the Court of Cassation of 11 February 2021, precisely because "*the contested judgment*,

*dismissing the appeal lodged by the Republic of Kazakhstan and ordering it to pay the costs, and in so doing confirming the exequatur of the Arbitral Award*,

*held in the present case that "the allegations put forward by the appellant, even assuming they are established, and the fact that KPMG withdrew its reports concerning the financial statements of TNG, KPM and Tristan for the years 2007 to 2009; are not of such a nature as to constitute fraud*

*vitiating the very basis of the Respondents' investment in Kazakhstan, this investment having begun well before the manoeuvres criticized by the appellant. They are not of such a nature as to influence the jurisdiction of the arbitral tribunal"(page 35 of the contested judgment);*

*and that "both the arguments of fraud already alleged before the SVEA Court and the few new pieces of evidence brought before this Court as well as the new evidence currently invoked relating to KPMG's letter, are intended to establish that KMG's indicative offer is based on false elements and could not then be used by the arbitrators to evaluate the damages for the LPG plant" (page 40 of the judgment under appeal);*

*whereas by acting in this way the Court of Appeals based its decision on elements which were not subject to an adversarial debate by the parties, thus violating the principle of adversarial proceedings and therefore the right to a fair trial."*

the Court of Appeal took into consideration two exhibits that had not been subject to the adversarial debate and analysed them with regard to their impact on the outcome of the dispute, therefore violating the principle of contradiction, which is enshrined in Article 65 of the New Code of Civil Procedure;

In addition to this, in the criminal part of the case, the criminal investigation of the complaint with the constitution of Kazakhstan as a civil party dated 27 May 2019, relating to the fraud that is asserted to have been committed by the Statis, is still underway and in in this context, the District Court of and in Luxembourg has ordered a stay of proceedings in the dispute concerning the request for release of the garnishment levied by the judgment of 19 December 2019, for the following reasons:

*"In the context of its criminal complaint filed on 27 May 2019, the REPUBLIC OF KAZAKHSTAN argues that the arbitral tribunal would have granted the STATI parties an amount of USD 497,685,101.00 and USD 8,975,496.40, of which USD 199 million for the LPG plant. Several documents, produced by the STATI parties in the arbitration proceedings, are said to be fraudulent, in particular the financial statements of Tristan Oil Ltd, KPM and ING, "the Information Memorandum" and the "KPMG Due Diligence Report". The STATI parties allegedly submitted false evidence, in full knowledge of the facts, to the arbitral tribunal with the aim of deliberately misleading the arbitrators in order to obtain a title against the REPUBLIC OF KAZAKHSTAN. The documents and information concealed by the STATI parties would have had a decisive influence on the Arbitral Award. The arbitral tribunal would never have granted the claims of the STATI parties, had it been aware*

*of their criminal and fraudulent behaviour at the time. The actions of the STATI parties are subject to criminal law. The STATI parties have knowingly and fraudulently misled the arbitral tribunal concerning the costs of the construction of the LPG plant with the aim of having the REPUBLIC OF KAZAKHSTAN ordered to pay them damages and interest for damages never actually suffered. These damages would have been calculated on the basis of fictitious costs and investments, and otherwise intentionally inflated for fraudulent purposes. They have also been documented by fictitious contracts and false documents, as well as by expert reports constituting false reasoning, insofar as they have been established on the basis of these same false documents and fictitious contracts. The Arbitral Award would then be the outcome of the offences of fraud, forgery and use of forgery whose use by the STATI parties in the context of the garnishment and enforcement proceedings would constitute fraudulent practices within the meaning of Article 496 of the Criminal Code. The use of the Arbitral Award by the STATI parties in the context of garnishment proceedings would constitute a money laundering infraction.*

*The STATI parties argue that judgment number 133/19 — VIII — Exequatur of 19 December 2019 of the Luxembourg Court of Appeal confirming the exequatur would have res judicata effect.*

*The Judgment number 133/19- VIII — Exequatur of 19 December 2019 of the Luxembourg Court of Appeal, rendered on appeal by the REPUBLIC OF KAZAKHSTAN against Order number 40/2017 of 30 August 2017 by which the Arbitral Award was declared enforceable in the Grand Duchy of Luxembourg, holds that:*

*" For there to be a breach of public order, the Award must have been obtained by obvious and decisive fraud.*

*The burden of proof lies with the party who opposes enforcement on the grounds of fraud.*
*(...)*
*In the present case, the alleged fraud does not result from the decision of the arbitral tribunal, or from the decision of the SVEA (Stockholm Court of Appeals) or the Supreme Court of Sweden,  or from a decision of a criminal court or a court of another State.*

*In so far as the fraud must be obvious, it is not for the Court, addressed for an enforceability application (exequatur), to take measures of inquiry in order to establish the existence of the alleged fraud.*
*(...)*

FILED: NEW YORK COUNTY CLERK 05/16/2022 09:42 PM
INDEX NO. 652522/2020

NYSCEF DOC. NO. 44
Case 1:14-cv-01996-BAH   Document 245-1   Filed 07/14/22   Page 13 of 32
RECEIVED NYSCEF: 05/16/2022

Court of Appeal Brussels - 2020/AR/252 – Pg. 13

*Even if it were established, the alleged fraud would not have influenced the arbitrators' decision as to Kazakhstan's liability, but would only concern part of the damages in question, in this case the damages and interest relating to the LPG plant.*

*(...)*

*If it is accepted that the exequatur judge is a civil judge within the meaning of Article 3 of the Code of Criminal Procedure, the request for a stay of proceedings may be granted only if the facts denounced as constituting the offense have a direct impact on the cause of refusal of the exequatur, and if the criminal decision to be taken is likely to affect the civil decision.*

*However, it has been held, as per the above, that the alleged fraud and, consequently, the facts described as constituting the infringement, do not directly affect the exequatur.*

*There is therefore no need to stay the proceedings".*

*The res judicata is defined as all the effects related to a judicial decision, such as the force of legal truth (see Gerard Cornu, Legal Vocabulary, PUF, 8th edition 2007, verbo autorité)*

*It should be noted that the judgment of the Luxembourg Court of Appeal of 19 December 2019 does not exclude that the alleged fraud may have an influence on the damages awarded which are related to the LPG plant, and which amount, under the terms of the Arbitral Award, to 199,000,000.00 USD.*

*The Court underlines that the question of the amount of the prejudice is, nevertheless, of paramount importance in the context of the present proceedings concerning the validation of garnishments.*

*It must be concluded that the principle of res judicata effect attached to judgment number 133/19 — VIII — Exequatur of December 19, 2019 of the Luxembourg Court of Appeals does not therefore preclude a stay of proceedings.*

*It should also be noted that, assuming that the STATI parties committed the violations alleged against them by the REPUBLIC OF KAZAKHSTAN, this circumstance would necessarily have an impact on the request for validation of the garnishments.*

*In view of the foregoing developments, it should be noted that the criminal action and the civil action for validation of the garnishment of the present proceedings are connected by a close link and that there*

FILED: NEW YORK COUNTY CLERK 05/16/2022 09:42 PM
INDEX NO. 652522/2020

NYSCEF DOC. NO. 44
Case 1:14-cv-01996-BAH  Document 245-1  Filed 07/14/22  Page 14 of 32
RECEIVED NYSCEF: 05/16/2022

Court of Appeal Brussels - 2020/AR/252 – Pg. 14

*is a risk of contradiction between the decisions to be given, with the consequence that the second condition for the stay of proceedings is, in the present case, satisfied.*

*It is established that no final decision has yet been handed down on the public action, with the consequence that the last condition for the stay of proceedings is also fulfilled."*

4) in the Netherlands, the Prosecutor General at the Court of Cassation (Hoge Raad) recommended, in an opinion issued at the hearing of 4 June 2021 (Exhibit 6.10 of Kazakhstan), to quash the decision of the Amsterdam Court of Appeal of 14 July 2020 granting the enforcement of the Award in the Netherlands. If the Dutch Court of Cassation follows the opinion of its Prosecutor General (at a hearing scheduled for 21 November 2021), a new trial will also take place in the Netherlands on the fraud committed by the Statis.

5) in the United States, the decisions relating to the exequatur application of the Statis do not relate to the fraudulent acts discovered only in 2019, on the contrary, the American courts have declined to examine the accusations of fraud on the basis of the consideration - obviously mistakenly - that Kazakhstan was aiming at the re-examination of the dispute resolved by the arbitral tribunal, while the alleged fraud had not yet been discovered at that time, and even the Swedish courts were not aware of it when they ruled in the context of the annulment proceedings, of which only the first proceeding had resulted in a decision on the merits (judgment of the Court of Svea dated 9 December 2016) (see Exhibits 3.1 - 3.2. of the Statis);

As for the civil complaint rejected by the courts of the District of Columbia by decisions dated 30 March 2019 and 21 February 2020 (respectively), it is completely independent from the exequatur application in Belgium. The decisions and considerations from the judges, in particular insofar as they relate to *"the full opportunity (for Kazakhstan) to present its arguments in the context of the applications in Sweden",* and to the finding that these allegations have been rejected (see the latest submissions of the Statis, p. 148), are not binding to this Court.  They clearly show that the new elements of fraud discovered only in 2019 have not been taken into account;

6) as regards the decision of enforcement in Italy, the Court finds that Kazakhstan's first complaint, rejected by the Rome Court of Appeal (Exhibit 3.15 of the Statis), concerns *"the compatibility of the Award with the domestic legal system".* The Court states that it has reviewed *"the compatibility of the "effects" of the decision in the Italian legal system and that to do so it is required "to decide whether these effects are abnormal in*

FILED: NEW YORK COUNTY CLERK 05/16/2022 09:42 PM
NYSCEF DOC. NO. 44

INDEX NO. 652522/2020
RECEIVED NYSCEF: 05/16/2022

Case 1:14-cv-01996-BAH Document 245-1 Filed 07/14/22 Page 15 of 32

Court of Appeal Brussels - 2020/AR/252 – Pg. 15

*our system (= the Italian system) as they openly contradict the set of values and laws that govern the matter (see Cassation SU 16601/2017".*

It is obvious that this Court is not bound either by what the Italian judge of Exequatur has decided or by the considerations which support his decision concerning the compatibility (of the effects) of the Arbitral Award with the Italian legal system.

As for the reference to the Swedish annulment decisions, it is not any more convincing since the Rome Court of Appeal, in its judgment of 27 February 2019 which is the subject of an appeal in cassation that is still pending, merely considers that the Swedish courts "*have examined the arguments which are in substance the same as the arguments raised before this Court (see the judgment delivered during the Swedish proceedings against the Award, on page 8, docs 5 and 5-bis for the English translation relating thereto, record of the enforcement proceedings), with a decision which is not in favour of the applicant, essentially stressing the irrelevance, for the purposes of the decision, of the allegations of fraud against Stati Anatolie and Stati Gabriel*' adding that '*in any event, the alleged falsification of the evidence on which the Award is allegedly based does not appear in any res judicata judgment (art. 395 No2 of the CPC).*"

7) As for the decision concerning the third-party opposition against exequatur in Belgium, it is the subject of the present appeal.

With regard to the decisions in respect of the attachments, the Court will recall:

- that the decision by which the attachment judge approved the application for renewal of the conservatory garnishment of the Statis does not concern the exequatur. It is not relevant here;
- that the decision of this Court dated 29 June 2021, in respect of the third-party opposition and opposition against the order authorizing a conservatory garnishment dated 11 October 2017 and the garnishment levied on 13 October 2017, is based on a *prima facie* assessment, which the Court pointed out more than once (see among others, page 15 of the judgment, point 4.2.2, Exhibit 4.8 of the Statis),
- and that the decision regarding the opposition against the executory garnishment of 12 June 2018 has not yet been rendered.

In view of the above, this ground of inadmissibility is unfounded.

1.3. Prohibition to rely on an irregularity of which Kazakhstan was aware of

FILED: NEW YORK COUNTY CLERK 05/16/2022 09:42 PM
INDEX NO. 652522/2020

NYSCEF DOC. NO. 44

RECEIVED NYSCEF: 05/16/2022

Case 1.14-cv-01996-BAH   Document 245-1   Filed 07/14/22   Page 16 of 32

Court of Appeal Brussels - 2020/AR/252 – Pg. 16

<u>before the arbitral tribunal but which it did not raise</u>

The Statis base this ground of inadmissibility on Article 1679 (new) of the Belgian Judicial Code which provides: *"A party who, knowingly and without legitimate reason, refrains from invoking an irregularity before the arbitral tribunal at the relevant time shall be deemed to have waived the right to invoke it"*, allegedly applicable because it was already recognized as a '*general principle*' under the old Law.

By its judgment of 17 November 2020, the Court decided that the present proceedings are subject to the provisions of Part Six of the Judicial Code as in force before the adoption of the Law of 24 June 2013: see page 11 of said judgment.

Contrary to what the Statis assert, Article 1679 (new) BJC is not the result of the outright codification of a principle generally accepted under the old Law.

The idea of procedural fairness existed but not as a general principle justifying the inadmissibility of an application for refusal of enforcement.

See in this sense:

- Caprasse, O, Introduction au nouveau droit belge de l 'arbitrage, in Actualités en droit judiciaire, 2013, 420, n°93;

- Stein, E., Article 1679 in Arbitration in Belgium- A practitioner's Guide, 2016, 46, no.2 : "*In the Old B.L.A., there was no general rule dedicated to waiver. Instead, there were only two specific instances where waiver was invoked, namely: (i) in Article 1704, 4° Old B.J.C., where a party loses its right to assert a ground for annulment of .. an Award when it learned of the ground over the course of the arbitral procedure and did not raise it; and (ii) in Article 1717, 4° Old B.J.C., where a party may waive its right to set aside on Award*".

  Liberal translation: "*In the former 6th part of the BJC, there was no general rule consecrated to the waiver. On the contrary, there were only two specific situations in which the waiver was mentioned, namely:*

  *(i) In the former Article 1704,4° BJC, where a party loses its right to invoke a reason for annulment of an Award when that party had learned of this reason in the course of the arbitration proceedings but had not invoked it;*

  *and (ii) in the former article 1717, 4°BCJ, where a party may waive its right to annul the Arbitral Award*".

However, article 1704, paragraph 4, of the Judicial Code, referred to by the above-mentioned writers, is also not applicable in the present case.

This article provides that *"the cases provided for in paragraph 2 (c), (d) and (f) shall not be considered grounds for annulment of the Award [or for refusing exequatur], when the party who relies on them had become aware thereof in the course of the arbitral proceedings and has not then invoked them"*.

Assuming that this provision could be applied to the grounds for refusal of the exequatur even though it refers expressly to "*grounds for annulment of the Award",* it must in any event be noted that the situations referred to in this provision are not invoked in the present proceedings.

In view of the above and without it being useful to examine the other arguments raised by the Statis which cannot lead to any other result, this plea of inadmissibility is rejected.

## 2. Grounds for Refusing Exequatur

Under article 1723 (former) BJC, the judge refuses exequatur if it is established that there is a ground for annulment provided for in article 1704 (former) BJC.

Article 1704 (3) (a) (former) BJC provides that the judge refuses exequatur of the Arbitral Award if it was obtained by fraud.

Article 1704.3 (b) (former) BJC. provides that the Arbitral Award may be cancelled if it is based on evidence declared to be false by a judicial decision which has become final or on evidence which has been found to be false.

A piece of evidence recognized as false is that which emanates from a person who, betraying common trust in the written document, seeks to obtain, for himself or for others, an advantage or benefit of any kind whatsoever, which would not have been obtained if the truth or the sincerity of the written document had been respected. (Cass. 27 January 2010, RG P.09.0770.F)

The words "*recognized as false*" in article 1704, §3, b), of the Judicial Code "*refer to the evidence recognized as false by the party who invoked it or by*

*the party in favour of which this evidence has operated*". (G. Keutgen and G.-A. Dal, *L'arbitrage en droit belge et international*, vol. I : "Le droit belge", 2nd ed., Brussels, Bruylant, 2006, p. 485).

The provision does not require this recognition to take any specific form, and it can therefore include any admission in the common sense of the term.

In other words, the Award must be considered to be based on evidence recognized as false if that evidence influenced, in one way or another, the decision of the arbitral tribunal.

The Arbitral Award which is based on false evidence shall not be afforded any effects, as it cannot be accepted that one of the parties alter the truth and to betray the common trust in the written document for the purpose of obtaining for one's own benefit an advantage which could not have been obtained in the absence of such artifice.

Article 1704.3 (c) provides that the Arbitral Award may be annulled *'if, since it was rendered, a document or other evidence has been discovered which would have had a decisive influence on the Award and which had been retained by the opposing party*.'


In support of their case the Statis cite the judgment of this Court dated 29 June 2021, where the Court is said to have *prima facie* held that:

*"Insofar as there would be a question of fraud committed by the Statis, there is to date no evidence of a causal link between the fraud and the arbitral decisions on the one hand, and the Belgian decision of exequatur on the other"* (Exhibit 4.8, p. 19*).*

This citation must be read and understood in the light of the context and the subject matter of the dispute, which is fundamentally different from the subject matter of the present dispute.

Not only did the Court confine itself to a *prima facie* examination of the case, but it also held that:
- *"to date"* the alleged fraud had not resulted in the annulment of the Arbitral Awards nor in the reversal of the decision of exequatur;
- *prima facie* the fraudulent practices advanced by Kazakhstan do not take precedence over the final decisions establishing the debt of the Statis;
- the impact of the fraudulent acts that are invoked on the decisions taken in the annulment or exequatur proceedings is *"uncertain"*;

-   the Court does not have to rule on the validity of the decisions of annulment / exequatur,

these considerations do not lead to the conclusion - as wrongly asserted by the Statis - that this Court would be "*in substance*" of the same view as the view of the exequatur judge in the lower judgment of 20 December 2019.

Fraud occurs when the arbitral tribunal is misled, when it is deceived by a false statement or by the concealment of an important fact so that the arbitral tribunal is not correctly informed.

The Arbitral Award was *"obtained"* by fraud within the meaning of Article 1704 (3) (a) BJC if the fraudulent practices in question led the arbitrators to rule as they did, if, in other words, these actions had an unquestionable impact on the Arbitral Award, which, without the fraud invoked, would not have been given in the manner that it was.

To require that the fraud constitutes the "*determining cause"* of the Arbitral Award adds a condition that has no legal basis.

Based on the examination of the exhibits filed in the proceedings and of the submissions from the Parties, it is demonstrated that the Statis have committed acts which must be characterized as fraudulent acts and acts of deception which have caused an unquestionable impact on the Arbitral Award which, without these fraudulent acts, would not have been rendered in the way that it was, and [the Statis] have used pieces of evidence which have been recognized to be false:

The Statis produced in the arbitration the Indicative Offer of KMG, which they knew was prepared on the basis of several elements including the financial statements of Tristan, KPM and TNG from 2007 to 2009 (Exhibits C-706-709, Exhibit 1.1. of Kazakh5tan). These financial statements are said to be prepared in accordance with IFRS standards: Exhibit 1.83 of Kazakhstan, p.1, second paragraph; p.2, first point; p.4, point 8; Exhibits 1.140 and 1.142 of Kazakhstan.

It appears from the evidence in the file that the transactions between Perkwood, a related company, but which was presented by the Statis - in the course of the arbitration proceedings –as a third party without suggesting any doubt as to the truth of this information supported by the audited financial statements ("*third party*" Exhibit 1.1. of the Statis),

and TNG, do not appear in these financial statements, and that this omission is based on a considered strategy of the Statis (see Exhibits 1.85, 1.87 and 1.88 of Kazakhstan), which enabled them to present the costs of the LPG plant in a much more advantageous way for them.

KPMG has considered that this omission is "*a material misstatement*": "*our audit working papers indicate that TNG undertook transactions with Perkwood during 2007, 2008 and 2009. These transactions should have been disclosed in its annual and interim financial statements for those reporting periods, in accordance with IAS 24. Having concluded an independent assessment of the documents provided by Herbert Smith Freehills and our own workpapers, we consider this omission to be material, both to the financial statements of TNG the years ended 31 December 2007, 2008 and 2009, and to the combined financial statements of KPM, TNG and Tristan Oil Ltd for said period*" (Exhibit 9.10 of Kazakhstan).

On this basis, KPMG has decided that no reliance should be placed on the audit reports issued by KPMG Audit LLC, and ordered the Statis to *"immediately take all the necessary steps to prevent any further, or future, reliance on the following audit reports issued by KPMG"*.

According to the Statis, this decision would be *"illegal.* This Court does not take into account this allegation, which is not based on a decision of a competent court.

This faulty information was in turn the basis of other documents produced in the arbitration proceedings *that were 'presented as reliable',* while in reality they were based on faulty premises and were in turn unreliable, as well as the Due Diligence Report of KPMG, in which Perkwood also appears as *'(main) third party'* (pp. 11 and 72 of Exhibit 1. 88 of Kazakhstan), thus making it possible to inflate the investments related to the construction of the LPG Plant.

- Thus, the Statis produced in the arbitration a document entitled *"Project Zenith - Confidential Information Memorandum - Renaissance Capital - August 2008"* (Exhibit 1.84 of Kazakhstan).

In this document, it is mentioned that the combined and individual financial statements of Tristan Oil, KPM and TNG were prepared in accordance with IFRS standards: see pages 59 and 60 of this document, and that they were audited by Deloitte first and later by KPMG "*following the best practice of periodically changing auditors*", which considerably increased the degree of credibility of this information. On page 66 of the same document, it is stated that if a transaction is envisaged for which the consideration exceeds the amount of USD 10 million, it is necessary to provide "*an independent fairness opinion"* (an independent "*honesty*" report).

FILED: NEW YORK COUNTY CLERK 05/16/2022 09:42 PM
NYSCEF DOC. NO. 44

INDEX NO. 652522/2020

RECEIVED NYSCEF: 05/16/2022

Case 1:14-cv-01996-BAH   Document 245-1   Filed 07/14/22   Page 21 of 32

Court of Appeal Brussels - 2020/AR/252 – Pg. 21

Yet, by not disclosing Perkwood in the financial statements, the Statis have failed to comply with the IFRS standards.

As for the change of auditor, the explanation of the Statis is not at all confirmed by the documents on record, quite the contrary.

Finally, the Statis deliberately concealed the transactions between Perkwood and TNG in order to avoid having to obtain "*an independent (honesty) fairness*" opinion.

These actions are evidence of bad faith and a clear willingness to deceive in order for the arbitrators to give a favourable Award for them.

As to the fact that:

- Perkwood was indeed a related company within the meaning of IFRS standards;

- the Statis were aware that an independent "fairness" (honesty) opinion was required, unless Perkwood was presented as a third party, a deceit confessed by Mr. Artur Lungu in his deposition reproduced in Exhibit 8.5 of Kazakhstan: p. 242;

- the Statis were well aware of all of this;

the deposition of the former financial director of the Statis, Mr. Artur Lungu (Exhibit 8.S of Kazakhstan, p. 263-271), in combination with the consolidated submissions of the Stati in the Luxembourg proceedings (Exhibit 6.7 of Kazakhstan, p. 138), do not leave room for the slightest doubt in this respect.

With regard to the admissions made by Mr Artur Lungu, the Court notes that Artur Lungu was the Vice-President of Ascom, one of the plaintiffs in the arbitration proceedings.

In this capacity, he was in charge of developing and implementing financial management systems and supervising financial management and sales activities relating to Ascom/Tristan and their operational subsidiaries.

Artur Lungu played a major role in the arbitration proceedings. He submitted, on behalf of the Statis, two witness statements (Exhibits 2.23 and 2.28 of Kazakhstan), in which he claimed to be "*intimately familiar with the history, operations, holdings, contracts, finances, and corporate structure of Ascom and its affiliate, Terra Raf* [ ..]*"* and "*intimately familiar with the history, operations, holdings, contracts, finances, and corporate structure of the two Kazakh companies that were owned and controlled by Ascom and Terra Raf, [KPM and TNG]"*. (Exhibit 2.23 of Kazakhstan, paragraph 3).

He appeared at the hearings to be examined and cross-examined alongside the Statis, which leads to the conclusion that he can be identified with the Statis within the meaning of articles 1704, §3, b) and 1723,3°, of the Belgian Judicial Code.

Yet, both in these witness statements and at the hearings, Artur Lungu has expressly referred to exhibits which he has now admitted to be false, namely the financial statements (Kazakhstan Exhibit 2.35, p. 183), the KPMG Due Diligence Report (Kazakhstan Exhibit 2.23, point 30) and the Information Memorandum (Kazakhstan Exhibit 2.23, point 31):

*"(...) We also retained the services of KPMG to perform vendor financial and tax due diligence in connection with the process. KPMG issued a complete Vendor Due Diligence presentation for Project Zenith in August of 2008;"*. KPMG performed a full vendor due diligence presentation for the Zenith project in August 2008).

The arbitral tribunal based its decision at least in part on the above evidence which has now been recognized as false by the Statis. As stated above, a tribunal must be considered to have relied on evidence that has been found to be false as soon as this evidence has had an unquestionable influence on the contents of the arbitral tribunal. In the present case, the evidence recognized as false as per the above had an influence on the Arbitration Award both at the stage of assessing the causal link between Kazakhstan's liability and the damage and at the stage of assessing the quantum of the damage claimed by the Statis.

The Award relates to an investment arbitration.

The financial situation of the investment, *i.e.* the financial situation of KPM and TNG, was reflected in the financial statements prepared by the Statis and audited between 2007 and 2009 by KPMG. It is stated in them that the Statis conducted the bulk of their "investment" through transactions between related companies: "*a significant proportion of the Companies' business [Tristan, KPM and TNG] is conducted through transactions with related parties, and the effect of these, on the basis determined between the related parties is reflected below. The Companies' ultimate controlling party is Anatol Stati*". (Kazakhstan Exhibit 1.1, pp. 62, 225 and 392)

Subsequently, the Statis acknowledged that the section on related party transactions, namely the core of their purported investment, was affected by material misstatements, that this section was false.

The norm ISA 320 stipulates that misstatements are material "*when it is reasonable to expect that, individually or in the aggregate, they could influence the economic decisions that users of the financial statements made in reliance*

*on them*" (Kazakhstan Exhibit 11.3 point 2). In the context of the arbitration, the arbitral tribunal became one of these users. Indeed, the Statis had repeatedly invited [the tribunal] to rely on their false financial statements.

On the issue of causation, the Statis' contention was (see Mr Anatolie Stati's second written witness statement in the arbitration), that "*Kazakhstan's action contributed to a severe liquidity crisis in the companies [TNG and KMP] in the first half of 2009 (*Kazakhstan Exhibit 2.29, para 41*).* Artur Lungu added also in his second witness statement: *"Kazakhstan's harassment campaign also caused a liquidity crisis for TNG and KPM in the spring and summer of 2009*" (Kazakhstan Exhibit 2.28, point 7).

The Statis then relied on their financial statements to dispute Kazakhstan's contention that the Statis had themselves driven their Kazakh companies into bankruptcy before the start of the alleged *"Kazakhstan harassment campaign"*, i.e. before mid-October 2008:
*"The crux of Kazakhstan's causation argument is that KPM and TNG were overleveraged prior to any actions of the State, which doomed them to fail when oil prices dropped during the global financial crisis. No credible evidence supports this argument, and it is belied by all objective facts. While KPM and TNG experienced a liquidity shortage in the first half of 2009, that problem was temporary and surmountable. Moreover, Kazakhstan itself contributed significantly to that problem. Kazakhstan presents no credible evidence that KPM and TNG were overleveraged prior to October 14, 2008"* (Kazakhstan Exhibit 2.44, paragraphs 249-250).

During the hearing on jurisdiction and liability, the Statis insisted on the reliability of their financial statements to demonstrate the reality and legality of their investment: *"Kazakhstan argues that [the Statis'] investments were opaque, suggesting that they were structured to conceal profits and disguise who was the "real investor". This position either is completely disingenuous, or the respondent understands nothing about finance. These companies created annual financial statements between 2003 and 2009 that were audited by "Big Four" accounting firms. They raised debt on the public debt markets, and banks such as Goldman Sachs and UBS deemed the companies to be transparent and reliable enough to loan hundreds of millions of dollars to them. [...] The fact is that [the Statis] made substantial investments in KPM and TNG through the form of their acquisition of the shares, shareholder loans to the companies, the reinvestment of profits, and then by risking their investments to secure the companies' debts"* (Kazakhstan Exhibit 2.33, point 45:1-46:4).

- Before the arbitrators, the Statis have insisted on the relevance, complete reliability, seriousness and credibility of the information provided to determine the value of the LPG Plant: see Kazakhstan's Exhibit 2.35, pp. 28-29, stressing that Kazakhstan had not suggested the slightest inaccuracy or deficiency in the information contained in the Information Memorandum distributed to potential purchasers and the reliability of the offers, which were indicative but presented indications of the potential value of the assets for companies whose seriousness and reliability could not be disputed and which are all active in the oil and gas sector.

The Statis have also insisted on the reliability of their financial statements in that they had been prepared *in tempore non suspecto*, *"in the ordinary course of business, not for the purpose of the litigation"* and that the information taken from their financial records, especially the information from audited financial statements, constitute perfectly reliable evidence.

This line of arguments is reproduced in the Arbitral Award (Statis Exhibit 1.1., p.390, no. 1700), which finds its basis on it.

It is undisputed that:

if the arbitrators had been aware of the fact that the documents produced by the Statis were based on financial statements containing such crucial inaccuracies and deficiencies, to such an extent that it led KMPG to decide that no reliance should be placed on the audit reports issued by KPMG Audit LLC, they would have, at the very least, allowed Kazakhstan to take a position as to this matter - just as Kazakhstan has done in the current proceedings: see pp. 115-125 of Kazakhstan's latest submissions - with the consequence that this argument would undoubtedly have been reflected in the Arbitral Award, which would not have been made in the same way, and that, therefore, documents and evidence discovered after the notification of the Award would have had a fundamental impact on the Award.

Again relying on their financial statements, and in particular on the section concerning related party transactions, the Statis argued in their post-hearing submissions that their Kazakh companies "*were a very long way from being insolvent*" (Kazakhstan Exhibit 2.44, para 254). They explained that the accumulation of debts by KPM's and TNG's related debtor companies was due to external factors beyond the control of the Statis:

*"Kazakhstan's insinuation that the extension of credit terms for the liquids buyers was anything other than a reasonable decision in the ordinary course of business is unfounded. According to KPMG's Auditors' Report, "the management of TNG and KPM agreed to extend the payment terms for their largest customers, Stadoil Ltd. and General Affinity Ltd., which are related parties, after they were informed that these customers would not be able to comply with existing contractual payment terms". It is hardly surprising that with the onset of the global financial crisis and the associated rapid price declines in 2009, slow payments and defaults cascaded through the industry"* (Kazakhstan Exhibit 2.39, p.156, paragraph 417).

Having been misled in relation to these facts, the arbitrators relied on the Statis' financial statements which they considered to be a true reflection of the Statis' financial situation in order to adjudicate the issue of causation: in this respect, see the diagram entitled "*Causality concerning the quantum of the LPG plant*" (exhibit 35 + annexes of Kazakhstan's hearing submissions):

FILED: NEW YORK COUNTY CLERK 05/16/2022 09:42 PM    INDEX NO. 652522/2020
NYSCEF DOC. NO. 44    Case 1:14-cv-01996-BAH   Document 245-1   Filed 07/14/22   Page 26 of 32    RECEIVED NYSCEF: 05/16/2022

Court of Appeal Brussels - 2020/AR/252 – Pg. 26

## Causality concerning the Quantum of the LPG Plant



1. Financial Statements of 6/30/2008: construction costs for the "*LPG Plant (under construction)*": "*USD 192,969,994*" Exhibit 1.1, Pg. 553).

⚠ This amount includes triple the amount of [illegible] Equipment invoiced by TNG in March 2006 via Appendix 2 in the Perkwood Contract (1.32, Pg. 1618) (CCL Summary of the RdK §144).

Sale of Kazakh companies in the context of the Zenith Project

2. Memorandum of Information of 8/2008 prepared by the Statis for potential buyers: based on (false) Financial Statements adopted on "*July 1, 2008, TNG spent approximately USD 193 million for the LPG Plant*" (Exhibit 1.84, Pg. 10).

3. Indicative Offer of 9/25/2008 from a potential buyer (KMG):

a. "*key hypotheses [...]: the historic production, the revenues, the costs and the CAPEX are such as stated in the Memorandum of Information*" (Exhibit 1.89, Pgs. 3-4).

b. "*We estimate [...] the value of the LPG Plant at USD 199 million*", "*calculated as an arithmetic mean between the matrix of the value of the comparative method and that of the costs method [...]*" (1.89, Pg. 3).

c. "*Historic costs of USD 193 million were used as the basis for the valuation according to the costs method*" (1.89, Pg. 3).

⚠ The KMG evaluation is 50% based on the construction costs mentioned in the Memorandum of Information, themselves repeated in the Financial Statements (admitted by the Statis, see Statis CCL Summary, §715].

Introduction of an Investment Arbitration following the failure of the Zenith Project

4. Statis Request to the Arbitral Tribunal in 1/2013: the Arbitral Tribunal was to consider the KMG Indicative Offer as *"an absolute minimum"* (Exhibit 2.35, Pgs. 49:9-15).

5. Decision of the Arbitral Tribunal in 12/2013: the KMG Indicative Offer produced by the Statis constitutes "*the relatively best source of information for the valuation of the LPG Plant among the various sources of information submitted by the Parties regarding the valuation of the LPG Plant during the relevant period of evaluation date accepted by the Tribunal*" (Exhibit 2.1, §1747).

FILED: NEW YORK COUNTY CLERK 05/16/2022 09:42 PM    INDEX NO. 652522/2020
NYSCEF DOC. NO. 44    Case 1:14-cv-01996-BAH    Document 245-1    Filed 07/14/22    Page 27 of 32    RECEIVED NYSCEF: 05/16/2022

Court of Appeal Brussels - 2020/AR/252 – Pg. 27

whereas these financial statements were tainted by material misstatements, and the Statis had deliberately striped Perkwood from their financial statements and concealed the existence of the Perkwood contract in order to avoid the scrutiny of the transactions between Perkwood and the TNG company by an independent third party.

The Statis have withheld documents that would have most likely had an important impact on the Award, including the following correspondence between the Statis and KPMG: the Perkwood power of attorney, Kazakhstan Exhibit 1.20, the representation letters to KPMG: Kazakhstan Exhibits 1.83, 1.122, 1.140 and 1.142, which would have revealed that the Statis had purposefully misled their auditor in order to give credibility to their financial statements in the eyes of third parties.

If the arbitrators had been aware of these practices, they could have taken them into account when examining the matter and they could have considered the consequences of this conduct for the resolution of the dispute.

With regard to the LPG Plant, the Statis have expressly invited the arbitral tribunal to rely on the indicative offers which they had produced, including the one from KMG, because these offers "*present indications of the potential value of the assets to companies that I think no one can dispute are serious and credible, and they are all in the oil and gas business. There is really a nice cross-section of companies that you look at. You've got a state-controlled company with KMG* (...)" (Kazakhstan Exhibit 2.35, pp. 31-32). The Statis have stated in conclusion of their claim that the Indicative Offer from KMG should represent "*an absolute minimum*" for the valuation of their assets (Kazakhstan Exhibit 2.35, p 49).

The Statis have insisted on the reliability of their financial statements, arguing in particular that they had been prepared *"in the ordinary course of business, and not for litigation"* against Kazakhstan:
*"TNG's audited 2009 financial statements, which are backup to the annual report, list the net book value of the LPG Plant as US $248 million at December 31, 2009, which corroborates FTI's assessment of US $245 million. Data from [the Statis'] historical financial records, particularly data from audited financial statements, is perfectly reliable evidence, and is not simply FTI parroting [the Statis]"* (Kazakhstan Exhibit 2.44., para 354).

The arbitral tribunal relied on the arguments from the Statis and on the evidence to which they referred (audited financial statements, KPMG's Due Diligence Report, Information Memorandum and KMG's Indicative Offer) for the purpose of the assessment of the value of the LPG Plant since [the tribunal] reproduced them in the Award (para. 1699 and 1700 of the Award). As expressly requested by the Statis, the arbitral tribunal relied on the "*undisputed indicative offers made by interested buyers in 2008*" and decided that KMG's Indicative Offer of USD 199 million constituted "*the relatively best source of information for the valuation of the LPG Plant among the various sources of information submitted by the Parties regarding the valuation of the LPG Plant during the relevant period of evaluation date accepted by the tribunal*" (see Award, points 1746-1747).

In reaching such a conclusion, the arbitral tribunal necessarily relied on evidence that is now known to be inaccurate and tainted by material misstatements.

In its Indicative Offer, KMG had expressly stated that it had relied on several "*key assumptions*", including that "*Historical production, revenues, costs and capital expenditure [CAPEX] were as reported in the Information Memorandum*" (Kazakhstan Exhibit 1.89, pp. 3-4).

At the quantum hearing, the Statis' financial expert, Mr. Rosen, confirmed that KMG had relied precisely on the historical construction costs as reported by the Statis in their financial statements and in the Information Memorandum: "*I further noted that in KMG's analysis of value for their indicative offer, they had also approached the LPG plant on a cost basis, and at the valuation date it was closer to $200 million, because that was the information on the cost of the plant at that time* " (Kazakhstan Exhibit 238, p. 57).

According to the Information Memorandum, all financial information, including the historical expenditure of USD 193 million that the Statis claimed to have already incurred, came from the financial statements of the Statis. Once again under the terms of the Information Memorandum, the financial statements of KPM and TNG had been "*prepared in accordance with IFRS*", as the Statis had stated in the financial statements themselves.

Since then, the Statis have admitted that the financial statements that they had presented as being made "*in accordance with IFRS*" to KMG (Kazakhstan Exhibit 1.84, p. 60) and as "*perfectly reliable*" to the arbitral tribunal (Kazakhstan Exhibit 2.44, item, 354), are in fact tainted by material misstatements. They have admitted to concealing Perkwood from their

financial statements, in clear violation of IFRS, with the view in particular to avoid a review of the transactions between Perkwood and TNG by an independent third party. This is an important admission, especially considering that Perkwood was the main "*supplier*" for the construction of the LPG Plant and therefore the main source of the "historical capital expenditure" on which KMG had relied to formulate its bid.

Had the arbitral tribunal been aware of all this, it is likely that it would not have accepted the Statis' case that the indicative offers provided an indication of the value of the LPG Plant *"that no one can dispute are serious and credible*" (Kazakhstan Exhibit 2.35, p. 32) and KMG's Indicative Offer was to be an "*absolute minimum*" (Kazakhstan Exhibit 2.35, p. 49), and that it would not have concluded that the indicative offers were "*undisputed*" (Kazakhstan Exhibit 2.1, point 1746).

To the contrary, the arbitral tribunal could have observed that the Statis had deliberately concealed the true status of Perkwood, the main "*supplier*" of the LPG Plant, in order to avoid third party scrutiny of the transactions between Perkwood and TNG. This could have led [the tribunal] to draw the consequence that most of the capital expenditure declared by the Statis in the Information Memorandum on which KMG had based its Indicative Offer was unreliable. Therefore, [the tribunal] could have avoided accepting that KMG's Indicative Offer is "*the relatively best source of information for the valuation of the LPG Plant*" (Kazakhstan Exhibit 2.1, paragraph 1747).

The Court concludes that due to the Statis manoeuvres and withholding of information, the arbitrators were misled. They were prevented from taking cognizance of the real financial situation of the Statis, which was essential to be able to adjudicate the matter.

Their decision is based on erroneous information, which did not accurately reflect the situation of the Statis companies.

The evidence that has been gathered since the Award, demonstrating beyond any possible doubt the fraudulent behaviour of the Statis, was unknown to the arbitral tribunal as it has only been gradually discovered after the Award was issued. As a result, Kazakhstan was unable to expose to the arbitral tribunal that the Statis' investment in Kazakhstan was conducted in bad faith. The case discussed before the arbitral tribunal did not match the reality of the facts as revealed by the evidence newly gathered after the notification of the

FILED: NEW YORK COUNTY CLERK 05/16/2022 09:42 PM
NYSCEF DOC. NO. 44

INDEX NO. 652522/2020

RECEIVED NYSCEF: 05/16/2022

Case 1:14-cv-01996-BAH   Document 245-1   Filed 07/14/22   Page 30 of 32

Court of Appeal Brussels - 2020/AR/252 – Pg. 30

Award. In other words, due to the Statis' inaccurate and fraudulent statements and to the fact that they have concealed numerous pieces of evidence during the arbitration proceedings, Kazakhstan was deprived of its right to be heard on this fundamental issue.

Thus, the arbitral tribunal necessarily did not, and could not, consider whether the Statis' conduct was in accordance with the principle of good faith.

The evidence gathered since the notification of the Award would undoubtedly have had a conclusive impact on the decision.

The facts discovered after the notification of the Award and KPMG's letter of 21 August 2019 to the Statis "*withdrawing*" their audit reports based on materially flawed financial statements are particularly revealing as to the strategy of the Statis to influence the arbitrators in order to obtain a favourable Award.

It is patently clear that if the arbitrators had been able to examine the case on the basis of truthful information and had known that the financial statements produced by the Statis, touted as reliable because they had been audited by highly reputable auditors: *"audited by "Big Four" accounting firms"* (Kazakhstan exhibit 2.33), were found to be worthless, as the Statis had deceived these same audit firms, [the arbitrators] would never have reached the same conclusion on the issue of causation and they would not have decided that Kazakhstan remained in default of proving that the Statis had themselves caused, or contributed to cause, the damage suffered by the investment of the Statis.

If the arbitrators had been aware of the facts, documents and evidence concerning the real financial situation of the Statis, if they had been aware of the fraudulent and deceptive actions of the Statis, the debate before the arbitrators would have been different and would have allowed the parties, the experts and/or the witnesses to confront each other with this new evidence.

When taking into account the foregoing, and without the need to consider the other grounds for denying exequatur, the appeal is declared well founded.

**3.      Costs of service**

The costs of service shall be incurred by the Statis, the party that has lost the case, and with regard to whom they have been unnecessarily incurred.

**4. Legal costs**

Legal costs shall be borne by the Statis who lost the case.

In view of the nature and complexity of the dispute, it is appropriate to fix the procedural compensation due to Kazakhstan at 13,000 Euros, i.e. the maximum amount pursuant to Article 1022 of the Judicial Code.

**FOR THE ABOVE REASONS,**

**THE COURT,**

Ruling following an adversarial debate between the parties,

Having regard to article 24 of the law of 15 June 1935 on the use of languages in judicial matters;


Declares the main appeal of the Republic of Kazakhstan to be well-founded;

Overturns the below judgment, except insofar as it had declared that the third-party opposition to the enforcement order dated 11 December 2017 was admissible;

Ruling *de novo* on the matter under these limits:

Declares the third-party action against the Exequatur Order dated 11 December 2017 to be well-founded;

Annuls the Exequatur Order dated 11 December 2017;

Declares the cross appeal filed by the Stati parties, the Ascom Group and the Terra Raf Trans Trading company to be unfounded;

Dismisses the arguments of the defendants;

Declares that the costs of serving the judgement shall be borne by the Stati parties,

Ascom Group and Terra Raf Trans Trading;

Orders the Stati parties, the Ascom Group and Terra Raf Trans Trading to pay the costs of the proceedings, settled as follows :

- . in the case filed by the Republic of Kazakhstan:
- . costs of the summons: 591.91 Euros
- . first instance procedural indemnity: 13,000 Euros
- . Registration fee (appeal), amount to be paid to the Belgian State, SPF Finances, in accordance with article 2691 of the Code of registration, mortgages and court fees: 400 Euros
- . FB: 20 Euros;
  appeal procedural indemnity: 13,000 Euros;
- . In the case filed by the Stati parties, the Ascom Group and the Terra Raf Trans Trading company:
- . nihil.

Judgment issued and handed down at a public hearing in civil matters of the 17th Chamber of the Court of Appeal of Brussels on:

**16 Nov. 2021**.

Attended by:

Mme Dominique DEGREEF, Judge,
Ms Patricia DELGUSTE, Clerk,

(signature)                                    (signature)

P. DELGUSTE                                    D. DEGREEF