**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

HULLEY ENTERPRISES LTD, *et al.*,

               Petitioners,

               v.

THE RUSSIAN FEDERATION,

               Respondent.

Civil Action No. 14-1996

Judge Beryl A. Howell

## MEMORANDUM OPINION

Petitioners Hulley Enterprises, Ltd., Yukos Universal Ltd., and Veteran Petroleum Ltd. (collectively, the "Shareholders") instituted this suit in 2014 against respondent, the Russian Federation, to enforce three arbitral awards (the "Final Awards") issued by an arbitral Tribunal (the "Tribunal") sitting in the Hague under the auspices of the Permanent Court of Arbitration. Petition to Confirm Arbitration Awards ("Pet.") ¶ 1–2, ECF No. 1; *id.*, Ex. A to Decl. of Emmanuel Gaillard ("Gaillard Decl."), Hulley Final Award, ECF No. 2-1; *id.*, Ex. B to Gaillard Decl., Yukos Final Award, ECF No. 2-2; *id.*, Ex. C to Gaillard Decl., VPL Final Award, ECF No. 2-3 (collectively, the "Final Awards").[1]  The Final Awards total over $50,000,000,000 in United States Dollars, which the Shareholders won after nearly ten years of arbitration proceedings that began in 2004 and concluded in 2014.  *Id* ¶ 1, 34.  In addition to filing this case, the Shareholders have sought to enforce these awards in multiple other countries, including Belgium, France, Germany, India, and the United Kingdom.  *See* Resp't's Opp'n Mot. Stay, Ex. 2, Decl. Expert Op. Dr. Andrey Kondakov ¶ 26, ECF No. 127-2.  In 2015, the Russian

---

[1]  On the same day the original Petition was filed, the Shareholders filed a Notice of Corrected Petition, ECF No. 4, without providing a redline version or otherwise identifying any "correct[ions]" made.  The only apparent correction was to include the parties' addresses and the case number on the first page of the Petition.

Federation moved, pursuant to Federal Rule of Civil Procedure 12(b)(1), to dismiss the

Shareholder's petition for lack of subject matter jurisdiction, on the grounds of sovereign

immunity not exempted under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C.

§ 1602 *et seq.*, and inapplicability of the Convention on the Recognition and Enforcement of

Foreign Arbitral Awards of June 10, 1958 ("New York Convention") to support the exercise of

jurisdiction.  *See* Resp't's Mot. Dismiss for Lack of Jurisdiction ("Resp't's Mot."), ECF No. 24.

The Russian Federation also separately moved to deny confirmation of the petition under the

New York Convention, *see* Resp't's Mot. to Deny Confirmation of Arbitration Awards Pursuant

to the New York Convention ("Resp't's Mot. Deny Pet."), ECF No. 23, which motion is not

resolved in this Memorandum Opinion, since the enforceability of an arbitral award is separate

from, and need not be decided as part of, the question of whether a court has jurisdiction to

entertain a petition for such enforcement, *see, infra,* Part II.[2]

Before resolution of the Russian Federation's dismissal motions, the Shareholders moved

to stay this case pending their appeal of a 2016 lower court ruling in the Dutch District Court that

set aside the arbitration awards.  Pet'rs' Mot. Stay, ECF No. 105.  Shortly after, the Russian

Federation filed a Supplemental Motion to Dismiss, based predominantly on the Dutch District

Court's ruling.  Resp't's Suppl. Mot. Dismiss at 1, ECF No. 108.[3]  As the appeal of that

---

[2]      The Russian Federation's pending Motion to Deny Confirmation of the Awards raises several defenses to confirmation of the Final Awards, including that the awards are a "nullity" because the parties' never had an agreement to arbitrate.  Resp't's Mot. Deny Pet. at 13. While that particular challenge is resolved—and rejected—in this Memorandum Opinion, the Russian Federation also argues against confirmation of the awards as contrary to United States public policy, *id.* at 13–26, and due to various challenges to the arbitral Tribunal's procedures and composition, *id.* at 26–39.

[3]      The Russian Federation twice moved to amend its Supplemental Motion to Dismiss, see Resp't's Mots. Amend Suppl. Mot. to Dismiss, ECF Nos. 139 and 142, which motions were granted over the Shareholders' objection, *see Hulley Enterprises Ltd. v. Russian Federation* ("*Hulley I*"), 211 F. Supp. 3d 269, 275 n.4 (D.D.C. 2016).  Yet, having obtained the Court's authorization, the Russian Federation did not file its amended motions on the docket, an oversight corrected by the Court by docketing the amended motions at ECF Nos. 271 and 272. Those amended motions have been fully considered.

judgment progressed through the appellate courts in the Netherlands, this case was stayed for six years, until November 2021, at the request of both or only one of the parties, depending on which party prevailed in the most recent decision by a Dutch appellate court. *See Hulley Enterprises Ltd. v. Russian Federation* ("*Hulley II*"), 502 F. Supp. 3d 144, 150 (D.D.C. 2020) (recounting history of motions to stay by parties). After the Dutch Supreme Court sided with the Shareholders and remanded the case to the Amsterdam Court of Appeal, the Russian Federation moved to continue the stay of these proceedings. *See* Resp't's Second Mot. to Stay at 1, ECF No. 201. This latest request for a stay was denied, given the substantial years-long delays in resolving this case, when the Dutch proceedings had "no evident resolution in the horizon." *Hulley Enterprises Ltd. v. Russian Federation* ("*Hulley III*"), No. 14-cv-1996, 2022 WL 1102200, at *9–10 (April 13, 2022).

This case has now consumed judicial resources in the District of Columbia for almost a decade, and related proceedings have likewise demanded judicial attention in multiple jurisdictions abroad, including the Netherlands, Belgium, France, Germany, India, and the United Kingdom. The Russian Federation has repeatedly advanced permutations of the same arguments in attempts to avoid enforcement of the Final Awards in these different fora around the world, and though succeeding in delaying enforcement of the Final Awards, these efforts have achieved little success on the merits. *See id.* at *1.

The Russian Federation seeks dismissal of this enforcement action, claiming foreign sovereign immunity that precludes this Court's exercise of subject matter jurisdiction to resolve the Petition and a lack of jurisdictional basis to enforce the award under the New York Convention. Resp't's Mot. at 4–5. The Shareholders counter that jurisdiction may be exercised, pursuant to the New York Convention and the arbitration exception to foreign sovereign

immunity set out in the FSIA.  *See* Pet'rs' Mem. Opp'n Resp't's Mot. Dismiss ("Pet'rs' Opp'n"), ECF No. 63.

Despite explicit findings to the contrary by the arbitral Tribunal, after extensive evidentiary hearings and proceedings lasting almost ten years, as well as set-aside proceedings in appellate courts in the Netherlands that resulted in a favorable decision for the Shareholders at the Dutch Supreme Court, the Russian Federation continues to insist that no arbitration agreement covering the underlying dispute at issue was agreed-to or entered by the Russian Federation and, further, demands that this Court exercise *de novo* review to revisit the existence of such an agreement, which is key here to exercising jurisdiction as an exception to foreign sovereign immunity.

In urging this Court to eschew exercising jurisdiction over this arbitration enforcement action, the Russian Federation asserts arguments that cannot be squared with binding precedent and that risk upending the global community's predominant mechanism for international commercial dispute resolution and decreasing international accountability of states and private parties conducting business abroad, with concomitant adverse repercussions for international investments and transactions.  For reasons explained more fully below, the Russian Federation's original and supplemental motions to dismiss the Shareholders' Petition on foreign sovereign immunity and subject matter jurisdiction grounds are denied, and this case may proceed to the merits to determine enforcement of the Final Awards under the New York Convention.

## I.     BACKGROUND

Summarized below is the factual background and procedural history relevant to resolving the pending motions to dismiss.

### A.  Factual Background

The Shareholders were the controlling shareholders of Yukos, Russia's largest and first fully privatized oil company following the dissolution of the Soviet Union.  Pet. ¶ 11.  According to the Shareholders, in 2003, the Russian Federation "began a campaign devised to bankrupt Yukos, appropriate the company's assets, and silence the company's head, Mikhail Khodorkovsky," out of concern about Khodorkovsky's support for political parties not aligned with President Vladimir Putin and Yukos's plans to merge with Western oil interests.  *Id.* ¶ 12.  "[A]lleging that Yukos had engaged in a series of tax-avoidance schemes," the Russian Federation aggressively investigated Yukos, conducting raids of its offices and the homes of Yukos employees.  *Id*. ¶¶ 14–15.  Ultimately, the Russian Federation arrested, charged, and tried high-ranking Yukos officers, including Khodorkovsky, resulting in lengthy sentences of incarceration.  *Id.* ¶ 16.  Following Khodorkovsky's arrest in October 2003, numerous Yukos personnel left Russia fearing the possibility of continued harassment or prosecution; the Russian Federation's extradition requests to their countries of flight were "uniformly rejected."  *Id.* ¶ 18.

While its investigation and charging of Yukos and its employees was ongoing, the Russian Federation also began "levying a series of tax reassessment judgments against [the company]."  *Id.* ¶ 24.  From December 2003 to December 2004, the Russian Federation ordered Yukos to pay a total of over $20,000,000,000 in United States Dollars for tax liabilities between the years 2000 and 2003, and then, to satisfy those alleged debts, auctioned off Yukos's "core asset," YNG, for a "fraction of [its] value."  *Id.* ¶¶ 25–30.  Shortly after the auction, the entity that acquired YNG was itself acquired by the state-owned oil company, Rosneft, *id.* ¶ 30, described as a "creature of President Putin's entourage," *id.* ¶ 59.  "Gutt[ed] . . . of its most profitable asset," and after a series of transactions also involving Rosneft, Yukos was placed under supervision for bankruptcy proceedings.  *Id.* ¶¶ 31–32.  In July 2006, its creditors voted to

declare Yukos bankrupt.  *Id.* ¶ 32.  As the actions against Yukos were occurring, the Shareholders initiated steps to recoup the massive losses they suffered, leading, as described below, to arbitration proceedings and litigation around the world.

### 1. Shareholders' Initiation of Arbitration Under the Energy Charter Treaty

 In November 2004, the Shareholders notified the Russian Federation of alleged violations of the Energy Charter Treaty (the "ECT"), to which the Russian Federation was at the relevant time, indisputably, a signatory.  Pet. ¶ 34.[4]  The ECT requires every "Contracting Party" to "accord . . . fair and equitable treatment" to "Investors of other Contracting Parties," Pet., Ex. G to Gaillard Decl., ECT art. 10(1), ECF No. 2-7, and prohibits "nationalization or expropriation" of "Investments of Investors," except where such nationalization is in the public interest, nondiscriminatory, carried out under due process of law, and accompanied by appropriate compensation, ECT art. 13(1).  After failing to settle the dispute amicably within the three-month period required by the ECT, the Shareholders initiated arbitration proceedings, pursuant to Article 26 of the ECT.  Hulley Final Award ¶ 10.

### 2. Selection of, and Unanimous Determinations by, the Arbitral Tribunal

In accordance with Article 26 of the ECT, a three-member arbitral Tribunal was assembled, composed of Judge Stephen M. Schwebel, appointed by the Russian Federation; Dr. Charles Poncet, appointed as a replacement arbitrator by the Shareholders in September 2007; and The Honorable L. Yves Fortier, appointed by the Permanent Court of Arbitration.  *Id.* ¶ 12.[5]

---

[4]     The Russian Federation does not contest being a signatory to the ECT from December 1994 to October 2009, Pet. ¶¶ 34, 40; *see* Resp't's Mot. at 28–30, and the arbitral Tribunal, which issued the Awards at issue, determined that investments made during that time period are subject to the ECT's protection, Pet. ¶ 40.

[5]     The Russian Federation's appointee to the Tribunal, Judge Schwebel, served three terms on the International Court of Justice, and as President of that Court, has been a member of the United Nation's ("UN") International Law Commission and other UN committees, and taught international law at Johns Hopkins University, Cambridge University, the Australian National University, and the Graduate Institute of International Studies in Geneva.

On August 1, 2005, the parties agreed that The Hague would be the seat of the arbitration. *Id.* ¶ 13.  During the arbitration proceedings, the Russian Federation challenged the Tribunal's jurisdiction over the dispute on multiple grounds, each of which the Tribunal exhaustively addressed first before turning to the merits of the Shareholders' claims.  *See, e.g.*, *id.* ¶¶ 14–21; 1272; 1373; 1446; 1888.  After hundreds of pages of filings and a ten-day hearing on the question of jurisdiction, in November 2009, the Tribunal rendered "Interim Awards" dismissing or deferring decision on each of the Russian Federation's jurisdictional challenges.  *See* Pet., Ex. D to Gaillard Decl., Hulley Interim Award, ECF No. 2-4; *id.*, Ex. E to Gaillard Decl., Yukos Interim Award, ECF No. 2-5; *id.*, Ex. F to Gaillard Decl., VPL Interim Award, ECF No. 2-6. Relevant here, the Tribunal unanimously rejected the Russian Federation's argument that it never accepted the ECT's arbitration provision and thus never agreed to the arbitration proceedings before the Tribunal.  Pet. ¶ 40; *see* Hulley Final Award ¶ 21.

Proceeding to the merits stage, the Tribunal then considered thousands of pages of filings, evidence, and arguments presented at a twenty-one day hearing, post-hearing briefing, and the parties' commentary on developments in other legal proceedings relating to Yukos. Hulley Final Award ¶¶ 41–62.  After nearly ten years of "mammoth" proceedings, *id.* ¶ 4, on July 18, 2014, the Tribunal rendered three substantially similar "Final Awards," consisting of over 600 pages each.  Pet. ¶ 55.  Notably, these Awards were unanimous and joined by Judge Schwebel, the Russian Federation's appointee to the Tribunal.  *See id.* ¶ 64.  The Tribunal determined that while Yukos "was vulnerable on some aspects of its tax optimization scheme," the Russian Federation had "taken advantage of that vulnerability by launching a full assault on Yukos and its beneficial owners in order to bankrupt Yukos and appropriate its assets while, at the same time, removing Mr. Khodorkovsky from the political arena."  Hulley Final Award

¶ 515.  Consequently, the Tribunal concluded that the Russian Federation had violated the ECT, *see id.* ¶ 1580, and awarded the Shareholders a combined $50,020,867,798 USD in damages, plus interest, as well as $60,000,000 USD in attorneys' fees and €4,240,000 in arbitration costs, plus interest.  Pet. ¶¶ 62–63.

### B.  Procedural History

Following the issuance of the Final Awards, the Shareholders began efforts to collect by initiating confirmation and enforcement proceedings in Belgium, France, Germany, India, the United Kingdom, and the United States.  *See* Resp't's Opp'n Mot. Stay, Ex. 2, Decl. Expert Op. Dr. Andrey Kondakov ¶ 26, ECF No. 127-2.  The Shareholders initiated the instant proceeding on November 25, 2014, pursuant to the Federal Arbitration Act (the "FAA"), which provides for confirmation and enforcement of arbitral awards falling under the New York Convention.  *See* 9 U.S.C. §§ 201–207; Pet. ¶ 3.[6]

Meanwhile, the Russian Federation began efforts to set aside the Final Awards.  On November 10, 2014—fifteen days before the initiation of the instant confirmation proceedings— the Russian Federation submitted a request to set aside the Final Awards to the District Court of The Hague.  *See* Resp't's Mot., Ex. R-328, Writ of Summons at 2, ECF No. 43-8.  By the terms of the New York Convention, confirmation and enforcement of the Final Awards "may be refused" if the Awards have been set aside by courts at the seat of the arbitration.  New York Convention, art. V(1)(e).  In support of its request, the Russian Federation advanced several arguments, including repeating the argument previously rejected by the Tribunal that the

---

[6]        Under the FAA, a district court "shall confirm" an award "falling under the [New York] Convention . . . unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention."  9 U.S.C. § 207.  An award "fall[s] under" the New York Convention if it is "rendered within the jurisdiction of a signatory country."  *Creighton Ltd. v. Gov't of State of Qatar*, 181 F.3d 118, 123 (D.C. Cir. 1999). The Netherlands, the Russian Federation, and the United States are members of the New York Convention.  *See* New York Arbitration Convention, Contracting States, http://www.newyorkconvention.org/countries (last visited Nov. 16, 2023).

Tribunal did not have jurisdiction to issue the Final Awards because the Russian Federation had never agreed to arbitrate its dispute with the Shareholders. Writ of Summons at 46–93. Specifically, the Russian Federation contended that because the ECT was never ratified by the Russian State Duma, only certain ECT provisions applied to the Russian Federation, and the ECT's arbitration provision, which constitutes a standing offer by parties to the ECT to arbitrate disputes arising under the treaty, was not among those that applied. *Id*.

While the set aside proceedings were pending, on October 20, 2015, the Russian Federation moved in this Court to deny the Shareholders' request for confirmation of the Final Awards, Resp't's Mot. Deny Pet., and to dismiss the Petition for lack of subject matter jurisdiction, invoking the Russian Federation's entitlement to sovereign immunity under the FSIA, 28 U.S.C. §§ 1330, 1602–1611, and challenging the applicability of the New York Convention, Resp't's Mot. at 25–43. In those filings, the Russian Federation also suggested that the Final Awards were rendered improperly on the merits, characterizing the Shareholders as "shell companies that are owned, controlled and operated by . . . criminal oligarchs," including Khodorkovsky, Resp't's Mot. at 1; *see also* Resp't's Mot. Deny Pet. at 2, and, further, that the Shareholders "were not candid with the arbitration tribunal," *i.e.,* "did not disclose . . . their participation in . . . fraud" or "correct [certain] misimpression[s] of the Tribunal" about the companies, Resp't's Mot. at 2. Not surprisingly, the Shareholders oppose dismissal. *See* Pet'rs' Opp'n.

Before the Russian Federation's pending motion to dismiss was resolved, the District Court of The Hague granted, on April 20, 2016, the Russian Federation's request to set aside the Awards. *See* Resp't's Notice Suppl. Auth., Ex. 2, Dist. Ct. The Hague Judgment April 20, 2016 (Eng. Trans.) ("Dutch District Court Judgment"), ECF No. 102-2. That court concluded the

arbitral Tribunal lacked jurisdiction to issue the Final Awards because the Russian Federation had never agreed to arbitrate its disputes under the ECT.  Dutch District Court Judgment at 62; *see also Hulley II*, 502 F. Supp. 3d at 149.[7]  The Russian Federation notified this Court of the decision, arguing that the Dutch District Court Judgment supports its position that this Court lacks subject matter jurisdiction over the action, and submitting a Supplemental Motion to Dismiss the Shareholders' Petition.  *See* Resp't's Notice Suppl. Auth., ECF No. 102; Resp't's Suppl. Mot. Dismiss.  The Shareholders appealed the April 2016 Dutch District Court Judgment setting aside the awards to the Court of Appeal of The Hague and also requested that this Court stay the instant proceedings pending that appeal.  *Hulley Enterprises Ltd. v. Russian Federation* ("*Hulley I*"), 211 F. Supp. 3d 269, 272 (D.D.C. 2016).  Over the Russian Federation's objections, the Shareholders' stay request was granted and these proceedings paused "until January 21, 2019, or until resolution of proceedings in the Netherlands to set aside [the Final Awards], whichever date occurs earlier."  Order (Sept. 30, 2016) ("2016 Stay Order"), ECF No. 153; *see Hulley I,* 211 F. Supp. 3d at 288.

More than two years later, on December 27, 2018, the parties jointly moved to extend the 2016 Stay Order until January 21, 2020, due to the anticipated date for the Court of Appeal of The Hague to issue its decision on the Shareholders' appeal of the set-aside judgment in "either late 2019 or early 2020."  Parties' Joint Mot. to Extend Stay at 3, ECF No. 171.  This motion was

---

[7]        The Dutch District Court found that no arbitration agreement existed between the parties, agreeing with the Russian Federation that the ECT's Article 45(1) allowed the Russian Federation, as a signatory, to apply the ECT in a piecemeal fashion and not apply the ECT's arbitration provision because of a conflict with domestic law, with the result that the ECT's arbitration provision was inapplicable to the Russian Federation.  Dutch District Court Judgment at 36–37, 50, 62–63.  In reaching this conclusion, the Dutch District Court not only construed the ECT and Russian domestic law differently than the Tribunal, *see* Hulley Interim Award ¶ 301—and, ultimately, also differently than appellate Dutch courts—but also seemingly failed to consider or credit the Russian Federation's letter submitted to the Tribunal in July 2005, affirmatively accepting the Tribunal's authority to determine its jurisdiction, *see, generally,* Dutch District Court Judgment; *see also* Pet'rs' Opp'n, Decl. of Yas Banifatemi ("Banifatemi Decl."), Ex. 3, Letter, dated July 29, 2005, from Russian Federation to Tribunal ("2005 Letter") at 1–2, ECF No. 63-5.

granted that same day.  Minute Order (Dec. 27, 2018).  Again, on October 10, 2019, the parties

jointly moved to extend the 2016 Stay Order until May 20, 2020, upon being notified that the

Court of Appeal of The Hague would be rendering its decision regarding the Shareholders'

appeal of the set-aside judgment on February 18, 2020.  *See* Joint Status Report, ECF No. 175.

This second joint extension request was also granted.  Minute Order (Oct. 10, 2019).

On February 18, 2020, almost four years after the original 2016 Stay Order took effect,

the Court of Appeal of The Hague issued, in a 145-page decision, a judgment reversing the 2016

Dutch District Court Judgment and rejecting additional arguments by the Russian Federation

seeking to invalidate the awards.  *Hulley II*, 502 F. Supp. 3d at 150.[8]  Following the lifting of the

2016 Stay Order in May 2020, the Russian Federation promptly moved, on June 15, 2020, to

impose a second stay in this action pending its appeal to the Dutch Supreme Court of the

February 2020 Court of Appeal of The Hague decision.  *Id.* at 150–151.  After extensive briefing

on this motion was completed, the Russian Federation's motion was granted, over the

Shareholders' objection, on November 20, 2020, and this case was stayed "until the earlier of

November 18, 2022 or the conclusion of the proceedings to set aside the Awards in the Dutch

Supreme Court."  *Id.* at 164; *see also* Order (Nov. 20, 2020) ("2020 Stay Order"), ECF No. 193.

In so doing, this Court concluded, *inter alia*, "that the enforceability of the arbitral award [was]

in flux to such a degree that a stay is warranted," *Hulley II*, 502 F. Supp. 3d at 157, and

expressed concern that "any conclusion reached [in this Court] may be upended by contrary

findings by the Dutch Supreme Court," *id.* at 155.

---

[8]    Before issuing this judgment, the Court of Appeal of The Hague conducted a full *de novo* review of each of
the Russian Federation's grounds for attacking the Final Awards.  Pet'rs' Suppl. Submission in Opp'n to Resp't's
Mot. to Dismiss Under the Foreign Sovereign Immunities Act ("Pet'rs' Suppl. Submission."), Decl. of Steven M.
Shepard, Esq. ("Shephard Decl."), Ex. 2, First Decl. of Tobias Cohen Jehoram ("First Cohen Jehoram Decl.") at ¶¶
22, 30, ECF No. 240-2.

Dissatisfied with the continued pause in their efforts to confirm the Final Awards in the United States now that developments in the Dutch courts had turned to their favor, the Shareholders appealed the 2020 Stay Order to the D.C. Circuit, *see* Notice of Appeal, ECF No. 195, which heard oral argument on October 15, 2021.  Three weeks later, however, on November 5, 2021, the Dutch Supreme Court rendered a decision on the Russian Federation's appeal that automatically lifted the 2020 Stay Order.  *See* 2020 Stay Order at 1; Pet'rs' Status Report, Ex. 1, Dutch Supreme Court Judgment, ECF No. 198–1.[9]  This lapse of the 2020 Stay Order prompted the Shareholders to seek dismissal of their appeal, *see* Consent Mot. to Dismiss, Case No. 20-7113 (D.C. Cir. Nov. 17, 2021), which was granted by the D.C. Circuit, with the mandate remanding the case to this Court issued on December 1, 2021, *see* Mandate, ECF No. 200.

The next day, on December 2, 2021, after noting "that the stay imposed on November 20, 2020 is now lifted with 'resolution of proceedings in the Dutch Supreme Court,'" this Court directed the parties to brief whether this case should be subject to a stay "pending resolution of proceedings on remand from the Dutch Supreme Court."  Minute Order (Dec. 2, 2021) (quoting 2020 Stay Order) (internal citations omitted).  In addition to responding to this order, the Russian Federation moved to stay this litigation for the duration of the current remand proceedings before the Amsterdam Court of Appeal, *see* Resp't's Second Mot. to Stay at 1, which was the third

---

[9]  The Dutch Supreme Court's judgment, which was issued upon review of almost 950 pages of briefing, pleading notes, and post-hearing submissions and after a day-long oral hearing, affirmed the holdings of the Court of Appeal of The Hague rejecting the Russian Federation's arguments that the country was not bound provisionally to apply the ECT's arbitration provision, that the Shareholders were not "investors," that the transactions at issue were not "investments" under the definitions in the ECT, and that the Tribunal's failure to refer tax-related questions to Russian tax authorities invalidated the Awards.  Pet'rs' Suppl. Submission at 6–7.  Notwithstanding the exhaustive and considered appellate review provided by both the Court of Appeal of The Hague, which reversed the Dutch District Court's Judgment setting-aside the Final Awards, and the Dutch Supreme Court, which affirmed this reversal, the Russian Federation urges that this Court rely instead on the Dutch District Court Judgment as authority to find that subject matter jurisdiction is lacking in this Court.  *See* Resp't's Suppl. Mot. Dismiss at 6–44.  For obvious reasons put bluntly, the Dutch District Court Judgment is simply not good law in its own local forum and therefore not persuasive authority in this one.

opposed motion for a stay to be considered by this Court since 2016, *see* Pet'rs' Opp'n to Resp't's Mot. to Extend Stay ("Pet'rs' Stay Opp'n") at 4, ECF No. 204.

In March, 2022, based on the Russian Federation's characterization as "baseless" of the Shareholders' expressed concern that armed conflict between the Russian Federation and Ukraine may lead to the unavailability of Russian Federation assets in the United States, Resp't's Reply in Supp. Mot. to Stay ("Resp't's Stay Reply") at 6, ECF No. 208, the Court directed the Russian Federation to advise of any "material developments affecting arguments it previously presented regarding the propriety of a stay or prejudgment security in this case following the Russian Federation's invasion of Ukraine beginning on February 24, 2022," Minute Order (March 16, 2022). In response, the Russian Federation explained that its invasion of Ukraine is an "evolving situation provid[ing] yet another reason to stay these proceedings during the ongoing parallel set-aside litigation in Amsterdam and while steps are taken to locate available and acceptable substitute Counsel for the Russian Federation." Resp't's Status Report at 1, ECF No. 224. In any event, the Russian Federation represented that it is "not aware of any foreseeable risk of [Russian Federation] assets leaving the United States" as the result of sanctions or other economic measures flowing from the war. *Id.* at 2. The Shareholders disagreed with these representations, stating that the "unprecedented sanctions" being imposed on the Russian Federation "almost daily" will make "[f]inding and executing on assets . . . far more difficult," Pet'rs' Resp. to Status Report at 1-2, ECF No. 225, such that further delay in this litigation "would in effect reward the Russian Federation for invading Ukraine in violation of international law," *id.* at 2 (citing March 16, 2022 International Court of Justice ruling ordering

the Russian Federation to "suspend the military operations commenced on 24 February 2022 in the territory of Ukraine").[10]

After considering these concerns raised by the Shareholders and the factors identified as relevant to a stay inquiry by the D.C. Circuit, the Russian Federation's motion to stay was denied. *Hulley III*, 2022 WL 1102200, at *10.  Relying on recent D.C. Circuit precedent requiring consideration of "'(1) the general objective of arbitration [in] the expeditious resolution of disputes and the avoidance of protracted and expensive litigation' [and] '(2) the status of the foreign proceedings and the estimated time for those proceedings to be resolved,'" in determining whether to further extend a stay of enforcement of a foreign arbitration award, *Hulley III*, 2022 WL 1102200, at *6 (quoting *LLC SPC Stileks v. Republic of Moldova* ("*Stileks*"), 985 F.3d 871, 880–81 (D.C. Cir. 2021)), this Court found both factors "firmly militate[d] against entry of another stay," *id*.  This Court also cited recent binding precedent that "a foreign court's order ostensibly setting aside an arbitral award has *no* bearing on the district court's jurisdiction and is instead an affirmative defense properly suited for consideration at the merits stage." *Id.* at *8 (quoting *Process & Indus. Devs. Ltd. v. Fed. Republic of Nigeria* ("*P&ID*"), 27 F.4th 771, 772 (D.C. Cir. 2022)) (emphasis in original).

Since this most recent motion to stay the case was denied, the Russian Federation and the Shareholders have filed supplemental briefing. *See* Resp't's Suppl. Submission in Supp. of Resp't's Mot. to Dismiss Under the Foreign Sovereign Immunities Act ("Resp't's Suppl. Submission"), ECF No. 232; Pet'rs' Suppl. Submission in Opp'n to Resp't's Mot. to Dismiss Under the Foreign Sovereign Immunities Act ("Pet'rs' Suppl. Submission"), ECF No. 239;

---

[10]     The International Court of Justice's ruling is available at https://www.icj-cij.org/public/files/case-related/182/182-20220316-ORD-01-00-EN.pdf.

Resp't's Proposed Suppl. Reply ("Resp't's Suppl. Reply), ECF No. 246-1.[11]  The Russian Federation has also requested an evidentiary hearing to provide an opportunity to cross-examine four witnesses, two of whom previously testified and were extensively cross-examined in the proceedings before the arbitral Tribunal, and all four of whom submitted sworn declarations in support of the Shareholders' position in this case.  *See* Resp't's Mot. for Evidentiary Hearing to Cross-Examine Pet'rs' Witnesses ("Discovery Mot."), ECF No. 244; Pet'rs' Opp'n to Resp't's Mot. for Evidentiary Hearing ("Discovery Opp'n") at 6, ECF No. 251.  The parties have also submitted several notices of supplemental authority. *See, e.g.*, Pet'rs' Not. Suppl. Auth. of Sept. 14, 2022, ECF No. 252; Pet'rs' Not. Suppl. Auth. of Oct. 18, 2022, ECF No. 257; Resp't's Not. Suppl. Auth. of May 12, 2023, ECF No. 265; Resp't's Not. Suppl. Auth. of Aug. 9, 2023, ECF No. 267; Pet'rs' Not. Suppl. Auth. of Oct. 2, 2023, ECF No. 269; Pet'rs' Not. Suppl. Auth of Nov. 8, 2023, ECF No. 273.  In total the parties have submitted over 400 pages of briefing related to the instant motion, more than 1,000 pages of supplemental authorities, and in excess of 100,000 pages of exhibits, including declarations, affidavits, and other documents, all of which have been considered.

After almost eight years of delay at the request of the parties—with litigation still underway before Dutch courts, the seat of the arbitral Awards, on the enforceability of the Final Awards—the Russian Federation's original and supplemental motions to dismiss for lack of subject matter jurisdiction are ripe for decision.

## II.    LEGAL STANDARD

"Federal courts are courts of limited jurisdiction," *Gunn v. Minton*, 568 U.S. 251, 256 (2013) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)), and

---

[11]    The Russian Federation filed a Motion for Leave to File a Proposed Supplemental Reply, at ECF No. 246. That motion is granted, and the Proposed Supplemental Reply attached to that motion has been considered.

"have only the power that is authorized by Article III of the Constitution and the statutes enacted by Congress pursuant thereto," *Johnson v. Comm'n on Presidential Debates*, 869 F.3d 976, 980 (D.C. Cir. 2017) (quoting *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986)).  To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), plaintiff thus "bears the burden of invoking the court's subject matter jurisdiction."  *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).  "It is settled law that [t]he FSIA is the sole basis for obtaining jurisdiction over a foreign state in our courts in civil cases." *P&ID*, 27 F.4th at 775 (quoting *Creighton Ltd. v. Gov't of State of Qatar*, 181 F.3d 118, 121 (D.C. Cir. 1999)) (internal quotation marks omitted).  A foreign state is presumptively immune from suit in United States courts, and to exercise jurisdiction over a foreign sovereign, a district court must determine that one of the FSIA's exceptions to sovereign immunity applies.  *Id.*

    "Where a plaintiff has asserted jurisdiction under the FSIA and the defendant foreign state has asserted 'the jurisdictional defense of immunity,' the defendant state 'bears the burden of proving that the plaintiff's allegations do not bring its case within a statutory exception to immunity.'"  *Belize Social Dev. Ltd. v. Gov't of Belize*, 794 F.3d 99, 102 (D.C. Cir. 2015) (quoting *Phoenix Consulting Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000)).  Further, in deciding a motion to dismiss on the basis of the FSIA, courts' subject-matter and personal jurisdictional inquiries often collapse into the same question: "If none of the exceptions to sovereign immunity set forth in the Act applies, the District Court lacks both statutory subject matter jurisdiction and personal jurisdiction."  *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 485 n.5 (1983); *see also Schubarth v. Federal Republic of Germany*, 891 F.3d 392, 397 n.1 (D.C. Cir. 2018) ("Under the FSIA, personal jurisdiction exists where (1) subject matter

jurisdiction has been satisfied, and (2) proper service has been effected." (citing 28 U.S.C. § 1330(b))).

"The district court's task in assessing jurisdiction under the FSIA varies depending on whether the defendant presents a legal or a factual challenge." *Simon v. Republic of Hungary*, 77 F.4th 1077, 1116 (D.C. Cir. 2023) (citing *Phoenix Consulting*, 216 F.3d at 40). Where a jurisdictional dispute challenges only the "legal sufficiency" of the jurisdictional basis, the court should take the petitioner's factual allegations as true and draw all reasonable inferences in the plaintiff's favor. *Id.* When a respondent "seeks at the jurisdictional threshold to challenge the factual basis of the court's jurisdiction . . . the court must go beyond the pleadings and resolve" any dispute necessary to the disposition of the motion to dismiss. *Id.* (quoting *Phoenix Consulting*, 216 F.3d at 40) (internal quotations marks omitted); *see also Feldman v. F.D.I.C.*, 879 F.3d 347, 351 (D.C. Cir. 2018). In such situations, the "court may properly consider allegations in the complaint and evidentiary material in the record," affording plaintiff "the benefit of all reasonable inferences." *Feldman*, 879 F.3d at 351; *see also Am. Freedom Law Ctr. v. Obama*, 821 F.3d 44, 49 (D.C. Cir. 2016) ("In considering a motion to dismiss for lack of subject matter jurisdiction . . . we 'may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction.'" (quoting *Jerome Stevens Pharm., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005))).

In conducting this inquiry, "[t]he district court retains 'considerable latitude in devising the procedures it will follow to ferret out the facts pertinent to jurisdiction,' but it must give the plaintiff 'ample opportunity to secure and present evidence relevant to the existence of jurisdiction.'" *Simon*, 77 F.4th at 1116 (quoting *Phoenix Consulting*, 216 F.3d at 40). Regardless of the procedures, however, "the sovereign 'defendant bears the burden of proving

that the plaintiff's allegations do not bring its case within a statutory exception to immunity.'"

*Id.* (quoting *Price v. Socialist People's Libyan Arab Jamahiriya*, 389 F.3d 192, 197 (D.C. Cir.

2004)).  The "burden of proof in establishing the inapplicability of [the FSIA's] exceptions is

upon the party claiming immunity," because sovereign immunity is an affirmative defense.

*Transam. S.S. Corp. v. Somali Democratic Republic*, 767 F.2d 998, 1002 (D.C. Cir. 1985).

The FAA authorizes a party to seek several kinds of action from a federal court, such as

the confirmation or vacatur of an arbitral award, but "the federal courts . . . may or may not have

jurisdiction to decide such a request."  *Badgerow v. Walters*, 142 S. Ct. 1310, 1314 (2022).  The

federal courts must have an "independent jurisdictional basis" to resolve such requests.  *Id.*

(citing *Hall Street Assoc., LLC v. Mattel, Inc.*, 552 U.S. 576, 582 (2008)).  In the context of an

action brought under the FAA's Sections 9 or 10 to confirm or vacate an arbitral award, a court

"may look only to the application actually submitted to it in assessing its jurisdiction."  *Id.*  An

applicant seeking to vacate an arbitral award must identify a grant of jurisdiction, apart from the

FAA itself, authorizing "access to a federal forum."  *Id.* at 1316 (citing *Vaden v. Discover Bank*,

556 U.S. 49, 59 (2009)).

Whether a court has jurisdiction to entertain a petition brought under the FAA is a

separate question from the merits question concerning the validity or enforceability of an arbitral

award.  *P&ID*, 27 F.4th at 772; *see Human, S.E. v. Czech Republic—Ministry of Health*, 824

F.3d 131, 137–38 (D.C. Cir. 2016).  Thus, "the district court need not determine the validity of

the arbitral award as part of its jurisdictional inquiry."  *P&ID*, 27 F.4th at 776.

## III.    DISCUSSION

To exercise subject matter jurisdiction over a petition to enforce a foreign arbitral award

against a foreign sovereign, two inter-related requirements must be satisfied: (1) "there must be a

basis upon which a court in the United States may enforce a foreign arbitral award," and (2) the foreign state "must not enjoy sovereign immunity from such an enforcement action." *Creighton Ltd.*, 181 F.3d at 121.[12]  Here, the parties' dispute whether the Russian Federation enjoys sovereign immunity arises principally from the latter's challenge to the existence of an arbitration agreement, which is therefore a threshold question also critical to determining a basis upon which the Final Awards may be enforced.  The second prong of the *Creighton* inquiry will thus be considered first, after brief review of the FSIA.

### A.  FSIA's Arbitration Exception and Applicable Legal Principles

The FSIA is "a comprehensive statute containing a 'set of legal standards governing claims of immunity in every civil action against a foreign state or its political subdivisions, agencies, or instrumentalities.'"  *Republic of Austria v. Altmann*, 541 U.S. 677, 691 (2004) (quoting *Verlinden*, 461 U.S. at 488).  The FSIA "provides, with specified exceptions, that a 'foreign state shall be immune from the jurisdiction of the courts of the United States . . . .'" *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 581 U.S. 170, 173 (2017) (quoting 28 U.S.C. § 1604).  Consequently, "subject matter jurisdiction in any [FSIA] action depends on the existence of one of the specified exceptions to foreign sovereign immunity."  *Verlinden,* 461 U.S. at 493.

At issue here is the FSIA's arbitration exception, 28 U.S.C. § 1605(a)(6), which permits U.S. courts to confirm an arbitration award rendered outside of the United States in certain

---

[12]   The Russian Federation raises no dispute as to proper service and the exercise of personal jurisdiction in this case, *see, generally*, Resp't's Mot., and thus this prerequisite for exercise of jurisdiction is met, *see GSS Group Ltd v. Nat'l Port Authority*, 680 F.3d 805, 811–12 (D.C. Cir. 2012) (requiring both subject matter jurisdiction and personal jurisdiction in FSIA case).

instances.[13]  Congress amended the FSIA in 1988 to include the arbitration exception, ensuring

that foreign agreements to arbitrate and arbitral awards governed by certain treaties would be

enforceable in U.S. courts, even against sovereigns.  *See Process & Indus. Dev. Ltd. v. Fed.*

*Republic of Nigeria*, 506 F. Supp. 3d 1, 10 (D.D.C. 2020), *aff'd,* 27 F.4th 771 (D.C. Cir. 2022).

This exception has authorized the participation of U.S. federal courts in upholding the

international arbitration system that has flourished since the post-World War II era to facilitate

cross-border investments and business dealings.

The conventional wisdom undergirding the international arbitration system is that

promising foreign investors an efficient and fair alternative dispute-resolution mechanism

outside of potentially biased local courts would encourage foreign direct investment, insulated

from the uncertainties created by the host country's domestic politics and law.  *See generally*

Jeswald W. Salacuse & Nicholas P. Sullivan, *Do BITS Really Work? An Evaluation of Bilateral*

*Investment Treaties and Their Grand Bargain*, 46 Harv. Int'l L. J. 67, 68–79 (2005) (arguing that

arbitration provisions in bilateral international treaties ("BITs") are a "mechanism that gives

important, practical significance to BITs, a mechanism that truly enables these bilateral treaties

to afford protection to foreign investment," and that BITs have promoted foreign direct

investment in developing countries and the United States); Leonard V. Quigley, *Accession by the*

*United States to the United Nations Convention on the Recognition and Enforcement of Foreign*

---

[13]     The Shareholders also assert, in a footnote to their opposition to the Russian Federation's Motion to Dismiss, that subject matter jurisdiction may also be exercised under the FSIA's waiver exception, 28 U.S.C. § 1605(a)(1), because "the Russian Federation's agreement to arbitrate constitutes an implied waiver of immunity with respect to award enforcement."  Pet'rs' Opp'n at 10 n.4.  This footnote-worthy only assertion, as well as the Russian Federation's counterarguments, *see, e.g.*, Resp't's Suppl. Submission at 27–31; Resp't's Suppl. Reply at 2–7, need not be addressed since the subject matter jurisdiction issue is resolved on different grounds that the FSIA's arbitration exception applies given the parties' clear and unambiguous intent to delegate the determination of whether an arbitration agreement existed to the Tribunal.

*Arbitral Awards*, 70 Yale L. J. 1049 (June 1961) (detailing the reasons for the United States'
ratification of the New York Convention).

The Supreme Court has recognized the importance of international dispute resolution
through arbitration and the need to respect and preserve parties' agreements to resolve disputes
through arbitration. *See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth*, 473 U.S. 614,
629, 631 (1985) (highlighting "that concerns of international comity, respect for the capacities of
foreign and transnational tribunals, and sensitivity to the need of the international commercial
system for predictability in the resolution of disputes require that we enforce the parties'
agreement" to arbitrate disputes, and noting "the emphatic federal policy in favor of arbitral
dispute resolution . . . [a] federal policy [that] applies with special force in the field of
international commerce."); *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 516-17 (1974) ("A
parochial refusal by the courts of one country to enforce an international arbitration agreement
would not only frustrate these purposes [to achieve orderliness and predictability essential to any
international business transaction], but would invite unseemly and mutually destructive
jockeying by the parties to secure tactical litigation advantages. . . . [It would] damage the fabric
of international commerce and trade, and imperil the willingness and ability of businessmen to
enter into international commercial agreements."). International arbitration enables "contending
states under appropriate conditions to settle significant international conflicts" without turning to
war or other means of resolving conflicts by force. *See generally* Jeswald W. Salacuse,
*Interstate Arbitration:* ". . . Settling Disputes Which Diplomacy Has Failed to Settle," 38 Harv.
Negotiation J. 179, 180–96 (Spring 2022) (describing the history of sovereign states using
international arbitration to resolve disputes in place of war).

The FSIA's arbitration exception provides, in pertinent part:

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . . in which the action is brought . . . to confirm an award made pursuant to . . . an agreement to arbitrate, if . . . the agreement or award is or may be governed by a treaty or other international agreement in force . . . calling for the recognition and enforcement of arbitral awards.

28 U.S.C. § 1605(a)(6).

For the Court's jurisdiction to attach against a foreign sovereign under the arbitration exception, "the existence of an arbitration agreement, an arbitration award and a treaty governing the award are all jurisdictional facts that must be established." *Stileks*, 985 F.3d at 877 (citing *Chevron Corp. v. Republic of Ecuador*, 795 F.3d 200, 204 (D.C. Cir. 2015)). As to all three requirements, petitioner bears "a burden of production" to support a claim that the arbitration exception applies. *Chevron*, 795 F.3d at 204. This burden as to the existence of an arbitration agreement may be satisfied by a straight-forward production of a foreign sovereign's agreement to arbitrate, with the burden then shifting to the foreign sovereign to demonstrate that the *prima facie* evidence presented by the petitioner "did not constitute a valid arbitration agreement between the parties." *Id* at 205. "The burden of persuasion rests with the foreign sovereign claiming immunity, which must establish the absence of the factual basis by a preponderance of the evidence." *Id.* at 204 (quoting *Agudas Chasidei Chabad of U.S. v. Russian Fed'n*, 528 F.3d 934, 940 (D.C. Cir. 2008)). After "the party challenging immunity has presented prima facie evidence of an agreement between the parties and [] the sovereign asserting immunity has" had an opportunity to rebut that evidence, the "jurisdictional task before the District Court [is] to determine whether [the foreign sovereign] had sufficiently rebutted the presumption that the [treaty and] notice of arbitration constituted an agreement to arbitrate." *Id.* at 205 & n.3.

This "jurisdictional task"—namely, determining whether the foreign sovereign has rebutted the presumption that the treaty and notice of arbitration constitute an arbitration

agreement between the parties—is simplified in cases where the parties have agreed to delegate

the determination of the existence of an arbitration agreement applicable to the dispute to the

arbitral tribunal.  Notably, where the parties have chosen to delegate this threshold question, the

arbitral tribunal's determination as to the parties' agreement to arbitrate the dispute is binding on

the enforcing court.  *See Stileks*, 985 F.3d at 878 (recognizing "the background understanding []

that courts, not arbitrators, decide questions of arbitrability," but "[t]hat understanding is

overcome, however, if the parties clearly and unmistakably provide otherwise" such that "[i]f

arbitrability itself is delegated to the arbitrators, 'the court's standard for reviewing the

arbitrator's decision about that matter should not differ from the standard courts apply when they

review any other matter that the parties have agreed to arbitrate.'" (quoting *First Options of Chi.,

Inc. v. Kaplan* ("*First Options*"), 514 U.S. 938, 943 (1995))).

### B.   The Russian Federation Is Not Immune Under the FSIA

The shareholders have met their burden of production to establish that jurisdiction

attaches to this case under the arbitration exception.  The parties do not dispute that the

Shareholders have met their burden as to the second requirement for application of the FSIA's

arbitration exception—establishing "an arbitration award," *Stileks*, 985 F.3d at 877—by

producing the Final Awards, *see* Final Awards; Pet. ¶¶ 1–3, and to the extent the Russian

Federation raises challenges to the applicability of the New York Convention, those challenges

are considered, and rejected, *infra*, in Part III.C, *see Creighton Ltd.*, 181 F.3d at 123–24

(describing the "New York Convention [as] 'exactly the sort of treaty Congress intended to

include in the arbitration exception'" (quoting *Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d

1012, 1018 (2d Cir. 1993))).  As to the first prerequisite to meet the FSIA's arbitration

exception—*i.e.*, establishing "the existence of an arbitration agreement," *Stileks*, 985 F.3d at

877—the Russian Federation falls short of persuasively rebutting the record evidence produced

by the Shareholders showing that an arbitration agreement existed between the parties. *See* Resp't's Mot. at 28–39; *see generally* Resp't's Suppl. Mot. Dismiss; Resp't's Suppl. Submission; Resp't's Suppl. Reply.

The record in this matter plainly establishes that the parties had an arbitration agreement sufficient to satisfy this prerequisite for application of the FSIA arbitration exception for several reasons, including that, first, the ECT, to which the Russian Federation was a signatory, provided for the arbitration proceeding in which both parties vigorously participated for a decade; second, the parties' chose to delegate questions related to jurisdiction under the ECT to the Tribunal; and, finally, the Tribunal's determination that an arbitration agreement existed here is binding on this Court.  Each of these reasons are addressed below, followed by examination of the Russian Federation's objections, which generally go to the arbitrability of this dispute and are misplaced when directed to the jurisdictional inquiry and, in any event, fail to meet the burden of persuasion that would be necessary to negate the factual basis as to the existence of an arbitration agreement here.

### 1.  The ECT is an Arbitration Agreement Applying to this Dispute

The ECT, to which the Russian Federation was indisputably a signatory at the time this dispute arose, combined with the Shareholders' invocation, and the Russian Federation's acceptance, of this treaty's arbitration process, establishes the existence of an arbitration agreement.  *See* Pet. ¶ 34.  The ECT requires signatories to "accord . . . fair and equitable treatment" to investors of other signatory countries and prohibits undue "nationalization or expropriation" of their investments.  ECT art. 10(1).  The Shareholders complied with the procedural requirements of the ECT by notifying the Russian Federation of the country's alleged violations and seeking to settle the dispute amicably, and then initiating arbitration proceedings pursuant to Article 26 of the ECT.  *See* Hulley Final Award ¶ 10; *BG Group, PLC v. Republic of*

*Argentina* ("*BG Group*"), 572 U.S. 25, 42 (2014) (noting that investors may accept an offer to arbitrate under an investment treaty by filing a notice of arbitration); *see also* Resp't's Suppl. Submission at 7 (acknowledging that an investor may accept an offer to arbitrate by submitting a notice of arbitration, "concluding the arbitration agreement at the same moment that the arbitration commences") (citing *BG Group*, 572 U.S. at 42). The Shareholders and the Russian Federation then participated in arbitration proceedings that spanned an entire decade, after which the Tribunal detailed its findings in the Final Awards, which the Shareholders submitted along with their Petition for confirmation of those Awards under the New York Convention. *See generally* Final Awards. None of those factual matters are disputed by the Russian Federation.

Further bolstering the parties' agreement to arbitrate is the fact that the Shareholders and the Russian Federation affirmatively agreed to resolve the underlying dispute through arbitration and executed a Terms of Appointment memorializing this agreement and its terms. *See* Pet'rs' Opp'n, Banifatemi Decl., Ex. 5, Terms of Appointment, ECF 63-7. Each party appointed their own arbitrator, with expertise in the field of international arbitration and in the rules of international law. *See* Hulley Final Award ¶ 12. Both parties actively participated in ten days of hearings related to the question of jurisdiction, after submitting hundreds of pages of filings and documentary evidence. *Id.* ¶¶ 20–21. They then continued to the merits stage, again actively participating by submitting *thousands* of pages of filings and presenting arguments and evidence at a twenty-one day hearing.

The terms of the ECT, to which the Russian Federation was a signatory, combined with the parties' invocation of its procedures and active participation in the decades-long arbitration proceedings, go a long way to establishing the existence of an agreement to arbitrate for the purposes of jurisdiction under the FSIA.

**2. The Parties Delegated Jurisdictional Determinations to the Tribunal**

At the outset of the arbitration proceedings, the parties affirmatively delegated authority to decide jurisdictional questions to the Tribunal.  Specifically, a two-page letter, dated July 29, 2005, from counsel, "[o]n behalf of the Russian Federation," to the arbitral Tribunal, stated that "we accept The Hague as an appropriate venue" and "accept" that a preliminary hearing "be held in the premises of the Permanent Court of Arbitration," and "propose[d] that The Hague be selected for the venue for the [] arbitrations" and "that the arbitrations be administered by the Permanent Court of Arbitration."  Pet'rs' Opp'n, Banifatemi Decl., Ex. 3, Letter, dated July 29, 2005, from Russian Federation to Tribunal ("2005 Letter") at 1–2, ECF No. 63-5.  The Russian Federation made scheduling suggestions, "pursuant to Article 19 of the UNCITRAL Arbitration Rules," requesting that any deadlines set by the Tribunal "take into account the unprecedented size and scope of the claims asserted, and that they call into question the actions and policies of each of" an enumerated list of Russian Federation government entities, requiring "[c]oordination of submissions on behalf of the Russian Federation" that "is thus necessarily a time-consuming process," as well as "take into account [] the normal vacation period in Russia . . . ." *Id*. at 2.

In addition to these clear statements of "accept[ing]" The Hague as the venue for the arbitrations, the Permanent Court of Arbitration as the administer of the arbitrations, and the authority of the Tribunal to set a schedule of deadlines to govern the arbitration proceedings, the Russian Federation also addressed the crucial jurisdictional question of whether it agreed to the arbitrations.  After acknowledging "[i]t is true that the requests for arbitration in the above-referenced arbitrations have been in the possession of the Russian Federation for some time," the Russian Federation's letter goes on to explain that it had used the time to reach a critical determination.  Most significantly, the letter states: "The Russian Federation during that time has reached the determination to accept the jurisdiction of this Arbitral Tribunal to determine its own

26

jurisdiction and has participated fully in the process of constitution of the Arbitral Tribunal." *Id*. This crucial statement has no caveats or reservations.

Seemingly to impress the Tribunal with the weightiness of its agreement to arbitrate and delegate the arbitrability question to the Tribunal, while simultaneously exploiting the opportunity presented by the letter to preview the thrust of its jurisdictional challenge, the Russian Federation then observes that the Shareholders' arbitration requests "represent the first and unprecedented attempt by any claimant against any State to submit the latter to international dispute settlement procedures on the basis of a consent allegedly expressed in a treaty subject to ratification that the State in question has not ratified." *Id*.  In an upbeat closing, affirmatively embracing the upcoming arbitration proceedings, the Russian Federation states "[w]e welcome the constitution of the Arbitral Tribunal and look forward to working with the Tribunal." *Id*.

This explicit statement of a "determination to accept the jurisdiction of this Arbitral Tribunal to determine its own jurisdiction," *id*., provides clear evidence that the Russian Federation agreed to have the Tribunal decide arbitrability, including the inherent predicate issue of the existence of an arbitration agreement. *See First Options*, 514 U.S. at 994 ("Courts should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so." (internal quotations omitted; cleaned up)); *see also* Resp't's Suppl. Reply at 2–6 (explaining that "a foreign State's consent to any decision-maker's jurisdiction . . . must be <u>clear and unambiguous</u>) (emphasis in original).  As the Shareholders point out, the Russian Federation specifically acknowledged in this letter the concern reiterated by the Russian Federation here about the existence of an arbitration agreement when the Russian Federation, though a signatory, did not ratify the ECT.  Pet'rs' Opp'n at 16.  Nonetheless, the Russian Federation expressly accepted the jurisdiction of the Tribunal to resolve jurisdictional issues.

27

The Russian Federation then vigorously participated in the arbitration proceeding for almost a decade, *see* Pet. ¶¶ 1–2, including independently selecting one of the three members of the Tribunal, Judge Schwebel, *id.* ¶ 12, raising dozens of challenges to both jurisdiction and the merits of the underlying dispute, as well as offering experts and additional evidence to advance their arguments, *see id.* ¶ 2; Pet'rs' Opp'n, Banifatemi Decl., Ex. 4, Oct. 15, 2005 Statements of Defense, ECF No. 63-6.

The Russian Federation argues that its 2005 Letter demonstrated "nothing more than an acknowledgment of the principle of Competence-Competence—the principle that an international arbitral tribunal inherently possesses 'jurisdiction . . . to determine its own jurisdiction' *at the outset of arbitration*."  Resp't's Reply at 9, ECF No. 64 (citing Aff. to Resp't's Reply, Second Expert Opinion of Professor George A. Bermann ¶¶ 14–30, ECF No. 65-1) (emphasis in original); *see* Resp't's Suppl. Mot. Dismiss at 10–11; Resp't's Suppl. Submission at 9–10.  Downplaying the express words in the 2005 Letter, the Russian Federation denies that its statement indicates any agreement to waive post-arbitration judicial review as to the existence of an arbitration agreement.  Resp't's Reply at 9.  The Russian Federation's reliance on the principle of Competence-Competence, however, is merely a deflection of the import of its explicit agreement to have the Tribunal decide its own jurisdiction to resolve the arbitration claims brought by the Shareholders.  To do this, the Tribunal necessarily had to determine the existence of an arbitration agreement between the parties under the ECT and, further, that the claims were covered by, or subject to arbitration per, that agreement.  To be sure, the Russian Federation is correct that the 2005 Letter does not mention forgoing challenge to the Tribunal's exercise of jurisdiction in a judicial forum, Resp't's Reply at 9 ("The Russian Federation therefore did not agree . . . in the letter dated July 29, 2005, to exclude post-

arbitration judicial review of arbitrability by this Court."), but that silence does not operate to relieve the Russian Federation of the legal repercussions in this Circuit from its agreement to delegate the jurisdictional question to the Tribunal.  Having expressly agreed in the 2005 Letter to have the Tribunal determine its jurisdiction, rather than contesting any right of the tribunal to do so, the Russian Federation is bound by the Tribunal's determination.  *Cf. First Options*, 514 U.S. at 945–46 (declining to defer to an arbitration panel's jurisdictional determination where respondents in arbitration never signed contract with arbitration clause nor otherwise indicated any agreement to submit any issue to arbitration and, while participating in arbitral proceedings, never stopped contesting the arbitration panel's jurisdiction).

The Russian Federation insists that "numerous authorities" support its reading of the 2005 Letter, including the Third Circuit's decision in *China Minmetals Materials Imp. & Exp. Co., Ltd. v. Chi Mei Corp.* ("*China Minmetals*"), 334 F.3d 274 (3d Cir. 2003).  Resp't's Reply at 9–10.[14]  This Third Circuit decision only undercuts rather than helps the Russian Federation's position, however.  In *China Minmetals*, the Third Circuit first describes competence-competence as "the principle that gives arbitrators the power to decide their own jurisdiction— **more than American arbitration rules**."  *Id.* at 287 (emphasis added).  The court then explained that "[c]ompetence-competence is applied in slightly different ways around the world," noting that "[i]n its simplest form, competence-competence simply means that the arbitrators can examine their own jurisdiction without waiting for a court to do so; if one side says the arbitration clause is invalid, there is no need to adjourn arbitration proceedings to refer

---

[14]    The Russian Federation also cites to "the ALI's Draft Restatement (Third), the U.K. Supreme Court, the French Supreme Court, the Netherlands Supreme Court, and the published views of **Petitioners' own arbitration lawyers**," Resp't's Reply at 9 (emphasis in original), as well as the UNCITRAL Model Law, Resp't's Suppl. Reply at 11, but none of these authorities can overcome the binding principle that where parties have made a clear agreement to delegate an issue to arbitration, deference to the tribunal's determination of that issue is required.

the matter to a judge." *Id.* at 288.  In this "simplest form," the principle serves a procedural

purpose to move along arbitration proceedings, without awaiting a judicial determination on

jurisdiction, and does not foreclose "judicial review of an arbitral tribunal's decision that it has

jurisdiction over a dispute." *Id*. at 289.  The Russian Federation urges that its 2005 Letter be

construed as reflecting this "simplest form" of a jurisdictional finding by the arbitral Tribunal

and, under the Third Circuit's reasoning, "judicial review of the arbitrator's jurisdictional

decision" should be allowed "where the party seeking to avoid enforcement of an award argues

that no valid arbitration agreement ever existed." *Id.* at 288; *see also id*. at 289 (observing

"[i]nternational norms of competence-competence are therefore not inconsistent with the

Supreme Court's holding in *First Options*, at least insofar as the holding is applied in a case

where, as here, the party resisting enforcement alleges that the contract on which arbitral

jurisdiction was founded is and always has been void.").  Applying the holding in *First Options,*

the Third Circuit concluded that the district court should "make an independent determination of

the agreement's validity and therefore the arbitrability of the dispute," *id*. at 289, without

deference to the arbitrator's determination, where the challenging party "repeatedly objected to

CIETAC's jurisdiction but, nevertheless, appeared before it, submitting evidence that the

contracts which contained the arbitration clause on which Minmetals relied were forged," *id.* at

278.

The critical flaw in the Russian Federation's reliance on *China Minmetals* is that the

challenging party in that case (as in *First Options*) never clearly and unambiguously agreed to let

the arbitration panel decide whether they were able to exercise jurisdiction over the dispute.  By

contrast, here, this is what the Russian Federation agreed to do in the 2005 Letter.  The Russian

Federation's belated gloss to an agreement plainly and clearly expressed eighteen years ago

amounts to a *post hoc* revision that is simply unpersuasive, particularly when the D.C. Circuit's precedents in *Stileks* and *Chevron* require that this Court defer to the Tribunal's determinations on questions that the parties agreed to arbitrate, as further discussed *infra*, in Part III.B.3.

The parties' agreement to arbitrate the jurisdictional question as to the existence of an arbitration agreement is also evidenced by their agreement to arbitrate in accordance with the 1976 Arbitration Rules of the United Nations Commission on International Trade Law ("UNCITRAL Rules").  *See* Parties' Terms of Appointment ¶ 4(a) ("Pursuant to Article 26(4)(b) of the Treaty and paragraph 14 of Claimant's Notice of Arbitration and Statement of Claim, the proceedings shall be conducted in accordance with the UNCITRAL Rules."); *see also id.* ¶ 9 ("Pursuant to Article 26(6) of the Treaty, the Tribunal shall decide the issues in dispute in accordance with the Treaty and applicable rules and principles of international law.").  Article 21 of those Rules provides that the "tribunal shall have the power to rule on objections that it has no jurisdiction, including any objections with respect to the existence or validity of the arbitration clause."  UNCITRAL Rules, art. 21, ¶ 1.  Such "[i]ncorporation of the UNCITRAL arbitration rules . . . constitutes clear and unmistakable evidence that the parties agreed to arbitrate arbitrability," and is further reason not to conduct a renewed inquiry into the existence of an arbitration agreement.  *Chevron*, 795 F.3d at 208 (quoting *Oracle Am., Inc. v. Myriad Group A.G.*, 724 F.3d 1069, 1077 (9th Cir. 2013)).  The D.C. Circuit has confirmed as recently as 2021 that, under the UNCITRAL Rules, the "arbitral tribunal shall have the power to rule on its own jurisdiction," *Stileks*, 985 F.3d at 878, which is consistent with and confirmation of the Russian Federation's explicit agreement in the 2005 Letter that the Tribunal had such power at the outset of the arbitration proceedings.

The Russian Federation argues strenuously that the parties' Terms of Appointment incorporating the UNCITRAL Rules applied "only to the then-ongoing 'proceedings' before the arbitral tribunal, and thus have no legal effect on post-arbitration proceedings."  Resp't's Reply at 10; *see also* Resp't's Suppl. Mot. Dismiss at 9.[15]  The Russian Federation makes no effort to square that contention with the D.C. Circuit's holding in *Stileks* that an agreement to arbitrate under the UNCITRAL Rules requires an enforcing court to respect the parties' contract to arbitrate under those rules and defer to the jurisdictional determinations of the tribunal.  *Stileks*, 985 F.2d at 878–79.

In sum, the record demonstrates that the Russian Federation agreed to arbitrate the Shareholders' claims and further agreed to delegate the determination of the existence of an arbitration agreement to the Tribunal.  The Tribunal undertook the time-consuming burden of resolving that question, with the Russian Federation's full participation.  To be sure, merely litigating before an arbitration panel issues regarding the existence of an arbitration agreement, the scope of the agreement and applicability to the dispute, does not mean the party raising such challenges "agreed to have the arbitrators decide (*i.e.*, to arbitrate) the question of arbitrability." *First Options*, 514 U.S. at 946; *id.* (observing that "merely arguing the arbitrability issue to an arbitrator does not indicate a clear willingness to arbitrate that issue, *i.e.*, a willingness to be effectively bound by the arbitrator's decision on that point.").  The Supreme Court's observations in *First Options* were prompted by circumstances where the respondents objecting

---

[15]     The Russian Federation also briefly offers the convoluted argument that "[s]ince the ECT and Petitioners' Notices of Arbitration did not constitute an agreement, therefore, the UNCITRAL Arbitration Rules were not incorporated into any instrument binding on the Russian Federation."  Resp't's Reply at 10.  Based on the incorrect predicate of no arbitration agreement existing, the Russian Federation reasons that "the Russian Federation never offered to abide by" the ECT provision incorporating the UNCITRAL Rules, and that the Shareholders were not eligible to accept an offer to abide by those terms.  Resp't's Suppl. Mot. Dismiss at 9.  The key point this argument elides, however, is that the agreement to arbitrate under the UNCITRAL Rules was in the Terms of Appointment, which both parties specifically signed and agreed to.

to confirmation of an arbitration award had not personally signed the key document containing

an arbitration clause and, consequently, had not clearly agreed either to submit to arbitration or

to submit the question of arbitrability to arbitration, and thus could not be bound by the

arbitrators' decision as to jurisdiction or arbitrability, leaving the arbitrability of the dispute

"subject to independent review by the courts." *Id*. at 947.

By contrast, here, the Russian Federation did clearly agree, through being a signatory to

the ECT, its 2005 Letter, and agreeing to comply with the 1976 UNCITRAL Rules, to submit to

the Tribunal authority to resolve jurisdiction and arbitrability challenges, including, as pertinent

here, the issue of the existence of an agreement to arbitrate.  To find otherwise would mean that

the Russian Federation, despite its clear and express agreement to arbitrate, reserved the right to

relitigate every issue presented to the Tribunal anew in courts in this and other countries, even

after consuming the time and resources of the Shareholders and the Arbitral Tribunal for ten

years, undercutting the "basic objective" of arbitration "to ensure that commercial arbitration

agreements, like other contracts, are enforced according to their terms, and according to the

intentions of the parties[.]"  *Id*. (internal quotations and citations omitted).

### 3. The Tribunal's Jurisdictional Determinations Bind this Court

The Tribunal's determination that an arbitration agreement existed between the parties is

well founded, as the Russian Federation is a signatory to the ECT, agreed to comply with the

1976 UNCITRAL Rules, and expressly agreed to arbitration and to have the Tribunal determine

jurisdiction in its 2005 Letter.  This determination is also binding on this Court, not only blunting

but effectively precluding the Russian Federation from rebutting the presumption to which the

Shareholders are entitled on this issue after production of the notice of arbitration and ECT, to

which the Russian Federation is a signatory.  *See Chevron*, 795 F.3d at 205 & n.3.  As explained

*supra,* in Part III.A, parties to an arbitration may enter into a binding agreement to allow arbitrators to determine threshold questions, such as the existence of an arbitration agreement. "[W]here a party has agreed to arbitrate, he or she, in effect, has relinquished much of" the right to a court's independent review of the dispute. *First Options*, 514 U.S. at 942. When the parties have agreed to submit the question of arbitrability to the arbitration tribunal, "the court should give considerable leeway to the arbitrator, setting aside his or her decision only in certain narrow circumstances," because "arbitration is simply a matter of contract between the parties; it is a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration." *Id.* at 943.

The D.C. Circuit has applied the Supreme Court's instructions in *First Options* to arbitration disputes with foreign sovereigns, noting that "[a] recent, unanimous opinion of the Supreme Court drove . . . home" that the standard of review "is more than mere deference." *Stileks*, 985 F.3d at 878.[16] "If an agreement assigns the arbitrability determinations to an arbitrator, 'a court possesses no power to decide the arbitrability issue,' even if it thinks the argument for arbitrability is 'wholly groundless.'" *Id.* (citing *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529 (2019)). "When the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract." *Henry Schein*, 139 S. Ct. at 529. Applying this holding to the jurisdictional question of whether an arbitration agreement existed here, this Court may not second guess the Tribunal's determination as to that

---

[16] The Russian Federation asserts in its supplemental reply that *Stileks* is inapplicable because, in that case, the foreign sovereign raised "only a non-jurisdictional challenge to 'the scope of the submission' under the New York Convention's Article V(1)(c)." Resp't's Suppl. Reply at 6 (quoting *Stileks*, 985 F.3d at 878); *see* Resp't's Suppl. Reply at 15–16. The Russian Federation's reading of *Stileks* is simply incorrect, since the *Stileks* Court specifically described the foreign sovereign's challenges as jurisdictional. *Stileks*, 985 F.3d at 877 (noting that "one jurisdictional fact is in dispute: whether Energoalliance's award was made pursuant to the ECT" and that "Moldova counters that the ECT did not give the arbitral tribunal jurisdiction of the dispute and thus the resulting award was not 'made pursuant to such an agreement to arbitrate.'" (quoting 28 U.S.C. § 1605(a)(6))).

question.  "The conjunction of *Chevron* and *Henry Schein* means that [a court] must accept the arbitral tribunal's determination" as to issues the parties agreed to arbitrate.  *Stileks*, 985 F.3d at 879.[17]

### 4. The Russian Federation Fails to Sustain Its Burden to Rebut the Existence of an Arbitration Agreement

The Russian Federation's challenges to the existence of an arbitration agreement—and thereby the Court's subject matter jurisdiction under the arbitration exception to the FSIA—can be distilled into five distinct arguments.  First, the Russian Federation insists that *de novo* review of whether an arbitration agreement existed between the parties is required here.  Next, the Russian Federation presents four arguments as to why no arbitration agreement may be found to exist due to the ECT's Russian ratification history, procedural concerns with the arbitration proceedings, and alleged fraud committed by the Shareholders prior to the arbitration proceedings.  Each of these four arguments was litigated before, and rejected as lacking merit by, the arbitral Tribunal. *See, e.g.*, Hulley Interim Award ¶¶ 301–29, 411. Each argument is addressed *seriatim*.

### (a) De Novo *Determination of the Existence of an Arbitration Agreement Is Not Required*

The parties dispute whether the arbitral Tribunal's determination as to the existence of an arbitration agreement authorizing the Tribunal to make arbitrability determinations is dispositive, as the Shareholders posit, *see* Pet'rs' Opp'n at 15–16, or whether this Court must conduct a *de novo* review to determine the existence of an arbitration agreement, as the Russian Federation

---

[17]     The Shareholders additionally contend that "this Court should accord issue-preclusive effect to the decisions of the Dutch courts" rejecting the Russian Federation's attempts to set aside the Final Awards, *see* Pet'rs' Suppl. Submission at 9–13, but this contention, and the Russian Federation's counterarguments, *see e.g.*, Resp't's Suppl. Reply at 7–10, need not be addressed since the jurisdictional question is resolved on alternative grounds, including the deference afforded to the arbitral Tribunal's determinations as to the existence of an arbitration agreement and arbitrability of the instant dispute.

insists, *see* Resp't's Mot. at 27–28; Resp't's Reply at 3–9; Resp't's Suppl. Submission at 6–11;

Resp't's Suppl. Reply at 7–22.  Essentially, the Russian Federation wants to scrap the decade of

litigation presided over by the arbitral Tribunal and repeat those evidentiary proceedings in some

manner here in order for this Court to make *de novo* assessments of its challenges to the

arbitrability of the dispute.  *See* Resp't's Mot. at 27–28.

      *De novo* review is unnecessary and, in fact, improper in this case. The D.C. Circuit in

*Chevron* rejected precisely the argument that the Russian Federation makes here, holding that

asking a district court "to make a *de novo* determination of whether" a treaty encompassed the

claims at issue in order to satisfy itself of jurisdiction would improperly "conflate[] the

jurisdictional standard of the FSIA with the standard for review under the New York

Convention."  *Chevron*, 795 F.3d at 205.  In reaching that holding, the D.C. Circuit relied on

Supreme Court precedent instructing district courts to consider a treaty "as if it were an ordinary

contract between private parties" and where "the parties had intended to allow the arbitrator" to

determine the jurisdictional question at issue, that was sufficient, under the FSIA, for federal

courts to exercise jurisdiction to consider an action to confirm or enforce the award.  *Id*. at 205–

06 (discussing *BG Group*, 572 U.S. 25 (2014)).  Any dispute as to whether the claims were

subject to the treaty was "properly considered as part of review under the New York

Convention."  *Id.* at 206.

      Here, where the Shareholders have met the burden of production for each of the

jurisdictional elements of the arbitration exception to the FSIA, the burden of persuasion has

shifted to the Russian Federation to establish the absence of a factual basis supporting

jurisdiction.  *Id.* at 204.  In determining whether the Russian Federation has sustained its burden

of persuasion, this Court is bound by the Tribunal's decisions as to the existence of an arbitration

agreement, given that the Russian Federation is an ECT signatory, the Russian Federation agreed to the UNCITRAL Rules, and the Russian Federation expressly agreed to the Tribunal determining jurisdiction over the dispute in its 2005 Letter.  *See, supra*, Part III.B.1–3.

The Russian Federation fails to grapple with this binding precedent and instead switches tack to re-frame the issue, insisting that the Court is under "*an independent obligation* to determine whether subject-matter jurisdiction exists," Resp't's Reply at 7 (quoting *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006)) (emphasis in original), stressing that "'*no action of the parties* can confer subject-matter jurisdiction upon a federal court,' where it does not otherwise exist," *id.* (quoting *NetworkIP, LLC v. F.C.C.*, 548 F.3d 116, 120 (D.C. Cir. 2008)) (emphasis in original), and that "this Court cannot abdicate this responsibility or delegate it to the arbitrators," *id.* at 8.  While this outline of legal principles is entirely correct, the Russian Federation takes a wrong turn in concluding that legal analysis of subject matter jurisdiction under the FSIA's arbitration exception is compromised by anything less than *de novo* review of the factual question whether an arbitration agreement existed between the parties.  When this precise factual question is a matter that the parties *agreed* to arbitrate and *delegated* to an arbitral panel to resolve, the arbitral Tribunal's determination of this factual question may be relied upon in the court's legal analysis of whether subject matter jurisdiction is properly exercised.

The law is well settled that "parties can agree to arbitrate gateway questions of arbitrability, such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 68–69 (2010) (internal quotations omitted).  Moreover, the Supreme Court has made clear that "a court must defer to an arbitrator's arbitrability decision when the parties submitted that matter to arbitration." *First Options*, 514 U.S. at 943.  Where, as here, "clear and unmistakable" evidence

37

is presented that the parties agreed to delegate determinations about arbitrability to the Tribunal, that agreement will be enforced.  *See First Options*, 514 U.S. at 943–44.  As noted by the Shareholders, this agreement was established here by the Russian Federation's express "determination to accept the jurisdiction of [the] Tribunal," Pet'rs' Opp'n at 19 (quoting 2005 Letter), and its adoption of the UNCITRAL Rules.

The cases cited by the Russian Federation purporting to hold that a *de novo* determination of the existence of an arbitration agreement is required are inapposite for two reasons.  First, several of these cases do not address circumstances, as here, where the parties clearly and affirmatively agreed to submit an issue to arbitration.  *See* Resp't's Mot. at 27–28 (citing *Granite Rock Co. v. Teamsters*, 561 U.S. 287, 296–304 (2010) (recognizing that "a court may submit to arbitration only those disputes . . . that the parties have agreed to submit" and holding that the court cannot refer questions to arbitration "[w]here there is no provision validly committing them to an arbitrator" and the party seeking arbitration failed to establish through clear and unmistakable evidence that an agreement to arbitrate questions of arbitrability was in force on the date of the dispute); *Phoenix Consulting*, 216 F.3d at 40 (D.C. Cir. 2000) (holding that "the court must go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss" in the context of foreign sovereign immunity in a breach of contract suit with no arbitration agreement); *Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 449 (D.C. Cir. 1990) (remanding to the district court for further development of the record as to whether the FSIA applies in a case where the underlying dispute was not brought pursuant to an arbitration agreement or award); *China Minmetals*, 334 F.3d 291–92 (holding that respondent had not agreed to delegate questions of jurisdiction to the arbitrators when respondent's only participation in the arbitration proceedings

was to argue that the arbitration agreement was tainted by forgery)); Resp't's Suppl. Submission at 8 (citing *KenAmerican Res., Inc. v. Int'l Union, United Mine Workers of Am.*, 99 F.3d 1161, 1163 (D.C. Cir. 1996) (holding that agreement of a company's President to submit disputes with that company to arbitration and allow the arbitrators to decide questions of arbitrability does not clearly bind the President's other companies, who were not parties to that agreement)).  Second, some of these cases actually support settled caselaw that where parties have clearly agreed to arbitrate an issue, courts should enforce that agreement and defer to the arbitrators.  *See* Resp't's Mot. at 27–28 (citing *Nat'l R.R. Passenger Corp. v. Boston & Maine Corp.*, 850 F.2d 756, 764 (D.C. Cir. 1988) (holding that "[b]ecause the agreement contains a broad arbitration clause, requiring arbitration of all disputes concerning the meaning of the contract, we presume that the parties intended to arbitrate questions about its expiration or termination.")); Resp't's Suppl. Submission at 6–7 (citing *BG Group*, 572 U.S. at 29–36 (holding that Argentina was not entitled to *de novo* review of whether the petitioners complied with a procedural provision of an arbitration treaty, and deferring to the arbitrators on that question)).  In sum, none of these cases relied on by the Russian Federation overcome the binding holdings in *Stileks* and *First Options* requiring that the Tribunal's determination of the existence of an arbitration agreement be considered and granted dispositive deference when considering whether the Russian Federation has sustained its burden of persuasion.

The Russian Federation also cites a non-binding Second Circuit opinion to argue that this Court must consider the context of any agreement to arbitrate questions of jurisdiction under uniform rules of arbitration, such as the UNCITRAL Rules, when evaluating whether to defer to the Tribunal on such questions.  *See* Resp't's Suppl. Submission at 9–10 (citing *DDK Hotels, LLC v. Williams-Sonoma, Inc.*, 6 F.4th 308, 318–19 (2d Cir. 2021) ("Incorporation of [the AAA

Commercial Arbitration Rules] into an arbitration agreement does not, *per se*, demonstrate clear and unmistakeable evidence of a parties' intent to delegate threshold questions of arbitrability" and "in evaluating the import of incorporation of the AAA Rules (or analogous rules) into an arbitration agreement, context matters.")); Resp't's Suppl. Reply at 10–12.  Describing the "context" of the arbitration proceedings, the Russian Federation asserts that the parties never intended the incorporation of the UNCITRAL Rules to preclude judicial review and that the Shareholders never suggested an agreement to delegate questions of arbitrability to the Tribunal, among other arguments.  Resp't's Suppl. Submission at 10–11.  These arguments fail, however, because, contrary to the Russian Federation's representations that the Shareholders have never presented the argument that the parties delegated questions of jurisdiction, such as the existence of an arbitration agreement, to the Tribunal, the Shareholders raised *precisely* this point in their opposition to the Russian Federation's initial motion to dismiss, and have consistently asserted this argument throughout the course of this litigation.  *See* Pet'rs' Opp'n at 15–21.  Moreover, review of the "context" of the parties' conduct does not help the Russian Federation; its 2005 Letter delegating to the arbitral Tribunal jurisdictional issues, followed by its full participation in litigating questions of jurisdiction before the arbitral Tribunal over many years, provide probative context demonstrating the Russian Federation's clear intention to agree that the Tribunal may decide disputes as to jurisdiction.  *See, e.g.*, Hulley Final Award ¶¶ 244–398, 399–435, 1273–1374, 1385–1428.

    As further support for conducting *de novo* review, the Russian Federation points to a recent decision declining to defer to the arbitral tribunal's determination that an arbitration agreement existed covering the disputed claim.  Resp't's Not. of Suppl. Authority of May 12, 2023 at 1–5, ECF No. 265 (discussing *Blasket Renewable Investments, LLC v. Kingdom of*

*Spain*, No. 21-cv-3249 (RJL), 2023 WL 2682013 (Mar. 29, 2023)).  *Blasket* is inapposite here,

however, as the Shareholders correctly explain, *see* Pet'rs' Resp. to Not. of Suppl. Authority at 3,

ECF No. 268, because the *Blasket* court determined that the parties could not agree to defer to

the arbitral tribunal's determination of jurisdiction because the European Union ("EU") Treaties,

which are the ultimate sources of EU law governing EU Member States, forbade arbitration

between an EU national and an EU Member State, thereby obviating the state's authority to enter

into such an arbitration agreement as well as restricting the tribunal's own powers to determine

jurisdiction over the case.  *Blasket*, 2023 WL 2682013, at *5–6.  Relevant here, the *Blasket* court

acknowledged that this holding diverged from the D.C. Circuit's reasoning in *Chevron* and

*Stileks* but explained that, in those cases, "neither challenge was predicated on an argument that,

under the law applicable to them, the parties were *incapable* of entering into an agreement to

arbitrate anything at all."  *Id.* at *5 (emphasis in original).[18]

By contrast to the specific circumstances in *Blasket*, the Russian Federation is not a

member of the EU and asserts no similar treaty or legal limitation either on its ability to enter

into an arbitration agreement with the Shareholders, or on an arbitral tribunal's authority to

determine jurisdiction over an arbitration with the Russian Federation.  Indeed, the Russian

Federation does not even assert here that the Tribunal lacked the authority to determine its own

---

[18]     Not only is the *Blasket* decision inapposite on its facts and non-binding on this Court, but also its reasoning
has been rejected in two other decisions that followed the D.C. Circuit's decisions in *Stileks* and *Chevron*.  *See, e.g.*,
*NextEra Energy Global Holdings B.V. v. Kingdom of Spain*, No. 19-cv-1618 (TSC), 2023 WL 2016932, at *7, 12–
13 (D.D.C. Feb. 15, 2023) (relying on *Stileks* to find that Spain and a global energy investment company delegated
the authority to determine whether the underlying disputes were arbitrable to an arbitral tribunal, and determining
that the foreign nation's denial of any legal basis for an arbitration agreement was "not a challenge to the
jurisdictional fact of that agreement's existence but rather a challenge to that agreement's arbitrability."); *9Ren
Holding S.A.R.L. v. Kingdom of Spain*, No. 19-cv-1871 (TSC), 2023 WL 2016933, at *6 (D.D.C. Feb. 15, 2023)
(relying on *Stileks* to hold that arguments about a party's ability to enter an arbitration agreement are reserved for
consideration during enforcement, and not a matter of jurisdiction under the FSIA).

jurisdiction at the outset of the arbitration proceeding and merely asks for *de novo* review of this issue.

In determining whether the Tribunal had jurisdiction to issue the Awards, the Tribunal considered each of the challenges to the existence of an arbitration agreement that the Russian Federation asserts anew here.  *See* Hulley Final Award, ¶ 21; *see generally* Final Awards.  Under the binding precedent of the Supreme Court and the D.C. Circuit, including those Courts' holdings in *First Options*, *Henry Schein*, and *Stileks*, the unanimous decision of the arbitral Tribunal that the parties had an arbitration agreement covering the claims at issue resolves this factual question, which need not be considered *de novo*.  *See Stileks*, 985 F.3d at 878–879.

Even if "the FSIA required a *de novo* determination of arbitrability, however, . . . [i]n order to prevail on its jurisdictional argument, [the Russian Federation] would have to demonstrate by a preponderance of the evidence that [the Shareholders'] suits were" not subject to the ECT, and this [the Russian Federation] has failed to do," *Chevron*, 795 F.3d at 206, as is clear from consideration of the next four of its arguments.[19]

---

[19]     The Russian Federation attempts to distinguish its challenges from those in *Chevron* and *Stileks,* arguing that its disputes are to the *formation* of the arbitration agreement, rather than to its *scope,* Resp't's Reply at 4, 6, and noting that those cases "considered exclusively whether admittedly proper offerees had attempted to arbitrate improper disputes under valid, existing arbitration agreements," Resp't's Suppl. Reply at 15 (emphasis in original). Although the Russian Federation's distinction between formation and scope is not merely semantic, the problem for the Russian Federation is that the respondents in *Chevron* and *Stileks* contested the existence of an arbitration agreement covering the investments at issue, similarly to the Russian Federation here, and the D.C. Circuit rejected consideration of such challenges during the jurisdictional inquiry.  *Chevron*, 795 F.3d at 204–06; *Stileks*, 985 F.3d at 878.  In an effort to side-step the holdings in *Chevron* and *Stileks*, the Russian Federation urges reliance on two non-binding decisions of other circuits, Resp't's Mot. at 16–17 (citing *Al-Qarqani v. Saudi Arabian Oil Co.*, 19 F.4th 794, 802 (5th Cir. 2021) and *Al-Qarqani v. Chevron Corp.*, 8 F.4th 1018, 1026 (9th Cir. 2021)), but neither decision involved a facially applicable arbitration agreement, as here presented with the ECT, to which the Russian Federation is a signatory, and thus neither case would counsel a different outcome here.  *See Al-Qarqani v. Saudi Arabian Oil Co.*, 19 F.4th at 801–02 (explaining that the district court lacked jurisdiction where the arbitration agreement was not signed by the petitioners or the respondent, and that the arbitration agreement signed by third-parties did not apply to the parties in the case); *Al-Qarqani v. Chevron Corp.*, 8 F.4th at 1021 (same).

### *(b) The Russian Federation was Required to Apply the Entire ECT Provisionally*

The Russian Federation complains that no arbitration agreement existed because its provisional application of the ECT did not include application of the Arbitration Provision, included in Article 26.  Resp't's Mot. at 28–31; Resp't's Suppl. Mot. Dismiss at 12–22; Resp't's Suppl. Submission at 11–16; Resp't's Suppl. Reply at 12–15.  Another ECT provision, Article 45(1), governs the operation of the treaty after provisional adoption by the country.  Specifically, ECT's Article 45(1) states, in full, that "[e]ach signatory agrees to apply this Treaty provisionally pending its entry into force for such signatory in accordance with Article 44, to the extent that such provisional application is not inconsistent with its constitution, laws or regulations." "[S]uch provisional application," in this context, refers to the application of the treaty between the time when a foreign sovereign is a signatory and the time when the treaty is ratified following any domestic law procedural requirements.  *See* Resp't's Mot. at 29.  The arbitral Tribunal found, and the Shareholders concur, that provisional application requires that, even when not fully ratified, signatories must apply and fulfill all obligations created by the ECT under international law.  Hulley Interim Award ¶ 301.

The Russian Federation would read Article 45(1) differently to permit, while the ECT is pending provisionally, cherry-picking of specific provisions of the treaty to apply or not to apply, depending on a signatory's view that application of the specific provision would violate its domestic laws.  Resp't's Mot. at 28–29; Resp't's Suppl. Submission at 11–16.  The Shareholders dispute this reading based on the plain text of Article 45(1).  Pet'rs' Opp'n at 23 ("the plain language establishes that it is the principle of provisionally applying a treaty that is subject to consistency with a signatory's laws").  In the Shareholders' reading, the ECT must be applied in its entirety during a provisional period (after signing but before ratification), unless "such

43

provisional application" is deemed to violate domestic law; if provisional application is

inconsistent with domestic law, then the ECT may not be applied, in whole or in part.  The

arbitral Tribunal agreed with the Shareholders' reading and, further, concluded that provisional

application of the ECT was not contrary to domestic law of the Russian Federation.  *See* Hulley

Interim Award ¶¶ 301–70.

This issue was considered in great detail by the Tribunal, after the Russian Federation

submitted over 200 pages of briefing and sixteen expert opinions and witness statements, and

argument and testimony pertaining to this issue was presented to the Tribunal for over five days.

Pet'rs' Opp'n at 23 n.11.  The Tribunal found that Russian law expressly states that a treaty

"may, prior to its entry into force, be applied by the Russian Federation provisionally if the treaty

itself so provides."  Hulley Interim Award ¶ 332 (quoting Russian Federal Law on International

Treaties, art. 23(1) (1995)).  The Tribunal thus concluded that the ECT applies provisionally to

the Russian Federation in its entirety, including the agreement in Article 26 to arbitrate disputes

that arise under the treaty.  *Id.* ¶ 301.

Under the binding precedent of the Supreme Court and the D.C. Circuit, *see* Part III.B.3,

*supra*, this Court may not revisit the Tribunal's determination as to the textual meaning of

Article 45(1) and the requirements of provisional application of the ECT.  In any event, the

Russian Federation's arguments that the arbitration clause of the ECT is inconsistent with

Russian law would be more properly raised at the enforcement stage of this proceeding and, on

their merits, are dubious at best.  For example, the Russian Federation claims that "Russian law

prohibits the arbitration of public law disputes, which encompasses most disputes involving the

government."  Resp't's Mot. at 29.  As discussed in more detail *infra*, in Part C, however, the

dispute submitted to arbitration by the Shareholders had a *commercial* nature, and was not purely

regulatory or related to administration of government tax regimes as the Russian Federation

claims.  The Tribunal thus reasonably found that the instant dispute was an investor-state

investment dispute, and not a public law dispute, *see* Hulley Interim Award ¶¶ 370–97, relying

on its interpretation of Russian law, which allows for resolution of investment disputes in

arbitration, *id.* at ¶ 370 (quoting Russian Federation's *Law on Foreign Investment*, art. 9 (1991)

and art. 10 (1999)).[20]  This challenge thus fails to alter this Court's conclusion that the FSIA's

arbitration exception applies to allow the exercise of subject matter jurisdiction.[21]

### (c) The Russian Federation's Fraud Allegations Do Not Strip Jurisdiction from this Court

The Russian Federation next asserts that any agreement to arbitrate under the ECT is

inapplicable as to the Shareholders because of purported fraudulent behavior committed prior to

the arbitration proceedings by the Shareholders and their predecessor investors in Yukos.

Resp't's Mot. at 31–36; Resp't's Reply at 17–19; Resp't's Suppl. Mot. Dismiss at 23–39;

Resp't's Suppl. Submission at 16–27.  This argument was also exhaustively considered and

rejected by the Tribunal when issuing the Final Awards, Pet'rs' Opp'n at 27–28 (citing Hulley

---

[20]    In supplemental briefing, the Russian Federation presented a 2009 decision of the Supreme Court of the Russian Federation purportedly holding that treaties entered into by the Executive Branch of the Russian Federation cannot supersede acts of the Russian Parliament and remain subordinate to statutes enacted by the Parliament, and a 2020 decision of the Constitutional Court of the Russian Federation purportedly rejecting "the assertion that the ECT's Article 26 obligates Respondent to arbitrate in contravention of Respondent's applicable statutory law." Resp't's Suppl. Submission at 13–14; *see* Resp't's Suppl. Reply at 14–15.  With those decisions in hand, the Russian Federation relies on *dicta* in a U.S. Supreme Court case addressing the evaluation of foreign law under Federal Rule of Civil Procedure 44.1, stating that "[i]f the relevant state law is established by a decision of 'the State's highest court,' that decision is '*binding on the federal courts.*'"  Resp't's Suppl. Submission at 12 (quoting *Animal Sci. Prods. v. Hebei Welcome Pharm. Co.*, 138 S. Ct. 1865, 1874 (2018)) (emphasis in original); Resp't's Suppl. Reply at 14.   None of these cases, either from the U.S. Supreme Court or the Russian Federation, addresses the issue here, however, of whether determinations by an arbitral tribunal, to which the parties delegated issues of jurisdiction, are binding on an enforcing court.  The decisions in *First Options* and *Stileks* require that the Tribunal's jurisdictional determinations be given binding deference, and the cases provided by the Russian Federation at this late stage do not overcome those holdings.

[21]    The Russian Federation also asserts that its agreement to arbitrate could not be "clear[] and unambiguous[]" because of the dispute as to interpretation of ECT Article 45(1), *see* Resp't's Suppl. Submission at 14–15; Resp't's Suppl. Reply at 12–13, but such an argument fails in the face of the clear and unmistakable agreement to arbitrate issues of jurisdiction in the 2005 Letter and incorporation of the UNCITRAL Rules.

Interim Award ¶ 71; Hulley Final Award ¶ 201), and that determination must be afforded deference to the extent the issue is raised here as a jurisdictional challenge.  In any event, any purported fraud would not be relevant to the jurisdictional question of whether the ECT qualified as the parties' agreement to arbitrate in this case.  The FAA provides grounds for a party to ask a court to review and to set aside an arbitral decision "in very unusual circumstances." *First Options*, 514 U.S. at 942 (citing, *e.g.,* FAA, 9 U.S.C. § 10 (award procured by corruption, fraud, or undue means; arbitrator exceeded his powers)).  Consequently, this challenge may be relevant to enforcement of the Final Awards, but cannot strip this Court of jurisdiction to hear this case.

This point is well illustrated by the D.C. Circuit's decision in *P&ID*, where the Court evaluated challenges to jurisdiction under the arbitration exception when the foreign sovereign alleged that the petitioner had engaged in fraud before and during the arbitration proceedings.  27 F.4th at 773.  In that case, an arbitration panel in England issued an arbitration award to P&ID based on Nigeria's breach of a natural gas pipeline construction agreement.  *Id.* at 772.  Nigeria first sought to set aside the relief in English courts, but when the English courts denied that application as untimely, Nigeria sought a set-aside order in its own courts and the Federal High Court of Nigeria issued an order, with no reasoning or explanation, simply setting aside the award in May 2016.  *Id.* at 772–73.

P&ID brought suit in this Court to enforce the arbitration award, *id.* at 773, while, in a parallel proceeding in England, Nigeria petitioned the High Court of Justice of England to extend its deadline to challenge the award based on "new evidence of fraud in the arbitration and underlying contract negotiations."  *Id.*  The English court determined that Nigeria had "established a strong prima facie case" of P&ID's fraud and bribery in procuring the contract agreement and throughout the arbitration proceedings, and granted Nigeria's request to extend

the deadline to challenge the award.  *Id.*  Even as Nigeria presented in the High Court of Justice

of England a potentially meritorious defense based on alleged fraud by the petitioners, the D.C.

Circuit held that "the application of the arbitration exception here is straightforward, as all of the

jurisdictional facts required by the statute exist."  *Id.* at 776 (citing the arbitration exception to

the FSIA at 28 U.S.C. § 1605(a)(6)).  The D.C. Circuit found dispositive that the contract

between P&ID and Nigeria "included an agreement to arbitrate[]; [t]he arbitral tribunal issued an

award to P&ID[]; [a]nd the New York Convention governs the award, as Nigeria, the United

States and the United Kingdom are all member states."  *Id.*  Nigeria argued that the arbitration

exception did not apply, asserting that P&ID lacked a "valid and enforceable arbitral award"

because "in its view, the Federal High Court of Nigeria set aside the arbitral tribunal's liability

award."  *Id.*  The D.C. Circuit, however, concluded that consideration of such challenges "is a

merits question," and that the district court did not need to consider the validity of the arbitral

award, or allegations of fraud, as part of the jurisdictional inquiry.  *Id.*

 *P&ID*'s holding has full force here. Consequently, the Russian Federation's allegations

of fraud on the part of the Shareholders need not and, indeed, should not be addressed as part of

the jurisdictional inquiry.

###  *(d) The Russian Federation's Allegations that the Shareholders are Russian Nationals Cannot Negate Jurisdiction*

 Next, the Russian Federation argues that an arbitration agreement could not be formed

because any agreement to arbitrate under the ECT did not apply to arbitration with Russian

nationals.  Resp't's Mot. at 34–36; Resp't's Suppl. Mot. Dismiss at 23–39; Resp't's Suppl.

Submission at 16–27; Resp't's Suppl. Reply at 17–22.  This argument fails for the same reasons

as the Russian Federation's allegations of fraud.  The arbitral Tribunal already squarely

addressed and rejected the Russian Federation's claim as to the nationality of the Shareholders,

Hulley Interim Award ¶¶ 406–435, a finding that is entitled to deference in considering jurisdiction, even if the Russian Federation would prefer to relitigate this issue now with new evidence that it claims was unavailable to the Tribunal.  *See, e.g.*, Resp't's Suppl. Mot. Dismiss at 23–39.  In any event, however, this challenge is better evaluated as a defense to enforcement of the Final Awards, rather than an issue to confront during a subject matter jurisdiction inquiry.

The Russian Federation requests an evidentiary hearing and the opportunity to cross-examine four witnesses, who submitted witness statements to this Court in support of the Shareholders, in order to pose questions related to whether the Shareholders were genuinely "foreign" investors under the ECT's Article 26, whether the Shareholders were genuinely "investors," under the ordinary meaning of that term, and whether the Shareholders abused their corporate formalities in a way that would require their corporate status to be disregarded "when applying the ECT's Article 26 in accordance with principles of piercing the corporate veil," among other questions.  Discovery Mot. at 4, 7–10, ECF No. 244; *see* Resp't's Suppl. Reply at 22–25.  More specifically, the Russian Federation asserts that, although the three Shareholders present themselves as companies based in Cyprus and the Isle of Man, they are actually shell companies that do not engage in any business and instead are wholly owned and controlled by six Russian Oligarchs: Mikhail Khodorkovsky, Leonid Nevzlin, Platon Lebedev, Mikhail Brudno, Vassili Shakhnovsky, and Vladimir Dubov.  Resp't's Mot. at 5; Resp't's Suppl. Submission at 16–27.  In requesting a hearing and cross-examination of the Shareholders' four witnesses, the Russian Federation asserts that this discovery is critical to evaluating these allegations and possible findings that Russian nationals exercised control in fact over the Shareholders and that the Shareholders' corporate veils should be pierced, all to reach the conclusion, urged by the Russian Federation, that the Shareholders should be deemed Russian

nationals and ineligible to qualify as investors under the ECT.  Discovery Mot. at 2; Resp't's

Suppl. Reply at 22–25.

The Shareholders strongly dispute each of the Russian Federation's allegations, asserting

that, as a legal matter, the Russian Federation's attempts to disqualify them as investors would

subject them to additional definitional requirements simply not included in the ECT, or even

ECT drafts.  Pet'rs' Suppl. Submission at 30–31 (explaining that the ECT defines "Investors" to

"include 'a company or other organization organized in accordance with the law applicable in [a]

Contracting Party.'" (internal citation omitted)).  The Shareholders also strongly contest, as a

factual matter, the Russian Federation's allegations that they are shell companies or were

otherwise wholly owned or controlled by Russian nationals at the time of the arbitration

proceedings.  *Id.* at 31–35.  They point to witness statements from the four witnesses whom the

Russian Federation seeks to cross-examine, and filings submitted to the Court of Appeal of The

Hague, describing in "painstaking detail" their prior denial of these allegations.  *Id.* at 35.

Two of the witnesses named by the Russian Federation, Leonid Borisovich Nevzlin and

Vladimir Matveevich Dubov, submitted written witness statements and appeared as witnesses in

the arbitration proceedings, where they were extensively cross-examined by the Russian

Federation.  Pet'r's Suppl. Submission, Decl. of Michael Cotlick ("Cotlick Decl."), Ex. 8, First

Witness Statement of Leonid Borisovich Nevzlin, at 1, 5–6, ECF No. 241-8; Cotlick Decl., Ex.

28, First Witness Statement of Vladimir Matveevich Dubov, at 1, ECF No. 241-28.  The

Shareholders offered to present a third witness identified by the Russian Federation, Kelvin Mark

Hudson, for testimony during the arbitration proceedings, but the Russian Federation declined to

exercise that opportunity.  Discovery Opp'n at 6.  As noted, written testimony from each of these

witnesses was also presented during the *de novo* proceedings held before the Court of Appeal of The Hague.  Discovery Opp'n at 7.

Further testimony and a hearing with cross-examination of these witnesses is unnecessary to resolve the issue of subject matter jurisdiction in this case because, first, the Tribunal's determination as to the existence of an arbitration agreement is binding on this Court and nothing presented in such a hearing could overcome the Tribunal's finding, and, second, because much like the allegations of fraud considered in Part III.B.4.c, *supra*, consideration of such challenges "is a merits question," and further inquiry into the Russian Federation's allegations that Russian nationals exercised control in fact over the Shareholders and the corporate veil of the Shareholders should be pierced to treat them as Russian nationals may only be addressed at the enforcement stage of these proceedings.  *See P&ID*, 27 F.4th at 776; *see also Chevron*, 795 F.3d at 206 (deeming "dispute over whether the lawsuits were 'investments' for purposes of the treaty [as] properly considered as part of review under the New York Convention" rather than FSIA jurisdictional questions).  The Russian Federation's detailed arguments as to the Shareholders' corporate ownership and structure, *see, e.g.*, Resp't's Suppl. Submission at 16–27; Discovery Mot. at 3–10, therefore need not be addressed in this Memorandum Opinion.  Additionally, an evidentiary hearing with cross-examination of the Shareholders' witnesses is unnecessary, if not improper, at this procedural stage of this case.[22]

### (e) The Tax-Dispute Precondition to Enforcement Also Cannot Overcome the Jurisdictional Grant of the Arbitration Exception

Finally, the Russian Federation challenges the arbitration agreement on the grounds that neither the Shareholders nor the Tribunal followed the "mandatory tax-dispute referral

---

[22]    For this reason, the Russian Federation's Motion for an Evidentiary Hearing to Cross-Examine Petitioners' Witnesses is denied, without prejudice.

mechanism under Article 21(5) of the ECT, which is a precondition to the formation of consent

with respect to tax disputes under the treaty."  Resp't's Mot. at 36–38; Resp't's Suppl.

Submission at 21–22.  Once again, this argument was thoroughly considered and rejected by the

Tribunal.  *See* Hulley Final Award ¶¶ 1421, 1426.

As the Shareholders point out, the Supreme Court has held that questions about

adherence to pre-conditions of arbitrability are a matter "for the arbitrators, and courts must

review their determinations with deference."  *BG Group*, 572 U.S. at 29 (holding that the court

owed deference to the arbitrators in determining whether an investor's failure to follow a local

litigation requirement of a treaty stripped the arbitrators of jurisdiction).  In *BG Group*, "the local

litigation requirement [was] highly analogous to procedural provisions that both this Court and

other have found are for arbitrators, not courts."  *Id.* at 36.  The Russian Federation argues that

the tax-dispute referral mechanism differs from the pre-condition in *BG Group* because it is

"substantive," rather than a "procedural claims-processing rule," as it describes the local

litigation requirement considered in *BG Group*.  *See* Resp't's Reply at 21.  This argument fails,

however, because the holdings in *First Options* and *Stileks* apply just as strongly here as in *BG
Group*, no matter how the Russian Federation characterizes its specific challenge, and, because

the parties agreed to arbitrate questions of jurisdiction, the Tribunal's decision of whether the

Shareholders and Tribunal needed to comply with the tax-dispute referral mechanism before the

issuance of the Final Awards is entitled to deference.  Additionally, any review of this decision is

a merits, rather than a jurisdictional, question.

In sum, none of the challenges brought by the Russian Federation succeed in sustaining

its burden of persuasion to rebut the Shareholders' *prima facie* showing that the arbitration

exception to the FSIA applies here.

### C.  Jurisdiction Under the New York Convention

Upon determination that an arbitration agreement exists, and that the FSIA's arbitration exception to sovereign immunity applies, the next issue to assess is whether this matter presents a "basis upon which a court in the United States may enforce a foreign arbitral award." *Creighton Ltd.*, 181 F.3d at 121.  The Shareholders correctly point to the New York Convention as providing the requisite treaty basis for the exercise of jurisdiction.[23]

The New York Convention is an international treaty ratified by the United States that provides for signatory states' recognition of arbitral awards "made in the territory of a State other than the State where the recognition and enforcement of such awards are sought."  *P&ID*, 27 F.4th at 774 (quoting New York Convention, art. I(1)).  "It further provides that signatory states 'shall recognize arbitral awards as binding and enforce them in accordance with the rules of procedure of the territory where the award is relied upon, under the conditions laid down in the . . . articles [of the Convention].'"  *Id.* at 774–75 (quoting New York Convention, art. III).  The FAA codified the New York Convention into law, providing that "[a]n action . . . falling under the Convention shall be deemed to arise under the laws and treaties of the United States," and granted district courts original jurisdiction over such actions.  9 U.S.C. § 203.

For an arbitral award to "fall[] under the Convention," two requirements—both optional elements of the New York Convention that the United States adopted at ratification—must be satisfied.  *See* Restatement (Third) of the Foreign Relations Law of the United States § 487 cmts. b, f (Am. L. Inst. 1987).  First, the arbitral award must be "rendered within the jurisdiction of a signatory country," pursuant to the reciprocity reservation of the Convention.  *Creighton Ltd.*,

---

[23]     Though the FAA authorizes parties to arbitration agreements "to file specified actions in Federal court," this statute does not itself "support federal jurisdiction," *Badgerow*, 142 S. Ct. at 1316, and thus "[a] federal court may entertain an action brought under the FAA only if the action has an 'independent jurisdictional basis.'" *Id.* (quoting *Hall Street Assoc, LLC*, 552 U. S. at 582).

181 F.3d at 123 (New York Convention, art. III).  Neither party contests that the awards here were rendered within the jurisdiction of a signatory country of the New York Convention, namely, the Netherlands.

Second, pursuant to the Convention's commercial reservation, which the United States adopted along with a minority of the Convention's signatories, the award must "aris[e] out of a legal relationship, whether contractual or not, which is considered as commercial."  9 U.S.C. § 202; *Belize Social Dev.*, 794 F.3d at 103 (explaining that "[f]or most signatories, the New York Convention applies to all private arbitral agreements, regardless of the subject matter. The United States, however, made a declaration, authorized by Article I(3) of the Convention, that the Convention would be applicable 'only to differences arising out of legal relationships whether contractual or not, which are considered commercial under the national law of the State making such declaration.'") (internal citations omitted).  In the context of international arbitration, commercial "refers to matters which have a connection to commerce."  *Belize Social. Dev.*, 794 F.3d at 105.  The D.C. Circuit invites a broad interpretation of the meaning of commercial in this context, explaining that "[a] matter or relationship may be commercial even though it does not arise out of or relate to a contract, so long as it has a connection with commerce, whether or not that commerce has a nexus with the United States."  *Id.* at 104 (quoting Restatement (Third) of U.S. Law of Int'l Comm. Arbitration § 1–1 cmt. e).

Contrary to the Russian Federation's position, the Final Awards arose out of a commercial relationship between the parties based on the Russian Federation's own admitted and undisputed facts as to the history of the parties' relationship and applicable caselaw, as reviewed in more detail below.

### 1.   The Parties' Commercial Relationship

As the Russian Federation detailed in its initial motion to dismiss, the parties' dispute leading to the arbitral Awards arose from a complicated commercial investment relationship that the Russian Federation entered into with the Shareholders, dating back to the 1990s.  Resp't's Mot. at 7–8.  This relationship began when the Shareholders took ownership of Yukos through a Loan-for-Shares ("LFS") auction held by the Russian Federation in 1995.  *Id.* at 1.  The LFS program was established by Russian Federation President Boris Yeltsin the same year the auction was held.  *See* Resp.'t's Mot., Ex. R-261, Presidential Decree No. 889, ECF No. 40-1. "The purpose of the LFS program was to use highly valuable state-owned assets as collateral for the Government of the Russian Federation to borrow funds 'for covering the federal budget deficit.'" Resp't's Mot. at 8 (citing Presidential Decree No. 889).  Under the program, private bidders were allowed to submit proposals to loan funds to the Government, and those loans were secured by pledges of shares of large, state-owned enterprises as collateral.  *Id.* at 8.  If the government of the Russian Federation defaulted on any of these loans, the private persons or entities who held the loans would be allowed to sell the shares to a third party to recoup their investment.  *Id.*  At the highest level, this overall program is inherently commercial in nature, and involves significant entanglement between the government of the Russian Federation and private investors who participate in the program.

The winning bidder in the LFS auction paid $159 million for the shares of Yukos.  *Id.* at 11.  While the Russian Federation claims that the Shareholders and their predecessor owners of Yukos committed fraud in the course of this auction to obtain shares of the state-owned company, that alleged fraud does not actually alter the fact that this was an inherently *commercial* transaction.  The Shareholders' claims arose out of their investment in Yukos, a company "engag[ed] in exploration, production, refining, marketing and distribution of crude oil,

natural gas and petroleum products" that employed thousands of people and was a competitor of the Russian Federation's state-owned oil company.  Hulley Final Award ¶¶ 71–73.

When the Shareholders' suffered massive losses as a result of the series of tax assessments leveled by the Russian Federation, forcing the sale of Yukos' key asset and ultimately bankruptcy, the Shareholders, in 2004, sought arbitration under the ECT.  *See id.* at ¶ 10.  In July, 2005, the Russian Federation agreed to submit the dispute to arbitration under the ECT, stating that "[t]he Russian Federation during that time has reached the determination to accept the jurisdiction of this Arbitral Tribunal to determine its own jurisdiction and has participated fully in the process of constitution of the Arbitral Tribunal."  2005 Letter.  As already noted, the Russian Federation also effectuated this arbitration by participating in the selection of the arbitral Tribunal, with the specific appointment of Judge Schwebel.  Pet. ¶ 12.

These facts proffered and otherwise undisputed by the Russian Federation demonstrate conclusively that the relationship underlying the arbitration proceedings in this case was commercial in nature.  By choosing to auction off state-owned assets to private persons and organizations, in order to raise funds to cover the state's national debt, the Russian Federation chose to involve itself in commercial investment transactions with the Shareholders.

Further, by choosing to submit the dispute to arbitration under the ECT, as expressly stated in its 2005 Letter, the Russian Federation at least impliedly acknowledged the commercial nature of the dispute.  The ECT is aimed solely at governing how signatories treat *commercial* investments, *see* Pet. ¶ 34, as confirmed by the ECT's Article 26(5)(b), which provides that any claims submitted to arbitration on the basis of that treaty "shall be considered to arise out of a commercial relationship or transaction for the purposes of Article I of the [New York]

Convention."[24]  Although the Russian Federation denies that this ECT article applies because the treaty was not ratified by the country in its entirety, and because "the national law of the State where enforcement is sought, which is U.S. law in the present case," should be used to determine whether the dispute is "commercial" under the New York Convention, Resp't's Reply at 25, Article 26(5)(b) nonetheless supports the conclusion that the underlying relationship submitted to arbitration was commercial in nature.

Finally, the actions by the Russian Federation found to be unlawful by the arbitral Tribunal, including the malicious tax prosecution and seizure of the Shareholders' asserts, were also undoubtedly commercial in nature because they were aimed at increasing the market share of the state-owned oil company and reducing the share held by a competitor, Yukos.  *See* Pet. ¶¶ 33, 59-60.

In sum, the history of the parties' dealings, the nature of the assets involved, and reliance on the ECT for the convening of the arbitration between the parties all confirm the commercial relationship underlying the dispute leading to the Final Awards.

### 2.     Caselaw Confirms the Parties' Commercial Relationship

The conclusion that the parties' dispute arose from a commercial relationship subject to the New York Convention is further bolstered by review of binding caselaw.  For its part, the Russian Federation contests that the relationship underlying the Final Awards falls within the New York Convention's commercial reservation, characterizing "[p]etitioners' claims [as] concern[ing] public law matters because they are in connection with the exercise of Russia's sovereign authority: its police, taxation, procurement, and enforcement powers."  Resp't's Mot.

---

[24]     The Shareholders indicate that the text of ECT Article 26(5) is often used in international treaties, including the North American Free Trade Agreement ("NAFTA"), to encourage parties to submit disputes to arbitration, and a decision undermining the force of this language could have widespread implications for the international dispute resolution regime.  Pet'rs' Opp'n at 39–40.

at 43; *see* Resp't's Reply at 22–25.  In this vein, the Russian Federation says its relationship with

the Shareholders is purely regulatory, arising from "imposition of tax penalties, conduct of

bankruptcy proceedings, tendering of State-owned property, and regulation of natural resources."

Resp't's Reply at 24.  In making this argument, the Russian Federation conveniently ignores the

commercial nature of the transaction that created the relationship at issue with the Shareholders,

as well as the fact that the series of tax reassessments imposed by the Russian Federation,

culminating in auctioning off key Yukos assets to pay punitive tax debts and drive Yukos out of

competition in the oil market, *see* Pet. ¶¶ 24–30, does nothing to negate the clear commercial

relationship between the parties, as binding precedent amply illustrates.

For example, in *BG Group*, the Supreme Court approved the exercise of jurisdiction to

enforce investment treaty awards under the New York Convention, where the underlying dispute

submitted to arbitration involved the tariff treatment of an investment made in the energy sector

of a foreign state, similar to the dispute submitted to arbitration here.  572 U.S. at 44–45.

Although the application of the Convention's commercial reservation was not directly addressed

in that case, the Supreme Court rejected other challenges to the enforcement of the arbitration

award and the D.C. Circuit affirmed the district court's confirmation of the award on remand.

*Republic of Argentina v. BG Group PLC*, 555 F. App'x 2, 3 (D.C. Cir. 2014).

Likewise, the D.C. Circuit has previously held that the imposition of taxes on a company

creates the requisite connection to commerce under the New York Convention.  *See Belize Social

Dev.*, 794 F.3d at 104.  In *Belize Social Development*, Belize's largest private

telecommunications company, Telemedia, purchased state-owned properties in exchange for

"relief from tax and regulatory burdens," along with "other significant benefits."  *Id.* at 100.

When a new Prime Minister took office, Belize ceased to honor its contractual obligations to

Telemedia.  *Id.* at 101.  Telemedia submitted the dispute to arbitration and was awarded over 38

million Belize dollars in damages, and Telemedia's successor in interest sued in this court

seeking confirmation of the award.  *Id.*

The government of Belize argued that its relationship with Telemedia failed to meet the

requisite connection to commerce under the New York Convention, "because the award [did] not

arise from a commercial transaction, as required by the treaty, but from a government

transaction."  *Id.* at 103.  The D.C. Circuit rejected that argument, holding that the arbitration

"involve[d] the sale of real property in exchange for certain accommodations, a transaction with

a connection to commerce," and that "[t]he taxes Belize levies against a company also have a

connection with commerce, as do the duties Belize charges (or foregoes charging)."  *Id.* at 104

(internal citation omitted).  The D.C. Circuit thus concluded that the arbitration at issue was

commercial and "governed by the New York Convention."  *Id.*

The Russian Federation tries to avoid the holding in *Belize Social Development* by

distinguishing the underlying dispute in that case as involving breach-of-contract claims by

investors, and not commercial investments, *see* Resp't's Reply at 24, but the D.C. Circuit's

recognition of the commercial connection applies just as strongly in this case.  The facts at issue

here enjoy key similarities to those in *Belize Social Development*, as both cases involve

investments or purchases of state-owned assets, which the foreign sovereign chose to transfer to,

in financial transactions with, a private party.  In both cases, a taxation dispute arose related to

those investments, and the taxation dispute was submitted to arbitration.  The D.C. Circuit relied

on both the commercial nature of the underlying state-owned property sales and the taxes levied

by Belize to find the requisite connection to commerce.  *Id.* at 104.  Both of these elements in the

relationship between the Shareholders and the Russian Federation support finding that this dispute satisfies the commercial requirement of the New York Convention.

The D.C. Circuit's recent decision in *Simon* addressing the meaning of "commercial activity" in the context of a separate FSIA exception for expropriations also counsels in favor of finding that the relationship at the core of this dispute was commercial. *Simon*, 77 F.4th at 1121. In *Simon*, the Court concluded that "the commercial-activity prong is met based on [the foreign sovereign]'s issuance of bonds," after relying on the interpretation of the word "commercial" in the FSIA's commercial activity exception and thereby applying a consistent interpretation of this term across FSIA exceptions. *See id* at 1122. In evaluating the applicability of the commercial activity exception, the Court explained that "a foreign state's actions are 'commercial' under the FSIA when the state 'acts, not as regulator of a market, but in the manner of a private player within it.'" *Id.* at 1122 (quoting *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992)). The Court found dispositive that "private parties regularly issue [such] bonds," and described the bonds as "garden-variety debt instruments," noting that "private parties could hold them, trade them on the international market, and use them to secure a future stream of income." *Id.* (citing *Weltover*, 504 U.S. at 615).

By participating in commercial investment transactions and accepting loans from private entities the Russian Federation was similarly participating in commercial transactions in a manner indistinguishable from a private party. The shares issued in exchange for loans through the LFS program were standard debt instruments, much like the bonds issued by the Hungarian Government in *Simon*. The Russian Federation promised in issuing these shares that "the winner of the LFS auction was entitled to receive 30%" of any "proceeds in excess of the loan amount," if the underlying state-owned assets were sold, Resp't's Mot. at 8, just as the bonds issued by

Hungary promised a return-on-investment of 6.250% per year, *see Simon*, 77 F.4th at 1122.  In issuing these shares, the Russian Federation transacted as any private party offering stock or shares in a business or property would.  The issuance of shares in state-owned entities and acceptance of loans from private parties in return thus undoubtedly qualifies as "commercial" under the D.C. Circuit's consistent interpretation of that term in the context of the FSIA.  *See id.*  The Russian Federation's blinkered focus only on the subsequent tax enforcement and bankruptcy actions cannot erase the facts of its involvement in commercial investment agreements through the LFS program.

***

The Shareholders have fully demonstrated a "basis upon which a court in the United States may enforce a foreign arbitral award," *Creighton Ltd*, 181 F. 3d at 121, since the Final Awards were rendered within the jurisdiction of a signatory country to the New York Convention and arise from a commercial relationship between the parties, satisfying the prerequisites for the exercise of jurisdiction under the New York Convention.

**D.    NEXT STEPS**

In addition to the pending motions to dismiss this action for lack of subject matter jurisdiction, the Russian Federation has moved to deny confirmation of the Final Awards pursuant to the New York Convention.  Resp't's Mot. Deny Pet.  Due to the timing of the multiple stays imposed over the course of this litigation, the Shareholders have not yet responded to that motion to deny confirmation of the Awards.  *See* Minute Order (Oct. 22, 2015).[25]  The

---

[25]    This Minute Order, which was entered by another Judge of this Court before this matter was randomly reassigned to the undersigned, directs the Shareholders to "respond in part to the motion to dismiss, focusing their opposition solely on the legal issues raised in pages 25–44 of respondent's [] memorandum in support of its motion to dismiss, and in particular, the issues raised on pages 38–44," and notes that "[o]nce the Court has ruled on the question of its subject matter jurisdiction, it will, if necessary, provide petitioners with an opportunity to respond to the factual allegations raised in the first 23 pages of the memorandum in support of the motion to dismiss and set a schedule for further briefing on the [] motion to deny confirmation of the arbitration award."

relief sought in the Shareholders' original Petition to confirm the Final Awards, countered by the Russian Federation's pending motion to deny such confirmation, are now front and center as the final issue to address in this long-standing litigation.  To the extent that the Russian Federation's challenges to the existence of an arbitration agreement between the parties and to the arbitrability of the underlying dispute are resolved in this Memorandum Opinion, those objections need not and should not be repeated or relitigated in connection with the pending motion to deny confirmation of the Awards.  The parties will be directed to confer and propose a briefing schedule for the final stage of this litigation before this Court.[26]

## IV.    CONCLUSION

The Russian Federation has failed to discharge its burden of persuasion to establish that the FSIA's arbitration exception is inapplicable here.  As a result, the FSIA arbitration exception applies, and the Russian Federation's general sovereign immunity provides no protection in this action to enforce the Final Awards issued by the arbitral Tribunal.  Moreover, the New York Convention provides a treaty basis upon which this Court may enforce those Final Awards, thereby establishing this Court's subject matter jurisdiction to resolve the Shareholders' Petition. Accordingly, the Russian Federation's Motion to Dismiss for Lack of Subject Matter Jurisdiction and Supplemental Motion to Dismiss for Lack of Subject Matter Jurisdiction, ECF Nos. 24 and 108 (as amended by ECF Nos. 271 and 272), are **DENIED**.  The Russian Federation's Motion for Leave to File a Proposed Supplemental Reply, ECF No. 246, is **GRANTED**; the Russian Federation's Motion for an Evidentiary Hearing to Cross-Examine Petitioners' Witnesses, ECF

---

[26]    Both the Russian Federation's Sealed Motion for Leave to File Document Under Seal, at ECF No. 259, and the Shareholders' responding Sealed Motion for Leave to File Document Under Seal, ECF No. 260, are granted. The Russian Federation's Sealed Motion, ECF No. 259-3, with Memorandum in Support at ECF No. 259-4, is denied, without prejudice, given the complex procedural history of this case, the extensive record, including over 100,000 pages of filings, and the significant delays that have already impacted the progression of this case.

No. 244, is **DENIED WITHOUT PREJUDICE**; the Shareholders' Motion to Strike the Third

Avtonomov Declaration, ECF No. 250, is **DENIED AS MOOT**; the Russian Federation's

Sealed Motion for Leave to File Document Under Seal, ECF No. 259, and the Shareholders'

responding Sealed Motion for Leave to File Document Under Seal, ECF No. 260, are

**GRANTED**; and the Russian Federation's Sealed Motion, ECF No. 259-3, is **DENIED**

**WITHOUT PREJUDICE**.

      This case will progress to consideration of the relief sought in the Petition to confirm the

Final Awards and the Russian Federation's Motion to Deny Confirmation of the Arbitration

Awards Pursuant to the New York Convention.  The parties are directed to submit a Joint Status

Report by December 5, 2023, proposing a schedule to resolve the final issues in this matter.

      An order consistent with the Memorandum Opinion will be entered contemporaneously.

Date:  November 17, 2023

<br>

                            _____

                            **BERYL A. HOWELL**
                            United States District Judge