**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

HULLEY ENTERPRISES LTD.,
YUKOS UNIVERSAL LTD., and
VETERAN PETROLEUM LTD.,

*Petitioners,*

v.

THE RUSSIAN FEDERATION,

*Respondent.*

Case No. 1:14-cv-1996 (BAH)

**SUPPLEMENTAL BRIEF OF THE RUSSIAN FEDERATION**
**IN SUPPORT OF THE MOTION TO DISMISS FOR LACK OF JURISDICTION**

David P. Riesenberg (D.C. Bar No. 1033269)
Dilmurod Satvaldiev (D.C. Bar No. 90027884)
PINNA GOLDBERG U.S. PLLC
10 G Street NE, Suite 600
Washington, D.C., 20002, U.S.A.
T: +1 (202) 549-2477
E: driesenberg@pinna-goldberg.com

May 26, 2026                    *Counsel for Respondent*

## PRELIMINARY STATEMENT

Throughout this litigation, Respondent ("Russia" or the "Russian Federation") has maintained that the Energy Charter Treaty ("ECT") (ECF No. 2-7) did not commit Russia to any "clear and unambiguous" agreement to arbitrate under Article 26 of the ECT. Accordingly, this Court lacks jurisdiction under the "arbitration" exception to the Foreign Sovereign Immunities Act ("FSIA"), codified at 28 U.S.C. § 1605(a)(6).

On appeal, the D.C. Circuit has now affirmed in part and reversed in part this Court's analysis with respect to whether certain of Russia's arguments implicated subject-matter jurisdiction under the FSIA. *See Hulley Enters. v. Russian Fed'n*, 149 F.4th 682 (D.C. Cir. 2025). As relevant here, the D.C. Circuit confirmed that the following argument must be determined by this Court under § 1605(a)(6) as a jurisdictional question:

> "Russia maintains that it never made a standing offer to arbitrate. Because the Russian Parliament did not ratify the Treaty, Russia committed only to applying the Treaty provisionally. And the Treaty by its terms provides for provisional application only 'to the extent that such provisional application is not inconsistent with [the signatory's] constitution, laws or regulations.' [ECT] art. 45(1). Russia contends that its law does not permit arbitration of 'public law disputes,' including 'most disputes involving the government' and 'government contracts.' As a result, Russia was not provisionally bound to the Treaty's arbitration clause.
>
> This argument pertains to our jurisdiction under the FSIA's arbitration exception to sovereign immunity. . . . On remand, the district court must decide whether provisional application of the Treaty's arbitration clause is consistent with Russian law."

*Hulley*, 149 F.4th at 689.

In addition, the D.C. Circuit acknowledged—without deciding—that this Court must also address the significance of the Dutch courts' rulings (ECF 102-2, 240-1, 240-5) in the present case—including whether the Dutch courts' rulings could be entitled to "preclusive effect" in respect of the § 1605(a)(6) determination. *Hulley*, 149 F.4th at 692.

2

In this regard, the D.C. Circuit also instructed this Court to "invite the United States to express the government's position on this issue." *Id.* The U.S. Government has now complied with this request and provided a submission of sixteen (16) pages concerning one possible way of . *See* U.S. Statement (ECF 303).

Accordingly, as instructed by this Court, Respondent now files the present Supplemental Brief in Support of the Motion to Dismiss for Lack of Jurisdiction (ECF 24) and provides herein its response to the position of the U.S. Government. This Supplemental Brief is supported by the Consolidated Expert Report on Russian Law by Professor Alexei Avtonomov (May 26, 2026), the Joint Expert Report on Dutch Law by Jacob Cornegoor, Marcus A.M. Wagemakers, and Arjan H.M. van den Steenhoven (May 26, 2026), and the Declaration of David P. Riesenberg (May 26, 2026).

**ARGUMENT**

## I.   THE DUTCH JUDGMENTS ARE NOT ENTITLED TO ISSUE-PRECLUSIVE EFFECT IN THIS CASE

On remand, this Court must now "determine the jurisdictional facts regarding Russia's sovereign immunity" by evaluating "whether the FSIA's arbitration exception applies" to this case under 28 U.S.C. § 1605(a)(6). *Hulley Enters. v. Russian Fed'n*, 149 F.4th 682, 691 (D.C. Cir. 2025). The first step will be to determine "whether the Dutch courts' judgments . . . are entitled to preclusive effect" in regard to "whether provisional application of the Treaty's arbitration clause was consistent with Russian law" under the ECT's Article 45(1). *Id.* at 691–92.

For the reasons described below, neither the Dutch 2020 Judgment (ECF 240-1) nor the Dutch 2021 Cassation Ruling (ECF 240-5) is entitled to preclusive effect on any jurisdictional questions under § 1605(a)(6). *See, e.g.*, *Hulley Enters. v. Russian Fed'n*, No. 14-cv-1996 (BAH), 2022 U.S. Dist. LEXIS 68521, at *24–25 (D.D.C. Apr. 13, 2022) (ECF 228) ("[A]t a minimum,

assessment of this Court's jurisdiction is independent of any Dutch court ruling to set-aside—or not—the award.").

### A.    ISSUE PRECLUSION DOES NOT APPLY TO § 1605(A)(6) DETERMINATIONS

According to the U.S. Government, "there is no categorical bar" against applying issue preclusion to § 1605(a)(6) determinations.  *See* U.S. Statement 5, 7 (ECF 303).  Respectfully, the interpretation proposed by the U.S. Government is wrong—and contrary to relevant precedents of the D.C. Circuit and other U.S. appellate courts, which the U.S. Government has regrettably failed to address.[1]

Significantly, where this Court is called upon to interpret § 1605(a)(6) and the other jurisdictional requirements of the FSIA, the views of the U.S. Government are not entitled to any "special deference."  *FG Hemisphere Assocs., LLC v. Democratic Republic of Congo*, 637 F.3d 373, 379 n.2 (D.C. Cir. 2011) (quoting *Republic of Austria v. Altmann*, 541 U.S. 677, 701 (2004)); *City of N.Y. v. Permanent Mission of India to the UN*, 446 F.3d 365, 376 n.17 (2d Cir. 2006) (disregarding the U.S. Government's submission because "'interpretation of the FSIA's reach [is]

---

[1] Indeed, although it need not be addressed in this case, the U.S. Government's statement contains another inaccuracy with respect to whether issue preclusion may be invoked against a foreign-sovereign defendant—even based upon a domestic judgment.  Of the five cases cited by the U.S. Government, three involved defensive preclusion—invoked by sovereigns to affirm immunity. *Gupta v. Thai Airways Int'l, Ltd.*, 487 F.3d 759 (9th Cir. 2007); *Mortimer Off Shore Servs., Ltd. v. Federal Republic of Germany*, No. 10-11551-RWZ, 2012 U.S. Dist. LEXIS 42993 (D. Mass. Mar. 28, 2012); *Samco Glob. Arms, Inc. v. Republic of Honduras*, 2012 WL 13008165 (S.D. Fla. Jan. 25, 2012), aff'd, 511 F. App'x 828 (11th Cir. 2013).  One case did not involve a sovereign. *Biton v. Palest. Interim Self-Gov't Auth.*, 412 F.Supp.2d 1 (D.D.C. 2005).  The sole case that applied issue preclusion against the sovereign, *Preble-Rish Haiti, S.A. v. Republic of Haiti*, 2023 WL 4267215 (S.D.N.Y. June 29, 2023), is inapposite because (1) Haiti in that case initiated litigation in state court thereby waiving immunity under the FSIA, and (2) SDNY applied *Seetransport*, a 1993 outlier decision, which has been recently rejected by this Court in *Amaplat Mauritius Ltd. v. Zimbabwe Mining Dev. Corp.*, 143 F.4th 496, 501 (D.C. Cir. 2025).

a pure question of statutory interpretation' that is 'well within the province of the Judiciary'"

(quoting *Altmann*, 541 U.S. at 701)).

Accordingly, irrespective of the U.S. Government's position, this Court must reach its own

conclusion in regard to whether, as a matter of law, the FSIA can be satisfied by the application of

issue preclusion. Indeed, as described below, this Court must apply § 1605(a)(6) independently

and *de novo* without deference to any foreign courts based upon the applicable precedents.

### (1)    The D.C. Circuit Has Held that § 1605(a)(6) Cannot Be Satisfied Merely by "Recognition" of a Foreign Judgment

Fundamentally, as the D.C. Circuit has held, § 1605(a)(6) cannot be satisfied by any

request "to recognize a foreign court judgment." *Amaplat Mauritius Ltd. v. Zimbabwe Mining

Dev. Corp.*, 143 F.4th 496, 501 (D.C. Cir. 2025). In particular, § 1605(a)(6) does not "mention

foreign court judgments," and "reading foreign court judgments into statutory text that references

only award confirmation would require collapsing two concepts that . . . [are] understood to be

distinct." *Id.* at 502. Accordingly, because HVY "ultimately asks" the U.S. court "to review a

foreign court judgment, not an arbitral award," then the FSIA does not authorize jurisdiction over

HVY's request. *See id.*

These binding principles were described by the D.C. Circuit in the *Amaplat* case, where

the petitioner asserted that § 1605(a)(6) could be satisfied by recognizing "a judgment of the High

Court of Zambia that confirmed an arbitral award issued in Zambia." *Id.* at 498. The D.C. Circuit

rejected this argument in view of the "basic distinction between actions to confirm foreign arbitral

awards and actions to domesticate foreign judicial judgments. The arbitration exception by its

plain terms applies to the former, not the latter." *Id.* at 502.

As the D.C. Circuit concluded, therefore, § 1605(a)(6) does not cover "judgment

recognition," which focuses the Court's analysis upon "review of the foreign court order and

5

judicial process." *Id.*  On the contrary, what § 1605(a)(6) requires is "review of the arbitral award and arbitral process," which HVY is impermissibly asking this Court to forego.  *Id.*[2]

In the present case, the holding of *Amaplat* prohibits HVY from invoking issue preclusion in order to satisfy § 1605(a)(6).  Applying issue preclusion under § 1605(a)(6) would improperly transform the litigation from an "action . . . to confirm an award . . . made pursuant to such an agreement to arbitrate," which the FSIA does permit, into an unpermitted lawsuit seeking recognition of the Dutch judgments based on international comity.

In this regard, it is well established that a foreign judgment is not entitled to issue-preclusive effect—or any other attributes of *res judicata* status—until after that foreign judgment is first <u>recognized</u>.  The Restatement (Fourth) of Foreign Relations Law § 487 thus provides that a foreign judgment is given "preclusive effect by a court in the United States" only if it is "entitled to recognition."  *See also* Restatement (Fourth) § 481, cmt. b ("Recognition of a foreign judgment is a prerequisite to its enforcement" and to the U.S. courts' granting preclusive effect to any determinations "of law or fact addressed in the foreign proceeding (issue preclusion)."); 2005 Uniform Foreign-Country Money Judgments Recognition Act § 4, cmt. 2 ("a foreign-country

---

[2] The *Amaplat* decision accords with other decisions recognizing consistently that the FSIA contains no exception for the recognition of foreign judgments.  For example, in *Nassif v. Republic of Iraq*, 2026 U.S. App. LEXIS 4463, at *11–13 (D.C. Cir. Feb. 13, 2026), the D.C. Circuit explained that the FSIA did not provide jurisdiction for the enforcement of a Jordanian judgment either under the "waiver" exception under 28 U.S.C. § 1605(a)(1) or the "commercial activity" exception under 28 U.S.C. § 1605(a)(2).  In *Firebird Global Master Fund II Ltd. v. Republic of Nauru*, 915 F. Supp. 2d 124, 127 (D.D.C. 2013), the U.S. District Court held that the FSIA did not provide jurisdiction for the enforcement of a Japanese judgment under § 1605(a)(1), given the absence of an unambiguous waiver covering such enforcement.  In *Al-Qarqani v. Saudi Arabian Oil Co.*, 19 F.4th 794, 801 (5th Cir. 2021), the Fifth Circuit also emphasized the narrowness of each individual FSIA exception—such that 28 U.S.C. § 1605(a)(3) did not authorize "enforcement of an arbitral award," even if the underlying dispute arguably involved "rights in property taken in violation of international law."

judgment also <u>must be recognized before it can be given preclusive effect</u> under . . . collateral estoppel principles" (emphasis added)).

Appellate courts routinely confirm this proposition: "Recognition of a judgment is a prerequisite to its enforcement.  In recognizing a judgment, a court acknowledges . . . that the judgment may have preclusive effect." *Ohno v. Yasuma*, 723 F.3d 984, 987 & n.2 (9th Cir. 2013); *see also Lessors of Abchakan Vill. v. Sec'y of Def.*, 137 F.4th 1301, 1311–12 (Fed. Cir. 2025) (confirming that "[i]ssue preclusion only applies" if the foreign judgment "was entitled to recognition"); *Evans Cabinet Corp. v. Kitchen Int'l, Inc.*, 593 F.3d 135, 142 n.8 (1st Cir. 2010) ("'Whether a foreign judgment should be recognized, may be in issue . . . for example where the defendant seeks to rely on a prior adjudication of a controversy (res judicata).'" (quoting the Restatement (Third) of Foreign Relations Law § 481, cmt. b)); *Shen v. Leo A. Daly Co.*, 222 F.3d 472, 476 (8th Cir. 2000) (explaining that "[t]o give the judgment of a foreign country preclusive effect, it must be recognized" (citation omitted)).

Lower courts have also consistently applied this framework as reflecting the obligatory sequence of operations: "To resolve the . . . defendants' motion, the Court must determine (1) whether the [foreign] judgment is entitled to recognition by this Court; and (2) if so, the extent to which the Court should accord preclusive effect to the [foreign] judgment under the principles of issue preclusion." *Alfadda v. Fenn*, 966 F. Supp. 1317, 1325 (S.D.N.Y. 1997); *see also State St. Glob. Advisors Tr. Co. v. Visbal*, 677 F. Supp. 3d 209, 241 (S.D.N.Y. 2023) ("In order for a foreign judgment to have preclusive effect, the court <u>first must 'recognize</u> the foreign judgment . . . based on principles of comity.'" (emphasis added, citation omitted)); *Aldini AG v. Silvaco, Inc.*, 2022 U.S. Dist. LEXIS 242829, at *48 (N.D. Cal. Aug. 3, 2022) ("Having recognized the French

judgments, the Court <u>next determines</u> the extent to which it should accord <u>preclusive effect</u> to the French judgments under the principles of res judicata." (emphasis added)).[3]

For the present case, the consequence is straightforward.  Under *Amaplat*, 143 F.4th at 499–501, the FSIA does not authorize jurisdiction over any request "to recognize a foreign court judgment."  Accordingly, if the Dutch court's judgments are not "entitled to recognition" in this litigation, then they cannot be given "preclusive effect by a court in the United States." Restatement (Fourth) of Foreign Relations Law § 487; *Lessors of Abchakan*, 137 F.4th at 1311–12 (confirming that "[i]ssue preclusion only applies" if the foreign judgment "was entitled to recognition").

On this basis alone, issue preclusion is inapplicable to the § 1605(a)(6) determination in this case.

### (2) The U.S. Courts Must Independently Determine Whether the Parties Agreed to Arbitrate, Which Is a Jurisdictional Fact under § 1605(a)(6)

As the D.C. Circuit confirmed, "[w]hether an arbitration agreement exists is a jurisdictional fact under the FSIA that must be independently evaluated by the district court." *Hulley*, 149 F.4th at 685.  The applicable precedents show that this type of jurisdictional fact cannot be decided on the basis of issue preclusion.

***First***, as the Second Circuit has held explicitly, the U.S. courts must not "directly enforce <u>or give preclusive effect</u> to the judgments" of foreign courts when evaluating whether the parties agreed to arbitrate—even if such courts were situated in the so-called primary jurisdiction (where

---

[3] *M Seven Sys. Ltd. v. Leap Wireless Int'l, Inc.*, 2014 U.S. Dist. LEXIS 207105, at *10 (S.D. Cal. June 4, 2014) ("The court therefore recognizes the South Korean judgment. <u>Next</u>, the court must determine the extent of the preclusive effect of the South Korean judgment." (emphasis added)); *Hunt v. BP Expl. Co. (Libya), Ltd.*, 492 F. Supp. 885, 891 (N.D. Tex. 1980) ("If the English judgment were not entitled to recognition, then Hunt would be free to proceed to trial on the merits here without preclusion of any issue.").

the arbitration was held). *VRG Linhas Aereas S.A. v. MatlinPatterson Glob. Opportunities Partners II L.P.*, 605 F. App'x 59, 60–61 (2d Cir. 2015) (emphasis added) (refusing to give preclusive effect to a prior Brazilian judgment); *VRG Linhas Aereas S.A. v. MatlinPatterson Glob. Opportunities Partners II L.P.*, 717 F.3d 322, 327 (2d Cir. 2013) (instructing the lower court to "determin[e] whether [the defendant] agreed to be bound by the arbitration clause in the Agreement" irrespective of the Brazilian court's prior decision on the same issue).

Accordingly, "whether a party has consented to arbitrate is an issue to be <u>decided by the Court in which enforcement of an award is sought</u>." *Sarhank Grp. v. Oracle Corp.*, 404 F.3d 657, 661 (2d Cir. 2005) (emphasis added) (refusing to give preclusive effect to a prior Egyptian judgment). In the *Sarhank* and *VRG* cases before the Second Circuit, the respective defendants had unsuccessfully challenged the arbitral awards in set-aside litigation before the primary-jurisdiction courts in Egypt and Brazil. In both these cases, the Second Circuit held that the Egyptian and Brazilian judgments respectively had <u>no preclusive effect</u> in the subsequent U.S. litigation. *See id.* at 662–63 (instructing "the district court to find as a fact whether [the defendant] agreed to arbitrate, by its actions or inaction" irrespective of the Egyptian court's prior decision on the same issue).

***Second***, the correctness of the Second Circuit's approach is confirmed by the text of the New York Convention, 21 U.S.T. 2517, in three respects:

**[1]** Under Article III of the New York Convention, the courts of "[e]ach Contracting State" are responsible for adjudicating the questions arising under Article V(1)(a), including whether the litigants formed a valid agreement to arbitrate. This obligation is not merely imposed upon the first court to decide the question. In the present litigation, this obligation rests squarely and exclusively with this Court.

**[2]** Under the first sentence of Article V(1) and the first sentence of Article V(2), the New York Convention provides that the court in the country "where recognition and enforcement is sought" will be the exclusive "competent authority" to decide whether the parties have agreed to arbitrate. Although the Dutch judicial system was certainly the "competent authority" for the annulment (set aside) litigation in accordance with Article V(1)(e) and Article VI of the New York Convention, this does not render the Dutch courts the exclusive "competent authority" for all purposes.[4]

**[3]** The explicit reference under Article V(1)(e) to a single, unique category of foreign judicial ruling as having significance within this structure—*i.e.*, a decision granting set aside—implies strongly that no other types of foreign judicial ruling will have any similar significance. As a matter of treaty interpretation, the "specific mention" of this single basis for deference to one type of foreign judicial ruling must be interpreted to "exclude others." *See National Grid plc v. The Argentine Republic*, Decision on Jurisdiction (June 20, 2006) ¶ 82 (Riesenberg Decl., Ex. 1); *see also Question of the Delimitation of the Continental Shelf between Nicaragua and Colombia beyond 200 Nautical Miles from the Nicaraguan Coast (Nicaragua v Colombia)*, Judgment, 2016 I.C.J. Rep. 100, ¶ 35 (Mar. 17) ("[T]he fact that the provision expressly provides for one category of situations is said to justify the inference that other comparable categories are excluded.") (Riesenberg Decl., Ex. 2); *see also Doe v. Bin Laden*, 663 F.3d 64, 70 (2d Cir. 2011) (applying the "maxim *expressio unius est exclusio alterius* (mention of one impliedly excludes others)" and declining to "engraft[] an additional exception" into the FSIA's comprehensive scheme).

---

[4] In this regard, it is relevant that "[n]either" the term "primary jurisdiction" nor the term "secondary jurisdiction . . . appears in the Convention," as the U.S. Government acknowledges. *See* U.S. Statement 7 (ECF 303). Nor does the Dutch legal system recognize these concepts. *See* Joint Expert Report on Dutch Law ¶¶ 48–56.

Accordingly, the text and structure of the New York Convention confirm the Second Circuit's understanding that "whether a party has consented to arbitrate is an issue to be decided by the Court in which enforcement of an award is sought." *Sarhank*, 404 F.3d at 661.

***Third***, in addition to the text of the New York Convention, the Second Circuit's approach is also supported by the worldwide majority practice. For example, in *Diag Human v. Czech Republic*, a Belgian court refused to apply preclusive effect to foreign courts' rulings in earlier proceedings concerning the validity of the same arbitral award. *See Diag Human SE v. De Tsjechische Republiek*, Court of Appeal of Brussels, Nov. 12, 2019, No. 2016/AR/1596 (Riesenberg Decl., Ex. 3). The Belgian court recognized that each forum court was individually required to make such determinations *de novo* and independently. This was because, within the international arbitration system, foreign judgments concerning the validity of arbitral awards "have effect only in the country where the [recognition] proceedings were conducted," and not "beyond the territory" of the rendering jurisdiction. *Id.* at 364.

Similarly, when asked to apply preclusive effect based upon an earlier Chinese court's judgment, a Hong Kong court again ruled that this approach was contrary to the structure of the international arbitration system under the New York Convention. This was because "[e]stoppel, a term developed in the English law of equity, does not lie comfortably in the context of enforcing a Convention award. It is not a legal concept of universal currency among the contracting states to the New York Convention." *Hebei Import & Export Corp. v. Polytek Engineering Co.*, Judgment, Final Appeal No. 10, ¶ 17 (Hong Kong Ct. of Final Appeal, Feb. 9, 1999) (Riesenberg Decl., Ex. 4). The Hong Kong court thus ruled that the award's validity needed to be analyzed *de novo* and independently by each national court.

The Dutch and French courts apply the same principle.[5] So do many other courts, including the courts of Brazil, Colombia, Germany, Luxembourg, Poland, and Spain.[6] A wide range of legal commentators confirm the correctness of this approach, including Professor Born, Professor Gaillard, and Professor Park.[7] Fundamentally, "the question of a valid arbitration agreement is so central to the respect which New York Convention countries owe to foreign awards that <u>accepting the determination of a foreign court</u> on this issue may be seen to constitute an <u>abdication of the forum court's obligations</u> under the Convention."[8]

Indeed, this same approach has now been codified in legislation by the European Union. In Regulation No. 1215/2012, the European Union confirmed that judicial rulings are "not . . .

[5] For the relevant Dutch law, Albert Marsman, *International Arbitration in the Netherlands*, § 17-054 (Wolters Kluwer 2021) (summarizing decisions from the Amsterdam and Rotterdam courts). For the relevant French law, see *Société Unichips Finanziaria SpA S.A v. François Gesnouin, Michèle Gesnouin*, Paris Court of Appeal, Feb. 12, 1993 (ICCA Yearbook Volume XIX 658) ("With respect to the control of the international efficacy of the arbitration award, the French judge . . . is not bound by the decision of the Swiss courts . . . .").

[6] *Deutsche Telekom v. India*, Judgment ¶ 42, Higher Regional Court of Berlin, Jan. 26, 2023, No. 12 Sch 7/21; *ASA Bioenergy Holding AG et al. v. Adriano Giannetti Dedini Ometto et al.*, Judgment ¶¶ 68–70, Superior Court of Justice of Brazil, Apr. 19, 2017, No. 9.412 (ICCA Yearbook Volume XLIII 426); *Tampico Beverages, Inc. v. Productos Naturales de la Sabana S.A. (Alquería)*, Judgment ¶¶ 33–36, Supreme Court of Colombia, July 12, 2017, No. SC9909-2017 (ICCA Yearbook Volume XLV 216); *E.T. Sp. z o.o. v. T.M.D. GmbH et al.*, Judgment ¶¶ 28, 32 Supreme Court of Poland, Nov. 6, 2009 (ICCA Yearbook Volume XXXVI 310); *Actival Internacional SA v. Conservas El Pilar SA*, Judgment ¶¶ 7–8, Supreme Court of Spain, Apr. 16, 1996, No. 3868/1992 (ICCA Yearbook XXVII 528).

[7] *See* Gary Born, *International Commercial Arbitration* § 27.02 (3d ed. 2021) (explaining that decisions by arbitral seats' courts are "not binding" in the enforcement forum); Emanuel Gaillard, *International Arbitration as a Transnational System of Justice,* in Albert Jan van den Berg (ed.), *Arbitration: The Next Fifty Years* 66, 72 (ICCA 2012) (explaining that prior decisions by the arbitral seat's courts "with respect to the validity of the award do not have a binding effect in other legal systems"); William W. Park, *Duty and Discretion in International Arbitration*, 93 Am. J. Int'l L. 805, 816 (1999) ("the best approach . . . allows enforcement judges to make up their own minds on whether awards are defective," irrespective of prior foreign rulings).

[8] M. Scherer, *Effects of Foreign Judgments Relating to International Arbitral Awards: Is the 'Judgment Route' the Wrong Road?,* 4 J. of Int'l Dispute Settlement, 587, 622 (2013) (emphasis added).

subject" to otherwise applicable "rules of recognition and enforcement," such as the European Union's internal equivalent to international comity, when courts evaluate "whether or not an arbitration agreement is null and void."[9]  On the contrary, as the European Union accepts, only the New York Convention determines "the competence of the courts . . . to decide on the recognition and enforcement of arbitral awards."[10]  No other rules of international comity or issue preclusion may be applied within this decentralized system.

Accordingly, the structure and design of the international arbitration system—as confirmed by the Second Circuit, the New York Convention, and the worldwide majority practice—establish yet another reason why the FSIA's "arbitration" exception cannot be satisfied based upon the doctrine of issue preclusion.

This jurisdictional fact must be decided under § 1605(a)(6) independently and *de novo*, without deference to any foreign court.

**B.    THE DUTCH 2020 JUDGMENT DOES NOT SATISFY THE "HEIGHTENED" STANDARD PROPOSED BY THE U.S. GOVERNMENT**

Even if this Court were to conclude that issue preclusion could permissibly be applied to the § 1605(a)(6) determination, the Dutch judgments would not withstand the "heightened *Hilton* analysis" proposed by the U.S. Government in any event.  *See* U.S. Statement 10-15 (ECF 303). In this regard, as the U.S. Government confirms, this Court may grant "issue-preclusive effect" to the Dutch 2020 Judgment only if it can be shown that "the issues of both proceedings" were "identical."  U.S. Statement 15 (citation omitted, emphasis added).  This requirement of issue preclusion is not satisfied here.

---

[9] Regulation (EU) No. 1215/2012, *Official Journal of the European Union*, 2012 O.J. (L 351) 2, recital 12.

[10] *Id.*

Under binding precedent, "[i]ssues are <u>not identical</u> if the second action involves application of a <u>different legal standard</u> . . . ." *B&B Hardware, Inc. v. Hargis Indus.*, 575 U.S. 138, 154 (2015) (citation and quotation marks omitted) (emphasis added); *Inland Diamond Prods. Co. v. Cherry Optical Inc.*, 155 F.4th 1365, 1368 (Fed. Cir. 2025) ("[O]ne 'well-known exception[]' to issue preclusion is where 'the second action involves application of a <u>different legal standard</u>.'" (citation omitted, emphasis added)); *Entes Indus. Plants, Constr. & Erection Contracting Co. v. Kyrgyz Republic*, No. 18-2228 (RC), 2019 U.S. Dist. LEXIS 179473, at *22 n.4 (D.D.C. Oct. 17, 2019) (invoking this requirement in FSIA litigation and declining to hold that a Canadian judgment could be issue-preclusive as to the § 1605(a)(6) inquiry without first determining "the relevant principles of Canadian law that applied in the first action," which then must be "<u>compared</u> . . . to <u>the governing standards</u> in this Court" (emphasis added)).

Here, the Dutch courts analyzed different issues and applied different legal standards than § 1605(a)(6) requires in this U.S. litigation, as described below.

### (1)    The Dutch Courts Applied a "Different Legal Standard" for Interpretation of the ECT's Article 45(1)

As the D.C. Circuit reaffirmed, § 1605(a)(6) requires this Court to determine the existence of an "arbitration agreement triggering a <u>waiver of immunity</u> under the FSIA." *Hulley*, 149 F.4th at 688 (emphasis added). The standard for identifying such a waiver under the FSIA is well established. "A foreign sovereign will not be found to have waived its immunity unless it has <u>clearly and unambiguously</u> done so." *World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1162 (D.C. Cir. 2002) (citation omitted, emphasis added). The FSIA does not provide jurisdiction over a foreign-state respondent if "the treaty's terms do not amount to a <u>clear and unambiguous</u> waiver of . . . sovereign immunity in United States courts." *Ivanenko v. Yanukovich*, 995 F.3d 232, 240 (D.C. Cir. 2021) (emphasis added).

14

Just as with other types of "waiver" cases litigated under § 1605(a)(1), the "clear and unambiguous" standard also necessarily applies to § 1605(a)(6) determinations regarding the existence of an agreement to arbitrate.[11]  When § 1605(a)(6) was enacted in 1988 under Public Law 100-669, the settled understanding was that "contracts in which a foreign state has agreed to arbitrate disputes" comprise "waivers" of sovereign immunity under §1605(a)(1).  *Frolova v. Union of Soviet Socialist Republics*, 761 F.2d 370, 377 (7th Cir. 1985) ("Cases involving arbitration clauses illustrate that provisions allegedly waiving sovereign immunity are narrowly construed." (emphasis added)); Restatement (Third) of Foreign Relations Law § 456(2)(b) (1987) ("an agreement to arbitrate is a waiver of immunity from jurisdiction" (emphasis added));[12] *see also* U.S. Amicus Br., *Libyan Am. Oil Co. v. Libya*, No. 80-1207 (D.C. Cir. 1980) (Riesenberg Decl., Ex. 5) ("Congress manifestly intended that an arbitration agreement should constitute a waiver of foreign sovereign immunity." (emphasis added)).

Neither the text of § 1605(a)(6) nor its legislative history[13] suggest that Congress intended to change this understanding—or to abrogate the "clear and unambiguous" standard applicable

[11] Indeed, for all "fundamental arbitration questions" even outside the FSIA context, the Supreme Court requires "more than ambiguity" to show that "the parties actually agreed to arbitrate." *Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 183 (2019); *see also Atricure, Inc. v. Meng*, 12 F.4th 516, 523 (6th Cir. 2021) ("Absent an unambiguous agreement, the Court refuses to infer this consent to arbitrate 'fundamental' questions about the arbitration." (citation omitted)).

[12] Because it was "the operative Restatement at the time," the 1987 Restatement (3d) is entitled to "'authoritative weight'" concerning the principles of international law codified under § 1605(a)(6) by the 1988 Amendment.  *De Csepel v. Republic of Hungary*, 165 F.4th 572, 584 (D.C. Cir. 2026) (citation omitted).

[13] Indeed, the legislative history shows that Congress broadly endorsed the pre-1988 case law analyzing arbitration agreements as waivers under § 1605(a)(1) and, therefore, were intending merely to codify the pre-existing jurisprudence in statute.  *See* Statement of Sen. Lugar (1986) 132 Cong. Rec. S. 14795, No. 134, Part 2 (ECF 245-12) ("[C]ourts are finding that arbitral agreements constitute waivers in the appropriate cases . . . ." (emphasis added)); Statement of Sen. Mathias (1985) 131 Cong Rec S 5369, No. 56 (ECF 245-13) (explaining §1605(a)(6) would confirm "that an agreement to arbitrate constitutes a waiver of immunity" (emphasis added)).

under § 1605(a)(1).  Indeed, the same requirement applies to all sovereign defendants, including not only foreign states but also domestic-sovereign defendants under federal common law.  *See Fin. Oversight & Mgmt. Bd. for P.R. v. Centro de Periodismo Investigativo, Inc.*, 598 U.S. 339, 346- & n.3 (2023) (describing the "clear-statement rule" applicable to the jurisdictional immunities of all sovereign defendants, which can never be waived or abrogated by ambiguous statements).  This silence must be construed to mean that the "clear and unambiguous" standard applies to § 1605(a)(6) as well as to § 1605(a)(1), because "if Congress intends for legislation to change the interpretation" applied by federal courts, then Congress "makes that intent specific" in the new text.  *Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela*, 863 F.3d 96, 114 (2d Cir. 2017) (citation omitted); *Envt'l. Def. Fund v. Reilly*, 909 F.2d 1497, 1507 & n.120 (D.C. Cir. 1990) (citing the same principle).

The Dutch courts, however, examined a "different issue" and applied a "different standard" than the FSIA requires, such that "preclusion is 'inappropriate.'"  *See Smith v. Bayer Corp.*, 564 U.S. 299, 310 (2011); *Inland Diamond*, 155 F.4th at 1368.  In particular, the Dutch courts found that Russia had agreed to arbitrate under the ECT's Article 26, despite having also concluded explicitly that Article 45(1) was ambiguous, as detailed below.

In the Dutch 2020 Judgment, the COATH <u>refused</u> to consider whether the Russian Federation "unequivocally agreed to arbitration" by signing and provisionally applying the ECT under Article 45(1).  COATH ¶ 4.3.4.  Supposedly, even though Article 45(1) was explicitly found to be ambiguous (*i.e.*, "a difference of opinion is possible"),[14] this did not matter because any

---

[14] This fits the textbook definition of "ambiguous."  *See, e.g., Nat'l Ass'n of Clean Water Agencies v. EPA*, 734 F.3d 1115, 1128 (D.C. Cir. 2013) (explaining that terms are "ambiguous" if "susceptible to different meanings").

"requirement" as to a clear, unambiguous consent was somehow "satisfied with Article 26 ECT" alone. *Id.*

Similarly, the Dutch Supreme Court also found explicitly that Article 45(1) was ambiguous and unclear.[15] Without giving reasons, however, the Dutch Supreme Court refused to review the lower Dutch court's finding that Article 26 alone could somehow establish that "the Russian Federation clearly, unambiguously, and voluntarily consented to arbitration" when viewed in isolation from Article 45(1).[16]

The Dutch courts' approach—*i.e.*, searching for Russia's purportedly clear and unambiguous consent exclusively in Article 26, in isolation from Article 45—cannot be reconciled with how the D.C. Circuit explicitly formulated this Court's task under the FSIA. *See Hulley*, 149 F.4th at 689–690 ("[A]n an arbitration agreement between Russia and the Shareholders would exist only if Russia had made a standing offer to arbitrate through provisional application of the Treaty," such that the FSIA requires consideration of "whether provisional application of the Treaty's arbitration clause is consistent with Russian law" (emphasis added)). As the D.C. Circuit has now held in this case, whether Russia consented to Article 26 depends on what commitments Russia undertook by signing the ECT under Article 45(1). Accordingly, determining whether Russia agreed to arbitrate depends on finding that Articles 26 and 45 together constituted a clear and unambiguous "arbitration agreement triggering a waiver of immunity under the FSIA." *Hulley*, 149 F.4th at 688 (emphasis added).

---

[15] The DSC noted that Article 45(1) had been given multiple "divergent interpretations" by the lower Dutch courts and the arbitral tribunal. DSC ¶ 5.2.10 (ECF 240-5). The Dutch Supreme Court further concluded that Article 45(1) ECT was sufficiently unclear (i.e., not "a*cte clair*") that, but for its inability to review questions of Russian law in a cassation proceeding, the law of the European Union would have required the Dutch Supreme Court "to refer the interpretation" of Article 45(1) "to the Court of Justice of the European Union." *Id.*

[16] DSC ¶¶ 5.2.3–5.2.4 (ECF 240-5).

The Dutch 2020 Judgment, however, examined a "different issue" and applied a "different standard," such that "preclusion is 'inappropriate.'" *Smith,* 564 U.S. at 310; *Inland Diamond*, 155 F.4th at 1368. Indeed, as detailed further below in **Part II-A**, these different formulations of the issue and standard were determinative of the outcome in the Dutch litigation.

### (2)    The Dutch Courts Applied a "Different Legal Standard" When Interpreting the Russian Law

With respect to issues of Russian law, the Dutch 2020 Judgment likewise applied a "different standard" than this Court must apply in FSIA litigation. In particular, when a court in the United States is called upon to decide questions of foreign law under Federal Rule of Civil Procedure 44.1, two distinct standards of deference must be applied.

***First***, the decisions of the foreign state's "highest court" regarding the interpretation of foreign law is "binding on the federal courts." *Animal Sci. Prods. v. Hebei Welcome Pharm. Co.*, 585 U.S. 33, 44 (2018); *see also Elmendorf v. Taylor*, 23 U.S. 152, 159 (1825) ("'[N]o Court in the universe, which professed to be governed by principle, would, we presume, undertake to say, that the Courts of Great Britain, or of France, or of any other nation, had misunderstood their own statutes.").

Unlike this Court must do under the FSIA, the Dutch courts did not apply the binding precedents of the Russian courts. In particular, as explained by Professor Avtonomov, the Russian Constitutional Court explicitly concluded that "[t]he Russian Federation <u>may</u> agree <u>to provisional application of an international treaty in full or in part</u> . . . and to <u>condition the provisional application</u> of such international treaty (or part thereof) prior to its entry into force <u>on its compliance with</u> the Constitution of the Russian Federation, <u>statutes and other normative legal acts</u> of the Russian Federation." Constitutional Court of the Russian Federation, Resolution No. 8-P, March 27, 2012, Section 4 (Annex ASA-2026-052).

The Dutch courts, however, disregarded this explicit holding of the Russian Constitutional Court. In particular, the Dutch 2020 Judgment (ECF 240-1) ruled that Article 15(4) of the Russian Constitution prevented the Russian Federation from "condition[ing]" the ECT's provisional application on "compliance with" Russian law. According to the Dutch 2020 Judgment, the entirety of the ECT had to be applied—irrespective of any contrary provisions—in accordance with the Dutch courts' interpretation of the Russian Constitution. Since this interpretation disregarded the analysis of the Russian Constitutional Court, the Dutch courts necessarily did not apply the standard applicable to such case law under *Animal Sci. Prods. v. Hebei Welcome Pharm. Co.*, 585 U.S. 33, 44 (2018).

***Second***, applying the second standard applicable to foreign-law determinations, "a government's expressed view of its own law is ordinarily entitled to substantial [although] not conclusive weight." *Animal Science*, 585 U.S. at 44. In particular, the authoritative value of the foreign government's interpretation of its own law must be determined based upon its "clarity, thoroughness, and support," as well as "the statement's consistency with the foreign government's past positions." *Id.* at 43. If the foreign government has provided a "consistently salient presentation of official views," then—although not binding—the foreign government's interpretation is entitled to "considerable weight" in U.S. litigation. *Animal Sci. Prods. v. Hebei Welcome Pharm. Co. (In re Vitamin C Antitrust Litig.)*, 8 F.4th 136, 157 (2d Cir. 2021). Moreover, because the FSIA must be interpreted in accordance with international law,[17] the Russian Government is entitled to significant deference because "it is for each State, in the first instance,

---

[17] The FSIA "ought never to be construed to violate the law of nations if any other possible construction remains." *See F. Hoffmann-La Roche Ltd v. Empagran S.A.*, 542 U.S. 155, 164 (2004); *United States v. Ali*, 718 F.3d 929, 935 (D.C. Cir. 2013) ("[A]bsent contrary indication, Congress intends its enactments to comport with international law."); *see also De Csepel*, 165 F.4th at 584 (interpreting the FSIA in accordance with international law).

to interpret its own domestic law" unless "a State puts forward a manifestly incorrect interpretation of its own domestic law." *Guinea v. Democratic Republic of the Congo*, Judgment ¶ 70, I.C.J. Reports 2010 (Riesenberg Decl., Ex. 10).

In the present case, the Dutch courts did not apply the latter standard, which this Court must necessarily apply here to the Russian Federation's arguments concerning the proper interpretation of Russian law. Under the Dutch standard, the Dutch courts are precluded from showing any deference to any litigant regarding questions of foreign law. As HVY's own expert has previously confirmed, "Dutch courts have an independent duty to determine the content of the applicable foreign law," and therefore must "determine *ex officio* the content of the applicable foreign law." *See* First Expert Op. of Prof. Cohen Jehoram ¶¶ 41-42 (ECF 181-43). There is no basis to give special weight to any litigant's arguments—even where the litigant is the government of the relevant foreign state—with respect to such an *ex officio* determination. Indeed, as observed by Professor Avtonomov, in some instances the COATH gave more weight to the writings of "a postgraduate student" than to the arguments raised by the Russian Government in the Dutch litigation. *See* Consolidated Expert Report of Prof. Avtonomov ¶ 74 & n. 48 (describing the Dutch court's approach).

Within the U.S. legal system, the FSIA now requires this Court to determine "whether provisional application of the Treaty's arbitration clause was consistent with Russian law" under the ECT's Article 45(1). *Id.* at 691–92 (emphasis added). To determine the requirements of Russian law in this U.S. litigation, Respondent's own views are entitled to "considerable weight," so long as they have been presented with "consistency," as well as "clarity, thoroughness, and support." *Animal*, 8 F.4th at 157.

As explained by Professor Avtonomov, the Russian Federation's current interpretation undoubtedly satisfies this standard, inasmuch as this interpretation is fully in accord with "how the ECT negotiators, ECT Secretariat, and Russian officeholders had consistently described Article 26 ECT and other ECT terms throughout the 1990s and early 2000s." Consolidated Expert Report of Prof. Avtonomov (May 26, 2026). The Dutch courts, however, disregarded all these statements irrespective of their "consistency," and further purported to adopt its own highly tendentious view of what Russian law requires. The substantive errors reflected in the Dutch courts' approach are further detailed below in **Part II-B**.

For the purposes of issue preclusion, however, it is sufficient to recognize that the Dutch courts approached Russian law using a "different legal standard" than is required of this Court for analyzing Russian law under the FSIA. Accordingly, because the Dutch court applied a "different legal standard," the issues are not "identical" and the Dutch court's findings are not entitled to issue-preclusive effect. *B&B Hardware*, 575 U.S. at 154.

### C.    THE DUTCH COURTS DO NOT RECOGNIZE "TRANSNATIONAL" ISSUE PRECLUSION FOR SPECIFIC DETERMINATIONS REQUIRED BY § 1605(A)(6)

The Dutch courts' rulings also are not entitled to issue preclusion because "[a] foreign judgment will not be given greater preclusive effect in the United States than the judgment would be accorded in the state of origin." Restatement (Fourth) of the Foreign Relations Law § 487 (emphasis added); *see also, e.g., Servipronto De El Salvador v. McDonald's Corp.*, 837 F. App'x 817, 820 (2d Cir. 2020) ("[T]he law of the rendering jurisdiction . . . would also limit elsewhere the preclusive effect of the judgment"); *Diag Human S.E. v. Czech Republic*, 907 F.3d 606, 611 (D.C. Cir. 2018) (confirming that, in determining the consequences of a set-aside ruling, "the court may look to the law of the rendering jurisdiction").

21

Indeed, as confirmed by the U.S. Supreme Court, this is a fundamental principle concerning the recognition of <u>all judgments</u>, including U.S. domestic judgments within the United States' federal system: "[A] federal court gives no greater preclusive effect to a state-court judgment than the state court itself would do . . . ." *Johnson v. De Grandy*, 512 U.S. 997, 1005 (1994). On this basis, U.S. courts should not apply issue preclusion in any circumstances where the foreign court itself would not apply issue preclusion.

In the present case, HVY have suggested that this Court should apply a concept known as "transnational issue estoppel" based upon the analysis of a Singapore court. *See* HVY's Final App. Br. 29 (Riesenberg Decl., Ex. 6) (citing the Singapore decision); *Republic of India v. Deutsche Telekom*, [2023] SGCA(I) 10 ¶ 4 (Riesenberg Decl., Ex. 7) ("In our judgment, as a matter of Singapore law, transnational issue estoppel does apply in the context of international commercial arbitration . . . ."). HVY also attempt to show that the Dutch courts themselves would apply transnational preclusive effect in this way, based on the Expert Report of Professor Cohen Jehoram (Riesenberg Decl., Ex. 8).

As explained by the Russian Federation's experts on Dutch law, however, the analysis of HVY's expert is "incomplete." Joint Dutch Legal Op. ¶¶ 12-16. Indeed, as confirmed by the consistent judicial decisions of the Dutch courts, "foreign judicial decisions are <u>not</u> entitled to <u>any</u> transnational recognition (or so-called "preclusive effect") in litigation where the Dutch courts must adjudicate questions concerning foreign sovereign immunity and/or the international-arbitration system." *Id.* ¶ 14.

In particular, HVY's expert has disregarded multiple Dutch judicial authorities holding that a Dutch court "must make its own judgement (first and foremost) on the question whether the immunity of the Russian Federation is at issue. Thus, <u>the Dutch court cannot simply accept the</u>

<u>opinion of the [foreign] court on jurisdictional immunity</u> (whether it should be respected or not)" of a foreign-state defendant. *Id.* ¶ 40 (quoting *Farm SYU Zhnyva v. Gazprom International Limited*, Hague Court of Appeal, No. ECLI:NL:RBDHA:2025:9883 (June 5, 2025), ¶ 4.7). Significantly, this understanding was recently upheld by the Court of Appeal of The Hague. *See id.* ¶ 41.

Similarly, the Dutch courts have also repeatedly held that, "[w]hereas the findings of the setting aside court offers <u>important guidance</u> to all enforcement courts, <u>these courts may still reach different conclusions</u> (both as compared to the courts at the seat and as compared to courts in other enforcement jurisdictions)." Albert Marsman, *International Arbitration in the Netherlands*, § 17-054 (Wolters Kluwer 2021) (summarizing Dutch authorities) (emphasis added) (Riesenberg Decl., Ex. 9).

For example, the Court of Appeal of The Hague confirmed that a foreign judicial decision concerning whether "there was no valid arbitration agreement" was "not eligible for recognition and enforcement in the Netherlands. After all, such decisions relate only to recognition and enforcement in the relevant foreign country. Only the Dutch court rules on recognition and enforcement in the Netherlands." Joint Dutch Legal Op. ¶¶ 54-55 (analyzing *Catz International B.V. v. Gilan Trading KFT.*, Hague Court of Appeal, No. ECLI:NL:GHSGR:2011:BU8275 (Dec. 20, 2011). Similar conclusions have also been reached in judicial decisions of the Amsterdam Court of Appeal and the Joint Court of Appeal of the Dutch Caribbean, which both disregarded foreign judicial decisions in determining whether arbitral awards were enforceable. Joint Dutch Legal Op. ¶¶ 56-57.

Fundamentally, this internal limitation of Dutch law provides a "special reason why the comity" of the U.S. judicial system "should not allow . . . full effect" to determinations made by

the Dutch courts, where the Dutch courts themselves do not contemplate any transnational preclusive effect. *Hilton v. Guyot*, 159 U.S. 113, 202–03 (1895).

For example, the Ninth Circuit refused to grant a specific type of preclusive effect ("third-party collateral estoppel") to a Chinese ruling on the basis that "Chinese law does not recognize the principle of third-party collateral estoppel." *Folex Golf Indus., Inc. v. O-Ta Precision Indus. Co., Ltd.*, 603 F. App'x 576, 578-79 (9th Cir. 2015). Many other U.S. courts have applied the same analysis. *See, e.g., Gordon & Breach Sci. Publ. S.A. v. Am. Inst. of Physics*, 905 F. Supp. 169, 179 (S.D.N.Y. 1995) (rejecting preclusive effect based on German and Swiss judgments because "neither Switzerland nor Germany recognizes . . . collateral estoppel"); *United States v. Buruji Kashamu*, 656 F.3d 679, 684 (7th Cir. 2011) (rejecting preclusion because the United Kingdom does not recognize it in criminal cases). Many legal commentaries confirm the correctness of this approach. For example, Professor Gardner emphasizes "the risk of real unfairness to parties who may find themselves effectively bound . . . by judgments that the issuing court did not intend to have preclusive effect." M. Gardner, *Deferring to Foreign Courts*, 169 U. Pa. L. Rev. 2291, 2347 (2021).[18]

In the present case, the Dutch courts' own understanding was that their decisions concerning Russia's sovereign immunity would "'relate only to . . . enforcement in the Netherlands,'" and that this U.S. District Court would qualify as the exclusive "competent authority" in this U.S. litigation. *See* Joint Dutch Legal Op. ¶¶ 55-58.

---

[18] *See also* Kevin M. Clermont, *Res Judicata as Requisite for Justice*, 68 Rutgers U. L. Rev. 1067, 1088 (2016) ("it would be basically unfair to give greater effect to a judgment than it would have at its source. . . . A person should know the detrimental effect of the potential judgment, and the effect should not change with the particular [second forum] in which the opponent later chooses . . . to invoke it."); William S. Dodge, *Jurisdiction in the Fourth Restatement of Foreign Relations Law,* 18 Y.B. Priv. Int'l L. 143, 167 (2016) ([t]his principle limits issue preclusion in particular, since many other countries do not permit issue preclusion.").

24

Accordingly, it would be contrary to U.S. law to apply greater preclusive effect to the Dutch court's ruling and grant transnational deference where the Dutch courts themselves would not recognize this concept.

## II.     THE ENERGY CHARTER TREATY IS NOT CLEAR AND UNAMBIGUOUS

The "clear and unambiguous" standard was not satisfied by the ECT's Articles 26 and 45(1). To recall, Respondent has never been a "Contracting Party" under Article 26, but was merely a "signatory" and provisionally applied the ECT under Article 45(1) "to the extent" that the ECT's provisions were consistent with Russian law. In this regard, two key points must be emphasized.

First, as detailed below, each substantive decision in this case—including the decisions of the arbitrators and the successive instances of Dutch courts—was in conflict with each of the other decisions. This is the very definition of "ambiguous," since it shows the ECT and applicable Russian law are both "susceptible to at least two reasonable but conflicting meanings." *CNH Indus. N.V. v. Reese*, 138 S. Ct. 761, 765 (2018) (citation omitted).

The present case, therefore, is directly analogous to the ECtHR's 2019 decision to uphold Burundi's foreign-sovereign immunity because "three national instances" of Swiss courts interpreted a forum-selection clause "in very different ways," such that "the clause in question" did not reflect Burundi's "clear and non-ambiguous" consent "to waive its immunity from jurisdiction." *Ndayegamiye-Mporamazina v. Switzerland*, No. 16874/12, ECtHR Judgment (Feb. 5, 2019) ¶ 59 (ECF 245-10).

To recall, when interpreting the ECT's Article 45(1), the arbitrators purported to apply a so-called "all-or-nothing" approach, whereas the Hague District Court ("HDC") rejected that

25

interpretation in favor of the "piecemeal" interpretation. *Compare* ECF 2-4 ¶¶ 292, 311-12 with ECF 102-2 ¶¶ 5.17-5.18, 5.23.

The Dutch Court of Appeals ("DCOA") then rejected both approaches and adopted a brand new "third possibility," which Petitioners raised "for the first time on appeal" in 2017—i.e., twelve years after they began the arbitration. See ECF 176-1 ¶¶ 4.4.2, 4.5.14. The Dutch Supreme Court ("DSC") ultimately sidestepped this question and left "Complaint 2.4" unresolved, and yet agreed with Respondent that the multiple "divergent interpretations" rendered the ECT ambiguous (i.e., not "an acte clair"). *Compare* ECF 204-8 ¶¶ 5.2.10, 5.2.20 with ECF 182-11 ¶ 5 (explaining that "reasonable doubt" remains, if legal provisions are not "acte clair").

Similarly, the applicable Russian law was also interpreted differently in each successive instance. The HDC held it was "beyond doubt" that the ECT's Article 26 concerns disputes of a "public-law nature" in the Russian legal system, whereas the DCOA believed such disputes have "a civil law nature"—while admitting to a conflict of authorities (i.e., this view was "not exclusive," to say the least). *Compare* ECF 102-2 ¶ 5.41 *with* ECF 176-1 ¶ 4.7.35.

The HDC found that the Russian Constitution's Article 15(4) gives only ratified treaties priority over statutes of Parliament, whereas the DCOA believed that Article 15(4) also gives priority to unratified treaties applied provisionally—and yet, mysteriously, not to unratified treaties after they enter into force (though Article 15(4)'s text draws no such distinction). Compare ECF 102-2 ¶ 5.91 with ECF 176 ¶¶ 4.7.22, 4.7.25. The arbitrators never addressed these questions, because Petitioners never raised them in the arbitration.

The DSC was ultimately precluded by Dutch procedural rules from addressing any of the Russian law questions at all. See ECF 204-8 ¶ 5.2.18.

26

*Second*, even accepting Petitioners' own affirmative case, Petitioners' theory of interpretation is highly ambiguous, as explained by the prominent arbitrator, Professor Brigitte Stern. Stern Op. ¶ 69 (ECF 233-1) (describing the "circularity" of the claimants' reasoning under the ECT's Article 45(1)). Specifically, Petitioners have relied upon a theory of double renvoi, such that the ECT's reference to domestic law under Article 45(1) fully incorporates the mutually contradictory reference back to "international treaties" under Article 15(4) of the Russian Constitution and similar Russian statutory provisions.

Like the District Court of The Hague, Professor Stern thus concludes that the ECT's conflict provision should prevail over any mutually contradictory provisions found in Russian law, thus defeating consent to arbitration. After all, unambiguous consent to arbitration cannot be established by double renvoi, where the treaty "makes a renvoi to national law [and] national law makes a renvoi to the treaty, which creates . . . circularity." Stern Op. ¶ 69 ("[I]f the treaty says that it does not apply if it is inconsistent with the national legal order, so be it.").

Fundamentally, even Petitioners' affirmative case on double renvoi (which is wrong in any event) cannot establish clear and unambiguous consent to arbitrate.

Accordingly, the applicable standard for the abrogation of sovereign immunity under the FSIA and international law is not satisfied. *See World Wide Minerals*, 296 F.3d at 1162 & n.11, 15 (explaining that "[a] foreign sovereign will not be found to have waived its immunity unless it has clearly and unambiguously done so," including where a claimant in arbitration alleges that "the state has agreed to arbitrate" (emphasis added)); *Djibouti* J. at 62 (ECF 233-4) (explaining that "the attitude of the respondent State 'must be capable of being regarded as an 'unequivocal indication' of the desire of that State to accept the Court's jurisdiction in a 'voluntary and indisputable' manner" (collecting cases, emphasis added)).

## III.  ARTICLE 26 OF THE ENERGY CHARTER TREATY IS "INCONSISTENT" WITH RUSSIAN LAW

Finally, as explained in detail by Professor Avtonomov, the ECT's Article 26 has always been inconsistent with "the applicable Russian laws concerning dispute resolution." *See* Prof. Avtonomov's Consolidated Expert Report ¶¶ 15 - 17 (May 26, 2026).  Accordingly, the Russian Federation's signature of the ECT in 1994 did not commit Russia to applying the ECT's arbitration provisions under Article 26.  *See id.* ¶ 99.  In this regard, a number of points must be made about the Russian legal system.

***First***, the arbitration clause established under the ECT's Article 26 "inherently concerns the resolution of disputes pertaining to the State's exercise of governmental functions," which "which cannot be arbitrated without a statute authorizing their arbitrability."  *Id.* ¶ 17.

For example, pursuant to the explicit terms of APC Article 198(3), all claims involving allegations that the Russian Government has committed expropriation or otherwise committed "'invalid'" or " 'illegal'" acts shall be "'<u>shall</u> be adjudicated in arbitrazh court unless jurisdiction of other courts to adjudicate them is provided for by a federal statute.'"  *Id.* ¶ 18 (emphasis added) (quoting Arbitrazh Procedure Code of the Russian Federation, No. 95-FZ, 24 July 2002, Article 198(3) (**Annex ASA-2026-015**)).  Based on a number of similar statutory provisions in Russian law, the Russian Constitutional Court has observed that "disputes arising from administrative or other <u>public-law</u> relations . . . <u>cannot</u> be submitted to arbitration" within the Russian legal system (absent a statute authorizing such arbitration).  *Id.* ¶ 57 (quoting Constitutional Court of the Russian Federation, Resolution No. 10-P, 26 May 2011, Section 3.1 (**Annex ASA-2026-010**) (emphasis added).

28

Accordingly, in order to change this *status quo*, Article 47(1) of the Russian Constitution requires the enactment of a statute by the Russian Parliament, inasmuch as it is "[t]he right of the federal legislator. . .  to determine – based on the need to balance out private and public interests – a list of types of disputes that may be submitted to arbitration."  *Id.* ¶ 262 (quoting Constitutional Court of the Russian Federation, Resolution No. 10-P, 26 May 2011, Section 3.1. (**Annex ASA-2026-010**).

***Second***, because the ECT was <u>unratified</u>, the ECT could not <u>itself</u> regulate dispute resolution within the Russian legal system, vest arbitral tribunals with jurisdiction, or infringe upon "[t]he right of the federal legislator" to determine the "types of disputes that may be submitted to arbitration."  *Id.* ¶ 113.  In this regard, as Russian statutory law has consistently required since 1978, "a treaty must be ratified wherever such a treaty 'set[s] out rules different from those provided for by a statute."  *Id.* ¶ 81 (analyzing the 1978 Soviet Law applicable to international treaties when the ECT was signed in 1994, as well as the subsequent Russian statute governing treaties that was enacted in 1995).

"This is why, whenever Russia has genuinely consented" to arbitration under an investor-State arbitration clause, "the Russian Parliament has consistently enacted—and the Russian President has consistently signed—a statute of ratification."  *Id.* ¶ 19.  Accordingly, as the Russian Ministry of Foreign Affairs consistently explained throughout the 1990s and the early 2000s, therefore, investor-State arbitration was "was 'different' from what was already provided for within the Russian legal system—thus requiring the Russian Parliament to ratify" any relevant treaties "and preventing the Russian Government from giving effect" to any investor-State arbitration clause "immediately after merely signing the BIT into force."  *Id.* ¶ 83 (quoting, *e.g.*, Explanatory Note on the Russia-Argentina BIT, 25 October 2005 (**Annex ASA-2026-043**);

Explanatory Note on the Russia-Egypt BIT, 8 April 2000 (Annex ASA-2026-039); Explanatory Note on the Russia-Macedonia BIT, 30 May 1998 (Annex ASA-2026-040).

*Third*, for constitutional purposes, the same understanding—that the Russian Government cannot agree to investor-State arbitration without a statute of ratification enacted by the Russian Parliament—is not affected by the distinction between an unratified treaty that is "in force" and an unratified treaty that is "provisionally applicable." *Id.* ¶ 198. Indeed, the constitutional provision addressing the hierarchical ranking of treaties, Article 15(4) of the Russian Constitution, makes no textual distinction based upon "provisional application" or entry "into force."

"What matters is the constitutional position of the State organ that has adopted the legal enactment." *Id.* ¶ 27. Accordingly, as the Russian Supreme Court explained in a 2009 decision, "[s]ince the Government of the Russian Federation does not have the authority to establish, amend or annul the rules of [federal statutes], the provisions of the unratified [treaty] . . . in the part establishing rules other than those provided for by [federal statutes] . . . are not applicable in the territory of the Russian Federation." *Id.* ¶ 185 (quoting Supreme Court of the Russian Federation, Cassation Ruling, No. 59-O09-35, 29 December 2009, Section 4 (Annex ASA-2026-083) (emphasis added)). This broad description of the placement of "unratified" treaties was categorical—and did not make any distinction between unratified "provisionally applicable" treaties, as opposed to unratified treaties "in force."

Indeed, as Professor Avtonomov further explains, this understanding is confirmed by many other Russian legal authorities. In particular, Resolution No. 8-P concluded expressly that a provisionally applicable treaty "is to be applied on an equal footing with international treaties that have entered into force." *Id.* ¶ 241 (quoting Constitutional Court of the Russian Federation, Resolution No. 8-P, 27 March 2012, Section 4 (Annex ASA-2026-052) (emphasis added)). This

passage confirms that the Russian Government cannot somehow exercise significantly greater authority—*i.e.*, enough to somehow override a statute enacted by the Russian Parliament and signed by the Russian President—merely by electing to "provisionally apply" a treaty rather than signing it directly into force.

Moreover, in 2020, this understanding was confirmed in a decision issued in clarification proceedings by the Russian Constitutional Court.  *See* Ruling No. 2867-O-R dated 24 December 2020 ("Ruling 2867-O-R").  As the Russian Constitutional Court explained in that case, "the provisional application of the provisions of an international treaty of the Russian Federation that establish the mandatory jurisdiction of international arbitration for resolving disputes between the state and foreign investors" cannot be given effect under Russian law "without the adoption of a federal statute on its ratification."  *Id.* ¶ 109 (quoting Constitutional Court of the Russian Federation, Ruling No. 2867-O-R, 24 December 2020, Section 5 (Annex ASA-2026-023)).

*Fourth*, none of the above considerations are altered by the various Russian statutes that HVY have cited periodically, such as the 1991 RSFSR Law "On foreign investments in RSFSR" (the "1991 FIL") and the Federal Law "On foreign investments in the Russian Federation" (the "1999 FIL").  As Professor Avtonomov explains in detail, neither of these statutes authorize the Russian Government to agree to investor-State arbitration in a provisionally applicable treaty or, indeed, in a treaty that has entered into force.  *Id.* ¶ 246.  In particular, as Professor Avtonomov explains, these provisions contain "blanket" provisions, which "are not complete, self-contained sources of legal authority," and do not "grant any delegation of power to the Russian Government or any other Russian State authority to deviate from other provisions of Russian statutory law."  *Id.* ¶ 252.  The 1991 FIL and the 1999 FIL could not be interpreted as delegating power to regulate

31

dispute resolution, inasmuch as this authority is exclusively reserved to the Russian Parliament under Article 47 of the Russian Constitution. *Id.* ¶ 268.

From another perspective, these "blanket" provisions could not be interpreted as "delegation" provision, inasmuch as they do not include any "'criteria or reference points'" to guide the exercise of the delegation. *Id.* ¶ 29 (quoting Constitutional Court of the Russian Federation, Resolution No. 7-P, 6 April 2004, Section 3.2 (Annex ASA-2026-112)). Indeed, unlike the standard language used to delegate power within the Russian legal system (*e.g.*, for the establishment of the rates of customs duties), these provisions do not even identify "which Russian State authority is supposedly the recipient of the purported delegation." *Id.* ¶ 268 (emphasis added). Accordingly, based on the established jurisprudence of the Russian courts, these provisions could not satisfy the applicable standard of "legal certainty, clarity, and unambiguity" to establish a proper delegation. *Id.* ¶ 264 (quoting Constitutional Court of the Russian Federation, Resolution No. 7-P, 6 April 2004, Section 3 (Annex ASA-2026-112)).

***Fifth***, the above analysis is subject to certain standards of deference in accordance with how U.S. courts are instructed to interpret foreign law. In particular, the decisions of the Russian Federation's courts are "binding on the federal courts." *Animal Sci. Prods. v. Hebei Welcome Pharm. Co.*, 585 U.S. 33, 44 (2018); *see also Elmendorf v. Taylor*, 23 U.S. 152, 159 (1825) (""[N]o Court in the universe, which professed to be governed by principle, would, we presume, undertake to say, that the Courts of Great Britain, or of France, or of any other nation, had misunderstood their own statutes.").

Separately, the views of the Russian Federation itself—as expressed in this brief and in the Consolidated Expert Report submitted by Professor Avtonomov—are entitled to "considerable weight." *Animal Sci. Prods. v. Hebei Welcome Pharm. Co. (In re Vitamin C Antitrust Litig.)*, 8

32

F.4th 136, 157 (2d Cir. 2021).  Indeed, under international law—which is applicable here for the interpretation of the FSIA—the Russian Federation's interpretation must be accepted unless "manifestly incorrect." *Guinea v. Democratic Republic of the Congo*, Judgment ¶ 70, I.C.J. Reports 2010 (Riesenberg Decl., Ex. 10).

In particular, although "not conclusive," at least "substantial" weight must be given to the above analysis of Russian law because of its "consistency with the foreign government's past positions." *Animal Science*, 585 U.S. at 43-44.  These past positions are set forth in the detailed timeline provided by Professor Avtonomov, which identifies numerous "contemporaneous statements of ECT negotiators, the ECT Secretariat, and Russian officeholders throughout the 1990s and early 2000s."  *See* Prof. Avtonomov's Consolidated Expert Report ¶¶ 102 (May 26, 2026).  As reflected in these consistent statements, "there is no contemporaneous evidence that Russia had given consent to Article 26 ECT through provisional application—or that any informed observer believed that such consent had been given."  *Id.*

Accordingly, based on the above legal analysis of Russian law and the applicable standards of deference, this Court must conclude that "provisional application of the Treaty's arbitration clause" was not "consistent with Russian law" under the ECT's Article 45(1).  *See Hulley*, 149 F.4th at 691–92.  On this basis, the Russian Federation did not agree to arbitrate under Article 26, and § 1605(a)(6) does not establish subject-matter jurisdiction in the present case.

**CONCLUSION**

For the foregoing reasons, the Court should grant the Russian Federation's Motion to Dismiss for lack of Subject-Matter Jurisdiction under the Foreign Sovereign Immunities Act.

33

Date:  May 26, 2026

Respectfully submitted,

*/s/ David P. Riesenberg*
David P. Riesenberg (D.C. Bar No. 1033269)
Dilmurod Satvaldiev (D.C. Bar No. 90027884)
PINNA GOLDBERG U.S. PLLC
10 G Street NE, Suite 600
Washington, D.C., 20002, U.S.A.
T: 202-549-2477
E: driesenberg@pinna-goldberg.com


*Counsel for Respondent*

34